FILED

MAY 16 PM 3:36

PHILLIP G. CASADY, CLERK
U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
SAN FRANCISCO, CA.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In re | ) | Case No. 01-30923-SFM |
| | ) | |
| PACIFIC GAS & ELECTRIC COMPANY, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

TENTATIVE RULING AND ORDER TO MEET AND CONFER
FOLLOWING HEARING ON EMERGENCY MOTION OF
MID-SET COGENERATION CO., ET AL.

I. **Introduction**

On May 10, 2001, the court heard the Emergency Motion For Relief From Stay ("Motion") filed by Mid-Set Cogeneration Co., Coalinga Cogeneration Co., Salinas River Cogeneration Co. and Sargent Canyon Cogeneration Co. (collectively "Mid-Set"), each of which is commonly referred to as a "QF" or "Qualifying Facility."[1] The appearances of counsel are noted in the record.

Presently on the court's calendar are similar motions by other QFs (the "Other Moving QFs") which supply energy to Pacific Gas & Electric Company ("PG&E" or "Debtor"). By this Tentative

---

[1] The term "qualifying facility" is shorthand for various cogeneration, solar and similar facilities. See 18 C.F.R. §§ 292.101(b)(1) and 292.201-292.207 and 16 U.S.C. § 796(17) and (18), part of the Public Utilities Regulatory Policies Act of 1978, as amended, 16 U.S.C. § 824 et seq. ("PURPA").

-1-

Ruling,[2] the court is setting forth certain findings of fact and conclusions of law it is prepared to enter regarding Mid-Set's Motion and PG&E's opposition. Rule 7052(a).[3] It is also directing that the parties explore interim remedies as described below.

## II. Discussion

### A. Nature of Relief Sought

Mid-Set seeks various forms of relief, including:

1. Relief from the automatic stay imposed by section 362 to permit Mid-Set to suspend performance under its Power Purchase Agreements ("PPAs") with PG&E and sell power in the open market;

2. Adjustment of the price to be paid for energy and capacity above those presently being tendered by PG&E under California Public Utilities Commission ("CPUC") Decision No. 01-03-067 ("Wood Decision");

3. Acceleration of payments under its PPAs;  and

4. Imposition of an immediate deadline for PG&E to assume or

---

[2] At a hearing on May 10, 2001, the court heard argument on Mid-Set's Motion, PG&E's opposition, and comments of counsel for the Official Committee of Unsecured Creditors ("OCC") and others. The court acknowledges that it also told counsel for Mid-Set that at the continued hearing on May 24, 2001, he would be permitted to present his final closing argument. That offer remains open, and counsel for Mid-Set, PG&E, and the OCC will be allowed to address not only the matters presented via testimony at the May 24 hearing, but all matters covered in this Tentative Ruling.

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and all rule references are to the Federal Rules of Bankruptcy Procedure.

-2-

1    reject the PPAs under section 365.[4]

2        B.   Broader Issues

3        In deciding whether Mid-Set and the Other Moving QFs should
4    be granted relief, the court cannot and will not ignore other
5    considerations, including:

6        The interests of creditors and parties in interest in this
7    Chapter 11 estate;

8        The current California energy crisis and the need to keep QFs
9    on-line, producing power for California;

10       PG&E's right to reorganize and to make deliberate, reasonable
11   and reasoned business decisions whether to assume or reject its
12   executory contracts;

13       Several specific factors articulated by counsel for the OCC,
14   including: efforts by the members of the OCC to bring about a
15   consensus on the issues pertaining to the QFs, who produce
16   approximately 22% of PG&E's energy needs; the ramifications of any
17   decision pertaining to Mid-Set's motion; the need to enhance the
18   potential for power generation in California; and, if relief is
19   granted, a determination of how much power will be generated and
20   sold for use in California rather than elsewhere.

21       C.   Imponderables

22       The court has heard and read much about a number of other

23   _____

24       [4]    Several Other Moving QFs go one step further and contend
     that forcing them to deliver power to PG&E is an impermissible
25   involuntary extension of credit under Bankruptcy Code section 364.
     It appears that any QF would be obligated to perform if it is
26   given adequate assurance of performance.  Cf. Continental Energy
     Assocs. Ltd. P'ship v. Hazleton Fuel Mgmt. Co. (In re Continental
27   Energy Assocs. Ltd. P'ship), 178 B.R. 405, 409 (Bankr. M.D. Pa.
     1995) (debtor can enforce terms of contract prior to assumption or
28   rejection).  Mid-Set agreed to such performance in the PPAs.

                              -3-

factors that bear upon the problems confronting PG&E, Mid-Set, the QFs, creditors and parties in interest. The court has not been asked, nor does it presently determine that it is even able to attempt to resolve those complex matters, but they include the following:

The future of the Wood Decision at the CPUC and the Federal Energy Regulation Commission ("FERC");

PG&E's pending or anticipated litigation over its rates in other courts;

The possibility of regulatory or legislative solutions to these major problems;

The future of natural gas prices and the impact of those prices on the cost of power and capacity produced by QFs that use natural gas.

D. <u>Bankruptcy Considerations</u>

Within the province of this court is the need to apply bankruptcy principles in order to decide Mid-Set's Motion. The court envisions its role as devising a legal and equitable remedy to maintain a balance while parties in interest in this case are given an opportunity to make crucial decisions that affect their rights, duties and obligations, and while parties outside of this case work as they are charged, either to leave in place or to alter the Wood Decision and otherwise to attend to the problems of the California energy crisis.

Those bankruptcy considerations and the court's treatment of them follows.

1. <u>Suspension of performance</u>

Mid-Set argues that it should be allowed to suspend

-4-

1  performance pending PG&E's assumption or rejection of its PPAs.
2  Presumably this concept is rooted in Uniform Commercial Code
3  section 2609, which protects the non-debtor's expectation of
4  receiving due performance.  Outside bankruptcy, when reasonable
5  grounds for insecurity arise with respect to performance and
6  absent adequate assurance of due performance, a party may – if
7  commercially reasonable – suspend any performance for which it has
8  not received its agreed return.  See Cal. Comm. Code § 2609.

9      In the context of a bankruptcy case, non-debtor parties may
10 not unilaterally terminate existing contracts.  Computer
11 Communications, Inc. v. Codex Corp. (In re Computer
12 Communications, Inc.), 824 F.2d 725, 728-29 (9th Cir. 1987)
13 (creditor violated automatic stay by unilaterally terminating
14 contract; "[e]ven if [creditor] had a valid reason for terminating
15 the Agreement, it was still required to petition the court for
16 relief from the automatic stay under § 362");  Carroll v. Tri-
17 Growth Centre City, Ltd (In re Carroll), 903 F.2d 1266, 1271 (9th
18 Cir. 1991) (an "executory contract that is property of the estate
19 can only be terminated after a grant of relief from the stay").
20 Nonetheless, they are entitled to ask the court to require the
21 debtor to provide assurances of performance or adequate
22 protection.  If the court is satisfied that post-petition
23 performance of an unassumed executory contract cannot reasonably
24 be assured, then relief from stay based upon that finding is
25 appropriate.

26     PG&E has demonstrated that it is able to perform its post-
27 petition obligations under the PPAs between it and Mid-Set at the
28 present time, based upon its substantial cash reserves of

-5-

approximately $2.5 billion. PG&E projects that through the coming months those reserves will not be materially reduced unless intervening events at FERC or the CPUC (or otherwise) alter the short term course of its financial affairs.

In that regard PG&E suggests it can provide adequate protection to Mid-Set by tendering payments at the Wood Decision level on a going-forward basis, and that the "disconnect" between this amount and the cost of generating the power is a problem of Mid-Set's (and other QFs') own making. PG&E essentially argues that Mid-Set should be held to the bargain it struck in the PPAs, namely being paid what has been determined to be the agreed price. In each instance Mid-Set elected to receive what are described in the respective PPA as PG&E's "full short-run avoided operating costs," which in turn are defined to be CPUC "approved costs which are the basis of PG&E's published energy prices" ("Avoided Cost").[5]

Mid-Set suggests that it could sell electricity on the open

---

[5] The court notes that in the Wood Decision, when discussing whether or not a price ceiling should be adopted, the CPUC made the following observation about the plight of QFs who complain that the avoided cost recovery formula may not allow them to recover operating costs:

> QFs have never been absolutely entitled to a payment to cover their operating costs under any and all circumstances, only to a payment consistent with the utility's avoided cost. As we have seen recently in both the gas and electricity markets, over-reliance on spot market purchases can lead to significant volatility in prices. The Commission has never directed QFs to enter into gas purchase arrangements based on California border indices; this decision is left to QFs. The fact that a QF may not have protected itself from pricing volatility is not a reason not to establish a cap on QF payments at utility avoided costs.

Wood Decision, pp. 23-24.

-6-

market and share some of the extra revenue with PG&E.  The court
is not inclined to authorize PG&E to release Mid-Set from its
obligations so it can sell power at potentially extreme prices to
California.  Not only is this harmful to California, but PG&E
states that the CPUC could view this as a violation of PG&E's
duties to its ratepayers, and would likely penalize PG&E and
reduce its rates to compensate for the increased prices.  In other
words, the cure may be worse than the disease.  Moreover, a debtor
in bankruptcy generally has to comply with valid state laws
governing the operation and management of property.  <u>See</u> 28 U.S.C.
§ 959(b).

     For the foregoing reasons the court at this time is not
inclined to grant Mid-Set its requested relief from the automatic
stay to suspend performance under the PPAs.  As discussed below,
the court reserves the issue whether to grant Mid-Set any other
form of relief from the automatic stay until after conclusion of
the May 24, 2001 hearing.

               2.   <u>Reasonable rate</u>

     "During the period prior to assumption or rejection of an
executory contract or unexpired lease, the estate must pay the
reasonable value of any contractual benefits the estate receives
during that period, as an administrative expense."  <u>In re Resource
Technology Corp.</u>, 254 B.R. 215, 221 (Bankr. N.D. Ill. 2000),
<u>citing</u> <u>Continental Energy</u>, 178 B.R. at 408.  As noted by the
Supreme Court in <u>National Labor Relations Board v. Bildisco and
Bildisco</u>, 465 U.S. 513, 533 (1984):

          If the debtor-in-possession elects to continue to
          receive benefits from the other party to an executory
          contract pending a decision to reject or assume the

-7-

1  contract, the debtor-in-possession is obligated to pay
   for the reasonable value of those services[6] [citation
2  omitted], which, depending on the circumstances of a
   particular contract, may be what is specified in the
3  contract.

4  <u>Id.</u> at 533.  <u>See also</u> <u>Peoples Gas System, Inc. v. Thatcher Glass</u>

5  <u>Corp. (In re Thatcher Glass Corp.)</u>, 59 B.R. 797, 799 (Bankr. D.

6  Conn. 1986) (pending assumption or rejection, a non-debtor is

7  entitled to the reasonable value of post-petition goods, although

8  "the contract rate is presumed to be reasonable"); <u>cf. Thompson v.</u>

9  <u>IFG Leasing Co. (In re Thompson)</u>, 788 F.2d 560, 563 (9th Cir.

10 1986) (in case involving rejected lease, Ninth Circuit held that

11 rejection damages are "fair and reasonable value" of lease; lease

12 rental rate is "presumptive evidence of fair and reasonable

13 value," but if presumption was rebutted then the open market value

14 would provide "fairest measure of compensation for all

15 concerned").[7]

16    As noted above, PG&E is tendering to Mid-Set, and has

17

18    [6]    The court notes that counsel for one set of the Other
   Moving QFs seeking relief quoted this sentence, but chose to end
19 the quote at "services" by placing a period at that point in the
   sentence.  The quote was therefore misleading, because it omitted
20 (without even an ellipsis to indicate deleted text) a clause from
   the sentence that was somewhat detrimental to the QFs' position.
21 The court cautions counsel that such editing of quoted text is
   inappropriate and will not be tolerated in the future.

22
      [7]    The statute had changed since <u>Thompson</u> as to leases, but
23 not other executory contracts.  The provisions of section
   365(d)(3) regarding payment of post-petition pre-assumption or
24 rejection amounts to be paid on non-residential leases were
   interpreted in <u>Towers v. Chickering and Gregory (In re Pacific-</u>
25 <u>Atlantic Trading Co.)</u>, 27 F.3d 401, 403-405 (9th Cir. 1994), to
   require the contract rate of rent to be paid as a post-petition
26 administrative expense claim.  The 1994 amendments to the Code
   made similar changes as to non-consumer personal property leases
27 beginning 60 days after the petition date.  <u>See</u> section
   365(d)(10).  As to other post-petition pre-assumption or rejection
28 contractual obligations, the "reasonable" rate would still apply.

-8-

represented that it is tendering to the other QFs, the avoided cost amounts required in the respective PPAs and as determined by the CPUC in the Wood Decision. Mid-Set correctly argues that pending assumption or rejection, it is entitled to a "reasonable" price for the energy and/or capacity it provides PG&E. Mid-Set's counsel specifically concedes – and the court deems correct as a matter of law – that "reasonable" is not the same as "market" price. In this contested matter, Mid-Set has not shown that any price other than that set by the PPAs and the Wood Decision is "reasonable."

First, the existing power markets are not functioning competitively. The FERC has already found that, under certain conditions, short-term wholesale power rates in the California market were "unjust and unreasonable" within the meaning of § 206(a) of the Federal Power Act, as amended, 16 U.S.C. § 824e(a). 93 FERC ¶ 61,121, at, e.g., text accompanying n. 50.

Second, even if the existing markets were reliable, Mid-Set has offered no basis for this court to determine which "market" is relevant. If the court looks to the market in "comparable" long-term PPAs executed by other parties, would the court look at PPAs executed in the last year, the last month, or the last week – given the wild fluctuations in prices, the differences could be enormous? Would the court only consider PPAs executed by parties in comparable geographic locations, of similar duration, type of facility, and other characteristics? As the Wood Decision illustrates, seemingly minor differences can have large consequences. The court questions whether any decisions it might make on all these variables would result in a more "reasonable"

-9-

rate than that determined in the Wood Decision.

Third, the statutory and regulatory scheme itself provides one way to measure the reasonable "market" price – namely, the avoided cost. See 18 C.F.R. § 292.303 and 292.304(b)(2) (1982) (utilities' obligation to purchase from QFs at "avoided cost"); 18 CFR 292.101(b)(6) (1982) (defining "avoided costs"); 16 U.S.C. § 824a-3. The federal and state legislatures have established regulatory bodies with specialized expertise to figure out the geographic and other measures of that market. In adopting the then-current regulatory/market rate as the "reasonable" rate, the Thatcher court observed:

> The contractual arrangement between these parties must not be viewed in a vacuum. Rather, this court must recognize that the public served by the regulatory agency has an interest in rates charged for natural gas and that the lower [contract] rate is contrary to the guidelines of the public authority.

Thatcher Glass, 59 B.R. at 800. See also Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36 (3d Cir. 1989) (contract required debtor to take a minimum amount of gas each month and provided a minimum demand charge, but the regulated rate for other customers did not; the court held that the regulated rate was reasonable).

For all the above reasons, assuming without deciding that Mid-Set could overcome the presumptive reasonableness of its contract rate, it has made no argument or offer of proof that would establish a more satisfactory measure of what is "reasonable" than the elaborate statutory and regulatory structure for determining avoided costs. Therefore, the court will adopt the rate established by the Wood Decision as the "reasonable" rate

-10-

1  to compensate Mid-Set for performance under its PPAs.

2          3.  Accelerated payments.

3      The court will not require PG&E to make payments more

4  frequently or earlier than ordered by the CPUC (see Wood Decision,

5  conclusion of law 21 and ordering paragraphs 10-12).  The court is

6  satisfied that there is ample - more than adequate - assurance

7  that PG&E will be able to perform under the PPAs, pending its

8  assumption or rejection of those PPAs.

9          4.  Assumption or rejection of executory contracts

10      Bankruptcy Code section 365 entitles a debtor in possession

11  to assume or reject executory contracts and unexpired leases.  In

12  general the decision to assume or reject is left to the business

13  judgment of the debtor in possession.  Robertson v. Pierce (In re

14  Chi-Feng Huang), 23 B.R. 798, 800-802 (9th Cir. BAP 1982)

15  (adopting and explaining nature of business judgment test).  This

16  is a very complex case and the decision to assume or reject any

17  particular PPA (with Mid-Set or any other QF) may itself involve a

18  very complex analysis.  Moreover, numerous other executory

19  contracts and many other urgent matters demand the attention of

20  legal and business professionals for PG&E, the OCC, and other

21  parties in interest.  In addition PG&E and the OCC argue that

22  forcing an early assumption of its PPAs could result in PG&E

23  having to use its available cash to pay pre-petition breaches that

24  may be close to $1 billion,[8] which could have an adverse effect on

25  the reorganization.  For all of these reasons the court is

26  _____

27      [8]  Although there is no specific evidence as to the aggregate prepetition defaults to QFs, various counsel have represented that those defaults are approximately $1 billion.

28  Counsel for PG&E and the OCC have not challenged that assertion.

-11-

1  reluctant to force an early decision whether to assume or reject
2  PPAs or any other executory contracts.

3      On the other hand, delaying the decision whether to assume or
4  reject may cause serious harm to Mid-Set and others.  Until PG&E
5  assumes or rejects the PPAs, Mid-Set may be unable to operate
6  except at a loss and unable to enter into PPAs with anyone other
7  than PG&E.  This may leave Mid-Set unable to pay its employees or
8  creditors, particularly because, based upon the evidence
9  presented, Mid-Set is owed approximately $58 million on account of
10  PG&E's prepetition defaults.  The upshot is that Mid-Set may have
11  to go off-line, file its own bankruptcy petition, or even shut
12  down completely.

13      Numerous third parties may be harmed.  For example, Mid-Set
14  may have to lay off its employees and breach its agreements with
15  third parties.  California would suffer, according to Mid-Set,
16  because of the ripple effect to the economy, less power in the
17  grid, rolling blackouts, and skyrocketing electricity prices.[9]
18  Such effects would be dangerous and probably irreparable:  as PG&E
19  has stated, "public health and safety depend upon a steady supply
20  of electricity ... Memorandum of Points and Authorities In
21  Support of Debtor's Emergency Motion for Authority to Pay Pre-
22  Petition Compensation and Benefits, p. 34:17.

23      Moreover, for the following three reasons the court is

24  _____

25      [9]    Mid-Set's counsel argued that in recent days rolling
   blackouts were only narrowly averted and the crucial margin of
26  power supply preventing blackouts was largely due to Mid-Set and
   other QFs temporarily coming back on-line.  Mid-Set's counsel
27  claimed this reprieve was due to the "fluke" that gas prices were
   temporarily low enough for QFs to operate profitably under the
28  Wood Decision.

-12-

concerned that if Mid-Set's predictions have any validity then,[10] ironically, PG&E and its other creditors could be seriously harmed:

First, if Mid-Set is correct that QFs will have to go off-line, and if this causes power losses and/or price spikes, then PG&E could suffer considerable losses. In fact, PG&E has blamed price spikes for pushing it into bankruptcy, because of the "disconnect" between buying electricity at peak wholesale prices and selling it at frozen retail prices.

Second, if PG&E eventually assumes the PPAs it will have to "cure" all defaults and, in addition, compensate Mid-Set for its "actual pecuniary loss" resulting from PG&E's defaults. 11 U.S.C. § 365(b)(1)(A) and (B). Although section 365(b)(2)(D) appears to excuse PG&E from having to satisfy any "penalty rate or provision," PG&E will likely have to pay any other "pecuniary loss" recoverable under applicable state law, which generally includes consequential damages and interest. See Bildisco, 465 U.S. at 531-532 (debtor who elects to assume contract does so "cum onere"); In re Eagle Bus Mfg., Inc., 148 B.R. 481 (Bankr. S.D. Tex. 1992) (interest on unpaid rent allowed as pecuniary loss). See also Lacey v. Westside Print Works, Inc. (In re Westside Print Works, Inc.), 180 B.R. 557 (9th Cir. BAP 1995) (following Eagle Bus Mfg., but affirming denials of claim for attorneys' fees, increased taxes and insurance and other alleged costs, because not adequately proven).

---

[10] The doomsday scenarios may repeat themselves for other QF's; still others may have the economic resources to weather this storm.

-13-

This is not just a technical issue. If PG&E's default to the QF's is close to $1 billion, as various counsel have claimed, then the interest alone will be very substantial. Consequential damages under state law could include not only damage to Mid-Set but also, if PG&E's non-payment under the PPAs forces Mid-Set to breach its own contracts with third parties, any damages from those breaches. <u>See</u> 1 Witkin, <u>Sum. of Cal. Law</u>, Contracts §§ 825 (future profits), 842 (attorneys' fees, including fees incurred in bringing or defending action against third person), 848 (consequential damages) (9th ed. & Supp. 2000).

Third, if PG&E eventually rejects the PPAs, PG&E might nevertheless still have to pay 100% of any consequential damages and interest. The Bankruptcy Code treats rejection of executory contracts as a pre-petition breach. 11 U.S.C. § 502(g). In general, the effect is that post-petition consequential damages are treated as unsecured, non-priority pre-petition claims. <u>See</u> <u>Abercrombie v. Hayden Corp. (In re Abercrombie)</u>, 139 F.3d 755, 758-759 (9th Cir. 1998) (attorneys' fees incurred litigating post-petition bankruptcy issues treated as part of pre-petition unsecured claim). If PG&E were insolvent, those claims would be paid something less than their face value, without post-petition interest. 11 U.S.C. §§ 502(b)(2), 726(a)(5) and 1129(a)(7)(A)(ii).

PG&E claims, however, that it is solvent. PG&E's counsel has made numerous representations to the court to the effect that PG&E intends this case to be conducted on a "business as usual" basis and that all creditors will be paid in full. In addition, the information that accompanied the voluntary petition, while not

-14-

conclusive, leads the court to believe at this point that PG&E is solvent in a balance sheet sense. If PG&E is correct that it is solvent, pre-petition claims should receive payment in full with interest. 11 U.S.C. §§ 726(a)(5) and 1129(a)(7)(A)(ii). Indeed, this has led some courts to refuse to approve solvent debtors' motions to reject executory contracts, because the net effect would be _worse_ for the bankruptcy estate than assuming the contracts. See _Chi-Feng Huang, supra_, 23 B.R. at 803 (if estate is solvent, rejection would "accomplish nothing for the general unsecured creditors" and "might only impose unwarranted administrative expenses or delay"); _Bregman v. Meehan (In re Meehan)_, 59 B.R. 380 (E.D.N.Y. 1986) (bankruptcy court may decline to authorize rejection of contract in solvent estate because it will not benefit unsecured creditors).[11]

In other words, the longer PG&E takes to decide whether to

---

[11]   Given the above analysis it might seem that it makes economic sense for PG&E to assume all its executory contracts. Moreover, it seems likely that PG&E will want to assume Mid-Set's PPAs, both because they appear to be below-market at present and because if PG&E rejects the PPAs it might be required by the Federal Power Act to enter into a new PPA with Mid-Set (possibly at a higher rate). See generally 16 U.S.C. § 824i and 824k and 18 C.F.R. § 292.303 and 292.304 (1982) (utilities' obligation to purchase from QFs). See also _American Paper Institute, Inc. v. American Elec. Power Service Corp._, 461 U.S. 402 (1983) (upholding validity of rules). The court notes that a delay in assuming or rejecting an executory contract can be at least temporarily beneficial to debtors but might ultimately be detrimental to the bankruptcy estate. See _R and O Elevator Co., Inc. v. Harmon_, 93 B.R. 667 (D. Minn. 1988) (debtor did not move to assume or reject executory contract with former president until plan confirmation, thereby benefitting from non-competition agreement without having to assume contract and pay cure, but president was therefore under no duty to mitigate damages). Nonetheless, the court recognizes that there may be many valid business reasons for PG&E to defer the decision whether to assume or reject its executory contracts, not least of which are shifting regulatory and economic circumstances.

-15-

1 assume or reject the PPAs the greater the damage might be to PG&E
2 and its creditors. As already noted, there may also be
3 substantial harm to Mid-Set, third parties and California.

4 PG&E, however, disputes Mid-Set's dire predictions. PG&E
5 claims that most QFs are able and willing to live up to their
6 bargains in the PPAs. From the evidence presently before the
7 court, there is scant showing of harm to anyone other than Mid-
8 Set.[12] The court notes that Mid-Set's alleged damages may be
9 subject to set-off if PG&E can establish that Mid-Set violated
10 duties it may have under the PPAs and applicable law to stay on-
11 line, help avoid price increases and rolling blackouts, and
12 mitigate damages. Resolution of those matters is for another day.
13 At present the factual record simply is not sufficiently developed
14 for this court to determine whether it is appropriate to set any
15 deadline, let alone an immediate deadline, for PG&E to assume or
16 reject the Mid-Set PPAs.

17 At the May 10, 2001 hearing the OCC joined with PG&E in
18 asking for more time. The court established procedures for
19 expedited discovery and an evidentiary hearing on May 24, 2001 to
20 consider the harm alleged in Mid-Set's declarations. Based on
21 that harm, and the foregoing discussion, the court will decide at
22 that time whether to set a deadline for PG&E to assume or reject

---

23

24 [12] The court notes that it has not read the Second
Supplemental Declaration of Kelly Lucas, submitted by Mid-Set
25 under seal, for reasons explained at the May 10, 2001 hearing.
The court is not inclined, however, to expand discovery beyond the
scope of what is already alleged in Mid-Set's declarations
26 (including the declaration under seal, if that is admitted in
evidence). Nor is the court inclined to continue the May 24, 2001
27 hearing or hold further hearings on Mid-Set's motion unless, of
course, the parties reach an interim resolution of their current
28 differences. See ¶ D.6, infra.

-16-

1 | Mid-Set's PPAs.

2 |       5.    <u>The need for interim relief</u>

3 |      Other than expedited procedures the court has so far
4 | indicated that it will deny Mid-Set any relief. The court is
5 | concerned, however, that from the evidence Mid-Set has already
6 | presented there may be irreparable harm to Mid-Set (and other QFs)
7 | if it is not afforded some form of immediate relief. Of more
8 | concern to the bankruptcy estate, and ultimately to California and
9 | all parties in interest, the court has been informed that without
10 | some form of relief Mid-Set may be unable to produce power in
11 | accordance with its PPAs when needed. Therefore the court
12 | suggests the following as a template for interim relief to Mid-Set
13 | (and perhaps to Other Moving QF's).

14 |       6.    <u>Interim relief</u>

15 |      a.    <u>An extraordinary case calling for extraordinary</u>
16 |            <u>remedies</u>.

17 |      Mid-Set alleges that the threat to its continued ability to
18 | perform under the PPAs comes from a combination of (a) having to
19 | operate at a loss under the Wood Decision and (b) not being paid
20 | anything on account of the $58 million allegedly owed to Mid-Set
21 | by PG&E. The court has already declined to impose a rate at
22 | variance with the Wood Decision. The court has also declined to
23 | require PG&E to make an immediate decision whether to assume or
24 | reject – which would involve "prompt" payment of the entire $58
25 | million if PG&E assumed the PPAs – because that decision may be
26 | too complex to be rushed. 11 U.S.C. § 365(b)(1)(A). Despite that
27 | complexity, the economic analysis seems very simple: unless there
28 | are compelling reasons to the contrary, under the standards set

-17-

forth below, a portion of Mid-Set's $58 million claims should be paid sooner rather than later.

In the first hours of the case (as with most other Chapter 11 cases involving operating businesses) the court was asked, and without objection, authorized PG&E to pay certain prepetition obligations. These included wages, customer deposits and other "ordinary course of business" type expenses. Paying selected critical pre-petition debts is not only the accepted practice in many Chapter 11 cases, as set forth below it is authorized under controlling Ninth Circuit authority.

Here Mid-Set and the Other Moving QFs, not unlike PG&E's own employees, are providing a valuable service to PG&E, its customers, and ultimately the citizens of California. That valuable service is the provision of desperately needed electrical energy. No purpose would be served by forcing Mid-Set to reduce or cease production or substitute its performance with that of less efficient power generators. Certainly that would reduce the total amount of energy available, not to mention the domino effect it would have on parties who could assert damages against Mid-Set, thus exacerbating the situation for PG&E by an almost inestimable breach of contract claim. But because Mid-Set will be entitled to be paid either way, the court will set in motion a procedure that might get Mid-Set paid sooner rather than later in order to avoid exponential increases of damage claims and perhaps increasing the energy havoc already rolling through California.

b.   Authority to pay critical pre-petition obligations

Numerous courts have authorized early payment of some pre-petition obligations where those payments are essential to the

-18-

debtor's attempts to reorganize. As already noted the most common example is wages and benefits to key employees, who would otherwise leave and cripple the debtor. <u>See, e.g.</u>, <u>Pension Benefit Guar. Corp. v. Sharon Steel Corp. (In re Sharon Steel Corp.)</u>, 159 B.R. 730, 736-737 (Bankr. W.D. Pa. 1993) (allowing $1.5 million payment of pre-petition wages over objection, where alternative would "far exceed" that cost); <u>In re Eagle-Picher Industries, Inc.</u>, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (payment of $931,000 on account of prepetition general unsecured debts to certain customers, because debtor "show[ed] that the payment is necessary to avert a serious threat to the chapter 11 process"); <u>In re Gulf Air, Inc.</u>, 112 B.R. 152 (Bankr. W.D. La. 1989) (granting motion to pay employee-related expenses); <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174 (Bankr. S.D.N.Y. 1989) (reaffirming court's prior authorization to pay some pre-petition wages, but denying union's motion for payment of non-working employees); <u>Michigan Bureau of Workers' Disability Comp. v. Chateaugay Corp. (In re Chateaugay Corp.)</u>, 80 B.R. 279, 287 and n.17 (S.D.N.Y. 1987) (payment of workers' compensation claims allowed, to permit "greatest likelihood-of-survival of the debtor and payment of creditors" even though "it is not clear [that employees] are entitled to priority under § 507"); <u>In re Jewish Memorial Hospital</u>, 13 B.R. 417 (S.D.N.Y.1981) (hospital permitted to pay a portion of pre-petition employee benefits, emphasizing public health and welfare concerns). <u>See also</u> <u>Craft Precision Indus., Inc. v. U.S. Healthcare, Inc. (In re Crafts Precision Indus., Inc.)</u>, 244 B.R. 178, 180 and 183 (1st Cir. BAP 2000) (noting that, by allowing debtor to pay pre-petition vacation

-19-

benefits that "did not comply with § 507's priority scheme," bankruptcy court "preserved [debtor's] potential for rehabilitation"); <u>Cohen v. KDC Fin. Serv., Inc. (In re Miller Mining, Inc.)</u>, 219 B.R. 219, 223 (Bankr. N.D. Ohio 1998) (court noted that it has permitted payment of pre-petition wages so debtor-in-possession can maintain "effective work force").

A minority view refuses to authorize requested payments of pre-petition obligations, but cases adopting that view almost invariably lack adequate showings of any benefit <u>to the estate</u> from the proposed payments. <u>See, e.g.</u>, <u>Official Comm. of Equity Security Holders v. Mabey</u>, 832 F.2d 299, 302 (4th Cir. 1987), <u>cert. denied</u>, 485 U.S. 962 (1988) (payments could not be made for reconstructive surgery or in vitro fertilization for women injured by the Dalkon Shield); <u>In re FCX, Inc.</u>, 60 B.R. 405, 411-412 (E.D. N.C. 1986) (inadequate showing of "public interest" to support payment of employees and grain producers, and it is "simply inequitable" to pay some pre-petition debts because "such action may be detrimental to the remaining unsecured creditors if the reorganization fails and the estate has to be liquidated").

The Ninth Circuit has issued no decision directly on point, but two cases are particularly useful. In the earlier case, the Ninth Circuit rejected wholesale incorporation of the so-called "necessity of payment" rule traditionally applied in railroad reorganizations, but left open the possibility of paying pre-petition obligations upon a proper showing of sufficient justification:

> Because the Necessity of Payment Rule does not concern priorities of creditor claims, it is not included by reference in § 1171(b). Therefore, the

-20-

limitation to railroad cases imposed by § 103(g) is not applicable. Nevertheless, we decline to extend the rule to the facts of this case. The Necessity of Payment Rule was created for and has been applied only to railroad cases. Absent compelling reasons, we deem it unwise to tamper with the statutory priority scheme devised by Congress in the 1978 Act. See 11 U.S.C. § 507. Even if we were convinced that the Necessity of Payment Rule survived the 1978 Act, <u>appellants have not presented to this court sufficient justification</u> for extending the Necessity of Payment Rule to trucking reorganizations.

<u>B & W Enterprises, Inc. v. Goodman Oil Co. (Matter of B & W Enterprises, Inc.)</u>, 713 F.2d 534, 537 (9th Cir. 1983) (emphasis added).

A later Ninth Circuit case, <u>Burchinal v. Central Washington Bank (In re Adams Apple, Inc.)</u>, 829 F.2d 1484, 1490 (9th Cir. 1987), squarely favors payment of pre-petition obligations where necessary. The court's comments are dicta, but the Ninth Circuit pointed out that rehabilitation of debtors is a "fundamental tenet" of bankruptcy law, and this tenet can "supersede the policy of equal treatment":

> [A]ppellants claim that the cross-collateralization clause[13] violates a fundamental tenet of bankruptcy law that like creditors must be treated alike. This argument is simply a restatement of their general assertion that cross-collateralization clauses are illegal per se. It is flawed because the "fundamental tenet" conflicts with another "fundamental tenet" – rehabilitation of debtors, which may supersede the policy of equal treatment. Cases have permitted

---

[13]   Cross-collateralization means granting a post-petition lender a security interest in assets of the estate to secure pre-petition debts to that lender, as part of the consideration for the post-petition financing. That practice is generally frowned upon. See this court's <u>Guidelines for Cash Collateral and Financing Stipulations</u>. In the <u>Adams Apple</u> case, however, the court held that it was not bad faith for the post-petition lender to seek and obtain an order from the bankruptcy court approving cross-collateralization and therefore section 364(e) protected the lender even if the bankruptcy court had acted beyond its authority.

-21-

unequal treatment of pre-petition debts when necessary
for rehabilitation, in such contexts as (i) pre-petition
wages to key employees; (ii) hospital malpractice
premiums incurred prior to filing; (iii) <u>debts to
providers of unique and irreplaceable supplies</u>; and (iv)
peripheral benefits under labor contracts.  <u>See</u> Ordin,
Case Comment,  <u>In re Texlon Corporation, 596 F.2d 1092
(2d Cir.1979): Finality of Order of Bankruptcy Court</u>, 54
Amer. Bankr. L.J. 173, 177 (1980).  In addition,
Congress provided in section 364(d) that pre-petition
debts, even secured interests, may be subordinated by
post-petition obligations.  Although this more
traditional application of section 364(d) does not
involve disparate treatment of creditors, it illustrates
a Congressional willingness to subordinate the interests
of pre-petition creditors to the goal of rehabilitation.

Cross-collateralization clauses may provide the
only means for saving a failing company.  As noted
above, a lender may be willing to take the risk of
advancing funds to a debtor only if the gain derived
from cross-collateralization is available.  If the
lender is the sole lender willing to finance the debtor,
a cross-collateralization clause may mean the difference
between an ongoing enterprise and a company in
liquidation.

<u>Adams Apple</u>, 829 F.2d at 1490 (emphasis added).

Since <u>Adams Apple</u> the Ninth Circuit has emphasized that the

above-quoted comments were dicta, and has suggested that to "pay

certain pre-petition unsecured claims in full while others remain

unpaid" would "impermissibly violate the priority scheme of the

Bankruptcy Code."  <u>Transamerica Comm. Fin. Corp. v. Citibank, N.A.

(In re Sun Runner Marine, Inc.)</u>, 945 F.2d 1089, 1094-1095 (9th

Cir. 1991) (rejecting cross-collateralization as justification for

bankruptcy court's order authorizing payment in full to pre-

petition flooring financier).

This broad comment in <u>Sun Runner</u> is also dicta, as the court

acknowledged.  <u>See id.</u> at 1094-1094 and n.8 (declining to rule on

"hypothetical" question whether bankruptcy court would have

justified its ruling by allowing cross-collateralization, or

-22-

whether it is "ever permissible").[14]  Moreover, whereas <u>Sun Runner</u>
speaks of payment "in full" and in violation of section 507, this
court is concerned with partial payments that, given PG&E's
apparent solvency, are more a matter of timing than priority.

PG&E's fortunes depend in part, on an adequate supply of
power from all available sources.  Mid-Set has presented proof
that it generates approximately 148 MGw of power when it performs
under the PPAs, and Mid-Set has also presented proof that it may
be unable to continue generating such power if it must continue
selling at a loss under the Wood Decision, and if it cannot
receive some relief to the negative cash flow it is presently
experiencing.  Payment of some amount on account of the $58
million allegedly owed by PG&E will enhance cash flow and help
Mid-Set solve its immediate problems.  Although, as discussed
above, the court does not yet have much evidence of harm other
than to Mid-Set itself, the court can take judicial notice that
electric power is scarce enough in California that the
availability of those 148 MGw when needed is likely to make a
difference.  Therefore, the court believes that a necessary cost
of preserving the estate is for PG&E to pay Mid-Set, on account of
the $58 million default, sufficient amounts to enable it to
perform when needed under the PPAs.

    c.  <u>Role of the OCC and PG&E's cash</u>

The OCC is charged with a duty to perform such services as
are in the interest of those represented.  11 U.S.C. § 1103(c)(5).

---

[14]    Of course, cross collateralization is not the same as
partial payment on account of certain pre-petition debts, but the
economic effect is much the same.

-23-

The OCC's counsel expressed the conviction and desire of the
members of the OCC to work on a coordinated "global solution."
The court can think of no better place to start such a solution
than to draw upon the skills and interest of the OCC and its
professionals to work with PG&E and its professionals to allocate
some portion of PG&E's $2.5 billion cash reserve to mitigate the
inevitable damages being suffered by Mid-Set and which will
inevitably be visited upon this estate.

    d.   Meet and Confer

    1.  Counsel for PG&E, the OCC, and Mid-Set, accompanied
by representatives of their clients authorized to act on behalf of
PG&E, the OCC and Mid-Set, respectively, are hereby ordered to
meet and confer as soon as possible[15] with a goal of reaching an
agreement as to an amount of money to be paid by PG&E to Mid-Set
as partial payment(s) on account of PG&E's prepetition defaults
under the PPAs. Meeting in this fashion will permit those parties
to attempt to arrive first at a consensual confidentiality
agreement whereby sensitive financial information which Mid-Set
desires to keep from the public eye can be shared as appropriate
to assist the parties in reaching an agreement.

    2.  The court has in mind that Mid-Set would be entitled
to no less than the economic equivalent of the difference between
the Wood Decision rates being paid for energy since the petition
date, and what would be received by Mid-Set were it to be
permitted to sell power on the open market. The court cannot

---

[15]   The court is mindful of the shortness of time available
before the May 24, 2001 hearing. If the meeting ordered by the
court cannot take place by then, at the May 24 hearing the parties
should advise the court when such a meeting will occur.

-24-

readily determine that amount (or any other appropriate terms and safeguards for all concerned) but the parties can bring their expertise and experience to bear and do so. The parties should note, however, that the court is not departing from the "reasonable" rate tentatively ordered herein. Rather, it is trying to suggest a formula whereby Mid-Set will receive at least sufficient monies to eliminate the "disconnect" on a going-forward basis while at the same time bringing down its rejection (breach) or assumption (cure) claim.

3. The actual terms of any such agreement, including the amount and timing of payments, are for the parties to explore. If an agreement is reached, the court expects that PG&E and the OCC will bring before the court on an expedited basis a Rule 9019(a) motion for approval of this partial compromise with Mid-Set.[16]

4. In the event there is no agreement among PG&E, the OCC and Mid-Set, and if Mid-Set convinces the court on May 24 that it should be granted relief from stay to suspend performance or that the court should set a deadline for PG&E to assume or reject the Mid-Set PPAs, it will be required to produce satisfactory evidence to assure PG&E, the OCC and the court that it will be available to perform under its PPAs with PG&E if motions to assume are brought within a reasonable time and granted. Mid-set must further demonstrate that during any such period of suspended performance, its power generation will be dedicated to the needs

---

[16] The court is not ordering the parties to reach agreement, only to meet to consider the possibility of doing so. If no agreement is reached the court need only be advised of that fact.

-25-

of the citizens of California. PG&E and the OCC will be given an opportunity to take exception to Mid-Set's showing as to the foregoing items. Before the court makes any order granting relief from stay it will consider as an alternative form of adequate protection, payments from PG&E's cash reserves to be applied on account of Mid-Set's prepetition default claim.

Further, if the meeting directed in paragraph 1 has not taken place by May 24, 2001, the court will defer ruling on the Motion until that meeting has occurred and the court is advised of the outcome.

## IV. Conclusion

In summary, the court's _tentative_ ruling on this matter is:

1. <u>Suspension of contract/performance</u>.

The court is denying Mid-Set's request for relief from stay to be allowed to suspend performance under its PPAs and deliver power elsewhere. Whether any other relief is ultimately granted depends upon the facts to be developed at the May 24, 2001 hearing, although the court is likely to direct PG&E to pay Mid-Set, as a necessary cost of preserving the estate, a portion of the $58 million pre-petition obligation, to enable Mid-Set to perform when needed under the Mid-Set PPAs. Such relief will be conditioned on Mid-Set agreeing to perform under the PPAs, provide power only to California, and any other appropriate limitations.

2. <u>Reasonable rate</u>.

Mid-Set is entitled to be paid under its PPAs at a reasonable rate, which the court concludes is PG&E's avoided cost as determined by the Wood Decision. Obviously any modification, reversal, or vacation of the Wood Decision will necessarily alter

-26-

the amount of payments to be made under the PPAs, as so
established by controlling law and authorities.

       3.   <u>Accelerated payments</u>

    The court will not presently require PG&E to make payments
more frequently or earlier than ordered by the CPUC.

       4.   <u>Assumption or rejection of executory contracts</u>

    At this time the court will not set a deadline for PG&E to
assume or reject the Mid-Set PPAs.

    The court's <u>order</u> is that PG&E, the OCC and Mid-Set proceed
as outlined in ¶ III.6.(d).

    Nothing in this Tentative Ruling should be construed to be,
nor is it intended to be a determination of anything beyond
exactly what it states.  In particular, the court has not
predetermined PG&E's right to assume or reject any PPA; it has not
predetermined the damage claims of Mid-Set; it has not fixed a
deadline for PG&E to move to assume or reject any PPA; it has not
decided to grant relief to Mid-Set; and it has not decided to
order payments to Mid-Set on account of prepetition defaults.

Dated:  May 16, 2001

                                      _____
                                       Dennis Montali
                          United States Bankruptcy Judge

-27-

I, the undersigned, a regularly appointed and qualified clerk in the office of the Bankruptcy Judge of the United States Bankruptcy Court for the Northern District of California, at San Francisco, hereby certify:

That I, in the performance of my duties as such clerk, served a copy of the foregoing document by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's Office, or by facsimile to the facsimile numbers listed below, at San Francisco, California, on the date shown below.

Dated: May 16, 2001

Dorothy A. Timo

James L. Lopes, Esq.
William J. Lafferty, Esq.
Kimberly A. Bliss, Esq.
Howard, Rice, Nemerovski, Canady, Falk & Rabkin
Three Embarcadero Center, 7th Fl.
San Francisco, CA 94111-4065

Robert Jay Moore, Esq.
Milbank, Tweed, Hadley & McCloy
601 S. Figueroa St., 30th Fl.
Los Angeles, CA 90017-5735

Gregory S. Clore, Esq.
Gnazzo Thill, P.C.
625 Market St., Ste. 1100
San Francisco, CA 94105

Patricia A. Cutler, Asst. U.S. Trustee
Stephen L. Johnson, Trial Atty.
Office of the United States Trustee
250 Montgomery St., Ste. 1000
San Francisco, CA 94104