DAVID L. NEALE (SBN 141225)
CRAIG M. RANKIN (SBN 169884)
DANIEL H. REISS (SBN 150573)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.,
1801 Avenue of the Stars, Suite 1120
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244

Attorneys for California Independent
System Operator Corporation

**FILED**

**AUG - 2 2001**

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PACIFIC GAS & ELECTRIC COMPANY, a California corporation,<br><br>            Debtor.<br><br>Federal I.D. No. 94-0742640 | Case No. 01-30923 DM<br><br>Chapter 11<br><br>**OBJECTION BY CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION TO MOTION BY DEBTOR FOR ORDER ESTABLISHING PROCEDURES AND DEADLINES FOR FILING CERTAIN ADMINISTRATIVE CLAIMS; DECLARATION OF SPENCE GERBER**<br><br>Date: August 7, 2001<br>Time: 9:30 a.m.<br>Place: 235 Pine St., 22nd Floor<br>       San Francisco, CA |

**TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE:**

The California Independent System Operator Corporation ("ISO") hereby submits its objection to the Motion ("Motion") filed by Pacific Gas and Electric Company, debtor and debtor in possession in the above-captioned Chapter 11 case ("PG&E" or

"Debtor"), for an order establishing procedures and deadlines for filing certain administrative claims as follows:

## I. INTRODUCTION

In its Motion, PG&E requests that the Court set special bar dates for the filing of Administrative Claims by the ISO and the Department of Water Resources ("DWR"). Specifically, PG&E requests that September 10, 2001 be established as the bar date for Administrative Claims arising between April 6 and May 31, 2001, and that all such claims arising after May 31, 2001 be filed no later that three months after the end of the applicable month.

> In support of its Motion, PG&E states that:
>
> It is critically important to PG&E's ability to reorganize to ensure that it is not incurring significant administrative claims for the purchase of energy or services by or through the ISO or by the DWR, including power sold by third party suppliers.

From this statement, and the remainder of the Motion, it is clear that the target of the Motion is the cost of the electric energy and related services purchased from third parties to cover what is referred to as the "net short" position, which is the power provided to PG&E retail customers in excess of PG&E's scheduled generation and third-party contracts. What is not clear is why PG&E has included the ISO in its Motion.

The ISO has publicly and unequivocally stated that it does not intend to file an Administrative Claim against the Debtor's estate with respect to costs incurred by the ISO to procure

2

power to cover its "net short" position  In fact, this issue has already been the subject of litigation between the Debtor and the ISO, and has resulted in a preliminary injunction prohibiting the ISO from asserting these claims against PG&E.

The ISO is not prohibited from asserting certain other claims against the Debtor's estate, including the Grid Management Charge, Transmission Access Charge, Reliability Must-Run service costs, Federal Energy Regulatory Commission ("FERC") fees, and other charges not covered by the FERC "creditworthiness" orders issued to date.  The ISO's administrative claims will be limited to those types of non-market costs.  Accordingly, there is no rational basis to subject such costs to the stringent bar dates PG&E proposes.

With respect to these administrative costs that are not the subject of the Preliminary Injunction, the time limits in the Motion are completely unreasonable in light of the process by which invoices are computed and delivered to the Debtor by the ISO – a process controlled in some large part by PG&E.  Further, the Motion is premature because it requests a bar date in advance of dates already set in this case for other claims, including those of governmental entities.

Rather than a well thought-out approach to creating certainty regarding administrative expense priority, the Motion seems to be yet another thinly-veiled attempt to induce the Department of Water Resources ("DWR") to take a position in this

3

case and waive its Eleventh Amendment sovereign immunity. In any event, as set forth below, the procedures set forth in the Motion will not generate the relief ostensibly requested by the Debtor, and the Motion should be denied.

In further support of its objection, the ISO respectfully represents as follows:

### A. *The Motion is Premature.*

The Motion requests the Court to set an administrative claims bar date of September 10, 2001 for post-petition expenses arising from April 6 through May 31, 2001. Ostensibly, PG&E seeks this bar date to achieve certainty in the amount of claims made against its estate. However, the Court has already fixed bar dates for parties to file proofs of claim in this case. Creditors must file their proofs of claim for pre-petition claims by September 5, 2001, with the exception of governmental units, which are permitted to file claims through and including October 3, 2001. There appears to be no need, therefore, to have another bar date prior to October 3, 2001, to achieve the "certainty" sought by the Debtor.

Rather, there may be an additional motivation for PG&E to seek an intervening bar date. The Motion appears calculated by the Debtor to induce DWR to appear in the bankruptcy case by way of an asserted administrative expense claim. Apparently, the Debtor is seeking to exploit the Court's general power to set bar dates for claims to force the hand of the DWR regarding the

4

potential waiver of sovereign immunity.[1] While it is not the ISO's function nor intention to advance arguments on behalf of DWR, the foregoing suggests that the Motion is premature and should be considered at a later date.

By October 3, 2001, the DWR will have either filed a proof of claim or foregone its opportunity to do so. Under either circumstance, the "certainty" that the Debtor alleges in the Motion is so important to the plan process will be greatly enhanced. Undoubtedly, if DWR files a proof of claim, the Debtor will argue that the DWR has waived its sovereign immunity, and the Debtor will thereafter pursue all of its rights and claims against DWR.

Under these circumstances, the ISO believes that consideration of the Motion should be deferred until the October 3, 2001 bar date has passed. At that point, the parties will know whether DWR has elected to actively participate in this case and the Motion may be considered in that context. Given that the Debtor has now requested an extension of its exclusivity period for filing a plan of reorganization through December 2001, suggesting that no plan will be filed prior to

---

[1] Indeed, the Court has previously commented in the Adversary Proceeding on the absence of DWR, and the ISO believes that it has been treated, improperly, by the Debtor as the DWR's surrogate in the Adversary Proceeding. The Debtor has clearly been frustrated in its efforts to drag the DWR into this case and the Adversary Proceeding, and the Motion is just another clever effort by the Debtor to achieve a result it has thus far been unable to achieve.

5

that time frame, the Debtor would not be prejudiced by deferring consideration of the Motion to a date in mid-October.

**B. *The Relief Requested in the Motion Ignores The Claims Settlement Process as Between the ISO and the Debtor, and Is Procedurally Unworkable.***

As stated above, the ISO reserves its rights to assert an administrative claim related to various fees and charges, including but not limited to, the Grid Management Charge, the Transmission Access Charge, Reliability Must-Run service costs, the FERC fee, and other similar non-market charges which are not covered by FERC's creditworthiness orders. The ISO does not dispute the general proposition that the Court has the authority to fix a bar date for the filing of these administrative expense priority claims. However, in the Motion, the Debtor studiously ignores the length of actual process for settling claims and proposes a 90-day bar date, which is too early in the ISO's settlements process to produce amounts with certainty or that will likely not be adjusted as the process is completed.

Under the ISO Tariff and the ISO's Settlement and Billing Protocol, on a monthly basis, the ISO is charged with the responsibility of calculating the amount due from (or to, as the case may be) each Scheduling Coordinator for Grid Management Charges, grid operations charges, ancillary services, imbalance energy, usage charges and other amounts relating to the

6

provision of electricity service. The Debtor is a Scheduling Coordinator. One source of the data used by the ISO to perform its calculations is the actual meter read data collected and provided to the ISO by Scheduling Coordinator's, including the Debtor. Under the ISO's Payment Calendar, the Debtor has 45 calendar days following an operating day within which to deliver preliminary meter read data, and 49 business days to submit corrected meter read data (approximately 70 calendar days) to the ISO to enable the ISO to generate daily preliminary and final statements. It is not at all unusual for Scheduling Coordinators such as the Debtor to miss the deadline for providing the meter read data.

Once the meter read data is provided to the ISO, the ISO prepares a preliminary settlement statement which is delivered to each Scheduling Coordinator 38 business days (approximately 51 calendar days) after the particular operating date. The Scheduling Coordinator then has the opportunity to review, validate and confirm the preliminary statement. Scheduling Coordinators such as the Debtor have the opportunity to provide notice of a dispute regarding the statement delivered within 8 days following the delivery of a preliminary statement. At that time, a Scheduling Coordinator may request a re-run of a settlement statement and, if granted, may be set aside for an indeterminate period of time until such dates can be included in

7

a market rerun. In sum, the timing of further processing of the statement is out of the control of the ISO.

Once that process is complete, which may include adjustments to the Debtors statement, the ISO delivers a final settlement statement to the Scheduling Coordinator. Preliminary and final statements are not invoices.

Preliminary and final invoices are not delivered to the Debtor until the final statement for the last day of the month is processed. For preliminary billing this is approximately 84 calendar days after the first day of the month invoiced and *for final billings, the process is completed approximately 102 calendar days after the first day of the month invoiced.*

Even after a "final" invoice is generated, the various charges may be subject to further substantial adjustment. These adjustments are due to a variety of factors which are unique to the ISO's function in the energy market. For example, adjustments may arise from miscalculations or errors in any aspect of the voluminous cost and meter data each Scheduling Coordinator submits to the ISO, the settlement of outstanding billing disputes (which number in the thousands per year), or an order by FERC. Any of these occurrences may result in a determination that one or more Scheduling Coordinators have been over or undercharged, which necessitates a re-run or recalculation of the entire market to adjust the charges and/or payments so that all Scheduling Coordinators are billed

8

appropriate amounts. Therefore, due to circumstances beyond the control of the ISO, it is impossible for the ISO to determine with reasonable certainty the accuracy of any "final" invoice for several months. In fact, the ISO is currently rerunning the market for 2001, which takes considerable time. The month of May 2001 will not be re-run for approximately two months.

As the foregoing abbreviated description of the settlement process illustrates, the 90-day period proposed by the Debtor within which the ISO would be required to compute and assert administrative expense priority claims against the Debtor is totally unworkable. If PG&E's proposed bar date schedule is adopted, the effect in all likelihood would be that the ISO at the end of 90 days would only be able to assert a placeholder claim to preserve the right to assert its administrative expense claims when known. Claims submitted at the 90-day demarcation would be inaccurate, subject to significant adjustment and, ultimately, unreliable.

If the Court is otherwise inclined to set a bar date for the filing of administrative expense priority claims, such date should be fixed 180 days following the end of any given billing period. Thus, in lieu of the September 10, 2001 bar date proposed by the Debtor for the claims arising during the period from April 6, 2001 through May 31, 2001, the Court should fix November 30, 2001 as the bar date for that period. Thereafter, administrative claims arising in this case would be filed by not

9

later than 180 days following the end of any given month. In this manner, there is a reasonable opportunity for the ISO to generate reliable and accurate settlement data for invoicing purposes, and the claims asserted would not likely be subject to further significant adjustment, which would provide the certainty PG&E purportedly seeks.

WHEREFORE, the ISO respectfully requests that the Court enter an order (i) denying the Motion in its entirety; (ii) in the alternative, continuing the hearing on the Motion to a date in mid-October 2001 after the governmental unit's claims bar date, as the Court's calendar may permit; (iii) alternatively, setting an initial bar date of November 30, 2001 for administrative claims arising from the petition date through and including May 31, 2001, and requiring the filing of administrative claims within 180 days following the end of any given billing cycle thereafter; and (iv) granting such other and further relief as is just and proper under the circumstances.

Dated: August 2, 2001

CALIFORNIA INDEPENDENT SYSTEM OPERATOR CORPORATION

By: *Daniel H. Reiss /rf*
DAVID L. NEALE
DANIEL H. REISS
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
Attorneys for California Independent System Operator Corporation

## DECLARATION OF SPENCE GERBER

Spence Gerber declares as follows:

1. I am the Director of Settlements for the California Independent System Operator Corporation ("ISO"). I have principal oversight responsibility for the preparation of settlement statements and invoices provided by the ISO to Scheduling Coordinators operating under the ISO Tariff. I have personal knowledge of the facts set forth herein, and, if called as a witness, I could and would testify competently with respect thereto.

2. Under the ISO Tariff and the ISO's Settlement and Billing Protocol, on a monthly basis, the ISO is charged with the responsibility of calculating the amount due from (or to, as the case may be) each Scheduling Coordinator for Grid Management Charges, grid operations charges, ancillary services, imbalance energy, usage charges and other amounts relating to the provision of electricity service. The Debtor is a Scheduling Coordinator. One source of the data used by the ISO to perform its calculations is the actual meter read data collected and provided to the ISO by Scheduling Coordinator's, including the Debtor. Under the ISO's Payment Calendar, the Debtor has 45 calendar days following an operating day within which to deliver preliminary meter read data, and 49 business days to submit corrected meter read data (approximately 70 calendar days) to the ISO to enable the ISO to generate daily preliminary and

final statements. Occasionally, Scheduling Coordinators such as the Debtor will miss the deadline for providing the meter read data, or submit incorrect data.

3. Once the meter read data is provided to the ISO, the ISO prepares a preliminary settlement statement which is delivered to each Scheduling Coordinator 38 business days (approximately 51 calendar days) after the particular operating date. The Scheduling Coordinator then has the opportunity to review, validate and confirm the preliminary statement. Scheduling Coordinators such as the Debtor have the opportunity to provide notice of a dispute regarding the statement delivered within 8 days following the delivery of a preliminary statement.

4. Once that process is complete, which may include adjustments to the Debtors statement, the ISO delivers a final settlement statement to the Scheduling Coordinator. Preliminary and final statements are not invoices. Under certain circumstances, a Scheduling Coordinator may request a re-run of a settlement statement and, if granted, may be set aside for an indeterminate period of time until such dates can be included in a market rerun. In sum, the timing of further processing of the statement is beyond the control of the ISO.

5. Preliminary and final invoices are not delivered to the Debtor until the final statement for the last day of the month is processed. For preliminary billing this is approximately 84 calendar days after the first day of the month

12

invoiced and *for final billings, the process is completed approximately 102 calendar days after the first day of the month invoiced.*

6. Even after a "final" invoice is generated, the various charges may be subject to further substantial adjustment. These adjustments are due to a variety of factors which are unique to the ISO's function in the energy market. For example, adjustments may arise from miscalculations or errors in any aspect of the voluminous cost and meter data each Scheduling Coordinator submits to the ISO, the settlement of outstanding billing disputes (which number in the thousands per year), or an order by FERC. Any of these occurrences may result in a determination that one or more Scheduling Coordinators have been over or undercharged, which necessitates a re-run or recalculation of the entire market to adjust the charges and/or payments so that all Scheduling Coordinators are billed appropriate amounts. Therefore, due to circumstances beyond the control of the ISO, it is impossible for the ISO to determine with reasonable certainty the accuracy of any "final" invoice for several months. In fact, the ISO is currently rerunning the market for 2000 and 2001, which takes considerable time. The month of May 2001 will not be re-run for approximately two months.

7. As the foregoing abbreviated description of the settlement process illustrates, the 90-day period proposed by

the Debtor within which the ISO would be required to compute and assert administrative expense priority claims against the Debtor is totally unworkable. If PG&E's proposed bar date schedule is adopted, the effect in all likelihood would be that the ISO at the end of 90 days would only be able to assert a placeholder claim to preserve the right to assert its administrative expense claims when known. Claims submitted at the 90-day demarcation would be inaccurate, subject to significant adjustment and, ultimately, unreliable.

8. If the Court is otherwise inclined to set a bar date for the filing of administrative expense priority claims, such date should be fixed 180 days following the end of any given billing period. Thus, in lieu of the September 10, 2001 bar date proposed by the Debtor for the claims arising during the period from April 6, 2001 through May 31, 2001, the Court should fix November 30, 2001 as the bar date for that period. Thereafter, administrative claims arising in this case would be filed by not later than 180 days following the end of any given month. In this manner, there is a reasonable opportunity for the ISO to generate reliable and accurate settlement data for invoicing purposes, and the claims asserted would not likely be

///

///

subject to further significant adjustment, which would provide the certainty PG&E purportedly seeks.

Executed this 2 day of August, 2001 at Folsom, California.

_____
SPENCE GERBER