

COPY

1 | LATHAM & WATKINS
Michael S. Lurey (State Bar No. 48235)
2 | Ernest J. Getto (State Bar No. 55662)
Kirk A. Wilkinson (State Bar No. 128367)
3 | Cynthia H. Cwik (State Bar No. 141234)
Belinda S Lee (State Bar No. 199635)
4 | 633 West Fifth Street, Suite 4000
Los Angeles, California 90071-2007
5 | Telephone: (213) 485-1234
Facsimile: (213) 891-8763
6
TATRO • COFFINO • ZEAVIN •
7 | BLOOMGARDEN LLP
Rene Tatro (State Bar No. 78383)
8 | 1875 Century Park East, Suite 1220
Los Angeles California 90067
9 | Telephone: (310) 229-2490

10

Attorneys for Pacific Gas and Electric Company,
11 | Debtor and Debtor-in-Possession

**FILED**

**NOV 1 4 2001**

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

12

### UNITED STATES BANKRUPTCY COURT

13

### NORTHERN DISTRICT OF CALIFORNIA

14

### SAN FRANCISCO DIVISION

15

| In re | Bankruptcy Case No. 01-30923 SFM11 |
| --- | --- |
| PACIFIC GAS AND ELECTRIC COMPANY, a California corporation, | Chapter 11 |
| Debtor. | PACIFIC GAS AND ELECTRIC COMPANY'S OMNIBUS OBJECTIONS TO CHROMIUM CLAIMS |
| | [Hearing dates to be requested by subsequent Motions by Debtor and Debtor-In-Possession] |
| Federal I.D. No. 94-0742640 | |

16

17

18

19

20

21

22

23

24

25

26

27

28

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

## TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY.................................................................................. 1

II. JURISDICTION.............................................................................................................. 6

III. THE PARTIES............................................................................................................... 6

IV. OVERVIEW OF THE FACTS........................................................................................ 7

    A.    The Former Use Of Chromium At PG&E Stations. ............................................. 7

    B.    The Claimants Had Extremely Minimal, If Any, Exposure To
         Chrome Six .......................................................................................................... 9

V. OVERVIEW OF THE SCIENCE..................................................................................... 10

    A.    Background Regarding Chromium. ...................................................................... 10

    B.    The Importance Of The Route Of Exposure........................................................ 10

    C.    Exposure To Low Levels Of Chromium Is Not Associated With
         Adverse Health Effects. ....................................................................................... 12

VI. BECAUSE CLAIMANTS CANNOT ESTABLISH CAUSATION, THEIR CLAIMS
     SHOULD BE DISALLOWED ...................................................................................... 13

    A.    The Chromium Claims Will Be Governed By California
         Substantive Tort Law........................................................................................... 14

    B.    Claimants Cannot Present Competent Expert Evidence To
         Establish Causation.............................................................................................. 15

VII. THERE ARE ADDITIONAL PROCEDURAL AND LEGAL BASES FOR
      OBJECTIONS.............................................................................................................. 18

    A.    The Claims Of All Non-Minors Should Be Disallowed Because
         They Are Barred By The Applicable Statute Of Limitations. ............................. 18

    B.    Claimants Who Were Employed By PG&E Are Limited To The
         Remedies Provided By Workers' Compensation. ............................................... 20

    C.    The Claims Filed Do Not State A Valid Legal Or Equitable Basis
         For Relief. ............................................................................................................ 21

    D.    The Claims Are Made For Inflated And Unsubstantiated Amounts.................... 22

VIII. CONCLUSION AND PRAYER FOR RELIEF .............................................................. 23

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

i

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 2 of
29

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Brock v. Merrell Dow Pharm., Inc.,
  874 F.2d 307 (5th Cir. 1989) .................................................................. 10

Casey v. Ohio Medical Prod.,
  877 F. Supp. 1380 (N.D. Cal. 1995) ........................................................ 14

Daubert v. Merrell Dow Pharm., Inc.,
  43 F. 3d 1311 (9th Cir. 1995), cert. denied, 516 U.S. 869 ........................ 14

Daubert v. Merrell Dow Pharm., Inc.,
  509 U.S. 579 (1993) ............................................................................... 15

General Electric Co. v. Joiner,
  522 U.S. 136 (1997) ............................................................................ 4, 10

Hughes Aircraft Co. v. Superior Court,
  44 Cal. App. 4th 1790 (1996) ................................................................. 21

In re A.H. Robins Co., Inc.,
  89 B.R. 555 (E.D. Va. 1988) .................................................................. 23

In re Applebaum,
  162 B.R. 548 (Bankr. E.D. Cal. 1993) .................................................... 23

In re Circle J. Dairy, Inc.,
  112 Bankr. 297 (W.D. Ark. 1989) ...................................................... 21, 22

In re Colin,
  68 B.R. at 627 ........................................................................................ 23

In re GAC Corp.,
  681 F.2d 1295 (11th Cir. 1982) .............................................................. 23

In re Hanford Nuclear Reservation Litigation,
  1998 WL 775340 (E. D. Wash. 1998) ..................................................... 16

In re Hillsborough Holdings Corp.,
  247 B.R. at 512 ...................................................................................... 23

In re Johns-Manville Corp.,
  68 B.R. 618 (Bankr. S.D.N.Y. 1987) ...................................................... 23

In re Marino,
  90 Bankr. 25 (D. Conn. 1988) ................................................................ 22

In re W.G. Wade Shows, Inc,
  218 B.R. 625 (Bankr. M.D. Fl. 1998) ..................................................... 23

Johns-Manville Products Corp. v. Superior Court,
  27 Cal. 3d 465 (1980) ............................................................................ 21

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

ii

PG&E'S OMNIBUS DISEASE OBJECTION
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 3 of 29

1  Jolly v. Eli Lilly & Co.,
     44 Cal. 3d 1103 (1988) ............................................................................... 5, 20

2
3  Jones v. Ortho Pharm. Corp.,
     163 Cal. App. 3d 396 (1985) ............................................................................. 14

4  Kumho Tire Co. v. Carmichael,
     526 U.S. 137 (1999) .......................................................................................... 4

5
6  Lopez v. Wyeth-Ayerst Laboratories,
     No. C 94-4054 CW, 1996 WL 784566, (N.D. Cal. Dec. 13, 1996)...................... 14

7  Magpali v. Farmers Group, Inc.,
     48 Cal. App. 4th 471 (1996) ............................................................................. 18

8
9  McKelvey v. Boeing North America Inc.,
     74 Cal. App. 4th 151 (1999) ........................................................... 5, 18, 19, 20

10  Nat'l Bank of Commerce v. Associated Milk Producers, Inc.,
     22 F. Supp. 2d 242 (E.D. Ark. 1998), aff'd, 191 F.3d 858 (8th Cir. 1999)........... 17

11
12  Nodine v. Shiley Inc.,
     240 F.3d 1149 (9th Cir. 2001) ......................................................................... 18

13  O'Connor v. Boeing North American, Inc., et al.,
     92 F. Supp. 2d 1026 (C.D. Cal. 2000) ............................................................... 19

14
15  Privette v. Superior Court,
     5 Cal. 4th 689 (1993) ...................................................................................... 21

16  Prudential Home Mortgage Co., Inc. v. Superior Court,
     66 Cal. App. 4th 1236 (1998) ........................................................................... 20

17
18  Rutherford v. Owens-Illinois, Inc.,
     16 Cal. 4th 953 (1997) ............................................................................... 14, 15

19  San Diego v. Sanfax Corp.,
     19 Cal. 3d 862 (1977) ...................................................................................... 18

20
21  Whiting v. Boston Edison Co.,
     891 F. Supp. 12 (D. Mass. 1995) .................................................................. 15, 17

22                        **STATUTES**

23  Cal. Labor Code Section 3602 ......................................................................... 20

24  Cal. Labor Code Section 3602(b)(2) .................................................................. 21

25                    **OTHER AUTHORITIES**

26  28 U.S.C. §§ 1334(b) and 157(b)(2)(C) ............................................................. 6

27  Chapter 11 of the U.S. Bankruptcy Code ............................................................ 7

28  Federal Rule of Evidence 702 ...................................................................... 15, 16

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES
LA_DOCS\744097.18 [W97]

iii

PG&E'S OMNIBUS DISEASE OBJECTION
TO CHROMIUM CLAIMS

Sections 1107 and 1108 of the Bankruptcy Code ......................................................... 7

U.S. EPA, <u>Toxicological Review of Hexavalent Chromium</u> (1988) ("EPA
    Review") ..................................................................................................................... 11

World Health Organization, <u>Guidelines for Drinking-Water Quality</u> (2d ed. 1993)
    ("WHO Guidelines") ................................................................................................. 11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

iv

**PG&E'S OMNIBUS DISEASE OBJECTION
TO CHROMIUM CLAIMS**

Case: 01-30923   Doc# 3162   Filed: 11/14/01   Entered: 11/16/01 09:49:00   Page 5 of
29

# I.

## INTRODUCTION AND SUMMARY

Approximately 1,250 individuals identified on Exhibit A (the "Chromium Claimants" or "Claimants") have filed proofs of claim (the "Chromium Claims" or "Claims") in this bankruptcy proceeding asserting that exposure to chrome six (hexavalent chromium) from Pacific Gas and Electric Company's ("PG&E") facilities caused their wide range of illnesses and injuries. Nearly all of the Chromium Claims are filed by individuals who are plaintiffs in twelve civil suits pending against PG&E in the California state courts. All of the Claims fail because, both as a matter of science and a matter of law, Claimants cannot establish that exposure to chrome six from PG&E caused their alleged injuries. Claimants will be unable to present admissible scientific evidence that exposure to environmental (as opposed to occupational) levels of chrome six can cause the massive list of ailments they claim. In addition, many of these Chromium Claims should be disallowed, in whole or in part, because they are based on causes of action that were brought after the expiration of the applicable one-year statute of limitations, are preempted by the California Workers' Compensation Act, and fail to set forth a valid legal or equitable basis for relief as required under applicable California and bankruptcy law. As set forth in greater detail in Sections VI and VII below the Chromium Claims should be disallowed.

One key issue with regard to all of the Claims is whether chrome six caused Claimants' alleged personal injuries. Based upon the discovery that was conducted concerning the Chromium Claimants, the alleged injuries include a wide variety of general complaints such as headaches, hay fever, dizziness, frequent colds, and dental problems, as well as many different types of cancer, including prostate cancer, breast cancer, colon cancer, leukemia, and Hodgkin's disease. In order to prevail on the Claims, Claimants must prove both that: (1) chrome six is capable of generally causing their claimed injuries; and (2) exposure to chromium from PG&E actually did cause their specific injuries. However, the overwhelming majority of scientific and medical studies compel a finding that chromium is *not* capable of generally causing the Claimants' diseases.

///

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

1    There is vast scientific literature going back more than 100 years regarding chrome six,
2  including dozens of epidemiological studies of workers exposed to chrome six. Several
3  government agencies have issued reports evaluating the literature on the known health effects of
4  exposure to chrome six, including the International Agency for Research on Cancer ("IARC"),
5  the World Health Organization ("WHO"), the United States Environmental Protection Agency
6  ("EPA"), the Agency for Toxic Substances and Disease Registry (a division of the United States
7  Department of Health and Human Services) ("ATSDR"), the National Institute of Occupational
8  Safety and Health ("NIOSH"), and the National Toxicology Program ("NTP").[1]  This literature
9  establishes that long-term occupational exposure *via inhalation* to certain types of chrome six is
10  associated with an increased risk of lung and other respiratory cancers. Many of the Chromium
11  Claimants, however, have alleged that their most significant exposure was through the drinking
12  water, rather than through inhalation. This literature does *not* support the conclusion that
13  ingestion of chrome six through drinking water causes any type of cancer or serious disease.

14    For example, the EPA Office of Water has concluded: "There is no evidence that
15  chromium in drinking water has the potential to cause cancer from lifetime exposure in drinking
16  water." EPA Office of Water: Drinking Water And Health, Technical Fact Sheet On:
17  Chromium at 1. The California Department of Health Services has also concluded that "the
18  evidence for [chrome six's] carcinogenicity when ingested is not compelling." This report also
19  noted that "IARC and NTP have not identified chromium-6 as carcinogenic when administered
20  orally." California Department of Health Services, Chromium-6 (Hexavalent Chromium) In
21  Drinking Water, March 2, 2001 at 2.

22    In fact, a "blue ribbon" panel of distinguished scientists was recently asked by the
23  California Office of Environmental Health and Hazard Assessment ("OEHHA") to review the
24  scientific literature regarding the issue of whether ingestion of chrome six can cause cancer.
25  This panel issued its report on August 31, 2001, which concluded:

26

---

[1]  True and correct copies of the scientific literature and deposition testimony cited in these Omnibus Objections will be filed with the Court in support of PG&E's forthcoming motions on these issues.

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

2

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 7 of 29

<blockquote>
We found no basis in either the epidemiological or animal data published in the literature for concluding that orally ingested Cr(VI) [chrome six] is a carcinogen.
</blockquote>

OEHHA Chromate Toxicity Review Committee, <u>Scientific Review of Toxicological And Human Health Issues Related To The Development Of A Public Health Goal For Chromium(VI)</u>, Aug. 31, 2001 (the "OEHHA Report").

Many of the Chromium Claims are based upon circumstances that would cause little or no chromium exposure. Approximately 50 of the Claims are based upon visits to the Kettleman Station after PG&E stopped using chromium in those cooling towers and after the water supply well that Claimants asserted as a source of exposure had closed. More than 350 of the Chromium Claims are based upon alleged exposure to chrome six at ranches located two to five miles from the Kettleman Compressor Station. Finally, more than 200 of the Chromium Claims are based upon visiting the general vicinity of one of the compressor stations for hours or days. This is simply not the frequency duration or intensity of chromium exposure associated with any potential adverse health effects. As the OEHHA panel of scientists concluded after reviewing the scientific literature, "[t]aken together, the epidemiologic data on [chrome six] exposure from environmental sources (as opposed to generally much higher occupational exposures) provide no support for a causal association of exposure to [chrome six] and overall or site-specific cancer mortality for the general public." <u>Id.</u> at 19-20.

Despite the absence of scientific literature indicating that there is any connection between exposure to chrome six and the vast majority of the Claimants' ailments, several of the Claimants offered "expert" testimony in litigation before the California state courts that purported to conclude that exposure to chrome six caused a myriad of different health problems. However, Claimants' experts failed to follow even the most basic scientific methodologies and, as a result, their conclusions – having no support in the scientific or medical literature – are inadmissible. For example, these experts were repeatedly forced to admit that there is no scientific literature to support their speculation that chromium causes the various diseases as alleged by the Claimants. For example, Claimants' expert Dr. Daniel Teitelbaum testified:

> Q.    Can you refer me to any scientific literature that says

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

3

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 8 of 29

1    chrome causes non-Hodgkin's lymphoma?

2        A.    No.

3        Q.    Can you refer me to any scientific literature that says that
               chrome causes Hodgkin's disease?

4        A.    No, I can't.

5    Deposition of Daniel Teitelbaum ("Teitelbaum Dep.") at 69:24-70:4.[2] Their opinions also

6    displayed an astonishing lack of knowledge regarding the basic facts relevant to this case and the

7    individual Claimants. Dr. Rodger Bick, for example, did not even know what type of chrome six

8    was used at the PG&E facilities (Bick Dep. at 17:23-25), nor did he know when chrome six was

9    used at the PG&E facilities – except for what he seemed to remember from watching the movie

10   *Erin Brockovich*:

11              I mean, one of the things that really, you know, goofs up my mind
12              in these answers is watching the movie, you know, and then trying
                to discern what's – what I remember from the movie versus all the
13              materials that I've read.

14   Id. at 19:3-20:4. As Justice Scalia recently commented, judges have an obligation to exclude

15   "expertise that is *fausse* and science that is junky." Kumho Tire Co. v. Carmichael, 526 U.S. 137

16   (1999) (Scalia, J., concurring). Claimants' purported evidence attempting to link a myriad of

17   health problems to exposure to chrome six from PG&E facilities is an exemplar of *fausse*

18   expertise and "junky" science and does not even come close to meeting Claimants' burden of

19   establishing medical causation through competent, admissible expert testimony. As will be set

20   forth in greater detail in PG&E's forthcoming motions for summary judgment, the Chromium

21   Claims should therefore be disallowed.

22          There also are several additional reasons why the Chromium Claims are procedurally and

23   legally deficient. Most, if not all, of the Chromium Claims are untimely. The first lawsuits for

24

25   ─────────────
     [2]    Of note, Dr. Teitelbaum is no stranger to the courtroom: he has testified hundreds of times
26   (almost always for plaintiffs), and his "expert opinion" has been excluded at least six times in the
     past four years in state and federal courts across the country. In fact, the United States Supreme
27   Court, in the seminal case of General Electric Co. v. Joiner, 522 U.S. 136 (1997) ("Joiner"),
     specifically rejected the opinions of Dr. Teitelbaum because they were nothing more than
28   "subjective belief or unsupported speculation." Joiner, 522 U.S. at 140.

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES                LA_DOCS\744097.18 [W97]

4                          PG&E'S OMNIBUS OBJECTIONS
                           TO CHROMIUM CLAIMS

Case: 01-30923   Doc# 3162   Filed: 11/14/01   Entered: 11/16/01 09:49:00   Page 9 of
                                      29

alleged exposure to chromium from PG&E were filed in 1994. The cases were the subject of a torrent of local and national press, and ultimately a major motion picture. The Chromium Claims are barred because Claimants knew, or should have known, of the basis of their Claims well over one year before they filed the pending state court lawsuits or Claims at issue. See McKelvey v. Boeing North American Inc., 74 Cal. App. 4th 151, 160 (1999). In particular, the more than 150 Claimants who lived, visited or had contacts with the Hinkley area after 1987 must have known about the chrome six cleanup and the lawsuits regarding chrome six in groundwater that were the subject of massive local and regional publicity. See Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1112-13 (1988) (timely investigation would have discovered numerous articles concerning the types of claims alleged). In addition, the Chromium Claims filed by current or former PG&E employees are further deficient because workers' compensation is the exclusive remedy to resolve such Claims.

Moreover, the grossly inflated damages asserted are not substantiated by the proofs of claim filed. According to written discovery responses, many of these Claimants are healthy. There is no basis set forth in their proofs of claims to determine that they have been harmed in any way by the alleged exposure to chromium. The illnesses purportedly caused by chromium are not described in the proof of claims and the damages reportedly suffered are not described with any specificity. More than 150 of the Claims are filed by individuals seeking tens of thousands of dollars who claim no exposure to chromium themselves, but claim only loss of consortium. Without any substantiating data, the Chromium Claims seek from $10,000 to more than $10 million. Finally, the Claims are also inflated because they incorrectly seek to recover punitive damages against the debtor-in-possession for the use of chromium water treatment products that ceased more than 15 years ago. Punishing historical conduct by an entity that no longer exists serves no legal or bankruptcy purpose. The unpredictable and inconsistent nature of punitive damage claims could deny the reorganized debtor a fresh start.

For the reasons set forth herein, PG&E objects to the Chromium Claims.[3]

---

[3] The Claims filed with the Bankruptcy Court do not provide sufficient information from which to determine which of the objections apply to each of the particular Claimants identified on Exhibit A. Based upon the information provided in the various civil complaints and

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

## II.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(B) & (C).

## III.

## THE PARTIES

The objector, PG&E, is the debtor and Debtor-in-Possession in the Case. Thousands of proofs of claims were filed in this Case by the September 5, 2001 bar date. The Chromium Claimants are the approximately 1,250 individuals who have filed proofs of claim in the Case, and who allege or may allege, *inter alia*, claims for personal injuries and related damages pertaining to the alleged release of chrome six by PG&E in Kettleman, Hinkley, and Topock, California including plaintiffs in the civil actions pending in California state courts known as: Aguayo v. PG&E, et al., Los Angeles Superior Court ("L.A.S.C.") Case No. BC123749 (filed Mar. 15, 1995); Aguilar v. PG&E, et al., L.A.S.C. Case No. BC158588 (filed Oct. 4, 1996); Acosta v. Betz Laboratories, et al., L.A.S.C. Case No. BC161669 (filed Nov. 27, 1996); Adams v. PG&E, et al., L.A.S.C. Case No. BC233964 (filed Jul. 25, 2000); Baldonado v. PG&E, L.A.S.C. Case No. BC239104 (filed Oct. 25, 2000); Bowers v. PG&E, San Bernardino Superior Court Case No. BCV05733 (filed June 29, 2001); Gale v. PG&E, L.A.S.C. Case No. BC244229 (filed Jan. 30, 2001); Martinez v. PG&E, L.A.S.C. Case No. MC012543 (filed April 20, 2001); Monice v. PG&E, San Bernardino Superior Court Case No. BCVS505563 (filed Mar. 15, 2001); Puckett v. PG&E, L.A.S.C. Case No. BC247763 (filed Mar. 30, 2001); Alderson v. Pacific Gas and Electric Corporation, et al., L.A.S.C. Case No. BC248532 (filed Apr. 11, 2001); and Boyd v. PG&E, et al., L.A.S.C. Case No. BC249693 (filed May 2, 2001).[4]

---

information obtained from written and other discovery in the pending civil actions, PG&E has been able to determine that each of the Claims identified on Exhibit A will be subject to one or more of the objections described herein. As additional information is developed, PG&E and the Court will be able to determine which of the Claimants will be the subject of each of the objections described herein.

[4] The Aguayo, Aguilar, and Acosta cases, were deemed related by the Los Angeles Superior Court for purposes of trial (the "Aguayo Related Cases"). The Adams and Alderson cases were also deemed related for purposes of trial. Each plaintiff in the Aguayo Related Cases was

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

6

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

On April 6, 2001, PG&E filed a voluntary petition under Chapter 11 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "Case"). Since filing the Case, PG&E has continued to operate its business and manage its property as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. All proceedings in the above-listed civil actions pending in the California state courts were stayed as a result of PG&E's bankruptcy.

**IV.**

## OVERVIEW OF THE FACTS

### A. The Former Use Of Chromium At PG&E Stations.

Since 1952, PG&E has operated a pipeline transporting natural gas from production fields in the southwest United States for use by PG&E's customers. There are compressor stations along this pipeline (at Topock, Hinkley, and Kettleman, California) which compress the gas to a higher pressure to transport it further down the pipeline. Each compressor station had cooling towers to reduce the temperature of the compressed gas and protect the insulation and integrity of the pipeline. Water is sprinkled inside the cooling towers to cool the gas, and water treatment products were used to prevent corrosion of metal parts within the towers.

PG&E purchased chromium water treatment products from Betz Chemical Company, a national supplier of water treatment products. PG&E used water treatment products containing chromium in its cooling towers from 1952 to 1985 at Topock, 1952 to 1966 at Hinkley, and from 1952 to 1979 at Kettleman. The type of chromium used by PG&E was a highly soluble sodium dichromate (a specific type of chrome six). Deposition of Ronald Cavagrotti at 143:20-144:2,

---

required to complete a Plaintiff's Questionnaire, which included detailed information relating to, among other things, the plaintiffs' alleged exposure, medical history and illnesses. In the Aguayo Related Cases, a group of 18 individual plaintiffs (all of whom are now Chromium Claimants) served as trial test plaintiffs (the "Aguayo Trial Plaintiffs"). Further fact discovery was taken of the Aguayo Trial Plaintiffs, including the depositions of the Aguayo Trial Plaintiffs and third party witnesses (such as relatives, employers, and treating physicians). Expert discovery had also begun in the Aguayo Related Cases: all eight of the experts designated by the plaintiffs were deposed, and three of the experts designated by PG&E were deposed. In March and April of 2001, PG&E filed several motions for summary judgment (on the grounds that plaintiffs in the Aguayo Related Cases could not establish by a reasonable medical probability that exposure to chrome six from PG&E was a substantial factor in the cause of their claimed injuries) and several motions *in limine* (to exclude the testimony of plaintiffs' experts).

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

187:6-18. The NTP, in its most recent report on carcinogens, repeats the NIOSH conclusion that sodium dichromate is "noncarcinogenic." National Toxicology Program, 9th Annual Report on Carcinogens, (2000) at "Chromium Hexavalent Compounds," at 2 ("9th Annual Report").

PG&E's use of chromium in its cooling towers was by no means unique.[5] From the 1950s into the 1980s, chromium water treatment products were used throughout the United States because chromium was the best compound for fighting corrosion. In 1990, there were approximately 38,000 cooling towers across the U.S. which were potential sources for emissions of chromium. See Agency for Toxic Substances and Disease Registry, Toxicological Profile for Chromium, (2000) at 286 (emphasis added) ("ATSDR Profile").[6]

- Topock Station: PG&E first discovered the presence of chromium in groundwater at its Topock Compressor Station when Betz performed tests on the water being supplied to the cooling towers in 1953. For unrelated reasons, bottled water was already being used for drinking water at the Topock Station.

- Kettleman Station: In the fall of 1964, PG&E discovered the presence of chromium on its Kettleman Station property in Well #4 (which was not used for drinking water). From 1964 until 1979 (when PG&E discontinued the use of chromium in the Kettleman cooling towers), PG&E pumped and treated the groundwater and the cooling tower wastewater to reduce the concentration of chromium in the well and assure that no more chromium was added to the soil or groundwater.

- Hinkley Station: PG&E discovered chromium in a well near the Hinkley Station in September 1965. PG&E tested numerous other wells and leased (and later purchased) the

---

[5] From 1952 until the mid-1960s PG&E followed the standard industry practice of releasing its cooling tower wastewater to unlined ponds. Beginning in the mid-1960s, PG&E began treating the cooling tower wastewater to convert the chrome six into chrome three (a naturally occurring and essential nutrient required by the human body) before it was released to the ponds.

[6] The ATSDR's Toxicological Profile for Chromium is a peer-reviewed profile of the toxicological and adverse health effects of chromium, prepared in accordance with the ATSDR's and the U.S. Environmental Protection Agency's guidelines. Plaintiffs' experts have repeatedly relied upon, reviewed, and confirmed the importance and accuracy of the ATSDR's Profile. In fact, plaintiffs' expert Dr. Max Costa testified that the ATSDR report was a proper summary of chromium toxicology and that he had participated in the review of the ATSDR report. Costa Dep. at 134:18-135:3.

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

8

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 13
of 29

1  surrounding property to pump and treat the well water from 1965 to 1972. In 1987, PG&E
2  conducted further groundwater testing, which disclosed chrome six levels in Well # 7, eight area
3  drinking wells, and five agricultural wells above the drinking water standard of 0.05 ppm.
4  PG&E provided bottled water to the twelve families (consisting of 26 adults and 20 children)
5  which had used the eight drinking wells. Since 1987, as part of its approved remediation project,
6  PG&E has purchased or leased virtually all of the property in the area immediately north of the
7  Hinkley Station, pumps the groundwater containing low levels of chrome six, and uses it for
8  irrigation in alfalfa fields where it naturally converts to chrome(III).

9  **B.** **The Claimants Had Extremely Minimal, If Any, Exposure To Chrome**
10  **Six**

11  The generic Claims allege exposure to chrome six at or near PG&E's compressor
12  stations in Hinkley, Kettleman and Topock, and fail to specify the time and location of each
13  Claimant's alleged exposure. According to written discovery responses in pending litigation,
14  more than 200 Claimants never lived or worked at or near the Hinkley, Kettleman or Topock
15  stations. Instead, their Claims are based upon periodic visits of very short duration to the areas
16  where they claim chrome six could have been present. In addition, written discovery responses
17  confirm that more than 350 Chromium Claimants allege that they were exposed to chromium at
18  ranches that are located two to five miles away from the Kettleman station. No chromium was
19  detected at the wells serving these ranches. Moreover, written discovery responses confirm that
20  approximately 50 of the Claimants allege they were at the Kettleman Station only after 1982,
21  when there was no opportunity for exposure to chrome six.[7]

22
23
24
25

---

26  [7]    At the Kettleman station, chrome six has only been identified in a single industrial water
        supply well known as Well #4. The evidence will show that Well #4 was a backup for the
27     industrial water supply to the Kettleman cooling towers; it was not used for domestic water.
        Well #4 was closed in December 1982. PG&E stopped using chromium in the Kettleman Station
28     cooling towers in 1979.

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

9

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 14
of 29

V.

**OVERVIEW OF THE SCIENCE**

A.    **Background Regarding Chromium.**

Chromium is a naturally occurring element found in rocks, animals, plants, soil, and volcanic dust and gases. ATSDR Profile at 1. There also are many industrial sources of chromium exposure – the ATSDR report lists more than *seventy* such industries. ATSDR Profile at 305. Many consumer products also contain chromium, including "certain wood preservatives, cement, cleaning materials, textiles, and leather tanned with chromium." Id. at 313. On average, adults in the U.S. take in approximately 60 micrograms of chromium daily from food. Id.

Chromium exists in several different valance or "oxidation" forms, including chromium(III) (also referred to as chrome three or trivalent chromium) and chromium(VI) (also referred to as chrome six or hexavalent chromium). ATSDR Profile at 313. Chrome three is a naturally occurring and essential nutrient required by the human body to enable the body's absorption of sugar, protein, and fat, while chrome six is generally produced through industrial processes. Id. Chrome six, if ingested or inhaled, is reduced by the human body's organs to chrome three. Id. at 5.

B.    **The Importance Of The Route Of Exposure.**

The route of exposure to chromium can make a critical difference in the type of health effects that exposure can cause. There are three primary routes of exposure to chrome six – inhalation, ingestion (*i.e.*, oral exposure), and dermal exposure (*i.e.*, exposure through the skin). ATSDR Profile at 3 (including separate discussion sections for each of these routes of exposure). Epidemiological studies conducted by federal, state, and public health agencies do not conclude that ingestion of drinking water containing chromium (as the Chromium Claimants have alleged) is carcinogenic.[8] Likewise, these studies do not suggest that dermal exposure to chromium causes the diseases or cancers claimed by the Chromium Claimants. Indeed, the

---

[8]    Epidemiological studies "examine the pattern of disease in human population." General Electric Co. v. Joiner, 522 U.S. 136, 144, n.2 (1997). Federal courts have recognized that epidemiological studies are "the most useful and conclusive type of evidence" in toxic tort cases. See, e.g., Brock v. Merrell Dow Pharm., Inc., 874 F.2d 307, 311 (5th Cir. 1989).

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

10

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923   Doc# 3162   Filed: 11/14/01   Entered: 11/16/01 09:49:00   Page 15
of 29

1  studies linking chromium to lung cancer or nasopharangeal cancer have involved only *high level*
2  *occupational exposures* to *airborne* chromium.  See ATSDR Profile at 6 ("The health effects
3  resulting from exposure to chromium(III) and chromium(VI) are fairly well described in the
4  literature . . . . Long-term exposure to chromium has been associated with *lung cancer* in
5  workers exposed to levels *in air* that were 100 to 1,000 times higher than those found in the
6  natural environment.").

7          As to ingestion of chrome six in drinking water, many governmental agencies have
8  concluded there is no evidence that this type of exposure to chrome six causes any type of cancer
9  or serious disease.[9]  For example:

10          (1)     The EPA Office of Water concluded: "There is no evidence that chromium in
11  drinking water has the potential to cause cancer from lifetime exposure in drinking water."  EPA
12  Office of Water:  Drinking Water And Health, Technical Fact Sheet On:  Chromium at 1.

13          (2)     The EPA, in its Toxicological Review of Hexavalent Chromium, also has
14  determined: "At present, the carcinogenicity of hexavalent chromium by the oral route of
15  exposure *cannot be determined.*"  EPA, Toxicological Review of Hexavalent Chromium (1988)
16  at 32 (emphasis supplied) ("EPA Review").

17          (3)     The WHO reported: "the limited data available do not show evidence for
18  carcinogenicity via the oral route."  World Health Organization, Guidelines for Drinking-Water
19  Quality (2d ed. 1993) at 45-46 ("WHO Guidelines").

20          (4)     The California Department of Health Services concluded that "the evidence for
21  carcinogenicity when ingested is not compelling."  This report also noted that "IARC and NTP
22  have not identified chromium-6 as carcinogenic when administered orally."  California

23

24

---

25  [9]   At most, this literature establishes that *long-term occupational exposure via inhalation* to
   certain types of chrome six (which applies to very few, if any, of the Claimants) is associated
26  with an increased risk of lung and other respiratory cancers.  The ATSDR report, for example,
   states: "The health effects resulting from exposure to chromium(III) and chromium(VI) are
27  fairly well described in the literature . . . . Long-term exposure to chromium has been associated
   with *lung cancer* in workers exposed to levels *in air* that were 100 to 1,000 times higher than
28  those found in the natural environment."  ATSDR Profile at 6 (emphasis added).

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES
LA_DOCS\744097.18 [W97]

11

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 16
of 29

1   Department of Health Services, "Chromium-6 (Hexavalent Chromium) In Drinking Water,"

2   March 2, 2001 at 2.

3          (5)    The recent report released by the "blue ribbon" panel of scientists commissioned

4   by OEHHA again confirms that there is no evidence that chrome six is carcinogenic when

5   ingested orally.  OEHHA commissioned a panel of distinguished scientists to perform a risk

6   assessment and identify the optimum drinking water level (also known as "public health goal" or

7   "PHG") for chrome six in drinking water.  See OEHHA Report.  After reviewing the pertinent

8   scientific literature, the OEHHA study concluded:

9              *We found no basis in either the epidemiological or animal data*
              *published in the literature for concluding that orally ingested*
10             *Cr(VI) [chrome six] is a carcinogen*, and a relatively large number
              of negative studies by the oral route of exposure, even at
11             concentrations in excess of current MCLs [California State
              Maximum Contaminant Levels].
12

13   OEHHA Report at 3 (emphasis supplied).

14      C.     **Exposure To Low Levels Of Chromium Is Not Associated With**

15             **Adverse Health Effects.**

16          Studies have found that exposure to low levels of chromium is *not* associated with

17   adverse health effects.  Chrome six is present at low levels in the air throughout California and

18   the United States.  ATSDR Profile at 3-4.  There is no evidence that exposure to low

19   concentrations of chromium for extended periods of time causes *any* adverse health effects, let

20   alone the wide range of ailments that the Chromium Claimants with only environmental

21   exposure have alleged.  As one very recent study concluded, there is "no clear evidence to relate

22   exposure to environmental levels of chromium with adverse health effects in either the general

23   population or sub-groups exposed to Cr(VI) around industrialized or contaminated sites."  A. L.

24   Rowbotham et al., "Chromium in the environment:  an evaluation of exposure of the UK general

25   population and possible adverse health effects," J. Toxicol. Environ. Health & Crit. Rev., vol. 3

26   (2000) ("Rowbotham (2000)").

27          The OEHHA Report also similarly concluded:

28             the epidemiologic data on Cr(VI) exposure from environmental

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

12

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

sources (as opposed to generally much higher occupational exposures) provide no support for a causal association of exposure to Cr(VI) and overall or site-specific cancer mortality for the general public . . . . a large increase in cancer risk upon exposure to Cr(VI) by ingestion at environmental concentrations can reasonably be excluded.

OEHHA Report at 19-20.

In reaching this conclusion, the OEHHA Report cited a mortality study published in July 2001, Jon P. Fryzek et al., "Cancer Mortality in Relation to Environmental Chromium Exposure," J. Occupational & Environ. Medicine, vol. 43, no. 7 (July 2001) ("Fryzek Study"), as "the best epidemiologic data to date on potential carcinogenicity of environmental chromium exposure." OEHHA Report at 19. The Fryzek Study examined cancer rates in the residential population in the postal zip codes surrounding PG&E's three compressor stations in Kettleman, Hinkley, and Topock, California. Id. at 638-39. After abstracting and reviewing the causes of death listed in the California Statistical Master File for all residents in these zip codes from 1989 to 1998, the Fryzek Study concluded:

[T]his study found no evidence that persons living in postal codes near gas compressor plants are experiencing higher death rates due to cancer overall or lung cancer specifically. Furthermore, the mortality rate for all causes of death in KHT [Kettleman-Hinkley-Topock] areas was not different than non-KHT areas. *This study suggests that the health of residents in and around Kettleman City, Hinkley, and Topock is similar to the health of residents in the rest of Kings and San Bernardino County.*

Id. at 639. (emphasis added).

Even Claimants' own experts have conceded that there are no epidemiological studies establishing that low, environmental levels of chromium causes adverse health effects. See, e.g., Deposition of Max Costa ("Costa Dep.") at 421:2-21.

## VI.

## BECAUSE CLAIMANTS CANNOT ESTABLISH CAUSATION, THEIR CLAIMS SHOULD BE DISALLOWED

PG&E objects to the Chromium Claims because Claimants cannot establish through reliable, relevant, and admissible scientific evidence that exposure to chrome six can cause the

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

13

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 18
of 29

diseases and injuries alleged by the Chromium Claimants, generally, or that exposure to chrome
six from PG&E actually did cause the specific diseases and injuries alleged by each individual
Chromium Claimant. As will be set forth in PG&E's forthcoming motions for summary
judgment, the Chromium Claims thus must be disallowed as a matter of law.

### A.   The Chromium Claims Will Be Governed By California Substantive Tort Law.

To establish their Claims, the Chromium Claimants will need to prove that exposure to
chrome six from PG&E is capable of causing their claimed injuries (*i.e.*, general causation) and
did, in fact, cause their actual injuries (*i.e.*, specific causation). See Jones v. Ortho Pharm. Corp.,
163 Cal. App. 3d 396, 404 (1985). General causation is most often established through
statistically significant data derived from sound epidemiological data. See Lopez v. Wyeth-
Ayerst Laboratories, No. C 94-4054 CW, 1996 WL 784566, *5 (N.D. Cal. Dec. 13, 1996)
("Epidemiological evidence is one of the most valuable pieces of scientific evidence of
causation."). A plaintiff must first establish the general causation proposition that a chemical is
capable of causing an injury before the court will consider testimony as to whether the chemical
actually caused this plaintiff's injury. See Casey v. Ohio Medical Prod., 877 F. Supp. 1380,
1385-86 (N.D. Cal. 1995) (failure to produce epidemiological or etiological evidence of general
causation made it unnecessary to review plaintiff's claimed evidence of specific causation)
(applying California law).

To establish specific causation, Claimants must establish that exposure to chromium from
PG&E was a "substantial factor" in causing their specific conditions. See Rutherford v.Owens-
Illinois, 16 Cal. 4th 953, 968 (1997) ("California has definitively adopted the substantial factor
test of the Restatement Second of Torts for cause-in-fact determinations."), modified, 16 Cal.
App. 4th 1008 (1997). Federal courts have explained and applied California's substantial factor
test: "California tort law requires claimants to show not merely that [the chemical] increased the
likelihood of injury, but that it more likely than not caused *their* injuries." Daubert v. Merrell
Dow Pharm., Inc., 43 F. 3d 1311, 1320 (9th Cir. 1995) (emphasis in original), cert. denied, 516
U.S. 869 ("Daubert II").

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

14

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923   Doc# 3162   Filed: 11/14/01   Entered: 11/16/01 09:49:00   Page 19
of 29

## B. Claimants Cannot Present Competent Expert Evidence To Establish Causation.

Federal Rule of Evidence 702, as amended in December 2000, imposes an affirmative obligation on the federal courts to act as the "gatekeepers" of expert evidence.[10] See Advisory Comm. Notes to Fed. R. Evid. 702 at 408 (West 2001) ("[t]he amendment affirms the trial court's role as gatekeeper"). Claimants bear the burden of establishing the admissibility of any expert evidence offered under Rule 702 by a preponderance of the evidence. See id. ("the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence").[11] As courts have noted, it is particularly important to exclude opinion testimony in cases "where the plaintiff claims that exposure to a toxic substance caused his injury, [because a] jury may blindly accept an expert's opinion that conforms with their underlying fears of toxic substances without actually understanding or examining the basis for that opinion." Whiting v. Boston Edison Co., 891 F. Supp. 12, 24 (D. Mass. 1995).

Rule 702 was amended specifically to codify the evidentiary standards previously enunciated by the Supreme Court. In particular, the 2000 Amendments to Rule 702 added the following three requirements:

> (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As explicitly stated in the Advisory Committee Notes, these new requirements were adopted specifically to codify the relevance and reliability tests identified by the Supreme Court in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) ("Daubert I"), and its progeny. See Advisory Comm. Notes at 408. The Advisory Committee Notes also list

---

[10] The 2000 Amendments to Rule 702 were made by Order of the Supreme Court on April 17, 2000. Pursuant to the Court's Order, these amendments "[took] effect on December 1, 2000, and shall govern all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending."

[11] Under California substantive law, because the issue of causation in the Chromium Claims involves complex questions of disease etiology that are beyond the experience or knowledge of laypersons, Claimants can meet their causation burden *only* through competent, expert testimony. See Rutherford, 16 Cal. 4th at 967 n.11.

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

15

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

several factors that are germane to a court's reliability analysis under Rule 702. For example, the Advisory Committee Notes indicate that courts should consider whether "the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion." See id. at 409.

Considering the applicable standards, the Claimants cannot present admissible expert evidence establishing that exposure to chrome six caused their injuries. When one expert for Claimants, Dr. Max Costa, was asked to identify literature to support his sweeping assertions that chrome six is capable of causing cancer in virtually any tissue in an animal's body, he testified: "Well, I think people generally in this field believe that, and I said, *we don't have the animal studies yet to support it and we don't have human epidemiology to support it.*" Costa Dep. at 97:5-13 (emphasis added). Similarly, Claimants' expert Dr. Daniel Teitelbaum admitted he could not identify any scientific literature to support the assertion that chrome six causes either Hodgkin's disease or non-Hodgkin's lymphoma. Teitelbaum Dep. at 69:24-70:4.

In fact, one federal district court which has addressed the question of whether orally ingested chrome six could cause gastrointestinal cancer found that the scientific literature and research cited by the plaintiffs were unreliable and *did not* support such a finding of causation. See In re Hanford Nuclear Reservation Litigation, 1998 WL 775340 (E. D. Wash. 1998).[12] As in the Pending California state court suits, In re Hanford involved sodium dichromate which was used in water to cool and inhibit corrosion at an energy facility. See id. at *129. The Hanford court rejected the plaintiffs' theories of causation, granted an order excluding the plaintiffs' experts from testifying (including Claimants' experts Drs. Ruttenber and Hoffman) and held: "To the extent, if any, the report purports to opine ingested Cr VI is 'capable of causing' certain health effects in humans, *it is scientifically unreliable*." Id. at *142 (emphasis added).

Similarly, there are several critical flaws with the methodologies of Claimants' experts which also make their testimony insufficient to establish specific causation. For example, these experts failed to quantify or understand each plaintiff's specific dose or exposure. Rather than

---

[12] This matter is currently on appeal before the Ninth Circuit.

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

16

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 21
of 29

1   offer opinions based upon knowledge regarding a particular plaintiff's established exposure and
2   dose levels, Claimants' experts instead speculate that any level of exposure is enough to cause
3   disease. For example, Dr. Teitelbaum's causation theory posits that any exposure to chromium –
4   regardless of the duration and dose – can cause cancer, and an exposure "so small that you can't
5   quantitate" it would be a significant contributing factor to the development of a cancer.
6   Teitelbaum Dep. at 111:15-24.

7          Dr. Teitelbaum's theories ignore one of the fundamental tenets of toxicology – that
8   chemicals have a threshold dosage, below which no effect will be incurred. Even Dr. Costa, one
9   of Claimants' own experts, has recognized that chrome six has a threshold dosage. Costa Dep.
10  at 471:14-19. This fundamental failing of Dr. Teitelbaum's theories has already been recognized
11  by the courts. The federal district court in Nat'l Bank of Commerce v. Associated Milk
12  Producers, Inc., criticized Dr. Teitelbaum's "no threshold dose" theory as "flawed logic" which
13  was "no substitute for reliable scientific proof of causation." Nat'l Bank, 22 F. Supp. 2d 242,
14  966 (E.D. Ark. 1998), aff'd, 191 F.3d 858 (8th Cir. 1999).

15         Moreover, the Claimants' experts do not quantify the purported contribution of chrome
16  six to the development of Claimants' illnesses, and so this testimony should be excluded as
17  speculative and irrelevant. See Whiting, 891 F. Supp. at 25 (excluding expert's opinion as
18  "merely an hypothesis" with "no capacity to be of assistance to a jury in resolving the ultimate
19  issues of the case"). For example, when Dr. Bick was asked how much chromium contributed to
20  the development of a plaintiff's cancer, he responded:

21              I don't think that can be quantitated. I don't think anybody is
                smart enough to do that . . . . It could have been a tiny amount. It
22              could have been 99 percent of it. I don't know.

23  Bick Dep. at 71:12-18. Similarly, Claimants' other experts were not able to quantify how much
24  chrome six contributed to Claimants' various diseases. See Teitelbaum Dep. at 172:6-9 (lung
25  cancer); 186:15-22 (prostate cancer); 213:10-15 (Hodgkin's disease); 223:18-21, 298:20-299:4
26  (esophageal/stomach cancer); 233:21-25 (kidney cancer); 308:11-16 (leukemia); Dahlgren Dep.
27  at 261:2-262:19 ("You can't really say 'tiny' or 'large'. . . . [T]here's no way to quantify it.").
28  The Claimants' experts' testimony does not meet the legal standard of establishing that each

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

17

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923   Doc# 3162   Filed: 11/14/01   Entered: 11/16/01 09:49:00   Page 22
of 29

1 Claimants' alleged exposure to chromium from PG&E was a "substantial factor" in the actual

2 cause of each claimed injury of each plaintiff, and thus is inadmissible because it does not assist

3 the trier of fact.

4       Claimants thus have not, and cannot, present admissible expert testimony establishing

5 that their wide array of illnesses were caused by exposure to chrome six from a PG&E facility.

6 All of the Chromium Claims should fail for lack of admissible scientific evidence, and the

7 Claims by 350 Claimants alleging exposure at Kettleman ranches, 250 Claimants who only

8 visited the vicinity of the compressor stations and 50 Claimants who allege they were exposed at

9 Kettleman after 1982 are particularly subject to these objections. The Chromium Claims should

10 therefore be disallowed.

11 **VII.**

12 **THERE ARE ADDITIONAL PROCEDURAL AND LEGAL BASES FOR OBJECTIONS**

13       **A.    The Claims Of All Non-Minors Should Be Disallowed Because They**

14                **Are Barred By The Applicable Statute Of Limitations.**

15       The Claims are based upon the use of chromium at PG&E compressor stations from 1952

16 through 1985. As conceded in various civil complaints filed by these Claimants in the California

17 state court actions, in December 1987 the presence of chromium in groundwater was reported to

18 state and local agencies. The Claims are therefore untimely on their face,[13] and each individual

19 Claimant must allege facts that demonstrate that Claimant did not discover – and that a

20 *reasonable person* could not have discovered – facts sufficient to raise even a suspicion of injury

21 until one year prior to joining this action. See McKelvey v. Boeing North American, Inc., et al.,

22 74 Cal. App. 4th 151, 160 (1999), rev. denied (Sept. 29, 1999) (upholding demurrer on statute of

23 _____

24 [13]   The Claims for personal injury (including negligence, negligence per se, strict liability, battery, and intentional infliction of emotional distress), wrongful death, and fraud are subject to a one-year statute of limitations. See Cal. Code Civ. Proc. § 340(3) (one-year statute for

25 personal injury or wrongful death claim); Magpali v. Farmers Group, Inc., 48 Cal. App. 4th 471, 485 (1996) (one-year statute on intentional infliction of emotional distress claim). In addition, a

26 one-year limitations period applies where, as here, the fraud Claims are based upon or grow out of personal injury Claims. See Nodine v. Shiley Inc., 240 F.3d 1149, 1153, n.2 (9th Cir. 2001)

27 (applying 1-year statute of Section 340(3) to fraud claim, rather than 3-year statute for general fraud claims because fraud claim grew out of plaintiff's underlying personal injury claim); San

28 Diego v. Sanfax Corp., 19 Cal. 3d 862, 871 (1977) (accord).

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

18

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

1    limitations grounds to injury claims alleging exposure to "toxic" chemicals released into

2    groundwater several decades before plaintiffs filed suit); O'Connor v. Boeing North American,

3    Inc., et al., 92 F. Supp. 2d 1026, 1039 (C.D. Cal. 2000) (applying McKelvey standard of pleading

4    discovery rule to dismiss personal injury claims as untimely).

5         All of the Claims made by adults identified on Exhibit A,[14] and particularly those made

6    by at least 150 Claimants who lived in or visited Hinkley after 1987, should be disallowed

7    because they are barred by the applicable statute of limitations.  By May 13, 1993, over

8    600 former and current Hinkley residents filed the first of a long line of personal injury lawsuits

9    against PG&E stemming from the use of chromium at Hinkley Station (the "Anderson lawsuit").

10   By June 1996, PG&E settled the Anderson lawsuit.  The contamination and the lawsuit were

11   widely reported in local, regional and national media.  See, e.g., "Nine Hinkley wells

12   contaminated" (The Barstow Desert Dispatch, December 12, 1987, front page); "PG&E admits

13   contamination" (The San Bernardino Sun, May 24, 1994, at B1) and "Utility sued over toxic

14   plume" (The San Bernardino Sun, June 27, 1993, front page); "PG&E to Pay $333 Million In

15   Pollution Suit" (The San Francisco Chronicle, July 2, 1996, Business Section front page).  The

16   television news media have been equally taken with the Hinkley chromium story.  In May 1994,

17   Fox 11 News aired a three-part news "exposé" about Hinkley, chromium, and the Anderson

18   lawsuit.  In May 1996, PrimeTime Live aired an episode nationally, detailing the Anderson

19   lawsuit and the discovery of possible chromium contamination in Hinkley.

20        In a factually similar case, the McKelvey court affirmed the grant of defendants'

21   demurrer against thousands of personal injury claims on statute of limitations grounds for failing

22   to state facts constituting a claim, and dismissed plaintiffs' personal injury claims without leave

23   to amend.  See McKelvey, 74 Cal. App. 4th at 160.  In unambiguous language, the McKelvey

24   court stated:

25            A plaintiff whose complaint shows on its face that his claim would
26            be barred without the benefit of the discovery rule must
             specifically plead facts to show (1) the time and manner of

27   ───────────────────────

28   [14]  The Chromium Claimants who were minors at the time their Claims were filed are identified
     with an asterisk on Exhibit A.

Latham & Watkins   LA_DOCS\744097.18 [W97]
ATTORNEYS AT LAW
LOS ANGELES                              19                    PG&E'S OMNIBUS OBJECTIONS
                                                              TO CHROMIUM CLAIMS

discovery and (2) the inability to have made earlier discovery despite reasonable diligence. *The burden is on the plaintiff to show diligence, and conclusory allegations will not withstand demurrer.*

Id. (emphasis added). The McKelvey court found plaintiffs' complaint insufficient because it alleged facts that occurred well before plaintiffs filed their action, yet failed to explain how or why plaintiffs untimely filed: "[T]hey say (without elaboration), they did not suspect any wrongdoing. . . . They do not allege that they were not aware of facts sufficient to make a reasonably prudent person sufficiently suspicious to investigate further. . . . In light of the facts they do allege, these omissions are fatal." See id. (citation omitted); see also Prudential Home Mortgage Co., Inc. v. Superior Court, 66 Cal. App. 4th 1236, 1246 (1998) (plaintiff must "plead facts showing an excuse for [the] late discovery of facts").

Jolly and McKelvey held that knowledge of similar lawsuits supports the existence of presumptive knowledge sufficient to bar invocation of the discovery rule. See Jolly, 44 Cal. 3d at 1108 ("plaintiff was aware of the pendency of one or more [similar] suits"); McKelvey, 74 Cal. App. 4th at 155 (noting plaintiff's allegations that there were "a series of lawsuits" prior to plaintiff's action). The Jolly and McKelvey courts also pointed to the existence of newspaper articles as another fact allowing a court to infer presumptive knowledge on the part of the plaintiff. See Jolly, 44 Cal. 3d at 1112-13 ("a timely investigation would have disclosed numerous articles concerning [similar] suits"); McKelvey, 74 Cal. App. 4th at 161 ("[plaintiffs] fail to explain how they managed to ignore those newspaper articles"). At least 150 of the Chromium Claimants lived in or visited Hinkley during the deluge of publicity after 1987. Given the volume of public information concerning prior lawsuits and chromium contamination, the adult Chromium Claimants on Exhibit A, and any other Claimants with similar access to this information, cannot meet the McKelvey requirements and their Claims should be disallowed.

**B.     Claimants Who Were Employed By PG&E Are Limited To The Remedies Provided By Workers' Compensation.**

When employees are injured in the course of their employment, they are limited to pursuing damages under the Workers' Compensation Act, Cal. Labor Code Section 3602, et seq.

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

20

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS

Case: 01-30923     Doc# 3162     Filed: 11/14/01     Entered: 11/16/01 09:49:00     Page 25
of 29

1  See, e.g., Hughes Aircraft Co. v. Superior Court, 44 Cal. App. 4th 1790, 1794 (1996). Thus,

2  where the Workers' Compensation Act is implicated by an employee's injuries, no civil action

3  will lie against the employer. See Privette v. Superior Court, 5 Cal. 4th 689, 697 (1993).

4        More than 50 Claimants allege that they were injured by their exposure to chromium

5  while working as PG&E employees at the compressor stations. Because Claimants alleged

6  injuries were sustained during the course of their employment for PG&E, their injuries are

7  covered by workers' compensation. Thus, absent some exception to the exclusivity of workers'

8  compensation, their Claims against PG&E cannot survive.

9        In order to avoid the exclusivity of workers' compensation, Claimants may allege that

10 PG&E concealed their injuries. This narrow fraudulent concealment exception to workers'

11 compensation exclusivity was first enunciated in Johns-Manville Products Corp. v. Superior

12 Court, 27 Cal. 3d 465 (1980), and was later codified in Labor Code Section 3602(b)(2). To meet

13 this exception, a Claimant must establish that: (1) the employer knew of the injury; (2) the

14 employer concealed the injury from the employee; (3) the employer concealed the connection

15 between the injury and the employment; and (4) the injury was aggravated because of the

16 concealment. See Hughes, 44 Cal. App 4th at 1794. The exception cannot apply to the Claims,

17 because written discovery responses provided during pending litigation confirm that these

18 Claimants were aware of the injuries claimed and sought and received treatment for those

19 injuries during their employment years ago. Their compensation, if any, is from the workers'

20 compensation system. The Chromium Claims of PG&E employees should be disallowed, in

21 whole or in part, because these employees cannot maintain civil claims for compensatory or

22 punitive damages.

23        **C.    The Claims Filed Do Not State A Valid Legal Or Equitable Basis For**

24               **Relief.**

25        The proofs of claim filed asserting Chromium Claims against the debtor do not set forth

26 sufficient justification for the Claims asserted and are not accompanied by supporting evidence.

27 A claim is valid only when the claim is properly filed and sets forth the facts necessary to

28 establish the claim. See In re Circle J. Dairy, Inc., 112 Bankr. 297, 300 (W.D. Ark. 1989). None

**Latham & Watkins** LA_DOCS\744097.18 [W97]
ATTORNEYS AT LAW
LOS ANGELES

21                    **PG&E'S OMNIBUS OBJECTIONS**
                     **TO CHROMIUM CLAIMS**

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 26
of 29

1  of the Claimants have alleged when, where, and how they were purportedly exposed to

2  chromium, how they were injured by that exposure and how their claimed individual damages

3  are estimated. The Chromium Claims are also subject to the defenses PG&E filed in responding

4  to the civil complaints listed above, including failure to state a cause of action, uncertainty,

5  laches, justification and privilege, estoppel and unclear hands, comparative fault, fault of others,

6  and failure to mitigate damages. Given the lack of specificity, and the defenses listed in PG&E's

7  General Denials and these Objections, all of the Chromium Claims should be disallowed.

8       **D.**    **The Claims Are Made For Inflated And Unsubstantiated Amounts.**

9       The generic Claims of the approximately 1,250[15] Claimants alleging that chromium used

10  at PG&E compressor stations caused personal injuries and other injuries provide no

11  substantiation for the amount of the Claim submitted. More than 1,000 of these Claimants have

12  filed Claims ranging from $10,000 to $10,000,000, which total more than $500 million. None of

13  the Claims provide any justification for the amount claimed.[16] There is no description of the

14  nature of the Claim (*e.g.*, personal injury, loss of consortium[17] or wrongful death), the alleged

15  exposure (*e.g.*, how long the Claimant lived or visited the area and how the Claimant allegedly

16  encountered chromium during those times), what illnesses the Claimant reportedly suffered

17  because of the exposure (*e.g.*, respiratory problems or more serious illness claims). A claim is

18  only valid if it sets forth all facts needed to establish the claim. See In re Circle J. Dairy, 112

19  Bankr. at 300; In re Marino, 90 Bankr. 25, 28 (D. Conn. 1988). The Chromium Claims should

20  be disallowed because there is simply no information provided in the Claims to substantiate or

21  estimate the value of the Claims made or the more than $500 million in damages sought in the

22  Claims.

23  ///

24

25  [15]   Approximately 200 of the Chromium Claimants have filed duplicate Claims, one signed by
the Claimant and one by the Claimant's attorney. The duplicate Claims filed by counsel should
26  be disallowed.

27  [16]   In addition, more than 200 of the Claims are filed for "unknown" amounts.

[17]   Written discovery in pending litigation confirms that more than 150 of the Chromium Claims
28  are seeking tens of thousands of dollars each based only for an alleged loss of consortium.

**Latham & Watkins**
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

22

**PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS**

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 27
of 29

1    .         The Claims are also inflated because they seek to recover punitive damages[18] that should

2    be disallowed because they are contrary to the bankruptcy reorganization process.  Numerous

3    bankruptcy courts have recognized that because "the purpose of punitive damages is to punish

4    tortfeasors and to deter them from any wrongful conduct in the future, in the context of a

5    reorganization, neither purpose would be served by permitting the recovery of punitive

6    damages."  In re Hillsborough Holdings Corp., 247 B.R. at 512 (citing In re Johns-Manville

7    Corp., 68 B.R. 618 (Bankr. S.D.N.Y. 1987)); see also In re GAC Corp., 681 F.2d 1295, 1301, n.5

8    (11th Cir. 1982) ("Where the punitive damages claim is asserted against a representative of the

9    wrongdoer, whether it be a receiver, executor, or, as in this case, a trustee in bankruptcy, the

10   purposes for awarding punitive damages will not be furthered and thus the punitive damages

11   claim should not be allowed.")  In this case, PG&E stopped using water treatment products

12   containing chrome six more than 15 years ago.  No purpose is served by imposing punitive

13   damages against the reorganized PG&E for this historical practice.  Imposing such penalties also

14   could deny the reorganized PG&E entities the fresh start bankruptcy reorganization is supposed

15   to provide.  See In re Applebaum, 162 B.R. 548, 551 (Bankr. E.D. Cal. 1993).  Under the

16   circumstances, all Chromium Claims for punitive damages should be disallowed.

17                                          **VIII.**

18                          **CONCLUSION AND PRAYER FOR RELIEF**

19             Each of the approximately 1,250 Chromium Claims is subject to one or more of the

20   objections set forth above.  None of the 1,250 Chromium Claimants will be able to present

21   admissible scientific evidence that chrome six from the PG&E compressor stations was the cause

22   of the injuries alleged.  Many of these Claimants allege cancer (e.g., prostate, breast) or other

23   illnesses not associated with chromium.  As noted above, certain groups of Claimants will have

24   particular difficulty presenting any admissible scientific evidence that their alleged illnesses were

25   caused by claimed sporadic low level exposure to chrome 6, including more than 350 Claimants

---

26   [18]      The Claims filed do not distinguish between punitive and compensatory damages.
27   However, the pending civil actions by the Claimants seek both compensatory and punitive
     damages and the amounts asserted by Claimants seeking a specific dollar amount in their proofs
28   of claim cannot be substantiated as a compensatory damages.

**Latham & Watkins**  LA_DOCS\744097.18 [W97]
ATTORNEYS AT LAW
LOS ANGELES
                                                23              **PG&E'S OMNIBUS OBJECTIONS
                                                                TO CHROMIUM CLAIMS**

Case: 01-30923    Doc# 3162    Filed: 11/14/01    Entered: 11/16/01 09:49:00    Page 28
                                         of 29

1   who assert exposure at Kettleman area ranches, the more than 250 Claimants who assert

2   exposure by visiting the area of the compressor stations, and approximately 50 Claimants who

3   allege exposure at the Kettleman Station after 1982.  In addition, all of the adult Claims, and

4   particularly the Claims by more than 150 individuals who lived in or visited Hinkley after 1987,

5   are untimely.  PG&E will be filing dispositive motions to resolve the Objections described herein

6   and to disallow the unmeritorious Chromium Claims.

7          The enumeration of specific objections herein is without prejudice to any and all other

8   objections which PG&E may have and which may be asserted under the Bankruptcy Code and

9   the rules of this Court, including without limitation, any objections that may be revealed after

10  discovery is taken in these proceedings.

11         WEREFORE, PG&E respectfully requests that the Court enter an order disallowing the

12  Chromium Claims asserted by the Chromium Claimants, and awarding such other relief as is

13  just.

14  Dated: November __, 2001                    LATHAM & WATKINS
                                                Michael S. Lurey
15                                              Ernest J. Getto
                                                Kirk A. Wilkinson
16                                              Cynthia H. Cwik

17

18                                          By
                                                Ernest J. Getto
19                                          Attorneys for Debtor and Debtor-in-Possession
                                            Pacific Gas and Electric Company
20

21

22

23

24

25

26

27

28

Latham & Watkins
ATTORNEYS AT LAW
LOS ANGELES

LA_DOCS\744097.18 [W97]

24

PG&E'S OMNIBUS OBJECTIONS
TO CHROMIUM CLAIMS