FILED

01 DEC 12 PM 2:50

U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
SAN FRANCISCO, CA.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 01-30923DM |
| PACIFIC GAS & ELECTRIC COMPANY, | ) |
| | ) Chapter 11 |
| Debtor. | ) |

MEMORANDUM DECISION REGARDING APPLICATIONS
FOR INTERIM COMPENSATION OF PROFESSIONALS

I.  Introduction

A hearing was held on October 22, 2001, on interim
compensation applications of professionals and a final expense
application of the members of the Official Unsecured Creditors'
Committee ("Committee").  At the hearing the court considered the
applications of five law firms which represent Pacific Gas &
Electric Company, the above-named debtor ("Debtor"); Debtor's
financial and restructuring advisor; and the Committee's
attorneys, accountants, and financial advisors.  The court also
considered the requests by Committee members for reimbursement of
expenses.

During the course of the hearing the court approved, without
objection from the United States Trustee ("UST") or anyone else,
the application filed by Debtor's attorneys Cooley Godward LLP.

-1-

It also approved the application of Howard, Rice, Nemerovski, Canady, Falk & Rabkin, A Professional Corporation ("Howard Rice").[1]  It also approved without objection the application of Saybrook Capital, LLC ("Saybrook"), the Committee's financial advisor, and the expense request of the Committee members.  Orders have already been entered consistent with those allowances. The court took under advisement the remaining applications of the professionals, and invited further submissions by the UST and certain of the professionals as reflected on the record.  Since then the court has issued orders allowing without reduction the fees of Keker & Van Nest, LLP, special counsel to the Debtor, thus overruling the objections of the UST, and allowing the fees of Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), Debtor's special regulatory counsel, with a reduction of $7,287, thus sustaining, in part, the objections of the UST.

Also subsequent to the hearing the court entered orders allowing the fees of Ernst & Young Corporate Finance LLC ("EYCF"), Debtor's financial and restructuring advisor, with a total reduction of $42,315, and the fees of Heller Ehrman making adjustments, in part, based upon the court's own concerns and

---

[1]  The UST objected to Howard Rice's fees on one ground: that its work on the TURN accounting action and on other ancillary matters substantially overlapped with the work performed by Heller, Ehrman, White & McAuliffe LLP ("Heller Ehrman"), special counsel to Debtor.  In suggesting a remedy for the purported duplicative work, however, the UST directed her comments solely at Heller Ehrman; the UST sought supplementation of Heller Ehrman's application and reduction of Heller Ehrman's fees in the "ancillary services" category.  Inasmuch as the UST did not specifically object to Howard Rice's fees and instead focused exclusively on Heller Ehrman's fees, and to the extent Heller Ehrman has supplemented its fee application to address the UST's concerns, the court notes that the purported objection to Howard Rice's fees is not a meaningful substantive objection.

1  sustaining, in part, the objections of the UST, with a total
2  reduction of $18,466.20.

3      Concurrent with the issuance of this Memorandum Decision, the
4  court is issuing orders dealing with the remaining applications,
5  namely those of Milbank, Tweed, Hadley & McCloy LLP ("Milbank"),
6  counsel to the Committee, and PriceWaterhouseCoopers LLP ("PWC"),
7  accountants and financial advisors to the Committee.

8      In this Memorandum Decision the court explains its reasoning
9  for the adjustments that have been made and also sets forth some
10 guidance to the professionals for future compensation applications
11 that may be filed by these professionals or any others as this
12 case progresses.[2]

13 II.  General Considerations

14     The following represents the court's reasoning about items
15 charged by various professionals in the applications, some or all
16 of which may be the subject of future requests.

17     (a) Airplane Travel Time

18     Under this district's Guidelines For Compensation and Expense
19 Reimbursement of Professionals and Trustees ("Guidelines"),
20 promulgated pursuant to B.L.R. 9029-1, Guideline 17 indicates that
21 airplane travel time is not compensable except for work actually
22 done during a flight.  Guideline 17 further specifies that if
23 significant airplane travel time is expected in a case, specific
24 guidelines should be obtained for that case.  Some professionals

25 _____

26     [2]  The court regrets and apologizes to the professionals for
   the delay in issuing this Memorandum Decision, particularly if new
27 applications for compensation for later periods are already being
   prepared.  Appropriate adjustments may be necessary on some of
28 those applications.

-3-

have requested fees for time charged for airplane travel time notwithstanding the clear language of Guideline 17; none of them requested specific guidelines in advance. For this reason the court will not allow any of the portions of the applications that included airplane travel time.[3]

Notwithstanding the foregoing, anyone who has traveled since September 11, 2001, has become painfully aware of the difficulties and delays now being encountered when venturing forth to an airport and onto a plane. Thus, for air travel after September 11, 2001, the court will allow actual time charges for up to two hours per trip between any professional's principal office and the destination to which that professional must travel on business involving this case, and likewise up to two hours per return trip.

(b) <u>Conflict Checks/Ethical Walls</u>

Some professionals have included charges for time expended identifying and/or clearing conflicts and ascertaining and documenting their various connections as required by Fed. R. Bankr. P. 2014(a). Not only do some seek to be paid for clearing conflicts, they seek further compensation for avoiding conflicts and preserving confidences. While this type of work is not overhead in the traditional sense (see Guideline 22),[4] the court does not believe it is "reasonable" under 11 U.S.C. § 330(a)(1)(A) for professionals to charge the Debtor's estate for such

---

[3] This is why Skadden's request was reduced.

[4] Thus the cases cited by EYCF in its response to the UST's objections are not helpful. The court acknowledges that the work in this category is specific to Debtor's case; that does not make it compensable.

-4-

activities. This is not very different from a firm absorbing the time expended on its own efforts to secure a new client, for which the court doubts any professional would bill. Further, as pointed out by the UST, fees of this nature are routinely disallowed in this court.[5]

   (c) <u>File Management</u>

   While file management is generally part of office overhead and thus not reimbursable under Guideline 22 (Office Overhead) or Guideline 18 (Administrative Tasks), the court will allow reasonable charges under this category upon a proper showing that the demands of this case require efforts over and above the normal tasks performed by the professionals as part of their regular business activities.

   Nonetheless, the court believes that the use of paralegals or other para-professionals to perform such <u>clerical</u> tasks is a cost item, not a profit-generating fee item. As such, the firms shall be reimbursed the <u>actual</u> cost of obtaining such services. In other words, to the extent a firm has to hire or devote personnel to file management, a firm should receive <u>only</u> an hourly fee that represents the <u>actual</u> hourly pay (plus additional amounts to

---

   [5] The only published case presented to the court on this issue is <u>In re Bennett Funding Group, Inc.</u>, 213 B.R. 234 (Bankr. N.D.N.Y. 1997). There the court devotes three sentences and no analysis to the issue, concluding that just over ten thousand dollars is a reasonable amount for the trustee's counsel to charge for performing a conflicts check. That is insufficient precedent or authority to change the practice here. The Ninth Circuit has recognized that because of the particularly burdensome task of preparing fee applications, time expended in preparing those applications is compensable. <u>In re Nucorp Energy, Inc.</u>, 764 F.2d 655 (9th Cir. 1985). Unless directed by a higher court or the Congress to allow compensation for preparing to become an employed professional, the court will not extend <u>Nucorp</u> and allow time expended for this type of work.

-5-

represent benefits and other employers' costs) of that employee.
The court does not know how much the para-professionals are
actually being paid; for the purposes of the current fee
applications the court will allow the firms to recover $40 an hour
for these para-professionals.  This amount presumptively covers
the actual hourly rate paid to these individuals, plus other costs
of their employment.  In future fee applications, firms must
adjust their requested fees in accordance with these comments.
The hourly rate for this type of service should not exceed $40,
unless the applicant demonstrates to the satisfaction of the UST
that the actual direct and indirect costs of employing the
personnel handling file management exceed $40 an hour.  Before the
court will allow an hourly rate in excess of $40 for this type of
work, the professional applicant will have to certify that it has
provided the UST with evidence justifying a higher rate,
consistent with this decision.  If the UST disagrees, she may
object with a representation that the increased rate has not been
justified.  No specifics should be filed.  If the UST and the
applicant disagree on the proper rate, the court will hold a
hearing as appropriate, after first safeguarding any financial
information the applicant convinces the court should be kept
confidential.

    (d) <u>Use of Paralegals and Law Students</u>

    The court will consider charges by paralegals, law students
or others on a case by case basis, mindful of the caution in
Guideline 16 that the use of multiple professionals (including
para-professionals) must be justified.

-6-

(e) Generic Entries

Guideline 13 (Descriptions) requires time entries to identify the person performing the services, the date performed, what was done and the subject involved. Notations of telephone calls, conferences, research, drafting, etc., may result in disallowance. The court will look with a great deal of skepticism on generic entries such as "review file," etc.

(f) Multiple Professionals

Several applicants charged time by multiple professionals to attend one meeting or one hearing. Guideline 16 states that "Professionals should be prepared to explain the need for more than one professional or para-professional from the same firm at the same court hearing, deposition or meeting. Failure to justify this time may result in compensation for only the person with the lowest billing rate."

The court acknowledges that in this case, where meetings are frequent, it would not necessarily be efficient to justify each meeting involving multiple professionals. Nonetheless, the court does want a general explanation for the use of multiple professionals and a specific explanation for any meeting in which significant fees are incurred. Further, the court will require justification for the appearance of more than one professional at any court hearing. In other words, an applicant must identify each hearing involving multiple professionals and justify specifically the use of professionals at each such hearing.

(g) The Guidelines

Following the hearing on the fee applications, one of the professionals suggested that the court should have held a status

-7-

conference so that the professionals could know what services and costs would be compensable. The court notes that its Guidelines serve this purpose; they clearly define the parameters of acceptable billing and cost items. The court understands that many of the firms now seeking compensation actively solicited and competed for the opportunity to represent the Debtor and the Committee in this case, knowing that the case was pending in San Francisco and that the Northern District of California Bankruptcy Court had adopted the Guidelines. Had the professionals adhered closely to the Guidelines, many of the objections raised by the UST would be moot. All applicants should familiarize themselves with the Guidelines prior to the submission of further fee applications.

(h) <u>Fees For Supplementing Fee Applications</u>

The court is allowing many requested fee and cost items based on supplemental materials provided by applicants after the UST objected to initial applications. The UST noted at the hearing (and the court agrees) that it was forced to object to the applications because some applicants initially failed to provide adequate narrative or adequate explanations for deviations from the Guidelines. Had the applicants simply and sufficiently described the work performed in their initial applications, the UST would not have been forced to object and the estate would not have incurred the cost of having the professionals supplement their fee applications. The UST correctly responded to what it was provided by the professionals. The court appreciates this enormous effort by the UST and her staff.

Because the estate should not bear the expense of having

-8-

professionals supplement inadequate applications and because the applicants should not benefit from their initial failure to comply with the Guidelines, the court will in the future disallow any fees and costs associated with the supplementation of the fee applications. Applicants should heed this directive when submitting future fee applications, and not request recovery of such fees.

## III.  Specifics As To Remaining Professionals

### (a) Milbank

The UST objected to Milbank's fees in the following areas:

#### (i) Regulatory Matters

The UST complains that Milbank requested $659,810 for regulatory and legislative matters, originally describing work in that area in only three general categories: business operations, business analysis, and other litigation. The UST correctly points out that Milbank did not initially provide adequate information to illustrate the benefits achieved by its efforts, and why those efforts were necessary. Going further, the UST also correctly complained about generic descriptions by Milbank such as "tracking," "review and analysis," and "monitoring."

In response, Milbank provided a further description of its work in the foregoing general area subdivided into thirty-five categories. But again, as required by Guideline 3, it did not provide dollar amounts for the work performed in each category. In his supplemental declaration filed on October 26, 2001, Mr. Feo acknowledged the confusion and has undertaken to provide more clarity. In response, the UST then complained that there is heavy concentration of work in certain matters (e.g., FERC refund

-9-

settlement procedures; "creditworthiness" issues, etc.) but only light involvement in others (El Paso proceedings; filed rate cases; "ring fencing," etc.). The UST then jumps to the conclusion that this disparate level of work in similar categories translates into a lack of helmsmanship and a lack of effective oversight of case strategy.

While this is a convenient criticism to make, the court has no basis to reach the same conclusion. Frankly, it seems more like spirited advocacy than a thorough analysis that leads the UST to use such pejorative terms.

The court is not able to second-guess the professionals who have performed the work, particularly in the face of the Committee's support for Milbank's request and Debtor's lack of opposition to it. The court cannot know the thought processes or strategies of the professionals; it can only judge these matters from an overall sense of reasonableness or unreasonableness. The fees requested by Milbank for this work are reasonable.

That being said, the court is troubled by Milbank's failure to comply with the Guidelines to the same degree that other professionals whose applications have come before the court have done so. While the UST suggests a punitive adjustment of nearly $66,000, the court believes some more modest adjustment for Milbank's failure to comply with the Guidelines, even after its supplemental filings, is appropriate. Thus, for the vague entries and lack of specific cost analysis by category, and not based on a decision assessing the importance of one project versus the lack of importance of some other project, the court will reduce Milbank's application by $15,000. See paragraph II(e) and

-10-

Guideline 13.

### (ii) Overlap With Saybrook

The court is satisfied that Saybrook and Milbank were brought into this case to perform different assignments for the Committee, and that by and large they have done so. As with the difficulty in analyzing the specific tasks as set forth in the foregoing subparagraph, the court also finds it virtually impossible to evaluate the work of the attorneys at Milbank in comparison with the work of the financial advisors at Saybrook. To the extent there is some degree of overlap between work performed by these two professional firms, and perhaps by PWC as well, that is more likely a natural consequence of the extreme complexity of Debtor's affairs and this case, a condition that the court will not use as an offensive weapon to penalize Milbank or any other particular professional.[6]

### (iii) Commodities Trading Motion and Public Relations Firm Motion

The court accepts Milbank's explanation regarding the history of and necessity for these motions. The fees for these services will be allowed.

### (iv) Plan Process

The court accepts Milbank's explanation regarding the need to maintain confidentiality concerning the evolution of Debtor's Plan of Reorganization, and Milbank's contribution to that process. The fees for these services will be allowed. Nevertheless, as

---

[6] If and when the UST, the Debtor or the Committee believes that any professional is taking advantage of the complexity of this case in order to generate fees, this issue can be revisited by the court.

-11-

this case progresses, and Debtor supplements and revises its current Plan of Reorganization and Disclosure Statement, the court will expect on an on-going basis Milbank's exercise of billing judgment in making sure that it is not duplicating Debtor's efforts.

>(v)    Overhead and Administrative Time (Including Use
>        of Case Clerk

The court appreciates that having an attorney review and delegate in-coming matters is essential and actually a very cost-effective way to handle the vast legal issues presented.  The court also appreciates that having a case clerk handle the filing and organization is optimal in a case of this magnitude, particularly where the firm is not involved in one isolated or specialized project.  The court will allow Milbank to recover file management and calendaring costs related to its non-lawyer working on the case.  Nevertheless, as indicated in subparagraph II(c), Milbank shall be entitled to recover only the <u>actual</u> direct and indirect costs of retaining such a case clerk; the case clerk shall not be a profit-generating entity.  For the purposes of this application, the court will allow an hourly rate of $40 as reasonably representing the actual direct and indirect costs of employing a case clerk.  See subparagraph II(c).

According to the UST, Milbank charged $100 an hour for 314.8 hours in services provided by its case clerk.  The court will allow Milbank to recover $12,592 (314.8 hours at $40 an hour), and will disallow $18,888 in fees charged in this category.

-12-

1    (vi) Non-working Travel Time

2    For the reasons discussed in subparagraph II(a), the court

3    will disallow Milbank's travel charges in the amount of $37,256.

4    (vii) Printer

5    In response to the UST's objections, Milbank withdrew its

6    charge of $3,275 for a printer.  This amount will be deducted from

7    the costs allowed.

8    Based on the foregoing, Milbank's requested fees will be

9    reduced by $71,144 and its requested costs will be reduced by

10   $3,275.

11   (b) Heller Ehrman

12   The UST objected to charges for some of the services

13   performed by Heller Ehrman relating to the TURN accounting action,

14   Heller Ehrman's "ancilliary services," work that appeared to

15   overlap that performed by Keker & Van Nest LLP on

16   "seller/generator issues," and finally what the UST called

17   administrative time billed by various paralegals and members of

18   Heller Ehrman's staff.

19   The court is satisfied from the explanations presented at the

20   hearing and the declaration of Robert L. Bordon, Deputy General

21   Counsel of Debtor, that Heller Ehrman's work on the three

22   substantive matters mentioned above are not duplicative, were

23   necessary, and that the charges Heller Ehrman has submitted for

24   that work are reasonable.  Thus to the extent the UST persists in

25   her objection for these categories of work, the objection is

26   overruled.

27   The more difficult analysis comes about because the court

28   must examine the UST's remaining objection, namely, charges by

-13-

various non-lawyers within Heller Ehrman for work they have performed in this case. The court is not unmindful of Mr. Bordon's complete satisfaction with Heller Ehrman's work in this regard. That being said, the court also appreciates the thorough analysis of these charges made by the UST and her concern over the possibility that general overhead work is being billed under the guise of para-professionals. The UST correctly refers to Guideline 5, requiring that para-professionals be identified by their qualifications, that their services reflect specialized training, and that they perform services that might normally be done by a professional.

The court has reviewed carefully the time records of the six individuals identified within the Heller Ehrman application and questioned by the UST. As noted in subparagraph II(d), the court must examine work of this nature on a case by case basis.

(i) <u>David Luster, senior litigation paralegal</u>.

Mr. Luster is highly qualified and his declaration demonstrates his enormous value to the firm and to his client, the Debtor. His billing rate of $140 an hour is reasonable. What is troublesome about his charges, however, are that his time entries are nondiscriptive. See Guideline 13 and subparagraph II(e). In particular, he has expended what the court estimates to be 35.8 hours doing what Mr. Luster himself describes as reviewing daily newspapers and other publications carrying articles about Debtor and the California energy crisis, and circulating these articles to attorneys within the firm. The court cannot figure out why a person of Mr. Luster's experience and value should be doing the kind of work that no doubt could be done by in-house personnel at

-14-

Debtor who are in media relations and public relations, or, as suggested by the UST, are to be found either within Debtor's or Heller Ehrman's library staff. Further, Mr. Luster's time entries include 9.9 hours in performing work described as reviewing appellate rules. This task has not been justified. The court has disallowed the aggregate of 45.7 hours, or $6,398 for these charges.[7]

(ii) <u>M. Brett Stone, litigation paralegal</u>.

Mr. Stone's resume, accompanying the Certification of Peter J. Benvenutti, does not establish his credentials or professional experience sufficiently to convince the court that his work should be billed at $90 per hour. While the court accepts the representations of Mr. Bordon and Heller Ehrman concerning the need to staff the Debtor's projects specifically, this hourly rate is not justified. . For this work the court will permit an hourly rate of $40. See subparagraph II(c). Based upon Mr. Stone's time entries assembled by the UST of 25 hours, totaling $2,250, an adjustment to the reduced hourly rate of $40 resulted in a reduction of the requested fees by $1,250.

(iii) <u>Cheryl Morris, litigation paralegal</u>.

Ms. Morris' credentials establish her entitlement to be billed at her hourly rate of $68, even though some of her duties are secretarial in nature. The time charges are reasonable and no

---

[7] Mr. Luster and others at Heller Ehrman and other firms involved should consider avoiding reductions in the future by departing from the practice of using the same routine entries for their charges. The professionals in Heller Ehrman and most of the other firms coming before the court have adequately complied with Guideline 13, and there is no reason why the para-professionals should not do so also.

-15-

adjustment will be made for her work.

                (iv) <u>Ann Constantine, senior paralegal manager</u>.

Ms. Constantine's credentials justify her hourly rate and her work falls within the category contemplated by Guideline 5. The time charges are reasonable and no adjustment will be made for her work.

                (v) <u>Nneka Nwosu, litigation paralegal</u>.

Ms. Nwosu's resume does not establish that she is entitled to billed as a paralegal. Further, Heller Ehrman has not explained how her time can be charged at $113 an hour. The work she has performed is more clerical and administrative in nature. It is not that of a trained paralegal. The UST has identified 93.4 hours, which at $113 an hour amounts to charges totaling $10,554.20. As with Mr. Stone above, Ms. Nuosu's has been allowed at $40 an hour, resulting in fees of $3,736, and a reduction of $6,818.20. See subparagraph II(c).

                (vi) <u>Jennifer Lynne Gordon, litigation & corporate paralegal</u>.

Ms. Gordon's credentials justify her hourly rate and her work falls within the category contemplated by Guideline 5. The time charges are reasonable and no adjustment will be made for her work.

The certification of Peter J. Benvenutti acknowledges that approximately $4,000 has been billed for airplane travel time. Heller Ehrman's fees have been reduced by $4,000 for this time. See subparagraph II(a).

Based upon the foregoing, Heller Ehrman's requested fees have been reduced by $18,466.20. An order allowing fees in the amount

-16-

of $2,095,773.32 and expenses in the amount of $150,554.49 was issued on November 21, 2001.

     (c) <u>PWC</u>

The UST objected to PWC's fee application in the following areas:

          (i) <u>Use of Multiple Professionals</u>

Except for the specific exceptions noted below, PWC has justified the use of multiple professionals at various meetings. Neither the court nor the UST attended these meetings and cannot second-guess the professional judgment of PWC that key personnel with differing expertise needed to be present. The court assumes that while the PWC professionals were "multi-tasking" at the meetings, all such tasks involved PG&E and not other matters.[8] If the applications hinted at unnecessary duplication, the court assumes that the debtor -- who is paying the bills of these professionals -- would object. The court will therefore allow all fees where multiple professionals attended hearings, except those identified below (in which case no satisfactory explanation was provided or the meetings appear to involve delegation of work as opposed to matters involving accounting and financial expertise of the participants). See subparagraph II(f) and Guideline 16.

With respect to the meetings identified below, only the fees of Thomas Lumsden will be allowed. The court will also disallow fees where multiple professionals attended court hearings.

---

    [8] The court would question the ethics of any professional billing two different clients for the same time.

-17-

1  Disallowed Fees:

2      April 18, 2001 (Staff Meeting)

3      Theodore Huang ($570)
       Floris Iking ($475)
4      Margery Neis ($617.50)
       David Ortwein ($380)
5      Ryan Perfit ($380)
       Allison Young ($712.50)

6
       July 3, 2001 (Staff Meeting)
7
       James Drzemiecki ($445.50)
8      Mike Hamilton ($576)
       Margery Neis ($292.50)
9      Wesley Smyth ($270)
       Allison Young ($337.50)
10
       July 16, 2001 (Exclusivity Conference Call)
11
       Rocky Ito ($225)
12     Freddie Reiss ($297.50)

13     May 8, 2001 (Court Hearing)

14     Rocky Ho ($630)
       Freddie Reiss ($833)
15
       May 24, 2001 (Court Hearing)
16
       Rocky Ho ($3,105)
17
       June 5, 2001 (Court Hearing)
18
       Mike Hamilton ($1,536)
19     Freddie Reiss ($1,071)

20     July 13, 2001 (Court Hearng)

21     Mike Hamilton ($896)

22     July 23, 2001 (CPUC Hearing)

23     David Ortwein ($620)

24     In total, the court will disallow $14,270 for use of multiple

25  professionals at meetings and hearings.

26          (ii) Financial Grid Modeling

27     The court is satisfied from the explanation provided by

28  Mr. Lumsden that these services were reasonable and necessary.  No

-18-

adjustment will be made.

(iii) <u>Creation of Extranet Website</u>

The court is satisfied from the explanation provided by Mr. Lumsden that these services were reasonable and necessary. No adjustment will be made.

(iv) <u>Travel</u>

The court acknowledges that PWC has made some voluntary adjustments with respect to time billed for travel. Nonetheless, PWC must still follow the Guidelines. See subparagraph II(a). Therefore, the court will disallow $52,315 in fees incurred for travel time.

(v) <u>Conflict Checks and Ethical Walls</u>

The court will disallow fees relating to conflict checks and ethical walls. See subparagraph II(b). The court will therefore disallow $55,587 in fees.

(vi) <u>Creation of Time and Billing System</u>

PWC conceded the UST's objection that building a time-keeping system cannot be billed to the estate. Similarly, the actual clerical input of time into time records should not be billed to the estate. The court will therefore disallow the $63,850 in fees attributable to this project.

Based on the foregoing, PWD's requested will be reduced by $186,022.

(d) <u>EYCF</u>

At the hearing on October 22, 2001, the representative of EYCF was given time to submit a further description of work performed by his firm. The UST was given seven days thereafter to respond. On November 2, 2001, the UST filed a Reply in respect of

-19-

several of the professionals' applications, including that of

EYCF.  In that Reply the UST responded only to the EYCF arguments

concerning conflicts, or "connections" checks.  From this the

court concludes that EYCF has no intention of submitting any

further information concerning the nature and extent of the work

it performed.

EYCF asked for $50,000 for a category described as "Firm

Retention."  Apparently it sought even more, but entered into a

compromise with Debtor, fixing the amount for this category at

$50,000.[9]  Nevertheless, the UST determined that within the time

entries totaling $50,000, charges totaling $29,705 should be

disallowed.  The court agrees with the UST for the reasons stated

in subparagraph II(b); it also observes that the balance in this

category, in excess of $20,000, probably is itself overly generous

but will not be reduced further.

Category 12 of the EYCF application is entitled "Analysis Of

Bankruptcy Schedules And Statement Of Financial Affairs."  A total

of $63,527.50 was sought for this work, resulting in a blended

hourly rate of approximately $495.  Within that total, however,

are 54.9 hours charged by two of the three highest hourly rate

professionals of EYCF who have worked on this case.  While the

court acknowledges again (as it has many times throughout this

case) that this case is exceedingly complex and no doubt presents

almost unprecedented problems in every aspect of case

administration and legal issues to be encountered, EYCF has still

---

[9]  This amount represents approximately 9% of the total
amount sought by EYCF, an extraordinarily large percentage of the
total request under the circumstances.

-20-

not justified why professionals at the top of the billing ladder must spend over 40% of the time on this project. The court has reduced the amount requested in this category by $6,500, calculated by taking the time spent by those two highest priced professionals and adjusting it to the overall blended rate for EYCF's work during the period covered by the First Interim Fee Application.

EYCF has charged $6,110 in Category 55 for preparing for and participating in the education of Debtor's employees about bankruptcy terms and procedures. The court is not satisfied that this is a necessary task to be performed by Debtor's financial and restructuring advisor given the Debtor's highly capable in-house legal staff and outside bankruptcy counsel. $6,110 has been disallowed for this work.

Based on the foregoing, EYCF's fees have been reduced by $42,315. An order allowing fees in the amount of $513,967.50 was issued on November 21, 2001.

IV.  <u>Conclusion</u>

With the exception of Milbank and PWC, the court has already entered orders on the various applications for interim compensation addressed in this Memorandum Decision. Concurrent with the issuance of this Memorandum Decision, the court is entering orders allowing the fees and expenses, as adjusted, of Milbank and PWC.

Dated: December 12, 2001

Dennis Montali
United States Bankruptcy Judge

-21-

1       I, the undersigned, a regularly appointed and qualified clerk in the office of the Bankruptcy Judge of the United States Bankruptcy Court for the Northern District of California, at San Francisco, hereby certify:

2

3

4       That I, in the performance of my duties as such clerk, served a copy of the foregoing document by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's Office, or by facsimile to the facsimile numbers listed below, at San Francisco, California, on the date shown below.

5

6

7

8

Dated: December *12*, 2001

9

                              Dorothy A. Timo

10  See Attached Service List

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

```
 1   Janet A. Nexon, Esq.
     Howard, Rice, Nemerovski,
 2   Canady, Falk & Rabkin
     Three Embarcadero Ctr., 7th Fl.
 3   San Francisco, CA 94111-4065

 4   Marie L. Fiala, Esq.
     Heller Ehrman White & McAuliffe LLP
 5   333 Bush St.
     San Francisco, CA 94104-2878
 6
     Robert Jay Moore, Esq.
 7   Milbank, Tweed, Hadley & McCloy LLP
     601 South Figueroa St., 30th Fl.
 8   Los Angeles, CA 90017

 9   J. Michael Kelly, Esq.
     Cooley Godward LLP
10   One Maritime Plaza, 20th Fl.
     San Francisco, CA 94111-3580
11
     Eric Carlson, Esq.
12   Ernst & Young Corporate Finance LLC
     1451 California Ave.
13   Palo Alto, CA 94304

14   Robert J. Rosenberg, Esq.
     Latham & Watkins
15   885 Third Ave., Ste. 1000
     New York, NY 10022
16
     Steven A. Hirsch, Esq.
17   Keker & Van Nest, L.L.P.
     710 Sansome St.
18   San Francisco, CA 94111-1704

19   Thomas E. Lumsden, Esq.
     PricewaterhouseCoopers LLP
20   199 Fremont St.
     San Francisco, CA 94105
21
     Jonathan Rosenthal, Esq.
22   Saybrook Capital, LLC
     401 Wilshire Blvd., Ste. 850
23   Santa Monica, CA 90401

24   Richard Levin Esq.
     Jamie L. Edmonson, Esq.
25   Skadden, Arps, Slate, Meagher & Flom LLP
     Four Embarcadero Ctr.
26   San Francisco, CA 94111
```

United States Trustee
250 Montgomery St., Ste. 1000
San Francisco, CA 94104

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26