1  WALTER J. LACK (State Bar No. 57550)
   GARY A. PRAGLIN (State Bar No. 101256)
2  JOY L. ROBERTSON (State Bar No. 165150)
   ELIZABETH A. HERNANDEZ (State Bar No. 204322)
3  **ENGSTROM, LIPSCOMB & LACK**
   Sixteenth Floor
4  10100 Santa Monica Boulevard
   Los Angeles, California 90067
5  (310) 552-3800

6  THOMAS V. GIRARDI, State Bar No. 36603
   **GIRARDI & KEESE**
7  1126 Wilshire Boulevard
   Los Angeles, California 90017
8  Telephone: (213) 977-0211

9  EDWARD L. MASRY, State Bar No. 31016
   **LAW OFFICES OF MASRY & VITITOE**
10 5707 Corsa Avenue, Second Floor
   Westlake Village, California 91362
11 Telephone: (818) 991-8900

12 Attorneys for Chromium Litigation Plaintiffs

FILED
DEC 2 1 2001
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

13        **UNITED STATES BANKRUPTCY COURT**

14        **NORTHERN DISTRICT OF CALIFORNIA**

15        **SAN FRANCISCO DIVISION**

16 In re                                    ) Bankruptcy Case No. 01-30923SFM11
                                            )
17 PACIFIC GAS AND ELECTRIC                 ) Chapter 11
   COMPANY, a California Corporation,       )
18                                          ) **CHROMIUM LITIGATION**
                  Debtor,                   ) **CLAIMANTS' RESPONSE TO**
19                                          ) **PACIFIC GAS & ELECTRIC**
   Federal I.D. No. 94-0742640             ) **COMPANY'S OMNIBUS**
20                                          ) **OBJECTIONS TO CHROMIUM**
                                            ) **CLAIMS**
21                                          )
                                            ) **[DECLARATION OF JOY L.**
22                                          ) **ROBERTSON AND CLAIMANTS'**
                                            ) **APPENDIX OF NON-**
23 _____ ) **FEDERAL CASES FILED**
                                              **CONCURRENTLY HEREWITH]**
24

25

26

27                                            3985

28     The Chromium Litigation Plaintiffs respectfully submit the following Memorandum of

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

1    **MEMORANDUM OF POINTS AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . 1

2    1.    BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

3    2.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

4    3.    SUMMARY OF CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

5    4.    PG&E'S OVERVIEW OF THE SCIENCE IS INCOMPLETE

6          AND MISLEADING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7    5.    THE REAL FACTS ABOUT CHROMIUM 6. . . . . . . . . . . . . . . . . . . . 4

8          A.    PG&E Admits Chromium 6 Is Highly Toxic. . . . . . . . . . . . . . . 4

9          B.    PG&E Admits Chromium Causes Cancer. . . . . . . . . . . . . . . . . . 5

10         C.    PG&E Admits That Chrome 6 Is Mutagenic, Carcinogenic And
                 Teratogenic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

11

12         D.    PG&E Admits that Hexavalent Chromium is Absorbed by Humans. . . . . . . . 7

13         E.    PG&E's Own Expert has Documented Elevated Chromium Levels in
                 the Urine of Hinkley Residents. . . . . . . . . . . . . . . . . . . . . . . . 7

14         F.    The State of California Regards Hexavalent Chromium as a Human
15               Carcinogen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

16         G.    The U.S. EPA/ATSDR Considers Chromium to be Carcinogenic by
                 Inhalation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

17         H.    IARC Regards Chromium 6 as a Human
18               Carcinogen. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

19         I.    Animal Data Proves Chromium 6 is Carcinogenic by Ingestion . . . . . . . . . . . 9

20   6.    MULTIPLE STUDIES ASSOCIATE CHROME 6 WITH CANCERS OTHER THAN
           THE LUNG. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

21   7.    THE STATE OF CALIFORNIA REGARDS CHROMIUM 6 AS CARCINOGENIC
22         BY INGESTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

23   8.    PG&E'S CHARACTERIZATION OF PLAINTIFFS' EXPOSURE AS "MINIMAL"
           IS OFFENSIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

24   9.    THE CHROMIUM CLAIMANTS HAVE ESTABLISHED CAUSATION. . . . . . . . 11

25         A.    PG&E Misrepresents the Law Regarding Specific Causation. . . . . . . . . . . 11

26         B.    California Uses the "Substantial Factor" Test For Cause in Fact
                 Determinations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

27
28

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

C. Defendant Deliberately Misleads The Court About Plaintiffs Burden of Proof Under the Substantial Factor Test. . . . . . . . . . . . . . . . . . . 13

   (1) Plaintiffs Are Not Required to Show That Their Exposure to Chromium "More Likely Than Not" Caused Their Injuries. . . . . . . . . . . . . . . . . . . . . . . . . . 13

   (2) Plaintiffs Are Only Required to Show that In a Reasonable Probability Their Exposure Was a Substantial Factor Contributing to the *Risk* of Plaintiffs' Illnesses. . . . . . . . . . . . . . 13

D. Plaintiffs Experts Used Proper Methodology . . . . . . . . . . . . . . . . . . 15

   (1) Reliance on Animal Studies is Proper Methodology. . . . . . . . . . . . . 15

   (2) Reliance on Toxicological Studies is Proper Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

   (3) Plaintiffs' Experts Considered Dose and Exposure. . . . . . . . . . . 17

E. Dr. Teitelbaum Did Not Admit That There Was No Scientific Literature to Support His Opinions. . . . . . . . . . . . . . . . . . . . . . . 17

F. Proper Scientific Methodology Does Not Require Plaintiffs' Experts to Quantify the Precise Dose In Order to Establish a Causal Link Between Chromium Exposure and Illness. . . . . . . . . . . . . . . . . . . . . 18

10. PG&E IS ATTEMPTING TO RE-LITIGATE ISSUES WHICH HAVE ALREADY BEEN DECIDED BY THE STATE COURT. . . . . . . . . . . . . . . . . . . . . . . . 19

A. The Superior Court of the State of California Has Declined to Dismiss Plaintiffs' Claims Based Upon the Statute of Limitations. . . . . 19

B. The Superior Court of the State of California Has Ruled That Worker Compensation Does Not Bar the Claims of PG&E Employees. . . . . . . . 20

11. PUNITIVE DAMAGES ARE APPROPRIATE IN THIS CASE. . . . . . . . . . . . . . 21

A. PG&E KNEW OF THE CHROMIUM CONTAMINATION . . . . . . . . 21

   (1) Hinkley. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   (2) Topok. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   (3) Kettleman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

B. PG&E KNEW THAT CHROMIUM WAS TOXIC . . . . . . . . . . . . . . . 22

C. PG&E CONCEALED THE CHROMIUM CONTAMINATION FROM THE PUBLIC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

12. THE CLAIMS MADE BY PLAINTIFFS ARE NOT INFLATED . . . . . . . . . . . . 25

13. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELI.DOM.ELI.PO.Documents:160200.1

# TABLE OF AUTHORITIES

## FEDERAL CASES

Daubert v. Merrell Dow Pharmaceutical, Inc.,
   43 F.3d 1311 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Kennedy v. Southern California Edison
   (2000) 219 F.3d 988 . . . . . . . . . . . . . . . . . . . . . . 12, 13, 15

## STATE CASES

Bockrath v. Aldrich Chemical Co.,
   (1999) 21 Cal.4th 71 . . . . . . . . . . . . . . . . . . . . . . . . . 15

Crawford v. Workers Compensation Appeals Board
   (1986) 185 Cal.App.3d 1265, [230 Cal.Rptr. 425] . . . . . . . . . . . . 20

Lineaweaver v. Plant Insulation Company
   (1995) 31 Cal.App.4th 1409, [37 Cal.Rptr.2d 902] . . . . . . . . . . . 12

Mitchell v. Gonzales
   (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913] . . . . . . . . . . . . . . 12

People v. Leahy
   (1994) 8 Cal.4th 587, [34 Cal.Rptr.2d 663] . . . . . . . . . . . . . . 13

Rutherford v. Owens-Illinois inc.,
   (1997) 16 Cal.App.4th, 953 [67 Cal.Rptr.2d 16,
   [941 P.2d 1203] . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14

## MISCELLANEOUS

BAJI No. 376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

BAJI No. 3.77 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Case: 01-30923   Doc# 3985   Filed: 12/21/01   Entered: 12/28/01 14:54:00   Page 4 of
31

# MEMORANDUM OF POINTS AND AUTHORITIES

## 1. BACKGROUND

The law offices of Engstrom, Lipscomb & Lack, Girardi & Keese and Masry and Vititoe have been involved in litigation against PG&E for chromium contamination for approximately 8 years. The original case, <u>Anderson v. Pacific Gas &Electric Co.</u>, Case No. BCV 00300, Superior Court for the County of San Bernardino, was filed in 1993 on behalf of 650 Hinkley residents. The <u>Anderson</u> plaintiffs sued PG&E for damages arising out of exposure to chromium at the Hinkley Compressor station. The parties agreed to a binding arbitration for certain Test Plaintiffs. The first group of Test Plaintiffs were tried to Retired Justice Jack Trotter and Retired Judge Daniel H. Weinstein. The second group of cases were tried to a panel of three judges, Retired Justice Jack Goertzen, Retired Judge Harry Peetris and Retired Judge Jack Tenner. The <u>Anderson</u> case ultimately settled for $333,000,000.00.

The current cases consist of 1,035 plaintiffs in eight (8) separate lawsuits filed against PG&E for injuries sustained as a result of exposure to chromium 6.[1] Each of these 1,035 plaintiffs is a creditor to PG&E. Each plaintiff has filed a Proof of Claim form. There are approximately 811 personal injury claims, 210 wrongful death claims and 168 claims for loss of consortium. Every case seeks punitive damages. Therefore, these cases present PG&E with potential liability of hundreds of millions of dollars.

The vast majority of plaintiffs are in the <u>Acosta</u>, <u>Aguayo</u> and <u>Aguilar</u> cases. These three (3) cases have been deemed related cases. A total of 911 plaintiffs are in these 3 related cases. The remaining 124 plaintiffs are in the <u>Baldonado</u>, <u>Bowers</u>, <u>Boyd</u>, <u>Puckett</u> and <u>Miller</u> cases. The related cases have been pending in Los Angeles for almost 7 years. The <u>Aguayo</u> <u>Acosta</u> and <u>Aguilar</u> cases

---

[1] The 8 cases are: <u>Acosta v. Pacific Gas & Electric Company, et. al.</u>, Case Number BC 16111669; <u>Aguayo v. Pacific Gas & Electric Company, et.al.</u>, Case Number BC 123749; <u>Aguilar v. Pacific Gas & Electric Company, et. al.</u>, Case Number BC 158588; <u>Baldonado v. Pacific Gas & Electric Company, et. al.</u>, Case Number BC 239104; <u>Bowers v. Pacific Gas & Electric Company, et. al.</u>, Case Number MC 012543; <u>Boyd v. Pacific Gas & Electric Company, et. al.</u>, Case Number 249693; <u>Puckett v. Pacific Gas & Electric Company, et. al.</u>, Case Number BC 247763; and <u>Miller v. Pacific Gas & Electric Company, et. al.</u>, Case Number BC262238.

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200 1

were filed against PG&E and Betz Laboratories in March of 1995, November of 1996 and May of 1997 respectively.[2]   After numerous demurrers in all 3 cases, the legal issues surrounding the sufficiency of the pleadings have now been resolved.[3]

In February of 2000 a confidential settlement was reached between plaintiffs and Betz Laboratories.  The settlement was for a substantial amount of money.  However, the amount of the settlement is confidential.

Throughout the years, hundreds of depositions have been taken.  A total of approximately 400 depositions had been completed at the time PG&E declared Bankruptcy.  After almost 5 years of discovery in these cases, 20 trial plaintiffs were selected for the first trial.  A pre-trial schedule was in place and expert witnesses were being deposed. Had PG&E not filed for bankruptcy, this case would have gone to trial on July 2, 2001 in the Complex Litigation Division, Department 323 of the Central Civil West Branch of the Los Angeles Superior Court.  This is a specially designed court dedicated exclusively to the trial of complex or lengthy cases, modeled after the Federal system where one judge handles the case from cradle to grave.

## 2.   **INTRODUCTION**

PG&E's Omnibus Objection to Chromium Claims consists of  incomplete quotes, out context statements and outright misstatements of the law and chromium plaintiffs' experts' opinions. In its objection, PG&E asks this court to enter an order disallowing the claims asserted by the Chromium Litigation Plaintiffs. In doing so, PG&E has offered absolutely no evidence to support its position. Instead, PG&E simply asks this court to accept as true the numerous self serving conclusions which are made throughout this Objection. When the Court examines all of the evidence it is apparent that what this all boils down to is the fact that the experts on both sides

---

[2]      In February of 2000 a settlement was reached between plaintiffs and defendant Betz Laboratories.  The settlement was for a substantial sum of money. However, the amount of the settlement is confidential.

[3]      The Baldanado case was filed on October 25, 2000 in the Los Angeles Superior Court and was deemed related to the Aguayo, Aguilar and Acosta cases. Bowers, Boyd, Puckett and Miller were filed after PG&E declared bankruptcy and thus Notice of Related Cases could not be filed in order to officially deem these cases related.

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELI.DOM.ELI.PO Documents:160200 1

of this case disagree about the cause of the chromium litigation plaintiffs' injuries. This is not new. Experts always disagree. What is new, however, is PG&E's twisted, contrived, selective interpretation of the scientific literature on chromium VI.

### 3. SUMMARY OF CASE

PG&E operates a natural gas pipeline in California, which includes compressor stations at Hinkley, Kettleman and Topock, California. Since 1951, PG&E used chromium 6, a known carcinogen, as a corrosion inhibitor in the cooling towers at all three stations. Plaintiffs lived and worked near the Stations and were exposed to chromium VI through inhalation, ingestion and dermal contact of the contaminated air, water and soil.

A chromium contaminated mist was emitted from the cooling towers. This exposed the plaintiffs who breathed it. Wastewater contaminated with chromium 6 was discharged into huge unlined evaporation ponds. The wastewater rapidly percolated through the soil into the local groundwater supply. This exposed the plaintiffs to contaminated water through drinking, bathing and swimming. The wastewater was also sprayed into the air to accelerate the evaporation rate from the ponds and was emitted into the air through local irrigation. By the estimate of PG&E's own expert, it disposed of 26 tons of chromium 6 at Hinkley and approximately 33-39 tons of chromium 6 at Kettleman.

PG&E knew about the contamination, but concealed it from the local residents. A PG&E memo explains that the concealment was done to avoid "... undo alarm or establishing a difficult liability question." (PG40069241-42). (Exhibit 1) PG&E concealed the contamination from the governmental authorities such as the local Water Quality Control Boards and from the state of California. As a result, the chromium litigation plaintiffs were unknowingly exposed to chromium *for decades*.

### 4. PG&E'S OVERVIEW OF THE SCIENCE IS INCOMPLETE AND MISLEADING.

PG&E's Omnibus Objection downplays the toxicity and carcinogenicity of chromium 6. PG&E's "Overview of the Science" is nothing more than an incomplete misrepresentation of the real facts about chromium 6 exposure. PG&E knows that chromium 6 is highly toxic. In fact,

ENGSTROM, LIPSCOMB & LACK

PG&E has admitted that chromium 6 is highly toxic. To now represent to this court that there was no real problem with the drinking water is nothing more than an obvious attempt to mislead this court about the real facts of chromium 6.

## 5. THE REAL FACTS ABOUT CHROMIUM 6.

The real facts about chromium 6 are set forth below. These "real facts" are, in part, based upon PG&E's own admissions about the toxicity and carcinogenicity of chromium 6. Dating back as far as 1953, PG&E has been well aware of the problem of chromium 6 in drinking water. A December 10, 1953 PG&E memo regarding Drinking Water at the Topock Compressor Station warns that due to chromium contamination the water should be condemned for human consumption. (Exhibit 2, PG20078483).

### A. PG&E Admits Chromium 6 Is Highly Toxic.

On September 29, 1964, PG&E's claims and safety department prepared a memo regarding Chemical Toxicity, wherein PG&E rated potassium dichromate as "highly toxic" as an irritant, "highly toxic" by ingestion and "highly toxic" by inhalation. (Exhibit 3, PG40129221)

On March 29, 1966, a PG&E memo regarding the Soil and Water Survey at Hinkley stated that Chromate (CrO4) is considered toxic. The memo went on to state "... the reduction of the chromate takes precedence in that it is considered harmful." ((Exhibit 4, PG10101919)

On May 10, 1966, in a confidential summary of field data on the Hinkley Groundwater Study, PG&E's engineering geologist, Raymond Blum wrote as follows:

"A resultant effluent containing significant concentrations of dissolved chromic acid salt has been dumped or ponded on the ground surface in the area immediately northeast of the plant and allowed to percolate downward through the sandy soil to the groundwater table. It is estimated that this practice has existed for approximately 15 years.

* * *

This development led to immediate and understandable concern in as much as:

1. "Chromate is known to have toxic effects on man."(Exhibit 5, PGQ160200-201)

### B. PG&E Admits Chromium Causes Cancer.

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

PG&E's study on it's Hinkley Cooling Towers states:

"Hexavalent chromate is a toxic pollutant which will cause nausea and cancer. Chromium is toxic to plants at all concentrations and is toxic to animals and wild life above certain concentrations, depending upon the species. Both hexavalent and trivalent chromates are toxic, with lower forms of aquatic life suffering more from the effects.

Industrial hygiene reports indicate that workers who handled chromate have a much higher incidence of lung cancer than workers in other chemical factories. Chromate particles can develop lesions of the flesh (disappearing of the flesh) where they fall." (Exhibit 6, PG40043710-712)

### C.    PG&E Admits That Chrome 6 Is Mutagenic, Carcinogenic And Teratogenic.

On December 7, 1987, PG&E advised the local water board and the State of California about it's contamination problem at Hinkley. This was the first formal notice given by PG&E. Three days before that date, on December 4, 1987, PG&E's scientists at TES (Technical Environmental Services) wrote to PG&E's Geosciences Department in San Francisco (77 Beale Street) about an "intensive literature search" regarding hexavalent chromium. PG&E's intensive literature search, done at the time that it was going public, for the first time, with it's contamination of Hinkley, is the best evidence of what the world's scientific literature knew about chromium 6 at that time.

PG&E's memo on this subject is very enlightening. It says:

"On the other hand, the hexavalent form of chromium (Cr6) is toxic because it has a high oxidizing potential and it easily penetrates biological membranes.

***

**Under lab conditions, chromium is mutagenic, carcinogenic and teratogenic (birth defects) to a wide variety of organisms**, with Cr6 having the highest biological activity.

***

ENGSTROM, LIPSCOMB & LACK

In mammals, chromium is <u>causally</u> associated with mutations and malignancy. (Leonard & Lawsrys 1980; Norseth 1981). Under appropriate conditions, **Cr is a human and animal carcinogenic agent.**

The incidence of human cancers related to Cr is primarily from airborne sources. This has included chromate in manufacturing processes but could potentially include an aerosol from a shower if the concentrations in the water were high enough. Levels of Cr6 at 10ug\m3 in air produced strong irritation in nasal membranes after short exposure.

\*\*\*

Teratogenic effects induced by intravenous administration of 5mg Cr6\kg body wt to pregnant hamsters included cleft palates, and defect in the osification of the skeletal system (Gale 1978).

\*\*\*

Cr6 (11.2 ppm) administered in drinking water to dogs may cause accumulation to occur in many body tissues, the highest accumulation levels were found in the brain (Steven et al., 1976). (Exhibit 7, PG40108436-37)

\*\*\*

Based on exposure to chromium via inhalation, the IARC (IARC, 1982) have classified chromium and certain chromium compounds in Group 1 (chromium VI); sufficient evidence for carcinogenicity in humans and animals.

\*\*\*

Applying the criteria described in EPA's proposed guidelines for assessment of carcinogenic risk (US EPA, 1984), chromium may be classified in Group A; human carcinogen." (Exhibit 7, PG4108445)

### D.   PG&E Admits that Hexavalent Chromium is Absorbed by Humans.

Contrary to what PG&E is now saying, in 1988 PG&E prepared a report for filing with the Water Board regarding the Hinkley groundwater contamination. In that report, PG&E said

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

"Absorption of ingested hexavalent chromium is estimated to be less than 5%. Chromium may also be absorbed through the lungs and skin." (Exhibit 8, PG60002269). PG&E also stated "Less than half of the absorbed chromium is deposited in body tissues including the liver, kidney, spleen and bone marrow." (Exhibit 8, PG60002269). PG&E further stated "Chronic inhalation of chromium may cause pulmonary obstruction or asthma. Chromium is known to cause skin sensitization and subsequent contact dermatitis in some individuals following skin contact. There are no studies of humans with long term oral exposure to chromium." (Exhibit 8, PG60002270).

### E. PG&E's Own Expert has Documented Elevated Chromium Levels in the Urine of Hinkley Residents.

In April, 1988, PG&E's consultant, Environmental Health Associates found that the Hinkley residents "had higher urinary chromium levels compared to those living in residences without chromium contaminated wells." (Exhibit 9, PG10122308). That same report went on to find "Exposure to dusts or aerosols containing hexavalent chromium may cause irritation of the upper and lower respiratory tract." (Exhibit 9, PG10122311). That same report went on to acknowledge "There are no human or animal data to show ingested chromium is carcinogenic." (Exhibit 9)

### F. The State of California Regards Hexavalent Chromium as a Human Carcinogen.

When the State of California, Department of Toxic Substances Control began investigating PG&E for contamination at its Topock site, the State had its Human and Ecological Risk Section research the toxicity of chromium. The State of California found:

"Since hexavalent chromium is a potent known human carcinogen when inhaled, exposure to fugitive dusts accounts for 85% of the risk at these soil levels." (Exhibit 10, PG20085137). The State of California had this to say about hexavalent chromium: "First, hexavalent chromium is much more toxic than the trivalent forms. Hexavalent chromium is a known human carcinogen when inhaled and is probably carcinogenic when ingested. Hexavalent chromium is a more potent carcinogen when inhaled than when ingested." (Exhibit 10,

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

PG20085139)...Cal/EPA considers hexavalent chromium to be carcinogenic when ingested, where as U.S. Environmental Protection Agency (U.S. EPA) has not determined that Cr (VI) is carcinogenic when ingested (citations omitted). Both Cal/EPA and U.S. EPA consider Cr (VI) to be carcinogenic when inhaled. **The toxicological basis for Cal/EPA determining hexavalent chromium to be carcinogenic when ingested is based upon a weight of toxicological evidence: Cr (VI) is genotoxic; when inhaled Cr (VI) causes lung and digestive system cancers in humans, and lung cancers in rats; and ingestion of Cr (VI) resulted in forestomach tumors in mice.**" (Exhibit 10, PG20085140) (Emphasis added.)

### G. The U.S. EPA/ATSDR Considers Chromium to be Carcinogenic by Inhalation.

Based upon occupational studies, the U.S. EPA's Toxicological Profile for Chromium indicates that Cr (VI) is a carcinogen by inhalation. (Exhibit 11, page 56 et seq.) The ATSDR document also indicates that many adverse health outcomes result from exposure to Cr (VI), including respiratory effects (page 74), gastrointestinal effects (page 92 et seq.), including gastric ulcers, gastritis, gastric mucosa irritation, stomach cramps and indigestion). Case reports indicate hematological effects in humans after the ingestion of lethal *or sublethal* doses of Cr (VI) compounds. (page 94). There have also been documented effects upon the liver, kidneys, and immunological systems. (pages 96-99).

### H. IARC Regards Chromium 6 as a Human Carcinogen.

IARC classifies chromium 6 as a human carcinogen, stating "There is sufficient evidence in humans for the carcinogenicity of chromium VI compounds..." (Exhibit 12, pages 213 and 214)

### I. Animal Data Proves Chromium 6 is Carcinogenic by Ingestion.

IARC recognizes that in certain situations, it is appropriate to rely, as have plaintiffs' experts, upon animal data. IARC says:

Information compiled from the first 41 volumes of the IARC monographs shows

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

that, of the 44 agents and mixtures for which there is sufficient or limited evidence of carcinogenicity to humans, all 37 that have been tested adequately experimentally produce cancer in at least one animal species. Although this association cannot establish that all agents and mixtures that cause cancer in experimental animals also cause cancer in humans, nevertheless, "in the absence of adequate data on humans, it is biologically plausible and prudent to regard agents and mixtures for which there is sufficient evidence of carcinogenicity in experimental animals as if they presented a carcinogenic risk to humans." (Exhibit 12, at 25)

This is exactly the approach used by plaintiffs' experts. Due to the fact that we cannot experiment on humans by having them ingest chromium 6 for decades, and then studying the effect upon them, animal data is useful where there is biological plausibility where the chemical agent would act in the same fashion upon humans. Plaintiffs' experts all relied upon animal data in support of their opinions. Animal data is appropriate to rely upon as proof that chromium 6 causes cancer.

### 6.   **MULTIPLE STUDIES ASSOCIATE CHROME 6 WITH CANCERS OTHER THAN THE LUNG.**

Dr. Costa, one of plaintiffs' experts has published a peer reviewed scientific article that shows higher rates of cancer associated with exposure to chrome 6 for sites other than the lung. Specifically, hexavalent chrome exposure elevates the incidence of cancer in the urinary tract, bladder, testes, kidney, prostate, brain and stomach. Other studies indicated that lymphoma, hodgkin's disease and leukemia were also elevated in workers with a higher exposure to hexavalent chromium compounds. (Exhibit 13, page 439)

### 7.   **THE STATE OF CALIFORNIA REGARDS CHROMIUM 6 AS CARCINOGENIC BY INGESTION.**

The state of California considers chromium 6 to be carcinogenic by ingestion. The last update of the state of California's Department of Health Services' website states: OEHHA assumed chromium 6 to be carcinogenic when ingested based on its carcinogenicity by other routes of administration, and on the results of the single ingestion study in laboratory mice (Borneff, et al.,

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

1968) (Exhibit 14, page 2).  Contrary to what PG&E says in it's Omnibus Objection, the state of California does not regard this as incompetent evidence that ingestion of chromium causes cancer. While defendant criticizes the position of the state of California, as well as the research on which it is based, the fact remains that the scientific community in California supports plaintiffs' view in this case.

## 8.    PG&E'S CHARACTERIZATION OF PLAINTIFFS' EXPOSURE AS "MINIMAL" IS OFFENSIVE.

In an attempt to persuade this court that the claims of the chromium litigation plaintiffs should be disallowed, PG&E has the audacity to claim that these plaintiffs were not really exposed to chromium 6 or that their exposure was "minimal."  This is absolutely false.  Many of these plaintiffs are employees who lived in housing located directly on PG&E property.  These employees moved their families into PG&E housing believing that it was a safe environment to raise their children.  These employees had no idea that they were exposing their families to water which had been contaminated with a known carcinogen.  In addition to employees, many of the plaintiffs are residents who lived in close proximity to one of the PG&E compressor stations.

Each and every plaintiff used well water for all of their daily needs, both domestic and agricultural.  Thus, these plaintiffs were constantly exposed throughout the time they lived at or near the PG&E compressor stations.  They were exposed while eating, drinking, showering and bathing, washing clothes, washing cars, irrigating the fields, taking care of their animals, swimming, playing in the water, etc.  Moreover, a large number of plaintiffs also had swamp coolers in their homes which utilized contaminated well water.  These swamp coolers would run almost constantly throughout the summer months.

Additionally, at the Hinkley and Kettlemen compressor stations, chromium was emitted from the top of the cooling towers on a continuous basis *for decades*.

## 9.    THE CHROMIUM CLAIMANTS HAVE ESTABLISHED CAUSATION.

PG&E asks this court to reject the claims of the chromium litigation plaintiffs because it claims that plaintiffs are unable to establish causation.  Defendant is wrong.  Plaintiffs have

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

established causation.

PG&E has blatantly misrepresented plaintiffs burden of proof regarding causation. Simply put, PG&E's position with respect to the admissibility of expert testimony does not make sense. PG&E argues that California law applies. (See PG&E's Omnibus Objections to Chromium Claims page 14 lines 5-6). However, throughout the objection, PG&E repeatedly misstates the current state of the law in California courts with respect to causation. Instead of citing California law, PG&E refers the court to a number of federal cases regarding the admissibility of expert testimony. These federal cases have no application to this case and do not represent the standard for admissibility of expert testimony in California state courts.

### A. PG&E Misrepresents the Law Regarding Specific Causation.

In its objection, PG&E refers to the Federal Court's "gatekeeper" role with respect to expert evidence. This reference does not belong in this case. This is a state court case, not a federal case. This case has been pending in state court for almost 7 years. Plaintiff discovery was completed. Forty Eight days of expert depositions had been completed. Nearly 500 days of depositions had taken place. All of this was done under state law. Federal law was never even addressed until PG&E declared bankruptcy. Had PG&E never declared bankruptcy there would be no discussion or argument that federal law controlled the case. It is certainly unfair to hold plaintiffs to federal standards when this is a state court case. Moreover, in a separate motion, plaintiffs have asked this court to abstain from hearing this matter and to send it back to state court where it rightfully belongs. Thus, PG&E's discussion of federal standards for admissibility of expert testimony has no place in this matter.

### B. California Uses the "Substantial Factor" Test For Cause in Fact Determinations.

California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. Rutherford v. Owens-Illinois, Inc., (1997) 16 Cal.4th 953, 967, 941 P.2d 1203, citing Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1044, fn.2, 1052 fn.7, 1 Cal.Rptr.2d 913. In Mitchell the California Supreme Court held that under the "substantial

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

factor" standard, a cause-in-fact is something that is a substantial factor in bringing about the injury. Id. at 1052-1053.

Thus, the law in California requires plaintiffs to prove causation by demonstrating that the plaintiffs' exposure to chromium in reasonable medical probability was a **"substantial factor"** in contributing to the risk of developing injuries and/or cancer. [Emphasis Added]. (See Lineaweaver v. Plant Insulation Company (1995) 31 Cal.App.4th 1409, 37 Cal.Rptr.2d 902; Rutherford v. Owens-Illinois, Inc., (1997) 16 Cal.4th 953, 941 P.2d 1203; Kennedy v. Southern California Edison Company (2000) 219 F.3d 988.

"Substantial factor" has not been judicially defined, and some think it neither possible nor desirable to reduce it to any lower terms. Lineaweaver at 1415, 905. See also Rutherford v. Owens-Illinois, Inc., (1997) 16 Cal.4th 953, 970, 941 P.2d 1203. The word "substantial" should not be weighted too heavily. Mitchell v. Gonzales (1991) 54 Cal.3d 1041, 1053, 1 Cal.Rptr.2d 913. The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical. Rutherford v. Owens-Illinois inc., (1997) 16 Cal.App4th, 953, 979, 67 Cal.Rptr.2d 16, 941 P.2d 1203. Thus, a force which plays only an "infinitesimal" or "theoretical" part in bringing about injury, damage or loss is not a substantial factor, but a very minor force that does cause harm is a substantial factor. Kennedy v. Southern California Edison Company (2000) 219 F.3d 988, 996. Thus, all plaintiffs need to prove is that it is more probable than not that there was more than a negligible probability that plaintiff's or decedent's injuries were caused by defendant. Id. at 999.

**C.    Defendant Deliberately Misleads The Court About**
**Plaintiffs Burden of Proof Under the Substantial**
**Factor Test.**

Interestingly, throughout its brief, defendant completely ignores the current state of California law regarding causation and the substantial factor test.

/ / /

/ / /

/ / /

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

**(1)** **Plaintiffs Are Not Required to Show That Their**
**Exposure to Chromium "More Likely Than Not"**
**Caused Their Injuries.**

PG&E makes the statement that "California tort law requires claimants to show not merely that [the chemical] increased the likelihood of injury, but that it more likely than not caused *their* injuries." (See PG&E's Omnibus Objection page 14 lines 25 through 26). **This statement is absolutely false.** The only case cited by defendant in support of this proposition is <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 43 F.3d 1311, 1320 (9th Cir. 1995). This is a federal case. Nonetheless, PG&E cites <u>Daubert</u> as defining plaintiffs' burden of proof under the substantial factor test. This is a bold misstatement of the law. The federal standards for admissibility of expert's testimony and opinions are not the same as California. In fact, in 1994 the Supreme Court of California expressly rejected <u>Daubert's</u> approach in determining the reliability and admissibility of new scientific techniques. See <u>People v. Leahy</u> (1994) 8 Cal.4th 587, 34 Cal.Rptr.2d 663.

**(2)** **Plaintiffs Are Only Required to Show that In a**
**Reasonable Probability Their Exposure Was a**
**Substantial Factor Contributing to the *Risk* of**
**Plaintiffs' Illnesses.**

Throughout its Omnibus Objection, PG&E repeatedly states that plaintiffs cannot show that chromium substantially contributed to plaintiffs' injuries. Plaintiffs are not required to make this showing. Instead, plaintiffs must only show that in a reasonable medical probability their exposure to chromium was a substantial factor in contributing to the *risk* of developing cancer or other illnesses. <u>Rutherford v. Owens-Illinois Inc.,</u> (1997) 16 Cal.App4th, 953, 941 P.2d 1203,1219-1220, <u>Kennedy v. Southern California Edison</u> (2000) 219 F.3d 988, 996.

In <u>Rutherford v. Owens-Illinois Inc.,</u> (1997) 16 Cal.App4th, 953, 941 P.2d 1203, the Supreme Court of California altered plaintiffs' burden of proof on causation. The <u>Rutherford</u> court was presented with the issue of proper jury instructions to be given on causation when multiple potential causes of the injury exist. The <u>Rutherford</u> case involved a worker who had been exposed to asbestos and subsequently died of lung cancer. The case was originally filed against nineteen

ENGSTROM,
LIPSCOMB
& LACK

manufacturers or distributors of asbestos products. Decedent's case was consolidated with four other cases and proceeded to trial. The trial was bifurcated into damages and liability phases heard by separate juries. In the first damages phase of trial, the jury was to determine if the plaintiff or decedent's exposure to asbestos was a proximate cause of injury, and, if so the total amount of damages. At the end of this phase, the jury determined that the decedent's lung cancer was legally caused by inhalation of asbestos fibers and awarded damages.

Between the first and second phases of trial all the defendants settled except for Owens-Illinois. The liability phase of the trial proceeded. The jury was instructed to assign percentages of fault among the decedent, the defendant, the other manufacturers of asbestos and each employer that may have contributed to exposure. Defendant then appealed. Plaintiffs then petitioned the California Supreme court for review. Review was granted.

In addressing the issue of plaintiffs' burden of proof on causation, the California Supreme Court found that BAJI Nos. 3.76 and 3.77 were inadequate and ordered that an additional instruction was required in order to assure that the jury understood the true nature of plaintiff's burden. Id. at 976. The court stated that "the generally applicable standard instruction on causation are insufficient for this purpose. Id. The court goes on the state:

> those instructions tell the jury that every "substantial factor in bringing about an injury" is a legal cause (BAJI No. 376), even when more than one such factor "contributes concurrently as a cause of the injury" (BAJI No. 3.77). They say nothing, however, to inform the jury that, in asbestos-related cancer cases, a particular asbestos-containing product is deemed to be a substantial factor in bringing about the injury if its contribution to the plaintiff or decedent's risk or probability of developing cancer was substantial.

> Without such guidance, a juror might well conclude that the plaintiff needed to prove that fibers from the defendant's product were a substantial factor **actually** contributing to the development of the plaintiff's or decedent's cancer. In many cases, such a burden will be medically impossible to sustain....We therefore hold that...**the jury should be told that the plaintiff's or decedent's exposure to a particular product was a substantial factor in causing or bringing about the disease if in reasonable medical probability it was a substantial factor contributing to plaintiff's or decedent's risk of developing cancer.**

Rutherford, supra at 976. [Emphasis Added].

In Kennedy v. Southern California Edison (2000) 219 F.3d 988, the U.S. Court of Appeal, Ninth Circuit, held that Rutherford applies to single defendant hazardous substance cases where the defense of possible alternative causes is raised. In Kennedy, the plaintiffs were the husband

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

and four children of Ellen Kennedy who died in 1996 of Chronic Myelogenous Leukemia (CML). She was only 43 years old at the time of her death. Plaintiffs sued defendants for wrongful death alleging that Joe Kennedy who worked for Southern California Edison at its San Onofre Nuclear Generating Station inadvertently brought home microscopic particles of radioactive materials from the power plant on his clothing, hair, tools, etc. These materials contained radiation dosages in excess of the maximum allowable by Federal regulations, came in contact with Mrs. Kennedy and caused her fatal cancer.

Prior to trial, plaintiffs requested a "Rutherford" causation instruction. The request was denied. After trial there was a jury verdict in favor of defendants. The district court denied plaintiffs' Motion For New Trial. Plaintiffs appealed.

The U.S. Court of Appeal for the Ninth Circuit held that Rutherford was applicable and that the district court erred in refusing to instruct the jury that plaintiffs may meet the burden of proving that exposure to defendant's product was a substantial factor causing the illness by showing that *in reasonable medical probability it was a substantial factor contributing to the plaintiff's or decedent's risk of developing cancer.* Kennedy at 996. [Emphasis Added].

In reaching its decision, the court pointed out that Rutherford was applicable in cases involving exposure to substances other than asbestos. See e.g. Bockrath v. Aldrich Chemical Co., (1999) 21 Cal.4th 71(Cancer claim based on exposure to multiple workplace chemicals).

### D. Plaintiffs Experts Used Proper Methodology

Despite what PG&E would have this court believe, plaintiffs experts did in fact use proper methodology and were able to show causation.

### (1) Reliance on Animal Studies is Proper Methodology.

The Reference Manual on Scientific Evidence (2d ed.) (West 2000) (Exhibit 15) recognizes "however, because it is often unethical to experiment on humans by exposing them to known doses of chemical agents, animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure." (Exhibit 15, at 405). Plaintiffs' experts relied upon animal toxicological evidence in support of their opinions.

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

ENGSTROM,
LIPSCOMB
& LACK

The <u>Reference Manual</u> underscores the importance of animal data, stating "[o]f the perhaps two dozen chemicals that reputable international authorities agree are known human carcinogens based on positive epidemiological studies, arsenic is the only one not known to be an animal carcinogen." (Exhibit 15, <u>Reference Manual</u>, at 414).

### (2) Reliance on Toxicological Studies is Proper Methodology.

Relevant epidemiological data does <u>not</u> exist about cancer from <u>ingestion</u> of chromium 6. Thus, reliance on toxicological studies is proper methodology.

The <u>Reference Manual</u> underscores the need to rely upon toxicological studies, as plaintiffs' experts have done. The <u>Reference Manual</u> states as follows:

> "The absence of epidemiological data is due, in part, to the difficulties in conducting cancer epidemiology studies, including the lack of suitably large groups of individuals exposed for a sufficient period of time, long latency periods between exposure and manifestation of disease, the high variability in the background incidence of many cancers in the general population, and the inability to measure actual exposure levels. These same concerns have led some researchers to conclude that "many negative epidemiological studies must be considered inconclusive" for exposures to low doses or weak carcinogens. "Pitot and Dragan" (Exhibit 15, <u>Reference Manual</u>, at 414 footnote 40.

The <u>Reference Manual</u> also acknowledges that "[e]ven though there is little toxicological data on many of the 75,000 compounds in general commerce, there is far more information from toxicological studies than from epidemiological studies." (Exhibit 15, <u>Reference Manual</u>, at 414).

Finally, the <u>Reference Manual</u> explains the need for reliance upon toxicological research as follows:

> "However, because it is often unethical to experiment on humans by exposing them to known doses of chemical agents, <u>animal toxicological evidence often provides the best scientific information about the risk of disease from a chemical exposure.</u>" (Exhibit 15, <u>Reference Manual</u>, at 405). (Emphasis added.)

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELI.DOM.ELI.PO Documents:160200.1

**(3)** **Plaintiffs' Experts Considered Dose**

**and Exposure.**

PG&E falsely claims that claimants' experts "...failed to quantify or understand each plaintiffs' specific dose or exposure." (PG&E's Omnibus Objection page 16 lines 25 through 26). PG&E's only support for this is an incomplete and inaccurate excerpt from the testimony of plaintiffs' expert, Dr. Teitelbaum. PG&E asserts that it is Dr. Teitelbaum's testimony that any exposure to chromium regardless of the duration and dose can cause cancer and an exposure so small that you can't quantitate it would be a significant contributing factor to the development of a cancer. Defendant has taken 8 pages of testimony and included less than one sentence. (Relevant portions of Dr. Teitelbaum's deposition testimony are attached hereto as Exhibit 16). Dr. Teitelbam testified that it is his opinion that "genotoxic carcinogens possess the capability of inducing the carcinogenic step that they control at any dose, if the interaction takes place." (Exhibit 16 at 105:14-17).

Each of plaintiffs' experts addressed the issue of dose and exposure in their deposition testimony. Defendant has simply failed to include it. For instance Dr. Teitelbaum testified that "I have reviewed Dr. Ruttenber's risk assessment. I've reviewed the various successive mathematical calculations made by Dr. Sharma on the air dispersion. I've looked at the water dose calculations which have been done and the shower calculation which Dr. Ruttenber did." (Exhibit 16 at 132:20-133:9).

Dr. Costa testified that he relied upon air contamination estimates performed by Dr. Sharma. He also testified that he relied upon the risk assessments that were prepared by Dr. Ruttenber (Exhibit 17, relevant portions of Dr. Costa's deposition testimony at 376:15 -378:6 and 525:12 - page 526:3).

Clearly plaintiffs' experts testified about dose. PG&E is simply deliberately attempting to mislead this court about the true facts of this case.

**E.** **Dr. Teitelbaum Did Not Admit That There Was No**

**Scientific Literature to Support His Opinions.**

PG&E completely misrepresents Dr. Teitelbaum's testimony regarding the scientific literature regarding chromium. Beginning on page 3 line 22 and continuing through page 4 line 5

ENGSTROM, LIPSCOMB & LACK

of its Omnibus Objection, PG&E claims that Dr. Teitelbaum admitted that there was no scientific literature to support his claim that chromium causes injuries. **This statement is simply not true.** This is <u>not</u> Dr. Teitelbaum's complete testimony. PG&E conveniently left out his entire response. His true testimony is set forth below. The portion that PG&E has deleted from his response is in bold.

> Q: Can you refer me to any scientific literature that says that chrome causes Hodgkin's disease?
>
> A: No, I can't. **What I can do is refer you to literature which shows that chrome 6 is a carcinogen and, as such, can and likely does participate in the causation of any cancer in any organ it is capable of reaching.** (Exhibit 16 at 69:24-70:8)

It is clear that PG&E has deliberately attempted to mislead this court about the opinions of Dr. Teitelbaum. This type of conduct should not be tolerated by this court.

### F. <u>Proper Scientific Methodology Does Not Require Plaintiffs' Experts to Quantify the Precise Dose In Order to Establish a Causal Link Between Chromium Exposure and Illness.</u>

PG&E seeks to have the claims of the chromium litigation plaintiffs dismissed because claimants' experts allegedly were not able to quantify how much chrome six contributed to Claimants' various diseases. (Omnibus Objection page 17 lines 23 through 24). There is absolutely no basis for the court to do this. Proper scientific methodology does not require a finding of the precise quantity of chromium which contributed to the plaintiffs' injuries. PG&E does not direct the court to any controlling scientific or legal authority to support its position. Plaintiffs experts repeatedly testified about the exposure of each trial plaintiff. Each of the experts testified about how the exposure contributed to the illnesses claimed by the plaintiffs. Each of the experts addressed possible alternative causes for the illnesses of plaintiffs and yet still concluded that exposure to chromium was a substantial factor in contributing to the illnesses claimed by the plaintiffs. This is the legal standard. The experts met this standard and did establish causation.

/ / /

ENGSTROM,
LIPSCOMB
& LACK

## 10. PG&E IS ATTEMPTING TO RE-LITIGATE ISSUES WHICH HAVE ALREADY BEEN DECIDED BY THE STATE COURT.

With its Omnibus Objection, PG&E is asking this court to hear matters which were already decided by the Los Angeles County Superior Court. On the one had PG&E urges the court to dismiss the claims based on judicial economy and on the other it is asking that this court as well as the parties to go to the expense of re-litigating issues which took months to resolve. PG&E asserts that plaintiffs claims are all barred due to the statute of limitations. This is simply not true. PG&E knows this is not true. It already made this argument and lost. The Superior Court found that the claims were not time barred.

Additionally, PG&E argues that the claims of employees should be barred due to workers compensation laws. Again, PG&E is wrong. The superior court has already ruled against PG&E on this very same issue.

### A. The Superior Court of The State Of California Has Declined to Dismiss Plaintiffs' Claims Based Upon the Statute of Limitations.

PG&E claims that the chromium litigation claimants' claims should be disallowed because they are barred by the Statute of Limitations. PG&E has already made this argument. On October 15, 1999, PG&E filed its Motion For Judgment on the Pleadings Dismissing Claims For Personal Injury, Wrongful Death and Loss of Consortium. PG&E also filed a Motion For Summary Judgment or in the Alternative Summary Adjudication as to Plaintiff Ted Chenoweth Only. In these motions, PG&E sought to dismiss the claims of plaintiff Ted Chenoweth and all personal injury, wrongful death and loss of consortium plaintiffs on the grounds that the claims were barred by the applicable Statute of Limitations.

These matters were heard before the Honorable Judge Francis Rothschild in Department 28 of the Los Angeles County Superior Court. PG&E's Summary Judgment Motion with respect to Ted Chenoweth was denied. (Exhibit 18 ). As for the Motion for Judgment on the Pleadings, Judge Rothschild granted the motion but declined to dismiss any of the plaintiffs. Instead, she granted plaintiffs leave to amend in order to plead facts showing that plaintiffs were entitled to rely on the

delayed discovery rule. Moreover, pursuant to stipulation of the parties, the determination of the sufficiency of the amended allegations of delayed discovery was referred to Justice Howard Wiener. (Exhibit 19)

Thereafter, plaintiffs filed declarations for each of the plaintiffs who were subject to the ruling. On July 18, 2000 Justice Wiener issued his ruling regarding the supplemental declarations. (Exhibit 20). Justice Wiener declined to dismiss any of the plaintiffs and instead ordered plaintiffs to provide supplemental declarations on behalf of many of the plaintiffs. The supplemental declarations were served in October of 2000.

### B. The Superior Court of the State of California Has Ruled That Worker's Compensation Does Not Bar the Claims of PG&E Employees.

This issue was already ruled upon by the Superior Court. PG&E filed a Demurrer to Plaintiffs Second Amended Complaint alleging, among other things, that the claims of employees were barred by worker's compensation laws. The hearing on the Demurrer was held before the Honorable Judge Francis Rothschild in Department 28 of the Los Angles County Superior Court. On April 5, 1996 Judge Rothschild overruled PG&E's Demurrer finding that the claims of the employees were not barred by worker's compensation laws in that the employees alleged contamination while living in company owned housing or within the general vicinity of the company premises. (Exhibit 21).

A vast majority of the employee claimants lived and worked at the Kettleman Compressor station. These employees actually lived on site with their families. They paid rent. After work, they returned to their homes which were located directly on PG&E property. All of the water supplied to their homes came from a contaminated well on PG&E property. The remaining employees either lived in the areas surrounding one of the PG&E facilities ore were exposed while visiting the park and pool area at one of the PG&E stations. In all cases, the exposure was clearly not contemplated by the employment relationship. See Crawford v. Workers Compensation Appeals Board (1986) 185 Cal.App.3d 1265, 230 Cal.Rptr. 425. These workers were poisoned at home without their knowledge by a product whose dangers they were not made aware of. Workers were never told that

ENGSTROM,
LIPSCOMB
& LACK

by living at or near a PG&E station they were exposing themselves and their families to a known carcinogen. Thus, it is clear that worker's compensation is inapplicable to this matter.

## 11. PUNITIVE DAMAGES ARE APPROPRIATE IN THIS CASE.

PG&E has asked this court to deny any claims for punitive damages. PG&E states that "[n]o purpose is served by imposing punitive damages against the reorganized PG&E for this historical practice." What PG&E does not tell the court is that for decades it chose to cover up the chromium contamination problem. In so doing, hundreds of innocent people suffered severe injuries and in some cases death. Set out below is an abbreviated version of the liability and punitive damage case.

### A. PG&E KNEW OF THE CHROMIUM CONTAMINATION

PG&E was well aware of the chromium contamination for a number of years before going public with the problem.

#### (1) Hinkley

PG&E was aware as early as the **1950s** that the chromium used and disposed of at its compressor stations was seriously contaminating the local environment, including the groundwater. PG&E's own consultant, for example, reported that "**PG&E has determined that chromium contamination was detected in groundwater in the area of the [Hinkley] compressor station in the early 1950's.**" (See Exhibit 22, p. 2-4). A **1965** water test conducted by PG&E revealed that a local resident's groundwater well in Hinkley (the Ross Well) contained greenish water with chromium levels 300 times higher than the legal limit! (See, September 24, 1965 Intra-Company Memorandum Re "**Chromate Infiltration of Water Supply**", Exhibit 23).

In **1965**, the Hinkley Plant Manager visited the home of John Speth at Mr. Speth's request. The Speth home was located just north of the Hinkley Compressor Station (and near the Ross Well). Mr. Speth noticed that his toilet bowl was developing a "discoloration deposit" and wanted PG&E to determine if it was connected to PG&E's activities at the Hinkley station. In a December 22, 1965 Intra-Company Memorandum concerning the visit to the Speth home, the PG&E's Plant Manager noted that "I inspected the toilet bowl and found a gray-green deposit.... Mr. Speth...asked what the company was going to do about his water problem. ... I assured Mr. Speth that PG&E was not doing anything...that would affect his water supply...and told him ...that I didn't think PG&E would do

ENGSTROM, LIPSCOMB & LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

anything about water problem." (See Exhibit 24) Not surprisingly, Mr. Speth died of cancer in 1974. Also not surprising is the fact that PG&E has not produced any documents regarding the testing of Mr. Speth's water. Mr. Speth's wrongful death claim is a current test case for trial.

A **1980** handwritten PG&E Memorandum states that **"water wells on our [Hinkley Compressor Station] property show chromate contamination. We have purchased land in the past when the contamination spread out of the plant property limits."** (See Exhibit 25).

### (2) <u>Topock</u>

In **1953**, PG&E received a letter from Betz Laboratories--PG&E's chromium supplier and cooling tower water treatment consultant--which advised PG&E that groundwater testing at the **Topock** Station revealed elevated levels of Chromium. (See Exhibit 26). In a **1959** letter to PG&E from another PG&E consultant, PG&E was informed that "the [cooling] tower [at Topock] is an induced draft type tower [and] **chromate treated water sprays out and has coated even the office buildings and grounds with a yellow chromate coating.**" (See Exhibit 27).

The **1980** handwritten PG&E Memorandum (Exhibit 25, supra) states that **"we expect that the subsurface water is extensively contaminated in the vicinity of the [Topock] station."**

### (3) <u>Kettleman</u>

At Kettleman, PG&E knew of the contamination since at least **1964**. In a November 5, 1964, letter from Betz Laboratories, PG&E was advised that **"significant chromate contamination is reported"** in your groundwater well No. 4. (See Exhibit 28). The **1980** handwritten PG&E Memorandum (Exhibit 25, supra) also states that "[t]his [Kettleman] site has used percolation ponds for disposal of waste water for approximately 40 years. The waste water has contained chromates and **extensive groundwater contamination is evident in water wells on the property.**"

### B. <u>PG&E KNEW THAT CHROMIUM WAS TOXIC</u>

In a **1966** PG&E document outlining the Hinkley chromium contamination problem, PG&E states as follows: "This [chromium contamination] development led to immediate and understandable concern inasmuch as: **1) Chromate is known to have toxic effects on man.**" (See Exhibit 29) Another PG&E document states that "hexavalent chromate in the effluent from the cooling towers has been permitted to return to the Hinkley groundwater system by the existing disposal method. ...

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

The material is toxic." (See Exhibit 30).

In the **1953** letter from Betz Laboratories to PG&E wherein chromium was reported found in the groundwater near the Topock station, (Exhibit 26, supra), Betz stated that "[a]lthough the *amount* of chromate indicated by the. . .analyses for the wells might not be toxic, it would be wiser not to employ either source for drinking purposes." Another **1953** letter from the Gas Control and Supply Division of PG&E to the Topock Compressor Station states as follows: "This is to call to your attention a report submitted by...Betz dated Nov. 27, 1953, relative to the chemical analysis of water samples from the #1 and #2 wells at the Topock Compressor Station. ... **The report indicates the presence of chromium...in excess of those amounts approved under the Public Health Service Drinking Water Standards.... ... In view of these facts, this water should be condemned for human consumption....**" (See Exhibit 2, supra)

At Kettleman, a **1965** PG&E document states that "**it is of the utmost importance to note that the State Department of Public Health regards the maximum allowable chromate level of drinking water as 0.05 parts per million. Therefore, it would seem mandatory...to take all necessary steps to ensure that the [contaminated] water from No. 4 well at Kettleman...not be...used...for human consumption.**" (Exhibit 31).

## C.    PG&E CONCEALED THE CHROMIUM CONTAMINATION FROM THE PUBLIC.

Evidence of PG&E's intention to cover-up the contamination is found in a handwritten PG&E document which states as follows: "**The problem is to remove this material from the water supply [at Hinkley] as rapidly as possible without causing undo alarm or establishing a difficult liability question.**" (See Exhibit 30, supra).

In the **1965** Intra-Company Memorandum referencing the "greenish water" from the off-site Ross Well near the Hinkley Station which tested positive for chromate at 15 ppm (Exhibit 23, supra), PG&E advised the employee who discovered the green water that "**it would be better not to discuss the green water problem any further with Mr. Pulanski [the tenant] or other neighbors.**" This document also states that "it will be extremely difficult to keep this activity and our intended treatment [of the Ross Well] confidential."

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

In **1966**, PG&E's Hinkley Plant Superintendent, Richard Jacobs, attended a Mojave Water Agency meeting. In an August 17, 1966 PG&E Intra-Company Memorandum concerning this meeting, Jacobs reported that despite discussion about contaminated water in the area, he did not advise the Water Agency of his presence at the meeting, nor of PG&E's knowledge regarding the contamination. (Exhibit 32).

PG&E again **actively concealed** the contamination from the water authorities in the early 1970s. In fact, in 1972 PG&E intentionally mislead a Water Board inspector during a visit to the Hinkley station. The inspector asked about chemicals which were added to the tower and was not told about the use of chromium in the towers. (Exhibits 33 and 34). In a PG&E Intra-Company Memorandum PG&E admitted that it intentionally mislead the Water Board inspector in 1972.

Even the most rudimentary concept of moral accountability or social responsibility mandates some disclosure to the Water Board of the water pollution in the 1952 to 1972 time frame.

The fact of the matter is that PG&E concealed the chromium contamination for roughly thirty (30) years until 1980 when, at Kettleman, as a result of mounting pressure to comply with state and federal hazardous waste laws, PG&E admitted to the California Regional Water Quality Control Board that its toxic Chromium wastes had polluted the local groundwater.

Following PG&E's admission to the Water Board that it contaminated the groundwater at Kettleman, the State of California considered penalties against PG&E for concealing the contamination: **"[It appears PG&E may have been aware of hex chrome in well [at Kettleman] as early as '68 and did not let us know. Please look into this & see if penalties are in order."** (Exhibit 35).

In the case of Hinkley, PG&E did not tell the Water Board, nor any of the affected residents, about the contamination of the town's drinking water until **1987**. (See, December 7, 1987 letter from PG&E to Water Board, Exhibit 36). **This public notice came (at least) twenty-two (22) years after PG&E was aware that it had contaminated Hinkley's groundwater with deadly hexavalent chromium!**

Quite disingenuously, PG&E's **1987** letter to the Water Board feigned only recent knowledge of the problem and expressed a false concern for immediate remedial action to protect local residents.

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160200.1

Given the above-referenced evidence of PG&E's early knowledge of the chromium contamination, PG&E's false representation to the Water Board in 1987 that it only "recently" discovered the chromium problem is highly reprehensible. Equally abhorrent is PG&E's false concern that immediate action be taken to protect the residents. If such immediate action was necessary to remedy the chromium contamination, why did PG&E, knowing the chromium was toxic, conceal the problem from both the Water Board and local residents for over twenty years?

### 12. THE CLAIMS MADE BY PLAINTIFFS ARE NOT INFLATED.

Litigation against PG&E for chromium 6 contamination has been pending for the past 8 years. The original case Anderson, et al., v. PG&E, spawned the hit movie *Erin Brockovich*. That case, involving 650 plaintiffs, was settled by PG&E for $333,000,000.00 (Three Hundred and Thirty Three Million Dollars). The present cases involve approximately 1,035 plaintiffs. The average recovery per plaintiff in Anderson was $512,820.00 ($333,000,000.00 divided by 650). Applying the same formula to the pending cases yields an estimated exposure of $512,820,000.00 (Five Hundred Twelve Million , Eight Hundred Twenty Thousand Dollars, $512,820.00 x 1,000) in the Aguayo cases. PG&E has recognized the value of the case in its Annual Reports and 10K Filings.

### 13. Conclusion.

Based upon the foregoing the Chromium Litigation Claimants respectfully request that the court overrule PG&E's Omnibus Objections and allow these claims to proceed.

Dated: December 19, 2001

Respectfully submitted,

ENGSTROM, LIPSCOMB & LACK

By _____
WALTER J. LACK
GARY A. PRAGLIN
JOY L. ROBERTSON
ELIZABETH A. HERNANDEZ
Attorneys for Plaintiff

ENGSTROM,
LIPSCOMB
& LACK

::ODMA\GRPWISE\ELI.DOM.ELI.PO Documents:160200.1

## PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.

I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Boulevard, 16th Floor, Los Angeles, California 90067.

On December 19, 2001, I served the foregoing documents described as **CHROMIUM LITIGATION CLAIMANTS' RESPONSE TO PACIFIC GAS & ELECTRIC COMPANY'S OMNIBUS OBJECTIONS TO CHROMIUM CLAIMS** on the interested parties in this action by placing a true copy thereof in a sealed envelope, with postage thereon fully prepaid in the United States mail at Los Angeles, California, addressed as follows:

### SEE ATTACHED SERVICE LIST

**X**    (BY MAIL) I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid to the offices of the addressee(s) noted on the attached Service List. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. postal service on that same day in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

____ (BY PERSONAL SERVICE) I caused such envelope to be delivered by hand to the offices of the addressee.

____ (BY FEDERAL EXPRESS) I caused such envelope(s) to be delivered by FEDERAL EXPRESS to the offices of the addressee(s) noted on the attached Service List.

____ (BY ELECTRONIC TRANSFER) I caused all of the pages of the above-entitled documents to be sent to the recipients noted via electronic transfer (FAX) at the respective telephone numbers indicated.

**X**    (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

___ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 12 , 2001 at Los Angeles, California.

__MAUREEN JOHNSON__

_____
Signature

ENGSTROM,
LIPSCOMB
& LACK

## SERVICE LIST

Our File No.: 38000/1850

| | |
|---|---|
| Ernest J. Getto, Esquire<br>**LATHAM & WATKINS**<br>633 West Fifth, Suite 4000<br>Los Angeles, California 90071-2007<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763 | Attorneys for Defendant<br>PACIFIC GAS AND ELECTRIC<br>COMPANY<br>(Via Federal Express) |
| Thomas V. Girardi, Esquire<br>**GIRARDI & KEESE**<br>1126 Wilshire Boulevard<br>Los Angeles, California 90017<br>Telephone: (213) 977-0211<br>Facsimile: (213) 481-1554 | Attorneys for Plaintiffs<br>(Via U.S. Mail) |
| Edward L. Masry, Esquire<br>**MASRY & VITITOE**<br>5707 Corsa Avenue, 2nd Floor<br>Westlake Village, California 91362<br>Telephone: (818) 991-8900<br>Facsimile: (818) 991-6200 | Attorneys for Plaintiffs<br>(Via U.S. Mail) |
| Rene Tatro, Esquire<br>Craig S. Bloomgarden, Esquire<br>**TATRO COFFINO ZEAVIN<br>BLOOMGARDEN**<br>1875 Century Park East, Suite 1220<br>Los Angeles, California 90067<br>Telephone: (310) 229-2493<br>Facsimile: (310) 229-2491 | Attorneys for Defendant,<br>PG&E<br>(Via Federal Express) |
| Office of the U.S. Trustee<br>Attention Stephen Johnston<br>250 Montgomery Street, Suite 1000<br>San Francisco, CA 94104-3401 | Via Federal Express |

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160275.1

ENGSTROM,
LIPSCOMB
& LACK