WALTER J. LACK, State Bar No. 57550
GARY A. PRAGLIN, State Bar No. 101256
JOY L. ROBERTSON, State Bar No. 165150
ELIZABETH A. HERNANDEZ, State Bar No. 204322
**ENGSTROM, LIPSCOMB & LACK**
A Professional Corporation
Sixteenth Floor
10100 Santa Monica Boulevard
Los Angeles, California 90067-4107
(310) 552-3800

THOMAS V. GIRARDI, State Bar No. 36603
**GIRARDI & KEESE**
1126 Wilshire Boulevard
Los Angeles, California 90017
(213) 977-0211

EDWARD L. MASRY, State Bar No. 31016
**MASRY & VITITOE**
5707 Corsa Avenue, Second Floor
Westlake Village, California 91362
(818) 991-8900

Attorneys for Claimants/Plaintiffs

FILED
DEC 21 2001
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

In re

PACIFIC GAS AND ELECTRIC COMPANY, a California corporation,

Debtor.

Federal I.D. No. 94-0742640

Bankruptcy Case No. 01-30923 SFM11 - Chapter 11
[Assigned to: Judge Dennis Montali]

**DECLARATION OF JOY L. ROBERTSON FILED IN SUPPORT OF CLAIMANTS' RESPONSE TO PACIFIC GAS & ELECTRIC COMPANY'S OMNIBUS OBJECTION TO CHROMIUM CLAIMS**

[Filed Concurrently With The Appendix of Non-Federal Cases]

3986

ENGSTROM, LIPSCOMB LACK

::ODMA\GRPWISE\ELLDOM.ELLPO.Documents:160086.1

1

Decl. of Joy L. Robertson Filed In Support Of Claimants' Response to PG&E's Omnibus Objection-Case #01-30923 SFM11

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 1 of 125

I, JOY L. ROBERTSON, declare:

1. I am an attorney at law, duly licensed to practice law before all of the Courts of the State of California, including this Court herein. I am an associate in the law firm of Engstrom, Lipscomb & Lack, counsel of record for Claimants herein. I am one of the attorneys of record for plaintiffs in the Aguayo, Acosta, Aguilar, Baldonado, Boyd, Puckett, Bowers, and Miller cases. I have been working on these cases since their inception. In total, I have been working on the litigation against Pacific Gas & Electric Company for over seven years now. In addition, I worked on the related case of Anderson, et al. v. Pacific Gas & Electric Company, et al. since its inception. I have personal, first hand knowledge of the facts set forth herein, and if called upon to testify as a witness, I could and would testify competently thereto.

2. This Declaration is being filed in support of the Claimants' Response to PG&E's Omnibus Objection to Chromium Claims.

3. The law offices of Engstrom, Lipscomb & Lack, Girardi & Keese, and Masry and Vititoe represent a total of 1,035 plaintiffs in eight (8) separate lawsuits filed against PG&E for injuries sustained as a result of exposure to chromium 6.

4. The eight cases are: Acosta, et al. v. Pacific Gas & Electric Company, et al., Case Number BC 161669; Aguayo, et al. v. Pacific Gas & Electric Company, et al., Case Number BC 123749; Aguilar, et al. v. Pacific Gas & Electric Company, et al., Case Number BC 158588; Baldonado, et al. v. Pacific Gas & Electric Company, et al., Case Number BC 239104; Bowers, et al. v. Pacific Gas & Electric Company, et al., Case Number MC 012543; Boyd, et al. v. Pacific Gas & Electric Company, et al., Case Number BC 249693; Puckett, et al. v. Pacific Gas & Electric Company, et al., Case Number

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 2 of 125

BC 247763; and Miller v. Pacific Gas & Electric Company, et al., Case Number BC 262238. All of these cases were filed in the Los Angeles Superior Court.

5. PG&E knew about the contamination, but concealed it from the local residents. A PG&E memo explains that the concealment was done to avoid "...undo alarm or establishing a difficult liability question." (Attached hereto as Exhibit 1 is a true and correct copy of a PG&E memo entitled "Historical Background Regarding Hinkley Groundwater Contamination, Excerpts from File." Also attached is a summary of the text contained within this document. The December 1965 entry acknowledges that hexavalent chromium from the cooling towers was discharged to the Hinkley groundwater and had been detected in the water north of the property. The memo goes on to explain that the concealment was done to avoid "...undo alarm or establishing a difficult liability question").

6. Attached hereto as Exhibit 2 is a true and correct copy of a December 10, 1953 letter to F.E. Wilson from F.E. Glendening indicating the presence of chromium at the Topock Compressor station.

7. Attached hereto as Exhibit 3 is a true and correct copy of a September 29, 1964 letter to Mr. R.J. Owen from Hugh W. Reynolds where PG&E designates chromium as a highly toxic chemical.

8. Attached hereto as Exhibit 4 is a true and correct copy of a March 29, 1966 memo regarding the Soil and Water Survey at Hinkley where PG&E admits that chromium(Cr04) is considered toxic and the "...the reduction of the chromate takes precedence in that it is considered harmful."

9. Attached hereto as Exhibit 5 is a true and correct copy of the May 10, 1966 confidential study of field data on the Hinkley Groundwater Study prepared by PG&E's

[...]GSTRON, [...]PSCOMB [...]LACK

engineering geologist, Raymond Blum. Mr. Blum writes that concentrations of dissolved chromic acid salt has percolated downward through the soil into the grandwater table. He also states that this has been happening for 15 years.

10. Attached hereto as Exhibit 6 is a true and correct copy of a document entitled Water Treatment System Hinkley Compressor Station. This document represents a summary of PG&E's study on its Hinkley Cooling Towers. In this document, PG&E admits that chromium causes cancer.

11. Attached hereto as Exhibit 7 is a true and correct copy of the December 4, 1987 correspondence to Phillip C. Watson from Roland J. Risser regarding his intensive literature search of hexavalent chromium. In this letter, PG&E admits that chromium 6 is Mutagenic, Carcinogenic and Teratogenic.

12. Attached hereto as Exhibit 8 is a true and correct copy of a report prepared by PG&E for filing with the Water Board regarding the Hinkley groundwater contamination. In that report, PG&E said "Absorption of ingested hexavalent chromium is estimated to be less than 5%. Chromium may also be absorbed through the lungs and skin." (Exhibit 8, PG60002269). PG&E also stated "Less than half of the absorbed chromium is deposited in body tissues including the liver, kidney, spleen and bone marrow." (Exhibit 8, PG60002269). PG&E further stated "Chronic inhalation of chromium may cause pulmonary obstruction or asthma. Chromium is known to cause skin sensitization and subsequent contact dermatitis in some individuals following skin contact. There are no studies of humans with long term oral exposure to chromium." (Exhibit 8, PG60002270).

13. Attached hereto as Exhibit 9 is a true and correct copy of the Final Report-Medical Evaluations of Hinkley Residents with Well Water Chromium Concentrations equal to or exceeding 0.05 ppm dated May 10, 1988. This documents confirms that in April, 1988, PG&E's

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 4 of 125

consultant, Environmental Health Associates found that the Hinkley residents "had higher urinary chromium levels compared to those living in residences without chromium contaminated wells." This report went on to find "Exposure to dusts or aerosols containing hexavalent chromium may cause irritation of the upper and lower respiratory tract." The report goes on to acknowledge "There are no human or animal data to show ingested chromium carcinogenic.

14. Attached hereto as Exhibit 10 is a true and correct copy of a May 10, 1994 Department of Toxic Substances Control memorandum from Laura Valoppi, M.S., Associate toxicologist to Karen Barker regarding PG&E's Topock Compressor station. The memo states that "Since hexavalent chromium is a potent known human carcinogen when inhaled, exposure to fugitive dusts accounts for 85% of the risk at these soil levels." (Exhibit 10, PG20085137). The State of California had this to say about hexavalent chromium: "First, hexavalent chromium is much more toxic than the trivalent forms. Hexavalent chromium is a known human carcinogen when inhaled and is probably carcinogenic when ingested. Hexavalent chromium is a more potent carcinogen when inhaled than when ingested." (Exhibit 10, PG20085139)...Cal/EPA considers hexavalent chromium to be carcinogenic when ingested, where as U.S. Environmental Protection Agency (U.S. EPA) has not determined that Cr (VI) is carcinogenic when ingested (citations omitted). Both Cal/EPA and U.S. EPA consider Cr (VI) to be carcinogenic when inhaled. **The toxicological basis for Cal/EPA determining hexavalent chromium to be carcinogenic when ingested is based upon a weight of toxicological evidence**: Cr (VI) is genotoxic; when inhaled Cr (VI) causes lung and digestive system cancers in humans, and lung cancers in rats; and ingestion of Cr (VI) resulted in forestomach tumors in mice." (Exhibit 10, PG20085140) (Emphasis added.)

15. Attached hereto as Exhibit 11 is a true and correct copy of the U.S. EPA's Toxicological Profile for Chromium indicates that Cr (VI) is a carcinogen by inhalation.

GSTROM, PSCOMB LACK

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 5 of 125

(Exhibit 11, page 56 et seq.) The ATSDR document also indicates that many adverse health outcomes result from exposure to Cr (VI), including respiratory effects (page 74), gastrointestinal effects (page 92 et seq.), including gastric ulcers, gastritis, gastric mucosa irritation, stomach cramps and indigestion). Case reports indicate hematological effects in humans after the ingestion of lethal *or sublethal* doses of Cr (VI) compounds. (page 94). There have also been documented effects upon the liver, kidneys, and immunological systems. (pages 96-99).

16. Attached hereto as Exhibit 12 is a true and correct copy of IARC Monographs on the Evaluation of Carcinogenic Risks to Humans. IARC classifies chromium 6 as a human carcinogen, stating "There is sufficient evidence in humans for the carcinogenicity of chromium VI compounds..." (Exhibit 12, pages 213 and 214) IARC also recognizes that in certain situations, it is appropriate to rely, as have plaintiffs' experts, upon animal data. IARC says:

> Information compiled from the first 41 volumes of the IARC monographs shows that, of the 44 agents and mixtures for which there is sufficient or limited evidence of carcinogenicity to humans, all 37 that have been tested adequately experimentally produce cancer in at least one animal species. Although this association cannot establish that all agents and mixtures that cause cancer in experimental animals also cause cancer in humans, nevertheless, "in the absence of adequate data on humans, it is biologically plausible and prudent to regard agents and mixtures for which there is sufficient evidence of carcinogenicity in experimental animals as if they presented a carcinogenic risk to humans." (Exhibit 12, at 25)

17. Attached hereto as Exhibit 13 is a true and correct copy of the scientific article entitled Toxicity and Carcinogenicity of Cr(VI) in Animal Models and Humans by Max Costa

IGSTROM, :PSCOMB LACK

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 6 of 125

dated in 1997. Dr. Costa, has published a peer reviewed scientific article that shows higher rates of cancer associated with exposure to chrome 6 for sites other than the lung. Specifically, hexavalent chrome exposure elevates the incidence of cancer in the urinary tract, bladder, testes, kidney, prostate, brain and stomach. Other studies indicated that lymphoma, hodgkin's disease and leukemia were also elevated in workers with a higher exposure to hexavalent chromium compounds. (Exhibit 13, page 439)

18. Attached hereto as Exhibit 14 is a true and correct copy of Public Health Goal for Chromium in Drinking prepared by Office of Environmental Health Hazard Assessment California Environmental Protection Agency dated February 1999.

19. Attached hereto as Exhibit 15 is a true and correct copy of excerpts from The Reference Manual on Scientific Evidence (2d ed.) (West 2000).

20. Attached hereto as Exhibit 16 are true and correct copies of relevant portions of the deposition testimony of plaintiff's expert, Dr. Teitelbaum.

21. Attached hereto as Exhibit 17 are true and correct copies of relevant portions of the deposition testimony of plaintiff's expert, Dr. Costa.

22. PG&E claims that the chromium litigation claimants' claims should be disallowed because they are barred by the Statute of Limitations. PG&E has already made this argument. On October 15, 1999, PG&E filed its Motion For Judgment on the Pleadings Dismissing Claims For Personal Injury, Wrongful Death and Loss of Consortium. PG&E also filed a Motion For Summary Judgment or in the Alternative Summary Adjudication as to Plaintiff Ted Chenoweth Only. In these motions, PG&E sought to dismiss the claims of

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 7 of 125

plaintiff Ted Chenoweth and all personal injury, wrongful death and loss of consortium plaintiffs on the grounds that the claims were barred by the applicable Statute of Limitations.

These matters were heard before the Honorable Judge Francis Rothschild in Department 28 of the Los Angeles County Superior Court. PG&E's Summary Judgment Motion with respect to Ted Chenoweth was denied. (Attached hereto as Exhibit 18 is a true and correct copy of said order).

23. As for the Motion for Judgment on the Pleadings, Judge Rothschild granted the motion but declined to dismiss any of the plaintiffs. Instead, she granted plaintiffs leave to amend in order to plead facts showing that plaintiffs were entitled to rely on the delayed discovery rule. Moreover, pursuant to stipulation of the parties, the determination of the sufficiency of the amended allegations of delayed discovery was referred to Justice Howard Wiener. (Attached hereto as Exhibit 19 is a true and correct copy of said order).

24. Thereafter, plaintiffs filed declarations for each of the plaintiffs who were subject to the ruling. On July 18, 2000 Justice Wiener issued his ruling regarding the supplemental declarations. (Attached hereto as Exhibit 20 is a true and correct copy of said order). Justice Wiener declined to dismiss any of the plaintiffs and instead ordered plaintiffs to provide supplemental declarations on behalf of many of the plaintiffs. The supplemental declarations were served in October of 2000.

25. PG&E filed a Demurrer to Plaintiffs Second Amended Complaint alleging, among other things, that the claims of employees were barred by worker's compensation laws. The hearing on the Demurrer was held before the Honorable Judge Francis Rothschild in Department 28 of the Los Angles County Superior Court. On April 5, 1996 Judge Rothschild overruled PG&E's Demurrer finding that the claims of the employees were not barred by worker's compensation laws in that the employees alleged contamination while living in

GSTROM,
PSCOMB
LACK

26. Attached hereto as Exhibit 22 is a true and correct copy of the Site Characterization Work Plan for the Hinkley Gas Compressor Site dated 2/26/88.

27. Attached hereto as Exhibit 23 is a true and correct copy of PG&E Intra-Company memo from C.A. Miller dated 09/24/65.

28. Attached hereto as Exhibit 24 is a true and correct copy of PG&E Intra-Company memo from R.P. Jacobs to R.W. Horton dated 12/22/65.

29. Attached hereto as Exhibit 25 is a true and correct copy of PG&E memo from George Rowe to Dave Gilbert dated 07/17/80.

30. Attached hereto as Exhibit 26 is a true and correct copy of a letter from Robert L. Reed (Betz) to PG&E dated 11/27/53.

31. Attached hereto as Exhibit 27 is a true and correct copy of a letter from Francis de Buda to PG&E dated 03/27/59.

32. Attached hereto as Exhibit 28 is a true and correct copy of letter from S.O. Meyer (Betz) to R.I. Stark (PG&E) dated 11/15/64.

33. Attached hereto as Exhibit 29 is a true and correct copy of a handwritten memo from R.L. Blum to R. Cayot/W.Culver dated 05/10/66.

34. Attached hereto as Exhibit 30 is a true and correct copy of CAM - handwritten memo regarding Chromate Problem dated 10/12.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 9 of 125

35. Attached hereto as Exhibit 31 is a true and correct copy of a letter from W.O. Cheney (PG&E) to E.B. Anderson dated 07/19/65.

36. Attached hereto as Exhibit 32 is a true and correct copy of a handwritten memo from R.P. Jacobs (PG&E) to R.W. Horton dated 08/17/66.

37. Attached hereto as Exhibit 33 is a true and correct copy of PG&E Intra-Company memo from G. Reimers to file dated 08/07/72.

38. Attached hereto as Exhibit 34 is a true and correct copy of a handwritten memo from G. Reimers to file (selected text from Exhibit 1, supra, Historical Background regarding Hinkley Groundwater Contamination) dated 08/72.

39. Attached hereto as Exhibit 35 is a true and correct copy of the State of California's memo from WAC to Loren FSN/LSO dated 10/06.

40. Attached hereto as Exhibit 36 is a true and correct copy of letter from K. Carter to A. Bellomo (State Department of Health) dated 12/07/87.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 19th day of December, 2001 at Los Angeles, California.

JOY L. ROBERTSON

NGSTROM,
IPSCOMB
LACK

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 10 of 125

EXHIBIT 1

PG40069239

X

Rept to me:
Fresh ETE

Historical Background Regarding
Hinkley Groundwater Contamination
Excerpts from File

1) Fall, 1964
Chromate used as a biocide to prevent cooling tower scaling and discharged into unlined percolation ponds. Detected in Topock plant water wells (max 3.2 PPM). Problem at Hinkley addressed at same time.

2) 1965
Owner of (Ross) property (Mismisk) located immediately south of compressor station brought a gallon of "Greenish" water to the compressor station for testing. It tested at 15 PPM chromate (.05 was federal level). Owner was told it would be better not to discuss problem with tenant living on property or other neighbors. Tenant was not drinking water but stated that alfalfa wouldn't grow and fruit trees died. Initial plan was discussed to pump Ross well and a Company well. "In either case it will be extremely difficult to keep this activity and our intended treatment confidential."

D00029574 H086071 PGL0013850

AG094588
000011

3) December, 1965

J. Speth a property owner on Somerset Rd. North of Station had noticed the new change sumphole near Community Blvd. He claimed his green water problem began within weeks of time Company began using sump. (To trout Grandview scrubbed from Ross well)

A Company employee inspected Speth's toilet bowl which had a gray-green discoloration. Speth was told Company was not doing anything in sump that would affect his water supply. (Technically true since source of green water was percolation pond) Speth was told Company would probably not do anything about it.

4) March, 1966

Note to Amos Bechtold from Bob Hinton. Station employees were informed indirectly that a lady residing on Somerset Road was seriously ill. Dr. didn't know what cause of illness was. Employee "did not wish to indicate Company interest so he did

H086072

D0029575

PGL0013851

AG094589

000012

not question (informant) for more specific details. Such lady's home is located between sample points 7 & 13 as shown on your area map. This was brought to your attention mainly to point out that some people in the immediate area are aware that we do have a water contamination problem and that contamination could adversely affect public health." (Residence in question is near Smith and Ross propertys.)

September, 1965
Sampling of groundwater from certain wells north and east of station revealed a chromium plume ranging from 2.0 PPM on Ross property to nondetectable in some wells. (different domestic wells are screened at different depths - deep wells would show least chromate)

December, 1965
Memo on chromate problem
Documents permanent chromium from cooling tower discharged to nearby groundwater. Chromate detectable in supply wells north of property all exceeding Dept. of Public health

H086073

D0029576

PGL0013852

AG094590
000013

and State Water Pollution Board.
Notes "the material is toxic ...
problem is to remove material ...
without causing undue alarm or
establishing significant liability question.

(Along with treatment options supplying
drinking water to domestic supply
well locations is suggested but
never mentioned again.)

January 1966
Note to Harry Prudhomme
Discloses contamination problem
but is factually misleading as
to when and how problem was
discovered. (Ross property was
purchased to control water
supply, satisfy owner and to
provide place to treat plume
after 20 PPM was discovered.)

"For the past 15 years
we have been contaminating
the soil and subterranean water
with 15 tons of chromium ...
... we are trying to introduce
disulfite, (to groundwater) having
treated underground water
for several months we
seem to have hit a
plateau - we can't lower

H086074

D0029577

PGL0013853

AG094591

000014

5

"The Ross well been open." ...

" We became aware that the carbonate was in the aquifer when the well on the property we're proposing to lease showed 20 PPM carbonate."

March, 1966 Memo

" I was pointed out (to Ray F. Casey) that the sulfates found in the Ross well ... (injected by company to reduce and "soften" our chromates) were approaching the maximum allowable for potable water. (192 PPM found - 250 PPM allowed)"

-- " RWH (Horton) indicated that Amos Bechtold says to have Roy McClellan sample Taylor $H_2O$ merely on a 'good neighbor policy' via a ruling by Ray W. White - claims - also to sample Star Valley Ranch $H_2O$. Our stand is (contamination) is not tied to PG&E pipeline or plant; however to clear up any questions we are

6

willing to test water and substantiate our stand."

March, 1966

Note "RWH - relayed following message: Vic Mauro (plant supt.) was told by Howard King (same relative) that a woman living in a dwelling North of Ross property is ill and under a Doctors care. The do not know what is wrong with her. . . . This was reported to A.L.B. (Bochnuck) who asked that we keep him informed and if possible find out subtlety (sic) what we can about her condition and from what she is suffering."

May, 1966

Confidential memo to R. Cayot / W. Colvin From: Raymond L. Blum

Background Summary of Contamination

"In September of 1965, chromate was detected in water samples from a group of wells Northeast of The Plant ... Although most of the water pumped from the wells is used for land irrigation purposes, about ½ of the wells are used for domestic purposes as well. [Test results listed]

H086076

D0029579

AG094593 000016

PG40069245

This development led to immediate and understandable concern inasmuch as:

1) Chromate is known to have a toxic effect on man
2) Governmental Health Departments have established a "Maximum Allowable Limit" of chromate content in domestically used water of 0.005 PPM (incorrect) It is likely that this more or less arbitrary limit was arrived at using highest concentration found in natural, unpolluted groundwater" (also incorrect health based - animal studies)

March, 1966 (Two more neighbor complaints - Responsibility denied, E.G.) "pipeline could not be responsible... She asked me if we would analyze her water and I informed her we would not"

D0029580

H086077

AG094594

000017

8

May, 1966 Company employees designed and constructed a treatment system on Ross property using different locations and methods for disposal. Two areas of soil contamination at plant are result of disposing of treatment residue.

August / 1966 memo

" Did we ever hear why woman next to Spetz (property) went to hospital - ALB answer from RWH (?) Dr. didn't know what was wrong.

What ever happened to her. " No approved sampling(?)

D0029581

H086078

AG094595
000018

June, 1972
Telephone LOG.
From H. Suddy to R.P. Jacobs
"We are to stop pumping the (Ross) well, remove the sodium bisulfate hopper and a portion of the pipe line as soon as possible.

August, 1972
Memo to File Greg Reimes

Documents that California Regional Quality Control Board (CRQCB) inspector from Bishop office visited station and was misled with respect to cooling tower blowdown use of chemicals. Following tour in a general conversation with area superintendent CRWQCB inspector was assured that "PG&E's approached the Board with a proposal to prevent pollution of groundwater and to increase re-use of water in the cooling tower. (I believe this was in fact the changeover to phosphates and the pumping from Ross well to various [illegible] basis

D0029582

## TEXT OF DOCUMENT # PG40069239-247

(Poor Quality Text)

1. Fall, 1964

"Chromate was used as a biocide to prevent cooling tower scaling and discharged into unlined percolation ponds, detected in Topock plant water wells at (May 3.2 ppm). Problem at Hinkley addressed at same time."

2. 1965

"Owner of Ross property (Nemier) located immediately North of Compressor Station brought a gallon of "greenish water" to Compressor Station for testing. It tested at 15 ppm chromate. (.05 was [illegible?] level). Owner was told it would be better not to discuss problem with tenant living on property or other neighbors. Tenant was not drinking water but stated that alfalfa wouldn't grow and fruit trees died. Initial plan was to discussed to pump Ross well and a company well. 'In either case it will be extremely difficult to keep this activity and our intended treatment confidential.'"

3. December, 1965

"J. Speth a property owner on Summerset Road North of Station had noticed the new large sump hole near Community Blvd. He claimed his green water problem began within weeks of time Company began using sump. (To treat groundwater extricated from Ross Well.) A company employee inspected Speth's toilet bowl which had a gray green discoloration. Speth was told company was not doing anything in sump that would affect his water supply. (Technically true since source of green water was percolation pond.) Speth was told Company would probably not do anything about it."

4. March, 1966

"Note to Amos Bechtold from Bob Horton. Station Employees were informed indirectly that a lady residing on Summerset Road was seriously ill. Dr. didn't know what cause of illness was. Employee 'did not wish to indicate Company interest' so he did not question (informant) for more specific details. Sick lady's house 'is located between sample point 7 and 13 as shown on your area map. This was brought to your attention mainly to point out that some people in the immediate areas are aware that we do have a water contamination problem and that contamination could adversely affect public health.' (Residence in question is near Speth and Ross Propertys [sic].)"

5. September, 1965

"Sampling of groundwater from certain wells North and East of Station revealed a chromium plume ranging from 20 ppm on Ross property to nondetectable in some wells. (different [?] wells and screened at different depths - deep wells would show least chromate.)"

6. December 1965

"Memo on Chromate problem Documents Hexavalent Chromium from cooling tower discharged to Hinkley groundwater. Chromate detectable in supply wells North of

000020

EXH011230

property all exceeding Dept. of Health and State Water 'Pollution' Board. Notes 'the material is toxic . . . problem is to remove material without causing undo alarm or establishing difficult liability question.' (Along with treatment options supplying drinking water to domestic supply well locations suggested but never mentioned again.)"

7. January, 1966
"Notes to Harry Prudhomme discloses contamination problem but is factually misleading as to when and how problem was discovered. (Ross property was purchased to control water supply, satisfy owner and to provide place to treat plume after 20 ppm was discovered.)"

"For the past 15 years we have been contaminating the soil and subterranean water with 15 tons of chromium. . . . We are trying to introduce disulfate, (to groundwater) having treated underground water for several months we seem to have hit a plateau - we can't lower the Ross well below 6 ppm."

" We became aware that the chromate was in the aquifer when the well on the property we're proposing to lease showed 20 ppm chromate."

8. March, 1966 memo
"It was pointed out (to Ray F. Cayot) that the sulfates found in the Ross well'" (injected by company to reduce [?illegible] out chromates) were approaching the maximum allowable for potable water (192 ppm found - 250 ppm allowed)."

"RWH (Horton) indicated that Amos Bechtold says to have Roy McClellan sample Taylor H2O [menoly?] on a 'good neighbor policy' via a ruling by Ray W. White - claims. Also to sample Star Valley Ranch H2O. Our stand is 'Contamination is not tied to PG&E pipeline or plant; however to clean up any questions we are willing to test water and substantiate our stand.'"

9. March, 1966
"Note - RWH - relayed following message: Vic Moore (plant elect.) was told by Howard King (some relative) that a woman living in a dwelling North on Ross property is ill and under a doctor's care. They do not know what is wrong with her . . . . This was reported to A.L.B. (Bechtold) who asked that we keep him informed and if possible find out subtleley [sic] what we can about her condition and from what she is suffering."

10. May, 1966
"Confidential memo to R. Cayot/W. Culver from, Raymond L. [Blūn?]. <u>Background Summary of Contamination</u> 'In September of 1965, chromate was detected in water samples from a group of wells Northeast of the Plant. . . . Although most of the water pumped from the wells is used for land irrigation purposes, about 1/2 of the wells are used for domestic purposes as well. (Test results listed.)'"

"This development led to immediate and understandable concern inasmuch as:

1) Chromate is known to have a toxic effect on man,

2) Governmental Health Department have established a 'maximum allowable limit' of chromate content in domestically used water of 0.005 ppm (Chromate). It is likely that this more or less arbitrary limit was arrived at using highest concentration found in natural, unpolluted groundwater. (Also in connect [sic] health based - animal studies.)"

11. March, 1966
"(Two more neighbor complaints - responsibility denied. E.G.) 'pipeline should not be responsible . . . she asked me if we would analyze her water and I informed here we would not.'"

12. May, 1966
"Company employees designed and constructed a treatment system on Ross property using different locations and methods for disposal. Two areas of soil contamination at plant are result of disposing of treatment residue."

13. August, 1966 memo
"'Did we ever hear why woman next to Speth (property) went to hospital - ALB. Answer from RWH (?) Dr. didn't know what was wrong.' What ever happened to her? No approved sampling?"

14. June, 1972
" Telephone log. From H. Suddy to R.P.Jacobs 'We are to stop pumping the (Ross) well, remove the sodium bisulfate hopper and portion of the pipe line as soon as possible."

15. August, 1972
"Memo to [illegible?] Greg Reimes. Documents that California Regional Quality Control Board (CRQCB) inspector from Bishop office visited station and was mislead with respect to cooling tower blowdown use of chemicals. Following tour in a general conversation with areas superintendent CRQCB inspector was assured that 'PG&E approached the Board with a proposal to prevent pollution of groundwater and to increase re-use of water in the cooling tower. (I believe this was in fact the [critage? illegible] over to phosphates/ and the pumping from Ross well to cooling tower [bas? illegible]."

**EXHIBIT 2**

PG20078483

PACIFIC GAS AND ELECTRIC COMPANY **COPY**

Gas Supply and Control

481

December 10, 1953

Drinking Water -
Topock Compressor Station

MR. F. E. WILSON:

This is to call to your attention a report submitted by the W. E. & L. D. Bate Company, dated Nov. 27, 1953, relative to the chemical analysis of water samples from the #1 and #2 wells at the Topock Compressor Station.

The report indicates the presence of chromium, chloride, sulfate and magnesium in excess of those amounts approved under the Public Health Service Drinking Water standards, edition 1946.

In view of these facts, this water should be condemned for human consumption until such time it is proven otherwise.

It is recommended that each outlet be signed accordingly.

F. E. GLECKENING

FEG/dmb
cc: FFD
JEH
WVR
2-c

RECEIVED
DEC 1 1953
Department of Gas Supply and Control
TOPOCK COMPRESSOR STATION

TOP F 3148281

POOR QUALITY

AG040820
000023

EXHIBIT 3

12 9221

726 (56 TES)

CLAIMS AND SAFETY
File No. 010 - file
Chemical Toxicity

September 29, 1964

MR. R. J. OWENS:

I have reviewed the lists of chemicals forwarded by Mr. W. A. Stark and have indicated below those chemicals which have toxic properties. I have used a toxicity rating code of (1) mildly toxic, (2) moderately toxic, and (3) highly toxic. For the purpose of this report I have not differentiated between acute or chronic, or between local or systemic.

| CHEMICAL | IRRITANT | INGESTION | INHALATION |
|---|---|---|---|
| Acid Muriatic | 3 | 3 | 3 |
| Acid Sulphuric | 3 | 3 | 3 |
| Ammonia Anhydrous | 3 | 3 | 3 |
| Antimony | | 3 | 3 |
| Bleach-Sodium Hypocholorite | 2 | 2 | 2 |
| Caustic Soda | 3 | 3 | 2 |
| Chlorine | 3 | 3 | 3 |
| Copper Sulphate | | 2 | 2 |
| Lime | 2 | 2 | 2 |
| Litharge | | 3 | 3 |
| Mercury | | 3 | 3 |
| Nitric Oxide | 3 | | 3 |
| Sodium Phosphate | 3 | 3 | 3 |
| Sodium Sulphite | | 2 | |
| Hydrogen Peroxide | 3 | 3 | 3 |
| Potassium Dichromate | 3 | 3 | 3 |
| Potassium Hydroxide | 3 | 3 | 3 |
| Toluene | | | 2 |
| Methylethly Ketone | 1 | 1 | 2 |

HUGH W. REYNOLDS

HWR:dlb

000024

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 27 of 125

**EXHIBIT 4**

PG10101919

62-6318 (REV. 6-64)

**PG and E**

FOR INTRA—COMPANY USES

| | |
|---|---|
| DIVISION OR DEPARTMENT | Pipe Line Operations Department |
| FILE NO. | 461.1 |
| RE LETTER OF | |
| SUBJECT | Soil and Water Survey |

March 29, 1966

MEMO:

On Friday, March 25, 1966, the drilling of Well No. 7 at Hinkley was inspected and the proposed treatment to eliminate the hexivalent $CrO_4$ from the ground water was reviewed. On hand were Amos L. Bechtold and W. R. Park of Claims, Roy McLellan, Ray Blum, and Ray Cayot of the Department of Engineering Research, and W. J. McGowan and R. W. Horton of Pipe Line Operations.

No. 7 well progress showed the driller at a depth of 84 feet by the end of the day. So far, all samples have shown no trace of $CrO_4$.

The well on the northeast corner of the PG&E property was checked and found to have a standing water level of 84.5 feet. The Ross well had a standing level of 87 feet (taped) and 88.7 feet (electric) with a bottom depth of approximately 114 feet.

Ray Cayot expressed concern as to the possibility of raising the sulfate level above the potable limit of 250 ppm, when treatment to reduce the hexivalent $CrO_4$ is started through the use of either $SO_2$ or $Na_2SO_4$, either of which will raise the sulfate level. Water analysis of the Ross well on October 19, 1965, showed a sulfate level of 192 ppm. Make-up water shows a sulfate level of 31 ppm.

Roy McLellan feels it is doubtful that we will reach the potable limit of sulfate with our treatment and considers it less of a problem than the $CrO_4$ in that the $CrO_4$ is considered toxic, whereas the sulfates are not.

PGE0017352

Amos Bechtold agreed that if it comes to a decision as to whether we eliminate the chromates or prevent the sulfate level from reaching an unacceptable concentration, the reduction of the chromate takes precedence in that it is considered

AG024089

000025

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 29 of 125

harmful. He questioned whether enough consideration was being given to all salts and concentrated materials contained in our effluent. He recommended that we make some tests of the soil in and around the area where we are discharging our effluent to make sure no harmful ingredients are being carried in sufficient concentrations to affect either plant or animal life in the surrounding area by either surface soil or ground water contamination. Mr. Bechtold was concerned with the fact that the plant life in the leaching area is dying. Roy McLellan feels this may have been caused by problems with the $SO_2$ feed system. Low pH Roy doesn't think this will cause any trouble because the alkaline soil neutralizes the acidic water.

It was agreed, however, that this area of concern should be investigated and some analysis should be made of the effluent as it is discharged to ground.

The following program was agreed upon:

I. HOLDING POND WATER ANALYSIS

A. Samples will be taken for three consecutive days and analyzed.

B. Analysis results will be reviewed by a consultant, Mr. Garrod, at the request of A. L. Bechtold, to determine effects on plant life.

II. NO. 7 AND ROSS WELLS

A. Upon completion of No. 7 well, a production test will be run checking

1. Discharge rate - gpm - of No. 7 well.
2. Drawdown of No. 7 well.
3. Drawdown of Ross well.

B. Ross well will have a production test run at existing well condition

1. Discharge rate of Ross well - gpm.
2. Drawdown of Ross well.
3. Drawdown of No. 7 well.

C. Complete chemical analysis of both wells to be made. PGE0017353

D. Results of II B and C will determine treatment steps to be taken.

E. Ross well pump to be pulled and well reworked (swabbed and bailed) if treatment is to be initiated. The well will be sleeved if deemed necessary.

III. PREVENTION OF FUTURE CONTAMINATION

Methods of Preventing possible contamination of soil and/or water are to be investigated. A satisfactory program should be initiated as soon as possible.

W. J. McGOWAN

WJM:pm

MAR 29 1966 WJM. WELL #7 TO A DEPTH OF 121 Ft & INTO GREEN CLAY WITH LITTLE OR NO INDICATION OF $H_2O$.
READINGS AT 93,95 & 97 Feet SHOWED NO $CrO_4$ PRESENT
" " 103 & 107 " " $CrO_4$ "
" BELOW 107 Feet SHOWED NO " "

UPON OPENING THE DISCHARGE LINE FROM THE ROSS WELL IT WAS FOUND TO BE 1/2 FULL OF COARSE GRAVEL.

MAR 31 1966 WJM. 3/30 PERFORATED #7 WELL CASING & GRAVEL PACKED WITH 7 TONS GRAVEL

3/31 BAILED #7 HAD TO ADD GRAVEL
PRODUCED ROSS WELL TO 130 6PM BEFORE BREAKING SUCTION DRAW DOWN FROM 87' STANDING TO 102'. SAMPLE SHOWED 12 ppm $CrO_4$. NO DRAWDOWN EFFECT NOTICED AT #7 WELL.

PGE0017354

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 31 of 125

**EXHIBIT 5**



PG40436391

PGQ160200

H161250

May 10, 1966

Memo to R. Coyot / W. Culver

(CONFIDENTIAL INFORMATION)

Re: Summary of Field Data – Hinkley Ground Water Study

BACKGROUND

The Hinkley Compressor Plant has for some number of years utilized chromate-bearing chemical additives in plant cooling waters to inhibit corrosion and scaling in the cooling water towers and appurtenant structures. A resultant effluent containing significant concentrations of dissolved chromic acid salts has been dumped or ponded on the ground surface in the area immediately northeast of the plant and allowed to percolate downward through the sandy soil to the ground water table. It is estimated that this practice has existed for approximately 15 years.

In September of 1965, chromate was detected in water samples from a group of wells northeast of the plant. (See attached Map 1) Although most of the water pumped from these wells is used for land irrigation purposes, about 1/2 of the wells are used for domestic purposes as well. Chromate concentrations in these samples ranged from very minute trace amounts (say less than 0.05 ppm) in most wells up to a relatively high 7 20-ppm in well sample No. 3. (Data list showing specific concentrations from samples is filed with Company Claims & Safety Dept is not readily available at this time) The well containing this

(2)

H161251 PGQ160201

high concentration is locally designated as the "Ross well" or "Pulaski well" and is located about 1/4 mile north of the old effluent dumping area.

This development led to immediate and understandable concern inasmuch as:

1.) Chromate is known to have toxic effects on man

2.) Governmental health departments have established a "maximum allowable limit" of chromate content in domestically used waters of 0.005 ppm (It is likely that this more or less arbitrary limit was arrived at by using the highest concentration found in natural, unpolluted groundwater.)

After the contamination was discovered, steps were taken to chemically treat the chromate-laden effluent before dumping, and this treatment has continued to the present time. This action has supposedly eliminated any additional contamination (i.e. Sept. 1965) and concern now centers around the problem of correcting "pre-polluted" ground water thought to be circulating in the area north and east of the plant. Special significance is attached to the high chromate concentrations found in the Ross well, as the Company leases, but does not own the land upon which this well is located.

Several January and February, 1966, meetings between Pipeline Operations and Dept. of Engineering Research personnel resulted in the decision to drill a test well on Company owned property immediately south of the Ross well. Initially, the primary purpose of this well was to have been to

PG40436393.

(3)

PGQ160202

serve as an injection site for chemical treatment designed to eventually purify the ground water supplying the Ross well. In addition in was felt advisable to sample and analyze the various strata encountered during the drilling to determine, if possible, any vertical zoning or patterns of chromate concentrations in the soil.

The test well has been completed and pumping tests have been performed on both this well and the Ross well. To date, no chemical injection treatment has been performed; however fresh water has been injected in the test well to determine the rate of 'take' or permeability value of the surrounding strata.

This memo summarizes the data gathered from the field during the drilling, sampling and test pumping periods. In addition, remarks are included concerning:

1.) The general geological features of the area
2.) Ground water conditions and probable flow characteristics as concluded from the pumping tests.
3) recommendations as to future observations

H161252

Raymond L. Blum
Engineering Geologist

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 35 of 125

**EXHIBIT 6**

$H_2SO_4$ acid is added to maintain pH between 7.2 to 7.5

2. Tower B

Sulphuric acid is added to maintain the pH between 7.2 and 7.5. The raw make-up water with acid has been in use in Tower B since September 1969. Betz C-5 is also added to control bacteria and algae.

3. Tower C

Soft water (from ion exchange unit) is being used in this tower. The pH of water is about 8.8 to 8.9. Algaecide Betz C-5 and descaler Betz 408 are added to this tower.

Betz D-202 is injected into these towers twice a year as a shock treatment to kill algae and slime.

Betz 408 is mainly polyacrylate and phosphonate. It is biodegradable and is acceptable to USDA.

Betz C-5 is a chlorine donator and is also acceptable to USDA.

III. Chromate for Water Treatment

Trivalent chromate is supposed to be less toxic than the hexavalent chromate which is the form used for water treatment. Hexavalent chromate is a toxic pollutant which will cause nausea and cancer (1, 2). Chromium is toxic to plants at all concentrations and is toxic to animals and wild life above certain concentrations, depending upon the species. Both hexavalent and trivalent chromates are toxic, with lower forms of aquatic life suffering more from the effects (1).

Industrial hygiene reports (3) indicate that workers who handle chromates have a much higher incidence of lung cancer workers in other chemical factories. Chromate particles can develop lesions of the flesh (disappearing of the flesh) where they fall.

Allowable concentrations: in general the following concentrations of both trivalent and hexavalent are permissible:

| | |
|---|---|
| Domestic Water | 0.05 mg/l |
| Stock and Wildlife | 5.0 mg/l |
| Fish Life | 1.0 mg/l |
| Other Aquatic Life | 0.05 mg/l |

If chromate is used for cooling water treatment, the amount of chromate lost with "drift losses" is calculated below: average drift loss from cooling towers A and B (according to the manufacturer's specifications): 22 gpm = 31,680 gpd

= 119,909 liters/day

Chromate concentration in water = 10 ppm

= 10 mg/l

Chromate loss associated with the drift= 119,909 x 10 = 1,199,090 mg

= 2.5 lb/day.

Total amount of chromate requires per day = 14 lb/day

The water particles carrying chromate may fall as far as 850 feet away from a tower if its height is 850 feet (4). The chromate falling on the ground may get mixed with the surrounding soil which may trickle down to the aquifer along with the trickling water from the surface.

## IV. Performance of Cooling Towers

1. Study by the Department of Engineering Research: In 1967, DER made a comparative study of the performance of cooling towers A and B (5). The treatment at that time was: Tower A - Betz 35A - a zinc phosphate inhibitor and sulfuric acid for pH. Tower B - Sulfuric acid for pH control.

Corrosometer probes and mild steel and admiralty brass coupons were used for the study.

The data obtained indicated that the corrosion rate was higher in Tower A than in Tower B. The pH in the Tower B was fairly uniform throughout the basin, whereas in Tower A, there were wide variations of pH. This might have been one of the reasons for higher corrosion in Tower A. A beginning of corrosion of the structural steel of Tower B was noticed. The spectrographic analysis showed some de-zincification and de-tinification of brass tubes in Tower A. There was a heavy copper sulfate deposition on steel coupons in Tower A. The brass coupons from Tower B showed a fairly light Mg-Ca carbonate scale. Corrosion rate in both the towers was as follows:

| Coupon | Tower A | | | Tower B | | |
|---|---|---|---|---|---|---|
| | Min. Mil/Yr | Max. Mil/Yr | Avg. Mil/Yr | Min. Mil/Yr | Max. Mil/Yr | Avg. Mil/Yr |
| Brass | 0.116 | 2.29 | 1.03 | 0.215 | 0.603 | 0.3706 |
| Steel | 11.8 | 13.2 | 12.0 | 0.71 | 3.22 | 1.75 |

D0029772

2. DER made another study of these towers in 1968-69 (6). The treatment at that time was: Tower A: Treatment by Betz Corporation Corrosion-Scale Control - Betz 35A; Algae slime control - Betz C-5. Sulphuric acid to maintain a pH range of 6.6 to 7.0. This range was later changed to 6.8 - 7.2,

H040959

PGT0419533

AG092732

000032

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 38 of 125

EXHIBIT 7

Phillip C. Watson 222-2385
Geosciences Department
Room 2674, 77 Beale

Phil:

I have began the intensive literature search as you requested. I will be getting in some of the material by next week and will forward it to you at Hinckley Compressor Station, addressed to Dennis Woods-Superintendent but with attention Phil Watson.

As I mentioned, there is a lot of information about hexavalent chromium but very little about rigid limits of toxicity. I have included some of the information that is currently available to me.

## ENVIRONMENTAL TOXICITY

Cr+++ is an essential element in mammals as it maintains the efficiency of lipid, glucose, and protein metabolism (Steven et al. 1976). In general, the toxicity of this trivalent form is very low in mammals because its membrane permeability is low, it is fairly noncorrosive, and it does not tend to biomagnify or accumulate through the food chains in its inorganic form. On the other hand, the hexavalent form of Chromium (Cr++++++) is toxic because it has a high oxidizing potential and it easily penetrates biological membranes (S[illegible]on et al. 1976, Taylor and Parr 1978; Langard and Norseth 197[illegible] [illegible]cological Analysts 19[illegible]

T[illegible]e interact[illegible]n of Cr++++++ chromic oxide, dichromate, or chromate c[illegible] [illegible]nds with organic compounds [illegible] result in its reductio[illegible] th[illegible] [illegible]ss toxic trivalent form (Taylor and Parr 197[illegible])

## TOXICITY

Hexavalent chromium was fatal to dogs in 3 months at 100 ppm in their food, and killed most mammalian experimental animals at injected doses of 1 to 5 mg Cr/kg body weight. However, dietary levels of 100 ppm had no measurable effect upon chickens over a 30 day period.

Steven et al. (1976) in studies with Cr+6 and dogs showed that 6.0 ppm and 11.2 ppm in drinking water was not lethal over a 4 y[illegible] peri[illegible], although significant accumulation did take place. [illegible] [illegible],000 ppm dietary Cr+6 was the toxic threshold. All anima[illegible] [illegible]urvived 134 ppm Cr+6 in drinking water over 3 months.

[illegible] most mammalian species tested, the minimum fatal dose of [illegible]ected Cr+6 ranged from 1 to 5 mg/kg body weight.

A lethal oral dose of Cr+6 in a 14 year old boy was estimated to be 10 mg/kg body wt., which is much lower than levels tolerated by lab animals over a period of several months (Steven et al. 1976).

SUBLETHAL EFFECTS

Under lab conditions, Chromium is mutagenic, carcinogenic and teratogenic (birth defects) to a wide variety of organisms, with Cr+6 having the highest biological activity. At higher concentrations, Cr+6 is associated with abnormal enzyme activities, altered blood chemistry, lowered resistance to pathogenic organisms, behavioral modifications, disrupted feeding, histopathology, osmoregulatory upset, alterations in population structure and species diversity indices, and inhibition of photosynthesis. Not all of these sublethal effects observed were permanent, but acclimatization to Cr is not well documented (USFWS Hazard Review No. 6).

In mammals, chromium is causally associated with mutations and malignancy (Leonard and Lawerys 1980; Norseth 1981). Under appropriate conditions, Cr is a human and animal carcinogenic agent. The incidence of human cancers related to Cr is primarily from airborne sources. This has included chromate in manufacturing processes but could potentially include an aerosol from a shower if the concentrations in the water were high enough. Levels of Cr+6 at 10 ug/m3 in air produced strong irritation in nasal membranes after short exposure. The inhalation of Cr+6 may cause bronchial carcinomas (Langard and Norseth 1979). Several lab tests of animal reaction to Cr on the skin are cited in U. S. Fish and Wildlife Service Contaminant Hazard Reviews No. 6.

Teratogenic eff[illegible]s induced by intravenous administration of 5 mg Cr+6/kg body wt t[illegible] pregnant hamsters included cleft palates, and defects in the ossification of the skeletal system (Gale 1978).

Cr+6 (11.2 ppm) administered in drinking water to dogs may cause accumulation to occur in many body tissues, the highest accumulation levels were found in the brain (Steven et al 1976).

Phil, I am also sending along selected pages from a draft US EPA document dated September 30, 1985. Some of the information that I have provided above is more current, but the EPA document has some very pertinent information.

[G]ive me a call if this does not meet your current needs. I am [c]ontinuing my search for pertinent literature and will keep you [upd]ated. If you have any additional requests, please give me a ca[l]l.

Roland J Risser

Roland J. Risser
531-5842
3400 Crow Canyon Road
San Ramon, Ca 94583

H142437

PGS0008890

PG40108438

September 30, 1985

II-1

CHROMIUM

Health Advisory
Office of Drinking Water
U.S. Environmental Protection Agency

The Office of Drinking Water's non-regulatory Health Advisory Program provides information on health effects, analytical methodology and treatment technology that would be useful in dealing with contamination of drinking water. Health Advisories also describe concentrations of contaminants in drinking water at which adverse effects would not be anticipated to occur. A margin of safety is included to protect sensitive members of the population.

Health Advisories are not legally enforceable Federal standards. They are subject to change as new and better information becomes available. The Advisories are offered as technical guidance to assist Federal, State and local officials responsible for protection of the public health.

The Health Advisory numbers are developed from data describing non-carcinogenic end-points of toxicity. They do not incorporate quantitatively any potential carcinogenic risk from such exposure. For those chemicals which are known or probable human carcinogens according to the proposed Agency classification scheme, non-zero, One-day, Ten-day and Longer-term Health Advisories may be derived, with attendant caveats. Health Advisories for lifetime exposures may not be recommended. Projected excess lifetime cancer risks calculated by EPA's Carcinogen Assessment Group are provided to give an estimate of the concentrations of the contaminant which may pose a carcinogenic risk to humans. These hypothetical estimates usually are presented as upper 95% confidence limits derived from the linearized multi-stage model which is considered to be unlikely to underestimate the probable true risk.

[Summary table-to be added]

H142438

PBS000689?

Metabolism

- The metabolism of chromium in mammalian species is not well understood and is complicated by the presence of the two oxidation states, Cr III and Cr VI.

- Cr VI traverses biological membranes by diffusion or facilitated transport, possibly via an anion transport system (Alexander, et al., 1982). It is reduced to Cr III intracellularly by the cytochrome P-450 system in the presence of NADPH. Cr III reacts with nucleophilic ligands and cellular macromolecules (Gruber and Jennette, 1978).

Excretion

- The urinary system is the major excretory route for absorbed chromium (Kraintz and Talmage, 1952). Very little is known about the form in which chromium is excreted.

- After intravenous administration, chromium is also excreted in the feces, although reports in the literature vary considerably on the percentage. Hopkins (1965) reported that 0.3% to 1.7% of the initial dose of Cr III was excreted in the feces of rats eight hours after intravenous administration of $^{51}CrCl_3$ at 0.1 ug/100 g.

IV. HEALTH EFFECTS

- Chromium III is an essential nutrient required in trace quantities for normal glucose metabolism. Some forms of chromium may also be important in the metabolism of lipids and other carbohydrates (U.S. EPA, 1985).

- The toxicity of chromium has been attributed primarily to Cr VI, which has been shown to produce liver and kidney damage, internal hemorrhage, dermatitis and respiratory problems. The immediate symptoms are generally nausea, repeated vomiting and diarrhea (U.S. EPA, 1985).

Humans

- Doses of 0.5 to 1.5 g of $K_2Cr_2O_7$ have been fatal in humans. The estimated $LD_{50}$ for $K_2Cr_2O_7$ in children is 26 mg/kg (Cr VI at 9.2 mg/kg) (NIOSH, 1983).

- A family of four persons on Long Island, New York, drank for three years from a private well containing Cr VI at approximately 1 mg/L (0.03 mg/kg/day for a 70 kg human). No adverse health effects were detected by physical examination (no further details given) (Davids and Lieber, 1951).

- Subchronic and chronic dermal exposure to Cr VI in the form of chromic acid may cause contact dermatitis and ulceration of the skin (Burrows, 1978).

- Chronic inhalation of dust or air containing Cr VI may cause respiratory problems including perforated or ulcerated nasal septa and decreased spirometric values (U.S. EPA, 1985).

### Animals

#### Short-term Exposure

- Compounds of Cr III have low toxicity in humans and animals. In rats, $LD_{50}$ values for Cr III in various salts range from 600 to 2,600 mg/kg (Smyth, et al., 1969).
- Chromium VI is more toxic with an oral $LD_{50}$ (as $Na_2Cr_2O_7$) in rats of 19.9 mg/kg (NIOSH, 1983).
- Rats were exposed to drinking water containing $K_2CrO_4$ at 300 or 500 mg/L (Cr VI at 80 or 134 mg/L) for 60 days (Gross and Heller, 1946). The calculated doses were 8.3 and 14.4 mg/kg/day, and no adverse health effects were reported.

#### Longer-term Exposure

- Rats were supplied with drinking water containing 0 to 25 mg/L of either Cr III as $CrCl_3$ or Cr VI as $K_2CrO_4$ (0 to 1.87 mg/kg/day for male rats and 0-2.41 mg/kg/day for female rats for one year (Mackenzie, et al., 1958). No significant differences in weight gain and appearance, or pathological changes in the blood or other tissues were reported for the treatment groups.
- Schroeder, et al. (1965) investigated the effects of Cr III at 5 mg/L in drinking water on rats from the time of weaning until death. No significant effects were observed. The calculated dose of Cr III was about 0.42 mg/kg/day.
- Female dogs (five dose groups with two animals per group) were given Cr VI at 0.45 to 11.2 mg/L as $K_2CrO_4$ in their drinking water for four years (Anwar, et al., 1961). The calculated doses were 0.012 to 0.30 mg/kg of Cr VI. No significant changes were observed in physical condition, food consumption, growth rate, urinalysis or blood counts. Liver, kidney and spleen organ weights remained normal.

#### Teratogenic/Reproductive Effects

- The literature available on possible fetal damage caused by chromium compounds is limited. No studies were located on teratogenic effects resulting from ingestion of chromium.
- The placenta appears to be highly selective in its permeability to the various forms of chromium. Inorganic Cr III administered as $^{51}CrCl_3$ (chromium chloride) intravenously or by stomach intubation does not cross the placental barrier to an appreciable extent in rats (Mertz, et al., 1969). However, Cr III administered by stomach intubation to pregnant rats in the form of GTF (obtained from yeast) is recovered readily from the fetus (Mertz and Roginski, 1971). The dosages in these two studies were unspecified.

H142440

P050008893

## Mutagenicity

- The genotoxic effects of chromium are well documented both in *in vivo* and *in vitro* studies. The pathway by which chromium exerts these effects is believed to involve penetration of the cell membrane by Cr VI, followed by intracellular reduction to Cr III. Extracellular Cr III crosses the cell membrane, but less efficiently. Once inside the cell, Cr III can form tight complexes with DNA, accounting for its mutagenic potential (U.S. EPA,1985).

- Compounds of both Cr III and Cr VI increase non-complementary nucleotide incorporation into DNA (Raffetto, et al., 1977; Majone and Rensi, 1979), with Cr VI being effective at lower doses. Exposure of cells from rat liver and kidney to Cr VI leads to increased cross-linking in DNA. Petrilli and De Flora (1977, 1978) reported positive Ames tests for Cr VI; however, Cr III exerted no effect at relatively high concentrations (presumably because of its inability to penetrate cells). Similar results were reported by Gentile, et al. (1981).

- The difficulty of observing mutagenic effects of Cr III may be related to its slight uptake by cells under most conditions. Warren, et al. (1981), studied the mutagenicity of a series of hexacoordinate Cr III compounds and concluded that, in the proper ligand environment, the metal possesses considerable genetic toxicity.

## Carcinogenicity

- There is inadequate evidence to determine whether or not oral exposure to chromium can lead to cancer. Ivankovic and Preussmann (1975) exposed rats to Cr III at 293, 586 or 1,466 mg/kg/day in the diet (administered as chromium oxide pigments) for two years, but observed no increase in the tumor rates over that of the control animals.

- The carcinogenicity of inhaled Cr VI is well established for occupational exposure of humans (Hayes, et al., 1979). However, the effects are observed only in the respiratory passages and in the lungs, and have no bearing on carcinogenic risk following oral exposure to the metal.

## V. QUANTIFICATION OF TOXICOLOGICAL EFFECTS

Health Advisories are based upon the identification of adverse health effects associated with the most sensitive and meaningful non-carcinogenic end-point of toxicity. The induction of this effect is related to a particular exposure dose over a specified period of time, most often determined from the results of an experimental animal study. Traditional risk characterization methodology for threshold toxicants is applied in HA development. The general formula is as follows:

$$\frac{(\text{NOAEL or LOAEL})(\text{BW})}{(\text{UF}(\text{s}))(__\ \text{L/day})} = __\ \text{ug/L}$$

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 45 of 125

where:

NOAEL or LOAEL = No-Observed-Adverse-Effect-Level or Lowest-Observed-Adverse-Effect-Level (the exposure dose in mg/kg bw)

BW = assumed body weight of protected individual in kg (10 or 70)

UF(s) = uncertainty factors, based upon quality and nature of data

___ L/day = assumed daily water consumption (1 or 2) in liters

The Health Advisories will be determined on the basis of the effects of Cr VI. Separate Health Advisories will not be established for Cr III for the following reasons:

1. Cr III and Cr VI are in dynamic equilibrium, the degree of oxidation in an aqueous medium depending on factors such as pH, $pO_2$, presence of reducing agents, etc. Schroeder and Lee (1975) described the slow oxidation of Cr III to Cr VI in lake water (as opposed to sediments). The rate of this oxidation was accelerated by the addition of an oxidizing agent (25 mg/L $MnO_2$). It may be predicted, therefore, that water treatment involving chlorination will effectively transform Cr III to Cr VI. The normal presence of residual oxidizing capacity in treated water throughout the water distribution system will assure maintenance of dissolved Cr in the oxidized state; therefore, drinking water at the point of consumption (i.e., the tap) is likely to contain Cr VI.

2. Cr VI is more toxic than Cr III, since only the hexavalent species readily crosses cell membranes. The relative non-mutagenicity of Cr III, as contrasted with that of Cr VI, can be attributed directly to this fact (Jennette, 1979), even though Cr VI is reduced to Cr III intracellularly, and it is Cr III which reacts with DNA in the cells (Levis, et al., 1977, 1978a). A standard based on Cr VI, therefore, will be conservative with respect to any Cr III which might be present in water.

3. Even though orally ingested Cr VI is reduced in part during passage through the stomach, reduction is incomplete, and there is greater absorption (Donaldson and Barreras, 1966) and greater tissue accumulation (MacKenzie, et al., 1958) of chromium following ingestion of Cr VI than of Cr III.

One-day Health Advisory

There are no suitable data for calculating a One-day HA value. Therefore, it is recommended that the Ten-day HA also be used as a One-day HA.

Chromium September 30, 1985

## Ten-day Health Advisory

Gross and Heller (1946) exposed both male and female rats for 60 days to drinking water containing $K_2CrO_4$ at either 300 or 500 mg/L (Cr VI at 80 mg/L and 134 mg/L, respectively). Using reported average body weights of 270 and 260 g, respectively, and assuming consumption of 28 mL water per day, the average ingested doses of Cr VI are calculated to be 8.3 and 14.4 mg/kg/day, respectively. After two months, the rats receiving Cr VI at 8.3 mg/kg/day was described as normal. A "slight roughness of coat" was noted in rats receiving 14.4 mg/kg/day, but this is not considered to be an adverse health effect, and this observation is not associated with other adverse health effects.

Therefore, 14.4 mg/kg/day represents the NOAEL for Cr VI in this study.

The Ten-day HA for a 10 kg child is calculated as follows:

$$\text{Ten-day HA} = \frac{(14.4\ \text{mg/kg/day})\ (10\ \text{kg})}{(100)\ (1\ \text{L/day})} = 1.4\ \text{mg/L}\ \ (1400\ \text{ug/L})$$

where:

14.4 mg/kg/day = NOAEL

10 kg = assumed weight of a child

100 = uncertainty factor appropriate for use with NOAEL from animal study

1 L/day = assumed water consumption by child.

DRAFT

Because it is based on a 60-day exposure period, the Ten-day HA also would be protective for One-day exposures.

## Longer-term Health Advisory

Mackenzie, et al. (1958) studied the effects of chronic ingestion of Cr III and Cr VI by rats. Both male and female Sprague Dawley rats (34 days old) were supplied with drinking water containing Cr as $CrCl_3$ (Cr III) or as $K_2CrO_4$ (Cr VI) in a series of doses up to 25 mg/L for a period of one year. Assuming an average weight of 375 g for males and 290 g for females, and an average daily water intake of 28 mL (Arrington, 1972), the average dose for males and females receiving 25 mg/L is calculated to be 1.87 and 2.41 mg Cr/kg/day, respectively. No significant adverse effects on appearance, weight gain, food consumption or blood chemistry were noted at any of the dose levels. However, the animals receiving the highest dose (25 mg/L) of Cr VI showed an approximate 20% reduction in water consumption.

Cr VI at 2.41 mg/kg/day was identified as the NOAEL in this study. The Longer-term HAs are calculated as follows:

September 30, 1985

Chromium

For 10 kg child:

Longer-term HA = $\frac{(2.41 \text{ mg/kg/day}) (10 \text{ kg})}{(100) (1 \text{ L/day})}$ = 0.24 mg/L or 240 ug/L

For 70 kg adult:

Longer-term HA = $\frac{(2.41 \text{ mg/kg/day}) (70 \text{ kg})}{(100) (2 \text{ L/day})}$ = 0.84 mg/L or 840 ug/L

DRAFT

Where:

2.41 mg/kg/day = NOAEL

10 kg = assumed weight of a child

70 kg = assumed weight of an adult

100 = uncertainty factor appropriate for use with NOAEL from animal study

1 L/day = assumed water consumption by child

2 L/day = assumed water consumption by adult

Lifetime Health Advisory

In a four-year dog study, Anwar, et al. (1961) observed a NOAEL for Cr VI of 11.2 mg/L of drinking water, corresponding to 0.3 mg/kg/day. Although this study was four years in duration, only two dogs per dose group were employed. This study is excluded on the basis of the small test group size. The study by Mackenzie, et al. (1958) employed more animals (16 rats/dose group), although it lasted only one year. The NOAEL for Cr VI in this study was 2.41 mg/kg/day.

As previously discussed, the study by MacKenzie, et al. (1958) is the most appropriate from which to derive the Lifetime Health Advisory. From these results, a NOAEL of 2.41 mg/kg was identified.

Using this NOAEL, the Lifetime Health Advisory is derived as follows:

Step 1: Determination of a RfD

RfD* = $\frac{(2.41 \text{ mg/kg/day})}{(100) (5)}$ = 0.0048 mg/kg/day

H142444

Where:

2.41 mg/kg/day = NOAEL

100 = uncertainty factor appropriate for use with NOAEL from animal study

PGS0008897

000041

PG40108445

| | |
|---|---|
| 5 | = additional uncertainty factor to compensate for less than lifetime exposure |
| *RRfD | = Risk Reference Dose: Estimate of daily exposure to the human population which appears to be without appreciable risk of deleterious non-carcinogenic effects over a lifetime of exposure |

**Step 2: Determination of Lifetime HA**

$$\text{Lifetime HA} = \frac{(0.0049 \text{ mg/kg}) (70 \text{ kg})}{(2 \text{ L/day})} = 170 \text{ ug/L}$$

DRAFT

Where:

| | |
|---|---|
| 70 kg | = assumed weight of protected individual |
| 2 L/day | = assumed volume of water ingested per day by 70 kg adult |

Assuming a 71% relative source contribution for drinking water, the Lifetime HA would be 120 ug/L.

Evaluation of Carcinogenic Potential

There is no evidence of carcinogenic effects following oral exposure to chromium. Thus, no assessments for carcinogenic risks from oral exposure to chromium have been conducted. Inhalation of chromium, however, is associated with an increased frequency of lung cancer in humans.

EPA's CAG has estimated the lifetime cancer risk due to a constant exposure to air containing 1 ug/m³ of elemental chromium to be $1.2 \times 10^{-2}$ (U.S. EPA, 1983).

Based on exposure to chromium via inhalation, the IARC (IARC, 1982) have classified chromium and certain chromium compounds in Group 1 (Chromium VI); sufficient evidence for carcinogenicity in humans and animals.

Applying the criteria described in EPA's proposed guidelines for assessment of carcinogenic risk (U.S. EPA, 1984), chromium may be classified in Group A: Human carcinogen. This category is for agents for which there is sufficient evidence to support the causal association between exposure to the agents and cancer. However, as there are inadequate data to conclude that chromium is carcinogenic via ingestion, chromium is dealt with here as Group D: Not classified. This category is for agents with inadequate animal evidence of carcinogenicity.

P050008898

H142445

000042

VI. OTHER CRITERIA, GUIDANCE AND STANDARDS

- Recommended or established standards for chromium in the United States include:

  50 ug Cr VI per liter for drinking water (U.S. PHS, 1962)

  50 ug total chromium per liter for drinking water (NAS, 1974; U.S. EPA, 1976)

  1 ug/m$^3$ for carcinogenic forms of Cr VI in workplace air (NIOSH, 1975)

  25 ug/m$^3$ TWA or 50 ug/m$^3$ ceiling for non-carcinogenic forms of Cr VI in workplace air (NIOSH, 1975).

- The recommended ambient water quality criterion for Cr VI is 50 ug/L (U.S. EPA, 1980).

- An estimated adequate and safe intake for chromium of 50 to 200 ug/day for adults has been established (NAS, 1980a,b). This range is based on the absence of signs of chromium deficiency in the major portion of the U.S. population which consumes an average of 60 ug of chromium per day.

VII. ANALYSIS

- Determination of chromium is by atomic absorption (AA) using either direct aspiration into a flame (Method 218.1. Atomic Absorption, direct aspiration. U.S. EPA, 1979) or a furnace technique (Method 218.2. Atomic Absorption, furnace technique. U.S. EPA, 1979).

- The direct aspiration AA procedure is a physical method based on the absorption of radiation at 357.9 nm by chromium. The sample is aspirated into an air-acetylene flame and atomized. A light beam is directed through the flame into a monochromator, and onto a detector that measures the amount of light absorbed. Absorbance is proportional to the concentration of chromium in the sample. The detection limit is 50 ug/L using this procedure.

- The furnace AA procedure is similar to direct aspiration AA except a furnace, rather than a flame, is used to atomize the sample. The detection limit is 1 ug/L using this procedure.

VIII. TREATMENT

- The treatment technologies that are available to remove chromium from water include coagulation/filtration, lime softening, ion exchange and reverse osmosis. However, the type of treatment that may be applied is dependent on the species of chromium present.

- Laboratory and pilot plant studies indicated that using ferric sulfate, Cr III removals were near 100 percent in the range of pH 6.5 to 9.5. Alum was less effective between pH 7.5 and 8.5, with removals around

90 % or better. Above and below this pH range, removals were slightly lower, 80 to 90 %. In removing Cr VI, laboratory and pilot-plant tests confirmed that of the three coagulants used, only ferrous sulfate was effective. With alum and ferric sulfate, Cr VI removals did not exceed 30 %. By comparison, ferrous sulfate coagulation achieved 90 % removal or better (U.S. EPA, 1977).

- Results of jar and pilot-plant tests indicate that Cr III removal efficiencies with lime softening were approximately 72 % at pH 8.5 to 9.5 and greater than 99 percent at pH 11 to 11.5. Results with Cr VI in the same tests in all cases were less than 10 % (U.S. EPA, 1977; Sorg, 1979).

- Since Cr III exists as a cation and Cr VI exists as an anion, a cation exchanger in series with an anion exchanger may be required for their removal. Removal of Cr VI from sewage (Sorg, 1979), industrial wastewater, rinse waters from chromium plating operations (Miller, et al., 1978), cooling tower blowdown (Richardson, et al., 1968; Miller, et al., 1978), and metal recovery (Sussman, et al., 1945) has been demonstrated. Laboratory tests on a simulated Arizona well water (TDS 174 mg/L, pH 7.85) having 0.019 mg/L of Cr VI showed a breakthrough of Cr VI at roughly 12,000 bed volumes (U.S. EPA, MERL, 1982). Reports concerning industrial wastewater treatment indicate that ion exchange can successfully remove Cr III to below 0.05 mg/L (Patterson, 1978). Strong acid cationic resins have been used for removing Cr III as a contaminant from metal plating rinse waters and from chromate treated cooling waters. Vendor information indicates that operating pH levels of between 6 and 8 are adequate for Cr III removal with pH above 7 being slightly better than pH below 7 (Rohm and Haas Co., 1980). Ion exchange softening using standard strong acid synthetic resins operating in the sodium cycle should effectively remove Cr III with 90 percent or greater efficiency (Amore, 1977). In tests of home softeners with tap water spiked with 1 mg/L of chromium nitrate, the chromium content continued to be reduced to 0.020 mg/L after 192 cycles, at which point the test was discontinued.

- Reverse osmosis (RO) membranes can efficiently remove from 82 to 99 percent of the chromium in a feed water source (Fox, no date; Hixon, 1973; Johnston, et al., 1978). Pilot plant tests using both cellulose acetate and hollow fiber (polyamide) membranes demonstrated their effectiveness in removing both Cr III and Cr VI. Cr III removal ranged from 90 to 98 percent and Cr VI removal ranged from 82 to 97 percent. Slightly better removal was achieved with the hollow fiber than with the cellulose acetate membranes (Fox, no date).

H142447 PGS0008900

PG40108448

BIOLOGICAL REPORT 85(1.6)
JANUARY 1986

CONTAMINANT HAZARD REVIEWS
REPORT NO. 6

# CHROMIUM HAZARDS TO FISH, WILDLIFE, AND INVERTEBRATES: A SYNOPTIC REVIEW

H14244B

Fish and Wildlife Service

U.S. Department of the Interior

P889009901

000045

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 52 of 125

## FIELD INVESTIGATIONS

There is a wealth of data concerning the effects of chromium on living organisms under laboratory conditions simulating those encountered in the vicinity of high Cr discharges and accumulations typical of electroplating plants, tanneries, ocean dumping sites, and municipal waste outfalls. However, little research has been conducted under actual field conditions, except in three general fields: occupational exposures of humans in the chromate industry (discussed earlier), accidental poisoning of livestock resulting from oil-field activities, and Cr accumulations in ecosystems impacted by discharges associated with cooling waters or cooling towers.

All cases of accidental chromate poisoning in cattle have resulted from the exposure of animals to chromate compounds associated with oil field activities. Chromates are used as a corrosion inhibitor between the pipe and casing and are often added to drilling fluids (in the form of chromelignosulfonate) to improve thermal stability. One recorded case involved 20 mature cows and their 8-month-old calves, grazing in a native pasture where an oil well had just been completed. One cow and calf died and another cow and calf became uncoordinated and thin, and the feces contained bloody mucus. The calf soon died. The cow aborted, but appeared to recover completely. Liver from the dead calf had 14.8 mg Cr/kg fresh weight vs 1.8 in controls; levels of arsenic and lead were not elevated (Reagor and McDonald 1980). The cause of death was the consumption by the animals of concentrated sodium chromate found near the well site. In other cases, 2 of 80 heifers died after consuming concentrated zinc chromate, and 10 cows and one calf died after they had ingested ammonium chromate. In poisoned cows, Cr concentrations were 500 mg/kg in stomach contents, 15.8 ppm fresh weight in kidney vs. 3.0 ppm in controls, and 1.1 ppm in blood vs. 0.02 ppm for controls (Kerr and Edwards 1981).

Chromium is widely used as a corrosion inhibitor in cooling waters by the electric power industry. Its use in this capacity involves addition of a Cr+6 salt, typically sodium dichromate, which forms an oxide on metal surfaces. Chromates are subsequently released to surface waters in high concentrations, compared with background levels of Cr in most freshwaters. In White Oak Lake (Eastern Tennessee), which received chronic inputs of chromates from cooling towers located on two tributary streams, typical Cr+6 concentrations of 3 to 10 ppm in waste effluents produced 100 to 300 ppb of Cr+6 in White Oak Lake vs. 5 ppb in a control area (Elwood et al. 1980). Concentrations of Cr in muscle of bluegills and largemouth bass from White Oak Lake did not differ

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 53 of 125

significantly from those in fish from a control site--suggesting that these species either effectively regulated Cr concentration or that the elevated Cr levels in White Oak Lake (where 20 to 73% of the total chromium was Cr+6) were in a form that was unavailable for absorption into tissues. Elwood et al. (1980) suggested that Cr is an element with a determinant concentration in fish, and that accumulation is independent of environmental concentration. This concept requires validation. Noteworthy is the observation that Cr concentrations were lower in muscle and body of older freshwater teleosts--an observation consistent with the findings of Eisler (1984), who noted that liver Cr decreased with increasing age in marine teleosts.

Cooling towers of uranium enrichment facilities and gaseous diffusion plants, similar to those of 1,000-MW conventional steam electric stations, contain a chromate zinc-phosphate compound to inhibit corrosion and fouling within the cooling system. A small fraction of the cooling water, containing about 20 ppm of Cr+6, becomes entrained within the exit air flow and is deposited as drift on the landscape, together with other salts found in the recirculating water system, such as sodium pentachlorophenate, chromated copper arsenate, and acid copper chromate. Effects of the Cr component on biological systems have been under investigation in Kentucky and Tennessee for many years (Taylor and Parr 1978; Taylor 1980; Taylor et al. 1975, 1979, 1983). Analysis of vegetation along distance gradients from the cooling towers identified areas of significant drift depositon, accumulation, and magnitude of atmospheric transport over the landscape. At 13 m downwind from the point source, plant foliar concentrations of Cr were highest in winter at 1,390 ppm dry weight, decreasing to 190 in spring, and to 173 in summer as the demand for cooling--and hence the operation time of the facility--decreased. Decreased accumulations on foliage probably reflected high mobility due to leaching, and the short life span of individual leaves. In contrast, Cr concentrations in plant litter at 13 m increased from 894 ppm dry weight during winter to 1,890 ppm in summer and 2,140 ppm in autumn. Accumulation of Cr in the litter was probably related to the higher surface-to-volume ratio in the litter biomass resulting from seasonal senescence of foliage. Taylor and his co-workers emphasized that no adverse biological effects were observed in native vegetation bearing high Cr residues. Concentrations in plants and litter decreased with increasing distance from the cooling towers: concentrations in foliage at 168, 530, and 923 m downwind were 157, 10, and 1.3 ppm (dry weight), respectively; for litter, these values were 421, 24, and 5.8. Potted tobacco plants (Nicotiana tabacum) proved to be sensitive indicators of Cr contamination. Tobacco plants placed 15 m from the towers contained 30x background levels after 1 week and up to 237 ppm dry weight in 5 weeks; in plants placed 200 m downwind, leaf growth was reduced 75% after 7 weeks. Beetles and crickets collected near the towers contained 9 to 37 ppm Cr in gut contents (vs. 0.5 to 0.8 ppm for controls); however, assimilation rates were not measured. Cotton rats trapped in a fescue field adjacent to a large mechanical draft cooling tower contained up to 10x more Cr in hair, pelt, and bone than controls, but accumulations were negligible in viscera and other internal organs. Licking of the coat by rats appeared to be a primary route of Cr uptake--a likelihood confirmed experimentally by Langard and Nordhagen (1980). Feeding of radiochromium-51 to cotton rats demonstrated low

assimilation (0.8%), and rapid initial loss of Cr+6 (99% in 1 day)--suggesting that Cr is neither essential to cotton rats nor accumulated to any great extent through ingestion of drift-contaminated vegetation or inhalation of drift-contaminated air (Taylor 1980). Biological half times of Cr assimilated by man and cotton rats were similar: 616 and 693 days, respectively. The magnitude of the half times suggests that Cr derived from a chromate has a high potential for biological interaction, but that fractional assimilation is very low--thus reducing the likelihood of toxic effects.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 55 of 125

Table 6. Proposed chromium criteria for protection of selected resources.

| Category and criterion (units in parentheses) | Chromium concentration | Reference[a] |
|---|---|---|
| FRESHWATER AQUATIC LIFE PROTECTION (ug/l) | | |
| USA | <0.29 Cr+6 as 24 hour average; not to exceed 21 Cr+6 at any time | 1 |
| Water hardness, in mg $CaCO_3$/l | | |
| 50 | <2200 Cr+3 at any time | 1 |
| 100 | <4700 Cr+3 at any time | 1 |
| 200 | <9900 Cr+3 at any time | 1 |
| Colorado | <25 Cr+6; <100 Cr+3 | 2 |
| Florida | | |
| Effluent discharges | <500 Cr+6; <1,000 total Cr | 2 |
| Recovery waters | <50 total Cr | 2 |
| Indiana | | |
| Most waters | Not to exceed 0.1X 96-h LC-50 of aquatic species | 2 |
| Lake Michigan | <50 total Cr | 2 |
| MARINE AQUATIC LIFE PROTECTION (ug/l) | | |
| USA | <18 Cr+6 as 24 hour average; not to exceed 1,260 Cr+6 at any time | 1 |
| USA | Insufficient data base for Cr+3 at this time, but presumably less stringent than Cr+6 | 1 |
| California | <2 total Cr, 6 month median; <8 total Cr, daily maximum; <20 total Cr, instantaneous mix | 2 |
| California | | |
| Waste discharges into marine waters | <5 total Cr for 50% of measurements; <10 for 10% of measurements | 3 |
| DRINKING WATER (ug/l) | | |
| USA | <50 Cr+6; <170,000 Cr+3 | 1 |
| California | <50 total Cr | 2 |

H142452 PG50008905

000049

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 56 of 125

# PACIFIC GAS AND ELECTRIC COMPANY

PG&E
DEPARTMENT OF ENGINEERING RESEARCH • 3400 CROW CANYON ROAD • SAN RAMON, CALIF. 94583 • (415) 820-2000

PANAFAX COVER SHEET
MOORE BUILDING

DATE: Dec. 4, 1987

TO: Phil Watson
Geosciences
Room 2674, 77 Beale

FROM: Roland Risser
3400 Crow Canyon Rd.
San Ramon

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET: 18

COMMENTS:

CONFIRMATION NUMBER: (415) 866-5850 - Beckie

H142453

PGSD008706

X

Phil Watson
C/O Dennis Wood
Superintendent
Hinckley Compressor Station

December 8, 1987

Phil:

I have continued to peruse the literature for information pertinent to hexavalent chromium and its' effects upon mammals. Attached are some synopses of articles in the international literature. I have not requested copies of these, but will do so if you would like to have the complete reports. I have requested copies of several articles which reflect the carcinogenicity of hexavalent chromium. When these are available, I will send them along to you.

Thank you for the opportunity to provide this service. If you have any additional requests, we will be glad to comply.

Roland

Roland J. Risser
3400 Crow Canyon Road
San Ramon, CA 94583
PG&E 551-5842

cc: RLCritchlow

Attachment

H142113

PGS008FC8

RJRasser

Treatment of Drinking Water After Underground Pollution with Hexavalent Chromium (Traitment de l'Eau Potable Lors d'Une Pollution Souterraine due au Chrome Hexavalent)

Philipot, J.M. ; Lepretre, A.
Anjou Recherche, Centre de Recherche de Maisons-Laffitte,

Among the toxic materials, chromium is one of the most frequently found pollutants in the underground water around industrial areas. Contamination can occur either directly from infiltration or indirectly as a result of fallout from metal treatment plants. This article describes such pollution near Meulan (France), and the investigations to determine the origins of the chromium as well as the possible methods of treatment in a drinking water plant. Several methods of treatment are given. Reduction of hexavalent chromium by iron sulphate is the only method possible technically and economically. Difficulties due to overdosage are solved by a high flow filtration using a sand with very fine grain size. The reliability of the treatment relies upon the use of automatic analyzers continuously monitoring the dosage of the reagent.

Hexavalent Chromium Removal from Drinking Water

Philipot, J.M. ; Chaffange, F. ; Sibony, J.
Centre de Recherche de Maisons Laffitte (OTV), France ; Societe Francaise de Distribution d'Eau, France
Water Science and Technology, vol. 17, no. 6/7, p 1121-1132, 1985

A series of tests were performed with a view to solving the problem of chromium pollution in the Meulan district near Paris, due to the proximity of long-established metal-working plants. It was found that the accumulated pollution not only originated from the groundwater source but also from atmospheric contamination through fall-out from smoke and fumes issuing from local metal-works' stacks. Among the interesting features of this paper is the fact that, since the profound penetration by the pollutant affects potable feedstock, chromium removal studies have been made on potable water for the first time on record. Several methods are reviewed, among which the only economically feasible one appears to be the reduction of hexavalent chromium by a sufficient quantity of iron sulphate, the problem attached to iron-sulphate overdose being solved by the application of high-rate filtration on very fine sand. This arrests the fine precipitates and reduces the residual ferrous-iron by catalysis. Reliability of the treatment is ensured by a system of continuous metering that automatically controls reagent dosing.

H142114

PG50003207

**Standard Methods For the Examination of Water and Wastewater; Section 312 Chromium**

American Water Works Association; APHA; WPCF p 187-190, 1981

The hexavalent chromium concentration of U.S. drinking waters has been reported to vary between 3 and 40 micrograms/L with a mean of 3.2 micrograms/L. Chromium salts are used extensively in industrial processes and may enter a water supply through the discharge of wastes. Chromate compounds frequently are added to cooling water for corrosion control. Chromium may exist in water supplies in both the hexavalent and the trivalent states, although the trivalent form rarely occurs in potable water. The colorimetric method is used for the determination of hexavalent chromium in a natural or treated water intended for potable use. The atomic absorption spectrophotometric and colorimetric methods are used for the determination of total chromium in water and wastewater.

**A national survey for cadmium, chromium, copper, lead, zinc, calcium, and magnesium in Canadian drinking water supplies.**

Meranger, J. C.; Subramanian, K. S.; Chalifoux, C.
Health and Welfare Canada, Health Protection Branch, Environmental Health Centre, Tunney's Pasture, Ottawa, Ontario K1A 0L2, Canada

A national survey determined the levels of Cd, Cr, Cu, Pb, Zn, Ca, and Mg in Canadian drinking water supplies. Samples of raw, treated, and distributed water, obtained from 70 municipalities across Canada, were analyzed by AAS. The concentrations of trace metals found were essentially the same for all 3 types of water samples. The median and range values for distributed water expressed as nanogram of metal per milliliter of water were Cd <=0.01 (<=0.01-0.49); Cr [illegible] ([illegible]); Cu, 20 (5.0-620); Pb <=1.0 (<=1.0-65.0); and Zn, 10 (<=5.0-380). Values for water hardness, expressed as milligram of calcium carbonate per liter, ranged from 1 in St. John's, Newfoundland, to 554 in Selkirk, Manitoba. Contamination of the water supplies with these metals except Cu was minimal during treatment and distribution. In all cases, the median values for the distributed water were well below the WHO upper limit recommendations. (AM)

**Occupational and Environmental Standard Setting for Metals: More Questions than Answers**

Zielhuis, R. L.
Carcinogenic and Mutagenic Metal Compounds. Environmental and Analytical Chemistry and Biological Effects, E. Merian, R. W. Frei, W. Hardi, Ch. Schlatter, Editors; New York, Gordon and Breach Science Publishers, pages 477-490, 45 references 1985

Occupational and environmental standard setting for reducing the carcinogenic risks of metals are discussed. There is a lack of consistency between limits set for metal exposures in food, drinking water, workroom air, and ambient air. Most standards are still presented as concentrations of metals, although in some cases it is the metal combined in compounds that is carcinogenic. Exposures to the same metal compound may vary considerably between departments of the same factory. Expert committees

H142115 FGS0099112

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 60 of 125

that make risk assessments for exposure to carcinogenic metal compounds must consider several points: how to identify which metal compounds are carcinogenic; which carcinogenic metal compounds, if any, show threshold effects; the requirements for extrapolating from animal data; interaction with other chemicals; the possibility of basing monitoring and risk evaluations upon specified metal compounds; the possibility of establishing separate standards for different processes utilizing the same compound; and differentiating the effects of metal speciation when making risk assessments and establishing standards. Arsenic (7440382), chromium (7440473), and nickel (7440020) are presented as examples. The author concludes that animal data on arsenic, chromium, and nickel do not permit quantitative extrapolation to humans. Standards for these metals will have to be based on epidemiologic studies.

Chronic Toxicity Studies III. Chronic Toxicity of Cadmium and Chromium in Dogs

Anwar, R. A., R. F. Langham, C. A. Hoppert, B. V. Alfredson, and R. U. Byerrum
Archives of Environmental Health, Vol. 3, pages 92-96/456-460, 12 references October 1961

The concentration of cadmium in the liver and kidney of dogs was approximately proportional to the concentration of the element in the drinking water given to the animals, up to 5 ppm, while the tissue concentration of dogs given 10 ppm was about the same as in dogs treated with 5 ppm. Dogs receiving chromium as chromate in drinking water showed an accumulation of the element in liver, kidney and spleen, which appeared independent of the concentration of chromium in water. Pathologically, cadmium and chromium did not produce significant changes in the animals over the 4-year experimental period.

Chronic Toxicity Studies II. Hexavalent and Trivalent Chromium Administered in Drinking Water to Rats

MacKenzie, R. D., R. U. Byerrum, C. F. Decker, C. A. Hoppert, and R. F. Langham
A.M.A. Archives of Industrial Health, Vol. 18, pages 232-234, 13 references September 1958

Experimental studies were done on rats to determine the hazards of prolonged ingestion of small amounts of chromium (hexavalent, potassium chromate and trivalent, chromic chloride). Five groups of rats were given water containing between 0.45 and 11 ppm of chromium as chromate ion for a year. No differences were observed between these groups and the controls as to water intake, food consumption, or weight gain; nor did an analysis of blood at monthly intervals or examination of tissues at six months or a year show any significant differences between any of the groups given chromium and the control group. Kidney, liver, and femur were analyzed for chromium at the end of six months, and these plus spleen were analyzed at the end of one year. There was an abrupt rise in tissue chromium concentration when rats ingested water having concentrations above 5 ppm of

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 61 of 125

KJK

[illegible]. Two groups of rats were given water containing 25 ppm of chromium as hexavalent and trivalent chromium, respectively, for one year. No toxic symptoms were observed in either group. However, tissue concentrations of chromium were approximately nine times higher in the group given hexavalent chromium. This suggests that chromate ion is absorbed to a much greater extent than trivalent chromium at this level. Extensive industrial use of chromium and disposal of chromium wastes have resulted in contamination of many water supplies in the U.S. At present, maximum allowable chromate (as Cr) in potable water is 0.05 ppm.

## The Epidemiology of Cancer

Stocks, P.
Practitioner, Vol. 182, No. 1092, pages 667-672, 12 references June 1959

This paper concerns the usefulness of epidemiological studies in the collection of data concerning cancer. Epidemiological facts about several types of cancers are given. These include laryngeal and esophageal cancers, which show remarkable epidemiological differences between the sexes, and are also shown to be increased in those who smoke or drink alcohol. Cancer of the stomach has pronounced geographical variations, and has an association with atmospheric pollution, the eating of fried foods, high carbon content in the soil, and zinc and chromium content of the soil. Intestinal cancer also has geographical variation, and is associated with frequency of beer drinking and pipe smoking. Carcinoma of the uterus has a frequency rate that rises with the number of children born, and varies with marital and social history. Carcinoma of the lung shows occupational variation in rate, as well as a positive association with beer drinking, and coffee drinking, and smoking. A number of epidemiology studies concerning bronchogenic cancer and smoking are discussed. It is suggested that statistical evidence is a valid method of reaching conclusions concerning disease.

## Hexavalent chromium effects on motor activity and some metabolic aspects of Wistar albino rats.

Diaz-Mayans J; Laborda R; Nunez A
Comp Biochem Physiol [C] 1986, 83 (1) p191-5, ISSN 0742-8413

The effects of hexavalent chromium on the motor activity and some metabolic aspects of albino rats were studied. 0.07 g Cr(VI)/l administered in drinking water produced no effects on the motor activity of rats, at least over 30 days of treatment; 0.2 g Cr(VI)/l in drinking water and 2 mg Cr(VI)/kg body wt injected i.p. significantly decreased the motor activity of rats after [illegible] and 1 day, respectively. The treated rats showed a metabolic disadvantage in relation to the controls. The effects caused by Cr(VI) on the motor activity in rats could be an indication of the [illegible] of this metal.

PGS00089:2

H142117

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 62 of 125

RJR

Occupational causes of laryngeal cancer.

Olsen J; Sabroe S
J Epidemiol Community Health Jun 1984, 38 (2) p117-21, ISSN 0143-005X

In a case-control study of all new cases of laryngeal cancer in Denmark from 1980 to 1982, 326 cases and 1134 community selected controls participated. Questionnaires were used to obtain information on education, occupation, and number of occupational exposures as well as smoking and drinking habits. High risk ratios for laryngeal cancer were found for semiskilled and unskilled workers, workers exposed to dust, out of doors workers, drivers, and people working in the cement industries and port services. The study hypothesis was that exposure to chromium or nickel increases the incidence rate of laryngeal cancer. No support for this was found concerning chromium, but exposure to nickel had a statistically significant risk ratio of 1.7.

[Effect of several microelements contained in drinking water on the development of atherosclerosis]

Prouchvane vliianieto na niakoi mikroelementi, sudurzhashti se v piteinite vodi, vurkhu razvitieto na ateroskleroznata.
Novakova S; Nikolchev G; Mautner G; Angelieva R; Dinoeva S
Probl Khig 1983, 8 p121-31, ISSN 0323-9179 Journal Code: PPC

During his whole life man drinks water - about 2 litres in 24 hours for an adult in the countries with moderate climate. Usually, drinking water contains many microelements. Their type and concentration depend mainly on the geochemical characteristic of the earth layers. The pollution of waters by industrial enterprises has, very likely, an effect on the content of microelements. According to literature data, in epidemiological studies information was collected, providing grounds to admit that some microelements have an effect ion atherosclerosis advancement. The results obtained are not convincing enough to judge if a casual relationship exists between the microelements in the drinking water and atherosclerosis advancement. In order to supplement the existing studies, the authors carried out investigations to elucidate the role of some microelement in the progress of experimental atherosclerosis. The results obtained provided grounds to claim that the microelements chromium, zinc, lead, cadmium, vanadium stimulate or restrict the advancement of experimental atherosclerosis.

Use of domesticated rabbit tissues for monitoring of environmental pollution by toxic metals (Mn, Pb, Cr, Cd, Ni).

Bencko V; Arbetova D; Skupenova V
J Hyg Epidemiol Microbiol Immunol 1981, 25 (2) p113-20, ISSN

Domesticated rabbits were exposed to natural environmental conditions in an area polluted by emissions from a ferromanganese alloys producing plant. The samples of blood, liver, kidneys, bones, spleen, heart, muscle tissue and hair of rabbits were analyzed, after low-pressure low-temperature, ashing in RF oxygen plasma, for the presence of Mn, Pb, Cr, Cd and Ni, using the Varian Techtron AA 6-D apparatus. Groups of 3 rabbits were killed

H142118 PGE0008913

at the following time intervals: immediately after birth, and then after the exposure of 1, 2, 6 and 12 months. The levels of toxic metals detected in the examined biological samples were compared with those detected in control rabbits from non-polluted area. Contents of the analyzed toxic metals were also determined in animal feed samples as well as in samples of air (24-hour samples), drinking water and soil. The results show that the described biological monitoring might be feasibly coupled with the prepared epidemiological studies conducted in areas contaminated with toxic microelements or other persistent substances that are known to accumulate in the mammalian organism.

[Chromium concentrations in urine of persons non-occupationally exposed to chromium and its compounds]

Concentrazione di cromo nelle urine di soggetti non professionalmente esposti a cromo e suoi composti.
Metrico L
Ann Ist Super Sanita 1978, 14 (3) p613-7, ISSN 0021-2571

The investigation on 316 samples of urine from persons that are not professionally subject to the action of chromium or its compounds demonstrated the following: - chromium is absent in the 6% of tested people; - average chromium concentration is 6.6 micrograms/l; - maximum chromium concentration is 36.6 micrograms/l. The average chromium concentration with regard to tested people living in the districts of Bergamo, Bolzano and La Spezia (4.21 - 4.16 - and 5.32 micrograms/l respectively) is 40% lower than chromium concentration observed in people living in the districts of Agrigento and Milan. The high rate of chromium elimination in people living in Milan (10.34 micrograms/l) depend upon the high chromium concentration in drinking water of this city (10.40 micrograms/l). In the 70% of urine samples a chromium concentration was found corresponding to or lower than 10 micrograms/l.

PG40108123

R3R

# SCIENTIFIC REPORTS

Papers published in this section are reviewed by at least two qualified referees for accuracy, scientific soundness, experimental design, data analysis, and interpretation. Papers accepted may result from original research, critical literature reviews or well documented field investigations.

## CHROMATE POISONING IN LIVESTOCK FROM OIL FIELD WASTES

LA Kerr, DVM and VC Edwards, DVM,
Oklahoma Animal Disease Diagnostic Laboratory, Oklahoma State University, Stillwater, Oklahoma 74078

(Received March 18, 1981; Revision received May 11, 1981; Accepted May 13, 1981)

Chromium is an element of many uses that is present in the environment in several forms. It is found at levels of 100 ppm in the earth's crust. Chromite ($FeOCr_2O_3$) is the most important chrome ore. The major uses of chromium are chrome plating, leather tanning, steel fabrication, paint and pigment manufacturing. Chromium is also widely used in chemicals, explosives, ceramics and photography (1,2).

Once regarded as an abnormal trace element, chromium appears to be present in all plant and animal tissues (1,3). It can occur in all oxidation states from -2 to +6 but only the trivalent and hexavalent forms are biologically significant (1,2,3). Trivalent chromium is considered essential in animals in the active ingredient of the glucose tolerance factor (2). Both the trivalent (chromic) and hexavalent (chromate) forms are under investigation as environmental pollutants, industrial health hazards, and potential carcinogens (2,3).

Chromium is one of the most common causes of skin allergy and dermatitis (4). Its presence in cement is thought to be responsible for the high incidence of dermatitis among cement workers in the building industry (1).

Systemic poisoning from chromates has been seen in both man and animals (5). Oral administration of the chromic form (though poorly absorbed) results in its binding to the plasma proteins while the chromates (slightly better absorbed) circulate while bound largely to the red blood cells (1,2). Its deleterious effects are thought to be due to its ability to form complexes with enzymes or other functional proteins acting as electron donor molecules in the system (6). The toxic action is said to be confined to compounds such as the chromates and dichromates (5). Chronic poisoning in young calves resulted from a daily dose of zinc chromate of 30-40 mg/kg for one month. Clinical signs reported in chronic cases were profuse scouring and dehydration. Acute cases resulted in severe congestion and inflammation throughout the intestines and sloughing of the gastric mucous membranes. In calves dying from either acute or chronic poisoning, high chromium levels were found in the blood and the liver. Minimum tissue levels that would confirm chromate poisoning have been previously reported as 30 ppm in the liver and 4 ppm in whole blood (5). At least one case of bovine abortion has been attributed to the ingestion of chromates (11).

Chromates are widely used in the petroleum industry. Sodium chromate or dichromate is often added to drilling muds with chromelignosulfonate and lignite to improve the stability when temperatures exceed 200 F (7,8). Approximately 4000 tons of sodium chromate were used in deep well drilling in 1969 (7). Chromates are also used in producing oil wells as corrosive inhibitors. Ammonium chromate is a popular corrosion inhibitor ingredient of packer fluids (7). The increased oil and gas well drilling activity in the state of Oklahoma has resulted in a greater exposure of livestock to unfenced drilling and production sites. There were 4976 oil and gas well completions in 1977, 5899 in 1978, 6524 in 1979, and 8957 in 1981 (9).

During the fiscal year 1978-1979, the Oklahoma Animal Disease Diagnostic Laboratory investigated over 500 cases where oil field wastes or heavy metals were suspected as a cause of poisoning in livestock. As a result of these investigations, the following poisonings were confirmed: petroleum hydrocarbons, 34 cases; sodium ion (salt water), 72 cases; lead, 140 cases; arsenic, 25 cases; and chromium, 3 cases.

The widespread use of chromates (dichromates) in the petroleum industry and the accessibility of livestock to these chemicals prompted our laboratory to consider chromates as a potential toxicant in oil and gas field related cases. The purpose of this investigation was to establish normal background levels of chromium in bovine tissues and to report on two cases of confirmed chromium poisoning.

### MATERIALS AND METHODS

Normal background level data were collected by analyzing liver and kidney tissues from 10 randomly selected cows where there was no history of exposure to oil field wastes. Blood from 11 cows with no known exposure to oil field wastes was also analyzed for chromium to obtain background information.

The analyses were performed using a Perkin-Elmer model 460 atomic absorption spectrophoto-

PGS0009915

H142120

000058

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 65 of 125

meter equipped with a PE HGA-2100 graphite furnace and using deuterium arc background correction. Samples of kidney and liver, each weighing one gram, were anlyzed on a wet-weight basis. Samples were digested at 150 C for approximately 2 hours in 10 ml of 7.5 N $HNO_3$. The digested solution was then filtered and diluted to 100 ml with deionized water. A dilution of 8:1 was made for the blood using 0.1% Triton-X (J T Baker Chemical Co, Phillipsburg, NJ).

RESULTS

Results of chromium analyses of normal tissues are given in parts per million on a wet-weight basis in Table 1.

TABLE 1. Normal Tissue and Blood Chromium levels in the Bovine.

| Tissue | Number Examined | Range of Chromium (ppm) | Mean Value (ppm) |
|---|---|---|---|
| Liver | 10 | 0.20-3.80 | 1.83 |
| Kidney | 10 | 0.50-6.20 | 2.97 |
| Blood | 11 | 0.006-0.066 | 0.022 |

CASE REPORTS

Two case reports taken from our files follow.

In case I, 10 cows and 1 calf were found dead with no signs of struggle. A yellow material was observed on the muzzles and in the rumens of the dead cows. Severe inflammation of the abomasum with marked reddening was found on necropsy. Histopathologic examination showed extreme hepatic congestion. There was marked engorgement of hepatic sinusoids with erythrocytes and a dissociation of the hepatic cords. An oil well was recently completed in this pasture, and the owner noted that the soil used to cover the slush pit nearby had a yellow material oozing from it. When analyzed, this yellow material gave a positive reaction to the ammonium chromate test (10) and by atomic absorption spectrophotometry had a chromium level of 130,000 ppm (13.0%). The kidney and abomasal contents from one of the dead cows were also analyzed; the kidney contained 15.8 ppm chromium while the abomasal contents contained 300 ppm.

In case II, two heifers in a herd of 80 were found dead. They had access to a non-fenced drilling site. The heifers were thought to have consumed a yellow powder from the drilling site. Samples of the yellow powder were analyzed by atomic absorption spectrophotometry and contained 10,800 ppm (1.08%) chromium. The blood from one of the dead animals had a chromium level of 1.08 ppm. The material was later identified as zinc chromate.

SUMMARY AND CONCLUSIONS

Chromium is an element that has many uses. It exists in several states in our environment. An small amount of the trivalent form is considered essential for biological systems. However, excess amounts of the hexavalent form can lead to toxicity and acute death.

The kidneys and livers of 10 randomly selected cattle not exposed to oil field wastes were analysed for chromium by atomic absorption spectrophotometer. The chromium levels in kidneys ranged from 0.80 to 8.20 ppm, while the levels in livers ranged from 0.20 to 3.80 ppm. Whole blood samples from 11 randomly selected bovines were also analyzed for chromium. These samples gave a range of 0.006 to 0.066 ppm. Analysis of tissues in the instances of suspected chromium toxicity showed kidney and blood levels significantly elevated. In case I, in which 10 cows and 1 calf were found dead, one of the dead cows was found to have a kidney chromium level of 15.8 ppm while the abomasal contents contained 800 ppm. In case II, where 2 heifers were found dead, the blood from one of the dead animals contained 1.08 ppm chromium.

Chromium is widely used in the oil fields as a corrosion inhibitor and in drilling muds. Because of the increased drilling activity, there is an increasing likelihood of livestock being exposed to chromium compounds. This metal should be considered a potential toxicant in oil field related cases.

REFERENCES

1. Oehme, F.W., Toxicity of Heavy Metals in the Environment. Part 2, Marcel Dekker, Inc., New York, (1979) 568-571.
2. Casarett, J.J., Doull, J., Toxicology, the Basic Science of Poisons, MacMillan, Inc., New York, (1975) 470-471.
3. Cox, T.R.G., Richardson, B.A., Chromium in Wood Preservation: Health and Environment Aspects. International Journal of Wood Preservation 1 (1):(1979) 27-32.
4. Milner, J.E. Ascorbic Acid in the Prevention of Chromium Dermatitis. Journal of Occupational Medicine 22 (1): (1980) 51.
5. Clarke, E.G.C., Clarke, M.L., Veterinary Toxicology. The Williams & Wilkins Company, Baltimore, 1975, pp. 55-56.
6. Tandon, S.K., Gaur, J.S. Chelation in Metal Intoxication. IV. Removal of Chromium from Organs of Experimentally Poisoned Animals. Clinical Toxicology 11 (2): (1977) 257-263.
7. Oil Field Chemicals, Natural Gas Liquids in the Chemical Industry. Symposium of Division of Marketing and Economics of Petroleum Chemistry: 159th Meeting of American Chemical Society: Houston, Texas, Feb. 26027, R.A. Ginge; ed., 1970.
8. Collins, G.A., Oil and Gas Wells--Potential Polluters of the Environment? Journal Water Pollution Control Federation 43 (12): (1971) 2383-2393.
9. The Oil and Gas Compact Bulletin. Interstate Oil Compact Commission. Volume XXXVIII, no. 2: (1979) S-24, S-25.
10. Field Detection and Damage Assessment Manual for Oil and Hazardous Material Spills. Environmental Protection Agency--Division of Oil and Hazardous Materials, Washington, D.C. (1972).
11. Reagor, J.C., McDonald, D., Chromate Poisoning in Cattle--A Case Report. The Southwestern Veterinarian 33 (1): (1980) 10-11.

H142121

EXHIBIT 8

INTRODUCTION

#226 PG&E

Pacific Gas and Electric Company (PG&E) owns and operates a pipeline that transports natural gas from the southern California border to northern California. A corrosion inhibitor containing chromium was used in the engine cooling water at the Hinkley Compressor Station until 1966. This water was discharged periodically into unlined settling ponds. Since 1966, a phosphate based corrosion inhibitor has been used as a substitute for chromium to decrease costs and improve plant efficiency.

As part of a program initiated by PG&E to conduct environmental assessments of their facilities, one abandoned groundwater well located at the Hinkley Compressor Station was identified as containing levels of chromium exceeding the federal and state drinking water standards of 0.05 parts per million (ppm or mg/L). After discovering that this well contained chromium, in accordance with the San Bernardino County Health Department and the Regional Water Quality Control Board, PG&E conducted an investigation to determine the extent of the contamination. Several private wells north of the Hinkley Compressor Station were identified as having chromium in excess of the drinking water standard.

PG&E will also be investigating methods for cleaning up the contaminated sites and groundwater. PG&E plans to take remedial action at the contaminated site, if it is necessary to do so, as soon as cleanup agreements can be reached with federal and local regulatory agencies. Prior to the completion of the cleanup, PG&E has offered bottled water as an alternative drinking water source to all residents with wells containing chromium above the standard.

Medical evaluations of Hinkley residents were performed by Environmental Health Associates, Inc. (EHA) to determine whether there are any adverse health effects related to drinking water from chromium-contaminated wells. Results of these residents' evaluations are discussed along with their relationship to the residents' chromium exposure.

H068860

PGJ 425988

10-Mar-88

BACKGROUND

Because the metabolism and toxicology of chromium have been reviewed by several authors, (N.A.S. 1974, NIOSH 1975, Leonard et.al 1980, Norseth 1981; IARC 1982, EPA 1983, EPA 1984, NTP 1986) they will be summarized here only briefly.

Chromium is a naturally occurring metal, commonly found in soil, groundwater, food (especially shellfish), and many consumer products. There are three basic forms of chromium; chromium metal, trivalent and hexavalent compounds. Metallic chromium is biologically inert. Trivalent chromium is an essential element necessary to maintain normal metabolism. It is poorly absorbed by biological membranes and is relatively non-toxic, although it may play a role in dermatitis. Hexavalent chromium is the more toxic form probably because it crosses biological membranes more easily than the trivalent form. After its absorption, hexavalent chromium is rapidly reduced to the trivalent form, which is probably the only form to be found in biological systems (Leonard et. al. 1980). Absorption of ingested hexavalent chromium is estimated to be less than 5%. Chromium may also be absorbed through the lungs and skin. Absorption through the skin is related to the valence state, the concentration, and the pH of chromium applied.

Once absorbed, chromium is eliminated from the body in a rapid phase representing clearance from the blood and in a slower phase representing clearance from the body tissues. The primary route of elimination of chromium is in the urine, although the feces also play a small role. Less than 4% of injected chromate is excreted in the milk of lactating cows (Van Bruaene et. al. 1984). Levels of chromium in breast milk of lactating females has not been shown to correlate with chromium in the diet (Kumpulainen et. al. 1980). Less than half of the absorbed chromium is deposited in body tissues including the liver, kidney, spleen, and bone marrow. Estimated half-lives (the time it takes for 1/2 of the material to leave the body) for chromium are 22 days for hexavalent and 92 days for trivalent chromium (EPA 1983). Chromium is certainly a less cumulative toxic agent than other heavy metals such as lead or cadmium.

H068861

PGJ 425989

PG60002269

000061

In man, the acute health problems related to chromium are mainly the result of accidental or voluntary ingestion of hexavalent chromium salts. Severe irritation and corrosion of the upper digestive tract, kidney and liver damage, and even death by cardiovascular collapse may follow. Exposure to dusts or aerosols containing hexavalent chromium may cause irritation of the respiratory tract.

Chronic overexposure of workers to chromium has resulted in ulceration of the skin and lining of the nose. Chronic inhalation of chromium may cause pulmonary obstruction or asthma. Chromium is known to cause skin sensitization and subsequent contact dermatitis in some individuals following skin contact. There are no studies of humans with long term oral exposure to chromium, though there are a few anecdotal reports that people drinking up to 25 ppm of chromium in water experienced no deleterious effects. (National Research Council Canada 1976)

Epidemiologic studies have demonstrated that long-term inhalation exposure of workers to high levels of chromium is associated with lung cancer. The hexavalent form of chromium is suspected of being the carcinogenic form, since only this form of chromium has been found to cause cancer in animals. The hexavalent form is also known to be mutagenic, though mutagenicity is lost following the addition of gastric juices to the assay (Petrelli 1982). In the majority of mutagenicity assays, trivalent chromium has been shown to be inactive (Leonard et. al. 1980). Although a few long-term feeding studies in which animals were exposed to chromium have not resulted in adverse health effects, there have not been enough studies to determine if long-term oral exposure of animals might cause cancer. There are no human or animal data which suggest that ingestion of chromium causes cancer.

The current drinking water standard for chromium is based on animal studies (MacKenzie 1958) which showed that rats fed up to 25 ppm of hexavalent chromium in water had no adverse health effects (NOAEL). Another study (Anwar et. al 1981) exposed dogs to up to 11.2 ppm of hexavalent chromium in water for four years without adverse effects. Using this data, reducing the level to account for bio-accumulation, and adding a safety factor of 1000,

H068862

PGJ 425990

PG60002270

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 70 of 125

the EPA has recommended the safe level for human drinking water is 0.05 ppm ( U.S. EPA 1980)

METHODS

Levels of chromium in the wells in the vicinity of the Hinkley Compressor Station were determined using a colorimetric field test and a standard laboratory method by Harding Lawson and Associates (sampling and testing methods are not within the scope of this paper). All residents with well water containing chromium in excess of the 0.05 ppm were notified and invited to receive a medical evaluation on the following day (Saturday December 12, 1987). Residents who were not home at the time of the notification were contacted again later that day, on the following day, and if still not at home, written notification was left at the door of the house. Medical evaluations were offered again on Tuesday February 9, 1988 to those who were not available for the initial testing. Medical evaluations were offered free of charge to the residents. The location of the evaluations was the PG&E Hinkley District Office, within a distance of one mile from the residents. Although medical examinations were not offered to residents with well chromium levels below 0.05 ppm, two families were examined; one family who's well was being tested on the day of the initial medical evaluations and two children of a second family who visited several times per week at a home where the well contained excess chromium.

Medical evaluations consisted of a health history questionnaire; employment/exposure history; brief physical examination concentrating on the skin, lungs, and abdomen; dipstick urinalysis; spot urine (100 ml) for chromium and creatinine; and blood chemistry including kidney and liver function.

After obtaining signed consent from the residents, Ruth Lowengart M.D. reviewed the questionnaires and performed a physical examination. An assistant collected the blood and urine samples from the participants. The samples from participants on December 12 were collected within 24 hours of the notification of the contaminated water and the advise to drink from an alternative water source. The samples from the participants on February 9

were collected two months after the notification; these participants had already been provided with bottled water.

In order to obtain a control population for comparison of urine chromium levels, we asked several employees at the PG&E office to complete the exposure questionnaire and to submit urine samples for measurement of chromium. The employees are known to live outside of the contaminated area and to have jobs which do not expose them to chromium.

Data were managed using DBASE III and EHA-CHIMES (Computerized Health Information and Medical Evaluation System) on an IBM personal computer. Statistical analyses were performed using Epistat, a commercial statistical software program, to assess potential associations between particular health effects and exposure categories. Statistical tests included

EHA used the standard biomedical convention of the "p-value" less than 0.05 ($p<0.05$) to determine statistical significance. A p-value less thatn 0.05 means there is less than a 5% chance that the observed difference is a random chance finding.

RESULTS

Based on the results of the well water analyses, __ wells used for drinking water and __wells used for agricultural purposes were found to contain chromium in excess of the state and federal drinking water standard of 0.05 ppm. Of the wells used for drinking water, well water total chromium levels range from 0.06 to 1.0 ppm. There are 12 households or families (further referred to as families) who drink water from wells containing chromium in excess of 0.05 ppm. These 12 families are made up of 46 individuals: 25 adults and 21 children. A total of __families ( __residents) with contaminated wells participated in the medical evaluation program. In addition, we evaluated two families (7 residents) who were subsequently found to have well water with chromium levels below the standard. Participants included male adults, female adults, male children, and female children from ______

H068864

PGJ 425992

PG60002272

000064

separate households (Table 1). The age distribution ranged from __ to ____. There were __ eligible residents did not receive medical evaluations. WHY

Well water chromium levels of the participants ranged from none detected (<0.01) to 1.0 ppm. None of the participants were identified as having possible exposure to chromium through their occupations or hobbies.

questionnaire data

physical examination

laboratory tests:

H068865

PGJ 425993

PG60002273

000065

**EXHIBIT 9**



G10122305

FINAL REPORT
Medical Evaluations of Hinkley Residents with Well Water Chromium Concentrations equal to or exceeding 0.05 ppm
Environmental Health Associates, Inc.

AG028802

000066

PG10122306

# FINAL REPORT

Medical Evaluations of Hinkley Residents with Well Water Chromium Concentrations equal to or exceeding 0.05 ppm

Submitted to:
Pacific Gas and Electric

Submitted by:

Ruth Lowengart, M.D., M.S
Don Whorton, M.D., M.P.H.

April 14, 1988

Environmental Health Associates
520 Third Street
Suite 208
Oakland, CA 94607

(415) 451-1888

PGE0021000

AG028803

000067

TABLE OF CONTENTS

| | Page |
|---|---|
| EXECUTIVE SUMMARY | 1 |
| INTRODUCTION | 2 |
| BACKGROUND | 2 |
| METHODS | 5 |
| RESULTS | 7 |
| DISCUSSION | 10 |
| CONCLUSION | 12 |
| APPENDIX | 13 |
| TABLES AND FIGURES | |
| REFERENCES | |

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 77 of 125

EXECUTIVE SUMMARY

Medical examinations were conducted on 20 of the 46 Hinkley residents whose drinking water wells have chromium concentrations in excess of the state drinking water standard of 0.05 ppm. Pacific Gas and Electric Company (PG&E) requested that Environmental Health Associates (EHA) conduct medical evaluations of Hinkley residents to determine if these residents have any adverse health effects potentially related to drinking water from chromium-contaminated wells.

Medical evaluations consisted of the following: a health history questionnaire; employment/exposure history; brief physical examination concentrating on the skin, lungs, and abdomen; dipstick urinalysis; spot urine (100 ml) for chromium and creatinine concentration; and blood chemistry including kidney and liver function tests.

Twenty (20) out of 46 residents volunteered for the examinations. The primary finding of this examination survey indicates that those examined individuals living in residences who used drinking water from the contaminated wells had higher urinary chromium levels compared to those living in residences without chromium contaminated wells. Most of the urine chromium values for the exposed participants in this survey are within the range of other non-occupationally exposed populations studied, and well below the range of populations with occupational exposure to chromium. There were no other consistent medical history responses, physical examination findings, or other laboratory tests results among the examined, exposed group.

INTRODUCTION

Pacific Gas and Electric Company (PG&E) owns and operates a pipeline that transports natural gas from the Southern California border to Northern California. Until 1966 a chromium containing corrosion inhibitor was used in the engine cooling water at the Hinkley Compressor Station. This cooling water was discharged periodically into unlined settling ponds. A phosphate based corrosion inhibitor has been substituted and used since 1966 in place of the chromium based material in order to decrease costs and improve plant efficiency.

In December 1987, in accordance with the San Bernadino County Health Department and the Regional Water Quality Control Board, PG&E conducted an investigation to determine the extent of groundwater contamination with chromium. Several private wells northeast of the Hinkley Compressor Station have been identified as exceeding the drinking water standard for chromium of 0.05 parts per million (ppm or mg/L).

PG&E will be investigating remedial action alternatives for both the contaminated sites and groundwater. After PG&E reaches remedial action agreements with the appropriate governmental regulatory agencies, cleanup activities will commence. Since December 11, 1987 PG&E has offered bottled water as an alternative drinking water source to all residents with domestic wells containing chromium above the standard.

PG&E requested that Environmental Health Associates, Inc. (EHA) perform medical evaluations of Hinkley residents to determine if these residents have any adverse health effects potentially related to drinking water from the chromium-contaminated wells. These evaluations provided an opportunity for the residents to ask questions regarding their health. The results of medical evaluations are discussed in this report in relation to well water chromium levels.

BACKGROUND

Because the metabolism and toxicology of chromium have been reviewed by numerous organizations and/or authors, (N.A.S. 1974, NIOSH 1975, Leonard et al. 1980, Norseth 1981, IARC 1982, U.S. EPA

1980, U.S. EPA 1984, U.S. EPA 1984a, ATSDR 1987) we will only briefly summarize these findings.

Chromium is a naturally occurring metal, commonly found in soil, groundwater, food (especially shellfish), and many consumer products. There are three stable forms of chromium: chromium metal, trivalent compounds and hexavalent compounds. Metallic chromium is biologically inert. Chromium is poorly absorbed by biological membranes, including the gut, although hexavalent chromium is better absorbed than the trivalent form. Both hexavalent and trivalent chromium may also be absorbed through the lungs and skin. Absorption through the skin is related to the valence state, the concentration, and the pH of chromium applied.

Trivalent chromium is an essential element for humans and animals to maintain normal metabolism. It is relatively non-toxic although it may play a role in dermatitis.

Hexavalent chromium is the most toxic form probably because it crosses biological membranes more easily than the trivalent form. In the body, however hexavalent chromium is rapidly reduced to the trivalent form which is probably the only form to be found in biological systems (Leonard et al. 1980). Absorption of ingested hexavalent chromium is estimated to be less than 5% (U.S. EPA 1984).

Once hexavalent chromium is absorbed and reduced to the trivalent form, it is eliminated from the body in a rapid phase representing clearance from the blood and in a slower phase representing clearance from the body tissues. The primary route of elimination of chromium is via the urine although the feces also play a small rôle. Levels of chromium in breast milk of lactating females has not been shown to correlate with chromium in the diet (Kumpulainen et al. 1980). Approximately 0.0035% of an oral dose of chromate is secreted in the milk of lactating cows (Van Bruaene et al. 1984). Less than half of the absorbed chromium is deposited in body tissues including the liver, kidney, spleen, and bone marrow. Estimated half-lives (the time it takes for 1/2 of the material to leave the body) for chromium are 22 days for hexavalent and 92 days for trivalent chromium (U.S. EPA 1984).

In man, the acute health problems related to chromium are mainly the result of accidental or voluntary ingestion of hexavalent chromium salts. Severe irritation and corrosion of the upper digestive tract, kidney and liver damage, and even death by

cardiovascular collapse may follow. Exposure to dusts or aerosols containing hexavalent chromium may cause irritation of the upper and lower respiratory tract.

Chronic occupational chromium overexposure has resulted in ulceration of the skin and lining of the nose as well as nasal septal perforations of workers. Chromium can cause skin sensitization and subsequent allergic contact dermatitis in some individuals following skin contact.

Epidemiologic studies have demonstrated that long-term inhalation exposure of workers to high levels of some hexavalent chromium compounds is associated with lung cancer. Epidemiologic studies linking occupational chromium exposures to gastrointestinal cancer have been inconclusive. Hexavalent chromium also produces tumors in laboratory animals by subcutaneous injection or intrabronchial, intrapleural, intramuscular or intracheal implantation.

While the hexavalent form is also known to be mutagenic, its mutagenicity is lost following the addition of gastric juices to the assay (Petrilli 1982). In the majority of mutagenicity assays, trivalent chromium has been shown to be inactive (Leonard et al. 1980).

Although a few long-term feeding studies in which animals were exposed to chromium have not resulted in adverse health effects, there have not been enough studies to determine if long-term oral exposure of animals might cause cancer. There are no human or animal data to show ingested chromium is carcinogenic. There are a few anecdotal reports that people drinking up to 25 ppm of chromium in water experienced no deleterious effects. (Steven et al. 1976)

The current drinking water standard for chromium is based on animal studies (MacKenzie 1958) which showed that rats fed up to 25 ppm of hexavalent chromium in water had no adverse health effects (NOAEL). Another study (Anwar et al. 1981) exposed dogs to up to 11.2 ppm of hexavalent chromium in water for four years without adverse effects. Using these data, reducing the level to account for bio-accumulation, and adding a safety factor of 1000,

the EPA has recommended the safe level for human consumption of drinking water at 0.05 ppm (U.S. EPA 1980)

METHODS

Hinkley is a small town on the outskirts of Barstow in the high desert region of Southern California. Concentrations of chromium in the wells in the vicinity of PG&E's Hinkley Compressor Station were determined by Harding Lawson and Associates (lower limits of detection = 0.01 ppm; sampling and testing methods are not within the scope of this paper).

On December 11, 1987, PG&E and a representative of the San Bernadino County Health Department went door to door and verbally notified all residents whose well water contained chromium in excess of 0.05 ppm. PG&E also informed these residents about the no cost medical evaluations to be offered on the following day (Saturday) and invited them to participate. A written fact sheet describing chromium and a letter describing the medical evaluations was handed out at the time. Residents who were not home at the time of the notification were contacted again later that day, on the following day, and if still not at home, written notification was left at the door of the house. PG&E identified demographic characteristics of all residents including name, age, and number of years of residence at that location.

Medical evaluations were offered again on Tuesday February 9, 1988 to those who were not available for the initial testing. All residents who had not participated in the previous tesing were verbally notified of the opportunity. The evaluations were done both times at PG&E's Hinkley District Office located within a mile radius of the residences.

Although the purpose of the study was to offer medical examinations to residents with chromium concentrations in their well water in excess of the standard, two families (hereafter referred to as ineligible) with well water chromium concentrations well within the standard requested examinations. One family's well was tested on the day of the initial medical evaluations, and was found to have no detectable chromium (<0.01 ppm). Two children from the second family were tested; their potential exposure occurred during frequent (twice per week) visits to a home with well water containing 0.09 ppm chromium.

Medical evaluations consisted of the following: a health history questionnaire completed on the day of testing; employment/exposure history; brief physical examination concentrating on the skin, lungs, and abdomen; dipstick urinalysis; spot urine (100 ml) for chromium and creatinine concentration; and blood chemistry including kidney and liver function tests. We did not obtain blood from children. Parents were offered the opportunity to have their child obtain blood tests from a local clinic at a later time, but none of the parents accepted this offer. Participants collected urine on site in a collection bottle. We did not attempt to collect urine from infants.

After obtaining individual signed consent, Ruth Lowengart M.D. reviewed the questionnaires and performed the physical examination. Jenifer Freeman, R.N. (12/12/87) or Zach Weingart, EHA technician (2/9/88) collected the blood and urine samples from the participants. The samples from participants examined on December 12 were collected within 12 to 24 hours of the notification of the contaminated well water and the advice to use an alternative drinking water source. The participants examined on February 9 had already been provided with bottled water for approximately two months.

For comparison of urine chromium, we asked five non-chromium exposed employees at the Hinkley PG&E district office to complete the exposure questionnaire and to submit urine samples. These employees do not constitute a representative control population

Urine and blood tests were refrigerated and sent to Metpath Laboratory in New Jersey. Urine chromium analysis was performed using atomic absorption techniques with a lower detection limit of 1.0 ug/L.

Health and exposure data were managed using DBASE III and EHA-CHIMES (Computerized Health Information and Medical Evaluation System) on an IBM personal computer. We calculated a line between points on graphs using the least squares method, a standard statistical technique.

RESULTS

Eight drinking water wells and five agricultural wells had chromium concentrations in excess of the 0.05 ppm drinking water standard. The drinking water wells for both total and hexavalent chromium concentrations ranged from 0.04 to 1.0 ppm. Well water hexavalent chromium concentrations of these wells ranged from 0.04 to 1.0 ppm. Of note, three of seven wells had hexavalent concentrations greater than total chromium levels (one well was not tested for total chromium value).

Twelve households or families (further referred to as families) use these eight contaminated drinking water wells and were therefore eligible to participate in the medical evaluations. There are 46 individuals in these 12 families: 26 adults and 20 children. Of the 46 eligible residents, 20 participated in the medical evaluations (10 adults and 10 children), while 26 did not participate (16 adults and 10 children). Thus 43.5% of the eligible residents participated. Table 1 displays the individual well chromium level as well as the number of medical examination participants and nonparticipants by individual well. Of the nonparticipants, two families declined because they were not experiencing any health problems and did not believe there was a need. We do not know the reason for the other residents' nonparticipation. We also evaluated two families (six residents) who have well water with no detectable chromium and were considered as ineligible participants. As previously stated, two of these ineligible children drank water containing 0.09 ppm of chromium several times per week at the house of their friends.

The demographic characteristics of sex, age distribution and years of residence for the participants, both eligible and ineligible and elibible nonparticipants are shown in Table 2. There were no striking differences in these characteristics. between the eligible participants and nonparticipants. All of the participants used their well as their primary source of drinking water prior to being supplied with bottled water by PG&E. None of the participants had any recognized potential chromium exposure through their occupations or hobbies.

The responses of the eligible participants to the health history questionnaire are shown in Table 3. We asked questions about a variety of health problems including those that might

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 84 of 125

occur with chromium exposure. None of the residents had a history of liver disorders, asthma, lung cancer, or abnormal kidney function. One resident had a history of kidney stones while another noted frequent bladder and kidney infections in the past.

None of the residents noted recent nausea or indigestion. The one with complaints of heartburn had other medical conditions to explain this symptom. While three residents noted ulcers in the past, none of them had current symptoms associated with ulcers. One had the ulcer prior to moving to the area whereas the other two did not provide sufficient information to determine the time of ulcer onset. Four out of five members of one family noted intermittent bloody diarrhea for several months. No other families had similar complaints. Intermittent bloody diarrhea is most suggestive of an infectious or parasitic cause.

Four children and one adult noted skin rashes. While only one of the rashes was suggestive of eczema, this child does not currently have a rash. None of the rashes described are consistent with contact dermatitis. Two women gave a history of spontaneous abortions or miscarriages in the past. One woman experienced these prior to her current residence in Hinkley. The other woman experienced a miscarriage before and after living in Hinkley. She has subsequently given birth to a normal child. One resident has a history of uterine cancer.

Responses of the ineligible participants to symptom questions indicated that both adults had experienced ulcers, skin rashes, urinary tract infections, and multiple other medical problems. One of the two children who periodically consumed chromium contaminated water has experienced a rash localized to the skin around the umbillicus. On examination it appeared to be contact dermatitis resulting from his belt buckle.

The physical examination findings of the eligible participants are shown in Table 4. Few abnormalities were detected on examination. One resident had both high blood pressure and elevated blood sugar, the latter an indication of diabetes. Four individuals had minor, localized skin problems. One was an infant with tiny clear papules on the face and body which appeared to be typical of those frequently seen on infants. None of the residents had skin disorders like eczema or allergic contact dermatitis that can occur with sensitization to the chromium. None of the residents were found to have abnormal liver

or kidney findings. One had right upper abdominal tenderness suggestive of gall bladder dysfunction; her liver function tests were normal. Two children had ear or throat problems related to usual childhood illnesses.

The blood and urine dipstick test results for the ten eligible adult participants are shown in Table 5. The blood tests for kidney function were normal. Urinalyses were normal except for two individuals with positive tests for blood and one for glucose. Of the two with blood in the urine, one was a woman who was menstruating and the other a man with a trace of blood. He was advised to obtain follow-up. Two individuals had slight elevations to one liver function test: GGTP and SGPT. The values of the elevations were less than fifty percent above the normal reference range and are not considered clinically significant abnormalities. Both tests can be affected by alcohol consumption the night before the test. One individual had mild diabetes mellitus associated with elevated blood and urine glucose results. The elevations of the triglycerides and cholesterol are a common finding in adults and are not beyond expected levels.

Urine tests performed on 12/12/87 were collected from the individuals within 24 hours after the notification not to drink the water. This is within 1 to 1 1/2 half-lives of chromium in urine. Since the urine tests collected on 2/9/88 were several months after the notification, they would not be expected to reflect the past consumption of well water chromium. Results of urine chromium tests performed on 2/12/87 are shown in Table 6. Adults had higher average urine chromium concentrations (2.3 +/- 2.5 ug/L (standard deviation)) than children (1.5 +/- 1.3 ug/L). The same relationship held true for urine chromium, ug /gm creatinine, where the average concentrations for adults and children were 0.6 +/- 0.8 and 0.3 +/- 0.3 respectively. Participants who drank water from wells containing chromium had higher urine chromium concentrations than controls and ineligible participants who drank uncontaminated water. Chromium was also not detected in the urine of two out of three of the eligible participants tested on 2/9/88.

Figures 1 and 2 show the correlation between the urine chromium/gm creatinine and well water chromium of the eligible adults and children participating in the evaluations on 12/12/87. It can be seen that the highest urine chromium values correlated with the highest well water chromium concentrations. If a line is drawn, 59% of the variation in urine chromium is explained by the variation in well water ($r^2$ = .59). We might have been able to demonstrate a better linear relationship between urine chromium and well water chromium with a larger sample size and collection of the urines during the time when the residents were drinking the contaminated water.

DISCUSSION

Medical examinations were conducted on 20 of the 46 Hinkley residents whose drinking water wells have chromium concentrations in excess of the state drinking water standard of 0.05 ppm. These examinations were designed to assess potential health effects associated with ingestion and other uses of the water containing chromium. Since this was a voluntary examination we do not know if the 20 people who were examined had different health perceptions or complaints compared to those not tested. One of the purposes of the examination was to allow affected residents an opportunity of a health examination at no expense.

The primary finding of this examination survey indicates that those examined individuals living in residences who used drinking water from the contaminated wells had higher urinary chromium levels compared to those living in residences without chromium contaminated wells. There were no other consistent medical history responses, physical examination findings, or other laboratory tests results among the examined, exposed group.

The urinary chromium results were expected to be greater if the exposed group drank and otherwise used chromium contaminated well water. The use of urine chromium measurements has been found to be a good method for estimating individual short-term occupational exposure to chromium (Tola 1977, Lauwerys 1983). We used urine chromium values corrected for creatinine since this method is a more accurate estimate of exposure (Tola 1977).

The half-life of chromium in urine is estimated to be from 15 to 41 hours (Tossavainen et al. 1980). We were able to measure urine chromium values within 1 to 1 1/2 half-lives from the time the residents were advised to drink bottled water. Thus the absolute values we measured on 12/12/87 may well be approximately one half the value that may have been present at the time the residents were still drinking the contaminated water. The urine chromium values obtained on 2/9/88 have little relationship to well water chromium levels since all of the residents had been using supplied bottled water for nearly two months.

Urine chromium values for individuals without occupational chromium exposure vary depending on the population studied (Appendix I). Most authors have estimated that normal urinary chromium concentrations are less than 5 ug/g creatinine (Franchini 1975, Borghetti 1977, Anderson 1983). Metrico (1978) studied concentrations of chromium in nonoccupationally exposed persons from several regions in Italy with drinking water varying in chromium concentrations. He found that chromium was absent in 8% of those tested. The average chromium concentration of all groups was 6.6 ug/L. He found that persons drinking water containing 10.40 ug/L (ppb) of chromium had urine chromium levels around 10.39 ug/L. In comparison, persons from three other districts drinking water with lower chromium concentrations had urine chromium concentrations averaging between 4.16 and 5.32 ug/L.

Urine chromium values for individuals with occupational exposure to chromium are dependent upon the amount of inhaled chromium. A urine chromium level of 30 ug/g creatinine corresponds to an occupational exposure level of inhaled chromium (0.05 mg/m3) which is acceptable according to the American Conference of Governmental Industrial Hygienists (Tola 1977, Berode and Guillemin 1977, Gylseth et al. 1977, Mutti 1984).

Most of the urine chromium values for the exposed participants in this survey are within the range of other non-occupationally exposed populations studied. The survey group's urine chromium values average 50 times less than acceptable urine chromium values for occupationally exposed workers.

Some inhaled hexavalent chromium compounds are recognized human carcinogens. There are insufficient data in the literature

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 88 of 125

to determine if ingestion of hexavalent chromium is carcinogenic. This survey was not designed to address the issue of any increased cancer risk among the Hinkley residennts associated with chromium contaminated drinking water. Other study designs such as a retrospective analysis of mortality of the community would be necessary to address this question. Any such study would be hindered by the small number of residents, the mobility of the past residents, etc.

CONCLUSION

Medical evaluations of Hinkley residents were performed to determine if any had adverse health effects which could be related to drinking water from chromium-contaminated wells. Twenty (20) out of 46 residents volunteered for the examinations. The primary finding of this examination survey indicates that those examined individuals living in residences who used drinking water from the contaminated wells had higher urinary chromium levels compared to those living in residences without chromium contaminated wells. Most of the urine chromium values for the exposed participants in this survey are within the range of other non-occupationally exposed populations studied, and well below the range of populations with occupational exposure to chromium. There were no other consistent medical history responses, physical examination findings, or other laboratory tests results among the examined, exposed group.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 89 of 125

## APPENDIX

### URINARY CHROMIUM LEVELS

| Urine Chromium ug/L | ug/gm creatinine | Reference |
|---|---|---|
| **NORMAL POPULATION** | | |
| - | <5 | Franchini 1975 |
| 1.8 +/- 0.7 | 1.0 +/-0.3 | Borghetti 1977 |
| 4.16 - 10.39 | - | Metrico 1978 |
| 0.2 +/- 0.03 (f) | - | Anderson 1983 |
| 0.17 +/- 0.02 (m) | - | Anderson 1983 |
| **OCCUPATIONALLY EXPOSED POPULATION** | | |
| 38 | 30 | Tola 1977 |
| - | 29.8 (end of shift) | Mutti 1984 |
| - | 17.6 (pre shift) | |
| **RESIDENTS IN THIS STUDY** | | |
| none detected | (controls) | |
| 2.3 +/- 2.5 | 0.6 +/- 0.8 (adults) | |
| 1.5 +/- 1.3 | 0.3 +/- 0.3 (children) | |

TABLE 1

DOMESTIC WELL WATER CHROMIUM CONCENTRATIONS ≥0.05 ppm
FOR BOTH ELIGIBLE PARTICIPANTS AND NONPARTICIPANTS

| WELL WATER CHROMIUM LEVEL | | PARTICIPANTS (n = 20) | | NONPARTICIPANTS (n = 26) | | TOTALS |
|---|---|---|---|---|---|---|
| TOTAL(ppm) | HEXAVALENT(ppm) | ADULTS | CHILDREN | ADULTS | CHILDREN | |
| 0.04 | 0.07 | 2 | 2 | 0 | 0 | 4 |
| 0.06 | 0.04 | 0 | 0 | 5 | 6 | 11 |
| 0.06 | 0.08 | 0 | 0 | 3 | 0 | 3 |
| 0.09 | 0.09 | 1 | 3 | 1 | 0 | 5 |
| 0.25 | 0.25 | 4 | 5 | 4 | 4 | 17 |
| — | 0.58 | 0 | 0 | 2 | 0 | 2 |
| 0.87 | 0.98 | 2 | 0 | 0 | 0 | 2 |
| 1.00 | 1.00 | 1 | 0 | 1 | 0 | 2 |
| TOTALS | | 10 | 10 | 16 | 10 | 46 |

PGE0021015

AG028818

TABLE 2

DEMOGRAPHIC CHARACTERISTICS OF PARTICIPANTS AND NONPARTICIPANTS

| DEMOGRAPHIC PARAMETER | PARTICIPANTS | | NONPARTICIPANTS |
|---|---|---|---|
| | ELIGIBLE* (n = 20) | NON-ELIGIBLE (n = 6) | ELIGIBLE* (n = 26) |
| SEX: | | | |
| MALE | 7 | 5 | 11 |
| FEMALE | 13 | 1 | 15 |
| AGE DISTRIBUTION: | | | |
| 0 - 9 | 9 | 4 | 8 |
| 10 - 19 | 1 | 0 | 3 |
| 20 - 29 | 5 | 0 | 3 |
| 30 - 39 | 3 | 2 | 6 |
| 40 - 49 | 0 | 0 | 3 |
| 50 - 59 | 1 | 0 | 0 |
| 60+ | 1 | 0 | 2 |
| AGE NOT GIVEN | 0 | 0 | 1 |
| YEARS OF RESIDENCE: | | | |
| < 1 | 2 | 0 | 5 |
| 1 - < 2 | 2 | 0 | 9 |
| 2 - < 3 | 1 | 0 | 1 |
| 3 - < 4 | 7 | 1 | 9 |
| 4 OR > | 8 | 5 | 2 |

*ELIGIBLE PARTICIPANTS HAVE HOME DRINKING WATER WITH CHROMIUM ≥ 0.05 ppm

PGEC021016

AG028819

000083

PG10122323

TABLE 3

POSITIVE RESPONSES OF ELIGIBLE PARTICIPANTS TO SELECTED HEALTH QUESTIONS

| RESPONSES | ADULTS (n = 10) | | CHILDREN (n = 10) | | ALL PARTICIPANTS (n = 20) | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| GENERAL HEALTH PROBLEMS | 1 | 10% | 1 | 10% | 2 | 10% |
| EYE OR VISION PROBLEMS | 4 | 40% | 1 | 10% | 5 | 25% |
| Discharge from eyes | 2 | 20% | 1 | 10% | 3 | 15% |
| Burning, itching, watering | 1 | 10% | 0 | -- | 1 | 5% |
| Blurring of eyesight | 2 | 20% | 0 | -- | 2 | 10% |
| Other eye or vision problems | 1 | 10% | 0 | -- | 1 | 5% |
| EAR OR HEARING PROBLEMS | 3 | 30% | 5 | 50% | 8 | 40% |
| Injury to one or both ears | 1 | 10% | 0 | -- | 1 | 5% |
| Frequent infections or fluid | 0 | -- | 5 | 50% | 5 | 25% |
| Ringing in the ears | 2 | 20% | 0 | -- | 2 | 10% |
| Other ear / hearing problems | 0 | -- | 1 | 10% | 1 | 5% |
| NOSE OR SINUS PROBLEMS | 1 | 10% | 1 | 10% | 2 | 10% |
| Frequent sinus congestion | 1 | 10% | 0 | -- | 1 | 5% |
| Frequent nose bleeds | 0 | -- | 1 | 10% | 1 | 5% |
| MOUTH OR THROAT PROBLEMS | 6 | 60% | 3 | 30% | 9 | 45% |
| Frequent sore throats | 2 | 20% | 2 | 20% | 4 | 20% |
| Frequent mouth / tongue sores | 1 | 10% | 0 | -- | 1 | 5% |
| Cavities or tooth infections | 2 | 20% | 0 | -- | 2 | 10% |
| Bleeding gums | 1 | 10% | 0 | -- | 1 | 5% |
| Other mouth / throat problems | 0 | -- | 1 | 10% | 1 | 5% |

PGEG021017

AG028820

000084

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 93 of 125

TABLE 3 (Cont.)

POSITIVE RESPONSES OF ELIGIBLE PARTICIPANTS TO SELECTED HEALTH QUESTIONS

| RESPONSES | ADULTS (n = 10) | | CHILDREN (n = 10) | | ALL PARTICIPANTS (n = 20) | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| LUNG CONDITION | 2 | 20% | 0 | -- | 2 | 10% |
| BREATHING / CHEST PROBLEMS | 0 | -- | 1 | 10% | 1 | 5% |
| PROBLEMS WITH COUGHING | 1 | 10% | 0 | -- | 1 | 5% |
| SHORTNESS OF BREATH | 1 | 10% | 0 | -- | 1 | 5% |
| CIRCULATION PROBLEMS | 2 | 20% | 0 | -- | 2 | 10% |
| BLOOD / LYMPH PROBLEMS | 5 | 50% | 1 | 10% | 6 | 30% |
| Anemia | 4 | 40% | 1 | 10% | 5 | 25% |
| Excessive bleeding or bruising | 1 | 10% | 1 | 10% | 2 | 10% |
| Other blood or lymph problems | 2 | 20% | 1 | 10% | 3 | 15% |
| STOMACH / BOWELS / INTESTINES | 6 | 60% | 3 | 30% | 9 | 45% |
| Ulcer | 3 | 30% | 0 | -- | 3 | 15% |
| Frequent heartburn / indigestion | 1 | 10% | 0 | -- | 1 | 5% |
| Frequent diarrhea | 1 | 10% | 3 | 30% | 4 | 20% |
| Frequent constipation | 2 | 20% | 0 | -- | 2 | 10% |
| Black or bloody bowel movements | 1 | 10% | 3 | 30% | 4 | 20% |
| Possible gall stones | 1 | 10% | 0 | -- | 1 | 5% |
| KIDNEY PROBLEMS | 2 | 20% | 0 | -- | 2 | 10% |
| Kidney infections | 1 | 10% | 0 | -- | 1 | 5% |
| Kidney stones | 1 | 10% | 0 | -- | 1 | 5% |

PGE0021518

AG028821

TABLE 3 (Cont.)

POSITIVE RESPONSES OF ELIGIBLE PARTICIPANTS TO SELECTED HEALTH QUESTIONS

| RESPONSES | ADULTS (n = 10) | | CHILDREN (n = 10) | | ALL PARTICIPANTS (n = 20) | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| BLADDER / URINATION PROBLEMS | 4 | 40% | 1 | 10% | 5 | 25% |
| Pain or burning with urination | 2 | 20% | 0 | -- | 2 | 10% |
| Loss of bladder control | 1 | 10% | 0 | -- | 1 | 5% |
| Difficulty starting urination | 1 | 10% | 0 | -- | 1 | 5% |
| Frequent urination at night | 0 | -- | 1 | 10% | 1 | 5% |
| Other kidney / bladder problems | 1 | 10% | 0 | -- | 1 | 5% |
| SKIN / SCALP PROBLEMS | 3 | 30% | 5 | 50% | 8 | 40% |
| Peeling or scaling | 1 | 10% | 0 | -- | 1 | 5% |
| Abnormal sweating of palms | 1 | 10% | 0 | -- | 1 | 5% |
| Itching or dryness | 1 | 10% | 1 | 10% | 2 | 10% |
| Acne (other than as a youth) | 1 | 10% | 0 | -- | 1 | 5% |
| Rash | 0 | -- | 4 | 40% | 4 | 20% |
| BACK PROBLEMS | 5 | 50% | 0 | -- | 5 | 25% |
| BONE / JOINT PROBLEMS | 3 | 30% | 2 | 20% | 5 | 25% |
| HEADACHES | 7 | 70% | 2 | 20% | 9 | 45% |
| Migraine headaches | 3 | 30% | 0 | -- | 3 | 15% |
| Headaches req. medical attention | 1 | 10% | 0 | -- | 1 | 5% |
| Tension headaches | 7 | 70% | 1 | 10% | 8 | 40% |
| Sinus headaches | 2 | 20% | 2 | 20% | 4 | 20% |
| STRENGTH / MOVEMENT / BALANCE | 2 | 20% | 0 | -- | 2 | 10% |

PGE0021017

AG028822

000086

TABLE 3 (Cont.)

POSITIVE RESPONSES OF ELIGIBLE PARTICIPANTS TO SELECTED HEALTH QUESTIONS

| RESPONSES | ADULTS (n = 10) | | CHILDREN (n = 10) | | ALL PARTICIPANTS (n = 20) | |
|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| CONCENTRATION / MOOD / SLEEP | 2 | 20% | 1 | 10% | 3 | 15% |
| PREGNANCY | 8 | 80% | 0 | -- | 8 | 40% |
| Normal children | 8 | 80% | 0 | -- | 8 | 40% |
| Stillborn children | 1 | 10% | 0 | -- | 1 | 5% |
| Miscarriage | 2 | 20% | 0 | -- | 2 | 10% |
| HISTORY OF CANCER | 1 | 10% | 0 | -- | 1 | 5% |
| Uterine cancer | 1 | 10% | 0 | -- | 1 | 5% |
| TAKE MEDICATIONS DAILY | 3 | 30% | 1 | 10% | 4 | 20% |
| SMOKING STATUS | | | | | | |
| Not answered | 0 | -- | 4 | 40% | 4 | 20% |
| Never smoked cigarettes | 6 | 60% | 6 | 60% | 12 | 60% |
| Formerly smoked, but quit | 1 | 10% | 0 | -- | 1 | 5% |
| Currently smokes cigarettes | 3 | 30% | 0 | -- | 3 | 15% |
| BEER / WINE / LIQUOR CONSUMPTION | | | | | | |
| Not answered | 0 | -- | 4 | 40% | 4 | 20% |
| Never | 1 | 10% | 6 | 60% | 7 | 35% |
| Less than 7 servings per week | 7 | 70% | 0 | -- | 7 | 35% |
| 7 - 14 servings per week | 1 | 10% | 0 | -- | 1 | 5% |
| More than 14 servings per week | 1 | 10% | 0 | -- | 1 | 5% |

TABLE 4

PHYSICAL EXAM FINDINGS OF ELIGIBLE PARTICIPANTS
(n = 20)

| EXAM FINDING | NORMAL | | ABNORMAL | |
|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT |
| BLOOD PRESSURE (ADULTS) | 9 | 90% | 1 | 10% |
| (NORMAL ≤ 140/90) | | | | |
| SKIN | 16 | 80% | 4 | 20% |
| ACNE | | | 1 | 5% |
| CLEAR PAPULES | | | 1 | 5% |
| HYPERPIGMENTATION | | | 1 | 5% |
| SKIN TATOOS | | | 1 | 5% |
| ECZEMA | | | 0 | — |
| HEAD, EYES, EARS, NOSE, THROAT | 18 | 90% | 2 | 10% |
| HEART | 20 | 100% | 0 | — |
| LUNGS | 20 | 100% | 0 | — |
| ABDOMEN | 19 | 95% | 1 | 5% |
| LIVER / SPLEEN | 20 | 100% | 0 | — |
| KIDNEYS | 20 | 100% | 0 | — |
| NEUROLOGIC | 20 | 100% | 0 | — |

TABLE 5

BLOOD AND URINE TEST RESULTS
OF ELIGIBLE PARTICIPANTS

| TEST NAME (NORMAL REFERENCE RANGE) | NORMAL | | ABNORMAL | |
|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT |
| BLOOD TESTS (n = 10) | | | | |
| LIVER FUNCTION TESTS | | | | |
| ALBUMIN (3.7 - 5.5 gm/dL) | 10 | 100% | 0 | — |
| TOTAL BILIRUBIN (0.2 - 1.3 mg/dL) | 10 | 100% | 0 | — |
| DIRECT BILIRUBIN (< 0.2 mg/dL) | 10 | 100% | 0 | — |
| ALKALINE PHOSPHATASE (10 - 120 IU/L) | 10 | 100% | 0 | — |
| GGTP (1 - 45 IU/L) | 9 | 90% | 1 | 10% |
| SGOT (1 - 40 IU/L) | 10 | 100% | 0 | — |
| SGPT (1 - 40 IU/L) | 9 | 90% | 1 | 10% |
| LDH (80 - 225 IU/L) | 10 | 100% | 0 | — |
| KIDNEY FUNCTION TESTS | | | | |
| BUN (FEMALES 6 - 19 mg/dL) (MALES 6 - 25 mg/dL) | 10 | 100% | 0 | — |
| CREATININE (FEMALES 0.6 - 1.1 mg/dL) (MALES 0.5 - 1.5 mg/dL) | 10 | 100% | 0 | — |
| LIPIDS | | | | |
| CHOLESTEROL (130 - 233 mg/dL) | 6 | 60% | 4 | 40% |
| TRIGLYCERIDES (30 - 200 mg/dL)* | 7 | 70% | 3 | 30% |
| MISCELLANEOUS | | | | |
| GLUCOSE (65-130 mg/dL) | 9 | 90% | 1 | 10% |
| URIC ACID (2.2 - 8.4 mg/dL) | 10 | 100% | 0 | — |
| URINE TESTS (n = 14) | | | | |
| UROBILINOGEN (≤ 1.0 ERLICH UNIT/dL) | 14 | 100% | 0 | — |
| BLOOD (NEGATIVE) | 12 | 86% | 2 | 14% |
| BILIRUBIN (NEGATIVE) | 14 | 100% | 0 | — |
| KETONES (NEGATIVE, TRACE) | 14 | 100% | 0 | — |
| GLUCOSE (NEGATIVE) | 13 | 93% | 1 | 7% |
| PROTEIN (NEGATIVE, TRACE) | 13† | 100% | 0 | — |

* SUBJECTS WERE NOT FASTING; RESULTS MAY NOT REPRESENT ACTUAL TRIGLYCERIDE LEVEL.

† ONE SUBJECT WAS NOT TESTED FOR URINE PROTEIN.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 98 of 125

TABLE 6

VALUES OF URINE CHROMIUM AND URINE CHROMIUM / CREATININE RATIOS
FOR ALL PARTICIPANTS TESTED ON 12/12/87

| PARTICIPANT CATEGORY | URINE CHROMIUM (ug / L) | | | CHROMIUM / CREATININE (ug / gm) | | |
|---|---|---|---|---|---|---|
| | RANGE | AVERAGE | STANDARD DEVIATION | RANGE | AVERAGE | STANDARD DEVIATION |
| ELIGIBLE PARTICIPANTS (n = 20) | | | | | | |
| ADULTS (n = 8*) | ND† - 8.0 | 2.3 | ± 2.5 | ND - 2.1 | 0.6 | ± 0.8 |
| CHILDREN (n = 3§) | ND - 3.0 | 1.5 | ± 1.3 | ND - 0.7 | 0.3 | ± 0.3 |
| NON-ELIGIBLE PARTICIPANTS (n = 6) | | | | | | |
| ADULTS (n = 2) | ND | ND | | ND | ND | |
| CHILDREN (n = 2) | ND | ND | | ND | ND | |
| CONTROLS (n = 5) | | | | | | |
| ADULTS (n = 5) | ND | ND | | ND | ND | |

* ONE ADULT SUBJECT WAS NOT TESTED FOR URINE CREATININE AND WAS NOT CONSIDERED IN CALCULATING URINE CHROMIUM / CREATININE RATIO.

§ FOUR CHILDREN WERE NOT TESTED.

† ND = NONE DETECTED (< 1.0 ug CHROMIUM / L).

PG10122330

FIGURE 1

# ADULT URINE CHROMIUM, ug/gm CREATININE AND WELL WATER CHROMIUM CONCENTRATIONS

(TEST DATE 12/12/87)

URINE Cr, ug/gm CREATININE
2.10
2.00
1.90
1.80
1.70
1.60
1.50
1.40
1.30
1.20
1.10
1.00
0.90
0.80
0.70
0.60
0.50
0.40
0.30
0.20
0.10
0.00
0.00
0.20
0.40
0.60
0.80
1.00
WELL WATER Cr CONCENTRATIONS (ppm)
□ FEMALES
+ MALES

PGE0021024

AG028827

000091

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 100 of 125

FIGURE 2

# CHILD URINE CHROMIUM, ug/gm CREATININE AND WELL WATER CHROMIUM CONCENTRATIONS

(TEST DATE 12/12/87)

PGE0021025

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 101 of 125

PG10122332

REFERENCES

ATSDR (Agency for Toxic Substances and Disease Registry). 1987 Draft Toxicological Profile for Chromium. Oak Ridge National Laboratory.

Anderson RA, Polansky MM, Bryden NA, Patterson KY, Veillon C. Glinsmann W. 1983. Effects of chromium supplementation on urinary Cr excretion of human subjects and correlation of Cr excretion with selected clinical parameters. J Nutr; 113(2): 276-81.

Anwar RA, Langham CF, Hoppert CA, Alfredson BV, Byerrum RO. 1961. Chronic toxicity studies. III. Chronic toxicity of cadmium and chromium in dogs, Arch Environ; 3: 456.

Berode M and Guillemin M. 1977. Evaluation d'une exposition professionnelle au chrome par le dosage du chrome urinaire. Med. Soc, Prev; 22: 201. (In Lauwerys 1983)

Borghetti A etal. 1977. Indices renaux d'exposition aigue et d'impregnation chronique par le chrome. Med Lavoro; 68,(5): 355

Franchini I, Mutti A. 1975. (in Lauwerys 1983). Excretion et clearance renale du chrome par rapport au degre et a la duree de L'exposition professionnelle. In Rein et Toxique. Masson, Paris, p. 271.

Gylseth B, Gundersen N, Langard S. 1977. Evaluation of chromium exposure based on a simplified method of urinary chromium determination. Scand J Work Environ Health; 3: 28-31.

IARC (International Agency for Research on Cancer). 1982. IARC monographs on the evaluation of the carcinogenic risk of chemicals to humans: Chemicals, Industrial Processes and Industries Associated with Cancer in Humans. Lyons, France, IARC, WHO; (suppl 4): 91-93.

Kumpulainen J, Vuori E, Makinen S, Kara R. 1980. Dietary chromium intake of lactating Finnish mothers: effect on the Cr content of their breast milk. Br J Nutr; 44 (3). 257-263.

PGE0021026

AG028829

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 102 of 125

Lauwerys R. 1983. Industrial Chemical Exposure: Guidelines for Biological Monitoring. Biomedical Publications Davis, CA; p 25.

Leonard, A. and R.R. Lauwerys. 1980. Carcinogenicity and mutagenicity of chromium. Mutat. Res. 76: 227-239.

MacKenzie RD, Byerrum RU, Decker CF, Hoppert Ca, Langham FL. 1958. Chronic toxicity studies. II. Hexavalent and trivalent chromium administered in drinking water to rats. AMA Arch Ind Health; 18: 232-234.

Metrico L. 1978 (abstract). Chromium concentrations in urine of persons non-occupationally exposed to chromium and its compound. Ann 1st Super Sanita; 14 (3): 613-617.

Mutti A et al. 1984. Biological Monitoring of Occupational Exposure to different chromium compounds at various valency states. Int J Environ Anal Chem; 17(1). 35-41.

NAS (National Academy of Sciences). 1974. Medical and Biological Effects Environmental Pollutants: Chromium. Washington, DC: National Academy Press.

NIOSH (National Institute for Occupational Safety and Health). 1975. Criteria for a recommended standard - Occupational exposure to chromium(VI) Washington, DC: U.S. Department of Health, Education, and Welfare.

Norseth T. 1981. The carcinogenicity of chromium. Environ Health Perspect; 40: 121-130.

Petrilli, F.L and S. DeFlora. 1982. Interpretations on chromium mutagenicity and carcinogenicity. In: Mutagens In Our Environment. A.R. Liss, Inc., New York. p. 453-464.

Steven JD, Davies LJ, Stanley EK, et al. 1976. National Research Council of Canada Associate Committee on Scientific Criteria for Environmental Quality: Effects of Chromium in the Canadian Environment. Publ No 15017.

Tola S, Kilpio J, Virtamo M, Haapa K. 1977. Urinary chromium as an indicator of the exposure of welders to chromium. Scand j. work environ & health; 3: 192-202.

Tossavainen A, Nurminen M, Mutanen P, Tola S. 1980. Application of mathematical modelling for assessing the biological half-times of chromium and nickel in field studies. Br J Ind Med; 37: 285-291.

U.S. EPA. 1980. Ambient water quality criteria document for chromium. Washington, DC: Office of Water Regulations and Standards, Criteria and Standard Division, EPA. Springfield, VA: NTIS No. PB 81-117467.

U.S. EPA. 1984. Health assessment document for chromium. Research Triangle Park, NC: Environmental Assessment and Criteria Office. EPA/600/8-83-014F.

U.S. EPA. 1984a. Health effects assessment for hexavalent chromium. Cincinnati, OH: Environmental Assessment and Criteria Office. EPA 540/1-86-019.

Van Bruwaene R. Gerber GB. 1984. Metabolism of 51Cr, 54Mn, 59Fe and 60CO in lactating dairy cows. Health Phys; 46 (5): 1069-1082

EXHIBIT 10

STATE OF CALIFORNIA—ENVIRONMENTAL PROTECTION AGENCY

PETE WILSON, Governor

DEPARTMENT OF TOXIC SUBSTANCES CONTROL
400 P Street, 4th Floor
P.O. Box 806
Sacramento, CA 95812-0806

(916) 255-2052

M E M O R A N D U M

TO: Karen Baker
Facility Permitting Branch
Region 4
245 W. Broadway, Suite 350
Long Beach, California 90802

FROM: Laura M. Valoppi, M.S. LMValoppi
Associate Toxicologist
Office of Scientific Affairs

DATE: May 10, 1994

SUBJECT: PCA = 22010
Aerochem, Site =4004204/00, MPC=6
PG&E Topock, Site = 400240/00, MPC=6
Yates, Site = 400256/00, MPC=6

---

The Human and Ecological Risk Section (HERS) in the Office of Scientific Affairs (OSA) was requested by Region 4, Facility Permitting Branch, to provide information on total and hexavalent chromium persistence in soils and groundwater, health-based soil and water levels for hexavalent chromium, and the toxicity basis for the chromium maximum contaminant level in drinking water (MCL).

**HEALTH-BASED LEVELS**

Using the equations and assumptions contained in the Preliminary Endangerment Assessment Guidance Manual (January, 1994) (PEA), health-based levels of hexavalent chromium in soil and water are calculated for residential exposure over a 30 year period for risk levels of $10^{-4}$ to $10^{-6}$. The levels in soil are calculated assuming the exposure pathways of incidental soil ingestion as well as inhalation of fugitive dusts which originate from contaminated soils. Since hexavalent chromium is a potent known human carcinogen when inhaled, exposure to

AG042481

fugitive dusts accounts for 85% of the risk at these soil levels. However, due to the generic nature of the PEA, the fugitive dust model is a conservative estimate of air concentrations. Therefore, site-specific air modeling could be conducted to estimate site-specific health-based soil levels that may be higher than those calculated by the PEA model.

The levels in soils do not take into account the migration potential of hexavalent chromium from soil to groundwater. The levels in water only consider direct ingestion of domestic water, and does not take into account uptake by homegrown produce, or hazards to aquatic organisms or other wildlife.

| | Risk Level | | |
|---|---|---|---|
| | $10^{-4}$ | $10^{-5}$ | $10^{-6}$ |
| Soil (mg/kg) | 20 | 2.0 | 0.2 |
| Water (mg/L) | 1.6 E-2 | 1.6 E-3 | 1.6 E-4 |

These screening levels in soil and water are based upon an hexavalent chromium oral cancer potency factor of 0.42 $(mg/kg\text{-}day)^{-1}$ and an inhalation cancer potency factor of 510 $mg/kg\text{-}day)^{-1}$ (Cal/EPA, 1992).

PERSISTENCE OF CHROMIUM SPECIES

I have interpreted the question regarding persistence to mean factors effecting conversion of trivalent Cr(III) and hexavalent Cr(VI). Other valence states of chromium are also possible, but only these states are stable to any appreciable extent under environmental conditions.

In native soil, without anthropogenic sources of chromium added, the predominate forms of chromium are trivalent. Chromium can be added to soils from disposal of wastes from industrial operations such as metal plating industries, wood treatment, tanneries, and chromium mining and milling. Although hexavalent chromium is not generally naturally occurring in soils, once deposited from industrial activities, it can remain stable under oxidizing conditions at soil pH above 6.0. The trivalent forms of chromium are stable under moderate pH levels and reducing conditions.

AG042482

The interconversion between hexavalent chromium and trivalent chromium species is dependent upon complex processes. The reduction from hexavalent to trivalent forms can occur in soils with high organic matter specially at low pH; reduction can also occur under anaerobic conditions in the presence of reductive solids, such as Fe (II) oxides or reduced sulfur compounds. Conversely, the oxidation from trivalent to hexavalent forms can occur in soils with manganese(IV) oxides, high pH, or high temperatures. However, oxidation by manganese oxides is generally limited due to the lack of available Cr(III) to the manganese oxide surfaces. Trivalent chromium compounds bound to low-molecular weight organic compounds are more easily oxidized to hexavalent chromium (Wade, et al., 1993; Bartlett and James, 1988).

The species of chromium in soils is important for two reasons. First, hexavalent chromium is much more toxic than the trivalent forms. Hexavalent chromium is a known human carcinogen when inhaled and is probably carcinogenic when ingested. Hexavalent chromium is a more potent carcinogen when inhaled than when ingested. Second, the trivalent forms of chromium are generally more readily bound to soil minerals and, therefore, less bioavailable and less mobile. In contrast, hexavalent chromium is generally in the form of an anion species that makes it much more water soluble and thus more bioavailable than the trivalent forms. The greater mobility of the hexavalent forms means that once deposited or formed in soil, Cr(VI) can readily migrate to surface and ground water.

As is the case for chromium in soils, redox conditions will determine the dominant form of chromium in surface and groundwater. Hexavalent chromium is expected to be the dominant form in groundwater under oxidizing conditions, e.g. in shallow aquifers. Under reducing conditions, such as deeper aquifers, trivalent forms of chromium can become dominant. However, since most Cr(III) species can complex with organic ligands, bind with minerals, and have low water solubility, it is generally a small contributor to the total chromium in groundwater and is usually found at less than 0.05 mg/L. In contrast, Cr(VI) is hydrolyzed in water to form oxyanions which do not readily adsorb onto aquifer materials and remain mobile. Thus, Cr (VI) in groundwater can be transported away from the location of disposal (Wade, et al., 1993; Bartlett and James, 1988; Calder, 1988).

PG20085140

TOXICOLOGICAL BASIS FOR THE MCLs

The Federal MCL for chromium(total) is 0.1 mg/L, and was made final in 1991. The toxicological basis for this value is a study by MacKenzie, et al., 1958, which gave trivalent or hexavalent chromium to rats for one year, and observed "...no significant difference in weight gain, appearance, or pathological changes in the blood or other tissue." (as cited in IRIS2, April 1994). Using a no observed adverse effect level (NOAEL) from the MacKenzie study, a Drinking Water Equivalent Level (DWEL) of 0.17 mg chromium/liter of water was derived. This derivation assumes a human adult drinks 2 liters of water each day, that 20% of the chromium taken in by an individual is from drinking water, and an uncertainty factor of 100.

The State MCL of 0.05 mg/L is based upon an earlier Federal MCL which was also based upon the MacKenzie study. However, the State has acknowledged the oral carcinogenicity of hexavalent chromium by establishing a "recommended public health level" (RPHL) of 0.002 mg/L total chromium. This RPHL is based upon a $10^{-5}$ risk level and assumes that 20% of the total chromium intake of an individual is from drinking water. The RPHL is expected to be promulgated into law later this year, but the State MCL of 0.05 mg/L will remain. The RPHL is a goal that water purveyors are to work toward achieving; if drinking water exceeds the RPHL, then potential mitigation efforts are triggered. A detection limit of 0.01 mg/L for total chromium will be considered the "effective RPHL" (personal communication, Alexis Milea, Chief of Standards and Technology Unit, Division of Drinking Water, California Department of Health Services).

Cal/EPA considers hexavalent chromium to be carcinogenic when ingested, whereas U.S. Environmental Protection Agency (U.S. EPA) has not determined that Cr(VI) is carcinogenic when ingested (Cal/EPA, 1992; IRIS2, 1994). Both Cal/EPA and U.S. EPA consider Cr(VI) to be carcinogenic when inhaled. The toxicological basis for Cal/EPA determining hexavalent chromium to be carcinogenic when ingested is based upon a weight of toxicological evidence: Cr (VI) is genotoxic; when inhaled Cr(VI) causes lung and digestive system cancers in humans, and lung cancers in rats; and ingestion of Cr (VI) resulted in forestomach tumors in mice.

AG042484

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 109 of 125

The primary reason why the federal MCL is greater than the health-based water levels calculated using the PEA of between 0.016 to 0.00016 mg/L ($10^{-4}$ to $10^{-6}$ risk level), is that the Cal/EPA has classified Cr(VI) as an oral carcinogen. Another reason is that the MCL takes into account other factors, such as economics and treatment for water purveyors, in establishing the MCL. In other words, risk management considerations are included in setting the MCL. In contrast, the health-based water levels using the PEA methodology are based entirely upon risk assessment. However, the RPHL of 0.002 mg/L for $10^{-5}$ risk level is approximately the same as the $10^{-5}$ risk level of 0.0016 mg/L using the PEA methodology, since both these values are solely health-based and consider hexavalent chromium to be an oral carcinogen.

SUMMARY

Trivalent chromium compounds are the predominant forms of naturally occurring chromium in soils. Anthropogenic inputs of chromium can alter this equilibrium; the resulting proportion of hexavalent to trivalent chromium in soils is dictated by a complex interaction of redox conditions, pH, moisture, presence of certain minerals, and organic matter. Once deposited or converted in soils, the greater mobility of hexavalent chromium infers a potential for movement to groundwater. Stability of the hexavalent forms in groundwater is a function of pH and redox conditions.

Hexavalent chromium is considered a potent, known human carcinogen when inhaled by both the US. EPA and by Cal/EPA. However, Cal/EPA considers hexavalent chromium to also be carcinogenic when ingested. This difference between the State and Federal agencies results in differences in health-based criteria in water and in MCLs.

If you have any questions on these comments, please contact me at CALNET 494-2052.

AG042485

Reviewed by: A. Kimiko Klein, Ph.D
Staff Toxicologist
Human and Ecological Risk Section

cc: Judy Parker, Ph.D., DABT
HERS

REFERENCES

Bartlett and B.R. James. 1988. *Mobility and Bioavailability of Chromium in Soils.* In: Chromium in the Natural & Human Environments. Edited by J.O. Nriagu and E. Nieboer. A Wiley-Interscience Publication, John Wiley & Sons, New York, N.y. 571 pp.

Calder, L.M. 1988. *Chromium Contamination of Groundwater.* In: Chromium in the Natural & Human Environments. Edited by J.O. Nriagu and E. Nieboer. A Wiley-Interscience Publication, John Wiley & Sons, New York, N.y. 571 pp.

California Environmental Protection Agency (Cal/EPA). June 18, 1992. Memorandum to Cal/EPA Departments, Boards, and Offices, from Standards and Criteria Work Group, Subject: California Cancer Potency Factors.

Integrated Risk Information System (IRIS2). April 1994. A database compiled by the U.S. Environmental Protection Agency for government users.

Wade, M.J., B.K. Davis, J.S. Carlisle, A.K. Klein, L.M. Valoppi. 1993. *Environmental Transformation of Toxic Metals.* In: *De Novo* Toxicants: Combustion Toxicology, Mixing Incompatibilities, and Environmental Activation of Toxic Agents. D.J. Shusterman and J. E. Peterson Editors. Occupational Medicine: State of the Art Reviews, Volume 8, No. 3, pp. 575-601

AG042486

**EXHIBIT 11**

# Toxicological Profile for

# CHROMIUM

U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES
Public Health Service
Agency for Toxic Substances and Disease Registry

000102

# TOXICOLOGICAL PROFILE FOR CHROMIUM

Prepared by:

Syracuse Research Corporation
Under Contract No. 205-199-00024

Prepared for:

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**Public Health Service**
**Agency for Toxic Substances and Disease Registry**

September 2000

000103

## DISCLAIMER

The use of company or product name(s) is for identification only and does not imply endorsement by the Agency for Toxic Substances and Disease Registry.

## UPDATE STATEMENT

Toxicological profiles are revised and republished as necessary, but no less than once every three years. For information regarding the update status of previously released profiles, contact ATSDR at:

Agency for Toxic Substances and Disease Registry
Division of Toxicology/Toxicology Information Branch
1600 Clifton Road NE, E-29
Atlanta, Georgia 30333

000105

# FOREWORD

This toxicological profile is prepared in accordance with guidelines* developed by the Agency for Toxic Substances and Disease Registry (ATSDR) and the Environmental Protection Agency (EPA). The original guidelines were published in the *Federal Register* on April 17, 1987. Each profile will be revised and republished as necessary.

The ATSDR toxicological profile succinctly characterizes the toxicologic and adverse health effects information for the hazardous substance described therein. Each peer-reviewed profile identifies and reviews the key literature that describes a hazardous substance's toxicologic properties. Other pertinent literature is also presented, but is described in less detail than the key studies. The profile is not intended to be an exhaustive document; however, more comprehensive sources of specialty information are referenced.

The focus of the profiles is on health and toxicologic information; therefore, each toxicological profile begins with a public health statement that describes, in nontechnical language, a substance's relevant toxicological properties. Following the public health statement is information concerning levels of significant human exposure and, where known, significant health effects. The adequacy of information to determine a substance's health effects is described in a health effects summary. Data needs that are of significance to protection of public health are identified by ATSDR and EPA.

Each profile includes the following:

(A) The examination, summary, and interpretation of available toxicologic information and epidemiologic evaluations on a hazardous substance to ascertain the levels of significant human exposure for the substance and the associated acute, subacute, and chronic health effects;

(B) A determination of whether adequate information on the health effects of each substance is available or in the process of development to determine levels of exposure that present a significant risk to human health of acute, subacute, and chronic health effects; and

(C) Where appropriate, identification of toxicologic testing needed to identify the types or levels of exposure that may present significant risk of adverse health effects in humans.

The principal audiences for the toxicological profiles are health professionals at the Federal, State, and local levels; interested private sector organizations and groups; and members of the public.

This profile reflects ATSDR's assessment of all relevant toxicologic testing and information that has been peer-reviewed. Staff of the Centers for Disease Control and Prevention and other Federal scientists have also reviewed the profile. In addition, this profile has been peer-reviewed by a nongovernmental panel and was made available for public review. Final responsibility for the contents and views expressed in this toxicological profile resides with ATSDR.

Jeffrey P. Koplan, M.D., M.P.H.
Administrator
Agency for Toxic Substances and Disease Registry

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 117 of 125

*Legislative Background

The toxicological profiles are developed in response to the Superfund Amendments and Reauthorization Act (SARA) of 1986 (Public Law 99-499) which amended the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA or Superfund). This public law directed ATSDR to prepare toxicological profiles for hazardous substances most commonly found at facilities on the CERCLA National Priorities List and that pose the most significant potential threat to human health, as determined by ATSDR and the EPA. The availability of the revised priority list of 275 hazardous substances was announced in the *Federal Register* on October 21, 1999 (64 FR 56792). For prior versions of the list of substances, see *Federal Register* notices dated April 17, 1987 (52 FR 12866); October 20, 1988 (53 FR 41280); October 26, 1989 (54 FR 43619); October 17,1990 (55 FR 42067); October 17, 1991 (56 FR 52166); October 28, 1992 (57 FR 48801); February 28, 1994 (59 FR 9486); April 29, 1996 (61 FR 18744); and November 17, 1997 (62 FR 61332). Section 104(i)(3) of CERCLA, as amended, directs the Administrator of ATSDR to prepare a toxicological profile for each substance on the list.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 118 of 125

# QUICK REFERENCE FOR HEALTH CARE PROVIDERS

Toxicological Profiles are a unique compilation of toxicological information on a given hazardous substance. Each profile reflects a comprehensive and extensive evaluation, summary, and interpretation of available toxicologic and epidemiologic information on a substance. Health care providers treating patients potentially exposed to hazardous substances will find the following information helpful for fast answers to often-asked questions.

---

## *Primary Chapters/Sections of Interest*

**Chapter 1: Public Health Statement:** The Public Health Statement can be a useful tool for educating patients about possible exposure to a hazardous substance. It explains a substance's relevant toxicologic properties in a nontechnical, question-and-answer format, and it includes a review of the general health effects observed following exposure.

**Chapter 2: Health Effects**: Specific health effects of a given hazardous compound are reported by *route of exposure*, by *type of health effect* (death, systemic, immunologic, reproductive), and by *length of exposure* (acute, intermediate, and chronic). In addition, both human and animal studies are reported in this section.

*NOTE:* Not all health effects reported in this section are necessarily observed in the clinical setting. Please refer to the Public Health Statement to identify general health effects observed following exposure.

**Pediatrics:** Four new sections have been added to each Toxicological Profile to address child health issues:

Section 1.6 How Can Chromium Affect Children?
Section 1.7 How Can Families Reduce the Risk of Exposure to Chromium?
Section 2.7 Children's Susceptibility
Section 5.6 Exposures of Children

**Other Sections of Interest:**

Section 2.8 Biomarkers of Exposure and Effect
Section 2.11 Methods for Reducing Toxic Effects

---

*ATSDR Information Center*
*Phone:* 1-888-42-ATSDR or (404) 639-6357 *Fax:* (404) 639-6359
*E-mail:* atsdric@cdc.gov *Internet:* http://www.atsdr.cdc.gov

The following additional material can be ordered through the ATSDR Information Center:

*Case Studies in Environmental Medicine: Taking an Exposure History*—The importance of taking an exposure history and how to conduct one are described, and an example of a thorough exposure history is provided. Other case studies of interest include *Reproductive and Developmental Hazards; Skin Lesions and Environmental Exposures; Cholinesterase-Inhibiting Pesticide Toxicity;* and numerous chemical-specific case studies.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 119 of 125

*Managing Hazardous Materials Incidents* is a three-volume set of recommendations for on-scene (prehospital) and hospital medical management of patients exposed during a hazardous materials incident. Volumes I and II are planning guides to assist first responders and hospital emergency department personnel in planning for incidents that involve hazardous materials. Volume III—*Medical Management Guidelines for Acute Chemical Exposures*—is a guide for health care professionals treating patients exposed to hazardous materials.

*Fact Sheets (ToxFAQs)* provide answers to frequently asked questions about toxic substances.

---

## *Other Agencies and Organizations*

*The National Center for Environmental Health* (NCEH) focuses on preventing or controlling disease, injury, and disability related to the interactions between people and their environment outside the workplace. *Contact:* NCEH, Mailstop F-29, 4770 Buford Highway, NE, Atlanta, GA 30341-3724 • Phone: 770-488-7000 • FAX: 770-488-7015.

*The National Institute for Occupational Safety and Health* (NIOSH) conducts research on occupational diseases and injuries, responds to requests for assistance by investigating problems of health and safety in the workplace, recommends standards to the Occupational Safety and Health Administration (OSHA) and the Mine Safety and Health Administration (MSHA), and trains professionals in occupational safety and health. *Contact:* NIOSH, 200 Independence Avenue, SW, Washington, DC 20201 • Phone: 800-356-4674 or NIOSH Technical Information Branch, Robert A. Taft Laboratory, Mailstop C-19, 4676 Columbia Parkway, Cincinnati, OH 45226-1998 • Phone: 800-35-NIOSH.

*The National Institute of Environmental Health Sciences* (NIEHS) is the principal federal agency for biomedical research on the effects of chemical, physical, and biologic environmental agents on human health and well-being. *Contact:* NIEHS, PO Box 12233, 104 T.W. Alexander Drive, Research Triangle Park, NC 27709 • Phone: 919-541-3212.

---

## *Referrals*

*The Association of Occupational and Environmental Clinics* (AOEC) has developed a network of clinics in the United States to provide expertise in occupational and environmental issues. *Contact:* AOEC, 1010 Vermont Avenue, NW, #513, Washington, DC 20005 • Phone: 202-347-4976 • FAX: 202-347-4950 • e-mail: aoec@dgs.dgsys.com • AOEC Clinic Director: http://occ-env-med.mc.duke.edu/oem/aoec.htm.

*The American College of Occupational and Environmental Medicine* (ACOEM) is an association of physicians and other health care providers specializing in the field of occupational and environmental medicine. *Contact:* ACOEM, 55 West Seegers Road, Arlington Heights, IL 60005 • Phone: 847-228-6850 • FAX: 847-228-1856.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 120 of 125

## CONTRIBUTORS

### CHEMICAL MANAGER(S)/AUTHORS(S):

Sharon Wilbur
ATSDR, Division of Toxicology, Atlanta, GA

Lisa Ingerman, Ph.D.
Syracuse Research Corporation, Portland, OR

Mario Citra, Ph.D.
Syracuse Research Corporation, North Syracuse, NY

Mark Osier, Ph.D
Syracuse Research Corporation, North Syracuse, NY

Dave Wohlers, Ph.D.
Syracuse Research Corporation, North Syracuse, NY

### THE PROFILE HAS UNDERGONE THE FOLLOWING ATSDR INTERNAL REVIEWS:

1. Health Effects Review. The Health Effects Review Committee examines the health effects chapter of each profile for consistency and accuracy in interpreting health effects and classifying end points.

2. Minimal Risk Level Review. The Minimal Risk Level Workgroup considers issues relevant to substance-specific minimal risk levels (MRLs), reviews the health effects database of each profile, and makes recommendations for derivation of MRLs.

3. Data Needs Review. The Research Implementation Branch reviews data needs sections to assure consistency across profiles and adherence to instructions in the Guidance.

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 121 of 125

# PEER REVIEW

A peer review panel was assembled for chromium. The panel consisted of the following members:

1. Dr. William Berndt, Professor, Department of Pharmacology, University of Nebraska Medical Center, Omaha, Nebraska.

2. Dr. Max Costa, Professor, Department of Environmental Medicine, New York University School of Medicine, Tuxedo, New York.

3. Dr. Steven R. Patierno, Professor of Pharmacology, Genetics and Urology, The George Washington University Medical School; Professor of Environmental and Occupational Health, The George Washington University School of Public Health, Washington, D.C.

4. Dr. Elizabeth Snow, Assistant Professor, Nelson Institute of Environmental Medicine, New York University Medical Center, Tuxedo, New York.

These experts collectively have knowledge of chromium's physical and chemical properties, toxicokinetics, key health end points, mechanisms of action, human and animal exposure, and quantification of risk to humans. All reviewers were selected in conformity with the conditions for peer review specified in Section 104(I)(13) of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended.

Scientists from the Agency for Toxic Substances and Disease Registry (ATSDR) have reviewed the peer reviewers' comments and determined which comments will be included in the profile. A listing of the peer reviewers' comments not incorporated in the profile, with a brief explanation of the rationale for their exclusion, exists as part of the administrative record for this compound. A list of databases reviewed and a list of unpublished documents cited are also included in the administrative record.

The citation of the peer review panel should not be understood to imply its approval of the profile's final content. The responsibility for the content of this profile lies with the ATSDR.

000111

# CONTENTS

FOREWORD ..... v

QUICK REFERENCE FOR HEALTH CARE PROVIDERS ..... vii

CONTRIBUTORS ..... ix

PEER REVIEW ..... xi

LIST OF FIGURES ..... xvii

LIST OF TABLES ..... xix

1. PUBLIC HEALTH STATEMENT ..... 1
   1.1 WHAT IS CHROMIUM? ..... 1
   1.2 WHAT HAPPENS TO CHROMIUM WHEN IT ENTERS THE ENVIRONMENT? ..... 2
   1.3 HOW MIGHT I BE EXPOSED TO CHROMIUM? ..... 3
   1.4 HOW CAN CHROMIUM ENTER AND LEAVE MY BODY? ..... 5
   1.5 HOW CAN CHROMIUM AFFECT MY HEALTH? ..... 5
   1.6 HOW CAN CHROMIUM AFFECT CHILDREN? ..... 8
   1.7 HOW CAN FAMILIES REDUCE THE RISK OF EXPOSURE TO CHROMIUM? ..... 9
   1.8 IS THERE A MEDICAL TEST TO DETERMINE WHETHER I HAVE BEEN EXPOSED TO CHROMIUM? ..... 9
   1.9 WHAT RECOMMENDATIONS HAS THE FEDERAL GOVERNMENT MADE TO PROTECT HUMAN HEALTH? ..... 10
   1.10 WHERE CAN I GET MORE INFORMATION? ..... 12

2. HEALTH EFFECTS ..... 13
   2.1 INTRODUCTION ..... 13
   2.2 DISCUSSION OF HEALTH EFFECTS BY ROUTE OF EXPOSURE ..... 14
      2.2.1 Inhalation Exposure ..... 16
         2.2.1.1 Death ..... 16
         2.2.1.2 Systemic Effects ..... 17
         2.2.1.3 Immunological and Lymphoreticular Effects ..... 49
         2.2.1.4 Neurological Effects ..... 51
         2.2.1.5 Reproductive Effects ..... 52
         2.2.1.6 Developmental Effects ..... 53
         2.2.1.7 Genotoxic Effects ..... 54
         2.2.1.8 Cancer ..... 56
      2.2.2 Oral Exposure ..... 72
         2.2.2.1 Death ..... 72
         2.2.2.2 Systemic Effects ..... 74
         2.2.2.3 Immunological and Lymphoreticular Effects ..... 98
         2.2.2.4 Neurological Effects ..... 99
         2.2.2.5 Reproductive Effects ..... 99
         2.2.2.6 Developmental Effects ..... 104
         2.2.2.7 Genotoxic Effects ..... 106
         2.2.2.8 Cancer ..... 107
      2.2.3 Dermal Exposure ..... 108
         2.2.3.1 Death ..... 108

Case: 01-30923 Doc# 3986 Filed: 12/21/01 Entered: 12/28/01 14:56:00 Page 123 of 125

2.2.3.2 Systemic Effects ..... 109
2.2.3.3 Immunological and Lymphoreticular Effects ..... 119
2.2.3.4 Neurological Effects ..... 122
2.2.3.5 Reproductive Effects ..... 122
2.2.3.6 Developmental Effects ..... 122
2.2.3.7 Genotoxic Effects ..... 122
2.2.3.8 Cancer ..... 122
2.3 TOXICOKINETICS ..... 122
2.3.1 Absorption ..... 123
2.3.1.1 Inhalation Exposure ..... 123
2.3.1.2 Oral Exposure ..... 126
2.3.1.3 Dermal Exposure ..... 130
2.3.2 Distribution ..... 132
2.3.2.1 Inhalation Exposure ..... 132
2.3.2.2 Oral Exposure ..... 134
2.3.2.3 Dermal Exposure ..... 137
2.3.2.4 Other Routes of Exposure ..... 138
2.3.3 Metabolism ..... 141
2.3.4 Elimination and Excretion ..... 146
2.3.4.1 Inhalation Exposure ..... 146
2.3.4.2 Oral Exposure ..... 148
2.3.4.3 Dermal Exposure ..... 151
2.3.4.4 Other Routes of Exposure ..... 152
2.3.5 Physiologically based Pharmacokinetic (PBPK)/Pharmacodynamic (PD) Models . 154
2.3.5.1 Summary of PBPK Models. ..... 155
2.3.5.2 Chromium PBPK Model Comparison. ..... 155
2.3.5.3 Discussion of Models. ..... 157
2.4 MECHANISMS OF ACTION ..... 163
2.4.1 Pharmacokinetic Mechanisms ..... 163
2.4.2 Mechanisms of Toxicity ..... 166
2.4.3 Animal-to-Human Extrapolations ..... 167
2.5 RELEVANCE TO PUBLIC HEALTH ..... 168
2.6 ENDOCRINE DISRUPTION ..... 212
2.7 CHILDREN'S SUSCEPTIBILITY ..... 212
2.8 BIOMARKERS OF EXPOSURE AND EFFECT ..... 216
2.8.1 Biomarkers Used to Identify or Quantify Exposure to Chromium ..... 217
2.8.2 Biomarkers Used to Characterize Effects Caused by Chromium ..... 225
2.9 INTERACTIONS WITH OTHER CHEMICALS ..... 227
2.10 POPULATIONS THAT ARE UNUSUALLY SUSCEPTIBLE ..... 230
2.11 METHODS FOR REDUCING TOXIC EFFECTS ..... 231
2.11.1 Reducing Peak Absorption Following Exposure ..... 231
2.11.2 Reducing Body Burden ..... 234
2.11.3 Interfering with the Mechanism of Action for Toxic Effects ..... 235
2.12 ADEQUACY OF THE DATABASE ..... 238
2.12.1 Existing Information on Health Effects of Chromium ..... 238
2.12.2 Identification of Data Needs ..... 242
2.12.3 Ongoing Studies ..... 257

3. CHEMICAL AND PHYSICAL INFORMATION ..... 259
3.1 CHEMICAL IDENTITY ..... 259
3.2 PHYSICAL AND CHEMICAL PROPERTIES ..... 259

000113

4. PRODUCTION, IMPORT/EXPORT, USE, AND DISPOSAL ........ 273
4.1 PRODUCTION ........ 273
4.2 IMPORT/EXPORT ........ 277
4.3 USE ........ 277
4.4 DISPOSAL ........ 278

5. POTENTIAL FOR HUMAN EXPOSURE ........ 281
5.1 OVERVIEW ........ 281
5.2 RELEASES TO THE ENVIRONMENT ........ 285
5.2.1 Air ........ 285
5.2.2 Water ........ 290
5.2.3 Soil ........ 291
5.3 ENVIRONMENTAL FATE ........ 291
5.3.1 Transport and Partitioning ........ 291
5.3.2 Transformation and Degradation ........ 294
5.3.2.1 Air ........ 294
5.3.2.2 Water ........ 294
5.3.2.3 Sediment and Soil ........ 295
5.4 LEVELS MONITORED OR ESTIMATED IN THE ENVIRONMENT ........ 296
5.4.1 Air ........ 297
5.4.2 Water ........ 298
5.4.3 Sediment and Soil ........ 299
5.4.4 Other Environmental Media ........ 300
5.5 GENERAL POPULATION AND OCCUPATIONAL EXPOSURE ........ 302
5.6 EXPOSURES OF CHILDREN ........ 306
5.7 POPULATIONS WITH POTENTIALLY HIGH EXPOSURES ........ 307
5.8 ADEQUACY OF THE DATABASE ........ 309
5.8.1 Identification of Data Needs ........ 310
5.8.2 Ongoing Studies ........ 314

6. ANALYTICAL METHODS ........ 315
6.1 BIOLOGICAL SAMPLES ........ 315
6.2 ENVIRONMENTAL SAMPLES ........ 319
6.3 ADEQUACY OF THE DATABASE ........ 325
6.3.1 Identification of Data Needs ........ 325
6.3.2 Ongoing Studies ........ 326

7. REGULATIONS AND ADVISORIES ........ 327

8. REFERENCES ........ 339

9. GLOSSARY ........ 413

APPENDICES

A. ATSDR MINIMAL RISK LEVELS AND WORKSHEETS ........ A-1

B. USER'S GUIDE ........ B-1

C. ACRONYMS, ABBREVIATIONS, AND SYMBOLS ........ C-1