GARY M. COHEN, SBN 117215
AROCLES AGUILAR, SBN 94753
MICHAEL M. EDSON, SBN 177858
CALIFORNIA PUBLIC UTILITIES COMMISSION
505 Van Ness Avenue
San Francisco, California 94102
Telephone: (415) 703-2015
Facsimile: (415) 703-2262

ALAN W. KORNBERG
BRIAN S. HERMANN
SUSAN E. WELBER
PAUL, WEISS, RIFKIND, WHARTON & GARRISON
1285 Avenue of the Americas
New York, New York 10019-6064
Telephone: (212) 373-3000
Facsimile: (212) 757-3990

Attorneys for Objector California Public Utilities Commission

**FILED**

**JAN - 8 2002**

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 01-30923 DM |
| PACIFIC GAS AND ELECTRIC COMPANY,<br> a California corporation, | Chapter 11 Case |
| Debtor. | **OBJECTION TO PACIFIC GAS & ELECTRIC COMPANY'S SECOND MOTION FOR ORDER FURTHER EXTENDING EXCLUSIVITY PERIOD FOR FILING PLAN OF REORGANIZATION TO PERMIT THE CALIFORNIA PUBLIC UTILITIES COMMISSION TO FILE AN ALTERNATE PLAN OF REORGANIZATION** |
| Federal I.D. No. 94-0742640 | |
| | Date:   January 16, 2002<br>Time:  9:30 a.m.<br>Place: 235 Pine Street, 22nd Floor, San Francisco, California<br>Judge: Hon. Dennis Montali |

**[SUPPORTING DECLARATION OF GARY M. COHEN FILED SEPARATELY]**

4188

# TABLE OF CONTENTS

**Pages**

Table of Authorities .................................................................................................. ii

I. PRELIMINARY STATEMENT ........................................................................... 2

II. BACKGROUND .................................................................................................. 4

III. COMMISSION'S ALTERNATE PLAN ........................................................... 7

IV. ARGUMENT ...................................................................................................... 9

PG&E'S SECOND EXTENSION MOTION SHOULD BE DENIED FOR FAILURE TO SHOW "CAUSE" UNDER SECTION 1121(d) OF THE BANKRUPTCY CODE

    A.    PG&E Has Not Made Substantial Progress Towards A Successful *Consensual* Reorganization Sufficient To Justify An Extension of Exclusivity. ..................... 11

            (i)    PG&E Has Failed to Negotiate with the Commission and Other Key Parties in Interest. ................................................................... 12

            (ii)    It is Too Early to Determine Whether PG&E's Plan Can Result in a Successful Reorganization ................................................... 14

            (iii)    PG&E's Use of Exclusivity As a Tactical Device to Bully the Commission, the State and its Creditors to Accept its Plan Undermines its Requested Extension. ...................................... 16

    B.    The Size and Complexity of PG&E's Chapter 11 Case Do Not Justify an Extension. ............................................................................................. 17

    C.    Denying PG&E's Motion to Allow the Commission to File its Alternate Plan Would Benefit Interested Parties Without Prejudicing PG&E. ................... 20

V. CONCLUSION ..................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re Dow Corning Corp.*,
   208 B.R. 661 (Bankr. E.D. Mich. 1997) ...................................................... 9, 11, 20

*In re Express One Int'l, Inc.*,
   194 B.R. 98 (Bankr. E.D. Tex. 1996)........................................................ 9, 11, 19, 20

*Gaines* v. *Perkins (In re Perkins)*,
   71 B.R. 294 (W.D. Tenn. 1987)............................................................ 16, 20

*In re Gibson & Cushman Dredging Corp.*,
   101 B.R. 405 (E.D.N.Y. 1989)........................................................................ 16

*In re Homestead Partners, Ltd.*,
   197 B.R. 706 (Bankr. N.D. Ga. 1996)............................................................ 16

*In re Interco, Inc.*,
   137 B.R. 999 (Bankr. E.D. Mo. 1992) ............................................................ 21

*In re Manville Forest Prods. Corp.*,
   31 B.R. 991 (S.D.N.Y. 1983)........................................................................ 12

*In re McLean Indus., Inc.*,
   87 B.R. 830 (Bankr. S.D.N.Y. 1987) ............................................................ 15

*In re Nicolet, Inc.*,
   80 B.R. 733 (Bankr. E.D. Pa. 1988) ............................................................ 16

*In re Pub. Serv. Co. of New Hampshire,*
   88 B.R. 521 (Bankr. D. N.H. 1988) ...................................................... 17, 19, 20, 21

*In re Pine Run Trust, Inc.*,
   67 B.R. 432 (Bankr. E.D. Pa. 1986)...................................................... 10, 12, 15, 20

*In re Pub. Serv. Co. of New Hampshire,*
   99 B.R. 155 (Bankr. D.N.H. 1989) ...................................................... passim

*In re Sharon Steel Corp.*,
   78 B.R. 762 (Bankr. W.D. Pa. 1987) ............................................................ 9, 19

*In re Southwest Oil Co. of Jourdanton, Inc.*,
   84 B.R. 448 (Bankr. W.D. Tex. 1987) ............................................................ 12

*In re Swatara Coal Co.*,
   49 B.R. 898 (Bankr. E.D. Pa. 1985)............................................................ 15

*Teachers Ins. & Annuity Assoc. of Am.* v. *Lake in the Woods (In re Lake in the Woods),*
   10 B.R. 338 (E.D. Mich. 1981) ............................................................ 17

*In re Texaco Inc.*,
　　81 B.R. 806 (Bankr. SDNY 1988) ..... ....................................................... 18, 20, 22

*In re Trainer's, Inc.*,
　　17 B.R. 246 (Bankr. E.D. Pa. 1982)........................................................ 16

*In re United Press Int'l, Inc.*,
　　60 B.R. 265 (Bankr. D.C. 1986) ...................................... 16, 18, 20, 21

*United Savings Assoc. of Tx. v. Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*,
　　808 F.2d 363 (5th Cir. 1987) .............................................................. 10

*In re Washington -St. Tammany Elec. Coop., Inc.*,
　　97 B.R. 852 (E.D. La. 1989) ............................................................... 10

## STATUTES

11 U.S.C. §1121(d) ..................................................................................... passim

## LEGISLATIVE HISTORY

S. Rep. No. 95-989, at 118 (1978) *reprinted in* 1978 U.S.C.C.A.N. 5787, 5904. ........... 10

The California Public Utilities Commission (the "Commission"), a creditor and party in interest in this chapter 11 case, by and through its undersigned counsel, submits this objection (the "Objection") to Pacific Gas & Electric Company's Second Motion for Order Further Extending Exclusivity Period for Filing Plan of Reorganization (the "Second Extension Motion") to permit the Commission to file its alternative plan of reorganization (the "Alternate Plan"). In support of its Objection, the Commission respectfully represents as follows:

**I.**

**PRELIMINARY STATEMENT**

Plan exclusivity extensions must be earned by hard bargaining. That is the clear purpose and intent of section 1121(d) of the Bankruptcy Code, which balances the estate's interest in promoting a consensual reorganization plan with the debtor's urge to use its exclusive right tactically to compel creditors and other interested parties to accede to its view of the world. It is that very tension that is at issue in the Second Extension Motion filed by Pacific Gas & Electric Company ("PG&E").

PG&E has enjoyed the exclusive right to file a plan of reorganization for more than nine months, since April 6, 2001. During that period, PG&E has not even attempted to negotiate with the Commission, its chief regulator. Instead, PG&E has initiated a frontal assault on the Commission's and the State's regulatory authority. From the first days of this case, when PG&E filed an adversary proceeding to strike a portion of a Commission order, to its plan filing some five months later, PG&E's strategy has been obvious – it prefers to fight, rather than reach agreement, with the Commission.

Its confirmation efforts complicated by its own belligerence, PG&E seeks an additional four month extension of its exclusive period, until June 30, 2002, to seek confirmation of its plan. PG&E has not earned such an extension. PG&E has enjoyed nine months of exclusivity and the time has now come to level the playing field. PG&E's creditors and other interested parties no longer should be held hostage to PG&E's battle plans against the Commission. In addition, a further extension of exclusivity would unjustifiably reward PG&E for pursuing

1  precisely the type of "take-it-or-leave-it" attitude section 1121(d) of the Bankruptcy Code is
2  designed to prevent.

3      As described more fully in the Declaration of Gary M. Cohen filed in support hereof (the
4  "Cohen Declaration"), the Commission has developed an alternate approach, and this Court
5  should deny PG&E's Second Extension Motion to the extent necessary to permit the
6  Commission to file and solicit acceptances to its Alternate Plan. Such an approach is fully
7  justified. To begin with, PG&E has failed to meet its burden of establishing "cause" for its
8  second exclusivity extension, as it is required to do under section 1121(d) of the Bankruptcy
9  Code. In fact, PG&E's Second Extension Motion does not contain *any* evidence of "cause."
10 Rather, the Motion contains only unsupported allegations of alleged progress toward
11 confirmation of a plan and the size and complexity of this case. PG&E's Sec. Ext. Mot. at 7-9.
12 That, without more, is insufficient to satisfy the "cause" requirement.

13     The truth is, PG&E has made little, if any, progress toward confirmation of a *consensual*
14 plan. As is obvious from the roughly 70 Disclosure Statement objections filed to date, the Plan
15 does not enjoy the support of key constituencies in this case, including the Commission and the
16 State of California, and PG&E has done nothing to gain their support. Moreover, as those
17 objections point out, the Plan is infirm in a number of respects, leaving its confirmability in
18 doubt. Allowing PG&E to proceed with its current Plan to the exclusion of all others may result
19 in nothing more than wasted time and delay at the expense of PG&E's creditors who, in PG&E's
20 own words, are footing the bill for "literally millions of dollars per week in fees, costs and
21 interest accruals with respect to creditor claims." PG&E's Sec. Ext. Mot. at 4.

22     Similarly, the size and alleged complexity of this case do not support PG&E's second
23 requested extension. While this case is no doubt large, its size is largely irrelevant to PG&E's
24 need to maintain plan exclusivity. Size is important, where, unlike here, the existence of
25 multiple creditor constituencies with varying rights and priorities magnify the difficulty of
26 negotiating a consensual plan. Here, PG&E purportedly is offering to pay creditors in full.

27

28

3

1  Regardless of the number of constituencies involved, it should not be difficult for PG&E to

2  convince creditors to take 100 cents-on-the-dollar. In short, size really does not matter.

3        PG&E's assertions of complexity are similarly unavailing. Much of the complexity

4  surrounding this case has been engineered by PG&E. If PG&E were concerned only with

5  debtor-creditor issues and emerging quickly from bankruptcy, more mundane alternatives exist

6  for it to do so. In fact, the Commission has developed one such alternative, which is described

7  below and in the Cohen Declaration. But, PG&E obviously is more interested in walking a legal

8  minefield in an effort to remove itself from Commission and State regulation. Thus, PG&E itself

9  has unnecessarily complicated matters by foisting upon creditors and this Court its complicated

10  preemption battle. PG&E should not be allowed to create complexity where none needs to exist

11  and then use it as a basis to monopolize the plan process.

12        "Cause" lacking, PG&E should not be granted a further extension of its exclusive period.

13  Rather, this Court should deny PG&E's requested extension to allow the Commission to file and

14  solicit acceptances to its own Alternate Plan. The Commission is keenly interested in PG&E's

15  reorganization and has worked diligently to construct its Alternate Plan. The Commission is

16  now poised, with this Court's permission, to present creditors and this Court with an alternative

17  that, among other things, pays creditors in full in cash in a manner that is consistent with the

18  broader interests of the State of California and PG&E's ratepayers, allows PG&E to emerge

19  promptly from chapter 11 as a viable, creditworthy utility and avoids the costly preemption

20  litigation at the heart of PG&E's Plan. Whereas creditors currently are stranded by PG&E's

21  "take-it-or-leave-it" approach, they would now have a choice.

22        Accordingly, as discussed more fully below, the Commission requests that PG&E's

23  Second Extension Motion be denied to permit the Commission to file its Alternate Plan.

24  **II.**

25  **BACKGROUND**

26        1.     On April 6, 2001 (the "Petition Date"), PG&E filed a voluntary petition under

27  chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

28

1　Code"). PG&E continues to manage and operate its business and property as a debtor in

2　possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee has been

3　appointed in this case.

4　　　　2.　　　The Commission is an independent, Constitutional agency of the State of

5　California charged with, among other things, regulating California's public utilities. Cohen

6　Decl. ¶ 2. PG&E is a public utility subject to the Commission's jurisdiction. *Id.* The

7　Commission is also a creditor of PG&E and a party in interest in this case with standing to file a

8　plan of reorganization.[1]

9　　　　3.　　　On July 3, 2001, PG&E made its first request to extend exclusivity, which was

10　granted by an order (the "Extension Order") of the Court dated July 20, 2001. Order Extending

11　Exclusivity Period, *In re Pacific Gas & Elec. Co.,* No. 01-30923 DM (Bankr. N.D. Cal., July 20,

12　2001). PG&E's first request was premised principally upon the size and alleged complexity of

13　its chapter 11 case and its need for additional time to develop a plan of reorganization. Debtor's

14　Motion for Order Extending Exclusivity Period For Filing Plan of Reorganization at 7-8. The

15　Extension Order granted PG&E an additional four months within which to file a plan, until

16　December 6, 2001, and in the event that PG&E did file a plan by December 6, 2001, the

17　Extension Order extended the period during which plan exclusivity was maintained under section

18　1121(c)(3) until February 4, 2002. Extension Order at 1.

19　　　　4.　　　On September 20, 2001, PG&E, together with its parent company, PG&E

20　Corporation (the "Parent"), as co-proponent, filed a Plan of Reorganization under Chapter 11 of

21　the Bankruptcy Code for Pacific Gas and Electric Company (as amended, the "Plan") together

22　with a proposed disclosure statement (as amended, the "Disclosure Statement").

23

24

25　　　――――――――――――――――

26　[1]　On October 2, 2001, the Commission filed a proof of claim for approximately $12 million
　　representing amounts due from PG&E for, among other things, unpaid fees and expenses
27　　under the California Environmental Quality Act and unpaid user fees and other amounts due
　　under the Women/Minority/Disabled/Veteran Business Enterprise Program.

28

5.     The Plan and Disclosure Statement were prepared and filed without any negotiation or substantive discussion with many of the key players involved in this case and in the regulation of PG&E's operations, including the Commission.  Cohen Decl. ¶ 8.

6.     As this Court is keenly aware, the Plan is premised, in large part, upon PG&E's wholesale transfer of its generation and its electric and gas transmission assets to newly formed entities that would be beyond the purview of Commission regulation.  First Am. Plan, Art. 7.  In addition, the Plan hinges on PG&E's receipt of no fewer than fifteen affirmative declaratory and injunctive rulings against the Commission and various other State and local agencies, and approvals from the Federal Energy Regulatory Commission ("FERC"), the Securities and Exchange Commission ("SEC") and the Nuclear Regulatory Commission ("NRC"), all of which will be the subject of significant litigation before this Court and elsewhere.  First Am. Plan, Art. 7, 8; First Am. D.S. at 123, 200-01.  Assuming PG&E is successful on all of these fronts, the Plan allegedly provides for creditor claims to be satisfied in full, with interest, in the form of either cash or a combination of cash and debt securities.  First Am. Plan, Art. 4.

7.     As set forth more fully in the Commission's Objection to PG&E's Disclosure Statement, filed on November 27, 2001 (the "Disclosure Statement Objection"), the Commission submits that PG&E's Plan, which attempts to preempt myriad Commission, State and local laws and regulations, is unlawful and incapable of being confirmed.

8.     Specifically, the Commission and other parties have identified the following critical confirmation infirmities:

- The Plan may not comply with the Bankruptcy Code, as required by section 1129(a)(1), because it fails to contain adequate means for its implementation, a requirement under section 1123(a)(5) of the Bankruptcy Code. Discl. Stmt. Obj. 6-9.

- The Plan has not been proposed in good faith, as required by section 1129(a)(3), because it is inconsistent with the purposes and objectives of the Bankruptcy Code. *Id.* at 9-13.

- The Plan may provide for hidden rate increases without Commission approval, in violation of section 1129(a)(6) of the Bankruptcy Code. *Id.* at 14.

- The Plan may not be feasible, as required by section 1129(a)(11).  The Plan is predicated entirely upon PG&E's receipt of favorable rulings on many of its

requests for declaratory and injunctive relief relating to preemption, as well as favorable outcomes at the FERC, SEC and NRC. Until PG&E obtains such rulings, a feasibility determination is impossible. *Id.* at 14-15.

- The Plan fails the "best interests" test of section 1129(a)(7) of the Bankruptcy Code because it seeks to transfer proceeds of the Rate Recovery Litigation (as defined in the Plan) and other litigation to the Parent. *See* Objection of Certain Debtholders to Approval of the Disclosure Statement for Plan of Reorganization of Pacific Gas and Electric Company and PG&E Corp. at 10-14.

- The Plan improperly grants third party releases to the Parent and other creditors. *Id.* at 14-15.

- The Plan fails to comply with the "absolute priority rule" under section 1129(b)(2) of the Bankruptcy Code because it (a) allows equity holders to retain their ownership interest in PG&E when senior creditors are not paid in full, and (b) provides that QUIDS claimants will receive property of PG&E when senior creditors have not been paid in full. *Id.* at 15-19.

9.     Pursuant to this Court's Order dated December 5, 2001, PG&E filed its amended Plan and Disclosure Statement on December 19, 2001.  Hearings to consider approval of the amended Disclosure Statement are scheduled for January 14, 2002, to address the adequacy of disclosure only, and January 25, 2002, to address whether PG&E's Plan is unconfirmable as a matter of law based upon sovereign immunity or preemption grounds.

10.     Pursuant to this Court's December 5th Order, on December 18, 2001, the Commission and its counsel met with PG&E and its counsel and counsel to the Parent to discuss the Commission's objections to the Disclosure Statement.  Cohen Decl. ¶ 8.  As of the date of this Objection, many of the Commission's objections to the Disclosure Statement remain unaddressed by the amended Disclosure Statement, although the Commission and PG&E have scheduled a further "meet and confer" for January 9, 2001. *Id.* at ¶ 6.

11.     On December 19, 2001, PG&E filed its Second Extension Motion.

## III.

## COMMISSION'S ALTERNATE PLAN[2]

Faced with PG&E's refusal to negotiate, the Commission has developed its Alternate Plan.  Now, with PG&E's exclusive right about to expire (absent an extension), the Commission

---

[2]   The following description of the Alternate Plan is for informational purposes and is included only as support for this Objection.  By this Objection, the Commission is not proposing an alternative plan nor is it soliciting acceptances to any such alternative or rejections of PG&E's Plan.

is prepared to describe the salient features of its Alternate Plan and, with this Court's permission, to file a plan and disclosure statement in short order.

The following are certain of the significant provisions of the Commission's Alternate Plan:

- PG&E's short-term borrowings incurred during the energy crisis would be paid in full in cash (including accrued and unpaid interest through the effective date) by the first quarter of 2003 through a combination of PG&E's cash on hand (approximately $4.9 billion as of November 30, 2001 according to PG&E's most recent 8-K filing with the SEC)[3] and PG&E's residual revenues after deducting authorized revenue requirements from billed revenues ("residual revenues");

- all of PG&E's remaining indebtedness would be reinstated or refinanced;

- PG&E's creditworthiness and financial viability would be restored – the Commission would adopt a post-bankruptcy rate structure consistent with state law that would provide PG&E with an opportunity to earn a reasonable return that would allow it to maintain an investment-grade credit rating;

- valuable claims against the Parent (which under PG&E's Plan are to be released)[4] and other assets such as PG&E's refund claims pending before FERC would be preserved and transferred to a litigation trust or similar entity and prosecuted for the benefit of PG&E's ratepayers;

- costly and time-consuming preemption litigation would be avoided;

- PG&E would emerge promptly from chapter 11;

- the Commission and State of California would continue to regulate PG&E's operations;

- PG&E's integrated operations would not be disaggregated;

- rates would not increase, and may be reduced in 2003 (or earlier);

- utility assets would not be diverted to pay the Parent's expenses; and

- costly litigation at the FERC, NRC and SEC would be avoided.

Cohen Decl. ¶ 9.

---

[3] The Commission expects this number to increase over time. Cohen Decl. ¶ 10.

[4] These claims include, among others, claims that the Parent has violated the "first priority" condition imposed upon the Parent by a Commission order approving PG&E's holding company structure and claims that PG&E declared and paid dividends to its Parent while it was insolvent.

1         Mindful of the chaos that could ensue if PG&E's plan exclusivity were terminated

2 generally to allow any party in interest to file a plan, the Commission's Objection is more

3 limited. The Commission objects to PG&E's Second Extension solely to allow it to file and

4 solicit acceptances to the Commission's Alternate Plan. For the reasons that follow, the

5 Commission submits that such relief is required under section 1121(d) of the Bankruptcy Code

6 and is in the best interests of PG&E's estate, its creditors and other parties in interests.

7 **IV.**

8 **ARGUMENT**

9
**PG&E'S SECOND EXTENSION MOTION**
**SHOULD BE DENIED FOR FAILURE TO SHOW "CAUSE"**

10 **UNDER SECTION 1121(d) OF THE BANKRUPTCY CODE**

11         The Court should deny PG&E's Second Extension Motion to the extent necessary to

12 permit the Commission to file its Alternate Plan because PG&E has failed to meet its burden of

13 establishing "cause" for an extension as required under section 1121(d) of the Bankruptcy Code.

14 11 U.S.C. § 1121(d)[5]; *In re Dow Corning Corp.*, 208 B.R. 661, 663 (Bankr. E.D. Mich. 1997)

15 ("a debtor bears the burden of proof when it requests an extension of its period of exclusivity");

16 *In re Express One Int'l, Inc.*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996) ("The debtor-in-

17 possession bears the burden of establishing 'cause' for an extension of its exclusivity period.").

18 Though the Bankruptcy Code does not define "cause," it is well established that "cause" is a

19 flexible concept that provides courts with broad discretion in determining when it exists based

20 upon the particular facts and circumstances of each case. *See In re Sharon Steel Corp.*, 78 B.R.

21 762, 763-64 (Bankr. W.D. Pa. 1987) ("In essence, Congress has left the meaning of the phrase

22 'for cause' to be determined by the facts and circumstances in each individual case."); *In re*

23 *Public Serv. Co. of New Hampshire* ("*PSNH*"), 99 B.R. 155, 173 n.10 (Bankr. D.N.H. 1989)

24 ("[I]f a debtor-in-possession is to retain exclusive control of the formulation of a plan of

25
26
27

---

[5]    Section 1121(d) provides that "[o]n request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may *for cause* reduce or increase the 120-day period or the 180-day period referred to in this section." 11 U.S.C. § 1121(d) (emphasis added).

28

1  reorganization under an exclusivity period it must demonstrate that it uses its position to

2  effectively foster consensual agreement by all entities involved").

3         Critical to the determination of whether "cause" exists is consideration of the balance

4  Congress intended to strike in section 1121 between the relative negotiating positions of the

5  debtor and its creditors and other key constituents.  Section 1121 is the product of Congress'

6  attempt to remedy the imbalance between debtors and creditors found under chapter XI of the

7  former Bankruptcy Act.  Under chapter XI, debtors maintained the exclusive right to propose a

8  plan underlineindefinitely, thereby giving debtors undue leverage over creditors whose only recourse was

9  to move for conversion of the case to chapter X, an unattractive alternative.  In contrast, under

10 section 1121 of the Bankruptcy Code, debtors enjoy exclusivity only for a limited period of time

11 -- 120 days to file a plan and no more than 180 days from the inception of the case to seek its

12 acceptance -- which may only be extended or reduced upon a showing of "cause."  As the

13 legislative history of section 1121(d) makes clear, extensions should not be used to upset the

14 delicate balance Congress sought:  "Since the debtor has an exclusive privilege for 6 months

15 during which others may not file a plan, *the granted extension should be based on a showing of*

16 *some promise of probable success.  An extension should not be employed as a tactical device to*

17 *put pressure on parties in interest to yield to a plan they consider unsatisfactory.*"  S. Rep. No.

18 95-989, at 118 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5904.  *See also In re Pine Run*

19 *Trust, Inc.*, 67 B.R. 432, 434 (Bankr. E.D. Pa. 1986) ("By granting the debtor a limited period of

20 exclusivity in plan filing, the Code seeks to balance the relative negotiating positions of the

21 debtor and creditors."); *In re Washington –St. Tammany Elec. Coop., Inc.*, 97 B.R. 852, 855

22 (E.D. La. 1989) ("Congress enacted . . . 1121 in order to limit the debtor's exclusive rights to file

23 a plan to clearly defined periods."); *United Savings Assoc. of Tx.* v. *Timbers of Inwood Forest*

24 *Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 808 F.2d 363, 372 (5th Cir. 1987)

25 ("[T]he bankruptcy court must avoid reinstituting the imbalance between the debtor and its

26 creditors that characterized proceedings under the old Chapter XI.") (*en banc*), *aff'd*, 484 U.S.

27 365 (1988).

28

1     In balancing the relative positions of various constituencies, courts examine a variety of

2 factors to determine whether "cause" for an extension exists. In one of the leading decisions in

3 this area, the court in *PSNH* considered whether an extension was paid for with "hard

4 bargaining," whether a further extension would promote a consensual plan of reorganization

5 within a reasonable timeframe and whether chaos would ensue following the expiration of

6 exclusivity. *PSNH,* 99 B.R. at 173-77. Other courts have considered multiple factors, many of

7 which amount to variations on the same theme. *See, e.g., Express One Int'l,* 194 B.R. at 100;

8 *Dow Corning*, 208 B.R. at 64-65.[6]

9     PG&E has not submitted any evidence that "cause" for an extension exists. Instead, its

10 Second Extension Motion is premised solely upon boilerplate suggestions of "cause," including

11 PG&E's alleged progress towards reorganization and the size and complexity of this case. The

12 cited reasons are unsupportable. Even if true, though, they do not add up to "cause." Under such

13 circumstances it is appropriate for the Court to deny PG&E's Second Extension Motion to the

14 extent necessary to allow the Commission to file its Alternate Plan.

15 **A.    PG&E Has Not Made Substantial Progress Towards A Successful *Consensual Reorganization* Sufficient To Justify An Extension of Exclusivity.**

16

17     The purpose of the exclusive period is to enable the debtor to negotiate a *consensual* plan

of reorganization with its creditors. *See In re PSNH*, 99 B.R. at 173 n.10 ("if a debtor-in-

18

19 possession is to retain exclusive control of the formulation of the plan of reorganization under an

exclusivity period it must demonstrate that it uses its position to effectively foster consensual

20

---

21   [6]  The *Express One* court considered the following factors: (1) size and complexity of the case;
(2) necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and

22 prepare adequate information; (3) the existence of good faith progress toward reorganization;
(4) the fact that the debtor is paying its bills as they become due; (5) whether the debtor has

23 demonstrated reasonable prospects for filing a viable plan; (6) whether the debtor has made
progress in negotiations with its creditors; (7) the amount of time which has elapsed in the

24 case; (8) whether the debtor is seeking an extension of exclusivity to pressure creditors to
submit to the debtor's reorganization demands; and (9) whether an unresolved contingency

25 exists. *Express One Int'l,* 194 B.R. at 100. Courts that employ the factors analysis do not
merely tally the factors for and against an extension but rather view them holistically. *See*

26 *Dow Corning*, 208 B.R. at 659 ("Sometimes one or more factors strongly point to a particular
result while others point the other way only weakly. And sometimes certain factors are just

27 more relevant or important than others.").

28

1  agreement by *all entities involved*") (emphasis added). Accordingly, in evaluating whether cause

2  exists for an extension, courts examine whether there is a "reasonable probability that . . . [the

3  debtor] will be able to propose a plan that will result in a successful reorganization within a

4  reasonable time." *In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 451 (Bankr. W.D.

5  Tex. 1987); *see In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) (justifying

6  exclusivity extension on, among other things, a finding that "substantial progress has been made

7  in negotiations that, all concede, are critical to a successful reorganization"). Even after a plan is

8  filed, courts evaluate the status of negotiations between the debtor and key parties in interest

9  towards achieving a consensual reorganization. *See generally PSNH*, 99 B.R. at 175-76

10  (denying debtor utility's second extension request where status of negotiations indicate that a

11  further extension of exclusivity will not promote a consensual plan of reorganization within a

12  reasonable time frame).

13      PG&E claims that it has made "substantial efforts towards a successful reorganization,"

14  citing that (i) it has already filed a Disclosure Statement and Plan which it claims enjoy broad

15  creditor support, (ii) it is in the process of obtaining approval of its Disclosure Statement, and

16  (iii) it has amended the Plan and Disclosure Statement to address concerns raised by interested

17  parties. PG&E's Sec. Ext. Mot. at 9-10. PG&E's submissions in this respect are insufficient to

18  establish cause. First, PG&E has failed to engage in the "hard bargaining" (indeed *any*

19  bargaining) with several key constituencies, which is a necessary prerequisite to a grant of an

20  extension of exclusivity. *PSNH*, 99 B.R. at 173. Second, until critical determinations are made

21  regarding, among other things, the lawfulness of the preemption PG&E seeks under its Plan, its

22  confirmability remains very much in doubt. Therefore, whatever progress PG&E has made to

23  date may prove to be illusory and of no consequence to creditor recoveries and its eventual

24  emergence from chapter 11.

25          (i)     **PG&E Has Failed to Negotiate with the
                    Commission and Other Key Parties in Interest.**

26

27      Extensions of exclusivity must be paid for by "hard bargaining." *Id.* (citing *In re*

28  *Manville Forest Prods. Corp.*, 31 B.R. 991, 993 (S.D.N.Y. 1983)). As the government body

charged with regulating most of PG&E's operations, the Commission is a critical player in this case. Yet, PG&E has not negotiated any terms of a plan with the Commission, preferring instead to embroil this chapter 11 estate in a risk-laden attack on the Commission's regulatory authority. Such failure to negotiate is fatal to PG&E's Second Extension Motion.

Faced with a similar circumstance of a regulated utility failing to negotiate the terms of its reorganization plan with its regulators, the court in *PSNH* refused to grant the debtor utility a further extension of exclusivity. In that case, the court denied the debtor's second request for an extension of exclusivity because instead of continuing to bargain with state representatives, the debtor filed a non-consensual "FERC plan" similar in some respects to PG&E's Plan. Specifically, in *PSNH* the court found that although representatives of the debtor, the state and key creditor and equity security holder constituencies met on more than one occasion and discussed and exchanged proposals, the debtor was uninterested in making real progress in its negotiations with the state toward a consensual plan of reorganization. *PSNH*, 99 B.R. at 174. Instead, the court found that much like PG&E here, the debtor utility preferred to "stiff arm" the state and go it alone in furtherance of its own agenda. *Id.* at 175. The court there was left only to conclude that after the debtor utility's "FERC plan" was filed, unless exclusivity was terminated and parties were permitted to file alternative plans, there was little likelihood that the debtor and the state would negotiate a consensual plan of reorganization. *Id.* at 176. As a result, the court denied the debtor utility's requested extension of plan exclusivity. *Id.* at 177.

Here, PG&E's behavior is even more egregious than that of *PSNH*. PG&E flat out has not negotiated at all with the Commission. Cohen Decl. ¶ 8. During the approximately nine months in which PG&E has enjoyed exclusivity it has not met with or phoned representatives of the Commission to discuss substantively its Plan. *Id.* The most PG&E has done is to provide one informational "briefing" to Commission staff on November 30, 2001, at which it described its filings with the FERC, SEC and NRC in furtherance of its Plan. There was no negotiation over the terms of the Plan at this briefing. *Id.* In addition, the Commission's counsel attended a court-ordered "meet and confer" session on December 18, 2001 to discuss the Commission's

1  Disclosure Statement Objection. *Id.* Another "meet and confer" is scheduled for January 9,

2  2002. *Id.* at ¶ 6.

3      PG&E's deliberate decision to exclude its chief regulator from the Plan process reflects

4  PG&E's poor judgment and belligerence toward a significant constituency in this case. It also

5  flies directly in the face of section 1121 and its accompanying legislative history, which evince a

6  clear Congressional intent that favors a negotiated, consensual resolution of chapter 11 cases.

7  PG&E's failure to negotiate with the Commission and the State constitutes conduct undeserving

8  of a further extension of exclusivity. Given PG&E's recalcitrance, this Court, like the court in

9  *PSNH*, should promote a consensual plan of reorganization by terminating exclusivity to allow

10  the Commission to file its Alternate Plan. A contrary result would allow PG&E to reap the

11  benefits afforded by plan exclusivity without paying the toll of hard bargaining. It would also

12  allow PG&E to continue to kidnap the plan process to pursue its own deregulation goal, holding

13  the Commission, the State and creditors hostage in the meantime.[7]

14          **(ii)     It is Too Early to Determine Whether PG&E's Plan Can Result in**
15          **a Successful Reorganization.**

16      PG&E claims that an extension of exclusivity is warranted because it has "made

17  substantial efforts towards a successful reorganization." PG&E's Sec. Ext. Mot. at 9. PG&E

18  then pins its requested extension on a line of cases as well as section 1121's legislative history

19  which, as PG&E concedes, establish "that exclusivity period extensions are appropriate where

20  the debtor displays some likelihood of a successful, *consensual* reorganization." *Id.* at 8

21  (emphasis added). PG&E's factual averments are misleading and the cases upon which it relies

22  are factually inapposite.

23  _____

[7]     PG&E's creditors are hostage to PG&E's "willful blindness" to plan alternatives. PG&E
24     would have those voting on its Plan and this Court believe that its drastic "FERC plan"
       involving massive dislocations of Commission, state and local laws and regulations is the
25     only plan capable of being confirmed, *i.e.*, that there are no alternatives. First Am. D.S. at
       64-65. PG&E is wrong. If allowed to file its Alternate Plan, the Commission intends to
26     show that a very simple alternative exists, one that pays creditors in full in cash by the first
       quarter of next year without the need for years of litigation. Creditors and other parties in
27     interest should be given the chance to choose the alternative most attractive to them.

28

1    First, as detailed above, PG&E has made no effort during this case to build consensus

2 with the Commission on a plan of reorganization. It strains credulity for PG&E to imply

3 otherwise.

4    Second, despite having filed its Plan more than three months ago, PG&E has been unable

5 to move it out of the starting blocks. As PG&E admits, "70 parties have filed objections to the

6 Disclosure Statement, many of which also reflect opposition to the Plan." PG&E's Sec. Ext.

7 Mot. at 3-4. PG&E further freely concedes that "in view of the sheer number and complexity of

8 the issues involved, it may take months to fully resolve these matters and obtain confirmation of

9 the Plan." *Id.* at 4. PG&E also recognizes that there are likely to be "dozens of contested issues

10 with respect to confirmation of the Plan, many of which are likely to be quite time-consuming to

11 resolve or adjudicate." *Id.* Much of the same can be said of PG&E's various proceedings at the

12 FERC, NRC and SEC. In view of the foregoing, it is premature at best for PG&E to trumpet its

13 efforts at making substantial progress towards a successful reorganization (certainly not a

14 *consensual* reorganization). It may very likely be the case that PG&E's Plan has failed to

15 advance the confirmation ball at all.

16    Finally, the cases cited by PG&E where courts have granted an extension based in part on

17 a showing of progress towards reorganization are factually inapposite and do not support

18 PG&E's Second Extension Motion. In many, no plan of reorganization had yet been filed, and it

19 still appeared that extra time would afford the parties the opportunity to negotiate a consensual

20 plan.[8] Others involved unique circumstances not present here.[9]

---

21

[8] *See, e.g., In re Pine Run Trust, Inc.*, 67 B.R. 432, 435 (Bankr. E.D. Pa. 1986) (no plan filed;
22 granting first extension to allow debtors who run retirement community to continue
negotiations with residents' committee where creditor-objector asked *not* to be included in
23 such negotiations, and there was no evidence that debtor sought additional extension in order
to pressure creditors to accede to reorganization demands); *In re Swatara Coal Co.*, 49 B.R.
24 898, 899-900 (Bankr. E.D. Pa. 1985) (no plan filed; justifying first extension on fact that
debtor's owners did not acquire ownership and control of the debtor until nearly three months
25 after case was filed and that pursuant to stipulation and order agreed to by debtor and
objector-committee, debtor is required to negotiate with certain parties for a set period yet to
26 expire); *In re McLean Indus., Inc.*, 87 B.R. 830, 833, 835 (Bankr. S.D.N.Y. 1987) (no plan
filed; objector *agrees* with course of direction debtor is taking and complex issues relating to
27 liquidation and estimation of certain claims and asset valuation need to be resolved or close
to resolution before debtor can negotiate terms of plan, meaningful disclosure can be made to

28

1      In short, PG&E's mere filing of a Plan and Disclosure Statement that lacks the support of

2 key constituencies and is legally infirm does not, without more, constitute the type of progress

3 toward a successful reorganization that justifies a further extension of PG&E's exclusive period.

     (iii)    **PG&E's Use of Exclusivity As a Tactical Device to Bully**
4                  **the Commission, the State and its Creditors to Accept its Plan**
5                  **Undermines its Requested Extension.**

6      PG&E further argues that its "progress" towards reorganization justifies "cause" for an

7 extension because "there is nothing to suggest that PG&E seeks the requested extensions in order

8 to pressure its creditors to accede to its reorganization demands." PG&E's Sec. Ext. Mot. at 9.

9 The Commission disagrees. As demonstrated below, PG&E's strategy for seeking a further

10 extension of its exclusive period has at least two objectives: first, it allows PG&E to continue to

11 prevent the Commission from having a meaningful, affirmative voice in its reorganization; and

12 second, by silencing other voices, PG&E can pressure creditors into believing its own rhetoric

13 that "[t]he Plan . . . is, in the Proponents' reasoned opinion, the *only* reasonable solution . . . ."

14 First Am. D.S. at 64-65 (emphasis added). However, where, as here, a debtor seeks to employ

15 exclusivity as a tactical device to force parties in interest to accede to its reorganization demands,

16

---

17      creditors and creditors will be able to determine their distributions); *In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409-10 (E.D.N.Y. 1989) (no plan filed; debtor's attempts to
18 negotiate with creditors' committee ongoing); *In re Trainer's, Inc.*, 17 B.R. 246, 247 (Bankr. E.D. Pa. 1982) (no plan filed; debtor making substantial efforts to sell main asset, a
19 restaurant).

20 [9]   *In re Homestead Partners, Ltd.*, 197 B.R. 706, 719-20 (Bankr. N.D. Ga. 1996) ("new value"
21 plan filed; court denies motion to terminate on debtor's principal asset because need for competition can be satisfied by requirement that a competitive auction
22 for new equity interest be held at confirmation and grants motion to extend because of lien-holder's high degree of recalcitrance and presence of complex legal issues); *In re United
23 Press Int'l, Inc.*, 60 B.R. 265, 271 n.12 (Bankr. D.C. 1986) (granting debtor's motion to extend exclusivity to allow debtor to *file* a plan where the court had previously modified
24 exclusivity to allow creditors' committee and another creditor to file plans); *Gaines* v. *Perkins (In re Perkins)*, 71 B.R. 294, 295, 298 (W.D. Tenn. 1987) (affirming bankruptcy
25 court's decision allowing extension to continue soliciting acceptances where lower court had found, among other things, that the debtor's plan had already received acceptances from all
26 but a few creditors, the two bankruptcy judges in the district had to contend with approximately 14,000 pending cases between them and progress had been made with respect
27 to creditors who had objected to plan); *In re Nicolet, Inc.*, 80 B.R. 733, 744 (Bankr. E.D. Pa. 1988) (decision on exclusivity scheduled for a later date).

28

1  courts uniformly hold that such a factor weighs heavily against a finding of "cause" to extend a

2  debtor's plan exclusivity. *See, e.g., PSNH*, 88 B.R. 521, 537 (Bankr. D. N.H. 1988) (courts

3  consider general balancing analysis "to avoid allowing the debtor to hold the creditors and other

4  parties in interest 'hostage' so that the debtor can force its view of an appropriate plan upon the

5  other parties"); *Teachers Ins. & Annuity Assoc. of Am.* v. *Lake in the Woods* (*In re Lake in the*

6  *Woods*), 10 B.R. 338, 345-46 (E.D. Mich. 1981) (holding that "extensions are impermissible if

7  they are for the purpose of allowing the debtor to prolong reorganization while pressuring a

8  creditor to accede to its point of view on an issue in dispute").

9        Thus far, PG&E's actions amount to the very "take-it-or-leave-it" attitude Congress

10  sought to prevent by replacing the Bankruptcy Act. *See In re Lake in the Woods*, 10 B.R. at 344

11  ("'The take-it-or-leave-it attitude on the part of debtors as permitted by Chapter XI is fraught

12  with potential abuse. The granting of authority to creditors to propose plans of reorganization

13  and rehabilitation serves to eliminate the potential harm and disadvantages to creditors [and]

14  democratizes the reorganization process.'") (quoting Bankruptcy Act Revision, Serial No. 27,

15  Part 3, Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and Constitutional Rights

16  of the Comm. on the Judiciary, 94th Cong., 2d Sess. (March 29, 1976) (prepared statement of

17  Harvey R. Miller, William J. Rochelle and J. Ronald Trost ) 1875-76 (footnotes omitted)).

18  PG&E's own words evidence that it has foreclosed consideration of all alternatives. *See First*

19  *Am. D.S.* at 64-65. In so doing, it is forcing creditors to accept its own view of the world and, in

20  the process, using exclusivity to freeze out the Commission and the State while it embarks upon

21  a massive regulatory sea change. Terminating exclusivity now to allow the Commission to file

22  its own Plan would free creditors from the vise PG&E currently has them in and allow the

23  Commission to continue with its State-mandated mission to regulate California's public utilities.

24  **B.     The Size and Complexity of PG&E's Chapter 11 Case Do Not Justify an Extension.**

25        Aside from its alleged "progress" toward a successful reorganization, PG&E's only other

26  proffered justification for its requested extension is the often-cited (and overused) "size-and-

27  complexity" excuse. Specifically, PG&E argues that because this case involves "tens of billions

1  of dollars of assets, and claims of more than 13,000 creditors" its sheer size together with its

2  exceeding complexity justify its requested extension. PG&E's Sec. Ext. Mot. 7-8. PG&E's

3  argument in this regard elevates form over substance and ignores the fact that PG&E itself has

4  engineered much of the cited complexity.

5    This is a very large case — of course it is. However, size and complexity do not

6  necessarily go hand in hand. Here, for instance, where creditors likely will be paid in full, much

7  of the complexity associated with having to negotiate with multiple creditor constituencies with

8  different rights and priorities is nonexistent. After all, it should not be difficult to convince

9  creditors to take 100 cents-on-the-dollar with interest. So while the sheer size of this case may

10 present administrative difficulties, it does not support an extension of time ostensibly needed for

11 the debtor to negotiate with its creditors.

12   Nor can PG&E hide behind the alleged "complexities" of this case in seeking to extend

13 plan exclusivity. PG&E contends that this case "is exceedingly complex, based on, *inter alia*,

14 PG&E's status as a utility company subject to a myriad of state and federal statutes, rules and

15 regulations," many of which PG&E seeks to preempt through confirmation of its Plan. PG&E's

16 Sec. Ext. Mot. at 2, 8.[10] Elsewhere in its Motion PG&E contends that "in view of the sheer

17 number and complexity of the issues [raised in the objections to PG&E's Plan and Disclosure

18 Statement] . . . it may take months to fully resolve these matters and obtain confirmation of the

19 Plan." *Id*. at 4. Nowhere, however, does PG&E mention that it is responsible for much of the

20 complained-of complexity. As evidenced by the Commission's Alternate Plan, alternatives exist

21 to repay creditors in full and to have PG&E emerge from chapter 11. Indeed, the elegance of the

22 Commission's Alternate Plan lies in its simplicity. But PG&E is not interested in simplicity, or

23 primarily in creditor recoveries. Its interests lie elsewhere — in the massive dislocation of the

24

25  [10] PG&E further premises the complexity of this case on "the fact that PG&E continues to
grapple with an unprecedented energy crisis." PG&E's Sec. Ext. Mo. at 8. PG&E's
26   statement is an exaggeration. As the CPUC's Alternate Plan would very clearly show,
PG&E's retail electric rates exceed its wholesale costs, and have since at least around June
27   2001, leaving PG&E with substantial "residual revenues." Cohen Decl. ¶ 10.

28

Commission and the State of California's laws and regulations governing its operations. The preemption fight PG&E has started is the cause of much of the complexity surrounding this case, and PG&E should not be permitted to exploit problems it creates.

Finally, size and complexity cannot, without more, constitute "cause" for an extension of exclusivity where other bases for cause are lacking. *See, e.g., In re Sharon Steel Corp.*, 78 B.R. 762, 766 (Bankr. W.D. Pa. 1987) (denying extension of exclusivity despite size and complexity of debtor); *PSNH*, 88 B.R. at 537 (size and complexity alone do not justify extension for cause); *In re Express One Int'l*, 194 B.R. at 100-01 (same). The *PSNH* court thoroughly addressed the circumstances under which size and complexity would justify an extension for "cause" in its decision on the debtor's first extension request:

> It seems clear from a review of the relevant authorities that size and complexity alone cannot suffice as "cause" for a continuation of a debtor's plan exclusivity right in a chapter 11 reorganization. If that were so, a debtor in a case such as the present would automatically have a right to plan exclusivity throughout the proceedings – contrary to the "balancing" and "tension" rationale underlying § 1121 as detailed above. It does stand to reason that a debtor in a large and complex case may make a showing of cause on those facts for exclusivity extension in the *initial stages* of the reorganization by virtue of that factor . . . . If size and complexity *alone* were sufficient cause, that interpretation of the statutory standard would in effect eat up the rule.

> The court concludes that an appropriate interpretation of the "for cause" language of § 1121(d) would provide that the size and complexity must be accompanied by other factors pertinent to the particular debtor and its reorganization to justify extension of plan exclusivity, except perhaps in the very early, initial stages of the chapter 11 proceeding. Such factors include those developed in the cases, *i.e.*, the likelihood of an imminent consensual plan if the debtor retains control, no alternate substantial plan being held off by debtor exclusivity, and the general balancing analysis to avoid allowing the debtor to hold the creditors and other parties in interest "hostage" so that the debtor can force its view of an appropriate plan upon the other parties.[11]

---

[11] In this first *PSNH* decision on exclusivity, an extension was granted principally because the court saw a seven-month "window of opportunity" within which the parties could negotiate towards a consensual plan. 88 B.R. at 538.

Case: 01-30923-6  Doc# 4188  Filed: 01/08/02  Entered: 01/09/02 14:55:00  Page 22 of 25

*PSNH*, 88 B.R. at 537 (citations omitted) (underlined emphasis supplied).

Applying this rationale here, size and complexity alone simply do not justify a further extension for PG&E. First, PG&E has already enjoyed one extension, premised at least in part on the size and complexity of its case; granting PG&E another would lead to the very rule-swallowing cautioned against by the court in *PSNH*. Second, confirmation of PG&E's Plan is neither imminent, nor likely to be consensual. Third, here, exclusivity *would* prevent the filing of an "alternate substantial plan," the Commission's Alternate Plan. Finally, as argued above, it appears that the only benefit an extension would offer PG&E would be an opportunity to further cram its views of an appropriate Plan down the throats of creditors, the Commission and other parties in interest that are currently held hostage by PG&E's exclusivity. Under these circumstances, an extension should not rest on "size and complexity."[12]

## C. Denying PG&E's Motion to Allow the Commission to File its Alternate Plan Would Benefit Interested Parties Without Prejudicing PG&E.

Terminating PG&E's Plan exclusivity to allow the Commission to file and solicit acceptances to its Alternate Plan is in the best interests of PG&E's creditors and its estate and would not prejudice PG&E. Presently, creditors have only one choice — PG&E's Plan. Their options are to either accept PG&E's Plan and endure years of litigation and uncertainty while they continue to finance, in PG&E's words "literally millions of dollars per week in fees, costs and interest accruals" (PG&E's Sec. Ext. Mot. 4), or to reject PG&E's Plan in the face of no known alternatives. Neither option may be particularly appealing. Fortunately, a third option exists — the Commission's Alternate Plan. As detailed elsewhere, it provides for creditors to be

---

[12] The cases relied upon by PG&E do not suggest otherwise; in each there existed some independent basis for cause other than size and complexity. *See, e.g., In re Dow Corning*, 80 B.R. at 668 (debtor willing to discuss other means of reorganizing); *In re Express One*, 194 B.R. 100-01 (size and complexity only appropriate consideration where, among other things, no alternative plan); *PSNH*, 88 B.R. at 538 (extension premised principally on "window of opportunity" to negotiate, not size and complexity of debtor); *In re Texaco*, 76 B.R. 322 (plan product of settlement between primary adversaries; plan proposed by party seeking termination is substantially similar, the only changes affecting corporate governance); *In re Perkins*, 71 B.R. at 295 (plan had "overwhelming" creditor support; most acceptances already solicited); *In re Pine Run Trust*, 67 B.R. at 435 (court found that "traditional ground" of large size not established); *In re United Press Int'l*, 60 B.R. at 271 n.12 (modifications of exclusivity already granted to certain parties).

paid in full in cash by no later than the first quarter of 2003 and avoids the unnecessary and costly legal battle to preempt a century of state laws and regulations. In addition, it gives the Commission a voice in PG&E's restructuring, which to date it has been denied by PG&E. Creditors that are not interested in joining PG&E's preemption bandwagon should be given the option not to. Denying PG&E's Second Extension Motion to allow the Commission to file its Alternate Plan gives them that option.

Moreover, modifying PG&E's plan exclusivity to permit the Commission to file its Alternate Plan comes without cost to PG&E. PG&E may still pursue confirmation of its Plan should it choose to do so. In addition, notwithstanding PG&E's unsupported rhetoric to the contrary, the requested modification of PG&E's exclusive period would not "create needless confusion and conflicts that will presumably prejudice all parties." PG&E's Sec. Ext. Mot. at 4. This Objection is limited in that it seeks only to open up the plan process to the Commission's Alternate Plan — the Commission is not advocating that it be opened up generally to all parties in interest. Courts in similar situations have recognized that allowing competing plans may be efficient and can be used as an appropriate means of facilitating reorganization. *See In re Interco, Inc.*, 137 B.R. 999, 1001 (Bankr. E.D. Mo. 1992) (noting that "simultaneous consideration of competing plans may be an efficient procedure"); *PSNH,* 88 B.R. at 539 n.16 (rejecting an argument similar to PG&E's; "If taken literally, the debtor's position would mean that the debtor must have the sole power to present a plan, because multiple plans will bring chaos; therefore, the debtor's exclusivity period must be continued indefinitely."); *In re United Press Int'l,* 60 B.R. at 271 n.12 (justifying the "middle course" taken in an earlier decision to modify exclusivity to allow parties the opportunity to present plans and at the same time prevent the disturbance to the process that may result from terminating exclusivity entirely);[13] *In re*

---

[13] Specifically, the *United Press* court offered the following rationale for its approach: "Thus, this Court adopted a middle approach, initially suggested by the parties themselves – opening up the right to file a plan on a limited basis to those two entities (besides the Debtor itself) that have the most at stake in this case and have shown themselves to be responsible parties, while refraining from opening the floodgates completely. The statute does not expressly prohibit this eminently sensible middle course, and I can perceive no reason to find any such prohibition by implication." *United Press,* 60 B.R. at 271 n.12.

1 | *Texaco*, 81 B.R. at 808 (Bankr. S.D.N.Y. 1988) (referring to earlier ruling from bench that "it

2 | would be willing to terminate the exclusivity periods on motion if the statutory committees

3 | and . . . [the debtor's principal adversary] could agree unconditionally to a base/cap plan,

4 | provided that Texaco was given an opportunity to have input with respect to the negotiations").

5 | Finally, if PG&E's concerns about ensuing chaos have merit, then this Court can

6 | construct adequate procedural safeguards to address such concerns. *See PSNH*, 99 B.R. at 177.

7 | In sum, PG&E's threats of "chaos" are sufficiently remote and capable of being

8 | addressed so as not to warrant exclusion of the Commission's Alternate Plan.

**V.**

**CONCLUSION**

For the reasons set forth herein and in the Cohen Declaration, the Commission

respectfully requests that this Court deny PG&E's Second Extension Motion to the extent

necessary to permit the Commission to file its Alternate Plan and solicit acceptances thereto.

DATED:  January 8, 2002

Respectfully submitted,

GARY M. COHEN
AROCLES AGUILAR
MICHAEL M.EDSON

CALIFORNIA PUBLIC UTILITIES COMMISSION

By:_____

-and-

ALAN W. KORNBERG
BRIAN S. HERMANN
SUSAN E. WELBER
PAUL, WEISS, RIFKIND, WHARTON & GARRISON

Attorneys for the California Public Utilities Commission

Case: 01-30923  Doc# 4188   Filed: 01/08/02   Entered: 01/09/02 14:51:00   Page 25 of 25