1   JAMES L. LOPES (No. 63678)
    JEFFREY L. SCHAFFER (No. 91404)
2   JANET A. NEXON (No. 104747)
    HOWARD, RICE, NEMEROVSKI, CANADY,
3       FALK & RABKIN
    A Professional Corporation
4   Three Embarcadero Center, 7th Floor
    San Francisco, California 94111-4065
5   Telephone:    415/434-1600
    Facsimile:    415/217-5910
6
    Attorneys for Debtor and Debtor in Possession
7   PACIFIC GAS AND ELECTRIC COMPANY

8   ROGER J. PETERS (No. 77743)
    IATHAN T. ANNAND (No. 70009)
9   MICHAEL D. WHELAN (No. 58617)
    PACIFIC GAS AND ELECTRIC COMPANY
10  77 Beale Street
    San Francisco, California 94105
11  Telephone: 415/973-7000
    Facsimile: 415/973-5520
12

13              UNITED STATES BANKRUPTCY COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16
    In re
17
    PACIFIC GAS AND ELECTRIC COMPANY, a        Case No. 01-30923 DM
18  California corporation,
                                               Chapter 11 Case
19              Debtor.

20                                             Date:    March 27, 2002
                                               Time:    9:30 a.m.
21  Federal I.D. No. 94-0742640                Place:   235 Pine Street, 22nd Floor
                                                        San Francisco, CA
22                                             Judge:   Honorable Dennis Montali

23

24

25      PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING
        CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES;
26              MEMORANDUM OF POINTS AND AUTHORITIES

27          [DECLARATION OF IATHAN ANNAND FILED SEPARATELY]

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**TABLE OF CONTENTS**

|  |  |  | Page |
|---|---|---|---|
| NOTICE OF MOTION AND MOTION |  |  | 1 |
| MEMORANDUM OF POINTS AND AUTHORITIES |  |  | 1 |
| I. | INTRODUCTION AND OVERVIEW |  | 1 |
| II. | LEGAL ARGUMENT |  | 5 |
|  | A. | Estimation Of Claims For Feasibility Purposes, In General. | 5 |
|  | B. | The Statutory And Legal Bases For Estimating Claims For Feasibility Purposes. | 7 |
|  | C. | The Claims Requiring Estimation In This Case Are In Any Event Predominantly "Contingent" Or "Unliquidated" And Therefore Must Be Estimated For Feasibility Purposes. | 11 |
|  | D. | As To Claims Estimation-Related Matters As To Which The Debtor Suggests That It Retain An Expert, Section 327(a) Provides Authority For Such Retention. | 14 |
|  | E. | Alternatively, The Court Can Appoint An Expert Pursuant To Federal Rule of Evidence 706 For The Purpose Of Receiving And Evaluating Evidence And Advising The Court In Estimating The Aggregate Value Of Claims For Feasibility Purposes. | 14 |
|  | F. | In The Alternative, The Court May Exercise Its Discretion Under Section 105(a) To Appoint An Assistant For Claims Estimation Purposes. | 17 |
| III. | ENVIRONMENTAL CLAIMS |  | 19 |
|  | A. | The Value Of Environmental Claims Against PG&E Is Vastly Overstated. | 19 |
|  |  | 1. The State's Inflated Environmental Claims. | 20 |
|  |  |    a. Many Other Financially Viable Parties, Including DTSC, Also Are Responsible Parties At The Casmalia Landfill, And PG&E's Share Of That Liability Is A Small Percentage Of The Amount The State Is Claiming. | 20 |
|  |  |    b. PG&E Previously Settled All Its Obligations At The GBF/Pittsburgh Landfill, And Other Parties Are Performing The Cleanup There, Secured By A $120 Million Insurance Policy. | 23 |
|  |  |    c. The State's $100 Million Claim For Substation Contamination Is Speculative And Contrary To Fact. | 24 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF CONTENTS

Page

2. PG&E Already Has Settled Its Liabilities At A Number Of Sites Which The Claimants Include Within Their Respective Claims. ... 25

3. Claimants Estimate Total Cost Rather Than Present Value. ... 25

4. The Environmental Claims Filed By The Non-State Claimants Are Similarly Inflated. ... 26

B. If The Environmental Claims Must Be Estimated On A Claim-By-Claim Basis, Utilization Of A Court-Appointed Expert To Assist Will Materially Streamline The Estimation Process. ... 27

C. A Statistical Approach To Estimation Of Environmental Claims In The Aggregate, With The Assistance Of An Expert, Appears To Be A More Efficient Estimation Alternative. ... 30

IV. GENERATOR CLAIMS ... 32

A. Generator Claims Asserting PG&E Owes Sums Actually Owed By Southern California Edison. ... 32

B. PX Cash Holdings. ... 33

C. Claims For Electricity And Ancillary Services Provided On Or After 1/17/01. ... 33

D. Generator Claims Should Be Reduced By At Least $400 Million Because They Are Based On Prices FERC Has Determined Are Subject To Refund As Unjust And Unreasonable. ... 34

E. The PX Claim Duplicating That Of The Generators. ... 34

F. Underscheduling Penalty Claims. ... 35

V. ENERGY SERVICE PROVIDER CLAIMS ... 35

VI. COMMERCIAL CLAIMS ... 36

VII. TORT CLAIMS ... 38

VIII. EMPLOYMENT CLAIMS ... 42

CONCLUSION ... 44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-ii-

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

Amoco Oil Co. v. Borden, Inc., 889 F.2d 664 (5th Cir. 1989) ......... 22, 29

Audre, Inc. v. Casey (In re Audre, Inc.), 216 B.R. 19 (B.A.P. 9th Cir. 1997) ......... 11

Bancamerica Commercial Corp. v. Trinity Indus., Inc., 900 F. Supp. 1427 (D.Kan. 1995), <u>aff'd in part & rev'd in part on other grounds</u>, 100 F.3d 792 (10th Cir. 1996) ......... 22

Bittner v. Borne Chem. Co., 691 F.2d 134 (3d Cir. 1982) ......... 6

Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc. (In re Dennis Ponte, Inc.), 61 B.R. 296 (B.A.P. 9th Cir. 1986) ......... 6, 9

Bunn v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.), 137 B.R. 811 (Bankr. D. Colo. 1992) ......... 13

Corey v. Louis (In re Corey), 892 F.2d 829 (9th Cir. 1989) ......... 6

Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503 (7th Cir. 1992) ......... 22

Federal Deposit Ins. Corp. v. Wenberg (In re Wenberg), 94 B.R. 631 (B.A.P. 9th Cir. 1988), <u>aff'd</u>, 902 F.2d 768 (9th Cir. 1990) ......... 11, 12

Fostvedt v. Dow (In re Fostvedt), 823 F.2d 305 (9th Cir. 1987) ......... 12

In re A.H. Robins Co., 880 F.2d 694 (4th Cir. 1989) ......... 28

In re A.H. Robins Co., 88 B.R. 742 (Bankr. E.D.Va. 1988), <u>aff'd</u>, 880 F.2d 694 (4th Cir. 1989) ......... 39

In re Bell Petroleum Serv., Inc., 3 F.3d 889 (5th Cir. 1993) ......... 22

In re Distrigas of Mass. LLC., 93 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,275 (July 27, 2000) ......... 35

In re Dow Corning Corp., 211 B.R. 545 (Bankr. E.D. Mich. 1997) ......... 8, 17

In re Eagle-Picher Indus., Inc., 189 B.R. 681 (S.D. Ohio 1995) ......... 41

In re Farley, Inc., 146 B.R. 748 (Bankr. N.D. Ill. 1992) ......... 39

In re Johns-Mansville Corp., 36 B.R. 743 (Bankr. S.D.N.Y. 1984) ......... 18

In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.), 830 F. Supp. 686 (E.D.N.Y. & S.D.N.Y. 1993) ......... 15

In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.), 982 F.2d 721 (2d Cir. 1992) ......... 16

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
*A Professional Corporation*

Case: 01-30923    Doc# 5008    Filed: 03/01/02    Entered: 03/05/02 15:14:00    Page 4 of 52

## TABLE OF AUTHORITIES

Page(s)

In re Loya, 123 B.R. 338 (B.A.P. 9th Cir. 1991) ... 11

In re National Gypsum Co., 139 B.R. 397 (N.D.Tex 1992) ... 27

In re Nova Real Estate Inv. Trust, 23 B.R. 62 (Bankr. E.D. Va. 1982) ... 6, 9, 10

In re Poole Funeral Chapel, Inc., 63 B.R. 527 (Bankr. N.D. Ala. 1986) ... 39

In re Royal Composing Room, Inc., 62 B.R. 403 (Bankr. S.D.N.Y. 1986) ... 18

In re Thomson McKinnon Sec., Inc., 191 B.R. 976 (Bankr. S.D.N.Y. 1996) ... 6, 40

In re UNR Indus. Inc., 45 B.R. 322 (N.D.Ill. 1984) ... 39

In re Windsor Plumbing Supply Co., 170 B.R. 503 (Bankr. E.D.N.Y. 1994) ... 13

Interco, Inc. v. Ilgwa Nat'l Ret. Fund (In re Interco, Inc.), 137 B.R. 993 (Bankr. E.D. Miss. 1992) ... 6, 13

Kamb v. United States Coast Guard, 869 F. Supp. 793 (N.D. Cal. 1994) ... 22

Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988) ... 8. 28

Mathis v. Veliscol Chem. Corp., 786 F. Supp. 971 (N.D. Ga. 1991) ... 22

Nicholes v. Johnny Appleseed of Washington (In re Nicholes), 184 B.R. 82 (B.A.P. 9th Cir. 1995) ... 12, 13

Old Orchard Inv. Co. v. A.D.I. Distrib., Inc. (In re Old Orchard Inv. Co.), 31 B.R. 599 (W.D. Mich. 1983) ... 17

Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374 (9th Cir. 1985) ... 6, 8, 9

Prisco v. New York, 902 F. Supp. 374 (S.D.N.Y. 1995) ... 22

San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 93 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61, 294 (December 15, 2000) ... 35

San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 96 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61, 120 (July 25, 2001) ... 34

San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 97 Fed. Energy Reg. Comm'n Rep. (CCH) ¶21, 275 (December 19, 2001) ... 34, 35

Scott v. Spanjer Bros., Inc. 298 F.2d 928 (2d Cir. 1962) ... 15, 16

Southland Corp. v. Ashland Oil, Inc., 696 F. Supp. 994 (D.N.J. 1988) ... 22

United States v. Chem-Dyne Corp., 572 F. Supp. 802 (S.D. Ohio 1983) ... 21

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

-iv-

| | Page(s) |
|---|---|
| United States v. Rohm & Haas Co., 939 F. Supp. 1142 (D.N.J. 1996) | 29 |
| United States v. Sutton, 786 F.2d 1305 (5th Cir. 1986) | 18 |

Statutes

| | |
|---|---|
| 11 U.S.C. | |
| §§101 et seq. | 1 |
| §105 | 18, 29 |
| §105(a) | 1, 10, 14, 17, 18, 31, 38 |
| §109(e) | 11, 12 |
| §327(a) | 14, 17, 18, 31 |
| §502(c) | 1, 7, 9, 10, 11, 13, 14 |
| §502(j) | 8 |
| §1107(a) | 14 |
| §1113 | 18 |
| §1129(a)(11) | 1, 5, 6, 8, 10, 14, 17, 18, 42 |
| §1141(d) | 8 |
| 28 U.S.C. §157(b)(2)(B) | 39 |
| 42 U.S.C. §9601 et seq. | 20 |
| CERCLA §113(f) | 22 |
| Fed. R. Bankr. P. | |
| 3018 | 8 |
| 3018(a) | 8 |
| 9017 | 15, 18 |
| 9031 | 17, 18 |
| Fed. R. Civ. P. 14(a) | 22 |
| Fed R. Evid. | |
| 702 | 18 |
| 706 | 14, 15, 16, 17, 18, 29, 31, 38 |
| 706(a) | 15, 18 |

Other Authorities

| | |
|---|---|
| 126 Cong. Rec. (1980) | |
| 26,779 | 22 |
| 26,781 | 22 |
| 2 Lawrence P. King Collier on Bankruptcy ¶105.01 (15th ed. rev. 2000) | 10 |
| 5 Lawrence P. King Collier on Bankruptcy ¶1129.02[11] (15th ed. 1984) | 8 |
| H.R. Rep. No. 99-253 (III) (1985), reprinted in 1986 U.S.C.C.A.N. 3038 | 22 |
| Joe S. Cecil & Thomas E. Willging, Court Appointed Experts: Defining the Role of | |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

Page(s)

<u>Experts Appointed Under Federal Rule of Evidence 706</u> (Fed. Jud. Center 1993)     15, 16

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 01-30923     Doc# 5008     Filed: 03/01/02     Entered: 03/05/02 15:14:00     Page 7 of 52

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 27, 2002, at 9:30 a.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Dennis Montali, located at 235 Pine Street, 22nd Floor, San Francisco, California, Pacific Gas and Electric Company, the debtor and debtor in possession in the above-captioned Chapter 11 case ("PG&E" or the "Debtor"), will and hereby does move the Court (the "Motion") for order determining the process and procedures for estimating, for purposes of determining the feasibility of the pending First Amended Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company, as amended (the "Plan"), jointly propounded by PG&E and its parent PG&E Corporation (the "Plan Proponents"), those claims against the estate described in the accompanying Memorandum of Points and Authorities incorporated by reference herein.

This Motion is made pursuant to Sections 1129(a)(11), 502(c) and 105(a) of the United States Bankruptcy Code (11 U.S.C. §§1129(a)(11), 502(c) & 105(a)) and is based on the facts and law set forth herein (including the accompanying Memorandum of Points and Authorities), the Declaration of Iathan Annand filed concurrently herewith (hereinafter referred to as the "Annand Declaration" and cited as the "Annand Decl."), the record of this case and any evidence presented at or prior to the hearing on the Motion.

PLEASE TAKE FURTHER NOTICE that pursuant to Rule 9014-1(c)(2) of the Bankruptcy Local Rules for the Northern District of California, any written opposition to the Motion and the relief requested therein must be filed with the Bankruptcy Court and served upon appropriate parties (including counsel for PG&E, the Office of the United States Trustee and the Official Committee of Unsecured Creditors) at least five (5) days prior to the scheduled hearing date. If there is no timely objection to the requested relief, the Court may enter an order granting such relief without further hearing.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923    Doc# 5008    Filed: 03/01/02    Entered: 03/05/02 15:14:00    Page 8 of 52

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION AND OVERVIEW[1]

Many of the large claims filed in this case are grossly inflated. This is particularly the case with environmental, generator, energy service provider, tort and employment claims and certain commercial claims. PG&E intends to object to allowance of all or a portion of many of these claims, and the objection process has begun. However, were the Court to await final adjudication, liquidation and allowance or disallowance of these claims, it would materially retard the progress of the case and frustrate the reorganization effort. It is necessary and appropriate, therefore, for the Court to estimate these claims for the limited purpose of judging the feasibility of the Plan pursuant to Section 1129(a)(11) of the Bankruptcy Code,[2] and not for the purpose of adjudicating these claims or binding any claimholders to any resolution of their claims on the merits.

More specifically, approximately 13,000 proofs of claim ("POCs") have been filed in this case. Many are small, simple trade payables or are otherwise reasonably amenable to speedy liquidation (80% are for amounts less than $100,000). However, a number of the claims are large, complex, and not necessarily readily subject to resolution. These include approximately 112 environmental claims covering hundreds of sites for a total of approximately $1 billion, over 200 generator claims totaling about $8.4 billion, approximately 50 claims filed by energy service providers totaling more than $580 million, approximately nine commercial claims totaling over $4 billion, approximately 1,250 chromium-related tort claims totaling approximately $580 million, approximately 450 miscellaneous tort claims totaling more than $315 million, and approximately 15 employment claims totaling over $110 million (hereinafter collectively referred to as the "Claims"). As explained more fully in Parts III through VIII below, most of the Claims are for inflated

---

[1]Unless specifically noted otherwise, the evidentiary basis for all facts set forth in this memorandum of points and authorities is contained in the Annand Declaration.

[2]Unless otherwise specified, all statutory references are to the United States Bankruptcy Code (title 11 of the United States Code), 11 U.S.C. §§101 et seq.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  amounts, often for wildly inflated amounts, which in the aggregate constitute billions of dollars of

2  overstated Claims. Because such billions of dollars of overstated Claims may clearly affect the

3  feasibility of the Plan, under controlling Ninth Circuit authority these Claims must be estimated for

4  purposes of assessing the feasibility of the Plan. It bears emphasis that such estimation for

5  feasibility purposes has no binding or preclusive effect respecting the claims that are being

6  estimated, and therefore is in no way determinative of the allowed amount of such claims or the

7  distributions on such claims. Not surprisingly, then, the Court has substantial discretion and

8  flexibility in determining how best to proceed with claims estimation for feasibility purposes.

9         The challenge for the Court, the Debtor and parties in interest is to fashion a practicable

10  and reasonable process for estimating the Claims within a reasonable time frame. Estimation of the

11  Claims is likely to require substantial time and attention because of their volume, diversity and

12  complexity. If performed by the Court unassisted, the process could substantially burden the

13  Court's docket and interfere with the efficient administration of this case. Accordingly, the Court

14  will want to consider various means of streamlining the process. PG&E requests that the Court

15  consider the following suggested procedures and process for estimating the Claims, broken down by

16  type:

17         •    Environmental Claims. Retention of a Court-approved expert to evaluate the

18  approximately 112 environmental Claims[3] involving over 548 separate sites and totaling

19  approximately $1 billion. The expert would report to the Court with a recommendation regarding

20  the estimated amount PG&E will reasonably need to address these Claims. The expert could be

21  empowered to determine in the first instance, subject to the Court's approval, the appropriate

22  procedures for accomplishing the estimation (e.g., statistical methodologies, nature of

23  recommendations to the Court). The expert should be highly experienced in the evaluation of

24  liability and damages for all types of statutory and common law environmental claims, impartial,

25

26         [3]"Environmental claims" that PG&E proposes be subject to estimation include all
27  environmental claims for which timely POCs have been filed alleging pre-petition violations,
   except, to the extent discussed in footnote 36 infra and its accompanying text, claims that do not
28  state or refer to any dollar amount.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   and available to devote substantial time to the task over a relatively short period. Subject to the

2   Court's approval, PG&E proposes to file appropriate papers on or before April 17, 2002 for the

3   retention of such expert, coupled with a motion for the Court's estimation of such environmental

4   Claims for feasibility purposes at such time as the Court has the benefit of such expert's report.

5   •   Commercial Claims. Retention of a Court-approved expert to evaluate approximately

6   nine commercial Claims[4] totaling approximately $4 billion, and report back to the Court with a

7   recommendation regarding the estimated amount PG&E will reasonably need to address them. The

8   expert could be empowered to determine in the first instance, subject to the Court's approval, the

9   appropriate procedures for accomplishing the estimation. Such expert should be highly experienced

10  in the evaluation of liability and damages for contract and other commercial claims, impartial, and

11  available. Subject to the Court's approval, PG&E proposes to file appropriate papers on or before

12  April 17, 2002 for the retention of such expert, coupled with a motion for the Court's estimation of

13  such commercial Claims for feasibility purposes at such time as the Court has the benefit of such

14  expert's report.

15  •   Employment Claims. Retention of a Court-approved expert to evaluate approximately

16  15 employment Claims[5] totaling about $100 million and report back to the Court with a

17  recommendation regarding the estimated amount PG&E will reasonably need to address these

18  Claims. The expert could be empowered to determine in the first instance, subject to the Court's

19  approval, the appropriate procedures for accomplishing the estimation. Such expert should be

20  available, impartial, and highly experienced in the evaluation of liability and damages for all types

21  of statutory and common law employment claims. Subject to the Court's approval, PG&E proposes

22  to file appropriate papers on or before April 17, 2002 for the retention of such expert, coupled with a

23

24      [4]"Commercial claims" that PG&E proposes be subject to estimation include all commercial
    claims for which a timely POC in excess of $5 million has been filed, with the exception of two
25  large claims aggregating $9 billion (one filed by Baldwin Associates, Inc. and the other by Wayne
    Roberts) that already have been disallowed by separate orders dated January 23, 2002 (docket nos.
26  4490, 4488).

27      [5]"Employment claims" that PG&E proposes be subject to estimation include approximately 15
    claims by litigants alleging pre-petition employment law-related claims who have filed timely
28  POCs.



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

motion for the Court's estimation of such employment Claims for feasibility purposes at such time as the Court has the benefit of such expert's report.

- <u>Generator Claims</u>. Estimation by the Court of several categories of generator Claims[6] totaling over $8 billion, based on written submissions. Subject to the Court's approval, PG&E proposes to file one or more motions for estimation on or before April 17, 2002 for the estimation of these Claims.

- <u>Energy Service Provider Claims</u>. Estimation by the Court of Energy Service Provider ("ESP") Claims aggregating more than $580 million. Subject to the Court's approval, PG&E proposes to file a motion for the estimation of such Claims on or before April 17, 2002.

- <u>SPI Commercial Claim</u>. Estimation by the Court of one commercial Claim, asserted by Sierra Pacific Industries ("SPI"), for more than $1 billion, with which the Court is already familiar. Subject to the Court's approval, PG&E proposes to file a motion on or before April 17, 2002 for the estimation of this Claim.

- <u>Tort Claims</u>. Retention of a Court-approved expert to assist the Court in estimating, on an aggregate basis, approximately 450 miscellaneous tort Claims totaling more than $315 million,[7] based on the application of statistical methodology to relevant litigation data accumulated by PG&E over the last five years. PG&E also will ask the Court to estimate the reasonable aggregate value of approximately 1,250 additional personal injury tort Claims, with an alleged value of approximately $580 million, that relate to alleged exposure to chromium from particular PG&E compressor stations (the "Chromium Claims"). Subject to the Court's approval, PG&E proposes to file appropriate papers on or before April 17, 2002 for the retention of the expert to be retained in

_____

[6]"Generator claims" that PG&E proposes be subject to estimation include all claims by generators and related entities such as the PX and ISO which have filed timely POCs alleging amounts owed pre-petition, except, to the extent discussed in footnote 36 <u>infra</u> and its accompanying text, claims that do not state or refer to any dollar amount.

[7]"Tort claims" that PG&E proposes be subject to estimation include all claims for personal injury, wrongful death, and property damage by persons who have filed timely POCs alleging pre-petition torts, <u>except</u> (i) claims for workers' compensation, (ii) those pre-litigation claims that PG&E has assigned to its Safety, Health and Claims Department for resolution and that have been or are anticipated to be fully resolved through this process, and (iii) to the extent discussed in footnote 36 <u>infra</u> and its accompanying text, those claims that do not state or refer to any dollar amount.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  connection with valuation of the miscellaneous tort Claims, coupled with a motion for the Court's

2  estimation of such Claims for feasibility purposes at such time as the Court has the benefit of such

3  expert's analysis, as well as a motion for the Court's estimation of the Chromium Claims for

4  feasibility purposes.

5         PG&E addresses each of these categories of Claims requiring estimation in greater detail

6  in Parts III through VIII below.  However, before proceeding with such fuller explanation of the

7  extent to which the Claims are overstated and why estimation of each category of Claims is

8  necessary, we turn first to the applicable legal principles.

9

10                                      II.

11                              LEGAL ARGUMENT

12     A.     Estimation Of Claims For Feasibility Purposes, In General.

13         Section 1129(a)(11) requires as a condition of confirmation of any plan of

14  reorganization that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the

15  need for further financial reorganization, of the debtor or any successor to the debtor under the

16  plan . . . ."  In other words, a plan must be feasible and leave the reorganized entity financially stable

17  enough to be in a position to meet its obligations under the plan.

18         In this case, approximately 13,000 proofs of claim have been filed aggregating over $44

19  billion.[8]  Tellingly, a very small percentage of these filed claims account for a huge percentage of

20  the total claimed amount, such that less than 10% of the aggregate number of filed claims account

21  for approximately 90% of the aggregate amount of filed claims.  As noted above, PG&E maintains

22  that many of these large claims are materially overstated, to the tune of billions of dollars in the

23  aggregate.  Accordingly, in order to determine whether the Plan is feasible, the Court can and must

24

25         [8]This $44 billion figure includes approximately $9 billion of claims that already have been
   disallowed.  See footnote 4, supra.  In addition, PG&E is in the process of filing objections to
26  various facially duplicative claims (PG&E already has filed two omnibus objections covering
   numerous duplicative claims and intends to file one or more additional omnibus objections to other
27  groups of duplicative claims), which should be resolved relatively soon and further reduce the
   existing aggregate claims.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

estimate the Claims for feasibility purposes under Section 1129(a)(11). Pizza of Hawaii, Inc. v. Shakey's, Inc. (In re Pizza of Hawaii, Inc.), 761 F.2d 1374, 1382 (9th Cir. 1985) (bankruptcy court erred by finding the debtor's Chapter 11 plan feasible without estimating the value of a potentially large civil suit for damages against the estate).

As a lesser-included proposition, courts also have recognized that estimation of claims for feasibility purposes promotes the objectives of Chapter 11 reorganization, and that freezing the plan process pending the final allowance or disallowance of claims would be antithetical to the reorganization process. See Interco, Inc. v. Ilgwa Nat'l Ret. Fund (In re Interco, Inc.), 137 B.R. 993, 998 (Bankr. E.D. Miss. 1992) (claim liquidation would adversely affect debtor's ability to formulate and implement a plan of reorganization and frustrate the reorganization case); In re Nova Real Estate Inv. Trust, 23 B.R. 62, 65 (Bankr. E.D. Va. 1982) (same).

In the estimation proceeding, the bankruptcy court need only obtain a "rough estimate" of the value of the claims requiring estimation. In re Thomson McKinnon Sec., Inc., 191 B.R. 976, 989 (Bankr. S.D.N.Y. 1996). Further, the court has broad discretion in choosing the estimation process(es). Brutoco Eng'g & Constr. Co. v. Dennis Ponte, Inc. (In re Dennis Ponte, Inc.), 61 B.R. 296, 299 (B.A.P. 9th Cir. 1986) (citing with approval in the context of estimating a claim for feasibility purposes the directive in Bittner v. Borne Chem. Co., 691 F.2d 134, 135 (3d Cir. 1982), to "us[e] whatever method is best suited to the particular contingencies at issue"); Corey v. Louis (In re Corey), 892 F.2d 829, 834 (9th Cir. 1989) ("court has broad discretion when estimating the value of an unliquidated claim"). Non-bankruptcy law applicable to particular claims is binding, e.g., a claim based on a contract is governed by the contract and by legal principles applicable to that contract. Bittner, 691 F.2d at 135. Discretion is otherwise virtually unfettered.

Given that both Section 1129(a)(11) and controlling Ninth Circuit authority mandate the estimation of claims where necessary to determine whether a plan or reorganization is feasible, it is not surprising that bankruptcy courts have considerable discretion in choosing the means and methods of estimation, in order to complete the estimation process as promptly and efficiently as possible for feasibility purposes. This is because estimation of a claim for feasibility purposes does not in any way affect or bind the claimholder regarding the ultimate allowance of the claim or the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

distribution the claimholder will be entitled to receive thereon. Rather, it is merely a rough estimate

for the limited purpose of determining whether a plan of reorganization meets the feasibility

requirement. And if bankruptcy courts did not have broad authority to estimate claims for feasibility

purposes, virtually any recalcitrant creditor or group of creditors could bring the plan process to a

standstill by asserting large and factually complex claims that they claim are merely "disputed,"

insisting that the plan feasibility requirement could not be applied or satisfied until after the

conclusion of evidentiary hearings resulting in the allowance or disallowance of the claim. This

paralysis of the Chapter 11 process is neither contemplated nor countenanced by the Bankruptcy

Code.

      B.    The Statutory And Legal Bases For Estimating Claims For Feasibility Purposes.

      Although courts draw loosely upon Section 502(c) as authority for estimating claims for

feasibility purposes, this section applies by its terms only to estimation for allowance purposes.[9]

The differences in the goals and impact of estimation for allowance purposes, on the one hand, and

feasibility purposes, on the other, dictates against strict application of Section 502(c) requirements to

feasibility estimation. In particular, both logic and case law demonstrate that courts can and should

estimate any disputed claims for plan feasibility purposes if the alleged value of those claims may

affect the feasibility of a plan of reorganization.

      As necessary background, it is important to keep in mind that there are a variety of

circumstances under which a bankruptcy court may be required to estimate claims during the course

of a Chapter 11 case. Section 502(c), as already noted, provides for estimation of claims for the

purpose of the allowance of claims. The ramifications of a bankruptcy court's estimation of the

value of claims for this purpose is dramatic. Absent reconsideration for cause pursuant to Section

---

[9]Section 502(c) states in full:
    There shall be estimated for purpose of allowance under this section—

(1)    any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case; or

(2)    any right to payment arising from a right to an equitable remedy for breach of performance.

11 U.S.C. §502(c).

-7-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

502(j), the claim is allowed in the estimated amount, the claimant will be entitled to distributions

only up to the amount estimated by the bankruptcy court, and the claim will otherwise be discharged

under Section 1141(d) upon confirmation of a plan.[10] Similarly, the court may estimate claims

pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for purposes of determining

voting rights.[11] Creditors' interests are directly affected in this context as well, since disallowance

or underestimation of a claim reduces or eliminates any ability the claimant may otherwise have had

to affect the approval of a plan of reorganization.

A feasibility determination, in contrast, is a preliminary examination that does not

directly affect any particular creditor's rights. Rather, the feasibility test is designed merely to

"prevent confirmation of visionary schemes which promise creditors and equity security holders

more under a proposed plan than the debtor can possibly attain after confirmation.'" In re Pizza of

Hawaii, 761 F.2d at 1382 (quoting 5 Lawrence P. King Collier on Bankruptcy ¶1129.02[11] at

1129-34 (15th ed. 1984)). Courts have repeatedly held that "the feasibility standard is whether the

plan offers a reasonable assurance of success. Success need not be guaranteed." Kane v. Johns-

Manville Corp., 843 F.2d 636, 649 (2d Cir. 1988) (emphasis added). Consequently, estimation

serves a different goal for feasibility purposes than for allowance or even voting purposes.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

---

[10]This important distinction between the purposes for seeking estimation is highlighted by In re Dow Corning Corp., 211 B.R. 545 (Bankr. E.D. Mich. 1997). There, estimation of mass tort claims was sought for a number of purposes, including purportedly for plan feasibility purposes under Section 1129(a)(11). However, the court, in analyzing the plan, correctly noted that the proposed plan in that case was not a full payment plan, but rather provided that the reorganized debtor would set aside a specified dollar amount that the debtor anticipated would be sufficient to pay all claims in full, but that limited recovery to a pro rata share of the set-aside funds if such funds proved insufficient to pay all claims in full. Id. at 568. Thus the court properly concluded that "estimation is not necessary for plan confirmation purposes" because "[t]he Reorganized Debtor's ability to pay tort claims in full would simply not be an issue under §1129(a)(11) for no matter how large the actual aggregate tort liability may turn out to be, the Reorganized Debtor would clearly be able to perform the pertinent terms of the plan. If the Court estimated the aggregate claims at something within the $2 billion [to be set aside under the plan], the plan would be feasible. If the Court estimated the claims at an amount in excess of $2 billion, the plan would still be feasible, because the Reorganized Debtor's obligation is capped by the plan at $2 billion, and the Debtor has $2 billion." Id. at 568-69. In the PG&E case, by contrast, the Plan does provide for full payment and there is no artificial cap, and it therefore is necessary to obtain a realistic estimate of the overstated Claims in order for the Court to apply Section 1129(a)(11)'s feasibility test.

[11]Bankruptcy Rule 3018(a) states, in relevant part, that "[n]otwithstanding objection to a claim or interest, the court after notice and hearing may temporarily allow the claim or interest in an amount which the court deems proper for the purpose of accepting or rejecting the plan."

1      There is no particular Bankruptcy Code provision or rule that directly addresses the

2      bankruptcy court's power to estimate claims for feasibility purposes. Nevertheless, it is clear that a

3      bankruptcy court must take into account pending lawsuits and other claims in making its feasibility

4      determination if such claims could compromise the ability of the debtor to reorganize. In re Pizza of

5      Hawaii, 761 F.2d at 1382; In re Dennis Ponte, Inc., 61 B.R. at 299. Estimation of the value of large

6      claims, in other words, has been found to be inherent in the process of determining whether the

7      debtor's reorganization plan enjoys a reasonable prospect of success and therefore is feasible.

8      While some courts have cited generally to Section 502(c) as authority for the estimation

9      of claims for feasibility purposes, it is clear that the Section 502(c) standard is not strictly applied in

10     this context. Thus, although Section 502(c) specifically authorizes estimation of only "contingent"

11     or "unliquidated" claims for allowance purposes, a feasibility determination can require the

12     estimation of any sort of disputed claims. In Pizza of Hawaii, for example, Shakey's, a national

13     franchisor of fast food outlets, entered into a dealer agreement with three individuals. Shakey's filed

14     a suit in district court against the individuals for breach of contract and trademark infringement. Id.,

15     761 F.2d at 1375. Shortly thereafter, the individuals assigned their interest in the dealer agreement

16     to Pizza of Hawaii, which filed a Chapter 11 petition the following day. Id. Pizza of Hawaii was

17     granted leave to intervene in this lawsuit after Shakey's amended its complaint to allege violations

18     of its contractual and trademark rights by Pizza of Hawaii itself. Id. at 1375. Shakey's complaint

19     requested $58,335.23 in unpaid dealer fees, but did not quantify the damages for its unfair

20     competition and trademark infringement claims. Id. at 1381. The Ninth Circuit held that "[u]ntil the

21     bankruptcy court has estimated the value of Shakey's claim, it is impossible to determine whether

22     $291,295.99 is sufficient to effectuate the plan and enable Pizza to continue in business." Id. at

23     1382. Significantly, the Ninth Circuit did not limit estimation to the unquantified or non-contractual

24     claims of the complaint, nor did it discuss whether any portion of the claim was either contingent or

25     unliquidated.

26     Similarly, in In re Nova Real Estate Investment Trust, 23 B.R. 62, the court estimated

27     disputed contract-based claims for purposes of making a feasibility determination. In that case,

28     Nova loaned money to the claimant for the purpose of purchasing land and building a condominium.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

-9-

The claimant defaulted on the loans, and conveyed the land and the nearly completed building to
Nova. Three years later, the claimant filed suit against Nova in state court based on these contracts.
Id. at 64. Nova filed a petition for reorganization under Chapter 11 two years later, while the suit
was still pending in state court. The claimant asserted that his claims totaled $12 million. Id. The
court nevertheless estimated the claims for feasibility purposes, loosely deeming them to be
"unliquidated" and noting that "[s]imply allowing the claim in full as stated by [the claimant] . . .
could have jeopardized the feasibility of the debtor's plan." Id. at 65. Rather than allow the
claimant to unilaterally block confirmation of the plan, the court estimated all of the claimant's
causes of action—even those based purely on alleged nonpayment pursuant to the terms of the
contracts at issue in that case. Id.

Thus, a bankruptcy court has the authority to estimate any disputed claim for feasibility
purposes if the purported value of such disputed claim could reasonably affect the success of the
reorganization plan. In doing so, the court need not determine that the claim is either "contingent,"
or "unliquidated," as those terms are defined by the courts for other purposes. If such authority does
not exist squarely under Section 502(c), then it in any event surely exists under Section 1129(a)(11)
itself, since feasibility determinations necessarily require the evaluation of any factor that might
reasonably be expected to materially affect the success of a reorganization plan, including the
existence of large outstanding disputed claims. Additionally, Section 105(a) of the Bankruptcy
Code authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or
appropriate to carry out the provisions of this title." The purpose of Section 105 is "to assure the
bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of
their jurisdiction." 2 Lawrence P. King Collier on Bankruptcy ¶105.01 at 105-6 (15th ed. rev.
2000). Accordingly, Section 105(a) of the Bankruptcy Code also provides this Court with authority
to estimate the Claims for feasibility purposes in order to carry out the provisions of Section
1129(a)(11).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

C.   The Claims Requiring Estimation In This Case Are In Any Event Predominantly "Contingent" Or "Unliquidated" And Therefore Must Be Estimated For Feasibility Purposes.

Even assuming arguendo that Section 502(c) was the sole basis for the bankruptcy court's authority to estimate claims for feasibility purposes and that Section 502(c) applies only to "contingent" or "unliquidated" claims even in the feasibility determination context, the Claims that PG&E seeks to have estimated in any event qualify as "contingent" or "unliquidated" claims under applicable case law.

The Bankruptcy Code does not define the terms "contingent" or "unliquidated." In general, the courts have determined that "if all events giving rise to liability occurred prior to the filing of the bankruptcy petition, the claim is not contingent." Audre, Inc. v. Casey (In re Audre, Inc.), 216 B.R. 19, 30 (B.A.P. 9th Cir. 1997). In addition, "'whether a debt is liquidated or not . . . does not depend strictly on whether the claim sounds in tort or in contract, but whether it is capable of ready computation.'" Id. (quoting In re Loya, 123 B.R. 338, 340 (B.A.P. 9th Cir. 1991) (construing Section 109(e) to determine eligibility for relief under Chapter 13)).

Most of the bankruptcy case law construing the meaning of the term "unliquidated" analyzes Section 109(e), which governs eligibility for relief under Chapter 13.[12] The Ninth Circuit has held in this context that a dispute as to liability may render a debt "unliquidated," depending on whether resolution of the dispute would require more than a preliminary hearing. In Federal Deposit Ins. Corp. v. Wenberg (In re Wenberg), 94 B.R. 631 (B.A.P. 9th Cir. 1988), aff'd, 902 F.2d 768 (9th Cir. 1990), for example, the Ninth Circuit Bankruptcy Appellate Panel examined whether accounting and attorney fees imposed as part of a prepetition judgment constituted "liquidated" debts for purposes of Section 109(e). In doing so, the court noted that "the question whether a debt

---

[12]Section 109(e) provides:

Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $290,525 and noncontingent, liquidated, secured debts of less than $871,550, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $290,525 and noncontingent, liquidated, secured debts of less than $871,550 may be a debtor under Chapter 13 of this title.

11 U.S.C. §109(e).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-11-

is liquidated 'turns on whether it is subject to ready determination and precision in computation of the amount due.'" Id. at 634 (quoting Fostvedt v. Dow (In re Fostvedt), 823 F.2d 305, 306 (9th Cir. 1987)). The Wenberg court went on to explain that:

> The definition of "ready determination" turns on the distinction between a simple hearing to determine the amount of a certain debt, and an extensive and contested evidentiary hearing in which substantial evidence may be necessary to establish amounts or liability. (Wenberg, 94 B.R. at 634 (emphasis added))

In other words, a dispute as to liability may render a claim unliquidated.

Similarly, in Nicholes v. Johnny Appleseed of Washington (In re Nicholes), 184 B.R. 82 (B.A.P. 9th Cir. 1995), the Ninth Circuit Bankruptcy Appellate Panel reviewed a bankruptcy court determination that the debtor was ineligible for Chapter 13 relief under Section 109(e) due to excessive contingent and/or liquidated debts. The debtor argued that certain debts that the bankruptcy court had determined to be noncontingent were in fact contingent and/or unliquidated because they were earned in the name of his company.

The Nicholes court first noted that Section 109(e) "excludes unliquidated or contingent debts from the Chapter 13 eligibility computation, but does not exclude debts which are merely disputed." Id. at 88. Although the court noted that "the terms disputed, contingent and liquidated have different meanings," the court held that a dispute could, under certain circumstances, render a debt unliquidated. Id.

The Nicholes court noted that "[a] debt is liquidated if it is capable of 'ready determination and precision in computation of the amount due.'" Id. at 89. The test for this "ready determination" is "whether the amount due is fixed or certain or otherwise ascertainable by reference to an agreement or by a simple computation." Id. It further noted that "the term 'disputed' is broad and can encompass either liquidated or unliquidated debts." Id. In other words, "it is the nature of the dispute, and not the existence of the dispute, that makes a claim unliquidated." Id. at 90.

The Nicholes court specifically examined divergent lines of cases discussing whether a dispute as to liability alone could render a debt unliquidated. It followed Wenberg in holding that "if the dispute itself makes the claim difficult to ascertain or prevents the ready determination of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    amount due, the debt is unliquidated . . . ." Nicholes, 184 B.R. at 91.

2          Further, beyond these Ninth Circuit cases, courts throughout the country have shown a

3    flexible approach to determining what disputed claims qualify as "contingent" or "unliquidated."

4    Thus, in In re Windsor Plumbing Supply Co., 170 B.R. 503 (Bankr. E.D. N.Y. 1994), one part of the

5    claim was for a fixed amount allegedly due under invoices for merchandise shipped to the debtor,

6    and the second component of the claim was for treble damages under RICO.  In estimating the entire

7    claim for voting purposes (which presumably employs a stricter standard than for feasibility

8    purposes because of the more pronounced effect on the claimholder), the court stated "[w]hile the

9    magnitude of the plaintiff's loss may be fixed, liquidated and undisputed, the extent, if any, to which

10   The Debtors caused such loss or otherwise may be liable therefore clearly is not." Id. at 521.  In

11   other words, the court treated the claim as unliquidated because the debtor contested liability, not the

12   amount of the claimant's loss.  See also Bunn v. Frontier Airlines, Inc. (In re Frontier Airlines, Inc.),

13   137 B.R. 811 (Bankr. D. Colo. 1992) (court estimated for allowance purposes under Section 502(c)

14   various employee claims for wages and benefits, even though claims were contract-based and

15   appeared readily calculable from collective bargaining or other employment agreements); In re

16   Interco, Inc., 137 B.R. at 993 (over claimant's objection, court estimated for feasibility purposes

17   under Section 502(c) a retirement fund's claim for withdrawal liability under ERISA, holding that

18   claim was unliquidated even though ERISA set forth formulae for calculating such liability, noting

19   that the debtor intended to challenge the actuarial assumptions upon which the fund's computation

20   was based).

21         The Claims that PG&E seeks to have the Court estimate are virtually all properly

22   considered either "unliquidated" or "contingent."  Most of the Claims—such as the environmental

23   Claims and the tort Claims—fall within even the strictest definition of these terms.  Others, such as

24   the generator Claims, while based on contracts or tariffs, fall well within the case law concepts of

25   "unliquidated" because they involve complex factual matters and calculations, and resolution of the

26   disputes requires more than a cursory examination.  Indeed, the bulk of the generator Claims can not

27   be "liquidated" until final actions on matters pending at FERC.

28         In short, while there is and should be no requirement that large disputed claims be

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

strictly "unliquidated" or "contingent" to qualify for estimation for feasibility purposes under one or more of Section 1129(a)(11), Section 105(a) or Section 502(c), even if one accepted the proposition that this Court only has authority to estimate "unliquidated" or "contingent" claims for feasibility purposes, there is ample authority for determining that the Claims here at issue are "unliquidated" or "contingent" and therefore can and should be estimated by the Court.

D. **As To Claims Estimation-Related Matters As To Which The Debtor Suggests That It Retain An Expert, Section 327(a) Provides Authority For Such Retention.**

Section 327(a) authorizes a debtor in possession, with Bankruptcy Court approval, to employ one or more "appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtor in possession] in carrying out the [debtor in possession's] duties under this title. 11 U.S.C. §§327(a); 1107(a). In a Chapter 11 case, propounding and seeking confirmation of a plan of reorganization is one of the principal responsibilities and the ultimate goal of a debtor in possession. Thus, a debtor in possession's requested retention of experts for purposes of developing evidence to assist in any required estimation process under Section 1129(a)(11) appears to be well within the ambit of Section 327(a). PG&E proposes that it submit to the Court a list of proposed experts in the various relevant subject areas (including a detailed curriculum vitae of each such proposed expert) along with its applications for retention of such experts, and that the form of order(s) appointing the experts shall expressly charge and instruct the experts to be impartial in reviewing and analyzing relevant data and formulating recommendations as to estimated values of Claims. Accordingly, PG&E, with the Court's approval following the hearing on this Motion, will move for appointment of experts to assist in those estimations that PG&E has indicated would most efficiently be aided by an expert's analysis and recommendations.

E. **Alternatively, The Court Can Appoint An Expert Pursuant To Federal Rule of Evidence 706 For The Purpose Of Receiving And Evaluating Evidence And Advising The Court In Estimating The Aggregate Value Of Claims For Feasibility Purposes.**

As indicated in the foregoing paragraph, PG&E believes that the most efficient and expeditious way of enlisting expert assistance in the claims estimation process would be for PG&E to retain experts with Court approval pursuant to Section 327(a) of the Bankruptcy Code.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Nonetheless, if for any reason the Court believes that this is not the most salutary route to obtaining expert assistance in the claims estimation process, there are other statutory and rule bases for the appointment of experts to assist the Court. Most prominently, there is express authority for the Court to appoint its own expert under the Federal Rules of Evidence, which apply to cases under the Bankruptcy Code. See Fed. R. Bankr. P. 9017.

More particularly, Rule 706 of the Federal Rules of Evidence states:

> The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. (Fed. R. Evid. 706(a))

Even before the adoption of Rule 706 of the Federal Rules of Evidence, the importance and historical role of court-appointed experts was recognized. In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.), 830 F. Supp. 686, 692 (E.D.N.Y. & S.D.N.Y. 1993) (citing Scott v. Spanjer Bros., Inc. 298 F.2d 928, 930 (2d Cir. 1962) ("[a]ppellate courts no longer question the inherent power of a trial court to appoint an expert under proper circumstances, to aid it in the just disposition of a case . . . . [t]he appointment of an impartial . . . expert by the court in the exercise of its sound discretion is an equitable and forward-looking technique for promoting the fair trial of a lawsuit").

Although the appointment of court-appointed expert assistance under Rule 706 is not commonplace, the power is well recognized, and it is an important tool for dealing with "some of the most demanding evidentiary issues that arise in federal courts." 830 F. Supp. at 693 (citing Joe S. Cecil & Thomas E. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706 4-5 (Fed. Jud. Center 1993)). Judge Weinstein listed several factors which, "alone and in combination," justified the appointment of such experts in connection with a bankruptcy case: the questions are "complex and riven with uncertainties and interdependent variables"; the number of people affected is large; the courts "cannot proceed toward a just and equitable result without some reasonably firm data"; and "all parties have strong and conflicting interest in the character of that data." Id. The court further noted its obligations to oversee a complex bankruptcy reorganization, which "cannot be met without the oversight court

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

having a solid grounding in fact." Id. (citing In re Joint E. & S. Dist. Asbestos Litig. (In re Johns-Manville Corp.), 982 F.2d 721, 750 (2d Cir. 1992)).

The Johns-Manville litigation presents a good example of the use of an expert appointed under Rule 706 in a claims-related context. There, a class action suit was brought by beneficiaries of an insolvent bankruptcy trust, which sought to establish an equitable distribution of the trust res. The district court judge (overseeing the bankruptcy plan's implementation jointly with the bankruptcy court) appointed an expert to advise the court pursuant to Rule 706. See Johns-Manville Corp., 982 F.2d at 728-30. "Among the tasks assigned to [the expert] were reporting to the [c]ourt on the feasibility of providing accurate estimates of future claims upon the Trust . . . ." Id. at 731. The district court had recognized that a major issue in the administration of the trust would be the proper allocation of the proceeds between payment of current claims and maintenance of a reserve for future claims. See id. "Critical to that allocation would be estimates of the number of future claimants." Id.

When the parties objected to the court's adoption of the expert's interim Rule 706 report, the court responded, wholly apart from the class action portion of the case, "we have no doubt of the Court's authority to exercise its bankruptcy court powers to appoint experts to advise it on matters that concern the ongoing administration of the Chapter 11 proceeding." Id. at 750. The court ruled that the appointment of such an expert was not "in conflict with the mechanism contemplated by the [class action settlement] for estimation of future claims" and that the trust beneficiaries "lack the power to impair the authority of the Bankruptcy Court to exercise its retained powers under the Plan to implement the Plan." Id. Further, the court expressed "no doubt that the role of the experts is within the broad authority of Rule 706." Id. (citing Scott, 298 F.2d at 930).

Another case considering the use of Rule 706 experts in the claims estimation process is In re Dow Corning Corp., 211 B.R. at 554. There, the debtor had moved for the appointment of a panel of experts to estimate mass tort claims for a variety of purposes. The court denied the motion for estimation because estimation was not necessary or appropriate for feasibility purposes since the plan was feasible on its face insofar as the debtor's ability to discharge its obligations under the plan was concerned. Id. at 568-69; see also footnote 10, supra, for a more detailed explanation of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-16-

1   holding. As a lesser-included proposition, the court also declined to appoint a panel of experts,

2   since no estimation was necessary. Id. at 590-91. However, at the same time, the court noted the

3   bankruptcy court's power to appoint its own expert witness under Rule 706 of the Federal Rules of

4   Evidence. Id. at 591.[13]

5           In light of the complex issues attendant to the claims estimation process and the broad

6   authority conferred under Rule 706, this Court can and should proceed with the appointment of one

7   or more experts under Rule 706 if the Court for any reason is not comfortable authorizing PG&E to

8   retain an expert pursuant to Section 327(a). One way or another, the use of experts is a sensible

9   approach to moving forward with and timely concluding the claims estimation process without

10  causing an undue burden on the Court.

11      F.    In The Alternative, The Court May Exercise Its Discretion Under Section 105(a) To
            Appoint An Assistant For Claims Estimation Purposes.
12

13          Section 105(a) confers on bankruptcy courts the power to issue "any order, process or

14  judgment that is necessary or appropriate to carry out the provisions of this title," and confers

15  equitable powers upon the bankruptcy courts. Old Orchard Inv. Co. v. A.D.I. Distrib., Inc. (In re

16  Old Orchard Inv. Co.), 31 B.R. 599 (W.D. Mich. 1983). Where necessary and appropriate, courts

17  can and should rely on Section 105(a) to appoint third persons to assist in resolving various issues

18  that arise in a bankruptcy case.

19          For example, in a case involving a debtor's motion to reject its collective bargaining

20

21      [13]The Dow Corning court noted that there is some tension between the lack of authority for
    appointing special masters in bankruptcy cases pursuant to Federal Rule of Bankruptcy Procedure
22  9031, on the one hand, and the express authority for bankruptcy judges to appoint experts under
    Federal Rule of Evidence 706, on the other, and questioned whether the appointment of a panel of
23  experts as requested by the debtor would constitute the unauthorized appointment of a special
    master. The court deemed the issue "of no significance" in light of its prior ruling that estimation
24  under Section 1129(a)(11) was not required, and the court therefore did not reach or decide the
    issue. Id. at 591. PG&E submits that there should be and is little doubt that a bankruptcy court has
25  authority to appoint an expert to assist in the fact-finding process on time-consuming or complex
    issues, since the Bankruptcy Rules expressly makes the Federal Rules of Evidence (including Rule
26  706) applicable to bankruptcy cases. Further, and in any event, because the Dow Corning court did
    not fully discuss or vet the issue, it failed to appreciate that the function of an expert under Rule 706
27  is not to make the fact-finding decisions, but to render opinions and/or recommendations to assist
    the bankruptcy court as the ultimate trier of fact.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-17-

agreement with a union pursuant to Section 1113, the debtor and a union were unable to reach a

compromise on the debtor's desire to reject. In re Royal Composing Room, Inc., 62 B.R. 403, 405

(Bankr. S.D.N.Y. 1986). While the court noted that Section 1113 provides no mechanism for the

court to appoint a mediator, it stated that Section 105(a) might permit the creation of the office of

"labor negotiator." See id. (citing In re Johns-Mansville Corp., 36 B.R. 743, 758 (Bankr. S.D.N.Y.

1984) (appointment of representative for future claimants appropriate as "courts readily use their

equitable powers to protect the substantive rights of persons similarly situated who are not before

the court); United States v. Sutton, 786 F.2d 1305, 1307 (5th Cir. 1986) (Section 105(a) simply

authorizes a bankruptcy court to fashion such orders as are necessary to further the purposes of the

substantive provisions of the Bankruptcy Code)).

   In considering other options, that court contrasted the broad authority conferred by

Section 105 with the narrower functions accorded specific actors in the bankruptcy context, such as

a trustee, examiner, special master, or Rule 706 expert:

> A trustee would supplant the debtor-in-possession, not assist it. An
> examiner's role is investigative. The court need not consider whether a
> special master might be able to so function as the bankruptcy court is
> forbidden to appoint a special master. See Bankruptcy Rule 9031.
> Although the bankruptcy court could appoint an expert under Rule 706(a) of
> the Federal Rules of Evidence, an expert's function would appear to be
> limited to rendering opinions to assist the court as the trier of the fact to
> understand the evidence or to determine a fact in issue. See Rule 702 of the
> Federal Rules of Evidence and Bankruptcy Rule 9017. (Id.)

Thus, although declining to exercise its power under Section 105, the court suggested that the

authority conferred by the section is both broad and flexible in comparison to the specialized

purposes of other Bankruptcy Code provisions.

   Should the Court for any reason not want to authorize PG&E to retain experts pursuant

to Section 327(a) and find that the tasks required of an advisor in the claims estimation process

exceed the bounds of authority conferred by Rule 706 of the Federal Rules of Evidence, Section

105(a) represents a broader and more flexible grant of authority to this Court, enabling it to exercise

its discretion in the furtherance of other, substantive Bankruptcy Code provisions, such as the fact-

finding required in order to make the Plan feasibility determination required under Section

1129(a)(11).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    We turn now to a fuller description of the Claims requiring estimation and the proposed

2    processes for moving forward with the estimation of the several categories of Claims.  We pay

3    particular attention to the environmental claims category because it well illustrates the types of

4    overstatement and overlap (and the range of complex factual issues) that require estimation for

5    feasibility purposes, and two different potential approaches to the estimation process.

6

7                                              III.

8                               ENVIRONMENTAL CLAIMS

9            PG&E believes that the actual amount of environmental liabilities attributable to PG&E

10   is a small percentage of the amounts asserted, which are dramatically overstated.  By the very nature

11   of these environmental Claims, finally adjudicating and liquidating these Claims insofar as they may

12   be attributable to PG&E will be a long and complex process, conceivably stretching over years.

13   Such a process would inordinately consume the Court's and the Debtor's time and resources, delay

14   progress of the case, and frustrate the effort to reorganize, to the detriment of the estate and its

15   creditors.[14]  Therefore estimation of the environmental Claims is essential.

16   A.      The Value Of Environmental Claims Against PG&E Is Vastly Overstated.

17           The State of California ("State"), through the Department of Toxic Substance Control

18   ("DTSC"), the Regional Water Quality Control Boards ("RWQCBs"), and other divisions, has filed

19   eight Claims involving alleged environmental liability at approximately 535 sites throughout

20   California, and asserts that PG&E owes three-quarters of a billion dollars in related cleanup,

21   oversight and monitoring costs, as well as other costs and penalties.[15]  Private party claimants and

22   _____

23   [14]Indeed, it is in part because of the complexities and long-term horizon in resolving many
     environmental claims that the Plan Proponents, at the urging of key environmental claimants, have
     provided for unimpaired, pass-through treatment under the Plan for all timely asserted

24   environmental claims, meaning that for virtually all purposes such claims will be resolved in the
     ordinary course under applicable non-bankruptcy law in non-bankruptcy forums.  See Plan §4.18.

25   Thus, by virtue of the provisions of the Plan, there will not be any need for the Court to actually
     allow or disallow any timely asserted environmental claims, since the whole point of the pass-

26   through treatment is to provide that environmental claims will be determined by non-bankruptcy
     courts and enforced by the claimants as if the bankruptcy case had never been commenced.

27   [15]See, e.g., Claim Nos. 12680-12682 filed by DTSC and Claim Nos. 12684, 12689-12692 and

28   12694 filed by various Regional Water Quality Control Boards.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

local or quasi-governmental agencies (collectively "Non-State Claimants") have filed 113 Claims involving alleged environmental liability at a number of these same sites, as well as at other sites in California. These Non-State Claimants collectively assert PG&E owes approximately $259 million for PG&E's alleged share of cleanup, oversight, monitoring and other costs and penalties. The total for environmental Claims thus is approximately $1 billion.

The actual amount of environmental liabilities attributable to PG&E is a small percentage of the Claims values submitted by the State and Non-State Claimants (collectively "Environmental Claimants"). This is perhaps understandable in that the Environmental Claimants' claimed amounts are often calculated based on the maximum, most far-fetched theoretical exposure under environmental laws, since the Environmental Claimants are motivated to preserve their rights to assert claims, rather than to try and determine the actual probable liability of the Debtor. Thus, without intending this observation as a criticism of the Environmental Claimants, their cost estimations are frequently without regard for the ultimate legal, factual, technical and practical considerations applied by state and federal courts in resolving environmental claims and allocating costs among potentially responsible parties ("PRPs"), and their cost estimations therefore bear little relation to any real or probable liability outcomes.

    1.   The State's Inflated Environmental Claims.

The hyperinflated amount of the State's estimates is illustrated by three of the State's Claims. In these three Claims alone—Casmalia Landfill, GBF/Pittsburgh Landfill and the "Substation Sites"—the State asserts that PG&E is solely responsible for $432 million in cleanup costs. That amount of liability is extremely far-fetched and unrealistic.

    a.   Many Other Financially Viable Parties, Including DTSC, Also Are Responsible Parties At The Casmalia Landfill, And PG&E's Share Of That Liability Is A Small Percentage Of The Amount The State Is Claiming.

The Casmalia Landfill in Central California is being closed under the direction of the Environmental Protection Agency ("EPA") pursuant to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601 et seq. During its operation, over 10,000 entities, including the State, PG&E and many Fortune 500 companies, sent hazardous wastes for disposal at this site. About 50 of those parties, including PG&E, have formed

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

a steering committee that has entered into a judicially approved consent order with EPA to investigate the landfill contamination, establish the appropriate remedy, and install a functioning remedial system. EPA has filed a claim in this bankruptcy case maintaining its authority to direct PG&E regarding PG&E's allocated share of costs at Casmalia.[16] PG&E does not plan to object to that claim.

Notwithstanding the foregoing, DTSC has filed a Claim alleging PG&E owes it $294 million for Casmalia—the total cost for cleaning up the landfill.[17] The State's Claim overlooks the following facts: (1) over 10,000 entities are responsible for waste disposal at the site; (2) PG&E contributed less than 5.2% of the manifested waste sent there; (3) the State itself is a responsible party at the site and contributed a significant volume of waste to the site; (4) EPA brought the enforcement action, not the State; (5) substantial remediation work already has been completed at the site under an agreement with EPA; (6) PG&E already has paid most of the costs it owes under that agreement; and (7) the agreement with EPA looks to other, additional parties as responsible for ongoing cleanup activities through the point where a final remedy is implemented. Those other parties include many large, financially viable companies.

The State's $294 million Casmalia-related Claim apparently rests upon the theory that should it ever file an action (even though EPA already has done so), joint and several liability theoretically could be available under environmental statutes such as CERCLA. The State might then require PG&E to pay for the entire $294 million cleanup, despite PG&E's status as but one of thousands of companies that sent waste to the site, and despite EPA's ongoing enforcement of CERCLA.

However, in reality, where, as here, EPA has brought claims against numerous financially viable PRPs, joint and several liability is virtually never applied to require a single PRP to pay the entire cost of the cleanup.[18] Indeed, such a requirement would contravene Congress'

---

[16] Claim No. 12677.

[17] Claim No. 12682, at Exhibit 1, Table H. The amount claimed appears to be for all costs associated with the cleanup of the entire Landfill, including oversight costs, fines and penalties.

[18] United States v. Chem-Dyne Corp., 572 F. Supp. 802 (S.D. Ohio 1983).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 5008    Filed: 03/01/02    Entered: 03/05/02 15:14:00    Page 29
of 52

express intent that the financial burden of cleaning up hazardous waste sites be allocated fairly among all parties responsible for the creation and disposal of the waste.[19]  Pursuant to Section 113(f) of CERCLA and Rule 14(a) of the Federal Rules of Civil Procedure, each PRP can bring a claim for contribution seeking equitable allocation of cleanup costs during (or after) an action brought by EPA or DTSC.[20]  Further, if a PRP can prove its waste did not contribute to the cleanup costs or only contributed to a divisible portion of the harm, there will be no liability for those unrelated costs.[21]

The practical result is that before significant cleanup costs are paid, they are virtually always apportioned amongst the PRPs (here, including DTSC) in accordance with a variety of legal and equitable factors.  Those equitable factors often include the so-called Gore Factors,[22] though courts are not limited to those factors and may consider any facts relevant to allocating responsibility.[23]  Particularly in situations involving landfills, courts have allocated cleanup costs according to the relative percentages of waste a PRP contributed, taking into account variations for the relative toxicity of the wastes contributed.[24]

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

---

[19]Southland Corp. v. Ashland Oil, Inc., 696 F. Supp. 994, 998 (D.N.J. 1988).

[20]Mathis v. Veliscol Chem. Corp., 786 F. Supp. 971, 976 (N.D. Ga. 1991).

[21]Prisco v. New York, 902 F. Supp. 374 (S.D. N.Y. 1995).

[22]
  (i)    the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;

  (ii)    the amount of the hazardous waste involved;

  (iii)    the degree of toxicity of the hazardous waste involved;

  (iv)    the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;

  (v)    the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristic of such waste; and

  (vi)    the degree of cooperation by the parties with Federal, State, or local officials to prevent any harm to the public health or the environment.

126 Cong. Rec. 26,779, 26,781 (1980).  The legislative history of the Superfund Amendments and Reauthorization Act of 1986 cites the Gore factors as criteria that a court might consider in apportioning liability under Section 113(f)(1).  H.R. Rep. No. 99-253 (III) (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042.

[23]Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 673-674 (5th Cir. 1989); Environmental Transp. Sys., Inc. v. ENSCO, Inc., 969 F.2d 503, 508-509 (7th Cir. 1992).

[24]In re Bell Petroleum Serv., Inc., 3 F.3d 889, 895-903 (5th Cir. 1993) (adopting volumetric approach to apportioning harm); Kamb v. United States Coast Guard, 869 F. Supp. 793, 799 (N.D.Cal. 1994) (same); Bancamerica Commercial Corp. v. Trinity Indus., Inc., 900 F. Supp. 1427, ( . . . continued)

1    Accordingly, PG&E's actual liability at the Casmalia Landfill is but a fraction of the

2    $294 million amount set forth in the State's Claim, and such Claim can and should be estimated for

3    feasibility purposes.

4                    b.    PG&E Previously Settled All Its Obligations At The GBF/Pittsburgh
                           Landfill, And Other Parties Are Performing The Cleanup There, Secured By
5                          A $120 Million Insurance Policy.

6        The State's Claim asserts that PG&E has over $37 million in liability for cleanup of the

7    GBF/Pittsburgh Landfill, again apparently on the theory that PG&E could be jointly and severally

8    liable for the entire cost of cleaning up the site.  As with Casmalia, the State's Claim overlooks

9    crucial facts, such as:  (1) hundreds of parties have sent waste to this landfill over many years;

10   (2) DTSC's cleanup orders regarding the landfill list between 50 and 100 responsible parties, many

11   of which are large, financially viable entities; and (3) PG&E contributed less than 1% of the waste at

12   the site.  The issues identified above with respect to the Casmalia Landfill apply equally here, and

13   PG&E's actual responsibility for the GBF Landfill is a minor percentage of the $37 million amount

14   asserted in the State's Claim.

15       Practically speaking, PG&E's actual dollar exposure at the GBF/Pittsburgh Landfill is

16   likely zero.  Many of the responsible parties identified by DTSC in its cleanup order, including

17   PG&E and the former landfill owner and operator, have entered into a settlement agreement for the

18   GBF site.  Under the terms of this agreement TRC, a reputable remediation company that has

19   successfully remediated several sites, took possession of the GBF site and is undertaking the cleanup

20   obligations there.  As part of the settlement, TRC's performance has been secured by $120 million

21   in insurance, and PG&E is indemnified for all claims by any person or agency arising out of the

22   contamination.  In fact, DTSC has been working with TRC over the past year on implementation of

23   a final remedial action plan ("RAP") for the site.  In short, there is another responsible, viable party

24   and significant insurance fully covering the liabilities for which the State has now asserted the same

25   Claim against PG&E, no doubt trying to preserve all of its potential rights and claims.  But this

26

                                                                        (continued . . . )
27   1473-1474 (D.Kan. 1995) (allocating by volume and toxicity), aff'd in part, rev'd in part on other
     grounds, 100 F.3d 792, 802-803 (10th Cir. 1996).
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    "hedging" by the State, while understandable as a means of protecting its theoretical right to assert a

2    joint-and-several-liability claim against PG&E, in no way realistically measures PG&E's "true" or

3    likely remaining liability, which in fact is zero. Thus, if PG&E is correct, the State's Claim relating

4    to the GBF/Pittsburgh Landfill should be disregarded (i.e., valued at zero) for feasibility purposes.

5            c.    The State's $100 Million Claim For Substation Contamination Is
6                  Speculative And Contrary To Fact.

7            The State's Claim asserts that PG&E owes $100 million for hundreds of substations

8    scattered across Northern California,[25] several of which are no longer owned or operated by PG&E.

9    The State claims this $100 million (about $300,000 for each substation) is for "future investigation

10   and remedial action" of polynuclear aromatic hydrocarbons ("PAHs") and PCBs. The only

11   documentation it has submitted for this Claim, however, is an alphabetical list of 301 substations.

12   The State concedes its estimates are based upon "minimal information" and premised upon the

13   "assumption" that it will be forced to undertake cleanup at all these sites. Further, the State

14   essentially admits it has virtually no evidence of contamination at these sites.

15           The State's assumption that remediation is or may be required at all these 301 sites, and

16   its claim that PG&E is a "significant source" of contamination, are factually unsupported. For

17   example, the State listed all 32 substations in San Francisco as sites that allegedly contributed to its

18   $100 million estimate. The State apparently made this claim without investigating any of those

19   substations, since it is improbable that many of the listed substations could be the source of soil or

20   groundwater contamination. For example, 13 of the listed substations are located within buildings

21   or concrete vaults and have at least one, and often several, concrete building floors between the

22   substations and any soil or groundwater. One of those substations is located on the 54th floor of the

23   Bank of America building in downtown San Francisco. Further, not all of the equipment in

24   substations listed in the Claim of the San Francisco Bay Regional Water Quality Control Board is

25   classified as PCB equipment, which significantly impacts remediation costs. Similar facts apply to

26

27       [25]Claim No. 12690 by the San Francisco Bay Regional Water Quality Control Board
28   ("SFBRWQCB"), at 2 and Exhibit 2.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

the City of Oakland substations listed by the State.

In addition, the San Francisco Bay Regional Water Quality Control Board is aware of PG&E's pilot program for investigation of substations. As part of that program, 12 larger substations were selected for testing, and over 200 soil samples were taken in close proximity to the electrical equipment at those substations. None of those samples detected PAHs, and none contained PCB concentrations at or above actionable levels. Consequently, the data that is available on these sites indicates the State's estimates of cleanup costs are vastly overstated, if not entirely speculative. Absent factual support that an identifiable and imminent threat of harm to the public health and welfare or the environment exists, these claims should fairly be valued at zero. Accordingly, here too it is appropriate that PG&E have the opportunity to have this Court review and estimate the State's Claim for Plan feasibility purposes.

2.  PG&E Already Has Settled Its Liabilities At A Number Of Sites Which The Claimants Include Within Their Respective Claims.

PG&E has previously entered into Consent Decrees and other Settlement Agreements resolving its liability for at least seven of the sites listed by the State in its Claims, including, for example, the Casmalia and GBF Landfills discussed above. Pursuant to these Consent Decrees and Settlement Agreements, PG&E has liquidated its obligations for the presence of contaminants at these sites.

The State unaccountably assigns a value of $340,058,178 to those sites, claiming PG&E is 100% responsible for those costs, when it knows PG&E has already paid its allocable share of the cleanup costs in settlement either to EPA, the State itself, or to other PRPs. Under these Settlement Agreements, the other PRPs are contractually obligated to pay for cleanup. Under the Consent Decrees, EPA or the State itself have provided contribution protection to PG&E. Thus, PG&E believes the actual value of the State's claims for these eight sites is $0, and the Court should thus examine and estimate this Claim for feasibility purposes.

3.  Claimants Estimate Total Cost Rather Than Present Value.

The State further inflates its Claims by failing to recognize that cleanup of a contaminated property is a multi-phased project and that costs are not incurred or paid all at once or

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

immediately. Rather, the costs of investigation, remediation and monitoring are spread out over an extended period. Based on PG&E's experience, the average time for cleaning up manufactured gas plant ("MGP") sites is in excess of six years, with smaller costs incurred in the early years. The time required to clean up a landfill could be decades depending upon the size of the landfill and the nature of the contamination. Remediation costs at other types of sites are similarly spread out over time.

Nonetheless, the State's claims are styled as if the entire inflated or phantom amounts are to be paid all at once. However, the relevant consideration is the expected annual expenditures of PG&E for environmental liabilities, and PG&E's annual cost for environmental liabilities is far less than the State suggests. PG&E incurred expenditures of approximately $16 million for its entire hazardous substances cleanup program in 1999, and approximately $18.5 million in 2000. PG&E's cleanup budget for 2001 and 2002 are consistent with the amounts expended in prior years. There is no legitimate reason why this measured, empirical approach to addressing contamination at sites for which PG&E has liability should suddenly be ignored or cast aside, particularly in light of the pass-through treatment of environmental claims under the Plan. See footnote 14, supra.

4. The Environmental Claims Filed By The Non-State Claimants Are Similarly Inflated.

Claims filed by non-state claimants are similarly flawed legally and factually, or are otherwise inappropriately valued. Many of these Claims overlap those of the State, and often are based on invalid assumptions. In some the claimant is itself a PRP and the asserted value of such Claims is not always limited to that portion of costs incurred that exceeded or is likely to exceed the claimant's own equitably allocated share. The following examples illustrate some of the complex issues raised by these frequently overlapping Claims.

- The City and County of San Francisco has filed a Claim regarding various sites that it collectively values at over $75 million. Many of these Claims, such as the $56 million Claim relating to the Potrero Power Plant ("PPP"),[26] address sites that are the subject of claims filed by

---

[26]Claim No. 12640.

multiple claimants and typically involve a complex land use history. $37 million of this $56 million Claim apparently is based on a contractual obligation by PG&E to Mirant Corporation for remediation of the power plant site as the new plant is built. PG&E believes that the City has no standing under the contract or relevant environmental law to assert the Claim. In addition, the City is itself a PRP because its adjacent property was historically used as a sugar refinery, steel mill and towing yard.

- The City of Vallejo has filed two Claims regarding a single MGP site in Vallejo, each for over $33 million, which MGP site is also subject to two State Claims in excess of $1.6 million.[27] In addition to being duplicates, these Claims are materially overstated because they seek cleanup costs for environmental conditions associated with the long history of industrial uses in the area, including ship building, auto wrecking, fuel storage, and Kaiser steel operations, with which PG&E was not involved.



B. If The Environmental Claims Must Be Estimated On A Claim-By-Claim Basis, Utilization Of A Court-Appointed Expert To Assist Will Materially Streamline The Estimation Process.

Not only are the environmental claims in the main grossly inflated and premised upon overly generalized legal principles, but the State in particular and others in general disregard the scientific and factual inquiries necessary to derive technically valid and scientifically supportable valuations. Because the environmental claimants have taken such an expansive approach to valuation, if the Court determines that the estimation process must proceed on a Claim-by-Claim basis (rather than a statistical approach to estimating the environmental Claims in the aggregate, as discussed in Part III.C. below), PG&E will be required to challenge most Claims as to hundreds of sites, and the Court will need to estimate the amounts properly attributable to these Claims. An expert skilled in evaluating such claims could facilitate this process, as explained below.

In undertaking this estimation process, the Court should follow applicable environmental law as closely as possible.[28] For example, where equitable allocations among

_____

[27]Claim Nos. 9805, 10598.

[28]In re National Gypsum Co., 139 B.R. 397, 415 (N.D.Tex. 1992).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    multiple responsible parties are appropriate, as is typically the case, a claim should reflect only the

2    Debtor's allocated share.[29] Estimating the actual values allocable to PG&E will require an

3    understanding of the allocation decisions of multiple state and federal non-bankruptcy courts

4    applying sometimes divergent and contradictory state and federal substantive law and complex

5    scientific evaluations to an array of factual scenarios. Simply determining how estimated

6    environmental liability should be allocated at each of hundreds of sites will be time consuming.

7          For example, depending upon the source of a release, the chemical(s) released, and the

8    types of media impacted, various agencies could have overlapping and conflicting jurisdiction.[30]

9    Each of these agencies has its own statutory authority, standards, procedures, methods and

10    requirements for public input, enforcement mechanisms, preferred scientists, consultants and

11    attorneys, allocation procedures, and cleanup obligation enforcement. In addition, any number of

12    overlapping state and federal statutes could be implicated in a given claim.[31] Each of these statutes

13    has its own standards for establishing liability, the basis for cost recovery, cleanup procedures,

14    standards and goals, and recoverable costs and penalties. Given this complex overlap of

15    enforcement agencies and statutes, simply determining which standards of liability apply and what

16    costs are appropriate will be time consuming.

17          Further complicating the estimation process is the need to determine whether a

18    particular site presents a risk to the public health and welfare or the environment. Determining this

19    issue is a condition precedent to assessing environmental liabilities, and may involve an assessment

20    by scientific and environmental remediation experts who often differ among themselves.[32]

---

[29]Kane v. Johns-Manville Corp., 843 F.2d 636 (2d Cir. 1988); In re A.H. Robins Co., 880 F.2d 694 (4th Cir. 1989).

[30]E.g., DTSC, RWQCBs, EPA, California Department of Health Services, various California Air Quality Management Districts, California Department of Fish and Game, California Attorney General, and other certified local oversight agencies.

[31]E.g., the Federal Clean Water Act ("CWA"), Clean Air Act ("CAA"), Toxic Substance Control Act ("TSCA"), Resource Conservation and Recovery Act ("RCRA"), CERCLA, and California's Hazardous Substance Account Act ("HSAA"), Porter-Cologne Water Quality Control Act, common law claims such as nuisance and trespass law, Proposition 65, and the Fish and Game Code.

[32]E.g., chemists, geologists, hydrogeologists, toxicologists, environmental engineers and health risk assessors.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1   Experts and attorneys typically undertake studies and reach agreement to determine,

2   among other things, (1) the nature and extent of the investigation required, (2) the extent of the

3   contamination, (3) the feasibility and appropriateness of a remedial approach, including its cost-

4   effectiveness, (4) which party is responsible for which portion or volume of the contamination,

5   (5) whether a threat to the public health and welfare or the environment exits, (6) which cleanup

6   standards should apply, (7) the feasibility of attaining those standards, (8) the best remediation

7   methods to use under a given set of circumstances, and (9) what type of post-remediation monitoring

8   is appropriate.  Each of these factors can impact the cost of cleanup at a site and may need to be

9   evaluated prior to determining whether a cleanup is warranted, and if so the cost, which in turn

10  provides the basis upon which the estimate of the claims asserted against PG&E can be determined.

11          Further, in the common situation where multiple parties have owned, operated at, or

12  contributed to the contamination at a site, the Court will need to allocate the costs of cleanup among

13  those parties since PG&E as a practical matter only has real-world liability for its allocable share.

14  Application of these equitable apportionment factors is factually intensive.[33]  It can involve

15  generating, presenting and assessing volumes of historical, technical and financial information,

16  much of it in the form of expert opinion.  The discussion of Claims filed by the City and County of

17  San Francisco and the City of Vallejo demonstrate the complexity of the issues of property

18  ownership, overlapping releases of contaminates, hydrogeology and chemistry that can be involved

19  in allocating liability.

20          If the Court determines to estimate the environmental Claims on a Claim-by-Claim

21  basis, the Debtor's retention of an expert pursuant to Section 327(a) (or the Court's appointment of

22  an expert pursuant to Rule 706 or Section 105), who could develop the relevant facts and make

23  recommendations regarding the governing law, the allocation of liability and ultimately PG&E's

24  probable liability, would greatly streamline the estimation of these Claims for feasibility purposes.

25

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

---

26  [33]The courts are not limited to the Gore Factors and may consider any fact or set of factors that

27  reasonably relate to a PRPs "fault" in allocating liability.  United States v. Rohm & Haas Co., 939 F.
    Supp. 1142, 1151 (D.N.J. 1996).  See, e.g., Amoco Oil v. Borden, Inc., 889 F.2d at 673-674

28  (applying Gore Factors).

C.   A Statistical Approach To Estimation Of Environmental Claims In The Aggregate, With The Assistance Of An Expert, Appears To Be A More Efficient Estimation Alternative.

As is set out in the foregoing discussion, estimation of the value of the environmental claims brought by the State and private parties could prove to be a very lengthy, fact intensive and legally challenging endeavor, requiring a technical and legal analysis of the specific conditions and history at the many sites listed in the various Claims. This effort will be complicated by the need to deal with the many sites where no cost has been assigned for site remediation or where, as exists in many instances, duplicate or overlapping claims have been submitted.[34]

As the Court is aware, the Plan provides that all environmental claims will pass through the bankruptcy unimpaired. Plan §4.18. For this reason, the issue for the Court's consideration is in reality not the estimated aggregate amount of the environmental Claims at present, but rather, the amount of expense the reorganized Debtor can expect to face in the future on an annual basis as a result of the environmental liability upon which the environmental Claims are based. Thus, a more reasonable approach to estimating the value for sites where PG&E has not already resolved its liability through settlements or the entry of judicially approved Consent Orders is to utilize a statistical analysis to estimate the value of these Claims as they will be incurred over time.

For the past 15-plus years, PG&E has, under the supervision of State agencies, conducted an ongoing contamination remediation program[35] to address environmentally impaired sites. PG&E's budgeting and planning for the future of this remedial program remains consistent with the trend in past expenditures and resource commitments. PG&E expects, and there is no reason to believe otherwise, that this rate of expenditure and resource commitment will remain consistent into the future.

---

[34]In fact, government agencies have themselves filed duplicate and overlapping claims. The City and County of San Francisco, the DTSC and the SFBRWQCB have all filed claims for the Potrero Power Plant site; the DTSC and the Central Valley Regional Water Quality Control Board have filed claims for the Kern Power Plant Facility, while the DTSC and the SFBRWQCB have filed claims for Station T in San Francisco.

[35]See Motion for Authority to Continue Hazardous Substance Cleanup Program; Memorandum of Points and Authorities (docket no. 801), and supporting Declaration of Robert Doss (docket no. 802), filed with the Court on June 6, 2001, which together provide a detailed description of PG&E's historical remediation program and of agency oversight of that program.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    Based upon PG&E's history of expenditures and its experience and expertise in

2    implementing remedial programs, it is reasonable for the purposes of estimation to utilize this

3    historical information to derive a statistically and practically significant estimate of the realistic

4    value of the PG&E's true liability on a going-forward basis. Implementing a statistical procedure to

5    estimate these claims in the aggregate will eliminate the need to undertake the expensive and time-

6    consuming process of determining the value for each of the sites for estimation purposes, while

7    simultaneously providing the Court with an acceptable method to reasonably estimate all of the

8    environmental Claims for feasibility purposes.

9        Another advantage to the approach of estimating environmental Claims in the aggregate

10   based on statistical methodology is that there is no need to determine the significance, for Plan

11   feasibility estimation purposes, of POCs that do not state or incorporate any specific dollar amount.

12   Under the statistical approach to estimation that takes into account a variety of historical and current

13   data to estimate go-forward environmental liabilities in the aggregate, it is irrelevant whether any

14   particular POC states a dollar amount because the whole range of probable environmental liabilities

15   should in any event be included in the statistically-based estimation. On the other hand, if a Claim-

16   by-Claim approach is taken, one must decide what (if any significance) should be accorded to a

17   POC that fails to state any amount, i.e., whether such Claim must be estimated, or whether such

18   Claim should not be considered for feasibility purposes because it states no amount and therefore

19   should be presumed to be a zero dollar amount.[36]

20       If the Court determines to proceed with the statistical approach to estimating claims in

21   the aggregate, either PG&E should be authorized to retain pursuant to Section 327(a), or this Court

22   should retain pursuant to Rule 706 of the Federal Rules of Evidence or Section 105(a), an expert

23   qualified in assessment of environmental liabilities based on statistical analysis and extrapolation.

24       The estimation process selected, whether it be a technical/legal analysis of all sites set

25

26   [36]If the Court determines to proceed on a Claim-by-Claim approach to estimation with respect
     to any category of Claims, PG&E proposes that any POC in such category that does not state or
     incorporate any dollar amount should be valued at zero for Plan feasibility purposes, since there is
27   little basis to begin analyzing or estimating a Claim where the claimant has not been specific enough
     to state a dollar amount.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   out in the environmental Claims, on the one hand, or a statistical analysis based on historical

2   remediation efforts, on the other, will dictate the character of the estimation expert required for the

3   process.  In either case, the effort will require material time of one or more experts with significant

4   technical expertise in working with large volumes of information and data.

5

6                                                    IV.

7                                        GENERATOR CLAIMS

8           Sellers of power and ancillary services ("Generators") to the Power Exchange

9   Corporation ("PX") and Independent System Operator ("ISO"), supposedly for PG&E's benefit,

10  have filed over 200 Claims totaling about $8 billion.  Because these Claims vastly exceed the

11  amounts owed by the Debtor, PG&E will be filing objections if these Claims cannot be consensually

12  resolved.  However, because these objections may take a substantial time to resolve, PG&E will

13  request that the Court estimate the reasonable value of the Generators' Claims for Plan feasibility

14  purposes.  Through the estimation process, PG&E will seek to have the aggregate dollar amount of

15  generator Claims reduced by more than $5 billion for Plan feasibility purposes.[37]  The categories

16  described below are illustrative (but not a complete or exhaustive description) of the issues relevant

17  to the estimation of Generator Claims.  Each category involves many Claims, and many Claims fit

18  in more than one category.

19      A.     Generator Claims Asserting PG&E Owes Sums Actually Owed By Southern California

20             Edison.

21          Most Generators filed individual Claims for the aggregate amounts they believe PG&E,

22  Southern California Edison ("SCE"), the PX and ISO owe them.  PG&E's consultant has analyzed

23  the available data and allocated each Generator's charges between PG&E and SCE.  PG&E

24  estimates that approximately $850 million of the Generator Claims are properly attributable to SCE

25  and should be deducted from the gross amount of the Generator Claims.

26  _____

27      [37] After taking into account the results of the Court's estimation process and the ruling on
    PG&E's pending objections to duplicate claims, PG&E believes the Generator Claims ultimately
28  will be valued for Plan feasibility purposes at approximately $1.1 billion.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

B.  PX Cash Holdings.

The Generator Claims against PG&E also include approximately $400 million already paid by PG&E and others to the PX, but currently being held by the PX. This $400 million represents partial cash payments from PG&E and other market participants to the PX, as well as cash the PX has collected by calling on surety bonds and lines of credit. Normally, the PX would have distributed this cash to sellers of power upon receipt, but given the circumstances of non-payment and partial payment by various market participants, coupled with the bankruptcy of the PX, the PX did not pay this cash out to the generators. The PX is holding such cash pending the outcome of proceedings at FERC and other forums. Upon the conclusion of those proceedings, the $400 million in cash held by the PX will be distributed to parties with valid claims against the PX, as determined by those various proceedings. PG&E is prepared to demonstrate and support its estimation request with an analysis showing approximately $400 million of the Generator Claims are not owed by PG&E, but rather are owed by the PX and/or are attributable to the PX's cash holdings.

C.  Claims For Electricity And Ancillary Services Provided On Or After 1/17/01.

The PX, the Department of Water Resources ("DWR"), and many Generators have asserted claims for power purchases made on or after January 17, 2001. All of these purchases were made by DWR and ISO, not PG&E. Indeed, as of January 17, 2001, PG&E was precluded by the creditworthiness requirements of the ISO and PX tariffs from purchasing power from third-party suppliers. Under governing FERC orders and authorizing legislation, PG&E is not responsible for any charges for power purchases made on or after January 17, 2001. Many Generators did not segregate pre-January 17 and on-or-after-January 17 amounts in their Claim documentation, and PG&E will request estimation of those Claims based on its consultant's analysis of energy purchases by the ISO and DWR on or after January 17, 2001. PG&E's consultant has preliminarily estimated such power purchases made on or after January 17, 2001 at $1.5 billion.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

-33-

D.  Generator Claims Should Be Reduced By At Least $400 Million Because They Are Based On Prices FERC Has Determined  Are Subject To Refund As Unjust And Unreasonable.

FERC has found that prices charged by many Generators selling into the PX and ISO were not just and reasonable. FERC has held extensive hearings and issued a series of decisions ordering refunds from Generators selling into the PX and ISO after October 1, 2000, under specified criteria. On July 25, 2001, FERC issued an "Order Establishing Evidentiary Hearing Procedures, Granting Rehearing in Part, and Denying Rehearing in Part,"[38] that established the scope of, and methodology for, the calculation of refunds related to transactions in the electric spot markets operated by the ISO and the PX. The July 25 Order also set an evidentiary hearing to calculate the refunds based on the established methodology. FERC later issued a December 19, 2001 Order clarifying the scope of its July 25 Order and reaffirming the refund methodology set forth in that Order.[39]

PG&E's consultant has modeled the likely outcome of the FERC refund process, which probably will not be completed within any reasonable time frame contemplated for confirmation of the Plan. PG&E believes that the FERC-ordered refunds will reduce the Generator Claims by at least $400 million. PG&E therefore will request estimation of those Claims, based on its consultant's analysis of the anticipated FERC-ordered refund.

E.  The PX Claim Duplicating That Of The Generators.

The PX has asserted a Claim (no. 7411) for more than $1.7 billion for energy and ancillary services duplicating Claims of Generators which sold into the PX and ISO. A handful of Generators did not file Claims, but instead relied on the PX Claim to meet the claims bar date. For the most part, however, the PX Claim is duplicative of the Claims filed by Generators. PG&E will ask the Court to estimate the PX Claim to take into account only the Claims of those few Generators which did not file their own Claims.[40]

---

[38]San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 96 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,120 (July 25, 2001).

[39]San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 97 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,275 (December 19, 2001).

[40]PG&E intends to object to the PX Claim, at least to the extent it is duplicative of POCs ( . . . continued)

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

F.   Underscheduling Penalty Claims.

In December 2000, FERC ordered the ISO to assess underscheduling penalties to discourage market participants from using the ISO's real-time market as the primary spot market.[41] The underscheduling penalties were to be assessed by the ISO against underscheduling market participants and distributed to scheduling coordinators that could accurately schedule.[42] ISO market participants have filed Claims seeking approximately $400 million in underscheduling penalties. The penalties were stayed, and, upon rehearing, were invalidated by FERC before they were assessed by the ISO.[43] PG&E will object to all Claims seeking underscheduling penalties and will request the Court to estimate such Claims as zero for Plan feasibility purposes.

V.

ENERGY SERVICE PROVIDER CLAIMS

There are over $580 million in Claims from energy service providers ("ESPs") and their Direct Access ("DA") customers for a credit commonly referred to as the DA credit. DA customers purchase their energy from ESPs but use PG&E's distribution and transmission services. Pursuant to CPUC orders, these customers are charged by PG&E the same bundled service rate as other PG&E customers. However, since they buy their energy from an ESP, they receive a credit off the bundled service rate in an amount intended to approximate the energy component of PG&E's bundled service rate. The methodology for calculating the DA credit was established by the CPUC in Decision No. 97-08-056 and Resolution E-3510, and was intended to achieve the CPUC's objective of ensuring that during the rate freeze DA customers pay the same unbundled component

_____

(continued . . . )
timely filed by Generators. Alternatively, PG&E may object to the entire PX Claim as duplicative, and stipulate that those Generators who did not file their own POCs because they were included in the PX Claim can proceed to file their own POCs, which will be deemed to be timely filed.

[41]San Diego Gas & Elec. Co. v. Sellers of Energy & Ancillary Serv., 93 Fed. Energy Comm'n Rep. (CCH) ¶61,294 (December 15, 2000).

[42]97 Fed. Energy Comm'n Rep. ¶61,275; 93 Fed. Energy Comm'n Rep. ¶61,294, at 62,002-04.

[43]In re Distrigas of Mass. LLC., 93 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,275 (July 27, 2000).

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

charges, other than energy, as bundled service customers. The CPUC ordered PG&E to use the PX

price to approximate the energy component of the bundled rate, under the assumption the PX price

would reflect the amount PG&E actually saved by not being required to purchase energy for the DA

customers. As the PX prices began to skyrocket, so did the DA credit, and the DA customers'

charges from PG&E began to reflect amounts due to them from PG&E, i.e., the charges became

"negative." ·

PG&E believes the rate freeze and DA credit should have ended no later than August

2000. However, even assuming the rate freeze will not end until March 2002, the DA credit Claims

are overstated. FERC's July 25 Order discussed above effectively reduces PX wholesale energy

prices from October 2, 2000 to June 20, 2001, by requiring generators to refund amounts received or

due from the utilities for generation used during that period. FERC's July 25 Order reduces the DA

credit because it reduces the amount PG&E saved by not serving as the DA customers' ESP during

that period. The reduction of the PX price reduces the DA credit by approximately $100 million

from October 20, 2000 through January 17, 2001. Because it is unlikely the administrative

processes will be resolved within any reasonable time frame for obtaining confirmation of the Plan,

PG&E will seek a reduction in the amount of the DA credit Claims for Plan feasibility purposes.

PG&E believes a reasonable estimation can be made based on its consultant's FERC refund

analysis.

Further, some of the DA credit Claims are overlapping because both the ESPs and their

DA customers claim a right to the same DA credits. Thus, in the estimation process, PG&E also

will ask the Court to reduce the DA credit Claims by approximately $60 million due to duplicative

Claims.

VI.

COMMERCIAL CLAIMS

There are approximately nine miscellaneous commercial Claims for amounts totaling in

excess of $4 billion to which PG&E will be filing objections. However, because they are grossly

inflated and because it is unlikely they can be resolved any time soon, they will need to be estimated

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-36-

1  for feasibility purposes.

2      One such Claim, by Sierra Pacific Industries ("SPI"), is for "at least" $1,108,361,147,

3  mostly for alleged punitive damages, and arises out of PG&E's alleged interference with SPI's

4  efforts to sell its QF power at market prices well above the prices SPI had contracted to accept. The

5  Court is familiar with this Claim, having adjudicated preliminary injunction, partial summary

6  judgment and remand motions. The size of this Claim and its heavy reliance on punitive damages

7  make it appropriate for estimation, and by virtue of the nature of the Claim and this Court's

8  familiarity with it, it does not appear that retention of an expert is necessary or appropriate in

9  connection with such estimation.

10      The other commercial Claims total about $3 billion and could be estimated by the Court

11  with or without the assistance of an expert. They cover a wide range of causes of action. For

12  example, two Claims, aggregating over $100 million, are by irrigation districts alleging federal

13  antitrust violations stemming from PG&E's refusal to interconnect the districts' proposed electric

14  facilities. PG&E contended in federal court that each scheme proposed "sham wholesale"

15  transactions in violation of the Federal Power Act. The District Court's Order dismissing one of the

16  complaints without leave to amend is under submission to the Ninth Circuit. The other case is

17  currently inactive. Neither Claim is likely to be resolved within the timeframe contemplated by the

18  Plan.

19      Two other Claims for a total of almost $50 million are by 34 property developers

20  seeking punitive damages only, allegedly arising out of PG&E's failure to obtain CPUC approval

21  before changing the practice of paying refunds for gas franchise costs. The punitive nature of the

22  damages sought make these Claims particularly appropriate for estimation.

23      A $25 million Claim is by a residential developer for alleged breach of a contract to

24  relocate gas and electric transmission facilities. The claimant alleges it provided land to which the

25  facilities could be moved and PG&E alleges it did not. The Claim is grossly inflated because it fails

26  to take into account the existence of highly disputed factual and legal issues.

27      One QF has filed a Claim seeking approximately $10 million for alleged violation of the

28  fixed price period of its Interim Standard Offer 4 power purchase agreement. PG&E has

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  successfully defended identical suits by QFs before the same judge hearing the pending case. Other

2  commercial Claims assert a variety of breaches and violations allegedly arising under a variety of

3  causes of action.

4

5                                              VII.

6                                         TORT CLAIMS

7       PG&E believes that an expert could provide invaluable assistance in estimating the

8  aggregate value of the approximately 450 miscellaneous personal injury, wrongful death and

9  property damage Claims submitted as timely POCs. These Claims have an alleged value of more

10  than $315 million, which is significantly larger than any reasonable estimate of PG&E's true

11  liability to these claimants.[44]

12       Adjudicating and liquidating each of these 450 diverse Claims—ranging from slip and

13  falls to auto accidents to alleged asbestos exposure to electric contact wrongful death cases—will be

14  extremely fact-intensive. If considered individually, it could take many months of evidentiary

15  hearings to resolve these miscellaneous tort Claims, and such a protracted process will

16  disproportionately consume the Court and the Debtor's time and resources and will unduly delay

17  and frustrate the reorganization. An aggregate estimation procedure is the most reasonable method

18  for resolving these issues and Claims.

19       Accordingly, PG&E proposes that the Court authorize PG&E to retain (pursuant to

20  Section 327(a), or that the Court appoint (pursuant to Rule 706 or Section 105(a)) a

21  statistician/claims estimation expert to estimate the aggregate value of the miscellaneous tort Claims

22  based upon such factors as the number of Claims filed, the type or category of Claim made, the type

23  of injuries alleged, the data contained in the POCs submitted, and PG&E's historical litigation data

24  _____

25  [44]As an example of how inflated the alleged dollar value of these Claims is, between 1996 and
    2000, PG&E resolved an average of over 15,000 personal injury and property damage claims per
26  year, including litigation and pre-litigation claims, at an aggregate average cost of $31 million per
    year (excluding individual payments greater than $5 million and unusual events such as the 12/8/98
27  outage, which generated more than 19,000 claims.) Furthermore, PG&E's third-party claims
    department, which handles pre-litigation matters, is currently resolving bankruptcy claims at about
28  5% on average of the demand value.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-38-

1  from the last five years, including the average amount of the settlements for the various types of

2  claims in designated categories. The use of five years of historical data to determine a reasonable

3  estimate for these Claims is particularly logical and appropriate because PG&E's universe of

4  miscellaneous tort cases on April 6, 2001 was not materially different from any other time in the

5  previous five years. Under this proposal, the expert will review samples of historical claims within

6  the designated categories and will sort the POCs into similar categories. By using a variety of

7  statistical approaches predicated on PG&E's actual experience with similar type claims, the expert

8  will estimate the aggregate value of the miscellaneous tort Claims. Because so much historical data

9  is available for the estimation process, a statistically and practically significant estimate should be

10  possible without engaging in the time-consuming task of reviewing each claim on the merits. <u>See</u>

11  <u>generally</u> parallel discussion in Part III.C. above re environmental Claims. And, importantly, as

12  already noted, this estimation will have no binding effect on the individual claimants respecting the

13  allowable amount of their Claims or the distribution they will receive on their Claims.[45]

14       If an aggregate estimation method is not used, the 450 Claims will have to be addressed

15  individually, applying a fact-intensive, legal analysis. This would be a long, tedious process that

16  would constitute an unnecessary drain on the Court's resources and that is not necessary for Plan

17  feasibility determination purposes. Indeed, part of the reason a Claim-by-Claim review would be

18  difficult is because of the poor quality of information available in the POCs. Many of the tort

19  claimants have taken an unrealistic approach to the valuation of their Claims, perhaps believing that

20  there is settlement or other leverage in inflating rather than estimating actual worth. Thus, many

21  claimants have provided little in the way of information to readily and accurately assess liability and

22  damages. As to a significant number of the miscellaneous tort Claims, PG&E currently has little or

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

---

[45]Bankruptcy courts are constrained from utilizing abbreviated estimation procedures to definitively adjudicate and resolve personal injury and wrongful death claims, pursuant to 28 U.S.C. §157(b)(2)(B). However, bankruptcy courts may estimate such claims so long as that estimation is not for "the purposes of distribution." <u>See, e.g.</u>, <u>In re UNR Indus. Inc.</u>, 45 B.R. 322 (N.D.Ill. 1984). Accordingly, courts permit the use of estimation procedures to value tort claims for a variety of plan confirmation purposes, including determining whether a proposed plan is feasible. <u>See, e.g.</u>, <u>In re A.H. Robins Co.</u>, 88 B.R. 742, 751-52 (Bankr. E.D.Va. 1988), <u>aff'd</u>, 880 F.2d 694 (4th Cir. 1989); <u>In re Farley, Inc.</u>, 146 B.R. 748, 753 (Bankr. N.D. Ill. 1992); <u>In re Poole Funeral Chapel, Inc.</u>, 63 B.R. 527, 533-34 (Bankr. N.D. Ala. 1986).

1  no information other than that contained in the POC form and any accompanying attachments.

2  Discovery will be necessary to garner the data to individually evaluate each of these Claims.

3         The following will serve as a few illustrative examples of how overstated many of the

4  miscellaneous tort Claims are and how time-consuming it would be to individually assess the value

5  of these Claims:

6         •      One of the miscellaneous tort Claims against PG&E is for $14 million and arises out of

7  an explosion and fire that occurred at a residence.  Investigations by the police department, fire

8  department, District Attorney's office, and the Bureau of Alcohol, Tobacco and Firearms

9  determined the cause to be detonation of illegal fireworks in the home.  There are multiple

10  defendants named in this consolidated action.

11         •      A Claim for $5 million is premised on the notion that "balls of electricity" have flown

12  off the PG&E overhead lines causing personal and property damage to claimants.  Extensive testing

13  performed by public and private entities has not substantiated this Claim.  PG&E believes the actual

14  value of this Claim is zero.

15         •      Another Claim involves an auto accident in which the claimant rear-ended a PG&E

16  truck.  The personal injury Claim is for $1 million and alleges that claimant sustained a fractured

17  leg, cheek bone and jaw injury.  PG&E disputes liability and contends in any event that the damages

18  are vastly overstated.

19         •      A $1.4 million Claim is for contribution and indemnity for property damage allegedly

20  resulting from the diversion of water onto land owned by a recreation park.  PG&E is not a party to

21  the underlying lawsuit but has received a $1.4 million POC for indemnity from one of the

22  defendants named in the suit.  PG&E's sole information is limited to the assertions contained in the

23  complaint and the stated amount of the Claim.  Discovery will be required to determine the basis of

24  PG&E's alleged liability and the nature of the damages.

25         If the Court were required to individually review each of the tort cases, a tremendous

26  amount of judicial resources would be drained.  Therefore, the only logical and practical approach is

27  for the Court to make a "rough estimate" of the value of the claims requiring estimation for

28  feasibility purposes.  In re Thomson McKinnon Sec., 191 B.R. at 989.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    In addition to seeking estimation of the approximately 450 miscellaneous tort Claims,

2    PG&E will seek estimation by the Court of the Chromium Claims, consisting of the Claims filed by

3    approximately 1,250 individuals alleging exposure to chromium from PG&E's compressor stations

4    near Kettleman, Topock and Hinkley, California. Nearly all of the Chromium Claims were filed by

5    individuals who are plaintiffs in 15 civil lawsuits pending against PG&E in California courts.

6    According to their POCs, these claimants seek to recover approximately $580 million.[46] PG&E will

7    propose an estimate for the aggregate value of these Claims based upon such factors as (i) the

8    number of Chromium Claims filed, (ii) the particular PG&E facility from which a majority of those

9    plaintiffs claim exposure to chromium, (iii) the distance from the compressor station to the alleged

10   exposure locations, (iv) the type of claimed exposure (ingestion or inhalation), (v) the types of

11   injuries alleged, (vi) epidemiological data, (vii) scientific literature regarding chromium,

12   (viii) discovery responses, (ix) legal defenses, and (x) the POCs submitted.

13        PG&E's proposed estimated value of the Chromium Claims will also consider prior

14   settlements of other chromium cases. See In re Eagle-Picher Indus., Inc., 189 B.R. 681, 686 (S.D.

15   Ohio 1995) (estimating value of thousands of pre-petition personal injury asbestos cases; basing

16   estimation in part on settlement amounts of prior asbestos cases). Like the estimation process for

17   miscellaneous tort Claims, the estimation for Chromium Claims will be presented by noticed motion

18   to establish an aggregate estimate for Plan feasibility purposes, with no binding effect on PG&E or

19   the individual claimants in the pending cases or for any other purpose.

20        A motion for aggregate estimation is the most reasonable method for determining the

21   estimated value for Chromium Claims. If considered individually, it could take months of

22   evidentiary hearings to resolve them. Each individual claim presents questions regarding the alleged

23   method, duration and concentration of exposure. These issues will ultimately be resolved in the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

---

25   [46]There are approximately 1,450 personal injury Claims alleging chromium exposure,
     approximately 200 of which PG&E expects will be disallowed as duplicate claims. Approximately

26   1,050 of these individuals filed Claims aggregating approximately $580 million, and approximately
     210 of these individuals filed Claims for unknown amounts. PG&E expects that all of the

27   Chromium Claims (including those that state amounts and those that do not) will be estimated
     because it is requesting an aggregate approach to estimation of the Chromium Claims. See

28   footnote 37 supra and accompanying text.

1  pending litigation.  These issues are generally based upon detailed scientific and expert analysis of

2  groundwater contamination and air modeling.  The analysis must also include a determination of

3  whether the exposure alleged could have caused the particular ailments claimed.  These issues are

4  generally resolved by evaluating expert testimony from toxicologists, epidemiologists, particular

5  disease specialists and other medical professionals.  For example, the parties have estimated that

6  trial of 18 test cases involving these issues could take up to six months.

7            That level of detailed analysis for individual cases is not necessary to obtain a

8  reasonable aggregate estimate for Plan feasibility purposes.  Instead, the most reasonable method to

9  estimate the approximately 1,250 Chromium Claims for Plan feasibility purposes is to develop an

10  aggregate estimate by considering groups with similar characteristics.  For example, an examination

11  of categories of current claims based upon alleged exposure, type of injury and legal defenses can

12  provide a reasonable estimate of the value of the Chromium Claims.  Attempting to create that same

13  estimate by reviewing each individual case for each of these parameters to reach an estimate would

14  be a monumental and unnecessary task, given the limited purpose and effect of the estimation.  For

15  purposes of applying the feasibility test of Section 1129(a)(11), the aggregate estimation procedure

16  proposed by PG&E is the most reasonable and appropriate estimation method for the Chromium

17  Claims.

18

19                                              VIII.

20                              EMPLOYMENT CLAIMS

21            Approximately 15 litigants have filed employment-related POCs against the Debtor

22  totaling more than $110 million.  The amounts claimed are inflated in virtually all cases, sometimes

23  outrageously so.  One clear indicator of the extent to which employment Claims are very unrealistic

24  is that during the most recent five-year period for which data is fully available (from 1996 through

25  2000), the total paid out by PG&E in connection with employment-related litigation was $10.78

26  million, or an average of $2.15 million per year.  An expert experienced in the employment

27  litigation field would be able to assist in estimating the actual value of the inflated employment

28  Claims, which assert a variety of statutory and common law violations.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    For example, the largest Claim, seeking over $40 million, is a complex putative class

2    action lawsuit involving alleged violation of state and federal overtime laws. Specifically, four

3    employees purporting to represent 300 senior new business representatives, distribution engineers,

4    and others "similarly situated" allege PG&E improperly classified them as exempt administrators

5    and/or professionals, thus denying them overtime payments to which they were purportedly entitled.

6    The amount claimed is based on the assumption that all plaintiffs will prevail on all issues. PG&E

7    believes the claims do not meet the criteria for a class action, which then limits the number of

8    plaintiffs to four. Further, PG&E believes that plaintiffs have improperly calculated the number of

9    claimed overtime hours.

10    Several of the other employment Claims allege various forms of disability

11    discrimination, such as failure reasonably to accommodate an alleged disability, or wrongful

12    demotion. For example, one plaintiff, who seeks more than $36 million, suffers from a degenerative

13    condition and alleges that after years of attempting to accommodate his condition, PG&E

14    wrongfully removed him from his position as a fieldman in response to a physician's

15    recommendation after a fitness for duty exam. PG&E believes that this is a highly inflated claim.

16    One claim for $10 million is by a short-term former employee of Corestaff Services,

17    Inc., a PG&E contractor, who sued his former employer and several of its employees for wrongful

18    termination, and has named PG&E because it allegedly failed to respond to various complaints

19    plaintiff claims to have made against Corestaff. Corestaff has agreed to indemnify and defend

20    PG&E without reservation of rights. Particularly in view of the provision for indemnification, this

21    Claim has an actual value of zero, and, for Plan feasibility purposes, PG&E should have an

22    opportunity to so demonstrate to this Court.

23    Other Claims in this category requiring estimation allege sex discrimination, including

24    sexual harassment, intentional infliction of emotional distress, retaliation, and/or wrongful

25    termination.

26

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

-43-

CONCLUSION

Based on the foregoing, PG&E respectfully requests that this Court make and enter its order determining the processes and procedures for estimating the Claims in a timely fashion for purposes of determining the feasibility of the Plan under Section 1129(a)(11).

DATED: March 1, 2002

Respectfully,

HOWARD, RICE, NEMEROVSKI, CANADY,
FALK & RABKIN
A Professional Corporation

By: _Jeffrey L. Schaffer_
JEFFREY L. SCHAFFER

Attorneys for Debtor and Debtor in Possession
PACIFIC GAS AND ELECTRIC COMPANY

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation