1  JAMES L. LOPES (No. 63678)
JEFFREY L. SCHAFFER (No. 91404)
2  JANET A. NEXON (No. 104747)
HOWARD, RICE, NEMEROVSKI, CANADY,
3    FALK & RABKIN
A Professional Corporation
4  Three Embarcadero Center, 7th Floor
San Francisco, California  94111-4065
5  Telephone:   415/434-1600
Facsimile:    415/217-5910
6
Attorneys for Debtor and Debtor in Possession
7  PACIFIC GAS AND ELECTRIC COMPANY

8  ROGER J. PETERS (No. 77743)
IATHAN T. ANNAND (No. 70009)
9  MICHAEL D. WHELAN (No. 58617)
PACIFIC GAS AND ELECTRIC COMPANY
10  77 Beale Street
San Francisco, California  94105
11  Telephone: 415/973-7000
Facsimile:  415/973-5520

12

13              UNITED STATES BANKRUPTCY COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                 SAN FRANCISCO DIVISION

16

17  In re

18  PACIFIC GAS AND ELECTRIC COMPANY, a          Case No. 01-30923 DM
California corporation,
19                                               Chapter 11 Case
            Debtor.
20                                               Date:    March 27, 2002
Federal I.D. No. 94-0742640                  Time:    9:30 a.m.
21                                               Place:   235 Pine Street, 22nd Floor
                                                         San Francisco, California
22                                               Judge:   Honorable Dennis Montali

23

24

25  DECLARATION OF IATHAN T. ANNAND IN SUPPORT OF PG&E'S MOTION FOR ORDER
DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN
26                       FEASIBILITY PURPOSES

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

I, Iathan T. Annand, declare:

1. I am the Chief Counsel, Litigation in the Law Department of Pacific Gas and Electric Company ("PG&E" or the "Debtor"). I make this Declaration in support of PG&E's Motion For Order Determining Procedures For Estimating Certain Claims For Plan Feasibility Purposes (together with its accompanying Memorandum of Points and Authorities, the "Motion"). Unless otherwise expressly specified herein, all capitalized words and terms used in this Declaration have the same meanings ascribed to them in the Motion.

2. In my above-identified capacity, I directly or indirectly supervise the attorneys in PG&E's Law Department involved in analyzing and responding to claims asserted against PG&E in its Chapter 11 case, as well as outside counsel who are retained from time to time in connection with certain claims asserted against PG&E. By virtue of my knowledge and experience in dealing with claims asserted against PG&E, I also have been very involved in the process of dealing with the proofs of claim filed in PG&E's pending Chapter 11 case. I have concluded that estimation of the categories of claims specified in the Motion is necessary for purposes of determining Plan feasibility within any reasonable and practicable time frame because it likely will take years for all claims to be fully resolved, particularly in light of the pass-through treatment of environmental and tort claims under the pending Plan.

3. I have gathered and set forth the facts contained in this Declaration in order to shed light on the range and complexity of some of the larger claims filed in this case, so that the Court can better understand the need for the estimation of various claims and the need for a reasonable process and procedure for such estimation. In gathering the facts set forth in this Declaration to support the Motion, I necessarily have had to draw on the knowledge and information of numerous persons within PG&E, because there is no one person within PG&E who has first-hand knowledge about all of the facts and data described in this Declaration and the Motion. Accordingly, all of the information set forth in this Declaration is either based on my own knowledge, or is based on information and belief. If called as a witness, I could and would testify competently to the facts set forth herein.

4. PG&E will contend in the estimation process that many of the large claims filed in this

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

case are grossly inflated. This is particularly the case with environmental, generator, energy service provider, tort and employment claims and certain commercial claims. PG&E intends to object to allowance of all or a portion of many of these claims, and the objection process has begun.

5. Approximately 13,000 proofs of claim ("POCs") have been filed in this case aggregating over $44 billion.[1] (A very small percentage of the filed claims account for a huge percentage of the total claimed amount, such that less than 10% of the aggregate number of filed claims account for approximately 90% of the aggregate amount of filed claims.) Many of the filed claims are small, simple trade payables or are otherwise reasonably amenable to speedy liquidation (80% are for amounts less than $100,000). However, a number of the claims are large, complex, and not necessarily readily subject to resolution. These include approximately 112 environmental claims covering hundreds of sites for a total of approximately $1 billion, over 200 generator claims totaling about $8.4 billion, approximately 50 claims filed by energy service providers totaling more than $580 million, approximately nine commercial claims totaling over $4 billion, approximately 1,250 chromium-related tort claims totaling approximately $580 million, approximately 450 miscellaneous tort claims totaling more than $315 million, and approximately 15 employment claims totaling over $110 million (hereinafter collectively referred to as the "Claims").

6. Estimation of the Claims is likely to require substantial time and attention because of their volume, diversity and complexity. Accordingly, to make the Claims estimation process as efficient as reasonably possible, PG&E requests that the Court consider the following suggested procedures and process for estimating the Claims, broken down by type:

- Environmental Claims. Retention of a Court-approved expert to evaluate the approximately 112 environmental Claims[2] involving over 548 separate sites and totaling

---

[1]  · This $44 billion figure includes approximately $9 billion of claims that already have been disallowed. See footnote 3 infra. In addition, PG&E is in the process of filing objections to various facially duplicative claims (having already filed two such objections covering numerous duplicative claims and intending to file additional objections to other groups of duplicative claims), which should be resolved relatively soon and further reduce the existing aggregate claims.

[2]  "Environmental claims" that PG&E proposes be subject to estimation include all environmental claims for which timely POCs have been filed alleging pre-petition claims, except, to the extent discussed in footnote 8 infra and its accompanying text, claims that do not state or refer to any dollar amount.

Case: 01-30923    Doc# 5009    Filed: 03/01/02 -2 Entered: 03/05/02 15:16:00    Page 3 of 25

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 approximately $1 billion. The expert would report to the Court with a recommendation regarding

2 the estimated amount PG&E will reasonably need to address these Claims. The expert could be

3 empowered to determine in the first instance, subject to the Court's approval, the appropriate

4 procedures for accomplishing the estimation (e.g., statistical methodologies, nature of

5 recommendations to the Court). The expert should be highly experienced in the evaluation of

6 liability and damages for all types of statutory and common law environmental claims, impartial,

7 and available to devote substantial time to the task over a relatively short period. Subject to the

8 Court's approval, PG&E proposes to file appropriate papers on or before April 17, 2002 for the

9 retention of such expert, coupled with a motion for the Court's estimation of such environmental

10 Claims for feasibility purposes at such time as the Court has the benefit of such expert's report.

11 • Commercial Claims. Retention of a Court-approved expert to evaluate approximately

12 nine commercial Claims[3] totaling approximately $4 billion, and report back to the Court with a

13 recommendation regarding the estimated amount PG&E will reasonably need to address them. The

14 expert could be empowered to determine in the first instance, subject to the Court's approval, the

15 appropriate procedures for accomplishing the estimation. Such expert should be highly experienced

16 in the evaluation of liability and damages for contract and other commercial claims, impartial, and

17 available. Subject to the Court's approval, PG&E proposes to file appropriate papers on or before

18 April 17, 2002 for the retention of such expert, coupled with a motion for the Court's estimation of

19 such commercial Claims for feasibility purposes at such time as the Court has the benefit of such

20 expert's report.

21 • Employment Claims. Retention of a Court-approved expert to evaluate approximately

22 15 employment Claims[4] totaling about $110 million and report back to the Court with a

23 recommendation regarding the estimated amount PG&E will reasonably need to address these

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

---

[3]    "Commercial claims" that PG&E proposes be subject to estimation include all commercial claims for
which a timely POC in excess of $5 million has been filed, with the exception of two large claims
aggregating $9 billion (one filed by Baldwin Associates, Inc. and the other by Wayne Roberts) that already
have been disallowed by separate orders dated January 23, 2002 (docket nos. 4490, 4488).

[4]    "Employment claims" that PG&E proposes be subject to estimation include approximately 15 claims
by litigants alleging pre-petition employment law-related claims who have filed timely POCs.

Claims. The expert could be empowered to determine in the first instance, subject to the Court's approval, the appropriate procedures for accomplishing the estimation. Such expert should be available, impartial, and highly experienced in the evaluation of liability and damages for all types of statutory and common law employment claims. Subject to the Court's approval, PG&E proposes to file appropriate papers on or before April 17, 2002 for the retention of such expert, coupled with a motion for the Court's estimation of such employment Claims for feasibility purposes at such time as the Court has the benefit of such expert's report.

- Generator Claims. Estimation by the Court of several categories of generator Claims[5] totaling over $8 billion. Subject to the Court's approval, PG&E proposes to file one or more motions for estimation on or before April 17, 2002 for the estimation of these Claims.

- Energy Service Provider Claims. Estimation by the Court of Energy Service Provider ("ESP") Claims aggregating more than $580 million. Subject to the Court's approval, PG&E proposes to file a motion for the estimation of such Claims on or before April 17, 2002.

- SPI Commercial Claim. Estimation by the Court of one commercial Claim, asserted by Sierra Pacific Industries ("SPI"), for more than $1 billion, with which the Court is already familiar. Subject to the Court's approval, PG&E proposes to file a motion on or before April 17, 2002 for the estimation of this Claim.

- Tort Claims. Retention of a Court-approved expert to assist the Court in estimating, on an aggregate basis, approximately 450 miscellaneous tort Claims totaling more than $315 million,[6] based on the application of statistical methodology to relevant litigation data accumulated by PG&E over the last five years. PG&E also will ask the Court to estimate the reasonable aggregate value of

---

[5]    "Generator claims" that PG&E proposes be subject to estimation include all claims by generators and related entities such as the PX and ISO which have filed timely POCs alleging amounts owed pre-petition, except, to the extent discussed in footnote 8 _infra_ and its accompanying text, claims that do not state or refer to any dollar amount.

[6]    "Tort claims" that PG&E proposes be subject to estimation include all claims for personal injury, wrongful death, and property damage by persons who have filed timely POCs alleging pre-petition torts, _except_ (i) claims for workers' compensation, (ii) those pre-litigation claims that PG&E has assigned to its Safety, Health and Claims Department for resolution and that have been or are anticipated to be fully resolved through this process, and (iii) to the extent discussed in footnote 8 _infra_ and its accompanying text, those claims that do not state or refer to any dollar amount.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
_A Professional Corporation_

1   approximately 1,250 additional personal injury tort Claims, with an alleged value of approximately

2   $580 million, that relate to alleged exposure to chromium from particular PG&E compressor

3   stations (the "Chromium Claims"). Subject to the Court's approval, PG&E proposes to file

4   appropriate papers on or before April 17, 2002 for the retention of the expert to be retained in

5   connection with valuation of the miscellaneous tort Claims, coupled with a motion for the Court's

6   estimation of such Claims for feasibility purposes at such time as the Court has the benefit of such

7   expert's analysis. Additionally, subject to the Court's approval, PG&E will file a motion on or

8   before April 17, 2002 for the Court's estimation of the Chromium Claims for feasibility purposes.

9        7.   PG&E proposes that it submit to the Court a list of proposed experts in the various

10  relevant subject areas (including a detailed curriculum vitae of each such proposed expert) along

11  with its applications for retention of such experts, and that the form of order(s) appointing the

12  experts shall expressly charge and instruct the experts to be impartial in reviewing and analyzing

13  relevant data and formulating recommendations as to estimated values of Claims. Accordingly,

14  subject to the Court's approval, PG&E will move for appointment of relevant experts to assist in the

15  estimations process.

16       8.   A fuller description of the categories of Claims requiring such estimation, and PG&E's

17  requests and suggestions for the most reasonable and practicable way of moving forward with such

18  estimation, follows.

19  **ENVIRONMENTAL CLAIMS:**

20       9.   PG&E's will contend in the estimation process that the actual amount of environmental

21  liabilities attributable to PG&E is a small percentage of the amounts asserted. By the very nature of

22  these environmental Claims, finally adjudicating and liquidating these Claims insofar as they may

23  be attributable to PG&E will be a long and complex process, conceivably stretching over years.

24  Indeed, it is in part because of the complexities and long-term horizon in resolving many

25  environmental claims that the Plan Proponents, at the urging of key environmental claimants, have

26  provided for treatment under the Plan for all timely asserted environmental claims, meaning that for

27  virtually all purposes such claims will be resolved in the ordinary course under applicable non-

28  bankruptcy law in non-bankruptcy forums. See Plan §4.18. Therefore estimation of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  environmental Claims for feasibility purposes is essential.

2      10.  The State of California ("State"), through the Department of Toxic Substance Control

3  ("DTSC"), the Regional Water Quality Control Boards ("RWQCBs"), and other divisions, has filed

4  eight Claims involving alleged environmental liability at approximately 535 sites throughout

5  California, and asserts that PG&E owes three-quarters of a billion dollars in related cleanup,

6  oversight and monitoring costs, as well as other costs and penalties.  (See, e.g., Claim Nos. 12680-

7  12682 filed by DTSC and Claim Nos. 12684, 12689-12692 and 12694 filed by various Regional

8  Water Quality Control Boards.)  Private party claimants and local or quasi-governmental agencies

9  (collectively "Non-State Claimants") have filed 113 Claims involving alleged environmental

10  liability at a number of these same sites, as well as at other sites in California.  These Non-State

11  Claimants collectively assert PG&E owes approximately $259 million for PG&E's alleged share of

12  cleanup, oversight, monitoring and other costs and penalties.

13      11.  PG&E will contend in the estimation process that the actual amount of environmental

14  liabilities attributable to PG&E is a small percentage of the Claims values submitted by the State

15  and Non-State Claimants (collectively "Environmental Claimants").   PG&E further will contend

16  that the inflated amount of the State's estimates is illustrated by three of the State's Claims.  In these

17  three Claims alone – Casmalia Landfill, GBF/Pittsburgh Landfill and the "Substation Sites" – the

18  State asserts that PG&E is solely responsible for $432 million in cleanup costs.

19      12.  The Casmalia Landfill in Central California is being closed under the direction of the

20  Environmental Protection Agency ("EPA") pursuant to the Comprehensive Environmental

21  Response; Compensation and Liability Act ("CERCLA"), 42 U.S.C. §9601, et seq.  During its

22  operation, over 10,000 entities, including the State, PG&E and many Fortune 500 companies, sent

23  hazardous wastes for disposal at this site.  About 50 of those parties, including PG&E, have formed

24  a steering committee that has entered into a judicially approved consent order with EPA to

25  investigate the landfill contamination, establish the appropriate remedy, and install a functioning

26  remedial system.  EPA has filed a claim in this bankruptcy case maintaining its authority to direct

27  PG&E regarding PG&E's allocated share of costs at Casmalia. (Claim No. 12677).

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

13.   Notwithstanding the foregoing, DTSC has filed a Claim alleging PG&E owes it $294 million for Casmalia – the underline total cost for cleaning up the landfill (Claim No. 12682, at Exhibit 1, Table H).  PG&E will content in the estimation process that the State's Claim overlooks the following facts, which are a matter of public record: (1) over 10,000 entities are responsible for waste disposal at the site; (2) PG&E contributed less than 5.2% of the manifested waste sent there; (3) the State itself is a responsible party at the site and contributed a significant volume of waste to the site; (4) EPA brought the enforcement action, not the State; (5) substantial remediation work already has been completed at the site under an agreement with EPA; (6) PG&E already has paid most of the costs it owes under that agreement; and (7) the agreement with EPA looks to other, additional parties as responsible for ongoing cleanup activities through the point where a final remedy is implemented.  Those other parties include many large, financially viable companies.

14.   The State's $294 million Casmalia-related Claim apparently rests upon the theory that should it ever file an action (even though EPA already has done so), joint and several liability theoretically could be available under environmental statutes such as CERCLA.  The State might then require PG&E to pay for the entire $294 million cleanup, despite PG&E's status as but one of thousands of companies that sent waste to the site, and despite EPA's ongoing enforcement of CERCLA.

15.   Accordingly, PG&E will contend in the estimation process that its actual liability at the Casmalia Landfill is a  fraction of the $294 million amount set forth in the State's Claim.

16.   The State's Claim asserts that PG&E has over $37 million in liability for cleanup of the GBF/Pittsburg Landfill, again apparently on the theory that PG&E could be jointly and severally liable for the entire cost of cleaning up the site.  As with Casmalia, PG&E will contend in the estimation process that the State's Claim overlooks relevant facts which are a matter of public record, such as: (1) hundreds of parties have sent waste to this landfill over many years; (2) DTSC's cleanup orders regarding the landfill list between 50 and 100 responsible parties, many of which are large, financially viable entities; and (3) PG&E contributed less than 1% of the waste at the site.

17.   PGE will contend in the estimation process that PG&E's actual dollar exposure at the GBF/Pittsburg Landfill is likely zero.  Many of the responsible parties identified by DTSC in its

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  cleanup order, including PG&E and the former landfill owner and operator, have entered into a

2  settlement agreement for the GBF site. Under the terms of this agreement TRC, a reputable

3  remediation company that has successfully remediated several sites, took possession of the GBF site

4  and is undertaking the cleanup obligations there. As part of the settlement, TRC's performance has

5  been secured by $120 million in insurance, and PG&E is indemnified for all claims by any person or

6  agency arising out of the contamination. In fact, DTSC has been working with TRC over the past

7  year on implementation of a final remedial action plan ("RAP") for the site.

8      18.  The State's Claim asserts that PG&E owes $100 million for hundreds of substations

9  scattered across Northern California (Claim No. 12690 by the San Francisco Bay Regional Water

10  Quality Control Board ("SFBRWQCB"), at 2 and Exhibit 2), several of which are no longer owned

11  or operated by PG&E. The State claims this $100 million (about $300,000 for each substation) is

12  for "future investigation and remedial action" of polynuclear aromatic hydrocarbons ("PAHs") and

13  PCBs. The only documentation it has submitted for this Claim, however, is an alphabetical list of

14  301 substations. PG&E will contend in the estimation process that the State's assumption that

15  remediation is or may be required at all these 301 sites, and its claim that PG&E is a "significant

16  source" of contamination, are factually unsupported. For example, the State listed all 32 substations

17  in San Francisco as sites that allegedly contributed to its $100 million estimate. PG&E will contend

18  in the estimation process that it is improbable that many of the listed substations could be the source

19  of soil or groundwater contamination. For example, 13 of the listed substations are located within

20  buildings or concrete vaults and have at least one, and often several, concrete building floors

21  between the substations and any soil or groundwater. One of those substations is located on the 54th

22  floor of the Bank of America building in downtown San Francisco. Further, not all of the equipment

23  in substations listed in the Claim of the San Francisco Bay Regional Water Quality Control Board is

24  classified as PCB equipment, which significantly impacts remediation costs. Similar facts apply to

25  the City of Oakland substations listed by the State.

26      19.  In addition, the San Francisco Bay Regional Water Quality Control Board is aware of

27  PG&E's pilot program for investigation of substations. As part of that program, 12 larger

28  substations were selected for testing, and over 200 soil samples were taken in close proximity to the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

-8-

electrical equipment at those substations. None of those samples detected PAHs, and none contained PCB concentrations at or above actionable levels. Consequently, PG&E will contend in the estimation process that the data available on these sites indicates the State's estimates of cleanup costs are vastly overstated, if not entirely speculative. Absent factual support that an identifiable and imminent threat of harm to the public health and welfare or the environment exists, PG&E will contend in the estimation process that these claims should fairly be valued at zero.

20. PG&E has previously entered into Consent Decrees and other Settlement Agreements resolving its liability for at least seven of the sites listed by the State in its Claims, including, for example, the Casmalia and GBF Landfills discussed above. Pursuant to these Consent Decrees and Settlement Agreements, PG&E has liquidated its obligations for the presence of contaminants at these sites.

21. The State assigns a value of $340,058,178 to those sites, claiming PG&E is 100% responsible for those costs. PG&E will contend in the estimation process that PG&E already has paid its allocable share of the cleanup costs in settlement either to EPA, the State itself, or to other Potentially Responsible Parties ("PRPs"). Under these Settlement Agreements, the other PRPs are contractually obligated to pay for cleanup. Under the Consent Decrees, EPA or the State itself have provided contribution protection to PG&E. Thus, PG&E believes the Court should examine and estimate this Claim for feasibility purposes.

22. Generally, cleanup of a contaminated property is a multi-phased project and costs are not incurred or paid all at once or immediately. Rather, the costs of investigation, remediation and monitoring are spread out over an extended period. Based on PG&E's experience, the average time for cleaning up manufactured gas plant ("MGP") sites is in excess of six years, with smaller costs incurred in the early years. The time required to clean up a landfill could be decades depending upon the size of the landfill and the nature of the contamination. Remediation costs at other types of sites are similarly spread out over time.

23. Nonetheless, the State's claims are styled as if the entire amounts are to be paid all at once. PG&E will contend in the estimation process that the relevant consideration is the expected annual expenditures of PG&E for environmental liabilities. PG&E incurred expenditures of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 approximately $16 million for its entire hazardous substances cleanup program in 1999, and

2 approximately $18.5 million in 2000. PG&E's cleanup budgets for 2001 and 2002 are consistent

3 with the amounts expended in prior years.

4     24. PG&E in the estimation process will contend that Claims filed by non-state claimants

5 are similarly flawed. Many of these Claims overlap those of the State, and often are based on

6 invalid assumptions. In some the claimant is itself a PRP and the asserted value of such Claims is

7 not always limited to that portion of costs incurred that exceeded or is likely to exceed the

8 claimant's own equitably allocated share. The following examples illustrate some of the complex

9 issues raised by these frequently overlapping Claims.

10     • The City and County of San Francisco has filed a Claim regarding various sites that it

11 collectively values at over $75 million. Many of these Claims, such as the $56 million Claim

12 (Claim No. 12640) relating to the Potrero Power Plant ("PPP"), address sites that are the subject of

13 claims filed by multiple claimants and typically involve a complex land use history. $37 million of

14 this $56 million Claim is apparently based on a contractual obligation by PG&E to Mirant

15 Corporation for remediation of the power plant site as a new plant is built. PG&E will contend in

16 the estimation process that the City has no standing under the contract or relevant environmental law

17 to assert the Claim. In addition, as a matter of public record, the City is itself a PRP because its

18 adjacent property was historically used as a sugar refinery, steel mill and towing yard.

19     • The City of Vallejo has filed two Claims regarding a single MGP site in Vallejo, each

20 for over $33 million, which MGP site is also subject to two State Claims in excess of $1.6 million

21 (Claim Nos. 9805, 10598). In the estimation process PG&E will contend that these Claims, in

22 addition to being duplicates, seek cleanup costs for environmental conditions associated with the

23 long history of industrial uses in the area, including ship building, auto wrecking, fuel storage, and

24 Kaiser steel operations, with which PG&E was not involved.

25     25. PG&E understands that under pertinent law, in undertaking this estimation process, the

26 Court should follow applicable environmental law as closely as possible. For example, where

27 equitable allocations among multiple responsible parties are appropriate, as is typically the case, a

28 claim should reflect only the Debtor's allocated share. Estimating the actual values allocable to

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  PG&E will require an understanding of the allocation decisions of multiple state and federal non-

2  bankruptcy courts applying sometimes divergent and contradictory state and federal substantive law

3  and complex scientific evaluations to an array of factual scenarios. Simply determining how

4  estimated environmental liability should be allocated at each of hundreds of sites will be time

5  consuming.

6      26.  For example, depending upon the source of a release, the chemical(s) released, and the

7  types of media impacted, various agencies could have overlapping and conflicting jurisdiction (e.g.,

8  DTSC, RWQCBs, EPA, California Department of Health Services, various California Air Quality

9  Management Districts, California Department of Fish and Game, California Attorney General, and

10  other certified local oversight agencies). Each of these agencies has its own statutory authority,

11  standards, procedures, methods and requirements for public input, enforcement mechanisms,

12  preferred scientists, consultants and attorneys, allocation procedures, and cleanup obligation

13  enforcement. In addition, any number of overlapping state and federal statutes could be implicated

14  in a given claim (e.g., the Federal Clean Water Act ("CWA"), Clean Air Act ("CAA"), Toxic

15  Substance Control Act ("TSCA"), Resource Conservation and Recovery Act ("RCRA"), CERCLA,

16  and California's Hazardous Substance Account Act ("HSAA"), Porter-Cologne Water Quality

17  Control Act, common law claims such as nuisance and trespass law, Proposition 65, and the Fish

18  and Game Code). Each of these statutes has its own standards for establishing liability, the basis for

19  cost recovery, cleanup procedures, standards and goals, and recoverable costs and penalties. Given

20  this complex overlap of enforcement agencies and statutes, simply determining which standards of

21  liability apply and what costs are appropriate will be time consuming.

22      27.  Further complicating the estimation process is the need to determine whether a

23  particular site presents a risk to the public health and welfare or the environment. Determining this

24  issue is a condition precedent to assessing environmental liabilities, and may involve an assessment

25  by scientific and environmental remediation experts who may differ among themselves (e.g.,

26  chemists, geologists, hydrogeologists, toxicologists, environmental engineers and health risk

27  assessors).

28      28.  Experts and attorneys typically undertake studies and reach agreement to determine,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

among other things, (1) the nature and extent of the investigation required, (2) the extent of the contamination, (3) the feasibility and appropriateness of a remedial approach, including its cost-effectiveness, (4) which party is responsible for which portion or volume of the contamination, (5) whether a threat to the public health and welfare or the environment exits, (6) which cleanup standards should apply, (7) the feasibility of attaining those standards, (8) the best remediation methods to use under a given set of circumstances, and (9) what type of post-remediation monitoring is appropriate. Each of these factors can impact the cost of cleanup at a site and may need to be evaluated prior to determining whether a cleanup is warranted, and if so the cost, which in turn provides the basis upon which the estimate of the claims asserted against PG&E can be determined.

29. Further, in the common situation where multiple parties have owned, operated at, or contributed to the contamination at a site, in estimating the value of environmental Claims the Court will be asked to allocate the costs of cleanup among those parties. Application of equitable apportionment factors is factually intensive. It can involve generating, presenting and assessing volumes of historical, technical and financial information, much of it in the form of expert opinion. The discussion of Claims filed by the City and County of San Francisco and the City of Vallejo demonstrate the complexity of the issues of property ownership, overlapping releases of contaminates, hydrogeology and chemistry that can be involved in allocating liability.

30. If the Court determines to estimate the environmental Claims on a Claim-by-Claim basis, the Debtor's retention of an expert pursuant to Section 327(a) (or the Court's appointment of an expert pursuant to Rule 706), who could develop the relevant facts and make recommendations to the Court regarding the governing law, the allocation of liability and ultimately PG&E's probable liability, would greatly streamline the estimation of these Claims for feasibility purposes.

31. As is set out in the foregoing discussion, estimation of the value of the environmental claims brought by the State and private parties could prove to be a very lengthy, fact intensive and legally challenging endeavor, requiring a technical and legal analysis of the specific conditions and history at the many sites listed in the various Claims. This effort will be further complicated by the need to deal with the many sites where no cost has been assigned for site remediation or where, as exists in many instances, duplicate or overlapping claims have been submitted. The City and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  County of San Francisco, the DTSC and the SFBRWQCB have all filed claims for the Potrero

2  Power Plant site; the DTSC and the Central Valley Regional Water Quality Control Board have filed

3  claims for the Kern Power Plant Facility, while the DTSC and the SFBRWQCB have filed claims

4  for Station T in San Francisco.

5      32.  The Plan provides that all environmental claims will pass through the bankruptcy

6  unimpaired.  Plan §4.18.  For this reason, PG&E will contend in the estimation process that the issue

7  for the Court's consideration is in reality not the estimated aggregate amount of the environmental

8  Claims at present, but rather, the amount of expense the reorganized Debtor can expect to face in the

9  future on an annual basis as a result of the environmental liability upon which the environmental

10  Claims are based.  Thus, a more reasonable approach to estimating the value for sites where PG&E

11  has not already resolved its liability through settlements or the entry of judicially approved Consent

12  Orders is to utilize a statistical analysis to estimate the value of these Claims as they will be incurred

13  over time.

14      33.  For the past 15-plus years, PG&E has, under the supervision of State agencies,

15  conducted an ongoing contamination remediation program[7] to address environmentally impaired

16  sites.  PG&E's budgeting and planning for the future of this remedial program remains consistent

17  with the trend in past expenditures and resource commitments.  PG&E expects, and there is no

18  reason to believe otherwise, that this rate of expenditure and resource commitment will remain

19  consistent into the future.

20      34.  Based upon PG&E's history of expenditures and its experience and expertise in

21  implementing remedial programs, it is reasonable for the purposes of estimation to utilize this

22  historical information to derive a statistically and practically significant estimate of the realistic

23  value of the PG&E's true liability on a going forward basis.  Implementing a statistical procedure,

24  through the use of an expert to assist the Court, to estimate these claims in the aggregate will

25  eliminate the need to undertake the expensive and time-consuming process of determining the value

26  ───────────────────────

[7]    See Motion for Authority to Continue Hazardous Substance Cleanup Program; Memorandum of Points

27  and Authorities (docket no. 801), and supporting Declaration of Robert Doss (docket no. 802), filed with the
Court on June 6, 2001, which together provide a detailed description of PG&E's historical remediation

28  program and of agency oversight of that program.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  for each of the sites for estimation purposes, while simultaneously providing the Court with an

2  acceptable method to reasonably estimate all of the environmental Claims for feasibility purposes.

3      35.  Another advantage to the approach of estimating environmental Claims in the aggregate

4  based on statistical methodology is that there is no need to determine the significance, for Plan

5  feasibility estimation purposes, of POCs that do not state or incorporate any specific dollar amount.

6  Under the statistical approach to estimation that takes into account a variety of historical and current

7  data to estimate go-forward environmental liabilities in the aggregate, it is irrelevant whether any

8  particular POC states a dollar amount because the whole range of probable environmental liabilities

9  should in any event be included in the statistically-based estimation.  On the other hand, if a Claim-

10  by-Claim approach is taken, one must decide what (if any significance) should be accorded to a

11  POC that fails to state any amount, i.e., whether such Claim must be estimated, or whether such

12  Claim should not be considered for feasibility purposes because it states no amount and therefore

13  should be presumed to be a zero dollar amount.[8]

## GENERATOR CLAIMS

15      36.  Sellers of power and ancillary services ("Generators") to the Power Exchange

16  Corporation ("PX") and Independent System Operator ("ISO") have filed over 200 Claims totaling

17  about $8 billion.  PG&E will contend in the estimation process that these Claims vastly exceed the

18  amounts owed by the Debtor,  and PG&E will be filing objections if these Claims cannot be

19  consensually resolved.  However, because these objections may take a substantial time to resolve,

20  PG&E will request that the Court estimate the reasonable value of the Generators' Claims for Plan

21  feasibility purposes.  Through the estimation process, PG&E will seek to have the aggregate dollar

22  amount of generator Claims reduced by more than $5 billion for Plan feasibility purposes.  After

23  taking into account the results of the Court's estimation process and the ruling on PG&E's pending

24  objections to duplicate claims, PG&E will contend in the estimation process that the Generator

25  Claims ultimately will be valued for Plan feasibility purposes at approximately $1.1 billion.  The

---

26  [8]  If the Court determines to proceed on a Claim-by-Claim approach to estimation with respect to any
27  category of Claims, PG&E proposes that any POC in such category that does not state or incorporate any
     dollar amount should be valued at zero for Plan feasibility purposes, since there is little basis to begin
28  analyzing or estimating a Claim where the claimant has not been specific enough to state a dollar amount.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1 categories described below are illustrative (but not a complete or exhaustive description) of the

2 issues relevant to the estimation of Generator Claims. Each category involves many Claims, and

3 many Claims fit in more than one category.

4     37. Most Generators filed individual Claims for the aggregate amounts they believe PG&E,

5 Southern California Edison ("SCE"), the PX and ISO owe them. PG&E's consultant has analyzed

6 the available data and allocated each Generator's charges between PG&E and SCE. PG&E's

7 consultant estimates that approximately $850 million of the Generator Claims are properly

8 attributable to SCE and should be deducted from the gross amount of the Generator Claims.

9     38. The Generator Claims against PG&E also include approximately $400 million already

10 paid by PG&E and others to the PX, but currently being held by the PX. This $400 million

11 represents partial cash payments from PG&E and other market participants to the PX, as well as

12 cash the PX has collected by calling on surety bonds and lines of credit. Normally, the PX would

13 have distributed this cash to sellers of power upon receipt, but given the circumstances of non-

14 payment and partial payment by various market participants, coupled with the bankruptcy of the PX,

15 the PX did not pay this cash out to the generators. The PX is holding such cash pending the

16 outcome of proceedings at FERC and other forums. Upon the conclusion of those proceedings, the

17 $400 million in cash held by the PX will be distributed to parties with valid claims against the PX,

18 as determined by those various proceedings. PG&E will contend in the estimation process that

19 approximately $400 million of the Generator Claims are not owed by PG&E, but rather are owed by

20 the PX and/or are attributable to the PX's cash holdings.

21     39. The PX, the Department of Water Resources ("DWR"), and many Generators have

22 asserted claims for power purchases made on or after January 17, 2001. All of these purchases were

23 made by DWR and ISO, not PG&E. Indeed, as of January 17, 2001, PG&E was precluded by the

24 creditworthiness requirements of the ISO and PX tariffs from purchasing power from third-party

25 suppliers. Under governing FERC orders and authorizing legislation, PG&E is not responsible for

26 any charges for power purchases made on or after January 17, 2001. Many Generators did not

27 segregate pre-January 17 and on-or-after-January 17 amounts in their Claim documentation, and

28 PG&E will request estimation of those Claims based on its consultant's analysis of energy purchases

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

by the ISO and DWR on or after January 17, 2001. PG&E's consultant has preliminarily estimated such power purchases made on or after January 17, 2001 at $1.5 billion.

40. FERC has found that prices charged by many Generators selling into the PX and ISO were not just and reasonable. FERC has held extensive hearings and issued a series of decisions ordering refunds from Generators selling into the PX and ISO after October 1, 2000, under specified criteria. On July 25, 2001, FERC issued an "Order Establishing Evidentiary Hearing Procedures, Granting Rehearing in Part, and Denying Rehearing in Part" (San Diego Gas & Elec. Co. v Sellers of Energy & Ancillary Serv., 96 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,120 (July 25, 2001)) that established the scope of, and methodology for, the calculation of refunds related to transactions in the electric spot markets operated by the ISO and the PX. The July 25 Order also set an evidentiary hearing to calculate the refunds based on the established methodology. FERC later issued a December 19, 2001 Order clarifying the scope of its July 25 Order and reaffirming the refund methodology set forth in that Order (San Diego Gas & Elec. Co. v Sellers of Energy & Ancillary Serv., 97 Fed. Energy Reg. Comm'n Rep. (CCH) ¶61,275 (December 19, 2001)).

41. PG&E's consultant has modeled the likely outcome of the FERC refund process, which probably will not be completed within any reasonable time frame contemplated for confirmation of the Plan. PG&E will contend in the estimation process that the FERC-ordered refunds will reduce the Generator Claims by at least $400 million. PG&E therefore will request estimation of those Claims, based on its consultant's analysis of the anticipated FERC-ordered refund.

42. The PX has asserted a Claim (no. 7411) for more than $1.7 billion for energy and ancillary services duplicating Claims of Generators which sold into the PX and ISO. A handful of Generators did not file Claims, but instead relied on the PX Claim to meet the claims bar date. For the most part, however, the PX Claim is duplicative of the Claims filed by Generators. PG&E will ask the Court to estimate the PX Claim to take into account only the Claims of those few Generators which did not file their own Claims. (PG&E intends to object to the PX Claim, at least to the extent it is duplicative of POCs timely filed by Generators. Alternatively, PG&E may object to the entire PX Claim as duplicative, and stipulate that those Generators who did not file their own POCs because they were included in the PX Claim can proceed to file their own POCs, which will be

1  deemed to be timely filed.)

2      43.  In December 2000, FERC ordered the ISO to assess underscheduling penalties to

3  discourage market participants from using the ISO's real-time market as the primary spot market

4  (San Diego Gas & Elec. Co. v Sellers of Energy & Ancillary Serv., 93 Fed. Energy Reg. Comm'n

5  Rep. (CCH) ¶61,294 (December 15, 2000)).  The underscheduling penalties were to be assessed by

6  the ISO against underscheduling market participants and distributed to scheduling coordinators that

7  could accurately schedule (97 FERC ¶61,275; 93 FERC ¶61,294, at 62,002-62,004).  ISO market

8  participants have filed Claims seeking approximately $400 million in underscheduling penalties.

9  The penalties were stayed, and, upon rehearing, were invalidated by FERC before they were

10  assessed by the ISO (In re Distrigas of Mass. LLC., 93 Fed. Energy Comm'n Rep. (CCH) ¶61,275

11  (July 27, 2000)).  PG&E will object to all Claims seeking underscheduling penalties, and PG&E will

12  contend in the estimation process that such Claims should be estimated at zero for Plan feasibility

13  purposes.

14  **ENERGY SERVICE PROVIDER CLAIMS**

15      44.  There are over $580 million in Claims from energy service providers ("ESPs") and their

16  Direct Access ("DA") customers for a credit commonly referred to as the DA credit.  DA customers

17  purchase their energy from ESPs but use PG&E's distribution and transmission services.  Pursuant

18  to CPUC orders, these customers are charged by PG&E the same bundled service rate as other

19  PG&E customers.  However, since they buy their energy from an ESP, they receive a credit off the

20  bundled service rate in an amount intended to approximate the energy component of PG&E's

21  bundled service rate.  The methodology for calculating the DA credit was established by the CPUC

22  in Decision No. 97-08-056 and Resolution E-3510, and was intended to achieve the CPUC's

23  objective of ensuring that during the rate freeze DA customers pay the same unbundled component

24  charges, other than energy, as bundled service customers.  The CPUC ordered PG&E to use the PX

25  price to approximate the energy component of the bundled rate, under the assumption the PX price

26  would reflect the amount PG&E actually saved by not being required to purchase energy for the DA

27  customers.  As the PX prices began to skyrocket, so did the DA credit, and the DA customers'

28  charges from PG&E began to reflect amounts due to them from PG&E, i.e., the charges became

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

17

"negative."

45.   PG&E contends the rate freeze and DA credit should have ended no later than August 2000.  However, even assuming the rate freeze will not end until March 2002, the DA credit Claims are overstated.  FERC's July 25 Order discussed above effectively reduces PX wholesale energy prices from October 2, 2000 to June 20, 2001, by requiring generators to refund amounts received or due from the utilities for generation used during that period.  FERC's July 25 Order reduces the DA credit because it reduces the amount PG&E saved by not serving as the DA customers' ESP during that period.  The reduction of the PX price reduces the DA credit by approximately $100 million from October 20, 2000 through January 17, 2001.  PG&E also anticipates further reductions in DA credits arising from the unjust and unreasonable energy prices charged before October 2, 2000 and on and after January 17, 2001 as a result of CPUC proceedings that will determine the appropriate DA credit during those periods.  Because it is unlikely the administrative processes will be resolved within any reasonable time frame for obtaining confirmation of the Plan, PG&E in the estimation process will seek a reduction in the amount of the DA credit Claims for Plan feasibility purposes.  PG&E believes a reasonable estimation can be made based on its consultant's FERC refund analysis.

46.   Further, some of the DA credit Claims are overlapping because both the ESPs and their DA customers claim a right to the same DA credits.  Thus, in the estimation process, PG&E also will contends that the DA credit Claims should be reduced by approximately $60 million due to duplicative Claims.

## COMMERCIAL CLAIMS

47.   There are approximately nine miscellaneous commercial Claims for amounts totaling in excess of $4 billion to which PG&E will be filing objections.  However, because it is unlikely they can be resolved any time soon, they will need to be estimated for feasibility purposes.

48.   One such Claim, by Sierra Pacific Industries ("SPI"), is for "at least" $1,108,361,147, mostly for alleged punitive damages, and arises out of PG&E's alleged interference with SPI's efforts to sell its QF power at market prices well above the prices SPI had contracted to accept.  The Court is familiar with this Claim, having adjudicated preliminary injunction, partial summary

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  judgment and remand motions. The size of this Claim and its heavy reliance on punitive damages

2  make it appropriate for estimation, and by virtue of the nature of the Claim and this Court's

3  familiarity with it, it does not appear that retention of an expert is necessary or appropriate in

4  connection with such estimation.

5  49. The other commercial Claims total about $3 billion and could be estimated by the Court

6  with or without the assistance of an expert. They cover a wide range of causes of action. For

7  example, two Claims, aggregating over $100 million, are by irrigation districts alleging federal

8  antitrust violations stemming from PG&E's refusal to interconnect the districts' proposed electric

9  facilities. PG&E contended in federal court that each scheme proposed "sham wholesale"

10  transactions in violation of the Federal Power Act. The District Court's Order dismissing one of the

11  complaints without leave to amend is under submission to the Ninth Circuit. The other complaint is

12  set for trial during May 2002. Neither Claim is likely to be resolved within the time frame

13  contemplated by the Plan.

14  50. Two other Claims for a total of almost $50 million are by 34 property developers

15  seeking punitive damages only, allegedly arising out of PG&E's failure to obtain CPUC approval

16  before changing the practice of paying refunds for gas franchise costs.

17  51. A $25 million Claim is by a residential developer for alleged breach of a contract to

18  relocate gas and electric transmission facilities. The claimant alleges it provided land to which the

19  facilities could be moved and PG&E alleges it did not.

20  52. One QF project has filed a Claim seeking approximately $10 million for alleged

21  violation of the fixed price period of its Interim Standard Offer 4 power purchase agreement.

22  PG&E has successfully defended identical suits by QFs before the same judge hearing the pending

23  case. Other commercial Claims assert a variety of breaches and violations allegedly arising under a

24  variety of causes of action.

25  **TORT CLAIMS**

26  53. PG&E believes that an expert could provide invaluable assistance in estimating the

27  aggregate value of the approximately 450 miscellaneous personal injury, wrongful death and

28  property damage Claims submitted as timely POCs. These Claims have an alleged value of more

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

than $315 million, which is significantly larger than any reasonable estimate of PG&E's true liability to these claimants. As an example of how inflated the alleged dollar value of these Claims is, between 1996 and 2000, PG&E resolved an average of over 15,000 personal injury and property damage claims per year, including litigation and pre-litigation claims, at an aggregate average cost of $31 million per year (excluding individual payments greater than $5 million and unusual events such as the 12/8/98 outage, which generated more than 19,000 claims.) Furthermore, PG&E's third-party claims department, which handles pre-litigation matters, is currently resolving bankruptcy claims at about 5% on average of the demand value.

54. Adjudicating and liquidating each of these 450 diverse Claims—ranging from slip and falls to auto accidents to alleged asbestos exposure to electric contact wrongful death cases—will be extremely fact-intensive. If considered individually, it could take many months of evidentiary hearings to resolve these miscellaneous tort Claims.

55. Accordingly, PG&E proposes that the Court authorize PG&E to retain (or that the Court appoint) a statistician/claims estimation expert to estimate the aggregate value of the miscellaneous tort Claims based upon such factors as the number of Claims filed, the type or category of Claim made, the type of injuries alleged, the data contained in the POCs submitted, and PG&E's historical litigation data from the last five years, including the average amount of the settlements for the various types of claims in designated categories. The use of five years of historical data to determine a reasonable estimate for these Claims is appropriate because PG&E's universe of miscellaneous tort cases on April 6, 2001 was not materially different from any other time in the previous five years. Under this proposal, the expert will review samples of historical claims within the designated categories and will sort the POCs into similar categories. By using a variety of statistical approaches predicated on PG&E's actual experience with similar type claims, the expert will estimate the aggregate value of the miscellaneous tort Claims. Because so much historical data is available for the estimation process, a statistically and practically significant estimate should be possible without engaging in the time-consuming task of reviewing each claim on the merits.

56. If an aggregate estimation method is not used, the 450 Claims will have to be addressed individually, applying a fact-intensive, legal analysis. This would be a long, tedious process.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    Indeed, part of the reason a Claim-by-Claim review would be difficult is because of the poor quality

2    of information available in the POCs; many claimants have provided little in the way of information

3    to readily and accurately assess liability and damages. As to a significant number of the

4    miscellaneous tort Claims, PG&E currently has little or no information other than that contained in

5    the POC form and any accompanying attachments.

6         57.  The following will serve as a few illustrative examples of how overstated many of the

7    miscellaneous tort Claims are and how time-consuming it would be to individually assess the value

8    of these Claims:

9         •    One of the miscellaneous tort Claims against PG&E is for $14 million and arises out of

10   an explosion and fire that occurred at a residence. Investigations by the police department, fire

11   department, District Attorney's office, and the Bureau of Alcohol, Tobacco and Firearms

12   determined the cause to be detonation of illegal fireworks in the home. There are multiple

13   defendants named in this consolidated action.

14        •    A Claim for $5 million is premised on the notion that "balls of electricity" have flown

15   off the PG&E overhead lines causing personal and property damage to claimants. PG&E will

16   contend in the estimation process that extensive testing performed by public and private entities has

17   not substantiated this Claim.

18        •    Another Claim involves an auto accident in which the claimant rear-ended a PG&E

19   truck. The personal injury Claim is for $1 million and alleges that claimant sustained a fractured

20   leg, cheek bone and jaw injury. PG&E will contend in the estimation process that PG&E has no

21   liability.

22        •    A $1.4 million Claim is for contribution and indemnity for property damage allegedly

23   resulting from the diversion of water onto land owned by a recreation park. PG&E is not a party to

24   the underlying lawsuit but has received a $1.4 million POC for indemnity from one of the

25   defendants named in the suit. PG&E's sole information is limited to the assertions contained in the

26   complaint and the stated amount of the Claim.

27        58.  In addition to seeking estimation of the approximately 450 miscellaneous tort Claims,

28   PG&E will seek estimation by the Court of the Chromium Claims, consisting of the Claims filed by

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   approximately 1,250 individuals alleging exposure to chromium from PG&E's compressor stations

2   near Kettleman, Topock and Hinkley, California. Nearly all of the Chromium Claims were filed by

3   individuals who are plaintiffs in 15 civil lawsuits pending against PG&E in California courts.

4   According to their POCs, these claimants seek to recover approximately $580 million. There are

5   approximately 1,450 personal injury Claims alleging chromium exposure, approximately 200 of

6   which PG&E expects will be disallowed as duplicate claims. Approximately 1,050 of these

7   individuals filed Claims aggregating about $580 million, and approximately 210 of these individuals

8   filed Claims for unknown amounts. PG&E expects that all of the Chromium Claims (including

9   those that state amounts and those that do not) will be estimated because it is requesting an

10   aggregate approach to estimation of the Chromium Claims. See footnote 8 supra and accompanying

11   text. In the estimation process, PG&E will propose an estimate for the aggregate value of these

12   Claims based upon such factors as (i) the number of Chromium Claims filed, (ii) the particular

13   PG&E facility from which a majority of those plaintiffs claim exposure to chromium, (iii) the

14   distance from the compressor station to the alleged exposure locations, (iv) the type of claimed

15   exposure (ingestion or inhalation), (v) the types of injuries alleged, (vi) epidemiological data, (vii)

16   prior settlements of other chromium cases, (viii) scientific literature regarding chromium, (ix)

17   discovery responses, (x) legal defenses and (xi) the POCs submitted.

18   59.   A motion for aggregate estimation is the most reasonable method for determining the

19   estimated value for Chromium Claims. If considered individually, it could take months of

20   evidentiary hearings to resolve them. Each individual claim presents questions regarding the alleged

21   method, duration and concentration of exposure. These issues will ultimately be resolved in the

22   pending litigation. These issues are generally based upon detailed scientific and expert analysis of

23   groundwater contamination and air modeling. The analysis must also include a determination of

24   whether the exposure alleged could have caused the particular ailments claimed. These issues are

25   generally resolved by evaluating expert testimony from toxicologists, epidemiologists, particular

26   disease specialists and other medical professionals. For example, the parties have estimated that

27   trial of 18 test cases involving these issues could take up to six months.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

60. The most reasonable method to estimate the approximately 1,250 Chromium Claims for Plan feasibility purposes is to develop an aggregate estimate by considering groups with similar characteristics. For example, an examination of categories of current claims based upon alleged exposure, type of injury and legal defenses can provide a reasonable estimate of the value of the Chromium Claims. Attempting to create that same estimate by reviewing each individual case for each of these parameters to reach an estimate would be a monumental task.

**EMPLOYMENT CLAIMS**

61. Approximately 15 litigants have filed employment-related POCs against the Debtor totaling more than $110 million. One clear indicator of the extent to which these employment Claims are unrealistic is that during the most recent five-year period for which data is fully available (from 1996 through 2000), the total paid out by PG&E in connection with employment-related litigation was $10.78 million, or an average of $2.15 million per year. An expert experienced in the employment litigation field would be able to assist the Court in estimating the actual value of the employment Claims, which assert a variety of statutory and common law violations.

62. The largest Claim, seeking over $40 million, is a complex putative class action lawsuit involving alleged violation of state and federal overtime laws. Specifically, four employees purporting to represent 300 senior new business representatives, distribution engineers, and others "similarly situated" allege PG&E improperly classified them as exempt administrators and/or professionals, thus denying them overtime payments to which they were purportedly entitled. The amount claimed is based on the assumption that all plaintiffs will prevail on all issues. PG&E will contend in the estimation process that the Claims do not meet the criteria for a class action, which then limits the number of plaintiffs to four. PG&E also will contend in the estimation process that plaintiffs have improperly calculated the number of claimed overtime hours.

63. Several of the other employment Claims allege various forms of disability discrimination, such as failure reasonably to accommodate an alleged disability, or wrongful demotion. For example, one plaintiff, who seeks more than $36 million, suffers from a degenerative condition and alleges that after years of attempting to accommodate his condition, PG&E wrongfully removed him from his position as a fieldman in response to a physician's

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

recommendation after a fitness for duty exam. PG&E will contend in the estimation process that this is a highly inflated claim.

64. One claim for $10 million is by a short-term former employee of Corestaff Services, Inc., a PG&E contractor, who sued his former employer and several of its employees for wrongful termination, and has named PG&E because it allegedly failed to respond to various complaints plaintiff claims to have made against Corestaff. Corestaff has agreed to indemnify and defend PG&E without reservation of rights.

65. Other Claims in this category requiring estimation allege sex discrimination, including sexual harassment, intentional infliction of emotional distress, retaliation, and/or wrongful termination.

I declare under penalty of perjury under the Federal laws of the United States of America that the foregoing is true and correct, and that this Declaration was executed on March 1, 2002 at San Francisco, California.

IATHAN T. ANNAND

WD 030102/1-1419913/gff/977552/v5

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation