Mark Gorton (99312)
Mary E. Olden (109373)
Todd M. Bailey (109519)
McDONOUGH, HOLLAND & ALLEN
A Professional Corporation
555 Capitol Mall, Ninth Floor
Sacramento, California 95814
Telephone:    916-444-3900
Facsimile:    916-444-8334

Attorneys for Northern California Power Agency

FILED

MAR 2 0 2002

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| In re | Case No. 01-30923 SFM 11 |
| PACIFIC GAS and ELECTRIC COMPANY, | Chapter 11 |
| Debtor. | RESPONSE OF NORTHERN CALIFORNIA POWER AGENCY TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES |
| Tax I.D. No. 94-0742640 | (DECLARATION OF DONALD B. DAME IN SUPPORT THEREOF FILED SEPARATELY) |
| | Date:     March 27, 2002<br>Time:     9:30 a.m.<br>Place:    235 Pine Street<br>             San Francisco, CA<br>Judge:   Hon. Dennis Montali |

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

5359

# TABLE OF CONTENTS

Page

I. INTRODUCTION. .........................................................................................1

II. THE CLAIMS RESERVED IN NCPA'S PROOF OF CLAIM. ..........................3

III. THE FACTUAL AND LEGAL GROUNDS FOR THE
TRANSMISSION AND INTERCONNNECTION RELATED
DAMAGE CLAIMS. ..................................................................................5

    A.   The Incipient Claims and the Preliminary Nature of This
       Analysis ................................................................................................5

    B.   The Claim for Congestion Costs and Other Costs Resulting
       from Inadequate Transmission Construction. .........................................5
       1.   Description of the Claim. ...........................................................5
       2.   Valuation of the Claim. .............................................................7
       3.   Legal Basis for Claim. ................................................................7
           a.   The Stanislaus Commitments. .......................................7
           b.   The 1991 Settlement at FERC. ......................................8
           c.   The 1991 Settlement at NRC. .......................................8
           d.   Cal. Bus. & Prof. Code § 17200 *et seq.* ........................10
              (i)   Unlawful. ........................................................11
              (ii)  Unfair. .............................................................11
              (iii) Fraudulent. ......................................................12
           e.   The Antitrust Laws and the Cartwright Act. ................12

    C.   Cost Associated With Negligent or Incompetent Action As
       Agent. ...............................................................................................13
       1.   Description of Claim. ...............................................................13
       2.   Legal Basis for Claim. ..............................................................13

    D.   Theft of Services. ...............................................................................15
       1.   Description of Claim. ...............................................................15
       2.   Legal Basis for Claim. ..............................................................15
           a.   Electricity a Good. .......................................................16
           b.   Third Party Beneficiary Breach of Contract. .................16
           c.   Conversion. ..................................................................17
           d.   Restitution/Unjust Enrichment. ....................................18

IV. PG&E SHOULD FULLY AND COMPLETELY RESOLVE NCPA'S
TRANSMISSION AND INTERCONNECTION RIGHTS. .............................18

V. CONCLUSION. .......................................................................................19

## NCPA'S EXHIBIT LIST

Exhibit 1   –   Order Conditionally Accepting for Filing and Suspending, Subject
to Refund, Interconnection Agreements, and Subject to Further
Commission Order, 98 FERC ¶6, 281, issued March 14, 2002

Exhibit 2   –   Stipulation of City of Palo Alto, Northern California Power Agency
and Pacific Gas and Electric Company Regarding the Stanislaus
Commitments, entered into as of February 11, 2002

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

**TABLE OF AUTHORITIES**

Page

Cases

Carma Developers (California), Inc. v. Marathon Development California Inc.,
    2 Cal.4th 342 (1992) .................................................................. 14

Carter v. Variflex, Inc., 101 F.Supp.2d 1261 (C.D. Cal. 2000) ............................... 11

Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th
    163 (1999) ............................................................................. 10, 12

Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163 (2000) ............... 10, 11

Dorsey Brothers Inc. v. Anderson, 264 Md. 446, 287 A.2d 270 (Court of
    Appeals Maryland 1972) ................................................................. 14

First Nationwide Saving v. Perry, 11 Cal. App. 4th 1657 (1992) ........................... 18

Garcia v. Truck Ins. Exchange, 36 Cal. 3d 426 (1984) ..................................... 17

Hess v. Ford Motor Co., 2002 Cal. LEXIS 621 (2002) ...................................... 17

Johnson v. Bank United, 2001 Cal. App. LEXIS 3351, *8 n. 8 ............................. 17

Kendal v. Ernest Pestana Inc. 40 Cal.3d 488 (1985) ....................................... 14

Kraus v. Trinity Management Services, Inc., 23 Cal. 4th 116 (2000) ..................... 11

KS Tech Group, Inc. v. Crown Associates Realty, Inc., 2001 Cal. App. LEXIS
    943, *15 (2001) ........................................................................ 17

Lectrodryer v. Seoulbank, 77 Cal. App. 4th 723 (2000) .................................... 18

Meserall v. Fulwider, 199 Cal. App. 3d 1324 (1988) ....................................... 18

People v. Goulart, 224 Cal. App. 3d 71 (1990) ............................................. 16

Pierce v. Pacific Gas & Elec., 166 Cal. App. 3d 68 (1985) ................................ 16

Podolsky v. First Healthcare Corp., 50 Cal. App. 4th 632 (1996) ......................... 12

Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26 (1998) ..................... 11

Sunbelt Television, Inc. v. Jones Intercable, Inc., 795 F.Supp. 333 (C.D. Cal.
    1992) .................................................................................. 11

Terrace Water Co. v. San Antonio Light & Power Co., 1 Cal. App. 511 (1905). ....... 16

United States v. Pacific Gas and Elec. Co., 714 F. Supp. 1039 (N.D. Cal. 1989 ........ 17

ii

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

# Statutes

11 U.S.C. §§ 101 et seq........................................................................... 4

Cal. Bus. & Prof. Code § 16720 *et seq.* ........................................... 11

Cal. Bus. & Prof. Code § 17200 *et seq.* ........................................... 10

Cal. Pen. Code § 498 (2001) ................................................................ 15

# Other Authorities

5 B.E. Witkin, *Summary of California Law*, "Torts," § 610 (1988)........................... 17

5 Witkin, *Summary of California Law*, "Torts," § 611 ............................................. 18

H.C. Black, *Black's Law Dictionary*, p. 300 (5th ed. 1979)................................. 17

iii

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

## I. INTRODUCTION.

Northern California Power Agency ("NCPA"), a creditor and party in interest, hereby submits this response to the Motion of debtor Pacific Gas and Electric Company ("Debtor" or "PG&E") for Order Determining Procedures for Estimating Certain Claims for Plan Feasibility Purposes ("Estimation Motion"). In support thereof, NCPA submits the Declaration of Donald B. Dame, filed herewith, and refers to its prior filings in this case. NCPA, in addition, joins in the Objection By The City Of Palo Alto To PG&E's Motion For Order Determining Procedures For Estimating Certain Claims For Plan Feasibility Purposes, with emphasis on the estimation procedural concerns addressed there that are not covered in this Response.

NCPA's response is directed to the fact that it has a substantial contingent and unliquidated claim for damages arising out of the Debtor's imminent breach of the Stanislaus Commitments[1] and out of past and continuing negligent or intentional behavior also in breach of various PG&E obligations, that is not considered in the Estimation Motion. Because of the potential magnitude of these claims – a present value estimated to be nearly $1.5 Billion, which value does not include perhaps more significant consequential and treble damages – NCPA alerts the court, PG&E, its corporate parent, and others to those claims. We do so in particular because substantial portions of the total claim are easily avoided by the simple solution of providing NCPA with congestion-free firm transmission service, or allowing NCPA to purchase its load ratio share of the PG&E transmission system, which constitutes a mere sliver of the PG&E's overall system. Either of these solutions would provide an adequate substitute for the interconnection agreement PG&E is terminating and would be consistent with PG&E's obligations under

---

[1] The "Stanislaus Commitments," for purposes of this Response, refers to the rights and obligations described in (1) the 1991 Settlement Agreement between NCPA and PG&E in a Nuclear Regulatory Commission ("NRC") proceeding, implementing the Statement of Commitments accompanying the letter from PG&E to the U.S. Department of Justice of April 30, 1976 ("1991 Settlement Agreement"), (2) the letter from PG&E to the U.S. Department of Justice of April 30, 1976, to the extent that it represents obligations, a position disputed by PG&E (the "1976 Letter") and (3) the antitrust license conditions included in the Diablo Canyon Nuclear Power Plant NRC licenses.

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

MCDONOUGH, HOLLAND & ALLEN A PROFESSIONAL CORPORATION

1    the Stanislaus Commitments.

2          The court will recall the concerns of NCPA and its member Palo Alto over how the

3    PG&E Plan would affect the entitlements to interconnection and firm transmission

4    guaranteed through the year 2050 by the Stanislaus Commitments. In particular, we

5    questioned how NCPA would obtain interconnection and firm transmission after the

6    existing interconnection agreement (the "IA") expires, which was then scheduled for

7    April 1, 2002. (*See* Conditional Adversary Objection Of Northern California Power

8    Agency, filed November 6, 2001, Docket No. 3095; Palo Alto's Reservation Of Right To

9    Enforce Rights Of Governmental Units By Adversary Proceeding And Joinder In

10   Northern California Power Agency Objection, filed November 6, 2001, Docket No. 3122;

11   Disclosure Statement Objections Of Northern California Power Agency, filed

12   November 27, 2001, Docket No. 3488; Supplemental Disclosure Statement Objections filed

13   January 10, 2002 of Northern California Power Agency, Docket No. 4248, and of Palo

14   Alto, Docket No. 4245.)

15         The importance of resolving these interconnection and transmission concerns has

16   been recognized by the Federal Energy Regulatory Commission ("FERC"), which last

17   week on March 14, 2002 issued an order staying for five months the termination of the IA

18   and taking the unusual step of ordering all relevant parties (including PG&E, CAISO,

19   NCPA and Santa Clara) to attend a "technical conference" for purposes of negotiating

20   appropriate successor arrangements for NCPA and Santa Clara. (*See* Order Conditionally

21   Accepting for Filing and Suspending, Subject to Refund, Interconnection Agreements,

22   and Subject to Further Commission Order, 98 FERC 16, 281, issued March 14, 2002,

23   attached hereto as Exhibit 1.)

24         NCPA maintained in its Supplemental Disclosure Statement Objections, Docket

25   No. 4248, that the First Amended Disclosure Statement was materially misleading

26   because it failed to explain how NCPA's rights under the Stanislaus Commitments would

27   be affected. To resolve that and the other disclosure objections, PG&E, NCPA and Palo

28   Alto have entered into a stipulation concerning the Stanislaus Commitments which

2

MCDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

1 resolves the disclosure statement objections of NCPA and Palo Alto to the First Amended

2 Disclosure Statement and, more importantly, provides that the bankruptcy will have "no

3 adverse effect" on the Stanislaus Commitments and that those rights are unimpaired and

4 will pass through the bankruptcy unaffected. In addition, the parties have agreed that

5 the resolution of their' differences over the extent of those rights will be determined by a

6 forum other than the Bankruptcy Court. The stipulation is subject to court approval,

7 which PG&E is to obtain. To date, despite repeated requests from counsel for Palo Alto

8 and NCPA, the motion to approve the stipulation has not been filed. (*See* Stipulation of

9 City of Palo Alto, Northern California Power Agency and Pacific Gas and Electric

10 Company Regarding the Stanislaus Commitments, entered into as of February 11, 2002,

11 attached hereto as Exhibit 2.)

12 The Stipulation's reservation of rights and agreement to resolve differences of

13 interpretation in a nonbankruptcy forum, does not alleviate the need for this court to be

14 apprised and take into account for feasibility and claim distribution purposes the extent

15 of PG&E's potential exposure should it fail to fulfill its Stanislaus Commitments.

16 Finally, NCPA reemphasizes the importance of these long fought and hard earned

17 interconnection and transmission rights – NCPA has issued over $1 billion in publicly-

18 held debt to finance its generation resources and directly related transmission investment

19 to serve the electrical needs of the nearly 700,000 electric consumers in central and

20 northern California who are served by its members. Firm access to PG&E's transmission

21 grid is fundamental to NCPA's very existence.

22

23 II. . THE CLAIMS RESERVED IN NCPA'S PROOF OF CLAIM.

24 NCPA timely filed its proof of claim on September 4, 2001 (Claim No. 9520)

25 asserting a liquidated claim in the amount of $5,987,690.73, for sale of energy under the

26 Reliability Must Run Service Agreement and the Emergency Service Agreement and for

27 imbalance sales under the IA. In addition, NCPA reserved all other claims it may have as

28 follows:

MCDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

3

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 7 of
58

1        NCPA submits this claim to assert and to preserve
any and all claims (as defined in the Bankruptcy Code,
2   codified as 11 U.S.C. §§ 101 et seq.) it has or may have
against Pacific Gas and Electric Company ("PG&E"). This
3   proof of claim describes all known claims of NCPA against
PG&E (the "Known Claims") and preserves any and all
4   claims it has or may have that are: (a) unliquidated, (b)
contingent, (c) arising from rejection of executory contracts
5   or unexpired leases; (d) arising as a result of transfer
avoidance under chapter 5 of the Bankruptcy Code or (e)
6   unknown (the "Reserved Claims").

7

8        The Reserved Claims include any and all claims on
any basis (other than the Known Claims), including costs,
9   defenses, contracts, demands, setoffs, recoupments, credits,
causes of action, obligations, duties, bonds, accidents,
10  injuries, attorneys fees, expenses, interest, losses, penalties,
damages, punitive damages, special damages, rights of
11  contribution and indemnity, whether partial or full,
equitable, legal or contractual, and liabilities of all types,
12  whether known or unknown, whether in contract or tort,
whether in law or equity, or whether under federal or state
13  law. The Reserved Claims also include the claims of
NCPA in any capacity, whether held as owner, principal,
14  agent, scheduling coordinator, representative, subrogee or
beneficiary.
15

16       NCPA's Known Claims and Reserved Claims
include, but are not limited to, PG&E's obligations under
17  the Supporting Documents (defined below), any other
agreements/understandings between PG&E and NCPA, any
18  other act or failure to act by PG&E (arising in contract,
law, equity or otherwise) and PG&E's breach of duties
19  under the Supporting Documents, including fiduciary
duties.
20

21  (See NCPA Proof of Claim, filed September 4, 2001, Claim No. 9520.) The Supporting

22  Documents of NCPA's proof of claim include the IA and the documents establishing the

23  Stanislaus Commitments.

24       There can be little doubt that NCPA has adequately expressed its intent to protect

25  claims unknown, contingent and unliquidated in its proof of claim. In referring to its

26  proof of claim, NCPA does not intend to concede that the claims described here are not,

27  in fact, entitled to priority administrative expense status.

28

MCDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

4

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

## III. THE FACTUAL AND LEGAL GROUNDS FOR THE TRANSMISSION AND INTERCONNNECTION RELATED DAMAGE CLAIMS.

### A. The Incipient Claims and the Preliminary Nature of This Analysis

Because PG&E has filed the Estimation Motion, NCPA has prepared this analysis of the transmission and interconnection related damage claims that have arisen or will arise in the event PG&E continues down the path of attempting to abrogate the Stanislaus Commitments and push NCPA into the CAISO. The description of these claims, provided below, is by no means complete in its factual or legal development. The largest of the claims may not even come to fruition if PG&E agrees to provide interconnection and transmission services to NCPA and its members consistent with the Stanislaus Commitments (either before or as a result of the technical conference ordered by FERC).

### B. The Claim for Congestion Costs and Other Costs Resulting from Inadequate Transmission Construction.

#### 1. Description of the Claim.

In the event that the existing IA expires without a successor arrangement that fulfills the Stanislaus Commitments, then NCPA will have a claim for congestion costs and other costs resulting from PG&E's inadequate transmission construction. This is by far the largest single damage claim that will be suffered by NCPA, and in particular its member cities Palo Alto, Santa Clara and, to a lesser extent, Alameda, if FERC requires a "locational marginal price" ("LMP") pricing structure for congestion cost management. This results from inadequate transmission in the peninsula leading up to San Francisco. To a lesser extent, there will also be potential problems in the area of member cities Lodi and Lompoc resulting from inadequate transmission in those areas.

This claim assumes that the FERC Standard Market Design ("SMD") which will be adopted by the CAISO or a successor, will use an LMP design by node to manage and price transmission congestion. [2] In that design, the load at a congested area pays the

---

[2] The FERC staff working paper on standardized transmission service and wholesale electric market design was posted last week on March 15, 2002 at http://www.ferc.gov/electric/RTO/Mrkt-Strct-comments/discussion_paper.htm. The

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

market clearing price at that node whenever there is congestion between the generation and the load located at the node in question. One can think of this as a model in which computers, for example, can only be brought into the Bay Area (a congested node) at a rate of 100 per month. All other computers in the Bay Area would have to be purchased from the single manufacturer located inside of the congestion point. Obviously, the single manufacturer would have very significant market power, and all computers in stock within the area of the constraint would be expected to sell at a price higher than they would sell for elsewhere in the nation (i.e. outside the congested area).

In part, the value of this claim results from a difference in regulatory treatment expected. While the customers within the constrained area would cause congestion costs to be incurred, the CPUC policy at the moment is to spread all congestion costs evenly (or "socialize") those costs among all PG&E distribution customers, whether or not those customers are located in constrained areas. Thus the average retail customer of PG&E in the Central Valley (relatively unconstrained) would pay a little higher rate than otherwise, but the retail customer in the Bay Area would pay a much lower rate than otherwise, since he/she would be paying the same rate as the customer in the Central Valley. NCPA members Palo Alto and Santa Clara, on the other hand, and their retail customers, would be expected to pay a considerably higher rate than the PG&E customer across the border, since their congestion cost would not be socialized. Because Santa Clara and Palo Alto are among the largest NCPA members, the total effect for NCPA would be significant and negative in terms of increased costs and rates to pay them.[3]

The fact that there are congestion costs at all, of course, is a consequence of PG&E's

---

FERC staff proposes adoption of an LMP model. A nearly identical variation of this market design principle has also been proposed by the CAISO in its so-called Market Design 2002 (MD02) proposal (see Market Design – Draft Proposal, posted January 9, 2002, at http://www.caiso.com/docs/2001/12/21/200112210840719681.html). Given the clear direction of both the FERC and the CAISO, the LMP assumption is reasonable. NCPA's damage forecast model assumes that the LMP is not implemented until 2005.
[3] NCPA recognizes that there is a slight advantage in this model for NCPA members like Roseville or Biggs, where there is no constraint, since the socialized congestion cost for PG&E retail customers outside their borders will not be charged to them, and thus they would be expected to have a slight competitive advantage.

MCDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

6

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

failure to site and construct new transmission, since the whole transmission system into the western Bay Area is inadequate. Thus, there are damages to Palo Alto, Santa Clara and Alameda just from PG&E's failure to construct adequate transmission. NCPA acknowledges that these damages would have been somewhat offset by higher transmission costs if the construction had taken place, but the cost of construction would have been small compared to the congestion costs now likely to be imposed.

#### 2.    Valuation of the Claim.

NCPA has done a preliminary analysis of this claim that shows the present value of this claim to be almost $1.5 Billion according to the current damage forecast model. This amount does not include lost profits, loss of value of the system if a sell-out or liquidation results, other consequential damages or treble damages.

#### 3.    Legal Basis for Claim.

##### a.    The Stanislaus Commitments.

NCPA's Conditional Adversary Objection, Docket No. 3095, explained in some detail the obligations of PG&E under the Stanislaus Commitments and, therefore, we will not expound at length. Suffice it so say for these purposes that NCPA is entitled to interconnection and firm transmission from PG&E though 2050. As relevant to this claim, the language in section VII.A of PG&E's Statement of Commitments is clear:[4]

> Applicant *shall transmit power* pursuant to interconnection agreements, with provisions which are appropriate to the requested transaction and which are consistent with these license conditions.

(Ex. 1 to Docket 3065, emphasis supplied.) Section VII.B requires PG&E to "include in its planning and construction programs such increases in its transmission capacity or such additional transmission facilities as may be required" to carry out the commitment

---

[4] Citations to sections of the Stanislaus Commitments are to the version attached to the April 30, 1976 letter from John Bonner, President of PG&E, to the Honorable Thomas Kauper, Assistant Attorney General, United States Department of Justice. (Ex. 1 to Docket 3065.)

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

quoted above. The commitment clearly extends to transmission of firm power which is defined in Section I.G as "that power which is intended to be available to the customer at all times, and for which, in order to achieve that degree of availability, adequate installed and spinning reserves and sufficient transmission to move such power and reserves to the load center are provided." (Emphasis supplied.)

### b. The 1991 Settlement at FERC.

The 1991 Settlement at FERC amended the IA that PG&E sought to terminate April 1, 2002, and which termination FERC has stayed for five months. The IA (as amended in 1991) provides clearly that PG&E is responsible for the provision of four types of transmission service. (¶6.1, PG&E Rate Schedule FERC No. 147.) One of these four types, Firm Transmission Service, is designed to accommodate delivery of power from NCPA Projects to NCPA Member Customer load and to accommodate transactions between NCPA and Third Parties. (¶6.1.1.1, Original Sheet No. 38-39.) When NCPA seeks additional transmission service, it requests that service under ¶6.2.3, Original Sheet No. 57 et seq. A study process is set out, including a process which assures that any necessary additional construction will take place. NCPA may be required to pay for the additional facilities under certain circumstances, although NCPA is entitled to own facilities it pays for if it so elects. (¶9.12.4(e), Original Sheet No. 122-125.)

### c. The 1991 Settlement at NRC.

Attachment I, the Implementation of Stanislaus Commitments (Exhibit 5 to Docket No. 3095), provides for several things. Section 1 deals with the IA and possible successor Rate Schedules. In the event that it is proposed to terminate the IA (as PG&E did), and if NCPA makes a request for services at least fourteen months prior to the proposed termination (as NCPA did), then:

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

PG&E and NCPA shall negotiate in good faith towards a successor interconnection agreement. Should the parties fail to execute a successor agreement within four months, PG&E shall file with [the FERC], subject to refund, and not less than seven months prior to the proposed date of termination of the then-effective rate schedule a successor interconnection rate schedule (IRS) under which *PG&E shall provide NCPA with such services as NCPA may request to the extent set forth in the Stanislaus Commitments, or are at the date of NCPA's request being furnished by PG&E to NCPA or another Neighboring Entity or Neighboring Distribution System pursuant to commitment 5 of the Stanislaus Commitments as set forth in section 3, below,* but if such services exceed or go beyond those PG&E is obligated to provide by the Stanislaus Commitments, PG&E may, at its option, provide either the services requested by NCPA or the services PG&E is obligated to provide pursuant to the Stanislaus Commitments. . . . . PG&E's filing shall propose an effective date for the IRS coincident with the proposed date of termination of the then-effective rate schedule, and the then-effective rate schedule shall not terminate, and service under the then-effective rate schedule shall continue, until it is superseded by a successor rate schedule, subject to refund, as specified above. *The IRS shall comply with and be subject to the Stanislaus Commitments and this implementation agreement* . . . . .

If such IRS as filed includes rates and charges that would increase the total annual payments by NCPA for services to be provided under the IRS by more than 15 percent per year over the total annual payments for services under the predecessor rate schedule, then, at NCPA's option, until FERC issues a final order establishing rates no longer subject to refund under the IRS rates and charges under the IRS will not increase in any year by more than an amount which will increase NCPA's total annual payments by 15 percent per year.

(Exhibit 5 to Docket No. 3095, emphasis supplied.)

Taken together, PG&E has undertaken to provide NCPA the services for which it is obligated under the Stanislaus Commitments through the year 2050, and to limit the increase in rates to NCPA to 15 percent per year.

In short, if and when the IA is permitted to terminate, PG&E will have failed to

9

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

provide firm transmission service in accordance with its obligations that would avoid the congestion costs shown above and will thus be in violation of its contractual obligations to NCPA (and others), with damages that approximate the costs stemming from inadequate transmission imposed upon NCPA members by congestion management schemes. These costs include the congestion costs imposed upon NCPA members Palo Alto and Santa Clara, among others, and any calculation of costs recoverable would include the loss of value and loss of profitability associated with the likely loss of load and/or loss of value of the system if these entities are forced to sell out or liquidate.

        d.    <u>Cal. Bus. & Prof. Code § 17200 *et seq.*</u>

NCPA has potential outstanding legal claims against PG&E arising out of Cal. Bus. & Prof. Code § 17200 *et seq.*, known as the "unfair competition law" ("UCL") which specifically forbids unlawful, unfair, or fraudulent business practices. Section 17200 provides:

> As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

The UCL functions by borrowing the prohibitions of other laws, including criminal law, and providing a private right of action, even where no private right exists in the predicate statute, and furthermore prohibits any business practice that can be said to be "unfair" though not necessarily proscribed by other laws. See generally, *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co..*, 20 Cal. 4th 163, 179-187 (1999). Thus, NCPA could seek equitable relief including an injunction, disgorgement of gains, or restitution – on behalf of NCPA, its members, and the affected public. The UCL empowers the courts to examine any conduct that constitutes a business practice, and though confined to equitable remedies, provides for strict liability on showing of unlawful conduct. *Cortez v. Purolator Air Filtration Products Co.*, 23 Cal. 4th 163, 173 (2000).

10

MCDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Given the UCL's broad sweep, several business practices adopted by PG&E can be characterized as unfair, unlawful, and possibly fraudulent within the meaning of the UCL, and most of the causes of action outlined herein could be framed as UCL claims.

(i)     <u>Unlawful.</u>

PG&E's refusal to meet its obligations to relieve congestion could be actionable under the "unlawful" prong of the UCL if NCPA can demonstrate anticompetitive conduct proscribed by the Sherman Act and the Cartwright Act (Cal. Bus. & Prof. Code § 16720 *et seq.*). *Quelimane Co. v. Stewart Title Guaranty Co.,* 19 Cal. 4th 26, 42-48 (1998); *Carter v. Variflex, Inc.,* 101 F.Supp.2d 1261, 1270 (C.D. Cal. 2000); *Sunbelt Television, Inc. v. Jones Intercable, Inc.,* 795 F.Supp. 333, 338 (C.D. Cal. 1992). The UCL would authorize disgorgement of funds obtained through violation of those laws.

To the extent that NCPA has paid or otherwise enriched PG&E for construction of transmission or relief of congestion and did not receive a benefit in return, NCPA is entitled to seek restitution on its own behalf, and on behalf of the public if applicable. *Kraus v. Trinity Management Services, Inc.,* 23 Cal. 4th 116, 126 (2000); *Cortez v. Purolator Air Filtration Products Co.,* 23 Cal. 4th 163, 173 (2000).

Because virtually any local, state or federal law may serve as a predicate for a UCL action, NCPA should be able to use FERC or NRC orders as predicate law. NCPA recognizes that issues of preemption could arise to the extent that federal law occupies the field, or the application sought contradicts state law.

(ii)     <u>Unfair.</u>

In addition to the specific claims of unlawful behavior, the unfairness prong of the UCL could be applied to virtually any other business practice that meets the test established by the California Supreme Court, which makes clear that unfair conduct includes violating the spirit of antitrust law:

> When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient

11

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH, HOLLAND & ALLEN
PROFESSIONAL CORPORATION

```
 1          violation of an antitrust law, or violates the policy or
            spirit of one of those laws because its effects are
 2          comparable to or the same as a violation of the law, or
            otherwise significantly threatens or harms
 3          competition.
 4   Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co., supra, 20 Cal. 4th at 187. Thus,

 5   the UCL could also form the basis for recovery of funds paid to PG&E through conduct

 6   not expressly prohibited by law, if it can be shown to violate the spirit of the law.

 7                          (iii)    Fraudulent.

 8          Fraud under the UCL is distinguishable from common law fraud, and can be

 9   demonstrated ". . . even if no one was actually deceived, relied upon the fraudulent

10   practice, or sustained any damage. Instead, it is only necessary to show that members of

11   the public are likely to be deceived." Podolsky v. First Healthcare Corp., 50 Cal. App. 4th 632,

12   647 (1996). Thus, the fraud prong of the UCL might also be applied to the extent that it

13   can be shown that PG&E made deceptive ancillary services reports to the CAISO, as

14   noted below in II.C. Theft of Services.

15                  e.      The Antitrust Laws and the Cartwright Act.

16          There are at least strong suspicions that among the reasons that PG&E did not

17   bother to construct any significant new transmission in the last decade were reasons

18   which, if proven, would establish liability under the Antitrust Laws of the United States [5]

19   and the State's Cartwright Act.[6] Among these reasons would be to make it more difficult

20   for entities such as the City and County of San Francisco to municipalize, and to make it

21   more difficult for entities such as NCPA members Palo Alto and Santa Clara to compete

22   with it. Damages found to occur under the Antitrust Laws [7] and the Cartwright Act [8] are

23   trebled.

24

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [5] The Sherman Act, 15 U.S.C. 1, et.seq., and the Clayton Act, 15 U.S.C. 12, et seq.
27   [6] The Cartwright Act is codified at Chapter 2 (commencing with Section 16700) of Part 2
     of Division 7 of the Business and Professions Code.
28   [7] 15 U.S.C. 15.
     [8] Section 16750.a of the Business and Professions Code .
```

McDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

12

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

**C. Cost Associated With Negligent or Incompetent Action As Agent.**

    1.   Description of Claim.

There are several kinds of charges which the CAISO and/or PG&E are seeking to impose upon NCPA and its members by actions at FERC. These include the so-called Scheduling Coordinator Services Tariff (the "SC Tariff"), charges. The Commission accepted for filing, suspended, and set for hearing the proposed tariff pending the resolution of issues in ER97-2358-002, *et al. Pacific Gas & Elec.*, 90 F.E.R.C. ¶ 61,010 (2000),[9] *reh'g granted for further consideration, Pacific Gas & Elec.*, FERC Docket No. ER00–565-001, Letter Order (March 8, 2000). If and when the SC Tariff is set for hearing, NCPA will take the position that it does not owe PG&E for charges incurred by the ISO due to PG&E's failure to schedule properly. There are defenses which NCPA and its members have at FERC, and another, alternative claim, which NCPA has if it fails to succeed at FERC. If NCPA succeeds at FERC, as it believes it will, at least in part, there may well be a claim of abuse of process that can be raised, since NCPA costs of litigation have been significant. If NCPA loses, however, of these costs, which amount to approximately $70 million, are believed to be attributable to PG&E's actions as agent for NCPA which have been inconsistent with the duty as an agent.

    2.   Legal Basis for Claim.

The law of California is clear:

> "'Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.' (Rest.2d Contracts, §205.) This duty has been recognized in the majority of American jurisdictions, the Restatement, and the Uniform Commercial Code. (Burton, *Breach of Contract and the Common Law Duty to Perform in good Faith* (1980) 94 Harv.L.Rev. 369.)" (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 683-684. . . .

---

[9] This claim and the SC Tariff docket are contingent upon the outcome of Docket ER97-2358-002, because the Commission recognized that the outcome of that docket could moot PG&E's claim, causing PG&E to withdraw the SC Tariff. Unfortunately, the earlier docket has been pending before the Commission for some three years awaiting action, so the SC Tariff case remains unlitigated and in limbo.

13

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McCONOUGH, HOLLAND & ALLEN
PROFESSIONAL CORPORATION

The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. (*See, Perdue v. Crocker National Bank* (1985) 38 Cal.3d 913, 923; *California Lettuce Growers Assn. v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. However, defining what is required by this covenant has not always proven an easy task.

*Carma Developers (California), Inc. v. Marathon Development California Inc.*, 2 Cal.4th 342, 372-373 (1992).

As stated in *Kendal v. Ernest Pestana Inc.* 40 Cal.3d 488 (1985):

[in] every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. *Universal Sales Corp. v. Cal. Etc. Mfg. Co.* (1942) 20 Cal.2d 751, 771. See also *Bleecher v. Cone* (1981) 29 Cal. 3d 345, 350. "[Where] a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." (*Cal. Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484.

An illustrative example of this principal is found in *Dorsey Brothers Inc. v. Anderson,* 264 Md. 446, 287 A.2d 270 (Court of Appeals Maryland 1972). There the defendant contracted to determine when the plaintiff's beans were ripe for harvest and then to send machinery to pick them at its own expense. Defendant picked a time for harvesting that made the produce largely worthless. It argued that since the ascertainment of the optimum time was placed in its sole judgment its discretion can only be challenged on a showing of bad faith or fraud. The Court of Appeals agreed but found it not determinative. There was evidence which it believed could demonstrate that the decision which resulted in failure to harvest the crop was not made in good faith.

At a very minimum, PG&E's actions raise the question of good faith and it is subject to liability if it did not exercise good faith in exercising its discretion.

14

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

## D.  Theft of Services.

### 1.  Description of Claim.

There is another potential sub-issue arising out of the potential charges accruing under PG&E's SC Tariff.  Under Contract 2948A, WAPA pays in-kind for delivery of power that is firm, with all ancillary services included, to its customers, which include many of the members of NCPA.  In fact, the little information NCPA has about the size of the claims for ancillary services made by the CAISO against PG&E and subsequently to be made by PG&E against NCPA or WAPA under the Scheduling Coordinator Services Tariff (the "SC Tariff") for this delivery suggests that PG&E has been and continues to deliver that power as nonfirm, with the customer being charged for the ancillary services needed to make it firm.  If so, PG&E has claimed all of the benefit from the 2000 plus MW of WAPA hydro which WAPA has turned over to PG&E under Contract 2948A, as we understand it.  Thus PG&E has engaged in what is in essence a theft of services from those who had paid for them (NCPA and WAPA) while charging the CAISO (and thus NCPA) the market price for the services.  The damages associated with this will include amounts that may be claimed by PG&E from NCPA and WAPA in the future, and also the costs to NCPA and others of fighting this issue at FERC.

### 2.  Legal Basis for Claim.

PG&E's apparent failure to report WAPA's provision of ancillary services on NCPA's behalf to the CAISO, and its reporting of such ancillary services to the CAISO for its own benefit, may give rise to several causes of action under California law.  PG&E's "theft of services" from WAPA/NCPA would likely give rise to at least three causes of action: (1) breach of contract with NCPA suing as a third party beneficiary under the PG&E-WAPA contract; (2) conversion; and/or (3) unjust enrichment.

As an initial matter, it is worth noting that California criminal law recognizes and prohibits theft of utility services.  Cal. Pen. Code § 498 (2001).  Section 498 provides:

> (b) Any person who, with intent to obtain for himself or herself utility services without paying the full

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 19 of 58

lawful charge therefore, or with intent to enable another person to do so, or with intent to deprive any utility of any part of the full lawful charge for utility services it provides, commits, authorizes, solicits, aids, or abets any of the following shall be guilty of a misdemeanor:

(1) Diverts or cause to be diverted utility services, by any means whatsoever.

(2) Prevents any utility meter, or other device used in determining the charge for utility services, from accurately performing its measuring function by tampering or by any other means.

*****

In at least one case, a party who pleaded guilty to charges of unlawfully interfering with an electric line was forced to pay restitution for energy theft. *People v. Goulart*, 224 Cal. App. 3d 71 (1990). However, no case has yet found that this criminal statute gives rise to any claim for civil damages independent of a criminal prosecution.

a.     Electricity a Good.

California courts have held that electricity is a good. The court in *Pierce v. Pacific Gas & Elec.*, 166 Cal. App. 3d 68, at 86 n. 12 (1985), stated:

> In light of our holding in part I, *ante*, that electricity is a "product" for purposes of strict liability in tort we assume arguendo that electricity may also be considered a "good" for purposes of the California Uniform Commercial Code (§ 2105), and that plaintiffs could properly have pleaded a cause of action under this theory. (See *Baldwin-Lima-Hamilton Corp. v. Superior Court, supra,* 208 Cal. App. 2d at p. 819 [electricity a "commodity"]; see also *Helvey v. Wabash Court REMC* (1972) 151 Ind.App. 176 [278 N.E.2d 608, 610, 48 A.L.R.3d 1055].

The *Baldwin-Lima-Hamilton* court, cited in *Pierce*, stated that "[e]lectricity is a commodity which, like other goods, can be manufactured, transported and sold." 208 Cal. App. 2d at 819, citing *Terrace Water Co. v. San Antonio Light & Power Co.*, 1 Cal. App. 511, 513 (1905).

b.     Third Party Beneficiary Breach of Contract.

NCPA is a third party beneficiary of the PG&E-WAPA contract. See *United*

16

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 20 of 58

1  *States v. Pacific Gas and Elec. Co.*, 714 F. Supp. 1039 (N.D. Cal. 1989), *appeals dismissed per*

2  *stipulation*, No. 91-16011 (9th Cir. Mar 20, 1992). Assuming PG&E's failure to report to the

3  CAISO WAPA's provision of ancillary services, which we believe to be the case, that

4  action is a breach of such contract and NCPA would have a claim for damages in the

5  amount it has had to spend to procure additional ancillary services. As explained in *Hess*

6  *v. Ford Motor Co.*, 2002 Cal. LEXIS 621 (2002), the California Supreme Court made clear

7  that while a third party beneficiary may sue to enforce a contract made for its benefit,

8  "'[a] putative third party's rights under a contract are predicated upon the contracting

9  parties' intent to benefit' it." *Id.* at *21, quoting *Garcia v. Truck Ins. Exchange*, 36 Cal. 3d

10  426, 436 (1984). The test is whether, under ordinary contract interpretation, the third

11  party is intended to benefit from the contract, not whether the contract would result in a

12  benefit to the third party if literally interpreted. *Id.* A third party beneficiary can sue for

13  damages for breach of contract. *See, e.g. KS Tech Group, Inc. v. Crown Associates Realty,*

14  *Inc.*, 2001 Cal. App. LEXIS 943, *15 (2001).

15  There should be no question that NCPA (and its members) as customers of WAPA,

16  are intended to be benefited by Contract No. 2948A.

17                    c.    Conversion.

18  A cause of action for conversion lies where there is an unauthorized assumption or

19  exercise of the right of ownership of goods belonging to another leading to the exclusion

20  of the owner's right. 5 B.E. Witkin, *Summary of California Law*, "Torts," § 610, pp. 707-708

21  (1988). Similarly, according to Black's, constructive conversion occurs "where a person

22  does such acts in reference to the goods of another as amount in law to the appropriation

23  of the property to himself." H.C. Black, *Black's Law Dictionary*, p. 300 (5th ed. 1979). There

24  should be a colorable claim that PG&E improperly converted WAPA and NCPA's

25  ancillary services, at least constructively. The elements of the tort of conversion are: "(1)

26  ownership or right to possession of the property at the time of the conversion; (2)

27  defendant's conversion by a wrongful act or disposition of the property; and (3)

28  damages." *Johnson v. Bank United*, 2001 Cal. App. LEXIS 3351, *8 n. 8 , citing *Meserall v.*

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR
ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

McDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

Case: 01-30923   Doc#: 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 21
of 58

1 | *Fulwider*, 199 Cal. App. 3d 1324, 1329 (1988).A claim for conversion permits recovery of
2 | the property or the damages incurred as a result of the conversion. See, 5 Witkin,
3 | *Summary, supra*, § 611, p. 708.

### d. Restitution/Unjust Enrichment.

5 | PG&E's taking credit with the CAISO for ancillary services provided by WAPA for
6 | the benefit of NCPA should give rise to a cause of action for unjust enrichment. The
7 | elements for a cause of action for unjust enrichment are met where there is receipt of a
8 | benefit and unjust retention of the benefit at the expense of another. *Lectrodryer v.*
9 | *Seoulbank*, 77 Cal. App. 4th 723, 726 (2000), citing *First Nationwide Saving v. Perry*, 11 Cal.
10 | App. 4th 1657, 1662-63 (1992). In calculating damages for unjust enrichment, a court
11 | would likely award the amount of money that PG&E saved by not having to cover its
12 | own ancillary services. This amount should be the same NCPA had to spend to procure
13 | ancillary services to cover the shortfall caused by PG&E.

## IV. PG&E SHOULD FULLY AND COMPLETELY RESOLVE NCPA'S TRANSMISSION AND INTERCONNECTION RIGHTS.

16 | As the Court will recall from NCPA's previous filings in this case and this
17 | response, interconnection and transmission rights are critical to NCPA's very existence
18 | and have been the subject of regulatory and judicial litigation between NCPA and its
19 | members and PG&E for years. PG&E has sought to terminate NCPA's firm transmission
20 | rights under the existing IA, and leave to CAISO the responsibility of providing
21 | transmission rights, without any specific reference or protection of NCPA's entitlement to
22 | firm transmission over PG&E's transmission system. At the same time, the Debtor plans
23 | its own escape from CAISO, which typifies the inconsistency of position NCPA must
24 | endure. The recent FERC decision staying termination of the IA for five months and
25 | calling a technical conference is useful, but PG&E must resolve these issues consistent
26 | with its Stanislaus Commitments obligations in order to avoid the significant liability risk
27 | described above.

28
McDONOUGH, HOLLAND
& ALLEN
PROFESSIONAL CORPORATION

18

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 22 of 58

## V.  CONCLUSION.

For all of the foregoing reasons, NCPA respectfully requests that the Court to recognize this large but readily avoidable liability for estimation purposes and require PG&E to provide appropriate reserves under the plan, if it does not properly and prudently resolve NCPA's interconnection and transmission rights prior to confirmation.

DATED:  March 20, 2002

McDONOUGH, HOLLAND & ALLEN
A Professional Corporation

By _____
         MARK GORTON

Attorneys for Northern California Power Agency

Est Mtn Resp.NCPA_3/19.1 fnl

RESPONSE OF NCPA TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

98 FERC 61, 281
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
William L. Massey, Linda Breathitt,
and Nora Mead Brownell.

| | |
|---|---|
| Pacific Gas and Electric Company | Docket No. ER01-2996-000 |
| Pacific Gas and Electric Company | Docket No. ER02-358-000 |
| Northern California Power Agency | |
| v. | Docket No. EL02-64-000 (Not Consolidated) |
| Pacific Gas and Electric Company and the California Independent System Operator Corporation | |

ORDER CONDITIONALLY ACCEPTING FOR FILING AND SUSPENDING,
SUBJECT TO REFUND, INTERCONNECTION AGREEMENTS,
AND SUBJECT TO FURTHER COMMISSION ORDER

(Issued March 14, 2002)

On August 31, 2001 and November 16, 2001, Pacific Gas and
Electric Company (PG&E) filed notices of termination of
interconnection agreements with the Northern California Power
Agency (NCPA) and Silicon Valley Power (Silicon Valley),
respectively, and unexecuted Interconnection Agreements intended
to replace the terminated agreements.

On February 27, 2002, NCPA filed an emergency petition
seeking an expedited declaratory order confirming PG&E's
continuing contractual obligations under existing Interconnection
Agreements and Contract 2943A. NCPA also requests the Commission
to institute a technical conference or other settlement
resolution procedure that will allow NCPA, PG&E, and other
interested parties, including the California Independent Systems
Operator (California ISO) and Western Area Power Administration
(WAPA) to reach agreement on the terms of replacement
Interconnection Agreements, and any related implementation
issues.

In this order, we conditionally accept the unexecuted
replacement Interconnection Agreements for filing, suspend them
for five months, to become effective on    September 1, 2002,
subject to refund, and subject to further Commission order. We

**EXHIBIT 1**

2-

also accept the notices of termination of existing
interconnection agreements, suspend them for five months, to
become effective concurrent with the replacement Interconnection
Agreements. We also affirm that PG&E will continue to operate
under the terms of existing Interconnection Agreements and
Contract 2948A until the parties have worked out the terms of the
replacement agreements and any related implementation issues.
Finally, we are directing staff to convene a technical conference
at Commission headquarters for the parties in these proceedings
to discuss the terms and implementation of the replacement
Interconnection Agreements.

Our actions in this order will allow for the continuation of
transmission service under existing Interconnection Agreements
and Contract 2948A and, if subsequently authorized, a transition
to non-discriminatory open access transmission service without
any interruption of service.

I.    BACKGROUND

      A.    Existing Interconnection Agreement with NCPA

      NCPA, a public agency organized under the laws of the State
of California, and PG&E entered into the existing Interconnection
Agreement in November 1991, and the Commission accepted the
Agreement as PG&E Rate Schedule No. 142 on May 12, 1992. Under
the terms of the existing Interconnection Agreement, PG&E
provides interconnection, transmission, reliability and energy
services to NCPA. PG&E notes that section 9.4 of the existing
Interconnection Agreement provides that either party may
terminate the agreement upon three (3) years' notice. PG&E gave
notice to NCPA on July 21, 1997 that it was terminating the
existing Interconnection Agreement effective July 31, 2000. PG&E
and NCPA subsequently agreed to extend the termination date until
March 31, 2002. The existing Interconnection Agreement therefore
will terminate as of April 1, 2002, if the Commission accepts the
notice of termination.

      B.    Existing Interconnection Agreement with Silicon Valley

      Silicon Valley, a public agency organized under the laws of
the State of California, and PG&E entered into the existing
Interconnection Agreement in September 1983, and the Commission
accepted the Agreement as PG&E Rate Schedule No. 85 on October
27, 1983. Under the terms of the existing Interconnection
Agreement, PG&E provides interconnection, transmission,
reliability and energy services to Silicon Valley. PG&E notes
that section 9.4 of the existing Interconnection Agreement
provides that either party may terminate the agreement upon three
(3) years' notice. PG&E gave notice to Silicon Valley on May 6,
1998 that it was terminating the existing Interconnection
Agreement effective May 31, 2001. PG&E and Silicon Valley

3-

subsequently agreed to extend the termination date until March
31, 2002. The existing Interconnection Agreement therefore will
terminate as of April 1, 2002 if the Commission accepts the
notice of termination.

    C.   Contract 2948A Transmission Service Obligations

    Contract 2948A is an agreement between PG&E and the U.S.

1

Department of the Interior, contracting on behalf of WAPA.
Under the terms of the contract, PG&E obtains excess energy from
WAPA's hydropower resources, and provides energy to WAPA during
periods when WAPA resources are unable to meet the needs of its
customers. PG&E also provides transmission service to WAPA's
municipal customers, including NCPA, for the transmission of
WAPA's power. The scheduling provisions for the transmission
service agreed upon by PG&E, WAPA and NCPA are incorporated in
Contract 2948A and in PG&E's existing Interconnection Agreement
with NCPA. WAPA supplies one half of NCPA's pool requirements.

    D.   The Replacement Interconnection Agreements

    PG&E asserts that since the notice of termination, it has
engaged in good faith negotiations with both NCPA and Silicon
Valley on replacement Interconnection Agreements; however the
parties have been unable to reach an agreement. Consequently,
PG&E has filed unexecuted replacement Interconnection Agreements
for those services PG&E believes are required to meet any ongoing

2

service obligation to the parties. PG&E seeks an April 1, 2002
effective date for the replacement Interconnection Agreements.
PG&E contends that the replacement Interconnection Agreements,
which will provide only transmission service, combined with the
interconnection, energy and reliability services available under
the California ISO Tariff and the PG&E TO Tariff will provide
NCPA and Silicon Valley with services comparable to those
provided under the existing Interconnection Agreements. PG&E
also argues that the replacement Interconnection Agreements will

---

    1
    Contract 2948A is on file at the Commission as PG&E Rate
Schedule No. 79. Contract 2948A will terminate on January 1,
2005. To date, PG&E is not seeking to terminate Contract 2948A.
However, NCPA alleges in its petition in Docket No. EL02-64-000
that, according to PG&E, certain transmission scheduling services
in Contract 2948A and the existing Interconnection Agreements
will terminate under the Notice of Termination of the existing
Interconnection Agreements. See NCPA's Petition for Declaratory
Order at p. 20 and Attachment E.
    2
    PG&E further indicates that, upon termination of the
existing Interconnection Agreements, NCPA and Silicon Valley
would obtain certain services previously provided by PG&E

Case: 01-30923. Doc# 5359  Filed: 03/20/02  Entered: 03/21/02 10:39:00  Page 26
of 58

directly from the California ISO.

-4-

remove inconsistencies within, and administrative burdens to, the operation of the California ISO and the new market structure.

NCPA argues that PG&E is seeking to evade its contractual and license obligations to NCPA, to turn those contractual and license obligations over to the California ISO without NCPA's or the California ISO's permission, and to preempt decisions in

3

matters pending in other dockets at the Commission. According to NCPA, PG&E is abrogating its service obligation under the existing Interconnection Agreement because it is obligated to provide certain transmission- and generation-related services

4

under a 1991 Settlement Agreement. Finally, NCPA argues that PG&E did not engage in good faith negotiations on the terms of the replacement Interconnection Agreement.

5

The City of Santa Clara, California (Santa Clara) argues that its replacement Interconnection Agreement with PG&E fails to address long-standing agreements between the parties; does not ensure Silicon Valley's access to Western Area Power Administration power or to Silicon Valley's California-Oregon Transmission Project; and no longer requires PG&E to continue services required under a 1991 Settlement Agreement and

3

NCPA also questions whether it will be able to procure the services required under the existing Interconnection Agreement from the California ISO (NCPA Protest at 27-30). NCPA questions the ability of the California ISO to provide the services that NCPA would require. We will not address in this order the issue of if, and whether, the California ISO can provide the services that would otherwise be provided under the existing Interconnection Agreement with PG&E.

4

According to NCPA, the 1991 Settlement Agreement between PG&E and NCPA implemented the Stanislaus Commitments. The Stanislaus Commitments are a 1976 agreement between PG&E and the Department of Justice regarding conditions included in PG&E's Nuclear Regulatory Commission license for its Diablo Canyon Nuclear Plant. The Stanislaus Commitments, which resolved antitrust concerns against PG&E, describe conditions under which PG&E will provide interconnection, transmission, reliability and energy services to other utilities requesting such service.

5

Santa Clara is a city which owns and operates Silicon Valley Power, a municipal electric utility system engaged in the generation, transmission, distribution, purchase and sale of electric power and energy at wholesale and retail. Santa Clara purchases a portion of its energy requirements and certain transmission and coordination services from PG&E pursuant to certain contracts, including the Interconnection Agreement at issue in this proceeding and designated as PG&E Rate Schedule

FERC No. 85.

03/20/02 14:20 FAX                    MCDONOUGH HOLLAND ALLEN                    ☐030

Case: 01-30923    Doc# 5359    Filed: 03/20/02    Entered: 03/21/02 10:39:00    Page 29
of 58

Docket No. ER01-2998-000, et al.

6

Stanislaus Commitments.   Santa Clara then identifies a number of
specific perceived shortcomings, errors, inconsistencies and
improper provisions in the replacement Interconnection Agreement.
Santa Clara requests that, if the Commission will not reject
PG&E's filing, we suspend  the Notice of Termination and
replacement Interconnection Agreement for five months subject to
further order by the Commission prior to the end of the
suspension period.

E.  NCPA Request for Technical Conference

On February 27, 2002, NCPA filed an emergency petition
seeking a declaratory order and a request for a technical
conference.  NCPA notes its ongoing negotiations with the Cal ISO
on the terms of new Interconnection Agreements to provide
services that will no longer be provided under PG&E's proposed
replacement Interconnection Agreements have not been successful
to date.  Among other things, NCPA notes that the parties are
negotiating on a Vertically Integrated Utility operating
agreement concept that would allow vertically integrated
utilities such as NCPA and its members to operate competitively
with other market participants in the Cal ISO market.  According
to NCPA,  there are aspects in the design of the Cal ISO
operations that will penalize entities like NCPA without some
accommodation.

Concurrently with the negotiations with the Cal ISO, NCPA
notes that it is engaged in negotiations with PG&E on the
replacement Interconnection Agreements.  These negotiations with
PG&E include not only the terms of the replacement
Interconnection Agreements but also Contract 2948A, a contract
between PG&E and WAPA that covers nearly half of NCPA's energy
loads.  NCPA notes that PG&E and NCPA disagree on PG&E's
surviving service obligations to NCPA and to WAPA that NCPA
contends will not end with the termination of the existing
Interconnection Agreements.  If PG&E's service obligations are
not agreed upon by the parties before the replacement
Interconnection Agreements take effect, then under the Cal ISO
tariff, PG&E will provide operating instructions as to the
interpretation of Contract 2948A.  In that situation, PG&E's view
will prevail until the contract dispute is resolved.  NCPA argues

6
According to Santa Clara, under the 1991 Settlement
Agreement and the Stanislaus Commitments, PG&E is committed to
provide services to Silicon Valley as a Neighboring Entity and
Neighboring Distribution System.  Based on the 1991 Settlement
Agreement, PG&E withdrew a series of suits against its customers,
including litigation against Santa Clara, on the understanding
that the Settlement Agreement would bind PG&E to implement and be
bound by the Stanislaus Commitments through January 1, 2050.  See
Santa Clara Amended Protest and Request for Rejection, pp. 10-11.

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 30
of 58

that if PG&E does not comply with its obligations under Contract
2948A, it cannot finalize new Interconnection Agreements with the
Cal ISO. NCPA thus seeks a declaratory order that confirms
PG&E's continuing contractual obligations under the existing
Interconnection Agreements and Contract 2948A until the parties
develop suitable replacement arrangements and procedures. NCPA
also seeks a technical conference, or settlement or other less
formal procedure for NCPA, the Cal ISO, PG&E and WAPA, to work
out these issues with the assistance of Commission staff.

II  NOTICE OF FILING AND PLEADINGS

    A.  Docket No. ER01-2998-000

    Notice of PG&E's filing was published in the Federal
Register, 66 Fed. Reg. 48,128 (2001), with comments,
interventions and protests due on September 21, 2001. On
September 19, 2001, the Commission issued a notice of extension
of time to file interventions and protests until September 28,
2001.

    The Public Utilities Commission of California (California
PUC) filed a notice of intervention and comments in support of
PG&E's filing. The California Electricity Oversight Board
(California Oversight Board) filed a timely motion to intervene
and comments in support of PG&E's filing.

    NCPA filed a motion to intervene and protest and a motion to
reject PG&E's filing on September 28, 2001. The Modesto
Irrigation District (Modesto) and Santa Clara filed separate
timely motions to intervene. On October 1, 2001, the City of
Roseville, California filed a motion to intervene and protest out
of time. The California ISO filed a motion to intervene out of
time on November 13, 2001.

    On October 12, 2001, PG&E filed an answer to NCPA's protest
and motion to reject on October 12, 2001. NCPA filed a reply to
PG&E's answer on October 29, 2001.

    B.  Docket No. ER02-358-000

    Notice of PG&E's filing was published in the Federal
Register, 66 Fed. Reg. 59,588 (2001), with comments,
interventions and protests due on December 7, 2001. Modesto
filed a timely motion to intervene. NCPA and Santa Clara filed
separate timely motions to intervene and protest. Santa Clara
subsequently filed an amended protest and request for rejection
or, in the alternative, suspension and hearing.

    PG&E filed an answer to Santa Clara's protest and request
for rejection on December 26, 2001.

C.   Docket No. EL02-64-000

Notice of NCPA's filing was published in the Federal
Register, 67 Fed. Reg. 10,395 (2001), with comments,
interventions and protests due on March 11, 2002.  PG&E filed an
answer and motion to dismiss NCPA's complaint on March 8, 2002.
The California ISO, Southern California Edison Company and Santa
Clara filed timely motions to intervene on March 11, 2002.

III. DISCUSSION

A.   Preliminary Matters

We note that on April 6, 2001, PG&E filed for Chapter 11
bankruptcy protection.  Although the Bankruptcy Code provides
that the filing of a bankruptcy petition automatically stays

7

certain actions against the debtor,  the Code also provides an
exception from this automatic stay for:

An action or proceeding by a governmental unit . . . to
enforce such governmental unit's or organization's
police and regulatory power, including the enforcement
of a judgment other than a money judgment, obtained in
an action or proceeding by the governmental unit to
enforce such governmental unit's or organization's

8

police or regulatory power.

The Commission has found in the past that actions taken
under the authority granted it by the Federal Power Act and the
controlling regulations fit within this exception, and, 9
therefore, are exempt from the automatic stay provision.   In the
instant matter, we are exercising our regulatory power under
section 205 of the Federal Power Act as permitted by section
362(b)(4) of the Bankruptcy Code to issue an order that does not

---

7
   11 U.S.C.   362(a)(1) (1994 & Supp. 2000).
8
   11 U.S.C.   362(b)(4) (1994 & Supp. 2000).
9
   See Virginia Electric and Power Co., 84 FERC   61,254
(1998); and Century Power Corp., 56 FERC   61,087 (1991). The
Commission conclusion on this matter is consistent with judicial
precedent regarding the scope of the exemption to the automatic
stay.  E.g., Board of Governors of the Fed. Reserve Sys. v. MCorp
Fin., Inc., 502 U.S. 32 (1991); SEC v. Brennan, 250 F.3d 65 (2nd
Cir. 2000); NLRB v. Continental Hagen Corp., 932 F.2d 828 (9th
Cir. 1991); United States v. Commonwealth Cos. Inc. 913 F.2d 518
(8th Cir. 1990); NLRB v. Edward Cooper Painting, Inc. 804 F.2d
934 (6th Cir. 1986); Penn Terra Ltd. v. Dept. of Envtl.
Resources, 733 F.2d 267 (3rd Cir. 1984); see generally 3 Collier

on Bankruptcy    362.05 (15th ed. rev. 2000).

03/20/02  14:21 FAX              MCDONOUGH HOLLAND ALLEN                    @034

10    threaten the bankruptcy court's control over the property of the

bankruptcy estate.

B.  Procedural Matters

Pursuant to Rule 214 of the Commission s Rules of Practice and Procedure, the timely motions to intervene in the dockets in which they intervened, serve to make those who filed a party to that proceeding.

Due to the early stage of the proceeding in Docket No. ER01-2998-000, their interest in the proceeding, and the lack of undue prejudice or delay, we find good cause to grant the untimely motions of the City of Roseville and the California ISO.

Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits the filing of an answer to a protest or answer unless permitted by the decisional authority. We are not persuaded to permit PG&E's answers and NCPA's reply in Docket Nos. ER01-2998-000 and ER02-358-000. Accordingly, we reject them. We accept PG&E's answer in Docket No. EL02-64-000 as a valid answer pursuant to Rule 213(a)(1) of the Commission's Rules of Practice and Procedure.

C.  Commission Determination

We are unable to determine, on the record before us, whether termination of the existing Interconnection Agreements is appropriate. Furthermore, PG&E has not shown that the replacement Interconnection Agreements are just and reasonable and they therefore may be unjust, unreasonable, unduly discriminatory or preferential, or otherwise unlawful. Accordingly, we will accept the replacement Interconnection Agreements for filing and shall suspend for them for five months, subject to refund, to become effective on September 1, 2002. However, as discussed below, we will make these proceedings subject to further Commission order.

In light of the arguments raised in the protests and the petition for declaratory order, the Commission is concerned that terminating the existing Interconnection Agreements for NCPA and Silicon Valley without appropriate arrangements for replacement service that reflects the service obligations embodied in various agreements between the parties may be unjust and unreasonable. In addition, the protesters raise a number of issues with respect to the reasonableness of the scope of services as well as the terms and conditions of such services in the replacement Interconnection Agreements. In light of these concerns, as

10
This order does not change any monetary obligations, and therefore, has no effect on the estate.

Case: 01-30923    Doc# 5359    Filed: 03/20/02    Entered: 03/21/02 10:39:00    Page 34
of 58

discussed above, we will suspend the Notices of Termination and the replacement Interconnection Agreements for five months. Although an evidentiary hearing is one means to resolve the contested issues, the parties appear to be trying to reach an agreement on replacement service arrangements with the California ISO that will supercede PG&E's existing Interconnection Agreements.

We note that, on February 27, 2002, NCPA filed a request for technical conference in Docket No. EL02-64-000. The Commission directs Commission staff to schedule a technical conference at Commission headquarters inviting the parties in all three dockets to negotiate the terms and implementation of replacement Interconnection Agreements. In the meantime, we affirm PG&E's continuing contractual obligations to NCPA under the existing Interconnection Agreement and Contract 2948A, and PG&E's duty to comply with those obligations. Based on the outcome of our action in this order and the technical conference, the Commission will issue a subsequent order in these proceedings.

The Commission orders:

(A)     PG&E's replacement Interconnection Agreements with NCPA and Silicon Valley are conditionally accepted for filing, suspended for a five-month period, to become effective September 1, 2002, subject to refund, and subject to further Commission order, as discussed in the body of this order.

(B)     The notices of termination filed in Docket Nos. ER01-2998-000 and ER02-358-000, respectively, are hereby conditionally accepted for filing, suspended for a five- month period, to become effective September 1, 2002, and subject to further Commission order, as discussed in the body of this order.

(C)     Commission staff is directed to schedule a technical conference for the parties to negotiate the terms and implementation of the replacement Interconnection Agreements.

By the Commission.

( S E A L )

Linwood A. Watson, Jr.,
Deputy Secretary.

Docket No. ER01-2998-000, et al.

10-

## Stipulation of City of Palo Alto, Northern California Power Agency and Pacific Gas and Electric Company Regarding the Stanislaus Commitments

This Stipulation is entered into as of February 6, 2002, by and between the City of Palo Alto, California ("Palo Alto"), Northern California Power Agency ("NCPA") and Pacific Gas and Electric Company ("PG&E") (individually "Party" and collectively, "Parties").

### Recitals

The Parties intend this Stipulation to resolve (except as reserved below) the objections filed by NCPA and Palo Alto (except that as to Palo Alto and without PG&E admitting the meritorious nature of the objections, certain objections as to natural gas and GTrans issues are reserved) to the Disclosure Statement accompanying the Plan of Reorganization filed September 20, 2001, as amended December 19, 2001, by PG&E in its bankruptcy proceeding, Case No. 01-30923 DM 11 (N.D. Cal.).

Furthermore, the Parties intend to resolve through this Stipulation that the bankruptcy has no adverse effect on the Settlement and Stanislaus Commitments (as defined below) and that the rights of NCPA and Palo Alto under the Settlement and Stanislaus Commitments are unimpaired and pass through the bankruptcy unaffected. The Parties disagree concerning, among other things, the scope of the obligations and the extent of rights under the Settlement and Stanislaus Commitments and intend to reserve such disputes and disagreements for future resolution in a forum other than the Bankruptcy Court (except as reserved below).

### Agreement

Now, therefore, the Parties agree that the following fully resolves NCPA's and Palo Alto's objections to the Disclosure Statement as to the Settlement and Stanislaus Commitments, but not as to Palo Alto's Disclosure Statement objections pertaining to natural gas and GTrans issues:

    1. This Stipulation shall be effective as of the date filed in the Bankruptcy Court, but subject to approval by the Bankruptcy Court as a settlement, which shall be requested by PG&E. This Stipulation shall terminate and be of no further force or effect, unless extended by agreement of the Parties, if either of these events occurs: (x) the Bankruptcy Court does not confirm the Plan or (y) there is a failure of one or more conditions to the effectiveness of the Plan that has not been waived by PG&E on or before January 1, 2003, as specified in Section 8.3 of the Plan.

    2. The following language shall be included in PG&E's First Amended Disclosure Statement (together with any subsequently amended or restated version, "Disclosure Statement") and First Amended Plan of Reorganization (together with any subsequently amended or restated version, "Plan"):

"The obligations under (1) the 1991 Settlement Agreement between NCPA and PG&E in

**EXHIBIT 2**

a Nuclear Regulatory Commission ("NRC") proceeding, implementing the Statement of Commitments accompanying the letter from PG&E to the U.S. Department of Justice of April 30, 1976 ("1991 Settlement Agreement"), (2) the letter from PG&E to the U.S. Department of Justice of April 30, 1976, to the extent that it represents obligations, a position disputed by PG&E (the "1976 Letter") and (3) the antitrust license conditions included in the Diablo Canyon Nuclear Power Plant NRC licenses ("License Conditions") (collectively, the 1991 Settlement Agreement, the 1976 Letter and the License Conditions are referred to as the "Settlement and Stanislaus Commitments") shall be assigned to each of the Reorganized Debtor, ETrans LLC, and Electric Generation LLC, such that each such entity or, if determined by any court or governmental regulatory agency or authority of competent jurisdiction, such entity and any of its subsidiaries, is jointly and severally obligated for the full performance, and liable for the nonperformance of the Settlement and Stanislaus Commitments. Under the Plan, PG&E shall assume and assign the 1991 Settlement Agreement with the written consent of NCPA to the Reorganized Debtor, ETrans LLC, and Electric Generation LLC. PG&E has proposed in filings at the NRC that the Reorganized Debtor, ETrans LLC, and Electric Generation LLC shall be jointly and severally liable under the License Conditions ("the Joint and Several Filings"), although PG&E makes no representations or warranties as to whether the NRC will accept such proposal without modification. If the NRC fails for any reason to grant, authorize and approve the Joint and Several Filings, or any of them ("the NRC Adverse Ruling"), this Stipulation shall not affect the rights of any Party to take any action to assure the benefits of the License Conditions to the same extent as such benefits existed prior to PG&E's bankruptcy. Such actions include, without limitation, appeal of the NRC Adverse Ruling and taking such actions in available forums to mitigate the adverse effects of the NRC Adverse Ruling and to impose the same or substantially similar obligations to the License Conditions on the Reorganized Debtor, ETrans LLC and Electric Generation LLC and otherwise to protect their interests, rights and remedies from the NRC Adverse Ruling. The provisions of that certain Stipulation of City of Palo Alto, Northern California Power Agency and Pacific Gas and Electric Company Regarding the Settlement and Stanislaus Commitments, dated as of February 6, 2002, are incorporated herein."

3. With respect to the Settlement and Stanislaus Commitments and notwithstanding (i) the Plan, (ii) the Plan Confirmation Order, (iii) the filing of any document by or involving any Transmission Party (as defined below) or Party with any court or any governmental regulatory agency or authority, including to remedy or mitigate any NRC Adverse Ruling or (iv) any interpretive dispute between PG&E, a Transmission Party and NCPA or any of its members about the Settlement and Stanislaus Commitments:

(a) NCPA and its members shall have no lesser standing, rights, powers, interests, claims, remedies, obligations, defenses and excuses under the Settlement and Stanislaus Commitments with respect to the Transmission Parties, including their assets, jointly and severally, than NCPA and its members would have had with respect to PG&E if there had been no bankruptcy, disaggregation, Plan or Plan Confirmation Order;

2

(b) None of the Transmission Parties, including their assets, shall have any greater standing, obligations, rights, powers, interests, claims, remedies, defenses and excuses under the Settlement and Stanislaus Commitments than PG&E would have had if there had been no bankruptcy, disaggregation, Plan or Plan Confirmation Order;

(c) The Transmission Parties will not assert that the Plan or the Plan Confirmation Order provides a basis for adversely affecting any of the asserted or unasserted rights, powers, interests, claims, remedies, defenses or excuses that NCPA or its members may have against any Transmission Party or all Transmission Parties under the Settlement and Stanislaus Commitments;

(d) The assurances of Section 3(a), (b) and (c) apply notwithstanding existing differences in interpretation of the Settlement and Stanislaus Commitments and without admitting the correctness of any interpretation, but in order to confirm the full scope of such assurance as being sufficiently broad as to even apply in the case where the interpretations of the parties other than PG&E were to prevail;

(e) The assurances of Section 3(a), (b) and (c) are not intended to address or relate to changes in the financial condition of PG&E as it existed prior to bankruptcy as compared to the financial condition of the Transmission Parties after the bankruptcy; and

(f) PG&E makes no warranties or representations as to any actions the NRC may take which may affect, directly or indirectly, the standing, obligations, rights, powers, interests, claims, remedies, defenses and excuses of the Parties under the License Conditions. Other than as provided in Section 8, this Stipulation in no way limits the positions or actions that the Parties or the Transmission Parties may take at the NRC.

4.      The following words and phrases in this Stipulation have the meanings indicated:

(a) "Transmission Parties": Reorganized Debtor, ETrans LLC, Electric Generation LLC, and each of their other respective subsidiaries existing at the time of the Effective Date or thereafter created, whether pursuant to or as contemplated by the Plan or otherwise in order to:  (i) provide electric transmission service, whether now existing or hereafter arising in those functions or businesses, including, without limitation, maintenance, upgrades, repairs, siting, planning, and construction; (ii) acquire, lease, license, own, hold, or use any facility, equipment or other tangible asset of any Transmission Party that is directly or indirectly used to provide transmission service; or (iii) do anything else required by the Settlement and Stanislaus Commitments.  The Transmission Parties also include the successors and assignees of each such party.  The foregoing definition of Transmission Parties had been drafted broadly in order to assure application to all Reorganized Debtor, ETrans LLC, Electric Generation LLC subsidiaries that may be necessary for performance under the Settlement and Stanislaus Commitments.  Nothing in the foregoing definition of Transmission Parties or other provisions of this Stipulation shall be deemed or construed to expand, modify, interpret, define or otherwise change any obligation of a Transmission Party under the Settlement

3

and Stanislaus Commitments.

    (b) "Transmission Party": Any one of the Transmission Parties.

    (c) "1991 Settlement Agreement": The 1991 Settlement Agreement between NCPA and PG&E in an NRC proceeding, implementing the Statement of Commitments accompanying the letter from PG&E to the U.S. Department of Justice of April 30, 1976.

    (d) "License Conditions": The antitrust license conditions included in the Diablo Canyon Nuclear Power Plant Nuclear Regulatory Commission ("NRC") licenses, as such conditions may be modified by the NRC.

    (e) "1976 Letter": The letter from PG&E to the U.S. Department of Justice dated April 30, 1976, to the extent that it represents obligations, a position disputed by PG&E.

    (f) "Adverse NRC Ruling": PG&E has proposed in filings at the NRC that the Reorganized Debtor, ETrans LLC, and Electric Generation LLC shall be jointly and severally liable under the License Conditions ("the Joint and Several Filings"), although PG&E makes no representations or warranties as to whether the NRC will accept such proposal without modification. If the NRC fails for any reason to grant, authorize and approve the Joint and Several Filings, or any of them, such determination shall be referred to for purposes of this Stipulation as the "NRC Adverse Ruling".

    (g) "Neighboring Entities": As defined in the Settlement and Stanislaus Commitments.

    (h) "Settlement and Stanislaus Commitments": The 1991 Settlement Agreement, the 1976 Letter and License Conditions, collectively, subject to Section 3(f) of this Stipulation.

    5. The provisions of this Stipulation shall be incorporated by reference in the Plan and Plan Confirmation Order as one aspect of the implementation of the Plan and, as such, shall be deemed a court approved, enforceable obligation of each Party and Transmission Party, and not an executory contract that can be rejected pursuant to 11 U.S.C. § 365 or otherwise in this bankruptcy by any Party or Transmission Party.

    6. The standing, rights, powers, interests, claims, remedies, obligations, defenses or excuses of Palo Alto, NCPA and its other members, the Transmission Parties and Neighboring Entities under the Settlement and Stanislaus Commitments shall be unimpaired by the Plan and the Plan Confirmation Order, unaffected by any Plan discharge and otherwise not adversely affected by the bankruptcy, the Plan or Plan Confirmation Order, except that assumption and assignment of the 1991 Settlement Agreement to the Transmission Parties jointly and severally shall be accomplished in the Plan Confirmation Order. Without limiting the foregoing, the bankruptcy, the Plan, the

4

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 40 of 58

Plan Confirmation Order, the discharge and disaggregation shall not adversely affect the standing, rights, powers, interests, claims, remedies, obligations, defenses or excuses of Palo Alto, NCPA and its other members under the Settlement and Stanislaus Commitments against or with respect to any Party or Transmission Party. Furthermore, and without limiting the foregoing, the Parties and the Transmission Parties shall not be deemed to have cured, or to be excused from, any or all defaults existing as of the Effective Date, and shall not be deemed, as a consequence of assumption and assignment under 11 U.S.C. § 365 (including section 365(k)) or otherwise, to be in full and complete compliance with the 1991 Settlement Agreement as a result of either the assumption and assignment of the 1991 Settlement Agreement or the Plan Confirmation Order or implementation of the Plan, but rather all Parties shall retain all standing, rights, powers, interests, claims, remedies, obligations, defenses or excuses as if there had been no bankruptcy, disaggregation, Plan or Plan Confirmation Order.

7. The Bankruptcy Court shall not retain jurisdiction over any disputes regarding the Settlement and Stanislaus Commitments after the Effective Date; provided, however, that the Bankruptcy Court has and retains jurisdiction (i) that is found to exist independent of the Plan's or Plan Confirmation Order's retained jurisdiction provisions; (ii) that concerns any disputes regarding implementation and interpretation of the Stipulation; and (iii) that concerns any claim or administrative expense asserted by NCPA or any of its members, including Palo Alto, in the PG&E bankruptcy case.

8. PG&E warrants and assures Palo Alto, NCPA and its other members that, following the Effective Date, Reorganized Debtor, ETrans LLC and Electric Generation LLC shall be as capable as PG&E was prior to its disaggregation under the Plan of satisfying all obligations under the Settlement and Stanislaus Commitments. NCPA and Palo Alto will not assert in any court or governmental regulatory agency or authority, except as to NRC Adverse Ruling, that such disaggregation by itself will impair or adversely affect the ability of Reorganized Debtor, ETrans LLC or Electric Generation LLC to perform under the Settlement and Stanislaus Commitments. The foregoing is without prejudice to the rights, claims, defenses, excuses, powers and standing of Palo Alto, NCPA and its other members to continue to object to any nonperformance under the Settlement and Stanislaus Commitments or other wrongs by PG&E, Reorganized Debtor, ETrans LLC or Electric Generation LLC by any means and in any applicable forums (the "Reserved Claims"). The Reserved Claims include, without limitation, the rights, claims, defenses, excuses, powers and standing of Palo Alto, NCPA and its other members concerning the expiration of the interconnection agreement between NCPA and PG&E and NCPA's allegation that PG&E has proposed to cease to provide transmission services by interconnection agreements referenced in the Settlement and Stanislaus Commitments. NCPA and Palo Alto will not submit objections to Plan confirmation alleging such disaggregation under the Plan by itself will impair or adversely affect the ability of PG&E, Reorganized Debtor, ETrans LLC or Electric Generation LLC to perform under the Settlement and Stanislaus Commitments, except as to NRC Adverse Ruling or, if applicable, the Reserved Claims. In regard to this limitation on the right to object to confirmation, NCPA and Palo Alto will not argue, for example, that after disaggregation obtaining electric transmission service under the Settlement and

Case: 01-30923    Doc# 5359    Filed: 03/20/02    Entered: 03/21/02 10:39:00    Page 41
of 58

Stanislaus Commitments will be more burdensome, complex, costly, inconvenient, time-consuming or unreliable. Nothing in this Stipulation, however, shall be construed to diminish or alter the ability of NCPA and Palo Alto in any forum to pursue all rights, powers, interests, claims, remedies, defenses and excuses and exercise all available legal and equitable means to assure realization of the full benefits of the Settlement and Stanislaus Commitments and to assure that any Plan proposed or supported by PG&E provides such assurance. Furthermore, nothing in this Stipulation shall be construed to diminish or alter the ability of PG&E or the Transmission Parties to contest the scope, length and extent of its obligations under the Settlement and Stanislaus Commitments or in any forum to pursue all rights, powers, interests, claims, remedies, defenses and excuses and exercise all available legal and equitable means in connection with its performance or obligations under the Settlement and Stanislaus Commitments.

9. PG&E confirms and agrees to the following:

(a) PG&E intends to assume the Interconnection Agreement between PG&E and NCPA and assign it to ETrans LLC. This assumption and assignment will be specified in PG&E's February 1, 2002, Plan Supplement ("Plan Supplement"). Without limiting Section 6, and consistent therewith, this assumption and assignment will not seek or require the determination of any default or the calculation of any cure and will be without prejudice to any rights of NCPA and Palo Alto on account of any alleged breaches of the Settlement and Stanislaus Commitments.

(b) PG&E does not intend to reject in bankruptcy the 1991 Settlement Agreement and the disposition of the 1991 Settlement Agreement will be addressed in the Plan Supplement as provided in this Stipulation.

(c) PG&E does not seek nor intend to invoke or assert preemption under the Bankruptcy Code to alter, amend or modify existing contracts with NCPA or Palo Alto.

(d) PG&E agrees to provide advance notice to NCPA and Palo Alto as to any modification to the Plan that may adversely impact the rights, powers, interests, claims, remedies, defenses or excuses of NCPA or Palo Alto in connection with this Stipulation or the Settlement and Stanislaus Commitments. NCPA and Palo Alto fully reserve the right to object and otherwise respond to any such adverse modification.

10. This Stipulation represents the complete and final agreement of the Parties as to its subject matter and supersedes all prior communications, offers and agreements as to that subject matter. This Stipulation is made in and subject to the laws of the State of California, except to the extent federal law may preempt such laws.

11. Each person signing below warrants that he or she has complete authority to enter into this Stipulation on behalf of the Party for which he or she signs. This Stipulation may be signed in counterpart originals and is effective as of the last date entered with a signature below.

6

12. NCPA and Palo Alto hereby consent to the assignment of the 1991 Settlement Agreement from PG&E to Reorganized Debtor, ETrans LLC, and Electric Generation LLC as described in this Stipulation.

13. This Stipulation shall not be deemed or construed to alter, amend, modify, enhance, expand or limit any of the rights and obligations of the Parties, the Transmission Parties or any third parties under the Settlement and Stanislaus Commitments. The Parties hereby agree that they will not make assertions, representations or statements before any court, regulatory agency or other adjudicatory body that are inconsistent with this Section 13.

14. PG&E represents and warrants that by no later than the Effective Date it shall cause Reorganized Debtor, ETrans LLC, and Electric Generation LLC to assume liability for and divide functional responsibility for arranging services under the Settlement and Stanislaus Commitments as follows (such division of functional responsibility shall not affect the joint and several liability of each of Reorganized Debtor, ETrans LLC, and Electric Generation LLC under the Settlement and Stanislaus Commitments):

(a) Reorganized Debtor shall be principally responsible for implementation of the following services under the Settlement and Stanislaus Commitments: (i) interconnection, where the voltage is less than 60kV; (ii) reserve coordination; (iii) emergency power – first 11 years (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (iv) power exchange – first 11 years (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); and (v) wholesale power sales – first 11 years (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term).

(b) ETrans LLC shall be principally responsible for implementation of the following services under the Settlement and Stanislaus Commitments: (i) interconnection, where the voltage is 60 kV or greater and (ii) transmission service.

7

(c) Electric Generation LLC shall be principally responsible for implementation of the following services under the Settlement and Stanislaus Commitments: (i) Emergency Power after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (ii) Power Exchange after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (iii) Wholesale Power Sales after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); and (iv) Participation in new nuclear plants (to the extent applicable).

In Witness Whereof, the Parties have executed this Stipulation to be effective as of the date first above written.

PACIFIC GAS AND ELECTRIC COMPANY

By: _____

Name: Roger J. Peters
Title:  Senior Vice President and General
        Counsel

NORTHERN CALIFORNIA POWER AGENCY

By: _____
Name:
Title:

THE CITY OF PALO ALTO

By: _____
Name:
Title:

8

(c) Electric Generation LLC shall be principally responsible for implementation of the following services under the Settlement and Stanislaus Commitments: (i) Emergency Power after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (ii) Power Exchange after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (iii) Wholesale Power Sales after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); and (iv) Participation in new nuclear plants (to the extent applicable).

In Witness Whereof, the Parties have executed this Stipulation to be effective as of the date first above written.

PACIFIC GAS AND ELECTRIC
COMPANY

By: _____
Name: Roger J. Peters
Title:  Senior Vice President and General
       Counsel

NORTHERN CALIFORNIA POWER
AGENCY

By: _____
Name:  GEORGE FRASER
Title:  G. M.

THE CITY OF PALO ALTO

By: _____
Name:
Title:

8

     (c) Electric Generation LLC shall be principally responsible for implementation of the following services under the Settlement and Stanislaus Commitments: (i) Emergency Power after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (ii) Power Exchange after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); (iii) Wholesale Power Sales after year 11 (consistent with Electric Generation LLC –Reorganized Debtor power sales agreement term); and (iv) Participation in new nuclear plants (to the extent applicable).

In Witness Whereof, the Parties have executed this Stipulation to be effective as of the date first above written.

                           **PACIFIC GAS AND ELECTRIC COMPANY**

                           By: _____
                           Name: Roger J. Peters
                           Title:   Senior Vice President and General
                                     Counsel

                           **NORTHERN CALIFORNIA POWER AGENCY**

                           By: _____
                           Name:
                           Title:

                           **THE CITY OF PALO ALTO**

                           By: *Victor Ojakian*
                           Name: **VICTOR OJAKIAN**
                           Title:  **MAYOR**

                                   2

1    Mark Gorton (99312)
     Mary E. Olden (109373)
2    Todd M. Bailey (109519)
     McDONOUGH, HOLLAND & ALLEN
3    A Professional Corporation
     555 Capitol Mall, Ninth Floor
4    Sacramento, California 95814
     Telephone:   916-444-3900
5    Facsimile:    916-444-8334

6    Attorneys for Northern California Power Agency

7

8               UNITED STATES BANKRUPTCY COURT

9               NORTHERN DISTRICT OF CALIFORNIA

10                    (San Francisco Division)

| | |
|---|---|
| 11   In re | Case No.  01-30923 SFM 11 |
| 12   PACIFIC GAS and ELECTRIC COMPANY, | Chapter 11 |
| 13                 Debtor. | Date:    March 27, 2002<br>Time:   9:30 a.m. |
| 14   Tax I.D. No. 94-0742640 | Place:   235 Pine Street<br>          San Francisco, CA |
| 15 | |

16                      **PROOF OF SERVICE**
                       (Federal-Bankruptcy)

17

18        I am employed in the County of Sacramento; my business address is 555 Capitol Mall, 9th Floor, Sacramento, California.  I am over the age of 18 years and not a party to the foregoing action.

19        On March 20, 2002, I served the following documents:

20    •   **RESPONSE OF NORTHERN CALIFORNIA POWER AGENCY TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES**

21

22    ☒   **by facsimile transmission** to the following party(ies) at the facsimile number(s) indicated.

23

24

25

26

27

28

McDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION

POS-PG&E/Estimation Mtn

1  ☒ **by overnight delivery** on the following party(ies) in said action by placing a true
2     copy thereof enclosed in a sealed envelope, with delivery fees paid or
      provided for, in a designated area for outgoing overnight mail, addressed
3     as set forth below. Mail placed in that designated area is picked up that
      same day, in the ordinary course of business, for delivery the following
4     business day.

5  <u>*Counsel for Pacific Gas & Electric*</u>          Office of the U.S. Trustee
   James L. Lopes, Esq.                        Attn: Stephen Johnson
6  Howard, Rice, Nemerovski                    250 Montgomery Street, Ste. 1000
   3 Embarcadero Center, 7th Floor             San Francisco, CA 94104
7  San Francisco, CA 94111                     Phone No.: (415) 705-3333
   Phone No.: (415) 434-1600                   **Fax No.: (415) 705-3379**
8  **Fax No.: (415) 217-5910**                 Email: stephen.johnson2@usdoj.gov
   Email: jlopes@hrice.com

9  <u>*Counsel for Official Committee of*</u>          *Counsel for PG&E Corporation*
   <u>*Unsecured Creditors*</u>                        Michael P. Kessler, Esq.
10 Paul S. Aronzon                             Weil, Gotshal & Manges LLP
   Milbank, Tweed, Hadley, et al.              767 Fifth Avenue
11 601 South Figueroa Street, 30th Floor       New York, NY 10153
   Los Angeles, California 90017               Phone No.: (212) 310-8000
12 Phone No.: (213) 892-4000                   **Fax No.: (212) 310-8007**
   **Fax No.: (213) 629-5063**                 Email: michael.kessler@weil.com
13 Email: paronzon@milbank.com

14
   I declare under penalty of perjury that the foregoing is true and correct.
15
   Executed on March 20, 2002, at Sacramento, California.
16

17

18                                             _____
                                                      Stacey Ting
19

20 cc:   Larry Engel (via email only)
         Brobeck, Phleger & Harrison LLP
21       One Market-Spear Tower
         San Francisco, CA 94105
22       e-mail: lengel@brobeck.com

23       Kevin S. Smith (via email only)
         Northern California Power Agency
24       180 Cirby Way
         Roseville, CA 95678
25       Email: ksmith@ncpa.com

26

27 POS-PG&E/Estimation Mtn

28
MCDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION
                                    2

POS-PG&E/Estimation Mtn

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 48 of 58

Mark Gorton (99312)
Mary E. Olden (109373)
Todd M. Bailey (109519)
McDONOUGH, HOLLAND & ALLEN
A Professional Corporation
555 Capitol Mall, Ninth Floor
555 Capitol Mall, Ninth Floor
Sacramento, California 95814
Telephone: 916-444-3900
Facsimile: 916-444-8334

Attorneys for Northern California Power Agency

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| In re<br><br>PACIFIC GAS and ELECTRIC COMPANY,<br><br>                   Debtor.<br><br>Tax I.D. No. 94-0742640 | Case No. 01-30923 SFM 11<br><br>Chapter 11<br><br>DECLARATION OF DONALD B. DAME IN SUPPORT OF RESPONSE OF NORTHERN CALIFORNIA POWER AGENCY TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES<br><br>Date:     March 27, 2002<br>Time:    9:30 a.m.<br>Place:   235 Pine Street<br>            San Francisco, CA<br>Judge:  Hon. Dennis Montali |

I, DONALD B. DAME, declare:

1.     I am an employee of Northern California Power Agency (NCPA) and currently hold the position of Assistant General Manager of NCPA's Power Management Business Unit; I have had management responsibility for this business unit since 1996. I have a BA in Economics from the University of California and an MS in Regulatory Economics from the University of Wyoming. Prior to joining NCPA in 1992 as a Power

---

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

1   Contracts Engineer, I held various technical and management positions at the Colorado
2   Interstate Gas Company, Bonneville Power Administration, Pacific Power and Light
3   Company, and the California Department of Water Resources. I make this Declaration in
4   support of the Response of Northern California Power Agency to PG&E's Motion for
5   Order Determining Procedure for Estimating Certain Claims for Plan Feasibility Purposes
6   (the "Estimation Motion").

7       2.      NCPA's Power Management Business Unit is responsible for providing
8   Power Scheduling, Dispatch, Schedule Coordination, Power Contracting, Load
9   Forecasting, Long Term Load/Resource Planning, and Transmission Planning services on
10  behalf of NCPA's 10-member power pool. One of my primary functions is to oversee the
11  NCPA/PG&E Interconnection Agreement (IA) and I was involved in all meetings with
12  PG&E on this matter. My responsibilities include budgeting and forecasting for NCPA,
13  including forecasting transmission and interconnection costs.

14      3.      The IA is a critically important component of NCPA operations. NCPA
15  pool member service territories are located discontinuously throughout PG&E's northern
16  California service territory. Similarly, NCPA gas fired, hydro, and geothermal generation
17  resources are also scattered throughout PG&E's service territory. The existing IA
18  provides for, inter alia, the firm delivery of power from NCPA generation plants to the
19  PG&E grid, and from the PG&E grid to individual pool member service territory
20  interconnection points.

21      4.      During July 1997, PG&E gave 3-year notice to NCPA that it was terminating
22  the existing IA, effective August 1, 2000. Through various PG&E TO tariff cases at the
23  FERC, the effective date of IA termination was delayed to March 31, 2002.

24      5.      NCPA sent a letter to PG&E's Gordon Smith on January 31, 2001 indicating
25  that NCPA requested continuation of firm transmission service as provided for by the
26  Stanislaus Commitments. This followed up on an earlier letter, dated July 31, 1997, and
27  sent to James Macias. The Stanislaus Commitments provide NCPA with the provision of

28

McDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION

2

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

1    firm transmission service within PG&E service territory through 2050. This reassurance
2    was and is essential to NCPA members which are transmission dependent on PG&E. In
3    order to undertake the multi million dollar cost of building and operating generating
4    plants and to assure delivery of such power to public agency load centers, long term firm
5    transmission services under known terms and conditions remain an absolute necessity.

6        6.    Since NCPA's January 2001 letter requesting a continuation of long term
7    transmission service, NCPA staff has met several times with PG&E staff. I exclude e-
8    mails and voice-mails as meetings.

9        7.    Regarding a replacement IA, it was not evident to me at any time that
10   PG&E conceived of any other outcome apart from NCPA's complete separation from
11   PG&E's contractual provision to provide firm transmission service, and for NCPA to be
12   compelled to take all transmission, control area, and ancillary services needs completely
13   through the California Independent System Operator (ISO). And indeed, the
14   "replacement" IA filed at FERC by PG&E is no replacement of PG&E's obligation at all,
15   but rather a confirmation that PG&E never intended to negotiate a true, mutually
16   acceptable IA construct. The first "draft" replacement IA NCPA received from PG&E in
17   late spring 2001 was no draft at all but rather a series of chapter headings only. This
18   would be laughable if not such a serious matter. There was absolutely no substance from
19   which to proceed with any meaningful negotiations. PG&E asked for NCPA's comments
20   on this draft and I indicated that a bit more detail, other than just chapter headings would
21   be necessary.

22       8.    PG&E did finally convey a draft in early summer 2001 which still referenced
23   "District," which presumably was the same contract form PG&E issued to the Lassen
24   Municipal Utility District. This form was unsuited to the unique NCPA multi-member,
25   multi-power plant environment which requires, among other things, firm "points to
26   points" power receipt and delivery. NCPA's comments to PG&E on this version of the
27   proposed IA were simply that it was so far from what is required that it constituted a

28

McDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION

3

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

1    "non starter" for any type of serious negotiations in that it met none of NCPA's objectives.

2        9.      NCPA's overall objectives in a replacement IA focus around firm

3    transmission and the avoidance of undue congestion costs, while maintaining service and

4    cost comparability with PG&E's end use customers. Under the existing IA, PG&E could

5    develop its generation, transmission, and distributions system in such a way as to

6    minimize its expected total system cost. While NCPA was contractually receiving firm

7    transmission service from PG&E, PG&E had the latitude to provide such firmness with

8    either reliance on a bolstered transmission system or, in the absence of new transmission

9    capability, running its resources out of strict merit order dispatch. PG&E's operation was

10   transparent to NCPA as long as NCPA received its contractual firm transmission. Upon

11   PG&E's election to divest some of its generation facilities, the issue of inadequate

12   transmission capability, in the absence of the existing IA, has the ability to significantly

13   impact NCPA unless firm transmission rights can be attained. Without firm transmission

14   rights, NCPA members located in transmission congested locations (such as the San

15   Francisco Bay Area which affects the NCPA Cities of Palo Alto and Alameda) may be

16   subject to transmission congestion costs during periods of high loads and/or inadequate

17   resources.    The resource deficient PG&E would have no obligation or incentive to

18   substitute generation for transmission to ensure the meeting of NCPA loads. The affected

19   NCPA members would thus incur the congestion costs without any of the offsetting

20   congestion revenues accruing to the transmission owner.  Even without PG&E plant

21   divestiture, the removal of firm transmission service exposes NCPA members to the same

22   impact.

23       10.     Early on during the NCPA/PG&E meetings, NCPA and PG&E agreed on

24   the "bookends" of future PG&E provided IA services. Either PG&E had the obligation

25   under the Stanislaus Commitments to provide an extension of the currently provided IA

26   service through the year 2050, or PG&E could simply maintain that the ISO and power

27   marketplace provided all such service and that PG&E had no further obligation at all.

28

MCDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION

4

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

1  Indeed, PG&E's instant filing in the matter shows no movement in its thought from the

2  latter position.

3        11.    Throughout the handful of meetings over the last several years NCPA

4  maintained a willingness to seriously negotiate and compromise on matters that were

5  significant to both parties. PG&E demonstrated no willingness to negotiate at all. PG&E

6  on several occasions indicated the regulatory conundrum they were in: to negotiate

7  without any adjudicated, prescribed outcome, risked regulatory disallowance from the

8  CPUC. There can be no serious negotiations when one party comes to the table with this

9  perspective. Indeed, at the last meeting that took place, PG&E indicated that it simply

10  wanted to adjudicate this issue in order to have a forced resolution of our different

11  perspectives. And certainly after April 6, 2001, the day PG&E declared bankruptcy,

12  PG&E had little ability or authority to even suggest they were "negotiating" with NCPA

13  in earnest.

14        12.    Throughout the scattered meetings between PG&E and NCPA over the last

15  several years, NCPA put forth many elements of what might have constituted a potential

16  compromise to form a new IA. NCPA's suggestions included a cash payment, firm

17  transmission through 2013, establishing a congestion cost pool, a 10-year linear firm

18  transmission phase out, and other approaches. The ultimate objective of NCPA was and

19  is to achieve comparable services as those wholesale transmission services that are

20  provided to PG&E's retail customers, while retaining the ability to self provide such

21  services where feasible. NCPA further offered to buy a load ratio share of the PG&E

22  transmission system to assure NCPA of a known firm transmission capability along with

23  a mechanism to mitigate congestion charges. In my opinion, PG&E never gave any

24  serious consideration to these NCPA suggestions. In short, while there were multiple

25  meetings between NCPA and PG&E, no good faith negotiations took place.

26        13,    PG&E's Plan further muddies the replacement IA water in that the existing

27  PG&E structure is radically changed. If PG&E's proposal is attained, whereby it

28

MCDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION

5

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

successfully spins-off its natural gas, generation and transmission into new corporations, PG&E's current retail load centers could be in a similar position as NCPA's public power member load centers. PG&E generation and transmission will be fully separate with, ostensibly, some type of deal to sell firm generation and transmission back to the PG&E retail load, at least for some period of time. In my opinion, NCPA public agency loads should not be relegated to the existing dysfunctional ISO environment without the benefit of knowing any details of the arrangements PG&E intends to establish to serve existing PG&E retail loads through its proposed transmission company, "ETrans." And while NCPA seeks for its members transmission service comparability with PG&E retail customers, all regulatory bodies and affected parties must be especially vigilant that the PG&E retail customer transmission needs are not sacrificed to assure creditor repayment or longer term PG&E corporate profitability. NCPA would not seek "comparability" in the absence of fairness and equity. Moreover, it is unlikely that PG&E formulated its Plan in so short a time period that it could not have suggested that the replacement IA proceed on a parallel track to that which PG&E will likely propose for its own retail load. Yet it made no such revelation or suggestion. This further reinforces PG&E's lack of good faith negotiations with NCPA.

15. PG&E's replacement IA filing would result, if accepted, in NCPA being required to sign contracts with the ISO which may be problematic for NCPA. The ISO's existing PGA and LDC contracts do not appear to work with generation financed with tax free bonds, nor with the need for NCPA to maintain control over the disposition of power plant output and respond to NCPA members' obligation to serve. When we worked out the arrangements by which NCPA could provide "RMR" service as desired by the CAISO, for example, we had to substantially modify the contracts that otherwise were in use for RMR units to be able to make them consistent with our obligations in these areas. This took a significant amount of time to get done. Also, NCPA would be compelled to have third parties within NCPA member service territories sign agreements

---

6

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

Case: 01-30923   Doc# 5359   Filed: 03/20/02   Entered: 03/21/02 10:39:00   Page 54 of 58

with the ISO (cogenerators or behind the fence generators, for example). PG&E's filing also suggests abrogation of NCPA member contracts with PG&E through TANC regarding COTP scheduling. I believe a true replacement IA would be with the existing counter party and not an arrangement whereby PG&E simply steps completely out of the picture. As I indicated to PG&E, they are the Stanislaus Commitments, not the Stanislaus "Suggestions."

16. While NCPA genuinely laments the ongoing chaos and layering of multiple charges and non-payment of debts by the ISO specifically, and the California power marketplace in general, allowing PG&E to thrust, willy-nilly, NCPA into that situation in conspicuous avoidance of PG&E's Stanislaus Commitments is bad faith of the highest order.

17. I have supervised the preparation of a forecast of NCPA's transmission and interconnection costs under the CAISO regime as proposed by PG&E in its filings at FERC in connection with the termination of NCPA's existing interconnection agreement ("IA"). That forecast is extended through 2050, the last year of NCPA's rights under the Stanislaus Commitments

18. I have also prepared a forecast over that same time period in the event that NCPA were to continue to receive transmission and interconnection under the same terms and conditions as the exiting IA.

19. I have also prepared a comparison reflecting the increase in costs to NCPA under the CAISO regime compared to cost under an extension of the existing IA.

20. In my opinion, the present value of this claim is almost $1.5 Billion based on our current damage forecast model.

21. This declaration is prepared based upon my own personal knowledge and on information known or provided to me from sources I believe to be reliable and which is of a kind that experts making similar forecasts would reasonably rely upon.

I declare under penalty of perjury that the foregoing is true and correct. Executed

7

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

1    on March 20, 2002.

2                                    Donald B. Dame
                                     DONALD B. DAME

3

4    NCPA/PG&E/EstMtn/Dad

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

Declaration of Donald B. Dame in Support of NCPA's Response to Estimation Motion

Mark Gorton (99312)
Mary E. Olden (109373)
Todd M. Bailey (109519)
McDONOUGH, HOLLAND & ALLEN
A Professional Corporation
555 Capitol Mall, Ninth Floor
Sacramento, California 95814
Telephone: 916-444-3900
Facsimile: 916-444-8334

Attorneys for Northern California Power Agency

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| In re | Case No. 01-30923 SFM 11 |
| PACIFIC GAS and ELECTRIC COMPANY, | Chapter 11 |
| Debtor. | Date: March 27, 2002<br>Time: 9:30 a.m.<br>Place: 235 Pine Street |
| Tax I.D. No. 94-0742640 | San Francisco, CA |

**PROOF OF SERVICE**
(Federal-Bankruptcy)

I am employed in the County of Sacramento; my business address is 555 Capitol Mall, 9th Floor, Sacramento, California. I am over the age of 18 years and not a party to the foregoing action.

On March 20, 2002, I served the following documents:

- **DECLARATION OF DONALD B. DAME IN SUPPORT OF RESPONSE OF NORTHERN CALIFORNIA POWER AGENCY TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURE FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES**

☒ **by facsimile transmission** to the following party(ies) at the facsimile number(s) indicated.

POS-PG&E/Estimation Mtn

1. ☒ **by overnight delivery** on the following party(ies) in said action by placing a true
copy thereof enclosed in a sealed envelope, with delivery fees paid or
2. provided for, in a designated area for outgoing overnight mail, addressed
as set forth below. Mail placed in that designated area is picked up that
3. same day, in the ordinary course of business, for delivery the following
business day.
4.

5. **_Counsel for Pacific Gas & Electric_**
James L. Lopes, Esq.

6. Howard, Rice, Nemerovski
3 Embarcadero Center, 7th Floor

7. San Francisco, CA 94111
Phone No.: (415) 434-1600

8. **Fax No.: (415) 217-5910**
**Email: jlopes@hrice.com**

9. **_Counsel for Official Committee of_**
**_Unsecured Creditors_**

10. Paul S. Aronzon
Milbank, Tweed, Hadley, et al.

11. 601 South Figueroa Street, 30th Floor
Los Angeles, California 90017

12. Phone No.: (213) 892-4000
**Fax No.: (213) 629-5063**

13. **Email: paronzon@milbank.com**

Office of the U.S. Trustee
Attn: Stephen Johnson
250 Montgomery Street, Ste. 1000
San Francisco, CA 94104
Phone No.: (415) 705-3333
**Fax No.: (415) 705-3379**
**Email: stephen.johnson2@usdoj.gov**

**_Counsel for PG&E Corporation_**
Michael P. Kessler, Esq.
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Phone No.: (212) 310-8000
**Fax No.: (212) 310-8007**
**Email: michael.kessler@weil.com**

14.

15. I declare under penalty of perjury that the foregoing is true and correct.

16. Executed on March 20, 2002, at Sacramento, California.

17.

18. Stacey Ting

19.

20. cc: Larry Engel (via email only)
Brobeck, Phleger & Harrison LLP

21. One Market-Spear Tower
San Francisco, CA 94105

22. e-mail: lengel@brobeck.com

23. Kevin S. Smith (via email only)
Northern California Power Agency

24. 180 Cirby Way
Roseville, CA 95678

25. Email: ksmith@ncpa.com

26.

27. POS-PG&E/Estimation Mtn

28.

MCDONOUGH, HOLLAND
& ALLEN
A PROFESSIONAL CORPORATION

2

POS-PG&E/Estimation Mtn

Case: 01-30923    Doc# 5359    Filed: 03/20/02    Entered: 03/21/02 10:39:00    Page 58
of 58