ARIEL PIERRE CALONNE, State Bar No. 110268
GRANT KOLLING, State Bar No. 99858
CITY OF PALO ALTO
250 Hamilton Avenue
Palo Alto, CA 94301
Telephone: (650) 329-2171
Facsimile: (650) 329-2646

FILED
MAR 20 2002
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

*Attorneys for Member of Official Committee of Unsecured Creditors, THE CITY OF PALO ALTO*

G. LARRY ENGEL, State Bar No. 53484
ROBERTO J. KAMPFNER, State Bar No. 179026
JIM HOOVER, State Bar No. 217952
BROBECK, PHLEGER & HARRISON LLP
One Market Plaza, Spear Street Tower
San Francisco, CA 94123
Telephone: (415) 442-0900
Facsimile: (415) 442-1010

*Special Counsel to Member of Official Committee of Unsecured Creditors, THE CITY OF PALO ALTO*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

(San Francisco Division)

| | |
|---|---|
| In re<br><br>PACIFIC GAS AND ELECTRIC COMPANY, a California corporation,<br><br>Debtor.<br><br>Federal I.D. No. 94-0742640 | Case No. 01-30923 DM<br><br>CHAPTER 11<br><br>OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES<br><br>Date: March 27, 2002<br>Time: 9:30 a.m.<br>Place: 235 Pine Street, 22nd Floor<br>San Francisco, California |

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 1 of 25

5364

## TABLE OF CONTENTS

Page

I. INTRODUCTION AND STRATEGIC OVERVIEW OF THE REMAINING DISPUTES .......... 1

A. The General Context of These Comments .......... 1

B. Selected Comments on PG&E's Provocations .......... 3

C. PG&E's Strategies and Consequent Problems for Reorganization .......... 6

II. SELECTED BACKGROUND ON THE FINAL STANISLAUS COMMITMENTS CONFLICT: PG&E'S WRONGFULLY CUTTING OFF ESSENTIAL FIRM ELECTRIC TRANSMISSION REQUIRED FOR THE NCPA AND ITS MEMBERS, INCLUDING PALO ALTO .......... 8

A. Palo Alto's Exposure to Damages Caused from PG&E's Repudiation .......... 8

B. Historic and Present Accounts of PG&E's Wrongs Resulting in Palo Alto and the NCPA's Claims .......... 10

III. AS A SOLVENT DEBTOR WHOSE WRONGS COMPEL COMPLEX DEFENSIVE LITIGATION RESPONSES IN MULTIPLE FORUMS, PG&E LACKS THE EQUITY REQUIRED FOR ESTIMATION OF ANY CLAIMS OF THE WAPA/NCPA/PALO ALTO ALLIANCE .......... 14

IV. CONCLUDING COMMENTS .......... 19

i

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 2 of 25

## TABLE OF AUTHORITIES

**Page(s)**

Cases

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) .......... 4

Conopco, Inc. v. Roll Int'l., 231 F.3d 82, 86-87 (2d. Cir. 2000) .......... 1

In re Chi-Feng Huang, 23 B.R. 798 (9th Cir. B.A.P. 1982) .......... 15, 16

MacMillan Bloedel Ltd. v. Flintkote Co., 760 F.2d 580, 587 (5th Cir. 1985) .......... 1

Otter Tail Power Co. v. United States, 410 U.S. 366 (1973) .......... 4

United States v. Pacific Gas & Electric Co., 714 F. Supp. 1039 (N.D. Cal. 1989) .......... 4, 11, 16

Other Authorities

31 N.R.C. 595 (1990) .......... 5, 11

98 F.E.R.C. 61, 281 (March 14, 2002) .......... 4

11 U.S.C. § 362 .......... 21

15 U.S.C. § 1 *et seq.* (Sherman Act) .......... 11, 13

42 § 2135(c)(5) (Section 105c of the Atomic Energy Act) .......... 11

California Business & Professions Code §§ 16700 *et seq.* (Cartwright Act) .......... 11, 13

Exhibit A: Cases

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985) .......... Exhibit A, 8

Carter v. Variflex, Inc., 101 F.Supp. 2d 1261 (C.D. Cal. 2000) .......... Exhibit A, 5

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal. 4th 163 (1999) .......... Exhibit A, 5

Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163 (2000) .......... Exhibit A, 5

Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986) .......... Exhibit A, 8

Kraus v. Trinity Management Services, Inc., 23 Cal. 4th 116 (2000) .......... Exhibit A, 5

Otter Tail Power Co. v. United States, 410 U.S. 366 (1973) .......... Exhibit A, 8

Pacific Gas & Electric Co. v. County of Stanislaus, 16 Cal. 4th 1143 (1997) .......... Exhibit A, 4

i

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 3 of 25

People v. Goulart, 224 Cal. App. 3d 71 (1990) .................................................. Exhibit A, 9

Quelimane Co. v. Stewart Title Guaranty Co., 19 Cal. 4th 26 (1998) ........................ Exhibit A, 5

Sunbelt Television, Inc. v. Jones Intercable, Inc., 795 F. Supp. 333 (C.D. Cal. 1992). Exhibit A, 5

United States v. Pacific Gas & Electric Co., 714 F.Supp. 1039 (N.D. Cal. 1989).........Exhibit A, ..........................................................................................passim

Exhibit A: Other Authorities

15 U.S.C. § 1, *et seq*. (Sherman Act)................................................Exhibit A, 5, 8

98 F.E.R.C. 61, 281 (March 14, 2002)...................................................Exhibit A, 6

California Penal Code Section 498.......................................................Exhibit A, 10

California Business & Professions Code Section 17200 *et seq*. .........................Exhibit A, 6, 9, 10

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 4 of 25

## I. INTRODUCTION AND STRATEGIC OVERVIEW OF THE REMAINING DISPUTES

### A. <u>The General Context of These Comments</u>

The City of Palo Alto ("Palo Alto") objects to Pacific Gas & Electric Company's ("PG&E's") Motion for Order Determining Procedures for Estimating Certain Claims for Plan Feasibility Purposes; Memorandum of Points and Authorities (the "Estimation Motion") insofar as it applies to the WAPA/NCPA/Palo Alto alliance's (as defined below) claims and rights ("Palo Alto's Objection to Estimation"). We also join in the concurrent filings by the Northern California Power Agency ("NCPA") and any of its other members and by the Western Area Power Administration ("WAPA") or the WAPA members (all collectively referred to as the "WAPA/NCPA/Palo Alto alliance"), to the extent that such filings support our public power concerns, as described in this reply brief. In particular, we request judicial notice of all pleadings and documents as attached Exhibit B hereto, and as Exhibit 1 to Response of Northern California Power Agency to PG&E's Motion for Order Determining Procedure for Estimating Certain Claims for Plan Feasibility Purposes ("NCPA's Response to Estimation"), concurrently filed.[1] While PG&E's motion has not elected to specify the extent, if any, to which the WAPA/NCPA/Palo Alto alliance is threatened by this Estimation Motion, we cannot afford to take any risk of an adverse process being created into which we could ever be channeled. As illustrated below, the nature and seriousness of PG&E's continuing harm and threats to our "Stanislaus Commitments" rights (defined below) require that we avoid "getting backed into any corner." Our defensive concerns should be understandable, since as the NCPA member public utilities serving more than 700,000 citizens, our viability is being undermined by PG&E's wrongful attempt to terminate our electric transmission and related services.

While it may be possible consensually to develop a fair process for feasibility

---

[1] *See* <u>MacMillan Bloedel Ltd. v. Flintkote Co.</u>, 760 F.2d 580, 587 (5th Cir. 1985) (a federal court may take judicial notice of related proceedings and records in cases before it; <u>Conopco, Inc. v. Roll Int'l.</u>, 231 F.3d 82, 86-87 (2d. Cir. 2000) (a federal court may take judicial notice of proceedings and records in other courts).

1

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 5 of 25

estimation, PG&E's motion is not designed to achieve that result. Any fair process can only be fashioned by this Court for our claims when this Court understands the serious disputes that remain outstanding. Because of the extraordinary nature of the claims at issue (*see* Exhibit A) and the potential for great harm to the NCPA and Palo Alto from any inappropriate estimation process, we urge this Court to be cautious in balancing the competing interests of the parties. Safeguards are especially important for us, because PG&E's estimation at an early confirmation process will be stale and superseded by actual events as we implement our defensive strategies during the long wait for plan effectiveness, pending regulatory approvals and satisfaction of other conditions.

Palo Alto's Objection to Estimation also cross-references and incorporates the portions of the previous relevant briefs filed by Palo Alto and the NCPA,[2] which explain concerns regarding PG&E's treatment of the Stanislaus Commitments, as well as Supplemental Comments by the City of Palo Alto to Second Amended Disclosure Statement ("Comments to Second Amended Disclosure Statement"), filed March 19, 2002, with this Court,[3] in support of the settlement with PG&E of certain Disclosure Statement objections and related concerns as referenced in the proposed stipulation executed by the NCPA, Palo Alto and PG&E, attached to the soon-to-be-filed PG&E motion to approve the Stipulation of the City of Palo Alto, Northern California Power Agency and Pacific Gas and Electric Company Regarding the Stanislaus

---

[2] *See* Objection of the City of Palo Alto to Approval of Disclosure Statement ("Objection of Palo Alto"), filed November 27, 2001, Document 3521 on the Pacific Gas & Electric Docket; Disclosure Statement Objection of Northern California Power Agency ("Objection of the NCPA"), filed November 27, 2001, Document 3488 on the Pacific Gas & Electric Docket; *see also* Supplemental Comments Regarding the Objection of the City of Palo Alto to Approval of First Amended Disclosure Statement ("Supplemental Comments by Palo Alto"), filed January 10, 2002, Document 4245 on the Pacific Gas & Electric Docket; Supplemental Disclosure Statement Objection of Northern California Power Agency ("Supplemental Objection of the NCPA"), filed January 10, 2002, Document 4248 on the Pacific Gas & Electric Docket. *See* footnote 1, *supra*. The WAPA/NCPA/Palo Alto alliance has twice before had to respond to major strategic challenges by PG&E: first, to the preemption/adversary proceeding conflict, where we had to reserve our rights fearing the current battle now triggered by PG&E, and, second, to the original PG&E Plan of Reorganization and Disclosure Statement, where again we had to reserve our rights for the defenses that we now are forced by PG&E to deploy. *See* Reservation of Right to Enforce Rights of Governmental Units by Adversary Proceeding and Joinder in Northern California Power Agency Objections ("Palo Alto's Reservation"), filed November 6, 2001, Document 3122 on the Pacific Gas & Electric Docket) and Conditional Adversary Objection of Northern California Power Agency ("NCPA's Reservation"), filed November 6, 2001, Document 3095 on the Pacific Gas & Electric Docket. These prior briefs flagged the issues, but were unable to persuade PG&E to refrain from provoking this remaining conflict.

[3] Palo Alto's Comments to Second Amended Disclosure Statement explains what is settled versus what is reserved among the parties, as they attempt to reduce the disputes regarding the Stanislaus Commitments to the extent possible.

2

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 6 of 25

Commitments ("Stipulation").[4] As explained therein, these settlements make reciprocal compromises by the WAPA/NCPA/Palo Alto alliance and by PG&E in order to allow the WAPA/NCPA/Palo Alto alliance's force of law rights and contracts, including the Stanislaus Commitments and the WAPA's 2948A contract, to survive PG&E's final Plan of Reorganization without prejudice. The good news for creditors is that we have made concessions, including allowing certain of PG&E's disaggregation goals to proceed to Plan confirmation.[5] Unfortunately, the bad news for creditors is that PG&E persists in its meritless position that the Stanislaus Commitments (and the related WAPA 2948A transmission rights of the WAPA/NCPA/Palo Alto alliance) do not mean what they say and that PG&E can somehow unilaterally terminate our transmission, thereby forcing us into transactions with the California Independent System Operator ("CAISO"), with all of its problems explained below, as a transmission provider of last resort.[6] (Thanks to the Federal Energy Regulatory Commissions' ("FERC's") five-month emergency extension of our current Interconnection Agreement-based transmission rights, as explained below, the impact of PG&E's devastating attempted repudiation of our transmission and related services has been deferred from April to at least September 1, 2002.[7])

**B. Selected Comments on PG&E's Provocations**

In effect, for the fourth time PG&E is again trying to undercut the viability of its

---

[4] Although PG&E, the NCPA and Palo Alto executed the Stipulation on or about February 6, 2002, PG&E's motion for approval is expected to be filed shortly, if it has not already been filed. *See* Comments to Second Amended Disclosure Statement and Northern California Power Agency's Joinder in Supplemental Comments by the City of Palo Alto to Second Amended Disclosure Statement, which are incorporated herein by this reference.

[5] The WAPA/NCPA/Palo Alto alliance allows the disaggregation aspects of PG&E's plan process to proceed, while PG&E agrees not to attempt to use alleged bankruptcy powers as weapons in the continuing conflict over our transmission rights, claims and defenses. *See* Comments to Second Amended Disclosure Statement.

[6] Accordingly, since PG&E insists on continuing its efforts to impair or destroy our transmission-related rights required for our public power businesses to remain viable, the WAPA/NCPA/Palo Alto alliance is reserving many rights, claims and defenses for the continuing litigation and enforcement. *See* Comments to Second Amended Disclosure Statement.

[7] *See* NCPA's Reponse to Estimation, Exhibit 1. The FERC has wisely decided to extend the current Interconnection Agreement between PG&E and the NCPA, including its member Palo Alto, in order to determine key issues in PG&E's regulatory request, thereby thwarting what PG&E desired to be a quick and covert "switch" of our current transmission services from PG&E to a yet to be defined CAISO arrangement, which would not be a commercially viable substitute, either economically or operationally, especially for municipal utilities like Palo Alto which are located in "high congestion" areas created by PG&E's long neglect of the transmission infrastructure in violation of the Stanislaus Commitments.

3

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 7 of 25

competing public power customers by attempting to repudiate our transmission and related rights.[8] Our WAPA 2948A and related power supply contracts (which also assure our transmission from PG&E) do us little good without the cost-effective transmission and related services assured for us by the Stanislaus Commitments through 2050, by a continuous succession of Interconnection Agreements, the current of which PG&E now wishes to terminate as of August 31, 2002. *See* Exhibit A and NCPA's Response to Estimation. Recognizing the serious harms that would be caused to the NCPA and its members, especially Palo Alto and other members of the NCPA in "high congestion" areas created by deficient PG&E infrastructure work, if the FERC had permitted PG&E to terminate our transmission services on April 1, 2002, as PG&E requested in the FERC Docket No. ER01-2998-000, the FERC preserved the status quo for five additional months. In response to the NCPA's arguments, the FERC agreed that ". . . the Commission is concerned that terminating the existing Interconnection Agreements for NCPA and Silicon Valley Power (City of Santa Clara) without appropriate arrangements for replacement service *that reflects the service obligations embodied in various agreements between the parties* may be unjust and unreasonable."[9]

Because antitrust and other laws prohibit virtual monopolies like PG&E from so abusing their virtual monopoly power, especially in the arena of electric transmission,[10] PG&E is provoking for itself a far bigger problem than a mere breach of its obligations under the Stanislaus Commitments. *See* Exhibit A and Section II, *infra*, describing some of the various causes of

---

[8] The Stanislaus Commitments arose from a 1976 United States Justice Department's antitrust concern about PG&E trying to make the NCPA and its members nonviable as public power utilities. Notwithstanding the license conditions arranged by the United States Justice Department to the contrary, PG&E tried again unsuccessfully to extinguish our businesses, as described in the 1989 decision in United States v. Pacific Gas & Electric Co., 714 F. Supp. 1039 (N.D. Cal. 1989). Perhaps, thinking that the "third time is the charm," PG&E's subsequent wrongs resulted in an NRC Notice of Violation of the antitrust conditions in PG&E's Diablo Canyon license, inspiring the 1991 Settlement Agreement that reaffirms our firm transmission rights through at least 2050. *See* Exhibit A and NCPA's Response to Estimation. Considering PG&E's continuous effort to undercut our public power alternative to PG&E's virtual monopolies, PG&E's current maneuvers cannot plausibly be characterized as mere good faith, contract interpretation disputes. History will haunt PG&E, as described in Section II, *infra*. *See* Exhibit A.

[9] *See* 98 F.E.R.C. 61, 281 at p. 13 (March 14, 2002) (emphasis added).

[10] *See, e.g.*, Otter Tail Power Co. v. United States, 410 U.S. 366 (1973) (electric utility is subject to antitrust laws if it refuses to deal with municipal power systems in order to prevent or destroy their position in the market, or takes certain action to effect such a refusal). *See also* Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585 (1985).

4

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 8 of 25

actions that arise from this latest PG&E effort to effectively damage public power competitors by terminating transmission services and forcing the NCPA, Palo Alto and other public power utilities into a potentially dysfunctional transmission arrangement with the CAISO.[11] Indeed, the 1991 Settlement Agreement, which was supposed to end the decades of PG&E litigation by which PG&E unsuccessfully attempted to deny the NCPA and its members cost-effective transmission, was forged in the context of a Nuclear Regulatory Commission ("NRC") Notice of Violation by PG&E of the antitrust license conditions for PG&E's construction and use of its Diablo Canyon facility.[12] Because of PG&E's passionate, historical efforts both (i) to prove public power alternatives to be uneconomic (*e.g.*, PG&E's opposition in last fall's election in San Francisco to a public power initiative), and (ii) to use transmission as a weapon seriously to threaten the economics of the WAPA/NCPA/Palo Alto alliance, this new threat by PG&E to terminate transmission will necessarily provoke a revealing reexamination of that problematic history of PG&E's repeated abuse of its virtual monopoly power. When that history is matched against the current PG&E maneuvers, no one will accept whatever explanation PG&E may offer, especially the NCPA members and their citizen-customers suffering devastating cost increases from the only alternative, the CAISO. Indeed, since all of PG&E's public power customers will confront the same problems from PG&E when their own PG&E interconnection agreements expire, public power entities generally will rally to our defense, further raising the barriers which PG&E persists in creating to any political solutions for PG&E from our friends in the Legislature or Congress.

---

[11] As explained below and in Exhibit A, our continuing and escalating litigation with PG&E is one of the most serious, self-inflicted problems facing PG&E, because PG&E will ultimately be held accountable for the substantial damages that it causes us, which damages are vastly greater than the cost of PG&E's performance of the Stanislaus Commitments. Our damages arise both from PG&E's failure to honor its obligations to maintain and improve our transmission and from the many CAISO system problems that PG&E forces us to confront as the scheduling coordinator/transmission servicer of last resort. The FERC has recognized both in its highly critical audit of the CAISO and in the FERC's recent order of a technical conference with the FERC's staff at which PG&E will have to address with the CAISO and the WAPA/NCPA/Palo Alto alliance many legal, operational and economic problems created by PG&E's repudiation of its obligations under the Stanislaus Commitments. *See*, as Exhibit B attached hereto, the FERC audit of the CAISO. While one would expect PG&E to be more cautious about expanding these unnecessary disputes, PG&E now is necessarily dragging the CAISO into these disputes. PG&E cannot avoid publicly admitting (i) all of the CAISO problems chronicled in the recent FERC audit of the CAISO, plus (ii) PG&E's own motivation to eventually bail out of the CAISO, leaving the CAISO in an ever greater state of crisis and our transmission costs even higher. PG&E's long neglect of its transmission infrastructure may also become common ground on which the CAISO and the WAPA/NCPA/Palo Alto alliance may agree.

[12] *See* 31 N.R.C. 595 (1990).

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 9 of 25

## C. PG&E's Strategies and Consequent Problems for Reorganization

If this Court and the understandably frustrated creditors awaiting prompt payment by PG&E imagine that this Court and creditors have already grappled with all of the material flaws in the California energy deregulation mess, we are compelled to inform you that PG&E is now forcing everyone to confront the latent electric transmission crisis that has thus far received comparatively little attention in this bankruptcy forum, in the media, in the regulatory arenas, and in the energy crisis-weary Legislature and Congress. For those who share PG&E's interest in game theory, *i.e.*, how PG&E can maneuver to solve its own problems by relegating them on other parties, this new conflict involves PG&E (i) repudiating (*e.g.*, by meritless interpretations of the Stanislaus Commitments and applicable law) PG&E's electric transmission obligations to public power customers (*e.g.*, the NCPA and Palo Alto), and (ii) dumping those customers into the overstressed CAISO system already struggling to manage a massively dysfunctional energy deregulation program that was designed for PG&E and others, but not for public power alliances like the WAPA/NCPA/Palo Alto alliance.[13] Palo Alto's customers, for example, would suffer huge congestion charges that could harm its utility operations, creating massive damages rivaling what has been suffered by the qualifying facilities ("QFs") collectively. The CAISO may, of course, respond to that PG&E imposition of us on the CAISO by charging its involuntary, new NCPA/Palo Alto alliance customers extraordinarily high prices, especially to customers (like Palo Alto) which have the misfortune to be located in "high congestion" areas created by PG&E's continuous violations of its obligations under the Stanislaus Commitments to adequately maintain and improve its transmission infrastructure for our service through at least 2050.[14] *See* Exhibit A and NCPA's Response to Estimation. Indeed, when PG&E eventually completes its apparent strategy by bailing out of the CAISO, those costs will escalate to even more non-economic heights for the residual

---

[13] *See* footnotes 2-3, *supra*, and NCPA's Response to Estimation, where some of these system dysfunctions are discussed, including those relating to how PG&E can spread costs over its entire customer base, while the new CAISO fallback transmission arrangement would concentrate punitive charges for congestion (created by PG&E) on the NCPA member customers.

[14] Thus, having contributed to the transmission crisis and played a material role of the CAISO system dysfunction, PG&E not only intends to attempt once again to evade its transmission obligations to the WAPA/NCPA/Palo Alto alliance, but PG&E also intends to create new conflicts between the CAISO and its new involuntary customers, as those customers suffer uneconomic pricing.

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 10 of 25

CAISO customers.

From the perspective of PG&E's apparent strategy, this PG&E maneuver offers PG&E at least the following improper benefits: (i) public power competitors will be seriously injured by PG&E's anticompetitive behavior, as demonstrated by its failure to honor the antitrust compliance conditions and obligations under the Stanislaus Commitments (*see* Exhibit A attached), (ii) chaos and conflict are exacerbated within the CAISO and its customers, which either will inspire genuine reform or will give PG&E a convenient excuse to bail out of the CAISO system; and (iii) PG&E's cost of serving public power competitors can be avoided, thereby generating greater benefits for PG&E's equityholders. The appropriateness of PG&E's strategy will be tested by public power, this Court, the applicable regulators, the customers of the WAPA/NCPA/Palo Alto alliance facing PG&E-caused massive rate increases, and our Legislative and Congressional representatives. *See* Exhibit A.

Unfortunately, as we, the Official Committee of Unsecured Creditors ("Official Committee") and other informed parties in interest have continuously warned PG&E, the WAPA/NCPA/Palo Alto alliance cannot ever accept the ruinous transmission charges that PG&E seeks to foist upon us. Thus, should PG&E cease to perform its transmission obligations on September 1, 2002 (or any later date to which we can persuade the FERC to defer the effect of the PG&E repudiation of its obligations under the Stanislaus Commitments), PG&E forces us to respond in all forums by all means necessary to achieve the justice that we need in order to cost-effectively continue in our public power businesses. From a cost benefit perspective, PG&E's interim benefits to be reaped from this repudiation are comparatively small, while the risks and the direct and indirect liabilities and costs for PG&E are enormous, both economically and politically. *See* Exhibit A, discussing illustrative causes of action and damages. We have not been able to do more than convince PG&E to reduce, by the separate PG&E settlement motion soon to be filed in this Court, the scope of this battle that PG&E is forcing us to fight.[15]

---

[15] As explained in Palo Alto's Comments to Second Amended Disclosure Statement, the WAPA/NCPA/Palo Alto alliance has agreed with PG&E to allow certain disaggregation, as long as we have the same rights, defenses and claims against the disaggregated and reorganized PG&E that we have against the original PG&E. Thus, in that way we are not standing between PG&E and what it believes that it needs for reorganization, although we reserve our rights and claims as to these violations of our transmission rights by any or all of the applicable PG&E entities. In exchange,

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 11 of 25

In assessing PG&E's risks versus benefits in this needless conflict, PG&E should recognize that its potential damages exposure includes (before treble or punitive damages and massive consequential damages) the difference between (i) what we have to pay PG&E for electric transmission through at least 2050 under the Stanislaus Commitments, and (ii) the far higher amounts that we have to pay the CAISO during that same period. *See* Exhibit A and NCPA's Response to Estimation. Because the CAISO is charging extraordinarily high rates, especially for "congestion charges" to the NCPA members like Palo Alto, the amount of that cost spread between PG&E and the CAISO charges is huge, as described in NCPA's Response to Estimation. Conversely, the net cost of PG&E continuing to provide the transmission as required under the Stanislaus Commitments is comparatively nominal. Thus, while PG&E's cost saving motive is an incidental matter, PG&E's real goal is exposed as its desire to disable public power businesses, supplemented with the possible bonus that a focus on the escalating CAISO system dysfunctions can lead to reforms that help PG&E, on the theory that when things get bad enough someone else will be forced to solve these remaining deregulation problems.

## II. SELECTED BACKGROUND ON THE FINAL STANISLAUS COMMITMENTS CONFLICT: PG&E'S WRONGFULLY CUTTING OFF ESSENTIAL FIRM ELECTRIC TRANSMISSION REQUIRED FOR THE NCPA AND ITS MEMBERS, INCLUDING PALO ALTO

### A. Palo Alto's Exposure to Damages Caused from PG&E's Repudiation

To PG&E, Palo Alto and its public power allies may just be "the mouse that roared."[16] To the California Public Utility Commission ("CPUC"), Palo Alto may be an obligation the CPUC wishes that PG&E could shed, in their common effort to reduce the cost of reorganizing PG&E for the benefit of ratepayers and political realities. However, our many friends

---

PG&E agrees not to attempt to use its bankruptcy powers and the Second Amended Plan of Reorganization to negate the applicable WAPA/NCPA/Palo Alto rights, although PG&E reserves its rights to claim that the Stanislaus Commitments and the WAPA 2948A obligations somehow do not mean what they say, because of PG&E's disputed interpretive theories relying on the intervening deregulation laws and other insufficient theories.

[16] Although Palo Alto is exposed proportionately to as serious a threat and harm as anyone in this case, except perhaps some QFs (Palo Alto has been careful to deny PG&E any pretext for justifying its maneuvers. Some who will support PG&E against us believe that their interests are best served by PG&E denying fair treatment to any creditors or contract parties appearing vulnerable to PG&E's challenges, however meritless, since they fear that there will not be enough PG&E cash to go around, if PG&E has to honor all of its obligations fairly. Nevertheless, our policy both inside and outside the Official Committee has been to advocate that PG&E "do the right thing" for all deserving creditors and contract parties).

8

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 12 of 25

on the Official Committee and elsewhere know (among other things) that:

1. Palo Alto is one of the oldest (established in 1892) and most successful public utilities (for its size). The analysts for Standard & Poor's rate Palo Alto's municipal utility as double-'A'-plus ("AA+"), and Moody's rates it as "Aa3". Being successful at this business at Palo Alto's size requires skill, experience, intelligent management, functional alliances, loyal constituents and friends who can be counted on, and (as a last resort) a willingness responsibly to defend itself against unavoidable attacks in a manner proportional to the threat. Unfortunately, Palo Alto's small size makes it more vulnerable to the impact imposed by PG&E of the huge CAISO congestion and other charges. Ultimately, PG&E will be held accountable for its violations of the Stanislaus Commitments obligations that prejudice Palo Alto's utility, whether by higher costs imposed by the CAISO, by adverse effects on Palo Alto's ratings, by increasing Palo Alto's funding costs, by increasing other costs, or causing Palo Alto to suffer unreimburseable costs in mitigating Palo Alto's damages, or otherwise;

2. Palo Alto is a charter city which has long played honorably in bigger arenas than one would expect for its size. Palo Alto is a useful ally and friend of many greater powers and persons, who will never forgive PG&E for what it is doing to Palo Alto and the NCPA, in particular, and public power, in general. While PG&E may try to shift blame to the CAISO, the responsibility and liability of PG&E is unmistakable. When such people realize what PG&E is really doing, two results are inevitable: (i) PG&E will be held accountable for its wrongs, both directly in damages, and indirectly from burning whatever bridges are left for PG&E with our friends; and (ii) PG&E will hate this next coming movie even worse than the last one; and

3. Palo Alto is an intended victim of prior PG&E attempts to suffocate public power, which not only is an alternative competitive utility, but also a philosophical choice for electric customers faced with (i) pricing with a markup for investor owned utility shareholders, and (ii) pricing in the best interest of resident customers served by the

9

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 13 of 25

municipal utility. Palo Alto continues to be a model of how public power can be implemented successfully, even on a small municipal scale. PG&E's provocative conduct would subject small municipal utilities to both the dysfunctional aspects of our flawed California energy system and the abuse of PG&E's virtual monopoly power. *See* Exhibit A.

One might ask, why would PG&E attempt to attack Palo Alto and other competing public power interests, when PG&E is already facing high risk battles with the CPUC and various politicians, ratepayers, and other sympathetic victims? We offer this answer: as in PG&E's prior attacks, the "manifest destiny" philosophy is at the heart of PG&E's litigious culture, and PG&E unfortunately perceives that destiny to be threatened by any successful public power alternatives. While PG&E will not suffer for failing to capture our Palo Alto population as customers at PG&E's normally higher cost structure (*e.g.*, adjusted cost plus dividends to its shareholders), PG&E apparently fears that our example encourages others to experiment with public power, as witnessed by the ferocity with which PG&E waged its political campaign against public power initiatives in San Francisco in last fall's election. To discourage public power, PG&E apparently wants to be able to show that the government cannot successfully run a utility business. Therefore, PG&E repeatedly tries to convert us from a successful example of public power to a higher cost alternative that PG&E can claim to be an example of why small municipal utilities cannot succeed. However, this time PG&E will be the visible cause of our problems, and, ultimately, PG&E will be held accountable for all of the consequences of PG&E's wrongs, whether foreseeable or unforeseeable.

**B. <u>Historic and Present Accounts of PG&E's Wrongs Resulting in Palo Alto and the NCPA's Claims</u>**

While the details of the history of PG&E's abuses of its virtual monopoly power will be documented in the antitrust and other claims that will soon emerge (*see* Exhibit A), we note

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 14 of 25

the following examples of prior PG&E wrongful transmission cutoffs, as illustrated in NCPA's Response to Estimation, Exhibits thereto, and footnotes 2-3, *supra*:

1. In 1976, the U.S. Justice Department required PG&E to provide Palo Alto and other NCPA/WAPA members with transmission[17] for their WAPA generated power, since PG&E's transmission refusals were correctly perceived by the Justice Department as a violation of antitrust laws under Section 105c of the Atomic Energy Act, 42 § 2135(c)(5) and other laws. *See* Exhibit B hereto and Exhibit 1 of NCPA's Response to Estimation; *see also* Exhibit A hereto, discussing § 2 of the Sherman Act and the Cartwright Act (monopolizations and attempted monopolization abuse claims), and other claims.

2. Thereafter, a few years and another imagined change in circumstances later, PG&E again attempted to cut off our transmission and triggered meritless litigation, which PG&E lost in United States v. Pacific Gas & Electric Co., 714 F.Supp. 1039 (N.D. Cal. 1989). In particular, Judge Schwarzer ruled that PG&E could not escape liability for the harm that it caused by asserting what it characterized as another "good faith" interpretation dispute regarding the Stanislaus Commitments' meaning or effect. Efforts by PG&E to now relitigate with "new" interpretative disputes must be doomed by that earlier decision.

3. Subsequently, the NRC issued a Notice of Violation[18] of the antitrust conditions in PG&E's Diablo Canyon license (described herein, together with the foregoing rights, judgment, the WAPA 2948A transmission rights, and the subsequent settlement described below, collectively as the "Stanislaus Commitments"). PG&E then entered into the 1991 Settlement Agreement, which was supposed to end, "once and for all," these repeated PG&E transmission attacks on the NCPA and its members, including Palo Alto. Among other things, the 1991 Settlement Agreement assures the NCPA member parties (including Palo Alto) of (i) firm transmission through 2050 through a guaranteed succession of interconnection agreements with defined benefits, as reflected in the current

---

[17] Such compulsion was effected by conditioning PG&E's construction of the Diablo Canyon Nuclear Project on performance under the Stanislaus Commitments.

[18] *See* 31 N.R.C. 595 (1990).

11

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 15 of 25

Interconnection Agreement with PG&E, initially expiring March 31, 2002 (and now extended by the FERC for an additional five months), and (ii) continuous infrastructure repairs and improvements by PG&E in order to avoid the "congestion" problems from which we now suffer and to facilitate cost-effective transmission for the NCPA member parties, including Palo Alto. *See* Exhibit A and NCPA's Response to Estimation.

Now, in violation of that 1991 Settlement Agreement, the rest of the Stanislaus Commitments, the WAPA Agreement 2948A contract, and applicable antitrust and other laws, PG&E has refused to entered into another interconnection agreement, effectively cutting off our NCPA transmission starting September 1, 2002,[19] and forcing us to deal with the CAISO on whatever terms it requires as the transmission provider of last resort. (As reflected in NCPA's Response to Estimation, Exhibit A, the FERC has delayed the potential PG&E termination and ordered a technical conference as requested by the WAPA/NCPA/Palo Alto alliance, in which the nonconsensual transition to the CAISO can be arranged in the manner that best mitigates the damages for which PG&E will be liable.[20]) In effect, PG&E is arguing that, because it is theoretically possible to get transmissions from the CAISO (although with extraordinary operational problems and at horrendous cost), somehow we are forced to shift to future transmission and related services from the CAISO on whatever terms it wishes to require. PG&E cannot dispute that the CAISO transmission is not an economically or operationally satisfactory solution for us, and we believe that discovery will show that PG&E will itself attempt to bail out of the CAISO system, as soon as possible after its Second Amended Plan of Reorganization becomes effective, in effect making that the CAISO system even less functional and even more expensive

---

[19] As illustrated in the Supplemental Comments by Palo Alto, Appendix A, Section 5, filed January 10, 2002, Document 4245 on the Pacific Gas & Electric Docket, PG&E has asked the FERC to confirm the destruction of the NCPA's and Palo Alto's transmission rights under the Stanislaus Commitments, and we are seeking to prevent, or, at least, to delay, that cut-off. *See also* footnotes 2-3, *supra*.

[20] No judge or jury would seriously consider PG&E's purported excuse that its obligations under the Stanislaus Commitments are negated by AB 1890, which created the CAISO. PG&E will be challenged to prove a legislative intent to increase PG&E's virtual monopoly powers and to devastate municipal power alternatives. As explained in the recent FERC ruling, 98 F.E.R.C. 61, 281 (March 14, 2002), under the CAISO tariff, PG&E's approach will control for regulatory purposes until the WAPA/NCPA/Palo Alto alliance litigation prevails. Then, in addition to other damages, we will be entitled to a refund of the excess charges resulting from PG&E's incorrect interpretation of the Stanislaus Commitments. This process delays justice for the victims of PG&E's self-serving and incorrect interpretation, and this is one of several matters for Congress and Legislature to review in a reform agenda.

12

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 16 of 25

for those left behind (which, of course, is no surprise to PG&E). In any event, but for the Stanislaus Commitments being enforced as written, PG&E will have serious antitrust compliance problems. The 1991 Settlement Agreement and other Stanislaus Commitments obligations of PG&E to provide transmission and related services at a predictable cost, consistent with our long term planning, cannot be evaded.

While the contractual, regulatory, financial and operational issues associated with the PG&E transmission obligations under the Stanislaus Commitments are complex, the core of PG&E's wrongs are obvious. By analogy, assume that PG&E owns the Bay Bridge and a bus company that uses the diamond, express lane to avoid the cost and delay suffered by normal commuters at the toll plaza. Assume the NCPA members also have a competing bus company that has successfully litigated to use the same express lane on the same cost effective access, plus to obtain repairs/improvements for our access ramps, comparable to the Stanislaus Commitments. PG&E is again, in effect, telling us that our buses cannot use its diamond lanes, and that we have to wait in line and pay the ordinary commuter fees to another bridge manager. Even worse for Palo Alto, PG&E did not complete building the agreed-upon ramp access and other improvements needed to avoid the congestion, and PG&E has not even adequately repaired our access roads as agreed. Obviously, PG&E's position is intolerable and wrongfully eliminates effective competition in violation of § 2 of the Sherman Act, the corresponding Cartwright Act, and other applicable laws.[21] *See* Exhibit A.

Since the bankruptcy commenced, we have worked hard to be constructive and find solutions to this ultimate conflict. Indeed, so that we did not find ourselves "standing on the tracks" where PG&E's disaggregation plan "train" could run us over, we entered into a stipulation that allows PG&E to indulge its disaggregation goals (as long as we are not prejudiced in the battles with the disaggregated PG&E entities). *See* discussion in Section I herein. Unfortunately,

---

[21] While Palo Alto would prefer not to be the initial victim, PG&E should not assume that the other public power utilities will passively wait for their own PG&E interconnection agreements to expire before moving to protect themselves from similar treatment. While PG&E may think that the 60,000 residents of Palo Alto and 700,000 residents served by the NCPA are too small a force to be effective opposition when we explain the reasons for their PG&E-caused rate increases.

13

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 17 of 25

PG&E has decided to persist in an aggression policy that makes our peaceful co-existence approach to unresolved disputes difficult to maintain.

## III. AS A SOLVENT DEBTOR WHOSE WRONGS COMPEL COMPLEX DEFENSIVE LITIGATION RESPONSES IN MULTIPLE FORUMS, PG&E LACKS THE EQUITY REQUIRED FOR ESTIMATION OF ANY CLAIMS OF THE WAPA/NCPA/PALO ALTO ALLIANCE

Like the rest of the WAPA/NCPA/Palo Alto alliance, Palo Alto understands the need for a plan of reorganization to be feasible. We also understand that the amount of the judgment that PG&E will ultimately have to pay on our claims, illustrated in Exhibit A and otherwise, will be so massive as to raise feasibility concerns. However, as reflected in our partial settlement effort, which should assist PG&E's reorganizational goals, we continue to seek means for PG&E again to become creditworthy and able to honor its obligations to us. Of course, we cannot tolerate PG&E's approach to improving its virtual monopoly powers and economics at the expense of our WAPA/NCPA/Palo Alto alliance and our public power customers. Therefore, when PG&E requests estimation on the current basis, ignoring our rights and interests and leaving it unclear how we would fit into such a process, all we can do is object for the reasons stated. If this Court would find estimation an important part of the reorganization process, then we invite PG&E to engage our alliance in a meaningful discussion of a fair and even-handed process that benefits all parties, rather than just an objectionable process for selfishly advancing PG&E's tactical goals that needlessly increase our damages.

None of the precedents cited by PG&E address estimation in PG&E's context, and such cases are inapplicable, except to show why PG&E falls short of satisfying their requirements, even for feasibility estimation. As noted in Palo Alto's Objection to Estimation, NCPA's Response to Estimation, and Exhibits thereto, respectively, PG&E has extraordinarily unclean hands that bar any right for any such equitable relief. As a willful violator of antitrust laws and the Stanislaus Commitments, including the WAPA 2948A transmission obligations, and as a perpetrator of other wrongs addressed herein at Exhibit A, PG&E cannot be allowed to use estimation as a tactical



Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 18 of 25

maneuver[22] to advance such wrongs, especially when the victims are competing governmental units providing public power to more than 700,000 residents in the NCPA members' service areas, all of whom will suffer serious increases in their utility charges until this abuse of PG&E's virtual monopoly power is corrected. In the end, PG&E will be held accountable for those congestion charges and consequential damages, all trebled because of the related PG&E antitrust violations, as well as other liabilities. *See* Exhibit A hereto and NCPA's Response to Estimation.

Nevertheless, any fair estimation process does not make those PG&E damage exposure problems go away, but merely defers their recognition. Our goal is to compel recognition of the problem that PG&E is creating for itself as soon as possible, so that wiser parties compel PG&E to retract its repudiation of the Stanislaus Commitments and renew the Interconnection Agreement. If a consensual and specially designed process can accomplish that goal, then we would meet and confer to advance that possibility.

In weighing the equities with respect to PG&E's estimation request, this Court should also note the following:

1. Estimation is Not Equitable for Solvent Debtors Like PG&E, Especially with Such Positive Cash Flow. As a solvent debtor posting substantial profits during its bankruptcy operations (of which we ask this Court to take judicial notice from its operating reports and the PG&E Corporation's current SEC filings), there is no economic pressure on PG&E that requires extraordinary estimation accommodations by this Court.[23] *See* In re

---

[22] As explained below, estimation is a PG&E distraction maneuver designed to delay the WAPA/NCPA/Palo Alto alliance in advancing the defensive litigation and other actions required to cure the PG&E wrongs. Unless done on a consensual basis satisfactory to our alliance, estimation wastes our time and money without accomplishing anything useful, except perhaps (if PG&E succeeds) adding further to the existing gap between what PG&E estimates as allowable claims, versus what PG&E eventually must pay. Perhaps predicting how many citizens served by public power from the WAPA/NCPA/Palo Alto alliance and their representatives in the State Legislature and Congress will respond to this expensive and unnecessary PG&E attack on our public power transmission rights, one may view estimation as another relations/political tool for PG&E to attempt to deflect the storm that PG&E is inviting. None of these PG&E tactics are equitable or appropriate to be advanced in this Court.

[23] The urgency is not to advance the PG&E equityholders' concerns for prompt reorganization, but rather to get creditors paid, a valid concern which has many answers and alternatives besides holding their payment up as hostages to PG&E's litigation strategy. For example, PG&E could expand interim payments to undisputed creditors, as it is already doing for creditors less important to the PG&E strategy for using the understandable frustrations of unpaid creditors to pressure them to support PG&E's maneuvers against other creditors for whom justice may require the greater time inherent in due process. To such impatient creditors, we offer our sympathy and the suggestion that they are only PG&E hostages as long as they choose to suffer that treatment. If one considers the realistic time line for

15

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 19 of 25

Chi-Feng Huang, 23 B.R. 798 (9th Cir. B.A.P. 1982) (illustrating why solvent debtors cannot be allowed to abuse such bankruptcy powers, in that case, the rejection of executory contracts, to advance the interests of equityholders at the prejudice of creditors).

2. Delayed Second Plan of Reorganization Effectiveness Will Make Early Feasibility Findings Stale and in Need of Relitigation. Reality is that the conditions precedent to the effectiveness PG&E's Second Amended Plan of Reorganization will not be satisfied until the end of 2002, at best, and realistically far longer.[24] Thus, PG&E's position is to "hurry up" to Plan confirmation with estimation short cuts, and then "wait" as long as it takes to satisfy the conditions to the Effective Date. There are many alternative and more equitable ways to balance the competing goals of the parties in interest. Indeed, such a long gap between Plan confirmation and effectiveness, at a minimum, makes all the initial feasibility findings stale, especially as the Disputed Claims become allowed and administrative claims mount, such as those antitrust and other claims for damages of the NCPA and its members.[25] *See* Exhibit A. (A year is ample time for us and others to win summary judgments, especially since United States v. Pacific Gas & Electric Co., 714 F.Supp. 1039 (N.D. Cal. 1989) cannot be relitigated now by PG&E. Even if such victories are appealed by PG&E, PG&E's lower estimations are still then clearly erroneous and stale, and the Second Amended Plan of Reorganization would have to be reexamined before the delayed Effective Date.)

---

PG&E to fight its way through all of its adversaries and regulatory conditions, there is clearly no need to sacrifice our rights to PG&E's unrealistic, "hurry up and wait" schedule, designed for advancing PG&E's litigation strategy against those creditors who PG&E chooses to attack with such "process maneuvers."

[24] At the scheduling hearing this court will not only hear about litigation delays at the FERC and the NRC, but also about how to coordinate the massive discovery simultaneously required by PG&E's many adversaries, many of which have no common interests. For example, because the CPUC supports PG&E at the FERC against public power parties, there is no means for any of the WAPA/NCPA/Palo Alto alliance to expect any benefit or time savings from the CPUC discovery. Indeed, such other PG&E adversaries may actually slow things down, because PG&E's response capacity is going to be overwhelmed, and adversaries often will be seeking the same documents and deponents for opposite purposes.

[25] Cynics expect PG&E to dispute all claims above its threshold for creditworthiness under the Second Amended Plan of Reorganization. Also, history shows that PG&E's business practices during the long delay for effectiveness of the Second Amended Plan of Reorganization will result in additional tort claimants and increased damages from existing claimants beyond what will be addressed in the initial estimation. A pre-effectiveness reevaluation of feasibility seems inevitable, and should be addressed in the planning process now.

16

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 20 of 25

3. <u>"Ride Through" Does Not Require Estimation</u>. Unlike some other PG&E adversaries, our real goal is not to prevent confirmation of an economically realistic plan of reorganization, because we prefer a viable PG&E that can either perform its obligations to us, or pay the damages that PG&E is causing us.[26]

The reality is that California deregulation and other market events have created a problem that requires some creative solutions in order to enable PG&E to remain viable in the long term. However, that legitimate problem solving effort cannot be used by PG&E as a cover for profiting at the expense of those to whom PG&E owes existing obligations. Better estimation arrangements for the WAPA/NCPA/Palo Alto claims than are now proposed by PG&E must be negotiated before they can become a legitimate part of the PG&E reorganization effort.

4. <u>Equitable Balancing Requires Greater Focus on the Harm to PG&E's Estimation Victims</u>. Contrary to PG&E's selfish focus on estimation as a tactical means of advancing its litigation strategy, even feasibility estimation can hurt the creditors to be estimated. First, estimation is a huge expense and delay burden for us defending creditors, which effort cannot ever be cost-effective. There is no upside for us if we "win," since PG&E can and will ignore any adverse result (as shown by our litigation history of defending our rights under the Stanislaus Commitments from PG&E). Thus, since we would suffer the cost and burdens of contesting any required estimation without any benefit, we should not have to do so twice: once now, and once at the Effective Date (when the first decision becomes stale and superseded by intervening actual litigation results). Secondly, for Palo Alto and others trying to run a utility business damaged by PG&E wrongfully cutting off our transmission, an incorrect or unrealistic estimation decision is

---

[26] If we simply wanted to hold PG&E's Second Amended Plan of Reorganization hostage for PG&E resuming performance of PG&E's transmission obligations, we would not have settled our First Amended Disclosure Statement objections in a manner that accommodates PG&E's disaggregation. What we want is for PG&E to be required "to do the right thing" with respect to its existing obligations, including the Stanislaus Commitments. Unduly burdening PG&E with uneconomic, new obligations will simply prolong, rather than resolve, PG&E's bankruptcy maneuvers. However difficult it is to reconcile PG&E to honoring the existing obligations that PG&E wishes to evade, it will be far harder to make PG&E assume what PG&E perceives to be other parties' problems from the California energy crisis. The balance between the extremes of (1) PG&E's fear of being made a dysfunctional quasi-nonprofit entity, and (2) PG&E using its bankruptcy as a means of enriching its shareholders at the expense of creditors, is for (3) PG&E to do the right thing for its existing creditors and contract parties, including the WAPA/NCPA/Palo Alto alliance.

17

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 21 of 25

likely to be misinterpreted by our own creditors and rating agencies, thus compounding the harm that PG&E causes us in a manner for which it may be hard to compensate us in the end.

Moreover, Palo Alto cannot afford to be distracted or delayed in its other litigation seeking to obtain the regulatory relief, court justice, and other relief that we need to protect the business harmed by PG&E's transmission wrongs. Whatever this Court may do, estimation cannot be allowed to delay anything that we need to do in order to assure transmission under the Stanislaus Commitments as soon as possible and to hold PG&E accountable for damages that it has caused.

5. Estimator Selection Problems. The key issue for us is to have a judge/jury and/or regulator confirm the obvious: PG&E cannot succeed in this repudiation of its obligations under the Stanislaus Commitments. Once that legal issue is resolved, as quickly as possible, the calculation of our large damages (before treble damages for the antitrust claims and consequential and punitive damages for other torts and wrongs) may be a complex task for an estimator, but that will be a normal question for trial. In any event, if this Court decides this estimation issue, we urge this Court to remember the political/economic bias risks that are often at play when the antitrust, unfair business practices, and other issues are addressed by partisan estimators from the investor-owned utility culture, who are traditionally hostile to public power interests. The investor-owned utility "experts" or professionals desired as estimators by PG&E are not acceptable to us for the same reasons that a secured creditor would not want a career debtor specialist to estimate that creditor's claim. Philosophy or political bias can easily imperil whatever residual due process survives in this estimation process, if this Court is not very cautious in selecting an estimator. We ask this Court to personally estimate whatever is required.

Moreover, the utility financial experts who are qualified to estimate the damages

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 22 of 25

clearly are not the same persons qualified to confirm PG&E's legal liability for these causes of action. In addition, none of the other tort or commercial estimators proposed by PG&E are likely to be qualified for confirming PG&E's liability to us and its damages exposure therefor. Thus, estimation on a fair and equitable basis is not going to be as quick or easy as PG&E predicts, especially since it will need to be coordinated with substantial independent litigation and discovery by many adversaries.

To the extent that this Court requires us to estimate, we request this Court to consider the safeguards that we request in the Conclusion below. For any estimation to be as fair and meaningful as possible, this Court should design a consensual process around those safeguards. One size does not fit all for this estimation, and the size, complexity and importance of the WAPA/NCPA/Palo Alto alliance claims should justify a special process. We stand ready to work with PG&E and the Official Committee in creating a mutual acceptable process, if this Court finds estimation to be required.

## IV. CONCLUDING COMMENTS

For the reasons stated above, this Court should not estimate the WAPA/NCPA/Palo Alto alliance claims (except on mutually agreeable terms by agreed estimators, if any), but if estimation should be allowed, then:

1. Estimation should be deferred as long as possible in order to enable us to achieve actual results in our litigation, regulatory and other defensive actions, thus minimizing the risk of error and the burden without distracting us from simultaneously resolving the disputes in the manner that is more meaningful.

2. Estimation now should not prejudice any right to require updated estimation just before the eventual Effective Date, based on subsequent developments and staleness of any earlier estimation.

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 23 of 25

3. To avoid adverse consequences to the creditors of any rating agency or other party misunderstanding the nondefinitiveness of such estimations, the results should be reported only on an aggregate basis; *i.e.*, the estimation results for all parties should be aggregated and never specified on a creditor by creditor basis. (If PG&E is sincere about feasibility of its Second Amended Plan of Reorganization being the only reason for estimation, that procedure would be sufficient.)

4. The estimation process, which is purely for PG&E's benefit and is a burden and expense imposed on affected creditors, must be subordinated to all other parallel proceedings involving the estimating parties, including our real litigation against PG&E. In particular, real litigation discovery and other activities must get first call on PG&E's response resources, and PG&E shall not use estimation as a pretext for deferring or denying any other creditors' rights or remedies.

5. Estimation must not be done with "short cuts," or, if this Court is not going to do the estimation, must not be done by unqualified or biased estimators as to any component of the task (*e.g.*, a financial advisor calculating damages cannot be used to decide the legal merits of the dispute, and the lawyer deciding the legal merits cannot also calculate these complex damages). If PG&E persists in this course, it must either persuade this Court to conduct the estimation, or pay for the next best people available.

6. Because solvent PG&E is forcing estimation for its own goals and equityholders' benefits with no benefit to the participating creditors, PG&E should bear all costs, and, if the results reflect the estimator's rejection of any of the more overreaching PG&E positions, PG&E should be required to pay the other parties' costs and attorneys' fees (since otherwise creditors are being surcharged for the benefit of PG&E equityholders exclusively benefiting from the estimation).

7. This Court should balance the scales by conditioning any availability of estimation on PG&E consenting to (or suffering over its objection) whatever relief from the stay the WAPA/NCPA/Palo Alto alliance members reasonably request to protect their rights and interest, such as:

20

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 24 of 25

a. The right to regain the same transmission under the Stanislaus Commitments that we are denied by PG&E by allowing enforcement of our rights by any legal means in any forum of applicable jurisdiction.

b. The right to enforce any rights or claims with respect to the Stanislaus Commitments in any or all forums of applicable jurisdiction, including by combining any applicable pre-petition claims with our related administrative claims for a consolidated action (since the same wrongful conduct by PG&E occurred before and after the petition); and

c. The right to pursue any reasonable discovery which the WAPA/NCPA/Palo Alto alliance regards as useful for the foregoing or for Plan confirmation objections to the Second Amended Plan of Reorganization. (Of course, our Constitutional right to petition Congress and our State Legislature for just laws and redress of our grievances against PG&E should not be stayed, in any event, whether by § 362 or by any Second Amended Plan of Reorganization injunctions.)

At the end of the day under any realistic scenario, PG&E will have to honor its obligations under the Stanislaus Commitments and, one way or another, must fully compensate us for our damages. The PG&E theory for evading its transmission obligations is as bogus as its prior challenges have been determined to have been. When PG&E's wrongs are exposed and corrected, the questions are: how much damage has PG&E inflicted on us, how big the compensation award for our damages must be, and how badly PG&E's self-inflicted, nonmonetary woes will hurt it in the aftermath. We pray that someone soon saves PG&E from itself, since martyr roles are inconsistent with our business plans, and our damage recoveries will not be adequate compensation for the harm that we suffer.

DATE: March 20, 2002

Respectfully submitted,
BROBECK, PHLEGER & HARRISON

By: ______________________
G. Larry Engel

*Special Counsel to Member of Official Committee of Unsecured Creditors, THE CITY OF PALO ALTO*

21

OBJECTION BY THE CITY OF PALO ALTO TO PG&E'S MOTION FOR ORDER DETERMINING PROCEDURES FOR ESTIMATING CERTAIN CLAIMS FOR PLAN FEASIBILITY PURPOSES

Case: 01-30923 Doc# 5364 Filed: 03/20/02 Entered: 03/21/02 10:51:00 Page 25 of 25