COPY ● ●

1   PATRICIA S. MAR (BAR NO. 45593)
    MORRISON & FOERSTER LLP
2   425 Market Street
    San Francisco, California 94105-2482
3   Telephone: (415) 268-7000
    Facsimile:  (415) 268-7522
4
    Attorneys for AVISTA ENERGY, INC.
5   and IDAHO POWER COMPANY

*FILED*

MAR 2 2 2002

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

6
7                       UNITED STATES BANKRUPTCY COURT

8                       NORTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| In re | Case No. 01-20923 DM |
| PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation, | Chapter 11 |
| Debtor. | **OPPOSITION OF AVISTA ENERGY, INC. AND IDAHO POWER COMPANY TO PG&E MOTION FOR ESTIMATION OF CLAIMS FOR FEASIBILITY PURPOSES** |
| | Date: March 27, 2002<br>Time: 9:30 a.m.<br>Place: 235 Pine St., San Francisco, CA<br>22nd Floor |

19      **I.      INTRODUCTION**

20          Creditors Avista Energy, Inc. ("Avista Energy") and Idaho Power Company ("Idaho

21      Power")  oppose PG&E's Motion for Order Determining Procedures for Estimating Certain

22      Claims for Plan Feasibility Purposes ("Estimation Motion").[1]  They are each owed

23      approximately $45 million for energy sold in transactions involving the California Power

24

25          [1] Avista Energy, which is headquartered in Spokane, Washington, and Idaho Power, which is
26      headquartered in Boise, Idaho, are not affiliated with or related to each other.  This response is filed
        jointly on behalf of Avista Energy and Idaho Power because they share similar views and concerns
27      regarding the Estimation Motion.

28

1

5439

1    Exchange ("PX") and California Independent System Operator ("ISO") for which they have not

2    been paid because of the defaults of PG&E and Southern California Edison. Avista Energy and

3    Idaho Power are Class 6 creditors. [2]

4           PG&E proposes for feasibility purposes to discount Class 6 claims in a claims estimation

5    process, based on *its own consultant's* prediction of FERC refunds that may result from currently

6    pending FERC proceedings. The Estimation Motion is fundamentally flawed as to Class 6

7    claims. The amounts PG&E owes for its PX/ISO purchases are liquidated amounts,

8    ascertainable from settlement account statements of PX and ISO. What is unliquidated is

9    PG&E's claim for a refund, which is currently the subject of intensive and complex proceedings

10    before the FERC. PG&E should be required to demonstrate the feasibility of its Plan based on

11    the *liquidated* amounts it owes for PX/ISO claims and not on its disputed and *unliquidated*

12    refund claim.

13    **II.    PG&E'S DEBT TO ENERGY SELLERS IN CLASS 6.**

14           According to the PX's records, PG&E owes $1.7 billion to the PX for its purchases of

15    energy in the PX and ISO markets through January 17, 2001. PG&E acknowledges this

16    accounting in its Second Amended Disclosure Statement filed March 7, 2002 ("Disclosure

17    Statement."), page 200, and in its own proof of claim filed in the PX bankruptcy. Claims of the

18    PX and of individual energy sellers for PG&E's unpaid energy bill are classified as Class 6 of its

19    Second Amended Plan of Reorganization.

20           Of the $1.7 billion, PG&E states that one generator has agreed to a prepetition setoff,

21    which would reduce the PX/ISO related debt to $1.5 billion. (Disclosure Statement, at 201.)

22    However, PG&E seeks to "estimate" the Class 6 claims not at $1.5 billion, but at $1.1 billion on

23

24

25

---

26    [2] Idaho Power also has Class 7 claims as an energy service provider ("ESP") for direct access
credits ("DA Credits.") Idaho Power adopts the arguments of New West Energy in its opposition to
27    the Estimation Motion, as it applies to PG&E's proposal to estimate Class 7 claims.

28

1   the ground that it is entitled to reduce its debt by offsetting $400 million for an expected FERC

2   refund.[3]

3   **III.   ARGUMENT**

4         PG&E's attempt to have the Court "estimate" Class 6 claims based on an anticipated

5   FERC refund is totally inappropriate, unfair and prejudicial to Class 6 creditors.  The Court

6   should decline to make such an estimation and should reject PG&E's effort to involve the

7   Bankruptcy Court in speculating on the outcome of the FERC proceedings now in process.

8         **A.    The Estimation Motion is Premature**

9         Preliminarily, PG&E's motion is premature.  While it may be appropriate for a

10  bankruptcy court to estimate claims to determine the feasibility of a plan of reorganization (see,

11  e.g., *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985), there is no plan

12  confirmation proceeding underway of which the requested estimation process for feasibility

13  purposes can be a part.  While PG&E has consistently sought to prevent the Court from ruling on

14  any issues that PG&E considers to be plan confirmation issues in advance of the confirmation

15  hearing, it now seeks to have the Court consider feasibility issues separately, even in advance of

16  approval of its Disclosure Statement.  PG&E cites no precedent for such disembodied feasibility

17  estimation proceedings.

18        PG&E has not said that it cannot confirm a plan if claims are allowed as filed, or that it

19  needs to reduce Class 6 claims by $400 million for its Plan to be viable.  Perhaps the Plan, if and

20  when it eventually gets to confirmation proceedings, will be feasible regardless of the FERC

21  refund issue or will look different because of negotiations with interested parties.  Feasibility

22  estimation should take place, if at all, in the context of confirmation proceedings for a specific

23  _____

24        [3] PG&E states that total filed claims in Class 6 are $8 billion, and it also requests the Court to
25  reduce the claims for feasibility purposes on grounds other than FERC refunds, such as duplicative
     claims, cash already paid into the PX and overlap with debts owed by Southern California Edison.
26  (Estimation Motion, at 32-35.)  While not admitting that PG&E has a valid basis for reducing Class 6
     claims for each of the other stated reasons, Avista Energy and Idaho Power's main concern is with the
27  proposed FERC refund discount, and only that discount will be addressed in this opposition.

28

1    plan. Otherwise, the feasibility proceedings are akin to conducting a valuation hearing under

2    Section 506(a) without a purpose.

3         In effect, PG&E is asking the Court and all the creditors to allow PG&E to decide

4    whether to go ahead with the Plan as filed or modify it in some way. Thus, the Court is being

5    put to the inconvenience and the parties to the expense, of proceedings to help PG&E test the

6    waters. That is an inappropriate burden on them all.

7          **B.**     **The Class 6 Claims are Neither Contingent nor Unliquidated**

8         If feasibility estimation proceedings are allowed to go forward, the estimation process is

9    inappropriate for Class 6 claims. The Class 6 energy debt owed by PG&E cannot be compared

10    to unliquidated tort or environmental claims. PG&E's energy bill is not contingent, as the events

11    giving rise to liability have already occurred. *In re Nicholes*, 184 B.R. 82, 88 (9th Cir. BAP

12    1995.) The claims are also liquidated, as they are "readily capable of computation." *In re*

13    *Keenan*, 201 B.R. 201 B.R. 263, 265-66 (S.D. Cal. 1996.) The amounts billed to PG&E for its

14    purchases through the PX and ISO markets were based on FERC approved tariffs. PG&E does

15    not dispute the accuracy of the account statements it has received from the PX, setting forth its

16    unpaid energy bill at $1.7 billion.

17         While the debt PG&E owes to energy sellers is neither contingent nor unliquidated, what

18    is contingent and unliquidated is PG&E's claim for a FERC refund. Until the refunds have been

19    ordered by FERC, and reviewed upon any appeal, PG&E has no entitlement to a refund or to

20    subtract expected refunds from its liquidated payment obligation for energy it purchased.

21    Nowhere does PG&E provide any authority that the Court may estimate a contingent,

22    unliquidated claim *of the Debtor*, as contrasted to claims against the Debtor.

23         PG&E contends that claims estimation for feasibility purposes, as contrasted to claims

24    estimation for allowance purposes, is not limited to unliquidated or contingent claims. Rather,

25    PG&E claims, that a feasibility determination "can require the estimation of any sort of disputed

26    claim." (Estimation Motion, at 9.) If the claim is merely "disputed," there is no need to

27    "estimate" the claim for feasibility or any other purpose. PG&E should not be entitled to

28    confirm a Plan if the feasibility of the Plan depends on its prevailing in hotly contested litigation

1   at FERC. PG&E should be required to establish the feasibility of its Plan at the full amount of

2   $1.5 billion for Class 6 claims.

3        Recently, Southern California Edison ("SCE") paid its full PX obligation of $880 million

4   into the PX -- with no offset for any anticipated FERC refunds. In doing so, SCE reserved its

5   right to seek a refund after FERC determines its entitlement to a refund. The same should be

6   required of PG&E. For plan feasibility purposes, PG&E should be required to demonstrate its

7   ability to pay the full amount of its PX/ISO debt to the energy sellers -- without deduction for

8   potential FERC refunds which have not yet been established.

9          **C.**    **Claims Estimation for Feasibility Will Likely Lead to Claims**

10                **Estimation for the Disputed Claims Reserve**

11        While PG&E asserts that it seeks claims estimation for feasibility only, it will logically

     follow that the disputed claims reserve will be set at a level that is consistent with the feasibility

12   determination. Otherwise, the estimation feasibility purposes will be illusory. If PG&E's plan

13   is feasible only if claims are reduced to a certain level, it would be illogical for the Court to

14   confirm the Plan as feasible and then later require that PG&E set reserves for disputed claims at

15   a significantly higher amount than PG&E demonstrated that it had the capacity to absorb.

16        If it is appropriate to discount Class 6 claims by projected FERC refunds in assessing the

17   feasibility of its Plan, the same argument will inevitably be made that it is likewise appropriate to

18   discount the claims for FERC refunds in setting the reserve for disputed claims. Thus, claims

19   estimation for feasibility will likely lay the groundwork for a later PG&E argument that requiring

20   a higher claims reserve would jeopardize the viability of the confirmed Plan. The Court should

21   deny the Estimation Motion as to Class 6 claims.

22          **D.**    **PG&E's Proposed Estimation Procedure for Class 7 is Unfair and**

23                **Inadequate**

24        Even if the Court were to rule that some estimation of Class 6 claims is appropriate for

25   feasibility purposes, PG&E's proposed procedure for estimating Class 6 claims is totally

26   inadequate, unrealistic and unfair.

27        Preliminarily, PG&E does not provide an adequate description of its proposed estimation

28   process for estimating FERC refunds. In the Estimation Motion, PG&E states that its

1    "consultant has modeled the likely outcome of the FERC refund process." (Estimation Motion,

2    at 34.) PG&E proposes that Class 6 claims be estimated based on its consultants' analysis and

3    projections of the expected FERC refunds. (Estimation Motion, at 34.) PG&E also states that it

4    proposes to file a motion for estimation of Class 6 claims by April 17, 2002. (Estimation

5    Motion, at 4.)

6        In other words, the Estimation Motion is not the "real" motion. PG&E will tell what it

7    has in mind in another motion to be filed later. The Estimation Motion is apparently a motion

8    for authority to file a motion. But just the "peek" that PG&E provides in the Estimation Motion

9    suggests that PG&E has a totally unrealistic framework in mind. The thought that this Court

10   should estimate what FERC will likely order in refunds based on PG&E's *own consultant's*

11   analysis is truly mindboggling.

12        In reviewing PG&E's request, the Court needs to consider what is going on at FERC, and

13   whether it is practical or appropriate for the Court to attempt to predict the outcome of the FERC

14   refund proceedings.

15        On July 25, 2001, the FERC issued an order initiating the currently ongoing FERC

16   refund proceedings and setting forth a methodology to be used in calculating potential refunds

17   for wholesale power purchases in the PX and ISO markets for the period of October 2, 2000

18   through June 20, 2001. *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61, 120 (2001.) The July 25,

19   2001 order triggered evidentiary hearings that are currently ongoing before FERC.

20        Since the July 25, 2001 FERC order initiating refund proceedings, the FERC refund

21   proceedings in Washington, D.C. have been complex and intense. The FERC ordered the refund

22   proceedings to occur in three stages, the first of which is to establish a mitigated market clearing

23   price ("MMCP") *for each hour* in the October 2, 2000 through June 20, 2001 period for each PX

24   and ISO market. The second stage will involve calculating the refunds owed by each wholesale

25   energy supplier, and the third stage will involve calculating the amount currently owed to each

26   supplier by the ISO, the utilities and the Sate of California, after the refunds are calculated. The

27   second and third phases will be conducted without the benefit of any findings, by either the

28   administrative law judge or the FERC, as to the first phase MMCP.

1    While the FERC has set forth a broad methodology for calculating the market clearing

2    price on which refunds are based, there has been no agreement and no definitive FERC decision

3    on how the methodology is to be applied.  The disagreements and lack of clarity in the July 25,

4    2001 order resulted in suspension of the refund proceedings in December, 2001 to resolve

5    numerous petitions seeking rehearing and clarification of various issues in previous orders.  On

6    December 19, 2001, the FERC issued a 175 page order clarifying and modifying its July 25,

7    2001 methodology.  *San Diego Gas & Elect. Co.*, 97 FERC ¶ 61,275 (2001).  The refund

8    proceedings then resumed.

9        Months later, the FERC refund proceedings are still in process.  FERC's chief

10   administrative law judge has recently ordered that a portion of the hearings to be held in San

11   Francisco this summer.  This raises the possible spectacle of the Bankruptcy Court trying to

12   "estimate" in one courtroom in San Francisco what FERC will likely order in refunds, while at

13   the same time,  a FERC administrative law judge is holding hearings in another part of the city

14   on the same refund issues.  The Bankruptcy Court should not allow itself to be put in such a

15   position.

16       The complexity of the refund issues is illustrated by the "Order Adopting Revised Joint

17   Stipulation of Issues on MMCP Issues," *San Diego Gas & Elect. Co.*, 98 FERC ¶  63,026 (2002),

18   issued by FERC on March 11, 2002, and attached hereto as Exhibit A. This order identifies the

19   issues that must be decided in determining just the first phase of the FERC refund proceedings,

20   namely setting the mitigated market clearing price ("MMCP"), to be used in calculating refunds.

21   It also sets forth the various interested parties' competing positions on each of the issues.

22       As set forth in the order, the FERC litigants are divided into several "camps," such as the

23   "ISO Position," the "California Parties' Position," the "California Generators' Position,"  and the

24

25

26

27

28

1 "Sellers' Position." PG&E is one of the "California Parties." (Exh. A, at 1, n. 1.) [4] Avista

2 Energy and Idaho Power are part of the "Sellers" group. (Exh. A, at 2, n. 3.)

3       On many issues pertaining to the MMCP, the litigants are in significant disagreement on

4 how the broad methodology ordered by FERC in its July 25, 2001 and December 19, 2001 orders

5 is be applied in calculating refunds. The determination of these issues could cause very

6 substantial "swings," estimated at hundreds of millions of dollars, in the ultimate refund

7 outcome.

8       Furthermore, for marketers, such as Avista Energy and Idaho Power, as contrasted with

9 generators owning power plants in California, the FERC has left open the possibility that the

10 MMCP that is established after months of litigation will not even apply to them at all. Marketers

11 have argued that proposed methodology for the MMCP -- which is based on costs of generation

12 facilities in California -- has no relevance to the reasonableness of prices charged by marketers,

13 who buy and sell energy. The FERC's December 19, 2001 order provides that after the

14 conclusion of the refund proceedings, marketers will have the opportunity to submit cost

15 evidence and seek adjustments of the refund methodology as it applies to them. *San Diego Gas*

16 *& Elect. Co.*, 97 FERC ¶ 61,275, at 62, 193-194 (2001). This is further reason why PG&E's

17 proposal for claims estimation is inappropriate and highly prejudicial, especially to marketers.

18       It would obviously be unfair to energy sellers for the Court to wholesale adopt PG&E's

19 position on the complex refund issues. If the Court institutes a claims estimation procedure on

20 the FERC refund issue, energy sellers would obviously oppose PG&E's analysis and insist on

21 the Court considering their positions and their experts' analysis. The Court could become mired

22 in FERC refund issues for several months.

23

24

25

---

26    [4] The other "California Parties" are the California Attorney General, the California Electricity Oversight Board, the California Public Utilities Commission, and the other two California utilities,

27 SCE and San Diego Gas & Electric Company. (Exh. A, at 1, n. 1.)

28

1  **IV.  CONCLUSION**

2  For all of the above reasons, PG&E's Estimation Motion, as it applies to Class 6 claims,

3  should be denied.

4  Dated:  March 22, 2002

5  PATRICIA S. MAR
   MORRISON & FOERSTER LLP
6

7  By: _____

8  Patricia S. Mar
   Attorneys for Creditors
9  AVISTA ENERGY, INC. and IDAHO POWER
   COMPANY

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# E X H I B I T   A

# UNITED STATES OF AMERICA
## FEDERAL ENERGY REGULATORY COMMISSION

San Diego Gas & Electric Company,
     Complainant,

     v.                       Docket No. EL00-95-045

Sellers of Energy and Ancillary Service Into
Markets Operated by the California
Independent System Operator Corporation
and the California Power Exchange,
     Respondents.

Investigation of Practices of the California         Docket No. EL00-98-042
Independent System Operator and the
California Power Exchange

## ORDER ADOPTING REVISED JOINT STIPULATION OF ISSUES
## ON MMCP ISSUES

### (Issued March 11, 2002)

1.     This order confirms my ruling at today's prehearing conference adopting a revised Joint Narrative Stipulation of Issues (JS) filed on March 9, 2002 with regard to the mitigated market clearing price issues (mmcp) set for hearing and is reproduced in the Appendix. The JS shall apply to adjudication of these issues subject to further rulings and orders. A separate JS which pertains to section 202(c) issues will be filed later this week and, when adopted, will govern adjudication of those issues.

                                      Bruce L. Birchman
                                      Presiding Administrative Law Judge

APPENDIX

# STIPULATED ISSUES

1     **I.**      **How are the mitigated market clearing prices ("MMCPs") determined for each 10-minute interval during the refund period?**

2         **A. What is the applicable formula for determining the MMCPs for each interval?**

3     *All Parties' Position:* The Commission has required the following formula to be used in this hearing to determine the MMCP for each interval during the refund period:

$$MMCP = (\text{Heat Rate x Gas Price} + \$6.00) \times 1.1 \ (\text{beginning January 6}).$$

4         **B. What is the appropriate heat rate data set for each unit eligible to set the MMCP that should be referenced for insertion in the MMCP Formula?**

5            **1. Should average and/or incremental heat rate curves be used in the determination of the MMCP?**

6     *ISO Position:* Incremental heat rate curves should be used to calculate the MMCP. (ISO-5 at 21:20-24, 33:3-38:17; ISO-19 at 15:4-29:27).

7     *The California Parties Position[1]:* The Commission's orders require an analysis of the marginal cost in the real time Imbalance Energy market -- the marginal cost can only be evaluated by looking at the incremental heat rate. (CAL-19 at 7:19 to 9:13; CAL-6 at 7:5 to 9:25; CAL-21 at 11:18 to 13:12; CAL-21 at 16:9 to 17:14; CAL-21 at 19:14-22:2; CAL-21 at 29:11 to 31:14 (ending with "rates"); CAL-21 at 32:3 to 39:4; CAL-21 at 44:3 to 50:3; CAL-26 at 3:16 to 4:22; CAL-26 at 9:8 to 13:23; CAL-26 at 15:21 to 18:24).

8     *California Generators' Position[2]:* Actual average rather than incremental heat rate curves should always be used, to ensure that actual running costs in the interval are

---

[1]     The California Parties are, collectively, the Attorney General for the State of California (Attorney General), the California Electricity Oversight Board (EOB), the California Public Utilities Commission (CPUC), Pacific Gas and Electric Company (PG&E), Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E).

[2]     The California Generators are, collectively, Duke Energy, Dynegy, Mirant, Reliant, and Williams.

recovered. (GEN-1 at 5:15-20; 7:12-15:2; 16:7-19:11; recovered. GEN-23 at 4:11-5:6).
At a minimum, average heat rates should be used when a unit is running solely to respond to
an ISO dispatch instruction. (GEN-19 at 17:14- 19:48; GEN-23 at 5:9-6:8).

9          *Enron's Position:*  Average heat rate curves must be used given the predominate
characteristics of generation units selected as marginal and the FERC goal of recreating
competitive market outcomes. (ENR-1 5:w18 to 11:5; ENR-1 12:9 to 16:4 and ENR-1
19:15 to 22:6).

10         *Sellers' Position[3]*  Average heat rates generally should be used.  Incremental heat
rates should not be used to determine MMCP unless the incremental heat rate exceeds the
corresponding average heat rate for a specific unit of output. (SEL-1, page 19, lines 4-5
and page 19, line 19 - page 27, line 17).

11         *Powerex Corp.'s Position:*  Average, not incremental, heat rates should be used
to determine the MMCP.  (PWX-1 at 5:10-12, 5:20 to 6:1, 6:23 to 7:1, 9:10 to 12:6,
17:4 to 19:12; PWX-5 at 5:5 to 6:21, 14:10-13, 14:17 to 16:21).

12         *PPL Parties' Position:*  Use of average heat rates is necessary to replicate
market outcomes, under which sellers would have priced so as to recover fully their short-
run marginal costs.  Use of incremental heat rates would not allow the necessary recovery.
(PPL-1 at 7:11 - 12:11).

13         *Arizona Electric Power Cooperative, Inc. Position:*  Average heat rate curves
should be used in those hours where simple cycle turbines would not have been dispatched
at all but for spot sales to the ISO and others (AEP-12 at 10:6-11:7).

14         *Pasadena's Position:*  Average heat rate curves should be used.  (PAS-1A at
7:11-12:2; PAS-2; PAS-3)

15         *Modesto Irrigation District (MID)Position:*  MID believes that the proper heat
rates to be applied in calculating the Mitigated Market Clearing Price are the average heat
rates over the hour. (Ex. MID-1 at 3:9 to 4:18 (Jackson)).

16         *Staff Position:*  The Commission intended for incremental heat rate curves to be
used to develop the MMCP.  (S-26 at 19:9-22:22 and 32:3-33:11).

17              2.  Which heat rate source data should be used and are the data
                  accurate?

18         *All Parties' Stipulation:*  The Parties have stipulated to the use of the base heat

---

[3]      Sellers are, collectively, Avista Energy, BP, Coral Power, LLC, IDACORP, Puget and Sempra
Energy Trading Corp.  Sellers are sponsors of the testimony of Dr. Charles J. Cicchetti.

rate data supplied by generators pursuant to the April 26 Order as modified by the Stipulation as to Heat Rates and Non-Natural Gas Generation entered into in this proceeding ("Heat Rate Stipulation").

19      *Staff Position:*  Staff also disagrees with Pasadena's proposal to include minimum load fuel costs. (S-26 at 29:20-30:19).

20            **3.    If incremental heat rate curves are used, should they be adjusted to be monotonically non-decreasing?**

21      *ISO Position:*  The ISO adjusted incremental heat rate curves so that a unit's incremental heat rate curve never decreases as the operating level of the unit increases. The ISO did so in order to ensure consistency with the ISO's market design and software used to implement the June 19 Order, but the ISO does not contend that it is necessary to have monotonically non-decreasing heat rate curves during the refund period. (ISO-5 at 26:16-27:21; ISO-20 at 8:1-9:7).

22      *The California Parties Position:*  The monotonically non-decreasing constraint imposed on heat rates by the ISO is an improper adjustment that artificially increases the level of the heat rates used in calculating the MMCP. (CAL-1 at 16:14 to 18:10).

23      *California Generators' Position:*  Incremental heat rates should not be used, leaving no reason to reach the question whether the incremental heat rates should be adjusted to become monotonically non-decreasing.  See I.B.1 above.  It is "less wrong," however, to use monotonically non-decreasing incremental heat rates than to use unadjusted incremental heat rates.  Hence, if incremental heat rates were used—for example, under the "mixed heat rate" approach—it would be appropriate to use monotonically non-decreasing incremental heat rates.  (GEN-23 at 5:9-6:8).

24      *Enron's Position:*  The use of incremental heat rate curves in the ISO Methodology is inconsistent with economic theory. (ENR-11:7 to 14:3). The use of monotonically non-decreasing heat rates in the ISO Methodology is flawed, as it is only required under a hypothetical dispatch methodology contrary to the Commission's Orders. (ENR 1 18:8 to 22:6).

25      *Powerex Corp.'s Position:*  Monotonically non-decreasing heat rates should not be used.  Average heat rates should be used.  (PWX-1 at 9:10 to 12:5, 17:4 to 19:12; PWX-5 at 5:5 to 6:21, 14:10-13, 14:17 to 16:21; PWX-52 at 2:21-24; 4:16 to 7:2).

26      *Staff Position:* Staff agrees with the testimony of the generators and the
California parties in opposition to adjustment of incremental heat rates to be
monotonically non-decreasing. (S-26 at 34:19-36:23).

27  **C.**      **At what operating point on the heat rate curve should a unit's heat rate
be taken for insertion into the MMCP Formula?**

28      *ISO Position:* The actual incremental heat rate for units dispatched during each
10-minute interval should be based on the Acknowledged Operating Target ("AOT") for
each unit. The AOT is defined as the Final Hour-Ahead Schedule for Energy submitted for
each unit, plus any real-time Energy dispatched by the ISO during that hour. (ISO-1 at 28:6-
33:4; ISO-19 at 33:19-39:15).

29      *The California Parties Position:* The ISO properly determined the heat rate by
considering the Acknowledged Operating Target of a unit, which is the operating point that
results from the ISO's decisions to dispatch the unit in the BEEP stack. (CAL-1 at 3:11-
19; CAL-19 at 2:10-12).

30      *California Generators' Position:* The heat rate should be determined at the
actual operating level of each unit during each interval, not at a hypothetical target
operating level (i.e., the AOT) estimated by the ISO through selective inclusion of
dispatch instructions issued through the computerized BEEP Stack. (GEN-1 at 6:14-6:22
and 45:1-45:22; GEN –23 at 4:1-4:10).

31      *Enron's Position:* The operating point on the heat rate curve should be
determined by reviewing actual metered data- not hypothetical data. (ENR-1 22:7-24:3).

32      *Powerex Corp.'s Position:* Use the actual operating level of each unit during the
applicable interval. (PWX-1 at 18:8-14).

33      *Staff Position:* Staff does not oppose the ISO's position.

34  **D.  What units are eligible to set the MMCP for each 10-minute
interval in the refund period?**

35          **1.  Is eligibility to set the MMCP contingent upon a unit having
had a bid in the BEEP Stack?**

36      *ISO Position:* Only those units with bids dispatched in merit order through the
BEEP system (and "acknowledged" by the units' operators) so that they were actually
eligible to set the market clearing price in the ISO's Real Time Market should be eligible
to set the mitigated price for each interval. (ISO-1 at 41:1-52:22; ISO-19 at 40:1-42:10,
53:12-54:6).

37    The California Parties Position:  The ISO properly limited eligibility to set the
MMCP to units that had bid into the BEEP Stack (i.e. energy bids submitted to the ISO in
connection with bids in the ISO's ancillary services and supplemental energy markets),
consistent with the Commission's Refund Orders.  (CAL-19 at 9:14 to 11:4; CAL-21 at
13:16 to 15:7; CAL-21 at 50:6 to 61:21; CAL-26 at 5:17 to 5:23; CAL-26 at 6:2 to 6:5;
CAL-26 at 6:8 to 7:16(ending with "market");  CAL-26 at 19:1 to 19:11; CAL-26 at 19:13
to 19:15; CAL-26 at 19:17 to 20:2; CAL-26 at 20:9 to 21:14; CAL-26 at 21:20 to 25:5).
Of the various California markets, the merit order dispatch in the BEEP stack provides the
best proxy for the results that would have existed in an efficient, competitive market.
(CAL-21 at 14:11 to 15:7).

38    California Generators' Position:  Any unit that the ISO dispatched for energy to
serve real-time demand in an interval should be eligible to set the MMCP in such interval.
(GEN-1 at 19:12-32:5).  Eligibility cannot be limited to BEEP Stack units because the
BEEP Stack was not the primary mechanism of the ISO for meeting system imbalance
energy requirements during the refund period.  (GEN-1 at 22:6-28:9).  The Commission's
Orders do not restrict eligibility to set the MMCP to units that had bids in the BEEP Stack.
(GEN-1 at 28:10-32:5).

39    Enron's Position:  The BEEP Stack requirement is an artificial constraint put on
the selection criteria for marginal units and is not supported by FERC orders, the evidence
in this case or economic theory.  (ENR-1 24:5 to 29:20).

40    Sellers' Position:  No.  Dr. Cicchetti testifies that the marginal cost of the most
expensive source of supply dispatched in the real time market should be used to establish
the MMCP.  (SEL-1, at page 28, line 1-18; page 29, line 8-10, 23-24; page 30, line 2;
Exhibit SEL-3).

41    Powerex Corp.'s Position:  No.  The MMCP should be calculated using the
marginal cost of the most expensive source of supply dispatched in the real time market,
which includes energy supplied to the ISO from units outside of the BEEP stack.  (PWX-1
at 5:18-19, 6:1-18, 7:1-3, 12:7:7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-46 at
3:9-21; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

42    PPL Parties' Position:  No.  The CAISO improperly excludes many transactions
outside the BEEP stack even though those transactions were a significant portion of the
energy supplied to the CAISO, were integral to the marketplace, and are subject to refund.
(PPL-1 at 12:12 - 17:11).

43    Staff Position:  The Commission said to select from units dispatched in the real-
time imbalance market which means units dispatched through the BEEP stack.  (S-26 at
43:15-45:4).

2.     **Are the following energy types eligible to set the MMCP?**

a.     **BEEP Supplemental?**

*ISO Position:* Yes, if dispatched in merit order. (ISO-1 at 6:10-7:2, 41:1-45:2).

*The California Parties Position:* Yes, the ISO properly limited eligibility to set the MMCP to units that had bid into the BEEP stack, including those units that had submitted Supplemental Energy bids. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

*California Generators' Position:* Units providing load-following supplemental energy through the BEEP Stack were serving system real-time energy needs and should be eligible to set the MMCP. (GEN-1 at 32:15-33:2).

*Enron's Position:* Yes, although units allowed to set MMCP should not be constrained to those in the BEEP stack. (ENR-1 24:19-29:20).

*Sellers' Position:* Dr. Cicchetti conceptually would prefer to have all of these included. (SEL-1, page 15, line 3 – page 18, line 20).

*Powerex Corp.'s Position:* Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

*Staff Position:* Yes. (S-26 at 44:17-45:4).

b.     **BEEP Spin, Non-spin and Replacement A/S?**

*ISO Position:* Yes, if dispatched in merit order. (ISO-1 at 6:10-7:2, 41:1-45:2).

*The California Parties Position:* Yes, the ISO properly limited eligibility to set the MMCP to units that had bid into the BEEP stack, including those units that had submitted Energy bids associated with Spinning, Non-Spinning, and Replacement Reserves. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

*California Generators' Position:* Units providing ancillary services through the BEEP Stack were serving system real-time energy needs and should be eligible to set the MMCP. (GEN-1 at 32:24-33:2).

*Enron's Position:* Yes, although units allowed to set MMCP should not be constrained to those in the BEEP stack. (ENR-1 24:19-29:20).

*Sellers' Position:* Dr. Cicchetti conceptually would prefer to have all of these included. (SEL-1, page 15, line 3 – page 18, line 20).

*Powerex Corp.'s Position:* Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

60    *Staff Position:*  Yes, assuming this refers to the BEEP dispatch of energy
associated with these ancillary services.

61              **c.    OOS Non-congestion Imbalance Energy**
                        **Supplemental?**

62    *ISO Position:*  No.  (ISO-1 at 13:1-13, 41:1-45:14, 47:7-11; ISO-19 at 40:1-
42:10).

63    *The California Parties Position:*  No, the ISO properly excluded from eligibility
to set the MMCP units that were dispatched by the ISO for reasons other than the
economic merit order dispatch in the BEEP stack.  Thus, out of sequence energy -- which
by definition was not dispatched in merit order in the BEEP stack -- was properly excluded.
(CAL-1 at 3:11-19; CAL-19 at 2:10-12).

64    *California Generators' Position:*  Out-of-sequence dispatches of units with
BEEP Stack bids that were made for general system reliability reasons and not for
congestion-related local reliability reasons should be eligible to set the MMCP.  (GEN-1
at 33:4-35:4; GEN-19 at 4:6-4:11; 14:13-15:8).

65    *Enron's Position:*  Yes, although units allowed to set MMCP should not be
constrained to those in the BEEP stack.  (ENR-1 24:19-29:20).

66    *Sellers' Position:*  OOS calls to meet locational, rather than system reliability
requirements were incorrectly excluded by the ISO.  (SEL-1, page 28, line 7-18).

67    *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to
17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
9:15).

68    *PPL Parties' Position:*  To the extent these transactions were used to supply
imbalance energy to California electricity market they should be included.  (PPL-1 at
12:12-17:11).

69    *Staff Position:*  Yes.  S-26 at 50:14-50:23.

70              **d.    OOS Non-congestion Imbalance Energy Spin, Non-**
                        **Spin and Replacement A/S?**

71    *ISO Position:*  No.  (ISO-1 at 13:1-13, 41:1-45:14, 47:7-11; ISO-19 at 40:1-
42:10).

72    *The California Parties Position:*  No, the ISO properly excluded from eligibility
to set the MMCP units that were dispatched by the ISO for reasons other than the
economic merit order dispatch in the BEEP stack.  Thus, out of sequence energy -- which
by definition was not dispatched in merit order in the BEEP stack -- was properly excluded.
(CAL-1 at 3:11-19; CAL-19 at 2:10-12).

73      *California Generators' Position:*  Out-of-sequence dispatches of units with
BEEP Stack bids that were made for general system reliability reasons and not for
congestion-related local reliability reasons are eligible to set the market clearing price
under the ISO Tariff and should be eligible to set the MMCP.  (GEN-1 at 33:4-35:4; GEN-
19 at 14:13-15:8).

74      *Enron's Position:*  Yes, although units allowed to set MMCP should not be
constrained to those in the BEEP stack.  (ENR-1 24:19-29:20).

75      *Sellers' Position:*  OOS calls to meet locational, rather than system reliability
requirements were incorrectly excluded by the ISO.  (SEL-1, page 28, line 7-18).

76      *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to
17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
9:15).

77      *PPL Parties' Position:*  To the extent these transactions were used to supply
imbalance energy to California electricity market they should be included.  (PPL-1 at
12:12 - 17:11).

78      *Staff Position:*  Staff has not taken a position on this issue.

79                          **e.      OOS Congestion?**

80      *ISO Position:*  No.  (ISO-1 at 13:1-13, 41:1-45:14, 47:7-11; ISO-19 at 40:1-
42:10).

81      *The California Parties Position:*  No, the ISO properly excluded from eligibility
to set the MMCP units that were dispatched by the ISO for reasons other than the
economic merit order dispatch in the BEEP stack.  Thus, out of sequence energy -- which
by definition was not dispatched in merit order in the BEEP stack -- was properly excluded.
(CAL-1 at 3:11-19; CAL-19 at 2:10-12).

82      *California Generators' Position*:  Out-of-sequence units dispatched out-of-
merit for congestion/local reliability reasons should not be eligible to set the MMCP,
since they are presumed not dispatched for system energy needs.  (GEN-1 at 33:4-34:10).

83      *Sellers' Position:*  OOS calls to meet locational, rather than system reliability
requirements were incorrectly excluded by the ISO.  (SEL-1, page 28, line 7-18).

84      *Powerex Corp.'s Position*:  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to
17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
9:15).

85      *Staff Position:*  No.  S-26 at 50:14-50:23 (not eligible to set market clearing
price).

86                          **f.      OOM?**

87    *ISO Position:* No. (ISO-1 at 13:15-15:16, 41:1-45:14, 46:16-47:19; ISO-19 at
    40:1-42:10).

88    *The California Parties Position:* No, the ISO properly excluded from eligibility
    to set the MMCP units that did not submit bids for the ISO operated Imbalance Energy
    markets. Thus, out of market energy -- which by definition was sold to the ISO outside of
    the organized ISO markets -- was properly excluded. (CAL-1 at 3:11-19; CAL-19 at 2:10-
    12; CAL-21 at 53:11 to 56:2; CAL-21 at 56:3 to 56:13).

89    *California Generators' Position:* Since the ISO is authorized to procure out-of-
    market ("OOM") energy to meet system energy needs when the BEEP Stack is exhausted
    or unable to meet such needs, OOM units should be eligible to set the MMCP. (GEN-1 at
    35:6-36:23; GEN-19 at 12:5-12:11). ISO may have misclassified certain transactions as
    OOM. (GEN-19 at 11:10-14:12).

90    *Enron's Position:* Yes, units providing OOM energy should be eligible to set the
    MMCP, to avoid distortions created by the small and potentially biased set of units in the
    BEEP stack. (ENR-1 25:4 to 29:20; ENR-5).

91    *Sellers' Position:* OOM purchases needed for system reliability but outside the
    ISO actual control area were incorrectly excluded by the ISO. (SEL-1, page 28, line 7-
    18).

92    *Powerex Corp.'s Position:* Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to
    17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
    9:15).

93    *PPL Parties' Position:* The CAISO improperly excludes OOM transactions,
    supplied largely by CSG members, even though those transactions were a significant
    portion of the energy supplied to the CAISO, were integral to the marketplace, and are
    subject to refund. (PPL-1 at 12:12 - 17:11).

94    *Staff Position:* No. (S-26 at 47:11-48:17).

95              **g.    Residual Energy?**

96    *ISO Position:* No. (ISO-1 at 10:12-11:2, 41:1-45:14, 46:17-22; ISO-19 at
    53:12-54:6).

97    *The California Parties Position:* No, the ISO properly excluded from eligibility
    to set the MMCP units that provided more or less energy in real-time for reasons other
    than the economic merit order dispatch in the BEEP stack. Thus, residual energy -- which
    is the incidental result of ramping to reach Acknowledged Operating Targets -- was
    properly excluded. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

98    *California Generators' Position:* Units providing residual energy are allowed to
    set the clearing price under the Commission's mitigation orders and should be eligible to
    set the MMCP. (GEN-1 at 37:1-38:14).

99     *Sellers' Position*: Residual imbalance energy previously dispatched was incorrectly excluded by the ISO. (SEL-1, page 28, line 7-18).

100     *Powerex Corp.'s Position*: Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

101     *Staff Position*: No. (Ex. S-26 at 51:24-52:13).

102     **h.     Regulation?**

103     (ISO-1 at 11:4-21, 41:1-45:14, 47:1-5; ISO-19 at 53:12-54:6).

104     *The California Parties Position*: No, the ISO properly excluded from eligibility to set the MMCP units that were dispatched by the ISO for reasons other than the economic merit order dispatch in the BEEP stack. Thus, energy associated with regulation service -- which is produced for reliability reasons in response to instantaneous differences between load and supply rather than as a result of the merit order dispatch in the BEEP stack -- was properly excluded. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

105     *California Generators' Position*: Units dispatched for regulation should be not eligible to set the MMCP. (GEN-19 at 9:1-9:4).

106     *Sellers' Position*: Regulation energy needed but not ramped up or down in any specific merit order was incorrectly excluded by the ISO. (SEL-1, page 28, line 7-18).

107     *Powerex Corp.'s Position*: Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

108     *Staff Position*: No. (S-26 at 45:24-46:16 and 50:32-51:11).

109     **i.     Other Imbalance Energy?**

110     *ISO Position*: No. (ISO-1 at 12:1-22, 15:18-16:23, 41:1-45:14, 47:13-23, 49:21-50:4).

111     *The California Parties Position*: No, the ISO properly excluded from eligibility to set the MMCP units that were dispatched by the ISO for reasons other than the economic merit order dispatch in the BEEP stack. Thus, other energy sources -- such as energy pre-arranged in the PX markets, energy resulting from reliability must run agreements, uninstructed energy that the ISO had not requested, and energy associated with bilateral transactions -- was properly excluded. (CAL-1 at 3:11-19; CAL-19 at 2:10-12; CAL-21 at 55:9 to 56:2; CAL-21 at 57:18 to 61:21; CAL-26 at 20:15 to 21:8).

112     *California Generators' Position*: While uninstructed energy has been excluded, CTs operating for their minimum run time are eligible to set the MMCP. (GEN-1 at 41:11-41:15). RMR and other local reliability energy dispatches have not been treated as eligible to set the MMCP. (GEN-1 at 40:3-41:9).

113     *Enron's Position:* Units providing energy in the Cal PX market should also be eligible to set the MMCP. (ENR-1 32:5 to 34:3).

114     *Powerex Corp.'s Position:* Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

115     *Staff Position:* Staff supports Mr. Tranen's proposal to include combustion turbine units, dispatched by the ISO, for their entire minimum-run time. (S-26 at 52:14-52:27). Staff opposes Dr. Cicchetti's proposal to include RMR units. (S-26 at 52:28-53:3).

116     **3.**     **If eligibility of a unit is contingent upon having had a bid in the BEEP Stack, what 22approach to eligibility should be taken during intervals in which there were incremental dispatch instructions from the BEEP Stack?**

117     *ISO Position:* During intervals when a gas-fired unit was dispatched in merit order to provide incremental energy, the marginal unit is the gas-fired unit with the highest marginal operating costs that had an acknowledged dispatch for incremental energy. (ISO-16 at 4:13-5:5:2; ISO-19 at 42:12-51:6).

118     *The California Parties Position:* When there were units operating in response to incremental dispatch instructions from the BEEP stack, the ISO properly chose from those units that unit with the highest marginal operating cost during a particular interval. (CAL-1 at 3:11-19; CAL-19 at 2:10-12; CAL-21 at 22:3 to 26:4; CAL-21 at 27:8 to 29:7).

119     *California Generators' Position:* Eligibility should not be limited to units that had bids in the BEEP Stack, but, in all events, units with incremental dispatch instructions should be treated on the same basis as units with decremental instructions and the highest cost unit with such an instruction should be chosen. (GEN-1 at 7:1-7:8; 47:10-47:23; GEN-19 at 6:15-7:14).

120     *Enron's Position:* Eligibility of units should not be contingent upon having a bid in the BEEP stack, as the BEEP stack was small and potentially distorted by ISO actions for much of the period. (ENR-1 25:4 to 29:20).

121     *Sellers' Position:* The unit actually dispatched with the highest marginal running costs should set the MMCP Hypothetical or assumed dispatch should not be used. (SEL-1, page 31, line 8- page 46, line 20; SEL-11, page 7, line 8 – page 12, line 7).

122     *Powerex Corp.'s Position:* Eligibility of a unit should not be contingent upon having a bid in the BEEP Stack. All units that supplied energy to the ISO to help to maintain its system are eligible. (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

123    *Staff Position:*  Staff supports the ISO's position of preferring incremental over
decremental dispatch for choosing the marginal unit.  (S-26 at 39:4–40:12).

124    **4.    If eligibility of a unit is contingent upon having had a bid in
the BEEP Stack, what approach to eligibility should be
taken during intervals in which there were decremental
dispatch instructions, but not incremental dispatch
instructions, from the BEEP Stack?**

125    *ISO Position:*  During intervals when no gas-fired units were dispatched in merit
order to provide incremental energy, the marginal unit is the gas-fired  unit with the
lowest marginal operating costs that had an acknowledged decremental dispatch
instruction.  (ISO-1 at 37:1-38:9; ISO-16 at 5:4-20, 6:17-7:10; ISO-19 at 42:12-51:6).

126    *The California Parties Position:*  When there were decremental dispatch
instructions, but no incremental dispatch instructions, the ISO properly looked to the
unit on the margin in the BEEP stack, which was the decremental unit with the lowest
marginal operating cost.  (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

127    *California Generators' Position:*  Eligibility should not be limited to units that
had bids in the BEEP Stack, but, in all events, the highest cost unit with a decremental
instruction should be selected to set the MMCP rather than selecting the lowest cost
units with a decremental instruction.  (GEN-1 at 48:1-48:4; GEN-19 at 7:15-7:21).

128    *Enron's Position:*  Eligibility of units should not be contingent upon having a
bid in the BEEP stack, as the BEEP stack was small and potentially distorted by ISO
actions for much of the period.  (ENR-1 25:4 to 29:20; ENR-5).

129    *Sellers' Position:*  The unit actually dispatched with the highest marginal
running costs should set the MMCP.  Hypothetical or assumed dispatch should not be
used.  (SEL-1, page 31, line 8  - page 46, line 20; SEL-11, page 7, line 8 – page 12, line
7).

130    *Powerex Corp.'s Position:*  Eligibility of a unit should not be contingent upon
having had a bid in the BEEP Stack.  The real time metered data should be used, which
does not use the incremental or decremental labels and the correct approach is to use the
most expensive unit from the set running, as identified in the ISO's data file *rt_act.csv*.
(PWX-1 at 5:13-19, 6:1-23, 7:1-3, 12:7 to 17:2; PWX-5 at 4:13 to 5:2, 12:22 to 13:12;
PWX-46 at 3:9-21; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

131    *Staff Position:*  Staff supports the ISO's position of choosing the unit with the
lowest decremental cost as the marginal unit.  (S-26 at 38:21-38:23 and 40:21-40:37).

132    **5.    What approach to determining the unit that sets the MMCP
should be taken during intervals in which no eligible unit
was dispatched for imbalance energy?**

133      *ISO Position:* During these intervals, the marginal unit is the gas-fired unit with
the lowest marginal operating costs that had a bid for incremental energy submitted in
the ISO's BEEP system. (ISO-1 at 38:10-39:14; ISO-16 at 6:1-7:10; ISO-19 at 52:1-
53:10).

134      *The California Parties Position:* When there were no incremental or
decremental dispatch instructions in an interval, the ISO properly looked to the unit on
the margin in the BEEP stack, which was the incremental unit that would have next been
dispatched if a dispatch instruction was issued. (CAL-26 at 7:17-21; CAL-26 at 22:4 to
24:19 (ending at "to"); CAL-26 at 24:19 (beginning at "non-PGA") to 25:5).

135      *California Generators' Position:* During intervals in which no eligible unit was
dispatched for real-time energy, the MMCP should be determined by "filling in the
curve," i.e., by taking the average of the MMCP calculated for the interval before and the
interval after, rather than by choosing the unit with the lowest cost that had a BEEP Stack
bid. (GEN-1 at 7:3-7:8 and 46:6-46:17; GEN-19 at 8:1-8:16).

136      *Sellers' Position:* The unit actually dispatched with the highest marginal
running costs should set the MMCP. Hypothetical or assumed dispatch should not be
used. (SEL-1, page 31, line 8  - page 46, line 20; SEL-11, page 7, line 8 – page 12, line
7).

137      *Powerex Corp.'s Position:* Eligibility of a unit should not be contingent upon
having had a bid in the BEEP Stack. The real time metered data should be used, which
does not use the incremental or decremental labels and the correct approach is to use the
most expensive unit from the set running, as identified in the ISO's data file rt_act.csv.
(PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 4:13 to 5:2, 8:3 to 14:13;
PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

138      *Staff Position:* Staff supports the ISO's position. (S-26 at 37:11-38:14).

139      **6.      Should units running on fuels other than natural gas be
                eligible to set the MMCP?**

140      *All Parties' Stipulation:* Units running on fuels other than natural gas should
not be eligible to set the MMCP in those intervals in which they were operating on fuels
other than natural gas, as provided in the Heat Rate Stipulation.

141      **7.      Should units that did not show positive or negative
                responses to BEEP Stack dispatch instructions be eligible
                to set the MMCP?**

142      *ISO Position:* The ISO did not factor into its determination of the marginal unit
whether or not a unit actually responded to an acknowledged ISO dispatch instruction.
However, it may be appropriate to disqualify those units that did not deliver incremental
energy pursuant to ISO dispatches from eligibility to set the mitigated price. (ISO-19 at
39:1-15).

143      *The California Parties Position:* Units that failed to respond to BEEP stack dispatch instructions should not be counted as if they had run; such units should be excluded from eligibility to set the MMCP. (CAL-1 at 21:6 to 24:10).

144      *California Generators' Position:* BEEP Stack dispatch instructions should not be a criterion for eligibility to set the MMCP. Units that did not actually run in response to ISO dispatch instructions should, however, be excluded from the analysis (GEN-1 at 19:20-28:9; GEN-23 at 3:10-3:23).

145      *Enron's Position:* Eligibility of units should not be contingent upon having a bid in the BEEP stack, as the BEEP stack was small and potentially distorted by ISO actions for much of the period. (ENR-1 25:4 to 29:15; ENR-5).

146      *Powerex Corp.'s Position:* This issue is not relevant because the real time metered data should be used, which does not use the incremental or decremental labels and the correct approach is to use the most expensive unit from the set running, as identified in the ISO's data file *rt_act.csv*. (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 4:13 to 5:2, 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

147      *Staff Position:* If unit fails to respond it cannot set BEEP stack clearing price and should not set the MMCP. (S-26 at 43:4-43:13 and 56:21-57:6).

148      **8.      Should units outside the ISO control area be eligible to set the MMCP?**

149      *ISO Position:* No. (ISO-1 at 40:13-22; ISO-19 at 57:17-59:6).

150      *The California Parties Position:* The ISO properly excluded from its analysis supplies outside of the ISO control area -- it is generally not possible to determine the heat rates for supplies originating outside of the control area. (CAL-19 at 9:14 to 11:4; CAL-21 at 13:16 to 14:8.; CAL-21 at 14:11 to 15:7).

151      *California Generators' Position:* MMCPs were calculated on a data base that included only generating units within the ISO Control Area. (GEN-1 at 5:15).

152      *Arizona Electric Power Cooperative, Inc. Position:* Units outside the ISO control area should be eligible to set the MMCP (AEP-12 at 3:10-3:18 and 4:1-5:22, AEP-13).

153      *Sellers' Position:* Dr. Cicchetti believes units outside the ISO control area should be included in the determination of MMCP. (SEL-1, page 15, line 3 – page 18, line 20).

154      *Powerex Corp.'s Position:* Yes. Any generator that supplied energy to help maintain balance in the ISO system should be included. (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

155    *PPL Parties' Position*: Yes. The CAISO improperly excludes many units
       outside the ISO control area though those transactions were a significant portion of the
       energy supplied to the CAISO, were integral to the marketplace, and are subject to
       refund. (PPL-1 at 12:12 - 17:11).

156    *Staff Position:* Units outside California are not eligible to set MMCP. (S-26 at
       54:15-55:24).

157            **E.   Additional Issues Related to the MMCP Calculation.**

158                **1.   What is the proper use of gas price indices for the
                         calculation of the MMCP for each interval?**

159    *ISO Position:* The gas price used in calculating the mitigated price should be
       the average of the published midpoint daily spot gas prices reported in the indices
       required to be used by the Commission for the northern and southern zones. (ISO-5 at
       39:16-41:3; ISO-20 at 13:3-16:13).

160    *The California Parties Position* : The ISO properly used the simple average of
       the daily midpoint natural gas prices, reported by the indices selected by the
       Commission, a method which is mandated by the Commission's Refund Orders and
       Judge Wagner's July 12 Recommendation, and which is consistent with the way in which
       the spot gas markets operate. (CAL-22 at 5:7 to 7:4; CAL-22 at 14:1 to 15:15; CAL-22 at
       22:23 to 23:4).

161    *California Generators' Position*: MMCPs were calculated utilizing the same
       gas prices as the ISO (with one minor exception). (GEN-1 at 4:1-4:2).

162    *Sellers' Position:* The ISO used an incorrect method to determine gas prices,
       based upon midpoints, averages of recalculated averages and volume-weighted averages.
       The marginal natural gas cost for calculating MMCP is the "high" or "peak" price on a
       particular day and not the midpoint price, especially when the range of prices is quite large.
       Common high prices are conservative surrogates for the spot prices of natural gas. Thus,
       for SP15, the proper gas price index is the common high price reported in Gas Daily. For
       NP-15, the proper gas price index is the average of the common high price reported in Gas
       Daily and the high prices reported by NGI and Inside FERC. (SEL-1, page 46, line 21-page
       56, line 7; SEL-3; SEL-6; SEL-7; SEL-11, page 12, line 8 – page 14, line 15).

163    *Powerex Corp.'s Position:* Common High Value defined and published in Gas
       Daily which is a McGraw Hill publication. (PWX-7:10-18; PWX-46 at 2:26 to 3:7).

164    *PPL Parties' Position:* The proper gas price index for the purpose of
       calculating the MMCP, which is a spot market price, is Gas Daily's published "common
       high price" index for natural gas, which more accurately reflects the cost incurred to
       supply spot market electricity than does the index selected by the CAISO. (PPL-1 at 22:12
       - 28:17).

165    *Staff Position:* Staff does not oppose the ISO's approach.

166

**2.  To the extent hourly MMCPs are calculated based upon 10-minute interval MMCPs, should the interval MMCPs be averaged on a weighted or simple average basis?**

167

*ISO Position:*  Simple.  (ISO-1 at 55:11-56:14; ISO-19 at 60:10-66:8).

168

*The California Parties Position:*  The ISO properly developed hourly MMCPs by taking the simple average of the 10-minute MMCPs, rather than developing some complex weighting that is not called for in the Refund Orders.  (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

169

*California Generators' Position:*  MMCPs for each hour, to be used in calculating refunds in the PX spot markets, should be calculated using a weighted average of the 10-minute interval prices, with the weighting based on real-time generation by eligible units.  (GEN-1 at 48:8-50:11).

170

*Powerex Corp.'s Position:*  Simple average basis.  (PWX-5 at 28:7-8).

171

*Staff Position:*  "Average" implies simple average unless Commission instructs otherwise.  (S-26 at 42:3-43:3).

172

**3.  Is there a separate formula for calculating MMCPs for ancillary services and, if so, what is it?**

173

*Testimony on this issue will not be introduced in the hearing on Issue 1 and is deferred until the hearing on Issues 2 and 3.*

# EXHIBIT A

1

## PROOF OF SERVICE BY FACSIMILE TRANSMISSION
(CCP 1013(e), 2015.5)

2

I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is 425 Market Street, San Francisco, California, 94105; I am not a party to the within cause; I am over the age of eighteen years; and that the document described below was transmitted by facsimile transmission to a facsimile machine maintained by the person on whom it is served at the facsimile machine telephone number as last given by that person on any document which he or she has filed in the cause.

3

4

5

6

I further declare that on the date hereof I served a copy of:

7

**OPPOSITION OF AVISTA ENERGY, INC. AND IDAHO POWER COMPANY TO PG&E MOTION FOR ESTIMATION OF CLAIMS FOR FEASIBILITY PURPOSES**

8

9

on the following by sending a true copy from Morrison & Foerster's facsimile transmission telephone number **(415) 268-7522** and that the transmission was reported as complete and without error. The transmission report, which is attached to this proof of service, was properly issued by the transmitting facsimile machine.

10

11

12

| Howard, Rice, Nemerovski, Canady, | Office of the U.S. Trustee |
|---|---|
| Falk & Rabkin | Attn: Stephen L. Johnson, Esq. |
| Attn: James L. Lopes, Esq. | 250 Montgomery Street, Suite 1000 |
| Three Embarcadero Center, 7th Floor | San Francisco, CA 94104 |
| San Francisco, CA 94111-4065 | Tel: (415) 705-3333 |
| Tel: (415) 434-1600 | Fax: (415) 705-3379 |
| Fax: (415) 217-5910 | |
| | |
| Weil, Gotshal & Manges LLP | Milbank, Tweed, Hadley & McCloy |
| Attention: Michael P. Kessler, Esq. | Attn: Paul Aronzon, Esq. |
| 767 Fifth Avenue | 601 South Figueroa Street |
| New York, New York 10153 | Los Angeles, California 90017 |
| Tel: (212) 310-8000 | Tel: (213) 892-4000 |
| Fax: (212) 310-8007 | Fax: (213) 629-5063 |

13

14

15

16

17

18

19

20

21

22

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

23

Executed at San Francisco, California, this 22nd day of March, 2002.

24

25

26

| Tillie A. Lee | |
|---|---|
| (typed) | (signature) |

27

28