



1 PATRICIA S. MAR (BAR NO. 45593)
  MORRISON & FOERSTER LLP
2 425 Market Street
  San Francisco, California 94105-2482
3 Telephone: (415) 268-7000
  Facsimile:  (415) 268-7522
4
  Attorneys for
5 NEW WEST ENERGY CORPORATION

6

7                    UNITED STATES BANKRUPTCY COURT

8                    NORTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| In re | Case No. 01-20923 DM |
| PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation, | Chapter 11 |
| Debtor. | **OPPOSITION OF NEW WEST ENERGY CORPORATION TO PG&E MOTION FOR ESTIMATION OF CLAIMS FOR FEASIBILITY PURPOSES** |
| | Date:    March 27, 2002<br>Time:    9:30 a.m.<br>Place:   235 Pine St., San Francisco, CA<br>         22nd Floor |

19 **I.     INTRODUCTION**

20      Creditor New West Energy Corporation ("New West")[1] opposes PG&E's Motion for

21 Order Determining Procedures for Estimating Certain Claims for Plan Feasibility Purposes

22 ("Estimation Motion").  New West is an energy service provider ("ESP") with a Class 7 claim

23 for direct access credits ("DA Credits").

24

25 _____

26      [1] As set forth in the proofs of claim, New West assigned its claims to its parent, Salt River
   Project Agricultural Improvement and Power District ("SRP"), and acts as agent to SRP for the
27 purpose of pursuing the claims.

28

sf-1274425

1    PG&E proposes for feasibility purposes to discount Class 7 claims in a claims estimation

2    process, based on *its own consultant's* prediction of FERC refunds for energy sellers who sold in

3    wholesale markets through the California Power Exchange ("PX") and California Independent

4    System Operator ("ISO"). Not only is it inappropriate for this Court to attempt to "estimate"

5    refunds that may ultimately result from the highly complex FERC refund proceedings that have

6    been ongoing for months, but PG&E's assumption that FERC ordered refunds will lead to a

·7    reduction of DA Credit claims is fundamentally flawed.

8         DA Credits are part of the retail rate structure within the jurisdiction of the California

9    Public Utilities Commission ("CPUC"), not the FERC. The CPUC has issued no order or

10   decision indicating any intent to adjust DA Credits based on refunds that may be ordered by

11   FERC in the wholesale market. Furthermore, it is questionable whether the CPUC would have

12   the authority to retroactively alter the amount of DA Credits owed, even if it ever sought to do

13   so.

14        PG&E should be required to establish feasibility based on the *liquidated* DA Credits that

15   it now owes under CPUC orders, and not based on an *unliquidated* refund claim -- which would

16   require this court speculate as to what *two* administrative agencies, FERC and CPUC, may do in

17   the future.

18        **II.    STATEMENT OF FACTS**

19             **A.    ESP Providers and Their Claims Against PG&E**

20             A central feature of the restructuring of the California electricity markets was the

21   separation (or "unbundling") of the generation, transmission, and distribution of electricity, in

22   order to foster wholesale and retail competition. The utilities traditionally "bundled" services

23   together so that the customer bought them as a package. Deregulation, however, "unbundled"

24   these services and introduced customer choice in some aspects of purchasing electricity,

25   allowing customers to either continue purchasing electricity from the utility or to purchase

26   electricity from a non-utility ESP (called "direct access"). For customers purchasing electricity

27   from an ESP, the utility continued to provide delivery services (including distribution,

28   transmission, and other related services), which are reflected in line items on its bill. In this role,

1   the utility was called a Utility Distribution Company ("UDC"). Thus, PG&E was responsible for

2   and provided distribution, transmission and other services to direct access customers, even

3   though those customers received the electricity commodity from an ESP. PG&E also charged

4   those customers for the services that it provided in accordance with its electric rate schedules.

5   Direct access customers were billed in accordance with one of the three billing methods provided

6   by PG&E's Direct Access Tariff (Rule 22), approved by the CPUC. [2]

7          Pursuant to PG&E's Direct Access Tariff, ESPs in California were given a choice of

8   three billing options. First, the ESP could submit its electricity charges to PG&E, which would

9   then bill the customer for both PG&E's charges and the ESP's charges — referred to as "UDC

10  consolidated billing." Second, an ESP could bill a customer directly for electricity charges, and

11  PG&E could bill separately for its own charges — referred to as "separate billing" or "dual

12  billing." Third, PG&E could submit its charges to the ESP, and the ESP would in turn issue a

13  bill to the customer for both the PG&E charges and the ESP charges. This third billing method

14  is called "ESP consolidated billing," and is the billing method chosen by New West.

15         Pursuant to PG&E's Direct Access Tariff, an ESP choosing ESP consolidated billing was

16  strictly limited in its responsibility for the PG&E charges it passed through to the customer. For

17  example, an ESP was not responsible for either the accuracy or the content of PG&E's charges

18  on the bill.   *See* Direct Access Tariff, Section K.3.a.(3)(d). An ESP had "no obligations to the

19  customer with respect to services provided by PG&E." Direct Access Tariff, Section B.7.

20  There was no legal requirement under PG&E's Direct Access Tariff or any other decision or

21  tariff that the ESP must guarantee the obligations of PG&E in connection with PG&E charges to

22  the customer. The ESP acted solely as a billing agent, passing through PG&E's charges and

23  transferring the customers' payment on those charges back to PG&E.

24         A direct access customer therefore obtained service from both the UDC (in this case

25  PG&E) and the ESP. The ESP provided the electricity commodity, pursuant to its contract with

26  _____

27     [2] Relevant excerpts from the Direct Access Tariff (Rule 22) are attached hereto as Exhibit A.

28

1    the direct access customer. PG&E provided transmission, distribution, and other services,

2    pursuant to its Direct Access Tariff. PG&E billed the direct access customer for those services

3    pursuant to its electric rate schedules. Either the UDC or the ESP could also act as a billing

4    agent for the other, so that the direct access customer would receive one joint, rather than two

5    separate, bills.

6           Another feature of deregulation was that retail rates were to remain frozen for a period

7    not to extend beyond April 1, 2002. The DA Credit was used in conjunction with the frozen rate

8    to calculate PG&E's bills to ESP customers for delivery services. The DA Credit was a credit

9    paid to direct access customers by PG&E to avoid double payment for the electricity commodity.

10   The commodity portion of the utility bill was adjusted to reflect the fact that the customer was

11   purchasing power from a source other than the utility. For direct access customers, the UDC bill

12   was calculated as it would be for a bundled customer except that the direct access customer

13   received the DA Credit; that is, the utility deducted from the frozen rate an amount that roughly

14   equaled PG&E's avoided cost of purchasing power for the direct access customer. Under CPUC

15   rules, the DA Credit was offset against a direct access customer's PG&E bill, so that a direct

16   access customer would not have to pay for the energy more than once.

17          The CPUC established a formula for calculating the DA Credit payable to direct access

18   customers. Included within that formula was the price of wholesale power sold on the PX.

19   PG&E calculated the DA Credit owing to direct access customers pursuant to the formula

20   provided by the CPUC, and the DA Credit appeared as a line item on PG&E's bills to direct

21   access customers.

22          Due to rising wholesale electricity prices, it became possible for the DA Credit to be

23   greater than the frozen rate, resulting in a negative PG&E bill. In Resolution E-3510 (approved

24   December 16, 1997), the CPUC had originally prevented the PG&E bill from becoming

25   negative, adopting a provision known as the "zero minimum bill" provision. However, ESPs

26   challenged the zero minimum bill provision, arguing that it discriminated against direct access

27   customers. In early 1999, PG&E entered into a stipulation agreeing to abolish the zero minimum

28

1  bill provision, in exchange for obtaining ESP agreement on other issues. In Decision 99-06-058,

2  the CPUC approved the stipulation.

3       In mid-2000, rising wholesale electricity prices consistently caused the PG&E bills to

4  be negative, resulting in the payment of DA Credits to direct access customers. In reliance on

5  the stipulation and Decision 99-06-058, ESPs, including New West, advanced the DA Credits

6  to their customers by reducing their bills in the amount of the DA Credit, and sought

7  reimbursement from PG&E for the DA Credits. For some months, PG&E properly

8  reimbursed New West and other ESPs for the DA Credits, but required proof that such DA

9  Credits had either been passed through to the customers or that the customer had assigned

10  those credits to the ESP. Beginning in the fall of 2000, however, PG&E suddenly ceased

11  payments of DA Credits, claiming that it lacked sufficient funds, thereby causing ESPs to

12  suffer losses for amounts advanced to customers and not reimbursed by PG&E.

13       **B.     The Plan's Treatment of ESP Claims**

14       PG&E's Second Amended Plan of Reorganization ("Plan"), dated March 7, 2002,

15  classifies ESP claims for DA Credits in a separate unsecured creditor class, Class 7. The Plan

16  provides for ESP creditors in Class 7 to receive the same treatment that is afforded to most other

17  unsecured creditor classes, namely payment in full of allowed claims, through cash payment for

18  60% of allowed claim amounts and long term notes in the face amount of 40% of allowed claim

19  amounts. (Plan, Art. 4.16.) In the Second Amended Disclosure Statement, dated March 7, 2002

20  ("Disclosure Statement"), the Plan Proponents state that $576 million in ESP claims have been

21  filed in Class 7, that approximately $55 million are duplicate claims, and that the Debtor

22  "expects to ask the CPUC to make approximately $101 million in reductions in the credits to be

23  paid to the ESPs based on FERC orders." (Disclosure Statement, at 202.) Thus, PG&E seeks to

24  reduce Class 7 claims to approximately $420 million. The Plan Proponents also claim that

25  PG&E disputes the validity of all of the DA Credits, "since it believes that the retail rate freeze

26  ended as early as August 2000 (which would eliminate the credits)." (*Id.*)

27

28

## III.  ARGUMENT

In its Estimation Motion, PG&E proposes to "estimate" Class 7 claims by applying a $100 million discount based on projected FERC refunds for wholesale sales in the PX and ISO markets.[3]  Such estimation or discount of Class 7 claims for feasibility is totally inappropriate, unfair and prejudicial to ESP creditors and should not be allowed.

### A.  The Estimation Motion is Premature

Preliminarily, PG&E's motion is premature.  While it may be appropriate for a bankruptcy court to estimate claims to determine the feasibility of a plan of reorganization (see, e.g., *In re Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985), there is no plan confirmation proceeding underway of which the requested estimation process for feasibility purposes can be a part.  While PG&E has consistently sought to prevent the Court from ruling on any issues that PG&E considers to be plan confirmation issues in advance of the confirmation hearing, it now seeks to have the Court consider feasibility issues separately, even in advance of approval of its Disclosure Statement.  PG&E cites no precedent for such disembodied feasibility estimation proceedings.

PG&E has not said that it cannot confirm a plan if claims are allowed as filed, or that it needs to reduce Class 7 claims for its Plan to be viable.  Perhaps the Plan, if and when it eventually gets to confirmation proceedings, will be feasible regardless of the FERC refund issue or will look different because of negotiations with interested parties.  Feasibility estimation should take place, if at all, in the context of confirmation proceedings for a specific plan.

### B.  Claims Estimation is Inappropriate as the DA Credit Claims are Neither Contingent nor Unliquidated.

The DA Credit claims cannot be compared to unliquidated tort or environmental claims.  The DA Credit claims are not contingent, as the events giving rise to liability have already

---

[3]  PG&E also seeks to reduce DA Credit claims by approximately $60 million due to duplicate claims. (Estimation Motion, at 36.)  New West does not object to the elimination of duplicate claims for feasibility purposes.

1    occurred. *In re Nicholes*, 184 B.R. 82, 88 (9th Cir. BAP 1995.) They are fully liquidated, as

2    they are they are "readily capable of computation." *In re Keenan*, 201 B.R. 263 (Bankr. S.D.

3    Cal. 1996.) The DA Credits are based on PG&E's own computations in its billing statements,

4    following the formula mandated by the CPUC. What is contingent and unliquidated is PG&E's

5    claim that it is entitled to a reduction of the DA Credit claims on the ground that FERC refund

6    decisions will lead to CPUC decisions retroactively reducing the DA Credit claims.

7         PG&E contends that claims estimation for feasibility purposes, as contrasted to claims

8    estimation for allowance purposes, is not limited to unliquidated or contingent claims. Rather,

9    PG&E claims that a feasibility determination "can require estimation of any sort of disputed

10   claim." (Estimation Motion, at 9.)

11        If the claim is merely "disputed," then there is no need to "estimate" the claim for

12   feasibility or any other purpose. PG&E is, in effect, asking this court to rule, in the context of

13   feasibility determination, on the merits of PG&E's legal arguments that FERC refunds to

14   wholesale sellers will cause CPUC to retroactively reduce DA Credits. There is no reason for

15   the Court to engage in such unnecessary judicial decision making, which will require it to

16   speculate as to how *two* administrative agencies -- FERC and CPUC -- are likely to rule. PG&E

17   should not be entitled to confirm a Plan if the feasibility of the Plan depends on PG&E prevailing

18   on its theory that DA Credit claims will be reduced because of FERC refund decisions.

19            C.      **Claims Estimation for Feasibility Will Likely Lead to Claims**
20                    **Estimation for the Claims Reserve**

21        While PG&E asserts that it seeks claims estimation for feasibility only, it will logically

22   follow that the disputed claims reserve will be set at a level that is consistent with the feasibility

23   determination. Otherwise, the estimation of claims for feasibility will be illusory. If PG&E's

24   plan is feasible only if claims are reduced to a certain level, it would be illogical for the Court to

25   confirm the Plan as feasible and then later require that PG&E set reserves for disputed claims at

26   a significantly higher amount than PG&E demonstrated that it had the capacity to absorb.

27        If it is appropriate to discount Class 6 and Class 7 claims by projected FERC refunds in

28   assessing the feasibility of its Plan, the same argument will inevitably be made that it is likewise

1    appropriate to discount the claims for FERC refunds in setting the claims reserve.   Thus, claims

2    estimation for feasibility is likely to lay the groundwork for a later PG&E argument that

3    requiring a higher claims reserve would jeopardize the viability of the Plan.

4            Separately estimating liquidated and noncontingent claims for feasibility purposes only

5    makes no sense, and the Court should deny the Estimation Motion as to Class 7 claims.

6    **D.      FERC Refunds Are Not Likely to Reduce PG&E's DA Credits
              Liability**

7            On July 25, 2001, the FERC issued an order initiating the currently ongoing FERC refund

8    proceedings and setting forth a methodology to be used in calculating potential refunds for

9    wholesale power purchases in the PX and ISO markets for the period of October 2, 2000 through

10   June 20, 2001. *San Diego Gas & Elec. Co.*, 96 FERC ¶ 61, 120 (2001.)   The July 25, 2001

11   order triggered evidentiary hearings which are currently ongoing before FERC.   PG&E argues

12   that the July 25, 2001 order reduces the DA Credits, because it reduces the amount PG&E saved

13   by not serving as the energy provider for direct access customers during the relevant period.

14   (Estimation Motion, at 36.)   PG&E's assumption is without foundation and is fundamentally

15   flawed.

16           In contrast to the wholesale power transactions being investigated by the FERC, the DA

17   Credits are part of the retail rates that PG&E was allowed to charge as a UDC, and are not

18   subject to FERC jurisdiction.   The CPUC, not FERC, has jurisdiction over retail rates in

19   California.  During the pendency of FERC's investigation of wholesale rates, the CPUC has

20   never issued any order or decision indicating that the FERC's decision on refunds for wholesale

21   rates might lead to a recalculation of the retail rates that PG&E was allowed to charge.  Absent

22   such an order or decision by the CPUC, the DA Credit amounts will not change, regardless of the

23   refunds ordered by FERC.   Thus, PG&E is requesting that the Court allow it to confirm a Plan

24   as feasible based on pure speculation that it will receive a favorable ruling from the CPUC on a

25   petition it has not yet filed and for which there is no proceeding pending and no hint of a

26   favorable reception from the CPUC.

27

28

1    It is questionable that the CPUC even has the power to order a recalculation of the DA

2    Credits, were it so inclined.  Recalculation of DA Credits would result in a retroactive

3    adjustment of rates charged to direct access customers for the period from October 2, 2000

4    through January 17, 2001.  The CPUC is barred from engaging in retroactive ratemaking.

5    *Pacific Tel. & Tel. Co. v. Public Util. Comm.*, 62 Cal.2d 634 (1965); *City of Los Angeles v.*

6    *Public Util. Comm.*, 7 Cal. 3d 331 (1972).

7         Neither the ESPs nor their customers were given any notice that the amount of the DA

8    Credits might be adjusted, either downward or upward.   In contrast, FERC justifies its refund

9    proceedings because wholesale power generators selling into the PX and ISO markets had notice

10   that the transactions might be subject to subsequent review as to whether prices paid to the

11   sellers were "just and reasonable."  Given the hardships that would result, it is unlikely that the

12   CPUC would choose to retroactively alter the rate structure for direct access customers, even if it

13   had the power to do so.

14   **E.    PG&E's Proposed Estimation Procedure for Class 7 is Unfair and**
             **Inadequate**
15
         Even if the Court were to rule that some estimation of Class 7 claims is appropriate for
16
     feasibility purposes, PG&E's proposed procedure for estimating Class 7 claims is totally
17
     inadequate, unrealistic and unfair.
18
         Preliminarily, PG&E does not provide an adequate description of its proposed estimation
19
     process for estimating FERC refunds.  In the Estimation Motion, PG&E states that  its
20
     "consultant has modeled the likely outcome of the FERC refund process." (Estimation Motion,
21
     at 34.)   PG&E proposes that both Class 6 and Class 7 claims be estimated based on its
22
     consultants' analysis and projections of the expected FERC refunds.  (Estimation Motion, at 34,
23
     36.) PG&E also states that it proposes  to file a motion for estimation of Class 6 and Class 7
24
     claims by April 17, 2002.  (Estimation Motion, at  4.)
25
         In other words, the Estimation Motion is not the "real" motion.  PG&E will tell what it
26
     has in mind in another motion to be filed later.  The Estimation Motion is apparently a motion
27
     for authority to file a motion.  But just the "peek" that PG&E provides in the Estimation Motion
28

9

1    suggests that PG&E has a totally unrealistic framework in mind. The thought that this Court

2    should estimate what FERC will likely order in refunds based on PG&E's *own consultant's*

3    analysis is truly mindboggling.

4         Since the July 25, 2001 FERC order initiating refund proceedings, the FERC refund

5    proceedings in Washington, D.C. have been complex and intense. The FERC ordered the refund

6    proceedings to occur in three stages, the first of which is to establish a mitigated market clearing

7    price ("MMCP") for each hour in the October 2, 2000 through June 20, 2001 period for each PX

8    and ISO market. The second stage will involve calculating the refunds owed by each wholesale

9    energy supplier, and the third stage will involve calculating the amount currently owed to each

10   supplier by the ISO, the utilities and the Sate of California, after the refunds are calculated.

11        While the FERC has set forth a broad methodology for calculating the market clearing

12   price on which refunds are based, there has been no agreement and no definitive FERC decision

13   on how the methodology is to be applied. The disagreements and lack of clarity in the July 25,

14   2001 order resulted in suspension of the refund proceedings in December, 2001 to resolve

15   numerous petitions seeking rehearing and clarification of various issues in previous orders. On

16   December 19, 2001, the FERC issued a 175 page order clarifying and modifying its July 25,

17   2001 methodology. *San Diego Gas & Elect. Co.*, 97 FERC ¶ 61,275 (2001). The refund

18   proceedings then resumed.

19        Months later, the FERC refund proceedings are still in phase one of the process. The

20   complexity of the refund issues is illustrated by the "Order Adopting Revised Joint Stipulation of

21   Issues on MMCP Issues," *San Diego Gas & Elect. Co.*, 98 FERC ¶ 63,026 (2002), issued by

22   FERC on March 11, 2002, and attached hereto as Exhibit B. This order identifies the issues that

23   must be decided in determining just the first phase of the FERC refund proceedings, namely

24   setting the MMCP to be used in calculating refunds. It also sets forth the various interested

25   parties' competing positions on each of the issues.

26        As set forth in the order, the FERC litigants are divided into several "camps," such as the

27   "ISO Position," the "California Parties' Position," the "California Generators' Position" and the

28   "Sellers' Position." PG&E is one of the "California Parties." (Exh. A, at 1, n. 1.) On many

1    issues pertaining to the MMCP, the litigants are in significant disagreement on how the broad

2    methodology ordered by FERC in its July 25, 2001 and December 19, 2001 orders are to be

3    applied in calculating refunds.  The determination of these issues could cause very substantial

4    "swings," estimated at hundreds of millions of dollars, in the ultimate refund outcome.

5    　　　Against this backdrop, PG&E would have this court "estimate" FERC refunds on written

6    motion, based on its own consultant's analysis of how the refunds should be calculated.  It would

7    be totally inappropriate, unfair and potentially prejudicial to energy sellers for the Court to adopt

8    wholesale PG&E's position on the complex refund issues.  Energy sellers would obviously

9    oppose PG&E's analysis and insist on the Court considering their positions and their experts'

10   analysis.  The Court could become mired in FERC refund issues for several months.

11   **IV.    CONCLUSION**

12   　　　For all of the above reasons, PG&E's Estimation Motion, as it applies to Class 7 claims,

13   should be denied.

14   　　　Dated:  March 22, 2002

15   　　　　　　　　　　　　　　　　　PATRICIA S. MAR
                                    MORRISON & FOERSTER LLP
16

17

18   　　　　　　　　　　　　　　　　　By:_____
                                         Patricia S. Mar
19                                       Attorneys for Creditor
                                         NEW WEST ENERGY CORPORATION

20

21

22

23

24

25

26

27

28

# EXHIBIT A

Pacific Gas and Electric Company
San Francisco, California

Cancelling

Cal. P.U.C. Sheet No. 14888-E
Cal. P.U.C. Sheet No.

## RULE 22—DIRECT ACCESS SERVICE

TABLE OF CONTENTS

A.   CUSTOMER SERVICE ELECTIONS

B.   GENERAL TERMS

C.   CUSTOMER INQUIRIES AND DATA ACCESSIBILITY

D.   ESP SERVICE ESTABLISHMENT

E.   DIRECT ACCESS SERVICE REQUEST (DASR)

F.   INDEPENDENT VERIFICATION

G.   METERING SERVICES

H.   UTILITY METER SERVICE OPTIONS AND OBLIGATIONS

I.   GENERAL TERMS AND CONDITIONS FOR DIRECT ACCESS METERS AND
     METERING SERVICES

J.   METER READING DATA OBLIGATIONS

K.   BILLING SERVICE OPTIONS AND OBLIGATIONS

L.   PAYMENT AND COLLECTION TERMS

M.   LATE OR PARTIAL PAYMENTS AND UNPAID BILLS

N.   INVOLUNTARY SERVICE CHANGES

O.   SERVICE DISCONNECTIONS AND RECONNECTIONS

P.   CREDIT REQUIREMENTS

| | | |
|---|---|---|
| Advice Letter No.    1716-E | *Issued by* | Date Filed_____ December 1, 1997 |
| Decision No.    97-10-087 | *Thomas E. Bottorff* | Effective_____ January 10, 1998 |
| | *Vice President* | Resolution No._____ |
| 27053 x | *Rates & Account Services* | |



Pacific Gas and Electric Company
San Francisco, California

*Cancelling*

Original    *Cal. P.U.C. Sheet No.*    14893-E
          *Cal. P.U.C. Sheet No.*

### RULE 22—DIRECT ACCESS SERVICE
(Continued)

B.   GENERAL TERMS (Cont'd.)        (N)

7.   ESP Not Liable for PG&E Services

To the extent the customer takes service from PG&E, an ESP has no obligations to the customer with respect to the services provided by PG&E. The customer must look to PG&E to carry out the responsibilities associated with that service.

8.   Load Aggregation for Procuring Electric Power

Customers or ESPs may aggregate individually metered electric loads for procuring electric power only. Load aggregation will not be used to compute PG&E charges or for tariff applicability. The right of customers to physically aggregate by combining multiple accounts into a single metered account as permitted under CPUC-approved tariffs is not restricted by this section.

9.   Split Loads Not Allowed

Customers requesting Direct Access services may not partition the electric loads of a service account among electric service options or providers. The entire load of a service account must be nominated to only one of the electric service options or providers available to customers.

10.   Small Customers

All Small Customers, as defined in Rule 1, Definitions, except for agricultural and lighting customers, are eligible for a ten percent (10%) reduction in rates effective January 1, 1998. Service accounts of Small Customers, as defined in Rule 1, are eligible for statistical load profiling effective January 1, 1998. Small Customer service accounts will not be eligible for meter services provided by non-UDC parties until January 1, 1999.

For new customers without a history of electric use, PG&E will estimate new meter loads using existing criteria and use these estimates to evaluate the customer's eligibility for unbundled meter services and statistical load profiles.    (N)

(Continued)

| | | | |
|---|---|---|---|
| Advice Letter No. | 1716-E | *Issued by* | Date Filed_____ December 1, 1997 |
| Decision No. | 97-10-087 | **Thomas E. Bottorff** | Effective_____ January 10, 1998 |
| | | *Vice President* | Resolution No._____ |
| 27010 x | | *Rates & Account Services* | |


## RULE 22—DIRECT ACCESS SERVICE
### (Continued)

K.   BILLING SERVICE OPTIONS AND OBLIGATIONS (Cont'd.)                 (N)

   3.   Consolidated ESP Billing (Cont'd.)

      a.   Partial Consolidated ESP Billing (Cont'd.)

         3)   ESP Obligations (Cont'd.)

           c)   The ESP will prepare the bill and include both ESP and, subject to Section 5 below, PG&E charges.  In addition, the ESP will process customer payments and handle its own collections responsibilities. Under this billing option, ESPs must pay all undisputed PG&E charges due to PG&E regardless of whether the customer has paid the ESP.  The ESP must include all PG&E charges on the ESP consolidated bill.

           d)   The ESP has no obligations regarding the accuracy of PG&E charges calculated by PG&E or for related disputes.  Disputed charges will be handled according to CPUC procedures.

           e)   Subject to the limitations of this section and with the written consent of the customer, the ESP may offer customers customized billing cycles or payment plans which permit the customer to pay the ESP for PG&E charges in different amounts for any given billing period than PG&E charges to the ESP for that period.  Such plans will not, however, affect in any manner the obligation of the ESP to pay PG&E charges to PG&E as billed by PG&E.  Further, such plans must ensure that the charges as billed by PG&E are provided to the customer as soon as practicable and that the customer's payment of PG&E charges is adjusted such that over a reasonable time, which shall not exceed one year, the customer pays no more than PG&E charges as billed by PG&E.  Upon request, the ESP shall identify to PG&E any service accounts with such customized billing arrangements and provide a summary description of the arrangement as it pertains to PG&E charges.                  (N)

(Continued)

| | | | |
|---|---|---|---|
| *Advice Letter No.* | 1716-E | *Issued by* | *Date Filed*_____ December 1, 1997 |
| *Decision No.* | 97-10-087 | **Thomas E. Bottorff** | *Effective*_____ January 10, 1998 |
| | | *Vice President* | *Resolution No.*_____ |
| 27038 x | | *Rates & Account Services* | |

Case: 01-30923    Doc# 5440    Filed: 03/22/02    Entered: 03/22/02 16:18:00    Page 15
of 35

# E X H I B I T   B

# UNITED STATES OF AMERICA
# FEDERAL ENERGY REGULATORY COMMISSION

San Diego Gas & Electric Company,
    Complainant,

      v.                         Docket No. EL00-95-045

Sellers of Energy and Ancillary Service Into
Markets Operated by the California
Independent System Operator Corporation
and the California Power Exchange,
    Respondents.

Investigation of Practices of the California       Docket No. EL00-98-042
Independent System Operator and the
California Power Exchange

## ORDER ADOPTING REVISED JOINT STIPULATION OF ISSUES ON MMCP ISSUES

### (Issued March 11, 2002)

1.    This order confirms my ruling at today's prehearing conference adopting a revised Joint Narrative Stipulation of Issues (JS) filed on March 9, 2002 with regard to the mitigated market clearing price issues (mmcp) set for hearing and is reproduced in the Appendix. The JS shall apply to adjudication of these issues subject to further rulings and orders. A separate JS which pertains to section 202(c) issues will be filed later this week and, when adopted, will govern adjudication of those issues.

                               Bruce L. Birchman
                               Presiding Administrative Law Judge

## APPENDIX

**I.** **How are the mitigated market clearing prices ("MMCPs") determined for each 10-minute interval during the refund period?**

    **A. What is the applicable formula for determining the MMCPs for each interval?**

*All Parties' Position:* The Commission has required the following formula to be used in this hearing to determine the MMCP for each interval during the refund period:

$$MMCP = (\text{Heat Rate} \times \text{Gas Price} + \$6.00) \times 1.1 \text{ (beginning January 6)}.$$

    **B. What is the appropriate heat rate data set for each unit eligible to set the MMCP that should be referenced for insertion in the MMCP Formula?**

        **1. Should average and/or incremental heat rate curves be used in the determination of the MMCP?**

*ISO Position:* Incremental heat rate curves should be used to calculate the MMCP. (ISO-5 at 21:20-24, 33:3-38:17; ISO-19 at 15:4-29:27).

*The California Parties Position[1]:* The Commission's orders require an analysis of the marginal cost in the real time Imbalance Energy market -- the marginal cost can only be evaluated by looking at the incremental heat rate. (CAL-19 at 7:19 to 9:13; CAL-6 at 7:5 to 9:25; CAL-21 at 11:18 to 13:12; CAL-21 at 16:9 to 17:14; CAL-21 at 19:14-22:2; CAL-21 at 29:11 to 31:14 (ending with "rates"); CAL-21 at 32:3 to 39:4; CAL-21 at 44:3 to 50:3; CAL-26 at 3:16 to 4:22; CAL-26 at 9:8 to 13:23; CAL-26 at 15:21 to 18:24).

*California Generators' Position[2]:* Actual average rather than incremental heat rate curves should always be used, to ensure that actual running costs in the interval are

---

[1] The California Parties are, collectively, the Attorney General for the State of California (Attorney General), the California Electricity Oversight Board (EOB), the California Public Utilities Commission (CPUC), Pacific Gas and Electric Company (PG&E), Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E).

[2] The California Generators are, collectively, Duke Energy, Dynegy, Mirant, Reliant, and Williams.

recovered.  (GEN-1 at 5:15-20; 7:12-15:2; 16:7-19:11; recovered.  GEN-23 at 4:11-5:6).
At a minimum, average heat rates should be used when a unit is running solely to respond to
an ISO dispatch instruction.  (GEN-19 at 17:14- 19:48; GEN-23 at 5:9-6:8).

9       *Enron's Position:*  Average heat rate curves must be used given the predominate
characteristics of generation units selected as marginal and the FERC goal of recreating
competitive market outcomes. (ENR-1 5:w18 to 11:5; ENR-1 12:9 to 16:4 and ENR-1
19:15 to 22:6).

10      *Sellers' Position[3]* Average heat rates generally should be used.  Incremental heat
rates should not be used to determine MMCP unless the incremental heat rate exceeds the
corresponding average heat rate for a specific unit of output.  (SEL-1, page 19, lines 4-5
and page 19, line 19 - page 27, line 17).

11      *Powerex Corp.'s Position:*  Average, not incremental, heat rates should be used
to determine the MMCP.  (PWX-1 at 5:10-12, 5:20 to 6:1, 6:23 to 7:1, 9:10 to 12:6,
17:4 to 19:12; PWX-5 at 5:5 to 6:21, 14:10-13, 14:17 to 16:21).

12      *PPL Parties' Position:*  Use of average heat rates is necessary to replicate
market outcomes, under which sellers would have priced so as to recover fully their short-
run marginal costs.  Use of incremental heat rates would not allow the necessary recovery.
(PPL-1 at 7:11 - 12:11).

13      *Arizona Electric Power Cooperative, Inc. Position:*  Average heat rate curves
should be used in those hours where simple cycle turbines would not have been dispatched
at all but for spot sales to the ISO and others (AEP-12 at 10:6-11:7).

14      *Pasadena's Position:*  Average heat rate curves should be used.  (PAS-1A at
7:11-12:2; PAS-2; PAS-3)

15      *Modesto Irrigation District (MID)Position:*  MID believes that the proper heat
rates to be applied in calculating the Mitigated Market Clearing Price are the average heat
rates over the hour. (Ex. MID-1 at 3:9 to 4:18 (Jackson)).

16      *Staff Position:*  The Commission intended for incremental heat rate curves to be
used to develop the MMCP.  (S-26 at 19:9-22:22 and 32:3-33:11).

17                      2.  Which heat rate source data should be used and are the data
                            accurate?

18      *All Parties' Stipulation:*  The Parties have stipulated to the use of the base heat

---

[3]     Sellers are, collectively, Avista Energy, BP, Coral Power, LLC, IDACORP, Puget and Sempra
Energy Trading Corp.  Sellers are sponsors of the testimony of Dr. Charles J. Cicchetti.

rate data supplied by generators pursuant to the April 26 Order as modified by the
Stipulation as to Heat Rates and Non-Natural Gas Generation entered into in this
proceeding ("Heat Rate Stipulation").

19      *Staff Position:* Staff also disagrees with Pasadena's proposal to include
minimum load fuel costs. (S-26 at 29:20-30:19).

20          **3.    If incremental heat rate curves are used, should they be
            adjusted to be monotonically non-decreasing?**

21      *ISO Position:* The ISO adjusted incremental heat rate curves so that a unit's
incremental heat rate curve never decreases as the operating level of the unit increases.
The ISO did so in order to ensure consistency with the ISO's market design and software
used to implement the June 19 Order, but the ISO does not contend that it is necessary to
have monotonically non-decreasing heat rate curves during the refund period. (ISO-5 at
26:16-27:21; ISO-20 at 8:1-9:7).

22      *The California Parties Position:* The monotonically non-decreasing constraint
imposed on heat rates by the ISO is an improper adjustment that artificially increases the
level of the heat rates used in calculating the MMCP. (CAL-1 at 16:14 to 18:10).

23      *California Generators' Position:* Incremental heat rates should not be used,
leaving no reason to reach the question whether the incremental heat rates should be
adjusted to become monotonically non-decreasing. See I.B.1 above. It is "less wrong,"
however, to use monotonically non-decreasing incremental heat rates than to use
unadjusted incremental heat rates. Hence, if incremental heat rates were used—for
example, under the "mixed heat rate" approach—it would be appropriate to use
monotonically non-decreasing incremental heat rates. (GEN-23 at 5:9-6:8).

24      *Enron's Position:* The use of incremental heat rate curves in the ISO
Methodology is inconsistent with economic theory. (ENR-11:7 to 14:3). The use of
monotonically non-decreasing heat rates in the ISO Methodology is flawed, as it is only
required under a hypothetical dispatch methodology contrary to the Commission's Orders.
(ENR 1 18:8 to 22:6).

25      *Powerex Corp.'s Position:* Monotonically non-decreasing heat rates should not
be used. Average heat rates should be used. (PWX-1 at 9:10 to 12:5, 17:4 to 19:12;
PWX-5 at 5:5 to 6:21, 14:10-13, 14:17 to 16:21; PWX-52 at 2:21-24; 4:16 to 7:2).

26    *Staff Position:*  Staff agrees with the testimony of the generators and the
California parties in opposition to adjustment of incremental heat rates to be
monotonically non-decreasing.  (S-26 at 34:19-36:23).

27    **C.        At what operating point on the heat rate curve should a unit's heat rate
be taken for insertion into the MMCP Formula?**

28    *ISO Position:* The actual incremental heat rate for units dispatched during each
10-minute interval should be based on the Acknowledged Operating Target ("AOT") for
each unit.  The AOT is defined as the Final Hour-Ahead Schedule for Energy submitted for
each unit, plus any real-time Energy dispatched by the ISO during that hour.  (ISO-1 at 28:6-
33:4; ISO-19 at 33:19-39:15).

29    *The California Parties Position:*  The ISO properly determined the heat rate by
considering the Acknowledged Operating Target of a unit, which is the operating point that
results from the ISO's decisions to dispatch the unit in the BEEP stack.  (CAL-1 at 3:11-
19; CAL-19 at 2:10-12).

30    *California Generators' Position:*  The heat rate should be determined at the
actual operating level of each unit during each interval, not at a hypothetical target
operating level (i.e., the AOT) estimated by the ISO through selective inclusion of
dispatch instructions issued through the computerized BEEP Stack.  (GEN-1 at 6:14-6:22
and 45:1-45:22; GEN –23 at 4:1-4:10).

31    *Enron's Position:*  The operating point on the heat rate curve should be
determined by reviewing actual metered data- not hypothetical data.  (ENR-1 22:7-24:3).

32    *Powerex Corp.'s Position:*  Use the actual operating level of each unit during the
applicable interval.  (PWX-1 at 18:8-14).

33    *Staff Position:*  Staff does not oppose the ISO's position.

34        **D.   What units are eligible to set the MMCP for each 10-minute
interval in the refund period?**

35            **1.   Is eligibility to set the MMCP contingent upon a unit having
had a bid in the BEEP Stack?**

36    *ISO Position:*  Only those units with bids dispatched in merit order through the
BEEP system (and "acknowledged" by the units' operators) so that they were actually
eligible to set the market clearing price in the ISO's Real Time Market should be eligible
to set the mitigated price for each interval.  (ISO-1 at 41:1-52:22; ISO-19 at 40:1-42:10,
53:12-54:6).

37     The California Parties Position: The ISO properly limited eligibility to set the MMCP to units that had bid into the BEEP Stack (i.e. energy bids submitted to the ISO in connection with bids in the ISO's ancillary services and supplemental energy markets), consistent with the Commission's Refund Orders. (CAL-19 at 9:14 to 11:4; CAL-21 at 13:16 to 15:7; CAL-21 at 50:6 to 61:21; CAL-26 at 5:17 to 5:23; CAL-26 at 6:2 to 6:5; CAL-26 at 6:8 to 7:16(ending with "market"); CAL-26 at 19:1 to 19:11; CAL-26 at 19:13 to 19:15; CAL-26 at 19:17 to 20:2; CAL-26 at 20:9 to 21:14; CAL-26 at 21:20 to 25:5). Of the various California markets, the merit order dispatch in the BEEP stack provides the best proxy for the results that would have existed in an efficient, competitive market. (CAL-21 at 14:11 to 15:7).

38     *California Generators' Position:* Any unit that the ISO dispatched for energy to serve real-time demand in an interval should be eligible to set the MMCP in such interval. (GEN-1 at 19:12-32:5). Eligibility cannot be limited to BEEP Stack units because the BEEP Stack was not the primary mechanism of the ISO for meeting system imbalance energy requirements during the refund period. (GEN-1 at 22:6-28:9). The Commission's Orders do not restrict eligibility to set the MMCP to units that had bids in the BEEP Stack. (GEN-1 at 28:10-32:5).

39     *Enron's Position:* The BEEP Stack requirement is an artificial constraint put on the selection criteria for marginal units and is not supported by FERC orders, the evidence in this case or economic theory. (ENR-1 24:5 to 29:20).

40     *Sellers' Position:* No. Dr. Cicchetti testifies that the marginal cost of the most expensive source of supply dispatched in the real time market should be used to establish the MMCP. (SEL-1, at page 28, line 1-18; page 29, line 8-10, 23-24; page 30, line 2; Exhibit SEL-3).

41     *Powerex Corp.'s Position:* No. The MMCP should be calculated using the marginal cost of the most expensive source of supply dispatched in the real time market, which includes energy supplied to the ISO from units outside of the BEEP stack. (PWX-1 at 5:18-19, 6:1-18, ~~7:1-3, 12:7~~7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-46 at 3:9-21; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

42     *PPL Parties' Position:* No. The CAISO improperly excludes many transactions outside the BEEP stack even though those transactions were a significant portion of the energy supplied to the CAISO, were integral to the marketplace, and are subject to refund. (PPL-1 at 12:12 - 17:11).

43     *Staff Position:* The Commission said to select from units dispatched in the real-time imbalance market which means units dispatched through the BEEP stack. (S-26 at 43:15-45:4).

2.    **Are the following energy types eligible to set the MMCP?**

44

a.    **BEEP Supplemental?**

45

46    *ISO Position:*  Yes, if dispatched in merit order.  (ISO-1 at 6:10-7:2, 41:1-45:2).

47    *The California Parties Position:*  Yes, the ISO properly limited eligibility to set
the MMCP to units that had bid into the BEEP stack, including those units that had
submitted Supplemental Energy bids. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

48    *California Generators' Position:*  Units providing load-following supplemental
energy through the BEEP Stack were serving system real-time energy needs and should be
eligible to set the MMCP. (GEN-1 at 32:15-33:2).

49    *Enron's Position:* Yes, although units allowed to set MMCP should not be
constrained to those in the BEEP stack.  (ENR-1 24:19-29:20).

50    *Sellers' Position:*  Dr. Cicchetti conceptually would prefer to have all of these
included. (SEL-1, page 15, line 3 – page 18, line  20).

51    *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to
17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
9:15).

52    *Staff Position:*  Yes.  (S-26 at 44:17-45:4).

b.    **BEEP Spin, Non-spin and Replacement A/S?**

53

54    *ISO Position:*  Yes, if dispatched in merit order.  (ISO-1 at 6:10-7:2, 41:1-45:2).

55    *The California Parties Position:*  Yes, the ISO properly limited eligibility to set
the MMCP to units that had bid into the BEEP stack, including those units that had
submitted Energy bids associated with Spinning, Non-Spinning, and Replacement
Reserves. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

56    *California Generators' Position:*  Units providing ancillary services through the
BEEP Stack were serving system real-time energy needs and should be eligible to set the
MMCP. (GEN-1 at 32:24-33:2).

57    *Enron's Position:*  Yes, although units allowed to set MMCP should not be
constrained to those in the BEEP stack.  (ENR-1 24:19-29:20).

58    *Sellers' Position:*  Dr. Cicchetti conceptually would prefer to have all of these
included.  (SEL-1, page 15, line 3 – page 18, line 20).

59    *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to
17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
9:15).

60      *Staff Position:*  Yes, assuming this refers to the BEEP dispatch of energy
associated with these ancillary services.

61                              **c.    OOS Non-congestion Imbalance Energy
                                        Supplemental?**

62      *ISO Position:*  No.  (ISO-1 at 13:1-13, 41:1-45:14, 47:7-11; ISO-19 at 40:1-
42:10).

63      *The California Parties Position:*  No, the ISO properly excluded from eligibility
to set the MMCP units that were dispatched by the ISO for reasons other than the
economic merit order dispatch in the BEEP stack.  Thus, out of sequence energy -- which
by definition was not dispatched in merit order in the BEEP stack -- was properly excluded.
(CAL-1 at 3:11-19; CAL-19 at 2:10-12).

64      *California Generators' Position:*  Out-of-sequence dispatches of units with
BEEP Stack bids that were made for general system reliability reasons and not for
congestion-related local reliability reasons should be eligible to set the MMCP.  (GEN-1
at 33:4-35:4; GEN-19 at 4:6-4:11; 14:13-15:8).

65      *Enron's Position:*  Yes, although units allowed to set MMCP should not be
constrained to those in the BEEP stack.  (ENR-1 24:19-29:20).

66      *Sellers' Position:*  OOS calls to meet locational, rather than system reliability
requirements were incorrectly excluded by the ISO.  (SEL-1, page 28, line 7-18).

67      *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18; 7:1-3, 12:7 to
17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to
9:15).

68      *PPL Parties' Position:*  To the extent these transactions were used to supply
imbalance energy to California electricity market they should be included.  (PPL-1 at
12:12-17:11).

69      *Staff Position:*  Yes. S-26 at 50:14-50:23.

70                              **d.    OOS Non-congestion Imbalance Energy Spin, Non-
                                        Spin and Replacement A/S?**

71      *ISO Position:*  No.  (ISO-1 at 13:1-13, 41:1-45:14, 47:7-11; ISO-19 at 40:1-
42:10).

72      *The California Parties Position:*  No, the ISO properly excluded from eligibility
to set the MMCP units that were dispatched by the ISO for reasons other than the
economic merit order dispatch in the BEEP stack.  Thus, out of sequence energy -- which
by definition was not dispatched in merit order in the BEEP stack -- was properly excluded.
(CAL-1 at 3:11-19; CAL-19 at 2:10-12).

73     *California Generators' Position:*  Out-of-sequence dispatches of units with BEEP Stack bids that were made for general system reliability reasons and not for congestion-related local reliability reasons are eligible to set the market clearing price under the ISO Tariff and should be eligible to set the MMCP.  (GEN-1 at 33:4-35:4; GEN-19 at 14:13-15:8).

74     *Enron's Position:*  Yes, although units allowed to set MMCP should not be constrained to those in the BEEP stack.  (ENR-1 24:19-29:20).

75     *Sellers' Position:*  OOS calls to meet locational, rather than system reliability requirements were incorrectly excluded by the ISO.  (SEL-1, page 28, line 7-18).

76     *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

77     *PPL Parties' Position:*  To the extent these transactions were used to supply imbalance energy to California electricity market they should be included.  (PPL-1 at 12:12 - 17:11).

78     *Staff Position:*  Staff has not taken a position on this issue.

**e.     OOS Congestion?**

79

80     *ISO Position:*  No.  (ISO-1 at 13:1-13, 41:1-45:14, 47:7-11; ISO-19 at 40:1-42:10).

81     *The California Parties Position:*  No, the ISO properly excluded from eligibility to set the MMCP units that were dispatched by the ISO for reasons other than the economic merit order dispatch in the BEEP stack.  Thus, out of sequence energy -- which by definition was not dispatched in merit order in the BEEP stack -- was properly excluded.  (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

82     *California Generators' Position:*  Out-of-sequence units dispatched out-of-merit for congestion/local reliability reasons should not be eligible to set the MMCP, since they are presumed not dispatched for system energy needs.  (GEN-1 at 33:4-34:10).

83     *Sellers' Position:*  OOS calls to meet locational, rather than system reliability requirements were incorrectly excluded by the ISO.  (SEL-1, page 28, line 7-18).

84     *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

85     *Staff Position:*  No.  S-26 at 50:14-50:23 (not eligible to set market clearing price).

**f.     OOM?**

86

87      *ISO Position:* No. (ISO-1 at 13:15-15:16, 41:1-45:14, 46:16-47:19; ISO-19 at 40:1-42:10).

88      *The California Parties Position:* No, the ISO properly excluded from eligibility to set the MMCP units that did not submit bids for the ISO operated Imbalance Energy markets. Thus, out of market energy -- which by definition was sold to the ISO outside of the organized ISO markets -- was properly excluded. (CAL-1 at 3:11-19; CAL-19 at 2:10-12; CAL-21 at 53:11 to 56:2; CAL-21 at 56:3 to 56:13).

89      *California Generators' Position:* Since the ISO is authorized to procure out-of-market ("OOM") energy to meet system energy needs when the BEEP Stack is exhausted or unable to meet such needs, OOM units should be eligible to set the MMCP. (GEN-1 at 35:6-36:23; GEN-19 at 12:5-12:11). ISO may have misclassified certain transactions as OOM. (GEN-19 at 11:10-14:12).

90      *Enron's Position:* Yes, units providing OOM energy should be eligible to set the MMCP, to avoid distortions created by the small and potentially biased set of units in the BEEP stack. (ENR-1 25:4 to 29:20; ENR-5).

91      *Sellers' Position:* OOM purchases needed for system reliability but outside the ISO actual control area were incorrectly excluded by the ISO. (SEL-1, page 28, line 7-18).

92      *Powerex Corp.'s Position:* Yes. (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

93      *PPL Parties' Position:* The CAISO improperly excludes OOM transactions, supplied largely by CSG members, even though those transactions were a significant portion of the energy supplied to the CAISO, were integral to the marketplace, and are subject to refund. (PPL-1 at 12:12 - 17:11).

94      *Staff Position:* No. (S-26 at 47:11-48:17).

95              **g.     Residual Energy?**

96      *ISO Position:* No. (ISO-1 at 10:12-11:2, 41:1-45:14, 46:17-22; ISO-19 at 53:12-54:6).

97      *The California Parties Position:* No, the ISO properly excluded from eligibility to set the MMCP units that provided more or less energy in real-time for reasons other than the economic merit order dispatch in the BEEP stack. Thus, residual energy -- which is the incidental result of ramping to reach Acknowledged Operating Targets -- was properly excluded. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

98      *California Generators' Position:* Units providing residual energy are allowed to set the clearing price under the Commission's mitigation orders and should be eligible to set the MMCP. (GEN-1 at 37:1-38:14).

99    *Sellers' Position*:  Residual imbalance energy previously dispatched was incorrectly excluded by the ISO. (SEL-1, page 28, line 7-18).

100   *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

101   *Staff Position:*  No.  (Ex. S-26 at 51:24-52:13).

102   ### h.    Regulation?

103   (ISO-1 at 11:4-21, 41:1-45:14, 47:1-5; ISO-19 at 53:12-54:6).

104   *The California Parties Position:*  No, the ISO properly excluded from eligibility to set the MMCP units that were dispatched by the ISO for reasons other than the economic merit order dispatch in the BEEP stack.  Thus, energy associated with regulation service -- which is produced for reliability reasons in response to instantaneous differences between load and supply rather than as a result of the merit order dispatch in the BEEP stack -- was properly excluded.  (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

105   *California Generators' Position*:  Units dispatched for regulation should be not eligible to set the MMCP.  (GEN-19 at 9:1-9:4).

106   *Sellers' Position:*  Regulation energy needed but not ramped up or down in any specific merit order was incorrectly excluded by the ISO. (SEL-1, page 28, line 7-18).

107   *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

108   *Staff Position:*  No.  (S-26 at 45:24-46:16 and 50:32-51:11).

109   ### i.    Other Imbalance Energy?

110   *ISO Position:*  No.  (ISO-1 at 12:1-22, 15:18-16:23, 41:1-45:14, 47:13-23, 49:21-50:4).

111   *The California Parties Position:*  No, the ISO properly excluded from eligibility to set the MMCP units that were dispatched by the ISO for reasons other than the economic merit order dispatch in the BEEP stack.  Thus, other energy sources -- such as energy pre-arranged in the PX markets, energy resulting from reliability must run agreements, uninstructed energy that the ISO had not requested, and energy associated with bilateral transactions -- was properly excluded.  (CAL-1 at 3:11-19; CAL-19 at 2:10-12; CAL-21 at 55:9 to 56:2; CAL-21 at 57:18 to 61:21; CAL-26 at 20:15 to 21:8).

112   *California Generators' Position*:  While uninstructed energy has been excluded, CTs operating for their minimum run time are eligible to set the MMCP. (GEN-1 at 41:11-41:15).  RMR and other local reliability energy dispatches have not been treated as eligible to set the MMCP.  (GEN-1 at 40:3-41:9).

113    *Enron's Position:*  Units providing energy in the Cal PX market should also be eligible to set the MMCP.  (ENR-1 32:5 to 34:3).

114    *Powerex Corp.'s Position:*  Yes.  (PWX-1 at 5:18-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

115    *Staff Position:*  Staff supports Mr. Tranen's proposal to include combustion turbine units, dispatched by the ISO, for their entire minimum-run time.  (S-26 at 52:14-52:27).  Staff opposes Dr. Cicchetti's proposal to include RMR units.  (S-26 at 52:28-53:3).

116    **3.    If eligibility of a unit is contingent upon having had a bid in the BEEP Stack, what 22approach to eligibility should be taken during intervals in which there were incremental dispatch instructions from the BEEP Stack?**

117    *ISO Position:*  During intervals when a gas-fired unit was dispatched in merit order to provide incremental energy, the marginal unit is the gas-fired unit with the highest marginal operating costs that had an acknowledged dispatch for incremental energy. (ISO-16 at 4:13-5:5:2; ISO-19 at 42:12-51:6).

118    *The California Parties Position:*  When there were units operating in response to incremental dispatch instructions from the BEEP stack, the ISO properly chose from those units that unit with the highest marginal operating cost during a particular interval. (CAL-1 at 3:11-19; CAL-19 at 2:10-12; CAL-21 at 22:3 to 26:4; CAL-21 at 27:8 to 29:7).

119    *California Generators' Position:*  Eligibility should not be limited to units that had bids in the BEEP Stack, but, in all events, units with incremental dispatch instructions should be treated on the same basis as units with decremental instructions and the highest cost unit with such an instruction should be chosen.  (GEN-1 at 7:1-7:8; 47:10-47:23; GEN-19 at 6:15-7:14).

120    *Enron's Position:*  Eligibility of units should not be contingent upon having a bid in the BEEP stack, as the BEEP stack was small and potentially distorted by ISO actions for much of the period. (ENR-1 25:4 to 29:20).

121    *Sellers' Position:*  The unit actually dispatched with the highest marginal running costs should set the MMCP   Hypothetical or assumed dispatch should not be used.  (SEL-1, page 31, line 8- page 46, line 20; SEL-11, page 7, line 8 – page 12, line 7).

122    *Powerex Corp.'s Position:*  Eligibility of a unit should not be contingent upon having a bid in the BEEP Stack.  All units that supplied energy to the ISO to help to maintain its system are eligible.  (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

123      *Staff Position:* Staff supports the ISO's position of preferring incremental over decremental dispatch for choosing the marginal unit. (S-26 at 39:4–40:12).

124      **4.    If eligibility of a unit is contingent upon having had a bid in the BEEP Stack, what approach to eligibility should be taken during intervals in which there were decremental dispatch instructions, but not incremental dispatch instructions, from the BEEP Stack?**

125      *ISO Position:* During intervals when no gas-fired units were dispatched in merit order to provide incremental energy, the marginal unit is the gas-fired unit with the lowest marginal operating costs that had an acknowledged decremental dispatch instruction. (ISO-1 at 37:1-38:9; ISO-16 at 5:4-20, 6:17-7:10; ISO-19 at 42:12-51:6).

126      *The California Parties Position:* When there were decremental dispatch instructions, but no incremental dispatch instructions, the ISO properly looked to the unit on the margin in the BEEP stack, which was the decremental unit with the lowest marginal operating cost. (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

127      *California Generators' Position:* Eligibility should not be limited to units that had bids in the BEEP Stack, but, in all events, the highest cost unit with a decremental instruction should be selected to set the MMCP rather than selecting the lowest cost units with a decremental instruction. (GEN-1 at 48:1-48:4; GEN-19 at 7:15-7:21).

128      *Enron's Position:* Eligibility of units should not be contingent upon having a bid in the BEEP stack, as the BEEP stack was small and potentially distorted by ISO actions for much of the period. (ENR-1 25:4 to 29:20; ENR-5).

129      *Sellers' Position:* The unit actually dispatched with the highest marginal running costs should set the MMCP. Hypothetical or assumed dispatch should not be used. (SEL-1, page 31, line 8 - page 46, line 20; SEL-11, page 7, line 8 – page 12, line 7).

130      *Powerex Corp. 's Position:* Eligibility of a unit should not be contingent upon having had a bid in the BEEP Stack. The real time metered data should be used, which does not use the incremental or decremental labels and the correct approach is to use the most expensive unit from the set running, as identified in the ISO's data file *rt_act.csv*. (PWX-1 at 5:13-19, 6:1-23, 7:1-3, 12:7 to 17:2; PWX-5 at 4:13 to 5:2, 12:22 to 13:12; PWX-46 at 3:9-21; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

131      *Staff Position:* Staff supports the ISO's position of choosing the unit with the lowest decremental cost as the marginal unit. (S-26 at 38:21-38:23 and 40:21-40:37).

132      **5.    What approach to determining the unit that sets the MMCP should be taken during intervals in which no eligible unit was dispatched for imbalance energy?**

133     *ISO Position:*  During these intervals, the marginal unit is the gas-fired unit with the lowest marginal operating costs that had a bid for incremental energy submitted in the ISO's BEEP system.  (ISO-1 at 38:10-39:14; ISO-16 at 6:1-7:10; ISO-19 at 52:1-53:10).

134     *The California Parties Position:*  When there were no incremental or decremental dispatch instructions in an interval, the ISO properly looked to the unit on the margin in the BEEP stack, which was the incremental unit that would have next been dispatched if a dispatch instruction was issued.  (CAL-26 at 7:17-21; CAL-26 at 22:4 to 24:19 (ending at "to"); CAL-26 at 24:19 (beginning at "non-PGA") to 25:5).

135     *California Generators' Position:*  During intervals in which no eligible unit was dispatched for real-time energy, the MMCP should be determined by "filling in the curve," i.e., by taking the average of the MMCP calculated for the interval before and the interval after, rather than by choosing the unit with the lowest cost that had a BEEP Stack bid.  (GEN-1 at 7:3-7:8 and 46:6-46:17; GEN-19 at 8:1-8:16).

136     *Sellers' Position:*  The unit actually dispatched with the highest marginal running costs should set the MMCP.  Hypothetical or assumed dispatch should not be used.  (SEL-1, page 31, line 8  - page 46, line 20; SEL-11, page 7, line 8 – page 12, line 7).

137     *Powerex Corp.'s Position:*  Eligibility of a unit should not be contingent upon having had a bid in the BEEP Stack.  The real time metered data should be used, which does not use the incremental or decremental labels and the correct approach is to use the most expensive unit from the set running, as identified in the ISO's data file rt_act.csv.  (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 4:13 to 5:2, 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

138     *Staff Position:*  Staff supports the ISO's position.  (S-26 at 37:11-38:14).

139     **6.     Should units running on fuels other than natural gas be eligible to set the MMCP?**

140     *All Parties' Stipulation:*  Units running on fuels other than natural gas should not be eligible to set the MMCP in those intervals in which they were operating on fuels other than natural gas, as provided in the Heat Rate Stipulation.

141     **7.     Should units that did not show positive or negative responses to BEEP Stack dispatch instructions be eligible to set the MMCP?**

142     *ISO Position:*  The ISO did not factor into its determination of the marginal unit whether or not a unit actually responded to an acknowledged ISO dispatch instruction.  However, it may be appropriate to disqualify those units that did not deliver incremental energy pursuant to ISO dispatches from eligibility to set the mitigated price.  (ISO-19 at 39:1-15).

143     *The California Parties Position:* Units that failed to respond to BEEP stack dispatch instructions should not be counted as if they had run; such units should be excluded from eligibility to set the MMCP. (CAL-1 at 21:6 to 24:10).

144     *California Generators' Position*: BEEP Stack dispatch instructions should not be a criterion for eligibility to set the MMCP. Units that did not actually run in response to ISO dispatch instructions should, however, be excluded from the analysis (GEN-1 at 19:20-28:9; GEN-23 at 3:10-3:23).

145     *Enron's Position:* Eligibility of units should not be contingent upon having a bid in the BEEP stack, as the BEEP stack was small and potentially distorted by ISO actions for much of the period. (ENR-1 25:4 to 29:15; ENR-5).

146     *Powerex Corp.'s Position:* This issue is not relevant because the real time metered data should be used, which does not use the incremental or decremental labels and the correct approach is to use the most expensive unit from the set running, as identified in the ISO's data file *rt_act.csv*. (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 4:13 to 5:2, 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

147     *Staff Position:* If unit fails to respond it cannot set BEEP stack clearing price and should not set the MMCP. (S-26 at 43:4-43:13 and 56:21-57:6).

148     **8.     Should units outside the ISO control area be eligible to set the MMCP?**

149     *ISO Position:* No. (ISO-1 at 40:13-22; ISO-19 at 57:17-59:6).

150     *The California Parties Position:* The ISO properly excluded from its analysis supplies outside of the ISO control area -- it is generally not possible to determine the heat rates for supplies originating outside of the control area. (CAL-19 at 9:14 to 11:4; CAL-21 at 13:16 to 14:8.; CAL-21 at 14:11 to 15:7).

151     *California Generators' Position*: MMCPs were calculated on a data base that included only generating units within the ISO Control Area. (GEN-1 at 5:15).

152     *Arizona Electric Power Cooperative, Inc. Position:* Units outside the ISO control area should be eligible to set the MMCP (AEP-12 at 3:10-3:18 and 4:1-5:22, AEP-13).

153     *Sellers' Position:* Dr. Cicchetti believes units outside the ISO control area should be included in the determination of MMCP. (SEL-1, page 15, line 3 – page 18, line 20).

154     *Powerex Corp.'s Position*: Yes. Any generator that supplied energy to help maintain balance in the ISO system should be included. (PWX-1 at 5:13-19, 6:1-18, 7:1-3, 12:7 to 17:2; PWX-5 at 8:3 to 14:13; PWX-47 at 4:6; PWX-52 at 2:15-20, 3:1 to 4:14, 7:3 to 9:15).

155     *PPL Parties' Position*: Yes. The CAISO improperly excludes many units outside the ISO control area though those transactions were a significant portion of the energy supplied to the CAISO, were integral to the marketplace, and are subject to refund. (PPL-1 at 12:12 - 17:11).

156     *Staff Position:* Units outside California are not eligible to set MMCP. (S-26 at 54:15-55:24).

### E.  Additional Issues Related to the MMCP Calculation.

157

158     **1.   What is the proper use of gas price indices for the calculation of the MMCP for each interval?**

159     *ISO Position:* The gas price used in calculating the mitigated price should be the average of the published midpoint daily spot gas prices reported in the indices required to be used by the Commission for the northern and southern zones. (ISO-5 at 39:16-41:3; ISO-20 at 13:3-16:13).

160     *The California Parties Position* : The ISO properly used the simple average of the daily midpoint natural gas prices, reported by the indices selected by the Commission, a method which is mandated by the Commission's Refund Orders and Judge Wagner's July 12 Recommendation, and which is consistent with the way in which the spot gas markets operate. (CAL-22 at 5:7 to 7:4; CAL-22 at 14:1 to 15:15; CAL-22 at 22:23 to 23:4).

161     *California Generators' Position*: MMCPs were calculated utilizing the same gas prices as the ISO (with one minor exception). (GEN-1 at 4:1-4:2).

162     *Sellers' Position:* The ISO used an incorrect method to determine gas prices, based upon midpoints, averages of recalculated averages and volume-weighted averages. The marginal natural gas cost for calculating MMCP is the "high" or "peak" price on a particular day and not the midpoint price, especially when the range of prices is quite large. Common high prices are conservative surrogates for the spot prices of natural gas. Thus, for SP15, the proper gas price index is the common high price reported in Gas Daily. For NP-15, the proper gas price index is the average of the common high price reported in Gas Daily and the high prices reported by NGI and Inside FERC. (SEL-1, page 46, line 21-page 56, line 7; SEL-3; SEL-6; SEL-7; SEL-11, page 12, line 8 – page 14, line 15).

163     *Powerex Corp.'s Position:* Common High Value defined and published in Gas Daily which is a McGraw Hill publication. (PWX-7:10-18; PWX-46 at 2:26 to 3:7).

164     *PPL Parties' Position:* The proper gas price index for the purpose of calculating the MMCP, which is a spot market price, is Gas Daily's published "common high price" index for natural gas, which more accurately reflects the cost incurred to supply spot market electricity than does the index selected by the CAISO. (PPL-1 at 22:12 - 28:17).

165     *Staff Position:* Staff does not oppose the ISO's approach.

166

> **2.**   **To the extent hourly MMCPs are calculated based upon 10-minute interval MMCPs, should the interval MMCPs be averaged on a weighted or simple average basis?**

167

> *ISO Position:*  Simple.  (ISO-1 at 55:11-56:14; ISO-19 at 60:10-66:8).

168

> *The California Parties Position:*  The ISO properly developed hourly MMCPs by taking the simple average of the 10-minute MMCPs, rather than developing some complex weighting that is not called for in the Refund Orders.  (CAL-1 at 3:11-19; CAL-19 at 2:10-12).

169

> *California Generators' Position:*  MMCPs for each hour, to be used in calculating refunds in the PX spot markets, should be calculated using a weighted average of the 10-minute interval prices, with the weighting based on real-time generation by eligible units.  (GEN-1 at 48:8-50:11).

170

> *Powerex Corp.'s Position:*  Simple average basis.  (PWX-5 at 28:7-8).

171

> *Staff Position:*  "Average" implies simple average unless Commission instructs otherwise.  (S-26 at 42:3-43:3).

172

> **3.**   **Is there a separate formula for calculating MMCPs for ancillary services and, if so, what is it?**

173

> *Testimony on this issue will not be introduced in the hearing on Issue 1 and is deferred until the hearing on Issues 2 and 3.*

# E X H I B I T   A

1   **PROOF OF SERVICE BY FACSIMILE TRANSMISSION**
    (CCP 1013(e), 2015.5)
2
3       I declare that I am employed with the law firm of Morrison & Foerster LLP, whose address is
    425 Market Street, San Francisco, California, 94105; I am not a party to the within cause; I am over
    the age of eighteen years; and that the document described below was transmitted by facsimile
4   transmission to a facsimile machine maintained by the person on whom it is served at the facsimile
    machine telephone number as last given by that person on any document which he or she has filed in
5   the cause.

6       I further declare that on the date hereof I served a copy of:

7   **OPPOSITION OF NEW WEST ENERGY CORPORATION TO PG&E MOTION**
    **FOR ESTIMATION OF CLAIMS FOR FEASIBILITY PURPOSES**
8

9
    on the following by sending a true copy from Morrison & Foerster's facsimile transmission
10  telephone number **(415) 268-7522** and that the transmission was reported as complete and without
    error. The transmission report, which is attached to this proof of service, was properly issued by the
11  transmitting facsimile machine.

12
    Howard, Rice, Nemerovski, Canady,          Office of the U.S. Trustee
13     Falk & Rabkin                           Attn:  Stephen L. Johnson, Esq.
    Attn:  James L. Lopes, Esq.                 250 Montgomery Street, Suite 1000
14  Three Embarcadero Center, 7th Floor         San Francisco, CA  94104
    San Francisco, CA  94111-4065               Tel: (415) 705-3333
15  Tel: (415) 434-1600                         Fax: (415) 705-3379
    Fax: (415) 217-5910
16

17  Weil, Gotshal & Manges LLP                  Milbank, Tweed, Hadley & McCloy
    Attention:  Michael P. Kessler, Esq.        Attn:  Paul Aronzon, Esq.
18  767 Fifth Avenue                            601 South Figueroa Street
    New York, New York  10153                   Los Angeles, California  90017
19  Tel: (212) 310-8000                         Tel: (213) 892-4000
    Fax: (212) 310-8007                         Fax: (213) 629-5063
20

21

22      I declare under penalty of perjury under the laws of the State of California that the above is
    true and correct.
23
        Executed at San Francisco, California, this 22nd day of March, 2002.
24

25

26  _____            _____
            Tillie A. Lee
27           (typed)                              (signature)

28

PROOF OF SERVICE