1 | Bennett G. Young, State Bar No. 106504
LEBOEUF, LAMB, GREENE & MACRAE, LLP.
2 | One Embarcadero Center
San Francisco, CA 94111-3619
3 | Telephone: (415) 951-1100
Facsimile : (415) 951-1180
4
Counsel to ENRON POWER MARKETING, INC.
5

6

7

8 | IN THE UNITED STATES BANKRUPTCY COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10 | SAN FRANCISCO DIVISION

11

12 | In re                                          ) Case No. 01-30923-DM
                                                   )
13 | PACIFIC GAS AND ELECTRIC COMPANY, ) Chapter 11
    | a California corporation,                     )
14 |                                                ) ENRON'S OBJECTION TO MOTION FOR
                                                   ) TEMPORARY ALLOWANCE OF CLAIMS
15 |                    Debtor,                     ) OF CERTAIN ELECTRICITY GENERATOR
                                                   ) AND DISALLOWANCE OF CLAIMS OF
16 | Federal I.D. No. 94-0742640                    ) CALIFORNIA POWER EXCHANGE FOR
                                                   ) PLAN VOTING PURPOSES
17 |                                                )
                                                   ) Date:  June 17, 2002
18 | _____             ) Time:  1:30 p.m.
                                                     Dept:  Judge Montali

19 |        Enron Power Marketing, Inc. ("EPMI") objects to debtor Pacific Gas and Electric

20 | Company's ("PG&E's") Motion For Temporary Allowance Of Claims Of Certain Electricity

21 | Generators And Disallowance Of Claims Of California Power Exchange For Plan Voting

22 | Purposes (the "Motion"). In the Motion, PG&E seeks to disallow for voting purposes the claim

23 | of the California Power Exchange ("PX") and to allow for voting purposes the claims of

24 | electricity generators, and proposes to include in the generator claims for voting purposes

25 | amounts which may be allocable to Southern California Edison ("SCE").

26 |        EPMI supports the Motion to the extent PG&E proposes to permit generators, rather than

27 | the PX, to vote. Generators are the real financially interested parties and so ought to be the

28 | ///

                                                   1

6929

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/03/02 15:18:09   Page 1 of
154
SF 172068.1 09149 00687

1 voters. EPMI also supports PG&E's proposal to permit generators to vote all amounts due to
2 them on account of sales in the relevant markets, including amounts allocable to SCE.

3      The problem is the amount of the claim PG&E proposes to allow EPMI to vote. PG&E
4 proposes to allow EPMI to vote a claim in the amount of $25,795,559.76. PG&E offers no
5 explanation for this figure, and this amount is wholly unrelated to the claims set forth in EPMI's
6 timely filed proof of claim. EPMI therefore objects to the Motion and prays that its claim be
7 allowed for voting purposes in the amount of $176,538,199.33.

8      EPMI timely filed a proof of claim asserting claims against PG&E arising from and
9 relating to (1) PG&E's non-payment to the PX and the California Independent System Operator
10 ("ISO") of substantial sums due and owing by PG&E to the PX and ISO on account of the sale
11 by EPMI of electricity and ancillary services in the PX and ISO markets in the amount (including
12 amounts allocable to SCE) of $42,225,741.64 for the period prior to January 19, 2001 and
13 $349,436.66 for the period after January 19, all of which is allocable to PG&E; (2) under-
14 scheduling penalties in the amount (including amounts allocable to SCE) of $33,878,246.08; (3)
15 power sold under certain block forward contracts which were commandeered by the State of
16 California in the amount of $186,000; and (4) the potential loss of certain collateral placed with
17 the PX in the amount of $133,777,021.03. A copy of EPMI's proof of claim, which has been
18 assigned claim no. 8879, is attached.

19     PG&E objected to portions of EPMI's claim. PG&E objected to the claim to the extent
20 EPMI seeks recovery of underscheduling penalties or of amounts due for sales of electricity after
21 January 19, 2001, which PG&E asserts have been satisfied by the California Department of
22 Water Resources ("CDWR"). PG&E also objected to the extent EPMI's claim is duplicative of a
23 proof of claim filed by the PX, and sought to "cap" all generator claims for the sale of electricity
24 or ancillary services in the amount of $1.518 billion. However, PG&E did not produce any
25 evidence supporting this cap.

26      PG&E did not otherwise object to EPMI's claim. Specifically, other than raising the
27 duplication with the PX's claim and attempting to cap all generator claims, PG&E did not object
28 to EPMI's claim of $42,225,741.64 for electricity and ancillary services sold in the PX and ISO

2

1  markets prior to January 19, 2001. Nor did PG&E object on any ground to EPMI's claim for the
2  potential loss of EPMI's collateral.

3      EPMI has responded to PG&E's objections concurrently with the filing of this response.
4  EPMI does not object to the disallowance of the portion of its claim seeking underscheduling
5  penalties, provided that any order is without prejudice to EPMI's rights (i) to assert that the order
6  of the Federal Energy Regulatory Commission ("FERC") invalidating these penalties should be
7  overturned, and (ii) to assert a claim for such penalties in the event the FERC order is
8  overturned.

9      Nor does EPMI object to disallowance of its claim to the extent the claim has been paid
10  by the CDWR, provided such payments are verified. The amount of EPMI's claim subject to this
11  objection is $535,436.66, which includes the amount due under the commandeered contracts. As
12  explained in the response to this Objection, EPMI has not yet confirmed that these amounts have
13  been paid and PG&E has not produced any evidence of payment. EPMI therefore objects to
14  disallowance of this amounts pending such verification.

15      Finally, PG&E's objection that generator claims are duplicative of the PX's claim is not
16  relevant to this Motion, since PG&E proposes to allow generator claims to vote and to disallow
17  the PX claim for voting purposes. Moreover, the proposed cap is unsupported by any evidence
18  and an aggregate cap can not be used to limit any particular claim.

19      Thus, under the procedures proposed by PG&E in its Motion, EPMI's claim for sales of
20  electricity and ancillary services in the PX and ISO markets prior to January 19, 2001 should be
21  temporarily allowed for voting purposes in the amount of $42,225,741.64 (which includes
22  amounts allocable to SCE). This portion of EPMI's claim is not subject to any pending objection
23  other than the objection that the claim is duplicative with the PX's claim.

24      Further, EPMI should be permitted to vote its claim for the potential loss of over $133
25  million of collateral. This portion of EPMI's claim is not the subject of any pending objection
26  and therefore should be temporarily allowed for voting purposes. Finally, pending evidence or
27  confirmation that EPMI's sales of power after January 19 have been satisfied by the CDWR,
28  EPMI should be permitted to vote this aspect of its claim.

3

ENRON'S OBJECTION TO MOTION FOR
TEMPORARY ALLOWANCE OF CLAIMS OF
CERTAIN ELECTRICITY GENERATORS AND
DISALLOWANCE OF CLAIMS OF CALIFORNIA
POWER EXCHANGE FOR VOTING PURPOSES

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/03/02 18:43:08   Page 6 of

SF 172068.1 09149 00687

154

1    Accordingly, EPMI's claim should be temporarily allowed for voting purposes in the

2    amount of $176,538,199.33.

3    Dated: June 3, 2002                    LEBOEUF, LAMB, GREENE & MACRAE, L.L.P.

4

5

6                                          By: _____

7                                          Bennett G. Young
                                           Counsel to ENRON POWER MARKETING, INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                           4

SF 172068.1 09149 00687

United States Bankruptcy Court
Northern Division - San Francisco
Case No. 01-30923 DM

## PROOF OF SERVICE

I, Laurie A. Lee, declare:

I am employed in the City and County of San Francisco, California. I am over the age of eighteen and not a party to the within cause; my business address is LeBoeuf, Lamb, Greene & MacRae, L.L.P., One Embarcadero Center, Fourth Floor, San Francisco, California 94111. On June 3, 2002, I caused to have serve the following document(s)in the manner indicated on the below-named parties and/or counsel of record:

**ENRON'S OBJECTION TO MOTION FOR TEMPORARY ALLOWANCE OF CLAIMS OF CERTAIN ELECTRICITY GENERATOR AND DISALLOWANCE OF CLAIMS OF CALIFORNIA POWER EXCHANGE FOR PLAN VOTING PURPOSES**

[ x ] U.S. Mail, with First Class postage prepaid and deposited in sealed envelopes at San Francisco, California.
[ ] Federal Express
[ ] Hand Delivery by Messenger
[ ] Facsimile transmission

SEE ATTACHED LIST

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that I am readily familiar with this firm's practice for the collection and processing of documents for mailing with the U.S. Postal Service and the collection and processing of correspondence with Federal Express, and the transmittal of facsimile and that this declaration was executed on June 3, 2002, at San Francisco, California.

_____
Laurie A. Lee

SF 152467.1 09149 00687

**SERVICE LIST**

James L. Lopes
Howard, Rice, Nemerovski, et al.
3 Embarcadero Center, 7th Floor
San Francisco, CA 94111

Office of the U.S. Trustee
250 Montgomery Street, Suite 1000
San Francisco, CA 94104-3401

Paul S. Aronzon
Robert Jay Moore
Michael I. Sorochinsky
Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, 30th Floor
Los Angeles, CA 90017

PROOF OF SERVICE

SF 152467.1 09149 00687

## PROOF OF CLAIM

| UNITED STATES BANKRUPTCY COURT<br>NORTHERN DISTRICT OF CALIFORNIA | Creditor Number: F-923-459345 |
|---|---|

Debtor Name and Case Number

# Pacific Gas and Electric Company (Case No. 01-30923)

THIS SPACE IS FOR COURT USE ONLY

FILED

SEP 05 2001

By Robert L. Berger & Assoc., Claims Agent
For U.S. Bankruptcy Court
Northern District of CA
San Francisco Division

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name and Address of Creditor:**

Enron Power Marketing, Inc.
c/o Bennett G. Young
LeBoeuf, Lamb, Greene & MacRae, LLP
One Embarcadero Center, Suite 400
San Francisco, CA 94111

**Name and Address of Creditor (if different from information shown to the left:**

Enron Power Marketing, Inc.
c/o Lisa Mellencamp
Enron North America Corp.
1400 Smith Street, 38th Floor
Houston, TX 77002

Account or other number by which creditor identifies debtor:

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

Check one if this claim:
☐ replaces a previously filed claim dated_____
☐ amends a previously filed claim dated_____

**1. Basis for Claim**
- ☒ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☐ Other

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Your SS #: _____

Unpaid compensation for services performed

from _____ to _____
(Date) (Date)

**2. Date debt was incurred:**

**3. If court judgment, date obtained:**

**4. Classification of Claim:** Under the Bankruptcy Code all claims are classified as one or more of the following: (1) Unsecured Nonpriority, (2) Unsecured Priority, (3) Secured. It is possible for part of a claim to be in one category and part in another.

**Secured Claim.**
☒ Check this box if claim is secured by collateral (including a right of setoff).
Brief description of Collateral:
- ☐ Real Estate
- ☐ Motor Vehicle
- ☒ Other: See attached rider    Value of Collateral: See attached rider

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**Unsecured Non-Priority Claim.**
☐ Check this box if claim is an unsecured claim.

Unsecured Amount $_____

**Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim.
Amount entitled to priority $_____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650*), earned within 90 days before the filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(__).
*Amounts are subject to adjustment on 04/01/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**5. Total Amount of Claim at Time Case Filed:**

| $ See attached rider | $ See attached rider | $ | $ See attached rider |
|---|---|---|---|
| (UNSECURED) | (SECURED) | (PRIORITY) | (TOTAL) |

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

THIS SPACE IS FOR COURT USE ONLY

**6. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**7. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If documents are not available, explain. If documents are voluminous, attach summary.

**8. DATE-STAMPED COPY:** To receive an acknowledgement of the filing of your claim, enclose a STAMPED, self-addressed envelope and a copy of this proof of claim.

Date

Sign and print the name and title, if any, of the creditor or the person authorized to file this claim (attach copy of power of attorney, if any):

Enron Power Marketing, Inc.

MARK A. FREVERT

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In particular types of cases or circumstances, such as bankruptcy cases that are not filed voluntarily by a debtor, there may be exceptions to these general rules.*

## — DEFINITIONS —

### Debtor

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

### Creditor

A creditor is any person, corporation, or other entity to whom the debtor owed a debt to the date that the bankruptcy case was filed.

### Proof of Claim

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

### Secured Claim

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other items or property. A lien may have been obtained through a court proceeding before the bankruptcy case began: in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim (See also Unsecured Claim.)

### Unsecured Claim

If a claim is not secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

### Unsecured Priority Claim

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as Unsecured Nonpriority Claims.

---

## Items to be completed in Proof of Claim form (if not already filled in)

### Court, Name of Debtor, and Case Number:

Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, District of Delaware), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

### Information about Creditor:

Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

### 1. Basis for Claim

Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

### 2. Date Debt Incurred

Fill in the date when the debt was first owed by the debtor.

### 3. Court Judgments:

If you have a court judgment for this debt, state the date the court entered the judgment.

### 4. Total Amount of Claim at Time Case File

Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

### 5. Secured Claim

Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above).

### 6. Unsecured Priority Claim:

Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above). A claim may be partly priority and partly nonpriority if, for example, the claim is more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

### 7. Credits:

By signing the proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

### 8. Supporting Documents:

You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

Bennett G. Young (State Bar No. 106504)
LeBoeuf, Lamb, Greene & MacRae, LLP
One Embarcadero Center, Suite 400
San Francisco, California 94111
Telephone: (415) 951-1100
Facsimile: (415) 951-1180

Counsel to ENRON POWER MARKETING, INC.


## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: | ) Case No.: 01-30923-DM |
| | ) |
| **PACIFIC GAS AND ELECTRIC** | ) Chapter 11 |
| **COMPANY**, a California corporation, | ) |
| | ) **RIDER TO PROOF OF CLAIM OF** |
| Debtor. | ) **ENRON POWER MARKETING INC.** |
| | ) |
| Federal I.D. No. 94-0742640 | ) |
| | ) |

Enron Power Marketing Inc. ("EPMI") holds claims against Pacific Gas and Electric Company ("PG&E") arising from and relating to (1) PG&E's non-payment to the California Power Exchange ("PX") and the California Independent System Operator ("ISO") of substantial sums due and owing by PG&E to the PX and ISO which non-payments by PG&E (a) resulted in a shortfall in payments due and owing by the PX and ISO to EPMI and (b) with respect to the PX, may result in a "charge back liability" to EPMI for a portion of such payment failures pursuant to the PX tariff, and with respect to which, in both cases, EPMI is entitled to seek recourse directly against PG&E, the defaulting party (the "PX/ISO Passthrough Claim"); (2) ISO underscheduling penalty revenues (the "ISO Underscheduling Penalty Revenue Claim"); (3) power sold under certain block forward contracts which were commandeered by the State of California (the "Commandeering Claim"); and (4) the loss of certain collateral placed with the PX (the "Loss of Collateral Claim").

     1.     <u>PX/ISO Passthrough Claim.</u>

EPMI was a net seller of energy and/or ancillary services in the PX markets and/or the real time ISO market. Those markets operate on a pass-through basis; i.e., the PX or ISO holds an auction in which energy is pooled, and collects money from buyers and passes those monies through to sellers. As of November 2000, EPMI sold more than $42,225,741.64 (subject to adjustment) of energy or ancillary services into the ISO's market for which it has not received payment. A copy of EPMI's statements from the ISO reflecting the unpaid pre-petition amounts

owed to EPMI is attached as Exhibit A. EPMI estimates that sixty to eighty percent (60 % to 80%) of this amount is allocable to PG&E, and asserts a claim against PG&E for the amount allocable to it. Additionally, the ISO has advised EPMI that the amount of EPMI's sales of energy in the ISO's markets during February, 2001 that are allocable to PG&E is $348,885.58 (subject to adjustment). EPMI asserts a claim against PG&E in this amount. The PX has advised EPMI that as June 30, 2001 the unpaid amount of EPMI's sales of energy in the PX's markets that are allocable to PG&E is $551.08, subject to adjustment. A copy of EPMI's statements from the PX reflecting the unpaid pre-petition amounts owed to EPMI is attached as Exhibit B. The PX may assert interests in assets of PG&E in the nature of a security interest, trust beneficiary, ownership or other interest therein, and to that extent EPMI asserts the same interests.

At this time, EPMI lacks sufficient information from PG&E, ISO, the PX and the Federal Energy Regulatory Commission ("FERC") to determine the precise amount EPMI is owed by PG&E based on the facts and circumstances set forth in the preceding paragraph. Additionally, the PX and the ISO recently produced voluminous documents to EPMI's outside counsel, which have not yet been reviewed by EPMI. Finally, the precise amount which EPMI is owed by PG&E may be subject to amendment for a variety of reasons, including, but not limited to, certain proceedings pending before FERC.

2.     ISO Underscheduling Penalty Revenue Claim.

Pursuant to its FERC-approved tariff, the ISO assesses a penalty against Scheduling Coordinators whose actual demand exceeds scheduled demand by more than 5%. ISO Tariff, Section 2.2.13.2.3. Under the Tariff, the ISO is required to distribute Underscheduling Penalty revenues to Scheduling Coordinators whose actual demand exceeds scheduled demand by less than 5%. ISO Tariff Section 2.2.13.2.3.3.

The ISO has informed EPMI that it is due Underscheduling Penalty Revenues of $33.8 million. Attached is Exhibit C, which is a spreadsheet the ISO sent EPMI detailing its calculation of EPMI's share of the Underscheduling Penalty Revenues. The ISO has further informed EPMI that ISO's calculation of the Underscheduling Penalty Revenues due EPMI is subject to further calculation and to adjustment. The information the ISO provided does not show EPMI how much of the amount is attributable to PG&E and the ISO has expressly declined to provide an allocation. EPMI does not have enough information regarding PG&E's meter data to calculate with precision the amount of Underscheduling Penalty Revenues owing from PG&E. Both PG&E and the ISO possess the information necessary to calculate this amount. Nevertheless, based on statements by the ISO, EPMI estimates that PG&E's obligations constitute a large proportion of the Underscheduling Penalty Revenues owing to EPMI. For example, ISO stated in a letter to FERC that "Most of the shortfall in the amount of forward scheduled Load is attributable to PG&E and SCE....From January 1, 2001 to March 14, 2001, the ISO estimates that the penalties will exceed $400 million." Page 4, Transmittal Letter for Amendment 38 to the ISO Tariff, submitted to FERC on March 20, 2001, a copy of which is attached as Exhibit D.

### 3. Commandeering Claim.

EPMI asserts a claim against PG&E in the amount of $186,000 for payment for energy delivered under certain PX Block Forward Market Contracts during the period February 1 through 6, 2001. In 2000, PG&E entered into several Block Forward Market Contracts for purchase of wholesale electricity for delivery during various periods of 2001. Beginning no later than January 2001, PG&E defaulted on its obligations to the PX and the PX commenced liquidation of those Block Forward Market Contracts for the benefit, among others, of EPMI.

On January 31, 2001, the Governor of the State of California issued Executive Order D-21-01 commandeering the PG&E Block Forward Market Contracts. Notwithstanding the commandeering of the contracts, PG&E remains responsible for payment under them. EPMI delivered energy under these contracts during the period February 1 through 6, 2001 for which it has not been paid, and the sum of $186,000 is due and owing. Furthermore, EPMI may be obligated to deliver energy under the contract through December 31, 2001, and reserves its right to assert an administrative or other appropriate claim in the event it is not paid for such deliveries. EPMI therefore reserves its right to file an appropriate claim in the event the contract is rejected and/or EPMI is not paid any amounts due under such contract. The assertion of this claim is not intended to preclude efforts by the PX to collect amounts which may assert are owed to the PX for the benefit of EPMI, including, without limitation, amounts which may be collected by the PX arising out of the State of California's commandeering of the Block Forward Market Contracts.

### 4. Loss of Collateral Claim.

EPMI is entitled to a return of certain collateral placed with the PX consisting of letters of credit and/or the proceeds thereof, and cash in the sum of not less than $133,777,021.03. Following PG&E's default on payments to the PX, the PX filed a bankruptcy case. As a result, EPMI's collateral placed with the PX has been frozen, and such collateral may not be returned. EPMI asserts a claim against PG&E in the amount of the value of the collateral in the event such collateral is not returned to EPMI.

### 5. Interest, Costs and Fees.

EPMI asserts, with respect to each and every claim set forth in this proof a claim, a claim for all pre-petition interest and costs, as well as all post-petition interest, costs and other charges to the extent allowable pursuant to 11 U.S.C. section 506(b).

### 6. Setoff of Amounts Due Under Master Power Purchase and Sale Agreement.

Pursuant to contractual setoff rights contained in the Master Power Purchase and Sale Agreement (the "MPA") by and between EPMI and PG&E and pursuant to any and all setoff rights that EPMI has under applicable law, all amounts due to EPMI by PG&E are subject to setoff against amounts EPMI may owe PG&E on account of the termination of the MPA.

The MPA is a "forward contract" as defined in section 101(25) of the Bankruptcy Code. On April 9, 2001, consistent with section 556 of the Bankruptcy Code, EPMI exercised its contractual right under Articles 5.1 and 5.2 of the MPA to terminate the agreement as a result of PG&E's default. A copy of the MPA is attached as Exhibit E. Final settlement of this forward contract is exempt from the automatic stay pursuant to Section 362(b)(6) of the Bankruptcy Code.

Upon termination, the MPA requires EPMI, the non-defaulting party, to calculate the termination payment due in connection with such termination consistent with the parameters set forth in the MPA. Based on EPMI's calculations, in connection with power previously delivered by EPMI to PG&E, PG&E owes EPMI $3,481,880.00, which represents the sum of previously issued and unpaid invoices and additional amounts in respect of power deliveries through and including April 5, 2001[1]. EPMI, on the other hand, owes PG&E a total settlement amount (after aggregating the termination values for all of the transactions) of $86,112,819.21, thereby resulting in a total amount owing from EPMI to PG&E under the MPA as a result of the termination of the transactions of $82,630,939.21. Pursuant to Sections 5.4 and 5.6 of the MPA, as well as pursuant to all setoff rights existing under applicable law, EPMI has the right to setoff against amounts EPMI owes PG&E on account of the termination of the MPA all amounts owed by PG&E to EPMI, including the PX/ISO Passthrough Claims, the ISO Underscheduling Penalty Revenue Claim, the Commandeering Claim and the Loss of Collateral Claim.

7.    Reservation of Rights.

This proof of claim shall not constitute a waiver of any rights that EPMI may have under the applicable tariffs and other applicable law to insist on determination of these obligations and any potential counter-claims before a jury, arbitrator or other decisionmaker. EPMI reserves the right to amend this proof of claim to describe the claim, including, without limitation, the amount thereof, with more particularity after additional information sufficient to support such amendment becomes known. In addition, EPMI reserves the right to amend this proof of claim to assert any counter-claims it may have against PG&E in the event PG&E asserts claims against it. EPMI further reserves any and all rights of offset, recoupment or other similar right which it might have under any applicable contract or law.

---

[1] EPMI delivered power to PG&E under the contract during the period April 6 to April 9, 2001 for which it has not been paid. EPMI reserves its rights to file an administrative claim for the amounts due on account of these deliveries.

# EXHIBIT  A

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 13
of 154

Certification for Market Settlement July 24, 2001

**For the Trade Months of:**
**November 2000**
**December 2000**
**January 2001**
**February 2001**
**March 2001**
**April 2001**

Certification:

*I, William J. Regan, Jr., hereby certify as Chief Financial Officer at the California Independent System Operator Corporation ("ISO") that the following information and schedules and attached invoices of ISO Debtors is a true and accurate reflection of the current financial data set forth.*

Dated July 24, 2001
Signature:

by: *William J. Regan, Jr.* Chief Financial Officer

**For the Trade Month of April 2001**

**ISO Creditors to whom amounts are Owed:**

| # | Customer Name | Trade Month | | | Amount Owed | % of total owed to Creditors |
|---|---|---|---|---|---|---|
| 1001 | Enron Power Marketing | Apr-01 | | $ | 3,343.99 | 0.000% |
| | Amount owed to all other Creditors | | | | 726,282,070.54 | 100.000% |
| | **Total Due to 35 SCs (Creditors)** | | | $ | 726,285,414.53 | 100.000% |

**Amounts owed by ISO Debtor that remain unpaid:**
**Preliminary and final invoices are attached.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1007 | Arizona Public Service | 29-Jun-01 | 15591 | GMC | 20,921.76 | 0.003% |
| 1007 | Arizona Public Service | 12-Jul-01 | 15731 | GMC | 16.17 | 0.000% |
| 2606 | British Columbia Power Exchange | 29-Jun-01 | 15553 | GMC | 220,578.62 | 0.030% |
| 1684 | City of Azuza | 12-Jul-01 | 15705 | GMC | 17.04 | 0.000% |
| 1564 | City of Pasadena | 29-Jun-01 | 15566 | GMC | 87,075.42 | 0.012% |
| 1564 | City of Pasadena | 12-Jul-01 | 15706 | GMC | 78.29 | 0.000% |
| 2746 | Constellation Power Source | 29-Jun-01 | 15551 | GMC | 221.84 | 0.000% |
| 1020 | Dynegy Power Marketing | 29-Jun-01 | 15582 | GMC | 51,965.20 | 0.007% |
| 1020 | Dynegy Power Marketing | 12-Jul-01 | 15722 | GMC | 226.93 | 0.000% |
| 2064 | El Paso Power Services Company | 29-Jun-01 | 15562 | GMC | 63,175.41 | 0.009% |
| 1544 | Idaho Power Company | 29-Jun-01 | 15567 | GMC | 140,656.33 | 0.019% |
| 1022 | Mirant | 29-Jun-01 | 15581 | GMC | 98,058.73 | 0.013% |
| 3106 | Pacific Gas and Electric | 29-Jun-01 | 15545 | GMC | 1,288,148.84 | 0.175% |
| 3186 | Pacific Gas and Electric | 29-Jun-01 | 15543 | GMC | 90.00 | 0.000% |
| 1011 | Pacific Gas and Electric | 29-Jun-01 | 15588 | GMC | 171,090.87 | 0.023% |
| 1012 | Portland General Electric | 29-Jun-01 | 15587 | GMC | 22.43 | 0.000% |
| 2528 | Sacramento Municipal Utility District | 29-Jun-01 | 15556 | GMC | 157,189.18 | 0.021% |
| 1010 | Southern California Edison | 29-Jun-01 | 15589 | GMC | 3,119,404.25 | 0.424% |
| 2606 | British Columbia Power Exchange | 29-Jun-01 | 15617 | Mkt | 3,410,801.81 | 0.464% |
| 2606 | British Columbia Power Exchange | 12-Jul-01 | 15758 | Mkt | 361,608.15 | 0.049% |
| 1685 | City of Banning | 29-Jun-01 | 15629 | Mkt | 52,716.67 | 0.007% |
| 1504 | City of Glendale | 29-Jun-01 | 15635 | Mkt | 166,136.63 | 0.023% |
| 1504 | City of Glendale | 12-Jul-01 | 15777 | Mkt | 1,699.09 | 0.000% |
| 1564 | City of Pasadena | 29-Jun-01 | 15631 | Mkt | 4,061,716.02 | 0.553% |
| 1017 | Duke Energy and Trading | 29-Jun-01 | 15656 | Mkt | 6,105,737.21 | 0.831% |

**Amounts owed by ISO Debtor that remain unpaid (continued):**
**Preliminary and final invoices are attached.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1544 | Idaho Power Company | 29-Jun-01 | 15632 | Mkt | 4,262,853.17 | 0.580% |
| 1544 | Idaho Power Company | 12-Jul-01 | 15774 | Mkt | 91,010.61 | 0.012% |
| 1244 | Illinova Energy Partners | 29-Jun-01 | 15638 | Mkt | 4,724.13 | 0.001% |
| 1244 | Illinova Energy Partners | 12-Jul-01 | 15780 | Mkt | 19.79 | 0.000% |
| 2531 | Koch Energy Trading | 12-Jul-01 | 15760 | Mkt | 12.71 | 0.000% |
| 1005 | Louisville Gans and Electric | 12-Jul-01 | 15807 | Mkt | 204.79 | 0.000% |
| 1022 | Mirant | 29-Jun-01 | 15652 | Mkt | 1,748,611.56 | 0.238% |
| 2769 | Pacific Gas and Electric (California PX) | 29-Jun-01 | 15610 | Mkt | 486,576.92 | 0.066% |
| 3106 | Pacific Gas and Electric | 29-Jun-01 | 15603 | Mkt | 50,758,977.65 | 6.907% |
| 3106 | Pacific Gas and Electric | 12-Jul-01 | 15743 | Mkt | 256,089.02 | 0.035% |
| 3187 | Pacific Gas and Electric | 29-Jun-01 | 15599 | Mkt | 188,545,375.17 | 25.656% |
| 3187 | Pacific Gas and Electric | 12-Jul-01 | 15739 | Mkt | 8,324,121.67 | 1.133% |
| 3186 | Pacific Gas and Electric | 29-Jun-01 | 15600 | Mkt | 16,951,713.87 | 2.307% |
| 1011 | Pacific Gas and Electric | 29-Jun-01 | 15660 | Mkt | 1,100,362.11 | 0.150% |
| 1012 | Portland General Electric | 29-Jun-01 | 15659 | Mkt | 4,733.47 | 0.001% |
| 1012 | Portland General Electric | 12-Jul-01 | 15801 | Mkt | 1.86 | 0.000% |
| 1064 | Reliant Energy Services | 29-Jun-01 | 15650 | Mkt | 14,834,981.08 | 2.019% |
| 1064 | Reliant Energy Services | 12-Jul-01 | 15792 | Mkt | 59,627.09 | 0.008% |
| 2528 | Sacramento Municipal Utility District | 12-Jul-01 | 15762 | Mkt | 3,576.11 | 0.000% |
| 1010 | Southern California Edison | 29-Jun-01 | 15661 | Mkt | 427,893,504.99 | 58.224% |
| 1024 | Seattle City Light | 29-Jun-01 | 15651 | Mkt | 2,885.20 | 0.000% |
| 1024 | Seattle City Light | 12-Jul-01 | 15793 | Mkt | 1,750.76 | 0.000% |

**Total Due From SCs (Debtors)**  **$ 734,911,066.62**  **100.000%**

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 16 of 154

# Certification for Market Settlement July 24, 2001

## For the Trade Month of April 2001

### Due from SCs

|                                           |    |                |          |
|-------------------------------------------|----|----------------|----------|
| Preliminary Invoices                      | $  | 782,081,536.40 | 98.613%  |
| Final Invoices                            |    | 11,004,055.88  | 1.387%   |
| **Total Invoiced**                        |    | 793,085,592.28 | 100.000% |
|                                           |    |                |          |
| Collected 6/29/01                         |    | 59,675,885.69  |          |
| Collected 7/19/01                         |    | 727,819.20     |          |
| **Total Collected**                       |    | 60,403,704.89  | 7.616%   |
|                                           |    |                |          |
| Adjustments 7/19/01                       |    | 9,967.98       |          |
| Applied against Apr-01 Market AP 7/19/01  |    | 3,179,790.10   |          |
| **Total Adjustments**                     |    | 3,189,758.08   | 0.402%   |
|                                           |    |                |          |
| Add Uncollected Apr-01 GMC 7/24/01        |    | 5,418,937.31   | 0.683%   |
|                                           |    |                |          |
| **Balance Due from SCs**                  | $  | 734,911,066.62 | 92.665%  |

### Due to SCs

|                                              |    |                |          |
|----------------------------------------------|----|----------------|----------|
| Preliminary Invoices                         | $  | 781,819,933.97 | 99.592%  |
| Final Invoices                               |    | 3,200,427.52   | 0.408%   |
| **Total Invoiced**                           |    | 785,020,361.49 | 100.000% |
|                                              |    |                |          |
| Paid 6/29/01                                 |    | 53,933,943.25  |          |
| Paid 7/24/01                                 |    | 1,302,886.05   |          |
| **Total Paid**                               |    | 55,236,829.30  | 7.036%   |
|                                              |    |                |          |
| Applied against Apr-00 GMC 6/29/01           |    | 275,768.27     |          |
| Applied against Dec-01 Market AR 6/29/01     |    | 19,948.93      |          |
| Applied against Jan-01 GMC 6/29/01           |    | 1,929.28       |          |
| Applied against Feb-01 Market AR 6/29/01     |    | 10,525.68      |          |
| Applied against Mar-01 Market AR 6/29/01     |    | 205.19         |          |
| Adjustments 6/29/01                          |    | 9,950.21       |          |
| Applied against Apr-01 Market AR 7/24/01     |    | 3,179,790.10   |          |
| **Total Adjustments**                        |    | 3,498,117.66   | 0.446%   |
|                                              |    |                |          |
| **Balance Due to SCs**                       | $  | 726,285,414.53 | 92.518%  |

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Arizona Public Service Company
400 N. 5th Street,
MAIL STA. 9842
Phoenix          AZ     85072–3999

Invoice: 15591
Date: JUN–22–2001
BA ID : 1011

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord          CA     94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**     01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $12,316.37 |
| 0522 | 0522 – Interzonal Scheduling GMC | $6,117.30 |
| 0523 | 0523–Market Operations GMC | $8,508.77 |

**Invoice Total**

$26,942.44

**Payment Due Date:**     29–JUN–2001

# CALIFORNIA ISO

## FINAL GMC INVOICE

Arizona Public Service Company
400 N. 5th Street,
MAIL STA. 9842
Phoenix      AZ     85072–3999

Invoice: 15731
Date: JUL–12–2001
BA ID : 1011

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord      CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $0.00 |
| 0522 | 0522 – Interzonal Scheduling GMC | $0.00 |
| 0523 | 0523–Market Operations GMC | $16.17 |

**Invoice Total**

$16.17

**Payment Due Date:**    19–JUL–2001

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

British Columbia Power Exchange
666 Burrad Street
Suite 1400

VANCOUVER          BC      V6C 2X8

Invoice: 15553
Date: JUN–22–2001
BA ID : 3112

Please send payment to:

For all inquiries contact:
**916–351–4467**

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord                    CA      94520

**Comments:**

**Charges for settlement date:**      01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $103,366.21 |
| 0522 | 0522 – Interzonal Scheduling GMC | $83,562.65 |
| 0523 | 0523–Market Operations GMC | $34,152.60 |

**Invoice Total**

$221,081.46

**Payment Due Date:**      29–JUN–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 20
of 154

# CALIFORNIA ISO

## FINAL GMC INVOICE

City of Azusa
729 N. Azusa Ave.

Azusa                    CA      91702

Invoice: 15705
Date: JUL–12–2001
BA ID : 1868

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                    CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**      01–APR–01     to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $0.00 |
| 0522 | 0522 – Interzonal Scheduling GMC | $0.00 |
| 0523 | 0523–Market Operations GMC | $17.04 |

**Invoice Total**

$17.04

**Payment Due Date:**      19–JUL–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 21 of 154

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

City of Pasadena
150 S. Los Robles Ave.
Suite 200

Pasadena     CA    91101

Invoice: 15566
Date: JUN–22–2001
BA ID : 1688

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord      CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $34,713.86 |
| 0522 | 0522 – Interzonal Scheduling GMC | $31.28 |
| 0523 | 0523–Market Operations GMC | $52,330.28 |
| **Invoice Total** | | $87,075.42 |

**Payment Due Date:**     29–JUN–2001

# CALIFORNIA ISO

## FINAL GMC INVOICE

City of Pasadena
150 S. Los Robles Ave.
Suite 200

Pasadena      CA    91101

Invoice: 15706
Date: JUL–12–2001
BA ID : 1688

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord      CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $0.00 |
| 0522 | 0522 – Interzonal Scheduling GMC | $0.00 |
| 0523 | 0523–Market Operations GMC | $78.29 |

**Invoice Total**

$78.29

**Payment Due Date:**     19–JUL–2001

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Date: 22–JUN–2001
Page: 1 of 1

Constellation Power Source Inc.
111 Market Place
Suite 500

BALTIMORE        MD      21202

Invoice: 15551
Date: JUN–22–2001
BA ID : 3271

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA     94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $60.90 |
| 0522 | 0522 – Interzonal Scheduling GMC | $0.04 |
| 0523 | 0523–Market Operations GMC | $160.95 |

**Invoice Total**

$221.89

**Payment Due Date:**     29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Date: 22-JUN-2001
Page: 1 of 1

Dynegy Power Marketing, Inc.
1000 Louisiana St
Suite 5800

Houston      TX    77002

Invoice: 15582
Date: JUN-22-2001
BA ID : 1024

For all inquiries contact:
**916-351-4467**

**Please send payment to:**

> Bank of America– (Mkt and GMC)
> 1850 Gateway Boulevard
> ACCOUNT# 12336-26208
> Concord      CA    94520

**Comments:**

**Charges for settlement date:**    01-APR-01    to   30-APR-01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $57,804.63 |
| 0522 | 0522 – Interzonal Scheduling GMC | $43,190.43 |
| 0523 | 0523–Market Operations GMC | $208,699.45 |

**Invoice Total**      $309,694.51

**Payment Due Date:**    29-JUN-2001

## CALIFORNIA ISO

## FINAL GMC INVOICE

Date:   12–JUL–2001
Page:    1    of    1

Dynegy Power Marketing, Inc.
1000 Louisiana St
Suite 5800

Houston                    TX       77002

Invoice: 15722
    Date: JUL–12–2001
BA  ID : 1024

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                    CA      94520

**Comments:**

**Charges for settlement date:**    01–APR–01     to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | –$177.54 |
| 0522 | 0522 – Interzonal Scheduling GMC | $0.00 |
| 0523 | 0523–Market Operations GMC | $404.47 |

**Invoice Total**

$226.93

**Payment Due Date:**    19–JUL–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 26 of 154

El Paso Power Services Company
1001 Louisiana

Houston TX 77002

Invoice: 15562
Date: JUN–22–2001
BA ID : 2289

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord CA 94520

**Comments:**

**Charges for settlement date:** 01–APR–01 to 30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $1,844.69 |
| 0522 | 0522 – Interzonal Scheduling GMC | $49,864.99 |
| 0523 | 0523–Market Operations GMC | $11,468.66 |

**Invoice Total**

$63,178.34

**Payment Due Date:** 29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Date: 22–JUN–2001
Page: 1 of 1

Idaho Power Company
1221 West Idaho St
P.O.Box 70

Boise                    ID      83707

Invoice: 15567
Date: JUN–22–2001
BA ID : 1668

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                   CA      94520

**Comments:**

**Charges for settlement date:**   01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $54,529.80 |
| 0522 | 0522 – Interzonal Scheduling GMC | $62,984.42 |
| 0523 | 0523–Market Operations GMC | $23,562.19 |

**Invoice Total**

$141,076.41

**Payment Due Date:**     29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Mirant
900 Ashwood Parkway
Suite 490

Atlanta                GA        30338–4780

Invoice: 15581
Date: JUN–22–2001
BA ID : 1026

**Please send payment to:**

      Bank of America– (Mkt and GMC)
      1850 Gateway Boulevard
      ACCOUNT# 12336–26208
      Concord                CA        94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $5,538.25 |
| 0522 | 0522 – Interzonal Scheduling GMC | $23,103.76 |
| 0523 | 0523–Market Operations GMC | $69,429.90 |

**Invoice Total**

$98,071.91

**Payment Due Date:**      29–JUN–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 29 of 154

# CALIFORNIA ISO

# PRELIMINARY GMC INVOICE

Date: 22–JUN–2001
Page: 1 of 1

Pacific Gas and Electric Company,
77 Beale Street
PCG1 #3771

San Francisco     CA    94105

Invoice: 15545
Date: JUN–22–2001
BA ID : 3771

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord     CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $594,478.41 |
| 0522 | 0522 – Interzonal Scheduling GMC | $26,435.67 |
| 0523 | 0523–Market Operations GMC | $724,084.74 |

**Invoice Total**

$1,344,998.82

**Payment Due Date:**    29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

PACIFIC GAS & ELECTRIC COM.
77 Beale Street
PGAB #3931

San Francisco          CA      94105

Invoice: 15543
Date: JUN–22–2001
BA  ID : 3931

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord              CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $428,521.88 |
| 0522 | 0522 – Interzonal Scheduling GMC | $616.14 |
| 0523 | 0523–Market Operations GMC | $432,844.88 |
| **Invoice Total** | | $861,982.90 |

**Payment Due Date:**      29–JUN–2001

# CALIFORNIA ISO

# PRELIMINARY GMC INVOICE

Pacific Gas and Electric Company
77 Beale Street
PGAE #1015

San Francisco     CA     94105

Invoice: 15588
Date: JUN–22–2001
BA ID : 1015

**Please send payment to:**

.For all inquiries contact:
**916–351–4467**

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord     CA     94520

**Comments:**

**Charges for settlement date:**     01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $91,798.24 |
| 0522 | 0522 – Interzonal Scheduling GMC | $446.89 |
| 0523 | 0523–Market Operations GMC | $78,845.74 |

**Invoice Total**

$171,090.87

**Payment Due Date:**     29–JUN–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 32 of 154

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Date: 22–JUN–2001
Page: 1 of 1

Portland General Electric Company
One World Trade Center
121 SW Salmon St

Portland      OR     97204

Invoice: 15587
Date: JUN–22–2001
BA ID : 1016

**Please send payment to:**

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord      CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0522 | 0522 – Interzonal Scheduling GMC | $7.16 |
| 0523 | 0523–Market Operations GMC | $15.27 |

**Invoice Total**

     $22.43

**Payment Due Date:**    29–JUN–2001

# CALIFORNIA ISO

## FINAL MARKET INVOICE

Date:   12–JUL–2001
Page:   1   of   1

City of Glendale
141 N. Glendale Avenue
LEVEL 4

Glendale            CA      91206

Invoice: 15777
   Date: JUL–12–2001
BA ID : 1628

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord               CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | –$54.76 |
| 0112 | 0112–Non-spinning Reserve due ISo | –$58.95 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $0.00 |
| 0406 | 0406–UFE Settlement | $55.72 |
| 0407 | 0407–Uninstructed Energy | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $1,396.42 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $8.96 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $56.44 |
| 1030 | 1030–No Pay Provision Market Refund | –$0.04 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $3.39 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | $291.91 |

**Invoice Total**

$1,699.09

**Payment Due Date:**    19–JUL–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 34
of 154

# CALIFORNIA ISO

## PRELIMINARY GMC INVOICE

Southern California Edison Company
2244 Walnut Grove

Rosemead            CA     91770

Invoice: 15589
Date: JUN–22–2001
BA ID : 1014

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord                    CA     94520

**Comments:**

**Charges for settlement date:**   01–APR–01   to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0521 | 0521 – Control Area Services GMC | $2,748,560.97 |
| 0522 | 0522 – Interzonal Scheduling GMC | $276,690.47 |
| 0523 | 0523–Market Operations GMC | $2,264,462.84 |
| **Invoice Total** | | $5,289,714.28 |

**Payment Due Date:**     29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Date: 22–JUN–2001
Page: 1 of 2

British Columbia Power Exchange
666 Burrad Street
Suite 1400

VANCOUVER          BC     V6C 2X8

Invoice: 15617
Date: JUN–22–2001
BA ID : 3112

**Please send payment to:**

For all inquiries contact:
**916-351-4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                    CA    94520

**Comments:**

**Charges for settlement date:**     01–APR–01     to     30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | −$3,702.00 |
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | −$47,585.66 |
| 0111 | 0111–Spinning Reserve due ISO | $259,981.85 |
| 0112 | 0112–Non–spinning Reserve due ISO | $306,689.47 |
| 0114 | 0114–Replacement Reserve due ISO | $857.44 |
| 0115 | 0115–Regulation Up due ISO | −$20.05 |
| 0116 | 0116–Regulation Down due ISO | −$210.08 |
| 0117 | 0117–Demand Relief Monthly Charge | −$144.20 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $63,416.30 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | −$60,487.88 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $5,743.04 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $485,582.52 |
| 0383 | 0383 – Low Voltage Wheeling Charge due ISO | $43,707.51 |
| 0406 | 0406–UFE Settlement | $340,949.33 |
| 0407 | 0407–Uninstructed Energy | $226,504.37 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | −$4.24 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $2,233,898.30 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | −$10,301.19 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$318,524.32 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $1.14 |
| 1030 | 1030–No Pay Provision Market Refund | −$66,176.03 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | −$0.06 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | −$2.32 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | −$2.20 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$49,664.68 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $423.89 |
| 1999 | 1999–Rounding Charge/Refund | −$128.44 |

**Invoice Total**

$3,410,801.81

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 36 of 154

# PRELIMINARY MARKET INVOICE

British Columbia Power Exchange
666 Burrad Street
Suite 1400

VANCOUVER          BC      V6C 2X8

Invoice: 15617
Date: JUN–22–2001
BA ID : 3112

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                    CA     94520

**Comments:**

**Charges for settlement date:**    01–APR–01     to   30–APR–01

**Invoice Total**                                                                    $3,410,801.81

**Payment Due Date:**      **29–JUN–2001**

# CALIFORNIA ISO ●

## FINAL MARKET INVOICE

British Columbia Power Exchange
666 Burrad Street
Suite 1400

VANCOUVER　　　BC　　V6C 2X8

Invoice: 15758
Date: JUL-12-2001
BA ID : 3112

**Please send payment to:**

For all inquiries contact:
**916-351-4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord　　　　　CA　　94520

**Comments:**

**Charges for settlement date:**　　01-APR-01　　to　　30-APR-01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | $0.00 |
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | $0.00 |
| 0111 | 0111–Spinning Reserve due ISO | $71,455.11 |
| 0112 | 0112–Non–spinning Reserve due ISo | $269.78 |
| 0114 | 0114–Replacement Reserve due ISO | $0.00 |
| 0115 | 0115–Regulation Up due ISO | $1,407.36 |
| 0116 | 0116–Regulation Down due ISO | $1,531.45 |
| 0117 | 0117–Demand Relief Monthly Charge | $0.00 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $1.61 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | −$4,886.40 |
| 0383 | 0383 – Low Voltage Wheeling Charge due ISO | $0.00 |
| 0406 | 0406–UFE Settlement | −$7,026.48 |
| 0407 | 0407–Uninstructed Energy | $43,076.54 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $89,491.32 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $11,820.32 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$13,106.84 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | −$1.28 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | $0.00 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | $0.00 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $49,481.11 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.00 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | $118,094.55 |

**Invoice Total**

Case: 01-30923　Doc# 6929　Filed: 06/03/02　Entered: 06/04/02 14:19:00　Page 38 of 154

# CALIFORNIA ISO

## FINAL MARKET INVOICE

British Columbia Power Exchange
666 Burrad Street
Suite 1400

VANCOUVER        BC      V6C 2X8

Invoice: 15758
  Date: JUL–12–2001
BA ID : 3112

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA      94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

**Invoice Total**                                                  $361,608.15

**Payment Due Date:**      **19–JUL–2001**

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 39
of 154

City of Banning
99 E. Ramsey
PO Box 998

Banning      CA     92220–0998

Invoice: 15629
Date: JUN–22–2001
BA ID : 1869

For all inquiries contact:
**916–351–4467**

Please send payment to:

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord      CA    94520

Comments:

Charges for settlement date:    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $1,175.69 |
| 0112 | 0112–Non–spinning Reserve due ISo | $1,160.09 |
| 0114 | 0114–Replacement Reserve due ISO | $4,369.30 |
| 0115 | 0115–Regulation Up due ISO | $18,680.52 |
| 0116 | 0116–Regulation Down due ISO | $17,079.68 |
| 0117 | 0117–Demand Relief Monthly Charge | −$20.24 |
| 0406 | 0406–UFE Settlement | $6,233.89 |
| 0407 | 0407–Uninstructed Energy | −$650.74 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.64 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $45,494.11 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | −$3,359.53 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$17,556.68 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.06 |
| 1030 | 1030–No Pay Provision Market Refund | −$2,607.96 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | $0.00 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | −$0.21 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | −$0.20 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$450.87 |
| 1999 | 1999–Rounding Charge/Refund | −$9.75 |

**Invoice Total**

$69,537.80

**Payment Due Date:    29–JUN–2001**

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

City of Glendale
141 N. Glendale Avenue
LEVEL 4

Glendale          CA    91206

Invoice: 15635
Date: JUN–22–2001
BA ID : 1628

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord                CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $1,492.71 |
| 0112 | 0112–Non-spinning Reserve due ISo | $1,861.01 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $98,801.86 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | –$1.80 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $932.28 |
| 0406 | 0406–UFE Settlement | $560.18 |
| 0407 | 0407–Uninstructed Energy | $9,757.75 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $53,848.54 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $779.79 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$1,829.83 |
| 1030 | 1030–No Pay Provision Market Refund | –$128.38 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $63.87 |
| 1999 | 1999–Rounding Charge/Refund | –$1.35 |

**Invoice Total**                                                                    $166,136.63

**Payment Due Date:**    **29–JUN–2001**

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 41 of 154

# CALIFORNIA ISO ●

## FINAL MARKET INVOICE

Date: 12–JUL–2001
Page: 1 of 1

City of Glendale
141 N. Glendale Avenue
LEVEL 4

Glendale            CA      91206

Invoice: 15777
 Date: JUL–12–2001
BA ID : 1628

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord            CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**     01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | –$54.76 |
| 0112 | 0112–Non-spinning Reserve due ISo | –$58.95 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $0.00 |
| 0406 | 0406–UFE Settlement | $55.72 |
| 0407 | 0407–Uninstructed Energy | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $1,396.42 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $8.96 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $56.44 |
| 1030 | 1030–No Pay Provision Market Refund | –$0.04 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $3.39 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | $291.91 |

**Invoice Total**                                                                 $1,699.09

**Payment Due Date:**     19–JUL–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 42 of 154

City of Pasadena
150 S. Los Robles Ave.
Suite 200

Pasadena      CA    91101

Invoice: 15631
Date: JUN–22–2001
BA ID : 1688

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord      CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0001 | 0001–Day–Ahead Spinning Reserve due SC | −$565,934.46 |
| 0002 | 0002–Day–Ahead Non–Spinning Reserve due SC | −$1,326,812.64 |
| 0004 | 0004–Day–Ahead Replacement Reserve due SC | −$1,499,098.38 |
| 0005 | 0005–Day–Ahead Regulation Up due SC | −$1,901.97 |
| 0006 | 0006–Day Ahead Regulation Down due SC | −$192,356.96 |
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | $1,729.12 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | −$64,730.68 |
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | −$126,839.12 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | −$10,874.62 |
| 0056 | 0056–Hour AHead AGC/Regulation Down due SC | $4,478.91 |
| 0111 | 0111–Spinning Reserve due ISO | $43,932.26 |
| 0112 | 0112–Non–spinning Reserve due ISo | $53,611.90 |
| 0114 | 0114–Replacement Reserve due ISO | $95,420.63 |
| 0115 | 0115–Regulation Up due ISO | $160,913.38 |
| 0116 | 0116–Regulation Down due ISO | $146,120.56 |
| 0117 | 0117–Demand Relief Monthly Charge | −$163.22 |
| 0142 | 0142–No Pay Charge – Non–Spinning Reserve | $727.50 |
| 0144 | 0144–No Pay Charge – Replacement Reserve | $1,618.82 |
| 0146 | 0146–No Pay Charge – Regulation Down | $188.64 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $393.72 |
| 0401 | 0401–Instructed Energy | −$58,496.90 |
| 0406 | 0406–UFE Settlement | $6,694,955.07 |
| 0407 | 0407–Uninstructed Energy | $238,657.11 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $5.56 |
| 0481 | 0481–Excess Cost for Instructed Energy | −$48,195.74 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $834,777.66 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | −$26,519.29 |

# PRELIMINARY MARKET INVOICE

City of Pasadena
150 S. Los Robles Ave.
Suite 200

Pasadena          CA     91101

Invoice: 15631
  Date: JUN–22–2001
BA ID : 1688

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA     94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**     01–APR–01     to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$217,739.66 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.86 |
| 1030 | 1030–No Pay Provision Market Refund | −$22,103.34 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | −$0.02 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | −$2.02 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | −$1.93 |
| 1065 | 1065–Distribution of Preempted Regulation Up | $0.01 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$2,600.26 |
| 1999 | 1999–Rounding Charge/Refund | −$47.75 |

**Invoice Total**

$4,113,112.75

**Payment Due Date:**     29–JUN–2001

Duke Energy Trading and Marketing, L.L.C.
4 Triad Center
Suite 1000

Salt Lake City          UT     84180

Invoice: 15656
 Date: JUN-22-2001
BA ID : 1021

For all inquiries contact:
**916-351-4467**

**Please send payment to:**

Bank of America- (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336-26208
Concord                      CA     94520

**Comments:**

**Charges for settlement date:**     01-APR-01     to     30-APR-01

| Charge Type | Description | Amount |
|---|---|---|
| 0006 | 0006-Day Ahead Regulation Down due SC | -$10,713,732.14 |
| 0051 | 0051-Hour-Ahead Spinning Reserve due SC | $1,299.84 |
| 0052 | 0052-Hour-Ahead Non-Spinning Reserve due SC | $881.40 |
| 0054 | 0054-Hour-Ahead Replacement Reserve due SC | $115.02 |
| 0055 | 0055-Hour Ahead AGC/Regulation Up due SC | -$11,811.20 |
| 0056 | 0056-Hour AHead AGC/Regulation Down due SC | -$100,093.88 |
| 0111 | 0111-Spinning Reserve due ISO | $185,297.88 |
| 0112 | 0112-Non-spinning Reserve due ISo | $177,510.32 |
| 0114 | 0114-Replacement Reserve due ISO | $1,067,558.19 |
| 0115 | 0115-Regulation Up due ISO | $11,684.14 |
| 0116 | 0116-Regulation Down due ISO | $42.98 |
| 0117 | 0117-Demand Relief Monthly Charge | -$103.31 |
| 0146 | 0146-No Pay Charge - Regulation Down | $317,480.28 |
| 0203 | 0203-Day-Ahead Inter-Zonal Congestion Settlement due SC | -$148,744.07 |
| 0253 | 0253-Hour-Ahead Inter-Zonal Congestion Settlement due SC | $435,628.84 |
| 0256 | 0256-Hour-Ahead Inter-Zonal Congestion Debit due SC | $16,170.36 |
| 0382 | 0382 - High Voltage Wheeling Charge due ISO | $7,095.12 |
| 0401 | 0401-Instructed Energy | -$966,593.54 |
| 0406 | 0406-UFE Settlement | -$2,164.11 |
| 0407 | 0407-Uninstructed Energy | $9,442,704.17 |
| 0410 | 0410-Unscheduled RMR Energy | $6,146.72 |
| 0452 | 0452-Real-Time Intra-Zonal Congestion Charge/Refund | $0.87 |
| 0481 | 0481-Excess Cost for Instructed Energy | -$89,930.12 |
| 0485 | 0485-Insufficient Response to AWE Instruction | $4,165.07 |
| 0487 | 0487-Allocation of Excess Cost for Instructed Energy | $7,500,436.50 |
| 1010 | 1010-Neutrality Adjustment Charge/Refund | -$11,243.53 |
| 1011 | 1011-Ancillary Service Rational Buyer Adjustment | -$965,797.64 |
| 1012 | 1012-RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030-No Pay Provision Market Refund | -$379.91 |

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 45
of 154

Duke Energy Trading and Marketing, L.L.C.
4 Triad Center
Suite 1000

Salt Lake City          UT          84180

Invoice: 15656
Date: JUN–22–2001
BA ID : 1021

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord          CA          94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**          01–APR–01          to          30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 1061 | 1061–Distribution of Preempted Spinning Reserve | –$0.02 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | –$1.17 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | –$1.11 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$709.76 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $23.12 |
| 1999 | 1999–Rounding Charge/Refund | –$26.84 |

**Invoice Total**

$6,162,908.47

**Payment Due Date:**          29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Idaho Power Company
1221 West Idaho St
P.O.Box 70

Boise          ID    83707

Invoice: 15632
Date: JUN-22-2001
BA ID : 1668

**Please send payment to:**

      Bank of America– (Mkt and GMC)
      1850 Gateway Boulevard
      ACCOUNT# 12336–26208
      Concord        CA    94520

For all inquiries contact:
**916-351-4467**

**Comments:**

**Charges for settlement date:**    01-APR-01    to   30-APR-01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $208,848.63 |
| 0112 | 0112–Non-spinning Reserve due ISo | $188,164.77 |
| 0114 | 0114–Replacement Reserve due ISO | $7,109.48 |
| 0115 | 0115–Regulation Up due ISO | $10,369.37 |
| 0116 | 0116–Regulation Down due ISO | $9,843.40 |
| 0117 | 0117–Demand Relief Monthly Charge | –$75.04 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $1,986,447.86 |
| 0204 | 0204–Day–Ahead Inter–Zonal Congestion Settlement due TO | –$472,002.20 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | –$19,804.99 |
| 0254 | 0254–Hour–Ahead Inter–Zonal Congestion Settlement due TO | –$50,115.49 |
| 0255 | 0255–Hour–Ahead Inter–Zonal Congestion Debit to TOs | $2,289.13 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | –$22,747.74 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $211,825.87 |
| 0383 | 0383 – Low Voltage Wheeling Charge due ISO | $33,536.58 |
| 0406 | 0406–UFE Settlement | $45,413.89 |
| 0407 | 0407–Uninstructed Energy | $154,433.05 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $21.51 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $2,243,376.75 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | –$31,936.36 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$201,572.08 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.15 |
| 1030 | 1030–No Pay Provision Market Refund | –$33,952.91 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | –$0.04 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | –$0.45 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | –$0.33 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$7,539.06 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $986.39 |
| 1999 | 1999–Rounding Charge/Refund | –$66.97 |

**Invoice Total**

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 47 of 154

# PRELIMINARY MARKET INVOICE

Idaho Power Company
1221 West Idaho St
P.O.Box 70

Boise       ID     83707

Invoice: 15632
Date: JUN–22–2001
BA ID : 1668

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord       CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

**Invoice Total**                                       $4,262,853.17

**Payment Due Date:**     29–JUN–2001

Idaho Power Company
1221 West Idaho St
P.O.Box 70

Invoice: 15774
Date: JUL-12-2001
BA ID : 1668

Boise ID 83707

Please send payment to:

For all inquiries contact:
**916–351–4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord CA 94520

**Comments:**

**Charges for settlement date:** 01–APR–01 to 30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | −$4,499.47 |
| 0112 | 0112–Non-spinning Reserve due ISo | $1,215.07 |
| 0114 | 0114–Replacement Reserve due ISO | $221.09 |
| 0115 | 0115–Regulation Up due ISO | $48.11 |
| 0116 | 0116–Regulation Down due ISO | $185.38 |
| 0117 | 0117–Demand Relief Monthly Charge | $0.00 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0204 | 0204–Day–Ahead Inter–Zonal Congestion Settlement due TO | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0254 | 0254–Hour–Ahead Inter–Zonal Congestion Settlement due TO | $0.00 |
| 0255 | 0255–Hour–Ahead Inter–Zonal Congestion Debit to TOs | $0.00 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $0.21 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | −$2,821.71 |
| 0383 | 0383 – Low Voltage Wheeling Charge due ISO | $0.00 |
| 0406 | 0406–UFE Settlement | −$30,012.35 |
| 0407 | 0407–Uninstructed Energy | $7,024.69 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $14,299.45 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $8,733.12 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$6,821.23 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | −$1.83 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | $0.00 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | $0.00 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$574.07 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.00 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | $104,014.15 |

Idaho Power Company
1221 West Idaho St
P.O.Box 70

Boise                    ID        83707

Invoice: 15774
   Date: JUL–12–2001
BA ID : 1668

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                    CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

**Invoice Total**                                                        $91,010.61

**Payment Due Date:**    19–JUL–2001

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Illinova Energy Partners, Inc
6955 Union Park Center
Suite 300

Midvale            UT    84047

Invoice: 15638
  Date: JUN–22–2001
BA ID : 1249

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord              CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $20.40 |
| 0112 | 0112–Non–spinning Reserve due ISo | –$52.84 |
| 0114 | 0114–Replacement Reserve due ISO | $36.12 |
| 0115 | 0115–Regulation Up due ISO | –$3.81 |
| 0116 | 0116–Regulation Down due ISO | –$26.79 |
| 0117 | 0117–Demand Relief Monthly Charge | –$9.08 |
| 0406 | 0406–UFE Settlement | –$594.65 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.33 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $7,026.60 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | –$735.85 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$957.12 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $1.22 |
| 1030 | 1030–No Pay Provision Market Refund | $81.08 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | –$0.11 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | –$0.08 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$57.16 |
| 1999 | 1999–Rounding Charge/Refund | –$4.13 |

**Invoice Total**

$4,724.13

**Payment Due Date:**      29–JUN–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 51
of 154

# CALIFORNIA ISO

# FINAL MARKET INVOICE

Illinova Energy Partners, Inc
6955 Union Park Center
Suite 300

Midvale       UT     84047

Invoice: 15780
Date: JUL-12-2001
BA ID : 1249

For all inquiries contact:
**916-351-4467**

**Please send payment to:**

        Bank of America– (Mkt and GMC)
        1850 Gateway Boulevard
        ACCOUNT# 12336-26208
        Concord       CA     94520

**Comments:**

**Charges for settlement date:**    01-APR-01    to    30-APR-01

| Charge Type | Description | Amount |
|---|---|---:|
| 0111 | 0111–Spinning Reserve due ISO | $0.00 |
| 0112 | 0112–Non-spinning Reserve due ISo | $0.00 |
| 0114 | 0114–Replacement Reserve due ISO | $0.00 |
| 0115 | 0115–Regulation Up due ISO | $173.51 |
| 0116 | 0116–Regulation Down due ISO | $201.31 |
| 0117 | 0117–Demand Relief Monthly Charge | $0.00 |
| 0406 | 0406–UFE Settlement | $0.00 |
| 0452 | 0452–Real-Time Intra-Zonal Congestion Charge/Refund | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $0.00 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $0.00 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $15.21 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | $0.00 |
| 1062 | 1062–Distribution of Preempted Non-Spinning Reserve | $0.00 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $9.26 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | –$379.50 |

**Invoice Total**                                         $19.79

**Payment Due Date:**    19-JUL-2001

Koch Energy Trading
20 East Greenway Plaza

Houston          TX     77046

Invoice: 15760
Date: JUL–12–2001
BA ID : 2999

**Please send payment to:**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord                    CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**     01–APR–01     to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0117 | 0117–Demand Relief Monthly Charge | $0.00 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0406 | 0406–UFE Settlement | $0.00 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $0.00 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $0.10 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $12.61 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |

**Invoice Total**

$12.71

**Payment Due Date:**     19–JUL–2001

# CALIFORNIA ISO

## FINAL MARKET INVOICE

Louisville Gas and Electric Company
220 West Main St

Louisville      KY    40202

Invoice: 15807
Date: JUL–12–2001
BA ID : 1009

**Please send payment to:**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord      CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01   to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $0.00 |
| 0112 | 0112–Non–spinning Reserve due ISo | $0.00 |
| 0115 | 0115–Regulation Up due ISO | $20.43 |
| 0116 | 0116–Regulation Down due ISO | $24.17 |
| 0406 | 0406–UFE Settlement | $0.00 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $0.00 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $1.85 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $0.99 |
| 3999 | 3999–Interest and Penalty | $157.35 |

**Invoice Total**

$204.79

**Payment Due Date:**    19–JUL–2001

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 54 of 154

Mirant
900 Ashwood Parkway
Suite 490

Atlanta      GA   30338–4780

Invoice: 15652
Date: JUN–22–2001
BA ID : 1026

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord      CA   94520

**Comments:**

**Charges for settlement date:**   01–APR–01   to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | $704.43 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | $1,019.22 |
| 0111 | 0111–Spinning Reserve due ISO | $15,813.28 |
| 0112 | 0112–Non–spinning Reserve due ISo | $15,720.84 |
| 0114 | 0114–Replacement Reserve due ISO | $693,526.03 |
| 0115 | 0115–Regulation Up due ISO | $0.00 |
| 0116 | 0116–Regulation Down due ISO | $0.00 |
| 0117 | 0117–Demand Relief Monthly Charge | −$79.05 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $991,837.72 |
| 0204 | 0204–Day–Ahead Inter–Zonal Congestion Settlement due TO | −$1,123,759.10 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $25,257.12 |
| 0254 | 0254–Hour–Ahead Inter–Zonal Congestion Settlement due TO | −$100,203.51 |
| 0255 | 0255–Hour–Ahead Inter–Zonal Congestion Debit to TOs | $14,352.04 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | −$27,834.17 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $20,959.88 |
| 0401 | 0401–Instructed Energy | −$1,492,449.22 |
| 0406 | 0406–UFE Settlement | $15,033.75 |
| 0407 | 0407–Uninstructed Energy | −$40,109.33 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $2.65 |
| 0481 | 0481–Excess Cost for Instructed Energy | −$1,260,030.97 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $4,711,914.84 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | −$8,141.56 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$408,172.44 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | −$3,817.04 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | $0.05 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $456.01 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $183.21 |
| 1999 | 1999–Rounding Charge/Refund | −$18.06 |

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Mirant
900 Ashwood Parkway
Suite 490

Atlanta      GA   30338–4780

Invoice: 15652
Date: JUN–22–2001
BA ID : 1026

**Please send payment to:**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord      CA   94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01   to   30–APR–01

**Invoice Total**                                                               $2,042,166.62

**Payment Due Date:**    29–JUN–2001

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

California Power Exchange 3
1000 S. Fremont Avenue
Building A9–West

Alhambra            CA      91803

Invoice: 15610
Date: JUN–22–2001
BA ID : 3336

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                  CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**      01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $8,186.46 |
| 0112 | 0112–Non–spinning Reserve due ISo | $4.44 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $434,988.40 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $40,797.10 |
| 1030 | 1030–No Pay Provision Market Refund | $85.29 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $2,575.33 |
| 1999 | 1999–Rounding Charge/Refund | –$60.10 |

**Invoice Total**                                                                                $486,576.92

**Payment Due Date:**      **29–JUN–2001**

Pacific Gas and Electric Company,
77 Beale Street
PCG1 #3771

San Francisco        CA      94105

Invoice: 15603
Date: JUN-22-2001
BA ID : 3771

**Please send payment to:**

Bank of America- (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336-26208
Concord            CA      94520

For all inquiries contact:
**916-351-4467**

**Comments:**

**Charges for settlement date:**    01-APR-01    to    30-APR-01

| Charge Type | Description | Amount |
|---|---|---|
| 0001 | 0001-Day-Ahead Spinning Reserve due SC | -$123,784.92 |
| 0002 | 0002-Day-Ahead Non-Spinning Reserve due SC | -$805,043.47 |
| 0004 | 0004-Day-Ahead Replacement Reserve due SC | -$2,402,814.31 |
| 0005 | 0005-Day-Ahead Regulation Up due SC | -$1,311,291.79 |
| 0006 | 0006-Day Ahead Regulation Down due SC | -$412,345.94 |
| 0052 | 0052-Hour-Ahead Non-Spinning Reserve due SC | $19,299.49 |
| 0054 | 0054-Hour-Ahead Replacement Reserve due SC | $36,561.53 |
| 0055 | 0055-Hour Ahead AGC/Regulation Up due SC | -$140,803.96 |
| 0056 | 0056-Hour AHead AGC/Regulation Down due SC | -$33,398.76 |
| 0111 | 0111-Spinning Reserve due ISO | $224,827.34 |
| 0112 | 0112-Non-spinning Reserve due ISo | -$66,822.22 |
| 0114 | 0114-Replacement Reserve due ISo | $8,786,712.87 |
| 0115 | 0115-Regulation Up due ISO | $2,200,255.41 |
| 0116 | 0116-Regulation Down due ISO | $1,231,639.07 |
| 0141 | 0141-No Pay Charge - Spinning Reserve | $66,226.23 |
| 0142 | 0142-No Pay Charge - Non-Spinning Reserve | $119,099.38 |
| 0144 | 0144-No Pay Charge - Replacement Reserve | $96,126.36 |
| 0145 | 0145-No Pay Charge - Regulation Up | $27,319.92 |
| 0146 | 0146-No Pay Charge - Regulation Down | $15,992.70 |
| 0203 | 0203-Day-Ahead Inter-Zonal Congestion Settlement due SC | $1,154.68 |
| 0253 | 0253-Hour-Ahead Inter-Zonal Congestion Settlement due SC | -$154,098.45 |
| 0256 | 0256-Hour-Ahead Inter-Zonal Congestion Debit due SC | $13,862.30 |
| 0401 | 0401-Instructed Energy | -$4,315,538.10 |
| 0406 | 0406-UFE Settlement | -$3,125,099.51 |
| 0407 | 0407-Uninstructed Energy | $25,898,807.48 |
| 0410 | 0410-Unscheduled RMR Energy | $231.00 |
| 0481 | 0481-Excess Cost for Instructed Energy | -$48,487.76 |
| 0485 | 0485-Insufficient Response to AWE Instruction | $23,068.62 |
| 0487 | 0487-Allocation of Excess Cost for Instructed Energy | $31,614,294.14 |

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Pacific Gas and Electric Company,
77 Beale Street
PCG1 #3771

San Francisco          CA     94105

Invoice: 15603
Date: JUN–22–2001
BA ID : 3771

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA     94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**     01–APR–01     to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 1010 | 1010–Neutrality Adjustment Charge/Refund | –$397,202.86 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$5,896,203.61 |
| 1030 | 1030–No Pay Provision Market Refund | –$305,731.38 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$89,360.68 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $11,526.85 |

**Invoice Total**

$50,758,977.65

**Payment Due Date:**     29–JUN–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 59 of 154

Pacific Gas and Electric Company,
77 Beale Street
PCG1 #3771

San Francisco          CA    94105

Invoice: 15743
  Date: JUL–12–2001
BA ID : 3771

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord              CA    94520

For all inquiries contact:
  **916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0001 | 0001–Day–Ahead Spinning Reserve due SC | $0.00 |
| 0002 | 0002–Day–Ahead Non–Spinning Reserve due SC | $0.00 |
| 0004 | 0004–Day–Ahead Replacement Reserve due SC | −$15,042.42 |
| 0005 | 0005–Day–Ahead Regulation Up due SC | $0.00 |
| 0006 | 0006–Day Ahead Regulation Down due SC | $0.00 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | −$67,375.28 |
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | $0.00 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | $0.00 |
| 0056 | 0056–Hour AHead AGC/Regulation Down due SC | $0.00 |
| 0111 | 0111–Spinning Reserve due ISO | $11,481.79 |
| 0112 | 0112–Non–spinning Reserve due ISo | $32,088.35 |
| 0114 | 0114–Replacement Reserve due ISO | $28,254.88 |
| 0115 | 0115–Regulation Up due ISO | −$64,464.73 |
| 0116 | 0116–Regulation Down due ISO | $1,820.40 |
| 0141 | 0141–No Pay Charge – Spinning Reserve | $0.00 |
| 0142 | 0142–No Pay Charge – Non–Spinning Reserve | $0.00 |
| 0144 | 0144–No Pay Charge – Replacement Reserve | $0.00 |
| 0145 | 0145–No Pay Charge – Regulation Up | $0.00 |
| 0146 | 0146–No Pay Charge – Regulation Down | $0.00 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $0.22 |
| 0401 | 0401–Instructed Energy | $35,186.68 |
| 0406 | 0406–UFE Settlement | −$335,868.41 |
| 0407 | 0407–Uninstructed Energy | $428,013.27 |
| 0410 | 0410–Unscheduled RMR Energy | $0.00 |
| 0481 | 0481–Excess Cost for Instructed Energy | $0.00 |
| 0485 | 0485–Insufficient Response to AWE Instruction | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $234,930.65 |

# FINAL MARKET INVOICE

Pacific Gas and Electric Company,
77 Beale Street
PCG1 #3771

San Francisco          CA      94105

Invoice: 15743
Date: JUL–12–2001
BA ID : 3771

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA      94520

**Comments:**

**Charges for settlement date:**      01–APR–01   to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $70,019.69 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$55,780.47 |
| 1030 | 1030–No Pay Provision Market Refund | −$388.14 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$46,787.46 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.00 |

**Invoice Total**

$256,089.02

**Payment Due Date:**      19–JUL–2001

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 61 of 154

## PRELIMINARY MARKET INVOICE

PACIFIC GAS & ELECTRIC COMP
77 Beale Street
PCGB #3932

San Francisco          CA

Invoice: 15599
Date: JUN–22–2001
BA ID : 3932

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord          CA      94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0001 | 0001–Day–Ahead Spinning Reserve due SC | –$773,222.64 |
| 0002 | 0002–Day–Ahead Non–Spinning Reserve due SC | –$5,633,469.10 |
| 0004 | 0004–Day–Ahead Replacement Reserve due SC | –$12,036,443.11 |
| 0005 | 0005–Day–Ahead Regulation Up due SC | –$4,759,914.57 |
| 0006 | 0006–Day Ahead Regulation Down due SC | –$3,880,140.82 |
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | $69,179.59 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | –$1,069,591.82 |
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | –$204,754.13 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | –$3,003,405.37 |
| 0056 | 0056–Hour AHead AGC/Regulation Down due SC | –$208,535.55 |
| 0111 | 0111–Spinning Reserve due ISO | $2,158,976.52 |
| 0112 | 0112–Non–spinning Reserve due ISo | –$2,905,128.22 |
| 0114 | 0114–Replacement Reserve due ISO | $26,864,952.90 |
| 0115 | 0115–Regulation Up due ISO | $8,050,433.44 |
| 0116 | 0116–Regulation Down due ISO | $10,558,472.79 |
| 0141 | 0141–No Pay Charge – Spinning Reserve | $240,606.88 |
| 0142 | 0142–No Pay Charge – Non–Spinning Reserve | $517,365.87 |
| 0144 | 0144–No Pay Charge – Replacement Reserve | $432,767.70 |
| 0145 | 0145–No Pay Charge – Regulation Up | $428,618.28 |
| 0146 | 0146–No Pay Charge – Regulation Down | $334,255.32 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $2,714.56 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | –$67,115.11 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $75,238.82 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $3,600.00 |
| 0401 | 0401–Instructed Energy | –$8,084,673.48 |
| 0406 | 0406–UFE Settlement | $3,874,731.47 |
| 0407 | 0407–Uninstructed Energy | $55,249,924.44 |
| 0410 | 0410–Unscheduled RMR Energy | $1,000.18 |
| 0481 | 0481–Excess Cost for Instructed Energy | –$413,525.17 |

# PRELIMINARY MARKET INVOICE

PACIFIC GAS & ELECTRIC COMP
77 Beale Street
PCGB #3932

San Francisco          CA

Invoice: 15599
Date: JUN–22–2001
BA ID : 3932

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA    94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0485 | 0485–Insufficient Response to AWE Instruction | $289,412.86 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $146,455,270.06 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | –$513,156.50 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$21,957,945.54 |
| 1030 | 1030–No Pay Provision Market Refund | –$1,557,276.11 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$51,749.49 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $57,900.22 |

**Invoice Total**

$188,545,375.17

Payment Due Date:    29–JUN–2001

PACIFIC GAS & ELECTRIC COMP
77 Beale Street
PCGB #3932

San Francisco          CA

Invoice: 15739
    Date: JUL–12–2001
BA ID : 3932

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord                    CA  .  94520

**Comments:**

**Charges for settlement date:**      01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0001 | 0001–Day–Ahead Spinning Reserve due SC | $0.00 |
| 0002 | 0002–Day–Ahead Non–Spinning Reserve due SC | $0.00 |
| 0004 | 0004–Day–Ahead Replacement Reserve due SC | $15,042.40 |
| 0005 | 0005–Day–Ahead Regulation Up due SC | $0.00 |
| 0006 | 0006–Day Ahead Regulation Down due SC | $0.00 |
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | –$71,232.00 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | –$18,785.74 |
| 0054 | 0054–Hour–Ahead Replacement Reserve due SC | $0.00 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | $0.00 |
| 0056 | 0056–Hour AHead AGC/Regulation Down due SC | $0.00 |
| 0111 | 0111–Spinning Reserve due ISO | $661,944.32 |
| 0112 | 0112–Non–spinning Reserve due ISo | $495,453.73 |
| 0114 | 0114–Replacement Reserve due ISO | $1,369,988.23 |
| 0115 | 0115–Regulation Up due ISO | $152,681.77 |
| 0116 | 0116–Regulation Down due ISO | $91,089.59 |
| 0141 | 0141–No Pay Charge – Spinning Reserve | $0.00 |
| 0142 | 0142–No Pay Charge – Non–Spinning Reserve | $0.00 |
| 0144 | 0144–No Pay Charge – Replacement Reserve | $0.00 |
| 0145 | 0145–No Pay Charge – Regulation Up | $0.00 |
| 0146 | 0146–No Pay Charge – Regulation Down | $0.00 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $0.00 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $0.00 |
| 0401 | 0401–Instructed Energy | $72,964.27 |
| 0406 | 0406–UFE Settlement | –$1,322,529.10 |
| 0407 | 0407–Uninstructed Energy | $2,549,826.36 |
| 0410 | 0410–Unscheduled RMR Energy | $0.00 |
| 0481 | 0481–Excess Cost for Instructed Energy | $0.00 |

PACIFIC GAS & ELECTRIC COMP
77 Beale Street
PCGB #3932

San Francisco          CA

Invoice: 15739
Date: JUL–12–2001
BA ID : 3932

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord              CA      94520

**Comments:**

**Charges for settlement date:**      01–APR–01      to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0485 | 0485–Insufficient Response to AWE Instruction | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $6,109,422.31 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $179,033.91 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$1,851,099.44 |
| 1030 | 1030–No Pay Provision Market Refund | –$1,486.97 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$108,191.97 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.00 |

**Invoice Total**

$8,324,121.67

**Payment Due Date:      19–JUL–2001**

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 65 of 154

# PRELIMINARY MARKET INVOICE

Date: 22-JUN-2001
Page: 1 of 1

PACIFIC GAS & ELECTRIC COM.
77 Beale Street
PGAB #3931

Invoice: 15600
Date: JUN-22-2001
BA ID : 3931

San Francisco          CA      94105

**Please send payment to:**

For all inquiries contact:
**916-351-4467**

Bank of America- (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336-26208
Concord          CA      94520

**Comments:**

Charges for settlement date:     01-APR-01     to     30-APR-01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051-Hour-Ahead Spinning Reserve due SC | $14,449.46 |
| 0052 | 0052-Hour-Ahead Non-Spinning Reserve due SC | $9,738.88 |
| 0111 | 0111-Spinning Reserve due ISO | $586,352.36 |
| 0112 | 0112-Non-spinning Reserve due ISo | $391,038.73 |
| 0114 | 0114-Replacement Reserve due ISO | $7,518,386.95 |
| 0115 | 0115-Regulation Up due ISO | $447,755.69 |
| 0116 | 0116-Regulation Down due ISO | $830,520.17 |
| 0142 | 0142-No Pay Charge – Non-Spinning Reserve | $775.92 |
| 0203 | 0203-Day-Ahead Inter-Zonal Congestion Settlement due SC | -$151.17 |
| 0253 | 0253-Hour-Ahead Inter-Zonal Congestion Settlement due SC | $35,861.37 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $20,278.50 |
| 0406 | 0406-UFE Settlement | $909,398.00 |
| 0407 | 0407-Uninstructed Energy | $1,001,727.58 |
| 0487 | 0487-Allocation of Excess Cost for Instructed Energy | $10,464,817.58 |
| 1010 | 1010-Neutrality Adjustment Charge/Refund | -$111,707.82 |
| 1011 | 1011-Ancillary Service Rational Buyer Adjustment | -$4,739,425.71 |
| 1030 | 1030-No Pay Provision Market Refund | -$288,261.35 |
| 1210 | 1210-Existing Contracts Cash Neutrality Charge/Refund | -$8,150.54 |
| 1302 | 1302-Long Term Voltage Support Contract due ISO | $11,268.44 |

Invoice Total

$17,094,673.04

Payment Due Date:     29-JUN-2001

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 66 of 154

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Pacific Gas and Electric Company
77 Beale Street
PGAE #1015

San Francisco        CA        94105

Invoice: 15660
Date: JUN–22–2001
BA ID : 1015

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord            CA        94520

**Comments:**

Charges for settlement date:    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | $2,728.62 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | $4,029.24 |
| 0111 | 0111–Spinning Reserve due ISO | $34,476.60 |
| 0112 | 0112–Non–spinning Reserve due ISo | $57,105.08 |
| 0114 | 0114–Replacement Reserve due ISO | $949,065.80 |
| 0115 | 0115–Regulation Up due ISO | $211,457.85 |
| 0116 | 0116–Regulation Down due ISO | $126,411.06 |
| 0117 | 0117–Demand Relief Monthly Charge | −$1,209.24 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | −$4.68 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $82,376.80 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $3,003.00 |
| 0401 | 0401–Instructed Energy | −$101,662.98 |
| 0403 | 0403–Load Deviation Settlement | −$8.46 |
| 0406 | 0406–UFE Settlement | −$282,886.17 |
| 0407 | 0407–Uninstructed Energy | $157,288.71 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | −$113.96 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $733,561.08 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | −$140,885.32 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$476,485.07 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $6.52 |
| 1030 | 1030–No Pay Provision Market Refund | −$41,896.51 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | −$0.15 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | −$13.46 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | −$12.75 |
| 1065 | 1065–Distribution of Preempted Regulation Up | $0.04 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$20,776.77 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $3,128.39 |
| 1999 | 1999–Rounding Charge/Refund | −$343.99 |

Invoice Total

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 67 of 154

Pacific Gas and Electric Company
77 Beale Street
PGAE #1015

San Francisco          CA      94105

Invoice: 15660
   Date: JUN-22-2001
BA ID : 1015

**Please send payment to:**

For all inquiries contact:
**916-351-4467**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord          CA      94520

**Comments:**

**Charges for settlement date:**    01-APR-01    to    30-APR-01

**Invoice Total**                                                                      $1,298,339.28

**Payment Due Date:**    29-JUN-2001

# PRELIMINARY MARKET INVOICE

Portland General Electric Company
One World Trade Center
121 SW Salmon St

Portland                     OR       97204

Invoice: 15659
Date: JUN–22–2001
BA ID : 1016

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                     CA       94520

**Comments:**

**Charges for settlement date:**     01–APR–01     to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $1,405.25 |
| 0406 | 0406–UFE Settlement | $0.64 |
| 0407 | 0407–Uninstructed Energy | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $3,298.97 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $27.15 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$0.01 |
| 1030 | 1030–No Pay Provision Market Refund | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $1.51 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.09 |
| 1999 | 1999–Rounding Charge/Refund | –$0.13 |

**Invoice Total**

$4,733.47

**Payment Due Date:**     29–JUN–2001

Portland General Electric Company
One World Trade Center
121 SW Salmon St

Portland          OR     97204

Invoice: 15801
Date: JUL–12–2001
BA ID : 1016

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                    CA     94520

**Comments:**

Charges for settlement date:     01–APR–01      to     30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0406 | 0406–UFE Settlement | $0.00 |
| 0407 | 0407–Uninstructed Energy | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $0.00 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $0.00 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $0.00 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.00 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | $1.86 |

**Invoice Total**

$1.86

Payment Due Date:     19–JUL–2001

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Reliant Energy Services, Inc.
1111 Louisiana St.
P.O. 4455

Houston      TX    77251–4455

Invoice: 15650
Date: JUN–22–2001
BA ID : 1068

For all inquiries contact:
**916-351-4467**

**Please send payment to:**

     Bank of America– (Mkt and GMC)
     1850 Gateway Boulevard
     ACCOUNT# 12336–26208
     Concord      CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | –$24.00 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | –$2,241.00 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | –$16,745.80 |
| 0111 | 0111–Spinning Reserve due ISO | $39,763.81 |
| 0112 | 0112–Non–spinning Reserve due ISo | $38,278.72 |
| 0114 | 0114–Replacement Reserve due ISO | $1,858,379.03 |
| 0115 | 0115–Regulation Up due ISO | $3,823.58 |
| 0116 | 0116–Regulation Down due ISO | $4,512.00 |
| 0117 | 0117–Demand Relief Monthly Charge | –$349.14 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $9.21 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $20,613.70 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $415.43 |
| 0401 | 0401–Instructed Energy | –$563,339.80 |
| 0406 | 0406–UFE Settlement | –$25,549.05 |
| 0407 | 0407–Uninstructed Energy | $1,061,713.34 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $5.35 |
| 0481 | 0481–Excess Cost for Instructed Energy | –$1,079,792.38 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $14,644,702.80 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | –$14,554.27 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$1,134,248.12 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.87 |
| 1030 | 1030–No Pay Provision Market Refund | $196.22 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | $0.00 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | –$0.54 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | –$0.41 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | –$523.20 |
| 1999 | 1999–Rounding Charge/Refund | –$65.27 |

**Invoice Total**

     $14,834,981.08

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 71 of 154

# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Reliant Energy Services, Inc.
1111 Louisiana St.
P.O. 4455

Houston                TX      77251–4455

Invoice: 15650
  Date: JUN–22–2001
BA ID : 1068

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

      Bank of America– (Mkt and GMC)
      1850 Gateway Boulevard
      ACCOUNT# 12336–26208
      Concord                CA      94520

**Comments:**

**Charges for settlement date:**   01–APR–01    to   30–APR–01

**Invoice Total**                                                                $14,834,981.08

                                               **Payment Due Date:**   29–JUN–2001

# CALIFORNIA ISO

## FINAL MARKET INVOICE

Reliant Energy Services, Inc.
1111 Louisiana St.
P.O. 4455

Houston      TX    77251–4455

Invoice: 15792
Date: JUL–12–2001
BA ID : 1068

For all inquiries contact:
**916–351–4467**

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord      CA    94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | $0.00 |
| 0052 | 0052–Hour–Ahead Non–Spinning Reserve due SC | $0.00 |
| 0055 | 0055–Hour Ahead AGC/Regulation Up due SC | $0.00 |
| 0111 | 0111–Spinning Reserve due ISO | –$596.14 |
| 0112 | 0112–Non–spinning Reserve due ISo | –$349.07 |
| 0114 | 0114–Replacement Reserve due ISO | $23,302.41 |
| 0115 | 0115–Regulation Up due ISO | –$18,098.13 |
| 0116 | 0116–Regulation Down due ISO | –$33,512.89 |
| 0117 | 0117–Demand Relief Monthly Charge | $0.00 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $0.00 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | –$415.43 |
| 0401 | 0401–Instructed Energy | $0.00 |
| 0406 | 0406–UFE Settlement | $298.13 |
| 0407 | 0407–Uninstructed Energy | $0.00 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.00 |
| 0481 | 0481–Excess Cost for Instructed Energy | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $121,861.92 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $117.21 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$33,299.21 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | –$0.16 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | $0.00 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | $0.00 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $318.45 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |

**Invoice Total**

$59,627.09

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 ~~14:19:00 Page 73~~ of 154

Reliant Energy Services, Inc.
1111 Louisiana St.
P.O. 4455

Houston          TX      77251–4455

Invoice: 15792
Date: JUL–12–2001
BA ID : 1068

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

      Bank of America– (Mkt and GMC)
      1850 Gateway Boulevard
      ACCOUNT# 12336–26208
      Concord          CA      94520

**Comments:**

**Charges for settlement date:**    01–APR–01    to    30–APR–01

**Invoice Total**                                                  $59,627.09

                    **Payment Due Date:**    **19–JUL–2001**

# CALIFORNIA ISO

## FINAL MARKET INVOICE

Date:  12–JUL–2001
Page:  1    of    1

Sacramento Municipal Utility District
6201 S St.

Sacramento                    CA      95817–1899

Invoice: 15762
Date: JUL–12–2001
BA ID : 2995

**Please send payment to:**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord                    CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**      01–APR–01      to    30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 3999 | 3999–Interest and Penalty | $3,576.11 |

**Invoice Total**

    $3,576.11

**Payment Due Date:**      19–JUL–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 75 of 154



# CALIFORNIA ISO

## PRELIMINARY MARKET INVOICE

Southern California Edison Company
2244 Walnut Grove

Rosemead      CA   91770

Invoice: 15661
Date: JUN–22–2001
BA ID : 1014

**Please send payment to:**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord      CA   94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**   01–APR–01   to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0051 | 0051–Hour–Ahead Spinning Reserve due SC | $72,195.97 |
| 0111 | 0111–Spinning Reserve due ISO | $5,260,041.72 |
| 0112 | 0112–Non–spinning Reserve due ISo | $17,482,479.66 |
| 0114 | 0114–Replacement Reserve due ISO | $42,645,208.46 |
| 0115 | 0115–Regulation Up due ISO | $11,940,051.88 |
| 0116 | 0116–Regulation Down due ISO | $10,985,885.28 |
| 0117 | 0117–Demand Relief Monthly Charge | $32,008.22 |
| 0141 | 0141–No Pay Charge – Spinning Reserve | $81,479.49 |
| 0203 | 0203–Day–Ahead Inter–Zonal Congestion Settlement due SC | –$796,556.31 |
| 0204 | 0204–Day–Ahead Inter–Zonal Congestion Settlement due TO | –$731,978.76 |
| 0253 | 0253–Hour–Ahead Inter–Zonal Congestion Settlement due SC | $2,565.36 |
| 0254 | 0254–Hour–Ahead Inter–Zonal Congestion Settlement due TO | –$12,357.00 |
| 0256 | 0256–Hour–Ahead Inter–Zonal Congestion Debit due SC | $1,806.37 |
| 0382 | 0382 – High Voltage Wheeling Charge due ISO | $71,277.45 |
| 0401 | 0401–Instructed Energy | –$1,113,846.45 |
| 0403 | 0403–Load Deviation Settlement | –$772.50 |
| 0406 | 0406–UFE Settlement | $7,896,456.81 |
| 0407 | 0407–Uninstructed Energy | $73,112,475.62 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $25.53 |
| 0481 | 0481–Excess Cost for Instructed Energy | –$1.79 |
| 0485 | 0485–Insufficient Response to AWE Instruction | $447,786.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $306,553,594.96 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | –$1,087,807.56 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | –$42,031,515.90 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $5.24 |
| 1030 | 1030–No Pay Provision Market Refund | –$1,833,419.40 |
| 1061 | 1061–Distribution of Preempted Spinning Reserve | –$0.17 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | –$11.67 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | –$11.40 |
| 1065 | 1065–Distribution of Preempted Regulation Up | $0.04 |

Southern California Edison Company
2244 Walnut Grove

Rosemead                CA      91770

Invoice: 15661
   Date: JUN–22–2001
BA ID : 1014

**Please send payment to:**

Bank of America– (Mkt and GMC)
1850 Gateway Boulevard
ACCOUNT# 12336–26208
Concord                CA      94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**    01–APR–01    to   30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$64,529.08 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $1,164.48 |
| 1999 | 1999–Rounding Charge/Refund | −$93.89 |

**Invoice Total**

$428,913,606.66

**Payment Due Date:**    29–JUN–2001

# CALIFORNIA ISO ●

## PRELIMINARY MARKET INVOICE

Seattle City Light
700 Fifth Avenue, Suite 3300

Seattle                    WA     98104–5031

Invoice: 15651
 Date: JUN–22–2001
BA ID : 1029

**Please send payment to:**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord                    CA     94520

For all inquiries contact:
**916–351–4467**

**Comments:**

**Charges for settlement date:**     01–APR–01     to     30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | −$30.34 |
| 0112 | 0112–Non–spinning Reserve due ISo | −$43.96 |
| 0114 | 0114–Replacement Reserve due ISO | $6,186.16 |
| 0115 | 0115–Regulation Up due ISO | $2.97 |
| 0116 | 0116–Regulation Down due ISO | −$33.50 |
| 0117 | 0117–Demand Relief Monthly Charge | −$13.24 |
| 0406 | 0406–UFE Settlement | −$1,799.90 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.68 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $817.24 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | −$1,028.75 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | −$1,137.62 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.09 |
| 1030 | 1030–No Pay Provision Market Refund | $104.60 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | −$0.22 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | −$0.20 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | −$136.16 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $3.77 |
| 1999 | 1999–Rounding Charge/Refund | −$6.42 |

**Invoice Total**

$2,885.20

**Payment Due Date:**     29–JUN–2001

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 78 of 154

# CALIFORNIA ISO

# FINAL MARKET INVOICE

Seattle City Light
700 Fifth Avenue, Suite 3300

Seattle         WA    98104–5031

Invoice: 15793
Date: JUL–12–2001
BA ID : 1029

**Please send payment to:**

For all inquiries contact:
**916–351–4467**

    Bank of America– (Mkt and GMC)
    1850 Gateway Boulevard
    ACCOUNT# 12336–26208
    Concord         CA    94520

**Comments:**

**Charges for settlement date:**   01–APR–01   to  30–APR–01

| Charge Type | Description | Amount |
|---|---|---|
| 0111 | 0111–Spinning Reserve due ISO | $0.00 |
| 0112 | 0112–Non–spinning Reserve due ISo | $0.00 |
| 0114 | 0114–Replacement Reserve due ISO | $0.00 |
| 0115 | 0115–Regulation Up due ISO | $114.08 |
| 0116 | 0116–Regulation Down due ISo | $117.79 |
| 0117 | 0117–Demand Relief Monthly Charge | $0.00 |
| 0406 | 0406–UFE Settlement | $0.00 |
| 0452 | 0452–Real–Time Intra–Zonal Congestion Charge/Refund | $0.00 |
| 0487 | 0487–Allocation of Excess Cost for Instructed Energy | $0.00 |
| 1010 | 1010–Neutrality Adjustment Charge/Refund | $0.00 |
| 1011 | 1011–Ancillary Service Rational Buyer Adjustment | $9.38 |
| 1012 | 1012–RMR Preemption Revenue Allocation | $0.00 |
| 1030 | 1030–No Pay Provision Market Refund | $0.00 |
| 1062 | 1062–Distribution of Preempted Non–Spinning Reserve | $0.00 |
| 1064 | 1064–Distribution of Preempted Replacement Reserve | $0.00 |
| 1210 | 1210–Existing Contracts Cash Neutrality Charge/Refund | $5.91 |
| 1302 | 1302–Long Term Voltage Support Contract due ISO | $0.00 |
| 1999 | 1999–Rounding Charge/Refund | $0.00 |
| 3999 | 3999–Interest and Penalty | $1,503.60 |

Invoice Total                                  $1,750.76

**Payment Due Date:**   19–JUL–2001

**Certification for Market Settlement July 19, 2001**

**For the Trade Month of March 2001**

**ISO Creditors to whom amounts are Owed:**

| # | Customer Name | Trade Month | Amount Owed | % of total owed to Creditors |
|---|---|---|---|---|
| | **Total Due to 26 SCs (Creditors)** | | $ 849,418,315.80 | 100.000% |

**Amounts owed by ISO Debtor that remain unpaid:**
**Preliminary and final invoices were provided in June's certification.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1924 | Aquila Power Corporation | 24-May-01 | 15176 | GMC | $ 1,891.90 | 0.000% |
| 1007 | Arizona Public Service | 24-May-01 | 15204 | GMC | 5,887.54 | 0.001% |
| 1007 | Arizona Public Service | 12-Jun-01 | 15404 | GMC | 8.30 | 0.000% |
| 2606 | British Columbia Power Exchange | 24-May-01 | 15168 | GMC | 312,789.00 | 0.038% |
| 2606 | British Columbia Power Exchange | 12-Jun-01 | 15368 | GMC | 388.95 | 0.000% |
| 1103 | City of Riverside | 24-May-01 | 15191 | GMC | 89,223.57 | 0.011% |
| 1544 | Idaho Power Company | 24-May-01 | 15180 | GMC | 185,906.31 | 0.022% |
| 1544 | Idaho Power Company | 12-Jun-01 | 15380 | GMC | 84.70 | 0.000% |
| 3106 | Pacific Gas and Electric | 24-Apr-01 | 15161 | GMC | 7,053,774.19 | 0.850% |
| 3106 | Pacific Gas and Electric | 12-Jun-01 | 15361 | GMC | 23,950.72 | 0.003% |
| 1011 | Pacific Gas and Electric | 24-May-01 | 15201 | GMC | 732,545.14 | 0.088% |
| 1011 | Pacific Gas and Electric | 12-Jun-01 | 15401 | GMC | 3,838.57 | 0.000% |
| 2528 | Sacramento Municipal Utility District | 24-May-01 | 15170 | GMC | 199,000.28 | 0.024% |
| 1010 | Southern California Edison | 24-May-01 | 15202 | GMC | 3,586,669.37 | 0.432% |
| 1010 | Southern California Edison | 12-Jun-01 | 15402 | GMC | 53,768.11 | 0.006% |
| 1924 | Aquila Power | 24-May-01 | 15241 | Mkt | 159,815.43 | 0.019% |
| 1924 | Aquila Power | 12-Jun-01 | 15442 | Mkt | 24,618.66 | 0.003% |
| 1007 | Arizona Public Service | 24-May-01 | 15276 | Mkt | 10,566.40 | 0.001% |
| 1007 | Arizona Public Service | 12-Jun-01 | 15477 | Mkt | 35,686.06 | 0.004% |
| 2606 | British Columbia Power Exchange | 24-May-01 | 15228 | Mkt | 3,859,521.81 | 0.465% |
| 2606 | British Columbia Power Exchange | 12-Jun-01 | 15429 | Mkt | 2,887,840.08 | 0.348% |
| 1584 | City of Anaheim | 12-Jun-01 | 15447 | Mkt | 206,636.42 | 0.025% |
| 1684 | City of Azuza | 12-Jun-01 | 15444 | Mkt | 228.65 | 0.000% |
| 1685 | City of Banning | 12-Jun-01 | 15443 | Mkt | 13,824.19 | 0.002% |
| 1504 | City of Glendale | 24-May-01 | 15248 | Mkt | 15,853.26 | 0.002% |
| 1504 | City of Glendale | 12-Jun-01 | 15449 | Mkt | 47,046.31 | 0.006% |
| 1103 | City of Riverside | 12-Jun-01 | 15462 | Mkt | 384,728.44 | 0.046% |
| 2405 | Coral Power, LLC (Note 2) | 12-Jun-01 | 15438 | Mkt | 1,742.73 | 0.000% |
| 1017 | Duke Energy and Trading | 24-May-01 | 15269 | Mkt | 3,396,277.53 | 0.409% |
| 1017 | Duke Energy and Trading | 12-Jun-01 | 15470 | Mkt | 1,151,755.45 | 0.139% |
| 1000 | Edison Source | 24-May-01 | 15283 | Mkt | 41.41 | 0.000% |

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 80 of 154

# Certification for Market Settlement July 19, 2001

## For the Trade Month of March 2001

**Amounts owed by ISO Debtor that remain unpaid (continued):**
**Preliminary and final invoices were provided in June's certification.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1544 | Idaho Power Company | 24-May-01 | 15245 | Mkt | 9,664,579.10 | 1.164% |
| 1544 | Idaho Power Company | 12-Jun-01 | 15446 | Mkt | 1,378,767.61 | 0.166% |
| 1005 | Louisville Gas and Electric | 24-May-01 | 15278 | Mkt | 21,206.94 | 0.003% |
| 3106 | Pacific Gas and Electric | 24-May-01 | 15212 | Mkt | 250,061,586.25 | 30.117% |
| 3106 | Pacific Gas and Electric | 12-Jun-01 | 15413 | Mkt | 26,829,644.83 | 3.231% |
| 1011 | Pacific Gas and Electric | 24-May-01 | 15273 | Mkt | 11,636,159.73 | 1.401% |
| 1011 | Pacific Gas and Electric | 12-Jun-01 | 15474 | Mkt | 1,220,018.43 | 0.147% |
| 1012 | Portland General Electric | 24-May-01 | 15272 | Mkt | 251.74 | 0.000% |
| 2528 | Sacramento Municipal Utility District | 24-May-01 | 15232 | Mkt | 2,359.04 | 0.000% |
| 1010 | Southern California Edison | 24-May-01 | 15274 | Mkt | 416,053,783.75 | 50.108% |
| 1010 | Southern California Edison | 12-Jun-01 | 15475 | Mkt | 88,939,559.70 | 10.712% |
| 2465 | Strategic Energy | 12-Jun-01 | 15436 | Mkt | 53,494.83 | 0.006% |

**Total Due From SCs (Debtors)** $ 830,307,321.43 100.000%

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 81 of 154

**Certification for Market Settlement July 19, 2001**

**For the Trade Month of March 2001**

### Due from SCs

| | | |
|---|---:|---:|
| Preliminary Invoices | $ 832,494,154.59 | 85.391% |
| Final Invoices | 142,425,386.26 | 14.609% |
| **Total Invoiced** | 974,919,540.85 | 100.000% |
| | | |
| Collected 5/31/01 | 25,834,711.77 | |
| Collected 6/19/01 | 42,129,119.37 | |
| Collected 7/19/01 | 67,572.38 | |
| **Total Collected** | 68,031,403.52 | 6.978% |
| | | |
| Applied against Nov-00 Market AR 5/31/01 | 1,321,875.76 | |
| Applied against Dec-00 Market AR 5/31/01 | 2,962,776.90 | |
| Applied against Jan-01 Market AR 5/31/01 | 882,262.79 | |
| Applied against Mar-01 Market AR 5/31/01 | 6.32 | |
| Applied against Mar-01 Market AP 5/31/01 | (120,400.45) | |
| Applied against Mar-01 GMC 5/31/01 | 10.33 | |
| Applied against Feb-01 Market AP 6/19/01 | 19,892.77 | |
| Applied against Mar-01 Market AP 6/19/01 | 83,763,912.94 | |
| Applied against Apr-01 Market AP 6/19/01 | 205.19 | |
| **Total Adjustments** | 88,830,542.55 | 9.112% |
| | | |
| Add Uncollected Feb-01 GMC 7/24/01 | 12,249,726.65 | 1.256% |
| | | |
| **Balance Due from SCs** | $ 830,307,321.43 | 85.167% |

### Due to SCs

| | | |
|---|---:|---:|
| Preliminary Invoices | $ 846,325,629.70 | 85.595% |
| Final Invoices | 142,425,377.73 | 14.405% |
| **Total Invoiced** | 988,751,007.43 | 100.000% |
| | | |
| Paid 6/4/01 | 12,908,276.50 | |
| Paid 6/19/01 | 42,048,639.13 | |
| **Total Paid** | 54,956,915.63 | 5.558% |
| | | |
| Applied against Dec-00 Market AR 6/4/01 | 1,202.39 | |
| Applied against Jan-01 GMC 6/4/01 | 7,944.92 | |
| Applied against Feb-01 GMC 6/4/01 | 34,176.54 | |
| Applied against Feb-01 Market AR 6/4/01 | 4,951.29 | |
| Applied against Mar-01 GMC 6/4/01 | 604,563.39 | |
| Applied against Mar-01 Market AR 6/4/01 | (120,400.45) | |
| Applied against Dec-00 Market AR 6/19/01 | 5,100.63 | |
| Applied against Feb-01 GMC 6/19/01 | 31,955.82 | |
| Applied against Feb-01 Market AR 6/19/01 | 522.23 | |
| Applied against Mar-01 GMC 6/19/01 | 41,846.30 | |
| Applied against Mar-01 Market AR 6/19/01 | 83,763,912.94 | |
| **Total Adjustments** | 84,375,776.00 | 8.534% |
| | | |
| **Balance Due to SCs** | $ 849,418,315.80 | 85.908% |

### Excess of Balance Due to SCs over Due from SCs

| | | |
|---|---:|---:|
| Attributable to Trade Month of December 2000 | $ 19,110,994.37 | |
| **Total** | $ 19,110,994.37 | |

Case: 01-30923　Doc# 6929　Filed: 06/03/02　Entered: 06/04/02 14:19:00　Page 82 of 154

**Certification for Market Settlement July 24, 2001**

**For the Trade Month of February 2001**

**ISO Creditors to whom amounts are Owed:**

| # | Customer Name | Trade Month | | Amount Owed | % of total owed to Creditors |
|---|---|---|---|---|---|
| 1001 | ENRON Power Marketing Inc. | Feb-01 | | $ 665,669.73 | 0.068% |
| | Amount owed to all other Creditors | | | 978,342,344.76 | 99.932% |
| | **Total Due to 27 SCs (Creditors)** | | | **$ 979,008,014.49** | **100.000%** |

**Amounts owed by ISO Debtor that remain unpaid:**
**Preliminary and final invoices were provided in May's certification.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1924 | Aquila Power | 24-Apr-01 | 14803 | GMC | $ 9,619.33 | 0.001% |
| 1007 | Arizona Public Service | 24-Apr-01 | 14832 | GMC | 22,082.10 | 0.002% |
| 2606 | British Columbia Power Exchange | 24-Apr-01 | 14792 | GMC | 275,048.66 | 0.028% |
| 2606 | British Columbia Power Exchange | 10-May-01 | 14992 | GMC | 684.97 | 0.000% |
| 1243 | California Power Exchange | 24-Apr-01 | 14812 | GMC | 1,793.36 | 0.000% |
| 2769 | Pacific Gas and Electric (California Power Exchange) | 24-Apr-01 | 14788 | GMC | 3,568,650.18 | 0.357% |
| 2769 | Pacific Gas and Electric (California Power Exchange) | 10-May-01 | 14988 | GMC | 90,679.93 | 0.009% |
| 1103 | City of Riverside | 10-May-01 | 15018 | GMC | 252.41 | 0.000% |
| 1544 | Idaho Power Company | 24-Apr-01 | 14807 | GMC | 105,256.55 | 0.011% |
| 1544 | Idaho Power Company | 10-May-01 | 15007 | GMC | 207.76 | 0.000% |
| 3103 | Pacific Gas and Electric | 24-Apr-01 | 14781 | GMC | 4,291,209.47 | 0.429% |
| 1011 | Pacific Gas and Electric | 24-Apr-01 | 14829 | GMC | 639,755.47 | 0.064% |
| 2528 | Sacramento Municipal Utility District | 24-Apr-01 | 14795 | GMC | 157,012.97 | 0.016% |
| 1024 | Seattle City Light | 24-Apr-01 | 14821 | GMC | 2,141.81 | 0.000% |
| 1010 | Southern California Edison | 24-Apr-01 | 14830 | GMC | 5,142,134.40 | 0.514% |
| 1924 | Aquila Power | 24-Apr-01 | 14870 | Mkt | 508,508.33 | 0.051% |
| 1924 | Aquila Power | 10-May-01 | 15070 | Mkt | 45,068.84 | 0.005% |
| 1007 | Arizona Public Service | 24-Apr-01 | 14908 | Mkt | 1,024,112.25 | 0.102% |
| 2606 | British Columbia Power Exchange | 24-Apr-01 | 14857 | Mkt | 6,897,234.62 | 0.690% |
| 2606 | British Columbia Power Exchange | 10-May-01 | 15057 | Mkt | 1,350,389.95 | 0.135% |
| 1243 | California Power Exchange | 24-Apr-01 | 14884 | Mkt | 9,016,270.52 | 0.902% |
| 2769 | Pacific Gas and Electric (California Power Exchange) | 24-Apr-01 | 14850 | Mkt | 298,219,558.92 | 29.832% |
| 2769 | Pacific Gas and Electric (California Power Exchange) | 10-May-01 | 15050 | Mkt | 22,318,778.21 | 2.233% |
| 1584 | City of Anaheim | 24-Apr-01 | 14876 | Mkt | 291,092.85 | 0.029% |
| 1584 | City of Anaheim | 10-May-01 | 15076 | Mkt | 127,265.99 | 0.013% |
| 1684 | City of Azuza | 24-Apr-01 | 14873 | Mkt | 74,944.38 | 0.007% |
| 1684 | City of Azuza | 10-May-01 | 15073 | Mkt | 38,533.39 | 0.004% |

**Certification for Market Settlement July 24, 2001**

**For the Trade Month of February 2001**

**Amounts owed by ISO Debtor that remain unpaid (continued):**
**Preliminary and final invoices were provided in May's certification.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1103 | City of Riverside | 10-May-01 | 15093 | Mkt | 201,892.28 | 0.020% |
| 1544 | Idaho Power Company | 24-Apr-01 | 14875 | Mkt | 1,784,223.49 | 0.178% |
| 1544 | Idaho Power Company | 10-May-01 | 15075 | Mkt | 357,475.41 | 0.036% |
| 3103 | Pacific Gas and Electric | 24-Apr-01 | 14839 | Mkt | 156,420,353.66 | 15.647% |
| 3103 | Pacific Gas and Electric | 10-May-01 | 15039 | Mkt | 10,964,758.17 | 1.097% |
| 1011 | Pacific Gas and Electric | 24-Apr-01 | 14905 | Mkt | 16,247,132.24 | 1.625% |
| 1011 | Pacific Gas and Electric | 10-May-01 | 15105 | Mkt | 2,153,805.64 | 0.215% |
| 2626 | Puget Sound Energy | 24-Apr-01 | 14856 | Mkt | 24,932.27 | 0.002% |
| 2528 | Sacramento Municipal Utility District | 24-Apr-01 | 14861 | Mkt | 1,223.99 | 0.000% |
| 1008 | Salt River Project | 24-Apr-01 | 14907 | Mkt | 38,142.15 | 0.004% |
| 1008 | Salt River Project | 10-May-01 | 15107 | Mkt | 8,419.49 | 0.001% |
| 1024 | Seattle City Light | 24-Apr-01 | 14896 | Mkt | 203,919.45 | 0.020% |
| 1024 | Seattle City Light | 10-May-01 | 15096 | Mkt | 18,881.31 | 0.002% |
| 1010 | Southern California Edison | 24-Apr-01 | 14906 | Mkt | 420,279,224.40 | 42.042% |
| 1010 | Southern California Edison | 10-May-01 | 15106 | Mkt | 36,735,052.77 | 3.675% |

**Total Due From SCs (Debtors)**                    **$  999,657,724.34    100.000%**

**Certification for Market Settlement July 24, 2001**

**For the Trade Month of February 2001**

### Due from SCs

| | | |
|---|---:|---:|
| Preliminary Invoices | $    972,588,030.84 | 92.228% |
| Final Invoices | 81,964,016.81 | 7.772% |
| **Total Invoiced** | 1,054,552,047.65 | 100.000% |
| | | |
| Collected 5/2/01 | 59,861,543.33 | |
| Collected 5/1701 | 1,703,105.49 | |
| Collected 5/31/01 | 171,667.35 | |
| Collected 6/1901 | 2,754,904.04 | |
| Collected 7/19/01 | 459,411.62 | |
| **Total Collected** | 64,950,631.83 | 6.159% |
| | | |
| Applied against Feb-01 Market AP 5/2/01 | 12,423.05 | |
| Cancelled invoices 5/2/01 | 12.91 | |
| Applied against Feb-01 Market AP 5/17/01 | 4,221,121.69 | |
| Applied against Feb-01 Market AP 5/31/01 | 5,615.29 | |
| Applied against Mar-01 Market AP 5/31/01 | 522.23 | |
| Applied against Mar-01 Market AP 6/29/01 | 10,525.68 | |
| **Total Adjustments** | 4,250,220.85 | 0.403% |
| | | |
| Add Uncollected Feb-01 GMC 7/24/01 | 14,306,529.37 | 1.357% |
| | | |
| **Balance Due from SCs** | $    999,657,724.34 | 94.795% |

### Due to SCs

| | | |
|---|---:|---:|
| Preliminary Invoices | $    952,742,085.50 | 92.078% |
| Final Invoices | 81,965,705.44 | 7.922% |
| **Total Invoiced** | 1,034,707,790.94 | 100.000% |
| | | |
| Paid 5/3/01 | 42,468,820.18 | |
| Paid 5/17/01 | 3,857,696.65 | |
| Paid 6/19/01 | 2,755,696.19 | |
| **Total Paid** | 49,082,213.02 | 4.744% |
| | | |
| Applied against Feb-01 GMC 5/3/01 | 859,595.64 | |
| Applied against Dec-00 Market AR 5/3/01 | 1,476,860.84 | |
| Applied against Jan-01 GMC 5/3/01 | 17,369.41 | |
| Applied against Feb-01 Market AR 5/3/01 | 12,423.05 | |
| Applied against Dec-00 Market AR 5/17/01 | 1,284.97 | |
| Applied against Jan-01 GMC 5/17/01 | 1,655.43 | |
| Applied against Feb-01 GMC 5/17/01 | 4,188.11 | |
| Applied against Feb-01 Market AR 5/17/01 | 4,221,121.69 | |
| Applied against Dec-00 Market AR 6/19/01 | 1,433.91 | |
| Applied against Feb-01 Market AR 6/19/01 | 1,737.61 | |
| Applied against Mar-01 Market AR 6/19/01 | 19,892.77 | |
| **Total Adjustments** | 6,617,563.43 | 0.640% |
| | | |
| **Balance Due to SCs** | $    979,008,014.49 | 94.617% |

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 85
of 154

# Certification for Market Settlement July 24, 2001

## For the Trade Month of January 2001

**ISO Creditors to whom amounts are Owed:**

| # | Customer Name | Trade Month | Amount Owed | % of total owed to Creditors |
|---|---|---|---|---|

**Total Due to 53 SCs (Creditors)**  $ 824,467,724.60  100.000%

**Amounts owed by ISO Debtor that remain unpaid:**
**Preliminary and final invoices were provided in April's certification.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1924 | Aquila Power | 27-Mar-01 | 14426 | GMC | $ 3,725.04 | 0.000% |
| 2606 | British Columbia power Exchange | 27-Mar-01 | 14415 | GMC | 145,848.15 | 0.018% |
| 1544 | Idaho Power Company | 27-Mar-01 | 14431 | GMC | 80,164.40 | 0.010% |
| 2528 | Sacramento Municipal Utility District | 27-Mar-01 | 14418 | GMC | 159,458.66 | 0.020% |
| 1010 | Southern California Edison | 27-Mar-01 | 14459 | GMC | 2,678,130.43 | 0.332% |
| 2966 | Turlock Irrigation District | 13-Apr-01 | 14602 | GMC | 617.11 | 0.000% |
| 1924 | Aquila Power | 27-Mar-01 | 14495 | Mkt | 361,251.60 | 0.045% |
| 2606 | British Columbia Power Exchange | 27-Mar-01 | 14483 | Mkt | 2,008,731.95 | 0.249% |
| 1243 | California Power Exchange | 27-Mar-01 | 14510 | Mkt | 415,999,776.30 | 51.641% |
| 1243 | California Power Exchange | 13-Apr-01 | 14709 | Mkt | 14,624,579.52 | 1.815% |
| 2769 | Pacific Gas and Electric (California Power Exchange) | 27-Mar-01 | 14475 | Mkt | 204,590,489.40 | 25.397% |
| 2769 | California Power Exchange | 27-Mar-01 | 14475 | Mkt | 2,136,592.33 | 0.265% |
| 1544 | Idaho Power Company | 27-Mar-01 | 14500 | Mkt | 1,844,911.74 | 0.229% |
| 1011 | Pacific Gas and Electric | 27-Mar-01 | 14531 | Mkt | 3,798,392.40 | 0.472% |
| 1010 | Southern California Edison | 27-Mar-01 | 14532 | Mkt | 155,833,733.33 | 19.345% |
| 2465 | Strategic Energy | 27-Mar-01 | 14489 | Mkt | 1,298,819.78 | 0.161% |

**Total Due From SCs (Debtors)**  $ 805,565,222.14  100.000%

Certification for Market Settlement July 24, 2001

## Summary of activity for Trade Month of January 2001:

### Due from SCs

| | | |
|---|---|---|
| Preliminary Invoices | $ 852,880,070.61 | 94.702% |
| Final Invoices | 47,714,325.73 | 5.298% |
| **Total Invoiced** | 900,594,396.34 | 100.000% |
| | | |
| Collected 4/2/01 | 12,952,984.79 | |
| Collected 4/20/01 | 1,948,770.11 | |
| **Total Collected** | 14,901,754.90 | 1.655% |
| | | |
| Applied against Jan-01 Market AP 4/2/01 | 816,816.06 | |
| Cancelled invoices 4/2/01 | 30,344,780.58 | |
| Applied against Dec-00 Market AP 4/13/01 | 5,033,891.43 | |
| Applied against Jan-01 Market AP 4/20/01 | 46,774,875.92 | |
| Applied against Nov-00 Market AP 5/17/01 | 7,683.69 | |
| Applied against Dec-00 Market AP 5/17/01 | 217,315.41 | |
| **Total Adjustments** | 83,195,363.09 | 9.238% |
| | | |
| Add Uncollected Jan-01 GMC 7/24/01 | 3,067,943.79 | 0.341% |
| | | |
| **Balance Due from SCs** | $ 805,565,222.14 | 89.448% |

### Due to SCs

| | | |
|---|---|---|
| Preliminary Invoices | $ 835,450,696.80 | 94.566% |
| Final Invoices | 48,005,063.31 | 5.434% |
| **Total Invoiced** | 883,455,760.11 | 100.000% |
| | | |
| Paid 4/2/01 | 5,980,329.05 | |
| Paid 4/27/01 | 3,500,845.61 | |
| **Total Paid** | 9,481,174.66 | 1.073% |
| | | |
| Applied against Jan-01 GMC 4/2/01 | 2,355,642.34 | |
| Add Invoice Jan-01 AP 4/2/01 | (1,758,172.13) | |
| Applied against Jan-01 Market AR 4/2/01 | 838,299.18 | |
| Applied against Jan-01 Market AR 4/13/01 | 46,774,875.92 | |
| Cancelled invoice 4/13/01 | 291,030.55 | |
| Applied against Dec-00 Market AR 4/27/01 | 118,141.50 | |
| Applied against Jan-01 GMC 4/27/01 | 4,780.70 | |
| Applied against Mar-01 Market AR 5/31/01 | 882,262.79 | |
| **Total Adjustments** | 49,506,860.85 | 5.604% |
| | | |
| **Balance Due to SCs** | $ 824,467,724.60 | 93.323% |

### Excess of Balance Due to SCs over Due from SCs

| | | |
|---|---|---|
| Attributable to Trade Month of November 2000 | $ 9,160,381.67 | |
| Attributable to Trade Month of December 2000 | 9,742,120.79 | |
| **Total** | $ 18,902,502.46 | |

**Certification for Market Settlement July 24, 2001**

**For the Trade Month of December 2000**

**ISO Creditors to whom amounts are Owed:**

| # | Customer Name | Trade Month | Amount Owed | % of total owed to Creditors |
|---|---|---|---|---|
| | **Total Due to 49 SCs (Creditors)** | | $ 1,471,113,049.64 | 100.000% |

**Amounts owed by ISO Debtor that remain unpaid:**
**Preliminary and final invoices were provided in March's certification.**

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 1243 | California Power Exchange | 27-Feb-01 | 14163 | Mkt | $ 1,430,114,437.65 | 94.435% |
| 1243 | California Power Exchange | 15-Mar-01 | 14323 | Mkt | 54,594,957.95 | 3.605% |
| 2769 | California Power Exchange | 27-Feb-01 | 14126 | Mkt | 12,171,363.36 | 0.804% |
| 2769 | California Power Exchange | 15-Mar-01 | 14286 | Mkt | 235,652.69 | 0.016% |
| 1011 | Pacific Gas and Electric | 27-Feb-01 | 14183 | Mkt | 11,394,577.60 | 0.752% |
| 1008 | Salt River project | 15-Mar-01 | 14345 | Mkt | 1,725,316.52 | 0.114% |
| 1010 | Southern California Edison | 15-Mar-01 | 14344 | Mkt | 3,337,442.11 | 0.220% |
| 2465 | Strategic Energy | 15-Mar-01 | 14298 | Mkt | 816,221.35 | 0.054% |
| | **Total Due From SCs (Debtors)** | | | | $ 1,514,389,969.23 | 100.000% |

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 88 of 154

**Certification for Market Settlement July 24, 2001**

**Summary of activity for Trade Month of December 2000:**

### Due from SCs

| | | | |
|---|---|---:|---:|
| Preliminary Invoices | $ | 1,503,186,210.21 | 95.380% |
| Final Invoices | | 72,817,565.78 | 4.620% |
| **Total Invoiced** | | 1,576,003,775.99 | 100.000% |
| | | | |
| Collected 3/5/01 | | 46,371,366.56 | |
| Applied against Nov-00 Market AR 3/5/01 | | (352,934.19) | |
| Collected 3/9/01 | | 1,095,680.05 | |
| Collected 3/22/01 | | 4,668,657.91 | |
| Collected 4/20/01 | | 31.02 | |
| **Total Collected** | | 51,782,801.35 | 3.286% |
| | | | |
| Applied against Dec-00 Market AP 3/22/01 | | 8,130,738.02 | |
| Applied against Jan-01 Market AP 4/9/01 | | 21,483.12 | |
| Applied against Nov-00 Market AP 4/20/01 | | 2,463.45 | |
| Applied against Jan-01 Market AP 4/20/01 | | 21.04 | |
| Applied against Jan-01 GMC 4/20/01 | | 52,347.65 | |
| Applied against Jan-01 Market AP 4/27/01 | | 118,120.46 | |
| Applied against Feb-01 Market AP 5/10/01 | | 1,476,860.84 | |
| Applied against Feb-01 Market AP 5/17/01 | | 1,284.97 | |
| Applied against Mar-01 Market AP 5/31/01 | | 1,202.39 | |
| Applied against Feb-01 Market AP 6/19/01 | | 6,534.54 | |
| Applied against Apr-01 Market AP 6/30/01 | | 19,948.93 | |
| **Total Adjustments** | | 9,831,005.41 | 0.624% |
| | | | |
| **Balance Due from SCs** | $ | 1,514,389,969.23 | 96.091% |

### Due to SCs

| | | | |
|---|---|---:|---:|
| Preliminary Invoices | $ | 1,490,781,469.67 | 94.813% |
| Final Invoices | | 81,563,642.97 | 5.187% |
| **Total Invoiced** | | 1,572,345,112.64 | 100.000% |
| | | | |
| Paid 3/7/01 | | 45,426,874.33 | |
| Paid 3/97/01 | | 1,095,680.05 | |
| Paid 3/23/01 | | 4,660,365.50 | |
| Paid 3/27/01 | | 8,292.41 | |
| Paid 4/23/01 | | 1,243.61 | |
| **Total Paid** | | 51,192,455.90 | 3.256% |
| | | | |
| Applied against Dec-00 GMC 3/7/01 | | 554,063.09 | |
| Applied against Dec-00 GMC 3/9/01 | | 1,911.84 | |
| Applied against Dec-00 GMC 3/22/01 | | 35,583.11 | |
| Applied against Dec-00 Market AR 3/22/01 | | 7,982,988.02 | |
| Cancelled invoices 3/22/01 | | 28,418,123.25 | |
| Applied against Jan-01 Market AR 4/20/01 | | 8,575,440.34 | |
| Applied against Jan-01 Market AR 5/17/01 | | 217,315.41 | |
| Applied against Mar-01 Market AR 5/31/01 | | 2,962,776.90 | |
| FERC ordered reduction 5/31/01 | | 1,291,405.14 | |
| **Total Adjustments** | | 50,039,607.10 | 3.182% |
| | | | |
| **Balance Due to SCs** | $ | 1,471,113,049.64 | 93.562% |

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 89 of 154

**Certification for Market Settlement July 24, 2001**

**For the Trade Month of November 2000**

## ISO Creditors to whom amounts are Owed

| # | Customer Name | Trade Month | | | Amount Owed | % of total owed to Creditors |
|---|---|---|---|---|---|---|
| 1001 | ENRON Power Marketing Inc | Nov-00 | - | - | 42,225,741.64 | 8.471% |
| | Amount owed to all other Creditors | | | | 456,237,324.83 | 91.529% |
| | **Total Due to 59 SCs (Creditors)** | | | | **$  498,463,066.47** | **100.000%** |

## Amounts owed by ISO Debtor that remain unpaid:
## Preliminary and final invoices were provided in February's certification.

| # | Customer Name | Date | Inv # | Type | Unpaid Balance | % of total due from Debtors |
|---|---|---|---|---|---|---|
| 2769 | California Power Exchange | 14-Feb-01 | 14006 | Mkt | $          93,414.80 | 0.018% |
| 1243 | California Power Exchange | 26-Jan-01 | 13881 | Mkt | 507,530,033.34 | 99.982% |
| | **Total Due From SCs (Debtors)** | | | | **$  507,623,448.14** | **100.000%** |

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 90 of 154

**Certification for Market Settlement July 24, 2001**

**Summary of activity for Trade Month of November 2000:**

### Due from SCs

| | | |
|---|---|---|
| Preliminary Invoices | $ 669,272,884.00 | 99.531% |
| Final Invoices | 3,153,175.74 | 0.469% |
| **Total Invoiced** | 672,426,059.74 | 100.000% |
| | | |
| Collected 2/1/01 | 2,983,589.97 | |
| Collected 2/9/01 | 144,397,659.30 | |
| Collected 2/22/01 | 62,787.65 | |
| Collected 3/5/01 | 352,934.19 | |
| **Total Collected** | 147,796,971.11 | 21.980% |
| | | |
| Applied against Nov-00 Market AP 2/22/01 | 16,925,215.71 | |
| Cancelled invoice 2/22/01 | 80,424.78 | |
| **Total Adjustments** | 17,005,640.49 | 2.529% |
| | | |
| **Balance Due from SCs** | $ 507,623,448.14 | 75.491% |

### Due to SCs

| | | |
|---|---|---|
| Preliminary Invoices | $ 669,155,560.78 | 97.445% |
| Final Invoices | 17,546,615.96 | 2.555% |
| **Total Invoiced** | 686,702,176.74 | 100.000% |
| | | |
| Paid 2/1/01 | 12,113,244.29 | |
| Paid 2/9/01 | 149,333,046.54 | |
| Paid 2/22/01 | 62,787.65 | |
| Paid 3/7/01 | 352,693.64 | |
| Paid 4/26/01 | 5,209.76 | |
| **Total Paid** | 161,866,981.88 | 23.572% |
| | | |
| Applied against Oct-00 Market AR 2/1/01 | 957,235.81 | |
| Applied against Nov-00 GMC 2/1/01 | 443,900.10 | |
| Applied against Nov-00 Market AR 2/22/01 | 16,925,215.71 | |
| Applied against Dec-00 GMC 3/7/01 | 240.55 | |
| Applied against Dec-00 Market AR 4/27/01 | 2,463.45 | |
| Applied against Jan-01 GMC 4/27/01 | 4,918.46 | |
| Applied against Jan-01 Market AP 5/17/01 | 7,683.69 | |
| Applied against Mar-01 Market AR 5/31/01 | 1,321,875.76 | |
| FERC ordered reduction 5/31/01 | 6,708,594.86 | |
| **Total Adjustments** | 26,372,128.39 | 3.840% |
| | | |
| **Balance Due to SCs** | $ 498,463,066.47 | 72.588% |

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 91 of 154

# EXHIBIT B



CALIFORNIA
POWER EXCHANGE

Account Summary
EPMI
ENRON POWER MKTG INC
6/30/01

|  | Activity | Balance |
|---|---|---|
| Dec 00 Day Ahead/Day of Billing dated Jan 9th amount due to (from) PX | (12,526,251.16) | (12,526,251.16) |
| Dec DA DO Cash Received |  |  |
| Dec CTS billing dated Jan 9th amounts due to (from) PX | 32,648,116.00 |  |
| Dec CTS Cash Received | (32,648,116.00) |  |
| SCE Default Dec DADO Chrg billing dated Jan 18th | 7,924,498.80 |  |
| Reverse SCE Default Chrg billing dated Jan 18th | (7,924,498.80) |  |
| Payment Jan 18th | 4,116,842.50 |  |
| Correction Adjustment Invoice dated Jan 24th | 25,426.86 |  |
| Reverse Correction Adjustment Invoice dated Jan 24th | (25,426.86) |  |
| Cash Received Default Invoices |  |  |
| Payment Jan 30th | 155,542.37 |  |
| Credit Held as offset for Oct RT Final | 172,172.76 |  |
| Reverse Credit Held as offset for Oct RT Final | (172,172.76) |  |
| Shortfall Payout used as offset for Nov RT Prel | 131,767.87 |  |
| Reverse Shortfall Payout used as offset for Nov RT Prel | (131,767.87) |  |
| Oct RT Final billing dated Jan 18th due to (from) PX | 54,076.51 |  |
| Oct RT F Cash received | (54,076.51) |  |
| Oct RT F Payment |  |  |
| SCE Default Oct RT F Charge | 172,172.76 |  |
| Reverse SCE Default Charge | (172,172.76) |  |
| SCE Default Cash Received |  |  |
| Nov RT Prel billing dated Jan 29th due to (from) PX | 1,498,185.81 |  |
| Nov RT P Cash received | (1,498,185.81) |  |
| SCE Nov RT P Default Charge | 1,146,496.56 |  |
| Reverse SCE Default Charge | (1,146,496.56) |  |
| PG&E Nov RT P balance Default Charge | 16,636,920.89 |  |
| Reverse PG&E Default Charge | (16,636,920.89) |  |
| BPA Nov RT P balance Default Charge | 18,644.02 |  |
| Reverse BPA Default Charge | (18,644.02) |  |
| Sierra Pacific Industries Nov RT P balance Default Charge | 9,976.08 |  |
| Reverse Sierra Pacific Industries Default Charge | (9,976.08) |  |
| Salt River Project Nov RT P Default Charge | 33,683.88 |  |
| Reverse Salt River Project Default Charge | (33,683.88) |  |
| WAPA Nov RT P balance Default Charge | 309.39 |  |
| Reverse WAPA Default Charg | (309.39) |  |
| Nov RT Final billing dated Feb 15th due to (from) PX | (19,262.94) |  |
| Nov RT Final Cash received |  |  |
| Jan DA Dof Admin Fees dated Feb 22nd due to (from) PX | 55,007.32 |  |

# Account Summary
## EPMI
## ENRON POWER MKTG INC
## 6/30/01

|  | Activity | Balance |
|---|---|---|
| Jan DA Dof Admin Fees cash received | (55,007.32) | |
| JAN CTS Admin Fees Dated Feb 22nd due to (From) PX | 1,232.00 | |
| Jan CTS Admin Fees Cash Received | (1,232.00) | |
| Dec RT Prel billing dated Feb 27th due to (from) PX | 864,091.23 | |
| Transfer to(from) Collateral | (864,091.23) | |
| Dec RT P cash received | | |
| Dec RT Final billing dated March 20th due to (from) PX | 15,297.24 | |
| Transfer to(from) Collateral | (15,297.24) | |
| Dec RT F Cash received | | |
| Feb Core billing dated Mar__ due to (from) PX | | |
| Feb CTS billing dated Mar __ due to (from) PX | | |
| Jan RT Prel billing dated March 28th due to (from) PX | 64,547.04 | |
| Transfer to(from) Collateral | (64,547.04) | |
| Jan RT P Cash received | | |
| Jan RT F billing dated Apr 16th due to(from) PX | 2,255.74 | |
| Transfer to(from) Collateral | (2,255.74) | |
| Jan RT F Cash received | | |
| Feb RT P billing dated 4/27 due to(from) PX | (100.63) | |
| Feb RT P Cash received | | |
| Jan DA DO billing dated 5/15 due to(from) PX | 8,406,061.58 | |
| Jan DA DO Cash received | | |
| Feb RT F billing dated 5/16 due to(from) PX | | |
| Feb RT F Cash received | | |
| Jan CTS billing dated 5/15 due to (from) PX | 13,338,624.00 | |
| Feb CTS billing dated 5/15 due to (from) PX | (833,880.00) | |
| Transfer to (From) Collateral | (12,637,575.72) | |
| Mar RT P billing dated 6/15 due to(from) PX | (551.08) | |
| Mar RT P Cash received | | |
| Mar RT F billing dated 6/22 due to (from) PX | | |
| Mar RT F Cash received | | |
| Total Balance due to (from ) PX for all Billings | | |
| STATEMENT BALANCE 6-30-01 | | (551.08) |

As a reminder, the California Power Exchange wiring instructions for Participant payments are via Fedwire to:

Bank of America,
Concord, CA.
ABA No. 121000358
Account Name: California Power Exchange - Clearing
Acccount Number: 1233525421
If there are any questions relating to the payment process, please contact Rachel Axelrad at 626-685-9843 or
Clark Cheng at 626-685-9846.

# EXHIBIT C

## Underscheduled Load Net Obligation

| NAME | BA_ID | Jan | Feb | Mar | Apr | Grand Total |
|------|-------|-----|-----|-----|-----|-------------|
| EPMI | 1005 | -31271870 | -5563438 | 2698005 | 299057 | $ (33,838,246.08) |

# EXHIBIT  D

March 20, 2001

The Honorable David P. Boergers
Secretary
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC 20426

Re:     **California Independent System Operator Corporation,**
        **Docket No. ER01-____-000**
        **Amendment No. 38 to the ISO Tariff**

Dear Secretary Boergers:

Pursuant to Section 205 of the Federal Power Act ("FPA"), 16 U.S.C. § 824d, and Sections 35.11 and 35.13 of the Commission's regulations, 18 C.F.R. §§ 35.11, 35.13, the California Independent System Operator Corporation ("ISO")[1] respectfully submits for filing six copies of an amendment ("Amendment No. 38") to the ISO Tariff. Amendment No. 38 would modify the ISO Tariff in two respects. First, due to the current financial situation of Pacific Gas and Electric Company ("PG&E") and Southern California Edison Company ("SCE") and their inability to make forward purchases to serve their entire Load, Amendment No. 38 would suspend the penalty for underscheduling of Load (*i.e.*, the requirement that Market Participants have at least 95 percent of their Load scheduled prior to real time). The suspension of the penalty is in response to the current conditions in the California electricity market and does not diminish either the importance to forward-schedule resources and Load or the need to limit the amount of activity in the ISO's real time Imbalance Energy market. Thus, the proposed suspension of the penalty is temporary and would be limited to the period from January 1, 2001 through May 31, 2001. Second, Amendment No. 38 would give Market Participants with

---
[1]     Capitalized terms not otherwise defined herein are defined in the Master Definitions Supplement, ISO Tariff Appendix A, as filed August 15, 1997, and subsequently revised.

resources that have been selected to provide Spinning and Non-Spinning Reserves (collectively, Operating Reserves) the ability to indicate that their resources should not be dispatched to provide Imbalance Energy unless there is a Contingency or an imminent or actual System Emergency. The benefits of giving Market Participants this ability include increasing the supply of Operating Reserves available to the ISO and facilitating the preservation of those reserves for Contingency and System Emergency use.

## I.    Suspension of the Underscheduling Penalty

###        A.    Background

During the last nine months, the ISO consistently has expressed its concern about the underscheduling of Load and its affect on reliability.[2] Underscheduling played a large role in creating the stressful and difficult conditions under which the ISO operated during the past year, and the ISO supported the underscheduling penalty contained in the Commission's November 1, 2000 and December 15, 2000 orders.[3]

The underscheduling penalty was one facet of the Commission's price mitigation plan presented in the December 15 Order in Docket Nos. EL00-95, *et al.*,[4]. The Commission appropriately recognized that underscheduling jeopardizes reliable system operations by forcing the ISO to satisfy far more Load in real time than the intended 5 percent. Indeed, the ISO's real-time imbalance market at times has been called upon to satisfy up to 30 percent or more of the Control Area Load. The Commission found that such a large real time Energy market creates a strong sellers' market and high real time prices. Therefore, the Commission required all Market Participants to preschedule their Load and imposed penalties when real time Load exceeds more than five percent of an entity's scheduled Load. That is,

---

[2]      *See, e.g.*, August 25, 2000 Board Memorandum from Terry Winter to the Board of Governors; October 20, 2000 Offer of Settlement filed by the ISO in *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange, et al.*, Docket No. EL00-95, *et al.* at 7; November 22, 2000 Comments of the ISO on the Commission's November 1, 2000 Order at 18-20; and the January 16, 2001 Request for Rehearing of the on the Commission's December 15, 2000 Order at 3.

[3]      The only modification to the Commission's actions requested by the ISO was that some form of underscheduling penalty should be applied to Generation as well as Load. November 22, 2000 Comments at 18-19; January 16, 2001 Request for Rehearing at 3.

[4]      *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services Into Markets Operated by the California Independent System Operator and the California Power Exchange, et al.*, 93 FERC ¶ 61,294 (2000) ("December 15 Order").

95 percent of a Market Participant's Load must be scheduled into the forward markets (*i.e.*, the Day-Ahead or Hour-Ahead markets) or scheduled bilaterally prior to real time. The Commission also established a 10 MW minimum deviation to accommodate smaller entities (*i.e.*, those with less than 200 MW of Load). Thus, no charge will be assessed for a scheduling shortfall up to the greater of five percent of an entity's Load or 10 MW.

The Commission set the penalty for those entities that exceed the five percent or 10 MW "deadband" for any trading hour at two times the cost of Imbalance Energy during that hour (including any Out-of-Market ("OOM") purchases for that hour), with the penalty not to exceed $100/MWh. The Commission also directed that the penalty revenues be disbursed to those Market Participants that scheduled accurately during the trading hour in which the penalties were incurred. December 15 Order, 93 FERC at 61,982. In its January 2, 2001 filing in compliance with the December 15 Order, the ISO stated that it would institute the underscheduling penalty as directed by the Commission.

On February 2, 2001, SCE and PG&E tendered for filing a Request for Immediate Suspension of the underscheduling penalty adopted by the Commission in its December 15 Order ("Request").[5] In their filing, SCE and PG&E recognize that the purpose of the penalty was to alleviate the reliance on the ISO's Imbalance Energy Market to meet Load. Request at 3. They note, however, a series of events that render it impossible for them to expand their forward purchases. First, the California Power Exchange ("PX") has ceased operating its Day-Ahead and Day-of Markets. *Id.* at 4. Second, credit and supply problems have rendered it impossible for SCE and PG&E to access forward power markets. *Id.*

On March 2, 2001, the ISO filed a Motion to Intervene and Comments in response to SCE's and PG&E Request of February 2. The ISO noted that in response to the current situation in the California electricity market, the ISO Governing Board, at its February 28, 2001 meeting, approved management's recommendation to file a tariff amendment requesting suspension of the underscheduling penalty for the January 1, 2001 to May 31, 2001 period. This filing implements that direction.

B.     Need For Amendment

---

[5]     This Request was assigned Docket No. EL01-34-000.

Since January 1, 2001 (the effective date of the underscheduling penalty), a large amount of Load continues to appear unscheduled in real time. Most of the shortfall in the amount of forward scheduled Load is attributable to PG&E and SCE. As has been well documented, these utilities are experiencing severe financial difficulties, rendering them unable to pay for the supply itself, let alone for penalties imposed in addition to the cost of Energy. Without the financial wherewithal to make their own bilateral purchases or access to a forward market, SCE and PG&E are incapable of scheduling 95 percent of their Load. Approximately 15 percent of Load has been, and continues to be, scheduled in real time. From January 1, 2001 to March 14, 2001, the ISO estimates that the penalties will exceed $400 million.[6]

Early in January of 2001, the State of California acted to help to secure supplies for the so-called "net short" Load of the investor-owned utilities ("IOUs").[7] Pursuant to state legislation, the California Department of Water Resources ("CDWR") has been given the responsibility to secure supplies for these net short amounts. This responsibility went far beyond CDWR's previous scheduling activities. Despite extraordinary effort by CDWR to meet the net short needs on forward basis, the amount of Load appearing in real time continues to average approximately 15 percent from January 1, 2001 to March 14, 2001.[8]

As noted earlier, the ISO has been a vigorous proponent of the need to forward schedule resources and Load and thereby reduce the amount of Load to be served in real time. Underscheduling penalties are an appropriate tool to use in ensuring reliable operations and are an important part of the market design in California. Given the current conditions that exist in California, however, a temporary suspension of the underscheduling penalty is warranted. The current

---

[6] *See* the attached affidavit Spence Gerber, the Director of Settlements at the ISO (Attachment E). Mr. Gerber explains that calculating the penalty amounts requires a comparison of scheduled Loads to real time Loads based on meter data. Since meter data is not yet available for most of the period from January 1, 2001 to March 14, 2001, Mr. Gerber's estimates are based upon comparing the amount of real time purchases to the daily control area Load. This comparison results in an accurate aggregate estimate of penalty revenues. In addition, Mr. Gerber notes that his estimates are based on applying the penalty to all the Load unscheduled in real time once the 5 percent threshold is reached. In other words, if 15 percent of a Scheduling Coordinator's Load were to appear unscheduled in real time, Mr. Gerber applied the penalty to the entire 15 percent. If the penalty were applied to only that amount above the 5 percent threshold, the penalty revenues would be approximately $257 million for the period of January 1 through March 14, 2001.

[7] The "net short" position of the IOUs is that amount of their Load that is not met by their own resources.

[8] Mr. Gerber estimates that for the first 14 days in March about 13 percent of Load continued to be served in real time.

financial condition of IOUs doesn't allow the penalty to have the desired effect of encouraging forward contracting; rather, imposition of the penalty would only place hundreds of millions of dollars of additional costs on the IOUs at a time of severe financial distress. Moreover, while CDWR recognizes the need to forward schedule the resources it procures and while it has made significant improvement since it began to secure supplies for the net short amounts, it will require more time before it can meet the 95 percent criteria.

Rather than add costs to the financial burdens already facing California consumers, the ISO requests that the Commission approve the suspension of the underscheduling penalty from January 1, 2001 through May 31, 2001. By this date the ISO anticipates either that the state will have remedied the financial situation of SCE and PG&E such that they will be able to enter into forward purchases, or CDWR will be in a position to meet the full net short demands and avoid having the underscheduling penalty assessed on IOU Loads.

## II. Split BEEP Stack

### A. Background

The ISO's Ancillary Services market consists of an auction for four types of reserves: Regulation, Spinning Reserve, Non-Spinning Reserve, and Replacement Reserve.[9] Bidders for Ancillary Services submit bids with two price components, capacity and Energy. The capacity price component is used in the Day Ahead and Hour Ahead markets to procure the required amount of reserves and the Energy price component is used in the real time Imbalance Energy or "BEEP" stack to determine the order in which capacity from Ancillary Services is converted to Energy.[10] Spinning and Non-spinning Reserves (collectively, Operating Reserves) are intended to be used for Contingencies such as the loss of a generating unit or of a transmission path; or System Emergencies such as the imminent loss of firm load, voltage collapse, or transmission path overload.

The ISO is a member of the Western Systems Coordinating Council ("WSCC") and must maintain the amount of contingency Operating Reserves required by the WSCC's Minimum Operating Reliability Criteria ("MORC"). Under the WSCC MORC criteria, the ISO must have contingency Operating Reserves

---

[9] Voltage Support and Black Start capability are also Ancillary Services under the ISO Tariff but they are procured using Reliability Must-Run resources.

[10] The acronym BEEP comes from the name of the software (i.e., the Balancing Energy and Ex-post Pricing software) used to dispatch Energy from Ancillary Service capacity and Supplemental Energy bids to meet real time demands.

equal to either (a) 5 percent of the Demand to be met by Generation from hydroelectric resources plus 7 percent of the Demand to be met by Generation from other resources, or (b) the single largest contingency, if it is greater.[11]  The ISO, with its control area, is subject to the first set of criteria above (the percentage requirements for Operating Reserves).

The ISO has the authority to determine the required amount of Operating Reserves based on the quantity and location of the system requirements.[12]  In addition, when dispatching resources in real time, it is within the ISO's discretion to determine the effectiveness of an Energy bid in meeting the real time fluctuation in Demand or Generation.[13]

B.    Need For Amendment

As discussed above, it is within the ISO's discretion to consider the effectiveness of resources in determining which, if any, resources contracted to provide Operating Reserves (either procured through the ISO's competitive market, or self-provided by Scheduling Coordinators) should be dispatched to supply Imbalance Energy.[14]  During real time, if the amount of Operating Reserves approaches or falls below the minimum requirements, the ISO can use its discretion to withhold or not dispatch the Energy bids associated with the Operating Reserve capacity.  For example, the ISO may consider WSCC Operating Reserve requirements and other factors, such as the overall availability of Energy from resources contracted to provide Operating Reserves, in determining the effectiveness of resources to be dispatched.  If a resource supplying Operating Reserve is dispatched to provide Imbalance Energy, the ISO must replace the Operating Reserve within the time frame specified in the WSCC guidelines.[15]

Under the ISO's current real time dispatch practices, the decision to withhold Energy bids to prevent a deficiency in Operating Reserves is often an all or nothing proposition.  In other words, as the amount of Operating Reserves approaches or falls below the minimum requirements, the ISO will withhold all of the Energy bids

---

[11]    See ISO Tariff § 2.5.3.2.

[12]    See, e.g., ISO Tariff § 2.5.4 and § 2.5.12(b).

[13]    ISO Tariff §§ 2.5.22.2(e).

[14]    ISO Tariff § 2.5.22.3.

[15]    Id.

associated with contracted-for Operating Reserves.[16]  Stated differently, existing dispatch practices do not afford Market Participants with a mechanism to express their desire to either: (1) have their Operating Reserves dispatched only in the event of a Contingency or System Emergency, or (2) have their Operating Reserves dispatched for Imbalance Energy (*i.e.*, to provide Imbalance Energy in the absence of a Contingency or System Emergency).[17]  In order to assist the ISO in preserving contingency Operating Reserves and to increase the supply of those reserves, the ISO proposes to give Market Participants the ability to indicate that these reserves should be dispatched to provide Imbalance Energy only if there is a Contingency or an imminent or actual System Emergency. [18]

With the energy shortages of the past few months, there have been frequent deficiencies in Operating Reserves. These deficiencies put the ISO in the position of declaring System Emergencies and incurring WSCC penalties.  The ISO incurred over $1 million in WSCC penalties in the year 2000 due to such shortfalls.[19]  The deficiencies have occurred because the Energy associated with Operating Reserves has been dispatched to supply Imbalance Energy and the ISO has been unable to replace the Operating Reserves within the time frames specified in WSCC guidelines.

Moreover, during the past few months, the ISO has observed a marked decrease in the amount of Operating Reserve being bid into the ISO markets.[20]  The decrease has been observed with regard to both in-state resources as well as imports of Operating Reserves.  Certain suppliers have resource capacity that can be used to supply Operating Reserves but the amount of Energy available for dispatch is limited for some reason (*e.g.*, hydroelectric units with water restrictions or generating units with emission constraints).  Part of reason for the decline in Operating Reserves is because these energy-limited resources are not making themselves available to the ISO where the probability of dispatch is high under

---

[16]  *See, e.g.*, ISO Procedure M-403 ("Balancing Energy Ex Post Pricing") § 1.4, which provides that if all Spinning and Non-Spinning bids are going to be skipped to maintain Operating Reserve criteria, the ISO will send a notice to market participants.

[17]  While individual Market Participants may be able to make the ISO aware of the conditions that may relate to the effectiveness of their Energy bids dispatched to supply Imbalance Energy, these currently are non-structured communications and are not integrated into the ISO's business systems.

[18]  *See* Attachment F to this filing which contains a February 15, 2001 Memorandum to the ISO Board of Governors and a February 27, 2001 Memorandum to ISO Board of Governors regarding the split BEEP proposals.

[19]  *See* Attachment F, February 27 Memorandum at 3.

[20]  *Id.* at 1.

current conditions. This problem is further exacerbated by the Commission's approval of market reforms with pricing breakpoints and "as bid" prices above those breakpoints. Before "as bid" pricing, bidders could express the willingness to be dispatched only for Contingencies or System Emergencies by submitting high or near price cap Energy bids. With "as bid" pricing above a $150 break point, bidders submitting high bids may find themselves not only dispatched to provide Imbalance Energy, but faced with the requirement to justify the high price to the Commission.

To correct the above-mentioned problems, the ISO proposes to give Market Participants with resources selected to provide Operating Reserves the ability to indicate whether the dispatch of these resources should, or should not, be limited to Contingencies or System Emergencies. Market Participants will be able to indicate this preference on an hourly basis. The flexibility to restrict the dispatch of Operating Reserves will increase the available supply of Operating Reserves and will assist the ISO in preserving those reserves for Contingency and System Emergency use.

Giving Market Participants the flexibility to designate in each hour whether the Operating Reserves can be dispatched to provide Imbalance Energy will require changes to ISO software. Prior to Commission approval and implementation of software changes, the ISO has asked Market Participants to indicate whether their resources have energy limitations such that the resources should only be dispatched for Contingencies and System Emergencies.

The ISO's request amounts to a one-time election for Market Participants and the information provided will allow the ISO to exercise its existing discretion more efficiently (i.e., to determine whether or not contracted-for Operating Reserves should be dispatched to provide Imbalance Energy). Any Market Participant designations will remain in place until the Commission acts on this filing. If a Market Participant does not make an election, the Energy associated with accepted Operating Reserve bids will be available for dispatch to supply Imbalance Energy.

III.    Tariff Changes

The tariff changes necessary for the temporary suspension of the underscheduling penalty amount to adding the phrase "Beginning June 1, 2001" at the start of ISO Tariff Section 2.2.13.2.3.1. The tariff changes associated with the Split Beep proposal involve clarification and modifications to: (1) real time dispatch

rules, (2) the information required of bidders for Spinning and Non-Spinning Reserves, and (3) the rules for substitution of Ancillary Services according to the ISO's rational buyer protocol. Revised Tariff Sheets are provided in Attachment A (suspension of underscheduling penalty) and Attachment B (Split BEEP proposal) to this filing. The black-lined Tariff provisions are provided in Attachments C and D, respectively.

## IV. Requested Effective Date and Request for Waiver of 60 Day Prior Notice Requirement

### A. Split BEEP Proposal.

Due to the software changes and the operational mechanisms required to implement the ISO's Split Beep proposal, the ISO requests an effective date for the Split BEEP proposal on the later of May 18, 2001 or at least ten days after the ISO posts notice on the ISO Home Page that the modified software is ready for use to accommodate this change.

### B. Temporary Suspension of the Underscheduling Penalty

The ISO respectfully requests, pursuant to Section 35.11 of the Commission's regulations, 18 C.F.R. § 35.11, that the Commission waive its notice requirements and approve a temporary suspension of the under-scheduling penalty from January 1, 2001 through May 31, 2001. Moreover, the ISO believes that immediate implementation of this provision is necessary so that the IOUs can avoid worsening their already precarious financial situation, at a time when such penalties are not achieving the goals for which they were created.[21]

## V. Service

The ISO has served this filing on Public Utilities Commission of the State of California, the California Energy Commission, the California Electricity Oversight Board, and all parties with effective Scheduling Coordinator Service Agreements under the ISO Tariff.

---

[21] The Preliminary Settlement Statement for January 1, 2001 was produced and delivered to Scheduling Coordinators on February 26, 2001. This and subsequent Preliminary Statements for January and beyond will not include the penalty and allocation of revenue until the Commission has taken action on this matter. The ISO has and will continue to calculate the penalty and allocation for inclusion in a future Settlement Statement and Invoice should the Commission reject Tariff Amendment No. 38. The design of the penalty is insular in that no other market charges are affected by its implementation, and thus it can be administered independently from any other settlement elements. In a Market Notice issued on February 23, 2001, the ISO notified Market Participants that while the penalty will continue to be calculated, the results will not appear unless the Commission determines that it is appropriate to reject the suspension.

## VI.    Communication

Communications regarding this filing should be addressed to the following individuals, whose names should be placed on the official service list established by the Secretary with respect to this submittal:

Charles F. Robinson
General Counsel
Roger E. Smith
Senior Regulatory Counsel
The California Independent System
    Operator Corporation
151 Blue Ravine Road
Folsom, CA  95630
Tele: (916) 608-7135
Fax:  (916) 608-7296

Kenneth G. Jaffe
David B. Rubin
Julia Moore
Sean A. Atkins
Swidler Berlin Shereff Friedman, LLP
3000 K Street, N.W.
Washington, DC  20007
Tel: (202) 424-7500
Fax: (202) 424-7643

## VII.    Supporting Documents

The following documents, in addition to this letter, support this filing:

| | |
|---|---|
| Attachment A | Revised Tariff Sheets - Underscheduling Penalty |
| Attachment B | Revised Tariff Sheets – Split BEEP Proposal |
| Attachment C | Black-lined Tariff provisions - Underscheduling Penalty |
| Attachment D | Black-lined Tariff provisions – Split BEEP Proposal |
| Attachment E | Affidavit of Spence E. Gerber |
| Attachment F | February 15, 2001 and February 27, 2001 Memoranda to the ISO Board of Governors |
| Attachment G | Notice of this filing, suitable for publication in the Federal Register (also provided in electronic format). |

The Honorable David P. Boergers
March 20, 2001
Page 11

Two additional copies of this filing are enclosed to be stamped with the date and time of filing and returned to our messenger. If there are any questions concerning this filing, please contact the undersigned.

Respectfully submitted,

Charles F. Robinson
General Counsel
Roger E. Smith
Senior Regulatory Counsel
The California Independent
System Operator Corporation
151 Blue Ravine Road
Folsom, CA 95630
Tel: (916) 608-7135

Kenneth G. Jaffe
David B. Rubin
Julia Moore
Sean A. Atkins
Swidler Berlin Shereff Friedman, LLP
3000 K Street, N.W., Suite 300
Washington, DC 20007
Tel: (202) 424-7500

# EXHIBIT E

# Master Power Purchase & Sale Agreement

 **EDISON ELECTRIC INSTITUTE**



Version 2.1 (modified 4/25/00)

©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

ALL RIGHTS RESERVED UNDER U.S. AND FOREIGN LAW, TREATIES AND CONVENTIONS
AUTOMATIC LICENSE – PERMISSION OF THE COPYRIGHT OWNERS IS GRANTED FOR REPRODUCTION BY DOWNLOADING
FROM A COMPUTER AND PRINTING ELECTRONIC COPIES OF THE WORK. NO AUTHORIZED COPY MAY BE SOLD. THE
INDUSTRY IS ENCOURAGED TO USE THIS MASTER POWER PURCHASE AND SALE AGREEMENT IN ITS TRANSACTIONS.
ATTRIBUTION TO THE COPYRIGHT OWNERS IS REQUESTED.

# MASTER POWER PURCHASE AND SALES AGREEMENT

## TABLE OF CONTENTS

COVER SHEET ..................................................................................................... 1

GENERAL TERMS AND CONDITIONS ............................................................. 9

ARTICLE ONE:        GENERAL DEFINITIONS ................................................ 9

ARTICLE TWO:        TRANSACTION TERMS AND CONDITIONS .................. 14
    2.1        Transactions .................................................................................. 14
    2.2        Governing Terms .......................................................................... 14
    2.3        Confirmation ................................................................................ 14
    2.4        Additional Confirmation Terms .................................................... 15
    2.5        Recording ..................................................................................... 15

ARTICLE THREE:        OBLIGATIONS AND DELIVERIES ............................ 15
    3.1        Seller's and Buyer's Obligations .................................................. 15
    3.2        Transmission and Scheduling ....................................................... 15
    3.3        Force Majeure ............................................................................... 16

ARTICLE FOUR:        REMEDIES FOR FAILURE TO DELIVER/RECEIVE ......... 16
    4.1        Seller Failure ................................................................................ 16
    4.2        Buyer Failure ................................................................................ 16

ARTICLE FIVE:        EVENTS OF DEFAULT; REMEDIES ........................... 16
    5.1        Events of Default .......................................................................... 16
    5.2        Declaration of an Early Termination Date and Calculation of Settlement
        Amounts ....................................................................................... 18
    5.3        Net Out of Settlement Amounts .................................................... 18
    5.4        Notice of Payment of Termination Payment ................................ 18
    5.5        Disputes With Respect to Termination Payment ........................... 18
    5.6        Closeout Setoffs ........................................................................... 19
    5.7        Suspension of Performance ........................................................... 19

ARTICLE SIX:        PAYMENT AND NETTING ...................................... 19
    6.1        Billing Period ............................................................................... 19
    6.2        Timeliness of Payment ................................................................. 20
    6.3        Disputes and Adjustments of Invoices .......................................... 20
    6.4        Netting of Payments ..................................................................... 20
    6.5        Payment Obligation Absent Netting .............................................. 20
    6.6        Security ......................................................................................... 21
    6.7        Payment for Options ..................................................................... 21
    6.8        Transaction Netting ...................................................................... 21

i

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

ARTICLE SEVEN:   LIMITATIONS .................................................................21
    7.1    Limitation of Remedies, Liability and Damages ....................................21

ARTICLE EIGHT:   CREDIT AND COLLATERAL REQUIREMENTS ...............................22
    8.1    Party A Credit Protection ..................................................................22
    8.2    Party B Credit Protection ..................................................................24
    8.3    Grant of Security Interest/Remedies ...................................................25

ARTICLE NINE:   GOVERNMENTAL CHARGES ..........................................................26
    9.1    Cooperation ....................................................................................26
    9.2    Governmental Charges .....................................................................26

ARTICLE TEN:   MISCELLANEOUS .......................................................................26
    10.1    Term of Master Agreement ..............................................................26
    10.2    Representations and Warranties .........................................................26
    10.3    Title and Risk of Loss ....................................................................28
    10.4    Indemnity .....................................................................................28
    10.5    Assignment ...................................................................................28
    10.6    Governing Law ..............................................................................28
    10.7    Notices ........................................................................................29
    10.8    General ........................................................................................29
    10.9    Audit ...........................................................................................29
    10.10  Forward Contract ...........................................................................30
    10.11  Confidentiality ..............................................................................30

ATTACHMENTS:

    SCHEDULE P:  PRODUCTS AND RELATED DEFINITIONS
    EXHIBIT A:  CONFIRMATION LETTER
    EXHIBIT B.  ENRON FORM OF GUARANTY

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 112 of 154

# MASTER POWER PURCHASE AND SALE AGREEMENT
## COVER SHEET

This *Master Power Purchase and Sale Agreement* (Version 2.1; modified 4/25/00) ("*Master Agreement*") is made as of the following date: October 9, 2000 ("Effective Date"). The *Master Agreement*, together with the exhibits, schedules and any written supplements hereto, the Party A Tariff, if any, the Party B Tariff, if any, any designated collateral, credit support or margin agreement or similar arrangement between the Parties and all Transactions (including any confirmations accepted in accordance with Section 2.3 hereto) shall be referred to as the "Agreement." The Parties to this *Master Agreement* are the following:

| | |
|---|---|
| Name: Enron Power Marketing, Inc. ("Party A") | Name: Pacific Gas and Electric Company ("Counterparty" or "Party B") |
| All Notices: P.O. Box 4428<br>Houston, Texas 77210-4428 | All Notices: P. O. Box 770000, MC~~B7C~~ N12E |
| Street: 1400 Smith Street | Street: 77 Beale Street |
| City: Houston          Zip: 77002 | City: San Francisco, CA      Zip: 94177 |

Attn: Power Contract Administration
Phone: (713) 853-1771
Facsimile: (713) 646-2443
Duns: 848921276
Federal Tax ID Number: 76-0413675

Invoices:
  Enron Power Marketing, Inc.
  1400 Smith
  Houston, Texas 77002-7361
  Attn: Power Settlements Manager
  Phone: (713) 853-3163
  Facsimile: (713) 646-4061

Scheduling:
  Enron Power Marketing, Inc.
  1400 Smith
  Houston, Texas 77002-7361
  Attn: Manager of Scheduling
  Phone:   (800) 349-5527 (East) (800) 684-1336 (West)
  Facsimile:   (713) 646-8272 (East) (503) 464-3740 (West

Payments:
  Enron Power Marketing, Inc.
  1400 Smith
  Houston, Texas 77002-7361
  Attn: Power Settlements Manager
  Phone: (713) 853-3163
  Facsimile: (713) 646-4061

Attn: Contract Administration
Phone:   (415) 973-4941
Facsimile:   (415) 973-9176
Duns:   556650034
Federal Tax ID Number:   94-0742640

Invoices:
  Attn:  Director, Utility Electric Supply
  Phone: (415) 973-1340          Settlement
  Facsimile (415) 972-5507
    Pacific Gas and Electric Company
    P. O. Box 770000, MC N12F
    San Francisco, CA  94177

Scheduling:
  Attn:  Manager, Forecasting, Bidding &
  Phone: (415) 973-4489          Scheduling
  Facsimile: (415) 973-5804
    Pacific Gas and Electric Company
    P. O. Box 770000, MC N12E
    San Francisco, CA  94177

Payments:
  Attn:  Director, Utility Electric Supply
  Phone: (415) 973-1340          Settlement
  Facsimile (415) 972-5507
    Pacific Gas and Electric Company
    P. O. Box 770000, MC N12F
    San Francisco, CA  94177

1

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

**Wire Transfer:**
   BNK:   Bank of America
         for: Enron Power Marketing, Inc.
   ABA:   Routing # 111000012
   ACCT:  #375 046 9312
   Confirmation: Enron Power Marketing, Inc.
                 Credit and Collections
                 (713) 853-5667

**Credit and Collections:**
   Enron Power Marketing, Inc.
   1400 Smith
   Houston, Texas 77002-7361
   Attn: Power Settlements Manager
   Phone: (713) 853-3163
   Facsimile: (713) 646-4061

**With additional Notices of an Event of Default or**
**Potential Event of Default to:**
   Enron Power Marketing, Inc.
   1400 Smith Street
   Houston, Texas 77002-7361
   Attn: Assistant General Counsel, Trading Group
   Facsimile: (713) 646-4818

**Wire Transfer:** Mellon GCM (Boston Safe Deposit
   BNK:  __& Trust Co.), Boston, MA__
   ABA:  __Routing # 011001234__
   ACCT: __# 059994__
   Contact: Margaret Wetter (415) 973-3293
  Alternate: Tim Hopkins (415) 973-5621

**Credit and Collections:** Credit Risk Management
   Attn:  __Chris Chung__
   Phone: __(415) 972-5654__
   Facsimile: __(415) 973-7301__

**With additional Notices of an Event of**
**Default or Potential Event of Default to:**
   Attn:  __Joseph C. Henri__
   Phone: __(415) 973-4941__
   Facsimile __(415) 973-9176__

The Parties hereby agree that the General Terms and Conditions are incorporated herein, and to the following provisions as provided for in the General Terms and Conditions:

| | | | |
|---|---|---|---|
| Party A Tariff | Tariff FERC | Dated 12/2/93 | Docket Number ER94-24-027 |
| Party B Tariff | Tariff __FERC__ | Dated __10/30/97__ | Docket Number EC96-19-001 |

**Article Two**

Transaction Terms and Conditions     ☐ Optional provision in Section 2.4. If not checked, inapplicable.

**Article Four**

Remedies for Failure to Deliver or Receive    ■ Accelerated Payment of Damages. If not checked, inapplicable.

**Article Five**

Events of Default; Remedies

             ■ Cross Default for Party A:

             ☐ Party A:_____    Cross Default Amount $_____

             ■ Other Entity: Enron Corp.    Cross Default Amount
                                       $100,000,000

             ■ Cross Default for Party B:

             ■ Party B:_____    Cross Default Amount
                                         $100,000,000

             ☐ Other Entity: _____    Cross Default Amount $_____

             5.6 Closeout Setoff

                ■   Option A (Applicable if no other selection is made.)

                ☐   Option B - Affiliates shall have the meaning set forth in the

2

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 114
of 154

Agreement unless otherwise specified as follows: _____

    ☐  Option C (No Setoff)

---

**Article 8**

Credit and Collateral Requirements

8.1  **Party A Credit Protection:**

  (a) Financial Information:

      ■  Option A
      ☐  Option B  Specify: _____
      ☐  Option C  Specify: _____

  (b) Credit Assurances:

      ■  Not Applicable
      ☐  Applicable

  (c) Collateral Threshold:

      ☐  Not Applicable
      ■  Applicable

If applicable, complete the following:

Party B Collateral Threshold:  (The lower of either S&P or Moody's ratings to apply.)

| Termination Payment | S&P | Moody's |
| --- | --- | --- |
| $40,000,000 | AA- or better | Aa3 or better |
| $35,000,000 | A+ | A1 |
| $30,000,000 | A | A2 |
| $25,000,000 | BBB+ or A- | Baa1 or A3 |
| $15,000,000 | BBB | Baa2 |
| $10,000,000 | BBB- | Baa3 |
| $0 | below BBB- | below Baa3 |

provided, however, that Party B's Collateral Threshold shall be zero if an Event of Default with respect to Party B has occurred and is continuing.

Party B Independent Amount: $0

Party B Rounding Amount: $250,000.00

  (d) Downgrade Event:

      ☐  Not Applicable
      ■  Applicable

If applicable, complete the following:

      ■  It shall be a Downgrade Event for Party B if Party B's Credit Rating falls below BBB- from S&P or Baa3 from Moody's or if  Party B is not rated by either S&P or Moody's.

      ☐  Other:
          Specify: _____

  (e) Guarantor for Party B: _____

      Guarantee Amount: $ _____

3

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

8.2 Party B Credit Protection:

   (a) Financial Information:

       ☐  Option A
       ■  Option B   Specify: Enron Corp.
       ☐  Option C  Specify: _____

   (b) Credit Assurances:

       ■  Not Applicable
       ☐  Applicable

   (c) Collateral Threshold:

       ☐  Not Applicable
       ■  Applicable

If applicable, complete the following:

Party A Collateral Threshold: (The lower of either S&P or Moody's ratings to apply.)

| Termination Payment | S&P | Moody's |
| --- | --- | --- |
| $40,000,000 | AA- or better | Aa3 or better |
| $35,000,000 | A+ | A1 |
| $30,000,000 | BBB+, A-, or A | Baa1, A3, or A2 |
| $15,000,000 | BBB | Baa2 |
| $10,000,000 | BBB- | Baa3 |
| $0 | below BBB- | below Baa3 |

provided, however, that Party A's Collateral Threshold shall be zero if an Event of Default with respect to Party A has occurred and is continuing.

Party A Independent Amount: $0

Party A Rounding Amount: $250,000.00

   (d) Downgrade Event:

       ☐  Not Applicable
       ■  Applicable

If applicable, complete the following:

       ■  It shall be a Downgrade Event for Party A if Enron Corp.'s Credit Rating falls below BBB- from S&P or Baa3 from Moody's or if Enron Corp. is not rated by either S&P or Moody's.

       ☐  Other:
          Specify: _____

   (e) Guarantor for Party A: Enron Corp.

       Guarantee Amount: $35,000,000

---

**Article 10**

Confidentiality            ■ Confidentiality Applicable     If not checked, inapplicable.

4

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

| Schedule M | ☐ Party A is a Governmental Entity or Public Power System |
| | ☐ Party B is a Governmental Entity or Public Power System |
| | ☐ Add Section 3.6. If not checked, inapplicable |
| | ☐ Add Section 8.6. If not checked, inapplicable |
| Other Changes | Specify, if any: Yes, the following changes shall be applicable: |

## Part 1. GENERAL TERMS AND CONDITIONS.

(a) **Definitions.** The following definitions are amended as set forth below:

(1)  Section 1.51 is amended by replacing the current definition with the following:

""Replacement Price" means the price at which Buyer, acting in a commercially reasonable manner, purchases for delivery at the Delivery Point a replacement for any Product specified in a Transaction but not delivered by Seller, plus (i) costs reasonably incurred by Buyer in purchasing such substitute Product and (ii) additional transmission charges, if any, reasonably incurred by Buyer to the Delivery Point, or absent a purchase, the market price at the Delivery Point for such Product not delivered as determined by Buyer in a commercially reasonable manner. The Replacement Price shall also include charges and/or penalties that the California Independent System Operator ("CAISO") passes through to the Buyer, now or in the future, in respect of the underscheduling of supply resulting from the Seller's failure to deliver. For the sake of clarity, these charges and/or penalties currently are "Ten Minute Incremental Price" and "Replacement Reserves" charged on the deviation quantities as defined in the CAISO Tariff. Buyer and Seller understand and agree that in the future the CAISO could assess the Buyer new or additional charges and/or penalties as a result of Seller's failure to deliver. Such new charges and/or penalties may be included in Buyer's calculation of the Replacement Price; provided that, Buyer has previously notified Seller of the existence of these new or additional charges and/or penalties prior to these charges and/or penalties being incurred. Subject to the foregoing, in no event shall the calculation of the Replacement Price include any ratcheted demand charges (or similar charges) assessed Buyer for hours other than the hours for which Seller has failed to deliver the Product. In addition, the Buyer shall not be required to utilize or change its utilization of its owned or controlled assets or market positions to minimize Seller's liability. For the purposes of this definition, Buyer shall be considered to have purchased replacement Product to the extent Buyer shall have entered info one or more arrangements in a commercially reasonable manner whereby Buyer repurchases its obligation to sell and deliver the Product to another party at the Delivery Point."

(2)  Section 1.53 is amended by replacing the current definition with the following:

""Sales Price" means the price at which Seller, acting in a commercially reasonable manner, resells any Product not received by Buyer, deducting from such proceeds any (i) costs reasonably incurred by Seller in reselling such Product and (ii) additional transmission charges, if any, reasonably incurred by Seller in delivering such Product to the third party purchasers, or absent a sale, the market price at the Delivery Point for such Product not received as determined by Seller in a commercially reasonable manner; provided, however if the Seller is unable after using commercially reasonable efforts to resell all or a portion of the Product not received by Buyer, the Sales Price with respect to such Product shall be deemed equal to zero (0). The Sales Price shall also include charges and/or penalties that the CAISO passes through to the Seller, now or in the future, in respect of the overscheduling of supply resulting from the Buyer's failure to deliver. For the sake of clarity, this charge/penalty is currently the "Ten Minute Decremental Price" as defined in the CAISO Tariff. Buyer and Seller understand and agree that in the future the CAISO could assess the Seller new or additional charges and/or penalties as a result of Buyer's failure to schedule and receive. Such new charges and/or penalties may be included in Seller's calculation of the Sales Price; provided that, Seller has previously notified Buyer of the existence of these new or additional charges and/or penalties prior to these charges and/or penalties being incurred. Subject to the foregoing, in no event shall the calculation of the Sales Price include any ratcheted demand charges (or similar charges) assessed Seller for hours other than the hours for which Buyer has failed to schedule and receive the Product. For purposes of this definition, Seller shall be considered to have resold such Product to the extent Seller shall have entered into one or more arrangements in a commercially reasonable

5

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

manner whereby Seller repurchases its obligation to purchase and receive the Product from another party at the Delivery Point."

(b)   **Declaration of an Early Termination Date and Calculation of Settlement Amount.** Section 5.2 is amended to delete the following phrase from the last two lines: "under applicable law on the Early Termination Date, as soon thereafter as is reasonably practicable".

The following shall be added to the end of Section 5.2: "under applicable law on the Early Termination Date, then each such Transaction (individually, an "Excluded Transaction" and collectively, the "Excluded Transactions") shall be terminated as soon thereafter as reasonably practicable, and upon termination shall be deemed to be a Terminated Transaction and the Termination Payment payable in connection with all such Transactions shall be calculated in accordance with Section 5.3 below. The Gains and Losses for each Terminated Transaction shall be determined by comparing the value of the remaining term, transaction quantities, and transaction prices under each Terminated Transaction had it not been terminated to the equivalent quantities and relevant market prices for the remaining term either quoted by a bona fide third-party offer or which are reasonably expected to be available in the market under a replacement contract for each Terminated Transaction. To ascertain the market prices of a replacement contract, the Non-Defaulting Party may consider, among other valuations, quotations from leading dealers in energy contracts, any or all of the settlement prices of the New York Mercantile Exchange power futures contracts and other bona fide third party offers, all adjusted for the length of the remaining term and differences in transmission. It is expressly agreed that the Non-Defaulting Party shall not be required to enter into replacement transactions in order to determine the Termination Payment. .

(c)   **Notice of Payment of Termination Payment.** The following shall be added to the end of Section 5.4:

"Notwithstanding any provision to the contrary contained in this Agreement, the Non-Defaulting Party shall not be required to pay to the Defaulting Party any amount under Article 5 until the Non-Defaulting Party receives confirmation satisfactory to it in its reasonable discretion (which may include an opinion of its counsel) that all other obligations of any kind whatsoever of the Defaulting Party to make any payments to the Non-Defaulting Party under this Agreement or any physical natural gas purchase or sale agreement(s) between Party B and Party A or Party A's Affiliates which are due and payable as of the Early Termination Date (including for these purposes amounts payable pursuant to Excluded Transactions) have been fully and finally performed."

(d)   **Closeout Setoffs.** Section 5.6 Option A is amended by inserting the following after the word "Party" in the sixth line: (which agreements shall include any natural gas purchase and sale agreements between EPMI's Affiliates and Party B.). Notwithstanding anything to the contrary in this Agreement, any right of setoff to which any Party may otherwise be entitled (whether by operation of law, contract or otherwise) shall not apply with respect to any amounts owed under any other agreements between the parties that are based on the International Swaps and Derivatives Association Master Agreement.

(e)   **Timeliness of Payment.** Section 6.2 is amended to delete the first sentence in its entirety and to replace with the following: "Unless otherwise agreed by the Parties in a Transaction, all invoices under this Agreement shall be due and payable in accordance with each Party's invoice instructions on or before ten (10) days after receipt of the invoice or, if such day is not a Business Day, then on the next Business Day."

(f)   **Limitation of Remedies, Liability and Damages.** The fifth sentence of Section 7.1 is amended to delete the phrase "UNLESS EXPRESSLY HEREIN PROVIDED,".

(g)   **Collateral Threshold.** Sections 8.1(c) and 8.2(c) are amended by adding the following paragraph at the end of thereof:

"For purposes of calculating the amount of Performance Assurance due pursuant to Article Eight hereof, the party that would be owed Performance Assurance ("the Requesting Party") shall compare the value of the remaining term, transaction quantities, and transaction prices under each Transaction to the equivalent quantities and relevant market prices for the remaining term either quoted by a bona fide third-party offer or which are reasonably expected to be available in the market. To ascertain the relevant market prices, the Requesting Party may consider, among other valuations, quotations from leading dealers in energy contracts, any or all of the settlement prices of the New York Mercantile Exchange power futures contracts and other bona fide third party offers, all adjusted for the length of the

6

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 118
of 154

remaining term and differences in transmission. If the Requesting Party requests Performance Assurance from the other Party ("the Transferring Party") pursuant to Article Eight hereof, and the Transferring Party disputes the amount of Performance Assurance requested, the Transferring Party shall provide the undisputed amount of Performance Assurance, if any, within the time frame specified in Article Eight. The dispute shall be resolved under the dispute resolution procedures specified herein. If, upon the resolution of the dispute, the Transferring Party is required to provide additional Performance Assurance, it shall do so within three (3) Business Days of the date of such resolution."·

(h) **Downgrade Event.** Section 8.1(d) is amended to add the following phrase after the phrase "or other credit assurance acceptable to Party A within three (3) Business Days of receipt of notice": "or fails to maintain such Performance Assurance or guaranty or other credit assurance for so long as the Downgrade Event is continuing".

(i) **Downgrade Event.** Section 8.2(d) is amended to add the following phrase after the phrase "or other credit assurance acceptable to Party B within three (3) Business Days of receipt of notice": "or fails to maintain such Performance Assurance or guaranty or other credit assurance for so long as the Downgrade Event is continuing".

(j) **Confidentiality.** Section 10.11 is amended to add the phrase "or the completed Cover Sheet to this Master Agreement" immediately before the phrase "to a third party" and to add the phrase "or the Party's Affiliates'" immediately after the phrase "(other than the Party's".

(k) **Arbitration.** The following provision is added as Section 10.12:

<u>Arbitration</u>. Any claim, counterclaim, demand, cause of action, dispute, and controversy arising out of or relating to this Agreement or the relationship established by this Agreement, any provision hereof, the alleged breach thereof, or in any way relating to the subject matter of this Agreement, involving the Parties and/or their respective representatives (for purposes of this Section 10.12 only, collectively the "Claims"), even though some or all of such Claims allegedly are extra-contractual in nature, whether such Claims sound in contract, tort, or otherwise, at law or in equity, under state or federal law, whether provided by statute or the common law, for damages or any other relief, shall be resolved by binding arbitration. Arbitration shall be conducted in accordance with the rules of arbitration of the Federal Arbitration And, to the extent an issue is not addressed by the federal law on arbitration, by the Commercial Arbitration Rules of the American Arbitration Association. The validity, construction, and interpretation of this agreement to arbitrate, and all procedural aspects of the arbitration conducted pursuant hereto shall be decided by the arbitrators. In deciding the substance of the Parties' Claims, the arbitrators shall refer to the governing law. It is agreed that the arbitrators shall have no authority to award treble, exemplary or punitive damages of any type under any circumstances whether or not such damages may be available under state or federal law, or under the Federal Arbitration Act, or under the Commercial Arbitration Rules of the American Arbitration Association, the Parties hereby waiving their right, if any, to recover any such damages. The arbitration proceeding shall be conducted in New York City, New York. Within thirty (30) days of the notice of initiation of the arbitration procedure, each party shall select one arbitrator. The two (2) arbitrators shall select a third arbitrator. The third arbitrator shall be a person who has over eight years professional experience in electrical energy-related transactions and who has not previously been employed by either Party and does not have a direct or indirect interest in either Party or the subject matter of the arbitration. While the third arbitrator shall be neutral, the two party-appointed arbitrators are not required to be neutral, and it shall not be grounds for removal of either of the two party-appointed arbitrators or for vacating the arbitrators' award that either of such arbitrators has past or present minimal relationships with the Party that appointed such arbitrator. To the fullest extent permitted by law, any arbitration proceeding and the arbitrator's award shall be maintained in confidence by the Parties.

## Part 2. <u>SCHEDULE P</u>

The following definitions are hereby added to Schedule P:

"CAISO Firm" means with respect to a Transaction, a Product under which the Seller shall sell and the Buyer shall purchase a quantity of energy equal to the hourly quantity without Ancillary Services (as defined in the Tariff) that is or will be scheduled as a schedule coordinator to schedule coordinator transaction pursuant to the applicable tariff and protocol provisions of the California Independent System Operator ("CAISO") (as amended from time to time, the "Tariff") for which the only excuse for failure to deliver or receive is "an Uncontrollable Force" (as defined in the Tariff) called by the CAISO in accordance with the terms in the Tariff.

7

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

"West Firm" means with respect to a Transaction, a Product that is or will be scheduled as firm energy consistent with the most recent rules adopted by the WSCC for which the only excuses for failure to deliver or receive are if an interruption is (i) due to an Uncontrollable Force as provided in Section 10 of the WSPP Agreement; or (ii) where applicable, to meet Seller's public utility or statutory obligations to its customers. Notwithstanding any other provision in this Agreement, if Seller exercises its right to interrupt to meet its public utility or statutory obligations, Seller shall be responsible for payment of damages for failure to deliver firm energy as provided in Article 4 of this Agreement.

"WSCC" means the Western Systems Coordinating Council.

"WSPP Agreement" means the Western Systems Power Pool Agreement as amended from time to time.

IN WITNESS WHEREOF, the Parties have caused this Master Agreement to be duly executed as of the date first above written.

Party A – ENRON POWER MARKETING, INC.

By: _____

Name: _____

Title: _____

Party B - PACIFIC GAS & ELECTRIC COMPANY

By: _____

Name: __Kent M. Harvey_____

Title: Sr. VP-CFO, Controller & Treasurer

**DISCLAIMER: This Master Power Purchase and Sale Agreement was prepared by a committee of representatives of Edison Electric Institute ("EEI") and National Energy Marketers Association ("NEM") member companies to facilitate orderly trading in and development of wholesale power markets. Neither EEI nor NEM nor any member company nor any of their agents, representatives or attorneys shall be responsible for its use, or any damages resulting therefrom. By providing this Agreement EEI and NEM do not offer legal advice and all users are urged to consult their own legal counsel to ensure that their commercial objectives will be achieved and their legal interests are adequately protected.**

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

## GENERAL TERMS AND CONDITIONS

## ARTICLE ONE:    GENERAL DEFINITIONS

1.1    "Affiliate" means, with respect to any person, any other person (other than an individual) that, directly or indirectly, through one or more intermediaries, controls, or is controlled by, or is under common control with, such person. For this purpose, "control" means the direct or indirect ownership of fifty percent (50%) or more of the outstanding capital stock or other equity interests having ordinary voting power.

1.2    "Agreement" has the meaning set forth in the Cover Sheet.

1.3    "Bankrupt" means with respect to any entity, such entity (i) files a petition or otherwise commences, authorizes or acquiesces in the commencement of a proceeding or cause of action under any bankruptcy, insolvency, reorganization or similar law, or has any such petition filed or commenced against it, (ii) makes an assignment or any general arrangement for the benefit of creditors, (iii) otherwise becomes bankrupt or insolvent (however evidenced), (iv) has a liquidator, administrator, receiver, trustee, conservator or similar official appointed with respect to it or any substantial portion of its property or assets, or (v) is generally unable to pay its debts as they fall due.

1.4    "Business Day" means any day except a Saturday, Sunday, or a Federal Reserve Bank holiday. A Business Day shall open at 8:00 a.m. and close at 5:00 p.m. local time for the relevant Party's principal place of business. The relevant Party, in each instance unless otherwise specified, shall be the Party from whom the notice, payment or delivery is being sent and by whom the notice or payment or delivery is to be received.

1.5    "Buyer" means the Party to a Transaction that is obligated to purchase and receive, or cause to be received, the Product, as specified in the Transaction.

1.6    "Call Option" means an Option entitling, but not obligating, the Option Buyer to purchase and receive the Product from the Option Seller at a price equal to the Strike Price for the Delivery Period for which the Option may be exercised, all as specified in the Transaction. Upon proper exercise of the Option by the Option Buyer, the Option Seller will be obligated to sell and deliver the Product for the Delivery Period for which the Option has been exercised.

1.7    "Claiming Party" has the meaning set forth in Section 3.3.

1.8    "Claims" means all third party claims or actions, threatened or filed and, whether groundless, false, fraudulent or otherwise, that directly or indirectly relate to the subject matter of an indemnity, and the resulting losses, damages, expenses, attorneys' fees and court costs, whether incurred by settlement or otherwise, and whether such claims or actions are threatened or filed prior to or after the termination of this Agreement.

1.9    "Confirmation" has the meaning set forth in Section 2.3.

9

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

1.10    "Contract Price" means the price in $U.S. (unless otherwise provided for) to be paid by Buyer to Seller for the purchase of the Product, as specified in the Transaction.

1.11    "Costs" means, with respect to the Non-Defaulting Party, brokerage fees, commissions and other similar third party transaction costs and expenses reasonably incurred by such Party either in terminating any arrangement pursuant to which it has hedged its obligations or entering into new arrangements which replace a Terminated Transaction; and all reasonable attorneys' fees and expenses incurred by the Non-Defaulting Party in connection with the termination of a Transaction.

1.12    "Credit Rating" means, with respect to any entity, the rating then assigned to such entity's unsecured, senior long-term debt obligations (not supported by third party credit enhancements) or if such entity does not have a rating for its senior unsecured long-term debt, then the rating then assigned to such entity as an issues rating by S&P, Moody's or any other rating agency agreed by the Parties as set forth in the Cover Sheet.

1.13    "Cross Default Amount" means the cross default amount, if any, set forth in the Cover Sheet for a Party.

1.14    "Defaulting Party" has the meaning set forth in Section 5.1.

1.15    "Delivery Period" means the period of delivery for a Transaction, as specified in the Transaction.

1.16    "Delivery Point" means the point at which the Product will be delivered and received, as specified in the Transaction.

1.17    "Downgrade Event" has the meaning set forth on the Cover Sheet.

1.18    "Early Termination Date" has the meaning set forth in Section 5.2.

1.19    "Effective Date" has the meaning set forth on the Cover Sheet.

1.20    "Equitable Defenses" means any bankruptcy, insolvency, reorganization and other laws affecting creditors' rights generally, and with regard to equitable remedies, the discretion of the court before which proceedings to obtain same may be pending.

1.21    "Event of Default" has the meaning set forth in Section 5.1.

1.22    "FERC" means the Federal Energy Regulatory Commission or any successor government agency.

1.23    "Force Majeure" means an event or circumstance which prevents one Party from performing its obligations under one or more Transactions, which event or circumstance was not anticipated as of the date the Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the Claiming Party, and which, by the exercise of due diligence, the Claiming Party is unable to overcome or avoid or cause to be avoided. Force Majeure shall not be based on (i) the loss of Buyer's markets; (ii) Buyer's inability economically

10

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

to use or resell the Product purchased hereunder; (iii) the loss or failure of Seller's supply; or (iv) Seller's ability to sell the Product at a price greater than the Contract Price. Neither Party may raise a claim of Force Majeure based in whole or in part on curtailment by a Transmission Provider unless (i) such Party has contracted for firm transmission with a Transmission Provider for the Product to be delivered to or received at the Delivery Point and (ii) such curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the Transmission Provider's tariff; provided, however, that existence of the foregoing factors shall not be sufficient to conclusively or presumptively prove the existence of a Force Majeure absent a showing of other facts and circumstances which in the aggregate with such factors establish that a Force Majeure as defined in the first sentence hereof has occurred. The applicability of Force Majeure to the Transaction is governed by the terms of the Products and Related Definitions contained in Schedule P.

1.24  "Gains" means, with respect to any Party, an amount equal to the present value of the economic benefit to it, if any (exclusive of Costs), resulting from the termination of a Terminated Transaction, determined in a commercially reasonable manner.

1.25  "Guarantor" means, with respect to a Party, the guarantor, if any, specified for such Party on the Cover Sheet.

1.26  "Interest Rate" means, for any date, the lesser of (a) the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under "Money Rates" on such day (or if not published on such day on the most recent preceding day on which published), plus two percent (2%) and (b) the maximum rate permitted by applicable law.

1.27  "Letter(s) of Credit" means one or more irrevocable, transferable standby letters of credit issued by a U.S. commercial bank or a foreign bank with a U.S. branch with such bank having a credit rating of at least A- from S&P or A3 from Moody's, in a form acceptable to the Party in whose favor the letter of credit is issued. Costs of a Letter of Credit shall be borne by the applicant for such Letter of Credit.

1.28  "Losses" means, with respect to any Party, an amount equal to the present value of the economic loss to it, if any (exclusive of Costs), resulting from termination of a Terminated Transaction, determined in a commercially reasonable manner.

1.29  "Master Agreement" has the meaning set forth on the Cover Sheet.

1.30  "Moody's" means Moody's Investor Services, Inc. or its successor.

1.31  "NERC Business Day" means any day except a Saturday, Sunday or a holiday as defined by the North American Electric Reliability Council or any successor organization thereto. A NERC Business Day shall open at 8:00 a.m. and close at 5:00 p.m. local time for the relevant Party's principal place of business. The relevant Party, in each instance unless otherwise specified, shall be the Party from whom the notice, payment or delivery is being sent and by whom the notice or payment or delivery is to be received.

11

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

1.32    "Non-Defaulting Party" has the meaning set forth in Section 5.2.

1.33    "Offsetting Transactions" mean any two or more outstanding Transactions, having the same or overlapping Delivery Period(s), Delivery Point and payment date, where under one or more of such Transactions, one Party is the Seller, and under the other such Transaction(s), the same Party is the Buyer.

1.34    "Option" means the right but not the obligation to purchase or sell a Product as specified in a Transaction.

1.35    "Option Buyer" means the Party specified in a Transaction as the purchaser of an option, as defined in Schedule P.

1.36    "Option Seller" means the Party specified in a Transaction as the seller of an option , as defined in Schedule P.

1.37    "Party A Collateral Threshold" means the collateral threshold, if any, set forth in the Cover Sheet for Party A.

1.38    "Party B Collateral Threshold" means the collateral threshold, if any, set forth in the Cover Sheet for Party B.

1.39    "Party A Independent Amount" means the amount , if any, set forth in the Cover Sheet for Party A.

1.40    "Party B Independent Amount" means the amount , if any, set forth in the Cover Sheet for Party B.

1.41    "Party A Rounding Amount" means the amount, if any, set forth in the Cover Sheet for Party A.

1.42    "Party B Rounding Amount" means the amount, if any, set forth in the Cover Sheet for Party B.

1.43    "Party A Tariff" means the tariff, if any, specified in the Cover Sheet for Party A.

1.44    "Party B Tariff" means the tariff, if any, specified in the Cover Sheet for Party B.

1.45    "Performance Assurance" means collateral in the form of either cash, Letter(s) of Credit, or other security acceptable to the Requesting Party.

1.46    "Potential Event of Default" means an event which, with notice or passage of time or both, would constitute an Event of Default.

1.47    "Product" means electric capacity, energy or other product(s) related thereto as specified in a Transaction by reference to a Product listed in Schedule P hereto or as otherwise specified by the Parties in the Transaction.

12

1.48    "Put Option" means an Option entitling, but not obligating, the Option Buyer to sell and deliver the Product to the Option Seller at a price equal to the Strike Price for the Delivery Period for which the option may be exercised, all as specified in a Transaction. Upon proper exercise of the Option by the Option Buyer, the Option Seller will be obligated to purchase and receive the Product.

1.49    "Quantity" means that quantity of the Product that Seller agrees to make available or sell and deliver, or cause to be delivered, to Buyer, and that Buyer agrees to purchase and receive, or cause to be received, from Seller as specified in the Transaction.

1.50    "Recording" has the meaning set forth in Section 2.4.

1.51    "Replacement Price" means the price at which Buyer, acting in a commercially reasonable manner, purchases at the Delivery Point a replacement for any Product specified in a Transaction but not delivered by Seller, plus (i) costs reasonably incurred by Buyer in purchasing such substitute Product and (ii) additional transmission charges, if any, reasonably incurred by Buyer to the Delivery Point, or at Buyer's option, the market price at the Delivery Point for such Product not delivered as determined by Buyer in a commercially reasonable manner; provided, however, in no event shall such price include any penalties, ratcheted demand or similar charges, nor shall Buyer be required to utilize or change its utilization of its owned or controlled assets or market positions to minimize Seller's liability. For the purposes of this definition, Buyer shall be considered to have purchased replacement Product to the extent Buyer shall have entered into one or more arrangements in a commercially reasonable manner whereby Buyer repurchases its obligation to sell and deliver the Product to another party at the Delivery Point.

1.52    "S&P" means the Standard & Poor's Rating Group (a division of McGraw-Hill, Inc.) or its successor.

1.53    "Sales Price" means the price at which Seller, acting in a commercially reasonable manner, resells at the Delivery Point any Product not received by Buyer, deducting from such proceeds any (i) costs reasonably incurred by Seller in reselling such Product and (ii) additional transmission charges, if any, reasonably incurred by Seller in delivering such Product to the third party purchasers, or at Seller's option, the market price at the Delivery Point for such Product not received as determined by Seller in a commercially reasonable manner; provided, however, in no event shall such price include any penalties, ratcheted demand or similar charges, nor shall Seller be required to utilize or change its utilization of its owned or controlled assets, including contractual assets, or market positions to minimize Buyer's liability. For purposes of this definition, Seller shall be considered to have resold such Product to the extent Seller shall have entered into one or more arrangements in a commercially reasonable manner whereby Seller repurchases its obligation to purchase and receive the Product from another party at the Delivery Point.

1.54    "Schedule" or "Scheduling" means the actions of Seller, Buyer and/or their designated representatives, including each Party's Transmission Providers, if applicable, of notifying, requesting and confirming to each other the quantity and type of Product to be delivered on any given day or days during the Delivery Period at a specified Delivery Point.

13

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

1.55 "Seller" means the Party to a Transaction that is obligated to sell and deliver, or cause to be delivered, the Product, as specified in the Transaction.

1.56 "Settlement Amount" means, with respect to a Transaction and the Non-Defaulting Party, the Losses or Gains, and Costs, expressed in U.S. Dollars, which such party incurs as a result of the liquidation of a Terminated Transaction pursuant to Section 5.2.

1.57 "Strike Price" means the price to be paid for the purchase of the Product pursuant to an Option.

1.58 "Terminated Transaction" has the meaning set forth in Section 5.2.

1.59 "Termination Payment" has the meaning set forth in Section 5.3.

1.60 "Transaction" means a particular transaction agreed to by the Parties relating to the sale and purchase of a Product pursuant to this Master Agreement.

1.61 "Transmission Provider" means any entity or entities transmitting or transporting the Product on behalf of Seller or Buyer to or from the Delivery Point in a particular Transaction.

## ARTICLE TWO: TRANSACTION TERMS AND CONDITIONS

2.1 <u>Transactions</u>. A Transaction shall be entered into upon agreement of the Parties orally or, if expressly required by either Party with respect to a particular Transaction, in writing, including an electronic means of communication. Each Party agrees not to contest, or assert any defense to, the validity or enforceability of the Transaction entered into in accordance with this Master Agreement (i) based on any law requiring agreements to be in writing or to be signed by the parties, or (ii) based on any lack of authority of the Party or any lack of authority of any employee of the Party to enter into a Transaction.

2.2 <u>Governing Terms</u>. Unless otherwise specifically agreed, each Transaction between the Parties shall be governed by this Master Agreement. This Master Agreement (including all exhibits, schedules and any written supplements hereto), , the Party A Tariff, if any, and the Party B Tariff, if any, any designated collateral, credit support or margin agreement or similar arrangement between the Parties and all Transactions (including any Confirmations accepted in accordance with Section 2.3) shall form a single integrated agreement between the Parties. Any inconsistency between any terms of this Master Agreement and any terms of the Transaction shall be resolved in favor of the terms of such Transaction.

2.3 <u>Confirmation</u>. Seller may confirm a Transaction by forwarding to Buyer by facsimile within three (3) Business Days after the Transaction is entered into a confirmation ("Confirmation") substantially in the form of Exhibit A. If Buyer objects to any term(s) of such Confirmation, Buyer shall notify Seller in writing of such objections within two (2) Business Days of Buyer's receipt thereof, failing which Buyer shall be deemed to have accepted the terms as sent. If Seller fails to send a Confirmation within three (3) Business Days after the Transaction is entered into, a Confirmation substantially in the form of Exhibit A, may be forwarded by Buyer to Seller. If Seller objects to any term(s) of such Confirmation, Seller shall notify Buyer of such objections within two (2) Business Days of Seller's receipt thereof, failing

14

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

which Seller shall be deemed to have accepted the terms as sent. If Seller and Buyer each send a Confirmation and neither Party objects to the other Party's Confirmation within two (2) Business Days of receipt, Seller's Confirmation shall be deemed to be accepted and shall be the controlling Confirmation, unless (i) Seller's Confirmation was sent more than three (3) Business Days after the Transaction was entered into and (ii) Buyer's Confirmation was sent prior to Seller's Confirmation, in which case Buyer's Confirmation shall be deemed to be accepted and shall be the controlling Confirmation. Failure by either Party to send or either Party to return an executed Confirmation or any objection by either Party shall not invalidate the Transaction agreed to by the Parties.

2.4  Additional Confirmation Terms. If the Parties have elected on the Cover Sheet to make this Section 2.4 applicable to this Master Agreement, when a Confirmation contains provisions, other than those provisions relating to the commercial terms of the Transaction (e.g., price or special transmission conditions), which modify or supplement the general terms and conditions of this Master Agreement (e.g., arbitration provisions or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 2.3 unless agreed to either orally or in writing by the Parties; provided that the foregoing shall not invalidate any Transaction agreed to by the Parties.

2.5  Recording. Unless a Party expressly objects to a Recording (defined below) at the beginning of a telephone conversation, each Party consents to the creation of a tape or electronic recording ("Recording") of all telephone conversations between the Parties to this Master Agreement, and that any such Recordings will be retained in confidence, secured from improper access, and may be submitted in evidence in any proceeding or action relating to this Agreement. Each Party waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording and to obtain any necessary consent of such officers and employees. The Recording, and the terms and conditions described therein, if admissible, shall be the controlling evidence for the Parties' agreement with respect to a particular Transaction in the event a Confirmation is not fully executed (or deemed accepted) by both Parties. Upon full execution (or deemed acceptance) of a Confirmation, such Confirmation shall control in the event of any conflict with the terms of a Recording, or in the event of any conflict with the terms of this Master Agreement.

## ARTICLE THREE:  OBLIGATIONS AND DELIVERIES

3.1  Seller's and Buyer's Obligations. With respect to each Transaction, Seller shall sell and deliver, or cause to be delivered, and Buyer shall purchase and receive, or cause to be received, the Quantity of the Product at the Delivery Point, and Buyer shall pay Seller the Contract Price; provided, however, with respect to Options, the obligations set forth in the preceding sentence shall only arise if the Option Buyer exercises its Option in accordance with its terms. Seller shall be responsible for any costs or charges imposed on or associated with the Product or its delivery of the Product up to the Delivery Point. Buyer shall be responsible for any costs or charges imposed on or associated with the Product or its receipt at and from the Delivery Point.

3.2  Transmission and Scheduling. Seller shall arrange and be responsible for transmission service to the Delivery Point and shall Schedule or arrange for Scheduling services

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923   Doc# 6929   Filed: 06/03/02   Entered: 06/04/02 14:19:00   Page 127 of 154

with its Transmission Providers, as specified by the Parties in the Transaction, or in the absence thereof, in accordance with the practice of the Transmission Providers, to deliver the Product to the Delivery Point. Buyer shall arrange and be responsible for transmission service at and from the Delivery Point and shall Schedule or arrange for Scheduling services with its Transmission Providers to receive the Product at the Delivery Point.

3.3     Force Majeure.  To the extent either Party is prevented by Force Majeure from carrying out, in whole or part, its obligations under the Transaction and such Party (the "Claiming Party") gives notice and details of the Force Majeure to the other Party as soon as practicable, then, unless the terms of the Product specify otherwise, the Claiming Party shall be excused from the performance of its obligations with respect to such Transaction (other than the obligation to make payments then due or becoming due with respect to performance prior to the Force Majeure).  The Claiming Party shall remedy the Force Majeure with all reasonable dispatch.  The non-Claiming Party shall not be required to perform or resume performance of its obligations to the Claiming Party corresponding to the obligations of the Claiming Party excused by Force Majeure.

## ARTICLE FOUR:    REMEDIES FOR FAILURE TO DELIVER/RECEIVE

4.1     Seller Failure.  If Seller fails to schedule and/or deliver all or part of the Product pursuant to a Transaction, and such failure is not excused under the terms of the Product or by Buyer's failure to perform, then Seller shall pay Buyer, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified on the Cover Sheet, within five (5) Business Days of invoice receipt, an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Contract Price from the Replacement Price.  The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount.

4.2     Buyer Failure.  If Buyer fails to schedule and/or receive all or part of the Product pursuant to a Transaction and such failure is not excused under the terms of the Product or by Seller's failure to perform, then Buyer shall pay Seller, on the date payment would otherwise be due in respect of the month in which the failure occurred or, if "Accelerated Payment of Damages" is specified on the Cover Sheet, within five (5) Business Days of invoice receipt, an amount for such deficiency equal to the positive difference, if any, obtained by subtracting the Sales Price from the Contract Price.  The invoice for such amount shall include a written statement explaining in reasonable detail the calculation of such amount.

## ARTICLE FIVE:    EVENTS OF DEFAULT; REMEDIES

5.1     Events of Default.  An "Event of Default" shall mean, with respect to a Party (a "Defaulting Party"), the occurrence of any of the following:

(a)     the failure to make, when due, any payment required pursuant to this Agreement if such failure is not remedied within three (3) Business Days after written notice;

16

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

(b)    any representation or warranty made by such Party herein is false or misleading in any material respect when made or when deemed made or repeated;

(c)    the failure to perform any material covenant or obligation set forth in this Agreement (except to the extent constituting a separate Event of Default, and except for such Party's obligations to deliver or receive the Product, the exclusive remedy for which is provided in Article Four) if such failure is not remedied within three (3) Business Days after written notice;

(d)    such Party becomes Bankrupt;

(e)    the failure of such Party to satisfy the creditworthiness/collateral requirements agreed to pursuant to Article Eight hereof;

(f)    such Party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all of its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer, the resulting, surviving or transferee entity fails to assume all the obligations of such Party under this Agreement to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other Party;

(g)    if the applicable cross default section in the Cover Sheet is indicated for such Party, the occurrence and continuation of (i) a default, event of default or other similar condition or event in respect of such Party or any other party specified in the Cover Sheet for such Party under one or more agreements or instruments, individually or collectively, relating to indebtedness for borrowed money in an aggregate amount of not less than the applicable Cross Default Amount (as specified in the Cover Sheet), which results in such indebtedness becoming, or becoming capable at such time of being declared, immediately due and payable or (ii) a default by such Party or any other party specified in the Cover Sheet for such Party in making on the due date therefor one or more payments, individually or collectively, in an aggregate amount of not less than the applicable Cross Default Amount (as specified in the Cover Sheet);

(h)    with respect to such Party's Guarantor, if any:

    (i)    if any representation or warranty made by a Guarantor in connection with this Agreement is false or misleading in any material respect when made or when deemed made or repeated;

    (ii)    the failure of a Guarantor to make any payment required or to perform any other material covenant or obligation in any guaranty made in connection with this Agreement and such failure shall not be remedied within three (3) Business Days after written notice;

17

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 129 of 154

<blockquote>
(iii)    a Guarantor becomes Bankrupt;

(iv)    the failure of a Guarantor's guaranty to be in full force and effect for purposes of this Agreement (other than in accordance with its terms) prior to the satisfaction of all obligations of such Party under each Transaction to which such guaranty shall relate without the written consent of the other Party; or

(v)    a Guarantor shall repudiate, disaffirm, disclaim, or reject, in whole or in part, or challenge the validity of any guaranty.
</blockquote>

5.2    <u>Declaration of an Early Termination Date and Calculation of Settlement Amounts</u>. If an Event of Default with respect to a Defaulting Party shall have occurred and be continuing, the other Party (the "Non-Defaulting Party") shall have the right (i) to designate a day, no earlier than the day such notice is effective and no later than 20 days after such notice is effective, as an early termination date ("Early Termination Date") to accelerate all amounts owing between the Parties and to liquidate and terminate all, but not less than all, Transactions (each referred to as a "Terminated Transaction") between the Parties, (ii) withhold any payments due to the Defaulting Party under this Agreement and (iii) suspend performance. The Non-Defaulting Party shall calculate, in a commercially reasonable manner, a Settlement Amount for each such Terminated Transaction as of the Early Termination Date (or, to the extent that in the reasonable opinion of the Non-Defaulting Party certain of such Terminated Transactions are commercially impracticable to liquidate and terminate or may not be liquidated and terminated under applicable law on the Early Termination Date, as soon thereafter as is reasonably practicable).

5.3    <u>Net Out of Settlement Amounts</u>. The Non-Defaulting Party shall aggregate all Settlement Amounts into a single amount by: netting out (a) all Settlement Amounts that are due to the Defaulting Party, plus, at the option of the Non-Defaulting Party, any cash or other form of security then available to the Non-Defaulting Party pursuant to Article Eight, plus any or all other amounts due to the Defaulting Party under this Agreement against (b) all Settlement Amounts that are due to the Non-Defaulting Party, plus any or all other amounts due to the Non-Defaulting Party under this Agreement, so that all such amounts shall be netted out to a single liquidated amount (the "Termination Payment") payable by one Party to the other. The Termination Payment shall be due to or due from the Non-Defaulting Party as appropriate.

5.4    <u>Notice of Payment of Termination Payment</u>. As soon as practicable after a liquidation, notice shall be given by the Non-Defaulting Party to the Defaulting Party of the amount of the Termination Payment and whether the Termination Payment is due to or due from the Non-Defaulting Party. The notice shall include a written statement explaining in reasonable detail the calculation of such amount. The Termination Payment shall be made by the Party that owes it within two (2) Business Days after such notice is effective.

5.5    <u>Disputes With Respect to Termination Payment</u>. If the Defaulting Party disputes the Non-Defaulting Party's calculation of the Termination Payment, in whole or in part, the Defaulting Party shall, within two (2) Business Days of receipt of Non-Defaulting Party's calculation of the Termination Payment, provide to the Non-Defaulting Party a detailed written

18

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 130 of 154

explanation of the basis for such dispute; provided, however, that if the Termination Payment is due from the Defaulting Party, the Defaulting Party shall first transfer Performance Assurance to the Non-Defaulting Party in an amount equal to the Termination Payment.

5.6    Closeout Setoffs.

Option A:  After calculation of a Termination Payment in accordance with Section 5.3, if the Defaulting Party would be owed the Termination Payment, the Non-Defaulting Party shall be entitled, at its option and in its discretion, to (i) set off against such Termination Payment any amounts due and owing by the Defaulting Party to the Non-Defaulting Party under any other agreements, instruments or undertakings between the Defaulting Party and the Non-Defaulting Party and/or (ii) to the extent the Transactions are not yet liquidated in accordance with Section 5.2, withhold payment of the Termination Payment to the Defaulting Party.  The remedy provided for in this Section shall be without prejudice and in addition to any right of setoff, combination of accounts, lien or other right to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

Option B:  After calculation of a Termination Payment in accordance with Section 5.3, if the Defaulting Party would be owed the Termination Payment, the Non-Defaulting Party shall be entitled, at its option and in its discretion, to (i) set off against such Termination Payment any amounts due and owing by the Defaulting Party or any of its Affiliates to the Non-Defaulting Party or any of its Affiliates under any other agreements, instruments or undertakings between the Defaulting Party or any of its Affiliates and the Non-Defaulting Party or any of its Affiliates and/or (ii) to the extent the Transactions are not yet liquidated in accordance with Section 5.2, withhold payment of the Termination Payment to the Defaulting Party.  The remedy provided for in this Section shall be without prejudice and in addition to any right of setoff, combination of accounts, lien or other right to which any Party is at any time otherwise entitled (whether by operation of law, contract or otherwise).

Option C:  Neither Option A nor B shall apply.

5.7    Suspension of Performance.  Notwithstanding any other provision of this Master Agreement, if (a) an Event of Default or (b) a Potential Event of Default shall have occurred and be continuing, the Non-Defaulting Party, upon written notice to the Defaulting Party, shall have the right (i) to suspend performance under any or all Transactions; provided, however, in no event shall any such suspension continue for longer than ten (10) NERC Business Days with respect to any single Transaction unless an early Termination Date shall have been declared and notice thereof pursuant to Section 5.2 given, and (ii) to the extent an Event of Default shall have occurred and be continuing to exercise any remedy available at law or in equity.

## ARTICLE SIX:    PAYMENT AND NETTING

6.1    Billing Period.  Unless otherwise specifically agreed upon by the Parties in a Transaction, the calendar month shall be the standard period for all payments under this Agreement (other than Termination Payments and, if "Accelerated Payment of Damages" is specified by the Parties in the Cover Sheet, payments pursuant to Section 4.1 or 4.2 and Option premium payments pursuant to Section 6.7).  As soon as practicable after the end of each month,

19

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923   Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 131 of 154

each Party will render to the other Party an invoice for the payment obligations, if any, incurred hereunder during the preceding month.

6.2    Timeliness of Payment. Unless otherwise agreed by the Parties in a Transaction, all invoices under this Master Agreement shall be due and payable in accordance with each Party's invoice instructions on or before the later of the twentieth (20th) day of each month, or tenth (10th) day after receipt of the invoice or, if such day is not a Business Day, then on the next Business Day. Each Party will make payments by electronic funds transfer, or by other mutually agreeable method(s), to the account designated by the other Party. Any amounts not paid by the due date will be deemed delinquent and will accrue interest at the Interest Rate, such interest to be calculated from and including the due date to but excluding the date the delinquent amount is paid in full.

6.3    Disputes and Adjustments of Invoices. A Party may, in good faith, dispute the correctness of any invoice or any adjustment to an invoice, rendered under this Agreement or adjust any invoice for any arithmetic or computational error within twelve (12) months of the date the invoice, or adjustment to an invoice, was rendered. In the event an invoice or portion thereof, or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of the invoice shall be required to be made when due, with notice of the objection given to the other Party. Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment. Payment of the disputed amount shall not be required until the dispute is resolved. Upon resolution of the dispute, any required payment shall be made within two (2) Business Days of such resolution along with interest accrued at the Interest Rate from and including the due date to but excluding the date paid. Inadvertent overpayments shall be returned upon request or deducted by the Party receiving such overpayment from subsequent payments, with interest accrued at the Interest Rate from and including the date of such overpayment to but excluding the date repaid or deducted by the Party receiving such overpayment. Any dispute with respect to an invoice is waived unless the other Party is notified in accordance with this Section 6.3 within twelve (12) months after the invoice is rendered or any specific adjustment to the invoice is made. If an invoice is not rendered within twelve (12) months after the close of the month during which performance of a Transaction occurred, the right to payment for such performance is waived.

6.4    Netting of Payments. The Parties hereby agree that they shall discharge mutual debts and payment obligations due and owing to each other on the same date pursuant to all Transactions through netting, in which case all amounts owed by each Party to the other Party for the purchase and sale of Products during the monthly billing period under this Master Agreement, including any related damages calculated pursuant to Article Four (unless one of the Parties elects to accelerate payment of such amounts as permitted by Article Four), interest, and payments or credits, shall be netted so that only the excess amount remaining due shall be paid by the Party who owes it.

6.5    Payment Obligation Absent Netting. If no mutual debts or payment obligations exist and only one Party owes a debt or obligation to the other during the monthly billing period, including, but not limited to, any related damage amounts calculated pursuant to Article Four, interest, and payments or credits, that Party shall pay such sum in full when due.

20

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

6.6    Security. Unless the Party benefiting from Performance Assurance or a guaranty notifies the other Party in writing, and except in connection with a liquidation and termination in accordance with Article Five, all amounts netted pursuant to this Article Six shall not take into account or include any Performance Assurance or guaranty which may be in effect to secure a Party's performance under this Agreement.

6.7    Payment for Options. The premium amount for the purchase of an Option shall be paid within two (2) Business Days of receipt of an invoice from the Option Seller. Upon exercise of an Option, payment for the Product underlying such Option shall be due in accordance with Section 6.1.

6.8    Transaction Netting. If the Parties enter into one or more Transactions, which in conjunction with one or more other outstanding Transactions, constitute Offsetting Transactions, then all such Offsetting Transactions may by agreement of the Parties, be netted into a single Transaction under which:

(a)    the Party obligated to deliver the greater amount of Energy will deliver the difference between the total amount it is obligated to deliver and the total amount to be delivered to it under the Offsetting Transactions, and

(b)    the Party owing the greater aggregate payment will pay the net difference owed between the Parties.

Each single Transaction resulting under this Section shall be deemed part of the single, indivisible contractual arrangement between the parties, and once such resulting Transaction occurs, outstanding obligations under the Offsetting Transactions which are satisfied by such offset shall terminate.

## ARTICLE SEVEN:    LIMITATIONS

7.1    Limitation of Remedies, Liability and Damages. EXCEPT AS SET FORTH HEREIN, THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED. THE PARTIES CONFIRM THAT THE EXPRESS REMEDIES AND MEASURES OF DAMAGES PROVIDED IN THIS AGREEMENT SATISFY THE ESSENTIAL PURPOSES HEREOF. FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, THE OBLIGOR'S LIABILITY SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, THE OBLIGOR'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR

21

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

## ARTICLE EIGHT:    CREDIT AND COLLATERAL REQUIREMENTS

8.1    Party A Credit Protection. The applicable credit and collateral requirements shall be as specified on the Cover Sheet. If no option in Section 8.1(a) is specified on the Cover Sheet, Section 8.1(a) Option C shall apply exclusively. If none of Sections 8.1(b), 8.1(c) or 8.1(d) are specified on the Cover Sheet, Section 8.1(b) shall apply exclusively.

(a)    Financial Information. Option A: If requested by Party A, Party B shall deliver (i) within 120 days following the end of each fiscal year, a copy of Party B's annual report containing audited consolidated financial statements for such fiscal year and (ii) within 60 days after the end of each of its first three fiscal quarters of each fiscal year, a copy of Party B's quarterly report containing unaudited consolidated financial statements for such fiscal quarter. In all cases the statements shall be for the most recent accounting period and prepared in accordance with generally accepted accounting principles; provided, however, that should any such statements not be available on a timely basis due to a delay in preparation or certification, such delay shall not be an Event of Default so long as Party B diligently pursues the preparation, certification and delivery of the statements.

Option B: If requested by Party A, Party B shall deliver (i) within 120 days following the end of each fiscal year, a copy of the annual report containing audited consolidated financial statements for such fiscal year for the party(s) specified on the Cover Sheet and (ii) within 60 days after the end of each of its first three fiscal quarters of each fiscal year, a copy of quarterly report containing unaudited consolidated financial statements for such fiscal quarter for the party(s) specified on the Cover Sheet. In all cases the statements shall be for the most recent accounting period and shall be prepared in accordance with generally accepted accounting principles; provided, however, that should any such statements not be available on a timely basis due to a delay in preparation or certification, such delay shall not be an Event of Default so long as the relevant entity diligently pursues the preparation, certification and delivery of the statements.

Option C: Party A may request from Party B the information specified in the Cover Sheet.

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 134 of 154

(b)     <u>Credit Assurances</u>. If Party A has reasonable grounds to believe that Party B's creditworthiness or performance under this Agreement has become unsatisfactory, Party A will provide Party B with written notice requesting Performance Assurance in an amount determined by Party A in a commercially reasonable manner. Upon receipt of such notice Party B shall have three (3) Business Days to remedy the situation by providing such Performance Assurance to Party A. In the event that Party B fails to provide such Performance Assurance, or a guaranty or other credit assurance acceptable to Party A within three (3) Business Days of receipt of notice, then an Event of Default under Article Five will be deemed to have occurred and Party A will be entitled to the remedies set forth in Article Five of this Master Agreement.

(c)     <u>Collateral Threshold</u>. If at any time and from time to time during the term of this Agreement (and notwithstanding whether an Event of Default has occurred), the Termination Payment that would be owed to Party A plus Party B's Independent Amount, if any, exceeds the Party B Collateral Threshold, then Party A, on any Business Day, may request that Party B provide Performance Assurance in an amount equal to the amount by which the Termination Payment plus Party B's Independent Amount, if any, exceeds the Party B Collateral Threshold (rounding upwards for any fractional amount to the next Party B Rounding Amount) ("Party B Performance Assurance"), less any Party B Performance Assurance already posted with Party A. Such Party B Performance Assurance shall be delivered to Party A within three (3) Business Days of the date of such request. On any Business Day (but no more frequently than weekly with respect to Letters of Credit and daily with respect to cash), Party B, at its sole cost, may request that such Party B Performance Assurance be reduced correspondingly to the amount of such excess Termination Payment plus Party B's Independent Amount, if any, (rounding upwards for any fractional amount to the next Party B Rounding Amount). In the event that Party B fails to provide Party B Performance Assurance pursuant to the terms of this Article Eight within three (3) Business Days, then an Event of Default under Article Five shall be deemed to have occurred and Party A will be entitled to the remedies set forth in Article Five of this Master Agreement.

For purposes of this Section 8.1(c), the calculation of the Termination Payment shall be calculated pursuant to Section 5.3 by Party A as if all outstanding Transactions had been liquidated, and in addition thereto, shall include all amounts owed but not yet paid by Party B to Party A, whether or not such amounts are due, for performance already provided pursuant to any and all Transactions.

(d)     <u>Downgrade Event</u>. If at any time there shall occur a Downgrade Event in respect of Party B, then Party A may require Party B to provide Performance Assurance in an amount determined by Party A in a commercially reasonable manner. In the event Party B shall fail to provide such Performance Assurance or a guaranty or other credit assurance acceptable to Party A within three (3) Business Days of receipt of notice, then an Event of Default shall be deemed to have occurred and Party A will be entitled to the remedies set forth in Article Five of this Master Agreement.

(e)     If specified on the Cover Sheet, Party B shall deliver to Party A, prior to or concurrently with the execution and delivery of this Master Agreement a guarantee in an amount not less than the Guarantee Amount specified on the Cover Sheet and in a form reasonably acceptable to Party A.

23

Version 2.1 (modified 4/25/00)<br>©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

8.2    Party B Credit Protection. The applicable credit and collateral requirements shall be as specified on the Cover Sheet. If no option in Section 8.2(a) is specified on the Cover Sheet, Section 8.2(a) Option C shall apply exclusively. If none of Sections 8.2(b), 8.2(c) or 8.2(d) are specified on the Cover Sheet, Section 8.2(b) shall apply exclusively.

(a)    Financial Information. Option A: If requested by Party B, Party A shall deliver (i) within 120 days following the end of each fiscal year, a copy of Party A's annual report containing audited consolidated financial statements for such fiscal year and (ii) within 60 days after the end of each of its first three fiscal quarters of each fiscal year, a copy of such Party's quarterly report containing unaudited consolidated financial statements for such fiscal quarter. In all cases the statements shall be for the most recent accounting period and prepared in accordance with generally accepted accounting principles; provided, however, that should any such statements not be available on a timely basis due to a delay in preparation or certification, such delay shall not be an Event of Default so long as such Party diligently pursues the preparation, certification and delivery of the statements.

Option B: If requested by Party B, Party A shall deliver (i) within 120 days following the end of each fiscal year, a copy of the annual report containing audited consolidated financial statements for such fiscal year for the party(s) specified on the Cover Sheet and (ii) within 60 days after the end of each of its first three fiscal quarters of each fiscal year, a copy of quarterly report containing unaudited consolidated financial statements for such fiscal quarter for the party(s) specified on the Cover Sheet. In all cases the statements shall be for the most recent accounting period and shall be prepared in accordance with generally accepted accounting principles; provided, however, that should any such statements not be available on a timely basis due to a delay in preparation or certification, such delay shall not be an Event of Default so long as the relevant entity diligently pursues the preparation, certification and delivery of the statements.

Option C: Party B may request from Party A the information specified in the Cover Sheet.

(b)    Credit Assurances. If Party B has reasonable grounds to believe that Party A's creditworthiness or performance under this Agreement has become unsatisfactory, Party B will provide Party A with written notice requesting Performance Assurance in an amount determined by Party B in a commercially reasonable manner. Upon receipt of such notice Party A shall have three (3) Business Days to remedy the situation by providing such Performance Assurance to Party B. In the event that Party A fails to provide such Performance Assurance, or a guaranty or other credit assurance acceptable to Party B within three (3) Business Days of receipt of notice, then an Event of Default under Article Five will be deemed to have occurred and Party B will be entitled to the remedies set forth in Article Five of this Master Agreement.

(c)    Collateral Threshold. If at any time and from time to time during the term of this Agreement (and notwithstanding whether an Event of Default has occurred), the Termination Payment that would be owed to Party B plus Party A's Independent Amount, if any, exceeds the Party A Collateral Threshold, then Party B, on any Business Day, may request that Party A provide Performance Assurance in an amount equal to the amount by which the Termination Payment plus Party A's Independent Amount, if any, exceeds the Party A Collateral

24

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Threshold (rounding upwards for any fractional amount to the next Party A Rounding Amount) ("Party A Performance Assurance"), less any Party A Performance Assurance already posted with Party B. Such Party A Performance Assurance shall be delivered to Party B within three (3) Business Days of the date of such request. On any Business Day (but no more frequently than weekly with respect to Letters of Credit and daily with respect to cash), Party A, at its sole cost, may request that such Party A Performance Assurance be reduced correspondingly to the amount of such excess Termination Payment plus Party A's Independent Amount, if any, (rounding upwards for any fractional amount to the next Party A Rounding Amount). In the event that Party A fails to provide Party A Performance Assurance pursuant to the terms of this Article Eight within three (3) Business Days, then an Event of Default under Article Five shall be deemed to have occurred and Party B will be entitled to the remedies set forth in Article Five of this Master Agreement.

For purposes of this Section 8.2(c), the calculation of the Termination Payment shall be calculated pursuant to Section 5.3 by Party B as if all outstanding Transactions had been liquidated, and in addition thereto, shall include all amounts owed but not yet paid by Party A to Party B, whether or not such amounts are due, for performance already provided pursuant to any and all Transactions.

(d)     Downgrade Event. If at any time there shall occur a Downgrade Event in respect of Party A, then Party B may require Party A to provide Performance Assurance in an amount determined by Party B in a commercially reasonable manner. In the event Party A shall fail to provide such Performance Assurance or a guaranty or other credit assurance acceptable to Party B within three (3) Business Days of receipt of notice, then an Event of Default shall be deemed to have occurred and Party B will be entitled to the remedies set forth in Article Five of this Master Agreement.

(e)     If specified on the Cover Sheet, Party A shall deliver to Party B, prior to or concurrently with the execution and delivery of this Master Agreement a guarantee in an amount not less than the Guarantee Amount specified on the Cover Sheet and in a form reasonably acceptable to Party B.

8.3     Grant of Security Interest/Remedies. To secure its obligations under this Agreement and to the extent either or both Parties deliver Performance Assurance hereunder, each Party (a "Pledgor") hereby grants to the other Party (the "Secured Party") a present and continuing security interest in, and lien on (and right of setoff against), and assignment of, all cash collateral and cash equivalent collateral and any and all proceeds resulting therefrom or the liquidation thereof, whether now or hereafter held by, on behalf of, or for the benefit of, such Secured Party, and each Party agrees to take such action as the other Party reasonably requires in order to perfect the Secured Party's first-priority security interest in, and lien on (and right of setoff against), such collateral and any and all proceeds resulting therefrom or from the liquidation thereof. Upon or any time after the occurrence or deemed occurrence and during the continuation of an Event of Default or an Early Termination Date, the Non-Defaulting Party may do any one or more of the following: (i) exercise any of the rights and remedies of a Secured Party with respect to all Performance Assurance, including any such rights and remedies under law then in effect; (ii) exercise its rights of setoff against any and all property of the Defaulting Party in the possession of the Non-Defaulting Party or its agent; (iii) draw on any outstanding

25

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Letter of Credit issued for its benefit; and (iv) liquidate all Performance Assurance then held by or for the benefit of the Secured Party free from any claim or right of any nature whatsoever of the Defaulting Party, including any equity or right of purchase or redemption by the Defaulting Party. The Secured Party shall apply the proceeds of the collateral realized upon the exercise of any such rights or remedies to reduce the Pledgor's obligations under the Agreement (the Pledgor remaining liable for any amounts owing to the Secured Party after such application), subject to the Secured Party's obligation to return any surplus proceeds remaining after such obligations are satisfied in full.

## ARTICLE NINE: GOVERNMENTAL CHARGES

9.1    Cooperation. Each Party shall use reasonable efforts to implement the provisions of and to administer this Master Agreement in accordance with the intent of the parties to minimize all taxes, so long as neither Party is materially adversely affected by such efforts.

9.2    Governmental Charges. Seller shall pay or cause to be paid all taxes imposed by any government authority("Governmental Charges") on or with respect to the Product or a Transaction arising prior to the Delivery Point. Buyer shall pay or cause to be paid all Governmental Charges on or with respect to the Product or a Transaction at and from the Delivery Point (other than ad valorem, franchise or income taxes which are related to the sale of the Product and are, therefore, the responsibility of the Seller). In the event Seller is required by law or regulation to remit or pay Governmental Charges which are Buyer's responsibility hereunder, Buyer shall promptly reimburse Seller for such Governmental Charges. If Buyer is required by law or regulation to remit or pay Governmental Charges which are Seller's responsibility hereunder, Buyer may deduct the amount of any such Governmental Charges from the sums due to Seller under Article 6 of this Agreement. Nothing shall obligate or cause a Party to pay or be liable to pay any Governmental Charges for which it is exempt under the law.

## ARTICLE TEN: MISCELLANEOUS

10.1    Term of Master Agreement. The term of this Master Agreement shall commence on the Effective Date and shall remain in effect until terminated by either Party upon (thirty) 30 days' prior written notice; provided, however, that such termination shall not affect or excuse the performance of either Party under any provision of this Master Agreement that by its terms survives any such termination and, provided further, that this Master Agreement and any other documents executed and delivered hereunder shall remain in effect with respect to the Transaction(s) entered into prior to the effective date of such termination until both Parties have fulfilled all of their obligations with respect to such Transaction(s), or such Transaction(s) that have been terminated under Section 5.2 of this Agreement.

10.2    Representations and Warranties. On the Effective Date and the date of entering into each Transaction, each Party represents and warrants to the other Party that:

(i)    it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its formation;

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

(ii)     it has all regulatory authorizations necessary for it to legally perform its obligations under this Master Agreement and each Transaction (including any Confirmation accepted in accordance with Section 2.3);

(iii)    the execution, delivery and performance of this Master Agreement and each ' Transaction (including any Confirmation accepted in accordance with Section 2.3) are within its powers, have been duly authorized by all necessary action and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party or any law, rule, regulation, order or the like applicable to it;

(iv)    this Master Agreement, each Transaction (including any Confirmation accepted in accordance with Section 2.3), and each other document executed and delivered in accordance with this Master Agreement constitutes its legally valid and binding obligation enforceable against it in accordance with its terms; subject to any Equitable Defenses.

(v)     it is not Bankrupt and there are no proceedings pending or being contemplated by it or, to its knowledge, threatened against it which would result in it being or becoming Bankrupt;

(vi)    there is not pending or, to its knowledge, threatened against it or any of its Affiliates any legal proceedings that could materially adversely affect its ability to perform its obligations under this Master Agreement and each Transaction (including any Confirmation accepted in accordance with Section 2.3);

(vii) .  no Event of Default or Potential Event of Default with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Master Agreement and each Transaction (including any Confirmation accepted in accordance with Section 2.3);

(viii)   it is acting for its own account, has made its own independent decision to enter into this Master Agreement and each Transaction (including any Confirmation accepted in accordance with Section 2.3) and as to whether this Master Agreement and each such Transaction (including any Confirmation accepted in accordance with Section 2.3) is appropriate or proper for it based upon its own judgment, is not relying upon the advice or recommendations of the other Party in so doing, and is capable of assessing the merits of and understanding, and understands and accepts, the terms, conditions and risks of this Master Agreement and each Transaction (including any Confirmation accepted in accordance with Section 2.3);

(ix)    it is a "forward contract merchant" within the meaning of the United States Bankruptcy Code;

27

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

(x)    it has entered into this Master Agreement and each Transaction (including any Confirmation accepted in accordance with Section 2.3) in connection with the conduct of its business and it has the capacity or ability to make or take delivery of all Products referred to in the Transaction to which it is a Party;

(xi)    with respect to each Transaction (including any Confirmation accepted in accordance with Section 2.3) involving the purchase or sale of a Product or an Option, it is a producer, processor, commercial user or merchant handling the Product, and it is entering into such Transaction for purposes related to its business as such; and

(xii)    the material economic terms of each Transaction are subject to individual negotiation by the Parties.

10.3    <u>Title and Risk of Loss</u>.  Title to and risk of loss related to the Product shall transfer from Seller to Buyer at the Delivery Point.  Seller warrants that it will deliver to Buyer the Quantity of the Product free and clear of all liens, security interests, claims and encumbrances or any interest therein or thereto by any person arising prior to the Delivery Point.

10.4    <u>Indemnity</u>.  Each Party shall indemnify, defend and hold harmless the other Party from and against any Claims arising from or out of any event, circumstance, act or incident first occurring or existing during the period when control and title to Product is vested in such Party as provided in Section 10.3.  Each Party shall indemnify, defend and hold harmless the other Party against any Governmental Charges for which such Party is responsible under Article Nine.

10.5    <u>Assignment</u>.  Neither Party shall assign this Agreement or its rights hereunder without the prior written consent of the other Party, which consent may be withheld in the exercise of its sole discretion; provided, however, either Party may, without the consent of the other Party (and without relieving itself from liability hereunder), (i) transfer, sell, pledge, encumber or assign this Agreement or the accounts, revenues or proceeds hereof in connection with any financing or other financial arrangements, (ii) transfer or assign this Agreement to an affiliate of such Party which affiliate's creditworthiness is equal to or higher than that of such Party, or (iii) transfer or assign this Agreement to any person or entity succeeding to all or substantially all of the assets whose creditworthiness is equal to or higher than that of such Party; provided, however, that in each such case, any such assignee shall agree in writing to be bound by the terms and conditions hereof and so long as the transferring Party delivers such tax and enforceability assurance as the non-transferring Party may reasonably request.

10.6    <u>Governing Law</u>.  THIS AGREEMENT AND THE RIGHTS AND DUTIES OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED, ENFORCED AND PERFORMED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.  EACH PARTY WAIVES ITS RESPECTIVE RIGHT TO ANY JURY TRIAL WITH RESPECT TO ANY LITIGATION ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT.

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 140 of 154

10.7    Notices. All notices, requests, statements or payments shall be made as specified in the Cover Sheet. Notices (other than scheduling requests) shall, unless otherwise specified herein, be in writing and may be delivered by hand delivery, United States mail, overnight courier service or facsimile. Notice by facsimile or hand delivery shall be effective at the close of business on the day actually received, if received during business hours on a Business Day, and otherwise shall be effective at the close of business on the next Business Day. Notice by overnight United States mail or courier shall be effective on the next Business Day after it was sent. A Party may change its addresses by providing notice of same in accordance herewith.

10.8    General. This Master Agreement (including the exhibits, schedules and any written supplements hereto), the Party A Tariff, if any, the Party B Tariff, if any, any designated collateral, credit support or margin agreement or similar arrangement between the Parties and all Transactions (including any Confirmation accepted in accordance with Section 2.3) constitute the entire agreement between the Parties relating to the subject matter. Notwithstanding the foregoing, any collateral, credit support or margin agreement or similar arrangement between the Parties shall, upon designation by the Parties, be deemed part of this Agreement and shall be incorporated herein by reference. This Agreement shall be considered for all purposes as prepared through the joint efforts of the parties and shall not be construed against one party or the other as a result of the preparation, substitution, submission or other event of negotiation, drafting or execution hereof. Except to the extent herein provided for, no amendment or modification to this Master Agreement shall be enforceable unless reduced to writing and executed by both Parties. Each Party agrees if it seeks to amend any applicable wholesale power sales tariff during the term of this Agreement, such amendment will not in any way affect outstanding Transactions under this Agreement without the prior written consent of the other Party. Each Party further agrees that it will not assert, or defend itself, on the basis that any applicable tariff is inconsistent with this Agreement. This Agreement shall not impart any rights enforceable by any third party (other than a permitted successor or assignee bound to this Agreement). Waiver by a Party of any default by the other Party shall not be construed as a waiver of any other default. Any provision declared or rendered unlawful by any applicable court of law or regulatory agency or deemed unlawful because of a statutory change (individually or collectively, such events referred to as "Regulatory Event") will not otherwise affect the remaining lawful obligations that arise under this Agreement; and provided, further, that if a Regulatory Event occurs, the Parties shall use their best efforts to reform this Agreement in order to give effect to the original intention of the Parties. The term "including" when used in this Agreement shall be by way of example only and shall not be considered in any way to be in limitation. The headings used herein are for convenience and reference purposes only. All indemnity and audit rights shall survive the termination of this Agreement for twelve (12) months. This Agreement shall be binding on each Party's successors and permitted assigns.

10.9    Audit. Each Party has the right, at its sole expense and during normal working hours, to examine the records of the other Party to the extent reasonably necessary to verify the accuracy of any statement, charge or computation made pursuant to this Master Agreement. If requested, a Party shall provide to the other Party statements evidencing the Quantity delivered at the Delivery Point. If any such examination reveals any inaccuracy in any statement, the necessary adjustments in such statement and the payments thereof will be made promptly and shall bear interest calculated at the Interest Rate from the date the overpayment or underpayment was made until paid; provided, however, that no adjustment for any statement or payment will be

29

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

made unless objection to the accuracy thereof was made prior to the lapse of twelve (12) months from the rendition thereof, and thereafter any objection shall be deemed waived.

10.10  Forward Contract.  The Parties acknowledge and agree that all Transactions constitute "forward contracts" within the meaning of the United States Bankruptcy Code.

10.11  Confidentiality.  If the Parties have elected on the Cover Sheet to make this Section 10.11 applicable to this Master Agreement, neither Party shall disclose the terms or conditions of a Transaction under this Master Agreement to a third party (other than the Party's employees, lenders, counsel, accountants or advisors who have a need to know such information and have agreed to keep such terms confidential) except in order to comply with any applicable law, regulation, or any exchange, control area or independent system operator rule or in connection with any court or regulatory proceeding; provided, however, each Party shall, to the extent practicable, use reasonable efforts to prevent or limit the disclosure. The Parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with, this confidentiality obligation.

30

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

## SCHEDULE P: PRODUCTS AND RELATED DEFINITIONS

"Ancillary Services" means any of the services identified by a Transmission Provider in its transmission tariff as "ancillary services" including, but not limited to, regulation and frequency response, energy imbalance, operating reserve-spinning and operating reserve-supplemental, as may be specified in the Transaction.

"Capacity" has the meaning specified in the Transaction.

"Energy" means three-phase, 60-cycle alternating current electric energy, expressed in megawatt hours.

"Firm (LD)" means, with respect to a Transaction, that either Party shall be relieved of its obligations to sell and deliver or purchase and receive without liability only to the extent that, and for the period during which, such performance is prevented by Force Majeure. In the absence of Force Majeure, the Party to which performance is owed shall be entitled to receive from the Party which failed to deliver/receive an amount determined pursuant to Article Four.

"Firm Transmission Contingent - Contract Path" means, with respect to a Transaction, that the performance of either Seller or Buyer (as specified in the Transaction) shall be excused, and no damages shall be payable including any amounts determined pursuant to Article Four, if the transmission for such Transaction is interrupted or curtailed and (i) such Party has provided for firm transmission with the transmission provider(s) for the Product in the case of the Seller from the generation source to the Delivery Point or in the case of the Buyer from the Delivery Point to the ultimate sink, and (ii) such interruption or curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the applicable transmission provider's tariff. This contingency shall excuse performance for the duration of the interruption or curtailment notwithstanding the provisions of the definition of "Force Majeure" in Section 1.23 to the contrary.

"Firm Transmission Contingent - Delivery Point" means, with respect to a Transaction, that the performance of either Seller or Buyer (as specified in the Transaction) shall be excused, and no damages shall be payable including any amounts determined pursuant to Article Four, if the transmission to the Delivery Point (in the case of Seller) or from the Delivery Point (in the case of Buyer) for such Transaction is interrupted or curtailed and (i) such Party has provided for firm transmission with the transmission provider(s) for the Product, in the case of the Seller, to be delivered to the Delivery Point or, in the case of Buyer, to be received at the Delivery Point and (ii) such interruption or curtailment is due to "force majeure" or "uncontrollable force" or a similar term as defined under the applicable transmission provider's tariff. This transmission contingency excuses performance for the duration of the interruption or curtailment, notwithstanding the provisions of the definition of "Force Majeure" in Section 1.23 to the contrary. Interruptions or curtailments of transmission other than the transmission either immediately to or from the Delivery Point shall not excuse performance

P-1

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

"Firm (No Force Majeure)" means, with respect to a Transaction, that if either Party fails to perform its obligation to sell and deliver or purchase and receive the Product, the Party to which performance is owed shall be entitled to receive from the Party which failed to perform an amount determined pursuant to Article Four. Force Majeure shall not excuse performance of a Firm (No Force Majeure) Transaction.

"Into _____ (the "Receiving Transmission Provider"), Seller's Daily Choice" means that, in accordance with the provisions set forth below, (1) the Product shall be scheduled and delivered to an interconnection or interface ("Interface") either (a) on the Receiving Transmission Provider's transmission system border or (b) within the control area of the Receiving Transmission Provider if the Product is from a source of generation in that control area, which Interface, in either case, the Receiving Transmission Provider identifies as available for delivery of the Product in or into its control area; and (2) Seller has the right on a daily prescheduled basis to designate the Interface where the Product shall be delivered. An "Into" Product shall be subject to the following provisions:

1.   Prescheduling and Notification.  Subject to the provisions of Section 6, not later than the prescheduling deadline of 11:00 a.m. CPT on the Business Day before the next delivery day or as otherwise agreed to by Buyer and Seller, Seller shall notify Buyer ("Seller's Notification") of Seller's immediate upstream counterparty and the Interface (the "Designated Interface") where Seller shall deliver the Product for the next delivery day, and Buyer shall notify Seller of Buyer's immediate downstream counterparty.

2.   Availability of "Firm Transmission" to Buyer at Designated Interface; "Timely Request for Transmission," "ADI" and "Available Transmission."  In determining availability to Buyer of next-day firm transmission ("Firm Transmission") from the Designated Interface, a "Timely Request for Transmission" shall mean a properly completed request for Firm Transmission made by Buyer in accordance with the controlling tariff procedures, which request shall be submitted to the Receiving Transmission Provider no later than 30 minutes after delivery of Seller's Notification, provided, however, if the Receiving Transmission Provider is not accepting requests for Firm Transmission at the time of Seller's Notification, then such request by Buyer shall be made within 30 minutes of the time when the Receiving Transmission Provider first opens thereafter for purposes of accepting requests for Firm Transmission.

Pursuant to the terms hereof, delivery of the Product may under certain circumstances be redesignated to occur at an Interface other than the Designated Interface (any such alternate designated interface, an "ADI") either (a) on the Receiving Transmission Provider's transmission system border or (b) within the control area of the Receiving Transmission Provider if the Product is from a source of generation in that control area, which ADI, in either case, the Receiving Transmission Provider identifies as available for delivery of the Product in or into its control area using either firm or non-firm transmission, as available on a day-ahead or hourly basis (individually or collectively referred to as "Available Transmission") within the Receiving Transmission Provider's transmission system.

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

3.    Rights of Buyer and Seller Depending Upon Availability of/Timely Request for Firm Transmission.

A.    Timely Request for Firm Transmission made by Buyer, Accepted by the Receiving Transmission Provider and Purchased by Buyer. If a Timely Request for Firm Transmission is made by Buyer and is accepted by the Receiving Transmission Provider and Buyer purchases such Firm Transmission, then Seller shall deliver and Buyer shall receive the Product at the Designated Interface.

i.    If the Firm Transmission purchased by Buyer within the Receiving Transmission Provider's transmission system from the Designated Interface ceases to be available to Buyer for any reason, or if Seller is unable to deliver the Product at the Designated Interface for any reason except Buyer's non-performance, then at Seller's choice from among the following, Seller shall: (a) to the extent Firm Transmission is available to Buyer from an ADI on a day-ahead basis, require Buyer to purchase such Firm Transmission from such ADI, and schedule and deliver the affected portion of the Product to such ADI on the basis of Buyer's purchase of Firm Transmission, or (b) require Buyer to purchase non-firm transmission, and schedule and deliver the affected portion of the Product on the basis of Buyer's purchase of non-firm transmission from the Designated Interface or an ADI designated by Seller, or (c) to the extent firm transmission is available on an hourly basis, require Buyer to purchase firm transmission, and schedule and deliver the affected portion of the Product on the basis of Buyer's purchase of such hourly firm transmission from the Designated Interface or an ADI designated by Seller.

ii.    If the Available Transmission utilized by Buyer as required by Seller pursuant to Section 3A(i) ceases to be available to Buyer for any reason, then Seller shall again have those alternatives stated in Section 3A(i) in order to satisfy its obligations.

iii.    Seller's obligation to schedule and deliver the Product at an ADI is subject to Buyer's obligation referenced in Section 4B to cooperate reasonably therewith. If Buyer and Seller cannot complete the scheduling and/or delivery at an ADI, then Buyer shall be deemed to have satisfied its receipt obligations to Seller and Seller shall be deemed to have failed its delivery obligations to Buyer, and Seller shall be liable to Buyer for amounts determined pursuant to Article Four.

iv.    In each instance in which Buyer and Seller must make alternative scheduling arrangements for delivery at the Designated Interface or an ADI pursuant to Sections 3A(i) or (ii), and Firm Transmission had been purchased by both Seller and Buyer into and within the Receiving Transmission Provider's transmission system as to the scheduled delivery which could not be completed as

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Case: 01-30923    Doc# 6929    Filed: 06/03/02    Entered: 06/04/02 14:19:00    Page 145 of 154

a result of the interruption or curtailment of such Firm Transmission, Buyer and Seller shall bear their respective transmission expenses and/or associated congestion charges incurred in connection with efforts to complete delivery by such alternative scheduling and delivery arrangements. In any instance except as set forth in the immediately preceding sentence, Buyer and Seller must make alternative scheduling arrangements for delivery at the Designated Interface or an ADI under Sections 3A(i) or (ii), Seller shall be responsible for any additional transmission purchases and/or associated congestion charges incurred by Buyer in connection with such alternative scheduling arrangements.

B.　Timely Request for Firm Transmission Made by Buyer but Rejected by the Receiving Transmission Provider. If Buyer's Timely Request for Firm Transmission is rejected by the Receiving Transmission Provider because of unavailability of Firm Transmission from the Designated Interface, then Buyer shall notify Seller within 15 minutes after receipt of the Receiving Transmission Provider's notice of rejection ("Buyer's Rejection Notice"). If Buyer timely notifies Seller of such unavailability of Firm Transmission from the Designated Interface, then Seller shall be obligated either (1) to the extent Firm Transmission is available to Buyer from an ADI on a day-ahead basis, to require Buyer to purchase (at Buyer's own expense) such Firm Transmission from such ADI and schedule and deliver the Product to such ADI on the basis of Buyer's purchase of Firm Transmission, and thereafter the provisions in Section 3A shall apply, or (2) to require Buyer to purchase (at Buyer's own expense) non-firm transmission, and schedule and deliver the Product on the basis of Buyer's purchase of non-firm transmission from the Designated Interface or an ADI designated by the Seller, in which case Seller shall bear the risk of interruption or curtailment of the non-firm transmission; provided, however, that if the non-firm transmission is interrupted or curtailed or if Seller is unable to deliver the Product for any reason, Seller shall have the right to schedule and deliver the Product to another ADI in order to satisfy its delivery obligations, in which case Seller shall be responsible for any additional transmission purchases and/or associated congestion charges incurred by Buyer in connection with Seller's inability to deliver the Product as originally prescheduled. If Buyer fails to timely notify Seller of the unavailability of Firm Transmission, then Buyer shall bear the risk of interruption or curtailment of transmission from the Designated Interface, and the provisions of Section 3D shall apply.

C.　Timely Request for Firm Transmission Made by Buyer, Accepted by the Receiving Transmission Provider and not Purchased by Buyer. If Buyer's Timely Request for Firm Transmission is accepted by the Receiving Transmission Provider but Buyer elects to purchase non-firm transmission rather than Firm Transmission to take delivery of the Product, then Buyer shall bear the risk of interruption or curtailment of transmission from the Designated Interface. In such circumstances, if Seller's delivery is interrupted as a result of transmission relied upon by Buyer from the Designated Interface, then Seller shall be deemed to have satisfied its delivery obligations to Buyer,

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Buyer shall be deemed to have failed to receive the Product and Buyer shall be liable to Seller for amounts determined pursuant to Article Four.

D. No Timely Request for Firm Transmission Made by Buyer, or Buyer Fails to Timely Send Buyer's Rejection Notice. If Buyer fails to make a Timely Request for Firm Transmission or Buyer fails to timely deliver Buyer's Rejection Notice, then Buyer shall bear the risk of interruption or curtailment of transmission from the Designated Interface. In such circumstances, if Seller's delivery is interrupted as a result of transmission relied upon by Buyer from the Designated Interface, then Seller shall be deemed to have satisfied its delivery obligations to Buyer, Buyer shall be deemed to have failed to receive the Product and Buyer shall be liable to Seller for amounts determined pursuant to Article Four.

4. Transmission.

A. Seller's Responsibilities. Seller shall be responsible for transmission required to deliver the Product to the Designated Interface or ADI, as the case may be. It is expressly agreed that Seller is not required to utilize Firm Transmission for its delivery obligations hereunder, and Seller shall bear the risk of utilizing non-firm transmission. If Seller's scheduled delivery to Buyer is interrupted as a result of Buyer's attempted transmission of the Product beyond the Receiving Transmission Provider's system border, then Seller will be deemed to have satisfied its delivery obligations to Buyer, Buyer shall be deemed to have failed to receive the Product and Buyer shall be liable to Seller for damages pursuant to Article Four.

B. Buyer's Responsibilities. Buyer shall be responsible for transmission required to receive and transmit the Product at and from the Designated Interface or ADI, as the case may be, and except as specifically provided in Section 3A and 3B, shall be responsible for any costs associated with transmission therefrom. If Seller is attempting to complete the designation of an ADI as a result of Seller's rights and obligations hereunder, Buyer shall co-operate reasonably with Seller in order to effect such alternate designation.

5. Force Majeure. An "Into" Product shall be subject to the "Force Majeure" provisions in Section 1.23.

6. Multiple Parties in Delivery Chain Involving a Designated Interface. Seller and Buyer recognize that there may be multiple parties involved in the delivery and receipt of the Product at the Designated Interface or ADI to the extent that (1) Seller may be purchasing the Product from a succession of other sellers ("Other Sellers"), the first of which Other Sellers shall be causing the Product to be generated from a source ("Source Seller") and/or (2) Buyer may be selling the Product to a succession of other buyers ("Other Buyers"), the last of which Other Buyers shall be using the Product to serve its energy needs ("Sink Buyer"). Seller and Buyer further recognize that in certain Transactions neither Seller nor Buyer may originate the decision as to either (a) the original identification of the Designated Interface or ADI (which designation

P-5

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

may be made by the Source Seller) or (b) the Timely Request for Firm Transmission or the purchase of other Available Transmission (which request may be made by the Sink Buyer). Accordingly, Seller and Buyer agree as follows:

A.     If Seller is not the Source Seller, then Seller shall notify Buyer of the Designated Interface promptly after Seller is notified thereof by the Other Seller with whom Seller has a contractual relationship, but in no event may such designation of the Designated Interface be later than the prescheduling deadline pertaining to the Transaction between Buyer and Seller pursuant to Section 1.

B.     If Buyer is not the Sink Buyer, then Buyer shall notify the Other Buyer with whom Buyer has a contractual relationship of the Designated Interface promptly after Seller notifies Buyer thereof, with the intent being that the party bearing actual responsibility to secure transmission shall have up to 30 minutes after receipt of the Designated Interface to submit its Timely Request for Firm Transmission.

C.     Seller and Buyer each agree that any other communications or actions required to be given or made in connection with this "Into Product" (including without limitation, information relating to an ADI) shall be made or taken promptly after receipt of the relevant information from the Other Sellers and Other Buyers, as the case may be.

D.     Seller and Buyer each agree that in certain Transactions time is of the essence and it may be desirable to provide necessary information to Other Sellers and Other Buyers in order to complete the scheduling and delivery of the Product. Accordingly, Seller and Buyer agree that each has the right, but not the obligation, to provide information at its own risk to Other Sellers and Other Buyers, as the case may be, in order to effect the prescheduling, scheduling and delivery of the Product

"Native Load" means the demand imposed on an electric utility or an entity by the requirements of retail customers located within a franchised service territory that the electric utility or entity has statutory obligation to serve.

"Non-Firm" means, with respect to a Transaction, that delivery or receipt of the Product may be interrupted for any reason or for no reason, without liability on the part of either Party.

"System Firm" means that the Product will be supplied from the owned or controlled generation or pre-existing purchased power assets of the system specified in the Transaction (the "System") with non-firm transmission to and from the Delivery Point, unless a different Transmission Contingency is specified in a Transaction.  Seller's failure to deliver shall be excused:  (i) by an event or circumstance which prevents Seller from performing its obligations, which event or circumstance was not anticipated as of the date the Transaction was agreed to, which is not within the reasonable control of, or the result of the negligence of, the Seller; (ii) by Buyer's failure to perform; (iii) to the extent necessary to preserve the integrity of, or prevent or limit any instability on, the System; (iv) to the extent the System or the control area or reliability council within which the System operates declares an emergency condition, as determined in the

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

system's, or the control area's, or reliability council's reasonable judgment; or (v) by the interruption or curtailment of transmission to the Delivery Point or by the occurrence of any Transmission Contingency specified in a Transaction as excusing Seller's performance. Buyer's failure to receive shall be excused (i) by Force Majeure; (ii) by Seller's failure to perform, or (iii) by the interruption or curtailment of transmission from the Delivery Point or by the occurrence of any Transmission Contingency specified in a Transaction as excusing Buyer's performance. In any of such events, neither party shall be liable to the other for any damages, including any amounts determined pursuant to Article Four.

"Transmission Contingent" means, with respect to a Transaction, that the performance of either Seller or Buyer (as specified in the Transaction) shall be excused, and no damages shall be payable including any amounts determined pursuant to Article Four, if the transmission for such Transaction is unavailable or interrupted or curtailed for any reason, at any time, anywhere from the Seller's proposed generating source to the Buyer's proposed ultimate sink, regardless of whether transmission, if any, that such Party is attempting to secure and/or has purchased for the Product is firm or non-firm. If the transmission (whether firm or non-firm) that Seller or Buyer is attempting to secure is from source to sink is unavailable, this contingency excuses performance for the entire Transaction. If the transmission (whether firm or non-firm) that Seller or Buyer has secured from source to sink is interrupted or curtailed for any reason, this contingency excuses performance for the duration of the interruption or curtailment notwithstanding the provisions of the definition of "Force Majeure" in Article 1.23 to the contrary.

"Unit Firm" means, with respect to a Transaction, that the Product subject to the Transaction is intended to be supplied from a generation asset or assets specified in the Transaction. Seller's failure to deliver under a "Unit Firm" Transaction shall be excused: (i) if the specified generation asset(s) are unavailable as a result of a Forced Outage (as defined in the NERC Generating Unit Availability Data System (GADS) Forced Outage reporting guidelines) or (ii) by an event or circumstance that affects the specified generation asset(s) so as to prevent Seller from performing its obligations, which event or circumstance was not anticipated as of the date the Transaction was agreed to, and which is not within the reasonable control of, or the result of the negligence of, the Seller or (iii) by Buyer's failure to perform. In any of such events, Seller shall not be liable to Buyer for any damages, including any amounts determined pursuant to Article Four.

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

**EXHIBIT A**

## MASTER POWER PURCHASE AND SALE AGREEMENT
## CONFIRMATION LETTER

This confirmation letter shall confirm the Transaction agreed to on _____, 2000 between Enron Power Marketing, Inc. ("Party A") and Pacific Gas and Electric Company ("Party B") regarding the sale/purchase of the Product under the terms and conditions as follows:

Seller: _____

Buyer: _____

Product:

[]      Into _____, Seller's Daily Choice

[]      Firm (LD)

[]      Firm (No Force Majeure)

[]      System Firm

         (Specify System: _____ )

[]      Unit Firm

         (Specify Unit(s): _____ )

[]      Other _____

[]      Transmission Contingency (If not marked, no transmission contingency)

         []     FT-Contract Path Contingency     []    Seller     []    Buyer

         []     FT-Delivery Point Contingency    []    Seller     []    Buyer

         []     Transmission Contingent        []    Seller     []    Buyer

         []     Other transmission contingency

         (Specify: _____ )

Contract Quantity: _____

Delivery Point: _____

Contract Price: _____

Energy Price: _____

Other Charges: _____

1

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

Confirmation Letter
Page 2

Delivery Period: _____

Special Conditions: _____

Scheduling: _____

Option Buyer: _____

Option Seller: _____

    Type of Option: _____

    Strike Price: _____

    Premium: _____

    Exercise Period: _____

This confirmation letter is being provided pursuant to and in accordance with the Master Power Purchase and Sale Agreement dated October 9, 2000 (the "Master Agreement") between Party A and Party B, and constitutes part of and is subject to the terms and provisions of such Master Agreement. Terms used but not defined herein shall have the meanings ascribed to them in the Master Agreement.

**ENRON POWER MARKETING, INC.**      **PACIFIC GAS AND ELECTRIC COMPANY**

Name: _____    Name: _____

Title: _____    Title: _____

Phone No: _____    Phone No: _____

Fax: _____    Fax: _____

2

Version 2.1 (modified 4/25/00)
©COPYRIGHT 2000 by the Edison Electric Institute and National Energy Marketers Association

# ENRON CORP.

## Guarantee Agreement

This Guarantee Agreement (this "Guarantee"), dated as of October 9, 2000, is made and entered into by Enron Corp., an Oregon corporation ("Guarantor").

## WITNESSETH:

WHEREAS, Enron Power Marketing, Inc. (the "Company") will enter into a Master Power Purchase and Sale Agreement (the "Agreement") effective as of the date of this Guarantee with Pacific Gas & Electric Company ("Counterparty") pursuant to which Company and Counterparty may enter into transactions related to the purchase and sale of energy; and

WHEREAS, Guarantor will directly or indirectly benefit from the Agreement.

NOW THEREFORE, in consideration of Counterparty entering into the Agreement, Guarantor hereby covenants and agrees as follows:

1.      GUARANTY.   Subject to the provisions hereof, Guarantor hereby irrevocably and unconditionally guarantees the timely payment when due of the obligations of Company (the "Obligations") to Counterparty in accordance with the Agreement.  To the extent that Company shall fail to pay any Obligations, Guarantor shall promptly pay to Counterparty the amount due.  This Guarantee shall constitute a guarantee of payment and not of collection.  The liability of Guarantor under the Guarantee shall be subject to the following:

(a)      Guarantor's liability hereunder shall be and is specifically limited to payments expressly required to be made in accordance with the Agreement (even if such payments are deemed to be damages) and, except to the extent specifically provided in the Agreement, in no event shall Guarantor be subject hereunder to consequential, exemplary, equitable, loss of profits, punitive, tort, or any other damages, costs, or attorney's fees.

(b)      The aggregate amount covered by this Guarantee shall not exceed Thirty Five Million U.S. Dollars ($35,000,000)

2.      DEMANDS AND NOTICE.   If Company fails or refuses to pay any Obligations, Counterparty shall notify Company in writing of the manner in which Company has failed to pay and demand that payment be made by Company.  If Company's failure or refusal to pay continues for a period of three business days after the date of Counterparty's notice to Company, and Counterparty has elected to exercise its rights under this Guarantee, Counterparty shall make a demand upon Guarantor (hereinafter referred to as a "Payment Demand").  A Payment Demand shall be in writing and shall reasonably and briefly specify in what manner and what amount Company has failed to pay and an explanation of why such payment is due, with a specific statement that Counterparty is calling upon Guarantor to pay under this Guarantee.  A Payment Demand satisfying the foregoing requirements shall be deemed sufficient notice to Guarantor that it must pay the Obligations.  A single written Payment Demand shall be effective as to any specific default during the continuance of such default, until Company or Guarantor has cured such default, and additional written demands concerning such default shall not be required until such default is cured.

3.      REPRESENTATIONS AND WARRANTIES.   Guarantor represents and warrants that:

(a)      it is a corporation duly organized and validly existing under the laws of the State of Oregon and has the corporate power and authority to execute, deliver and carry out the terms and provisions of the Guarantee;

Case: 01-30923     Doc# 6929     Filed: 06/03/02     Entered: 06/04/02 14:19:00     Page 152 of 154

(b)     no authorization, approval, consent or order of, or registration or filing with, any court or other governmental body having jurisdiction over Guarantor is required on the part of Guarantor for the execution and delivery of this Guarantee; and

(c)     this Guarantee constitutes a valid and legally binding agreement of Guarantor, except as the enforceability of this Guarantee may be limited by the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity.

4.     SETOFFS AND COUNTERCLAIMS.  Without limiting Guarantor's own defenses and rights hereunder, Guarantor reserves to itself all rights, setoffs, counterclaims and other defenses to which Company is or may be entitled to arising from or out of the Agreement or otherwise, except for defenses arising out of the bankruptcy, insolvency, dissolution or liquidation of Company.

5.     AMENDMENT OF GUARANTY.  No term or provision of this Guarantee shall be amended, modified, altered, waived, or supplemented except in a writing signed by the parties hereto.

6.     WAIVERS.  Guarantor hereby waives (a) notice of acceptance of this Guarantee; (b) presentment and demand concerning the liabilities of Guarantor, except as expressly hereinabove set forth; and (c) any right to require that any action or proceeding be brought against Company or any other person, or except as expressly hereinabove set forth, to require that Counterparty seek enforcement of any performance against Company or any other person, prior to any action against Guarantor under the terms hereof.

Except as to applicable statutes of limitation, no delay of Counterparty in the exercise of, or failure to exercise, any rights hereunder shall operate as a waiver of such rights, a waiver of any other rights or a release of Guarantor from any obligations hereunder.

Guarantor consents to the renewal, compromise, extension, acceleration or other changes in the time of payment of or other changes in the terms of the Obligations, or any part thereof or any changes or modifications to the terms of the Agreement.

Guarantor may terminate this Guarantee by providing written notice of such termination to Counterparty and upon the effectiveness of such termination, Guarantor shall have no further liability hereunder, except as provided in the last sentence of this paragraph.  No such termination shall be effective until fifteen business days after receipt by Counterparty of such termination notice.  No such termination shall affect Guarantor's liability with respect to any Transaction (as defined in the Agreement) entered into prior to the time the termination is effective, which Transaction shall remain guaranteed pursuant to the terms of this Guarantee.

7.     NOTICE.  Any Payment Demand, notice, request, instruction, correspondence or other document to be given hereunder by any party to another (herein collectively called "Notice") shall be in writing and delivered personally or mailed by certified mail, postage prepaid and return receipt requested, or by telegram or telecopier, as follows:

To Counterparty:                Pacific Gas & Electric Company
                                77 Beale Street
                                San Francisco, CA 94177
                                Attn.: Jack Foley
                                Fax No.: (415) 973-7301

gty2562                                    2

To Guarantor:

Enron Corp.
1400 Smith Street
Houston, Texas 77002
Attn.: Vice President, Finance and Treasurer
Fax No.: (713) 646-3422

Notice given by personal delivery or mail shall be effective upon actual receipt. Notice given by telegram or telecopier shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All Notices by telegram or telecopier shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which Notice is to be given to it by giving notice as provided above of such change of address.

8.    MISCELLANEOUS.    THIS GUARANTEE SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS. This Guarantee shall be binding upon Guarantor, its successors and assigns and inure to the benefit of and be enforceable by Counterparty, its successors and assigns. The Guarantee embodies the entire agreement and understanding between Guarantor and Counterparty and supersedes all prior agreements and understandings relating to the subject matter hereof. The headings in this Guarantee are for purposes of reference only, and shall not affect the meaning hereof. This Guarantee may be executed in any number of counterparts, each of which shall be an original, but all of which together shall constitute one instrument. Guarantor shall not assign this Guarantee without the express written consent of Counterparty.

EXECUTED as of the day and year first above written.

ENRON CORP.

By: _____

Timothy A. DeSpain
Deputy Treasurer

gty2562

3