JEFFREY L. SCHAFFER (No. 91404)
WILLIAM J. LAFFERTY (No. 120814)
KIMBERLY A. BLISS (No. 207857)
HOWARD, RICE, NEMEROVSKI, CANADY,
    FALK & RABKIN
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111-4065
Telephone: 415/434-1600
Facsimile: 415/217-5910

Attorneys for Debtor and Debtor in Possession
PACIFIC GAS and ELECTRIC COMPANY

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PACIFIC GAS and ELECTRIC COMPANY, a California corporation,<br><br>Debtor.<br><br>Federal I.D. No. 94-0742640 | Case No. 01-30923 DM<br><br>Chapter 11 Case<br><br>NOTICE OF MOTION AND MOTION OF PACIFIC GAS AND ELECTRIC COMPANY FOR AN ORDER AUTHORIZING ASSUMPTION OF POWER PURCHASE AGREEMENTS AND COMPROMISE OF CLAIMS WITH SIERRA PACIFIC INDUSTRIES<br><br>Date: September 12, 2002<br>Time: 1:30 p.m.<br>Place: 235 Pine Street, 22nd Floor<br>      San Francisco, California<br>Judge: Hon. Dennis Montali |

# TABLE OF CONTENTS

| | Page |
|---|---|
| NOTICE OF MOTION AND MOTION | 1 |
| MEMORANDUM OF POINTS AND AUTHORITIES | 1 |
| INTRODUCTION | 1 |
| FACTUAL AND PROCEDURAL BACKGROUND | 2 |
|     A. The Procedural History Of The Dispute Between The Parties. | 2 |
|     B. The Parties' Mediation And The Resulting Settlement And Assumption Agreements. | 4 |
|     C. The Agreements Are In The Best Interest Of The Estate. | 7 |
| ARGUMENT | 8 |
|     A. The Court Should Approve The Settlement And Assumption Agreements. | 8 |
|         1. The Probability Of Success On The Merits. | 10 |
|         2. The Complexity Of The Litigation, And The Expense, Inconvenience And Delay Attending It. | 10 |
|         3. The Settlement Is In The Best Interest Of The Creditors. | 10 |
|     B. The Court Should Approve The Assumption Agreement. | 11 |
| CONCLUSION | 13 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

# TABLE OF AUTHORITIES

Page(s)

### Cases

Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523 (1943) ... 11

In re III Enters., Inc., 163 B.R. 453 (Bankr. E.D. Pa.) aff'd, 169 B.R. 551 (E.D. Pa. 1994) ... 12

In re Purofied Down Prods. Corp., 150 B.R. 519 (S.D.N.Y. 1993) ... 9

In re W.T. Grant Co., 699 F.2d 599 (2d Cir. 1983) ... 9

Lewis v. Anderson, 615 F.2d 778 (9th Cir. 1979) ... 12

Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043 (4th Cir. 1985) ... 11, 12

Martin v. Kane (In re A & C Props.), 784 F.2d 1377 (9th Cir. 1986) ... 8, 9, 10, 11

Myers v. Martin (In re Martin), 91 F.3d 389 (3d Cir. 1996) ... 8, 9

NLRB v. Bildisco & Bildisco, 465 U.S. 513 (1984) ... 11

Nellis v. Shugrue, 165 B.R. 115 (S.D.N.Y. 1994) ... 8, 9

Official Unsecured Creditors' Comm. of Pennsylvania Truck Lines, Inc. v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.), 150 B.R. 595 (E.D. Pa. 1992), aff'd mem., 8 F.3d 812 (3d Cir. 1993) ... 9

Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095 (2d Cir. 1993) ... 11

Port O'Call Inv. Co. v. Blair (In re Blair), 538 F.2d 849 (9th Cir. 1976) ... 9

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) ... 8

Robertson v. Pierce (In re Chi-Feng Huang), 23 B.R. 798 (B.A.P. 9th Cir. 1982) ... 12

Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310 (Bankr. D. Utah 1981) ... 12

Turbowind, Inc. v. Post Street Mgmt., Inc. (In re Turbowind, Inc.), 42 B.R. 579 (Bankr. S.D. Cal. 1984) ... 12

Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499 (Bankr. S.D.N.Y. 1991) ... 8, 9, 10, 11

# TABLE OF AUTHORITIES

Page(s)

**Statutes**

11 U.S.C.
  §362 .......... 4
  §365 .......... 2, 6
  §365(a) .......... 12
  §503 .......... 7
  §1107 .......... 2
  §1108 .......... 2

Fed. R. Bankr. P. Rule 9019(a) .......... 1, 8

Northern Dist. Cal. Local Bankr. R. 9014-1(c)(2) .......... 1

**Other Authorities**

3 Lawrence P. King, Collier on Bankruptcy ¶365.03[2], at 365-22 (15th ed. rev. 2000) .......... 11

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on September 12, 2002, at 1:30 p.m., or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Dennis Montali, located at 235 Pine Street, 22nd Floor, San Francisco, California, Pacific Gas and Electric Company, the debtor and debtor in possession in the above-captioned Chapter 11 case ("PG&E" or the "Debtor"), will and hereby does move the Court for entry of an order authorizing PG&E to enter into: (1) a Settlement Agreement resolving ongoing litigation and claims between PG&E, Sierra Pacific Industries ("SPI") and the California Independent Systems Operator (the "ISO"); and (2) an Assumption Agreement to assume the Power Purchase Agreements ("PPAs") of four Qualifying Facilities ("QFs") owned by SPI—i.e., the Burney Facility (Log No. 13C049), the Quincy Facility (Log No. 10C018), the Susanville Facility (Log No. 10C009), and the Lincoln Facility (Log No. 12C008).

This Motion is based on the facts and law set forth herein (including the following Memorandum of Points and Authorities), the accompanying Declaration of Charles R. Middlekauff, the record of this case, and any evidence presented at or prior to the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Rule 9014-1(c)(2) of the Bankruptcy Local Rules for the Northern District of California, any written opposition to the Motion and the relief requested therein must be filed with the Bankruptcy Court and served upon appropriate parties (including counsel for PG&E, the Office of the United States Trustee and the Official Committee of Unsecured Creditors) at least five (5) days prior to the scheduled hearing date. If there is no timely objection to the requested relief, the Court may enter an order granting such relief without further hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

PG&E commenced this Chapter 11 case by the filing of a voluntary petition on April 6, 2001. PG&E continues to manage and operate its property as a debtor in possession

pursuant to Sections 1107 and 1108 of the Bankruptcy Code. PG&E submits this Memorandum of Points and Authorities in Support of its Motion For An Order Authorizing Assumption Of Power Purchase Agreements And Compromise Of Claims With Sierra Pacific Industries (the "Motion"). By this Motion, PG&E seeks authorization to enter into and be bound by two related agreements (the "Agreements"), setting forth the terms of PG&E's compromise of controversy and settlement with SPI. The first—the "Settlement Agreement"—resolves ongoing litigation and claims between SPI and PG&E, and is attached as Exhibit 1 to the Declaration of Charles Middlekauff In Support Of Motion Of Pacific Gas And Electric Company For An Order Authorizing Assumption Of Power Purchase Agreements And Compromise Of Claims With Sierra Pacific Industries ("Middlekauff Decl."),[1] filed concurrently herewith. The second—the "Assumption Agreement"—is required by the Settlement Agreement and provides for the assumption of four reinstated Power Purchase Agreements ("PPAs") between PG&E and SPI-owned qualifying facilities pursuant to Section 365 of the Bankruptcy Code. It is attached to the Settlement Agreement as Exhibit A.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. The Procedural History Of The Dispute Between The Parties.**

In the mid-1980s, PG&E entered into long-term contracts—otherwise known as PPAs—for the purchase of energy and capacity from four SPI facilities, referred to herein as the Burney Facility (Log No. 13C049), the Quincy Facility (Log No. 10C018), the Susanville Facility (Log No. 10C009), and the Lincoln Facility (Log No. 12C008). See Middlekauff Decl., Ex. 1 at 1-2.

---

[1] PG&E is not attaching exhibits to the service copies of the Middlekauff Declaration because they are too voluminous. However, any person served with this document may obtain copies of any of the exhibits to the Middlekauff Declaration by written request by mail to Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Attn: Nathaniel H. Hunt, Three Embarcadero Center, 7th Floor, San Francisco, California 94111-4065, or by e-mail request to nhunt@hrice.com.

MOTION FOR ORDER AUTH. ASSUMP. OF PPAS AND COMPROMISE OF CLAIMS WITH SPI
Case: 01-30923 Doc# 9466 Filed: 08/06/02 Entered: 08/09/02 13:56:00 Page 6 of 18
2

As the Court is aware from previous filings in this case, beginning in the late summer of 2000, PG&E was forced to pay dramatically increased wholesale prices for electricity. Moreover, PG&E was prevented from passing these costs on to retail customers, resulting in a staggering financial shortfall.[2] Accordingly, as with other QFs, PG&E was unable to fully pay SPI for its December 2000 and January 2001 deliveries, and made no payment for February and March 2001 energy deliveries. In total, PG&E's underpayment to SPI was approximately $18 million. See Middlekauff Decl., Ex. 1 at 2. As a result of PG&E's deteriorating financial position, PG&E filed a voluntary petition under Chapter 11 of title 11 on April 6, 2001.

Shortly before the filing of PG&E's voluntary petition, SPI filed a complaint against PG&E and the ISO in Sacramento Superior Court, Case No. 01AS02027 (the "State Court Action"). Id. at 2-3. SPI asserted eight separate contract based claims against PG&E in the State Court Action, all based on PG&E's defaults under the PPAs. Id. at 3. In addition, SPI asserted non-contractual claims against PG&E and the ISO for alleged antitrust violations under California's Cartwright Act, unfair competition, intentional interference with prospective business advantage, and declaratory relief. Those claims arose out of an alleged conspiracy between PG&E and the ISO to exclude SPI from the California energy market. On April 5, 2001, SPI sought and obtained on a temporary restraining order ("TRO") in the State Court Action, barring PG&E or the ISO from taking any extra-judicial steps to prevent SPI from selling its power to third parties. Id. The court found preliminarily that PG&E had breached the PPAs through its partial payment and that its asserted defense of force majeure failed.

A few weeks after filing its voluntary petition, PG&E removed the State Court Action to the U.S. Bankruptcy Court for the Eastern District of California, which court subsequently

---

[2]See, e.g., Declaration of Marc Renson In Support Of Pacific Gas And Electric Company's Opposition To Martinez Cogen LP's Motion For Entry Of An Order To Pay Fair Market Value In Advance For All Electricity Delivered By Martinez Cogen LP Pending Assumption Or Rejection Of Its Power Purchase Agreement With The Debtor [Docket No. 736] at 2.

MOTION FOR ORDER AUTH. ASSUMP. OF PPAS AND COMPROMISE OF CLAIMS WITH SPI

transferred the State Court Action to this Court. Id. On May 29, 2001, this Court granted SPI a preliminary injunction against PG&E, finding that there was a "likelihood of [SPI] prevailing on the merits of its claim against PG&E that SPI cancelled its power purchase agreement with PG&E before PG&E petitioned for bankruptcy [and] that the balance of hardships tip in favor of SPI." Order Granting Sierra Pacific Industries' Motion For Preliminary Injunction Against PG&E filed May 29, 2001 in Adversary Proceeding No. 01-3087 DM at 1. On October 9, 2001, this Court granted partial summary judgment in favor of SPI on its eighth cause of action for declaratory relief, finding that PG&E had materially breached its obligations under the PPAs, and that SPI had no further obligations under the PPAs. Middlekauff Decl., Ex. 1 at 3. Finally, on November 21, 2001, this Court granted SPI relief from the automatic stay provisions of Section 362 of the Bankruptcy Code, and remanded the State Court Action to the Sacramento Superior Court. PG&E appealed this Court's Order remanding the State Court Action, which appeal is currently pending before the U.S. Bankruptcy Appellate Panel of the Ninth Circuit (the "Appeal"). Id. at 3-4.

Additionally, SPI filed Proof of Claim No. 8845 on September 5, 2001 in the amount of $1,108,361,147.00 (the "Claim"), based primarily on damages it contended were owed in the State Court Action, including nearly $900 million in punitive damages.

**B. The Parties' Mediation And The Resulting Settlement And Assumption Agreements.**

In April 2002, the parties retained Layn R. Phillips, an experienced mediator, former United States District Judge and current partner at the law firm of Irell & Manella, to mediate the issues presented in the State Court Action. See Middlekauff Decl., Ex. 2 at 1.[3] Between them, SPI, PG&E and the ISO filed nearly 80 pages of mediation briefs and over 100 supporting exhibits. Id.

---

[3] As part of PG&E's application to the CPUC for approval of the Agreements, PG&E is submitting the prepared testimony of the mediator, Judge Phillips, a copy of which is attached as Exhibit 2 to the Middlekauff Declaration.

MOTION FOR ORDER AUTH. ASSUMP. OF PPAS AND COMPROMISE OF CLAIMS WITH SPI
-4-

On June 4, 2002, Judge Phillips presided over the mediation, which was attended by the chief executive officers of SPI, PG&E and the ISO. After nearly 12 hours of negotiations, the parties agreed on settlement terms which they memorialized in a term sheet. Over the next month, the parties negotiated the specific terms of the Settlement Agreement, including the amendment and assumption of the PPAs. On two different occasions, the parties returned to Judge Phillips to have him mediate disputes arising out of the finalization of the settlement. Id.

The result of the lengthy but productive settlement negotiations is the Settlement and Assumption Agreements attached to the Middlekauff Declaration. The Agreements provide for an integrated resolution of the State Court Action, the Appeal, and SPI's Claim, as well as the amendment and assumption of SPI's PPAs. Accordingly, the Agreements require the approval of both this Court and the California Public Utilities Commission ("CPUC"), which pursuant to the terms of the Settlement Agreement, must be achieved on or before October 4, 2002 or the Agreements will be deemed null and void. See Middlekauff Decl., Ex. 1 §1.0 & Ex. A to Ex. 1 §1. Concurrent with the filing of this Motion, PG&E is filing an application with the CPUC to obtain its approval.

The principal terms of the Settlement Agreement include:

(a) The reinstatement and amendment of the PPAs (see Middlekauff Decl., Ex. 1 §3.0);[4]

(b) PG&E's cure of all prepetition defaults owing to SPI under the PPAs in the amount of $17,950,371.15, and interest thereon at a rate of five percent per annum, compounded monthly, and paid in equal monthly installments starting within five days after final approval of the Settlement Agreement is

---

[4]The Settlement Agreement provides for several different PPA amendments, including: (1) the provision of a fixed energy price of 5.37 cents per kWh for a term of four years, pursuant to CPUC Decision 01-06-015, with reversion thereafter to PG&E's short-run avoided costs ("SRAC") as determined by the CPUC pursuant to the provisions of the PPAs (Middlekauff Decl., Ex. 1 §3.1); (2) the addition of provisions allowing for the pooling of capacity from the four QFs (id. §§3.1 & §3.2); and (3) the deletion of the minimum damages clause currently contained in the PPAs (id. §3.4).

obtained and continuing through June 4, 2003 (id. §2.0);

(c) SPI's payment of amounts due PG&E by SPI or its affiliate Sierra Pine for energy and energy related services provided by PG&E during the period from March 1, 2001 through June 1, 2001, in the amount of $912,050, and interest thereon at a rate of five percent per annum, compounded monthly, and paid in equal monthly installments starting within five days after final approval of the Settlement Agreement is obtained and continuing through June 4, 2003 (id. §2.1);

(d) PG&E's agreement not to derate or place SPI on probation for its failure to deliver either energy or capacity between March 21, 2001 and the date it begins to provide energy and capacity to PG&E pursuant to the amended PPAs (id. §3.4);

(e) The dismissal of both the State Court Action and the Appeal within 14 days of the final approval of the Settlement Agreement (id. §4.1(A)); and

(f) Full releases of all known and unknown claims between SPI and PG&E (id. §5.0(A)).[5]

In the event that the Court and the CPUC approve the Settlement Agreement, the Assumption Agreement provides for the assumption of the amended PPAs and the cure of any prepetition defaults thereunder pursuant to Section 365 of the Bankruptcy Code. With this Court's approval, the Assumption Agreement also provides for:

(a) PG&E's cure of the prepetition defaults and payment of interest thereon at a rate of five percent per annum, compounded monthly, and paid in accordance with Section 2.0 of the Settlement Agreement as outlined above (Middlekauff Decl., Ex. A to Ex. 1 at 3);

(b) SPI's withdrawal, within seven days of a bankruptcy court order approving

---

[5] In addition, the Settlement Agreement contains limited releases between SPI and the ISO, and between PG&E and the ISO. See Middlekauff Decl., Ex. A to Ex. 1 §5.0(B)-(C).

the Agreement, of any claims SPI filed in the bankruptcy case, other than the Section 503 administrative expense claims provided for in the Assumption Agreement with respect to PG&E's prepetition defaults and interest thereon (id. at 4); and

(c) SPI's waiver of its right to recover "pecuniary loss" damages in connection with the assumption of the amended PPAs (id.).[6]

C. **The Agreements Are In The Best Interest Of The Estate.**

As noted above, the Agreements provide not just for the amendment and assumption of SPI's PPAs, but also the resolution of all disputes between SPI and PG&E, including the State Court Action, the Appeal and SPI's Claim. In the Debtor's opinion, the Agreements achieve this result with terms that are in the best interest of the estate and its creditors.

In his prepared testimony attached to PG&E's application for CPUC approval of the Agreements, Judge Phillips notes that while neither PG&E nor the ISO has ever believed that SPI's non-contractual claims had validity, there was a risk that the State Court Action could have resulted in a finding that PG&E was liable for SPI's lost profits. Middlekauff Decl., Ex. 2 at 3-4. SPI claimed over $86 million in lost profits plus interest at seven percent in both the State Court Action and as part of its Claim. Id. Under both the Settlement and Assumption Agreements, PG&E avoids having to pay any lost profit damages to SPI. Moreover, PG&E avoids any risk that SPI could have recovered on its claim for punitive damages.

Not only do the Settlement and Assumption Agreements allow PG&E to avoid a potential award of lost profit damages to SPI, they also allow PG&E to avoid the substantial

---

[6] PG&E notes that other than the monthly compounding of interest, these terms are consistent with those reached between PG&E and over two hundred other qualifying facilities and already approved by the Court in a series of Stipulations and Orders between PG&E and the Committee, filed pursuant to this Court's December 21, 2001 oral Order granting PG&E's Motion For Authority To Compromise Claims Between Estate And Various Qualifying Facilities.

litigation costs associated with defending the State Court Action, prosecuting its Appeal, and defending the Claim. For example, PG&E's counsel in the State Court Action alone estimated that it would cost PG&E between $2-3 million to litigate the State Court Action through trial, not including an appeal. See Middlekauff Decl., Ex. 2 at 4.

For these and other reasons, not only the Debtor, but also Judge Phillips concluded that the Settlement Agreement was a reasonable and prudent alternative to the risks and expenses of continued litigation. Id.

## ARGUMENT

### A. The Court Should Approve The Settlement And Assumption Agreements.

Bankruptcy Rule 9019(a) empowers a bankruptcy court to approve any settlement or compromise related to a reorganization or liquidation.[7] Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); Vaughn v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.), 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991). Indeed, compromises and settlements are a common and favored occurrence in bankruptcy cases because they allow a debtor and its creditors to avoid the financial and other burdens associated with litigation over contentious issues and expedite the administration of the bankruptcy estate. Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968); Martin v. Kane (In re A & C Props.), 784 F.2d 1377, 1380-81 (9th Cir. 1986).

In reviewing proposed settlements, the bankruptcy court's inquiry focuses only upon whether the compromise is fair and equitable and in the best interest of the estate. TMT Trailer, 390 U.S. at 424; A & C Props., 784 F.2d at 1380-81; Nellis v. Shugrue, 165 B.R. 115, 121 (S.D.N.Y. 1994). In making this determination, however, the bankruptcy court is not required to conduct a mini-trial on the merits of the underlying dispute or an independent

---

[7]Bankruptcy Rule 9019(a) simply states, in part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

investigation into the reasonableness of the settlement. <u>Port O'Call Inv. Co. v. Blair (In re Blair)</u>, 538 F.2d 849, 851 (9th Cir. 1976); <u>see also</u> <u>In re Purofied Down Prods. Corp.</u>, 150 B.R. 519, 522 (S.D.N.Y. 1993); <u>Drexel Burnham</u>, 134 B.R. at 505.

Rather, the standards for such approval have been described as lenient and intended to encourage approval of settlements in bankruptcy cases. See <u>Purofied Down</u>, 150 B.R. at 522-23. The bankruptcy court need only canvass the legal and factual issues underpinning the compromise to ensure that the proposed settlement does not fall "'below the lowest point in the range of reasonableness.'" <u>Nellis</u>, 165 B.R. at 121-22 (quoting <u>In re W.T. Grant Co.</u>, 699 F.2d 599, 608 (2d Cir. 1983)); <u>Purofied Down</u>, 150 B.R. at 522; <u>Official Unsecured Creditors' Comm. of Pennsylvania Truck Lines, Inc. v. Pennsylvania Truck Lines, Inc. (In re Pennsylvania Truck Lines, Inc.)</u>, 150 B.R. 595, 598 (E.D. Pa. 1992), aff'd <u>mem.</u>, 8 F.3d 812 (3d Cir. 1993); <u>Drexel Burnham</u>, 134 B.R. at 505. In making this determination, significant deference may be given to the informed judgment of the debtor in possession and its counsel that a proposed compromise is fair and equitable. <u>Martin</u>, 91 F.3d at 395; <u>Nellis</u>, 165 B.R. at 122; <u>Purofied Down</u>, 150 B.R. at 522-23; <u>Drexel Burnham</u>, 134 B.R. at 505.

Over the years, four significant criteria have been developed by the courts for consideration in determining whether a proposed settlement falls below the lowest point in the range of reasonableness: (1) the probability of success on the merits; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views. <u>A & C Props.</u>, 784 F.2d at 1381; <u>see also</u> <u>Martin</u>, 91 F.3d at 393; <u>Nellis</u>, 165 B.R. at 122; <u>Pennsylvania Truck Lines</u>, 150 B.R. at 598. As demonstrated below, each of the applicable criteria is satisfied here.[8]

---

[8] The second factor typically considered by courts—difficulty associated with collection—is not applicable here.

### 1. The Probability Of Success On The Merits.

The Agreements fully and finally resolve numerous disputes between the Debtor and SPI without the need for expensive, distracting and time-consuming litigation. Although the Debtor believes that its positions with respect to SPI's non-contractual claims have considerable merit and that, if litigated, the Debtor would have prevailed on the issues in dispute, no litigation is without risk. Moreover, SPI's contractual claims and request for approximately $86 million in lost profits presented a considerably higher risk to the Debtor given the preliminary rulings of both the Sacramento Superior Court and this Court on the issues of PG&E's alleged breach and force majeure defense.

### 2. The Complexity Of The Litigation, And The Expense, Inconvenience And Delay Attending It.

As set forth above, the Settlement Agreement resolves numerous complex issues between the Debtor and SPI, including all causes of action in the State Court Action, the Appeal, and SPI's Claim. SPI asserted eight contractual claims, and numerous complex non-contractual claims, including antitrust violations and claims for unfair business practices. The litigation of these and other disputes between the parties in multiple fora could easily cost the Debtor millions of dollars in legal fees alone, as well as delay resolution of an over $1 billion claim in this bankruptcy case. Accordingly, in agreeing to the Settlement and Assumption Agreements, the Debtor has made what it believes is an economically prudent business judgment that the estate's assets are better utilized in facilitating a settlement rather than defending the State Court Action and Claim and prosecuting its Appeal.

### 3. The Settlement Is In The Best Interest Of The Creditors.

The last criteria considered by bankruptcy courts reviewing a proposed settlement is the paramount interest of creditors, with a deference to their reasonable views. A & C Props., 784 F.2d at 1381; Drexel Burnham, 134 B.R. at 505-06. While a creditor's objection

to a proposed settlement must be considered, it is not controlling and will not bar approval of settlements that "do not fall below the lowest point in the range of reasonableness." A & C Props., 784 F.2d at 1382; Drexel Burnham, 134 B.R. at 505.

The compromises reached in the Settlement Agreement benefit not only the estate but all creditors. To begin with, the Settlement Agreement calls for the dismissal of the State Court Action and the Appeal (Middlekauff Decl., Ex. 1 §4.1), as well as the withdrawal of SPI's Claim, all of which will preserve estate assets by avoiding further litigation costs. Id. Ex. 2 at 4. As well, given the risks of the State Court Litigation and the Claim (id. Ex. A to Ex. 1 ¶4), the terms of the Settlement Agreement—which provide for the cure of defaults under the PPAs, <u>but no payment of lost profits or other damages</u>—potentially save tens of millions of dollars in estate assets for the creditors.

## B. The Court Should Approve The Assumption Agreement.

In addition, the Court should approve the Assumption Agreement, which is an integral part of the settlement. The Bankruptcy Code does not provide courts with a standard to use in determining the propriety of a debtor in possession's decision to assume executory contracts. 3 Lawrence P. King, Collier on Bankruptcy ¶365.03[2], at 365-22 (15th ed. rev. 2000). Absent statutory guidance, the widely accepted test adopted by the courts is the business judgment standard. See NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984); Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("[T]he question whether a lease should be rejected and if not on what terms it should be assumed is one of business judgment"). Under this rule, courts accord great deference to a debtor in possession's decision to assume an executory contract. See, e.g., Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993) ("At heart, a motion to assume should be considered a summary proceeding . . ."); Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.), 756 F.2d 1043, 1046 (4th Cir. 1985) ("the bankrupt's decision . . . is to be accorded the deference mandated by the sound business judgment rule as generally

applied by courts to discretionary actions or decisions of corporate directors"); In re III Enters., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994) ("We will not substitute our own business judgment for that of the Debtor . . . unless 'the decision is so unreasonable that it could not be based on sound business judgment, but only on bad faith or whim'"), aff'd, 169 B.R. 551 (E.D. Pa. 1994); Summit Land Co. v. Allen (In re Summit Land Co.), 13 B.R. 310, 315 (Bankr. D. Utah 1981) ("[C]ourt approval under Section 365(a), if required, except in extraordinary situations, should be granted as a matter of course. To begin, this rule places responsibility for administering the estate with the trustee, not the court . . .").

The Ninth Circuit, in accordance with the widely accepted standard prevailing in other jurisdictions, also has adopted the business judgment rule for reviewing Section 365(a) motions. Robertson v. Pierce (In re Chi-Feng Huang), 23 B.R. 798, 800 (B.A.P. 9th Cir. 1982) ("We believe the 'business judgment' rule is the standard which controls the court's right to disapprove the [debtor in possession's] decision to reject an executory contract. . . . Virtually all recent Bankruptcy Court decisions follow this rule"); Turbowind, Inc. v. Post Street Mgmt., Inc. (In re Turbowind, Inc.), 42 B.R. 579, 585 (Bankr. S.D. Cal. 1984) ("The debtor has met its burden under the liberal 'business judgment' standard"). Under the rule as generally formulated and applied in corporate litigation, courts defer to decisions of corporate directors regarding matters entrusted to their business judgment except upon a finding of bad faith or gross abuse of business discretion. See Lubrizol, 756 F.2d at 1047; Lewis v. Anderson, 615 F.2d 778, 782-83 (9th Cir. 1979).

Applying the foregoing precedents to this case, it is clear that PG&E's decision to assume SPI's reinstated and amended PPAs as part of the global settlement of the parties' disputes is neither made in bad faith nor a gross abuse of its business discretion. To the contrary, PG&E's decision is based on fundamentally sound business reasons. To begin with, PG&E's decision to assume the amended PPAs on the terms in the Agreements was integral to an effective compromise of the State Court Action, the Appeal and SPI's Claim. In addition, the compromises reached in the Assumption Agreement with respect to the setting of interest and the payment of prepetition defaults benefit the estate and all creditors

to the extent that they preserve estate assets by: (i) providing for an interest rate which is favorable to the estate by any objective measure; and (ii) avoiding the cost of additional litigation.[9]

Accordingly, the Court should approve the Assumption Agreement as an integral part of the Settlement Agreement.

## CONCLUSION

The Debtor has carefully considered the risks, complexity and expense associated with further litigation of the disputes between it and SPI. In the Debtor's sound business judgment, these factors tip the scale heavily in favor of approval of the proposed Settlement and Assumption Agreements as fair, reasonable and equitable and in the best interests of the

///
///
///
///
///
///
///
///
///

---

[9] The Debtor acknowledges that the interest provisions in the Settlement and Assumption Agreements are slightly more generous than the rate provided almost all other qualifying facilities who have signed assumption and interest agreements with PG&E. Although the rate of interest is the same—five percent—the current Settlement and Assumption Agreements call for monthly compounding, while agreements with other qualifying facilities do not. PG&E believes that in light of the fact that the Settlement and Assumption Agreements provide for no payment of lost profits or other damages, the monthly compounding of interest—which allowed PG&E to reach settlement and obtain the various waivers, withdrawals and releases contained in the Agreements—is in the best interests of the estate as well as all creditors, including other qualifying facilities. Moreover, pursuant to Section 2.1 of the Settlement Agreement, SPI will pay PG&E the same monthly-compounded interest rate on the $912,050 it owes PG&E for energy and energy related services provided by PG&E. Middlekauff Decl., Ex. 1 at §2.1.

estate and its constituencies.  For these reasons, the Debtor respectfully requests that the Court grant its Motion and approve the Settlement and Assumption Agreements in the forms attached to the Middlekauff Declaration at Exhibit 1 and Exhibit A to Exhibit 1.

DATED: August 6, 2002.

Respectfully,

HOWARD, RICE, NEMEROVSKI, CANADY,
FALK & RABKIN
A Professional Corporation

By: /s/ Kimberly A. Bliss
KIMBERLY A. BLISS

Attorneys for Debtor and Debtor in Possession
PACIFIC GAS AND ELECTRIC COMPANY

WD 080602/F-1419920/Y8/1013807/v1