1  JAMES L. LOPES (No. 63678)
   JEFFREY L. SCHAFFER (No. 91404)
2  WILLIAM J. LAFFERTY (No. 120814)
   HOWARD, RICE, NEMEROVSKI, CANADY,
3  FALK & RABKIN
   A Professional Corporation
4  Three Embarcadero Center, 7th Floor
   San Francisco, California 94111-4065
5  Telephone:   415/434-1600
   Facsimile:   415/217-5910
6
7  Attorneys for Debtor and Debtor-in-Possession
   PACIFIC GAS AND ELECTRIC COMPANY
8  —and —
9  Attorneys for Co-Objector PG&E CORPORATION
   listed on attached Counsel Page
10

11              UNITED STATES BANKRUPTCY COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14

15  In re                          | Case No. 01-30923 DM

16  PACIFIC GAS AND ELECTRIC        | Chapter 11 Case
    COMPANY, a California corporation,
17                                  | Date:    October 2, 2002
                    Debtor.         | Time:    1:30 p.m.
18                                  | Place:   235 Pine Street, 22nd Floor
    Federal I.D. No. 94-0742640     |          San Francisco, California
19

20

21

22          PG&E'S OPPOSITION TO THE APPLICATION OF OFFICIAL
23       COMMITTEE OF UNSECURED CREDITORS AND CALIFORNIA
         PUBLIC UTILITIES COMMISSION FOR ORDER AUTHORIZING
24       THE EMPLOYMENT AND RETENTION OF UBS WARBURG,
         LLC AS FINANCIAL ADVISOR TO THE OFFICIAL
25       UNSECURED CREDITORS COMMITTEE AND THE
26       CALIFORNIA PUBLIC UTILITIES COMMISSION

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1

2 DEWEY BALLANTINE LLP WEIL, GOTSHAL & MANGES LLP
Two Houston Center 767 Fifth Avenue
3 909 Fannin Street, Suite 1100 New York, New York 10153
Houston Texas 77010 Telephone: (212) 310-8000
4 Telephone: (713) 576-1500

5

6 Attorneys for PG&E CORPORATION Attorneys for PG&E CORPORATION

7

8

9

10

11

12

13

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION .......................................................................... 1

ARGUMENT .............................................................................. 4

I.    THE COURT SHOULD DENY THE MOTION BASED UPON THE MYRIAD CONFLICTS OF INTEREST DISCLOSED BY WARBURG. .......................................................................... 4

II.    THE PROPOSED ENGAGEMENT LETTER PROVIDES FOR ABOVE-MARKET AND NON-CUSTOMARY FEES AND THE POSSIBILITY OF PAYMENT OF SUCH FEES WITH NO CORRESPONDING BENEFIT TO THE ESTATE. .................. 8

III.    THE ENGAGEMENT LETTER ALSO CONTAINS A NUMBER OF OTHER OBJECTIONABLE TERMS, WHICH WILL BE DETRIMENTAL TO THE ESTATE. ............................... 11

IV.    IN ANY EVENT, THE COURT SHOULD DECLINE TO APPROVE THE APPLICATION AS NOT NECESSARY AND NOT LIKELY TO BENEFIT THE ESTATE. .......................... 14

CONCLUSION ........................................................................... 17

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

Page(s)

## Cases

In re Bartley Lindsay Co., 120 B.R. 507 (Bankr. D. Minn. 1990), aff'd 137
B.R. 305 (D. Minn 1991) ....... 4

In re Caldor, Inc.—NY, 193 B.R. 165 (Bankr. S.D.N.Y 1996) ....... 5

In re Intech Capital Corp., 87 B.R. 232 (Bankr. D. Conn. 1988) ....... 7

In re Siliconix, Inc., 135 B.R. 378 (N.D. Cal. 1991) ....... 6

In re XGW Excavating Co., 111 B.R. 469 (Bankr. D.N.J. 1990) ....... 5

Michael v. Eagle – Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 999
F.2d 969 (6th Cir. 1993) ....... 7

Southern California Edison Co. v. Lynch, No. 01-56879, D.A.R. 11033
(September 23, 2002) ....... 2, 16

## Statutes

11 U.S.C.
§327(a) ....... 4
§328(c) ....... 4, 16, 17
1103(b) ....... 4

## Other Authorities

3 Collier on Bankruptcy ¶328.05 (15th ed. 2002) ....... 5

Michael J. Cook & Stephen J. Lubben, Retention, Payment, Ethical and
Other Obstacles for Non-Legal Professionals In Chapter 11
Reorganizations, 66 PLI/NY 175, 185 (Dec. 1999) ....... 5

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    The debtor Pacific Gas and Electric Company ("PG&E" or the "Debtor") and the

2    co-proponent of its plan of reorganization, PG&E Corporation, here jointly respond to the

3    "Application Of Official Committee Of Unsecured Creditors And California Public Utilities

4    Commission For Order Under 11 U.S.C. §1103 And F.R.B.P. 2014 And 2016 Authorizing

5    Retention And Employment Of UBS Warburg, LLC, As Financial And Capital Markets

6    Arranger" (the "Application"), filed jointly by the Official Committee of Unsecured

7    Creditors appointed in this case (the "OCC") and the California Public Utilities Commission

8    ("CPUC," and with the OCC, the "Applicants").

9

10                              INTRODUCTION

11           A little more than two months ago, this Court denied the motion (the "CPUC

12   Motion") brought by the CPUC seeking authorization substantially similar to that sought by

13   the Application, to employ UBS Warburg LLC ("Warburg") to act as the financial arranger,

14   at the Debtor's expense, for the debt and equity securities to be sold pursuant to the plan of

15   reorganization proposed by the CPUC.  The CPUC brought the Motion pursuant to Sections

16   105, 363, 364, 503 and/or 1107 of the United States Bankruptcy Code (the "Code").  In

17   denying the CPUC Motion the Court concluded as a matter of law that none of the cited

18   provisions of the Code provided any basis to permit the CPUC to engage an investment

19   banker at the estate's expense.  Oppositions to the CPUC Motion filed by the Office of the

20   United States Trustee ("UST") and by the Debtor pointed out that the Motion, if approved,

21   would have obligated the estate to pay as much as $128 million (or more) in fees to

22   Warburg.

23           Apparently undaunted by this Court's repudiation of the relief requested in the

24   CPUC Motion, the CPUC and Warburg executed an engagement letter dated as of

25   August 12, 2002 (the "August 12 Letter"), containing terms substantially similar to those

26   contained in the engagement letter which was attached as an exhibit to the CPUC Motion,

27   including payment for all services by the Debtor, after approval by the Bankruptcy Court.

28   And Warburg has been actively engaged on the CPUC's behalf, including participating in

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PG&E'S OPP. TO APPLICATION FOR ORDER TO EMPLOY UBS WARBURG LLC

1  informal discovery matters with the Debtor and delivering an "Expert's Report" in

2  connection with the CPUC's efforts to confirm its competing plan of reorganization.

3  On August 22, 2002, the OCC and the CPUC announced that they had entered

4  into an agreement pursuant to which they would amend the plan of reorganization for PG&E

5  filed by the CPUC, and that they would jointly become proponents of such "amended plan."

6  On September 3, 2002, the OCC and the CPUC filed their amended plan of reorganization

7  (the "Amended Competing Plan" dated August 30, 2002).

8  On September 20, 2002, the OCC and the CPUC jointly filed the Application,

9  seeking to employ Warburg, pursuant to Sections 328 and 1103 of the Code, as financial

10  arranger for the securities to be sold in connection with the Amended Competing Plan.

11  Attached as an exhibit to the Application is a copy of an engagement letter dated as of

12  September 12, 2002 (the "Engagement Letter"), between and among the CPUC, the OCC

13  and Warburg, setting forth the proposed terms of Warburg's engagement thereunder.[1]

14  The hearing on the Application has been set on shortened notice for October 2,

15  2002 at 1:30 p.m. However, as the Court will recall, minutes after this Court had set the

16  hearing for October 2, and after having heard argument from the OCC concerning the

17  urgency and exigencies supporting the immediate retention of Warburg in connection with

18  its Ex Parte Application For Order Shortening Time For Hearing, the CPUC and OCC

19  acknowledged on the record in the immediately subsequent hearing on confirmation matters

20  that the Ninth Circuit's recent decision in <u>Southern California Edison Co. v. Lynch</u>, No. 01-

21  56879, D.A.R. 11033 (September 23, 2002) casts extreme doubt on the ability of the CPUC

22  and the OCC to confirm the Amended Competing Plan. Nonetheless, the OCC and the

23  CPUC continue their demand for immediate retention of Warburg at an upfront expense to

24  the Debtor's estate of a minimum of $2 Million (and as much as $8 Million, on delivery of a

26  [1]It is noteworthy that the CPUC, after having been rejected once, is a joint applicant
27  with the OCC. As will be demonstrated, the Application is first and foremost a renewed
   CPUC application, and the OCC is being used in a transparent attempt to take advantage of
28  provisions of the Bankruptcy Code not available to the CPUC.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1   "highly confident letter", which could occur promptly after approval of the Application),

2   even as the OCC and the CPUC openly question the feasibility of the very plan upon which

3   Warburg will provide services.

4         The Court should deny the Application for four reasons. First, as disclosed by

5   Warburg in the Declaration of Kenneth Crews ("Crews Decl."), Warburg holds and

6   represents interests adverse to the estate, and has a multitude of "connections" with the

7   Debtor which disqualify Warburg from employment at the expense of the estate. The Court

8   should not ignore the enormity of these conflicts; rather, the Court should decline to approve

9   the Application on this ground alone.[2] Second, the Engagement Letter, like the predecessor

10   forms of engagement letter governing Warburg's retention, provides for excessive fees, for

11   services which are unlikely to benefit the estate. Third, similar to prior versions of the

12   Engagement Letter, this version contains numerous inappropriate terms which are also

13   detrimental to the estate, are of a type which have been disapproved in other cases in this

14   circuit, and should not be approved in this case. Fourth, the Court should decline to approve

15   the Motion, which would have the effect of obligating the estate to pay as much as $60

16   million for no apparent benefit, in light of the fact that Warburg is already employed by the

17   CPUC, and is active in this case on behalf of the CPUC's efforts to confirm the Amended

18   Plan. Notwithstanding the Application for retention by the OCC, Warburg's first and

19   foremost responsibilities are to the CPUC. The Engagement Letter clearly notes that

20   Warburg cannot earn its fees in connection with any plan not supported by the CPUC. The

21   OCC, therefore, gets the services of Warburg for only so long as it is a co-proponent of a

22   CPUC Plan, but the Debtor in any case is being asked to pay the fees.

23         The Application is a thinly-disguised ruse to foist uneconomic and deleterious

24   terms in the Engagement Letter onto the Debtor, on the basis that the OCC has a right to

25   engage an investment banker in this case. The Court should not indulge this attempt to

26

27       [2] Indeed, Warburg's conflicts on this matter likely should disqualify it upon non-bankruptcy grounds from representing an entity adverse to the Debtor.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  circumvent the provisions of the Code which prevented the CPUC from engaging Warburg,

2  and should deny the Application.

3

4  ARGUMENT

5  I.

6  THE COURT SHOULD DENY THE MOTION BASED UPON THE
   MYRIAD CONFLICTS OF INTEREST DISCLOSED BY
7  WARBURG.

8  Applicants have applied for an order under Sections 1103 and 328 of the

9  Bankruptcy Code authorizing the employment of Warburg at the Debtor's expense. Section

10 1103 authorizes a creditors' committee to employ professionals to represent and perform

11 services for the committee. Unlike Section 327(a), which sets out the requirements for

12 professionals hired by trustees, Section 1103(b) does not literally prohibit employment of a

13 professional representing a committee, other than an attorney or an accountant, who holds an

14 interest adverse to the estate or is not a "disinterested" person. 11 U.S.C. §§327(a), 1103(b).

15 The Code does provide, however, that a committee professional may be denied

16 compensation from the estate if the professional is not disinterested or represents or holds an

17 interest adverse to the interests of the estate:

18  [T]he court may deny allowance of compensation for services and
    reimbursement of expenses of a professional person employed under
19  section 327 or 1103 of this title if, at any time during such professional
    person's employment under section 327 or 1103 of this title, such
20  professional person is not a disinterested person, or represents or holds
    an interest adverse to the interest of the estate with respect to the
21  matter on which such professional person is employed. (11 U.S.C.
    §328(c))
22

23 Section 328(c) makes the "disinterestedness" requirement of Section 327(a) relevant to

24 decisions to approve or disapprove applications to hire committee professionals.[3] See In re

25  _____

26  [3]There is no question that UBS Warburg is a "professional person" under the Code.
    See In re Bartley Lindsay Co., 120 B.R. 507, 511 (Bankr. D. Minn. 1990), aff'd 137 B.R.
27  305 (D. Minn 1991) (explaining that it is a "generally accepted principle[]" that "[f]inancial
    advisors, workout specialists, and consultants . . . are professionals for the purpose of
28  §327").

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Caldor, Inc.—NY, 193 B.R. 165, 170-71 (Bankr. S.D.N.Y 1996).

In Caldor, the Official Committee of Unsecured Creditors requested that the court approve the employment of two groups of professionals as legal counsel, accountants, and financial advisors. The U.S. Trustee objected on the ground that the professionals were not disinterested. The professionals contended that the disinterestedness requirement of Section 327(a) was irrelevant because Section 1103(b) does not reference that section and does not otherwise state that a committee professional must be disinterested. The court rejected the professionals' argument, explaining that decisions under Section 327(a) regarding disinterestedness were relevant to its evaluation of the Section 1103 application because Section 328(c) denies allowance of compensation for committee professionals that are not disinterested or hold an adverse interest. See id.; see also 3 Collier on Bankruptcy ¶328.05 (15th ed. 2002) ("Section 328(c) should be read in conjunction with Sections 327(a) and 1103(b) of the Code"). Because Applicants are asking this Court to authorize the retention and employment of UBS Warburg "at the expense of the PG&E bankruptcy estate," Application at 1, the Application should not be granted if UBS Warburg is not disinterested or holds an adverse interest. See In re XGW Excavating Co., 111 B.R. 469, 471 (Bankr. D.N.J. 1990) (explaining that Section 328(c) allows the court to deny compensation to a committee professional when the professional is not a disinterested person); Michael J. Cook & Stephen J. Lubben, Retention, Payment, Ethical and Other Obstacles for Non-Legal Professionals In Chapter 11 Reorganizations, 66 PLI/NY 175, 185 (Dec. 1999) ("Thus, despite superficial differences in the statutory language for the retention of a committee professional, the retained professional will, in the end, have to be both disinterested and lack any adverse interest in order to be paid from the debtor's estate"). If it is clear that payment will later be denied under Section 328(c), employment in the first instance should be denied.

Even prior to examining the numerous conflicts and connections between Warburg and the Debtor as disclosed by the Declaration of Kenneth Crews, the Court should decline to approve the Application on the simple ground that the Application requests authorization for the OCC to retain and compensate (with estate funds) a professional which

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

already represents a party which is adverse to the Debtor. No matter how the CPUC may try to "spin" its engagement of Warburg as ultimately providing a benefit to the estate, there is no escaping the fact that the CPUC is highly adverse to the Debtor in this case and that the OCC's employment of Warburg would require this Court to ignore a blatant, and continuing, conflict of interest. Nor is this issue confined to a "technical" conflict which is unlikely to impact adversely the interests of this estate. Rather, as set forth in greater detail in section "IV" of this Opposition, infra, there are many reasons to suspect that Warburg's interests are aligned with the CPUC's, and not with the OCC, should the OCC and the CPUC "part ways". There is simply no reason for this Court to countenance this sort of conflict of interest.

Moreover, as demonstrated by the Crews Declaration filed in support of the Application, Warburg holds and represents interests adverse to the estate, and is therefore an "interested" party. Warburg holds for its own account long positions in excess of $20 million in the Debtor's debt securities and short positions in excess of $6 million in the Debtor's debt securities. Crews Decl., ¶15. These are not "static" positions which Warburg held as of the commencement of the case. To the contrary, Warburg candidly discloses that it trades the Debtor's securities on a daily basis, multiplying the complexity of the conflicts involved, and subjecting Warburg to another continuing, post-employment charge that it is not, and will not be, disinterested during the course of its employment, as required by Section 328(c). Id. By themselves, Warburg's holdings are sufficient grounds for denying the Application: "[C]reditors are per se interested and thus barred from employment . . . ." In re Siliconix, Inc., 135 B.R. 378, 380 (N.D. Cal. 1991).

UBS AG, Warburg's parent, is also a lender to the Debtor under a variety of credit agreements, with participations in aggregate issued amounts in excess of $28.5 million, as of the date of the Crews Declaration. Id. ¶17. In addition, in its role as administrative agent under a Reimbursement Agreement dated as of May 1, 1996, UBS AG has filed objections to the plan of reorganization filed by PG&E as well as the CPUC's competing plan, a position which renders UBS AG adverse not only to the estate, but also to

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 10455   Filed: 10/01/02   Entered: 10/02/02 12:15:00   Page 10 of 21

1   its proposed clients, the CPUC and the OCC. The OCC is already on record urging creditors

2   to vote for both the PG&E Plan and the Amended Competing Plan. Id. ¶16.

3   　　　　　Furthermore, Warburg or its affiliates, have, as recently as November 1998,

4   participated as underwriters of a number of the Debtor's securities which are still

5   outstanding, thereby further demolishing any argument that they are "disinterested." See 11

6   U.S.C. Section 101(14)(B) (defining "disinterested person" as a person that "is not and was

7   not an investment banker for any outstanding security of the debtor"); Michael v. Eagle –

8   Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.), 999 F.2d 969, 972 (6th Cir. 1993)

9   (holding that Goldman Sachs was disqualified from employment as financial advisor to the

10   debtor-in-possession because it had served as the managing underwriter for the debtor on a

11   number of outstanding revenue bonds). In addition, Warburg is also a stockholder in PG&E

12   Corporation, a co-proponent of the Debtor's Plan.[4] Stockholders of PG&E Corporation will

13   receive a stock dividend of the Reorganized Debtor's stock under the PG&E Plan.

14   　　　　　On any theory, Warburg's extensive contacts and adverse relationships with the

15   Debtor require the Court to find that Warburg is not disinterested and holds and represents,

16   and will continue to hold and represent, interests adverse to the estate. The Court should

17   deny the Application on that ground alone.

18   　　　　　Lastly, the Engagement Letter provides that upon approval of the Application,

19   Warburg will be entitled to receive the fees provided in the Engagement Letter without

20   having to apply to this Court under section 330 of the Code. Engagement Letter at  . There

21   is no basis to provide Warburg with such an extraordinary dispensation from the normal

22   practice or requiring professionals to apply for compensation, on notice to creditors. The

23   Court has already crafted a procedure which provides for regular hearings on applications

24   

25   _____
      [4]Warburg notes that the 741,525 shares of common stock its owns in PG&E

26   Corporation represent less than one percent of PG&E Corporation's outstanding common
      stock. See Crews Decl., ¶15. But the percentage amount of Warburg's holdings make no

27   difference in assessing whether it is a "disinterested person." See In re Intech Capital Corp.,
      87 B.R. 232, 234-35 (Bankr. D. Conn. 1988) (rejecting argument that professional can be

28   disinterested despite holdings in debtor if the holdings are "de minimis").

PG&E'S OPP. TO APPLICATION FOR ORDER TO EMPLOY UBS WARBURG LLC

HOWARD RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  for compensation, and expeditious payment of fees allowed. Every other professional in this
2  case is subject to these procedures, and there is no reason to exempt Warburg entirely from
3  an obligation to file an appropriate application for compensation. The Court should
4  therefore deny the Application.

6  II.

7  THE PROPOSED ENGAGEMENT LETTER PROVIDES FOR
   ABOVE-MARKET AND NON-CUSTOMARY FEES AND THE
8  POSSIBILITY OF PAYMENT OF SUCH FEES WITH NO
   CORRESPONDING BENEFIT TO THE ESTATE.

10  Assuming arguendo that the Court could approve the Application

11  notwithstanding the conflicts noted above, the Court in any event should not grant the

12  Application for the following reasons: (i) as PG&E pointed out in its opposition to the

13  CPUC Motion, the Warburg fees are excessive and above-market for financing transactions

14  of this type (see generally Declaration of Peter H. Kind filed concurrently herewith ("Kind

15  Decl.")); (ii) the fee structure makes no sense in the context of this case, and provides no real

16  benefit to the Debtor or to the estate; and (iii) the Engagement Letter provides for a $60

17  Million "Consummation Fee" which Warburg could "earn" (and the Debtor pay) without

18  completing, or indeed, even participating in, the financing necessary for the Debtor to

19  emerge from Chapter 11.

20  As PG&E pointed out in its Opposition to the CPUC Motion, the CPUC has

21  previously and repeatedly represented to this Court and to PG&E's creditors that its

22  proposed plan of reorganization is financeable and will return PG&E to investment grade

23  status. The OCC has now joined in this mantra. More recently, in their Joint Motion of the

24  CPUC and OCC for an Order Authorizing the Resolicitation of Votes and Preferences for

25  Movants' Amended Plan of Reorganization for the Debtor, etc. . . . , filed September 3,

26  2002. Applicants requested that the Court authorize a resolicitation of at least 26,500

27  creditors on the basis of Applicants' arguments that their Reorganization Agreement,

28  pursuant to which the CPUC "agreed" (in very vague terms) to permit PG&E to obtain

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PG&E'S OPP. TO APPLICATION FOR ORDER TO EMPLOY UBS WARBURG LLC
-8-

1   revenues sufficient to satisfy all obligations associated with the securities to be issued

2   pursuant to the Amended Competing Plan, materially increased the financeability, and

3   therefore the feasibility, of the Amended Competing Plan Joint Motion at 5-6. The

4   Application and the supporting declarations of Mr. Crews and of Paul Aronzon, counsel to

5   the OCC, argue that the fees included in the Engagement Letter are fair, and are customary

6   in transactions of this kind. Crews Decl., ¶36; Aronzon Decl., ¶5.

7          Given the above, and assuming that investment bankers charge higher fees in

8   connection with more difficult financing transactions, it appears that the fee structure

9   requested by Warburg in connection with this financing reflects either: (i) a challenge

10  premium associated with the uncertainty of being able to complete the financing; or (ii) fees

11  that are materially in excess of market standards. See Engagement Letter at 2-5.

12         The Engagement Letter provides for an aggregate of $8 million in "Retainer

13  Fees," which are essentially payable upfront. See Id. at 2. Two million dollars of these fees

14  are due and payable upon the effectiveness of the Engagement Letter (i.e., upon approval of

15  the Application). Payment of $2 million of a "Retainer Fee" at the inception of the

16  representation is itself in excess of market. Another $6 million is due upon delivery to the

17  CPUC and the OCC of a "highly confident letter" setting forth terms of a proposed financing

18  of the CPUC plan (as defined in the Engagement Letter, the "UBS Warburg Financing

19  Proposal")[5]. Id. Considering the fact that the Amended Competing Plan, with the support of

20  the Reorganization Agreement, supposedly describes a financeable and a feasible plan of

21  reorganization, with terms of a proposed financing, the UBS Financing Proposal serves no

22  apparent purpose.

23         There does not appear to be any purpose in obtaining a highly confident letter at

24  this stage of the Debtor's bankruptcy case. A "highly confident letter" does not provide a

25

26         [5]Though the Engagement Letter is not clear, PG&E presumes that both the highly
    confident letter and the UBS Warburg Commitment will cover all financing necessary to
27  execute the Amended Competing Plan including the commercial bank credit facilities
    described therein.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   financial commitment, the purpose it serves is to convince a third party that the company

2   which is the subject of the letter is financeable. However, in this instance, given the status of

3   the bankruptcy case (i.e., the voting closed weeks ago), the only "audience" for such a letter

4   now is the Court. Indeed, as the Application indicates, the highly confident letter is to be

5   prepared and delivered in connection with the hearing on confirmation of the Amended

6   Competing Plan (although nothing in the Engagement Letter would preclude Warburg from

7   delivering the highly confident letter well prior to the hearing on confirmation). Application

8   at 5-6. Ordinarily, the feasibility of a plan of reorganization is demonstrated by expert

9   testimony at trial. It is anomalous, to say the least, for this estate to pay $6 million just to

10  receive the equivalent of testimony that the Amended Competing Plan may be feasible. Id.

11          Nor does obtaining a highly confident letter from UBS Warburg appear to be

12  responsive to the inherent flaws in the Amended Competing Plan. Despite Applicants'

13  hyperbolic statements in the press and in their [Motion re Resolicitation] concerning the

14  salutary effect of the Reorganization Agreement on the Amended Competing Plan's

15  feasibility, PG&E believes that the principal flaw in the Amended Competing Plan relates to

16  the uncertainty of cash flow stability and revenues thereunder, which, along with the

17  skepticism by the rating agencies and institutional lenders concerning the CPUC's reliability,

18  combine to render the Amended Competing Plan unfeasible. Warburg is being engaged to

19  provide financing for a plan, not to provide financial advice (indeed, the Engagement Letter

20  expressly disclaims such duties) or to design a reliable and feasible regulatory structure,

21  acceptable to capital markets. Id. at 2. The highly confident letter which Warburg is to

22  produce is not responsive to the weaknesses of the Amended Competing Plan; paying

23  Warburg a $6 million fee to address the wrong problem seems nonsensical.

24          Most objectionably, the Engagement Letter provides (as did prior versions) for a

25  $60 million "Consummation Fee," payable to Warburg upon consummation of any

26  transaction which involves the offering of debt or equity securities of the Debtor or affiliates,

27  does not provide for the "disaggregation" of the Debtor's business with resulting loss of

28  regulatory control by the CPUC, and is acceptable to the CPUC, whether Warburg has any

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  involvement with such transaction or not, and, indeed, whether Warburg performs any

2  services under the Engagement Letter or not. Engagement Letter at 3. As the Kind

3  Declaration demonstrates, the amount of the Consummation Fee appears excessive in any

4  event. Kind Decl., ¶11. Beyond the sheer audacity of the amount of the Consummation Fee,

5  however, PG&E points out, again, that Warburg could be entitled to a Consummation Fee

6  even if it performs no work in relation to the plan that is ultimately confirmed. Permitting

7  Warburg to "lock-in" this Consummation Fee at the inception of the representation, before

8  there is any ability to gauge any benefit to the estate from Warburg's services, is completely

9  inappropriate. Even worse, under the provisions of the Engagement Letter Warburg would

10  be entitled to its fees at the Debtor's expense if the confirmed Plan was approved by the

11  CPUC, even if the OCC breaks ranks with the CPUC. This provision makes it abundantly

12  clear that Warburg is first and foremost responsible to the CPUC, and not the OCC, but the

13  OCC is being "used" to secure the retention at Debtor's expenses.

14      The Application should be denied for these reasons alone.

16                          III.

17    THE ENGAGEMENT LETTER ALSO CONTAINS A NUMBER OF
        OTHER OBJECTIONABLE TERMS, WHICH WILL BE
18                DETRIMENTAL TO THE ESTATE.

19      The Engagement Letter also contains a number of provisions which had been

20  highly objectionable in prior versions, and should also not be approved for that reason.

21  Indeed, as the UST has also noted in its Opposition to the Application ("UST Opp.") prior

22  drafts of the Engagement Letter appeared to provide greater value to the estate for the fees

23  included in the Engagement Letter than what is offered under the September 12 rendition.[6]

24      As the CPUC's Reply to PG&E's Opposition to the CPUC Motion made clear,

26      [6]PG&E also joins in the other objections to the retention of Warburg contained in the
    "United States Trustee's Opposition to Application of Official Committee of Unsecured
27  Creditors and CPUC For Order Employing UBS Warburg, LLC, filed with this Court on
    September 26, 2002.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

PG&E'S OPP. TO APPLICATION FOR ORDER TO EMPLOY UBS WARBURG LLC

the form of Warburg Engagement Letter which the CPUC urged the Court to approve in connection with the CPUC Motion provided for a commitment to provide or arrange for the financing of the securities to be sold pursuant to the CPUC's plan in exchange for the Retainer Fee. CPUC Reply at 11. Although Warburg's "commitment" in the prior version of the Engagement Letter was subject to a number of "outs," it represented some undertaking by Warburg to "put its balance sheet at risk" in connection with this financing. In contrast, the present fee structure provides materially less benefit to the estate, substituting an essentially meaningless highly confident letter for a commitment, in exchange for the same $8 million fee.

In light of this materially detrimental modification, PG&E notes with some trepidation that the Engagement Letter references, but does not provide the terms for a "Commitment Letter," beyond stating that they shall be acceptable to Warburg. Engagement Letter at 3. Moreover, although the prior versions of the Engagement Letter had at least provided a fee structure for commissions to Warburg in connection with the offering to be made pursuant to Warburg's "Commitment," which would have entitled Warburg to receive in excess of $128 million in fees, the Engagement Letter now provides no fixed terms whatsoever for these fees. This is especially ominous in light of the fact that the Engagement Letter retains provisions which require that Warburg is to have the "exclusive" right to provide or arrange for the financing of any plan for which the CPUC is a proponent. Engagement Letter at 2. Particularly given the astronomical amount of fees which Warburg had attempted to "lock-in" in its prior, arguably more conservative, forms of engagement letter, it appears foolhardy to leave critical terms concerning the fee structure to be negotiated later to the satisfaction of Warburg.

Although the Engagement Letter does not provide a "commitment" to provide financing for the Amended Competing Plan, it does describe, generically, a process by which Warburg might, at some point in the future, be required to deliver such a commitment. However, the "terms" of Warburg's proposed "commitment", and the securities to be issued thereunder, which would include such critical terms as the pricing of the securities, the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

-12-

interest rate and maturity of the securities, covenants and events of default, and, in the case of equity securities or convertible securities, the percentage of the issuer they represent, have not been negotiated or specified in advance and are expressly not subject to the approval of the Debtor, the issuer. Therefore, it is impossible to determine what value, if any, the Debtor would receive from such an arrangement. In addition, the proposed commitment is still subject to a number of highly vague "conditions" concerning market conditions, Warburg satisfaction, etc. which would render any such "commitment" entirely illusory at best.

When selecting an investment banker, issuers have the ability to negotiate with multiple investment banks at the same time, thus imposing a market discipline upon the fees being charged for their services. In large underwritings, as this one would be, issuers often elect to use joint book-running managers to ensure that this market discipline continues until the close of the financing. Here, by agreeing to give Warburg the exclusive right to provide or arrange for any financing as book-running lead manager prior to negotiating all of the terms and conditions of the financing arrangement, there is no market discipline imposed.

The "commitment" referenced in the Engagement Letter is not tied in any way to the securities to be issued pursuant to the Amended Competing Plan. The Engagement Letter reads as if Warburg will itself decide what type of securities it can sell, the Amended Competing Plan notwithstanding. This poses a dramatic and problematic issue. Warburg is <u>not</u> proposing necessarily to assist with the financing of the Amended Competing Plan. Warburg is proposing to determine what securities are financeable, and then presumably the Amended Competing Plan may have to be materially amended to incorporate such new provisions.

The Court should decline to approve the Application for all of these reasons.

IV.

IN ANY EVENT, THE COURT SHOULD DECLINE TO APPROVE THE APPLICATION AS NOT NECESSARY AND NOT LIKELY TO BENEFIT THE ESTATE.

In addition to the foregoing deficiencies in the Engagement Letter, the Court should decline to approve the Application, and thereby avoid saddling the estate with fees

1    that could amount to at least $60 million (and presumably much, much more if Warburg acts

2    as lead book runner for the offering of the Debtor's securities), because there is simply no

3    evidence that permitting the OCC to employ Warburg will provide any benefit to the estate.

4           First and foremost, Warburg is already engaged and on the job, pursuant to an

5    engagement letter entered into between the CPUC and Warburg, dated as of August 12,

6    2002. A true and correct copy of the August 12 Engagement Letter is attached as

7    Exhibit "A" to the Declaration of William J. Lafferty, filed concurrently herewith ("Lafferty

8    Decl."). Pursuant to that engagement, Warburg has already participated in informal

9    discovery proceedings with PG&E and has produced an "Expert's Report" in connection

10    with the confirmation hearing of the Amended Competing Plan. In light of this fact, the

11    OCC's assertions in the Application (at 8-10) that it is critical that Warburg be engaged by

12    the OCC pursuant to Sections 328(a) and 1103 of the Code ring hollow. Rather, it appears

13    that the true purpose of the Application is merely to insure that Warburg receives immediate

14    payment of at least $2 million from the Debtor. In any event it is does not appear that there

15    is any proper reason why the OCC's employment of Warburg will increase the likelihood

16    that the OCC will receive a benefit from Warburg' efforts, nor does it appear that there is

17    any benefit to the estate from having the OCC hire Warburg at this stage of the process.

18           There are also a number of other unique factors concerning the OCC's proposed

19    employment of Warburg which should cause this Court to exercise extreme caution before

20    approving the Application. As an initial matter, PG&E is concerned that the joint

21    engagement of Warburg by the OCC and the CPUC will lead to confusion. The Engagement

22    Letter provides for the OCC and the CPUC jointly to engage Warburg. Engagement Letter

23    at 1. The Application also requests authorization to permit the OCC and the CPUC to

24    employ Warburg. Application at 3. There is no apparent reason why the Court should rule

25    in any way upon the CPUC's contractual arrangements with Warburg. Including an

26    "approval" of the Engagement Letter as it pertains to the CPUC is confusing. Is it intended

27    that Warburg would continue to be paid by the estate under the terms of the Engagement

28    Letter if the OCC decides to terminate its role as a co-proponent of the Amended Competing

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

PG&E'S OPP. TO APPLICATION FOR ORDER TO EMPLOY UBS WARBURG LLC

Case: 01-30923   Doc# 10455   Filed: 10/01/02   Entered: 10/02/02 12:15:00   Page 18 of 21

1   Plan? That result seems bizarre, yet there is no language in either the Engagement Letter or
2   the Application prohibiting that outcome.

3            There is also no language in either the Application or the Engagement Letter
4   which deals directly with the issue of the parties' respective rights and obligations in the
5   event that the CPUC and the OCC decide to "part ways" in their approach to the Debtor's
6   reorganization. However, the implications of certain provisions of the Engagement Letter
7   appear to create disincentives to have the OCC follow any path but that charted by the
8   CPUC, and are thus quite troubling on this point. Assuming, as we must, that the OCC is
9   not insensitive to the amount of professional fees to be borne by this estate, the mere fact
10  that approval of the Engagement Letter creates an entitlement in Warburg to receive at least
11  $60 million in "Consummation Fees," means that the OCC would be reluctant to take any
12  action which would endanger their ability to utilize Warburg's services (or, alternatively,
13  require the OCC to engage yet another financial arranger in this case). In fact, the
14  exclusivity rights conferred upon Warburg in the Engagement Letter give Warburg a
15  substantial veto over decisions and negotiations which might be taken by either of the
16  proponents of the Amended Competing Plan. When one considers that the "Consummation
17  Fee" is payable on consummation of any plan which (a) sells securities of the Debtor (b) is
18  approved by the CPUC and (c) doesn't provide for disaggregation of the Debtor's business
19  with a resulting loss of regulatory control by the CPUC , it appears all the less likely that the
20  OCC will support any alternative plan which the CPUC does not also support. Engagement
21  Letter at 3. Since the Engagement Letter provides that Warburg cannot receive the $60
22  million "Consummation Fee" in connection with the confirmation of a plan that does not
23  include the CPUC's approval (Engagement Letter at 2, 3), the Engagement Letter essentially
24  prohibits Warburg from working for the OCC (or any other proponent) in connection with
25  any alternative plan of reorganization, including an independent OCC plan, or a plan with
26  the Debtor or another party. And yet the Debtor is being asked to finance Warburg's efforts
27  under provision of the Bankruptcy Code that would permit only the OCC and not the CPUC,
28  to retain professionals at the Debtor's expense. On these additional grounds the Application

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  should not be approved.

2  In addition, as the Court noted during the argument on July 22, 2002 on the

3  CPUC's Motion, courts exercise great caution in approving employment and compensation

4  arrangements pursuant to Section 328 of the Code, because that section effectively provides

5  that the Court's approval of alternative compensation systems is subject to reconsideration

6  only in extremely limited circumstances. Reporter's Transcript date July 22, 2002 at 22:10 –

7  23:09. Certainly, this Court should pause long and hard before approving this Application,

8  which would immediately saddle the estate with obligations that could total at least $60

9  million.

10  Last, but not least, as acknowledged repeatedly on the record by the CPUC and

11  the OCC during the lengthy hearing on September 25, 2002, the Ninth Circuit's recent

12  decision in <u>Southern California Edison Co. v. Lynch</u>, No. 01-56879, D.A.R. 11033

13  (September 23, 2002) casts extreme doubt over the ability of the CPUC and the OCC to

14  confirm the Amended Competing Plan. Indeed, the Court will recall that during the course

15  of that hearing the CPUC took the position on a number of occasions that the effect of the

16  Ninth Circuit's decision was to make the Amended Competing Plan and the PG&E Plan

17  infeasible as drafted (a proposition with which PG&E does not agree with regard to its plan),

18  and that for this reason, and for a variety of other reasons, the Court should delay the

19  commencement of the confirmation hearing pending further developments. Although the

20  CPUC ultimately, and grudgingly, agreed to go forward with the hearing on confirmation of

21  the Amended Competing Plan on November 18, they also reserved the right to file a brief

22  explaining their concerns regarding the impact of the Ninth Circuit's decision on scheduling

23  and substantive issues. In light of this admission by the co-proponents of the Amended

24  Competing Plan that their Plan appears to be infeasible as a matter of law, there is absolutely

25  no justification for rushing to approve the Application, with the ruinous provisions of the

26  Engagement Letter, and thereby create obligations of millions of dollars to the estate.

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# CONCLUSION

The Application should be denied as a matter of law because Warburg's connections and relationships with the Debtor constitute pervasive and continuing conflicts of interest which will require the Court to deny compensation to Warburg under the provisions of section 328(c) of the Code. The Court should not "approve" such a retention under circumstances which will clearly not permit compensation. Moreover, in light of the commercially untenable terms of the Engagement Letter, as well as the inappropriate alignment of interests between and among the OCC, the CPUC and Warburg which the Engagement Letter would perpetuate, the Court should not approve the proposed retention.

For all of the foregoing reasons, the Court should deny the Application.

DATED: October _1_, 2002.

Respectfully,

HOWARD, RICE, NEMEROVSKI, CANADY,
FALK & RABKIN
A Professional Corporation

By: _____
WILLIAM J. LAFFERTY

Attorneys for Debtor and Debtor in Possession
PACIFIC GAS AND ELECTRIC COMPANY

WD 100102/2-1419973/Y1/1025130/v4

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN

A Professional Corporation