**FILED**

**JUL 3 1 2003**

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 01 30923 DM |
| PACIFIC GAS AND ELECTRIC COMPANY, a California corporation, | Chapter 11 Case |
| Debtor. | |
| Federal I.D. No. 94-0742640 | |

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR PACIFIC GAS AND ELECTRIC COMPANY PROPOSED BY PACIFIC GAS AND ELECTRIC COMPANY, PG&E CORPORATION, AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED JULY 31, 2003

Counsel for the Debtor, Pacific Gas and Electric Company:

HOWARD, RICE, NEMEROVSKI, CANADY, FALK & RABKIN,
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
(415) 434-1600

COOLEY GODWARD LLP
One Maritime Plaza, 20th Floor,
San Francisco, California 94111-3580
(415) 693-2000

Counsel for PG&E Corporation:

DEWEY BALLANTINE LLP
700 Louisiana, Suite 1900
Houston, Texas 77002
(713) 445-1500

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

ORRICK, HERRINGTON & SUTCLIFFE LLP
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, California 94111
(415) 392-1122

Co-Counsel to PG&E Corporation for Constitutional Law Matters:

Professor Laurence Tribe
Hauser Hall 420
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-4621

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................. 1
    A.  CHAPTER 11. ............................................................ 4
    B.  THE PLAN OF REORGANIZATION. ............................ 5
    C.  HOLDERS OF CLAIMS ENTITLED TO VOTE. .......... 6
    D.  VOTING PROCEDURES. ............................................. 8
        1.  General. ............................................................... 8
        2.  Beneficial Owners of Bonds, Notes or Debentures. ......... 9
        3.  Nominees of Beneficial Owners of Bonds, Notes or Debentures. ... 9
        4.  Securities Clearing Agency. ................................. 9
    E.  CONFIRMATION HEARING. ....................................... 9
    F.  MISCELLANEOUS. ..................................................... 10

II.  OVERVIEW OF CLAIMS AND EQUITY INTERESTS ...... 11
    A.  SUMMARY CLAIMS TABLE. ..................................... 11
    B.  CLAIMS OBJECTION PROCESS. ............................... 31

III.  DESCRIPTION AND HISTORY OF BUSINESS .............. 32
    A.  OVERVIEW. ............................................................... 32
    B.  OPERATIONS. ............................................................ 33
        1.  Electric Utility Operations. .............................. 33
        2.  Gas Utility Operations. .................................... 34
    C.  REGULATION. ........................................................... 34

IV.  EVENTS PRECEDING THE COMMENCEMENT OF THE CHAPTER 11 CASE;
    FILING OF THE PLAN .................................................... 35
    A.  ELECTRIC INDUSTRY RESTRUCTURING. ............... 35
    B.  INCREASING WHOLESALE PRICES, THE RATE FREEZE AND THE
        FILING OF THE CHAPTER 11 PETITION. ................... 36
    C.  PROCUREMENT OF POWER BY THE STATE IN PLACE OF THE
        DEBTOR. ................................................................... 36
    D.  REGULATORY MATTERS ........................................ 37
        1.  FERC Actions Subsequent to Filing of the Chapter 11 Petition. ... 37
        2.  Certain Commission Actions Subsequent to Filing of the Chapter 11
            Petition. ............................................................ 39
        3.  DWR Revenue Requirement and Servicing Agreement; Resumption
            of Procurement ................................................. 40

V.  THE REORGANIZATION CASE ................................... 42
    A.  COMMENCEMENT OF THE CHAPTER 11 CASE. ...... 42

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 2 of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

# TABLE OF CONTENTS

Page

B. ADMINISTRATION OF THE CHAPTER 11 CASE.   42

  1. First Day Orders.   42

  2. Second Day Orders.   43

  3. Third Day Orders.   43

  4. Creditors' Committee.   43

  5. Public Purpose Programs.   44

  6. Assumption of Hydroelectric Power Purchases.   44

  7. Request for Preliminary Injunction against the ISO.   44

  8. Denial of Ratepayers' Committee, TURN's Motion to Intervene and Government Creditors' Committee.   45

  9. Authorization of Employee-Related Matters.   46

  10. Transition Period Accounting Proposal.   46

  11. Omnibus Motions.   47

  12. QF Agreements.   47

  13. Claims Management Motions.   48

  14. Stipulation with Letter of Credit Issuing Banks and the Banks.   50

  15. Motion to Assume Main Line Extension Contracts.   50

  16. Stipulation between Palo Alto, NCPA and the Debtor Regarding the Stanislaus Commitments.   50

  17. Estimation of Antitrust Claims.   51

  18. Settlement and Support Agreement with Senior Debtholders; and Agreement with Letter of Credit Issuing Banks.   52

  19. Motion Seeking Authorization to Pay Certain Claims   54

VI. HISTORY OF THE PLAN OF REORGANIZATION   54

VII. SUMMARY OF THE PROPOSED SETTLEMENT AGREEMENT   55

  A. REGULATORY ASSET   57

  B. RATEMAKING MATTERS   59

  C. IMPLEMENTATION OF RATEMAKING   60

  D. DIVIDEND PAYMENTS AND STOCK REPURCHASES   60

  E. DWR CONTRACTS   60

  F. HEADROOM REVENUES   61

  G. DISMISSAL OF RATE RECOVERY LITIGATION, AND CERTAIN OTHER LITIGATION AND PROCEEDINGS   61

  H. WITHDRAWAL OF APPLICATIONS IN CONNECTION WITH THE ORIGINAL PG&E PLAN   62

  I. ENVIRONMENTAL MEASURES   62

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# TABLE OF CONTENTS

Page

J.  WAIVER OF SOVEREIGN IMMUNITY                                63

K.  TERM AND ENFORCEABILITY                                     64

L.  TREATMENT OF CREDITORS                                      64

VIII. LITIGATION                                                64

A.  RATE RECOVERY LITIGATION.                                   64

B.  CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200
    LITIGATION.                                                 67

C.  ATTORNEY GENERAL SEC PETITION                              69

D.  COMPRESSOR STATION CHROMIUM LITIGATION.                     70

E.  BFM CONTRACT SEIZURE LITIGATION.                            73

F.  EL PASO SETTLEMENT.                                         75

G.  PENDING EXPRESS PREEMPTION APPEAL.                          78

IX. THE PLAN OF REORGANIZATION                                  79

A.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
    INTERESTS.                                                  79

    1.  Administrative Expense Claims.                          82

    2.  Professional Compensation and Reimbursement Claims.     83

    3.  Priority Tax Claims.                                    83

    4.  Ordinary Course Liabilities.                            84

    5.  Class 1—Other Priority Claims.                          85

    6.  Class 2—Other Secured Claims.                           85

    7.  Class 3a—Secured Claims Relating to First and Refunding Mortgage
        Bonds.                                                  86

    8.  Class 3b—Secured Claims Relating to PC-Related Mortgage Bonds.  87

    9.  Class 4a—Mortgage Backed PC Bond Claims.                88

    10. Class 4b—MBIA Insured PC Bond Claims.                   89

    11. Class 4c—MBIA Claims.                                   90

    12. Class 4d—Letter of Credit Backed PC Bond Claims.        91

    13. Class 4e—Letter of Credit Bank Claims.                  92

    14. Class 4f—Prior Bond Claims.                             98

    15. Class 4g—Treasury PC Bond Claims.                       100

    16. Class 5—General Unsecured Claims.                       100

    17. Class 6—ISO, PX and Generator Claims.                   101

    18. Class 7—ESP Claims.                                     103

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc#: 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 4
of 100

| | | | |
|---|---|---|---|
| | 19. | Class 8—Environmental, Fire Suppression, Pending Litigation and Tort Claims. | 104 |
| | 20. | Class 9—QUIDS Claims. | 107 |
| | 21. | Class 10—Workers' Compensation Claims. | 107 |
| | 22. | Class 11—Preferred Stock Equity Interests. | 107 |
| | 23. | Class 12—Common Stock Equity Interests. | 108 |
| B. | | FINANCING OF THE PLAN; WORKING CAPITAL FACILITIES; SECURITIES ISSUED UNDER THE PLAN. | 108 |
| | 1. | Equity Securities. | 109 |
| | 2. | New Money Notes. | 109 |
| | 3. | Credit Facilities. | 110 |
| | 4. | Hedging. | 110 |
| | 5. | New Mortgage Bonds. | 111 |
| C. | | METHOD OF DISTRIBUTION UNDER THE PLAN. | 111 |
| D. | | TIMING OF DISTRIBUTIONS UNDER THE PLAN. | 113 |
| E. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 113 |
| F. | | PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS. | 118 |
| G. | | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN. | 120 |
| H. | | CONDITIONS PRECEDENT TO EFFECTIVENESS OF THE PLAN. | 121 |
| I. | | IMPLEMENTATION AND EFFECT OF CONFIRMATION OF THE PLAN. | 123 |
| J. | | DISCHARGE AND INJUNCTION. | 123 |
| K. | | VOTING. | 124 |
| | 1. | Voting of Claims. | 124 |
| | 2. | Elimination of Vacant Classes. | 125 |
| | 3. | Nonconsensual Confirmation. | 125 |
| L. | | SUMMARY OF OTHER PROVISIONS OF THE PLAN. | 126 |
| | 1. | Amendment or Modification of the Plan. | 126 |
| | 2. | Cancellation of Existing Securities and Agreements. | 128 |
| | 3. | Termination of Committee. | 128 |
| | 4. | Effectuating Documents and Further Transactions. | 128 |
| | 5. | Corporate Governance. | 129 |
| | 6. | Execution of Proposed Settlement Agreement. | 129 |
| | 7. | Exculpation. | 129 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 5 of 100

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| 8. | Releases. | | 130 |
| 9. | Plan Supplement. | | 132 |
| 10. | Retention of Jurisdiction. | | 133 |
| 11. | Exemption from Transfer Taxes. | | 134 |
| 12. | Fees and Expenses. | | 134 |
| 13. | Payment of Statutory Fees. | | 135 |
| 14. | Binding Effect. | | 135 |
| 15. | Governing Law. | | 136 |
| 16. | Withholding and Reporting Requirements. | | 136 |
| 17. | Allocation of Plan Distributions. | | 136 |
| 18. | Preservation of Certain Claims. | | 136 |
| 19. | Subrogation Rights. | | 136 |
| X. | CONFIRMATION AND CONSUMMATION PROCEDURE | | 137 |
| A. | SOLICITATION OF VOTES. | | 137 |
| B. | THE CONFIRMATION HEARING. | | 138 |
| C. | CONFIRMATION. | | 139 |
| 1. | Acceptance. | | 140 |
| 2. | Unfair Discrimination and Fair and Equitable Tests. | | 140 |
| 3. | Feasibility. | | 141 |
| 4. | Best Interests Test. | | 142 |
| D. | CONSUMMATION. | | 144 |
| XI. | FINANCIAL INFORMATION | | 145 |
| XII. | SECURITIES LAWS MATTERS | | 145 |
| XIII. | CERTAIN RISK FACTORS TO BE CONSIDERED | | 146 |
| 1. | Inability to Obtain Commission Approval of the Proposed Settlement Agreement. | | 146 |
| 2. | Risk of Non-Confirmation of the Plan. | | 147 |
| 3. | Non-Consensual Confirmation. | | 147 |
| 4. | Risk of Delay or Non-Occurrence of the Effective Date. | | 147 |
| 5. | Risks Relating to the Issuance of New Debt Securities. | | 148 |
| 6. | Effect of California Supreme Court Ruling | | 148 |
| 7. | Risks Relating to the Business of the Reorganized Debtor After the Effective Date | | 150 |
| 8. | Risks Related to NEG | | 150 |
| XIV. | DESCRIPTION OF CERTAIN CLAIMS | | 151 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-v-

**TABLE OF CONTENTS**

| | | | Page |
|---|---|---|---|
| A. | POLLUTION CONTROL BONDS. | | 151 |
| | 1. | General. | 151 |
| | 2. | Mortgage Backed PC Bonds. | 154 |
| | 3. | Letter of Credit Backed PC Bonds. | 155 |
| | 4. | MBIA Insured PC Bonds. | 156 |
| | 5. | Prior Bonds. | 157 |
| | 6. | Treasury PC Bonds. | 159 |
| XV. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | | 159 |
| | A. | INTRODUCTION | 159 |
| | B. | CONSEQUENCES TO THE DEBTOR -- TREATMENT OF ESCROW(S) | 160 |
| | C. | CONSEQUENCES TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS, ALLOWED ISO, PX AND GENERATOR CLAIMS AND ALLOWED ESP CLAIMS | 161 |
| | D. | CONSEQUENCES TO HOLDERS OF SECURED CLAIMS RELATING TO FIRST AND REFUNDING MORTGAGE BONDS | 162 |
| | E. | CONSEQUENCES TO HOLDERS OF CERTAIN PC BOND CLAIMS | 163 |
| | F. | INFORMATION REPORTING AND WITHHOLDING | 164 |
| | A. | LIQUIDATION UNDER CHAPTER 7. | 164 |
| | B. | ALTERNATIVE PLAN OF REORGANIZATION. | 165 |
| | C. | LIQUIDATION UNDER CHAPTER 11. | 165 |
| XVII. | CONCLUSION AND RECOMMENDATION. | | 166 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# I.    INTRODUCTION

Pacific Gas and Electric Company (the "Debtor") and PG&E Corporation (the "Parent") submit this Disclosure Statement for Plan of Reorganization for Pacific Gas and Electric Company (the "Disclosure Statement"), under section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against and Equity Interests in the Debtor in connection with (i) the solicitation of acceptances of the Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company, dated July 31, 2003 (the "Plan"), filed by the Debtor, the Parent and the Official Committee of Unsecured Creditors (the "Committee") as co-proponents (collectively, the "Proponents") with the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan (the "Confirmation Hearing") scheduled on November 3, 2003.

The Plan is a joint plan proposed by the Proponents. It reflects the terms of a proposed settlement agreement (the "Proposed Settlement Agreement") between the Debtor, the Parent and the California Public Utilities Commission (the "Commission").

Prior to the filing of the Plan, the Debtor and the Parent filed a Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company, dated April 19, 2002 (as modified by various modifications, the "Original PG&E Plan"). On May 17, 2002, the Commission filed a competing plan of reorganization for the Debtor and, subsequently, the Committee joined with the Commission to file an amended plan of reorganization. On December 5, 2002, the Commission and the Committee filed their Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company (the "Commission Plan"). On November 18, 2002, the Bankruptcy Court commenced a hearing on confirmation of the competing plans. During the confirmation hearing on the Original PG&E Plan, the Bankruptcy Court, on March 4, 2003, entered an order mandating a judicial settlement conference and, on March 11, 2003, entered an order staying all proceedings with respect to confirmation of the competing plans to facilitate the mandatory settlement process. The stay was continued from time to time. Following that process, the Proposed Settlement Agreement was reached, the terms of which

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 8
of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  are incorporated by reference into the Plan and the stay has been continued indefinitely pending
2  further order of the Bankruptcy Court.

3      The Proposed Settlement Agreement provides for the Debtor and the Commission to
4  jointly support a proposed new plan of reorganization that embodies the terms and conditions
5  contained in the Proposed Settlement Agreement.  Pursuant to the Proposed Settlement Agreement,
6  among other things, the Debtor would agree to no longer propose to seek to disaggregate its historic
7  businesses, and the Commission would establish a $2.21 billion "regulatory asset" to be amortized
8  over nine (9) years in the Debtor's retail electric rates and to approve other provisions that will
9  restore the Debtor to financial health and maintain and improve the Debtor's financial condition in
10  the future so that the Debtor is able to provide safe and reliable electric and gas service to its
11  customers at just and reasonable rates.  See Section VII of this Disclosure Statement for a more
12  detailed description of the Proposed Settlement Agreement.

13      Attached as Exhibits to this Disclosure Statement are copies of the following
14  documents:

15      • The Plan and all Exhibits thereto, including the Proposed Settlement Agreement[1]
16        (Exhibit A);

17      • Order of the Bankruptcy Court entered on July 31, 2003 (the "Disclosure Statement
          Order") approving this Disclosure Statement (Exhibit B);

18      • Projected Financial Information (Exhibit C);

19      • Schedule of Currently Outstanding Securities of the Debtor (Exhibit D);

20      In addition, the Debtor and the Parent have filed the following documents, which are
21  incorporated herein by reference, with the United States Securities and Exchange Commission (the
22  "SEC"):

23      • Annual Report on Form 10-K/A Amendment No. 1, as amended by Form 10-K/A
          Amendment No. 2 and Amendment No. 3, of the Parent and the Debtor for the year
24        ended December 31, 2002;

25      • Quarterly Report on Form 10-Q of the Parent and the Debtor for the quarter ended
          March 31, 2003; and
26

27  ─────────────
28      [1]The term "Plan" as used herein includes all Exhibits to the Plan.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-2-

- Various Current Reports on Form 8-K of the Parent and the Debtor.

Such documents and other information are available at a website maintained by the SEC at http://www.sec.gov that contains reports, proxy and information statements and other information filed electronically with the SEC. The information included in this Disclosure Statement has been provided by the Debtor and the Parent and is derived from their books and records, public filings and various third-party sources.

A Ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to holders of Claims entitled to vote to accept or reject the Plan. All Equity Interests in the Debtor are unimpaired by the Plan, and therefore are deemed to have accepted the Plan, and holders of Equity Interests will not receive a Ballot.

On July 31, 2003, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical reasonable investors typical of the holders of Claims against and Equity Interests in the Debtor to make an informed judgment in voting to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Ballot sets forth the deadlines, procedures and instructions for voting to accept or reject the Plan. In addition, detailed voting instructions accompany each Ballot. Before voting, each holder of a Claim entitled to vote should read this Disclosure Statement (including the exhibits and documents incorporated herein by reference), the Plan and the instructions accompanying the Ballot. These documents contain, among other things, important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes. No solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In considering how to vote on the Plan, a holder of a Claim should not rely on any information relating to the Debtor and its business other than that contained, or incorporated by reference, in this Disclosure Statement, the Plan or as otherwise approved by the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Bankruptcy Court.

2  For the reasons discussed herein, **THE PROPONENTS URGE ALL CREDITORS**

3  **IN VOTING CLASSES TO VOTE TO ACCEPT THE PLAN.** Creditors are urged to read the

4  Disclosure Statement in its entirety prior to voting on the Plan.

5  **CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT BUT**

6  **NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO**

7  **SUCH TERMS IN THE PLAN. AN INDEX OF DEFINED TERMS IS ATTACHED TO**

8  **THIS DISCLOSURE STATEMENT IMMEDIATELY FOLLOWING THE SIGNATURE**

9  **PAGE.**

10  **A.    CHAPTER 11.**

11  Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.

12  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and

13  equitable interests of the debtor as of the date of filing of the bankruptcy petition. The Bankruptcy

14  Code provides that the chapter 11 debtor may continue to operate its business and remain in

15  possession of its property as a "debtor-in-possession." Under chapter 11, a debtor is authorized to

16  reorganize its business for the benefit of itself, its creditors and its equity interest holders. In

17  addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality

18  of treatment for similarly situated creditors and similarly situated equity interest holders with respect

19  to the distribution of a debtor's assets.

20  The principal objective of a chapter 11 case is the confirmation and consummation of a

21  plan. A plan sets forth the means for satisfying claims against and equity interests in a debtor.

22  Confirmation of a plan by the bankruptcy court binds, among others, the debtor, any issuer of

23  securities under the plan, any entity acquiring property under the plan and any creditor or equity

24  interest holder of the debtor. Subject to certain limited exceptions, the order approving confirmation

25  of a chapter 11 plan discharges a debtor from any debt that arose prior to the date of confirmation of

26  the plan and substitutes therefor the obligations specified under the confirmed plan.

27  Certain holders of allowed claims against and equity interests in a debtor are permitted

28  to vote to accept or reject the plan. Prior to soliciting acceptances of a proposed plan, however,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-4-

section 1125 of the Bankruptcy Code requires approval by the bankruptcy court of a disclosure statement containing adequate information of a kind and in sufficient detail to enable a hypothetical reasonable investor to make an informed judgment regarding the plan.

**B.   THE PLAN OF REORGANIZATION.**

Prior to the summer of 2000, the Debtor was one of the healthiest energy utilities in the United States, enjoying investment-grade credit ratings and consistently paying dividends to its shareholders. As a regulated public utility, the Debtor operated under the historical (and constitutionally-required) "regulatory compact." Under that compact, the Debtor undertook to serve all the electric and gas customers in its service territory in exchange for rates that allowed it to cover its costs of providing service, to recover its investment in facilities serving the public and the opportunity to earn a reasonable rate of return.

Beginning in May 2000, prices for power purchased on the wholesale market began to increase. For the seven-month period from June 2000 through December 2000, wholesale electric prices in California averaged $0.18 per kilowatt-hour ("kWh"). During this period, the Debtor's retail electric rates were frozen and provided only approximately $0.05 per kWh, which was insufficient to pay for the Debtor's electricity procurement and other costs. The Debtor's inability to recover approximately $8.9 billion in such costs from its customers ultimately resulted in billions of dollars of defaulted debt and unpaid bills. By April 6, 2001 (the "Petition Date"), all of the major credit rating agencies had downgraded the Debtor to uncreditworthy ratings, which precluded the Debtor from purchasing power in the wholesale markets under federally-approved tariffs. As a result, the Debtor turned to the Bankruptcy Court for relief. For a more detailed description of the events leading to the commencement of the Chapter 11 Case and the filing of the Plan, see Section IV of this Disclosure Statement.

The Proponents have developed a Plan designed to reaffirm the Debtor's financial viability and provide for the payment in full of all Allowed Claims, plus Post-Petition Interest. See Sections II and IX.A of this Disclosure Statement for detailed information regarding the payment of Allowed Claims. The purpose of the Plan is to pay all Allowed Claims in full, and enable the Debtor to emerge from the Chapter 11 Case with a strong and sustainable business. The Plan will

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  also assure that the Reorganized Debtor will be financially sound going forward, thus providing the

2  necessary assurance that it will be able to service the debt issued in connection with or reinstated

3  under the Plan, and provide safe and reliable service to its customers. See Section IX of this

4  Disclosure Statement for a more detailed description of the Plan.

5       The Proponents believe that the Plan is workable, fair and in the public interest. The

6  Plan provides for the Debtor to continue to operate its business under Commission and State

7  regulation, and in a manner consistent with sound business and environmental policies, and to

8  provide a safe, reliable and long-term energy supply to the Debtor's electric and gas customers in

9  Central and Northern California.

10       The Proponents believe that the Plan will enable the Debtor to successfully reorganize

11  its business and accomplish the objectives of chapter 11, and that acceptance of the Plan is in the

12  best interests of the Debtor, its creditors and all parties in interest.

13  **C.**   **HOLDERS OF CLAIMS ENTITLED TO VOTE.**

14       The Bankruptcy Code provides that only holders of allowed claims or equity interests in

15  classes of claims or equity interests that are impaired and are not deemed to have rejected a

16  proposed chapter 11 plan are entitled to vote to accept or reject such plan. Classes of claims or

17  equity interests in which the holders are unimpaired under a chapter 11 plan are deemed to have

18  accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity

19  interests in which the holders will receive no recovery under a chapter 11 plan are impaired, but are

20  deemed to have rejected the plan and are also not entitled to vote to accept or reject the plan. See

21  Section IX.A of this Disclosure Statement for a detailed description of the treatment of Claims and

22  Equity Interests under the Plan.

23       The following classes of Claims are impaired, will receive distributions under the Plan

24  and are entitled to vote to accept or reject the Plan: Class 3a—Secured Claims Relating to First and

25  Refunding Mortgage Bonds, Class 3b—Secured Claims Relating to PC-Related Mortgage Bonds,

26  Class 4a—Mortgage Backed PC Bond Claims, Class 4c—MBIA Claims, Class 4e—Letter of Credit

27  Bank Claims, and Class 5—General Unsecured Claims.

28       The following classes of Claims and Equity Interests are unimpaired and, therefore, are

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 conclusively presumed to have accepted the Plan: Class 1—Other Priority Claims, Class 2—Other

2 Secured Claims, Class 4b—MBIA Insured PC Bond Claims, Class 4d—Letter of Credit Backed PC

3 Bond Claims, Class 4f—Prior Bond Claims, Class 4g—Treasury PC Bond Claims, Class 6—ISO,

4 PX and Generator Claims, Class 7—ESP Claims,[2] Class 8—Environmental, Fire Suppression,

5 Pending Litigation and Tort Claims, Class 9—QUIDS Claims, Class 10—Workers' Compensation

6 Claims, Class 11—Preferred Stock Equity Interests, and Class 12—Common Stock Equity Interests.

7      There is no class of Claims or Equity Interests that will receive no recovery under the

8 Plan. Accordingly, none of the classes of Claims or Equity Interests is deemed to have rejected the

9 Plan.

10      The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance

11 by creditors in such class holding at least two-thirds ($^2/_3$) in dollar amount and more than one-half

12 ($\frac{1}{2}$) in number of the allowed claims in such class casting ballots for acceptance or rejection of the

13 plan. The Bankruptcy Code defines "acceptance" of a plan by a class of equity interests as

14 acceptance by holders in such class holding at least two-thirds ($^2/_3$) in amount of the allowed

15 interests casting ballots for acceptance or rejection of the plan. See Section X.C of this Disclosure

16 Statement for a more detailed description of the requirements for confirmation of the Plan.

17      If one or more classes of Claims entitled to vote on the Plan rejects the Plan, the

18 Proponents reserve the right to amend the Plan or request confirmation of the Plan pursuant to

19 section 1129(b) of the Bankruptcy Code. If at least one class of Claims that is impaired under the

20 Plan has accepted the Plan (determined without including acceptance of the Plan by any insider),

21 section 1129(b) permits confirmation of the Plan notwithstanding its rejection by one or more

22 impaired classes of Claims. Under that section, the Plan may be confirmed by the Bankruptcy Court

23 if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting

24 impaired class of Claims. See Section X.C.2 of this Disclosure Statement for a more detailed

25 description of the requirements for confirmation of a plan not accepted by all voting classes.

26

27    [2]See discussion in Sections IX.A.17 and IX.A.18 of this Disclosure Statement regarding the

28 classification and voting rights of Classes 6 and 7.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**D.  VOTING PROCEDURES.**

    **1.  General.**

    If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  Please vote and return your Ballot in the envelope provided.  If you are the beneficial owner of bonds, notes or debentures of the Debtor as of the Voting Record Date, your return envelope may be addressed to the brokerage firm or bank holding your securities, or to such firm's agent (each a "Nominee").  Other holders of Claims will receive a return envelope addressed directly to Innisfree M&A Incorporated (the "Voting Agent").

    DO NOT RETURN ANY SECURITIES OF PACIFIC GAS AND ELECTRIC COMPANY WITH YOUR BALLOT.

    TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>RECEIVED</u> NO LATER THAN 5:00 P.M., EASTERN TIME, ON SEPTEMBER 29, 2003 (THE "VOTING DEADLINE").  ANY EXECUTED BALLOT THAT FAILS TO INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

    BALLOTS WILL NOT BE ACCEPTED BY THE VOTING AGENT BY FACSIMILE TRANSMISSION OR ANY OTHER ELECTRONIC MEANS.

    The Voting Agent is:

    Innisfree M&A Incorporated
    501 Madison Avenue, 20th Floor
    New York, New York  10022
    Phone:  (877) 750-9501 (toll-free)
    Banks and brokers call:  (212) 750-5833

    The Bankruptcy Court has set August 4, 2003 as the Voting Record Date.  Accordingly, only holders of record of Claims as of the Voting Record Date who otherwise are entitled to vote under the Plan will receive a Ballot.

    If you are a holder of a Claim entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the Voting Agent at (877) 750-9501.

    Please note the following special instructions for holders of certain Claims.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**2. Beneficial Owners of Bonds, Notes or Debentures.**

If you are the beneficial owner of bonds, notes or debentures of the Debtor as of the Voting Record Date, and such bonds, notes or debentures are registered in your name, please complete the information requested on the Ballot; sign, date and indicate your vote; and return the Ballot to the Voting Agent in the enclosed return envelope or at the address set forth above on or prior to the Voting Deadline.

If you are the beneficial owner of bonds, notes or debentures of the Debtor as of the Voting Record Date, such bonds, notes or debentures are registered in "street name," AND YOUR BALLOT HAS BEEN PREVALIDATED BY YOUR NOMINEE, please complete the information requested on the Ballot; sign, date and indicate your vote; and return the Ballot to the Voting Agent in the enclosed return envelope or at the address set forth above on or prior to the Voting Deadline.

If you are the beneficial owner of bonds, notes or debentures of the Debtor as of the Voting Record Date, such bonds, notes or debentures are registered in "street name," AND YOUR BALLOT HAS <u>NOT</u> BEEN PREVALIDATED BY YOUR NOMINEE, please sign, date and indicate your vote, and return your Ballot to your Nominee prior to the Voting Deadline.

**3. Nominees of Beneficial Owners of Bonds, Notes or Debentures.**

If you are the Nominee for a beneficial owner of bonds, notes or debentures of the Debtor as of the Voting Record Date, please forward a copy of this Disclosure Statement and the appropriate Ballot to each beneficial owner. If you do not prevalidate the Ballots, the Ballots must be collected by you so that you can deliver them to the Voting Agent on a Master Ballot within two (2) days of the Voting Deadline as detailed in the Master Ballot.

**4. Securities Clearing Agency.**

If you are a securities clearing agency, please arrange for your participants to vote on the Plan by executing an omnibus proxy in their favor.

**E. CONFIRMATION HEARING.**

Pursuant to section 1128 of the Bankruptcy Code and the Bankruptcy Court's Discovery Protocol and Trial Scheduling Order of the PG&E/OCC Plan of Reorganization, the Confirmation Hearing to consider confirmation of the Plan will be held on November 3, 2003, commencing at

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN

1  9:30 a.m., Pacific Time, before the Honorable Dennis Montali, United States Bankruptcy Judge, at

2  the United States Bankruptcy Court for the Northern District of California, 235 Pine Street, San

3  Francisco, California 94014, or such other location as the Bankruptcy Court directs. The

4  Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be served and filed

5  so that they are received no later than September 2, 2003, at 4:00 p.m., Pacific Time, in the manner

6  described below in Section X.B of this Disclosure Statement. The Confirmation Hearing may be

7  continued from time to time by the Bankruptcy Court without further notice except for

8  announcement of the continuation date made at the Confirmation Hearing.

9  ### F.  **MISCELLANEOUS.**

10  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE

11  MADE AS OF THE DATE HEREOF UNLESS ANOTHER DATE IS SPECIFIED HEREIN. THE

12  DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION

13  THAT THE INFORMATION CONTAINED HEREIN HAS NOT CHANGED AFTER THE DATE

14  HEREOF. HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN SHOULD

15  CAREFULLY READ THIS DISCLOSURE STATEMENT (INCLUDING THE DOCUMENTS

16  INCORPORATED HEREIN BY REFERENCE) IN ITS ENTIRETY, INCLUDING THE PLAN

17  AND THE OTHER EXHIBITS, PRIOR TO VOTING ON THE PLAN.

18  FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY

19  INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.

20  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE

21  STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE

22  STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO

23  DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING

24  STATED HEREIN SHALL BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER

25  LEGAL EFFECTS OF THE PLAN ON THE PROPONENTS OR HOLDERS OF CLAIMS OR

26  EQUITY INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS

27  DISCLOSURE STATEMENT (INCLUDING THE DOCUMENTS INCORPORATED HEREIN

28  BY REFERENCE), TOGETHER WITH THE PROJECTED FINANCIAL INFORMATION

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  ANNEXED HERETO AS <u>EXHIBIT C</u> AND THE ASSUMPTIONS UNDERLYING SUCH

2  PROJECTED FINANCIAL INFORMATION, BY NATURE, ARE FORWARD-LOOKING AND

3  SUBJECT TO THE VARIOUS RISKS AND UNCERTAINTIES DESCRIBED IN SECTION XIII.

4  OF THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS INCORPORATED HEREIN

5  BY REFERENCE). ACTUAL OUTCOMES MAY DIFFER MATERIALLY FROM THOSE

6  EXPRESSED, IMPLIED OR ASSUMED FROM SUCH FORWARD-LOOKING STATEMENTS.

7  ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CAREFULLY READ AND

8  CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION XIII OF THIS

9  DISCLOSURE STATEMENT (AND THE DOCUMENTS INCORPORATED HEREIN BY

10  REFERENCE).

11  SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN

12  THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE

13  SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL

14  TEXT AND TO ALL OF THE PROVISIONS OF THE APPLICABLE AGREEMENT,

15  INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

16  **II.    OVERVIEW OF CLAIMS AND EQUITY INTERESTS**

17  A.    <u>SUMMARY CLAIMS TABLE.</u>

18  The following table briefly summarizes the classification and treatment of Claims[3] and

19  Equity Interests under the Plan. While approximately $50 billion of Claims have been filed with the

20  Bankruptcy Court in connection with this Chapter 11 Case, the Proponents believe that the estimated

21  amounts set forth in the following table represent the most reasonable estimates of the ultimate

22  Allowed Claims. See Section IX.A. of this Disclosure Statement for a more detailed discussion of

23  the treatment of Claims and Equity Interests under the Plan. See Section XIV.A of this Disclosure

24  Statement for a detailed description of the PC Bond obligations and the defined terms used in the

25

26  [3]As defined in the Plan, "Claim" has the meaning set forth in section 101(5) of the Bankruptcy
Code; provided, however, that any claim based on allocations under Commission Electric Rule 20,
27  Section A, relating to undergrounding of electric distribution facilities, shall not be a Claim for
purposes of the Plan and shall pass through the Plan unaffected.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

discussion of Class 4. A schedule of the Debtor's currently outstanding securities is attached hereto as Exhibit D.

The Debtor will pay all Allowed Claims in full. Allowed Claims shall include the amounts owed with respect to the period prior to the Petition Date and applicable interest accrued and unpaid during such period. Except as otherwise provided herein, holders of Allowed Claims will also be paid in Cash accrued and unpaid interest due on such Allowed Claims from the Petition Date through the Effective Date ("Post-Petition Interest"). Except as otherwise provided herein, including Exhibit B to the Plan, any Post-Petition Interest shall be calculated and paid on the Allowed Claim at the lowest non-default rate in accordance with the terms specified in the applicable statute, indenture or instrument governing such Allowed Claim or, if no such instrument exists or the applicable instrument does not specify a non-default rate of interest, Post-Petition Interest will be calculated and paid on the Allowed Claim at the Federal Judgment Rate. Except as provided under applicable non-bankruptcy law, or pursuant to certain agreements with the Debtor approved by the Bankruptcy Court, Post-Petition Interest will not be paid on the following Allowed Claims: Administrative Expense Claims, Environmental, Fire Suppression, Pending Litigation and Tort Claims, and Workers' Compensation Claims.

Except as set forth above and except to the extent a holder of an Allowed Claim or Equity Interest has otherwise been paid all or a portion of such holder's Allowed Claim or Equity Interest prior to the Effective Date, each of the distributions specified in Article IV of the Plan with respect to each Allowed Claim or Equity Interest shall (i) occur on the later of the Effective Date and the date such Allowed Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as practicable thereafter, and (ii) be in full and complete settlement, satisfaction and discharge of such Allowed Claim or Equity Interest.

As to any Disputed Claim not resolved by the Effective Date, within ten (10) days after a Final Order or the filing of a stipulation making such Disputed Claim an Allowed Claim, the holder of such Allowed Claim shall receive all Pre-Petition Interest on such Allowed Claim (if any) and, to the extent payable, Post-Petition Interest accrued and payable on such Allowed Claim pursuant to the Plan as of such date. See Section IX.D of this Disclosure Statement for more

information regarding the timing of distributions under the Plan.

The Debtor is authorized to pay, and has paid or will pay, all fees and expenses of the holders of Senior Indebtedness who are parties to the Settlement and Support Agreement, the Bond Trustees, the trustees under the Mortgage, and Debtor's various indentures, including but not limited to, the trustee under the Southern San Joaquin Valley Power Authority Agreement, the Issuer of the PC Bonds, and their respective professionals, and Bank of America, N.A., in its capacity as administrative agent under the Revolving Line of Credit (including such administrative agent's attorneys' fees), pursuant to a procedure that provides for twenty (20) days' notice to the Debtor, its counsel, counsel to the Committee and the U.S. Trustee, which parties thereby are afforded an opportunity to object to the reasonableness of such fees and expenses. Any other unpaid fees and expenses accrued through the Confirmation Date of any of the Bond Trustees and trustees under the Mortgage and various indentures shall be paid by the Debtor within ten (10) days after the Confirmation Date, to the extent allowed by law and any underlying agreement.

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| — | Administrative Expense Claims | Paid in full in Cash. | $57 |
| — | Professional Compensation and Reimbursement Claims | Paid in full in Cash. | $150[4] |
| — | Priority Tax Claims | Paid in full in Cash. | $46 |
| 1 | Other Priority Claims | Unimpaired—Paid in full in Cash. | Nominal |
| 2 | Other Secured | Unimpaired—Paid in full in Cash. | Nominal |

[4]This amount is comprised of $108 million in professional fees and expenses approved as of March 31, 2003, plus an estimated additional amount of $42 million to be incurred through the end of 2003. This amount does not include an estimated $125 million in professional fees and costs of the Parent and an estimated $26 million in professional fees and costs of the Commission, which the Debtor has agreed to reimburse. See Section IX.L.12. of this Disclosure Statement for discussion of the fees and costs of the Parent and the Commission.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 20 of 100

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|-----------------------------------------------------------|
| | Claims | | |
| 3a | Secured Claims Relating to First and Refunding Mortgage Bonds | Impaired—Paid in full in Cash. Allowed Secured Claims Relating to First and Refunding Mortgage Bonds will include prepayment penalties or premiums as follows: (i) with respect to the following series of First and Refunding Mortgage Bonds, a prepayment premium payable in cash upon the Effective Date as follows: a 1.0000% premium with respect to the 8.800% First and Refunding Mortgage Bonds Series 91A due May 1, 2024, a 0.1000% premium with respect to the 5.875% First and Refunding Mortgage Bonds Series 93E due October 1, 2005, a 0.0250% premium with respect to the 6.25% First and Refunding Mortgage Bonds Series 93G due March 1, 2004 and a 1.0000% premium with respect to the 7.05% First and Refunding Mortgage Bonds Series 93H due March 1, 2024; (ii) with respect to all other series of redeemable First and Refunding Mortgage Bonds as to which the redemption period commences prior to the Effective Date, any prepayment premium provided under the First and Refunding Mortgage Bonds that applies to prepayment of such First and | $2,653[5] |

[5] Approximately $234 million of such amount is held by the Debtor in treasury as of the date hereof. All or any portion of such bonds owned by the Debtor that remain outstanding may be cancelled on or reasonably promptly prior to the Effective Date, pursuant to the treatment of such treasury bonds specified in Section 4.5(b) of the Plan. Prior to the Effective Date, the Debtor shall not sell any such treasury bonds, provided that the Debtor may use any portion of such treasury bonds (and effect the cancellation thereof) for the purpose of meeting its sinking fund or similar obligations under the Mortgage. The $2.653 million amount does not include approximately $280,514,000 in principal amount of Series 93 C bonds maturing on August 1, 2003 (the "1993 Series C Bonds") that, but for such maturity date, otherwise would be within the definition of First and Refunding Mortgage Bonds that constitute Class 3a under the Plan. On June 20, 2003, the Debtor filed a motion with the Bankruptcy Court to permit timely payment of the approximately $280,514,000 principal amount of the 1993 Series C Bonds on August 1, 2003, and the Bankruptcy Court issued its order approving such motion on July 21, 2003. Accordingly, based on such order, the Debtor intends to pay off the 1993 Series C Bonds on or about August 1, 2003, well before the confirmation hearing on the Plan, and the 1993 Series C Bonds therefore are not included in the definition of First and Refunding Mortgage Bonds and are not part of Class 3a under the Plan. If for any reason the 1993 Series C Bonds are not timely paid off notwithstanding the approval of such motion, the Plan will be modified to add the 1993 Series C Bonds to the definition of First and Refunding Mortgage Bonds that constitute Class 3a under the Plan.

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 21 of 100

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| | | Refunding Mortgage Bonds on or prior to the Effective Date, which shall be payable in Cash; and (iii) with respect to all other series of redeemable First and Refunding Mortgage Bonds as to which the redemption period commences subsequent to the Effective Date, a prepayment premium equal to the premium that would apply at the commencement of such redemption period, shall be payable in Cash; provided, however, that Allowed Secured Claims Relating to First and Refunding Mortgage Bonds shall not include any other prepayment premium or penalties associated with the repayment of First and Refunding Mortgage Bonds; and provided further, that no prepayment premium will be paid on any series of First and Refunding Mortgage Bonds that matures in accordance with its terms prior to the Effective Date if the Allowed Secured Claims on such series of First and Refunding Mortgage Bonds are paid on or about the maturity date thereof. | |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 22
of 100

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| 3b | Secured Claims Relating to PC-Related Mortgage Bonds | Impaired—(i) If none of the New Money Notes are secured on the Effective Date, then each series of PC-Related Mortgage Bonds shall be replaced with New Mortgage Bonds. In such event, each holder of a PC-Related Mortgage Bond shall be paid an amount in Cash equal to any and all accrued and unpaid interest owed to such holder in respect of such PC-Related Mortgage Bond in accordance with the terms thereof to and including the last scheduled interest payment date preceding the Effective Date.<br><br>(ii) If any of the New Money Notes are secured on the Effective Date, then with respect to each series of PC-Related Mortgage Bonds securing a series of Mortgage Backed PC Bonds redeemed in accordance with Section 4.7(b)(ii) of the Plan, each holder of an Allowed Secured Claim relating to such series of PC-Related Mortgage Bonds shall be paid in Cash in an amount equal to such Allowed Claim. | $—[6] |
| 4a | Mortgage Backed PC Bond Claims | Impaired—(i) If none of the New Money Notes are secured on the Effective Date, then each series of Mortgage Backed PC Bonds, and each of the PC Bond Documents relating thereto, will be renewed and remain outstanding. To the extent such payments are not made or provided for by the payment of Class 3b Claims to or for the benefit of the Bond Trustee, each holder of a Mortgage Backed PC Bond will be paid Cash in an amount equal to any and all accrued and | $345 |

---

[6]With respect to each series of Mortgage Backed PC Bonds, in order to secure and provide for the repayment of the respective Bond Loan, the Debtor issued and delivered to the Bond Trustee its Mortgage Bonds, of like principal amount, maturity, interest rate and redemption provisions as the related series of Mortgage Backed PC Bonds. Under the terms of the respective PC Bond Documents related to the Mortgage Backed PC Bonds, the Debtor is obligated to repay principal and interest on the respective Bond Loan only to the extent that such payments are not timely provided for by the payment of principal and interest on the respective Mortgage Bonds. Funds received by the Bond Trustee as the payment of Class 3b Allowed Claims will be applied by the Bond Trustee to satisfy a like amount of Class 4a Allowed Claims. Accordingly, the estimate of $345 million is the aggregate amount of all Allowed Claims in Classes 3b and 4a.

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 23 of 100

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|-----------------------------------------------------------|

unpaid interest owed to such holder in respect of such Mortgage Backed PC Bond in accordance with the terms thereunder to and including the last scheduled interest payment date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond Trustee due and owing under the applicable Loan Agreements will also be paid in Cash.

(ii) If any of the New Money Notes are secured on the Effective Date, then all of the Mortgage Backed PC Bonds shall, at the option of the Reorganized Debtor with respect to each series of Mortgage Backed PC Bonds, be (A) redeemed in accordance with their terms and each holder of an Allowed Secured Claim relating to such series of Mortgage Backed PC Bonds shall be paid Cash in an amount equal to such Allowed Claim, or (B) to the extent permitted under the terms of the Indenture, purchased in lieu of redemption or otherwise in accordance with their terms, and each holder of a Mortgage Backed PC Bond of such series will be paid a purchase price in Cash for its Mortgage Backed PC Bond(s) in an amount equal to its Allowed Secured Claim with respect to such Mortgage Backed PC Bond(s); provided, however, that, in connection with any such purchase of the Mortgage Backed PC Bonds on the Effective Date, the Reorganized Debtor shall cause the PC-Related Mortgage Bonds securing such outstanding Mortgage Backed PC Bonds (and the Mortgage pursuant to which such PC-Related Mortgage Bonds were issued) to be released and cancelled. The Reorganized Debtor may, among other things, at its option fund the redemption or purchase price of Mortgage Backed PC Bonds tendered for redemption or purchase on the Effective Date in accordance with the terms of the Plan from remarketing proceeds received from the sale and remarketing of such bonds or from the proceeds of the issuance and sale of refunding bonds, which remarketed or refunding bonds may, at the option of the Reorganized Debtor, be secured by, among other things, contingent notes issued under the same indenture as the New Money Notes and ranking pari passu

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|--------------------------------------|----------|
| | | therewith in accordance with the provisions of Section 7.2 of the Plan. | |
| 4b | MBIA Insured PC Bond Claims | Unimpaired—The MBIA Insured PC Bonds, and each of the PC Bond Documents relating thereto, will remain outstanding. Each holder of a MBIA Insured PC Bond will be paid Cash in an amount equal to any and all accrued and unpaid interest owed to such holder in respect of such MBIA Insured PC Bond in accordance with the terms thereof to and including the last scheduled interest payment date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond Trustee due and owing under the Loan Agreement will also be paid in Cash. | $200 |
| 4c | MBIA Claims | Impaired—Each holder of an Allowed MBIA Claim will be paid Cash in an amount equal to its pro rata share of the aggregate amount paid by MBIA to the Bond Trustee with respect to the payment of interest on the MBIA Insured PC Bonds during the period from the Petition Date to and including the last scheduled interest payment date preceding the Effective Date, together with its pro rata share of all other amounts due and owing to MBIA under the terms of the MBIA Reimbursement Agreement through the Effective Date, including any accrued and unpaid interest due on such amounts to the extent provided in the MBIA Reimbursement Agreement at the non-default rate. | Nominal |
| | | In addition, (i) if any of the New Money Notes are secured on the Effective Date, the Reorganized Debtor will deliver to MBIA, or for the benefit of MBIA, a contingent note issued under the same indenture as the New Money Notes and ranking pari passu therewith, in an amount equal to the aggregate outstanding principal amount of the MBIA Insured PC Bonds as additional security for the Reorganized Debtor's obligations under the MBIA Reimbursement Agreement after the Effective Date, and (ii) if none of the New Money Notes are secured on the Effective Date but at least twenty-five percent (25%) of the aggregate principal amount of the credit | |

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| | | facilities established pursuant to the first sentence of Section 7.3 of the Plan are secured on the Effective Date, the Reorganized Debtor will deliver to MBIA, or for the benefit of MBIA, a contingent note issued under the same indenture as the New Mortgage Bonds and ranking pari passu therewith, in an amount equal to the aggregate outstanding principal amount of the MBIA Insured PC Bonds as additional security for the Reorganized Debtor's obligations under the MBIA Reimbursement Agreement after the Effective Date. Principal amounts under any contingent note issued pursuant to the preceding sentence shall be payable only to the extent that the Reorganized Debtor has failed to satisfy its obligations under the MBIA Reimbursement Agreement to reimburse MBIA for any payments made by MBIA pursuant to the PC Bond Insurance Policy for the payment of the principal of the MBIA Insured PC Bonds. Such contingent note shall accrue interest on any principal amount then due and payable thereunder at a rate equal to the interest rate which accrues on any outstanding reimbursement obligations of the Reorganized Debtor under the MBIA Reimbursement Agreement. Any payments made under such contingent note shall be deemed to satisfy the Reorganized Debtor's obligations under the MBIA Reimbursement Agreement. | |
| 4d | Letter of Credit Backed PC Bond Claims | Unimpaired—Each series of Letter of Credit Backed PC Bonds, and each of the PC Bond Documents relating thereto, will remain outstanding. Each of the Loan Agreements and the PC Bond Documents related to the Letter of Credit Backed PC Bonds will be reinstated and rendered unimpaired in accordance with Section 1124 of the Bankruptcy Code. Each holder of a Letter of Credit Backed PC Bond will be paid Cash in an amount equal to any and all accrued and unpaid interest owed to such holder in respect of such Letter of Credit Backed PC Bond in accordance with the terms thereof to and including the last scheduled interest payment date preceding the Effective Date. All unpaid | $614 |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 26 of 100

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| | | fees and expenses of the Issuer and Bond Trustee due and owing under the applicable Loan Agreements will also be paid in Cash. | |
| 4e | Letter of Credit Bank Claims | Impaired—With respect to each Letter of Credit Issuing Bank, until the earlier of (x) the Effective Date, (y) the date the respective Letter of Credit is terminated or the stated amount thereof is permanently reduced, or (z) the date that any of the related series of Letter of Credit Backed PC Bonds are redeemed, to the extent that the Debtor has not reimbursed the applicable Letter of Credit Issuing Bank and the applicable Banks, if any, for drawings made on the related Letter of Credit with respect to the payment of interest on the related series of Letter of Credit Backed PC Bonds to the extent provided in the respective Reimbursement Agreement, each holder of an Allowed Letter of Credit Bank Claim will be paid Cash in an amount equal to its pro rata share of the aggregate amount paid by the respective Letter of Credit Issuing Bank to the respective Bond Trustee under the terms of the applicable Letter of Credit with respect to the payment of the interest on the Letter of Credit Backed PC Bonds to which such Letter of Credit Bank Claim relates during the period from the Petition Date to and including the last scheduled interest payment date on such Letter of Credit Backed PC Bonds preceding the Effective Date. Each holder of an Allowed Letter of Credit Bank Claim will also be paid Cash in an amount equal to its pro rata share of all other amounts then due and owing to the respective Letter of Credit Issuing Bank and the applicable Banks, if any, under the terms of the respective Reimbursement Agreement (other than for reimbursement of drawings on the respective Letter of Credit) through the Effective Date, including, without limitation, interest at the interest rate due on such amounts to the extent provided in the respective Reimbursement Agreements, any due and owing Forbearance, Extension and Letter of Credit Fees through the Effective Date, and the reasonable fees and expenses of unrelated third-party professionals retained by | Nominal |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 27 of 100

| | Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|---|

the Letter of Credit Issuing Banks, to the extent incurred subsequent to the Petition Date in the Chapter 11 Case.

On the Effective Date, one of the following shall occur with respect to each series of Letter of Credit Backed PC Bonds and its respective Letter of Credit, at the option of the Debtor separately for each series of Letter of Credit Backed PC Bonds:

Purchase Option: The respective series of Letter of Credit Backed PC Bonds shall be called for mandatory tender in accordance with the terms of the respective Indenture and shall be purchased by the respective Bond Trustee through a draw on the related Letter of Credit and, at the option of the respective Letter of Credit Issuing Bank, shall either be registered in the name of the respective Letter of Credit Issuing Bank or in the name of the Debtor subject to a first lien security interest in favor of the respective Letter of Credit Issuing Bank to additionally secure the obligations of the Debtor under the related Reimbursement Agreement.

On the Effective Date, to the extent that the Letter of Credit Issuing Bank and the Banks have not been reimbursed therefor, the Letter of Credit Issuing Bank will receive Cash in an amount equal to the sum of (i) the interest portion of the purchase price of the tendered Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit, and (ii) the aggregate amount paid by the respective Letter of Credit Issuing Bank to the respective Bond Trustee under the terms of the applicable Letter of Credit with respect to the payment of the interest on the respective Letter of Credit Backed PC Bonds during the period from and after June 27, 2002 to and including the last scheduled interest payment date on such Letter of Credit Backed PC Bonds preceding the Effective Date, together with interest at the non-default rate due on such amounts to the extent provided in the respective Reimbursement Agreement.

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 28 of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| | | On the Effective Date, the Letter of Credit Issuing Bank shall transfer the related Letter of Credit Backed PC Bonds in the aggregate original principal amount set forth on Exhibit C to the Plan to the Debtor or its assignees free and clear of all liens. On the Effective Date, the Letter of Credit Issuing Bank will receive (i) Cash in an amount equal to the principal portion of the purchase price of the tendered Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit, and (ii) a fee (the "Purchase Option Incentive Fee") in an amount equal to 0.4% of the principal portion of the purchase price of the tendered Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit. | |

- or -

Remarketing Option: The respective series of Letter of Credit Backed PC Bonds shall be called for mandatory tender in accordance with the terms of the respective Indenture and shall be purchased by the respective Bond Trustee through a draw on the related Letter of Credit. The Debtor will then either (i) provide or cause to be provided to the respective Bond Trustee an alternative "Credit Facility" pursuant to the terms of the respective Indenture in lieu of the existing Letter of Credit, or (ii) obtain the consent of the Issuer to remarket the respective series of Letter of Credit Backed PC Bonds without credit enhancement in accordance with the terms of the applicable Indenture. In either event, the respective series of Letter of Credit Backed PC Bonds shall be remarketed, at par, in accordance with the terms of the Indenture and the other PC Bond Documents.

In such event, on the Effective Date, the Letter of Credit Issuing Bank will receive, to the extent that the Letter of Credit Bank has not been reimbursed therefor (i) from the Debtor, Cash in an amount equal to the sum of (A) the interest portion of the purchase price of the tendered Letter of Credit Backed PC Bonds

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 29 of 100

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|------------------------------------------------------------|

paid out of a draw on the respective Letter of Credit, and (B) the aggregate amount paid by the respective Letter of Credit Issuing Bank to the respective Bond Trustee under the terms of the applicable Letter of Credit with respect to the payment of the interest on the respective Letter of Credit Backed PC Bonds during the period from and after June 27, 2002 to and including the last scheduled interest payment date on such Letter of Credit Backed PC Bonds preceding the Effective Date, together with interest at the non-default rate due on such amounts to the extent provided in the respective Reimbursement Agreement, (ii) from the Debtor, a fee (the "Remarketing Option Incentive Fee") in an amount equal to either (1) 0.5% of the aggregate principal amount of the respective Letter of Credit Backed PC Bonds remarketed on the Effective Date the payment of the principal of and interest on which are secured by either a replacement Letter of Credit, with a term of not less than one year from the Effective Date, delivered to the Trustee in accordance with the terms of the respective Indenture upon terms acceptable to the Debtor or an extension of the existing Letter of Credit delivered to the Trustee in accordance with the terms of the respective Indenture upon terms acceptable to the Debtor, or (2) 0.4% of the aggregate principal amount of the respective Letter of Credit Backed PC Bonds remarketed on the Effective Date the payment of the principal of and interest on which are not secured by such a Letter of Credit, and (iii) from the Bond Trustee, an amount equal to the principal portion of the purchase price of the tendered Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit, which amount shall be paid from the remarketing proceeds of the respective Letter of Credit Backed PC Bonds in accordance with the terms of the respective Indenture.

- or -

No Bonds Option:  With respect to each Letter of Credit Issuing Bank and the related Banks, if any, in the event that neither the Purchase

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 30 of 100

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|-------------------------------------------------------------|

Option nor the Remarketing Option, as applicable, can be consummated or the respective series of Letter of Credit Backed PC Bonds are redeemed on or prior to the Effective Date as the result of the expiration of the respective Letter of Credit or otherwise, then at the option of the Debtor separately for each Letter of Credit Bank Claim and Reimbursement Agreement either:

(i)     On the Effective Date, the Letter of Credit Issuing Bank will receive Cash in an amount equal to the sum of (A) the principal portion of the redemption price of the redeemed Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit (the "Principal Reimbursement") and (B) any and all accrued and unpaid interest owing to the Letter of Credit Issuing Bank in respect of such Principal Reimbursement, at a fluctuating rate of interest, in accordance with the terms of the applicable Reimbursement Agreement; or

(ii)     On the Effective Date, the Letter of Credit Issuing Bank shall sell, transfer and assign to the Debtor or its assignee, without recourse, all of the Letter of Credit Issuing Bank's and the related Banks' rights, title and interest in the applicable Letter of Credit Bank Claim and Reimbursement Agreement, including, but not limited to, the right to receive repayment of the Principal Reimbursement in the aggregate principal amount as set forth on Exhibit C to the Plan, together with the right to receive payment of interest thereon as set forth in the amended Reimbursement Agreement, free and clear of all liens.  On the Effective Date, the Debtor or its assignee shall purchase from the Letter of Credit Issuing Bank and the related Banks, if any, all of their rights, title and interest in the applicable Letter of Credit Bank Claim and Reimbursement Agreement for a purchase price in Cash in an amount equal to the sum of (A) the respective Principal Reimbursement and (B) any and all accrued and unpaid interest owing to the Letter of Credit Issuing Bank in respect of such Principal

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|------------------------------------------------------------|
| | | Reimbursement, at a fluctuating rate of interest, in accordance with the terms of the applicable Reimbursement Agreement. | |
| | | In addition to the foregoing with respect to the No Bond Option, if (i) the Letter of Credit Issuing Bank maintains its Letter of Credit outstanding in the stated amount set forth on Exhibit C to the Plan through the Effective Date and does not provide the Trustee with notice of default under its Reimbursement Agreement or non-reinstatement of its Letter of Credit or take any other action which would result in the redemption, either in whole or in part, of the outstanding Letter of Credit Backed PC Bonds without the prior written consent of the Debtor, and (ii) the Letter of Credit Issuing Bank and each of the related Banks, if any, take all action reasonably required by the Debtor to keep the Letter of Credit Backed PC Bonds outstanding and to facilitate either the Purchase Option or the Remarketing Option, as applicable, including, without limitation, giving direction to the Trustee, providing commercially reasonable indemnification to the Issuer and Trustee, and using their best efforts to consummate the proposed amendments to the terms of the Letter of Credit Backed PC Bonds as set forth in the LC Bank Agreement and to consummate either the Purchase Option or the Remarketing Option as applicable, so as to maintain for the Debtor the benefits of the tax-exempt financing provided by the related series of Letter of Credit Backed PC Bonds, then, on the Effective Date (A) in the event that the Letter of Credit Backed PC Bonds were redeemed prior to the Effective Date for reasons beyond the control of the Letter of Credit Issuing Bank, the Letter of Credit Issuing Bank will receive from the Debtor, a fee in an amount equal to 0.05% of the principal portion of the redemption price of the redeemed Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit, and (B) in the event that the Letter of Credit Backed PC Bonds are redeemed on the Effective Date for reasons beyond the control of the Letter of Credit | |

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 32 of 100

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|--------------------------------------|-----------------------------------------------------------|

Issuing Bank, the Letter of Credit Issuing Bank will receive from the Debtor, a fee (the "No Bonds Option Fee") in an amount equal to 0.10% of the principal portion of the redemption price of the redeemed Letter of Credit Backed PC Bonds paid out on a draw on the respective Letter of Credit.

(iii)   Pursuant to the terms of an agreement among the Debtor and each of the Letter of Credit Issuing Banks (the "LC Bank Agreement") that was approved by order of the Bankruptcy Court entered on June 17, 2002, the Letter of Credit Issuing Banks have agreed, among other things and subject to certain conditions, to (A) maintain each of the Letters of Credit outstanding in the stated amounts set forth on Exhibit C to the Plan, (B) not provide the Trustee with notice of any default under any of the Reimbursement Agreements or non-reinstatement of any of the Letters of Credit or take any other action which would result in the mandatory tender or redemption, either in whole or in part, of any of the outstanding Letter of Credit Backed PC Bonds without the prior written consent of the Debtor, and (C) extend the expiration date of each of the Letters of Credit to the first Business Day subsequent to the one (1) year anniversary of the expiration date of each Letter of Credit existing as of the Petition Date; provided, however, that each Letter of Credit Issuing Bank is only obligated to undertake or refrain from undertaking those actions set forth in clauses (A) and (B) immediately above until the earlier of (i) the last interest payment date on the related series of Letter of Credit Backed PC Bonds immediately preceding the expiration date of such Letter of Credit, as such expiration date shall be extended in accordance with the terms of the LC Bank Agreement, or (ii) the occurrence of a "Termination Event" (as such term is defined in the LC Bank Agreement). In consideration for such forbearance and other actions by the Letter of Credit Issuing Banks, the Debtor shall, subject to certain terms and conditions as set forth in the LC Bank Agreement, pay to each Letter of Credit

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|------------------------------------------------------------|
| | | Issuing Bank, (1) during the period from and after June 17, 2002 and continuing until July 1, 2002, quarterly, in arrears, the Letter of Credit fee as set forth in the respective Reimbursement Agreement (the "Original Letter of Credit Fee"), together with an amount equal to the positive difference, if any, of an amount per annum equal to two percent (2%) of the Stated Amount of the Letter of Credit, less the Original Letter of Credit Fee, which total fee accrues from and after December 1, 2001 and until July 1, 2002, and has been payable on the same dates as are set forth for payment of Letter of Credit Fees in the applicable Reimbursement Agreement, and (2) during the period from and after July 1, 2002 and continuing until the Effective Date, quarterly, in arrears, the Original Letter of Credit Fee, together with an amount equal to the positive difference, if any, of an amount per annum equal to three percent (3%) of the Stated Amount of the Letter of Credit, less the Original Letter of Credit Fee, which total fee accrues from and after July 1, 2002 until the Effective Date, and shall be payable on the same dates as are set forth for payment of Letter of Credit Fees in the applicable Reimbursement Agreement (the Original Letter of Credit Fee together with such additional sums being referred to collectively as the "Forbearance, Extension and Letter of Credit Fees"). Additionally, pursuant to the terms of the LC Bank Agreement, the Debtor has agreed, among other things and subject to certain conditions, to pay to Deutsche Bank AG New York Branch an agency fee in the amount of $250,000, which fee was paid by the Debtor on June 18, 2002. | |
| 4f | Prior Bond Claims | Unimpaired—Each Allowed Prior Bond Claim will be reinstated and rendered | $454[7] |

---

[7]Each Allowed Prior Bond Claim will be paid in the amount necessary to render it unimpaired as set forth herein. The aggregate principal amount of Allowed Prior Bond Claims is currently estimated at $453,550,000 and is subject to increase by the amount of any Letter of Credit Bank Claim that is converted to a Prior Bond Claim in accordance with the "No Bonds Option" as described in treatment of Allowed Letter of Credit Bank Claims.

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 34 of 100

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|-------|----------------|-------------------------------------|-----------------------------------------------------------|
| | | unimpaired in accordance with section 1124 of the Bankruptcy Code. On the Effective Date one of the following shall occur with respect to each Prior Reimbursement Agreement and all of the Allowed Prior Bond Claims arising with respect thereto: | |
| | | Each holder of an Allowed Prior Bond Claim will be paid Cash in an amount equal to (i) the outstanding Reimbursement Obligation, or portion thereof, owing to such holder, (ii) any and all accrued and unpaid interest owing to such holder in respect of such Reimbursement Obligation or applicable portion thereof at a fluctuating rate of interest in accordance with the terms of the applicable Reimbursement Agreement and (iii) all other amounts due and owing to the respective holder of an Allowed Prior Bond Claim under the terms of the respective Prior Reimbursement Agreement, through the Effective Date. | |
| | | $-$ or $-$ | |
| | | Alternatively, upon the written request of the Debtor, with the prior written consent of the respective Prior Letter of Credit Issuing Bank, the related Banks and each of the other holders of Allowed Prior Bond Claims related thereto, each such holder of an Allowed Prior Bond Claim will be paid Cash in an amount equal to (i) any and all accrued and unpaid interest owing to such holder in respect of the Reimbursement Obligation or applicable portion thereof owing to such holder at a fluctuating rate of interest in accordance with the terms of the applicable Reimbursement Agreement, and (ii) all other amounts (other than the Reimbursement Obligation or applicable portion thereof) due and owing to the respective holder of an Allowed Prior Bond Claim under the terms of the respective Prior Reimbursement Agreement, through the Effective Date. On the Effective Date, the applicable Prior Letter of Credit Issuing Bank, the related Banks and any other holders of Allowed Prior Bond Claims related thereto shall sell, transfer and assign to the Debtor or its assignee all of the Prior Letter of Credit | |

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| | | Issuing Bank's, the related Banks' and the related Allowed Prior Bond Claim holders' rights, title and interest in the applicable Prior Reimbursement Agreement, including, but not limited to, the right to receive repayment of the related Reimbursement Obligation, together with the right to receive payment of interest thereon as set forth in the applicable Prior Reimbursement Agreement, free and clear of all liens. In such event, on the Effective Date, the Debtor or its assignee shall purchase from the Prior Letter of Credit Issuing Bank, the related Banks and the holders of the related Allowed Prior Bond Claims, all of their rights, title and interest in the applicable Prior Reimbursement Agreement for a purchase price in Cash in an amount equal to the respective Reimbursement Obligation. All of the documents related to the transfer and sale of rights under the Prior Reimbursement Agreement shall be in form and content satisfactory to the Debtor, the Prior Letter of Credit Issuing Bank, the related Banks and each of the other holders of Allowed Prior Bonds Claims related thereto. | |
| 4g | Treasury PC Bond Claims | Unimpaired—Each of the Loan Agreements and the PC Bond Documents related to the Treasury PC Bonds will be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. Each series of Treasury PC Bonds will remain outstanding. Each holder of a Treasury PC Bond will be paid Cash in an amount equal to any and all accrued and unpaid interest owed to such holder in respect of such Treasury PC Bond in accordance with the terms thereof to and including the last scheduled interest payment date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond Trustee due and owing under the applicable Loan Agreements will also be paid in Cash. | $81 |
| 5 | General Unsecured Claims | Impaired—Each holder of an Allowed General Unsecured Claim will be paid in Cash in an amount equal to such Allowed Claim (which shall include any Pre-Petition Interest). | $4,613 |

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 36 of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| 6 | ISO, PX and Generator Claims | Unimpaired—Each holder of an Allowed ISO, PX and Generator Claim will be paid Cash in an amount equal to such Allowed Claim (which shall include any Pre-Petition Interest).[8] | $1,607[9] |
| 7 | ESP Claims | Unimpaired—Each holder of an Allowed ESP Claim will be paid Cash in an amount equal to such Allowed Claim (which shall include any Pre-Petition Interest).[10] | $515[11] |
| 8 | Environmental, Fire Suppression, Pending Litigation and Tort Claims | Unimpaired—Subject to Section 4.17(b) of the Plan, each Allowed Environmental, Fire Suppression, Pending Litigation and Tort Claim shall be satisfied in full in the ordinary course of business at such time and in such manner as the Reorganized Debtor is obligated to satisfy such Allowed Claim under applicable law. | $250[12] |
| 9 | QUIDS Claims | Unimpaired—Each holder of an Allowed QUIDS Claim will be paid Cash in an amount equal to such Allowed Claim. | $300[13] |
| 10 | Workers' | Unimpaired—Each Allowed Workers' | $165 |

[8]See discussion in Section IX.A.17 of this Disclosure Statement regarding impairment with respect to Class 6.

[9]This amount represents the Debtor's estimate of Allowed ISO, PX and Generator Claims; but does not reflect reductions for amounts that the Debtor expects to recover in refunds through the FERC's determination of just and reasonable rates. The aggregate amount of filed ISO, PX and Generator Claims is materially higher. See Section IX.A.17 of this Disclosure Statement for more detailed information regarding ISO, PX and Generator Claims.

[10]See discussion in Section IX.A.18 of this Disclosure Statement regarding impairment with respect to Class 7.

[11]This amount represents the Debtor's estimate of Allowed ESP Claims, but does not reflect reductions for retroactive adjustments that the Debtor expects to receive with respect to the determination of just and reasonable wholesale electricity prices. The aggregate amount of filed ESP Claims is materially higher. See Section IX.A.18 of this Disclosure Statement for more detailed information regarding the ESP Claims.

[12]This amount represents the Debtor's estimate of Allowed Environmental, Fire Suppression, Pending Litigation and Tort Claims. The aggregate amount of filed Environmental, Fire Suppression, Pending Litigation and Tort Claims is materially higher.

[13]This amount excludes $9 million of QUIDS Claims held by a subsidiary of the Debtor.

| Class | Claim/Interest | Treatment of Allowed Claim/Interest | Estimated Aggregate Amount of Allowed Claims (in millions) |
|---|---|---|---|
| | Compensation Claims | Compensation Claim arising prior to the Petition Date shall be satisfied in full in the ordinary course of business at such time and in such manner as the Reorganized Debtor is obligated to satisfy such Allowed Claim under applicable law. Post-petition Workers' Compensation Claims are treated as Ordinary Course Liabilities herein and shall receive the same pass-through treatment as Workers' Compensation Claims arising prior to the Petition Date. Except as provided under applicable non-bankruptcy law, Post-Petition Interest will not be paid on any Workers' Compensation Claims. | |
| 11 | Preferred Stock Equity Interests | Unimpaired—Each holder of a Preferred Stock Equity Interest will retain its Preferred Stock in the Reorganized Debtor and will be paid in Cash any dividends and sinking fund payments accrued in respect of such Preferred Stock through the last scheduled payment date prior to the Effective Date. | $513 |
| 12 | Common Stock Equity Interests | Unimpaired—Each holder of a Common Stock Equity Interest will retain its Common Stock in the Debtor. | N/A |

## B. CLAIMS OBJECTION PROCESS.

Any party with a Claim against the Debtor in an impaired class and who wishes to vote on the Plan must have an Allowed Claim; provided, however, that the Debtor or the holder of a Disputed Claim may seek an order of the Bankruptcy Court estimating the allowable amount of the Disputed Claim for voting purposes. A creditor whose Claim was scheduled in the Debtor's Bankruptcy Schedules and whose Claim was not listed as disputed, contingent or unliquidated, is considered to have an Allowed Claim in the scheduled amount (unless such creditor filed a proof of claim, in which case the proof of claim will supersede the scheduled Claim). Unless otherwise agreed by the Debtor and the holder of the Claim, a Claim that is the subject of a properly filed proof of claim will be deemed Allowed in the amount shown in the proof of claim; provided, however, that, if the Debtor or another party in interest objects to the Claim, the Claim shall be

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 38 of 100

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
*A Professional Corporation*

1  Allowed in the amount determined by the Bankruptcy Court. As of the date hereof, the Debtor is

2  reviewing proofs of claim filed in this Chapter 11 Case, and has prepared and filed objections to

3  numerous Claims.

4  More than 13,000 proofs of claim have been filed in the Chapter 11 Case, in an

5  aggregate face amount of approximately $50.1 billion. However, the Debtor believes that accurate

6  estimates of the allowable amount of all Claims in this Chapter 11 Case are as set forth in the table

7  above. Of the approximately $50.1 billion of claims filed, claims aggregating approximately

8  $26.5 billion have been disallowed by the Bankruptcy Court due to objections, claim withdrawals

9  and agreements with claimants. The Debtor has objected to or intends to object to approximately

10  $5.4 billion of the remaining $23.6 billion of filed claims. In addition, pursuant to the Plan, of the

11  remaining $23.6 billion of filed claim, claims totaling approximately $5.5 billion are expected to

12  pass through the bankruptcy proceeding and be determined in the appropriate court or other tribunal

13  during the bankruptcy proceeding or after it concludes.

14  The Plan generally permits objections to be filed until the Effective Date (or such later

15  date as the Court may order), and the Debtor reserves the right for itself, the Committee and any

16  other party in interest to file Claims objections through the objection deadline. See Section IX.F of

17  this Disclosure Statement for more information on the treatment of Disputed Claims. At or before

18  the Confirmation Hearing, the Proponents intend to establish (i) the aggregate amount of Allowed or

19  allowable Claims, for purposes of evaluating the feasibility of the Plan and (ii) the aggregate amount

20  necessary to fund the Disputed Claims reserve.

21  Without limiting the foregoing, the Debtor believes that Claims in the following classes

22  are overstated and the Debtor has filed or will file objections to (or will otherwise dispute) virtually

23  all such Claims: Class 6—ISO, PX and Generator Claims, Class 7—ESP Claims, and Class 8—

24  Environmental, Fire Suppression, Pending Litigation and Tort Claims. Accordingly, all Claims in

25  the foregoing classes will be Disputed Claims.

26  ### III.    DESCRIPTION AND HISTORY OF BUSINESS

27  **A.    OVERVIEW.**

28  The Debtor, Pacific Gas and Electric Company, a California corporation, was

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-32-

incorporated in 1905. Effective January 1, 1997, the Debtor and its subsidiaries became subsidiaries of the Parent, a California corporation, whose common stock and related preferred stock purchase rights are publicly traded (NYSE:PCG). In the holding company reorganization, the outstanding common stock of the Debtor was converted on a share-for-share basis into common stock of the Parent. The Debtor's outstanding debt securities and preferred stock were unaffected by the holding company reorganization and, other than those debt securities repaid or preferred stock redeemed or repurchased, remain issued and outstanding securities of the Debtor. The Debtor is an operating public utility engaged principally in the business of providing electricity and natural gas distribution and transmission services throughout most of Northern and Central California. As of December 31, 2002, the Debtor served approximately 4.8 million electricity distribution customers and approximately 3.9 million natural gas distribution customers in a service territory covering over 70,000 square miles.

## B. OPERATIONS.

### 1. Electric Utility Operations.

The Debtor owns and operates electric generation facilities and an electric transmission and distribution system in Northern and Central California. As of December 31, 2002, the Debtor's generation facilities, consisting primarily of hydroelectric and nuclear generating plants, had an aggregate net operating capacity of 6,420 megawatts ("MW"). During 2002, the Debtor's own generation and generation purchased by the Debtor under power purchase agreements with qualifying facilities ("QFs") and other power suppliers represented approximately seventy percent (70%) of the demand of the Debtor's retail electric customers. To transport electricity to load centers, as of December 31, 2002, the Debtor owned 18,605 circuit miles of interconnected transmission lines and support facilities and is interconnected with generation facilities representing over 23,800 MW of installed generating capacity. For the year ended December 31, 2002, the Debtor sold or delivered approximately 104,500,000 MWh to its bundled retail customers and transported approximately 7,400,000 MWh to direct access customers. In connection with the California electric industry restructuring, the Debtor relinquished operational control, but not ownership, of its electric transmission facilities to the California Independent System Operator

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Corporation (the "ISO"). The ISO controls the operation of the transmission system, is responsible

2  for assuring the reliability of the electric system and provides open access transmission service on a

3  nondiscriminatory basis. See Section IX.A of this Disclosure Statement for a more detailed

4  discussion of the electric industry restructuring.

5  ### 2. Gas Utility Operations.

6  The Debtor owns and operates gas transmission, storage and distribution assets in

7  California. The Debtor offers gas transmission, storage and distribution services as separate and

8  distinct services to its customers. Industrial and larger commercial gas (non-core) customers have

9  the opportunity to select from a menu of services offered by the Debtor and pay only for the services

10  they use. Access to the gas transmission system is possible for all gas marketers and shippers, as

11  well as non-core end-users. The Debtor's residential and smaller commercial gas (core) customers

12  may select the commodity gas supplier of their choice, but the Debtor continues to purchase gas as a

13  regulated supplier for those core customers who do not select another supplier. As of December 31,

14  2002, the Debtor's gas system consisted of approximately 6,300 miles of high-pressure pipelines

15  that extend from the California-Oregon border to the California-Arizona border, three gas storage

16  facilities and approximately 39,000 miles of gas distribution lines.

17  ### C. REGULATION.

18  The Debtor is currently subject to both federal and state regulation. At the federal level,

19  the FERC regulates, among other things, electric transmission rates and access, interconnections,

20  operation of the ISO and the terms and rates of wholesale electric power sales. The ISO has

21  responsibility for meeting applicable reliability criteria, planning transmission additions and

22  assuring the maintenance of adequate reserves and is subject to FERC regulation of tariffs and

23  conditions of service. In addition, most of the Debtor's hydroelectric facilities operate pursuant to

24  licenses issued by the FERC.

25  The United States Nuclear Regulatory Commission (the "NRC") oversees the licensing,

26  construction, operation and decommissioning of nuclear facilities, including the Debtor's Diablo

27  Canyon Power Plant and the retired Humboldt Bay Power Plant Unit 3. NRC regulations require

28  extensive monitoring and review of the safety, radiological and certain environmental aspects of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Debtor's nuclear facilities.

2  　　　At the state level, the Commission has jurisdiction to set retail rates and conditions of

3  service for the Debtor's electric distribution, gas distribution and gas transmission services in

4  California.  The Commission also has jurisdiction over the Debtor's sales of securities, dispositions

5  of utility property, energy procurement on behalf of its electric and gas retail customers, rates of

6  return, rates of depreciation, siting and operation of gas transportation assets, and certain aspects of

7  the Debtor's siting and operation of its electric systems.  Ratemaking for retail sales from the

8  Debtor's remaining generation facilities is under the jurisdiction of the Commission.  To the extent

9  such power is sold for resale into wholesale markets, however, it is under the ratemaking jurisdiction

10  of the FERC.

11  　　　The California Energy Commission (the "CEC") has jurisdiction over the siting and

12  construction of new thermal electric generating facilities 50 MW and greater in size.  The CEC also

13  sponsors alternative energy research and development projects, promotes energy conservation

14  programs and maintains a statewide plan of action in case of energy shortages.  In addition, the CEC

15  administers funding for public purpose research and development and renewable technologies

16  programs.

17  　　　The Debtor's operations and assets are also regulated by a variety of other federal, state

18  and local agencies.

19  **IV.　EVENTS PRECEDING THE COMMENCEMENT OF THE CHAPTER 11 CASE;
    FILING OF THE PLAN**

20

21  **A.　ELECTRIC INDUSTRY RESTRUCTURING.**

22  　　　In 1998, California implemented electric industry restructuring and established a market

23  framework for electric generation in which generators and other electricity providers were permitted

24  to charge market prices for electricity sold on the wholesale market.  The restructuring of the electric

25  industry was mandated by the California Legislature in Assembly Bill 1890 ("AB 1890").  The

26  mandate included a retail electricity rate freeze and ten percent (10%) retail and small commercial

27  rate reduction, and a plan for recovery of generation-related costs ("transition costs") that were

28  expected to be uneconomic under the new market framework.  AB 1890 provided that the retail rate

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

freeze would end the earlier of (i) the date a utility recovered all of its transition costs, and (ii) March 31, 2002. The new market framework called for the creation of the PX and the ISO. Before it ceased operation in January 2001, the PX established market-clearing prices for electricity. The ISO's role is to schedule delivery of electricity for all market participants and operate certain markets for electricity. Until December 15, 2000, the Debtor was required to sell all of its owned and contracted generation to, and purchase all electricity for its retail customers from, the PX. Customers were given the choice of continuing to buy electricity from the Debtor, or to buy electricity from independent power generators or retail electricity suppliers (customers who chose to buy from independent power generators or retail electricity suppliers are referred to as "direct access customers"). Most of the Debtor's customers continued to buy electricity from the Debtor.

**B.** **INCREASING WHOLESALE PRICES, THE RATE FREEZE AND THE FILING OF THE CHAPTER 11 PETITION.**

Beginning in May 2000, the wholesale spot prices of electricity began to escalate. While forward and spot prices moderated somewhat in September and October, such prices skyrocketed in November and December to levels substantially higher than during the summer months. During this period, the Debtor's electric rates were frozen and provided only approximately $0.05 per kWh to pay for the Debtor's electricity costs.

The frozen rates were designed to allow the Debtor and the other investor owned utilities ("IOUs") to recover their authorized costs and, to the extent the frozen rates generated revenues in excess of authorized costs, recover their transition costs. However, beginning in May, 2000 and continuing during the California energy crisis, the Debtor's frozen retail rates were insufficient to cover the Debtor's wholesale electricity procurement costs and other costs of utility service. The Debtor's inability to recover its ongoing procurements costs from customers ultimately resulted in the Debtor incurring billions of dollars in defaulted debt and unpaid bills, and on April 6, 2001, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

**C.** **PROCUREMENT OF POWER BY THE STATE IN PLACE OF THE DEBTOR.**

On January 17, 2001, because the Debtor and Southern California Edison, another California IOU, were no longer creditworthy entities and consequently were unable to continue

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  buying power on behalf of their customers, the Governor of California signed an order declaring an

2  emergency and authorizing the State of California Department of Water Resources (the "DWR") to

3  purchase power to maintain the continuity of supply to retail customers. On February 1, 2001, the

4  Governor signed Assembly Bill No. 1 of the first extraordinary session of the California Legislature

5  ("AB 1X"). AB 1X authorized the DWR to enter into contracts for the purchase of electric power,

6  but prohibited the DWR from entering into such contracts after January 1, 2003. AB 1X required

7  the DWR to sell power that it purchases directly to retail end-use customers, except as may be

8  necessary to maintain system integrity. AB 1X also required the Debtor to deliver the power

9  purchased by the DWR over its distribution systems and act as a billing and collection agent on

10  behalf of the DWR, without taking title to such power or reselling it to its customers.

11  AB 1X authorizes the DWR to recover, as a revenue requirement to the extent just and

12  reasonable, among other things, (i) amounts needed to pay the principal and interest on bonds

13  issued to finance the purchase of power, (ii) amounts necessary to pay for the power and associated

14  transmission and related services, (iii) administrative costs, and (iv) certain other amounts associated

15  with the program. AB 1X requires the Commission to set rates to cover the DWR's reasonable

16  revenue requirements (but prohibits the Commission from increasing electric rates for residential

17  customers who use less power than 130% of their existing baseline quantities).

18  DWR has purchased power on the spot market and entered into long-term power

19  purchase agreements in fulfillment of its procurement obligations pursuant to AB 1X. The Debtor

20  has continued to distribute DWR's power to retail customers, and to collect and remit to DWR the

21  rates charged by DWR to those customers.

22  **D.  REGULATORY MATTERS**

23  **1.  FERC Actions Subsequent to Filing of the Chapter 11 Petition.**

24  In response to the unprecedented increase in wholesale electricity prices during 2000

25  and 2001, the FERC issued a series of significant orders in the spring and summer of 2001 and July

26  2002 aimed at mitigating future extreme wholesale energy prices like those in 2000 and 2001.

27  These orders established a cap on bids for real-time electricity and ancillary services of $250 per

28  megawatt-hour ("MWh") and established various automatic mitigation procedures. In the FERC's

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-37-

1 proposal for a standard market design, the FERC proposed to adopt a safety net bid cap as part of the
2 mitigation plan for wholesale energy markets.

3     In June and July of 2001, the FERC's chief administrative law judge ("ALJ") conducted
4 settlement negotiations among power sellers, officials representing the State of California and
5 representatives from the California IOUs in an attempt to resolve disputes regarding past power
6 sales. The negotiations did not result in a settlement, but the judge recommended that the FERC
7 conduct further hearings to determine possible refunds and the amounts (if any) owed to each power
8 seller and buyer. On December 12, 2002, a FERC ALJ issued an initial decision finding that power
9 companies overcharged the utilities, the State of California, and other buyers from October 2, 2000
10 to June 2001 by approximately $1.8 billion, but that California buyers still owe the power
11 companies approximately $3.0 billion, leaving approximately $1.2 billion in unpaid bills. The time
12 period reviewed in the FERC hearings excludes the claims for refunds for overcharges that occurred
13 before October 2, 2000, and after June 2001, when the DWR entered into contracts to buy
14 electricity.

15     On March 26, 2003 the FERC confirmed most of the ALJ's findings, but modified the
16 refund methodology in part. A FERC spokesman has estimated the total potential refunds, using the
17 modified methodology, at approximately $3.3 billion but the final amount of refunds will depend
18 upon the FERC's review of further pleadings as well as sellers' attempts to justify certain fuel costs.
19 No final order on the methodology or refunds has been issued. FERC is expected to act on the
20 refund methodology and amount shortly.

21     In March 2003, additional evidence of market manipulation and artificially inflated
22 prices for electricity and natural gas for the period from January 1, 2000 to June 20, 2001 was
23 presented to the FERC, and various power suppliers filed responsive materials. On June 25, 2002,
24 the FERC issued a series of orders directing more than forty companies to show cause why they
25 should not disgorge profits for a variety of tariff violations of the ISO and PX tariffs related to
26 market manipulation. The identified entities will receive data from the ISO about transactions to be
27 investigated within 21 days and respond within 45 days. The Debtor is named as one of the
28 responding entities in connection with two issues, and has already provided some responsive

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 45
of 100

1 information to FERC.

2     **2.**   **Certain Commission Actions Subsequent to Filing of the Chapter 11 Petition.**

3     In the first quarter of 2001, the Commission authorized the Debtor to begin collecting

4 energy surcharges totaling $0.04 per kWh (composed of a $0.01 per kWh surcharge in January and a

5 $0.03 per kWh surcharge approved in March).

6     In May 2001, the Commission authorized the Debtor to collect an additional $0.005 per

7 kWh surcharge revenue for 12 months to make up for the time lag between March 2001, when the

8 Commission authorized the $0.03 per kWh surcharge, and June 2001, when the Debtor began

9 collecting the $0.03 per kWh surcharge. Although collection of this "half-cent" surcharge was

10 originally scheduled to end on May 31, 2002, the Commission issued a resolution ordering the

11 Debtor to continue collecting the half-cent surcharge until further consideration by the Commission.

12 The Commission restricted the use of these surcharge revenues to pay for the Debtor's "ongoing

13 procurement costs" and "future power purchases."

14     In November 2002, the Commission approved a decision modifying the restrictions on

15 the use of revenues generated by the surcharges to permit use of the revenues for the purpose of

16 securing or restoring the Debtor's reasonable financial health, as determined by the Commission.

17     In October, 2001, the Commission and another California IOU, Southern California

18 Edison ("SCE") entered into a settlement agreement. The California Supreme Court is currently

19 considering certified questions asked by the U.S. Court of Appeals for the Ninth Circuit regarding

20 the authority of the Commission under state law to enter into the settlement agreement and allow

21 SCE to recover its under-collected procurement and transition costs in light of certain provisions of

22 AB 1890. The certified questions have been fully briefed, and the Supreme Court heard oral

23 argument on this matter on May 27, 2003. No decision has been issued yet, but a decision is

24 expected by the end of August 2003. See Section XIII of this Disclosure Statement entitled "Certain

25 Risk Factors To Be Considered."

26     In October and December of 2002, the Commission issued decisions ordering and

27 authorizing the Debtor to resume full procurement of the wholesale power needed to serve its retail

28 customers on January 1, 2003, under an approved procurement plan pursuant to a new state law, AB

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-39-

1  57/SB 1976, which provides for reasonableness standards and up-front approval by the Commission
2  of utility-procurement plans.

3      ### 3.   DWR Revenue Requirement and Servicing Agreement; Resumption of Procurement

5          In accordance with AB 1X, in January, 2001, the DWR began purchasing the amount of
6  electricity needed by the California IOUs' customers that could not be provided by the IOUs, either
7  through their own generation or by suppliers under contracts with the IOUs.  In addition to
8  purchasing electricity on the spot market, the DWR entered into long-term contracts for the supply
9  of electricity and associated goods and services.  In September 2002, the Governor signed SB 1976
10  into law.  SB 1976 required the Commission to allocate electricity subject to existing DWR
11  contracts among the customers of the California IOUs, including the Debtor's customers.  As
12  required by SB 1976, each California IOU submitted an electricity procurement plan to meet that
13  portion of its customers' needs that is not covered by the combination of the allocation of electricity
14  from existing DWR contracts to that IOU's customers and the IOU's own electric resources and
15  contracts, referred to as the "residual net open position."

16          On September 19, 2002, the Commission issued a decision allocating electricity subject
17  to the DWR contracts to the generation portfolios of the three California IOUs for operational and
18  scheduling purposes, with the DWR retaining legal title and financial reporting and payment
19  responsibilities associated with these contracts.  The IOUs became responsible for scheduling and
20  dispatch of the quantities subject to the allocated contracts and for many administrative functions
21  associated with those contracts on January 1, 2003.  On January 1, 2003, the IOUs also resumed the
22  function of procuring electricity to meet their customers' residual net open position.  On December
23  23, 2002, the Bankruptcy Court entered an order authorizing the Debtor to take all action necessary
24  to resume power procurement, including procurement of the residual net open position.

25          In April 2003, the Debtor and the DWR entered into an operating agreement, which has
26  been approved by the Commission, pursuant to which the Debtor provides operational, dispatch,
27  administrative and other services for the DWR allocated contracts.  Both the Debtor and the DWR
28  have filed petitions to modify certain terms of the operating agreement.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

In addition, pursuant to the Proposed Settlement Agreement, if the Commission desires, the Debtor would agree to accept an assignment of or to assume legal and financial responsibility for the DWR contracts previously allocated to the Debtor for operational and administrative purposes; provided, however, that (i) S&P has issued a long-term issuer credit rating for the Debtor after assumption and on a going-forward basis of not less than A and Moody's has issued an issuer rating for the Debtor of not less than A2, (ii) the Commission first makes a finding that the DWR Contracts being assumed or assigned are just and reasonable, and (iii) the Commission had acted to ensure that the Debtor will receive full and timely recovery in retail electric rates of all such contract costs over the life of the contracts without further review. Under this provision, the Commission shall retain its discretion to review the prudence of the Debtor's administration and dispatch of the DWR contracts, consistent with applicable law.[14]

---

[14]In connection with pre-petition and post-petition claims filed by DWR in the Chapter 11 Case, DWR and the Debtor are in dispute regarding certain matters relating to DWR's revenue requirements and the Debtor's remittances to DWR. DWR asserts as follows:

"DWR asserts that it provided pre-scheduled electric power and has paid for imbalance energy procured by the California Independent System Operator Corporation ('ISO') delivered directly to customers of the Investor Owned Utilities ('IOUs') from January 17, 2001 to December 31, 2002, and has and will continue to provide electric power through long term power contracts. Pursuant to various Commission decisions, including but not limited to Decision No. 012-12-072 (the 'Servicing Order') and the Operating Agreement with PG&E dated April 17, 2003 (the 'Operating Agreement'), PG&E and other IOUs have been collecting payments from their customers for DWR energy.

"Various disputes have arisen between DWR and PG&E relating to responsibility for various charges, the proper methodologies to use in calculating remittances from PG&E to DWR and the actual amount to be remitted. DWR asserts, and PG&E has acknowledged, that the moneys collected by PG&E for DWR energy are DWR moneys which are not property of PG&E's bankruptcy estate and which PG&E is holding in trust for the benefit of DWR until remitted to DWR. In addition, it is DWR's position that, under Commission Decision 02-09-023, modifying Decision 02-03-058, the Commission determined that DWR is only responsible for 'costs associated with procuring energy and energy-related services for the net short. All other costs are PG&E's responsibility.' See D. 02-09-023, at 10.

"To protect its interests, DWR filed several proofs of claim including Claim No. 12323, as amended by Claim No. 12592, in the Chapter 11 Case, to recover, *inter alia*, moneys DWR claimed were owed to it for funds expended in connection with energy purchased under AB1x provided to PG&E customers (the 'DWR Pre-Petition Claims'). In addition, DWR filed post-petition claims pursuant to the order of the Bankruptcy Court
(continued . . . )

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 48 of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

# V. THE REORGANIZATION CASE

## A. COMMENCEMENT OF THE CHAPTER 11 CASE.

The Chapter 11 Case was commenced on April 6, 2001. The Debtor continues to operate its business and manage its properties as a "debtor-in-possession" pursuant to sections 1107 and 1108 of the Bankruptcy Code.

## B. ADMINISTRATION OF THE CHAPTER 11 CASE.

### 1. First Day Orders.

On the Petition Date, the Debtor obtained a series of orders from the Bankruptcy Court designed to minimize any disruption of its business operations and to facilitate its reorganization. The Bankruptcy Court entered orders authorizing the Debtor, among other things, to pay employee compensation and benefits payable for period before the Petition Date and to continue to use its

( . . . continued)
dated August 20, 2001 (the 'DWR Post-Petition Claims').

"The DWR Pre-Petition Claims and DWR Post-Petition Claims, include, *inter alia*, DWR's claims for: Western Area Power Administration ('WAPA') retail remittances which could total in excess of $500 million; DWR's claim for retail remittances for imbalance energy (including OOM); and DWR's claims for certain disputed ISO Charges including Grid Management Charges, that have been determined to be PG&E's responsibility which could total in excess of $101 million. In addition, PG&E and DWR are in dispute regarding which of them has responsibility for January 17-18, 2001 purchases made on behalf of PG&E by the California Power Exchange Corporation which could total in excess of $55 million. Finally, PG&E and DWR have various disputes regarding remittances, including general under-remittances for November and December of 2002 (and potentially other periods) due to PG&E accounting systems and/or methodologies which could total in excess of $83 million; the remittance rate for Interim Renewable Contracts which could total in excess of $16 million; Direct Access Power Charges which could total in excess of $19 million; and Direct Access Bond Charges. The total amount is in excess of $770 million."

The Debtor agrees that the Proposed Settlement Agreement, the Plan and the Confirmation Order are not intended, nor shall they be construed, to affect in any way the rights, obligations and authority of DWR and the Commission under AB 1X as implemented in legally binding determinations and decisions by DWR, the Commission or the courts, and in legally binding agreements between DWR and the Debtor. However, the Debtor disputes DWR's assertions and claims, and further believes that its remittances to DWR are likely to be reduced or offset by reductions in DWR's revenue requirements, including, without limitation, DWR's proposal for a $1 billion reduction in its statewide revenue requirements for 2003. In addition, the Debtor is currently engaged in civil litigation against the DWR in California courts which it believes, if successful, could further significantly reduce its remittances to DWR. The Debtor has filed an objection to the DWR claims, and the Debtor and DWR have agreed to continue the hearing on such objection while they attempt to resolve their disputes amicably and before the Commission. The Debtor's objection remains pending before the Bankruptcy Court.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1   bank accounts, cash management system and corporate investment policy.

2       **2.    Second Day Orders.**

3           On April 9, 2001, the Debtor obtained various orders from the Bankruptcy Court

4   designed to enable the Debtor to continue to fulfill post-petition obligations to suppliers and other

5   creditors without disruption. The Bankruptcy Court granted the Debtor the authority to continue to

6   use its natural gas revenues to secure supplies in an effort to avoid the disruption of service for

7   millions of natural gas customers. In addition, the Bankruptcy Court authorized the interim use of

8   cash collateral in which mortgage bondholders have a beneficial interest and scheduled deadlines

9   relating to a final hearing on the issue.

10      **3.    Third Day Orders.**

11          On April 10, 2001, the Debtor obtained various orders from the Bankruptcy Court that

12  allowed the Debtor to satisfy certain obligations to its customers without disruption. The

13  Bankruptcy Court granted the Debtor the authority to issue refunds of security deposits to residential

14  and non-residential customers as those deposits become eligible for refund through the Debtor's

15  existing deposit refund policies. Based on historical averages, the Debtor refunds approximately

16  $3.5 million in residential and non-residential customer deposits per month. The Bankruptcy Court

17  also granted the Debtor the authority to issue refunds of mainline extension service deposits to

18  individual residential customers pursuant to an order issued the following day. These deposits are

19  required when engineering and construction work is needed to develop bare lots or add new loads to

20  existing service.

21      **4.    Creditors' Committee.**

22          Section 1102 of the Bankruptcy Code requires that as soon as practicable after the

23  commencement of a chapter 11 case, the United States Trustee must appoint an official committee

24  of unsecured creditors. On April 11, 2001, the United States Trustee appointed the Committee. The

25  Committee is comprised of Reliant Energy, Inc., Dynegy Power Marketing, Inc., P-E Berkeley, Inc.,

26  GWF Power Systems Company, Inc., Bank of America, N.A., Morgan Guaranty, Merrill Lynch,

27  Davey Tree Expert Co., the City of Palo Alto, California, the State of Tennessee and Pacific

28  Investment Management Company LLC. Morgan Guaranty, Pacific Investment Management

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-43-

1   Company and Reliant Energy were appointed by the United States Trustee on April 20, 2001,

2   August 8, 2001 and November 9, 2001, respectively, to replace U.S. Bank, the Bank of New York

3   and Enron Corp., respectively, which were initially appointed to, but later resigned from, the

4   Committee. The Committee has retained Milbank, Tweed, Hadley & McCloy LLP as its legal

5   counsel, FTI Consulting (formerly a part of PricewaterhouseCoopers) as its accounting advisor and

6   Saybrook Capital as its financial advisor.

7           **5.      Public Purpose Programs.**

8           On April 24, 2001, the Debtor filed a motion with the Bankruptcy Court asking the court

9   to confirm that the funds collected by the Debtor for its Public Purpose Programs—including energy

10  efficiency, low income, research and development and renewable generation programs—are not part

11  of the bankruptcy estate and can be used to honor obligations incurred before the Petition Date in

12  connection with the programs. At the time of the motion, the Debtor owed approximately $37

13  million to customers who requested rebates and contractors who performed work in homes and

14  businesses to make them more energy efficient. The Debtor operates the most extensive energy

15  efficiency programs in the nation and argued that the continued vitality of the programs is critical to

16  reduce the State's capacity constraints. The Bankruptcy Court approved the Debtor's motion on

17  May 16, 2001.

18          **6.      Assumption of Hydroelectric Power Purchases.**

19          On April 25, 2001, the Debtor filed a motion with the Bankruptcy Court asking the court

20  to authorize it to pay past-due amounts for hydroelectric power purchased under contracts with

21  several California irrigation districts and water agencies. Prior to the Petition Date, the Debtor had

22  made all regular payments due to these irrigation districts and water agencies. As a result of

23  bankruptcy law prohibitions against post-petition payment for services rendered but not yet paid for

24  prior to the Petition Date, however, the Debtor was unable to make $1.6 million in payments. The

25  Bankruptcy Court approved the Debtor's motion on May 25, 2001.

26          **7.      Request for Preliminary Injunction against the ISO.**

27          On May 3, 2001, the Debtor filed an adversary action and a motion for a preliminary

28  injunction in the Bankruptcy Court, asking the court to direct the ISO to comply with bankruptcy

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-44-

1   law, its tariff and a FERC ruling by ceasing to purchase wholesale power on behalf of the Debtor or

2   billing the Debtor for such purchases. The ISO had sent the Debtor a bill for spot market purchases

3   over a two-month period that totaled nearly $1 billion. The Debtor's adversary action, which

4   included a request for a preliminary injunction, asked the court to enjoin the ISO from requiring the

5   Debtor to pay costs the ISO has incurred and continues to incur to purchase wholesale power on its

6   behalf, unless the Debtor can fully recover these costs. The motion was premised upon a FERC

7   order specifying that since the Debtor failed to satisfy the credit requirements under the ISO tariffs,

8   it was not a creditworthy buyer and, consequently, the ISO lacked authority to make real time

9   purchases on its behalf.

10          On June 26, 2001, the Bankruptcy Court issued an injunction prohibiting the ISO from

11  violating the FERC orders discussed above. The Bankruptcy Court noted that the FERC orders

12  permit the ISO to schedule transactions that involve either a creditworthy buyer or a creditworthy

13  counterparty, but recognized that there are unresolved issues regarding how to ensure these

14  requirements for real-time transactions when the ISO has ordered power sellers to respond to the

15  ISO's emergency dispatch orders. The Bankruptcy Court noted that it would consider the foregoing

16  and other appropriate factors if and when it is asked to take action for any violation of its order or is

17  asked to deny a claim arising out of any purchases arranged by the ISO.

18          **8.      Denial of Ratepayers' Committee, TURN's Motion to Intervene and
19                    Government Creditors' Committee.**

20          On May 4, 2001, the United States Trustee appointed a Ratepayers' Committee. On

21  May 9, 2001, the Debtor filed a motion with the Bankruptcy Court asking the court to vacate the

22  United States Trustee's appointment of the Ratepayers' Committee. The filing indicated that the

23  creation of a Ratepayers' Committee exceeded the authority of the United States Trustee because it

24  was inconsistent with express provisions of the Bankruptcy Code. On May 18, 2001, the

25  Bankruptcy Court granted the Debtor's motion and vacated the Ratepayers' Committee. On July 10,

26  2001, the Bankruptcy Court denied a motion by the United States Trustee and the putative

27  Ratepayers' Committee for reconsideration of its order vacating the Ratepayers' Committee.

28          On November 5, 2001, The Utility Reform Network ("TURN") filed a motion to

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   intervene on behalf of residential and small business ratepayers. The Bankruptcy Court denied the
2   motion on December 3, 2001 since TURN is already a creditor in the Chapter 11 Case and has the
3   ability to appear and be heard in that capacity.

4           In November 2001, a group of seven (7) California cities and counties moved for the
5   appointment of a government creditors' committee. The Bankruptcy Court denied the motion on
6   December 7, 2001.

7           **9.    Authorization of Employee-Related Matters.**

8           On May 25, 2001, the Debtor filed a motion requesting authorization with respect to a
9   variety of employee-related matters, including: making payments for severance and transition
10  payable before the Petition Date to employees who worked on now-divested power plants; making
11  payments to administrative, technical and lower-level management employees (including hundreds
12  of first-line supervisors) payable before the Petition Date under various existing incentive and
13  recognition programs; implementing a retention program designed to retain a small number of
14  essential employees who are necessary to the reorganization process and the continuation of the
15  operation and maintenance of the gas and electric transmission and distribution facilities and
16  generation facilities; and continuing its existing severance program. The Bankruptcy Court
17  approved the Debtor's motion regarding each employee-related matter, other than the management
18  retention program, on June 28, 2001, and approved the Debtor's motion regarding the management
19  retention program on July 13, 2001.

20          **10.   Transition Period Accounting Proposal.**

21          On March 27, 2001, the Commission issued a regulatory accounting order (the "TURN
22  Accounting Order") that required the Debtor to restate all of its regulatory books and accounts
23  retroactively to January 1, 1998, by transferring on a monthly basis the balance in the Debtor's TRA
24  to the Debtor's TCBA. Thus, rather than transferring only the monthly "headroom" to pay down
25  transition costs in the months that revenues exceeded the costs of service, the Commission changed
26  the accounting rules to require the transfer of the monthly balance in the TRA, regardless of whether
27  it was overcollected or undercollected. The retroactive transfer of a TRA undercollection had the
28  effect of reversing some previously recorded transition cost recovery, and instead applying the prior

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  headroom to offset the undercollection of some procurement costs.  Depending on the amount and

2  timing of generation valuation, it is possible that the effect of the TURN Accounting Order would be

3  that such transition costs have not been fully recovered and the conditions for meeting the rate freeze

4  have not been met.  The Debtor's Application for Rehearing of the TURN Accounting Order was

5  denied by the Commission, and its petitions for writ of review of the Commission's decisions were

6  summarily denied by the California courts.

7  On April 9, 2001, the Debtor asked the Bankruptcy Court to stay the Commission's

8  TURN Accounting Order.  On June 1, 2001, the Bankruptcy Court denied with prejudice the

9  Debtor's request for a stay and an injunction on the transition period accounting proposal.  The

10  Debtor appealed the Bankruptcy Court's decision to the United States District Court for the

11  Northern District of California, which appeal is still pending.

12  ### 11. Omnibus Motions.

13  On June 6, 2001, the Debtor, with the approval of the Committee, filed a series of

14  "omnibus" motions with the Bankruptcy Court requesting authorization for the Debtor to enter into

15  a range of transactions in the course of its business within certain specified parameters and without

16  further motion or court approval.  These motions included requests for authorization for the Debtor

17  to settle post-petition third-party claims, make capital expenditures and continue its environmental

18  programs, in each case subject to specified per transaction or aggregate dollar limitations.  The

19  Bankruptcy Court approved all of the omnibus motions at the hearing on the motions held on

20  June 26, 2001, and subsequently issued its orders granting the motions.  In addition, in October

21  2001, the Bankruptcy Court granted a motion filed by the Debtor for authority to sell or otherwise

22  dispose of real and personal property and enter into certain lease, license and permit transactions,

23  within specified parameters.

24  ### 12. QF Agreements.

25  As of the Petition Date, the Debtor was party to approximately 330 power purchase

26  agreements ("PPAs") with various QFs.  Almost immediately after the Petition Date, several of the

27  QFs filed motions requesting various forms of relief, including:  (a) relief from the automatic stay to

28  permit the QFs to "suspend" deliveries of energy to the Debtor and sell into the market, pending the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

Debtor's assumption or rejection of the QF power purchase agreements, (b) an order requiring the Debtor to decide immediately whether to assume or reject the power purchase agreements, (c) an order requiring the Debtor to pay "market rates" for energy delivered under the power purchase agreements, rather than at the contract rate, and (d) an order requiring the Debtor to "pre-pay" for deliveries under the power purchase agreements. The Debtor opposed these motions on a number of grounds.

Following negotiations between the Debtor and the QFs, in July 2001, 197 QFs elected to adopt Commission-approved amendments to their PPAs to fix their energy payments at $0.0537 per kWh for five years. In December 2001, the Bankruptcy Court approved supplemental agreements between the Debtor and most QFs to resolve the applicable interest rate to be applied to amounts payable to QFs before the Petition Date. The Supplemental Agreements:

- set the interest rate for payables incurred before the Petition Date at five percent (5%) per annum;

- provided for a "catch up payment" of all accrued and unpaid interest through the initial payment date; and

- depending on the amount owed, provided for either (a) a lump-sum payment of the principal amount of the pre-petition payables and interest thereon, or (b) 6 or 12 monthly payments beginning on the last business day of the month during which the Bankruptcy Court approval of the Supplemental Agreement was granted. In the event the Effective Date occurs before the last monthly payment is made, the remaining unpaid principal and accrued but unpaid interest thereon shall be paid in full on the Effective Date.

The total amount the Debtor owed to the QFs when it filed the Chapter 11 Case was approximately $1 billion. The principal payments to the QFs amounted to $901 million in 2001 and 2002 and the interest payments amounted to $44 million in 2002 and $16 million in 2001.

Approximately 280 of the 313 QFs have signed assumption and/or supplemental agreements. The Debtor believes it will be able to enter into similar agreements with some of the remaining QFs.

### 13. Claims Management Motions.

On December 7, 2001, the Debtor filed two motions to expedite the process of settling and objecting to Claims. In the first motion, the Debtor sought authority to settle certain Claims without the burden and expense of seeking review by the Committee and other parties in interest,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    and without Bankruptcy Court approval of each proposed settlement. Over 13,000 proofs of claim

2    have been filed in this Chapter 11 Case, the vast majority of which were filed in an amount less than

3    $100,000. Accordingly, the Debtor sought the authority to settle any Claim (a) where the proposed

4    Allowed amount of such Claim is $100,000 or less and (b) where the proposed Allowed amount

5    exceeds $100,000 but is no more than $5.0 million, and is the lesser of (i) one hundred ten percent

6    (110%) of the amount of such Claim as set forth on the Debtor's Bankruptcy Schedules, and

7    (ii) $500,000 more than the amount of such Claim as set forth on the Debtor's Bankruptcy

8    Schedules. The requested authority enables the Debtor to reduce professional fees and other costs

9    for all affected parties in interest, provide flexibility to expeditiously resolve Claims and facilitate

10   the efficient administration of the estate. The Bankruptcy Court approved the motion at a hearing

11   held on December 27, 2001. Excepted from the authority to settle without Bankruptcy Court

12   approval are Claims of the Parent or any affiliate of the Parent, any officer or director of the Debtor

13   or the Parent or any member of the Committee.

14          In the second motion, the Debtor sought authority to file and seek adjudication of certain

15   preliminary omnibus or grouped objections to Claims on preliminary, but potentially dispositive,

16   grounds that can be addressed with a minimum expenditure of judicial time and estate resources,

17   without waiving the right to assert subsequent substantive objections to the same Claims if

18   necessary. For example, the Debtor asserted preliminary objections on the grounds that, among

19   other things, (a) certain Claims are duplicative, (b) certain Claims have been satisfied or otherwise

20   resolved, (c) certain Claims are time-barred, and (d) certain claims lacked adequate documentation.

21   This objection procedure was designed to allow the efficient and expeditious determination of

22   certain Claims aggregating billions of dollars without lengthy hearings on the merits. The

23   Bankruptcy Court approved the motion at a hearing held on December 27, 2001 and also ordered the

24   suspension of the application of Bankruptcy Rule 7026(a) and (f) to the Claims objections

25   proceedings, on the condition that any claimant whose Claim is subject to an objection be notified

26   that it may request application of such rule, and that the Bankruptcy Court will consider such request

27   at the first hearing on the objection.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 56
of 100

**14. Stipulation with Letter of Credit Issuing Banks and the Banks.**

Pursuant to an order dated September 7, 2001, the Bankruptcy Court approved a stipulation between the Debtor, on the one hand, and the Letter of Credit Issuing Banks and the Banks, on the other hand (the "Class 4e Stipulation"). The Class 4e Stipulation provides, among other things, that, in exchange for the Letter of Credit Issuing Banks and the Banks agreeing to continue to maintain and reinstate the Letters of Credit, any Post-Petition Interest drawings under the Letters of Credit will constitute Allowed Claims in favor of the Letter of Credit Issuing Banks and the Banks. See Section IX.A.13 of this Disclosure Statement for a description of the treatment of Class 4e under the Plan.

**15. Motion to Assume Main Line Extension Contracts.**

On December 27, 2001, the Debtor filed a motion for authorization to assume executory main line extension contracts and pay outstanding amounts due under non-executory main line extension contracts. The Debtor sought authorization to pay an estimated $89 million over a period of nine months to parties to approximately 50,000 main line extension contracts with respect to four types of payments: (a) return of project deposits; (b) payment for work requested by the Debtor that generally would otherwise be the responsibility of the Debtor; (c) payment for inspection fees; and (d) main line extension refunds. The Bankruptcy Court approved the motion at a hearing held on February 6, 2002.

**16. Stipulation between Palo Alto, NCPA and the Debtor Regarding the Stanislaus Commitments.**

On February 11, 2002, the Debtor entered into a stipulation with the Northern California Power Agency ("NCPA") and the City of Palo Alto ("Palo Alto") relating to the Stanislaus commitments. NCPA is a joint-powers agency that generates, transmits and distributes power to and on behalf of member cities and districts. The Stanislaus commitments refer to certain antitrust license conditions included in the Debtor's Diablo Canyon Power Plant NCR licenses, as implemented in a 1991 settlement agreement between NCPA and the Debtor in a NRC proceeding. In general terms, the Stanislaus commitments require the Debtor to make available electric transmission and interconnection services to the NCPA and its member entities.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    The Debtor has agreed, among other things, that the resolution of this Chapter 11 Case
2    will have no adverse effect on the ability of the Reorganized Debtor to fulfill the obligations in the
3    Stanislaus commitments.

4    ### 17.  **Estimation of Antitrust Claims.**

5    Following the filing of the Original PG&E Plan and the Commission Plan, the Northern
6    California Power Agency, the City of Palo Alto, and the City of Santa Clara (collectively,
7    "Municipal Objectors") filed objections contending that both the Original PG&E Plan and the
8    Commission Plan were not feasible because they did not provide a reserve for alleged damages
9    attributable to certain disputed and unliquidated claims of the Municipal Objectors based on
10   PG&E's alleged breaches of the Stanislaus commitments and Section 2 of the Sherman Act and
11   related alleged wrongs (collectively, the "Municipal Claims"). In general, these Claims concerned
12   the Municipal Objectors' assertions that PG&E had abused its alleged monopoly power in electrical
13   transmission or distribution to deny the Municipal Objectors reasonably priced transmission services
14   and otherwise to increase the Municipal Objectors' costs. In November 2002, the Municipal
15   Objectors and PG&E entered into a stipulation, the ("Estimation Stipulation"), which provided that
16   the Bankruptcy Court would estimate the Municipal Claims solely for purposes of determining plan
17   feasibility. The Estimation Stipulation provided for a three-day estimation trial, with a maximum of
18   five percipient witnesses and three expert witnesses per party, together with such written exhibits
19   (including deposition testimony and declarations) and demonstrative exhibits as each party offered.

20   The matter proceeded to trial on January 27, 2003. Through their damages expert, the
21   Municipal Objectors asserted that the present value of the Municipal Claims was between $452.1
22   and $1,213.6 million. The Municipal Objectors asserted that these damages would be subject to
23   automatic trebling under the antitrust laws, resulting in a present value damages figure as high as
24   $3.64 billion. In response, PG&E asserted that no violation of the antitrust laws had occurred and
25   that the damages figures advanced by the Municipal Objectors were defective as a matter of law.
26   The trial concluded on January 29, 2003. Thereafter, the parties submitted proposed findings of fact
27   and conclusions of law.

28   On May 15, 2003, the Bankruptcy Court entered its Memorandum Decision on

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    Estimation of Antitrust Claims and a companion Order on Estimation of Antitrust Claims.  Solely

2    for purposes of estimation for feasibility, the Bankruptcy Court found that PG&E had monopoly

3    power in electrical distribution and that PG&E and the Municipal Objectors were competitors, and

4    that PG&E transmission infrastructure was an "essential facility."  However, the Bankruptcy Court

5    also found, subject to the same qualifications, that any antitrust claims advanced by the Municipal

6    Objectors would fail because the Municipal Objectors failed to establish that PG&E denied them

7    access to its transmission system or made the cost of such access so high as to drive the Municipal

8    Objectors from the market, and that, at least until a new market structure is determined, it was not

9    clear that there would be a "regulatory gap" in pricing.  The Bankruptcy Court further found that

10   even if an antitrust claim could be established, PG&E likely had business justification defenses for

11   its actions in divesting a portion of its local generation capacity to third parties, refusing to sell the

12   Municipal Objectors a portion of the transmission system, and terminating certain prior contractual

13   arrangements with the Municipal Objectors, but that PG&E had failed to carry its burden to establish

14   a business justification defense for its transmission planning decisions.  The Bankruptcy Court also

15   found that PG&E likely would be unable to establish a state action immunity defense to all of its

16   actions.  Finally, the Bankruptcy Court found that the damages estimate advanced by the Municipal

17   Objectors was highly speculative and failed to account for the many ways in which the damages

18   might be reduced or eliminated.

19        On the basis of these findings, the Bankruptcy Court entered an order in which it

20   estimated the Municipal Claims "as having no value for purposes of feasibility under 11 U.S.C.

21   §1129(a)(11)."  The Municipal Objectors did not appeal this order.

22        **18.  Settlement and Support Agreement with Senior Debtholders; and Agreement
         with Letter of Credit Issuing Banks.**

23

24        a.    Settlement and Support Agreement with Senior Debtholders.

25        On March 27, 2002, the Bankruptcy Court issued its "Order on Motion by Pacific Gas

26   and Electric Company for Order (A) Approving Settlement and Support Agreement By and Among

27   Plan Proponents and Senior Debtholders, (B) Authorizing Payment of Pre- and Post-Petition Interest

28   to Holders of Undisputed Claims in Certain Classes, (C) Authorizing Payment of Fees and Expenses

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

-52-

1   of Indenture Trustees and Paying Agents and (D) Authorizing Debtor to Enter into Similar

2   Agreements" (the "Settlement Order"). The Settlement Order approved the Settlement and Support

3   Agreement between the Proponents and certain holders of Senior Indebtedness (the holders of

4   approximately $2 billion in Commercial Paper Claims, Floating Rate Note Claims, Medium Term

5   Note Claims, Senior Note Claims and Revolving Line of Credit Claims); authorized the Debtor to

6   pay Pre-Petition Interest and Post-Petition Interest to certain holders of undisputed Claims entitled to

7   interest under the Plan on a quarterly basis, and authorized the Debtor to pay the fees and expenses

8   of the holders of Senior Indebtedness who are parties to the Settlement and Support Agreement,

9   indenture trustees and administrative banks and other paying agents on a current basis.

10          Pursuant to the Settlement and Support Agreement, the principal amount of the Allowed

11  Claims in Class 5 held by the holders of Senior Indebtedness who are parties thereto is fixed, and

12  interest will accrue and be paid at certain agreed-upon rates, but such accrual and payment at the

13  agreed-upon rates may cease and prior payments of interest may be recharacterized under certain

14  circumstances, including (a) a determination by the Bankruptcy Court that the Debtor is insolvent,

15  (b) the confirmation of a plan of reorganization other than the Original PG&E Plan, and (c) certain

16  breaches of the Settlement and Support Agreement by such holders. The Plan incorporates the

17  provisions of the Settlement and Support Agreement, except those provisions that are rendered

18  inapplicable because of the payment of Senior Indebtedness and certain other Claims in Cash under

19  the Plan.

20          b.      Agreement With Letter of Credit Issuing Banks.

21          Subsequent to the entry of the Class 4e Stipulation (discussed in Section V.B.14 above),

22  the Debtor, the Letter of Credit Issuing Banks and the Banks entered into discussions regarding an

23  agreement with respect to the treatment under the Plan of the Allowed Claims in Class 4e which

24  would, at the same time, allow the Debtor to retain the benefits of the tax-free financing provided by

25  the Letter of Credit Backed PC Bonds. In general, the agreement provides, subject to certain

26  conditions, that in exchange for the payment of various amounts to the Letter of Credit Issuing

27  Banks and the Banks, such entities will extend the Letters of Credit and forbear from terminating the

28  Letters of Credit or causing the mandatory tender or redemption of the Letter of Credit Backed PC

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    Bonds for a period of time. The agreement also provides for certain treatment for the Claims of

2    Class 4e creditors under the Plan. The Bankruptcy Court entered an order approving the agreement

3    on April 9, 2002, and approving an amended and restated agreement on June 17, 2002, thus

4    resulting in the treatment of the Claims in Class 4e as described in Section IX.A.13 below.

5                    **19.    Motion Seeking Authorization to Pay Certain Claims.**

6                    At a hearing held on March 25, 2002, the Bankruptcy Court granted a motion filed by

7    the Debtor seeking authorization to pay certain valid Claims made before the Petition Date;

8    specifically, Allowed Claims for amounts of $5,000 or less (or voluntarily reduced by the claimant

9    to $5,000), undisputed mechanics' lien claims and undisputed reclamation claims. Pursuant to the

10   motion, the Debtor paid all such claims on or before July 31, 2002, with interest at the Federal

11   Judgment Rate from the Petition Date through June 30, 2002.

12                   **VI.    HISTORY OF THE PLAN OF REORGANIZATION**

13                   On September 20, 2001, the Debtor and the Parent, as co-proponents (the "PG&E

14   Proponents"), filed the Original PG&E Plan, which provided, generally, for the payment in full of

15   all of the Debtor's obligations, either in cash, in notes, or in a combination of cash and notes to be

16   distributed to creditors, and for the disaggregation of the Debtor's businesses. That plan was

17   amended and modified a number of times, with the most recent modification to the Original PG&E

18   Plan having been filed on May 22, 2003.

19                   On April 15, 2002, the Commission filed its original plan of reorganization for the

20   Debtor. Subsequently, the Commission and the Committee filed an amended plan of reorganization

21   for the Debtor, dated August 30, 2002, and filed further amended plans on November 6, 2002 and on

22   December 5, 2002, with the last such filing constituting the Commission Plan.

23                   The Bankruptcy Court commenced confirmation hearings on the competing plans of

24   reorganization on November 18, 2002. During the confirmation hearing on the Original PG&E

25   Plan, the Bankruptcy Court entered an order mandating a judicial settlement conference and, on

26   March 11, 2003, entered an order staying further confirmation and related proceedings for sixty (60)

27   days to facilitate the mandatory settlement process. On April 23, 2003, the Bankruptcy Court issued

28   an order staying further confirmation and related proceedings for an additional thirty (30) days, and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 61
of 100

1  scheduled a status conference for June 16, 2003. Pursuant to an order dated June 5, 2003, the
2  Bankruptcy Court extended the stay of proceedings until, and continued the status conference to,
3  June 20, 2003.

4        Through the settlement process, the Proposed Settlement Agreement was reached.
5  Pursuant to the Proposed Settlement Agreement, which is supported by the staff of the Commission
6  but is subject to review and approval by the Commission after public hearings, the Debtor and the
7  Commission agree to jointly support a proposed new plan of reorganization to be submitted to the
8  Bankruptcy Court that embodies the terms and conditions contained in the Proposed Settlement
9  Agreement. Upon being informed of the Proposed Settlement Agreement, at the June 20, 2003
10  Status Conference, the Bankruptcy Court stayed indefinitely all confirmation and related
11  proceedings in connection with the competing plans and scheduled a hearing to approve this
12  Disclosure Statement for July 30, 2003. On July 31, 2003, the Proponents filed this Disclosure
13  Statement and the Plan, pursuant to the Proposed Settlement Agreement. The Proposed Settlement
14  Agreement constitutes an integral and material part of the Plan and is incorporated in the Plan by
15  reference and made a part of the Plan with the same force and effect as if stated verbatim therein.

16  ## VII.  SUMMARY OF THE PROPOSED SETTLEMENT AGREEMENT.

17        The parties to the Proposed Settlement Agreement would be the Debtor, the Parent and
18  the Commission. Pursuant to the Proposed Settlement Agreement, the Debtor would no longer
19  propose to disaggregate its historic businesses, instead remaining a vertically-integrated utility under
20  Commission regulation. The Proposed Settlement Agreement states that it is in the public interest to
21  restore the Debtor to financial health and maintain and improve its financial condition in the future
22  to ensure that it is able to provide safe and reliable electric and gas service to its customers at just
23  and reasonable rates. The parties to the Proposed Settlement Agreement intend that the Debtor
24  emerge from Chapter 11 as soon as possible with an investment grade credit rating, and that the
25  Debtor's credit rating will improve over time. The Proposed Settlement Agreement states that
26  investment grade credit ratings are necessary for the Debtor to emerge from Chapter 11 and will
27  directly benefit the Debtor's ratepayers by reducing the cost of financings required for emergence
28  and required to fund future operations and capital expenditures. The parties would state that it is fair

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    and in the public interest to allow the Debtor to recover, over a reasonable period of time, prior

2    uncollected costs and to provide the opportunity for the Debtor's shareholders to earn a reasonable

3    rate of return on the Debtor's utility business. Under the Proposed Settlement Agreement, the

4    parties expect that retail electric rates charged by the Debtor will be reduced on January 1, 2004,

5    with further reductions expected thereafter. The Debtor would release claims against the

6    Commission that would have been retained by the Debtor or the Parent under the Original PG&E

7    Plan. In lieu of these claims and the value created under the Original PG&E Plan, the Debtor's

8    shareholder would receive value over nine years through the Proposed Settlement Agreement, the

9    Plan and the Confirmation Order.

10           The Proposed Settlement Agreement is subject to the approval of the Debtor's and the

11   Parent's respective boards of directors, approval by the Commission, and execution by the parties on

12   or before December 31, 2003. The Commission is expected to conduct an extensive public hearing

13   process before deciding whether to approve the Proposed Settlement Agreement, and has adopted a

14   schedule for such hearing process. The hearing process commenced on July 25, 2003. The Debtor

15   expects the Commission to issue a proposed decision on November 18, 2003 and a final decision on

16   December 18, 2003.

17           Once executed, the Proposed Settlement Agreement would terminate at the end of nine

18   years, except that all rights of the parties under the Proposed Settlement Agreement that have vested

19   before the end of nine years would survive the termination for the purpose of enforcing such vested

20   rights.

21           The Proposed Settlement Agreement is expressly conditioned on the preparation and

22   filing of the Plan and this Disclosure Statement, approval by the Bankruptcy Court of the Plan and

23   this Disclosure Statement and the Confirmation Order, each in form and substance reasonably

24   satisfactory to each party. The Proposed Settlement Agreement provides, among other conditions,

25   that the Plan would not become effective until Standard & Poors ("S&P") has issued a long-term

26   issuer credit rating for the Debtor of not less than BBB- and Moody's has issued an issuer rating for

27   the Debtor of not less than Baa3, and the Commission has given final, nonappealable approval for

28   all rates, tariffs, and agreements necessary to implement the Plan, although the Parent and the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Debtor may waive the finality provision with respect to any appeal of the Commission's approvals.

2  Among other things, the Proposed Settlement Agreement provides for the terms and

3  conditions described below.

4  ## A.  REGULATORY ASSET.

5  The Commission would establish a $2.21 billion regulatory asset as a new, separate and

6  additional part of the Debtor's[15] rate base that would be amortized on a mortgage-style basis over

7  nine (9) years beginning January 1, 2004.  The regulatory asset would earn a return on equity of no

8  less than 11.22% for the life of the asset and, after the equity component of the Debtor's capital

9  structure reaches 52%, the authorized equity component of the regulatory asset would be no less

10 than 52% for the remaining life of the asset.  The Commission would use its usual methodology for

11 tax-effecting the return on equity component of the regulatory asset in connection with establishing

12 the Debtor's revenue requirements for the regulatory asset.  In the event that the Debtor is required

13 to pay income taxes on the regulatory asset any earlier than it is amortized, the Commission would

14 authorize the Debtor to establish a tax tracking account to record the difference between taxes that

15 would have been incurred on account of the regulatory asset had it been taxed as it was amortized,

16 and taxes on the regulatory asset plus interest imposed by federal or state tax authorities with respect

17 to any earlier recognition of taxable income.  The tax tracking account would earn the authorized

18 rate of return provided for the regulatory asset and be amortized in rates over the greater of the

19 remaining life of the regulatory asset or five years.

20 The Debtor would commit to continue to cooperate with the Commission and the State

21 in seeking refunds from power generators and other energy suppliers.  The net after-tax amount of

22 any refunds, claim offsets or other credits from generators or other energy suppliers relating to the

23 Debtor's power procurement costs that are actually realized by the Debtor in cash or by offset of

24 creditor claims in the Chapter 11 Case would reduce the outstanding balance and the remaining

25 amortization of the regulatory asset, dollar for dollar.  Similarly, the net after-tax amount of any

---

27 [15]As used in this section, the term "Debtor" includes the "Reorganized Debtor," as
28 appropriate.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  consideration actually received by the Debtor that resolves the litigation in Public Utilities

2  Commission of California v. El Paso Natural Gas Co., et al., FERC Docket No. RP00-241-000 et al.,

3  and related state and federal court litigation, in settlement of damages claimed by the Debtor to have

4  caused it to incur high costs of electricity from March 1, 2000 to date, would be applied to reduce

5  the outstanding balance of the regulatory asset and remaining amortization of the regulatory asset,

6  dollar for dollar, provided that such a reduction is consistent with rules or orders of the Commission

7  relating to the consideration. See Section VIII.F. of this Disclosure Statement for a discussion of the

8  El Paso litigation and settlement.

9          Balances in the Debtor's TCBA as of the Effective Date and as determined by the

10  Commission in accordance with its Decision No. 01-03-082 would have no further impact on the

11  Debtor's retail electric rates and would not be subject to further Commission review, except for

12  verification of recorded balances, and the Debtor's current rates would be replaced by the retail

13  electric rates adopted pursuant to the Plan as of January 1, 2004, subject to certain exceptions.

14          To ensure that the Debtor receives the benefit of the Proposed Settlement Agreement

15  over the entire life of the regulatory asset, the Debtor's rate base for its utility retained generation, or

16  "URG," already established by the Commission pursuant to an April 2002 decision, would be

17  deemed just and reasonable and would not be subject to modification, adjustment or reduction,

18  except as necessary to reflect capital expenditures and any change in authorized depreciation;

19  provided, however, that the Commission would not be precluded from determining the

20  reasonableness of any capital expenditures made on URG after the Effective Date of the Plan. The

21  Commission would not in any way reduce or impair the value of the regulatory asset or the URG

22  rate base by taking the regulatory asset or the URG rate base, their amortization or earnings into

23  account when setting other revenue requirements of the Debtor and resulting rates. The

24  Commission also would not take the Proposed Settlement Agreement or the regulatory asset into

25  account in establishing the Debtor's authorized return on equity or capital structure, except as

26  specified in the Proposed Settlement Agreement.

27          In recognition of the importance of the Debtor's investment grade credit ratings in order

28  to provide safe and reliable service to customers and reduce the financing costs to customers of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-58-

1  Debtor's immediate and future borrowing and capital expenditure needs, the Commission would

2  agree to act to facilitate and maintain company investment grade credit ratings for the Debtor.  The

3  Commission also would timely act upon the Debtor's applications to collect in rates prudently

4  incurred costs (including return of and return on) of any new, reasonable investments in utility plant

5  and assets.  The Commission would promptly adjust the Debtor's rates consistent with AB 57 and

6  SB 1976 and the Commission-DWR rate agreement to ensure that the Debtor's collection of fixed

7  transition amounts to service existing rate reduction bonds, regulatory asset amortization and return,

8  and base revenue requirements (e.g., electricity and natural gas distribution, URG, gas commodity

9  procurement, existing qualifying facility contract costs and associated return) is not impaired.  The

10  Commission would not discriminate against the Debtor because of the Chapter 11 Case, the

11  Debtor's pending federal lawsuit against the Commission Commissioners to recover its previously

12  incurred costs of providing electric service from ratepayers under the federal filed rate doctrine, the

13  Proposed Settlement Agreement, the regulatory asset, or any other matters addressed or resolved by

14  the Proposed Settlement Agreement.

15      **B.  RATEMAKING MATTERS.**

16      The Commission would maintain the Debtor's retail electric rates at current levels

17  through December 31, 2003.  Thereafter, the Commission may adjust the Debtor's retail electric

18  rates prospectively consistent with the Proposed Settlement Agreement, the Plan, the Confirmation

19  Order and California law.

20      The Commission would set the Debtor's capital structure and authorized return on

21  equity in the Debtor's annual cost of capital proceedings in its usual manner; provided, however,

22  that, from January 1, 2004 until S&P has issued a long-term issuer credit rating for the Debtor of at

23  least A- or Moody's has issued an issuer rating for the Debtor of not less than A3, the authorized

24  return on equity would be no less than 11.22% per year and the authorized equity ratio for

25  ratemaking purposes would be no less than 52%, except that for 2004 and 2005, the authorized

26  equity ratio would equal the greater of the Forecast Average Equity Ratio (as defined in the

27  Proposed Settlement Agreement) or 48.6%.

28

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 66
of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

**C. IMPLEMENTATION OF RATEMAKING.**

As soon as practicable after Commission approval of the Proposed Settlement Agreement, the Debtor would be required to file an advice letter to implement all the rate and tariff changes necessary to implement the Plan. The Commission would act promptly on the advice filing and revised rates and tariffs and review and issue a decision promptly on the merits of any application for rehearing of the approval of the advice filing. The Commission also would act promptly on certain of the Debtor's pending ratemaking proceedings, including the Debtor's pending 2003 general rate case.

**D. DIVIDEND PAYMENTS AND STOCK REPURCHASES.**

There would be no restrictions on the ability of the Parent's or the Debtor's respective boards of directors to declare and pay dividends or repurchase common stock, other than the capital structure and stand-alone dividend conditions contained in prior Commission decisions authorizing the formation of the Parent as a holding company; provided, however, that the Debtor would agree that it would not pay dividends on its common stock before July 1, 2004. The Commission's jurisdiction and authority to enforce the holding company conditions are otherwise unaffected by the Proposed Settlement Agreement.

**E. DWR CONTRACTS.**

The Commission could require the Debtor to accept assignment of, or assume legal and financial responsibility for, the DWR Contracts previously allocated to the Debtor for operational and administrative purposes only if, (i) S&P has issued a long-term issuer credit rating for the Debtor after assumption and on a going-forward basis of not less than A and Moody's has issued an issuer rating for the Debtor of not less than A2, (ii) the Commission first makes a finding that the DWR Contracts being assumed or assigned are just and reasonable, and (iii) the Commission had acted to ensure that the Debtor will receive full and timely recovery in retail electric rates of all such contract costs over the life of the contracts without further review. The Commission would retain the right to review the prudence of the Debtor's administration and dispatch of the DWR Contracts, consistent with applicable law.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

## F.   HEADROOM REVENUES.

The headroom (as defined in the Proposed Settlement Agreement), surcharge and base revenues accrued or collected by the Debtor through December 31, 2003 would be the property of the Debtor's Chapter 11 estate, and the Commission would agree that such revenues have been or will be used for utility purposes, including to pay claims in the Chapter 11 Case, have been included in the Debtor's retail electric rates consistent with state and federal law, and are not subject to refund.  The Proposed Settlement Agreement provides that if headroom revenues accrued by the Debtor during 2003 are greater than  $875 million, pre-tax, the Debtor would refund the excess to ratepayers, and if headroom revenues are less than $775 million, pre-tax, the Commission would allow the Debtor to collect the shortfall in rates.

## G.   DISMISSAL OF RATE RECOVERY LITIGATION, AND CERTAIN OTHER LITIGATION AND PROCEEDINGS.

On or as soon as practicable after the later of the Effective Date or the date that Commission approval of the Proposed Settlement Agreement is no longer subject to appeal, the Debtor would dismiss with prejudice the Rate Recovery Litigation (as defined in the Plan) and withdraw the Original PG&E Plan (described in Section VIII.A of this Disclosure Statement).  In exchange, before January 1, 2004, the Commission would establish and authorize the collection of the regulatory asset and the URG rate base for its retained generation, and on or as soon as practicable after the Effective Date, the Commission would resolve phase 2 of the pending annual transition cost proceeding in which the Commission is reviewing the reasonableness of the Debtor's energy crisis procurement costs, with no adverse impact on the Debtor's cost recovery as requested.

On or as soon as practicable after the later of the Effective Date of the Plan or the date that Commission approval of the Proposed Settlement Agreement is no longer subject to appeal, the Parent and the Debtor, on the one hand, and the Commission, on the other hand, would execute full mutual releases and dismissals with prejudice of certain claims, actions or regulatory proceedings arising out of or related in any way to the energy crisis or the implementation of AB 1890, including the Commission's investigation into past holding company actions during the energy crisis (but only as to past actions, not prospective matters).  A complete list of the claims, actions and regulatory

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  proceedings to be so released and dismissed is set forth on Appendix C to the Proposed Settlement

2  Agreement.

3  **H.   WITHDRAWAL OF APPLICATIONS IN CONNECTION WITH THE**

4  **ORIGINAL PG&E PLAN.**

5       The Parent and the Debtor have requested a stay of all proceedings before the FERC, the

6  NRC, the SEC and other regulatory agencies relating to approvals sought to implement the Original

7  PG&E Plan, and also to suspend all actions to obtain or transfer licenses, permits and franchises to

8  implement the Original PG&E Plan.  The Parent and the Debtor have agreed that, promptly upon the

9  Effective Date, the Debtor and the Parent would withdraw or abandon all applications for these

10  regulatory approvals and related licenses, permits and franchises.  A complete list of such

11  applications is set forth on Appendix D to the Proposed Settlement Agreement.

12       The Debtor and the Parent also would agree that for the life of the regulatory asset

13  established by the Proposed Settlement Agreement, neither they nor any of their affiliates or

14  subsidiaries will make any filing under Sections 4, 5 or 7 of the Natural Gas Act to transfer

15  ownership of or ratemaking jurisdiction over the Debtor's intrastate natural gas pipeline and storage

16  facilities, and to keep such natural gas pipeline and storage facilities subject to the regulation of the

17  Commission.  In addition, the Debtor and the Parent would agree that the Commission has

18  jurisdiction to review and approve any proposal by the Debtor to dispose of property necessary or

19  useful in the performance of the Debtor's duties to the public as a public utility under California law.

20  **I.   ENVIRONMENTAL MEASURES.**

21       The Debtor would implement the following environmental enhancement measures:

22       •  the Debtor would encumber with conservation easements or donate
           approximately 140,000 acres of specific watershed and other lands to
23         public agencies or non-profit conservation organizations, and its
           obligation to do so would continue beyond the nine-year term of the
24         Proposed Settlement Agreement;

25       •  the Debtor would create a California non-profit corporation to oversee
           environmental enhancements associated with these lands and fund such
26         corporation with $70 million over ten (10) years, although it would be
           entitled to recover these payments in rates without further review;

27

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

- the governing board of the non-profit corporation would develop a conservation easement and land donation/disposition plan consistent with Appendix E of the Proposed Settlement Agreement; and

- the Debtor would create a non-profit corporation funded by shareholders with $15 million over five (5) years dedicated to support research and investment in clean energy technology, primarily in the Debtor's service territory.

Nothing in the environmental enhancement measures would affect any California state agency's or entity's statutory authority. Similarly, the Debtor expects that its rates will continue to cover the costs of property taxes and ordinary maintenance of owned lands as well as the costs of compliance with all regulatory requirements applicable to the lands, including the licenses that apply to lands within hydroelectric project boundaries. The land conservation commitment specifies that any environmental enhancements to the land undertaken by the non-profit corporation may not interfere with the Reorganized Debtor's or a joint licensee's hydroelectric operations, maintenance or capital improvements, but this does not apply to activities that may be required by government agencies pursuant to their regulatory authority. Nothing in Paragraph 17 or Appendix E of the Proposed Settlement Agreement is intended to be or shall be construed as a waiver of sovereign immunity by the state entities who may serve on the governing board of the Environmental Enhancement Corporation.

While the Bankruptcy Court would have exclusive jurisdiction over any claim that the Reorganized Debtor has failed to fulfill its obligations under the Plan, including the environmental enhancement measures, any future disputes with the governing board of the non-profit corporation would not be within the Bankruptcy Court's exclusive jurisdiction.

## J. WAIVER OF SOVEREIGN IMMUNITY.

Under the Proposed Settlement Agreement, the Commission would waive all existing and future rights of sovereign immunity, and all other similar immunities, as a defense in connection with any action or proceeding concerning the enforcement of the Proposed Settlement Agreement, the Plan or the Confirmation Order or other determination of the parties' rights under the Proposed Settlement Agreement, the Plan or the Confirmation Order. The Commission also would consent to the jurisdiction of any court or other tribunal or forum for such actions or proceedings including, but

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 70 of 100

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

1    not limited to, the Bankruptcy Court.[16]

2

3    ### K.    **TERM AND ENFORCEABILITY.**

4            The Proposed Settlement Agreement would generally terminate nine years after the

5    Effective Date.  The parties would agree that the Bankruptcy Court will have jurisdiction over the

6    parties for all purposes relating to enforcement of the Proposed Settlement Agreement, the Plan and

7    the Confirmation Order.  The parties also would agree that the Proposed Settlement Agreement, the

8    Plan and any order entered by the Bankruptcy Court contemplated or required to implement the

9    Proposed Settlement Agreement or the Plan would be irrevocable and binding on the parties, and

10   enforceable under federal law, notwithstanding any contrary state law or future decisions or orders

11   of the Commission.

12   ### L.    **TREATMENT OF CREDITORS.**

13           The Proposed Settlement Agreement contemplates the treatment of creditors and the

14   financing described in Section IX of this Disclosure Statement.

15   ## VIII. LITIGATION

16           The Debtor is a party to various lawsuits and administrative proceedings.  Set forth

17   below is a summary of some of the material pending litigation and administrative proceedings

18   involving the Debtor.

19   ### A.    **RATE RECOVERY LITIGATION.**

20           On November 8, 2000, the Debtor filed a lawsuit in the U.S. District Court for the

21

22           [16]The State Entities represented by the California Attorney General contend that the
23   Commission's waiver of sovereign immunity in connection with the Proposed Settlement
     Agreement does not apply to any other state agency or entity.  The Proponents contend that the
24   Bankruptcy Court in its February 7, 2002 memorandum decision prior to the filing of the Plan
     indicated a willingness to enjoin actual or threatened violations by the State or its agencies of a
25   confirmation order, as authorized under the Ex Parte Young doctrine.  The Proponents further
     contend that the State and the Commission have waived their ability to assert sovereign immunity in
26   this Chapter 11 Case (including with respect to the Plan and the relief sought in the Plan) through
     their extensive participation in the Debtor's chapter 11 proceedings (as well as the Commission
27   through its express agreement to waive sovereign immunity in the Proposed Settlement Agreement).
     The State Entities represented by the California Atttorney General contend that they have not
28   waived sovereign immunity.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 71
of 100

1  Northern District of California against the Commissioners of the Commission, asking the court to

2  declare that the federally tariffed wholesale power costs that the Debtor had incurred to serve its

3  customers are recoverable in retail rates under the federal filed rate doctrine and also asserting

4  claims under the Takings, Commerce and Due Process Clauses of the United States Constitution.

5  On January 29, 2001, the Debtor's lawsuit was transferred to the U.S. District Court for the Central

6  District of California where a similar lawsuit filed by Southern California Edison Company was

7  pending.

8  On May 2, 2001, the District Court dismissed the Debtor's amended complaint, without

9  prejudice to refiling at a later date, on the ground that the lawsuit was premature since two

10  Commission decisions referenced in the complaint had not become final under California law.

11  On August 6, 2001, the Debtor refiled its complaint and thereby commenced the Rate

12  Recovery Litigation in the U.S. District Court for the Northern District of California, based on the

13  Debtor's belief that the Commission decisions referenced in the District Court's May 2, 2001 order

14  had become final under California law. On November 26, 2001, the case was transferred to U.S.

15  District Court Judge Vaughn Walker in the Northern District of California as a related case to the

16  Debtor's appeal from the bankruptcy court's denial of the Debtor's request for injunctive and

17  declaratory relief against the retroactive accounting order adopted by the Commission in March

18  2001.

19  The Debtor's complaint in the Rate Recovery Litigation alleges that the wholesale

20  power costs that the Debtor has prudently incurred are paid pursuant to filed tariffs that the FERC

21  has authorized and approved, and that under the U.S. Constitution and numerous court decisions

22  such costs cannot be disallowed by state regulators. The Debtor's complaint also alleges that to the

23  extent that the Debtor is denied recovery of these wholesale power costs by order of the

24  Commission, such action constitutes an unlawful taking and confiscation of the Debtor's property.

25  The Debtor argues that the Commission's decisions are preempted by federal law under the filed

26  rate doctrine, which requires the Commission to allow the Debtor to recover in full its reasonable

27  procurement costs incurred under lawful rates and tariffs approved by the FERC, a federal

28  governmental agency. The complaint also pleads claims under the Commerce Clause, Due Process

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-65-

1  Clause, and Equal Protection Clause of the U.S. Constitution.

2  On April 18, 2002, the Debtor filed a motion for summary judgment requesting the court

3  to enter judgment in the first and second claims for relief pleaded in the complaint on the basis that

4  federal law requires the Commission to permit the Debtor to recover its wholesale procurement costs

5  incurred in FERC-tariffed markets. Also, on September 24, 2001, the Commissioners and TURN,

6  an intervenor in the Rate Recovery Litigation, filed motions to dismiss the Debtor's complaint, and

7  on April 18, 2002 filed motions for summary judgment asking the court to rule against the Debtor,

8  on its federal preemption claims as a matter of law. One of the principal grounds for the

9  Commissioners' and TURN's motions was that, by adopting a retroactive change in the accounting

10  mechanisms for recovery of transition and power procurement costs in March 2001, the

11  Commission had already allowed the Debtor to recover its wholesale procurement costs.

12  On July 25, 2002, the District Court issued an order denying the Commissioners' and

13  TURN's motions to dismiss the Rate Recovery Litigation, as well as motions for summary judgment

14  that had been filed by the Commissioners, the Debtor, and TURN. However, much of the District

15  Court's order is a discussion of the merits of the Debtor's federal preemption claims. The court

16  found that the filed rate doctrine applies to PG&E's case, stating: "in most instances today a utility

17  must purchase the power delivered to consumers pursuant to the rate filed with the appropriate

18  federal agency."

19  The court found, however, that the Debtor's preemption claims could not be decided on

20  summary judgment because two factual issues remained in dispute: the appropriate time period for

21  considering whether a net under-collection had occurred and the determination of which revenue

22  sources, within Constitutional bounds, may be applied against the Debtor's operating costs (which

23  included the question whether at the time of the energy crisis revenue was "available to sustain

24  PG&E's operations" and if not, whether the "unavailability was reasonable and not due to financial

25  mismanagement").

26  At an August 16, 2002 case management conference, the court adopted the pretrial and

27  trial schedule stipulated to by the parties, including a trial date set for June 9, 2003. On August 23,

28  2002, the defendants filed a Notice of Appeal from those portions of the July 25, 2002 order denying


HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-66-

1    defendants' motion to dismiss on Eleventh Amendment (sovereign immunity) and Johnson Act

2    grounds. (The Johnson Act prohibits the district courts from enjoining, suspending, or restraining

3    the operation of or compliance with any order affecting rates chargeable by a public Debtor and

4    made by a state administrative agency as long as certain conditions are met.) On September 4, 2002,

5    the Debtor filed a motion with the District Court seeking written certification that the Commission's

6    appeal of the July 25, 2002 order on Eleventh Amendment and Johnson Act grounds was frivolous.

7    On or about October 21, 2002, the District Court granted the Debtor's motion and certified the

8    Commission's appeal as frivolous, which allowed the District Court to retain jurisdiction to proceed

9    to trial while the Commission's appeal to the Ninth Circuit, or Ninth Circuit, was pending. On

10   November 21, 2002, the Ninth Circuit without discussion granted the Commission's motion to stay

11   the District Court proceedings pending the Commission's appeal of the District Court's July 25,

12   2002 order. As a consequence of the Ninth Circuit stay, the trial schedule previously set by the

13   District Court, including the June 9, 2003, trial date, is inoperative.

14       On January 8, 2003, the Debtor filed its Ninth Circuit brief in opposition to the

15   Commission's appeal, together with a motion asking the Ninth Circuit to expedite the hearing and

16   the decision on the appeal. On January 13, 2003, the Ninth Circuit notified the Debtor that a hearing

17   date for the appeal had been set for March 10, 2003. Briefing on the appeal has been completed, and

18   oral argument on the appeal has been heard.

19       Pursuant to the Proposed Settlement Agreement, the Debtor is required to dismiss the

20   Rate Recovery Litigation with prejudice as soon as practicable after the later of the Effective Date or

21   the date on which the Commission's approval of the Commission Settlement is no longer subject to

22   appeal. See Section VII above entitled "Summary of the Proposed Settlement Agreement" for more

23   information on the litigation.

24       **B.    CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200**
         **LITIGATION.**
25

26       On January 10, 2002, the California Attorney General filed a complaint in the San

27   Francisco Superior Court, styled People of the State of California ex rel. Bill Lockyer, Attorney

28   General of the State of California v. PG&E Corporation; et al., Case No. CGC-02-403289, against

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 the Parent and the directors of the Parent and Debtor ("Defendants") alleging that the Defendants

2 engaged in unfair or fraudulent business acts or practices in violation of California Business and

3 Professions Code Section 17200 ("§ 17200 Claims"). The Attorney General filed an amended

4 complaint on August 9, 2002 ("Attorney General Lawsuit").

5 The Attorney General seeks injunctive relief, the appointment of a receiver, restitution

6 in an amount according to proof, civil penalties of $2,500 against each defendant for each violation

7 of California Business and Professions Code Section 17200 and that the total penalty not be less

8 than $500 million, and costs of suit.

9 On February 11, 2002, the City and County of San Francisco (the "CCSF") filed an

10 almost identical complaint in San Francisco Superior Court styled City and County of San Francisco

11 v. PG&E Corporation, Case No. CGC-02-404453 ("CCSF Lawsuit"). The CCSF complaint

12 contains allegations against the Parent for conversion, unjust enrichment and violations of Section

13 17200 of the California Business and Professions Code ("§ 17200 Claims"). These claims are

14 similar, and in some instances practically identical, to the allegations contained in the Attorney

15 General Lawsuit.

16 CCSF also seeks injunctive relief, the appointment of a receiver, restitution in an amount

17 according to proof, and civil penalties of $2,500 against each defendant for each violation of

18 California Business and Professions Code Section 17200.

19 On February 14, 2002, Cynthia Behr, an individual creditor in the Chapter 11 Case, filed

20 a complaint styled Behr v. PG&E Corporation, et al., Case No. CV-805274, in Santa Clara County

21 Superior Court ("Behr Lawsuit"). The Behr complaint contains allegations against the Parent that

22 are practically identical to the allegations contained in the Attorney General's and CCSF's Lawsuits.

23 Behr seeks a set-aside of $10 million, other damages in an amount according to proof,

24 the appointment of a receiver, and other equitable relief.

25 The Parent (and the individual defendants in the Attorney General Lawsuit) removed all

26 three lawsuits to the bankruptcy court. The Plaintiffs in all three lawsuits filed motions to remand to

27 the state court for lack of jurisdiction. The bankruptcy court allowed the Parent (and the individual

28 defendants in the Attorney General Lawsuit) to file a consolidated memorandum of points and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 75
of 100

1   authorities to support the opposition to the motions to remand.

2         The Bankruptcy Court filed its consolidated decision to the motions to remand on June

3   14, 2002. The Bankruptcy Court remanded the Attorney General's Complaint, as amended, and

4   certain CCSF causes of action to state superior court, finding that the claims constituted non-

5   removable police and regulatory powers under 28 U.S.C. § 1452(a). The Bankruptcy Court retained

6   jurisdiction over, and declined to remand, CCSF's unjust enrichment and conversion causes of

7   action and Behr's fraudulent conveyance and Bulk Sales Law causes of action, as well as the "Plan

8   Claims," as described by the Bankruptcy Court. The Bankruptcy Court equitably remanded Behr's

9   other causes of action. Some of the claims retained by the Bankruptcy Court were omitted by the

10   parties asserting them. Certain claims asserted by the CCSF, including its unjust enrichment and

11   conversion claims, are still pending in the Bankruptcy Court but are inactive pending the outcome of

12   appeals and cross-appeals discussed below.

13         The remanded causes of action have been coordinated in the California Superior Court

14   for the City and County of San Francisco. Discovery is ongoing; no trial date has been set.

15         The Parent (and the individual defendants in the Attorney General Lawsuit) appealed the

16   Bankruptcy Court's remand decision to the United States District Court for the Northern District of

17   California on the basis that, if the claims exist at all, they are property of the Debtor's estate and

18   subject to the exclusive jurisdiction of the Bankruptcy Court. The Parent (and the individual

19   defendants in the Attorney General Lawsuit) allege, among other things, that all of the remanded

20   causes of action should have been retained in the Bankruptcy Court because, if they exist at all, they

21   are property of the Debtor's estate, and subject to exclusive Bankruptcy Court jurisdiction.

22         The Attorney General cross-appealed the denial of its Eleventh Amendment claim.

23   CCSF cross-appealed in the same court alleging, based on various arguments, that all of the causes

24   of action should have been remanded to state court.

25         The appeals and cross-appeals have been fully briefed and were argued before the

26   United States District Court for the Northern District of California on July 24, 2003.

27     **C.   ATTORNEY GENERAL SEC PETITION.**

28         In addition, the Attorney General has filed a petition with the SEC seeking revocation of


HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

### G. PENDING EXPRESS PREEMPTION APPEAL.

To accomplish the restructuring contemplated by the Original PG&E Plan, the PG&E Proponents sought as part of their Original Plan a determination that Section 1123 of the Bankruptcy Code expressly preempts otherwise applicable nonbankruptcy law in certain limited areas of state and local law: namely, that "pursuant to Section 1123 of the Bankruptcy Code, the approval of any California state and local Governmental Entity, including, but not limited to, the CPUC, shall not be required in order to, among other things, transfer or operate the [restructured entity's] Assets . . . or to otherwise effectuate the Restructuring Transactions." See generally December 19, 2001 First Amended Plan of Reorganization (Docket No. 3895) art. VII, §7.1(k) ("Regulatory Approvals" for ETrans); id. art. VII, §7.2(i) ("Regulatory Approvals" for GTrans); id. art. VII, §7.3(j) ("Regulatory Approvals" for Gen).

On February 7, 2002, the Bankruptcy Court issued a Memorandum Decision rejecting the PG&E Proponents' position regarding the express preemption of state law under Section 1123(a)(5) of the Bankruptcy Code (the "February 7 Decision") (Docket No. 4710), and thereafter entered an order on March 18, 2002 disapproving the First Amended Disclosure Statement for the reasons set forth in its February 7 Decision.[17] The PG&E Proponents thereafter appealed the express preemption aspect of the March 18, 2002 order to the United States District Court for the Northern District of California (the "District Court").

On August 30, 2002, the District Court reversed the Bankruptcy Court's express preemption ruling and directed that the matter be remanded for further proceedings consistent with its ruling. Judgment was entered on September 19, 2002, and the Commission and several other parties thereafter appealed the District Court's decision to the United States Court of Appeals for the Ninth Circuit (and sought discretionary review of the District Court's ruling pursuant to 28 U.S.C. Section 1292(b), which the PG&E Proponents did not oppose) (such consolidated proceedings are collectively referred to as "the appeal"). The appeal has been fully briefed and it was argued before

---

[17]The Plan and Disclosure Statement were amended to address the deficiency identified by the Bankruptcy Court, without prejudice to the Debtor's position that the Plan, in its original form, could have been confirmable.

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 77 of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   employees of the Debtor and their relatives, residents in the vicinity of the compressor stations and

2   persons who visited the gas compressor stations. The plaintiffs also include spouses or children of

3   these plaintiffs who claim loss of consortium or wrongful death.

4          The discovery referee has set the procedures for selecting trial test plaintiffs and

5   alternates in the Aguayo, Acosta and Aguilar cases (the "Aguayo Litigation"). Ten (10) of these

6   trial test plaintiffs were selected by plaintiffs' counsel, seven (7) plaintiffs were selected by defense

7   counsel and one (1) plaintiff and two (2) alternates were selected at random. Although a date for the

8   first test trial in the Aguayo Litigation was set for July 2, 2001, in Los Angeles County Superior

9   Court, the Chapter 11 Case automatically stayed all proceedings.

10          On March 27, 2002, the seven plaintiffs in the Fordyce case served their lawsuits on the

11  Debtor. The plaintiffs have all filed timely proofs of claim in the Chapter 11 Case.

12          In the Adams case, after a hearing on July 17, 2002, the state court dismissed 35

13  plaintiffs with prejudice because their claims are barred by the statute of limitations. The state court

14  dismissed another 65 plaintiffs without prejudice, so these plaintiffs may attempt to plead that their

15  claims are not barred by the statute of limitations. 30 of these plaintiffs filed a Fourth Amended

16  Complaint on October 16, 2002. The other 35 plaintiffs who were given leave to amend have been

17  dismissed with prejudice for failure to amend.

18          Prior to the Petition Date, the Debtor was responding to the complaints that were served

19  and asserting affirmative defenses. As of the Petition Date, the Debtor had filed thirteen (13)

20  summary judgment motions challenging the claims of the trial test plaintiffs in the Aguayo

21  Litigation and completed discovery of plaintiffs' experts. Plaintiffs' discovery of the Debtor's

22  experts was underway. Plaintiffs are completing discovery of the Debtor's experts and of related

23  issues, and four of the 13 summary judgment motions are scheduled for hearing in 2003. At a status

24  conference on March 17, 2003, the Los Angeles Superior Court scheduled a trial of eighteen (18)

25  test cases to commence in March 2004. At this stage of the proceedings and the claims objection

26  process, there is substantial uncertainty concerning the claims alleged, and the Debtor is attempting

27  to gather information concerning the alleged type and duration of exposure, the nature of injuries

28  alleged by individual plaintiffs, and the additional facts necessary to support its legal defenses.



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   Approximately 1,260 individuals have filed proofs of claim in this Chapter 11 Case
2   (nearly all by plaintiffs in the Chromium Litigation) asserting that exposure to chromium at or near
3   the compressor stations has caused personal injuries, wrongful death or related damages.
4   Approximately 1,035 claimants have filed proofs of claim requesting an aggregate amount of
5   approximately $580 million and another approximately 225 claimants have filed claims for an
6   "unknown amount." On November 14, 2001, the Debtor filed its Omnibus Objections to Chromium
7   Claims and its Motion to Certify and Transfer the Chromium Claims to the Federal District Court.
8   On January 8, 2002, the Bankruptcy Court issued a Memorandum of Decision denying the Debtor's
9   Motion to Certify and Transfer the Chromium Claims to Federal District Court, granting the
10  Claimants' Motion for Abstention and granting the Claimants' Motion for Relief from Stay. The
11  Memorandum of Decision required the parties to prepare orders that will lift the automatic stay and
12  allow the state court lawsuits to proceed for those individuals who timely filed Claims in the
13  Chapter 11 Case and filed state court lawsuits prior to the Petition Date. Orders granting such relief
14  from stay have been entered by the Bankruptcy Court.
15          As set forth in the objections to the Chromium Litigation Claims, the Debtor's position
16  is that all of the Chromium Litigation Claims should be disallowed because they are legally and
17  factually deficient. The claimants cannot establish that exposure to "chrome six" from the Debtor
18  caused their alleged injuries and will be unable to present admissible scientific evidence that
19  exposure to environmental (as opposed to occupational) levels of chrome six can cause the massive
20  list of ailments they claim. First, the medical and scientific literature does not support the
21  conclusion that ingestion of chrome six through drinking water causes any type of cancer or other
22  serious disease. For example, the EPA Office of Water has concluded: "There is no evidence that
23  chromium in drinking water has the potential to cause cancer from lifetime exposure in drinking
24  water." EPA Office of Water: Drinking Water and Health, <u>Technical Fact Sheet On: Chromium</u> at
25  1. In addition, a "blue ribbon" panel of distinguished scientists created by the California Office of
26  Environmental Health and Hazard Assessment ("OEHHA") to review the scientific literature "found
27  no basis in either the epidemiological or animal data published in the literature for concluding that
28  orally ingested Cr(VI) [chrome six] is a carcinogen." OEHHA Chromate Toxicity Review

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Committee, <u>Scientific Review of Toxicological, and Human Health Issues Related to the</u>

2  <u>Development of a Public Health Goal for Chromium (VI)</u>, Aug. 31, 2001. Nor does the medical and

3  scientific literature support any claim that exposure to environmental levels of airborne chromium

4  causes the illnesses claimed. As the OEHHA panel of scientists concluded after reviewing the

5  scientific literature, "[t]aken together, the epidemiologic data on [chrome six] exposure from

6  environmental sources (as opposed to generally much higher occupational exposures) provide no

7  support for a causal association of exposure to [chrome six] and overall or site-specific cancer

8  mortality for the general public." <u>Id.</u> at 19-20.

9       Second, the Chromium Litigation Claims are procedurally and legally deficient. Most,

10  if not all, of the Chromium Litigation Claims are untimely. The first lawsuits for alleged exposure

11  to chromium from the Debtor were filed in 1994. The Chromium Litigation Claims are barred

12  because Claimants knew, or should have known, of the basis of their Claims well over one (1) year

13  before they filed the pending state court lawsuits or Claims at issue. See <u>McKelvey v. Boeing North</u>

14  <u>American Inc.</u>, 74 Cal. App. 4th 151, 160 (1999). In addition, the Chromium Litigation Claims filed

15  by current or former employees of the Debtor are further deficient because workers' compensation is

16  the exclusive remedy to resolve such Claims. Moreover, the grossly inflated damages asserted are

17  not substantiated by the proofs of claim filed. Finally, the Claims are also inflated because they

18  incorrectly seek to recover punitive damages against the Debtor-in-Possession for the use of

19  chromium water treatment products that ceased more than fifteen (15) years ago.

20       For accounting purposes, the Debtor reserved $160 million for the Chromium Litigation

21  as described in the Plan. However, for all of the reasons set forth in the objections and summarized

22  above, it is the Debtor's position that the complaints in the Chromium Litigation are subject to legal

23  and factual defenses, and that the Chromium Litigation Claims are not valid claims. While all

24  Chromium Litigation Claims are Disputed Claims, the Chromium Litigation Claims are part of

25  Class 8 under the Plan and therefore are accorded pass-through treatment under the Plan.

26  **E.    BFM CONTRACT SEIZURE LITIGATION.**

27       On February 5, 2001, the Governor, acting under California's Emergency Services Act,

28  commandeered the Debtor's block forward market ("BFM") contracts for the benefit of the State.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-73-

1  The seized BFM contracts require the counterparties to deliver specified MW blocks of electricity

2  during peak hours throughout 2001 at agreed-upon prices. The Debtor filed an administrative claim

3  with the California Victim Compensation and Government Claims Board based on the Governor's

4  seizure of the BFM contracts. Southern California Edison (whose BFM contracts were

5  commandeered on or about February 2, 2001), the PX (through the PX Participants' Committee

6  appointed in the PX's bankruptcy case) and twenty-nine (29) PX participants also filed

7  administrative claims related to the Governor's seizure of the BFM contracts. Southern California

8  Edison's claim was subsequently resolved as part of a broader settlement with the State of

9  California. Following certain proceedings on the claims before the Board, on December 10, 2001,

10  the Debtor and the PX Participants' Committee each filed a writ of mandate in Sacramento Superior

11  Court seeking to terminate the Board proceeding for lack of jurisdiction and also requesting a stay of

12  the board proceedings until such time as the writ could be heard. In February 2002, the Sacramento

13  Superior Court determined that the writs were related to the coordinated cases (discussed below) and

14  assigned the writs to Honorable James T. Ford. The writs were heard before Judge Ford on

15  March 1, 2002. On July 16, 2001, the Debtor also filed a complaint against the State of California in

16  San Francisco Superior Court to recover the value of the seized BFM contracts alleging that the

17  State's seizure of the contracts was an inverse condemnation. The PX and a PX participant, Reliant

18  Energy, filed similar suits against the State in Los Angeles County Superior Court. The State has

19  filed motions to dismiss the three complaints arguing that the plaintiffs have not joined all

20  indispensable parties and that the parties have not fully exhausted administrative remedies.

21  Subsequently, the State filed an action for declaratory relief in Sacramento Superior Court that

22  sought adjudication regarding certain aspects of the State's seizure of the BFM contracts. The PX

23  filed with the California Judicial Council a motion to coordinate the various Superior Court actions.

24  As part of a larger stipulation, all parties, including the State, agreed to coordination of the

25  proceedings. On October 12, 2001 the Los Angeles County Superior Court judge ruled that

26  Sacramento Superior Court is the appropriate venue for the coordinated proceedings. The

27  coordinated cases were assigned to Judge Ford, who held a first case management conference on the

28  cases on February 15, 2002. On March 11, 2002, Debtor filed an amended complaint adding a cause

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION

1   of action under the California Emergency Services Act.

2           In March 2002, the State demurred to Debtor's cause of action for inverse condemnation

3   under the California constitution. The State also demurred to this cause of action in the complaints

4   filed by PX and Reliant Energy. After two rounds of briefing and two hearings, Judge Ford denied

5   the State's demurrer on July 26, 2002. On August 30, 2002, the State moved for a six month stay of

6   all proceedings in order to await developments in actions pending before the FERC as well as this

7   bankruptcy proceeding. Judge Ford granted the State's request. Judge Ford subsequently granted a

8   request for a 90-day stay, and the Court granted an additional continuation of the stay to

9   accommodate Judge Ford's schedule. As continued, the stay is set to expire on July 30, 2003. A

10  status conference statement is due from all parties on July 23, 2003 and a status conference hearing

11  has been tentatively scheduled for July 30, 2003. No discovery has been conducted thus far in this

12  case.



13  **F.    EL PASO SETTLEMENT.**

14          On March 21, 2003, the Debtor, along with a number of other parties, entered into a

15  memorandum of understanding ("MOU") with El Paso Natural Gas Company, its parent corporation

16  and affiliates (collectively, "El Paso") to settle claims against El Paso relating to the sale or delivery

17  of natural gas and/or electricity to or in the western United States from September 1, 1996 to March

18  20, 2003, including claims that El Paso took actions that resulted in artificially inflated gas prices

19  during the California energy crisis of 2000 and 2001. Since the MOU was signed the parties have

20  been negotiating a complex settlement agreement to implement the MOU. On June 26, 2003 a

21  comprehensive Master Settlement Agreement ("MSA") was signed, which resolves complaints

22  against El Paso in both state and federal court as well as at the Federal Energy Regulatory

23  Commission (FERC). The MSA provides for the following:

24          1.    Payment by El Paso of approximately $1.6 billion in consideration over the next 20

25  years as follows:

26                (i) on or before closing, El Paso will deposit $2 million into the escrow account from a

27  pool of funds set up for bonus payment to El Paso officers. On the later of the execution of the

28  settlement agreement and the execution of an escrow agreement, El Paso will deposit $100 million

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

into the escrow account. The price of the original DWR contract will be reduced on a pro rata basis over the remaining term of the contract, effective as of the execution of the settlement agreement, by $125 million.

(ii) 26,371,308 shares of El Paso common stock (at the current share price, worth approximately $227 million based on the June 16, 2002 closing price of El Paso common stock) will be sold into the market by El Paso, at its cost, at the direction of the settling claimants at any time after El Paso's shelf registration becomes effective with the SEC.

(iii) Within 150 days of the execution of the MSA, El Paso will deposit into the escrow account an additional $250 million. This amount represents the net present value of (and is in lieu of) the $440 million cash stream payable in annual installments over 20 years that was contemplated by the MOU.

(iv) In addition, El Paso shall pay $45 million in cash annually over 20 years ($900 million undiscounted future value). This replaces El Paso's obligation in the MOU to deliver $900 million nominal value of gas over 20 years. If El Paso becomes investment grade at any time during the first 15 years, at the option of the settling claimants, the amount of each annual cash payment will be recalculated so as to amortize the remaining amount due over 15 years instead of 20 years. The amortization will not revert to 20 years if El Paso thereafter becomes non-investment grade. The MSA also contains terms governing prepayment.

(v) El Paso will secure the obligations with oil and gas reserves with a value equal to 130% (a 1.3 to 1 coverage ratio) of the net present value of the obligations at execution of the MSA. Provision will be made for delivering letters of credit or other collateral acceptable to the settling claimants and to any applicable rating agency (if the obligations have been monetized).

2.      El Paso agrees to certain "structural remedies" to prevent any future manipulation of the California gas market, including guarantees to make physically available the capacity to deliver 3,290 MMcf/day of gas to California and clarifying certain capacity recall rights for PG&E. The structural remedies can be enforced in Federal District Court through a special master, except on issues that are within the exclusive jurisdiction of FERC, and as to these issues enforcement will lie with FERC.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-76-

3. All claims asserted by all parties for the period September 1, 1996 to March 20, 2003 are released, including El Paso's bankruptcy claim against PG&E. The release does not cover claims asserted by PG&E against other parties in various regulatory proceedings, such as the FERC Refund Proceeding and the 390 QF Proceeding at the Commission (where PG&E is seeking refunds of excessive energy payments made to QFs during the energy crisis (including El Paso owned/controlled QFs).

4. In addition to the settlement with El Paso, the settling claimants also agreed on allocation of and administration of the settlement proceeds. The key elements of the allocation agreement are as follows:

(i) All consideration is being divided pro rata based on calculation of the "damages" suffered by each party;

(ii) PG&E will receive approximately 6% (currently estimated at $81 million) of the total consideration for damages incurred as a result of gas purchases and approximately 16% (currently estimated at $216.7 million) of the total consideration for damages as a result of electricity purchases. The present value of such consideration, based on expected El Paso payment dates, is approximately $60 million for the core gas damages and $160 million for electricity damages (such present value calculated by applying a discount rate of approximately 7.5%).

(iii) The Commission will initiate an Order Instituting Rulemaking (OIR) to determine how the El Paso settlement proceeds should be allocated among various classes of customers, and the refund and accounting mechanisms for PG&E's portion of the proceeds. On July 10, 2003, the Commission issued an OIR with respect to such allocation and related mechanisms.

Further, the DWR (CERS) is allocated approximately 33% (estimated at $485 million, nominally) for damages as a result of electricity purchases, which include the reduced price of its contracts with El Paso. In the Allocation Agreement, all consideration received by the DWR shall be used to reduce the DWR's revenue requirement, and the allocation of such reduction among utilities shall be determined by the Commission.

The Debtor intends to seek the Bankruptcy Court's approval of the MSA pursuant to Bankruptcy Rule 9019.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

## G. PENDING EXPRESS PREEMPTION APPEAL.

To accomplish the restructuring contemplated by the Original PG&E Plan, the PG&E Proponents sought as part of their Original Plan a determination that Section 1123 of the Bankruptcy Code expressly preempts otherwise applicable nonbankruptcy law in certain limited areas of state and local law: namely, that "pursuant to Section 1123 of the Bankruptcy Code, the approval of any California state and local Governmental Entity, including, but not limited to, the CPUC, shall not be required in order to, among other things, transfer or operate the [restructured entity's] Assets . . . or to otherwise effectuate the Restructuring Transactions." See generally December 19, 2001 First Amended Plan of Reorganization (Docket No. 3895) art. VII, §7.1(k) ("Regulatory Approvals" for ETrans); id. art. VII, §7.2(i) ("Regulatory Approvals" for GTrans); id. art. VII, §7.3(j) ("Regulatory Approvals" for Gen).

On February 7, 2002, the Bankruptcy Court issued a Memorandum Decision rejecting the PG&E Proponents' position regarding the express preemption of state law under Section 1123(a)(5) of the Bankruptcy Code (the "February 7 Decision") (Docket No. 4710), and thereafter entered an order on March 18, 2002 disapproving the First Amended Disclosure Statement for the reasons set forth in its February 7 Decision.[17] The PG&E Proponents thereafter appealed the express preemption aspect of the March 18, 2002 order to the United States District Court for the Northern District of California (the "District Court").

On August 30, 2002, the District Court reversed the Bankruptcy Court's express preemption ruling and directed that the matter be remanded for further proceedings consistent with its ruling. Judgment was entered on September 19, 2002, and the Commission and several other parties thereafter appealed the District Court's decision to the United States Court of Appeals for the Ninth Circuit (and sought discretionary review of the District Court's ruling pursuant to 28 U.S.C. Section 1292(b), which the PG&E Proponents did not oppose) (such consolidated proceedings are collectively referred to as "the appeal"). The appeal has been fully briefed and it was argued before

---

[17]The Plan and Disclosure Statement were amended to address the deficiency identified by the Bankruptcy Court, without prejudice to the Debtor's position that the Plan, in its original form, could have been confirmable.

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 85 of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  a panel of the Ninth Circuit on May 14, 2003.

2  On July 8, 2003, the PG&E Proponents filed a notice advising the Ninth Circuit of the

3  Proposed Settlement Agreement and asking the Ninth Circuit on that basis to stay the pending

4  appeal. The appellants have opposed the motion and have asked the Ninth Circuit panel to proceed

5  to a decision. The Ninth Circuit has not yet ruled on the motion to stay the appeal. However the

6  Ninth Circuit rules on that motion or on the merits of the appeal itself, neither the Proposed

7  Settlement Agreement nor the Plan are conditioned upon any disposition in the pending appeal.

8  ## IX.  THE PLAN OF REORGANIZATION

9  ### A.  CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY
10  INTERESTS.

11  The Plan classifies Claims and Equity Interests separately and provides different

12  treatment for different Classes of Claims and Equity Interests in accordance with the provisions of

13  the Bankruptcy Code. As described more fully below, the Plan provides, separately for each Class,

14  that holders of certain Claims and Equity Interests will receive various amounts and types of

15  consideration, thereby giving effect to the different rights of holders of Claims and Equity Interests

16  in each Class.

17  The Debtor will pay all Allowed Claims in full. Allowed Claims shall include the

18  amounts owed with respect to the period prior to the Petition Date and applicable interest accrued

19  and unpaid during such period. Except as otherwise described herein and provided in the Plan,

20  holders of Allowed Claims will also be paid in Cash accrued and unpaid Post-Petition Interest on

21  such Allowed Claims. Except as otherwise provided in the Plan, including Exhibit B to the Plan,

22  any Post-Petition Interest shall be calculated and paid at the lowest non-default rate in accordance

23  with the terms specified in the applicable statute, indenture or instrument governing such Allowed

24  Claim or, if no such instrument exists, or if the applicable instrument does not specify a non-default

25  rate of interest, Post-Petition Interest will be calculated and paid on such Allowed Claim at the

26  Federal Judgment Rate. Except as provided under applicable non-bankruptcy law or certain

27  agreements with the Debtor approved by the Bankruptcy Court and which are incorporated into and

28  made a part of the Plan, Post-Petition Interest will not be paid on the following Allowed Claims:

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Administrative Expense Claims; Environmental, Fire Suppression, Pending Litigation and Tort

2  Claims, and Workers' Compensation Claims.

3  Pursuant to an order entered by the Bankruptcy Court on April 9, 2001, authorizing the

4  interim use of Cash collateral and an Order entered by the Bankruptcy Court on May 9, 2001

5  approving a Stipulation for the use of Cash collateral between the Debtor and the trustee under the

6  Mortgage, as subsequently amended, the Debtor has paid and will continue to pay Post-Petition

7  Interest to the holders of Allowed Claims in Classes 3a, 3b and 4a.

8  Pursuant to an order entered by the Bankruptcy Court on June 17, 2002, approving the

9  Debtor's execution and performance under an agreement with the Letter of Credit Issuing Banks

10  entitled "First Amended and Restated Summary of Terms with Respect to Forbearance and

11  Proposed Revised Treatment of Letter of Credit Bank Claims in the Plan of Reorganization" (the

12  "LC Bank Agreement"), the Debtor has paid, and subject to certain terms and conditions as set forth

13  in the LC Bank Agreement may continue to, pay to each Letter of Credit Issuing Bank (A) certain

14  increased letters of credit fees as hereinafter described, (B) certain reasonable fees and expenses of

15  professionals retained by the Letter of Credit Issuing Banks, and (C) reimbursement for certain

16  amounts drawn on the Letter of Credit Issuing Bank's respective Letter of Credit for the payment of

17  interest on the related series of Letter of Credit Backed PC Bonds to the extent provided in the

18  respective Reimbursement Agreement.  Additionally, pursuant to the terms of the LC Bank

19  Agreement, the Debtor has agreed, among other things and subject to certain conditions, to pay to

20  Deutsche Bank AG New York Branch an agency fee in the amount of $250,000, which fee was paid

21  by the Debtor on June 18, 2002.  See Section IX.A.13 of this Disclosure Statement for more

22  information regarding the LC Bank Agreement.

23  In addition, pursuant to the Settlement Order, the Debtor will make payments of Post-

24  Petition Interest accruing on and after the applicable Initial Calculation Date[18] and through the last

25

26  [18]February 28, 2002 is the Initial Calculation Date for holders of Allowed Claims in Class 5
   for Senior Indebtedness, holders of Allowed Southern San Joaquin Valley Power Authority Bond
   Claims and holders of Allowed Claims in Classes 4c, 4f, 4g and 9; June 30, 2002 is the Initial

27  Calculation Date for the remaining holders of Allowed Claims in Class 5 and the holders of Allowed
   Claims in Classes 1, 2, 6 and 7.

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DISCLOSURE STATEMENT FOR PLAN OF REORGANIZATION
-80-

1  day of the last calendar quarter ending prior to the Effective Date in arrears in quarterly installments

2  (or in the case of such first quarter following the Initial Calculation Date for holders of Allowed

3  Claims for which February 28, 2002 is the Initial Calculation Date, the four-month period from

4  March 1, 2002 to June 30, 2002) as follows: (x) on the first Business Day of the next calendar

5  quarter to the holders of Allowed Claims in Class 5 for Senior Indebtedness, the holders of Allowed

6  Southern San Joaquin Valley Power Authority Bond Claims and the holders of Allowed Claims in

7  Classes 4c, 4f, 4g and 9, and (y) within thirty (30) days following the end of the calendar quarter, to

8  the remaining holders of Allowed Claims in Class 5 and the holders of Allowed Claims in Classes 1,

9  2, 6 and 7. Any Post-Petition Interest that accrues during the period commencing on the first day of

10  the calendar quarter in which the Effective Date occurs and ending on the Effective Date will be

11  paid on the Effective Date. Pursuant to an Order entered by the Bankruptcy Court on November 26,

12  2002 approving a stipulation between the Debtor and MBIA, the Debtor continues to pay Post-

13  Petition Interest to the holders of Allowed MBIA Claims (Class 4c), but beginning December 1,

14  2002, converted to semi-annual payments of Post-Petition Interest on June 1 and December 1 of

15  each year in accordance with the terms of the applicable loan documents.

16      As to any Disputed Claim, within ten (10) days after a Final Order or the filing of a

17  stipulation making such Disputed Claim an Allowed Claim, the holder of such Allowed Claim shall

18  receive all Pre-Petition Interest and, to the extent payable, Post-Petition Interest accrued and payable

19  on such Allowed Claim pursuant to the Plan as of such date. See Section IX.D of this Disclosure

20  Statement for more information regarding the timing of distributions under the Plan.

21      The Debtor is authorized to pay, and has paid or will pay, all fees and expenses of the

22  holders of Senior Indebtedness who are parties to the Settlement and Support Agreement, the Bond

23  Trustees, the trustees under the Mortgage, and Debtor's various indentures, including, but not

24  limited to, the trustee under the Southern San Joaquin Valley Power Authority Agreement, the

25  Issuer of the PC Bonds, and their respective professionals, and Bank of America, N.A., in its

26  capacity as administrative agent under the Revolving Line of Credit (including such administrative

27  agent's attorneys' fees), pursuant to a procedure that provides for twenty (20) days' notice to the

28  Debtor, its counsel, counsel to the Committee and the U.S. Trustee, which parties thereby are

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  afforded an opportunity to object to the reasonableness of such fees and expenses. Any other unpaid
2  fees and expenses accrued through the Confirmation Date of any of the Bond Trustees and trustees
3  under the Mortgage and various indentures shall be paid by the Debtor within ten (10) days after the
4  Confirmation Date, to the extent allowed by law and any underlying agreement.

5  **1.  Administrative Expense Claims.**

6  Administrative Expense Claims are Claims constituting a cost or expense of
7  administration of the Chapter 11 Case allowed under sections 503(b) and 507(a)(1) of the
8  Bankruptcy Code. Such Claims include all actual and necessary costs and expenses of preserving
9  the estate of the Debtor, all cure amounts owed in respect of leases and contracts assumed by the
10  Debtor, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy
11  Court under sections 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against
12  the estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code;
13  provided, however, that Administrative Expense Claims do not include Ordinary Course Liabilities
14  (as described below).

15  Except to the extent that any Entity entitled to payment of any Allowed Administrative
16  Expense Claim agrees to a less favorable treatment, and except as otherwise provided in the Plan,
17  including Section 2.2 of the Plan (with respect to Professional Compensation and Reimbursement
18  Claims) and Section 6.4 of the Plan (with respect to cure amounts owed in respect of executory
19  contracts and unexpired leases assumed by the Debtor-in-Possession), (i) each holder of an Allowed
20  Administrative Expense Claim arising on or before the Confirmation Date shall receive Cash in an
21  amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and
22  the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or
23  as soon as practicable thereafter, or on such other date as may be ordered by the Bankruptcy Court;
24  and (ii) each holder of an Allowed Administrative Expense Claim arising after the Confirmation
25  Date and on or before the Effective Date shall receive Cash in an amount equal to such Allowed
26  Administrative Expense Claim on the later of the date that is 90 days after the Effective Date and the
27  date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as
28  soon as practicable thereafter, or on such other date as may be ordered by the Bankruptcy Court.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  Except as provided under applicable non-bankruptcy law or certain agreements with the Debtor

2  approved by the Bankruptcy Court and which are incorporated into and made a part of the Plan,

3  Post-Petition Interest will not be paid on Allowed Administrative Expense Claims.

### 2. Professional Compensation and Reimbursement Claims.

5  Professional Compensation and Reimbursement Claims are Administrative Expense

6  Claims for the compensation of professionals and reimbursement of expenses incurred by such

7  professionals, the Committee and members of the Committee pursuant to sections 330(a), 503(b)(2),

8  503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code. All payments to professionals for

9  Professional Compensation and Reimbursement Claims will be made in accordance with the

10  procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court

11  relating to the payment of interim and final compensation for services rendered and reimbursement

12  of expenses. The Bankruptcy Court will review and determine all applications for compensation for

13  services rendered and reimbursement of expenses.

14  Pursuant to the Plan, each holder of a Professional Compensation and Reimbursement

15  Claim (a) shall file by no later than the date that is ninety (90) days after the Confirmation Date or

16  such other date as may be fixed by the Bankruptcy Court a final application for the allowance of

17  compensation for services rendered and reimbursement of expenses incurred, and (b) if granted,

18  such an award by the Bankruptcy Court shall be paid in full in such amounts as are Allowed by the

19  Bankruptcy Court (i) on the date such Professional Compensation and Reimbursement Claim

20  becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon as

21  practicable thereafter or (ii) upon such other terms as may be mutually agreed upon between such

22  holder of an Allowed Professional Compensation and Reimbursement Claim and the Debtor.

### 3. Priority Tax Claims.

24  Priority Tax Claims are Claims for taxes entitled to priority in payment under section

25  507(a)(8) of the Bankruptcy Code.

26  Pursuant to the Plan, except to the extent that a holder of an Allowed Priority Tax Claim

27  has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, each

28  holder of an Allowed Priority Tax Claim shall be paid, in full and complete settlement, satisfaction

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 90
of 100

1 and discharge of its Allowed Priority Tax Claim, including Post-Petition Interest, Cash in an amount

2 equal to such Allowed Priority Tax Claim on the later of the Effective Date and the date such

3 Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon as practicable thereafter.

### 4. **Ordinary Course Liabilities.**

5 Ordinary Course Liabilities are (i) liabilities incurred in the ordinary course of business

6 by the Debtor-in-Possession, including, but not limited to, actual and necessary costs and expenses

7 of operating the business of the Debtor-in-Possession, any indebtedness or obligations incurred or

8 undertaken by the Debtor-in-Possession in connection with the conduct of its business, liabilities

9 arising under loans or advances to or other obligations incurred by the Debtor-in-Possession, and

10 real and personal property taxes and franchise fees; (ii) any Claims against the Debtor-in-Possession

11 constituting a cost or expense of administration of the Chapter 11 Case under sections 503(b) and

12 507(a)(1) of the Bankruptcy Code arising on or after sixty (60) days prior to the Effective Date,

13 other than Professional Compensation and Reimbursement Claims; and (iii) all cure amounts owed

14 in respect of executory contracts and unexpired leases assumed by the Debtor-in-Possession arising

15 on or after sixty (60) days prior to the Effective Date.

16 Ordinary Course Liabilities shall be paid in full and performed by the Debtor in the

17 ordinary course of business in accordance with the terms and subject to the conditions of any

18 agreements governing, instruments evidencing or other documents relating to such transactions and

19 pursuant to applicable law, without the necessity of the filing of an Administrative Expense Claim.

20 Except as provided under such agreements, instruments and documents or applicable non-

21 bankruptcy law, Post-Petition Interest will not be paid on any Ordinary Course Liabilities. Any

22 disputed Ordinary Course Liabilities shall be determined, resolved, or adjudicated, as the case may

23 be, in a manner as if the Chapter 11 Case had not been commenced (except that, under sections 365

24 and/or 1123(b)(2) of the Bankruptcy Code, contractual provisions, accelerations and defaults

25 eliminated or rendered unenforceable by such sections shall remain eliminated or unenforceable),

26 and shall survive the Effective Date as if the Chapter 11 Case had not been commenced. In the

27 event of a disputed Ordinary Course Liability, the Debtor shall be liable in the amount or in the

28 manner determined by a Final Order or by a binding award, agreement or settlement; provided,


HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 91
of 100

1  however, that the Debtor shall preserve all rights and defenses respecting any Ordinary Course

2  Liability that exists under applicable law. All disputed Ordinary Course Liabilities shall be

3  determined and liquidated under applicable non-bankruptcy law in the administrative or judicial

4  tribunal in which they are pending as of the Effective Date or, if no such action is pending on the

5  Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. In light of the

6  unimpaired pass-through treatment of Ordinary Course Liabilities under the Plan, the Reorganized

7  Debtor waives the discharge of section 1141(d) of the Bankruptcy Code as to any Ordinary Course

8  Liability.

9       **5.**    **Class 1—Other Priority Claims.**

10       Other Priority Claims are Claims that are entitled to priority in accordance with section

11  507(a) of the Bankruptcy Code, other than Administrative Expense Claims and Priority Tax Claims.

12  The Debtor believes that all Other Priority Claims have been or will be paid pursuant to an order of

13  the Bankruptcy Court. Accordingly, the Debtor believes that there should be no Allowed Other

14  Priority Claims.

15       Class 1 is unimpaired under the Plan. Pursuant to the Plan, except to the extent that a

16  holder of an Allowed Other Priority Claim has been paid by the Debtor prior to the Effective Date or

17  agrees to a different treatment, each holder of an Allowed Other Priority Claim, if any exist, will be

18  paid Cash in an amount equal to such Allowed Claim.

19       **6.**    **Class 2—Other Secured Claims.**

20       The Debtor believes that the Other Secured Claims will include Claims relating to

21  mechanics' and materialmens' liens and secured tax claims, as well as any Secured Claims other

22  than those Secured Claims in Class 3a, Class 3b and Class 4a.

23       Class 2 is unimpaired under the Plan. Pursuant to the Plan, except to the extent that a

24  holder of an Allowed Other Secured Claim has been paid by the Debtor prior to the Effective Date

25  or agrees to a different treatment, at the sole option of the Debtor, each holder of an Allowed Other

26  Secured Claim shall either be (a) reinstated and rendered unimpaired in accordance with section

27  1124(2) of the Bankruptcy Code, or (b) paid Cash in an amount equal to such Allowed Other

28  Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 92
of 100

1    pursuant to section 506(b) of the Bankruptcy Code and in accordance with the terms specified in the

2    applicable statute, indenture or instrument governing such Allowed Other Secured Claim.

3           **7.**      **Class 3a—Secured Claims Relating to First and Refunding Mortgage Bonds.**

4           Class 3a includes Secured Claims against the Debtor evidenced by the (a) 6.250% First

5    and Refunding Mortgage Bonds Series 93G due March 1, 2004; (b) 5.875% First and Refunding

6    Mortgage Bonds Series 93E due October 1, 2005; (c) 6.250% First and Refunding Mortgage Bonds

7    Series 81B due August 1, 2011; (d) 8.800% First and Refunding Mortgage Bonds Series 91A due

8    May 1, 2024; (e) 8.375% First and Refunding Mortgage Bonds Series 92B due May 1, 2025;

9    (f) 8.250% First and Refunding Mortgage Bonds Series 92D due November 1, 2022; (g) 7.250%

10    First and Refunding Mortgage Bonds Series 93A due March 1, 2026; (h) 7.250% First and

11    Refunding Mortgage Bonds Series 93D due August 1, 2026; (i) 6.750% First and Refunding

12    Mortgage Bonds Series 93F due October 1, 2023; (j) 7.05% First and Refunding Mortgage Bonds

13    Series 93F due October 1, 2033; and (k) 7.050% First and Refunding Mortgage Bonds Series 93H

14    due March 1, 2024, each issued by the Debtor under a First and Refunding Mortgage under which

15    BNY Western Trust Company was trustee on the Petition Date, together with any Matured and

16    Unpresented First and Refunding Mortgage Bonds; provided, however, that the Debtor is not

17    waiving any rights or claims it may have under applicable non-bankruptcy law against any holder of

18    any Matured and Unpresented First and Refunding Mortgage Bond or any other party with respect

19    thereto.[19]

20           Class 3a is impaired under the Plan. Except as provided in the next sentence, each

21    holder of an Allowed Secured Claim Relating to First and Refunding Mortgage Bonds will be paid

22    Cash in an amount equal to such Allowed Secured Claim. As to all First and Refunding Mortgage

23    Bonds owned in treasury by the Debtor that remain outstanding, the Debtor's Allowed Secured

24    Claim pertaining to such First and Refunding Mortgage Bonds may, in lieu of payment thereof in

25    Cash pursuant to the preceding sentence, be satisfied and discharged by the cancellation of such

26

27         [19]See footnote 3, above, regarding the Series 93C Bonds due August 1, 2003, which are not

28    included in Class 3a.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

First and Refunding Mortgage Bonds reasonably promptly prior to the Effective Date. Allowed

Secured Claims Relating to First and Refunding Mortgage Bonds will include prepayment penalties

or premiums as follows: (i) with respect to the following series of First and Refunding Mortgage

Bonds, a prepayment premium payable in cash upon the Effective Date as follows: a 1.0000%

premium with respect to the 8.800% First and Refunding Mortgage Bonds Series 91A due May 1,

2024, a 0.1000% premium with respect to the 5.875% First and Refunding Mortgage Bonds

Series 93E due October 1, 2005, a 0.0250% premium with respect to the 6.25% First and Refunding

Mortgage Bonds Series 93G due March 1, 2004 and a 1.0000% premium with respect to the 7.05%

First and Refunding Mortgage Bonds Series 93H due March 1, 2024; (ii) with respect to all other

series of redeemable First and Refunding Mortgage Bonds as to which the redemption period

commences prior to the Effective Date, any prepayment premium provided under the First and

Refunding Mortgage Bonds that applies to prepayment of such First and Refunding Mortgage Bonds

on or prior to the Effective Date, which shall be payable in Cash; and (iii) with respect to all other

series of redeemable First and Refunding Mortgage Bonds as to which the redemption period

commences subsequent to the Effective Date, a prepayment premium equal to the premium that

would apply at the commencement of such redemption period, shall be payable in Cash; provided,

however, that Allowed Secured Claims Relating to First and Refunding Mortgage Bonds shall not

include any other prepayment premium or penalties associated with the repayment of First and

Refunding Mortgage Bonds; and provided further, that no prepayment premium will be paid on any

series of First and Refunding Mortgage Bonds that matures in accordance with its terms prior to the

Effective Date if the Allowed Secured Claims on such series of First and Refunding Mortgage

Bonds are paid on or about the maturity date thereof. All existing Liens securing the Allowed

Secured Claims Relating to First and Refunding Mortgage Bonds shall be extinguished as of the

Effective Date.

> **8.** **Class 3b—Secured Claims Relating to PC-Related Mortgage Bonds.**

Class 3b includes Secured Claims against the Debtor evidenced by the PC-Related

Mortgage Bonds that secure the Mortgage Backed PC Bond Claims contained in Class 4a.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    Class 3b is impaired under the Plan. Pursuant to the Plan:

2        (a) if none of the New Money Notes are secured on the Effective Date, then each series

3    of PC-Related Mortgage Bonds shall be replaced with New Mortgage Bonds. In such event, each

4    holder of a PC-Related Mortgage Bond shall be paid an amount in Cash equal to any and all accrued

5    and unpaid interest owed to such holder in respect of such PC-Related Mortgage Bond in

6    accordance with the terms thereof to and including the last scheduled interest payment date

7    preceding the Effective Date.

8        (b) if any of the New Money Notes are secured on the Effective Date, then with respect

9    to each series of PC-Related Mortgage Bonds securing a series of Mortgage Backed PC Bonds

10   redeemed in accordance with Section 4.7(b)(ii) of the Plan, each holder of an Allowed Secured

11   Claim relating to such series of PC-Related Mortgage Bonds shall be paid Cash in an amount equal

12   to such Allowed Claim.

13       If any of the New Money Notes are secured on the Effective Date, all existing Liens

14   securing the Allowed Secured Claims Relating to PC-Related Mortgage Bonds shall be extinguished

15   as of the Effective Date.

16       **9.    Class 4a—Mortgage Backed PC Bond Claims.**

17       Mortgage Backed PC Bond Claims are the Claims of the Issuer, Bond Trustee and the

18   holders of Mortgage Backed PC Bonds for all amounts due and owing by the Debtor under the Loan

19   Agreements and each of the other PC Bond Documents executed by the Debtor in connection with

20   the issuance of each series of Mortgage Backed PC Bonds.

21       Class 4a is impaired under the Plan. Pursuant to the Plan:

22       (a) if none of the New Money Notes are secured on the Effective Date, then:

23           (i) Each series of Mortgage Backed PC Bonds, and each of the PC Bond

24   Documents relating thereto, shall be renewed and remain outstanding. To the extent such payments

25   are not made or provided for by the payment of Class 3b Claims to or for the benefit of the Bond

26   Trustee, each holder of a Mortgage Backed PC Bond shall be paid Cash in an amount equal to any

27   and all accrued and unpaid interest owed to such holder in respect of such Mortgage Backed PC

28   Bond in accordance with the terms thereunder to and including the last scheduled interest payment



HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 01-30923    Doc# 13299    Filed: 07/31/03    Entered: 08/04/03 15:06:09    Page 95
of 100

1  date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond Trustee due

2  and owing under the applicable Loan Agreements shall also be paid in Cash.

3  (ii) On or prior to the Effective Date, with respect to each series of Mortgage

4  Backed PC Bonds that will remain outstanding after the Effective Date, the Reorganized Debtor, the

5  Issuer and the Bond Trustee shall receive an opinion of the original bond counsel to the effect that

6  the transactions set forth herein with respect to each series of Mortgage Backed PC Bonds and the

7  execution and delivery of any releases, amendments or other agreements in connection therewith

8  will not, in and of themselves, cause interest on such series of Mortgage Backed PC Bonds to

9  become includable in the gross income of the holders thereof for federal income tax purposes.

10  (b) If any of the New Money Notes are secured on the Effective Date, then all of the

11  Mortgage Backed PC Bonds shall, at the option of the Reorganized Debtor with respect to each

12  series of Mortgage Backed PC Bonds, be (A) redeemed in accordance with their terms and each

13  holder of an Allowed Secured Claim relating to such series of Mortgage Backed PC Bonds shall be

14  paid Cash in an amount equal to such Allowed Claim, or (B) to the extent permitted under the terms

15  of the Indenture, purchased in lieu of redemption or otherwise in accordance with their terms, and

16  each holder of a Mortgage Backed PC Bond of such series will be paid a purchase price in Cash for

17  its Mortgage Backed PC Bond(s) in an amount equal to its Allowed Secured Claim with respect to

18  such Mortgage Backed PC Bond(s) ; provided, however, that, in connection with any such purchase

19  of the Mortgage Backed PC Bonds on the Effective Date, the Reorganized Debtor shall cause the

20  PC-Related Mortgage Bonds securing such outstanding Mortgage Backed PC Bonds (and the

21  Mortgage pursuant to which such PC-Related Mortgage Bonds were issued) to be released and

22  cancelled. The Reorganized Debtor may, among other things, at is option fund the redemption or

23  purchase price of Mortgage Backed PC Bonds tendered for redemption or purchase on the Effective

24  Date in accordance with the terms of the Plan from remarketing proceeds received from the sale and

25  remarketing of such bonds or from the proceeds of the issuance and sale of refunding bonds, which

26  remarketed or refunding bonds may, at the option of the Reorganized Debtor, be secured by, among

27  other things, contingent notes issued under the same indenture as the New Money Notes and ranking

28  pari passu therewith in accordance with the provisions of Section 7.2 of the Plan.

Case: 01-30923   Doc# 13299   Filed: 07/31/03   Entered: 08/04/03 15:06:09   Page 96
of 100

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

### 10.  **Class 4b—MBIA Insured PC Bond Claims.**

MBIA Insured PC Bond Claims are the Claims of the Issuer, Bond Trustee and the holders of MBIA Insured PC Bonds for all amounts due and owing by the Debtor under the Loan Agreement and each of the other PC Bond Documents executed by the Debtor in connection with the issuance of the MBIA Insured PC Bonds.

Class 4b is unimpaired under the Plan. Pursuant to the Plan, The MBIA Insured PC Bonds, and each of the PC Bond Documents relating thereto, shall remain outstanding. The Loan Agreement and the PC Bond Documents related to the MBIA Insured PC Bonds will be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. Each holder of a MBIA Insured PC Bond shall be paid Cash in an amount equal to any and all accrued and unpaid interest owed to such holder in respect of such MBIA Insured PC Bond in accordance with the terms of the respective MBIA Insured PC Bond, to and including the last scheduled interest payment date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond Trustee due and owing under the applicable Loan Agreement shall also be paid in Cash.

### 11.  **Class 4c—MBIA Claims.**

MBIA Claims consist of (a) the contingent Claims of MBIA with respect to payments that may become due by the Debtor under the terms of the MBIA Reimbursement Agreement as reimbursement for payments made by MBIA under the PC Bond Insurance Policy, and (b) the Claims of MBIA for any and all accrued and unpaid amounts due by the Debtor under the MBIA Reimbursement Agreement, including any and all amounts due by the Debtor as reimbursement of amounts paid by MBIA under the PC Bond Insurance Policy to the Bond Trustee for the payment of interest on the MBIA Insured PC Bonds.

Class 4c is impaired under the Plan. Pursuant to the Plan, each holder of an Allowed MBIA Claim shall be paid Cash equal to its pro rata share of the aggregate amount paid by MBIA to the Bond Trustee with respect to the payment of interest on the MBIA Insured PC Bonds during the period from the Petition Date to and including the last scheduled interest payment date preceding the Effective Date, together with its pro rata share of all other amounts due and owing to MBIA under the terms of the MBIA Reimbursement Agreement through the Effective Date, including any

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

accrued and unpaid interest due on such amounts to the extent provided in the MBIA

Reimbursement Agreement at the non-default rate. In addition, if any of the New Money Notes are

secured on the Effective Date, the Reorganized Debtor will deliver to MBIA, or for the benefit of

MBIA, a contingent note issued under the same indenture as the New Money Notes and ranking pari

passu therewith, in an amount equal to the aggregate outstanding principal amount of the MBIA

Insured PC Bonds as additional security for the Reorganized Debtor's obligations under the MBIA

Reimbursement Agreement after the Effective Date, and (ii) if none of the New Money Notes are

secured on the Effective Date but at least twenty-five percent (25%) of the aggregate principal

amount of the credit facilities established pursuant to the first sentence of Section 7.3 of the Plan are

secured on the Effective Date, the Reorganized Debtor will deliver to MBIA, or for the benefit of

MBIA, a contingent note issued under the same indenture as the New Mortgage Bonds and ranking

pari passu therewith, in an amount equal to the aggregate outstanding principal amount of the MBIA

Insured PC Bonds as additional security for the Reorganized Debtor's obligations under the MBIA

Reimbursement Agreement after the Effective Date. Principal amounts under any contingent note

issued pursuant to the preceding sentence shall be payable only to the extent that the Reorganized

Debtor has failed to satisfy its obligations under the MBIA Reimbursement Agreement to reimburse

MBIA for any payments made by MBIA pursuant to the PC Bond Insurance Policy for the payment

of the principal of the MBIA Insured PC Bonds. Such contingent note shall accrue interest on any

principal amount then due and payable thereunder at a rate equal to the interest rate which accrues

on any outstanding reimbursement obligations of the Reorganized Debtor under the MBIA

Reimbursement Agreement. Any payments made under such contingent note shall be deemed to

satisfy the Reorganized Debtor's obligations under the MBIA Reimbursement Agreement.

### 12. Class 4d—Letter of Credit Backed PC Bond Claims.

Letter of Credit Backed PC Bond Claims are the Claims against the Debtor by the

Issuer, Bond Trustee and the holders of Letter of Credit Backed PC Bonds for all amounts due and

owing by the Debtor under the Loan Agreements and each of the other PC Bond Documents

executed by the Debtor in connection with the issuance of each series of Letter of Credit Backed PC

Bonds.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    Class 4d is unimpaired under the Plan.  Pursuant to the Plan, each series of Letter of

2    Credit Backed PC Bonds, and each of the PC Bond Documents relating thereto, shall remain

3    outstanding.  Each of the Loan Agreements and the PC Bond Documents related to the Letter of

4    Credit Backed PC Bonds will be reinstated and rendered unimpaired in accordance with section

5    1124 of the Bankruptcy Code.  Each holder of a Letter of Credit Backed PC Bond shall be paid Cash

6    in an amount equal to any and all accrued and unpaid interest owed to such holder in respect of such

7    Letter of Credit Backed PC Bond in accordance with the terms thereof to and including the last

8    scheduled interest payment date preceding the Effective Date.  All unpaid fees and expenses of the

9    Issuer and Bond Trustee due and owing under the applicable Loan Agreement will also be paid in

10   Cash.

11   **13.   Class 4e—Letter of Credit Bank Claims.**

12            Letter of Credit Bank Claims consist of (a) the contingent Claims of each Letter of

13   Credit Issuing Bank and the applicable Banks, if any, with respect to payments which may become

14   due by the Debtor under their respective Reimbursement Agreements with the Debtor in an amount

15   equal to the outstanding Stated Amount of each of the Letters of Credit, and (b) the Claims of the

16   Letter of Credit Issuing Banks and the applicable Banks, if any, for any and all accrued and unpaid

17   amounts due by the Debtor under their respective Reimbursement Agreements, including amounts

18   due as reimbursement of amounts paid by each Letter of Credit Issuing Bank under its respective

19   Letter of Credit to the Bond Trustee for the payment of interest on the related series of Letter of

20   Credit Backed PC Bonds.

21            Class 4e is impaired under the Plan.  Pursuant to the Plan:

22            (a)   with respect to each Letter of Credit Issuing Bank, until the earlier of (x) the

23   Effective Date, (y) the date the respective Letter of Credit is terminated or the stated amount thereof

24   is permanently reduced, or (z) the date that any of the related series of Letter of Credit Backed PC

25   Bonds are redeemed, to the extent that the Debtor has not reimbursed the applicable Letter of Credit

26   Issuing Bank and the applicable Banks, if any, for drawings made on the related Letter of Credit

27   with respect to the payment of interest on the related series of Letter of Credit Backed PC Bonds to

28   the extent provided in the respective Reimbursement Agreement, each holder of an Allowed Letter

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 of Credit Bank Claim shall be paid Cash in an amount equal to its pro rata share of the aggregate

2 amount paid by the respective Letter of Credit Issuing Bank to the respective Bond Trustee under

3 the terms of the applicable Letter of Credit with respect to the payment of the interest on the Letter

4 of Credit Backed PC Bonds to which such Letter of Credit Bank Claim relates during the period

5 from the Petition Date to and including the last scheduled interest payment date on such Letter of

6 Credit Backed PC Bonds preceding the Effective Date. Each holder of an Allowed Letter of Credit

7 Bank Claim will also be paid Cash in an amount equal to its pro rata share of all other amounts then

8 due and owing to the respective Letter of Credit Issuing Bank and the applicable Banks, if any,

9 under the terms of the respective Reimbursement Agreement (other than for reimbursement of

10 drawings on the respective Letter of Credit) through the Effective Date, including, without

11 limitation, interest at the interest rate due on such amounts to the extent provided in the respective

12 Reimbursement Agreements and any due and owing Forbearance, Extension and Letter of Credit

13 Fees through the Effective Date, and the reasonable fees and expenses of unrelated third-party

14 professionals retained by the Letter of Credit Issuing Banks, to the extent incurred subsequent to the

15 Petition Date in the Chapter 11 Case.

16     (b)    On the Effective Date one of the following shall occur with respect to each series

17 of Letter of Credit Backed PC Bonds and its respective Letter of Credit, at the option of the Debtor

18 separately for each series of Letter of Credit Backed PC Bonds:

19         (i)    Purchase Option. The respective series of Letter of Credit Backed PC

20 Bonds shall be called for mandatory tender in accordance with the terms of the respective Indenture

21 and shall be purchased by the respective Bond Trustee through a draw on the related Letter of Credit

22 and, at the option of the respective Letter of Credit Issuing Bank, shall either be registered in the

23 name of the respective Letter of Credit Issuing Bank or in the name of the Debtor subject to a first

24 lien security interest in favor of the respective Letter of Credit Issuing Bank to additionally secure

25 the obligations of the Debtor under the related Reimbursement Agreement. On the Effective Date,

26 to the extent that the Letter of Credit Issuing Bank and the Banks have not been reimbursed therefor,

27 the Letter of Credit Issuing Bank will receive Cash in an amount equal to the sum of (i) the interest

28 portion of the purchase price of the tendered Letter of Credit Backed PC Bonds paid out of a draw

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation