FILED

03 DEC 12 PM 4:26

U.S. BANKRUPTCY COURT
NORTHERN DIST. OF CA.
SAN FRANCISCO, CA.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | ) Bankruptcy Case |
| | ) No. 01-30923DM |
| PACIFIC GAS AND ELECTRIC COMPANY, | ) |
| a California corporation, | ) Chapter 11 |
| | ) |
| Debtor. | ) |
| _____ | ) |

**MEMORANDUM DECISION APPROVING SETTLEMENT AGREEMENT
AND OVERRULING OBJECTIONS TO CONFIRMATION OF
REORGANIZATION PLAN**

## I. INTRODUCTION

Pacific Gas and Electric Company ("PG&E"), a solvent public utility, together with its corporate parent, PG&E Corporation ("Parent") and its Official Committee of Unsecured Creditors ("OCC"), seek confirmation of a chapter 11 plan of reorganization that will permit PG&E to begin its exit from a two and one-half year bankruptcy case and pay or reinstate billions of dollars in debt as soon as the plan becomes effective. The court must be satisfied that the plan complies with applicable provisions of the Bankruptcy Code and is consistent with the goals of reorganization under chapter 11.

A centerpiece of that plan, crucial to its success, is a Settlement Agreement that must be approved by the California

-1-

ENTERED IN BANKRUPTCY DOCKET

DEC 1 5 2003

Case: 01-30923   Doc# 14237   Filed: 12/12/03   Entered: 12/15/03 11:23:42   Page 1 of 42

Public Utilities Commission (the "Commission"). Within days the
Commission is expected to decide whether the Settlement Agreement
is appropriate as a matter of California public utility policy,
taking into account the interests of ratepayers, customers, PG&E,
its shareholders and the public in general. The Commission must
make a business judgment on the propriety of substantive
provisions of the Settlement Agreement, such as whether those
provisions are too burdensome for ratepayers and too generous for
PG&E; whether they are appropriate to relieve PG&E from its
financial crisis; whether any particular terms or provisions of
the Settlement Agreement should be replaced by some other terms or
conditions; and whether there are acceptable alternatives.

Both this court and the Commission have similar, but not
identical, tasks. Where those tasks coincide is the duty of each
to determine that the execution and performance of the Settlement
Agreement will be lawful.

While this court could defer until the Commission issues its
decision, it will discharge that duty, derived from section
1129(a)(3),[1] to be certain that the Settlement Agreement and the
plan's implementation of it comply with applicable law. It will
also assure that nothing in the Settlement Agreement undermines
the feasibility of the plan. 11 U.S.C. § 1129(a)(11). The court
remains mindful that the Ninth Circuit has made clear that:

> ". . . as a matter of federal law, state officials cannot
> enter into a federally sanctioned consent decree beyond their
> authority under state law . . ."

---

[1] Unless otherwise indicated, all section and rule
references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 and
the Federal Rules of Bankruptcy Procedure, Rules 1001-9036.

-2-

1  <u>Southern California Edison Co. v. Lynch</u>, 307 F.3d 794, 809 (9th
2  Cir. 2002), quoted in <u>Southern California Edison Co. v. Peevey</u>, 31
3  Cal.4th 781, 787 (2003).[2]

4        For the reasons stated below, the court will approve the
5  Settlement Agreement and will enter a separate Confirmation Order
6  confirming the plan, provided the Commission approves the
7  Settlement Agreement.[3]

8  **II.    <u>BACKGROUND</u>**

9        On April 19, 2002, PG&E and Parent as co-proponents proposed
10  a chapter 11 plan of reorganization.  That plan, amended from time
11  to time (the "Original Plan"), provided for the disaggregation of
12  PG&E's historic businesses into four separate entities.  Three of
13  those new business entities (electric generation, electric
14  transmission and gas transmission) would have been regulated by
15  the Federal Energy Regulatory Commission, free from decades of
16  regulation by the Commission.  The Commission would continue to

17  ─────────────────

18        [2]  While the Commission is not a proponent of the Plan, the
      Settlement Agreement's paragraphs 20, 21 & 22 commit the
19      Commission before this court just as much as a traditional federal
      court consent decree.

20        [3]  This Memorandum Decision is not intended to be and is not
      an order of the court that might establish a deadline to file a
21      notice of appeal.  If and when findings of fact and conclusions of
      law are entered concurrent with issuance of a Confirmation Order,
22      the court will incorporate this Memorandum Decision by reference
      as further findings of fact and conclusions of law, as the case
23      may be.

24        PG&E's counsel has submitted a proposed form of order
      confirming the plan, no doubt confident of favorable decisions
25      from this court and the Commission.  Because of the requirements
      of Rule 9021, which are far more than technical (<u>see</u> <u>In re Bonham</u>,
26      229 F.3d 750, 760 n.3 (9th Cir. 2000) (time for appeal does not
      start running until entry of a separate judgment)), the court
27      anticipates entry of a more streamlined form of Confirmation Order
      at a later time, separate from but consistent with this Memorandum
28      Decision.

-3-

regulate any electric distribution and sale by the surviving utility.

The Commission vigorously opposed the Original Plan virtually every step of the way (see Pacific Gas and Elec. Co. v. California, ___ F.3d ___, 2003 WL 22718162 (9th Cir. 2003)) and it filed a competing plan, which was subsequently joined by the OCC (the "Joint Plan").

On November 18, 2002, the court began hearings on confirmation of the competing plans. After the Commission and the OCC rested their case-in-chief in connection with the Joint Plan, the court heard and denied a motion by PG&E and Parent under Rule 7052(c) to deny confirmation of the Joint Plan. The motion was denied, in part, because the court concluded that a proposed Reorganization Agreement, discussed infra, was lawful. Trial on the Original Plan continued, but during that trial, on March 4, 2003, the court ordered a judicially supervised settlement conference. Shortly thereafter it stayed all proceedings on the Original Plan and the Joint Plan. PG&E, Parent, the OCC and the Commission, through its staff, then participated in a confidential settlement conference before Hon. Randall J. Newsome, United States Bankruptcy Judge. On June 19, 2003, Judge Newsome, accompanied by PG&E, Parent, and the OCC (collectively the "Plan Proponents") and the Commission staff announced a proposed settlement.[4]

On July 31, 2003, the Plan Proponents filed a Plan of

_____

[4]   The court extends its sincere appreciation to Judge Newsome for his tireless and unselfish efforts in attempting to bring about a resolution to this long and complex case.

-4-

1  Reorganization under Chapter 11 of the Bankruptcy Code for Pacific
2  Gas and Electric Company, dated July 31, 2003, and thereafter
3  amended it from time to time by various modifications (the
4  "Plan").  After the court approved the disclosure statement
5  accompanying the Plan, the Plan Proponents solicited the votes of
6  impaired classes of creditors.  All impaired classes but one
7  accepted the Plan.

8      Various parties filed objections to confirmation; by the
9  conclusion of the confirmation trial, all objections had been
10  resolved other than those filed by the City of Santa Clara ("Santa
11  Clara"), the Merced Irrigation District ("MID"), the City of Palo
12  Alto and the Northern California Power Agency (collectively with
13  Santa Clara and MID, the "Municipal Objectors"); the Attorney
14  General of the State of California on behalf of various state
15  agencies (the "AG"); and the City and County of San Francisco
16  ("CCSF," and collectively with the Municipal Objectors and the AG,
17  the "Objectors").

18      Trial on confirmation of the Plan began on November 10, 2003,
19  and after closing arguments for and against confirmation and for
20  and against admission of various documentary evidence were made on
21  November 24, and November 25, 2003, the court took the matter
22  under submission.[5]

23

24      [5]  By separate order issued this date, the court is
   sustaining PG&E's objections to the admission of Municipal
25  Objectors' exhibits 216, 217 and 218, respectively the
   Administrative Law Judge's tentative decision disapproving the
26  Settlement Agreement and Commissioner Peevey's two alternate
   proposed Commission decisions.  It is also sustaining PG&E's post-
27  trial objections to AG's and Municipal Objectors' post-trial
   tender of three newly issued alternate proposed decisions issued
28  by Commissioners Lynch, Wood and Brown.  Assuming those documents

-5-

1    Objectors' primary objections are directed at (1) the
2  legality and enforceability of the Settlement Agreement, relying
3  on section 1129(a)(3) ("[T]he plan has been proposed in good faith
4  and not by any means forbidden by law") and section 1129(a)(11),
5  commonly referred to as the "feasibility" requirement, and (2) the
6  extent and effect of releases to be given under the Plan, relying
7  on section 524(e) (". . . discharge of a debt of the debtor does
8  not affect the liability of any other entity . . ."). Objectors
9  have also raised numerous other challenges to confirmation. These
10 include: other subsections of section 1129(a) have been violated;
11 there is an indefinite gap between the entry of a Confirmation
12 Order and the likely Effective Date; Debtor has not justified the
13 release it will give to Parent; claims of creditors who are not
14 paid as of the Effective Date are treated unfairly as a result of
15 the financing, perhaps secured by PG&E's assets, that will be put
16 in place on the Effective Date; in property interests of Santa
17 Clara have not been protected; approval of a Stipulation Resolving
18 Issues Regarding the Land Conservation Commitments is needed; and
19 the Commission's waiver of sovereign immunity is overly broad.
20 This court overrules all objections to confirmation of the plan
21 and challenges to the Settlement Agreement, as all of the
22 applicable requirements of section 1129(a) have been satisfied.
23 Section 1129(b) has also been satisfied as to the one impaired
24
25 would survive PG&E's hearsay objections, the court is satisfied
   that they are not relevant to the task before it, and while the
26 court respects the efforts of Administrative Law Judge Barnett and
   the four Commissioners, their own views are irrelevant to this
27 court's independent decision. By the same order the court is also
   sustaining PG&E's objections to the admission of Municipal
28 Objectors' exhibit 219 as irrelevant.

-6-

1   class of creditors that did not vote.

2      No purpose would be served at this time by an extensive

3   discussion of all of the objections or the issuance of detailed

4   findings of fact and conclusions of law. The court will limit

5   this Memorandum Decision to an explanation of its reasons for

6   overruling Objectors' principal objections.[6]

7      The Settlement Agreement is presently unsigned, as the

8   Commission has not yet authorized its general counsel to sign it

9   nor has it approved the Commission's performance thereunder;

10  neither have the boards of directors of PG&E or Parent approved

11  the Settlement Agreement, but the court expects that to be done in

12  due course, assuming a favorable decision from the Commission. No

13  Confirmation Order will be signed until the court is satisfied

14  that the Commission, and PG&E and Parent, through their respective

15  boards, have authorized execution and performance thereunder.

16

17 ────────────────────

18     [6] The court briefly itemizes its conclusions on the other
objections. The Plan is "feasible" as that term has been used to
19  refer to the requirements of section 1129(a)(11). This court can
and will control any risks arising from any extension of the March
20  31, 2004, deadline by which the Plan's Effective Date must occur;
the waiver of sovereign immunity in the Settlement Agreement and
21  support for the Plan is limited to the Commission and does not
extend to other California agencies; Santa Clara's property
22  interests will be protected by appropriate language in the
Confirmation Order; and the stipulation regarding environmental
23  matters has been approved. To satisfy some of the AG's concerns,
the court will ensure that the provisions of the Confirmation
24  Order approving the release PG&E is giving Parent does not amount
to an adjudication of the claims being released.

25     The United States Trustee and some Objectors claim that the
Plan's contemplated payments to or on account of various
26  professionals, including the Parent's attorneys' fees, are
improper without court review pursuant to section 330. The court
27  will follow the unopposed suggestion of counsel for Parent and
reserve this issue for decision after issuance of a Confirmation
28  Order.

-7-

## III.  **THE SETTLEMENT AGREEMENT**

The following is a summary of key provisions of the Settlement Agreement, which if approved by the Commission, will be signed by PG&E, Parent and the Commission:

### Statement Of Intent

The parties recite the importance of reliable electric and gas service as being of the utmost importance to the safety, health and welfare of California's citizenry and economy and expect that the Plan will result in reduction of certain electric rates after January 1, 2004.  PG&E will continue to be regulated by the Commission.  The intent of the Settlement Agreement is to enable PG&E to emerge from chapter 11 and resume fully its traditional role of providing safe and reliable electric and gas service at just and reasonable rates, subject to Commission regulation.  The parties intend that PG&E emerge from chapter 11 with a company credit rating of Investment Grade, which rating is to improve over time and which will directly benefit PG&E's ratepayers by reducing the cost of financing to emerge from chapter 11 and to fund future operations.[7]

### Regulatory Asset

The Settlement Agreement provides that the Commission shall establish a Regulatory Asset of $2,210,000,000 as a new, separate and additional part of PG&E's rate base.  This Regulatory Asset will be amortized in PG&E's electrical rates over nine years.  The

---

[7]    The evidence at trial on the Plan established that if the Plan becomes effective, PG&E will likely obtain an Investment Grade rating and thus likely be able to raise approximately $8.7 billion to fund the Plan and pay or reinstate debts and preferred stock interests exceeding $12 billion on the Effective Date.

-8-

Regulatory Asset shall earn PG&E's authorized return on equity ("ROE") on the equity component of its capital structure as set forth in its annual cost of capital proceedings, provided that the ROE shall be no less than 11.22% per year for the life of the Regulatory Asset. Once the equity component of PG&E's capital structure reaches 52%, the authorized equity component of the Regulatory Asset shall be no less than 52% for the life of the Regulatory Asset. The outstanding balance of the Regulatory Asset will be reduced to the extent any net after-tax amount of refunds, claim offsets and other credits are available to PG&E from generators and other energy suppliers.[8]

PG&E's utility retained generation rate base already established in prior Commission proceedings shall be deemed just and reasonable and not subject to modification, adjustment or reduction (with certain exceptions) and the Commission will not reduce or impair the value of the Regulatory Asset or that utility retained generation rate base by taking the Regulatory Asset or that rate base, their amortization or earnings into account when setting other revenue requirements and resulting rates. The Commission will also not take into account the Settlement Agreement or the Regulatory Asset in establishing PG&E's authorized ROE or its capital structure.

The Commission acknowledges the importance of Investment Grade credit ratings for PG&E to function and it acknowledges that such a credit rating directly benefits PG&E's ratepayers by

---

[8] Appendix A to the Settlement Agreement indicates that over the nine-year term of the Settlement Agreement, in excess of $5 billion will have to be collected in rates to retire the Regulatory Asset.

-9-

reducing its immediate and future borrowing costs, which in turn will permit PG&E to finance its operations and make capital expenditures in the future at lower costs to its ratepayers. In furtherance of those objectives, the Commission agrees ". . . to act to facilitate and maintain Investment Grade company ratings for PG&E."

The Commission also agrees to act in a timely manner on PG&E's applications to collect in rates its prudently incurred costs of any new, reasonable investment utility plant and assets. Further, the Commission agrees that, absent "compelling evidence to the contrary, PG&E's expected regulatory outcomes and financial performance should be similar to those of the other investor-owned utilities in California under similar circumstances." The Commission agrees not to discriminate against PG&E by reason of its chapter 11 case, litigation filed by PG&E against the Commission to recover past lost revenues, the Settlement Agreement, the Regulatory Asset or other matters addressed or resolved therein.

Ratemaking Matters

The Commission agrees to maintain electrical rates at current levels through December 31, 2003, and may thereafter adjust electric rates consistent with the Settlement Agreement, the Plan, the Confirmation Order and California law. The Commission also agrees to set PG&E's capital structure and authorized ROE in the usual manner, except that beginning January 1, 2004, and continuing until either Standard & Poor's confers a credit rating of "A-" or Moody's confers a credit rating of at least "A3," the authorized ROE shall be no less than 11.22% per year and the

-10-

authorized equity ratio for ratemaking purposes shall be no less than 52%, except for a transition period described in the Settlement Agreement.

Dividends and Stock Repurchases

Under the Settlement Agreement PG&E and Parent are able to pay dividends and repurchase common stock when appropriate. Other than extant conditions in previous Commission decisions, the Commission will not restrict the ability of either corporation to declare and pay dividends or repurchase stock.

Headroom

Certain net income accrued or collected through and including December 31, 2003, is agreed to be property of PG&E's chapter 11 estate; provided, however, headroom (defined in the Settlement Agreement) revenues accrued during calendar year 2003 shall not exceed $875 million or be less than $775 million. If headroom exceeds $875 million, the Commission will take necessary action to refund such excesses; if it is less than $775 million, the Commission will permit PG&E to collect the shortage in rates.

Dismissal Of Litigation

PG&E agrees to dismiss pending rate recovery litigation,[9] foregoing any recovery from ratepayers of costs sought in that litigation not otherwise provided for in the Settlement Agreement.

---

[9] The principal action PG&E will dismiss is based on the federal filed-rate doctrine now pending in the United States District Court for the Northern District of California. The theory of the action is that PG&E should be allowed, as a matter of federal law, to recover the excess of wholesale electricity costs incurred during the energy crisis over retail electricity sales during that period. While the Commission denies liability, PG&E contends that it could recover several billion dollars in future rates were it to prevail.

-11-

It also agrees to withdraw the Original Plan, dismiss various other actions related to that plan and abandon its efforts to disaggregate.

## Waiver Of Sovereign Immunity

The Commission "knowingly and expressly" waives all existing and future rights of sovereign immunity, and all other similar immunities, as a defense in any action or proceeding concerning enforcement of the Settlement Agreement. It also consents to jurisdiction of "any court or other tribunal or forum for such actions or proceedings, including but not limited to, this court."[10] While the AG contends the waiver of sovereign immunity improperly extends to other state agencies, the court construes the provisions of the Settlement Agreement and the Plan pertaining to a waiver of sovereign immunity to extend only to the Commission.[11]

---

[10] This provision (paragraph 21) vests nonexclusive jurisdiction in this court. Provisions of the Plan purport to vest exclusive jurisdiction in this court for enforcement of the Settlement Agreement. At trial on the Plan, PG&E's counsel represented that the Plan Proponents expect to obtain the Commission's consent to clarify that this court's jurisdiction to enforce the Settlement Agreement is exclusive. If this matter is not resolved, this court will take it up in further proceedings before entering a Confirmation Order. The court discusses below the Objectors' contention that vesting jurisdiction in this court is impermissible.

[11] Counsel for PG&E contends that the AG and other agencies of the state of California have waived sovereign immunity by their conduct during this case. He concedes, however, that nothing in the Settlement Agreement or the Plan is specifically intended to constitute such a waiver. Based upon those representations and its own review of the Plan and the Settlement Agreement, the court concludes that the waiver of sovereign immunity that will become effective under the Plan applies only to the Commission.

-12-

1  <u>Validity and Binding Effect</u>

2      The Settlement Agreement provides that it will be

3  "irrevocable and binding" upon the parties and their successors

4  and assigns, "notwithstanding any future decisions and orders of

5  the Commission."  The parties also agree that this court shall

6  retain jurisdiction over them for all purposes relating to the

7  enforcement of the Settlement Agreement, Plan and the Confirmation

8  Order.  Due to the inadequacy of money damages the parties have

9  agreed to specific performance by way of injunctive or other

10 equitable relief to remedy any breach.  Further, the Settlement

11 Agreement is not intended, whether expressly or by implication, to

12 confer any rights or remedies on anyone other than the parties

13 thereto.

14     <u>Term of Settlement Agreement</u>

15     The Settlement Agreement terminates nine years after the

16 Plan's Effective Date, although vested rights survive and may be

17 enforced after termination.

18 **IV.  RELEASE PROVISIONS OF PLAN**

19     Sections 11.4 through 11.6 of the Plan provide for various

20 releases, many of which are required by Paragraph 24 of the

21 Settlement Agreement.  The Plan Proponents release each other and

22 their employees and advisors, among others.  Debtor (as debtor-in-

23 possession and as Reorganized Debtor) releases a broad class of

24 persons called "Releasees" from "any and all Causes of Action held

25 by, assertable on behalf of the Debtor or derivative of the

26 Debtor's rights, in any way relating to the Debtor, the Debtor-in-

27 Possession, the Chapter 11 Case, the Plan, negotiations regarding

28 or concerning the Plan, and the ownership, management and

-13-

1 operation of the Debtor and Debtor-in-Possession . . ."  The term
2 "Releasees" is defined to include the OCC, the Parent, and people
3 who are, on or after the petition date, their and Debtor's
4 officers, directors, members of management, or members, and all of
5 their advisors, consultants or professionals.

## V.  ISSUES

7      A.  Will the Settlement Agreement be legal and enforceable
          when fully executed and approved by the Commission and
8         this court?

9      B.  Has PG&E justified its release of Parent, and do other
          releases in the Settlement Agreement and Plan violate
10        the law?

## VI.  DISCUSSION

### A.  The Settlement Agreement is Legal and Enforceable.

13      As noted previously, the Plan and Settlement Agreement are
14 the results of months of judicially-supervised settlement
15 negotiations among PG&E, Parent, the Commission staff and the OCC.
16 The Settlement Agreement resolves the competing plans of
17 reorganization and ends lengthy and costly litigation between PG&E
18 and the Commission relating to the energy crisis.  Under the
19 Settlement Agreement, PG&E shall emerge from chapter 11 as a
20 vertically integrated utility subject to the traditional
21 ratemaking jurisdiction of the Commission, just as it has been for
22 nearly a century.

23      Objectors contend that the Plan is unconfirmable because it
24 has been proposed by means forbidden by law (11 U.S.C.
25 § 1129(a)(3)), in that future commissions allegedly cannot be
26 bound by the terms of the Settlement Agreement and the Settlement
27 Agreement allegedly constitutes improper ratemaking.  As explained
28

-14-

below, the court disagrees with the Objectors.[12]

        1.   <u>The Commission Is Authorized to Enter Into the Settlement Agreement.</u>

        a.   <u>Constitutional and Statutory Authority</u>

The Commission has the inherent authority under California Public Utilities Code section 701[13] to enter into binding contracts. This power arises from the Commission's broad constitutional and statutory authority to regulate public utilities. <u>See</u> Cal. Const., art. XII, §§ 5 & 6; Cal. Pub. Util. Code §§ 451, 701, 761, 762; <u>Wood v. Public Utilities Comm'n</u>, 4

---

[12] Nor is the court persuaded by Objectors' arguments regarding the lack of good faith required by section 1129(a)(3). The Ninth Circuit has held that a plan is proposed in good faith if it is designed to facilitate the purposes of the Bankruptcy Code -- purposes which include facilitating the successful rehabilitation of debtor and maximizing the value of the bankruptcy estate. <u>Security Farms v. General Teamsters etc. (In re General Teamsters etc.)</u>, 265 F.3d 869 (9th Cir. 2001). A plan has not been proposed with a lack of good faith merely because opponents question the legality of some of its terms. If those terms are found to be unlawful, confirmation will be denied for that reason and not based upon lack of good faith without other supporting evidence.

The Ninth Circuit has also ruled that a solvent debtor's use of bankruptcy to avoid paying a default rate of interest is not necessarily a lack of good faith. <u>Platinum Capital, Inc. v. Sylmar Plaza, LP (In re Sylmar Plaza, LP)</u>, 314 F.3d 1070 (9th Cir. 2002), <u>cert. denied</u>, ___ U.S. ___, 123 S.Ct. 2097 (2003).

The court is convinced that the Settlement Agreement is intended to facilitate the successful reorganization of PG&E and to maximize the value of the bankruptcy estate by settling protracted, expensive and uncertain litigation, including this very hard fought Chapter 11 case. Although PG&E is solvent, the pendency of this litigation is delaying payment of creditors and increasing PG&E's cost of borrowing to the detriment of all parties. Therefore, the court rejects the Objectors' arguments as to lack of good faith.

[13] This section of the Memorandum Decision discusses various provisions of the California Public Utilities Code, specifically sections 451, 701, 728, 761, 762, 816, 817, and 1708. These sections shall be referred to simply as "section ___." Other section references continue to refer to the Bankruptcy Code.

-15-

Cal.3d 288, 294-95 (1971). Specifically, section 701 provides that the Commission, in its supervision and regulation of public utilities, "may do all things, whether specifically designated in this part or in addition thereto, which are necessary and convenient in the exercise of such power and jurisdiction." Cal. Pub. Util. Code § 701. <u>See also</u> <u>U.S. Ecology, Inc. v. State of California</u>, 92 Cal.App.4th 113, 132 (2001) ("Administrative officials may exercise such additional powers as are necessary for the due and efficient administration of powers expressly granted by statute, or as may fairly be implied from the statute granting the powers. Thus, an administrative agency has the power to contract on a particular matter if this power may be fairly implied from the general statutory scheme.").

In addition to section 701, the Commission is empowered under other sections to make the commitments proposed in the Settlement Agreement. For example, section 816 authorizes the issuance of securities; section 817 specifically authorizes issuance of securities in a recapitalization or reorganization; and section 451 authorizes the Commission to permit PG&E to recoup the costs of securities as well as the reasonable ongoing cost of providing electric and gas services. Thus, the commitments in the Settlement Agreement are consistent with the Commission's regulatory obligations.

The Objectors contend that section 1708 and section 728 change this analysis. Section 1708 authorizes the Commission to rescind or alter its previous decisions and orders and section 728 authorizes the Commission to change a utility's rates if it determines current rates are no longer just or reasonable. As

-16-

discussed in more detail below, the Settlement Agreement is a contract and a settlement of litigation by the Commission, not an opinion or order of the Commission subject to section 1708.[14] Moreover, the Settlement Agreement addresses only discrete components from which future revenue requirements will be based but it does not set rates and therefore does not implicate section 728.

### b. Case Law

The California Supreme Court has recently confirmed in Southern California Edison Co. v. Peevey, 31 Cal.4th 781 (2003), that the Commission may enter into a binding agreement which compromises disputes and has prospective effects on rates. Recognizing the broad statutory powers of the Commission, the Supreme Court stated:

> Statutorily, [the Commission] is authorized to supervise and regulate public utilities and to 'do all things . . . which are necessary and convenient in the exercise of such power and jurisdiction' (§ 701); this includes the authority to determine and fix 'just, reasonable (and) sufficient rates' (§ 728) to be charged by the utilities. Adverting to these provisions, we have described [the Commission] as 'a state agency of constitutional origin with far-reaching duties, function and powers' whose 'power to fix rates [and] establish rules has been liberally construed.'

Id. at 792 (citations and some internal quotation marks omitted).

In Southern California Edison, Southern California Edison ("SCE") brought a federal suit against the Commission claiming that the Commission's regulation of electricity rates violated federal law in several respects. Id. at 786. The parties

---

[14]  This court specifically rejects MID's suggestion that the fact that a Commission order will be needed for approval of the Settlement Agreement somehow transforms the Settlement Agreement into the equivalent of an order of the Commission.

-17-

subsequently entered into a settlement agreement which became the basis for a stipulated judgment. _Id._  The Utility Reform Network ("TURN") objected that the stipulated judgment violated California state law.[15]  In its settlement agreement with SCE, the Commission agreed to allow SCE to recover certain costs by maintaining the existing rates for a set period of time. _Id._ at 799-800.  Like the current Settlement Agreement, the compromise agreement was "intended to . . . restore SCE's creditworthiness and avoid further instability and uncertainty for the company and consumers." _Id._ at 800.

Recognizing that the Commission's broad discretion included future ratemaking, the California Supreme Court held that the Commission had the authority under state law to freeze rates for a certain period of time. _Id._ at 803.  Thus, the court has acknowledged that the broad authority of section 701 includes the authority to enter into binding contracts, including contracts that constrain the Commission's future conduct in order to effectuate the Commission's regulatory mission.

In finding that the Commission had the inherent authority to enter into a rate settlement agreement with SCE, the California Supreme Court stated:

> If [the Commission] lacked substantive authority to propose and enter into the rate settlement agreement at issue here, it was not for lack of inherent authority, but because this rate agreement was barred by some specific statutory limit on [the Commission's] power to set rates.

_Id._  Even though TURN argued that the rate agreement violated

---

[15]  The case reached the California Supreme Court after the Ninth Circuit Court certified three state law questions to it. _See_ Southern California Edison Co. v. Lynch, 307 F.3d at 809.

-18-

specific statutes, the court disagreed and held that no "specific statutory limit" barred the rate agreement.

In other words, there is nothing in the law of California that prohibits the Commission from being a party to an agreement that settles existing litigation and supports a utility's reorganization on terms that are binding on future Commissions. Id.; Rich Vision Centers Inc. v. Bd. of Med. Exam'rs, 144 Cal.App.3d 110, 117 (1983) (holding that "we discern no reason in logic, law or policy to deny to the Board as a state agency acting on behalf of the state citizenry, or to its attorneys, the same options to settle cases on any legitimate terms as are available to private litigants and their attorneys"). This concept is not surprising. The Commission has the unquestioned power to appear in court, enter into contracts, fix rates and do many other things. Given these powers, it would be startling (and a severe handicap) if the Commission were prohibited from settling lawsuits by a consent decree or settlement agreement. Therefore, the court is satisfied that the Commission has authority to settle its disputes with PG&E and the Parent.[16]

---

[16] The court is not troubled that the Settlement Agreement obligates future commissions to include the Regulatory Asset in PG&E's rate base and to amortize it as a component of future revenue requirements over the life of that agreement. Nor is this court troubled that the ROE and the equity ratio will be frozen temporarily, until PG&E has achieved certain credit ratings. The form of settlement is different from what was authorized in Southern California Edison but the substance is not.

In Southern California Edison, the schedule of payments to SCE depended on the amount of a surplus (the difference between rates set by future commissions and the rate freeze). Under the Settlement Agreement, the payments to PG&E depend on how quickly PG&E returns to certain credit ratings and on the requirement to amortize the Regulatory Asset. The only essential difference is

-19-

In fact, the ability of the Commission to enter into binding contracts is an important attribute of the Commission's power. As recognized in <u>Santa Margarita Area Residents Together v. San Luis Obispo County Board of Supervisors</u>, 84 Cal.App.4th 221 (2000), a governmental agency has authority to enter into an enforceable agreement. In <u>Santa Margarita</u>, San Luis Obispo County and a real estate developer entered into a development agreement. The plaintiffs sued to set aside the agreement, contending that the zoning freeze in the agreement unconstitutionally contracted away the county's police power. The court disagreed:

> A governmental entity did not contract away its police power unless the contract amounts to the "surrender" or "abnegation" of a proper governmental function. . . . [¶] The county concluded that the zoning freeze in the Agreement advances the public interest by preserving future options. <u>This type of action by the County is more accurately described as a legitimate exercise of governmental police power and the public interest than as a surrender of police</u>

the amount of payment.

Various parties have referred to the schedule of payments on the Regulatory Asset as a mortgage-style amortization. Applying that analogy, the Commission staff and PG&E have essentially agreed to "principal" of $2.21 billion staff and "interest" at 11.22% (the amount of the ROE), subject to upward adjustments based on tax and other considerations.

Viewed from the perspective of that analogy, the Municipal Objectors essentially argue that the rate of interest is higher than usual ("extraordinary," they argue). If so, that only means that the present discounted value of the Regulatory Asset is somewhat higher than its $2.21 billion face amount. If the Municipal Objectors believe that this makes the Regulatory Asset too valuable or too costly for ratepayers, they have had the opportunity to argue to the Commission that the Settlement Agreement is not a good bargain. The same is true for the agreement for a minimum ROE of 11.22% and a minimum equity ratio until PG&E returns to certain credit ratings.

In sum, the court will not second-guess whether the effect on future rates is good or bad. All interested parties, including ratepayers, have had an opportunity to voice their opinions to the Commission.

-20-

1  power to a special interest.

2  Id. at 233 (emphasis added) (citations omitted). In addition, the

3  Santa Margarita court emphasized the binding nature of the

4  agreement on future versions of the governmental body that entered

5  into the contract:

> A contract which 'appears to have been fair, just and
> reasonable at the time of its execution, and prompted by
> the necessities of the situation or in its nature
> advantageous to the municipality at the time it was
> entered into, is neither void nor voidable merely
> because some of its executory features may extend beyond
> the terms of office of the members' of the legislative
> body which entered into the contract.

10  Id. at 232 (emphasis added)(citations omitted).

11  Like the Settlement Agreement here, the agreement in Santa

12  Margarita "represent[ed] the resolution of a protracted dispute

13  . . ." Id. at 231. Under the Settlement Agreement, the

14  Commission retains its power to set rates and regulate PG&E;

15  similarly, the governmental body in Santa Margarita retained the

16  right of review and final approval of the real estate development.

17  Like the contract in Santa Margarita, the Settlement Agreement

18  (assuming it is approved by the Commission) is "fair, just and

19  reasonable at the time of its execution and prompted by the

20  necessities of the situation or in its nature advantageous to the

21  [Commission] at the time it was entered into." Id. It is not

22  void or voidable merely because its terms are binding on future

23  commissions. Id.

24  The Public Utilities Code does not contain any provision that

25  exempts the Commission from honoring contractual obligations. To

26  the contrary, where the Commission has elected to become a party

27  to a contract, the obligations created under that contract have

28

-21-

been enforced.  <u>Southern California Edison</u>, 31 Cal.4th at 792.
Likewise, where other governmental agencies have contractually
agreed to certain rates, the contracts have been enforced.  For
example, in <u>Louisiana-Pacific Corp. v. Humboldt Bay Mun. Water</u>
<u>Dist.</u>, 137 Cal.App.3d 152, 156-57 (1982), the court enforced a
water district contract relating to water rates.  The Humboldt Bay
Municipal Water District (the "District") had entered into a
series of contracts with Louisiana-Pacific Corporation ("L-P") in
the 1950s and 1960s setting sliding-scale prices L-P would pay for
water from the District until 1999.  <u>Id.</u> at 154.  In 1977, the
District determined that the existing contracts "constituted an
invalid limitation on the power of the [District's] Board to set
rates," and passed a resolution superseding the rate structure in
the pre-existing contracts.  <u>Id.</u> at 155.  The state appellate
court held that the District was estopped from setting rates that
conflicted with the prior contracts, explaining:

> [W]here a municipality has both the power to contract as
> to rates and also the power to prescribe rates from time
> to time, if it exercises its power in contract, its
> power to regulate the rates during the period of the
> contract is thereby suspended, and the contract is
> binding.

<u>Id.</u> at 161 (citations omitted).

Similarly, in <u>Trans World Airlines v. City and County of San</u>
<u>Francisco</u>, 228 F.2d 473 (9th Cir. 1956), the Ninth Circuit ruled
that the Public Utilities Commission of the City and County of San
Francisco ("SF CPUC") could not, through a resolution purporting
to establish rates, obviate a valid contract already agreed to by
the City of San Francisco.  In 1942, the City entered into a 12-
year lease agreement with Trans World Airlines.  Eight years

-22-

later, the SF CPUC passed a resolution fixing the charges "at a figure higher than that set in the 1942 contract." Id. at 474. The Ninth Circuit ruled that the City had "bound itself as to rates and charges . . . by entering into a valid contract" and the contract could not be "superseded by subsequent regulation," stating:

> [I]t has been held in numerous cases, however, that a state legislature unless prohibited by constitutional provision may authorize a municipal corporation to establish by an inviolable contract the rates to be charged by a public utility for a reasonable term of years, the effect of which is to suspend, during the life of the contract, the governmental power of the state or municipality to fix or regulate the rates.

Id. at 476-77 (citation omitted).

After considering section 701, Southern California Edison, Santa Margarita, Louisiana-Pacific, and Trans World Airlines, this court concludes that the Commission is authorized to enter into the Settlement Agreement and to make the commitments necessary to compromise its costly and hotly-contested disputes with PG&E in furtherance of the goal of providing consumers of energy in California with stable access to electrical and gas services.

This result is consistent with the interplay of section 1129(a)(11)'s feasibility requirement, section 1129(a)(6), requiring commissions with jurisdiction to approve rates, and the general notion that chapter 11 plans may include settlement and compromises of claims. See 11 U.S.C. § 1129(b)(3)(A). The Commission, Parent and PG&E are resolving, by contract, complex disputes among them as a means of facilitating confirmation of Debtor's reorganization plan.

-23-

## 2. The Settlement Agreement Does Not Improperly Delegate Ratemaking Functions.

Contrary to the Municipal Objectors' assertions, the Settlement Agreement does not improperly surrender the Commission's section 728 ratemaking authority, nor does it transform this court into a "regulatory Supreme Court" as they fear. Like the Joint Plan and its related Reorganization Agreement, the Settlement Agreement merely establishes minimum components to be considered in setting PG&E's revenue requirements. It does not fix or set rates. The Commission must engage in traditional steps of determining other revenue requirements, rate design, and ratemaking. Subject to certain discrete limitations in the Settlement Agreement, rates can fluctuate as they normally do.[17] Therefore, section 728 -- which permits the Commission to change utility rates if it determines that those rates are "insufficient, unlawful, unjust, unreasonable, discriminatory, or preferential..." -- is not contravened by the Settlement Agreement.

In November 2002, this Court addressed the validity of the Commission's proposed Reorganization Agreement, which, with respect to ratemaking issues, contained similar terms to the Settlement Agreement.[18] Specifically, the court considered whether

---

[17] Paragraph 3c of the Settlement Agreement provides that nothing therein ". . . shall be construed to create a rate freeze or rate cap for PG&E's electric or gas business."

[18] The essential purposes of the Reorganization Agreement and the Settlement Agreement are identical: to facilitate PG&E's re-attainment of suitable credit ratings so that PG&E can issue securities to pay its creditors and emerge from bankruptcy as quickly as possible and continue to provide safe and reliable electric and gas service at just and reasonable rates. Both

-24-

the Commission, by proposing and entering into the Reorganization
Agreement, had abrogated its responsibilities to fix rates in the
future, impermissibly ceded to this Court jurisdiction vested in
California state courts, and improperly purported to bind future
commissions.  In addition to holding that the Commission had the
power to enter into the Reorganization Agreement, this court held
that the Commission was "not setting rates under the
Reorganization Agreement, but [was] instead agreeing not to change
the rules of the game so as to reassure the financial markets and
to make the plan feasible."  That is what it is doing here in the
Settlement Agreement.

Like the Settlement Agreement, the Reorganization Agreement
and the Joint Plan created a regulatory asset and allowed recovery
of costs in retail rates in connection with financing to be issued
under the Joint Plan.  This court ruled that these provisions
merely created a "floor of costs which should be recoverable as
currently required by the law in any event."  Id. at 8.  This
court specifically found that the Commission was not "setting
rates" under the Reorganization Agreement and that "[a]ny
ratemaking must occur as a separate matter."  Id. at 12.

While this court is not bound by its prior decision, the
legal principles and reasoning of that decision are equally
applicable here.  The Settlement Agreement is not legal <u>because</u>

---

agreements obligate the Commission to permit the issuance of
securities to pay off claims of the creditors of PG&E and, for a
set period of time, to include certain costs as a component of
PG&E's revenue requirements.  Both agreements also declare that
the Commission shall adopt such orders and decisions as necessary
to implement and carry out provisions of the agreements, and that
retail rates shall be sufficient to provide for payment of
securities and a regulatory asset.

-25-

the Reorganization Agreement was. Both were and are legal. Even though the Settlement Agreement contemplates a different size regulatory asset and a set return on equity for a finite length of time, it (like the Reorganization Agreement) sets necessary and minimum components to be considered. The only differences are financial; the monetary differences, however, do not change the underlying legal analysis.

In any event, even if the Settlement Agreement did fix rates, the Plan would still be confirmable. Section 1129(a)(6) specifically allows confirmation of a plan containing a rate change as long as the rate change is approved by the commission having jurisdiction over those rates.[19] Here, confirmation of the Plan is conditioned upon the Commission's approval of the Settlement Agreement. If it gives that approval, then any doubt about which body is engaging in ratemaking will be removed and section 1129(a)(6) will be satisfied. Thus, this court may lawfully confirm the Plan.

The Municipal Objectors cite <u>Bock v. Lompoc City Council</u>, 109 Cal.App.3d 52 (1980), in support of their contention that the Settlement Agreement unlawfully removes from future commissions the authority to set rates. <u>Bock</u>, however, is distinguishable. In that case, an individual (Bock) submitted to the Lompoc City

---

[19]    Section 1129(a)(6) provides:

        Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

11 U.S.C. § 1129(a)(6).

-26-

Council ("Council") an initiative petition which he requested the Council to place on the ballot. Id. at 54. That initiative contained a proposed ordinance which would have required the Council (which set the retail rates for electricity sold by the City of Lompoc) to charge its residential customers a rate identical to the lifeline rate charged by PG&E to its customers. Id. at 54-56. The Council refused, and Bock sought a writ of mandamus. The appellate court denied the relief sought by Bock.

In its ruling, the court noted that two sets of factors determine PG&E's lifeline rate and "neither set of factors used in that determination has any rational relevance to the electrical utility rates appropriate for the City [of Lompoc]." Id. at 56. "As a result of the factual dissimilarities between the two utilities, PG&E's lifeline rate bears no reasonable relationship to the rate Lompoc might need to charge its residential customers." Id. at 56. Yet, Bock wanted the City Council to use whatever lifeline rate had been established by the Commission for PG&E's customers; the Council would not have had any flexibility to set its own rates. Thus, the "result would be a utility rate that is irrational and arbitrary, and this would constitute an unlawful delegation of authority." Id.

Unlike the rate-setting governmental body in Bock, the Commission here (and future commissions) still have the flexibility to set and charge rates. No rate is being imposed by an outside agency or by the Settlement Agreement; future commissions are not compelled to set rates identical to those imposed by another entity. Moreover, the components which are to be incorporated into future revenue requirements here were

-27-

negotiated (with judicial supervision) and rationally relate to
the goals of allowing PG&E to emerge from bankruptcy as a
regulated utility. They are not "irrational and arbitrary." Id.

Similarly, the Municipal Objectors cite City and County of
San Francisco v. Patterson, 202 Cal.App.3d 95, 105 (1988), for the
proposition that "no legislative board, by normal legislative
enactment, may divest itself or future boards of the power to
enact legislation within its competence." Id. (internal quotation
marks and citations omitted). This court has no quarrel with this
unremarkable legal proposition set forth in Patterson and other
cases upholding legislative integrity. Nonetheless, that
proposition and Patterson are inapplicable here. In Patterson, a
proposed initiative ordinance limiting the power of all future
boards of education to sell or release real property was struck
down on the ground that because the current board could not
lawfully bind all future boards to a particular policy, the
electorate was similarly barred from doing so absent amendment to
the city charter. There is a significant difference between
enacting legislation that would bind all future boards to a
particular policy and entering a compromise agreement that covers
a fixed period of time (nine years) and provides value to a
legislative board and its constituents.[20] Although future
commissions' powers will have to be exercised subject to the

---

[20] Here, the Commission is receiving significant
consideration from Parent and Debtor. Debtor and Parent are
dropping high-stakes litigation with the potential for recovery in
the form of increased rates that could amount to billions of
dollars, foregoing dividends for a period of time, and abandoning
efforts to disaggregate and largely eliminate Commission
oversight.

-28-

Settlement Agreement, the same was true in <u>Southern California</u> <u>Edison</u>, and some effect on future ratemaking is inherent in any settlement. In any event, as discussed, <u>supra</u>, the Settlement Agreement's temporary and limited effects on components of PG&E's revenue requirements do not amount to ratemaking. The bottom line is that future commissions' powers have not been illegally usurped. Thus, <u>Patterson</u> and similar cases are distinguishable.

> 3. <u>The Settlement Agreement Is Binding on Future</u> <u>Commissions.</u>

Objectors contend that the Plan is not feasible because, under section 1708, the Commission may renege on its promises made in the Settlement Agreement. Section 1708 is a permissive grant of authority that allows the Commission "at any time, upon notice to the parties, and with opportunity to be heard as provided in the case of complaints, rescind, alter or amend any order or decision made by it." Pub. Util. Code § 1708. Objectors also contend that the Settlement Agreement is not enforceable under <u>In</u> <u>re Pacific Gas & Electric Co.</u>, 99 P.U.R. 4th 141, 1988 WL 391219 (C.P.U.C. 1988) ("<u>Diablo Canyon</u>"). In <u>Diablo Canyon</u>, the Commission approved a settlement agreement <u>to which it was not a</u> <u>party</u>. In dicta, the Commission warned that future commissions could revoke the approval under section 1708. The Objectors' argument misapprehends the distinction in California law between a <u>decision</u> by the Commission and a <u>contract</u> to which the Commission is a party.

Section 1708 and <u>Diablo Canyon</u> do not preclude future enforcement of contracts. <u>Diablo Canyon</u> did not involve a contractual obligation by the Commission. Rather, it dealt with a

-29-

Commission decision to approve a settlement among <u>other</u> parties,
namely the Commission's Division of Ratepayer Advocates, the AG
and PG&E.  Here, by contrast, the Commission will both approve the
Settlement Agreement and then, if approved, become a party to that
agreement.  Thus, although Commission decisions are subject to
modification under section 1708, the Commission's contractual
obligations are not.  And, as discussed earlier, the Public
Utilities Code does not contain any provision that exempts the
Commission from honoring contractual obligations.

>4.  <u>Specific Provisions of the Settlement Agreement</u>.

The Municipal Objectors cite numerous provisions of the
Settlement Agreement that they believe are either impermissible
attempts to bind future Commissions or else too vague to be
enforceable.  Alternatively, they argue, even if the Settlement
Agreement is enforceable it should not be approved because PG&E
intends to take advantage of this vagueness to argue later that
the Commission has bound itself under federal law to provisions
that would violate state law.

The Municipal Objectors focus on three provisions.  First,
Settlement Agreement Paragraph 2.g. states:

> g.   The Commission recognizes that the establishment,
> maintenance and <u>improvement</u> of Investment Grade company
> credit ratings is <u>vital</u> for PG&E to be able to continue to
> provide safe and reliable service to its customers.  The
> Commission further recognizes that the establishment,
> maintenance and <u>improvement</u> of PG&E's Investment Grade
> company credit ratings directly benefits PG&E's ratepayers by
> reducing PG&E's immediate and future borrowing costs, which,
> in turn, will allow PG&E to finance its operations and make
> capital expenditures on its distribution, transmission, and
> generation assets at lower cost to its ratepayer.  In
> furtherance of these objectives, <u>the Commission agrees to act</u>
> <u>to facilitate and maintain Investment Grade company ratings</u>
> <u>for PG&E</u>.   [Emphasis added.]

-30-

In the future, the Municipal Objectors claim, PG&E may rely on this provision to argue that "this Court must order the Commission to act more favorably than it otherwise would in order to maintain and improve PG&E's Investment Grade credit ratings." The Municipal Objectors ask this court to anticipate this possible interpretation and rule that this is impermissible because it would require the Commission to pay a higher amount than the maximum otherwise allowable under applicable California law.

Second, the Municipal Objectors cite Settlement Agreement Paragraph 2.j., which states:

> j. The Commission agrees that, <u>in the absence of compelling evidence to the contrary</u>, PG&E's expected regulatory outcomes and financial performance should be similar to those of other investor-owned energy utilities in California under <u>similar circumstances</u>. In furtherance of the foregoing, the Commission <u>shall not discriminate against PG&E</u> by reason of the Chapter 11 Case, the Rate Recovery Litigation, this Agreement, the Regulatory Asset or any other matters addressed or resolved herein. [Emphasis added.][21]

The Municipal Objectors urge this court to conclude that the phrase, "in the absence of compelling evidence to the contrary" does not change the standard of proof under California law. They also want this court to determine that because California's energy utilities are inherently "dissimilar" the requirement for similar treatment essentially "has no meaning or legal significance." They urge this court to rule that the quoted paragraph "does not change the applicable standard(s) of proof or law applicable to such matters stated therein" and that it would only be enforceable to the extent the Commission "willfully" denies PG&E the benefit

---

[21] The Municipal Objectors call this a "most-favored nation" clause. It is not. It is a "no-discrimination" clause, not too dissimilar from what is found in section 525.

-31-

of applicable law "in bad faith for retribution."

Third, the Municipal Objectors object that Settlement Agreement Paragraph 36 refers to rights that "vest" without defining those rights:

> 36. <u>Termination</u>. This Agreement shall terminate at the end of nine (9) years from the Effective Date, <u>provided that</u> all rights of the Parties under this Agreement that vest on or prior to such termination, including any rights arising from any default under this Agreement, shall survive such termination for the purpose of enforcing such vested rights. [Emphasis in original.]

To illustrate the alleged vagueness of the Settlement Agreement, Objectors' counsel asked witnesses from PG&E and the Commission's staff about the meaning of various provisions. The witnesses invariably testified that they would have to rely on counsel to interpret the Settlement Agreement's legal meaning, or else that the agreement speaks for itself, or else they qualified their views as being strictly a matter of personal opinion. Several Objectors argued that the Settlement Agreement's meaning can never be discerned because it has no "legislative history" -- it was negotiated in the course of confidential settlement discussions and Judge Newsome and this court have not permitted disclosure of those discussions.

These arguments as to specific provisions of the Settlement Agreement are not persuasive. The court rejects them for the following reasons.

> a. <u>No Change in California Law</u>.

Included within the foregoing objections are arguments as to the merits of the specific settlement terms, but as this court has already stated, that is primarily an issue for the Commission. Also included are arguments that the Settlement Agreement changes,

-32-

or may in future be read to change, California energy utility law.

The court has already ruled that ratepayers as such (as opposed to creditors who happen to be ratepayers) lack standing in these proceedings. This is not the forum for ratemaking or for making decisions about California energy policy; that is for the state legislature, the Commission or other state agencies. In this context, it would be both impractical and inappropriate for this court to determine whether, for example, the Settlement Agreement's proposed language as to the "absence of compelling evidence to the contrary" (Settlement Agreement Paragraph 2.j.) would change the standards of proof under California law, as the Municipal Objectors argue. Fortunately, this court does not need to decide these types of issues.

Despite its broad discretion in ratemaking and matters of energy policy, the Commission cannot change state law. If the Settlement Agreement is intended to make any change in state law then that change must be disapproved. This court is prohibited from approving any attempt by the Commission to consent either to change state law or to be enjoined from enforcing state law. <u>See</u> <u>Southern California Edison v. Lynch</u>, 307 F.3d at 809 and 812; Cal. Const. Art. III, Sec. 3.5; <u>Southern California Edison v. Peevey</u>, 31 Cal.4th at 787.

This is neither a fatal flaw in the Settlement Agreement nor a condition upon the court's approval of it or the Plan. PG&E's counsel have reassured the court that they know of no specific state law being preempted. In particular, they have represented that there is no switching of the traditional burdens of proof. Moreover, the Ninth Circuit has ruled that any express preemption

-33-

of California law applies only to specific types of laws, and that any implied preemption must be explicitly proven.  <u>Pacific Gas and Elec. Co. v. California</u>, <u>supra</u>, ___ F.3d ___, 2003 WL 22718162.  No party has argued in these proceedings that either of these conditions has been, nor needs to be met.  The Settlement Agreement's provisions regarding "vested rights" (Paragraph 36), and those purporting to be binding and enforceable in this court "notwithstanding state law" (Paragraphs 21 and 32), apparently are intended only to assure that the Settlement Agreement will not be eviscerated by a future commission's second thoughts or by future changes in the law.  It will not.  Without pre-judging issues that may arise in future, the court can confidently state that PG&E's rights under the Settlement Agreement will vest pursuant to applicable state and federal law, and this court's determinations will become binding under principles of res judicata, law of the case, etc.  <u>See</u>, <u>e.g.</u>, <u>Keith v. Volpe</u>, 118 F.3d 1386, 1390 (9th Cir. 1997) (federal court can enjoin state proceedings that interfere, derogate or conflict with federal judgments, orders, or settlements).  Thereafter, any attempt to alter the terms of the Settlement Agreement (other than by mutual consent) or obtain a determination contrary to this court's present determinations will be barred by those same principles.

In other words, the Settlement Agreement will not change state law, but it will assure that PG&E gets the benefit of its bargain.  Having acted in reliance on the Settlement Agreement (by dismissing its pending litigation, agreeing to be bound by the Plan, foregoing the Original plan, deferring dividends, etc.), PG&E and Parent will be able to enforce the Settlement Agreement.

-34-

This is no more and no less than what the Plan Proponents have asked for.  This is no more and no less than insisting the counterparty to a contract agree to be bound by it.  Finally, agreeing to enforcement in this court is much the same as a traditional forum-selection clause.

### b. Other Provisions that Purport to Bind or Delegate Future Commissions' Discretion.

While other provisions of the Settlement Agreement might affect in some fashion future commissions' discretion, the Settlement Agreement is closer to what is permitted under <u>Southern California Edison</u> and <u>Santa Margarita</u> than to what is prohibited by <u>Bock</u> and <u>Patterson</u>.

At the most general level, the Settlement Agreement appears to be predicated on the Commission continuing to apply cost-of-service ratemaking.  This might limit future commissions' discretion to change to a different system.  During the confirmation hearings, the court asked PG&E's counsel what would happen if the Commission were to choose (or be required) to change to a different system, like locational marginal pricing.  The response was that the Commission would not be barred from adopting a new system, but that PG&E would still be entitled to benefits at least as great as what it would have received under the Settlement Agreement.

This is consistent with this court's view of the Settlement Agreement as a binding settlement of PG&E's claims.  The Settlement Agreement essentially determines, among other things, that PG&E is entitled to recovery on account of various claims.  Future commissions will be bound by that determination, both as a

-35-

matter of contract and because the settlement will be binding
under principles such as res judicata. Future commissions should
not be able to eliminate this obligation by changing to a new
system of ratemaking.

Future commissions will also be bound to comply with non-
monetary obligations. In Paragraph 28 of the Settlement
Agreement, the Commission agrees "to act to facilitate and
maintain Investment Grade company ratings for PG&E." Robert
Glynn, Jr., the President and Chief Executive Officer of the
Parent and the chairman of the boards of both PG&E and the Parent,
testified that he interprets this provision as "a statement by the
parties to the settlement that investment-grade ratings are a
laudatory objective, in fact, mandatory for Pacific Gas & Electric
Company, and that the parties to the settlement will do <u>everything</u>
in furtherance of that goal and objective." (Emphasis added.)
The Commission might have a different interpretation, and the
parties might call upon this court to resolve the meaning of this
Paragraph. If so, this court will determine the issue. It is
impossible to predict exactly what disputes might arise regarding
the Settlement Agreement. Nevertheless, based on the foregoing
review this court is satisfied that the Settlement Agreement can
be read not to bind future commissions beyond what is permitted by
California law. Similarly, the Settlement Agreement can be read
not to permit any greater delegation than is permitted by
California law.

c. <u>The Settlement Agreement Is Not Too Vague</u>.

The legal issue is whether the Settlement Agreement is so
vague as not to be an agreement at all, or at least so vague as to

-36-

doom the Plan to failure, viz. not <u>legally</u> feasible, as contrasted
with not <u>financially</u> feasible. <u>See generally</u> 1 B.E. Witkin,
<u>Summary of Cal. Law (9th)</u> Contracts, §§ 119 et seq. (objective
theory of mutual consent), 145 et seq. (certainty of offer), and
365 et seq. (mistake). This court believes that the Settlement
Agreement is not so vague that consent is vitiated or mutual
mistake (or another legal theory) exists that would invalidate it.

The fact that there may be doubts about some terms, or that
enforcement might be difficult, or that each and every
hypothetical forecasted situation does not lend itself to a simple
solution, is no reason to decline to approve the Settlement
Agreement based on some perceived vagueness. The essential terms,
sufficient to bind the parties, are unmistakedly present.
Countless agreements might fail judicial approval before-the-fact
if the outcome of each and every future scenario had to be
predicted with certainty. The "proof will be in the pudding"
after-the-fact and the court will not withhold approval of the
agreement just because enforcement in the future might present a
difficult challenge to it and to the parties.

**B.    The Releases Are Permissible.**

    1.    <u>Debtor May Release Any And All Claims It or The
Estate May Have Against Parent</u>.

Section 1123(b)(3)(a) permits a plan to settle or adjust any
claim belonging to the debtor or to the estate. The Objectors
object to those provisions of the Plan which release claims that
are held by, assertable on behalf of, or derivative of the rights
of Debtor and the estate and assert that those release provisions
should be disapproved by this court under the standards

-37-

articulated by the Ninth Circuit for compromises under Rule 9019. See Fed. R. Bankr. P. 9019(a); In re A&C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986).

Given that section 1123(b)(3)(A) permits a plan of reorganization to include settlements, and given the overwhelming votes in favor of the Plan, such review might be unnecessary. Nevertheless, since there is some uncertainty (see, e.g., In re Public Service Co., 114 B.R. 820, 826-27 (Bankr. D.N.H. 1990) (applying Rule 9019 factors to settlement included in plan of reorganization)), the standards under Rule 9019 will be applied. The court will discuss the releases as if Rule 9019 governs, but it would reach the same result under any of these standards.

This court's role in approving any settlement under Rule 9019 is limited. Rather than an exhaustive investigation or a mini-trial on the merits, this court need only find that the settlement was negotiated in good faith and is reasonable, fair and equitable. A&C Properties, 784 F.2d at 1381. It has been held that the court's proper role is "to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." In re Drexel Burnham Lambert Group, Inc., 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991) (citations and internal quotation marks omitted); 10 L. King, Collier on Bankruptcy ¶ 9019.02 at p. 9019-5 (15th ed. rev. 2003). Applying these general principles, this court must consider:

    (a)   The probability of success in the litigation;

    (b)   the difficulties, if any, to be encountered in the matter of collection;

    (c)   the complexity of the litigation involved, and the expense, inconvenience and delay necessarily

-38-

1                    attending it;

2           (d)   the paramount interest of the creditors and a

3                proper deference to their reasonable views in the premises.

4 A&C Properties, 784 F.2d at 1381 (citations omitted).

5     It is not necessary to satisfy each of these factors provided

6 that the factors as a whole favor approving the settlement. See,

7 e.g., In re WCI Cable, Inc., 282 B.R. 457, 473-74 (Bankr. D. Or.

8 2002) (although debtor "likely would prevail on one or more causes

9 of action" and court-appointed examiner suggested that

10 "probability of success on the merits, considered in isolation,

11 militated against the proposed settlement," nevertheless court

12 agreed with examiner that settlement should be approved because of

13 other factors).

14     The A&C Properties factors are satisfied in this case. With

15 respect to the first factor, PG&E's witnesses testified that in

16 their view the claims against the Parent were worthless. Although

17 the Objectors cast some doubt on the objectivity of this evidence,

18 the testimony is nevertheless entitled to at least some weight,

19 and the Objectors presented no contrary evidence.

20     As to the second factor, although nobody has suggested that

21 the Parent lacks the resources to pay any judgment, there might be

22 some delay and difficulty in collection because the Parent has

23 demonstrated its willingness to use those resources in aggressive

24 and often protracted litigation. In addition, it is not necessary

25 to satisfy each of the A&C Properties factors. See WCI Cable, 282

26 B.R. at 473 ("these parties play for keeps and do not give

27 quarter"; approving settlement despite fact that probability of

28 success, considered in isolation, militated against settlement).

-39-

1        With respect to the third factor, this court's own
2  familiarity with the issues being settled (the Original Plan, the
3  disclosure statement hearings and subsequent appeals, the
4  contested confirmation hearings, hearings concerning removal of
5  causes of action, the failed attempt by PG&E to enjoin the
6  Commission (Pacific Gas and Elec. Co. v. Cal. Public Utilities
7  Comm'n (In re Pacific Gas and Elec. Co.), 263 B.R. 306 (Bankr.
8  N.D. Cal. 2001)), convince the court that the claims are very
9  complex and that settling them will avoid considerable expense,
10  inconvenience, uncertainty and delay.

11       Finally, as to the fourth factor, the overwhelming majority
12  of creditors voted in favor of the Plan, including its provisions
13  for releases, and the OCC as their official representative is a
14  Co-Proponent of the Plan. Since the Plan will pay creditors in
15  full, with interest, the logical inference is that those few
16  creditors who objected to releases of the Parent did so as
17  ratepayers, not as creditors. The releases are a requirement for
18  confirmation of the Plan, and there is no question that after two
19  and a half years creditors should be paid. Therefore, the
20  "paramount interest of creditors and a proper deference to their
21  reasonable views in the premises" favors approval of the
22  releases.[22]

23       Because the releases contained in the Settlement Agreement
24  satisfy the A&C Properties inquiry, this court will approve the
25  releases as part of any Confirmation Order.

26

27
_____

28     [22] It should go without saying that PG&E's shareholders,
primarily Parent, desire the same result.

-40-

2.  There Are No Impermissible Third-Party Releases in the Plan or Settlement Agreement.

Objectors, particularly the AG, contend that the Plan improperly releases nondebtors Parent and its officers and directors from "any claim or cause of action brought by third parties but does not belong to the debtor or the estate."[23]  As it did in its motion for summary judgment heard by this court on October 16, 2003, the AG contends that the release provisions in the Plan are purposefully ambiguous and overly broad and improperly discharge claims against third parties (i.e., Parent and its officers and directors).[24]  This court disagrees.  As this

---

[23]  In particular, the AG is concerned that the releases will extinguish claims brought against the Parent by it and others (including CCSF) pursuant to California Business & Professions Code section 17200 (the "§ 17200 Actions").  The § 17200 Actions have been the subject of several motions in the this court and of several appeals to the District Court.  Specifically, this court issued a ruling on three motions to remand the § 17200 Actions to state court.  See In re Pacific Gas and Electric Co., 281 B.R. 1 (Bankr. N.D. Cal. 2002).  The District Court affirmed this decision in part and reversed it in part (in an unpublished decision in Civil Actions No. C-02-3668-VRW, C-02-4071-VRW, and C-02-4330-VRW).  An appeal is currently pending before the Ninth Circuit.

The District Court held that a portion of the claims in the § 17200 Actions belong to the Debtor's estate.  That ruling (unless reversed on appeal) is law of the case.  These claims belonging to the estate would be released under the Plan.  Claims that may be asserted directly by third parties against nondebtors are not released by the Plan.  Consequently, Debtor has conceded that those portions of the § 17200 Actions seeking injunctive relief and penalties (which are directly assertable by the AG) are not released.

[24]  The AG contends that, under In re Lowenschuss, 67 F.3d 1394, 1401-02 (9th Cir. 1995), the Plan is nonconfirmable because it releases a nondebtor.  11 U.S.C. § 524(e).  This court is bound by, and does not question, the legal principle set forth in Lowenschuss, in In re American Hardwoods, Inc., 885 F.2d 621, 626 (9th Cir. 1989), and in Underhill v. Royal, 769 F.2d 1426, 1432 (9th Cir. 1985) that liabilities of nondebtors cannot be discharged through a plan.  This legal principle, however, is

-41-

court ruled at the motion for summary judgment, the release
provisions are not overly broad, particularly since language
similar to that below will be added to the Confirmation Order:

> The release sections of the Plan do not release claims that
> may be asserted directly by third parties against nondebtors.

Debtor, OCC, and some of the Objectors have agreed to the
insertion of this language.  Since the Confirmation Order will
contain this or similar language, this particular objection is
overruled.[25]

## VIII.   FURTHER PROCEEDINGS

This court will hold a status conference on December 22, 2003
at 9:30 A.M. to consider any action taken by the Commission on or
about December 18, 2003; whether this court should enter findings
of fact, conclusions of law and a Confirmation Order; if so, the
form of those findings, conclusions and order; and any other
matters relevant to the future conduct of this chapter 11 case.

Dated:   December 12, 2003

_____
Dennis Montali
United States Bankruptcy Judge

---

inapplicable here because (unlike in Lowenschuss, American
Hardwoods, and Underhill) the Plan does not discharge or release
nondebtors from claims that belong to others (except the
Commission, which has consented to the release).  Those cases did
not involve the release by debtor of only claims which were held
by, assertable on behalf of, or derivative of the debtor, and did
not involve a confirmation order containing language acknowledging
that the plan did not release claims which may be asserted
directly by third parties against nondebtors.  As noted
previously, it is permissible for a plan to provide for the
settlement or adjustment of any claim "belonging to the debtor or
to the estate."  11 U.S.C. § 1123(b)(3)(A).

[25]   The court intends to issue an order on the summary
judgment motion consistent with the foregoing when it issues its
Confirmation Order.

-42-