1

UNITED STATES BANKRUPTCY COURT

2

NORTHERN DISTRICT OF CALIFORNIA

3

SAN FRANCISCO DIVISION

**FILED**

DEC 2 2 2003

4

5

In re

Case No. 01 30923 DM    UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

6

PACIFIC GAS AND ELECTRIC COMPANY,
a California corporation,

Chapter 11 Case

7

Debtor.

8

Federal I.D. No. 94-0742640

9

10

PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE FOR
PACIFIC GAS AND ELECTRIC COMPANY DATED JULY 31, 2003, AS
MODIFIED BY MODIFICATIONS DATED NOVEMBER 6, 2003 AND
DECEMBER 19, 2003

11

12

13

Counsel for the Debtor, Pacific Gas and
Electric Company:

Counsel for PG&E Corporation:

14

15

HOWARD, RICE, NEMEROVSKI,
CANADY, FALK & RABKIN,
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
(415) 434-1600

DEWEY BALLANTINE LLP
700 Louisiana, Suite 1900
Houston, Texas 77002
(713) 445-1500

16

17

18

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

19

COOLEY GODWARD LLP
One Maritime Plaza, 20th Floor,
San Francisco, California 94111-3580
(415) 693-2000

20

21

ORRICK, HERRINGTON &
SUTCLIFFE LLP
Old Federal Reserve Bank Building
400 Sansome Street
San Francisco, California 94111
(415) 392-1122

22

23

24

Co-Counsel to PG&E Corporation for
Constitutional Law Matters:

25

26

Professor Laurence Tribe
Hauser Hall 420
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-4621

27

28

14267

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Counsel for the Official Committee of
Unsecured Creditors:

MILBANK, TWEED, HADLEY &
McCLOY LLP
601 South Figueroa St., Suite 3000
Los Angeles, California 90017
(213) 892-4000

Pacific Gas and Electric Company, a California corporation (the "Debtor"), the Parent (as defined below) and the Committee (as defined below) jointly propose the following plan of reorganization for the Debtor under section 1121(a) of the Bankruptcy Code:

# ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

1.1    Definitions.  As used herein, the following terms have the respective meanings specified below:

1976 Letter has the meaning set forth in Section 6.9 hereof.

1991 Settlement Agreement has the meaning set forth in Section 6.9 hereof.

92A Bonds means those certain California Pollution Control Financing Authority, 6 5/8% Pollution Control Revenue Bonds (Pacific Gas and Electric Company) 1992 Series A issued by the Issuer in the aggregate principal amount of $35,000,000.

92B Bonds means those certain California Pollution Control Financing Authority, 6.35% Pollution Control Revenue Bonds (Pacific Gas and Electric Company) 1992 Series B issued by the Issuer in the aggregate principal amount of $50,000,000.

93A Bonds means those certain California Pollution Control Financing Authority, 5 7/8% Pollution Control Revenue Bonds (Pacific Gas and Electric Company) 1993 Series A issued by the Issuer in the aggregate principal amount of $60,000,000.

93B Bonds means those certain California Pollution Control Financing Authority, 5.85% Pollution Control Revenue Bonds (Pacific Gas and Electric Company) 1993 Series B issued by the Issuer in the aggregate principal amount of $200,000,000.

96B Bonds means those certain California Pollution Control Financing Authority, Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series B issued by the Issuer in the aggregate principal amount of $160,000,000.

96C Bonds means those certain California Pollution Control Financing Authority, Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series C

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  issued by the Issuer in the aggregate principal amount of $200,000,000.

2  96D Bonds means those certain California Pollution Control Financing Authority,

3  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series D

4  issued by the Issuer in the aggregate principal amount of $100,000,000.

5  96E Bonds means those certain California Pollution Control Financing Authority,

6  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series E

7  issued by the Issuer in the aggregate principal amount of $165,000,000.

8  96F Bonds means those certain California Pollution Control Financing Authority,

9  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series F

10  issued by the Issuer in the aggregate principal amount of $100,000,000.

11  96G Bonds means those certain California Pollution Control Financing Authority,

12  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996 Series G

13  issued by the Issuer in the aggregate principal amount of $62,870,000.

14  97A Bonds means those certain California Pollution Control Financing Authority,

15  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1997 Series A

16  issued by the Issuer in the aggregate principal amount of $45,000,000.

17  97B Bonds means those certain California Pollution Control Financing Authority,

18  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1997 Series B

19  issued by the Issuer in the aggregate principal amount of $148,550,000.

20  97C Bonds means those certain California Pollution Control Financing Authority,

21  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1997 Series C

22  issued by the Issuer in the aggregate principal amount of $148,550,000.

23  97D Bonds means those certain California Pollution Control Financing Authority,

24  Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1997 Series D

25  issued by the Issuer in the aggregate principal amount of $17,900,000.

26  AB 57/SB 1976 means California Assembly Bill 57 and California Senate Bill 1976.

27  AB 1890 means California Assembly Bill 1890.

28  Administrative Expense Claims means all Claims against the Debtor constituting a cost

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

or expense of administration of the Chapter 11 Case under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, all actual and necessary costs and expenses of preserving the estate of the Debtor, all cure amounts owed in respect of executory contracts and unexpired leases assumed by the Debtor-in-Possession, all Professional Compensation and Reimbursement Claims, and any fees or charges assessed against the estate of the Debtor under section 1930 of chapter 123 of title 28 of the United States Code; provided, however, that Administrative Expense Claims shall not include any Ordinary Course Liabilities.

Allowed means, with reference to any Claim against or Equity Interest in the Debtor, (a) any Claim which has been listed by the Debtor in the Debtor's Bankruptcy Schedules, as such Schedules may be amended by the Debtor from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent, and for which no contrary proof of claim or objection to claim has been filed; (b) any Claim or Equity Interest allowed hereunder; (c) any Claim or Equity Interest which is not Disputed; (d) any Claim or Equity Interest that is compromised, settled or otherwise resolved pursuant to a Final Order of the Bankruptcy Court or under the Plan; or (e) any Claim or Equity Interest which, if Disputed, has been Allowed by Final Order; provided, however, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

Assumed Corporate Indemnities means all obligations of the Debtor, pursuant to the Debtor's Articles of Incorporation or Bylaws, applicable state law or specific agreement, or any combination of the foregoing, to defend or indemnify, or to reimburse or limit the liability of, its present and any former officers, directors and/or employees who were officers, directors and/or employees, respectively, on or after the Petition Date, solely in their capacity as officers, directors and/or employees, against or with respect to any Claims or obligations.

Assumed Indemnification Claims means all Claims against the Debtor, if any, as to which the claimant asserts rights based only upon the Assumed Corporate Indemnities.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    ATCP Application means the Debtor's Annual Transition Cost Proceeding Application

2    No. 01-09-003, presently pending before the Commission.

3    Ballot means the form distributed to each holder of an Impaired Claim or Impaired

4    Equity Interest on which such holder shall indicate acceptance or rejection of the Plan.

5    Bank means, with respect to each Reimbursement Agreement, those certain banking or

6    other financial institutions that are signatories thereto (other than the Letter of Credit Issuing Bank)

7    and their respective successors and assigns.

8    Bankruptcy Code means title 11 of the United States Code, as amended from time to

9    time.

10   Bankruptcy Court means the United States Bankruptcy Court for the Northern District of

11   California (San Francisco Division) having jurisdiction over the Chapter 11 Case and, to the extent

12   of any reference under section 157 of title 28 of the United States Code, the unit of such District

13   Court under section 151 of title 28 of the United States Code.

14   Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by

15   the United States Supreme Court under section 2075 of title 28 of the United States Code, as

16   amended from time to time, and any Local Rules of the Bankruptcy Court, as amended from time to

17   time.

18   Bond Loan means, with respect to each series of PC Bonds, the loan of the proceeds

19   from the sale of such series of PC Bonds made by the Issuer to the Debtor pursuant to the terms of

20   the respective Loan Agreement.

21   Bond Trustee means, with respect to the PC Bonds, Deutsche Bank Trust Company

22   Americas (formerly known as Bankers Trust Company), a corporation organized under the laws of

23   the State of New York, as trustee, or U.S. Bank, N.A., as trustee, under the Indentures pursuant to

24   which the PC Bonds were issued, as applicable, and their successors and assigns or any successor

25   trustee under such Indentures appointed in accordance with the terms thereof.

26   Business Day means any day other than a Saturday, a Sunday or any other day on which

27   commercial banks in San Francisco, California, or New York, New York, are required or authorized

28   to close by law or executive order.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    Carizzo Plains has the meaning set forth in Paragraph 17 of the Commission Settlement

2    Agreement.

3         Cash means legal tender of the United States of America.

4         Cause of Action means, without limitation, any and all actions, causes of action,

5    liabilities, obligations, rights, suits, damages, judgments, claims and demands whatsoever, whether

6    known or unknown, existing or hereafter arising, in law, equity or otherwise, based in whole or in

7    part upon any act or omission or other event occurring prior to the Petition Date or during the course

8    of the Chapter 11 Case, including through the Effective Date.

9         Chapter 11 Case means the case under chapter 11 of the Bankruptcy Code commenced

10   by the Debtor in the Bankruptcy Court on April 6, 2001, and filed under chapter 11 Case No. 01-

11   30923 DM.

12        Chromium Litigation means Causes of Action against the Debtor relating to alleged

13   chromium contamination, including, but not limited to, the following fourteen (14) civil actions

14   pending in California courts:  (a) Aguayo v. Pacific Gas and Electric Company, filed March 15,

15   1995, in Los Angeles County Superior Court; (b) Aguilar v. Pacific Gas and Electric Company, filed

16   October 4, 1996, in Los Angeles County Superior Court; (c) Acosta, et al. v. Betz Laboratories, Inc.,

17   et al., filed November 27, 1996, in Los Angeles County Superior Court; (d) Adams v. Pacific Gas

18   and Electric Company and Betz Chemical Company, filed July 25, 2000, in Los Angeles County

19   Superior Court; (e) Baldonado v. Pacific Gas and Electric Company, filed October 25, 2000, in Los

20   Angeles County Superior Court; (f) Gale v. Pacific Gas and Electric Company, filed January 30,

21   2001, in Los Angeles County Superior Court; (g) Fordyce v. Pacific Gas and Electric Company, filed

22   March 16, 2001, in San Bernardino Superior Court; (h) Puckett v. Pacific Gas & Electric Company,

23   filed March 30, 2001, in Los Angeles County Superior Court; (i) Alderson, et al. v. PG&E

24   Corporation, Pacific Gas and Electric Company, Betz Chemical Company, et al., filed April 11,

25   2001, in Los Angeles County Superior Court; (j) Bowers, et al. v. Pacific Gas and Electric Company,

26   et al., filed April 20, 2001, in Los Angeles County Superior Court; (k) Boyd, et al. v. Pacific Gas and

27   Electric Company, et al., filed May 2, 2001, in Los Angeles County Superior Court; (l) Martinez, et

28   al. v. Pacific Gas and Electric Company, filed June 29, 2001, in Los Angeles County Superior Court;

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 (m) Miller v. Pacific Gas and Electric Company, filed November 21, 2001, in Los Angeles County

2 Superior Court; and (n) Lytle v. Pacific Gas and Electric Company, filed March 22, 2002, in Yolo

3 County Superior Court.

4 Chromium Litigation Claims means all Claims against the Debtor arising from the

5 Chromium Litigation for damages or other obligations, including Punitive Damages; provided,

6 however, that Chromium Litigation Claims shall not include (a) any Claims settled, liquidated or

7 determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date

8 for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable

9 in a lump sum or by a series of payments (which Claims are classified as General Unsecured

10 Claims), (b) Environmental Claims, (c) Fire Suppression Claims, or (d) Pending Litigation Claims.

11 Claim has the meaning set forth in section 101(5) of the Bankruptcy Code; provided,

12 however, that any claim based on allocations under Commission Electric Rule 20, Section A,

13 relating to undergrounding of electric distribution facilities, shall not be a Claim for purposes of this

14 Plan and shall pass through the Plan unaffected.

15 Class means a category of holders of Claims against or Equity Interests in the Debtor as

16 set forth in Articles III and IV of the Plan.

17 Clerk means the clerk of the Bankruptcy Court.

18 Collateral means any property or interest in property of the estate of the Debtor subject

19 to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or

20 otherwise invalid under the Bankruptcy Code or applicable state law.

21 Commercial Paper means short-term promissory notes of the Debtor bearing various

22 interest rates based on the three (3) month London Interbank Offered Rate and issued under

23 commercial paper dealer agreements between the Debtor and (a) Goldman Sachs & Co., dated

24 May 30, 1997, (b) Bank of America, N.A., dated February 7, 1985, (c) Salomon Smith Barney, Inc.,

25 dated November 10, 2000, and (d) Merrill Lynch, Pierce Fenner & Smith (oral agreement).

26 Commercial Paper Claims means all Claims against the Debtor arising from

27 Commercial Paper.

28 Commission means the California Public Utilities Commission or any successor agency,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-6-

1  and the commissioners thereof in their official capacities and their respective successors.

2      <u>Commission-DWR Rate Agreement</u> means the agreement dated March 8, 2002 between

3  the Commission and DWR relating to the establishment of DWR's revenue requirements and

4  charges in connection with power sold by DWR under Division 27, commencing with section

5  80000, of the California Water Code.

6      <u>Commission Plan</u> has the meaning set forth in Section 7.1 hereof.

7      <u>Commission Settlement Agreement</u> means that certain Settlement Agreement (and each

8  term and provision thereof) by and among the Debtor, the Parent and the Commission, a true and

9  correct copy of which is attached as Exhibit D hereto, as the same may be amended or modified by

10  the Settling Parties.

11      <u>Committee</u> means the official Committee of Unsecured Creditors appointed in the

12  Chapter 11 Case by the United States Trustee pursuant to section 1102 of the Bankruptcy Code, as

13  reconstituted from time to time. As of the date hereof, the Committee is comprised of Reliant

14  Energy, Inc., Dynegy Power Marketing, Inc., P-E Berkeley, Inc., GWF Power Systems Company,

15  Inc., Bank of America, N.A., Morgan Guaranty, Merrill Lynch, Davey Tree Expert Co., the City of

16  Palo Alto, California, the State of Tennessee and Pacific Investment Management Company LLC.

17      <u>Common Stock</u> shares of the Debtor's common stock, par value $5.00 per share.

18      <u>Common Stock Equity Interests</u> means any right relating to the three hundred twenty-six

19  million, nine hundred twenty-six thousand, six hundred sixty-seven (326,926,667) issued and

20  outstanding shares of Common Stock as of the date hereof, all of which are held directly or

21  indirectly by the Parent.

22      <u>Confirmation Date</u> means the date on which the Clerk of the Bankruptcy Court enters

23  the Confirmation Order on the docket.

24      <u>Confirmation Hearing</u> means the hearing held by the Bankruptcy Court to consider

25  confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, as such hearing may be

26  adjourned or continued from time to time.

27      <u>Confirmation Order</u> means the order of the Bankruptcy Court confirming the Plan

28  pursuant to section 1129 of the Bankruptcy Code.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 9
of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    Continuing PC Bond Related Debt means collectively, but without duplication, as of the

2    date such calculation shall be made, (i) the aggregate principal amount of those Letter of Credit

3    Backed PC Bonds, MBIA Insured Bonds, Mortgage Backed PC Bonds, and Treasury PC Bonds that

4    remain outstanding under the terms of the related Indentures to the extent that such PC Bonds are

5    held by a Person or Persons other than the Debtor, the Reorganized Debtor or any Affiliate thereof,

6    (ii) the aggregate principal amount of the Reimbursement Obligations arising with respect to the

7    Prior Bonds to the extent that such obligations are held by a Person or Persons other than the Debtor,

8    the Reorganized Debtor or any Affiliate thereof, (iii) the aggregate principal amount owed by the

9    Debtor under the terms of the respective Reimbursement Agreements as reimbursement of amounts

10   drawn on the respective Letters of Credit for the payment of the principal of, or the principal portion

11   of the purchase price of, Letter of Credit Backed PC Bonds, and (iv) the aggregate principal amount

12   of any debt incurred by the Debtor or Reorganized Debtor to refund or otherwise refinance any of the

13   foregoing other than New Money Notes.

14            Debtor has the meaning set forth in the introduction to the Plan.

15            Debtor-in-Possession means the Debtor in its capacity as debtor-in-possession in the

16   Chapter 11 Case pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

17            Debtor's Articles of Incorporation means the Restated Articles of Incorporation of the

18   Debtor, effective as of May 6, 1998.

19            Debtor's Bankruptcy Schedules means the schedules of assets and liabilities, schedule of

20   current income and expenditures, schedule of executory contracts and unexpired leases, and

21   statement of financial affairs filed in this Chapter 11 Case by the Debtor pursuant to section 521 of

22   the Bankruptcy Code and Bankruptcy Rule 1007, as amended from time to time.

23            Debtor's Bylaws means the Bylaws of the Debtor, as amended as of February 21, 2001.

24            Disbursing Agent means any Entity in its capacity as a disbursing agent under

25   Section 5.4 hereof.

26            Disclosure Statement means the Disclosure Statement for the Plan of Reorganization

27   Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company Dated June __,

28   2003 proposed by the Proponents, including all exhibits, supplements, appendices and schedules

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-8-

thereto (including, without limitation, the Plan and the Plan Supplement), as approved on July __,
2003 by the Bankruptcy Court pursuant to the Disclosure Statement Order and all modifications
thereto.

Disclosure Statement Order means the order of the Bankruptcy Court entered pursuant to
section 1125 of the Bankruptcy Code approving the Disclosure Statement.

Disputed means (a) with reference to any Claim against the Debtor, proof of which was
timely and properly filed, or in the case of an Administrative Expense Claim or Claim as to which
the Debtor has interposed a timely objection and/or request for estimation in accordance with section
502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3018, which objection and/or request for
estimation has not been withdrawn or determined by a Final Order, and (b) any Claim against the
Debtor, proof of which was required to be filed by order of the Bankruptcy Court or pursuant to
applicable law, but as to which a proof of claim was not timely or properly filed. A Claim that is
Disputed by the Debtor as to its amount only shall be deemed Allowed in the amount the Debtor
admits owing, if any, and Disputed as to the excess.

Disputed Claim Amount means the disputed portion of the amount set forth in the proof
of claim relating to a Disputed Claim or, if an amount is estimated in respect of a Disputed Claim in
accordance with section 502(c) of the Bankruptcy Code and/or Bankruptcy Rule 3018, the amount so
estimated pursuant to an order of the Bankruptcy Court.

Distribution Record Date means the first Business Day after the date on which the
conditions specified in Section 8.2 hereof have been satisfied or waived by the Proponents.

DWR means the California Department of Water Resources.

DWR Contracts means the contracts entered into by the DWR for the purchase of
electric power and associated goods and services pursuant to California Assembly Bill No. 1X,
signed into law by the Governor of the State of California on February 1, 2001.

Effective Date means the tenth (10th) Business Day after the Distribution Record Date.

Entity has the meaning set forth in section 101(15) of the Bankruptcy Code.

Environmental, Fire Suppression, Pending Litigation and Tort Claims means all
Environmental Claims, Fire Suppression Claims, Pending Litigation Claims and Tort Claims.

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 11
of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1          <u>Environmental Claims</u> means all Claims against the Debtor arising from (i) any

2 accusation, allegation, notice of violation, action, claim, environmental Lien, demand, abatement or

3 other order, restriction or direction (conditional or otherwise) by any Governmental Entity or any

4 other Person for personal injury (including, but not limited to, sickness, disease or death), tangible or

5 intangible property damage, Punitive Damages, damage to the environment, nuisance, pollution,

6 contamination or other adverse effect on the environment or costs (to the extent recoverable under

7 applicable non-bankruptcy law) of any Governmental Entity related thereto, in each case resulting

8 from or based upon (a) the existence, or the continuation of the existence, of a release of (including,

9 but not limited to, sudden or non-sudden accidental or non-accidental releases), or exposure to, any

10 hazardous or deleterious material, substance, waste, pollutant or contaminant, odor or audible noise

11 in, into or onto the environment (including, but not limited to, the air, soil, surface water or

12 groundwater) at, in, by, from or related to any property (including any vessels or facilities of the

13 Debtor) presently or formerly owned, operated or leased by the Debtor or any activities or operations

14 thereof, (b) the transportation, storage, treatment or disposal of any hazardous or deleterious

15 material, substance, waste, pollutant or contaminant in connection with any property presently or

16 formerly owned, operated or leased by the Debtor or its operations or facilities, or (c) the violation or

17 alleged violation, of any environmental law, order or environmental permit or license of or from any

18 Governmental Entity relating to environmental matters connected with any property presently or

19 formerly owned, operated or leased by the Debtor (including, without limitation, any FERC license

20 pertaining to any environmental matter, such as the Belden FERC License 2105 and the fish stocking

21 requirements thereunder); and (ii) any claim for indemnification or contribution (whether based on

22 contract, statute or common law) against the Debtor by any third party, where such indemnification

23 or contribution claim of such third party is based on a claim against such third party that if asserted

24 directly against the Debtor would be a claim included with the immediately preceding clause (i);

25 <u>provided, however</u>, that Environmental Claims shall not include (i) any Claims fully settled,

26 liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the

27 Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar

28 amount payable in a lump sum or by a series of payments (which Claims are classified as General

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

Unsecured Claims), (ii) Tort Claims, (iii) Fire Suppression Claims, or (iv) Pending Litigation Claims.

Environmental Order has the meaning set forth in Section 4.17(b) hereof.

Equity Interest means any share of Common Stock, Preferred Stock or other instrument evidencing an ownership interest in the Debtor, whether or not transferable, and any option, warrant or other right, contractual or otherwise, to acquire any such interest.

ESP means energy service provider.

ESP Claims means all Claims against the Debtor arising from PX energy credits payable by the Debtor to ESPs.

Federal Judgment Rate means the interest rate allowed pursuant to section 1961 of title 28 of the United States Code, as amended, as published by the Board of Governors of the Federal Reserve System for the calendar week that preceded the Petition Date, which is 4.19% per annum.

Fed.Rules Civ.Pro. means the Federal Rules of Civil Procedure.

FERC means the United States Federal Energy Regulatory Commission.

FERC Refund Proceedings means the pending FERC refund proceedings bearing FERC Docket Nos. EL00-95-045 and EL00-98-042 and related subdockets.

Final Approval means (i) approval on behalf of the Commission that is not subject to any pending appeal or further right of appeal, or (ii) approval on behalf of the Commission that, although subject to a pending appeal or further right of appeal, has been agreed by each of the two PG&E Proponents in a writing filed with the Bankruptcy Court to constitute a "Final Approval" within the meaning of this clause (ii) of this definition.

Final Order means an order or decree of the Bankruptcy Court, or any other court of competent jurisdiction, as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue or rehear shall have been waived in writing in form and substance satisfactory to the Debtor or, in the event that an appeal, writ of certiorari or reargument or rehearing thereof has

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  been sought, such order or decree of the Bankruptcy Court or other court of competent jurisdiction

2  shall have been determined by the highest court to which such order or decree was appealed, or

3  certiorari, reargument or rehearing shall have been denied and the time to take any further appeal,

4  petition for certiorari or move for reargument or rehearing shall have expired; provided, however,

5  that the possibility that a motion under Rule 59 or Rule 60 of the Fed.Rules Civ.Pro., or any

6  analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be

7  filed with respect to such order or decree shall not prevent such order or decree from being a Final

8  Order.

9       Fire Suppression Claims means all Claims against the Debtor by any Governmental

10  Entity for damages and costs resulting from a fire that may be recovered under either state or federal

11  law, including, but not limited to, Claims for damages to property, the cost of restoring all property

12  damaged as a result of the fire, the cost of compensating all other losses resulting from damage to

13  property arising from a fire, and costs incurred in fighting a fire, including all investigative,

14  administrative, accounting, collection and other costs; provided, however, that the foregoing

15  "including, but not limited to" description of the types of damages and costs that are included in this

16  definition are for illustrative purposes only and do not constitute an acknowledgment or admission

17  by the Proponents that any such damages or costs are in fact recoverable under state or federal law.

18       First and Refunding Mortgage Bonds means (a) 6.25% First and Refunding Mortgage

19  Bonds Series 93G due March 1, 2004, (b) 5.875% First and Refunding Mortgage Bonds Series 93E

20  due October 1, 2005, (c) 6.250% First and Refunding Mortgage Bonds Series 81B due August 1,

21  2011, (d) 8.800% First and Refunding Mortgage Bonds Series 91A due May 1, 2024, (e) 8.375%

22  First and Refunding Mortgage Bonds Series 92B due May 1, 2025, (f) 8.25% First and Refunding

23  Mortgage Bonds Series 92D due November 1, 2022, (g) 7.25% First and Refunding Mortgage Bonds

24  Series 93A due March 1, 2026, (h) 7.25% First and Refunding Mortgage Bonds Series 93D due

25  August 1, 2026, (i) 6.75% First and Refunding Mortgage Bonds Series 93F due October 1, 2023,

26  (j) 7.05% First and Refunding Mortgage Bonds Series 93F due October 1, 2023, and (k) 7.05% First

27  and Refunding Mortgage Bonds Series 93H due March 1, 2024, each issued by the Debtor under the

28  Mortgage, together with any Matured and Unpresented First and Refunding Mortgage Bonds,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 14
of 92

provided that the Debtor is not waiving any rights or claims it may have under applicable non-bankruptcy law against any holder of any Matured and Unpresented First and Refunding Mortgage Bond or any other party with respect thereto.[1]

Fixed Transition Amounts has the meaning set forth in section 840(d) of the PU Code.

Floating Rate Note Claims means all Claims against the Debtor arising from the Floating Rate Notes.

Floating Rate Notes means the Floating Rate Notes due October 31, 2001, issued by the Debtor under an indenture by and between the Debtor and Wilmington Trust Company, as successor-in-interest to The Bank of New York, dated September 1, 1987, together with all amendments, modifications, renewals, substitutions and replacements thereof.

Forbearance, Extension and Letter of Credit Fees has the meaning set forth in Section 4.11(b)(iii) hereof.

FPA means the Federal Power Act of 1920, as amended.

General Unsecured Claims means (a) Revolving Line of Credit Claims; (b) Medium Term Note Claims; (c) Senior Note Claims; (d) Floating Rate Note Claims; (e) Southern San Joaquin Valley Power Authority Bond Claims; (f) Claims against the Debtor arising from the rejection of executory contracts and unexpired leases as defined in section 365 of the Bankruptcy Code; (g) Claims against the Debtor relating to pre-petition litigation; (h) Claims against the Debtor by the Debtor's vendors, suppliers and service providers; (i) Claims against the Debtor relating to intercompany obligations to Affiliates; and (j) Commercial Paper Claims; provided, however that

---

[1]This definition does not include approximately $280,514,000 in principal amount of Series 93 C bonds maturing on August 1, 2003 (the "1993 Series C Bonds") that, but for such maturity date, otherwise would be within the definition of First and Refunding Mortgage Bonds that constitute Class 3a under the Plan. On June 20, 2003, the Debtor filed a motion with the Bankruptcy Court to permit timely payment of the approximately $280,514,000 principal amount of the 1993 Series C Bonds on August 1, 2003. Assuming such motion is granted, the 1993 Series C Bonds will be paid off on or about August 1, 2003, well before the confirmation hearing on the Plan, and therefore are not included in the definition of First and Refunding Mortgage Bonds and are not part of Class 3a under the Plan. If for any reason such motion is not approved, or the 1993 Series C Bonds are not timely paid off notwithstanding the approval of such motion, the Plan will be modified to add the 1993 Series C Bonds to the definition of First and Refunding Mortgage Bonds that constitute Class 3a under the Plan.

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 15 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  General Unsecured Claims will not include any unsecured Claims included in any other Class

2  (including, without limitation, Claims classified as Class 8 Claims).

3  Governmental Entity has the meaning set forth for a governmental unit in section

4  101(27) of the Bankruptcy Code.

5  Impaired means any Class of Claims against or Equity Interests in the Debtor that is

6  impaired within the meaning of section 1124 of the Bankruptcy Code.

7  Indenture means, with respect to each series of PC Bonds, that certain indenture of trust

8  between the Issuer and the Bond Trustee pursuant to which such series of PC Bonds were issued, as

9  originally executed, together with all amendments, modifications, renewals, substitutions and

10  replacements thereof.

11  Initial Calculation Date means (i) February 28, 2002, with respect to holders of Allowed

12  Claims in Class 5 for Senior Indebtedness, holders of Allowed Southern San Joaquin Valley Power

13  Authority Bond Claims and holders of Allowed Claims in Classes 4c, 4f, 4g and 9; and (ii) June 30,

14  2002, with respect to the remaining holders of Allowed Claims in Class 5 and the holders of

15  Allowed Claims in Classes 1, 2, 6 and 7.

16  Interest Period means the period commencing on any interest payment date specified

17  herein and ending on the day preceding the next succeeding interest payment date; except in respect

18  of the first interest period which extends to June 30, 2002, where the Interest Period shall commence

19  on the earlier of the Petition Date or the date specified on Exhibit B, hereto, and shall end on

20  June 30, 2002, and the second interest period shall commence on July 1, 2002.

21  Interest Rate Hedges Motion means that certain "Motion For Authority To Enter Into

22  Certain Hedging Transactions In Connection With Financing Under Proposed Plan Of

23  Reorganization, And To Incur Secured Debt Related Thereto" filed by the Debtor in the Chapter 11

24  Case on August 29, 2003.

25  Interest Rate Hedges Order means that certain "Order On Debtor's Motion For Authority

26  To Enter Into Certain Hedging Transactions In Connection With Financing Under Proposed Plan Of

27  Reorganization, And To Incur Secured Debt Related Thereto" granting the Interest Rate Hedges

28  Motion, issued by the Bankruptcy Court in the Chapter 11 Case on September 26, 2003.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1      IRS means the United States Internal Revenue Service.

2      ISO means the California Independent System Operator.

3      ISO, PX and Generator Claims means all Claims against the Debtor arising from
4 amounts due to the ISO, PX and various power generators based on purchases of electricity or
5 ancillary services by the Debtor in markets operated by the PX and the ISO.

6      Issuer means the California Pollution Control Financing Authority, a public
7 instrumentality and political subdivision of the State of California, organized and existing under the
8 California Pollution Control Financing Authority Act, being Division 27 (commencing at section
9 44500) of the California Health and Safety Code, as supplemented and amended.

10      Land Conservation Commitment has the meaning set forth in Paragraph 17a of the
11 Commission Settlement Agreement.

12      LC Bank Agreement has the meaning set forth in Section 4.11(b)(iii) hereof.

13      Letter of Credit means, with respect to each series of Letter of Credit Backed PC Bonds,
14 that certain irrevocable direct pay letter of credit issued by the Letter of Credit Issuing Bank for the
15 account of the Debtor to the Bond Trustee and delivered to the Bond Trustee in accordance with the
16 terms of the respective Indenture, securing, among other things, the payment of the principal of, and
17 interest on, the respective series of Letter of Credit Backed PC Bonds, together with all amendments,
18 modifications, renewals, substitutions and replacements thereof.

19      Letter of Credit Backed PC Bond Claims means all Claims against the Debtor by the
20 Issuer, Bond Trustee and the holders of Letter of Credit Backed PC Bonds for all amounts due and
21 owing by the Debtor under the Loan Agreements and each of the other PC Bond Documents
22 executed by the Debtor in connection with the issuance of each series of Letter of Credit Backed PC
23 Bonds.

24      Letter of Credit Backed PC Bonds means, collectively, any series of 96C Bonds, 96E
25 Bonds, 96F Bonds and/or 97B Bonds that are outstanding as of the Voting Record Date or the
26 Effective Date, as applicable.

27      Letter of Credit Issuing Bank means, with respect to each series of Letter of Credit
28 Backed PC Bonds, the issuer of the Letter of Credit.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1      <u>Letter of Credit Bank Claims</u> means all Claims against the Debtor relating to (a) the

2  contingent Claims of each Letter of Credit Issuing Bank and the applicable Banks, if any, with

3  respect to payments that may become due by the Debtor under their respective Reimbursement

4  Agreements with the Debtor in an amount equal to the outstanding Stated Amount of each of the

5  Letters of Credit, and (b) the Claims of the Letter of Credit Issuing Banks and the applicable Banks,

6  if any, for any and all accrued and unpaid amounts due by the Debtor under their respective

7  Reimbursement Agreements, including amounts due as reimbursement of amounts paid by each

8  Letter of Credit Issuing Bank under its respective Letter of Credit to the Bond Trustee for the

9  payment of interest on the related series of Letter of Credit Backed PC Bonds.

10      <u>LIBOR</u> means, with respect to each Interest Period, the rate per annum appearing on

11  Bloomberg Professional page BBAM1 (or any successor page) as the London interbank offered rate

12  for deposits in U.S. dollars having the index maturity designated by the Debtor at approximately

13  11:00 a.m. (London time) on the LIBOR Interest Determination Date. If no rate appears on

14  Bloomberg Professional page BBAM1, LIBOR shall mean the rate per annum appearing on Bridge

15  Telerate Inc. page 3750 (or any successor page) as the London interbank offered rate for deposits in

16  U.S. dollars having the index maturity designated by the Debtor at approximately 11:00 a.m.

17  (London time) on the LIBOR Interest Determination Date. If no rate appears on Bridge Telerate

18  page 3750, the Debtor will request the principal London offices of each of four (4) major reference

19  banks in the London interbank market, as selected by the Debtor, to provide the Debtor with its

20  offered quotation for deposits in U.S. dollars having the index maturity designated by the Debtor to

21  prime banks in the London interbank market at approximately 11:00 a.m. (London time) on such

22  LIBOR Interest Determination Date and in a principal amount that is representative of a single

23  transaction in U.S. dollars in such market at such time. LIBOR determined will be the arithmetic

24  mean of the offered quotations. If fewer than two (2) quotations are provided, LIBOR determined

25  on such LIBOR Interest Determination Date will be the arithmetic mean of the rates quoted at

26  approximately 11:00 a.m. in New York City on such LIBOR Interest Determination Date, by three

27  (3) major banks in New York City selected by the Debtor for loans in U.S. dollars to leading

28  European banks, having the index maturity designated by the Debtor that is representative for a

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-16-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

single transaction in U.S. dollars in such market at such time. If the banks so selected are not quoting as mentioned above, LIBOR will remain LIBOR in effect on such LIBOR Interest Determination Date.

LIBOR Interest Determination Date means, for an Interest Period, the second (2nd) London Business Day immediately preceding the first day of that Interest Period; except that in the period prior to the Initial Calculation Date, the LIBOR Interest Determination Dates for (a) Allowed Claims under International Swap Dealers Association ("ISDA") Agreements shall be the Petition Date and each anniversary thereof prior to the Initial Calculation Date, and (b) Allowed Claims of power generators shall be as determined between the Debtor and each such power generator, notwithstanding the fact that none of such dates is an interest payment date.

London Business Day means any day on which commercial banks in London are ordinarily open for business.

License Conditions has the meaning set forth in Section 6.9 hereof.

Lien has the meaning set forth in section 101(37) of the Bankruptcy Code.

Loan Agreement means, with respect to each series of PC Bonds, that certain loan agreement by and between the Issuer and the Debtor with respect to such series of PC Bonds, as originally executed, together with all amendments, modifications, renewals, substitutions and replacements thereof.

Master Ballot means the Ballot to be completed by Nominees of beneficial owners of bonds, notes, debentures or shares of stock of the Debtor.

Matured and Unpresented First and Refunding Mortgage Bonds means, collectively, that portion of the Debtor's (a) First and Refunding Mortgage Bonds, Series II, 4.25%, (b) First and Refunding Mortgage Bonds, Series JJ, 4.5%, (c) First and Refunding Mortgage Bonds, Series LL, 4.625%, (d) First and Refunding Mortgage Bonds, Series MM, 5.375%, (e) First and Refunding Mortgage Bonds, Series NN, 5.75%, (f) First and Refunding Mortgage Bonds, Series OO, 5.50%, and (g) First and Refunding Mortgage Bonds, 8% Series 92C, to the extent that (i) such matured bonds have not been presented for payment by the holders thereof, and (ii) the Debtor is obligated to pay the principal of, and interest on, such bonds in accordance with the terms thereof under

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  applicable law, provided that the Debtor is not waiving any rights or claims it may have under

2  applicable non-bankruptcy law against any holder of any such bond or any other party with respect

3  thereto.

4       <u>MBIA</u> means MBIA Insurance Corporation.

5       <u>MBIA Claims</u> means all Claims against the Debtor relating to (a) the contingent Claims

6  of MBIA with respect to payments that may become due by the Debtor under the terms of the MBIA

7  Reimbursement Agreement as reimbursement for payments made by MBIA under the PC Bond

8  Insurance Policy, and (b) the Claims of MBIA for any and all accrued and unpaid amounts due by

9  the Debtor under the MBIA Reimbursement Agreement, including any and all amounts due by the

10  Debtor as reimbursement of amounts paid by MBIA under the PC Bond Insurance Policy to the

11  Bond Trustee for the payment of interest on the MBIA Insured PC Bonds.

12       <u>MBIA Insured PC Bond Claims</u> means all Claims against the Debtor by the Issuer, Bond

13  Trustee and the holders of the MBIA Insured PC Bonds for all amounts due and owing by the Debtor

14  under the Loan Agreements and each of the other PC Bond Documents executed by the Debtor in

15  connection with the issuance of each series of MBIA Insured PC Bonds.

16       <u>MBIA Insured PC Bonds</u> means those certain California Pollution Control Financing

17  Authority, Pollution Control Refunding Revenue Bonds (Pacific Gas and Electric Company) 1996

18  Series A issued by the Issuer in the aggregate principal amount of $200,000,000.

19       <u>MBIA Reimbursement Agreement</u> means that certain Reimbursement and Indemnity

20  Agreement, dated as of May 1, 2000, by and between the Debtor and MBIA, pursuant to which

21  MBIA has issued the PC Bond Insurance Policy, together with all amendments, modifications and

22  renewals thereof.

23       <u>Medium Term Note Claims</u> means all Claims against the Debtor arising from the

24  Medium Term Notes.

25       <u>Medium Term Notes</u> means those certain notes bearing various interest rates from

26  5.810% to 8.450% due through October 7, 2013, other than the Senior Notes and the Floating Rate

27  Notes, issued by the Debtor under an indenture by and between the Debtor and Wilmington Trust

28  Company, as successor-in-interest to The Bank of New York, dated September 1, 1987, together

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 20
of 92

1    with all amendments, modifications, renewals, substitutions and replacements thereof.

2        <u>Moody's</u> means Moody's Investors Service Inc. or its successor.

3        <u>Mortgage</u> means that certain First and Refunding Mortgage, dated December 1, 1920,

4    made by the Debtor, under which BNY Western Trust Company was trustee on the Petition Date,

5    together with all amendments, modifications, renewals, substitutions and replacements thereof.

6        <u>Mortgage Backed PC Bonds</u> means, collectively, the 92A Bonds, the 92B Bonds, the

7    93A Bonds and the 93B Bonds.

8        <u>Mortgage Backed PC Bond Claims</u> means all Claims against the Debtor by the Issuer,

9    Bond Trustee and the holders of the Mortgage Backed PC Bonds for all amounts due and owing by

10    the Debtor under the Loan Agreement and each of the other PC Bond Documents executed by the

11    Debtor in connection with the issuance of each series of Mortgage Backed PC Bonds.

12        <u>New Money Notes</u> has the meaning set forth in Section 7.2 hereof.

13        <u>New Mortgage Bonds</u> means mortgage bonds to be issued by the Reorganized Debtor,

14    the terms of which are set forth on the Summary of Terms of Debt Securities.

15        <u>Nominee</u> means any brokerage firm or bank, or the agent of such firm or bank, holding

16    the securities of a beneficial owner of bonds, notes, debentures or shares of stock of the Debtor.

17        <u>NRC</u> means the United States Nuclear Regulatory Commission.

18        <u>NYSE</u> means the New York Stock Exchange.

19        <u>Ordinary Course Liabilities</u> means (i) liabilities incurred in the ordinary course of

20    business by the Debtor-in-Possession, including, but not limited to, actual and necessary costs and

21    expenses of operating the business of the Debtor-in-Possession, any indebtedness or obligations

22    incurred or undertaken by the Debtor-in-Possession in connection with the conduct of its business,

23    liabilities arising under loans or advances to or other obligations incurred by the Debtor-in-

24    Possession, and real and personal property taxes and franchise fees; (ii) any Claims against the

25    Debtor constituting a cost or expense of administration of the Chapter 11 Case under sections 503(b)

26    and 507(a)(1) of the Bankruptcy Code arising on or after 60 days prior to the Effective Date, other

27    than Professional Compensation and Reimbursement Claims; and (iii) all cure amounts owed in

28    respect of executory contracts and unexpired leases assumed by the Debtor-in-Possession arising on

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 21 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1    or after 60 days prior to the Effective Date.

2         Original Letter of Credit Fee has the meaning set forth in Section 4.11(b)(iv) hereof.

3         Original PG&E Plan has the meaning set forth in Section 7.1(a) hereof.

4         Other Priority Claims means all Claims against the Debtor, other than Administrative

5 Expense Claims or Priority Tax Claims, entitled to priority in right of payment under section 507(a)

6 of the Bankruptcy Code.

7         Other Secured Claims means all Claims against the Debtor relating to mechanics' and

8 materialmen's Liens and secured tax Claims, as well as Secured Claims, other than Secured Claims

9 Relating to First and Refunding Mortgage Bonds, Secured Claims Relating to PC-Related Mortgage

10 Bonds and Mortgage Backed PC Bond Claims.

11         Parent and PG&E Corporation means PG&E Corporation, a California corporation, the

12 Debtor's parent company.

13         PC Bond Documents means, with respect to each series of PC Bonds, the Loan

14 Agreement, Indenture and all of the other documents, instruments, agreements and certificates

15 evidencing, securing, governing or otherwise pertaining to the respective Bond Loan or the

16 respective series of PC Bonds or otherwise executed and delivered by or on behalf of the Debtor in

17 connection with any of the foregoing, together with all amendments, modifications, renewals,

18 substitutions and replacements of or to any of the foregoing.

19         PC Bond Insurance Policy means that certain Financial Guaranty Insurance Policy issued

20 by MBIA with respect to the MBIA Insured PC Bonds, together with all amendments, modifications,

21 renewals, substitutions and replacements thereof.

22         PC Bonds means collectively, the Letter of Credit Backed PC Bonds, the MBIA Insured

23 Bonds, the Mortgage Backed PC Bonds, the Prior Bonds and the Treasury PC Bonds.

24         PC-Related Mortgage Bonds means, with respect to each series of Mortgage Backed PC

25 Bonds, those certain first and refunding mortgage bonds made by the Debtor in favor of the Bond

26 Trustee pursuant to and secured by the Mortgage, in an aggregate principal amount equal to the

27 related series of Mortgage Backed PC Bonds.

28         Pending Litigation Claims means all Claims against the Debtor that are asserted in

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

litigation pending against the Debtor and that are listed in the Plan Supplement; provided, however, that Pending Litigation Claims shall not include (a) any Claims settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum by a series of payments (which Claims are classified as General Unsecured Claims), (b) Environmental Claims, (c) Fire Suppression Claims or (d) Tort Claims.

Person has the meaning set forth in section 101(41) of the Bankruptcy Code.

Petition Date means April 6, 2001, the date on which the Debtor commenced the Chapter 11 Case.

PG&E Proponents means the Debtor and the Parent.

Plan means this Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company Dated July 31, 2003 proposed by the Proponents, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices and schedules hereto or thereto, either in their present form or as the same may be altered, amended or modified from time to time.

Plan Supplement means the documents, schedules and other instruments filed with the Bankruptcy Court on July 18, 2003, in accordance with Section 11.17 hereof, and any supplements or amendments thereto filed with the Bankruptcy Court prior to the date the Proponents commence solicitation for votes for this Plan.

Post-Petition Interest has the meaning set forth in Section 4.1 hereof.

Preferred Stock means the issued and outstanding shares of the Debtor's First Preferred Stock, par value $25.00 per share. The Debtor's outstanding First Preferred Stock is comprised of: (a) 6% Non-Redeemable First Preferred; (b) 5.5% Non-Redeemable First Preferred; (c) 5% Non-Redeemable First Preferred; (d) 5% Redeemable First Preferred Series D; (e) 5% Redeemable First Preferred Series E; (f) 4.80% Redeemable First Preferred; (g) 4.50% Redeemable First Preferred; (h) 4.36% Redeemable First Preferred; (i) 6.57% Redeemable First Preferred; (j) 7.04% Redeemable First Preferred; and (k) 6.30% Redeemable First Preferred.

Preferred Stock Equity Interests means any right relating to the Preferred Stock.

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 23 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1        Prior Bond Claims means all Claims against the Debtor by the Prior Letter of Credit

2   Issuing Banks for any and all accrued and unpaid amounts due by the Debtor under their respective

3   Prior Reimbursement Agreements, including amounts due as reimbursement of amounts paid by

4   each Prior Letter of Credit Issuing Bank under its respective Prior Letter of Credit to the Bond

5   Trustee for the payment of the redemption price of the related series of Prior Bonds.

6        Prior Bonds means, collectively, the 96B Bonds, the 96D Bonds, the 97A Bonds and the

7   97C Bonds.

8        Prior Letter of Credit means, with respect to each series of Prior Bonds, that certain

9   irrevocable direct pay letter of credit issued by the Prior Letter of Credit Issuing Bank for the account

10   of the Debtor to the Bond Trustee and delivered to the Bond Trustee in accordance with the terms of

11   the respective Indenture which secured, among other things, the payment of the principal of, and

12   interest on, the respective series of Prior Bonds, together with all amendments, modifications,

13   renewals, substitutions and replacements thereof.

14       Prior Letter of Credit Issuing Bank means, with respect to each series of Prior Bonds, the

15   issuer of the Prior Letter of Credit.

16        Prior Reimbursement Agreement means, with respect to each series of Prior Bonds, that

17   certain reimbursement or other agreement between the Debtor and the Prior Letter of Credit Issuing

18   Bank providing for, among other things, the issuance of the related Prior Letter of Credit and the

19   reimbursement of the Prior Letter of Credit Issuing Bank for draws made thereunder, together with

20   all amendments, modifications, renewals, substitutions and replacements thereof.

21       Priority Tax Claims means all Claims against the Debtor for taxes entitled to priority in

22   payment under section 507(a)(8) of the Bankruptcy Code.

23       Professional Compensation and Reimbursement Claims means all Administrative

24   Expense Claims for the compensation of professionals and reimbursement of expenses incurred by

25   such professionals, the Committee and members of the Committee pursuant to sections 330(a) or

26   503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code.

27       Proponents means the Debtor, the Parent and the Committee.

28       PU Code means the California Public Utilities Code.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 24 of 92

1       Punitive Damages means punitive, exemplary or similar damages, or fines, penalties or

2 similar charges that arise in connection with Environmental Claims, Fire Suppression Claims,

3 Pending Litigation Claims or Tort Claims.

4       PX means the California Power Exchange Corporation.

5       QFs means qualifying facilities operating pursuant to the Public Utility Regulatory

6 Policies Act of 1978 and the related regulations enacted thereunder.

7       QUIDS means the 7.90% Deferrable Interest Subordinated Debentures, Series A, Due

8 December 31, 2025, issued by the Debtor under the QUIDS Indenture, together with all

9 amendments, modifications, renewals, substitutions and replacements thereof.

10       QUIDS Claims means all Claims against the Debtor arising from the QUIDS.

11       QUIDS Indenture means the Indenture by and between the Debtor and National City

12 Bank of Indiana, as successor-in-interest to Bank One Trust Company, N.A., as successor-in-interest

13 to The First National Bank of Chicago, dated November 28, 1995, as supplemented by the First

14 Supplemental Indenture dated November 28, 1995, as supplemented by the Second Supplemental

15 Indenture dated March 25, 1996.

16       Rate Recovery Litigation means Pacific Gas and Electric Co., Plaintiff v. Loretta M.

17 Lynch, et al., Defendants, Case No. C-01-3023-VRW in the United States District Court for the

18 Northern District of California, and all appellate proceedings arising therefrom.

19       Rate Reduction Bonds has the meaning set forth in section 840(e) of the PU Code.

20       Refunding Bonds means, with respect to each series of Prior Bonds, a new series of

21 revenue bonds to be issued by the Issuer (or another authorized Governmental Entity) for the benefit

22 of the Reorganized Debtor, the proceeds of the sale of which shall be loaned by the Issuer to the

23 Reorganized Debtor for the purpose of paying the principal portion of the redemption price of such

24 series of Prior Bonds by repaying the related Reimbursement Obligation.

25       Regulatory Asset has the meaning set forth in Paragraph 2 of the Commission

26 Settlement Agreement.

27       Reimbursement Agreement means, with respect to each series of Letter of Credit Backed

28 PC Bonds, that certain reimbursement or other agreement between the Debtor and the Letter of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Credit Issuing Bank and certain other Banks, if any, that are signatories thereto providing for, among other things, the issuance of the related Letter of Credit and the reimbursement of the Letter of Credit Issuing Bank and certain other Banks, if any, that are signatories thereto for draws made under such Letter of Credit, together with all amendments, modifications, renewals, substitutions and replacements thereof.

Reimbursement Obligation means, with respect to each series of Prior Bonds, that portion of the reimbursement obligation of the Debtor under the Prior Reimbursement Agreement arising with respect to the portion of the final drawing made under the related Prior Letter of Credit for the payment of the principal portion of the redemption price of the related series of Prior Bonds.

Releasees means the Committee and the Parent, and all Persons who (a) are present or former officers or directors of the Debtor or the Parent who were directors and/or officers of the Debtor or the Parent, respectively, on or after the Petition Date; (b) serve or served as members of the management of the Debtor or the Parent on or after the Petition Date; (c) are present or former members of the Committee; (d) are present or former officers and directors and other Persons who serve or served as members of the management of any present or former member of the Committee; (e) are advisors, consultants or professionals of or to the Debtor and/or the Parent, the Committee, or the members of the Committee, but in each case only to the extent such Persons are or were acting in any of the capacities set forth in (a) through (e) above.

Reorganized Debtor means the Debtor, or any successor thereto by merger, consolidation or otherwise, on and after the Effective Date.

Retail Electric Rates means any and all charges authorized by the Commission to be collected from the Debtor's and/or the Reorganized Debtor's retail electric customers.

Retirement Plan has the meaning set forth in Section 6.7 hereof.

Revolving Line of Credit means the Amended and Restated Credit Agreement, dated as of December 1, 1997, as amended, as to which Bank of America, N.A., was the Administrative Agent on the Petition Date, together with all amendments, modifications, renewals, substitutions and replacements thereof.

Revolving Line of Credit Claims means all Claims against the Debtor arising from the

1   Revolving Line of Credit.

2         <u>ROE</u> has the meaning set forth in Paragraph 2b of the Commission Settlement

3   Agreement.

4         <u>SEC</u> means the United States Securities and Exchange Commission.

5         <u>Secured Claim</u> means all Claims against the Debtor, to the extent reflected in the

6   Debtor's Bankruptcy Schedules or a proof of claim as a Secured Claim, which are secured by a Lien

7   on Collateral but only to the extent of the value of such Collateral, as determined in accordance with

8   section 506(a) of the Bankruptcy Code, and, in the event that such Claim is subject to a permissible

9   setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

10         <u>Secured Claims Relating to First and Refunding Mortgage Bonds</u> means all Claims

11   against the Debtor arising from the First and Refunding Mortgage Bonds.

12         <u>Secured Claims Relating to PC-Related Mortgage Bonds</u> means all Claims against the

13   Debtor arising from Secured Claims evidenced by the PC-Related Mortgage Bonds that secure the

14   Mortgage Backed PC Bond Claims.

15         <u>Securities Act</u> means the Securities Act of 1933, as amended.

16         <u>Senior Indebtedness</u> means, collectively, Commercial Paper Claims, Floating Rate Note

17   Claims, Medium Term Note Claims, Senior Note Claims and Revolving Line of Credit Claims.

18         <u>Senior Note Claims</u> means all Claims against the Debtor arising from the Senior Notes.

19         <u>Senior Notes</u> means the 7.375% Senior Notes due November 1, 2005, issued by the

20   Debtor under an indenture by and between the Debtor and Wilmington Trust Company, as

21   successor-in-interest to The Bank of New York, dated September 1, 1987, together with all

22   amendments, modifications, renewals, substitutions and replacements thereof.

23         <u>Settlement and Stanislaus Commitments</u> has the meaning set forth in Section 6.9 hereof.

24         <u>Settlement and Support Agreement</u> means that certain Amended and Restated

25   Settlement and Support Agreement dated as of March 27, 2002, by and among the Debtor, the Parent

26   and certain holders of Senior Indebtedness who are parties thereto, as approved by the Order of the

27   Bankruptcy Court dated March 27, 2002, entitled "Order on Motion by Pacific Gas and Electric

28   Company for Order (A) Approving Settlement and Support Agreement By and Among Plan

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 27
of 92

1  Proponents and Senior Debtholders, (B) Authorizing Payment of Pre- and Post-Petition Interest to
2  Holders of Undisputed Claims in Certain Classes, (C) Authorizing Payment of Fees and Expenses of
3  Indenture Trustees and Paying Agents and (D) Authorizing Debtor to Enter into Similar
4  Agreements."

5        Settling Parties means the parties to the Commission Settlement Agreement.

6        Southern San Joaquin Valley Power Authority Agreement means the Agreement
7  between the Debtor and the Southern San Joaquin Valley Power Authority dated as of July 1, 1997,
8  and related Indenture of Trust, dated as of November 1, 1991, between the Southern San Joaquin
9  Valley Power Authority and Bank of America, N.A., as Trustee in respect of amounts payable on
10  certain bonds issued by Southern San Joaquin Power Authority maturing in 2001 through January 1,
11  2013, together with all amendments, modifications, renewals, substitutions and replacements
12  thereof.

13        Southern San Joaquin Valley Power Authority Bond Claims means all Claims against
14  the Debtor arising from the Southern San Joaquin Valley Power Authority Agreement.

15        S&P means Standard & Poor's, a division of The McGraw-Hill Companies, Inc., or its
16  successor.

17        State means the State of California.

18        Stated Amount means, with respect to each Letter of Credit, the aggregate amount
19  available to be drawn thereunder, from time to time, in accordance with the terms thereof.

20        Summary of Terms of Debt Securities means the summary of terms of the New Money
21  Notes and the New Mortgage Bonds as set forth on Exhibit A to the Plan.

22        Tax Code means the United States Internal Revenue Code of 1986, as amended, and the
23  Treasury Regulations thereunder.

24        TCBA means Transition Cost Balancing Account as established by Commission
25  decisions pursuant to sections 367 and 368 of the PU Code.

26        Tort Claims means (i) the Chromium Litigation Claims and all other Claims against the
27  Debtor arising from any accusation, allegation, notice, action, claim, demand or otherwise for
28  personal injury, tangible or intangible property damage, products liability or discrimination, or based

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

on employment, including Punitive Damages; and (ii) any Claim for indemnification or contribution (whether based on contract, statute or common law) against the Debtor by any third party, where such indemnification or contribution Claim of such third party is based on a Claim against such third party that if asserted directly against the Debtor would be a claim included within the immediately preceding clause (i); provided, however, that Tort Claims shall not include (a) any Claims settled, liquidated or determined by a Final Order or a binding award, agreement or settlement prior to the Petition Date for amounts payable by the Debtor for damages or other obligations in a fixed dollar amount payable in a lump sum by a series of payments (which Claims are classified as General Unsecured Claims); (b) Environmental Claims; (c) Fire Suppression Claims; or (d) Pending Litigation Claims.

Treasury PC Bond Claims means all Claims against the Debtor by the Issuer, Bond Trustee and the holders of Treasury PC Bonds for all amounts due and owing by the Debtor under the Loan Agreements and each of the other PC Bond Documents executed by the Debtor in connection with the issuance of each series of Treasury PC Bonds.

Treasury PC Bonds means, collectively, the 96G Bonds and the 97D Bonds.

Unimpaired means any Class of Claims or Equity Interests that is not Impaired.

URG means utility retained generation.

URG Rate Base means the rate base amounts set forth in the Debtor's Advice Letter 2233-E implementing Commission Decision (D.) No. 02-04-016.

Voting Record Date means August 4, 2003.

Watershed Lands has the meaning set forth in Paragraph 17 of the Commission Settlement Agreement.

Workers' Compensation Claims means all Claims against the Debtor by employees of the Debtor for the payment of workers' compensation benefits under applicable law.

Workers' Compensation Indemnity Agreements means (a) the Indemnity Agreement by PG&E Corporation, dated April 7, 2000, to indemnify American Home Assurances Company in connection with issuance of Surety Bond No. 00-207-724 issued on behalf of the Debtor for Workers' Compensation, (b) the Indemnity Agreement by PG&E Corporation, dated April 7, 2000,

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

1  to indemnify CAN Insurance Companies in connection with issuance of Surety Bond No.

2  159267371 issued on behalf of the Debtor for Workers' Compensation, (c) the Indemnity Agreement

3  by PG&E Corporation, dated April 7, 2000, to indemnify Kemper Insurance Companies in

4  connection with issuance of Surety Bond No. 955006 issued on behalf of the Debtor for Workers'

5  Compensation, (d) the Indemnity Agreement by PG&E Corporation, dated April 7, 2000, to

6  indemnify Travelers Insurance, as successor to Reliance Insurance Company, in connection with

7  issuance of Surety Bond No. B1686191 issued on behalf of the Debtor for Workers' Compensation,

8  and (e) the Indemnity Agreement by PG&E Corporation, dated April 7, 2000, to indemnify

9  Firemen's Fund Insurance Company in connection with issuance of Surety Bond No. 11133362811

10 issued on behalf of the Debtor for Workers' Compensation.

11        1.2    Interpretation; Application of Definitions and Rules of Construction. Wherever

12 from the context it appears appropriate, each term stated in either the singular or the plural shall

13 include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter

14 gender shall include the masculine, feminine and neuter. Unless otherwise specified herein, all

15 section, article, schedule or exhibit references in the Plan are to the respective Section in, Article of,

16 Schedule to, or Exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder" and other

17 words of similar import refer to the Plan as a whole and not to any particular section, subsection or

18 clause contained in the Plan. The rules of construction contained in section 102 of the Bankruptcy

19 Code shall apply to the construction of the Plan. A term used herein that is not defined herein, but

20 that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy

21 Code. The headings in the Plan are for convenience of reference only and shall not limit or

22 otherwise affect the provisions of the Plan.

23                              ARTICLE II

24 **TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, ORDINARY**
**COURSE LIABILITIES, PROFESSIONAL COMPENSATION AND**
25 **REIMBURSEMENT CLAIMS, AND PRIORITY TAX CLAIMS**

26        2.1    Administrative Expense Claims. Except as otherwise provided herein, including

27 Section 2.2 (with respect to Professional Compensation and Reimbursement Claims) and Section 6.4

28 hereof (with respect to cure amounts owed in respect of executory contracts and unexpired leases

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 30
of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

assumed by the Debtor-in-Possession), (i) all requests for allowance and payment of any Administrative Expense Claim arising on or before the Confirmation Date shall be filed no later than the date that is thirty (30) days after the Confirmation Date, and (ii) all requests for allowance and payment of any Administrative Expense Claim arising after the Confirmation Date and on or before the Effective Date shall be filed no later than the date that is thirty (30) days after the Effective Date. Except to the extent that any Entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, and except as otherwise provided herein, including Section 2.2 (with respect to Professional Compensation and Reimbursement Claims) and Section 6.4 hereof (with respect to cure amounts owed in respect of executory contracts and unexpired leases assumed by the Debtor-in-Possession), (i) each holder of an Allowed Administrative Expense Claim arising on or before the Confirmation Date shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon as practicable thereafter, or on such other date as may be ordered by the Bankruptcy Court; and (ii) each holder of an Allowed Administrative Expense Claim arising after the Confirmation Date and on or before the Effective Date shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the date that is 90 days after the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon as practicable thereafter, or on such other date as may be ordered by the Bankruptcy Court. Except as provided under applicable non-bankruptcy law or certain agreements with the Debtor approved by the Bankruptcy Court and which are incorporated into and made a part of the Plan, Post-Petition Interest will not be paid on Allowed Administrative Expense Claims.

    2.2 <u>Professional Compensation and Reimbursement Claims</u>. The holders of Professional Compensation and Reimbursement Claims shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by no later than the date that is ninety (90) days after the Confirmation Date, or such other date as may be fixed by the Bankruptcy Court. If granted by the Bankruptcy Court, such award shall be paid in full in such amounts as are Allowed by the

1 Bankruptcy Court either (a) on the date such Professional Compensation and Reimbursement Claim

2 becomes an Allowed Professional Compensation and Reimbursement Claim, or as soon as

3 practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such

4 holder of an Allowed Professional Compensation and Reimbursement Claim and the Debtor.

5       2.3    Priority Tax Claims. Except to the extent that a holder of an Allowed Priority

6 Tax Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment,

7 each holder of an Allowed Priority Tax Claim shall receive, in full and complete settlement,

8 satisfaction and discharge of its Allowed Priority Tax Claim, including Post-Petition Interest, Cash

9 in an amount equal to such Allowed Priority Tax Claim plus accrued and unpaid Post-Petition

10 Interest thereon on the later of the Effective Date and the date such Priority Tax Claim becomes an

11 Allowed Priority Tax Claim, or as soon as practicable thereafter.

12       2.4    Ordinary Course Liabilities. Ordinary Course Liabilities shall be paid in full and

13 performed by the Debtor in the ordinary course of business in accordance with the terms and subject

14 to the conditions of any agreements governing, instruments evidencing or other documents relating

15 to such transactions and pursuant to applicable law, without the necessity of the filing of an

16 Administrative Expense Claim. Except as provided under such agreements, instruments and

17 documents or applicable non-bankruptcy law, Post-Petition Interest will not be paid on any Ordinary

18 Course Liabilities. Any disputed Ordinary Course Liabilities shall be determined, resolved, or

19 adjudicated, as the case may be, in a manner as if the Chapter 11 Case had not been commenced

20 (except that, under sections 365 and/or 1123(b)(2) of the Bankruptcy Code, contractual provisions,

21 accelerations and defaults eliminated or rendered unenforceable by such sections shall remain

22 eliminated or unenforceable), and shall survive the Effective Date as if the Chapter 11 Case had not

23 been commenced. In the event of a disputed Ordinary Course Liability, the Debtor shall be liable in

24 the amount or in the manner determined by a Final Order or by a binding award, agreement or

25 settlement; provided, however, that the Debtor shall preserve all rights and defenses respecting any

26 Ordinary Course Liability that exists under applicable law. All disputed Ordinary Course Liabilities

27 shall be determined and liquidated under applicable non-bankruptcy law in the administrative or

28 judicial tribunal in which they are pending as of the Effective Date or, if no such action is pending

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. In light

of the unimpaired pass-through treatment of Ordinary Course Liabilities hereunder, the Reorganized

Debtor waives the discharge of section 1141(d) of the Bankruptcy Code as to any Ordinary Course

Liability.

<div align="center">

ARTICLE III

**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS**

</div>

Claims against and Equity Interests in the Debtor, other than Administrative Expense

Claims, Professional and Reimbursement Claims and Priority Tax Claims, are classified for all

purposes, including voting, confirmation and distribution pursuant to the Plan, as follows:

| Class | Claim/Interest | Status |
|-------|----------------|--------|
| 1 | Other Priority Claims | Unimpaired |
| 2 | Other Secured Claims | Unimpaired |
| 3a | Secured Claims Relating to First and Refunding Mortgage Bonds | Impaired |
| 3b | Secured Claims Relating to PC-Related Mortgage Bonds | Impaired |
| 4a | Mortgage Backed PC Bond Claims | Impaired |
| 4b | MBIA Insured PC Bond Claims | Unimpaired |
| 4c | MBIA Claims | Impaired |
| 4d | Letter of Credit Backed PC Bond Claims | Unimpaired |
| 4e | Letter of Credit Bank Claims | Impaired |
| 4f | Prior Bond Claims | Unimpaired |
| 4g | Treasury PC Bond Claims | Unimpaired |
| 5 | General Unsecured Claims | Impaired |
| 6 | ISO, PX and Generator Claims | Unimpaired[2] |

[2]The Proponents believe that Classes 6 and 7 are unimpaired by the Plan, and such Classes are accordingly so classified. However, the Proponents understand that certain holders of Class 6 and/or Class 7 Claims believe that Class 6 and/or Class 7 Claims are impaired by the Plan. Accordingly, to avoid any delay in the confirmation process, as a precautionary measure holders of Class 6 and Class 7 Claims will be solicited to vote on the Plan and their votes will be tabulated, so that in the event any such holders object to confirmation of the Plan based on the classification of their Claims as unimpaired and the Bankruptcy Court sustains such objection, the results of their votes will be known for purposes of applying the confirmation standard under section 1129(a)(8) of the

( . . . continued)

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 33 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

| Class | Claim/Interest | Status |
|-------|----------------|--------|
| 7 | ESP Claims | Unimpaired[2] |
| 8 | Environmental, Fire Suppression, Pending Litigation and Tort Claims | Unimpaired |
| 9 | QUIDS Claims | Unimpaired |
| 10 | Workers' Compensation Claims | Unimpaired |
| 11 | Preferred Stock Equity Interests | Unimpaired |
| 12 | Common Stock Equity Interests | Unimpaired |

## ARTICLE IV

### TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.1    <u>Payment of Interest</u>.  Allowed Claims shall include amounts owed with respect to the period prior to the Petition Date and applicable interest accrued and unpaid during such period. Except as otherwise provided herein, holders of Allowed Claims shall also be paid in Cash accrued and unpaid interest on such Allowed Claims from the Petition Date through the Effective Date ("Post-Petition Interest").  Except as otherwise provided herein, including <u>Exhibit B</u> attached hereto, any Post-Petition Interest shall be calculated and paid at the lowest non-default rate and in accordance with the terms specified in the applicable statute, indenture or instrument governing such Allowed Claim or, if no such instrument exists or the applicable instrument does not specify a non-default rate of interest, Post-Petition Interest shall be calculated and paid on such Allowed Claim at the Federal Judgment Rate.  Except as provided under applicable non-bankruptcy law or certain agreements with the Debtor approved by the Bankruptcy Court and which are incorporated into and made a part of the Plan, Post-Petition Interest will not be paid on the following Allowed Claims: Administrative Expense Claims, Environmental, Fire Suppression, Pending Litigation and Tort Claims, and Workers' Compensation Claims.

( . . . continued)

Bankruptcy Code.  Accordingly, allowing the holders of Class 6 and Class 7 Claims to vote is without prejudice to the Proponents' position that these Classes are unimpaired, and the Proponents reserve the right to contest any objection to the unimpaired status of Classes 6 and 7.

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 34 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1       4.2  <u>Timing of Payments and Distributions.</u>

2         (a) Pursuant to an Order entered by the Bankruptcy Court on April 9, 2001

3    authorizing the interim use of Cash collateral, and an Order entered by the Bankruptcy Court on May

4    9, 2001 approving a stipulation for the use of Cash collateral between the Debtor and the trustee for

5    the First and Refunding Mortgage Bonds, as subsequently amended, the Debtor has paid and will

6    continue to pay Post-Petition Interest to the holders of Allowed Claims in Classes 3a, 3b and 4a.  In

7    addition, the Debtor will make payments of Post-Petition Interest that has accrued and is unpaid on

8    and after the Initial Calculation Date and through the last day of the last calendar quarter ending

9    prior to the Effective Date, in arrears, in quarterly installments (or in the case of such first quarter

10   following the Initial Calculation Date, for holders of Allowed Claims for which February 28, 2002 is

11   the Initial Calculation Date, the four month period from March 1, 2002 to June 30, 2002) as follows:

12   (x) on the first Business Day of the next calendar quarter to the holders of Allowed Claims in Class

13   5 for Senior Indebtedness, the holders of Allowed Southern San Joaquin Power Authority Bond

14   Claims and the holders of Allowed Claims in Classes 4c, 4f, 4g and 9, and (y) within thirty (30) days

15   following the end of the calendar quarter, to the remaining holders of Allowed Claims in Class 5 and

16   the holders of Allowed Claims in Classes 1, 2, 6 and 7.  Any Post-Petition Interest that accrues

17   during the period commencing on the first day of the calendar quarter in which the Effective Date

18   occurs and ending on the Effective Date will be paid on the Effective Date.

19        (b) Pursuant to an Order entered by the Bankruptcy Court on November 26, 2002

20   approving a stipulation between the Debtor and MBIA, the Debtor continues to pay Post-Petition

21   Interest to the holders of Allowed MBIA Claims (Class 4c), but beginning December 1, 2002,

22   converted to semi-annual payments of Post-Petition Interest on June 1 and December 1 of each year

23   in accordance with the terms of the applicable loan documents.

24        (c) Pursuant to an Order entered by the Bankruptcy Court on April 9, 2002

25   approving the Debtor's execution and performance under an agreement with the Letter of Credit

26   Issuing Banks entitled "Summary of Terms with Respect to Forbearance and Proposed Revised

27   Treatment of Letter of Credit Bank Claims in the Plan of Reorganization" and pursuant to an Order

28   entered by the Bankruptcy Court on June 17, 2002 approving the Debtor's execution and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
*A Professional Corporation*

Case: 01-30923 Doc# 14267 Filed: 12/19/03 Entered: 12/22/03 11:13:17 Page 35
of 92

1  performance under the "First Amended and Restated Summary of Terms With Respect to

2  Forbearance and Proposed Revised Treatment of Letter of Credit Bank Claims in the Plan of

3  Reorganization," the Debtor has made and will continue to make certain payments to the Letter of

4  Credit Issuing Banks and to the holders of Allowed Claims in Class 4e prior to the Effective Date, as

5  set forth in such agreements and in Section 4.11 hereof.

6   (d) Except as set forth in Sections 4.2(a) and 4.2(b) above and except to the

7  extent a holder of an Allowed Claim or Equity Interest has otherwise been paid all or a portion of

8  such holder's Allowed Claim or Equity Interest prior to the Effective Date, each of the distributions

9  specified in this Article IV with respect to each Allowed Claim or Equity Interest shall (i) occur on

10  the later of the Effective Date and the date such Allowed Claim or Equity Interest becomes an

11  Allowed Claim or Equity Interest, or as soon as practicable thereafter, and (ii) be in full and

12  complete settlement, satisfaction and discharge of such Allowed Claim or Equity Interest.

13   (e) Nothing in the Plan shall affect the right of reconsideration set forth in

14  section 502(j) of the Bankruptcy Code. Any Claims that become Allowed Claims following

15  reconsideration by the Bankruptcy Court shall be treated in the same manner as Allowed Claims in

16  the same Class.

17   4.3 Class 1 - Other Priority Claims.

18   (a) Distributions. Each holder of an Allowed Other Priority Claim, if any exist,

19  shall be paid Cash in an amount equal to such Allowed Claim.

20   (b) Impairment and Voting. Class 1 is unimpaired by the Plan. Each holder of

21  an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan and is not

22  entitled to vote to accept or reject the Plan.

23   4.4 Class 2 - Other Secured Claims.

24   (a) Distributions/Reinstatement of Claims. Each holder of an Allowed Other

25  Secured Claim shall, at the option of the Debtor, (i) be reinstated and rendered unimpaired in

26  accordance with section 1124(2) of the Bankruptcy Code or (ii) be paid Cash in an amount equal to

27  such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim

28  required to be paid pursuant to section 506(b) of the Bankruptcy Code and in accordance with the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

terms specified in the applicable statute, indenture or instrument governing such Allowed Other Secured Claim.

(b) Impairment and Voting. Class 2 is unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

4.5 Class 3a - Secured Claims Relating to First and Refunding Mortgage Bonds.

(a) Allowance. The Secured Claims Relating to First and Refunding Mortgage Bonds shall be Allowed Secured Claims Relating to First and Refunding Mortgage Bonds in the amount of approximately $2,653,000,000[3] plus accrued and unpaid pre-petition interest on such amount, plus Allowed Claims in the amount of all unpaid fees and expenses of the related First and Refunding Mortgage Bond trustee accrued through the Petition Date under the terms of the Mortgage, plus:

(i) with respect to the following series of First and Refunding Mortgage Bonds, a prepayment premium payable in cash upon the Effective Date as follows: a 1.0000% premium with respect to the 8.800% First and Refunding Mortgage Bonds Series 91A due May 1, 2024, a 0.1000% premium with respect to the 5.875% First and Refunding Mortgage Bonds Series 93E due October 1, 2005, a 0.0250% premium with respect to the 6.25% First and Refunding Mortgage Bonds Series 93G due March 1, 2004 and a 1.0000% premium with respect to the 7.05% First and Refunding Mortgage Bonds Series 93H due March 1, 2024,

(ii) with respect to all other series of redeemable First and Refunding Mortgage Bonds as to which the redemption period commences prior the Effective Date, any prepayment premium provided under the First and Refunding Mortgage Bonds that applies to prepayment of such First and Refunding Mortgage Bonds on or prior to the Effective Date, which

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

---

[3]This $2,653,000 total includes approximately $234,000,000 in First and Refunding Mortgage Bonds owned in treasury by the Debtor as of the date hereof. All or any portion of such treasury bonds owned by the Debtor that remain outstanding may be cancelled on or reasonably promptly prior to the Effective Date pursuant to the treatment of such treasury bonds specified in Section 4.5(b) hereof. Prior to the Effective Date, the Debtor shall not sell any such treasury bonds, provided that the Debtor may use any portion of such treasury bonds (and effect the cancellation thereof) for the purpose of meeting its sinking fund or similar obligations under the Mortgage.

1   shall be payable in Cash, and

2                    (iii)      with respect to all other series of redeemable First and Refunding

3   Mortgage Bonds as to which the redemption period commences subsequent to the Effective Date, a

4   prepayment premium equal to the premium that would apply at the commencement of such

5   redemption period, shall be payable in Cash;

6                    provided, however, that Allowed Secured Claims Relating to First and Refunding

7   Mortgage Bonds shall not include any other prepayment premium or penalties associated with the

8   repayment of First and Refunding Mortgage Bonds; and provided further, that no prepayment

9   premium will be paid on any series of First and Refunding Mortgage Bonds that matures in

10  accordance with its terms prior to the Effective Date if the Allowed Secured Claims on such series

11  of First and Refunding Mortgage Bonds are paid on or about the maturity date thereof.

12                   (b) Distributions.   Except as provided in the next sentence, each holder of an

13  Allowed Secured Claim Relating to First and Refunding Mortgage Bonds shall be paid Cash in an

14  amount equal to such Allowed Secured Claim.  As to all First and Refunding Mortgage Bonds

15  owned in treasury by the Debtor that remain outstanding, the Debtor's Allowed Secured Claim

16  pertaining to such First and Refunding Mortgage Bonds may, in lieu of payment thereof in Cash

17  pursuant to the preceding sentence, be satisfied and discharged by the cancellation of such First and

18  Refunding Mortgage Bonds reasonably promptly prior to the Effective Date.

19                   (c) Liens.  All existing Liens securing the Allowed Secured Claims Relating to

20  First and Refunding Mortgage Bonds shall be extinguished as of the Effective Date.

21                   (d) Impairment and Voting. . Class 3a is impaired by the Plan.  Each holder of an

22  Allowed Secured Claim Relating to First and Refunding Mortgage Bonds is entitled to vote to

23  accept or reject the Plan.

24           4.6      Class 3b - Secured Claims Relating to PC-Related Mortgage Bonds.

25                   (a) Allowance.  The Claims of the PC-Related Mortgage Bonds trustee with

26  respect to payment of principal, prepayment premium, if any, and interest on the PC-Related

27  Mortgage Bonds shall be deemed contingent Claims, and the Claims of the PC-Related Mortgage

28  Bonds trustee with respect to all other amounts that may become due and owing by the Debtor under

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-36-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1   the terms of the Mortgage, including unpaid fees and expenses of the PC-Related Mortgage Bonds

2   trustee accrued through the Petition Date under the terms of the Mortgage, shall be deemed Allowed

3   Secured Claims.[4]

4           (b) <u>Distributions</u>.

5                (i)     If none of the New Money Notes are secured on the Effective

6   Date, then each series of PC-Related Mortgage Bonds shall be replaced with New Mortgage Bonds.

7   In such event, each holder of a PC-Related Mortgage Bond shall be paid an amount in Cash equal to

8   any and all accrued and unpaid interest owed to such holder in respect of such PC-Related Mortgage

9   Bond in accordance with the terms thereof to and including the last scheduled interest payment date

10   preceding the Effective Date.

11               (ii)     If any of the New Money Notes are secured on the Effective Date,

12   then with respect to each series of PC-Related Mortgage Bonds securing a series of Mortgage

13   Backed PC Bonds redeemed in accordance with Section 4.7(b)(ii) hereof, each holder of an

14   Allowed Secured Claim relating to such series of PC-Related Mortgage Bonds shall be paid Cash in

15   an amount equal to such Allowed Claim.

16           (c) <u>Liens</u>. If any of the New Money Notes are secured on the Effective Date, all

17   existing Liens securing the Allowed Secured Claims Relating to PC-Related Mortgage Bonds shall

18   be extinguished as of the Effective Date.

19           (d) <u>Impairment and Voting</u>. Class 3b is impaired by the Plan. Each holder of an

20   Allowed Secured Claim Relating to PC-Related Mortgage Bonds is entitled to vote to accept or

21   reject the Plan.

22

23       [4]With respect to each series of Mortgage Backed PC Bonds, in order to secure and provide for
the repayment of the respective Bond Loan, the Debtor issued and delivered to the Bond Trustee its

24   PC-Related Mortgage Bonds, of like principal amount, maturity, interest rate and redemption
provisions as the related series of Mortgage Backed PC Bonds. Under the terms of the respective

25   PC Bond Documents related to the Mortgage Backed PC Bonds, the Debtor is obligated to repay
principal and interest on the respective Bond Loan only to the extent that such payments are not

26   timely provided for by the payment of principal and interest on the respective PC-Related Mortgage
Bonds. Funds received by the Bond Trustee as the payment of Class 3b Allowed Claims will be

27   applied by the Bond Trustee to satisfy a like amount of Class 4a Allowed Claims. Accordingly, the
estimate of $345 million is the aggregate amount of all Allowed Claims in Classes 3b and 4a.

28

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-37-

4.7 Class 4a - Mortgage Backed PC Bond Claims.

(a) Allowance. The Mortgage Backed PC Bond Claims shall be deemed Allowed Secured Claims in the amount of $345,000,000,[5] plus accrued and unpaid pre-petition interest on such amount, plus prepayment premium, if any, plus Allowed Claims in the amount of all unpaid fees and expenses of the related Issuer and Bond Trustee accrued through the Petition Date under the terms of the applicable PC Bond Documents.

(b) Distributions.

(i) If none of the New Money Notes are secured on the Effective Date, then:

(A) Each series of Mortgage Backed PC Bonds, and each of the PC Bond Documents relating thereto, shall be renewed and remain outstanding. To the extent such payments are not made or provided for by the payment of Class 3b Claims to or for the benefit of the Bond Trustee, each holder of a Mortgage Backed PC Bond shall be paid Cash in an amount equal to any and all accrued and unpaid interest owed to such holder in respect of such Mortgage Backed PC Bond in accordance with the terms thereunder to and including the last scheduled interest payment date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond Trustee due and owing under the applicable Loan Agreements shall also be paid in Cash.

(B) On or prior to the Effective Date, with respect to each series of Mortgage Backed PC Bonds that will remain outstanding after the Effective Date, the Reorganized Debtor, the Issuer and Bond Trustee shall receive an opinion of the original bond counsel to the effect that the transactions set forth herein with respect to each series of Mortgage Backed PC Bonds and the execution and delivery of any releases, amendments or other agreements in connection therewith will not, in and of themselves, cause interest on such series of Mortgage Backed PC Bonds to become includable in the gross income of the holders thereof for federal income tax purposes.

(ii) If any of the New Money Notes are secured on the Effective Date,

---

[5]See footnote 4.

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 40 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  then all of the Mortgage Backed PC Bonds shall, at the option of the Reorganized Debtor with

2  respect to each series of Mortgage Backed PC Bonds, be (A) redeemed in accordance with their

3  terms and each holder of an Allowed Secured Claim relating to such series of Mortgage Backed PC

4  Bonds shall be paid Cash in an amount equal to such Allowed Claim, or (B) to the extent permitted

5  under the terms of the Indenture, purchased in lieu of redemption or otherwise in accordance with

6  their terms, and each holder of a Mortgage Backed PC Bond of such series will be paid a purchase

7  price in Cash for its Mortgage Backed PC Bond(s) in an amount equal to its Allowed Secured Claim

8  with respect to such Mortgage Backed PC Bond(s), provided that, in connection with any such

9  purchase of the Mortgage Backed PC Bonds on the Effective Date, the Reorganized Debtor shall

10  cause the PC-Related Mortgage Bonds securing such outstanding Mortgage Backed PC Bonds (and

11  the Mortgage pursuant to which such PC-Related Mortgage Bonds were issued) to be released and

12  cancelled.   The Reorganized Debtor may, among other things, at its option, fund the redemption or

13  purchase price of Mortgage Backed PC Bonds tendered for redemption or purchase on the Effective

14  Date in accordance with the terms hereof from remarketing proceeds received from the sale and

15  remarketing of such bonds or from the proceeds of the issuance and sale of refunding bonds, which

16  remarketed or refunding bonds may at the option of the Reorganized Debtor, be secured by, among

17  other things, contingent notes issued under the same indenture as the New Money Notes and ranking

18  *pari passu* therewith in accordance with the provisions of Section 7.2 hereof.

19  　　　　　　　　(c) Impairment and Voting.  Class 4a is impaired by the Plan.  Each holder of an

20  Allowed Mortgage Backed PC Bond Claim is entitled to vote to accept or reject the Plan.

21  　　　　　　　　4.8    Class 4b—MBIA Insured PC Bond Claims.

22  　　　　　　　　(a) Allowance.  The MBIA Insured PC Bond Claims shall be deemed Allowed

23  MBIA Insured PC Bond Claims in the amount of $200,000,000, plus accrued and unpaid pre-

24  petition interest on such amount, plus Allowed Claims in the amount of all unpaid fees and expenses

25  of the related Issuer and Bond Trustee accrued through the Petition Date under the terms of the

26  applicable PC Bond Documents.

27  　　　　　　　　(b) Distributions.  The MBIA Insured PC Bonds, and each of the PC Bond

28  Documents relating thereto, shall remain outstanding.  The Loan Agreement and the PC Bond

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 Documents related to the MBIA Insured PC Bonds will be reinstated and rendered unimpaired in

2 accordance with section 1124 of the Bankruptcy Code. Each holder of a MBIA Insured PC Bond

3 shall be paid Cash in an amount equal to any and all accrued and unpaid interest owed to such holder

4 in respect of such MBIA Insured PC Bond in accordance with the terms of the respective MBIA

5 Insured PC Bond, to and including the last scheduled interest payment date preceding the Effective

6 Date. All unpaid fees and expenses of the Issuer and Bond Trustee due and owing under the

7 applicable Loan Agreement shall also be paid in Cash.

8 (c) Impairment and Voting. Class 4b is unimpaired by the Plan. Each holder of

9 an Allowed MBIA Insured PC Bond Claim is conclusively presumed to have accepted the Plan and

10 is not entitled to vote to accept or reject the Plan.

11 4.9 Class 4c—MBIA Claims.

12 (a) Allowance. The Claims of MBIA with respect to payments that may become

13 due by the Debtor under the terms of the MBIA Reimbursement Agreement as reimbursement for

14 payments made by MBIA under the PC Bond Insurance Policy shall be deemed contingent Claims,

15 and the Claims of MBIA for any and all other accrued and unpaid amounts due by the Debtor under

16 the MBIA Reimbursement Agreement, including any and all amounts due by the Debtor as

17 reimbursement of amounts paid by MBIA under the PC Bond Insurance Policy to the Bond Trustee

18 for the payment of interest on the MBIA Insured PC Bonds shall be deemed Allowed MBIA Claims.

19 (b) Distributions. Each holder of an Allowed MBIA Claim shall be paid Cash

20 equal to its pro rata share of the aggregate amount paid by MBIA to the Bond Trustee with respect to

21 the payment of interest on the MBIA Insured PC Bonds during the period from the Petition Date to

22 and including the last scheduled interest payment date preceding the Effective Date, together with its

23 pro rata share of all other amounts due and owing to MBIA under the terms of the MBIA

24 Reimbursement Agreement through the Effective Date, including any accrued and unpaid interest

25 due on such amounts to the extent provided in the MBIA Reimbursement Agreement at the non-

26 default rate. In addition, (i) if any of the New Money Notes are secured on the Effective Date, the

27 Reorganized Debtor will deliver to MBIA, or for the benefit of MBIA, a contingent note issued

28 under the same indenture as the New Money Notes and ranking *pari passu* therewith, in an amount

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-40-

equal to the aggregate outstanding principal amount of the MBIA Insured PC Bonds as additional

security for the Reorganized Debtor's obligations under the MBIA Reimbursement Agreement after

the Effective Date, and (ii) if none of the New Money Notes are secured on the Effective Date but at

least twenty-five percent (25%) of the aggregate principal amount of the credit facilities established

pursuant to the first sentence of Section 7.3 hereof are secured on the Effective Date, the

Reorganized Debtor will deliver to MBIA, or for the benefit of MBIA, a contingent note issued

under the same indenture as the New Mortgage Bonds and ranking *pari passu* therewith, in an

amount equal to the aggregate outstanding principal amount of the MBIA Insured PC Bonds as

additional security for the Reorganized Debtor's obligations under the MBIA Reimbursement

Agreement after the Effective Date. Principal amounts under any contingent note issued pursuant to

the preceding sentence shall be payable only to the extent that the Reorganized Debtor has failed to

satisfy its obligations under the MBIA Reimbursement Agreement to reimburse MBIA for any

payments made by MBIA pursuant to the PC Bond Insurance Policy for the payment of the principal

of the MBIA Insured PC Bonds. Such contingent note shall accrue interest on any principal amount

then due and payable thereunder at a rate equal to the interest rate which accrues on any outstanding

reimbursement obligations of the Reorganized Debtor under the MBIA Reimbursement Agreement.

Any payments made under such contingent note shall be deemed to satisfy the Reorganized Debtor's

obligations under the MBIA Reimbursement Agreement.

(c) <u>Impairment and Voting</u>. Class 4c is impaired by the Plan. Each holder of an

Allowed MBIA Claim is entitled to vote to accept or reject the Plan.

4.10    <u>Class 4d—Letter of Credit Backed PC Bond Claims</u>.

(a) <u>Allowance</u>. The Letter of Credit Backed PC Bond Claims shall be deemed

Allowed Letter of Credit Backed PC Bond Claims in the amount of $613,550,000, plus accrued and

unpaid pre-petition interest on such amount, plus Allowed Claims in the amount of all unpaid fees

and expenses of the related Issuer and Bond Trustee accrued through the Petition Date under the

terms of the applicable PC Bond Documents.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
*A Professional Corporation*

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 43
of 92

1    (b) Distributions.  Each series of Letter of Credit Backed PC Bonds, and each of

2    the PC Bond Documents relating thereto, shall remain outstanding.  Each of the Loan Agreements

3    and the PC Bond Documents related to the Letter of Credit Backed PC Bonds will be reinstated and

4    rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.  Each holder of a

5    Letter of Credit Backed PC Bond shall be paid Cash in an amount equal to any and all accrued and

6    unpaid interest owed to such holder in respect of such Letter of Credit Backed PC Bond in

7    accordance with the terms thereof to and including the last scheduled interest payment date

8    preceding the Effective Date.  All unpaid fees and expenses of the Issuer and Bond Trustee due and

9    owing under the applicable Loan Agreement will also be paid in Cash.

10    (c) Impairment and Voting.  Class 4d is unimpaired by the Plan.  Each holder of

11    an Allowed Letter of Credit Bank Claim is conclusively presumed to have accepted the Plan and is

12    not entitled to vote to accept or reject the Plan.

13    4.11    Class 4e—Letter of Credit Bank Claims.

14    (a) Allowance.  The Letter of Credit Bank Claims with respect to payments that

15    may become due by the Debtor under the terms of each of the Reimbursement Agreements as

16    reimbursement for amounts drawn under the Letters of Credit shall be deemed contingent Claims in

17    an amount equal to the outstanding Stated Amount of each of the Letters of Credit, and Letter of

18    Credit Bank Claims for any and all other accrued and unpaid amounts due by the Debtor under each

19    of the Reimbursement Agreements, including any and all amounts due by the Debtor as

20    reimbursement of amounts paid by a Letter of Credit Issuing Bank under its Letter of Credit to the

21    Bond Trustee for the payment of interest on the related Letter of Credit Backed PC Bonds, shall be

22    deemed Allowed Letter of Credit Bank Claims.

23    (b) Distributions.

24    (i)    With respect to each Letter of Credit Issuing Bank, until the earlier

25    of (x) the Effective Date, (y) the date the respective Letter of Credit is terminated or the stated

26    amount thereof is permanently reduced, or (z) the date that any of the related series of Letter of

27    Credit Backed PC Bonds are redeemed, to the extent that the Debtor has not reimbursed the

28    applicable Letter of Credit Issuing Bank and the applicable Banks, if any, for drawings made on the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PLAN OF REORG.  DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-42-

related Letter of Credit with respect to the payment of interest on the related series of Letter of Credit Backed PC Bonds to the extent provided in the respective Reimbursement Agreement, each holder of an Allowed Letter of Credit Bank Claim shall be paid Cash in an amount equal to its pro rata share of the aggregate amount paid by the respective Letter of Credit Issuing Bank to the respective Bond Trustee under the terms of the applicable Letter of Credit with respect to the payment of the interest on the Letter of Credit Backed PC Bonds to which such Letter of Credit Bank Claim relates during the period from the Petition Date to and including the last scheduled interest payment date on such Letter of Credit Backed PC Bonds preceding the Effective Date. Each holder of an Allowed Letter of Credit Bank Claim will also be paid Cash in an amount equal to its pro rata share of all other amounts then due and owing to the respective Letter of Credit Issuing Bank and the applicable Banks, if any, under the terms of the respective Reimbursement Agreement (other than for reimbursement of drawings on the respective Letter of Credit) through the Effective Date, including, without limitation, interest at the interest rate due on such amounts to the extent provided in the respective Reimbursement Agreements and any due and owing Forbearance, Extension and Letter of Credit Fees (as hereinafter defined) through the Effective Date, and the reasonable fees and expenses of unrelated third-party professionals retained by the Letter of Credit Issuing Banks, to the extent incurred subsequent to the Petition Date in the Chapter 11 Case.

(ii) On the Effective Date one of the following shall occur with respect to each series of Letter of Credit Backed PC Bonds and its respective Letter of Credit, at the option of the Debtor separately for each series of Letter of Credit Backed PC Bonds:

(A) <u>Purchase Option</u>. The respective series of Letter of Credit Backed PC Bonds shall be called for mandatory tender in accordance with the terms of the respective Indenture and shall be purchased by the respective Bond Trustee through a draw on the related Letter of Credit and, at the option of the respective Letter of Credit Issuing Bank, shall either be registered in the name of the respective Letter of Credit Issuing Bank or in the name of the Debtor subject to a first lien security interest in favor of the respective Letter of Credit Issuing Bank to additionally secure the obligations of the Debtor under the related Reimbursement Agreement. On the Effective Date, to the extent that the Letter of Credit Issuing Bank and the Banks have not been

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  reimbursed therefor, the Letter of Credit Issuing Bank will receive Cash in an amount equal to the

2  sum of (i) the interest portion of the purchase price of the tendered Letter of Credit Backed PC

3  Bonds paid out of a draw on the respective Letter of Credit, and (ii) the aggregate amount paid by

4  the respective Letter of Credit Issuing Bank to the respective Bond Trustee under the terms of the

5  applicable Letter of Credit with respect to the payment of the interest on the respective Letter of

6  Credit Backed PC Bonds during the period from and after June 27, 2002 to and including the last

7  scheduled interest payment date on such Letter of Credit Backed PC Bonds preceding the Effective

8  Date, together with interest at the non-default rate due on such amounts to the extent provided in the

9  respective Reimbursement Agreement. On the Effective Date, the Letter of Credit Issuing Bank

10  shall transfer the related Letter of Credit Backed PC Bonds in the aggregate original principal

11  amount as set forth on Exhibit C attached hereto to the Debtor or its assignee free and clear of all

12  liens. On the Effective Date, the Letter of Credit Issuing Bank will receive (i) Cash in an amount

13  equal to the principal portion of the purchase price of the tendered Letter of Credit Backed PC Bonds

14  paid out of a draw on the respective Letter of Credit, and (ii) a fee (the "Purchase Option Incentive

15  Fee") in an amount equal to 0.4% of the principal portion of the purchase price of the tendered Letter

16  of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit.

17                           (B)    Remarketing Option.  The respective series of Letter of

18  Credit Backed PC Bonds shall be called for mandatory tender in accordance with the terms of the

19  respective Indenture and shall be purchased by the respective Bond Trustee through a draw on the

20  related Letter of Credit. The Debtor will then either (i) provide or cause to be provided to the

21  respective Bond Trustee an alternative "Credit Facility" pursuant to the terms of the respective

22  Indenture in lieu of the existing Letter of Credit, or (ii) obtain the consent of the Issuer to remarket

23  the respective series of Letter of Credit Backed PC Bonds without credit enhancement in accordance

24  with the terms of the applicable Indenture. In either event the respective series of Letter of Credit

25  Backed PC Bonds shall be remarketed, at par, in accordance with the terms of the Indenture and the

26  other PC Bond Documents. In such event, on the Effective Date, the Letter of Credit Issuing Bank

27  will receive, to the extent that the Letter of Credit Bank has not been reimbursed therefor (i) from the

28  Debtor, Cash in an amount equal to the sum of (A) the interest portion of the purchase price of the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 46
of 92

1  tendered Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit, and

2  (B) the aggregate amount paid by the respective Letter of Credit Issuing Bank to the respective Bond

3  Trustee under the terms of the applicable Letter of Credit with respect to the payment of the interest

4  on the respective Letter of Credit Backed PC Bonds during the period from and after June 27, 2002

5  to and including the last scheduled interest payment date on such Letter of Credit Backed PC Bonds

6  preceding the Effective Date, together with interest at the non-default rate due on such amounts to

7  the extent provided in the respective Reimbursement Agreement, (ii) from the Debtor, a fee (the

8  "Remarketing Option Incentive Fee") in an amount equal to either (1) 0.5% of the aggregate

9  principal amount of the respective Letter of Credit Backed PC Bonds remarketed on the Effective

10  Date the payment of the principal of and interest on which are secured by either a replacement Letter

11  of Credit, with a term of not less then one year from the Effective Date, delivered to the Trustee in

12  accordance with the terms of the respective Indenture upon terms acceptable to the Debtor or an

13  extension of the existing Letter of Credit delivered to the Trustee in accordance with the terms of the

14  respective Indenture upon terms acceptable to the Debtor, or (2) 0.4% of the aggregate principal

15  amount of the respective Letter of Credit Backed PC Bonds remarketed on the Effective Date the

16  payment of the principal of and interest on which are not secured by such a Letter of Credit, and

17  (iii) from the Bond Trustee, an amount equal to the principal portion of the purchase price of the

18  tendered Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit,

19  which amount shall be paid from the remarketing proceeds of the respective Letter of Credit Backed

20  PC Bonds in accordance with the terms of the respective Indenture.

21  (C)  No Bonds Option.  With respect to each Letter of Credit

22  Issuing Bank and the related Banks, if any, in the event that neither the Purchase Option nor the

23  Remarketing Option, as applicable, can be consummated or the respective series of Letter of Credit

24  Backed PC Bonds are redeemed on or prior to the Effective Date as the result of the expiration of the

25  respective Letter of Credit or otherwise, then at the option of the Debtor separately for each Letter of

26  Credit Bank Claim and Reimbursement Agreement either:

27  (i)  On the Effective Date, the Letter of Credit Issuing

28  Bank will receive Cash in an amount equal to the sum of (A) the principal portion of the redemption

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  price of the redeemed Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter
2  of Credit (the "Principal Reimbursement") and (B) any and all accrued and unpaid interest owing to
3  the Letter of Credit Issuing Bank in respect of such Principal Reimbursement, at a fluctuating rate of
4  interest, in accordance with the terms of the applicable Reimbursement Agreement; or

5             (ii)    On the Effective Date, the Letter of Credit Issuing
6  Bank shall sell, transfer and assign to the Debtor or its assignee, without recourse, all of the Letter of
7  Credit Issuing Bank's and the related Banks' rights, title and interest in the applicable Letter of
8  Credit Bank Claim and Reimbursement Agreement, including, but not limited to, the right to receive
9  repayment of the Principal Reimbursement in the aggregate principal amount as set forth on
10  Exhibit C attached hereto, together with the right to receive payment of interest thereon as set forth
11  in the amended Reimbursement Agreement, free and clear of all liens.  On the Effective Date, the
12  Debtor or its assignee shall purchase from the Letter of Credit Issuing Bank and the related Banks, if
13  any, all of their rights, title and interest in the applicable Letter of Credit Bank Claim and
14  Reimbursement Agreement for a purchase price in Cash in an amount equal to the sum of (A) the
15  respective Principal Reimbursement and (B) any and all accrued and unpaid interest owing to the
16  Letter of Credit Issuing Bank in respect of such Principal Reimbursement, at a fluctuating rate of
17  interest, in accordance with the terms of the applicable Reimbursement Agreement.

18             In addition to the foregoing with respect to the No Bond
19  Option, if (i) the Letter of Credit Issuing Bank maintains its Letter of Credit outstanding in the stated
20  amount set forth on Exhibit C attached hereto through the Effective Date and does not provide the
21  Trustee with notice of default under its Reimbursement Agreement or non-reinstatement of its Letter
22  of Credit or take any other action which would result in the redemption, either in whole or in part, of
23  the outstanding Letter of Credit Backed PC Bonds without the prior written consent of the Debtor,
24  and (ii) the Letter of Credit Issuing Bank and each of the related Banks, if any, take all action
25  reasonably required by the Debtor to keep the Letter of Credit Backed PC Bonds outstanding and to
26  facilitate either the Purchase Option or the Remarketing Option, as applicable, including, without
27  limitation, giving direction to the Trustee, providing commercially reasonably indemnification to the
28  Issuer and Trustee, and using their best efforts to consummate the proposed amendments to the

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 48
of 92

1 terms of the Letter of Credit Backed PC Bonds as set forth in the LC Bank Agreement (as hereinafter

2 defined) and to consummate either the Purchase Option or the Remarketing Option as applicable, so

3 as to maintain for the Debtor the benefits of the tax-exempt financing provided by the related series

4 of Letter of Credit Backed PC Bonds, then, on the Effective Date (A) in the event that the Letter of

5 Credit Backed PC Bonds were redeemed prior to the Effective Date for reasons beyond the control

6 of the Letter of Credit Issuing Bank, the Letter of Credit Issuing Bank will receive from the Debtor, a

7 fee in an amount equal to 0.05% of the principal portion of the redemption price of the redeemed

8 Letter of Credit Backed PC Bonds paid out of a draw on the respective Letter of Credit, and (B) in

9 the event that the Letter of Credit Backed PC Bonds are redeemed on the Effective Date for reasons

10 beyond the control of the Letter of Credit Issuing Bank, the Letter of Credit Issuing Bank will

11 receive from the Debtor, a fee (the "No Bonds Option Fee") in an amount equal to 0.10% of the

12 principal portion of the redemption price of the redeemed Letter of Credit Backed PC Bonds paid

13 out of a draw on the respective Letter of Credit.

14       (iii)     Pursuant to the terms of an agreement among the Debtor and each

15 of the Letter of Credit Issuing Banks (the "LC Bank Agreement") that was approved by order of the

16 Bankruptcy Court entered on June 17, 2002, the Letter of Credit Issuing Banks have agreed, among

17 other things and subject to certain conditions, to (A) maintain each of the Letters of Credit

18 outstanding in the stated amounts set forth on Exhibit C attached hereto, (B) not provide the Trustee

19 with notice of any default under any of the Reimbursement Agreements or non-reinstatement of any

20 of the Letters of Credit or take any other action which would result in the mandatory tender or

21 redemption, either in whole or in part, of any of the outstanding Letter of Credit Backed PC Bonds

22 without the prior written consent of the Debtor, and (C) extend the expiration date of each of the

23 Letters of Credit to the first Business Day subsequent to the one (1)-year anniversary of the

24 expiration date of each Letter of Credit existing as of the Petition Date; provided, however, that each

25 Letter of Credit Issuing Bank is only obligated to undertake or refrain from undertaking those actions

26 set forth in clauses (A) and (B) immediately above until the earlier of (i) the last interest payment

27 date on the related series of Letter of Credit Backed PC Bonds immediately preceding the expiration

28 date of such Letter of Credit, as such expiration date shall be extended in accordance with the terms

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 49 of 92

1    of the LC Bank Agreement, or (ii) the occurrence of a "Termination Event" (as such term is defined

2    in the LC Bank Agreement). In consideration for such forbearance and other actions by the Letter of

3    Credit Issuing Banks, the Debtor shall, subject to certain terms and conditions as set forth in the LC

4    Bank Agreement, pay to each Letter of Credit Issuing Bank, (1) during the period from and after

5    June 17, 2002 and continuing until July 1, 2002, quarterly, in arrears, the Letter of Credit fee as set

6    forth in the respective Reimbursement Agreement (the "Original Letter of Credit Fee"), together

7    with an amount equal to the positive difference, if any, of an amount per annum equal to two percent

8    (2%) of the Stated Amount of the Letter of Credit, less the Original Letter of Credit Fee, which total

9    fee accrues from and after December 1, 2001 and until July 1, 2002, and has been payable on the

10    same dates as are set forth for payment of Letter of Credit Fees in the applicable Reimbursement

11    Agreement, and (2) during the period from and after July 1, 2002 and continuing until the Effective

12    Date, quarterly, in arrears, the Original Letter of Credit Fee, together with an amount equal to the

13    positive difference, if any, of an amount per annum equal to three percent (3%) of the Stated

14    Amount of the Letter of Credit, less the Original Letter of Credit Fee, which total fee accrues from

15    and after July 1, 2002 until the Effective Date, and shall be payable on the same dates as are set forth

16    for payment of Letter of Credit Fees in the applicable Reimbursement Agreement (the Original

17    Letter of Credit Fee together with such additional sums being hereinafter referred to collectively as

18    the "Forbearance, Extension and Letter of Credit Fees"). Additionally, pursuant to the terms of the

19    LC Bank Agreement, the Debtor has agreed, among other things and subject to certain conditions, to

20    pay to Deutsche Bank AG New York Branch an agency fee in the amount of $250,000, which fee

21    was paid by the Debtor on June 18, 2002.

22          (c) Impairment and Voting. Class 4e is impaired by the Plan. Each holder of an

23    Allowed Letter of Credit Bank Claim is entitled to vote to accept or reject the Plan.

24          4.12    Class 4f—Prior Bond Claims.

25          (a) Allowance. The Prior Bond Claims shall be deemed Allowed Prior Bond

26    Claims in the amount of $453,550,000, plus any and all other accrued and unpaid amounts due by

27    the Debtor under the terms of each of the Prior Reimbursement Agreements; provided, however, that

28    each Allowed Prior Bond Claim shall be paid in the amount necessary to render it unimpaired as set

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  forth herein.

2      (b) <u>Distributions</u>. Each Allowed Prior Bond Claim will be reinstated and

3  rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. On the Effective

4  Date one of the following shall occur with respect to each Prior Reimbursement Agreement and all

5  of the Allowed Prior Bond Claims arising with respect thereto:

6      (i) Each holder of an Allowed Prior Bond Claim shall be paid Cash in

7  an amount equal to (A) the outstanding Reimbursement Obligation, or portion thereof, owing to

8  such holder, (B) any and all accrued and unpaid interest owing to such holder in respect of such

9  Reimbursement Obligation or applicable portion thereof at a fluctuating rate of interest in

10  accordance with the terms of the applicable Reimbursement Agreement, and (C) all other amounts

11  due and owing to the respective holder of an Allowed Prior Bond Claim under the terms of the

12  respective Prior Reimbursement Agreement, through the Effective Date.

13      (ii) Alternatively, upon the written request of the Debtor, with the

14  prior written consent of the respective Prior Letter of Credit Issuing Bank, the related Banks and

15  each of the other holders of Allowed Prior Bond Claims related thereto, each such holder of an

16  Allowed Prior Bond Claim shall be paid Cash in an amount equal to (A) any and all accrued and

17  unpaid interest owing to such holder in respect of the Reimbursement Obligation or applicable

18  portion thereof owing to such holder at a fluctuating rate of interest in accordance with the terms of

19  the applicable Reimbursement Agreement, and (B) all other amounts (other than the Reimbursement

20  Obligation or applicable portion thereof) due and owing to the respective holder of an Allowed Prior

21  Bond Claim under the terms of the respective Prior Reimbursement Agreement, through the

22  Effective Date. On the Effective Date, the applicable Prior Letter of Credit Issuing Bank, the related

23  Banks and any other holders of Allowed Prior Bond Claims related thereto shall sell, transfer and

24  assign to the Debtor or its assignee, all of the Prior Letter of Credit Issuing Bank's, the related

25  Banks' and the related Allowed Prior Bond Claim holders' rights, title and interest in the applicable

26  Prior Reimbursement Agreement, including, but not limited to, the right to receive repayment of the

27  related Reimbursement Obligation, together with the right to receive payment of interest thereon as

28  set forth in the applicable Prior Reimbursement Agreement, free and clear of all Liens. In such

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 51
of 92

1   event, on the Effective Date, the Debtor or its assignee shall purchase from the Prior Letter of Credit

2   Issuing Bank, the related Banks and the holders of the related Allowed Prior Bond Claims, all of

3   their rights, title and interest in the applicable Prior Reimbursement Agreement for a purchase price

4   in Cash in an amount equal to the respective Reimbursement Obligation. All of the documents

5   related to the transfer and sale of rights under the Prior Reimbursement Agreement shall be in form

6   and content satisfactory to the Debtor, the Prior Letter of Credit Issuing Bank, the related Banks and

7   each of the other holders of Allowed Prior Bonds Claims related thereto.

8           (c) Impairment and Voting. Class 4f is unimpaired by the Plan. Each holder of

9   an Allowed Prior Bond Claim is conclusively presumed to have accepted the Plan and is not entitled

10  to vote to accept or reject the Plan.

11          4.13    Class 4g—Treasury PC Bond Claims.

12          (a) Allowance. The Treasury PC Bond Claims shall be deemed Allowed

13  Treasury PC Bond Claims in the amount of $80,770,000, plus accrued and unpaid pre-petition

14  interest on such amount, plus Allowed Claims in the amount of all unpaid fees and expenses of the

15  related Issuer and Bond Trustee accrued through the Petition Date under the terms of the applicable

16  PC Bond Documents.

17          (b) Distributions. Each series of Treasury PC Bonds shall remain outstanding.

18  Each of the Loan Agreements and the PC Bond Documents related to the Treasury PC Bonds will be

19  reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code. The

20  Debtor's obligations under the PC Bond Documents related to the Treasury PC Bonds shall be the

21  obligation of the Reorganized Debtor. Each holder of a Treasury PC Bond shall be paid Cash in an

22  amount equal to any and all accrued and unpaid interest owed to such holder in respect of such

23  Treasury PC Bond in accordance with the terms thereof to and including the last scheduled interest

24  payment date preceding the Effective Date. All unpaid fees and expenses of the Issuer and Bond

25  Trustee due and owing under the applicable Loan Agreement shall also be paid in Cash.

26          (c) Impairment and Voting. Class 4g is unimpaired by the Plan. Each holder of

27  an Allowed Treasury PC Bond Claim is conclusively presumed to have accepted the Plan and is not

28  entitled to vote to accept or reject the Plan.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 52
of 92

4.14    Class 5—General Unsecured Claims.

(a) <u>Distributions</u>. Each holder of an Allowed General Unsecured Claim shall be paid Cash in an amount equal to such Allowed Claim (which shall include pre-petition interest only to the extent not previously paid).

(b) <u>Impairment and Voting</u>. Class 5 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

4.15    Class 6—ISO, PX and Generator Claims.

(a) <u>Distributions</u>. Each holder of an Allowed ISO, PX and Generator Claim shall be paid Cash in an amount equal to such Allowed Claim (which shall include pre-petition interest only to the extent not previously paid).

(b) <u>Impairment and Voting</u>. Class 6 is unimpaired by the Plan. Each holder of an Allowed ISO, PX and Generator Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan[6]

(c) <u>Disputed ISO, PX and Generator Claims</u>. As of the date hereof, all ISO, PX and Generator Claims are Disputed. The Debtor agrees that for purposes of determining the amount of Allowed ISO, PX and Generator Claims that are not resolved consensually by settlement, the Debtor will prosecute the FERC Refund Proceedings only before the FERC or any Court to which an appeal from the FERC order may be taken, and will not attempt to obtain a determination of such matters before the Bankruptcy Court, except (i) in connection with establishing the aggregate

---

[6]Although the Proponents believe that Class 6 is unimpaired and that the holders of Class 6 Claims therefore are not entitled to vote on the Plan, as a precautionary measure the Proponents as part of the solicitation process will be supplying ballots to and seeking the votes of the holders of Class 6 Claims that would be entitled vote on the Plan if Class 6 were impaired, and the votes of such holders of Class 6 Claims will be tabulated and available so as not to delay the confirmation process if the Bankruptcy Court determines that Class 6 is impaired. <u>See</u> footnote 2 <u>supra</u>. The following holders of ISO, PX and Generator Claims would be entitled to vote to accept or reject the Plan if Class 6 were impaired, and accordingly the following holders of ISO, PX and Generator Claims will be supplied ballots as part of the solicitation process: (i) each holder of an Allowed ISO, PX and Generator Claim, and (ii) each holder of an ISO, PX and Generator Claim that is Disputed and that has been temporarily allowed pursuant to the Bankruptcy Court's Order Re Debtor's Motion For Temporary Allowance Of Claims of Certain Electricity Generators And Disallowance Of Claims Of California Power Exchange For Plan Voting Purposes filed in the Chapter 11 Case on June 17, 2002.

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 53 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    amount of Allowed Claims for purposes of evaluating the feasibility of the Plan, and the aggregate

2    amount necessary to fund adequately the Disputed Claims escrow, and (ii) to the extent the Debtor

3    has an objection based on a matter that is not the subject matter of the FERC Refund Proceedings.

4    Nothing herein precludes the Debtor from asserting in the Bankruptcy Court or in any other forum

5    any other defense or objection to any ISO, PX and Generator Claims.

6          4.16    Class 7—ESP Claims.

7                  (a) Distributions.  Each holder of an Allowed ESP Claim shall be paid Cash in

8    an amount equal to such Allowed Claim (which shall include pre-petition interest only to the extent

9    not previously paid).

10                 (b) Impairment and Voting.  Class 7 is unimpaired by the Plan.  Each holder of

11   an Allowed ESP Claim is conclusively presumed to have accepted the Plan and is not entitled to

12   vote to accept or reject the Plan.[7]

13         4.17    Class 8—Environmental, Fire Suppression, Pending Litigation and Tort Claims.

14                 (a) Distributions.  Subject to Section 4.17(b), each Allowed Environmental, Fire

15   Suppression, Pending Litigation and Tort Claim shall be satisfied in full in the ordinary course of

16   business at such time and in such manner as the Reorganized Debtor is obligated to satisfy such

17   Allowed Claim under applicable law.  Except as provided under applicable non-bankruptcy law,

18   Post-Petition Interest will not be paid on Allowed Environmental, Fire Suppression, Pending

19   Litigation and Tort Claims.

20                 (b) Liquidation of Environmental, Fire Suppression, Pending Litigation and Tort

21   Claims. All Environmental, Fire Suppression, Pending Litigation and Tort Claims are Disputed

22   Claims and shall be determined, resolved, or adjudicated, as the case may be, in a manner as if the

23

24          [7]Although the Proponents believe that Class 7 is unimpaired and that the holders of Class 7
     Claims therefore are not entitled to vote on the Plan, as a precautionary measure the Proponents as
25   part of the solicitation process will be supplying ballots to and seeking the votes of the holders of
     Class 7 Claims, and the votes of holders of Class 7 Claims will be tabulated and available so as not
26   to delay the confirmation process if the Bankruptcy Court determines that Class 7 is impaired. See
     footnote 2 supra. The following holders of Class 7 Claims will be supplied ballots as part of the
27   solicitation process: (i) each holder of an Allowed ESP Claim, and (ii) each holder of an ESP Claim
     that is Disputed and that has not been disallowed pursuant to a Final Order of the Bankruptcy Court.
28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003
-52-

1 Chapter 11 Case had not been commenced (except that, under sections 365 and/or 1123(b)(2) of the

2 Bankruptcy Code, contractual provisions, accelerations and defaults eliminated or rendered

3 unenforceable by such sections shall remain eliminated or unenforceable, and the stay shall remain

4 in place for any Environmental, Fire Suppression, Pending Litigation and Tort Claims as to which

5 section 365 and/or 1123(b)(2) of the Bankruptcy Code are applicable) and shall survive the Effective

6 Date as if the Chapter 11 Case had not been commenced and, upon the determination, resolution or

7 adjudication of any such Claim as provided herein, such Claim shall be deemed to be an Allowed

8 Environmental Claim, Allowed Fire Suppression Claim, Allowed Pending Litigation Claim or

9 Allowed Tort Claim, as the case may be, in the amount or in the manner determined by a Final Order

10 or by a binding award, agreement or settlement; provided, however, that in addition to the Debtor's

11 preservation of all rights and defenses respecting any Environmental Claim, Fire Suppression Claim,

12 Pending Litigation Claim or Tort Claim that exist under applicable non-bankruptcy law, (i) any

13 rejection, avoidance, recovery, or other power or defense available to the Debtor under sections 365,

14 510 (except subordination), 542, 543, 544, 545, 547, 548, 549, 550, 553 or 724 of the Bankruptcy

15 Code is preserved, except with respect to any Environmental Order, and (ii) the Debtor may object

16 under section 502 of the Bankruptcy Code to any Environmental Claim, Fire Suppression Claim,

17 Pending Litigation Claim or Tort Claim on the ground that (A) such Environmental Claim, Fire

18 Suppression Claim, Pending Litigation Claim or Tort Claim was not timely asserted in the

19 Chapter 11 Case, (B) such Environmental Claim, Fire Suppression Claim, Pending Litigation Claim

20 or Tort Claim is subject to any power or defense reserved in clause (i) of this sentence and/or is

21 disallowable under section 502(d) of the Bankruptcy Code, or (C) such Environmental Claim, Fire

22 Suppression Claim, Pending Litigation Claim or Tort Claim is disallowable under section 502(e) of

23 the Bankruptcy Code, to the extent such section is relied on to ensure that there is no duplication in

24 the Claim of an allegedly subrogated claimant, on the one hand, and the underlying claimant whose

25 Claim allegedly gave rise to the subrogated claim, on the other. Subject to the foregoing, all

26 Environmental, Fire Suppression, Pending Litigation and Tort Claims shall be determined and

27 liquidated under applicable non-bankruptcy law in the administrative or judicial tribunal in which

28 they are pending as of the Effective Date or, if no such action is pending on the Effective Date, in

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    any administrative or judicial tribunal of appropriate jurisdiction (other than the Bankruptcy Court).

2    To effectuate the foregoing, the entry of the Confirmation Order shall, effective as of the Effective

3    Date, constitute a modification of any stay or injunction under the Bankruptcy Code that would

4    otherwise preclude the determination, resolution or adjudication of any Environmental Claims, Fire

5    Suppression Claims, Pending Litigation Claims or Tort Claims, except for any Environmental

6    Claim, Fire Suppression Claim, Pending Litigation Claim or Tort Claim arising out of the exercise

7    by the Debtor, as Debtor-in-Possession, of any rejection, avoidance, recovery or other power or

8    defense available to it pursuant to any one or more of sections 365, 510 (except subordination), 542,

9    543, 544, 545, 547, 548, 549, 550, 553 or 724 of the Bankruptcy Code, except with respect to any

10   Environmental Order. Nothing contained in this Section 4.17(b) will constitute or be deemed to

11   constitute a waiver or release of any (i) claim, right or Cause of Action that the Debtor or the

12   Reorganized Debtor may have against any Person or Governmental Entity in connection with or

13   arising out of any Environmental, Fire Suppression, Pending Litigation and Tort Claims, including,

14   but not limited to, any rights under section 157(b) of title 28, United States Code, or (ii) defense in

15   any action or proceeding in any administrative or judicial tribunal, including, but not limited to, with

16   respect to the jurisdiction of such administrative or judicial tribunal, except a defense to a Claim that

17   was timely asserted in the Chapter 11 Case and that constitutes an Environmental Claim, a Fire

18   Suppression Claim, a Pending Litigation Claim or a Tort Claim, where such defense is based on the

19   discharge of section 1141(d) of the Bankruptcy Code. In light of the unimpaired pass-through

20   treatment of Environmental Claims, Fire Suppression Claims, Pending Litigation Claims and Tort

21   Claims hereunder, the Reorganized Debtor waives the discharge of section 1141(d) of the

22   Bankruptcy Code as to any Claim that was timely asserted in the Chapter 11 Case and that

23   constitutes an Environmental Claim, a Fire Suppression Claim, a Pending Litigation Claim or a Tort

24   Claim.

25              As to any consent decree, injunction, cleanup and abatement order or any other

26   administrative or judicial order or decree binding upon the Debtor and in effect as of the Effective

27   Date (whether originating before or after the Petition Date) that pertains to any environmental matter

28   described in clauses (a) through (c) of the definition of Environmental Claims herein (each an

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1  "Environmental Order"), each such Environmental Order, regardless of whether it constitutes or is

2  characterized as an Environmental Claim, shall also survive the Effective Date as if the Chapter 11

3  Case had not been commenced, shall not be discharged under section 1141(d) of the Bankruptcy

4  Code, and shall not otherwise be adversely affected by the Chapter 11 Case (except for any objection

5  to such Environmental Claim based on the contention that such Environmental Order is an

6  Environmental Claim that was not timely asserted in the Chapter 11 Case).

7          (c) <u>Impairment and Voting</u>. Class 8 is unimpaired by the Plan. Each holder of

8  an Allowed Environmental, Fire Suppression, Pending Litigation and Tort Claim is conclusively

9  presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

10         4.18    Class 9—QUIDS Claims.

11         (a) <u>Allowance</u>. The QUIDS Claims shall be deemed Allowed QUIDS Claims in

12  the amount of $300,000,000, plus accrued and unpaid pre-petition interest on such amount.

13         (b) <u>Distributions</u>. Each holder of an Allowed QUIDS Claim shall be paid Cash

14  in an amount equal to such Allowed Claim.

15         (c) <u>Impairment and Voting</u>. Class 9 is unimpaired by the Plan. Each holder of

16  an Allowed QUIDS Claim is conclusively presumed to have accepted the Plan and is not entitled to

17  vote to accept or reject the Plan.

18         4.19    Class 10—Workers' Compensation Claims.

19         (a) <u>Distributions</u>. Each Allowed Workers' Compensation Claim arising prior to

20  the Petition Date shall be satisfied in full in the ordinary course of business at such time and in such

21  manner as the Reorganized Debtor is obligated to satisfy such Allowed Claim under applicable law.

22  Post-petition Workers' Compensation Claims are treated as Ordinary Course Liabilities herein and

23  shall receive the same pass-through treatment as Workers' Compensation Claims arising prior to the

24  Petition Date. Except as provided under applicable non-bankruptcy law, Post-Petition Interest will

25  not be paid on any Workers' Compensation Claims. Nothing in the Plan shall affect (i) the rights of

26  any surety or the Parent with respect to the Workers' Compensation Indemnity Agreements, (ii) the

27  rights of the parties to object to the existence of such rights, (iii) the subrogation rights, to the extent

28  applicable or available, of any surety of pre-petition or post-petition Workers' Compensation

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   Claims, or (iv) the rights of the Debtor to object, pursuant to the Bankruptcy Code, to the existence

2   of any such subrogation rights.

3               (b) Impairment and Voting.  Class 10 is unimpaired under the Plan.  Each holder

4   of an Allowed Workers' Compensation Claim is conclusively presumed to have accepted the Plan

5   and is not entitled to vote to accept or reject the Plan.

6        4.20     Class 11 - Preferred Stock Equity Interests.

7               (a) Treatment.  Each holder of a Preferred Stock Equity Interest shall retain its

8   Preferred Stock in the Reorganized Debtor and shall be paid in Cash any dividends and sinking fund

9   payments accrued in respect of such Preferred Stock through the last scheduled payment date prior to

10  the Effective Date.

11              (b) Impairment and Voting.  Class 11 is unimpaired under the Plan.  Each holder

12  of a Preferred Stock Equity Interest  is conclusively presumed to have accepted the Plan and is not

13  entitled to vote to accept or reject the Plan.

14       4.21     Class 12 - Common Stock Equity Interests.

15              (a) Treatment.  Each holder of a Common Stock Equity Interest shall retain its

16  Common Stock in the Debtor.

17              (b) Impairment and Voting.  Class 12 is unimpaired by the Plan.  Each holder of

18  an Allowed Common Stock Equity Interest is conclusively presumed to have accepted the Plan and

19  is not entitled to vote to accept or reject the Plan.

20

21                              ARTICLE V

22        **PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE
         PLAN AND TREATMENT OF DISPUTED, CONTINGENT AND
23       UNLIQUIDATED ADMINISTRATIVE EXPENSE CLAIMS, CLAIMS AND
         EQUITY INTERESTS**

24

25       5.1     Voting of Claims and Equity Interests.  Each holder of record as of the Voting

26  Record Date of an Allowed Claim or Equity Interest in an Impaired Class of Claims or Equity

27  Interests set forth in Article IV hereof shall be entitled to vote separately to accept or reject the Plan

28  with regard to each Impaired Class of Claims or Equity Interests.  If the Debtor objects to a Claim,

PLAN OF REORG.  DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003
-56-

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  the Claim becomes a Disputed Claim. A Disputed Claim is not entitled to vote on the Plan unless

2  the Debtor or the holder of the Disputed Claim obtains an order of the Bankruptcy Court temporarily

3  allowing the amount of the Disputed Claim for voting purposes. If the Debtor does not object to a

4  Claim prior to the date on which the Disclosure Statement and the Ballot are transmitted to creditors

5  for voting, the holder of such Claim will be permitted to vote on the Plan in the full amount of the

6  Claim as filed.

7       5.2  Elimination of Vacant Classes. Any Class of Claims that is not occupied as of

8  the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily

9  allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of

10  voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the

11  Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

12       5.3  Nonconsensual Confirmation. If any Impaired Class of Claims or Equity

13  Interests entitled to vote shall not accept the Plan by the requisite statutory majorities provided in

14  section 1126(c) of the Bankruptcy Code, each of the Proponents reserves the right to amend the Plan

15  in accordance with Section 11.11 hereof or to undertake to have the Bankruptcy Court confirm the

16  Plan under section 1129(b) of the Bankruptcy Code, or both.

17       5.4  Method of Distributions under the Plan.

18       (a) Disbursing Agent. All distributions under the Plan shall be made by the

19  Debtor as Disbursing Agent or such other Entity designated by the Debtor as Disbursing Agent. A

20  Disbursing Agent shall not be required to provide any bond, surety or other security for the

21  performance of its duties, unless otherwise ordered by the Bankruptcy Court; and, in the event that a

22  Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond, surety

23  or other security shall be borne by the Debtor. Distributions on account of Allowed Claims under

24  any indentures shall be made to the respective indenture trustees in accordance with Bankruptcy

25  Rule 3021, and such indenture trustees shall serve as the Distribution Agents under the respective

26  indentures. Each indenture trustee shall, in turn, administer the distribution to the holders of the debt

27  issued under the applicable indenture in accordance with the terms of such indenture. The

28  reasonable fees and expenses of each indenture trustee incurred on or after the Effective Date in

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 59
of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

connection with the distributions described in this subparagraph (a), including the reasonable fees and expenses of the indenture trustee's professionals and agents, shall be paid by the Reorganized Debtor without further application to or order of the Bankruptcy Court.

(b) <u>Distributions to Holders as of the Distribution Record Date</u>.

(i) Subject to Bankruptcy Rule 9010, all distributions under the Plan shall be made (A) to the holder of each Allowed Claim or Equity Interest at the address of such holder as listed on the Debtor's Bankruptcy Schedules as of the Distribution Record Date, unless the Debtor has been notified in writing of a change of address, including, without limitation, by the filing of a timely proof of Claim or Equity Interest by such holder that provides an address for such holder different from the address reflected on the Debtor's Bankruptcy Schedules, or (B) pursuant to the terms of a particular indenture of the Debtor or in accordance with other written instructions of a trustee under such indenture.

(ii) As of the close of business on the Distribution Record Date, the claims register and records of the stock transfer agent shall be closed, and there shall be no further changes in the record holder of any Claim or Equity Interest. The Debtor shall have no obligation to recognize any transfer of any Claim or Equity Interest occurring after the Distribution Record Date. The Debtor shall instead be authorized and entitled to recognize and deal for all purposes of the Plan with only those record holders stated on the claims register or the records of the stock transfer agent as of the close of business on the Distribution Record Date.

(c) <u>Distributions of Cash</u>. Any payment of Cash made by the Debtor pursuant to the Plan shall, at the Debtor's option, be made by check drawn on a domestic bank or wire transfer.

(d) <u>Timing of Distributions</u>. Except as otherwise set forth in the Plan, payments and distributions to holders of Allowed Claims or Equity Interests on the Effective Date shall be made on the Effective Date, or as soon as practicable thereafter. Any payment or distribution required to be made under the Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

(e) <u>Allocation of Plan Distributions</u>. All distributions in respect of Allowed Claims shall be allocated first to the portion of such Claims representing interest (as determined for

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 60
of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1 federal income tax purposes), second to the original principal amount of such Claims (as determined

2 for federal income tax purposes), and any excess to the remaining portion of such Claims.

3 (f) Unclaimed Distributions. All distributions under the Plan that are unclaimed

4 for a period of one (1) year after distribution thereof shall be deemed unclaimed property under

5 section 347(b) of the Bankruptcy Code and revested in the Debtor, and any entitlement of any holder

6 of any Claim or Equity Interest to such distributions shall be extinguished and forever barred.

7 (g) Escrow for Disputed Claims.

8 (i) General Treatment. On the Effective Date (or as soon as

9 practicable thereafter), and after making all distributions required to be made on the Effective Date,

10 the Reorganized Debtor shall establish one or more separate escrows, each of which shall be

11 administered in accordance with the terms hereof and pursuant to the direction of the Bankruptcy

12 Court, and shall deposit or segregate into such escrow account(s) sufficient Cash to make

13 distributions in respect of Disputed Claims; provided, however, that this provision shall not apply to

14 Environmental Claims, Fire Suppression Claims, Pending Litigation Claims, Tort Claims and

15 Workers' Compensation Claims. The amount to be deposited into such escrow by the Reorganized

16 Debtor shall be determined by the Bankruptcy Court no later than the Effective Date pursuant to a

17 reasonably noticed motion; provided, however, that the escrowed amount for Class 6 Claims shall be

18 at least $1.6 billion absent further order of the Bankruptcy Court. No distributions from the

19 escrow(s) shall be made until such Disputed Claims have been Allowed or otherwise resolved by the

20 Bankruptcy Court and any such distributions shall be made in accordance with the terms hereof.

21 From and after the Effective Date, the Cash reserved for such Disputed Claim will earn interest at

22 the same rate as if such Cash had been invested in either (i) money market funds consisting primarily

23 of short-term U.S. Treasury securities or (ii) obligations of or guaranteed by the United States of

24 America or any agency thereof, at the option of the Debtor, until the Disputed Claim becomes an

25 Allowed Claim; provided, however that a Disputed ESP Claim or a Disputed ISO, PX and Generator

26 Claim shall earn interest through the date of payment in accordance with Exhibit B hereto to the

27 extent it becomes an Allowed Claim as set forth herein. A Disputed ISO, PX and Generator Claim

28 shall become an Allowed Claim on the date designated by FERC when payments are to be made on

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

account of ISO, PX and Generator Claims, pursuant to an unstayed order in the FERC Refund

Proceedings; provided, however, that if no date is designated in such order, a Disputed ISO, PX and

Generator Claim shall automatically become an Allowed Claim forty-five (45) days after the

issuance of such order, provided such order has not been stayed. To the extent a Disputed Claim

becomes an Allowed Claim, such Allowed Claim will be satisfied in the manner as all other

Allowed Claims of the same Class. In addition, the holder of such a Disputed Claim will earn Post-

Petition Interest.

(ii)     Termination of Escrow(s). The escrow(s) shall be terminated by

the Reorganized Debtor when all distributions and other dispositions of the property of such escrow

account have been made in accordance with this Plan. If any property remains in an escrow account

after all Disputed Claims for which such escrowed property is being held have been resolved and

distributions made in respect thereof, such property shall revert to and become the property of

Reorganized Debtor. In determining the aggregate amount necessary to fund any escrow account(s),

the Debtor may deposit the estimated allowable amount of any Disputed Claim, as determined by the

Bankruptcy Court. Any such escrow(s) established pursuant to this Section 5.4 shall be subject to

the continuing jurisdiction of the Bankruptcy Court.

(iii)    Additional Cash. Any deficiency in the amount of Cash deposited

into the escrow(s) shall not limit the obligation of the Reorganized Debtor to satisfy Disputed

Claims which subsequently become Allowed Claims. In the event that the amount of Cash

deposited into the escrow(s) is insufficient to make the required payment upon a Disputed Claim

becoming an Allowed Claim, the Reorganized Debtor will pay the holder of such Allowed Claim the

Cash necessary to satisfy the shortfall.

5.5     Objections to and Resolution of Administrative Expense Claims, Claims and

Ordinary Course Liabilities. Except as to applications for allowance of compensation and

reimbursement of Professional Compensation and Reimbursement Claims under sections 330 and

503 of the Bankruptcy Code, the Debtor shall, on and after the Effective Date, have the exclusive

right to make and file objections to Administrative Expense Claims and Claims. Except as to

applications for allowance of compensation and reimbursement of Professional Compensation and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   Reimbursement Claims under sections 330 and 503 of the Bankruptcy Code, on and after the

2   Effective Date, the Debtor shall have the authority to compromise, settle, otherwise resolve or

3   withdraw any objections to Administrative Expense Claims and Claims, and compromise, settle or

4   otherwise resolve Disputed Administrative Expense Claims, Disputed Claims and Ordinary Course

5   Liabilities without the approval of the Bankruptcy Court. Unless otherwise ordered by the

6   Bankruptcy Court, (a) all objections to Claims (except for Administrative Expense Claims) shall be

7   filed and served upon the holder of the Claim as to which the objection is made (and, as applicable,

8   upon the Debtor and the Committee) as soon as is practicable, but in no event later than the Effective

9   Date, (b) all objections to Administrative Expense Claims arising on or before the Confirmation

10   Date shall be served and filed upon the holder of the Administrative Expense Claim as to which the

11   objection is made (and, as applicable, upon the Debtor and the Committee) as soon as is practicable,

12   but in no event later than ninety (90) days after the Effective Date; and (c) all objections to

13   Administrative Expense Claims arising after the Confirmation Date and on or before the Effective

14   Date shall be served and filed upon the holder of the Administrative Expense Claim as to which the

15   objection is made (and, as applicable, upon the Debtor and the Committee) as soon as is practicable,

16   but in no event later than one hundred eighty (180) days after the Effective Date.

17         5.6     Payment of Trustees', Issuer's and Certain Bank Fees. To the extent allowed by

18   law and any underlying agreement, any unpaid fees and expenses accrued through the Confirmation

19   Date (except for any unpaid fees and expenses previously disallowed by the Bankruptcy Court) of

20   the Bond Trustees and the trustees under the Mortgage, and various indentures, including, but not

21   limited to, the Southern San Joaquin Valley Power Authority Agreement (acting in their capacities

22   as trustees and, if applicable, acting in their capacities as disbursing agents), the Issuer of the PC

23   Bonds and their respective professionals, and Bank of America, N.A., in its capacity as

24   administrative agent under the Revolving Line of Credit (including such administrative agent's

25   attorney's fees), shall be paid by the Debtor within ten (10) days after the Confirmation Date. Any

26   such fees and expenses accruing after the Confirmation Date shall be payable as provided in the

27   applicable agreement providing for such payment, or, in the case of Bank of America, N.A., in its

28   capacity as administrative agent under the Revolving Line of Credit, at least quarterly. Upon

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

1  payment of such fees and expenses, such Persons shall be deemed to have released their Liens

2  securing payment of their fees and expenses for all fees and expenses accrued through the Effective

3  Date.

4          5.7   Cancellation of Existing Securities and Agreements.  On the Effective Date, the

5  notes, bonds, debentures and all other debt instruments evidencing any Claim (and any indentures

6  and other agreements related thereto), including Administrative Expense Claims, other than those

7  that are reinstated and rendered unimpaired or renewed and extended pursuant to Article IV hereof,

8  or renewed and remain outstanding pursuant to Article IV hereof, respectively, shall be deemed

9  cancelled without further act or action under any applicable agreement, law, regulation, order or rule

10  and the obligations of the Debtor under the agreements and indentures governing such Claims, as the

11  case may be, shall be discharged.  Notwithstanding the foregoing, the indentures for any of the

12  Debtor's debt securities shall be deemed to survive the Effective Date solely to effectuate

13  distributions to be made to holders of debt securities thereunder as provided in the Plan, and to

14  enforce against such distributions the rights, duties, charging liens and administrative functions of

15  the indenture trustees as provided in the respective indentures.  Nothing in the Plan shall be deemed

16  to impair, waive or discharge any indenture trustees' rights, liens and priorities, or any other rights of

17  the indenture trustee under the respective indentures(s), against the distributions to the holders of

18  debt securities thereunder.  The Common Stock and Preferred Stock representing Equity Interests

19  shall remain outstanding.  Holders of notes, bonds, debentures and any and all other debt instruments

20  evidencing any Claim shall not be required to surrender such instruments.

21  <div align="center">ARTICLE VI</div>

22  <div align="center">**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**</div>

23          6.1   Assumption or Rejection of Executory Contracts and Unexpired Leases.

24  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and

25  unexpired leases that exist between the Debtor and any Person or Governmental Entity shall be

26  deemed assumed by the Debtor as of the Effective Date, except for any executory contract or

27  unexpired lease (i) that has been assumed or rejected pursuant to a Final Order entered prior to the

28  Confirmation Date, (ii) as to which a motion for approval of the rejection of such executory contract

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1    or unexpired lease has been filed and served prior to the Confirmation Date that results in a Final

2    Order or (iii) that is set forth in Schedule 6.1 to the Plan Supplement; provided, however, that the

3    Debtor reserves the right, on or prior to the conclusion of the confirmation hearing, to amend

4    Schedule 6.1 to the Plan Supplement to delete any executory contract or unexpired lease therefrom

5    or add any executory contract or unexpired lease thereto, in which event such executory contract(s)

6    or unexpired lease(s) shall be deemed to be assumed by the Debtor or rejected, as the case may be, as

7    of the Effective Date.  The Debtor will give notice of any such amendment to each counterparty to

8    any executory contract the status of which is changed as a result of the amendment (i.e., any

9    executory contract which is to be assumed or rejected as a result of the amendment).  In the event

10   that the counterparty opposes such proposed amendment, the Debtor will make all reasonable efforts

11   to provide such counterparty a reasonable opportunity under the circumstances to object prior to

12   confirmation of the Plan and, to the extent that such counterparty had the right to vote on the Plan, or

13   became entitled to vote on the Plan as a result of the amendment to Schedule 6.1, to provide such

14   counterparty a reasonable time to cast a Ballot to accept or reject the Plan, or to amend its Ballot.

15   The listing of a document on Schedule 6.1 to the Plan Supplement shall not constitute an admission

16   by the Debtor that such document is an executory contract or an unexpired lease or that the Debtor

17   has any liability thereunder.  Notwithstanding anything to the contrary, the Debtor waives its right to

18   make amendments pursuant to this Section 6.1 with respect to the assumption of the PG&E-Western

19   Area Power Administration Contract 2948A and related contracts, as described in the Disclosure

20   Statement.

21          6.2      Schedule of Rejected Executory Contracts and Unexpired Leases; Inclusiveness.

22   Each executory contract and unexpired lease listed or to be listed on Schedule 6.1 to the Plan

23   Supplement shall include (i) modifications, amendments, supplements, restatements or other similar

24   agreements made directly or indirectly by any agreement, instrument, or other document that in any

25   manner affects such executory contract or unexpired lease, without regard to whether such

26   agreement, instrument or other document is listed on Schedule 6.1 to the Plan Supplement and

27   (ii) executory contracts or unexpired leases appurtenant to the premises listed on Schedule 6.1 to the

28   Plan Supplement, including, without limitation, all easements, licenses, permits, rights, privileges,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

immunities, options, rights of first refusal, powers, uses, usufructs, reciprocal easement agreements or vault, tunnel or bridge agreements, and any other interests in real estate or rights in rem relating to such premises to the extent any of the foregoing are executory contracts or unexpired leases, unless any of the foregoing agreements previously has been assumed by the Debtor.

6.3    Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Section 6.1 hereof, (b) the extension of time, pursuant to section 365(d)(4) of the Bankruptcy Code, within which the Debtor may assume or reject the unexpired leases of non-residential property specified in Section 6.1 hereof through the date of entry of the Confirmation Order, and (c) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 6.1 hereof.

6.4    Cure of Defaults. Except as may otherwise be agreed by the parties, the Debtor shall cure or provide adequate assurance that the Debtor will promptly cure, as provided in this Section 6.4, any and all defaults within thirty (30) days after the Effective Date with respect to executory contracts and unexpired leases assumed by the Debtor pursuant to Section 6.1 hereof, in accordance with section 365(b)(1) of the Bankruptcy Code. Within thirty (30) days after the Effective Date, the Debtor shall pay, in Cash, (i) all such cure amounts arising prior to the filing of the Chapter 11 Case and (ii) all such cure amounts arising from and after the Petition Date up to (but not including) the date which is sixty (60) days prior to the Effective Date. All such cure amounts arising on or after sixty (60) days prior to the Effective Date shall be treated as Ordinary Course Liabilities. The counterparty shall not be required to file an Administrative Expense Claim or any other Claim with respect to such cure payments.

(a) Notice of Cure and Cure Payment. Within thirty (30) days after the Effective Date, with respect to each executory contract or unexpired lease assumed by the Debtor pursuant to Section 6.1 hereof, the Debtor shall send to each counterparty by United States mail a "Notice of Cure," in a form to be approved by the Bankruptcy Court, to the extent necessary or appropriate,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 66
of 92

1 which shall (i) identify the applicable contract(s) or lease(s) and (ii) provide contact information for

2 the counterparty to obtain additional information. Concurrent with such Notice of Cure, the Debtor

3 shall send a check for the cure amount as set forth in the Debtor's books and records; provided

4 however, that no check will be sent if the cure amount is zero. The Notice shall also indicate, if

5 applicable, that no other cure (monetary or non-monetary) is required under the contract or lease.

6       (b) <u>Dispute Resolution</u>. In the event that the Debtor shall pay all cure amounts

7 due according to the Debtor's books and records pursuant to this Section 6.4 and the counterparty

8 disagrees that such cure is sufficient to cure all defaults within the meaning of Section 365(b)(1) of

9 the Bankruptcy Code, the counterparty shall notify the Debtor in writing within thirty (30) days of

10 the date of mailing of the Notice of Cure of such dispute (a "Dispute Notice"). The Dispute Notice

11 must contain a statement of the additional cure amount or other cure sought by the counterparty (the

12 "Additional Cure"), a brief description of the reasons that the counterparty believes it is entitled to

13 such Additional Cure, and copies of any documents in support of such Additional Cure. The Debtor

14 shall respond to such Dispute Notice in writing within sixty (60) days from the date of receipt of

15 such Dispute Notice (a "Dispute Response"). If the Debtor does not respond within such sixty (60)-

16 day period, the Additional Cure will be deemed to be owing by the Debtor and will be paid or

17 otherwise satisfied by the Debtor within thirty (30) days following the end of such sixty (60)-day

18 period. The counterparty shall have thirty (30) days from the service of the Dispute Response to

19 seek relief from the Bankruptcy Court regarding such dispute. If the counterparty does not seek such

20 relief within thirty (30) days after the service of the Debtor's Dispute Response, the amount paid, if

21 any, by the Debtor will be deemed the final cure amount and the counterparty shall be forever barred

22 from seeking any additional cure. In the event that the counterparty timely seeks such relief, within

23 thirty (30) days (or such other time as agreed by the parties) of (i) the entry of a Final Order

24 determining the additional liability of the Debtor, if any, with respect to the cure of the respective

25 contract or lease, or (ii) a final settlement between the parties with respect to such additional

26 liability, the Debtor will pay in Cash or otherwise satisfy such additional liability. Nothing herein

27 shall prohibit the Debtor from seeking appropriate relief from the Bankruptcy Court with respect to

28 any such cure.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
*A Professional Corporation*

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 67
of 92

6.5     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 6.1 hereof must be properly filed in the Chapter 11 Case and served upon the Debtor no later than thirty (30) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order and (c) notice of an amendment to Schedule 6.1(a) to the Plan Supplement. All such Claims not filed within such time shall be forever barred from assertion against the Debtor, its estate and its property.

6.6     Assumed Indemnification Obligations.  The Assumed Indemnification Claims shall, in all respects, irrespective of whether such claims arise under contracts or executory contracts, survive confirmation of the Plan, remain unaffected thereby, and not be discharged irrespective of whether indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before, on or after the Petition Date.

6.7     Compensation and Benefit Programs.  Except as provided in Section 6.1 hereof, all savings, retirement, health care, severance, performance-based cash incentive, retention, employee welfare benefit, life insurance, disability and other similar plans and agreements of the Debtor are treated as executory contracts under the Plan and shall, on the Effective Date, be deemed assumed by the Debtor in accordance with sections 365(a) and 1123(b)(2) of the Bankruptcy Code, and any defaults thereunder shall be cured as provided in Section 6.4 hereof.  With respect to the Pacific Gas and Electric Company Retirement Plan (the "Retirement Plan"), the Debtor affirms and agrees that it is and the Reorganized Debtor will continue to be the contributing sponsor of the Retirement Plan, as defined under 29 U.S.C. § 1301(a)(13) and 29 C.F.R. § 4001.2, or a member of the contributing sponsor's controlled group, as defined under 29 U.S.C. § 1301(a)(14) and 29 C.F. R. § 4001.2.  As a contributing sponsor (or member of the controlled group) of the Retirement Plan, the Debtor and the Reorganized Debtor intend to fund the Retirement Plan in accordance with the minimum funding standards under ERISA, 29 U.S.C. § 1802, pay all required Pension Benefit Guaranty Corporation (the "PBGC") insurance premiums, 29 U.S.C. § 1307, and comply with all requirements of the Retirement Plan and ERISA.  The Retirement Plan is a defined benefit pension

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1   plan insured by the PBGC under Title IV of ERISA, 29 U.S.C. §§ 1301-1461. The Retirement Plan

2   is subject to the minimum funding requirements of ERISA, 29 U.S.C. § 1082 and section 412 of the

3   Internal Revenue Code, 26 U.S.C. § 412. No provision of or proceeding within the Debtor's

4   reorganization proceedings, the Plan, nor the Confirmation Order shall in any way be construed as

5   discharging, releasing or relieving the Debtor, the Reorganized Debtor, or any other party in any

6   capacity, from any liability with respect to the Retirement Plan or any other defined benefit pension

7   plan under any law, governmental policy or regulatory provision. PBGC and the Retirement Plan

8   shall not be enjoined or precluded from enforcing liability resulting from any of the provisions of the

9   Plan or the Plan's confirmation.

10        6.8   Retiree Benefits. Payments, if any, due to any Person for the purpose of

11   providing or reimbursing payments for retired employees and their spouses and dependents for

12   medical, surgical or hospital care benefits, or benefits in the event of sickness, accident, disability or

13   death under any plan, fund or program (through the purchase of insurance or otherwise) maintained

14   or established in whole or in part by the Debtor prior to the Petition Date shall be continued for the

15   duration of the period the Debtor has obligated itself to provide such benefits.

16        6.9   Settlement and Stanislaus Commitments. The obligations under (a) the 1991

17   Settlement Agreement between Northern California Power Agency and the Debtor in an NRC

18   proceeding implementing the Statement of Commitments accompanying the letter from the Debtor

19   to the U.S. Department of Justice of April 30, 1976 ("1991 Settlement Agreement"), (b) the letter

20   from the Debtor to the U.S. Department of Justice of April 30, 1976, to the extent that it represents

21   obligations, a position disputed by the Debtor (the "1976 Letter"), and (c) the antitrust license

22   conditions included in the Diablo Canyon Nuclear Power Plant NRC licenses ("License

23   Conditions") (collectively, the 1991 Settlement Agreement, the 1976 Letter and the License

24   Conditions are referred to as the "Settlement and Stanislaus Commitments") shall remain in effect

25   and pass through the Chapter 11 Case unimpaired and unaffected so that the Debtor and Reorganized

26   Debtor are obligated for the full performance, and shall be liable for the nonperformance, of the

27   Settlement and Stanislaus Commitments. The 1991 Settlement Agreement is assumed by the

28   Debtor and the Reorganized Debtor under the Plan, and the provisions of that certain Stipulation of

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    City of Palo Alto, Northern California Power Agency and Pacific Gas and Electric Company

2    Regarding the Settlement and Stanislaus Commitments, dated as of February 11, 2002, are

3    incorporated herein.

4    　　　　6.10　　Franchise Fees and Related Obligations.  The Reorganized Debtor shall continue

5    to pay franchise fees and perform its obligations under franchise agreements and applicable law.

6    　　　　　　　　　　　　　　　ARTICLE VII

7    　　　　　　　　　　**IMPLEMENTATION OF THE PLAN**

8    　　　　7.1　　Commission Settlement Agreement.  The Debtor and the Parent filed a plan of

9    reorganization under Chapter 11 for the Debtor, dated April 19, 2002, as modified by Modifications

10   dated July 9, 2002, October 18, 2002, December 13, 2002, December 26, 2002, February 21, 2003,

11   February 24, 2003 and May 22, 2003 (the "Original PG&E Plan").  On April 15, 2002, the

12   Commission filed a competing plan of reorganization for the Debtor.  Subsequently, the

13   Commission and the Committee filed an amended plan of reorganization under Chapter 11 for the

14   Debtor dated August 30, 2002 and, on November 6, 2002 and December 5, 2002, respectively, a

15   second and third amended plan of reorganization (as amended, the "Commission Plan").  The

16   Bankruptcy Court began trial on the competing plans of reorganization on November 18, 2002.

17   During the trial on the Original PG&E Plan, the Bankruptcy Court on March 4, 2003 entered an

18   order mandating a judicial settlement conference and on March 11, 2003 entered an order staying

19   further confirmation and related proceedings for 60 days to facilitate such mandatory settlement

20   process before the Honorable Randall J. Newsome, Bankruptcy Judge.  On April 23, 2003, at the

21   request of Judge Newsome, the Bankruptcy Court issued orders staying further confirmation and

22   related proceedings respecting the Original PG&E Plan and the Commission Plan for an additional

23   thirty-four (34) days, which stay has been extended indefinitely by the Bankruptcy Court.  As a result

24   of the judicially supervised settlement negotiations, the Settling Parties have agreed to the terms of

25   the Commission Settlement Agreement.   The Commission Settlement Agreement sets forth the

26   terms of a comprehensive settlement among the Settling Parties regarding the restoration of the

27   Debtor to financial health, so that it can pay its debts, including those in existence at the Petition

28   Date, those that it will incur in connection with, or to fund, the Plan, and those that it will incur in

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN

A Professional Corporation

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 70
of 92

1   connection with its future operations, while continuing to provide safe and reliable gas and electric

2   service to its customers at just and reasonable rates.  Pursuant to the Commission Settlement

3   Agreement, the Proponents have filed the Plan.  The Commission Settlement Agreement constitutes

4   an integral and material part of the Plan and is incorporated herein by reference and made a part

5   hereof with the same force and effect as if stated verbatim herein.

6       7.2   New Money Notes; New Mortgage Bonds.

7           (a) Issuance of New Money Notes, New Mortgage Bonds.  On or before the

8   Effective Date, the Reorganized Debtor shall sell and issue new debt securities in the original

9   principal amount of approximately $8.7 billion, the general terms of which are set forth on the

10  Summary of Terms of Debt Securities (the "New Money Notes").   To the extent the amount of

11  Allowed Claims is greater or the amount of the Debtor's Cash available for payment of Claims is

12  lower than the estimates on which the Plan is based, or to the extent that Cash must be used to settle

13  hedge agreements entered into by the Debtor prior to the Effective Date pursuant to Section 7.4

14  below or pursuant to a Bankruptcy Court order an on a noticed motion by the Debtor, the amount of

15  New Money Notes will be increased.  To the extent the amount of Allowed Claims is lower or the

16  amount of the Debtor's Cash available for payment of Claims is greater than the estimates on which

17  the Plan is based (including a reduction of up to $450 million if all or a portion of the payment or

18  purchase of the Reimbursement Obligations under Class 4f are paid in Cash from the proceeds of the

19  issuance and sale of refunding bonds, and a reduction of up to $345 million if none of the New

20  Money Notes are secured on the Effective Date and the New Mortgage Bonds are exchanged for PC-

21  Related Mortgage Bonds), or to the extent the credit facilities or the accounts receivable financing

22  programs described in Section 7.3 below are used to fund the payment of Claims, the amount of

23  New Money Notes will be decreased.  If any of the New Money Notes are secured on the Effective

24  Date, contingent notes (in addition to the contingent notes to be issued to holders of Class 4c

25  Claims) may be issued under the same indenture as the New Money Notes and ranking *pari passu*

26  therewith, as security for obligations of the Reorganized Debtor after the Effective Date, with the

27  amounts under such contingent notes payable only to the extent that the Reorganized Debtor has

28  failed to satisfy the underlying obligation.  If none of the New Money Notes are secured on the

PLAN OF REORG.  DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 71 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Effective Date and the New Mortgage Bonds are exchanged for PC-Related Mortgage Bonds,
contingent notes may be issued under the same indenture as the New Mortgage Bonds and ranking
*pari passu* therewith, as security for obligations of the Reorganized Debtor after the Effective Date,
with the amounts under such contingent notes payable only to the extent that the Reorganized Debtor
has failed to satisfy the underlying obligation.

        (b) <u>Mechanics of New Money Notes Offering</u>.  Once the registration statement
with respect to the New Money Notes has been declared effective by the SEC, the New Money
Notes will be priced.  The settlement date for the sale of the New Money Notes by the Reorganized
Debtor will be determined in accordance with Securities and Exchange Act rules, and will generally
be three (3) Business Days after the pricing of the New Money Notes.  On the settlement date, the
gross proceeds from the New Money Notes issuance, together with funds sufficient to pay accrued
interest and a redemption premium through the Mandatory Redemption Date (as defined below),
will be placed in escrow.  Also on the settlement date, the Debtor will pay any commissions due and
owing to the underwriters of the offering of the New Money Notes.  The funds in the escrow shall be
released to the Reorganized Debtor on the Effective Date; provided, however, that if the Effective
Date does not occur by the ninetieth (90th) day following the settlement date for the New Money
Notes (the "Mandatory Redemption Date"), the New Money Notes will be thereafter mandatorily
redeemed and the escrowed funds will be used to effect such redemption.

        7.3   <u>Credit Facilities</u>.  As of the Effective Date, the Reorganized Debtor shall
establish one or more credit facilities (which may include revolving and term loan credit facilities,
and which may be secured in whole or in part) for the purpose of (i) funding operating expenses and
seasonal fluctuations in working capital, (ii) providing letters of credit or other forms of credit
support, and (iii) to the extent the Reorganized Debtor determines resort to such credit facilities to be
necessary or appropriate to perform the Reorganized Debtor's obligations under the Plan,
performing the Reorganized Debtor's obligations under the Plan.  The Reorganized Debtor may also
establish one or more customer accounts receivable financing programs for the same purposes
specified in the preceding sentence.  In addition, the Reorganized Debtor as of the Effective Date
may establish or utilize credit support devices such as surety bonds and credit insurance (which may

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 72
of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    be secured in whole or in part).

2         7.4   Binding Obligations.  Any obligation entered into by the Reorganized Debtor

3    pursuant to Section 7.2 or Section 7.3 herein shall be a valid obligation, binding upon and

4    enforceable against the Reorganized Debtor by the counterparty or counterparties to such obligation

5    in accordance with the terms and conditions of such obligation.

6         7.5   Hedging.  On or after the Confirmation Date (and, to the extent permitted by the

7    Interest Rate Hedges Order, prior to the Confirmation Date), the Debtor may enter into hedge

8    agreements with commercial and investment banks to reduce the effect to the Reorganized Debtor of

9    an increase in interest rates on the New Money Notes.  Such hedge agreements may include futures

10   contracts, forward contracts, option agreements, swaps, swaptions and other similar contracts

11   designed to limit the risk to borrowers of future interest rate changes, and will or may require that

12   the Debtor provide either cash collateral as credit enhancement (in the case of futures, forwards and

13   swaps) or an upfront cash payment (in the case of options and swaptions), all as more particularly

14   described in the Interest Rate Hedges Motion.   The cash settlement of any such hedge agreement

15   will occur on or before the date set forth in the applicable hedge agreement as authorized pursuant to

16   the Interest Rate Hedges Order.  To the extent such settlement under a hedge agreement occurs prior

17   to the Effective Date and the Debtor has any liabilities to the counterparty on the settlement date, the

18   Debtor shall be the settling party; and to the extent such settlement occurs after the Effective Date

19   and the Debtor has any liabilities to the counterparty on the settlement date, the Reorganized Debtor

20   shall be the settling party.

21        7.6   Corporate Governance.

22             (a) Board of Directors.  The members of the Board of Directors of the Debtor

23   immediately prior to the Effective Date shall serve as the Board of Directors of the Reorganized

24   Debtor on and after the Effective Date.  Each of the members of such Board of Directors shall serve

25   in accordance with the Debtor's Articles of Incorporation or the Debtor's Bylaws, as the same may

26   be amended from time to time.

27             (b) Officers.  The officers of the Debtor immediately prior to the Effective Date

28   shall serve as the officers of the Reorganized Debtor on and after the Effective Date.  Such officers

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 73
of 92

shall serve in accordance with any employment agreement with the Reorganized Debtor and applicable law.

(c) <u>Articles of Incorporation and Bylaws</u>. The Articles of Incorporation and Bylaws of the Reorganized Debtor shall contain provisions necessary to (i) prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such Articles of Incorporation and Bylaws as permitted by applicable law and (ii) effectuate the provisions of the Plan, in each case without any further action by the shareholders or Board of Directors of the Debtor.

7.7 <u>Regulatory Issues</u>. As of the Effective Date, the Commission shall have approved all of the financings, securities and accounts receivable programs provided for in the Plan, including, without limitation, the New Money Notes, the New Mortgage Bonds, the working capital facilities, the accounts receivable programs and the hedging agreements provided for in the Plan, and no further act, action or approval is or can be required by the Commission as a condition to such financings.

7.8 <u>Execution of Commission Settlement Agreement</u>. Upon approval of the Commission Settlement Agreement by the Commission and the PG&E Proponents, the Settling Parties shall execute the Commission Settlement Agreement.

<div align="center">ARTICLE VIII</div>

<div align="center"><strong>CONFIRMATION AND EFFECTIVENESS OF THE PLAN</strong></div>

8.1 <u>Conditions Precedent to Confirmation</u>. The Plan shall not be confirmed by the Bankruptcy Court unless and until the following conditions shall have been satisfied or waived pursuant to Section 8.4 hereof:

(a) the Bankruptcy Court shall have entered an order or orders, which may be the Confirmation Order, approving the Plan, authorizing the Debtor to execute, enter into and deliver the Plan, and to execute, implement and take all actions necessary or appropriate to give effect to the transactions contemplated by the Plan;

(b) the Bankruptcy Court shall have entered an order or orders, which may be the Confirmation Order, approving and authorizing the execution of, and finding reasonable the terms

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

1  and conditions of, the Commission Settlement Agreement;

2  (c) the Confirmation Order shall be, in form and substance, acceptable to the

3  Proponents and the Commission; provided that the Confirmation Order shall:

4  (i)  expressly order the Settling Parties to perform each and all of their

5  respective obligations under the Commission Settlement Agreement, including but not limited to

6  those obligations of the Settling Parties expressly set forth in the Confirmation Order;

7  (ii)  expressly order and state those obligations of the Commission

8  under the Commission Settlement Agreement that the PG&E Proponents request be expressly

9  ordered and stated in the Confirmation Order;

10  (iii)  expressly order and state those obligations of the PG&E

11  Proponents under the Commission Settlement Agreement that the Commission requests be expressly

12  ordered and stated in the Confirmation Order; and

13  (iv)  expressly order that those obligations of the Reorganized Debtor

14  entered into pursuant to Sections 7.2 and 7.3 herein are valid obligations, binding upon and

15  enforceable against the Reorganized Debtor by the counterparty or counterparties to such obligations

16  in accordance with the terms and conditions of such obligations.

17  (d)  in connection with the Confirmation Order, the Bankruptcy Court shall have

18  made findings of fact and/or conclusions of law, as applicable, as follows:

19  (i)  the Commission has waived its sovereign immunity and submitted

20  itself to the jurisdiction of the Bankruptcy Court in connection with the enforcement of the

21  Commission Settlement Agreement, the Plan and the Confirmation Order and the determination of

22  the Settling Parties' respective rights under the Commission Settlement Agreement, the Plan and the

23  Confirmation Order;

24  (ii)  because the Commission Settlement Agreement is a material part

25  of the Plan and is expressly attached to and incorporated by reference into the Plan, the Commission

26  Settlement Agreement and the Settling Parties' respective rights and obligations thereunder are fully

27  enforceable by the Bankruptcy Court as material provisions of the Plan the same as if they were set

28  forth verbatim in the Plan;

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

(iii) the Commission Settlement Agreement, and any order entered by the Bankruptcy Court contemplated or required to implement the Plan or the Commission Settlement Agreement upon the Plan and the Commission Settlement Agreement becoming effective, shall be enforceable under federal law;

(iv) the Commission Settlement Agreement and the Plan, upon becoming effective, and the orders to be entered by the Bankruptcy Court as contemplated under the Commission Settlement Agreement and the Plan, shall be irrevocable and binding upon the Settling Parties and their successors and assigns, notwithstanding any future decisions and orders of the Commission; and

(v) the Bankruptcy Court has jurisdiction to enforce the Commission Settlement Agreement.

8.2     Conditions Precedent to Effectiveness.  The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 8.4 hereof:

(a) the Effective Date shall have occurred on or before March 31, 2004;

(b) all actions, documents and agreements necessary to implement the Plan shall have been effected or executed;

(c) the Debtor and the Parent shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions or documents that are determined by the Debtor and the Parent to be necessary to implement the Plan;

(d) S&P shall have issued a long-term issuer credit rating for the Reorganized Debtor of not less than BBB-, and Moody's shall have issued an issuer rating for the Reorganized Debtor of not less Baa3.

(e) S&P and Moody's shall have issued credit ratings for the New Money Notes of not less than BBB- and Baa3, respectively;

(f) The Commission shall have given its Final Approval of the Commission Settlement Agreement on behalf of the Commission;

(g) Each of the parties to the Commission Settlement Agreement shall have

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN

A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-74-

1  executed and delivered to one another counterpart copies of the Commission Settlement Agreement;

2  (h) The Commission shall have given its Final Approval for all rates, tariffs and

3  agreements necessary to implement the Plan;

4  (i) The Commission shall have given its Final Approval for all of the

5  financings, securities and accounts receivable programs provided for in the Plan;

6  (j) the Plan shall not have been modified in a material way, including any

7  modification pursuant to Section 11.11 hereof, since the Confirmation Date; and

8  (k) the Reorganized Debtor shall have consummated the sale of the New Money

9  Notes as contemplated by the Plan.

10  8.3  Effect of Failure of Conditions. In the event that one or more of the conditions

11  specified in Section 8.2 hereof shall not have occurred or been waived on or before March 31, 2004

12  (or such later date as may be hereafter provided in an amended Section 8.2(a)), (a) the Confirmation

13  Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtor and all

14  holders of Claims and Equity Interests shall be restored to the status quo ante as of the day

15  immediately preceding the Confirmation Date as though the Confirmation Order had never been

16  entered and (d) the Debtor's obligations with respect to Claims and Equity Interests shall remain

17  unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any

18  Claims or Equity Interests by or against the Debtor or any Person or Governmental Entity or to

19  prejudice in any manner the rights of the Debtor or any Person or Governmental Entity in any further

20  proceedings involving the Debtor; provided, however, that the amounts paid pursuant to Section

21  4.2(a) hereof on account of Post-Petition Interest may be recharacterized as a payment upon the

22  applicable Allowed Claims, in the sole discretion of the PG&E Proponents, but the Debtor will not

23  otherwise seek to recover such amounts.

24  8.4  Waiver of Conditions. The Proponents collectively (but not otherwise) may

25  waive by a writing signed by an authorized representative of each of the Proponents and

26  subsequently filed with the Bankruptcy Court, one or more of the conditions precedent set forth in

27  Sections 8.1 and 8.2 hereof, except that the conditions set forth in Sections 8.2(d), (e), (f), (g), (h)

28  and (i) hereof cannot be waived.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

ARTICLE IX

**EFFECT OF CONFIRMATION OF PLAN**

9.1 <u>Term of Bankruptcy Injunction or Stays</u>. Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Case under section 105 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect in accordance with the terms of such injunctions. Unless otherwise provided, the automatic stay provided under section 362(a) of the Bankruptcy Code shall remain in full force and effect until the Effective Date.

9.2 <u>Revesting of Assets</u>. On the Effective Date, except as otherwise transferred, sold or otherwise provided for in the Plan, the property of the estate of the Debtor shall vest in the Reorganized Debtor.

9.3 <u>Operations Following Effective Date</u>. From and after the Effective Date, the Reorganized Debtor and its subsidiaries and affiliates may each operate its businesses, and may use, acquire and dispose of property free of any restrictions imposed under the Bankruptcy Code. As of the Effective Date, all property of the Reorganized Debtor and its subsidiaries and affiliates shall be free and clear of all Liens, claims and interests of holders of Claims and Equity Interests, except as otherwise provided in the Plan.

9.4 <u>Claims Extinguished</u>. As of the Effective Date, any and all avoidance claims accruing to the Debtor under sections 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code and not then pending, shall be extinguished.

9.5 <u>Discharge of Debtor</u>. The rights afforded herein and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge and release of Claims and Equity Interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, against the Debtor or any of its assets or properties. Except as otherwise provided herein, (a) as of the Confirmation Date, all such Claims against and Equity Interests in the Debtor shall be satisfied, discharged and released in full and (b) all Persons and Governmental Entities shall be precluded from asserting against the Debtor, its successors, or its assets or properties any other or further Claims or Equity Interests based upon any act or omission,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
<em>A Professional Corporation</em>

transaction or other activity of any kind or nature that occurred prior to the Confirmation Date.

        9.6    Injunction.  In addition to and except as otherwise expressly provided herein, the Confirmation Order or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in the Debtor, are permanently enjoined, on and after the Confirmation Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Claim or Equity Interest, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against the Reorganized Debtor on account of any such Claim or Equity Interest, (c) creating, perfecting or enforcing any Lien of any kind against the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor on account of any such Claim or Equity Interest, (d) asserting any right of setoff or recoupment of any kind against any obligation due to (or asserting any right of subrogation with respect to any type of claim against) the Reorganized Debtor or against the property or interests in property of the Reorganized Debtor on account of any such Claim or Equity Interest, to the extent and only to the extent such right of setoff, recoupment and/or subrogation is not permitted under applicable law, and (e) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claims or Causes of Action which are extinguished, dismissed or released pursuant to the Plan.  The injunction shall also enjoin all parties in interest, including, without limitation, all entities who have held, hold or may hold Claims against or Equity Interests in the Debtor, from taking any action in violation of the Confirmation Order.  Such injunction shall extend to successors of the Reorganized Debtor and their respective properties and interests in property.  Except as provided by Sections 11.4, 11.6 and 11.7, this Section 9.6 shall not enjoin, bar or otherwise impair the commencement or prosecution of direct personal claims against any Person other than the Reorganized Debtor.

<div align="center">

ARTICLE X

**RETENTION OF JURISDICTION**

</div>

        The Bankruptcy Court shall have jurisdiction of all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 79 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1          (a) to hear and determine applications for the assumption or rejection of

2  executory contracts or unexpired leases, if any are pending, and the allowance of cure amounts and

3  Claims resulting therefrom;

4          (b) to hear and determine any and all adversary proceedings, applications and

5  contested matters;

6          (c) to hear and determine any objection to Administrative Expense Claims or,

7  except as provided in Section 4.15(c) hereof, to Claims;

8          (d) to enter and implement such orders as may be appropriate in the event the

9  Confirmation Order is for any reason stayed, revoked, modified or vacated;

10         (e) to issue such orders in aid of execution and consummation of the Plan, to the

11  extent authorized by section 1142 of the Bankruptcy Code;

12         (f) to consider any amendments to or modifications of the Plan, to cure any

13  defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court,

14  including, without limitation, the Confirmation Order;

15         (g) to hear and determine all applications for compensation and reimbursement

16  of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

17         (h) to hear and determine disputes arising in connection with the interpretation,

18  implementation or enforcement of the Commission Settlement Agreement, the Plan and/or the

19  Confirmation Order;

20         (i) to hear and determine proceedings to recover assets of the Debtor and

21  property of the Debtor's estate, wherever located;

22         (j) to hear and determine matters concerning state, local and federal taxes in

23  accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

24         (k) to hear and determine matters concerning the escrow(s), if any, established

25  pursuant to Section 5.4(g) hereof;

26         (l) to hear any other matter not inconsistent with the Bankruptcy Code; and

27         (m) to enter a final decree closing the Chapter 11 Case.

28  The Confirmation Order shall provide that the Chapter 11 Case shall not qualify as "fully

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 80 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    administered" within the meaning of section 350 of the Bankruptcy Code and Rule 3022 of the

2    Federal Rules of Bankruptcy Procedure, and a final decree shall not be entered in the Chapter 11

3    Case, until the later of (i) nine (9) years after the Effective Date, and (ii) the date the Regulatory

4    Asset shall have been fully amortized in the Reorganized Debtor's Retail Electric Rates.

## ARTICLE XI

### MISCELLANEOUS PROVISIONS

8        11.1    Effectuating Documents and Further Transactions.  The Debtor (or the

9    Reorganized Debtor after the Effective Date), the Parent and their respective subsidiaries and

10   affiliates are each authorized to execute, deliver, file or record such contracts, instruments, releases,

11   indentures and other agreements or documents and take such actions as may be necessary or

12   appropriate to effectuate the intent and further evidence the terms and conditions of the Plan and any

13   securities (whether equity, debt, derivative or otherwise) issued pursuant to the Plan.

14       11.2    Corporate Action.  On the Effective Date, all matters provided for under the Plan

15   that would otherwise require approval of the shareholders or Board of Directors of the Debtor shall

16   be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to the

17   applicable law of the jurisdiction of incorporation or formation without any requirement of further

18   action by the shareholders or Board of Directors of the Debtor.  On the Effective Date, or as soon as

19   practicable thereafter, the Reorganized Debtor and its respective subsidiaries and affiliates shall, if

20   required, file their articles of incorporation or articles of organization or amended articles of

21   incorporation or amended articles of organization, as appropriate, with the Secretary of State of the

22   jurisdiction of incorporation or formation, as applicable, in accordance with applicable law.

23

24

25

26

27

28

1    11.3    Exemption from Transfer Taxes. Pursuant to section 1146(c) of the Bankruptcy

2    Code, the issuance, transfer or exchange of notes or the issuance of equity securities under the Plan,

3    the creation of any mortgage, deed of trust or other security interest under the Plan, the making or

4    assignment of any lease or sublease under the Plan, or the making or delivery of any instrument of

5    transfer under the Plan shall not be subject to any stamp, real estate transfer, documentary transfer,

6    mortgage recording or other similar tax.

7    11.4    Mutual Releases Between The PG&E Proponents and the Commission.

8    (a) Release of the Commission by the PG&E Proponents. On or as soon as

9    practicable after the later of the Effective Date or the date on which the Commission approval of the

10    Commission Settlement Agreement is no longer subject to appeal, the Debtor, the Debtor-in-

11    Possession, the Reorganized Debtor and the Parent each releases the Commission, its present and

12    former commissioners and employees, and the advisors, consultants and professionals of or to the

13    Commission, in each case in their respective capacities as such, from any and all Causes of Action

14    held by or assertable on behalf of the Debtor or the Parent or derivative of the Debtor's or the

15    Parent's rights, that are expressly released, resolved or dismissed pursuant to Paragraphs 9 and 10 of

16    the Commission Settlement Agreement.

17    (b) Release of the PG&E Proponents by the Commission. On or as soon as

18    practicable after the later of the Effective Date or the date on which the Commission approval of the

19    Commission Settlement Agreement is no longer subject to appeal, the Commission, its present and

20    former commissioners and employees, as well as the advisors, consultants and professionals of or to

21    the Commission, in each case in their respective capacities as such, each releases the Debtor, the

22    Debtor-in-Possession, the Reorganized Debtor and the Parent, in each case in any capacity, from any

23    and all Causes of Action held by or assertable on behalf of the Commission or derivative of the

24    Commission's rights, that are expressly released, resolved or dismissed pursuant to Paragraphs 9 and

25    10 of the Commission Settlement Agreement

26    11.5    Other Releases by the Debtor. As of the Effective Date, and subject to the

27    release by the Releasees set forth in Section 11.6 below, the Debtor, the Debtor-in-Possession and

28    the Reorganized Debtor, each releases all of the Releasees from any and all Causes of Action held

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-80-

by, assertable on behalf of the Debtor or derivative of the Debtor's rights, in any way relating to the Debtor, the Debtor-in-Possession, the Chapter 11 Case, the Plan, negotiations regarding or concerning the Plan, and the ownership, management and operation of the Debtor and the Debtor-in-Possession, including, without limitation, in the case of Parent, any transactions or transfers between the Parent and the Debtor and any Cause of Action arising under chapter 5 of the Bankruptcy Code or any state fraudulent conveyance statute; provided, however, that the foregoing shall not operate as a waiver of or release from any Causes of Action arising out of any express contractual obligation owing by any former director, officer or employee to the Debtor or any reimbursement obligation of any former director, officer or employee with respect to a loan or advance made by the Debtor to such former director, officer or employee and is not a waiver of or release for any professionals retained in connection with this Chapter 11 Case from claims by their respective clients.

11.6    Limited Release by Releasees. In consideration for the release of the Releasees and other valuable consideration, as of the Effective Date, each of the Releasees, at its option, releases the Debtor, the Debtor-in-Possession, the Reorganized Debtor, the Parent, and their respective subsidiaries and affiliates, in each case in any capacity, from any and all Causes of Action held by, assertable on behalf of or derivative from such Releasee, in any way relating to the Debtor, the Debtor-in-Possession, the Chapter 11 Case, the Plan, negotiations regarding or concerning the Plan, and the ownership, management and operation of the Debtor and Debtor-in-Possession. The release by the Debtor, the Debtor-in-Possession and the Reorganized Debtor in Section 11.5 hereof shall be provided only to Releasees who execute and deliver to the Debtor, the Debtor-in-Possession and the Reorganized Debtor a release as provided in this Section 11.6 and in a form acceptable to the Debtor, the Debtor-in-Possession and the Reorganized Debtor.

11.7    Exculpation. As of and subject to the occurrence of the Confirmation Date, (a) the Proponents shall be deemed to have negotiated the Plan in good faith, (b) the Proponents shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, section 1125(a) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation, and (c) the Proponents and each of their respective

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 83 of 92

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1    affiliates, agents, directors, officers, employees, advisors and attorneys shall be deemed to have

2    participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code

3    in the offer and issuance of any securities under the Plan, and therefore, none of the Debtor, the

4    Debtor-in-Possession, the Parent, the Committee or any of their respective members, officers,

5    directors, employees, advisors, professionals or agents shall have or incur any liability to any holder

6    of a Claim or Equity Interest or other party in interest for any act or omission in connection with,

7    related to, or arising out of, the Chapter 11 Case, negotiations regarding or concerning the Plan, the

8    pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan

9    or the property to be distributed under the Plan, except for willful misconduct or gross negligence,

10   and, in all respects, the Debtor, the Debtor-in-Possession, the Parent, the Committee and each of

11   their respective members, officers, directors, employees, advisors, professionals and agents shall be

12   entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the

13   Plan; provided that nothing in this Section 11.7 shall effect a release in favor of any Person other

14   than the Debtor with respect to any debt owed to any Governmental Entity for any liability of such

15   Person arising under (x) the Tax Code, or any state, city or municipal tax code, or (y) the

16   environmental laws of the United States, or any state, city or municipality.

17          11.8    Termination of Committee. The appointment of the Committee shall terminate

18   on the Effective Date, subject to continuation for specific purposes by a Final Order of the

19   Bankruptcy Court.

20          11.9    Fees and Expenses.

21          (a) Subject to section 1129(a)(4) and other provisions of the Bankruptcy Code,

22   and subject to the provisions of Paragraph 13d of the Commission Settlement Agreement regarding

23   limitations on the fees of UBS Warburg LLC, in each case to the extent applicable, as of the

24   Confirmation Date the Debtor shall reimburse the Commission for all of its professional fees and

25   expenses incurred in connection with the Debtor's Chapter 11 Case (such fees and expenses of the

26   Commission to include those of Paul, Weiss, Rifkind, Wharton & Garrison LLP, UBS Warburg LLC

27   and Chanin Capital Partners) without the need for any application under section 330 or 503(b) of the

28   Bankruptcy Code. If it is determined by Bankruptcy Court order that such an application is required

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

-82-

1  for all or any part of such fees and expenses to be reimbursed by the Debtor, then none of the

2  Proponents will object to such application, and the PG&E Proponents shall support such application

3  in a written pleading to be filed with the Bankruptcy Court, and such fees and expenses shall be

4  allowed and treated as Administrative Expense Claims in the amount approved by the Bankruptcy

5  Court.  On a monthly basis thereafter, the Debtor shall reimburse the Commission for any and all

6  fees and expenses of professional Persons thereafter reasonably incurred by the Commission directly

7  in connection with the consummation of the Plan.

8          (b) From and after the Confirmation Date and to the Effective Date, the Debtor

9  shall, in the ordinary course of business and without the necessity for any approval by the

10  Bankruptcy Court, pay the reasonable fees and expenses of those professional Persons employed by

11  or on behalf of the Debtor and/or the Debtor's bankruptcy estate by order of the Bankruptcy Court,

12  thereafter incurred, including, without limitation, those fees and expenses incurred in connection

13  with the implementation and consummation of the Plan.

14          11.10  <u>Payment of Statutory Fees</u>.  The Debtor or the Reorganized Debtor shall pay on

15  or before the Effective Date any unpaid fees payable on or before the Effective Date pursuant to

16  section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the

17  Confirmation Hearing.   In addition, the Reorganized Debtor shall timely pay all fees payable

18  pursuant to section 1930(a)(6) of title 28 of the United States Code after the Effective Date, until the

19  time the Bankruptcy Court enters a final decree closing the Chapter 11 Case.

20          11.11  <u>Amendment or Modification of the Plan</u>.

21          (a) Amendments or modifications of or to the Plan may be proposed in writing

22  by the Proponents acting collectively at any time prior to the Confirmation Date, <u>provided</u> that the

23  Plan, as amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy

24  Code and the Proponents shall have complied with section 1125 of the Bankruptcy Code.  The Plan

25  may be amended or modified by the Proponents acting collectively at any time after the

26  Confirmation Date and before substantial consummation of the Plan, <u>provided</u> that the Plan, as

27  amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code

28  and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as amended or modified,

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

1     under section 1129 of the Bankruptcy Code and the circumstances warrant such amendments or

2     modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the

3     Plan, as amended or modified, if the proposed amendment or modification does not materially and

4     adversely change the treatment of the Claim of such holder.

5                    (b) The Proponents shall negotiate in good faith with one another and with the

6     Commission in connection with any and all proposed amendments or modifications to the Plan and

7     in connection with any proposed waiver concerning any provision of the Plan, including but not

8     limited to the waiver of any conditions to confirmation of the Plan or the Effective Date of the Plan.

9     No  amendment, modification or waiver shall be made without the express consent of all the

10    Proponents. If either the PG&E Proponents, acting collectively, or the Committee desire an

11    amendment or modification of or to the Plan or a waiver under the Plan that the other Proponent

12    does not agree to after such negotiation, the PG&E Proponents, acting collectively, or the Committee

13    may propose such amendment, modification or waiver in writing at any time prior to the

14    Confirmation Date, or after the Confirmation Date and before substantial consummation of the Plan,

15.   provided, in each case, that (i) the Plan, as so amended or modified or after giving effect to such

16    waiver, does not materially alter any Settling Party's rights or obligations under the Plan and the

17    Commission Settlement Agreement or the Committee's rights or obligations under the Plan, (ii) the

18    Plan, as so amended or modified or after giving effect to such waiver, satisfies the conditions of

19    sections 1122 and 1123 of the Bankruptcy Code and the PG&E Proponents shall have complied with

20    section 1125 of the Bankruptcy Code, and (iii) the Bankruptcy Court, after hearing on such notice as

21    is provided below, determines that the circumstances warrant such amendment, modification or

22    waiver. The PG&E Proponents or the Committee, as the case may be, shall only implement such an

23    amendment, modification or waiver pursuant to a Final Order of the Bankruptcy Court obtained after

24    a hearing on not less than ten (10) days' notice to the other Proponent(s), the Commission and the

25    United States Trustee.  A holder of a Claim that has accepted the Plan shall be deemed to have

26    accepted the Plan, as amended or modified or after giving effect to a waiver, if the proposed

27    amendment, modification or waiver does not materially and adversely change the treatment of the

28    Claim of such holder.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 86
of 92

1    (c) If the Commission does not agree with (i) any amendment or modification

2  proposed by the Proponents pursuant to subparagraph (a) of this Section 11.11, (ii) any amendment

3  or modification proposed by the PG&E Proponents collectively or by the Committee pursuant to

4  subparagraph (b) of this Section 11.11, or (ii) any waiver proposed by the Proponents, PG&E

5  Proponents collectively or by the Committee pursuant to subparagraph (b) of this Section 11.11, then

6  in each such case (x) the Proponents or the PG&E Proponents, as the case may be, shall only

7  implement such amendment, modification or waiver pursuant to a Final Order of the Bankruptcy

8  Court obtained after notice and a hearing on not less than ten (10) days' notice to the Commission

9  and the United States Trustee, and (y) the Commission shall retain all rights, remedies, claims and

10  defenses which it may have pursuant to the Commission Settlement Agreement.

11    11.12  Binding Effect.  The Plan shall be binding upon and inure to the benefit of the

12  Proponents, the Reorganized Debtor, their respective subsidiaries and affiliates, the holders of

13  Claims and Equity Interests, all Settling Parties, other parties in interest, and their respective

14  successors and assigns.

15    11.13  Notices.  All notices, requests and demands to or upon the Debtor to be effective

16  shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been

17  duly given or made when actually delivered or, in the case of notice by facsimile transmission, when

18  received and telephonically confirmed, addressed as follows:

19    If to the Debtor:

20    Pacific Gas and Electric Company
      77 Beale Street
21    P.O. Box 7442
      San Francisco, California  94120
22    Attn:  General Counsel
      Telephone:  (415) 973-7000
23    Facsimile:  (415) 973-5320

24    with a copy to:

25    PG&E Corporation
      One Market, Spear Street Tower, Suite 2400
26    San Francisco, California  94105
      Attn:  General Counsel
27    Telephone:  (415) 267-7000
      Facsimile:  (415) 267-7265

28

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

PLAN OF REORG.  DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003

Case: 01-30923    Doc# 14267    Filed: 12/19/03    Entered: 12/22/03 11:13:17    Page 87
of 92

and:

Howard, Rice, Nemerovski, Canady, Falk & Rabkin
A Professional Corporation
Three Embarcadero Center, 7th Floor
San Francisco, California 94111
Attn: James L. Lopes
Telephone: (415) 434-1600
Facsimile: (415) 217-5910

and:

Dewey Ballantine LLP
700 Louisiana, Suite 1900
Houston, Texas 77002
Attn: Alan S. Gover
Telephone: (713) 445-1500
Facsimile: (713) 445-1533

and:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Michael P. Kessler
Telephone: (212) 310-8000
Facsimile: (212) 310-8007


If to the Committee:

Milbank, Tweed, Hadley & McCloy LLP
601 South Figueroa Street, Suite 3000
Los Angeles, California 90017
Attn: Paul S. Aronzon
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

If to the Trustee:

The Office of the United States Trustee
250 Montgomery Street, Suite 1000
San Francisco, California 94104
Attn: Patricia Cutler
Telephone: (415) 705-3333
Facsimile: (415) 705-3379

If to the Commission:

California Public Utilities Commission
505 Van Ness Avenue
San Francisco, California 94102
Attn: Arocles Aguilar
Telephone: (415) 703-2782
Facsimile: (415) 703-2262

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

and:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn: Alan W. Kornberg
Telephone: (212) 373-3000
Facsimile: (212) 757 3990

11.14  Governing Law.  Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable or to the extent an exhibit to the Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of California, without giving effect to the principles of conflicts of law of such jurisdiction; provided, however, that under all circumstances the Plan, the Commission Settlement Agreement, and any orders of the Bankruptcy Court (including the Confirmation Order) are intended to be enforceable under federal law.

11.15  Withholding and Reporting Requirements.  Except as otherwise provided by the Plan, in connection with the consummation of the Plan, the Debtor shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall be subject to any such withholding and reporting requirements.

11.16  Preservation of Certain Claims.  Except for those claims that are expressly released pursuant to the provisions of the Plan, the Debtor (and after the Effective Date, the Reorganized Debtor) shall retain all claims against third parties of any nature (including, without limitation, all contingent and unliquidated claims, all claims listed on Schedule 11.16, and all claims that are or were discovered after the date hereof), and reserves all rights to pursue any and all such claims in any appropriate forum, either prior to the Effective Date (as to the Debtor) or after the Effective Date (as to the Reorganized Debtor).

11.17  Plan Supplement.  The following documents are contained in the Plan Supplement: certain schedules to the Plan, including the schedule of executory contracts and unexpired leases to be rejected pursuant to the terms hereof, and the Schedule of Causes of Action

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

described in Section 11.16 hereof.  The Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours or through the "Pacific Gas & Electric Company Chapter 11 Case" link available through the website maintained by the Bankruptcy Court at http://www.canb.uscourts.gov.  In addition, holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to the Debtor at the address set forth in Section 11.13 hereof.

11.18   Exhibits/Schedules.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

11.19   Subrogation Rights.  Nothing in the Plan shall affect (a) the subrogation rights of any surety, to the extent applicable or available, which, if available or applicable, shall remain in full force and effect or (b) the rights of the Debtor to object, pursuant to the Bankruptcy Code, to the existence of such subrogation rights.

DATED:     December 19, 2003

<div style="margin-left:40%">

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Roger J. Peters
    Senior Vice President and General Counsel


PG&E CORPORATION

By: _____
    Peter A. Darbee
    Senior Vice President and Chief Financial Officer


OFFICIAL COMMITTEE OF UNSECURED CREDITORS

By: _____
    Paul S. Aronzon
    Attorney for Official Committee of
    Unsecured Creditors

</div>

HOWARD RICE NEMEROVSKI CANADY FALK & RABKIN
A Professional Corporation

Case: 01-30923   Doc# 14267   Filed: 12/19/03   Entered: 12/22/03 11:13:17   Page 90 of 92

APPROVED AS TO CONTENT AND FORM:

HOWARD, RICE, NEMEROVSKI, CANADY,
FALK & RABKIN, A PROFESSIONAL CORPORATION

BY: _James L. Lopes_____
James L. Lopes
ATTORNEYS FOR DEBTOR AND DEBTOR-IN-
POSSESSION

COOLEY GODWARD LLP

BY: _Stephen C. Neal_____
Stephen C. Neal
ATTORNEYS FOR DEBTOR AND DEBTOR-IN-
POSSESSION

DEWEY BALLANTINE LLP

BY: _Alan S. Gover_____
Alan S. Gover
ATTORNEYS FOR PG&E CORPORATION

WEIL, GOTSHAL & MANGES LLP

BY: _Michael P. Kessler_____
Michael P. Kessler
ATTORNEYS FOR PG&E CORPORATION

ORRICK, HERRINGTON & SUTCLIFFE LLP

BY: _Joseph S. Malkin_____
Joseph S. Malkin
ATTORNEYS FOR PG&E CORPORATION

PROFESSOR LAURENCE TRIBE

By: _Laurence Tribe_ _by ol_
    Laurence Tribe
    CO-COUNSEL TO PG&E CORPORATION
    FOR CONSTITUTIONAL LAW MATTERS

MILBANK, TWEED, HADLEY & McCLOY LLP

By: _Paul S. Aronzon_ _by ol_
    Paul S. Aronzon
    ATTORNEYS FOR OFFICIAL COMMITTEE OF
    UNSECURED CREDITORS

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

PLAN OF REORG. DATED JULY 31, 2003, AS MOD. NOVEMBER 6, 2003 AND DECEMBER 19, 2003