

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

**FILED**

JUL - 9 2004

UNITED STATES BANKRUPTCY COURT
San Francisco, CA

| | |
|---|---|
| IN THE MATTER OF:<br><br>**PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation**<br><br>Debtor.<br>Federal I.D. No. 94-0742640 | Chapter 11 Case<br><br>CASE NO.  01-30923-DM |

## EIGHTH INTERIM AND FINAL APPLICATION OF ROTHSCHILD INC. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES

Name of Applicant:  Rothschild Inc.

Authorized to Provide Professional Services to:  PACIFIC GAS AND ELECTRIC COMPANY

Date of Retention:  July 25, 2001

Period for which compensation and reimbursement are sought:  Eighth Interim: December 1, 2003 – April 12, 2004
Final:        July 25, 2001 – April 12, 2004

Amount of compensation sought as actual, reasonable, and necessary:  Eighth Interim: $20,220,000.00
Final:        $25,266,666.67

Amount of expense reimbursement sought as actual, reasonable, and necessary:  Eighth Interim: $20,542.98
Final:        $257,941.65

This is a(n):  ___X___ Interim  __X__ Final Application

If this is not the first application filed, disclose the following for prior applications:

| Date Filed | Period Covered | Requested Fees | Requested Expenses | Approved Fees | Approved Expenses |
|---|---|---|---|---|---|
| 1/11/02 | 7/25/01 – 11/30/01 | $1,296,666.67 | $154,407.17 | $1,296,666.67 | $154,407.17 |
| 5/10/02 | 12/1/01 – 3/31/02 | $800,000.00 | $24,340.61 | $800,000.00 | $24,340.61 |
| 9/10/02 | 4/1/02 – 7/31/02 | $800,000.00 | $39,477.60 | $800,000.00 | $39,477.60 |

| Date Filed | Period Covered | Requested Fees | Requested Expenses | Approved Fees | Approved Expenses |
|---|---|---|---|---|---|
| 1/10/03 | 8/1/02 – 11/30/02 | $800,000.00 | $8,916.86 | $800,000.00 | $8,916.86 |
| 5/14/03 | 12/1/02 – 3/31/03 | $800,000.00 | $5,343.72 | $800,000.00 | $5,343.72 |
| 9/10/03 | 4/1/03 – 7/31/03 | $350,000.00 | $4,577.71 | $350,000.00 | $4,577.71 |
| 1/8/04 | 8/1/03 – 11/30/03 | $200,000.00 | $335.00 | $200,000.00 | $335.00 |

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF:<br><br>**PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation**<br><br>         Debtor.<br>Federal I.D. No. 94-0742640 | **Chapter 11 Case**<br><br>**CASE NO.  01-30923-DM** |

## EIGHTH INTERIM AND FINAL APPLICATION
## OF ROTHSCHILD INC. FOR ALLOWANCE OF
## COMPENSATION AND REIMBURSEMENT OF EXPENSES

Rothschild Inc. ("Rothschild"), financial advisor and investment banker for the above-captioned debtor and debtor-in-possession ("PG&E," the "Debtor" or the "Company"), submits this eighth interim application for the period December 1, 2003 through April 12, 2004 (the "Eighth Interim Period") and final application for the period July 25, 2001 through April 12, 2004 (the "Final Period") for compensation and reimbursement of expenses, and in support thereof respectfully represents:

1. This application is made pursuant to (i) Sections 330 and 331 of Title 11 of the United States Code 11 U.S.C.§101-1330 (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (iii) the Second Amended Order of the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court" or this "Court"), dated March 18, 2002 (the "Fee Procedures Order"), establishing interim fee application and expense reimbursement procedures for professionals, (iv) the Order on Debtor's Application for an Order Authorizing the Retention and Employment of Rothschild Inc. as Financial Advisor and Investment Banker, dated August 21, 2001 (the "Retention Order"), approving the retention of Rothschild as financial advisor and investment banker to the Debtor,

0

nunc pro tunc to July 25, 2001, under the terms set forth in the Debtor's application therefor and under the terms of the engagement letter, dated July 25, 2001 (the "Engagement Letter"), between Rothschild and the Debtor, and (v) the Order of this Court, dated December 22, 2003 (the "Confirmation Order"),[1] confirming the Debtor's Plan of Reorganization (the "Plan"). Copies of the Retention Order and the Engagement Letter are attached hereto as Exhibit A.

2. Annexed hereto as Exhibit B are the invoices for the total compensation and expenses sought by Rothschild for the Eighth Interim Period, including a breakdown of Rothschild's expenses incurred during the Eighth Interim Period. In summary, during the Eighth Interim Period, Monthly Fees (as defined below) accrued under the Engagement Letter from December 1, 2003 through and including April 12, 2004 in the aggregate amount of $220,000.00. Upon the occurrence of the Effective Date, Rothschild also earned the Transaction Fee (as defined below) of $20,000,000.00. A final invoice is attached hereto as Exhibit B. In addition, Rothschild incurred reasonable and necessary expenses during the Eighth Interim Period in the amount of $20,542.98.

3. Copies of invoices detailing Rothschild's fees and expense reimbursements for the period from July 25, 2001 through November 30, 2003 are attached as exhibits to Rothschild's First through Seventh Interim Fee Applications filed in this Chapter 11 case and served upon the required notice parties. No objections were filed or received by Rothschild in respect of such applications, which were approved in their entirety by this Court pursuant to prior fee orders. Copies of such invoices therefore have not been attached hereto but are available from Rothschild upon request by any interested party.

---

[1] Capitalized terms used herein without definition have the meanings assigned to them in the Confirmation Order.

1

## BACKGROUND

4. The Debtor commenced this Chapter 11 reorganization case on April 6, 2001 (the "Petition Date"). During the pendency of this Chapter 11 case, the Debtor continued to operate its businesses and manage its properties as debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5. After interviewing several investment banking firms, the Company elected to engage Rothschild to advise the Company in this Chapter 11 case as of July 25, 2001. Rothschild understands that the Company chose to retain Rothschild due to Rothschild's reputation as a leading investment banking firm and financial advisor in the restructuring and utility sectors and its substantial experience advising debtors, creditors' committees and other parties in interest in connection with all aspects of financial restructurings, including financial advice regarding mergers, acquisitions, divestitures, public and private financings and spin-offs and evaluation of assets and liabilities, formulation and negotiation of plans of reorganization and the restructuring of indebtedness.

6. On or about August 10, 2001, the Debtor filed its Application seeking authorization to employ and retain Rothschild pursuant to the terms of the Engagement Letter. A copy of the Application has been attached as Exhibit A.

7. On August 21, 2001, this Court entered the Retention Order, pursuant to Section 327(a) of the Bankruptcy Code and Bankruptcy Rules 2014(a) and 5002, authorizing the employment and retention of Rothschild as financial advisor and investment banker for the Debtor as of July 25, 2001.

194066v1
Case: 01-30923    Doc# 15509    Filed: 07/09/04    Entered: 07/13/04 11:46:24    Page 5
of 39

8. By the Retention Order, this Court approved the employment and retention of Rothschild as financial advisor and investment banker to the Debtor to advise and assist the Debtor in evaluating the complex financial and economic issues raised by this Chapter 11 case and to assist the Debtor in fulfilling its statutory and fiduciary duties. Specifically, Rothschild was retained by the Debtor to perform such services as requested by the Company, including:

(a) to provide financial advice and assistance to the Company in developing and seeking approval of a reorganization plan and any modifications thereto;

(b) to evaluate the Company's debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Company;

(c) if requested by the Company, in connection therewith, to provide financial advice and assistance to the Company in structuring any new securities to be issued under the Plan;

(d) to assist the Company and its other professionals in determining a range of values for the Company and any securities that the Company offers or proposes to offer in connection with a plan or other transaction;

(e) if requested by the Company, to assist the Company and/or participate in meetings and negotiations with entities or groups affected by a plan, including, without limitation, the Company's Board of Directors, any current or prospective creditors of, holders of equity in, or claimants against the Company and/or their respective representatives in connection with the Plan or other transaction;

(f) if requested by the Company, to participate in hearings before the Bankruptcy Court, the California Public Utilities Commission and legislative bodies with respect to the matters upon which Rothschild has provided advice, including, as relevant, coordinating, with the Company's counsel with respect to testimony in connection therewith; and;

(g) to render such other financial advisory and investment banking services as may be agreed upon by Rothschild and the Company in connection with any of the foregoing.

9. Pursuant to the Retention Order, but subject to final allowance and approval by this Court pursuant to Sections 330 and 331 of the Bankruptcy Code, Rothschild is entitled to compensation as provided in the Engagement Letter, as follows:

(a) a cash monthly financial advisory fee of (i) $350,000 for each of the first two months of the engagement, (ii) $300,000 for the third month, (iii) $250,000 for the fourth month, and (iv) $200,000 for each month thereafter so long as the engagement continues (the "Monthly Fee");

(b) a transaction fee (the "Transaction Fee") equal to $20,000,000, payable in cash upon the substantial consummation of (i) a Plan of Reorganization, or (ii) a sale of all or substantially all of the Debtor's assets or equity interests under Section 363 of the Bankruptcy Code; and

(c) reimbursement of reasonable and necessary expenses.

10. Pursuant to a letter agreement, dated May 30, 2003, between the Debtor and Rothschild, Rothschild voluntarily agreed to reduce its Monthly Fee to $50,000 per month, which reduction commenced May 2003 and continued in effect thereafter through the Final Period.

## PRIOR COMPENSATION

11. Pursuant to the Fee Procedures Order and previously delivered monthly statements, the Debtor has paid Rothschild a total of $207,542.98 for services performed during the Eighth Interim Period, consisting of (i) $187,000.00, representing 85% of accrued Monthly Fees, plus (ii) $20,542.98 for reimbursement of necessary and reasonable expenses.

12. Pursuant to the Fee Procedures Order and previously approved interim fee applications, the Debtor has paid Rothschild a total of $5,284,065.34 for services performed during the Final Period, consisting of (i) $5,046,666.67 of accrued Monthly Fees, plus (ii) $237,398.67 for reimbursement of necessary and reasonable expenses.

## RELIEF REQUESTED

13. By this Application, Rothschild requests entry of an order: (i) granting (A) interim allowance and approval of compensation for services rendered during the Eighth Interim Period,

4

consisting of $20,220,000.00 of fees plus the reimbursement of reasonable and necessary expenses incurred by Rothschild during the Eighth Interim Period in the amount of $20,542.98, for a total of $20,240,542.98 and (B) final allowance and approval of compensation for services rendered during the Final Period, consisting of $25,266,666.67 of fees as outlined below plus the reimbursement of reasonable and necessary expenses incurred by Rothschild during the Final Period in the amount of $257,941.65, for a total of $25,524,608.32; (ii) ratifying and confirming all payments received by Rothschild in respect of fees and disbursements during the Eighth Interim Period and the Final Period, in each case pursuant to prior fee orders and the Fee Procedures Order, and as detailed in prior interim fee applications and monthly statements submitted by Rothschild and (iii) authorizing and directing the Debtor to make payment in respect of all allowed fees and disbursements not yet paid to Rothschild for the Eighth Interim Period and the Final Period, as detailed in the invoices, including any "holdback" amounts withheld pursuant to the Fee Procedures Order.

14. Given the size and complexity of these cases, the complicated corporate and financial structure of the Debtor, the degree of activity during the Eighth Interim Period and the Final Period, and the high level of services rendered by Rothschild to the Debtor, as more fully described below, Rothschild submits that the compensation it seeks is fair and reasonable and should be allowed.

## LEGAL BASIS FOR RELIEF REQUESTED

15. Rothschild is aware of the criteria set forth in Section 330 of the Bankruptcy Code for determining the reasonableness of the compensation sought thereunder, including (i) the time spent on providing the services, (ii) the rates charged for such services, (iii) whether the services were necessary to the administration of the Chapter 11 cases and beneficial for the estates at the

5

time that they were rendered, (iv) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance and nature of each particular problem, issue or task addressed, and (v) the customary compensation charged by comparably skilled practitioners in cases other than cases under the Bankruptcy Code. Rothschild respectfully submits that the compensation it is seeking for the services it rendered to the Debtors during the Final Period is reasonable under the above criteria.

## A. Time Spent, Complexity of Issues and Necessity of Services

16. All services rendered by Rothschild under the Engagement Letter and pursuant to the Retention Order during the Final Period, including services rendered during the Eighth Interim Period, were performed at the request or direction of the Debtor or legal professionals of Howard Rice Nemerovski Canady Falk & Rabkin, Cooley Godward LLP, Dewey Ballantine LLP, Weil Gotshal & Manges LLP or Orrick Herrington & Sutcliffe LLP. Throughout the course of Rothschild's engagement, Rothschild has provided a broad range of necessary financial advisory and investment banking services. Monthly descriptions of the activities and services performed by Rothschild during the Final Period, which were filed with Rothschild's monthly invoices, are attached hereto as Exhibit C.

17. As this Court is aware, this Chapter 11 case was unprecedented, both in terms of size and complexity. The fully consensual Plan, which was ultimately approved by overwhelming majorities of all constituencies entitled to vote thereon, produced an unsurpassable result for all creditor constituencies, who received 100% of their allowed claims plus interest thereon. This recovery under the Plan was a substantial increase from the trading values of the Debtor's unsecured debt securities at the time of the Petition Date, which were in the approximate range of mid 60% to mid 70% of par. In addition, current equity holders retained 100% ownership of

6

the reorganized company, contributing to the growth in PG&E Corporation's common equity value, which is currently greater than $11 billion, a substantial increase from an approximate $2.5 billion value at the Petition Date. Rothschild played a lead role in formulating the Plan and in negotiating the Plan structure and creditor distribution with the major creditor constituencies, including, among others, the Official Committee of Unsecured Creditors (the "Official Committee") and the Ad Hoc Committee of creditors (the "Ad Hoc Committee"). Rothschild's achievements in gaining the support of the creditor constituencies were instrumental in the success of this Chapter 11 case.



18. As is frequently the case in Chapter 11 "Mega Cases", the role of the financial advisor is highly variable, requiring a broad range of skills and expertise in numerous fields, including financial research, analysis and modeling, business planning, restructuring plan strategy, investment banking services and the ability to successfully manage complex negotiations with multiple constituencies, among many others. Along with accomplishing the many tasks that are capable of being anticipated during the course of a large, complex case, financial advisors in Chapter 11 cases are also often called upon to respond to unexpected exigencies and to provide thoughtful, detailed analysis to impending crises under severe time restraints. In addition, as is typical in complex reorganizations where many issues can become

7

subjects of litigation, the investment banker (as here) is a key intermediary, working among the principals to analyze alternatives, understand the rationale for a party's position, and suggest paths for resolving difficult issues. Thus, the varied nature of their role often requires the financial advisor to commit substantial firm resources to the resolution of fast-developing problems.

19. Rothschild played a critical and central role in many of the key phases of the Debtor's reorganization including, for example, (a) the development and structuring of the Plan, (b) the negotiation of creditor distribution, Plan structure and the Support Agreement with the Official Committee, (c) the structuring and negotiation of the Settlement Agreement with the Ad Hoc Committee and the resolution of other creditor issues, (d) the analysis of the competing plan of reorganization proposed by the California Public Utilities Commission ("CPUC") and development of strategies with respect to the competing plan process, (e) the development of the Plan solicitation process and the solicitation of creditor votes, (f) the development of strategies for Plan confirmation and CPUC settlement discussions, and (g) the implementation of the final consensual Plan. These and the other major areas of effort during the Final Period, including areas of effort during the Eighth Interim Period, may be summarized by project category as follows:

**1. Operational, Financial and Business Plan Due Diligence**

20. Rothschild was retained in July 2001 and dedicated significant resources in San Francisco to perform due diligence quickly with respect to the Debtor's operations, business plan, financial projections and key operational issues to be resolved in structuring the Plan. Rothschild's team, which is described in detail below, included both restructuring and utility industry professionals,

8

and its familiarity with the industry allowed it to quickly come up to speed and add value to the Plan development.

21. Given the Debtor's desire to propose a Plan by the Fall of 2001, Rothschild dedicated a significant team of utility industry and restructuring bankers to the due diligence process. For approximately two months during this period, Rothschild had between three and eight bankers at the Debtor's headquarters on a regular basis. This commitment of extensive resources enabled the Debtor to have the financial analytics in place to evaluate Plan alternatives.

22. Rothschild reviewed the Debtor's initial and revised long-term financial projections and held numerous worksessions with the Debtor regarding assumptions and sensitivities. Throughout the case, Rothschild reviewed and performed analysis on historical and recent operating performance. Rothschild prepared and revised detailed operating models of each business unit to analyze long-term projections, including testing of and sensitivities to various operating assumptions such as pricing, cost structure and capital expenditures. This analysis formed the basis for Rothschild's preliminary valuation work on the Debtor's component businesses.

23. Rothschild analyzed and reviewed key operational components of potential Plan structures, which included for example, the net open position, procurement auction requirements, corporate and legal structures and tax implications. Rothschild also researched and prepared analyses on the historical performance and operating structures of comparable energy companies to assess alternatives for the Debtor in formulating the reorganization.

24. Rothschild also reviewed and assisted the Debtor in the preparation of its monthly cash flow projections model, including numerous discussions with the Debtor regarding various

9

updated versions, assumptions and impact of various sensitivities. Rothschild also assisted the Debtor in assessing estimated cash available at emergence based on various creditor distribution scenarios.

25. Rothschild's extensive financial analysis and development of comprehensive, detailed financial restructuring models for the Debtor provided the critical framework for the Debtor to evaluate and negotiate Plan alternatives with the Official Committee, the Ad Hoc Committee and the CPUC. Throughout the case, Rothschild updated its financial model to reflect changes in the Debtor's business.

### 2. Plan of Reorganization Development and Formulation

26. Rothschild was instrumental in assisting the Debtor develop its initial and subsequently modified Plan, including operational restructuring, creditor distribution, post-petition interest payments, regulatory issues and capital structure requirements. Although the Debtor retained Rothschild subsequent to the Petition Date, development of the Plan structure was in the preliminary stages at the time of Rothschild's retention with many alternatives still under consideration, and Rothschild made substantial contributions to its formation. Rothschild quickly addressed the key Plan components and provided necessary and important structure and direction to assist the Debtor in resolving significant issues. Rothschild also provided insight into and judgment on likely creditor requirements and possible reactions to various Plan structures under consideration. The Plan was developed under an extremely tight timeline during which many significant structuring issues were resolved to achieve the Debtor's goal of filing a Plan in September 2001. The Company met this goal notwithstanding the turmoil in New York City in the aftermath of the September 11 attacks. Despite the difficulties in New York of that

period, Rothschild was able to complete the materials and analysis the Debtor required for its September 2001 Board of Directors meeting to approve the Plan.

27. Rothschild worked closely with the Debtor's senior management and its other advisors and made significant contributions in developing the operational and regulatory components of the Plan. As a framework for discussion and analysis, Rothschild developed detailed presentation materials comparing various potential Plan structures and other reorganization alternatives and assessed likely creditor reactions. Alternatives to the Plan included, for example, asset sales, legislated rate-based funding/recovery, co-op/municipalization and trust structures. In conjunction with this analysis, Rothschild researched and prepared presentation materials on comparable solvent debtor and utility bankruptcy cases. Rothschild also worked with the Debtor to address and resolve key Plan structuring issues, such as energy procurement (i.e., satisfying the procurement net open position and auction requirements), corporate legal structure, tax implications, and regulatory/jurisdictional issues. Throughout this Plan development process, Rothschild provided a valuable framework for discussion and resolution by preparing meeting agendas and presentation analyses of the relative benefits and risks of Plan alternatives, and by leading discussions with the Debtor and its other advisors.

28. Rothschild played a central role with respect to formulating creditor classification and treatment, and the Plan funding alternatives. Rothschild prepared, and presented to the Debtor, detailed presentation materials regarding Rothschild's analysis of and recommendations on alternatives for creditor distribution and classification, including proposed treatment, benefits to the Debtor, rationale and risks. Rothschild developed the approach to class structuring and creditor distribution that became the basis for Plan treatment, the assessment of feasibility and creditor negotiations. This approach addressed in one comprehensive analysis the absolute

priority of claims, the classification and treatment of claims, the form of creditor distributions and the Debtor's ability to raise debt and allocate cash and securities at the proposed four new operating entities. Rothschild was able to create consensus around its approach among the Debtor and its other advisors, which was instrumental in structuring the Plan. Rothschild led the effort to explain the structural issues to the Official Committee and its advisors.

29. Rothschild also prepared analyses and presentation materials on, and led the discussions with the Debtor to resolve, the appropriate interest payments to be made to creditors during the pendency of the case. Rothschild developed detailed models to calculate pre- and post-petition interest payments by individual creditor security, which formed the basis to assess the cost of various negotiating strategies. The model incorporated complex calculations for each of the Debtor's securities, and was expanded upon after Plan filing to analyze potential resolutions to post-filing objections. Rothschild prepared sensitivities and scenarios for changes in interest rate and payment assumptions, and researched the actual security agreements and legal precedents to develop possible payment alternatives.

30. As part of its detailed analysis that resulted in the formulation of the Plan's creditor treatment and funding structure, Rothschild, among other things:

- Identified key constituents and developed strategies for addressing their likely Plan requirements.
- Worked with the Debtor and its counsel to develop the appropriate classification and calculation methodology of claims, including for example, generator refunds, Enron claims, PC bonds, mortgage bonds and commercial paper.
- Developed detailed models that assessed the Debtor's ability to provide cash and restructured debt securities to the various creditor classes based on cash payment limitations resulting from debt capacity, tax constraints and debt allocation among new corporate entities.
- Worked with the Debtor to maximize cash recovery to creditors. The Plan provided for financing at the operating company level with a cash dividend to creditors, which were at the holding company level. Worked with the Debtor to calculate tax

12

limitations on issuing new debt securities and upstreaming cash at each proposed entity based on various LLC corporate structures.

- Worked with the Debtor to resolve issues with respect to the treatment of the mortgages bonds. Prepared detailed models, analyses and discussion materials regarding treatment alternatives, research of underlying indentures, payment of pre-payment premium, interest rate spreads and implied trading values.

- Worked with the Debtor to successfully resolve issues with respect to commercial paper claims. Prepared analyses and discussion materials on commercial paper interest rates and pre-filing draw down issues. Researched appropriate interest rates for similar securities without stated rates.

- Prepared analyses and recommendation for convenience class treatment addressing relative cost of early repayment.

- Prepared for and participated in rating agency meetings with S&P and Moody's to review likely credit ratings of the reorganized operations based on the proposed Plan.

### 3. Official Committee of Unsecured Creditors Support Agreement – Negotiations and Analysis

31. Rothschild played a lead role in negotiating with the Official Committee and with individual creditor groups, including the Ad Hoc Committee (discussed below). Rothschild worked with senior management and its other advisors to develop appropriate negotiating strategies and to address specific Official Committee and creditor issues with respect to Plan formulation. Rothschild led numerous discussions with senior management on negotiating alternatives and prepared discussion materials and meeting agendas on a variety of topics. For example, Rothschild was responsible for addressing, and providing critical advice on, creditor issues regarding distribution, including, for example, distribution of cash versus notes, post-petition interest rates, LC fees, the structure and allocation of new securities, timing of creditor payments and timing of the Plan process. Rothschild's considerable experience and expertise in the restructuring industry and its knowledge of key creditors provided the Debtor with critical insights into Plan structuring issues and was instrumental in achieving the appropriate resolution with each creditor class, whose members often had disparate goals and views.

13

32. Rothschild was instrumental in negotiating the Support Agreement with the Official Committee prior to filing the Plan, which was a key goal of the Debtor in its Plan strategy. Rothschild played a key role in the meetings and calls with the Official Committee and its advisors to negotiate Plan components and alternatives for creditor distribution. Primary Plan issues resolved with the Official Committee included, for example, corporate structure, legal structure, capital structure, and creditor treatment items such as classification, interest payments and amount of cash repayment versus new debt. In preparation for these meetings and calls, Rothschild worked with senior management of the Debtor and its other advisors to strategize on negotiations and prepare to present the Plan and address questions regarding structure, creditor distribution and timing. Rothschild also developed presentations for the Official Committee regarding the proposed Plan and creditor distribution and prepared detailed talking points outlining key messages for the Debtor to deliver.

### 4. Resolution of Plan of Reorganization Objections

33. Rothschild played a critical role in the analysis, research and negotiation necessary to resolve numerous objections to the Plan. Key parties objecting formally and informally included QF claimants, holders of mortgage bonds, PC bonds and supporting LC banks, floating rate notes, commercial paper, generator claims and Quids. For example, Rothschild was a critical participant in the extensive and prolonged negotiations with the mortgage bondholders and their counsel regarding satisfaction of pre-payment premiums. In response to concerns raised by these and other constituencies, Rothschild provided the necessary framework to assess alternatives by preparing, and reviewing with the Debtor, detailed creditor analyses that outlined negotiating status by creditor class, key issues/requirements, proposed interest treatment and recommended resolution.

14

34. Rothschild created detailed analyses and presentations for the Debtor on interest rate and payment alternatives for the many creditor claims, which provided the basis for the Debtor to determine appropriate negotiating positions with each class. Rothschild developed detailed models to analyze comparative interest expense, values of securities and creditor recoveries under various alternatives, including sensitivities for interest rates and payment timing. Rothschild performed these individual detailed analyses on a number of different classes of claims, including mortgage bonds, 4F PC bonds, LC banks, commercial paper, class 5 securities, generator claims, gas procurement claims and Quids.

### 5. Ad Hoc Committee – Negotiations and Settlement Agreement

35. Rothschild was the lead representative of the Debtor during the long and challenging process of negotiating a settlement and support agreement with the Ad Hoc Committee of creditors holding approximately $2 billion of Class 5 claims. Because this group held such a significant amount of claims, its support was as critical to confirmation of the Plan as that of the Official Committee. The Settlement Agreement that was reached with these Class 5 representatives and filed in March 2002, successfully resolved the Ad Hoc Committee's Plan objections regarding creditor distribution, including post-petition interest rates and the timing and form of payments.

36. In furtherance of these efforts, Rothschild held numerous calls with individual creditors and several negotiating sessions with the full Ad Hoc Committee during this process. During the pendency of this case, Rothschild was the Debtor's professional with the most knowledge of the Ad Hoc creditors. Owing chiefly to Rothschild's intimate understanding of the Ad Hoc Committee's goals and expectations, Rothschild was able to achieve a mutually acceptable settlement that induced the Ad Hoc Committee to remain committed to the Debtor's

Plan. The Ad Hoc Committee's willingness to execute the Ad Hoc Settlement Agreement, remain supportive of the Debtor throughout the competing plan process and vote in favor of the Debtor's Plan was a key component of the Debtor's successful reorganization and a major goal of the Company. The continued support of the Ad Hoc Committee allowed the Debtor to pursue its overall Plan strategy and mitigated the risk that competing interests would divert the Plan process in a direction inconsistent with that of the Debtor.

37. Rothschild led internal discussions with the Debtor and its other advisors and provided advice regarding the risks and benefits of various Ad Hoc Committee settlement negotiating alternatives, including preparation of presentations, discussion materials and meeting talking points on strategic issues and economic consideration. Rothschild prepared detailed analyses and sensitivities of comparative interest expense and creditor recoveries for various settlement alternatives and developed models to assess possible values of securities issued under the Plan. Rothschild participated in numerous work sessions with the Debtor to review interest rate treatment for various creditor claims under multiple scenarios, during which Rothschild presented detailed materials comparing multiple interest rate alternatives for all creditor classes. Rothschild also participated in the development of the Ad Hoc Settlement Agreement documents, including negotiation with the Ad Hoc Committee. Rothschild reviewed and provided comments on numerous settlement agreement drafts and prepared counter-proposals to the Ad Hoc Committee, including numerous discussions with the Debtor and its other advisors.

38. Once the Ad Hoc Settlement Agreement was finalized with the Ad Hoc Committee, Rothschild was responsible for developing a process of identifying and contacting other Class 5 creditors to participate in the settlement. Rothschild contacted numerous Class 5 creditors to solicit their execution of the settlement support agreement, prepared presentation materials to

16

creditors outlining the terms and benefits of the settlement and held numerous conversations with individual creditors. The Ad Hoc Settlement Agreement became the basis for creditor treatment in the final consensual plan of reorganization. Although the initial CPUC Plan did not reflect this settlement, the terms of the Ad Hoc Settlement Agreement were incorporated into the final confirmed Plan.

39. Rothschild also negotiated settlement agreements with Ad Hoc Committee members regarding PC bond class 4F and LC banks. These efforts included coordination with counsel, analysis of interest rate sensitivities, preparation of Debtor talking points and review of settlement agreement documents.

40. Throughout the settlement process, Rothschild coordinated and participated in negotiating meetings with the Ad Hoc Committee. Rothschild developed key messages for the Debtor to present to the Ad Hoc Committee regarding such issues as the SoCal Edison settlement, legal setbacks on pre-emption, the CPUC Plan and the competing plan process. These messages along with Rothschild's knowledge of key holders were critical to maintaining the Ad Hoc Committee support during the competing Plan process. The consistent backing of the Ad Hoc Committee during this period provided the Debtor significant leverage in its subsequent negotiations with the CPUC.

## 6. Plan of Reorganization, Disclosure Statement and Regulatory Filing Documentation

41. In addition to the development and negotiation of the Plan, Rothschild played an important role in the documentation of the disclosure statement, plan of reorganization and various regulatory filings.

17

42. Rothschild reviewed and provided comments on multiple draft disclosure statements and Plan documents for each of the amended versions, as well as associated regulatory filings required by the Internal Revenue Service (the "IRS") and the Federal Energy Regulatory Commission ("FERC"). Rothschild participated in numerous meetings and calls with the Debtor and its other advisors regarding revisions to and finalization of documents. Rothschild also assisted the Debtor and its other advisors in preparing for the distribution of balloting information.

43. Rothschild performed detailed valuation analyses to assist the Debtor in fulfilling its regulatory requirements, in particular with respect to filings required by the Public Utility Holding Company Act ("PUHCA"). Rothschild's team, which includes restructuring and utility industry professionals, reviewed and performed analyses on the Debtor's initial and revised long-term business plan, including detailed discussions with the Debtor regarding assumptions and revisions. In connection with its valuation work, Rothschild developed an independent projections model to test business plan assumptions and sensitivities. Rothschild performed detailed valuation analyses of the financial projections for each of the Debtor's component businesses, using discounted cash flow, comparable company and precedent transaction methods of analyses, and incorporating detailed research on comparable companies/transactions and appropriate discount rates. Rothschild prepared a formal detailed valuation presentation for the Debtor's energy generation business that was included as an exhibit to the publicly-filed PUHCA documents, and subsequently reissued an updated presentation based on revisions to the Debtor's business plan. Rothschild also reviewed and provided comments on draft PUHCA filing documents, including numerous discussions with the Debtor and its other advisors. Rothschild's considerable industry expertise was critical to the timely completion of the filings required by PUHCA.

18

## 7. Preparation for and Analysis of CPUC Competing Plan

44. Rothschild played an integral role in developing the Debtor's strategy for analyzing and responding to the competing reorganization plan proposed by the CPUC. Rothschild prepared significant discussion materials on possible CPUC Plan alternatives and participated in numerous meetings and calls with the Debtor's senior management and its other advisors to assess strategy, tactics and official communications, including communications with the Official Committee, the Ad Hoc Committee and rating agencies. Rothschild's extensive experience with this Chapter 11 process provided valuable insights into creditors' views and expectations regarding the competing plans.

45. Rothschild worked on a special senior-level internal team of the Debtor to assess potential strategies and structures for an alternative CPUC Plan. Rothschild prepared significant analyses of potential CPUC Plan structures and worked with the Debtor on variations to its long-term financial projections assuming various possible CPUC structures. For each scenario, Rothschild developed analyses to assess the relative creditor recoveries, souces/uses of funds and feasibility. As part of this process, Rothschild prepared, and reviewed with the Debtor, analyses of the SoCal Edison settlement and historical precedent competing plans of reorganization to assess applicability, alternatives and strategies.

46. Rothschild reviewed and performed significant analyses on the actual CPUC Plan, including analyses comparing the relative creditor recoveries, financing feasibility and sources/uses under each Plan. Rothschild prepared detailed models of potential bond ratings and market interest spreads of restructured creditor securities to compare potential creditor recoveries under both the Debtor's and the CPUC's Plans. For example, Rothschild calculated the potential

bond valuation for each mortgage bond series based on maturity date, callable/non-callable and various debt ratings.

47. Rothschild prepared discussion materials on possible responses to the CPUC Plan and worked with the Debtor's senior management and its other advisors to assess the strategy for responding to the CPUC Plan with respect to both plan feasibility and creditor treatment and recoveries. Rothschild also prepared materials, and led discussions with senior management, regarding such issues as creditor reaction to the CPUC Plan and strategies for communications with the CPUC.

48. Rothschild was also a constructive voice in the debate regarding the issues associated with a potential settlement with the CPUC. Rothschild prepared discussion materials that analyzed the potential risks and benefits of a consensual negotiation with the CPUC and led discussions with the Debtor's senior management and its other advisors regarding these issues. Rothschild held numerous conversations with the Debtor's senior management and its other advisors regarding the benefits of a consensual CPUC negotiation with the support of the Ad Hoc Committee. Rothschild also coordinated with the Debtor to prepare CPUC information requests.

8. **Plan of Reorganization Voting and Solicitation Process**

49. Rothschild worked closely with the Debtor and its other professionals on the Plan voting and solicitation process, including overall strategy, coordination and roadshow participation. The Plan voting process employed in this Chapter 11 case was highly unusual, especially for a contested case of this magnitude and complexity. Central to the Debtor's strategy for resolving the case was to obtain strong support for its Plan from the key creditor

194066v1

groups. Rothschild was responsible for developing key messages to the creditor classes regarding why they should vote in favor of the Debtor's Plan. Rothschild had a firm understanding of creditor expectations and requirements for the Plan process, which was instrumental in developing the appropriate message to each of the creditor constituencies. In August 2002, the Debtor's Plan received overwhelming approval from nine of the ten voting classes. The tremendous success of the creditor solicitation process, which was a key goal of the Debtor, provided the basis for a balanced and successful negotiation with the CPUC.

50. In coordinating the solicitation process, Rothschild prepared presentation materials for the Debtor's senior management regarding major issues, key messages to various creditor groups, the strategy for determining which creditors to meet with and the relative benefits and risks of various approaches. Rothschild worked directly with Ken Altman and D.F. King, as solicitation agents, to prepare the detailed database of individual creditors, develop key messages and talking scripts for employees to use with each creditor class, and coordinate creditor calling efforts.

51. Rothschild reviewed the detailed individual creditor lists by class and prioritized creditors into tiers for purposes of importance for having roadshow meetings and calls. Rothschild assisted the Debtor in preparing the roadshow presentation to creditors and formulating the key messages for Plan vote recommendations. Rothschild participated in numerous drafting sessions with the Debtor and its other advisors to review roadshow layout, content and message themes.

52. Rothschild had lead responsibility for certain creditor classes in the solicitation process, including mortgage bonds, Class 4 drawn/undrawn LC banks and Class 5, and also had primary responsibility for communicating with the Ad Hoc Committee members. Rothschild

21

directly set up many of the meetings with individual creditors and participated in numerous roadshow meetings, which provided an important introduction for senior management to many of these creditors. Rothschild also led a significant follow-up effort to answer questions from creditors following the roadshow meetings.

53. Rothschild led discussions with the Debtor's senior management regarding strategies on addressing the role of the Official Committee in the competing plan process. Rothschild prepared materials which analyzed the benefits and risks of negotiating with the Official Committee to realign their support with the Debtor. Rothschild led several meetings with the Debtor's senior management to evaluate this alternative.

### 9. Strategy for Confirmation and CPUC Settlement Discussions

54. Rothschild worked with the Debtor's senior management and its other advisors to address the competing plan confirmation process and CPUC settlement discussions, specifically with regard to tactics for Court motions, rating agencies, various negotiating positions and responses to the CPUC and TURN. Throughout the confirmation and settlement process, Rothschild provided an objective view on several of the key issues. Rothschild participated in the development of the confirmation strategy, provided input to the Debtor's senior management regarding a response to the CPUC objection and prepared materials regarding various settlement issues for discussion with senior management.

55. Rothschild remained active during the confirmation process. Rothschild worked closely on the special senior-level internal team of the Debtor to assess strategy and tactics for confirmation alternatives, continued regular communication with key creditors and successfully maintained Ad Hoc Committee support, which was critical in providing a balanced negotiating

22

dynamic. Rothschild performed analyses of the SoCal Edison settlement and was the lead in successfully communicating the issues to the Ad Hoc Committee. Rothschild also prepared a detailed memorandum to, and led discussions with, senior management regarding the potential for converting the Official Committee's support from the CPUC competing plan to the Debtor's Plan. In addition, Rothschild prepared for and provided depositions regarding Class 4F PC bond issues.

### 10. Implementation of CPUC Settlement Plan

56. Following the settlement agreement between the Debtor and the CPUC (the "Settlement Plan"), Rothschild worked with the Debtor to ensure creditor support for and the implementation of the Settlement Plan. Rothschild communicated the key components of the Settlement Plan to creditors and answered questions regarding impact on creditor treatment, timing and the confirmation process. Rothschild led meetings with the Debtor's senior management to develop a creditor solicitation plan and key messages for creditor groups, and was directly responsible for communications with a large portion of the creditor body. Rothschild also developed a list of key creditors for senior management to contact and developed talking points for those creditor discussions.

57. Rothschild's participation in the case continued to be critical to the resolution of creditor objections to the Plan. Rothschild's knowledge of key Class 4F creditors created an opportunity for settlement. Rothschild participated in numerous meetings with the Debtor to analyze settlement alternatives and prepare strategies for negotiations. Rothschild played a lead role in negotiating the settlement with the Class 4F creditors.

194066v1
Case: 01-30923    Doc# 15509    Filed: 07/09/04    Entered: 07/13/04 11:46:24    Page 26
of 39

58. Throughout the Debtor's process of determining the appropriate reorganized capital structure and specific securities to be issued in its public market bond financing, Rothschild provided the Debtor with independent analysis of comparable transactions to assess the benefits and risks of various financing alternatives. Rothschild prepared, and reviewed with the Debtor, detailed analyses of comparable company bond pricing and spreads for both secured and unsecured bonds at various maturities. Rothschild also prepared detailed analyses of comparable company "fall-away security" bonds and their relative pricing versus straight mortgage bonds and unsecured bonds. Rothschild's analysis assisted the Debtor in assessing the potential relative costs of issuing various types of securities and in determining the appropriate capital structure.

## 11. Plan Closing Process

59. Consummation of the Plan was extremely complex and required multiple closing processes. The Debtor asked Rothschild to take charge of certain specific areas in connection with these efforts, including, for example, the PC Bond transition and assignment process. Rothschild dedicated several professionals full time in San Francisco and oversaw the successful completion of its areas of responsibility within the targeted closing deadline. Rothschild coordinated, with the Debtor and its other advisors, the PC bond transition process to ensure that the PC bond claims were repaid and the actual PC bonds were successfully retained by the Debtor post-effectiveness. Rothschild played a lead role in negotiating and achieving the execution of the Class 4F PC bonds assignment and assumption agreements with each of the individual creditors, including coordination with the respective counsels. Rothschild was also responsible for coordinating and reviewing the broad internal effort to centralize and organize Plan documentation. In addition, Rothschild provided an objective view on several key issues associated with the Plan financing, including participation in exit financing discussions with

24

senior management regarding alternatives for new money bond duration/tenor and allocation between tranches.

60. This Plan of Reorganization produced tremendous results for all parties involved. Creditors received 100% of their allowed claims plus accrued interest. In addition, PG&E Corporation retained 100% of the reorganized entity, which contributed to the approximate $8.5 billion growth in equity market value since the Petition Date.

## B. Customary Compensation

61. The Engagement Letter was negotiated by the Debtor and Rothschild in good faith and at arms' length, with each party at all times represented by experienced counsel. As stated in the Debtor's Application for entry of the Retention Order, attached hereto as Exhibit A, in seeking Rothschild's retention pursuant to the terms of the Engagement Letter, the Debtor determined that such terms, including the compensation negotiated by the parties and set forth therein, were consistent with those approved for other financial advisors and investment bankers in matters of similar scope and complexity and were reasonable under the circumstances.

62. In setting Rothschild's compensation under the Engagement Letter, the parties also explicitly considered that the hours worked, the results achieved and the ultimate benefit to the Debtor of Rothschild's services may be variable, and that such factors were accounted for in setting Rothschild's fees.

63. The amount of fees and expenses sought in this application and Rothschild's billing processes are consistent with market practices for investment banking firms both in and out of a bankruptcy context. Rothschild does not bill its clients based on the number of hours expended by its professionals. It bills clients on a retainer basis (generally monthly or quarterly), plus a

25

transaction fee, based upon successful completion of a transaction. Accordingly, Rothschild does not have hourly rates for its professionals and Rothschild's professionals generally do not maintain time records for the work performed for its clients. Rothschild's policy, for all engagements in or out of bankruptcy, is to dedicate the appropriate number of professionals to the assignment to complete the work as efficiently as possible. Rothschild has, however, maintained a summary of services performed by Rothschild on behalf of the Debtor during the Eighth Interim Period and Final Period, which have been attached as Exhibit C. These market billing practices incentivise investment bankers to focus the resources and expertise to achieve successful results for clients in an efficient manner since a significant portion of the fees are paid at the successful completion of a transaction.

64. Attached hereto as Exhibit D is an analysis of the fees and other compensation terms for financial advisors and investment bankers in bankruptcy cases of comparable size and complexity to the this Chapter 11 case. Transaction fees for investment bankers in restructuring engagements are structured as a percentage of the face amount of the debt restructured, based on a sliding fee scale. This practice is similar to merger and acquisition fees, which are structured as a percentage of the total value of the transaction. As more fully set forth therein, the mean and median transaction fees in Chapter 11 cases with debt outstanding of between $3 billion and $15 billion, expressed as a percentage of total debt outstanding at the commencement of each case, was 0.26% and 0.27%, respectively. Rothschild's transaction fee requested herein for the Final Period represents 0.14% of the Debtor's total debt as of the Petition Date, well within these ranges.

26

## C. **Expenses Incurred**

65. In the course of rendering services to the Debtor as its financial advisor, Rothschild incurred and paid reasonable and necessary out-of-pocket expenses aggregating $20,542.98 during the Eighth Interim Period. Details of the expenses incurred during the Eighth Interim Period are provided in <u>Exhibit B</u>. Rothschild submits that all such expenses were necessarily incurred, are reasonable in amount and represent only the actual costs incurred by Rothschild.

66. Rothschild's charges for expenses to the Debtor are determined in the same manner as for clients in non-bankruptcy matters and are consistent with applicable U.S. Trustee Guidelines and the guidelines adopted by this court. Out-of-pocket expenses incurred by Rothschild are charged to a client if the expenses are incurred for the client or are otherwise necessary in connection with services rendered for such particular client. Rothschild does not factor general overhead expenses into disbursements charged to clients in connection with Chapter 11 cases. Rothschild has followed its general internal policies with respect to out-of-pocket expenses billed to the Debtor as set forth below, with any exceptions fully explained.

(a) Rothschild bills breakfast or dinner meals to a client if the employee is travelling on client matters at cost. Meal expenses incurred during meetings which employees and other meeting participants are required to attend are billed at cost.

(b) Messengers and couriers are used by Rothschild to deliver hard copy documents relating to a client matter which require receipt on an expedited basis; otherwise, Rothschild uses the regular postal system. Any charges for either messengers or couriers are billed to a client at cost.

(c) All airfare charges billed to a client in a Chapter 11 case are billed at cost and are based on coach fare rates.

(d) Rothschild charges for transportation to and from airports and while travelling on client matters at cost.

(e) Rothschild charges clients for the use of the research/database category consists of the cost of using databases (e.g., Disclosure, Securities Data Corporation, Dow Jones, Lexis-Nexis, etc.) to which Rothschild subscribes to search for and obtain

194066v1

information used in Rothschild's financial analyses. Rothschild pays the vendor's standard rate for such database services. In certain instances, Rothschild has determined that paying a flat annual or monthly fee for such services is less costly than contracting for such services on a per use basis. Such annual or monthly services are allocated to clients based on such clients' use of each service. The research category also consists of charges from outside services which supply, for a fee, financial documents from regulatory agencies which can not be obtained from databases subscribed to by Rothschild.

(f) Rothschild bills photocopying charges at the rate of $.10 per page for black and white copies and $1.00 per page for color copies.

(g) Telephone expenses are charged based on Rothschild's actual cost of telephone charges with respect to client matters. Cellular phone charges are based on vendor's actual invoices.

(h) Conference calls arranged through a third party vendor are charged a $0.75 per minute usage charge based on the vendor's charges for such services.

67. Rothschild respectfully submits that the services it has rendered to the Debtor have been necessary and in the best interest of the Debtor and its estate and have furthered the goals of all parties in interest. The compensation requested for the Eighth Interim Period and the Final Period for services rendered by Rothschild to the Debtor is fully justified and reasonable based on the following: (a) the degree of activity during the Eighth Interim and Final Periods, and the high level of services rendered by Rothschild to the Debtor, (b) the complexity of the issues presented, (c) the skill necessary to perform the financial advisory and investment banking services properly, (d) the preclusion of other employment, (e) customary fees charged in non-bankruptcy situations for similar services rendered, (f) time constraints required by the exigencies of the case and (g) the experience, reputation and ability of the professionals rendering services.

## PERSONNEL WHO RENDERED SERVICES

68. Senior level professionals with extensive experience in the areas of investment banking, bankruptcy services and the utility sector directed Rothschild's team. As described in

28

the description of services above, members of Rothschild's restructuring group and utility group performed the financial advisory and investment banking services summarized above. Annexed hereto as Exhibit E are the resumes of key professionals of Rothschild providing services to the Debtor. The restructuring group's services were performed primarily by David L. Resnick, Managing Director, Stephen S. Ledoux, Managing Director, William R. Shaw, Vice President, Jason Capone, Associate, Greg Laufer, Analyst, Carlos Orellana, Analyst, and other professionals and paraprofessionals, as needed. Rothschild's general staffing policy is to assign senior bankers, experienced junior bankers and financial analysts to each restructuring assignment. The senior bankers, David L. Resnick and Stephen S. Ledoux, have overall responsibility for the case. They are primarily responsible for developing strategy with respect to the case, directing negotiations, interfacing with the other senior professionals involved with the case and testifying, when necessary, in Bankruptcy Court. The additional senior banker, in this case William R. Shaw, is responsible for day-to-day coordination of the case and the review of all financial analyses. The experienced junior banker assists with the day-to-day coordination of the case and performs with the financial analysts extensive financial analysis and presentation preparation. The utility group's services were performed primarily by Matthew L.C. Savage, Managing Director, Robert Mudge, Director, John Chang, Vice President, and Alice Ku, Associate.

69. The senior bankers, the experienced junior bankers and the financial analysts coordinate their actions so as to not duplicate efforts. Given that the senior bankers, the experienced junior bankers and the financial analysts have different roles in the case but have overlapping responsibilities, there are frequent times where it is appropriate for two or more bankers to be present at a meeting.

29

## CONCLUSION

70. Rothschild submits that the services summarized by this application and rendered by Rothschild to the Debtor were substantial, highly professional and instrumental to the successful resolution of the Debtor's Chapter 11 case. Such services were reasonable and necessary to the Debtor's performance of its duties.

71. This Chapter 11 case was unprecedented, both in terms of size and complexity. It involved the negotiation of the Plan with multiple constituencies, including the Official Committee, the Ad Hoc Committee, individual creditor groups and the CPUC. Plan formulation involved the resolution of numerous complex issues relating to operational structure and industry factors (such as CPUC-regulation versus FERC-regulation, corporate structure and debt capacity), as well as restructuring issues (such as Plan structure and funding alternatives, creditor negotiations, Plan solicitation and the competing Plan process). Rothschild was instrumental in formulating the Plan and played a lead role in negotiating the Plan structure and creditor treatment with the major creditor constituencies (including, for example, the Official Committee Support Agreement and the Ad Hoc Settlement Agreement). Successful resolution of creditor issues with respect to the Plan resulted ultimately in approval of the fully consensual Plan by overwhelming majorities of all constituencies entitled to vote thereon. Rothschild worked on a special senior-level internal team of the Debtor to assess potential strategies and structures for an alternative CPUC Plan and worked to ensure creditor support of the CPUC Settlement Plan. Toward the end of the case, Rothschild remained committed to assist with the closing of the reorganization. Rothschild played an integral role and was critical to one of the most financially successful restructurings of recent period. As a result of the Debtor's reorganization, creditors received 100% of their allowed claims plus accrued interest and current equity holders retained

194066v1

100% ownership of the reorganized company, contributing to the growth in PG&E Corporation's common equity value, which is currently greater than $11 billion, a substantial increase from an approximate $2.5 billion value at the Petition Date.

72. Rothschild hereby certifies that all services for which compensation is sought were performed for and on behalf of the Company and not on behalf of any individual creditor or party in interest. Rothschild has not entered into any agreement, express or implied, with any party in interest for the purpose of fixing or sharing fees or other compensation to be paid for professional services rendered in these cases.

\* \* \*

194066v1

WHEREFORE, Rothschild respectfully requests that this Court enter an order: (i) granting (A) interim allowance and approval of compensation for services rendered during the Eighth Interim Period, consisting of $20,220,000.00 of fees plus the reimbursement of reasonable and necessary expenses incurred by Rothschild during the Eighth Interim Period in the amount of $20,542.98, for a total of $20,240,542.98 and (B) final allowance and approval of compensation for services rendered during the Final Period, consisting of $25,266,666.67 of fees plus the reimbursement of reasonable and necessary expenses incurred by Rothschild during the Final Period in the amount of $257,941.65, for a total of $25,524,608.32; (ii) ratifying and confirming all payments received by Rothschild in respect of fees and disbursements during the Eighth Interim Period and the Final Period, in each case pursuant to prior fee orders and the Fee Procedures Order, and as detailed in prior fee applications and the monthly statements submitted by Rothschild and (iii) authorizing and directing the Debtor to make payment in respect of all allowed fees and disbursements not yet paid to Rothschild for the Eighth Interim Period and the Final Period, as detailed in the invoices, including any "holdback" amounts withheld pursuant to the Fee Procedures Order.

Dated: New York, New York
   July 7, 2004

                              ROTHSCHILD INC.

                              By: _Stephen S. Ledoux_
                              Stephen S. Ledoux
                              Managing Director
                              1251 Avenue of the Americas
                              51st Floor
                              New York, New York 10020
                              Telephone: (212) 403-3500
                              Facsimile: (212) 403-3501
                              FINANCIAL ADVISOR AND INVESTMENT
                              BANKER FOR THE DEBTOR

Case: 01-30923    Doc# 15509    Filed: 07/09/04    Entered: 07/13/04 11:46:24    Page 35
of 39

## VERIFICATION

STEPHEN S. LEDOUX, under penalty of perjury, declares and says:

1. I am a Managing Director with the applicant firm, Rothschild Inc. ("Rothschild"), which firm maintains offices for providing financial advisory and investment banking services at 1251 Avenue of the Americas, New York, NY 10020. Rothschild has acted as financial advisor and investment banker to and rendered professional services on behalf of Pacific Gas and Electric Company (the "Debtor").

2. I have performed many of the financial advisory and investment-banking services rendered by Rothschild as advisor to the Debtor and am thoroughly familiar with all other work performed on behalf of the Debtor by the professionals in the firm.

3. I have reviewed the foregoing Application and the facts set forth therein are true and correct to the best of my knowledge, information and belief. Moreover, I have reviewed the United States Trustee Guidelines For Reviewing Applications For Compensation And Reimbursement of Expenses Filed Under 11 U.S.C. Section 330 (the "Guidelines") and the Application substantially complies with these Guidelines, as modified by any applicable local rules and any administrative or other orders entered in these cases.

_Stephen S. Ledoux_
STEPHEN S. LEDOUX
Managing Director

1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF:<br><br>**PACIFIC GAS AND ELECTRIC COMPANY, a California Corporation**<br>Debtor.<br>Federal I.D. No. 94-0742640 | **Chapter 11 Case**<br><br>**CASE NO.    01-30923-DM** |

### ORDER APPROVING EIGHTH INTERIM AND FINAL APPLICATION OF ROTHSCHILD INC. FOR ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES

Upon consideration of the Eighth Interim and Final Application of Rothschild Inc. for Compensation and Reimbursement of Expenses (the "Application") for (i) the period December 1, 2003 through April 12, 2004 (the "Eighth Interim Period") and (ii) the period July 25, 2001 through April 12, 2004 (the "Final Period"), filed on behalf of Rothschild Inc. ("Rothschild"); and the Court having found and determined that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, that this proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2) and that venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having reviewed the Application and prior fee applications submitted by or on behalf of Rothschild during the pendency of these Chapter 11 cases; and it appearing that the Application is in compliance with the terms and provisions of each of (i) Sections 330 and 331 of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rule 2016 of the Federal Rules of Bankruptcy Procedure, (iii) the Second Amended Order of this Court, dated March 18, 2002, establishing interim fee application and expense reimbursement procedures for professionals (the "Fee Procedures Order"),  (iv) the Order on Debtor's Application for an Order Authorizing the Retention and Employment of Rothschild Inc. as Financial Advisor and Investment Banker pursuant to Sections 327 and 330(a) of the Bankruptcy Code and Rule 2014 of the Bankruptcy

1

Rules, dated August 21, 2001 (the "Retention Order"), approving the retention of Rothschild as financial advisor and investment banker to the Debtor, nunc pro tunc to July 25, 2001, under the terms set forth in the Debtor's application therefor and under the terms of the engagement letter, dated July 25, 2001 (the "Engagement Letter"), between Rothschild and the Debtor, and (v) the Order of this Court, dated December 22, 2003, confirming the Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company Dated July 31, 2003 As Modified by Modifications Dated November 6, 2003 and December 19, 2003; and due and adequate notice of the Application having been given under the circumstances; and all persons with standing having been afforded the opportunity to be heard on the Application; and capitalized terms used but not defined herein being used with their defined meanings as set forth in the Application; and after due deliberation, and good and sufficient cause appearing therefor, it is hereby:

ORDERED, that the Application be, and it hereby is, granted in its entirety; and it is further

ORDERED, that Rothschild is granted (i) allowance of compensation for the Eighth Interim Period in the amount of $20,220,000.00 for services rendered by Rothschild as financial advisor and investment banker to the Debtor and reimbursement of $20,542.98 for actual, necessary and reasonable expenses incurred and recorded by Rothschild during the Eighth Interim Period for a total of $20,240,542.98 ; and (ii) final allowance of compensation for the Final Period in the amount of $25,266,666.67 for services rendered by Rothschild as financial advisor and investment banker to the Debtor, and reimbursement of expenses incurred and recorded by Rothschild during the Final Period in the amount of $257,941.65, for a total of $25,524,608.32; and it is further

2

ORDERED that the Debtor is authorized and directed to pay to Rothschild all compensation and reimbursements allowed hereunder, to the extent not already paid to Rothschild, including any and all fees and expenses allowed under this Order and not yet paid to Rothschild pursuant to the "holdback" provisions contained in the Fee Procedures Order; and it is further

ORDERED that any and all payments heretofore made to Rothschild pursuant to prior orders of this Court in respect of Rothschild's fees and expense reimbursements accrued during the Final Period are hereby ratified and confirmed as a final matter; and it is further

ORDERED that, notwithstanding the possible applicability of Bankruptcy Rules 6006(d), 7062, 9014, or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED, that this Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2004

_____
Hon. Dennis Montali
United States Bankruptcy Judge

194066v1
Case: 01-30923    Doc# 15509    Filed: 07/09/04    Entered: 07/13/04 11:46:24    Page 39
of 39