ARTHUR J. BURKE, SBN 229589
DANIEL G. KELLY, JR., SBN 125604
DAVIS POLK & WARDWELL
1600 El Camino Real
Menlo Park, CA 94025
Telephone: (650) 752-2000
Facsimile: (650) 752-2111

**Attorneys for UBS Securities LLC**

PAUL S. ARONZON, SBN 88781
ROBERT JAY MOORE, SBN 77498
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Telephone: (213) 892-4000
Facsimile: (213) 629-5063

**Attorneys for Official Committee of Unsecured Creditors**

FILED
JUL 12 2004
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re<br><br>PACIFIC GAS AND ELECTRIC COMPANY, a California corporation,<br><br>Debtor.<br><br>Federal I.D. No. 94-0742640 | Case No. SF 01-30923 DM<br><br>Chapter 11 Case<br><br>Date: September 14, 2004<br>Time: 1:30 p.m.<br>Place: 235 Pine Street, 22nd Floor<br>San Francisco, California |

COPY

Case: 01-30923 Doc# 15522 Filed: 07/12/04 Entered: 07/13/04 16:01:25 Page 1 of 16

15522.

**FIRST AND FINAL APPLICATION OF UBS SECURITIES LLC, FINANCING AND CAPITAL MARKETS ARRANGER TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND CALIFORNIA PUBLIC UTILITIES COMMISSION, FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES**

| | |
|---|---|
| Name of applicant | UBS Securities LLC |
| Authorized to provide professional services to: | Official Committee of Unsecured Creditors and California Public Utilities Commission |
| Date of retention: | October 30, 2002 (nunc pro tunc October 2, 2002) |
| Amount of compensation requested: | $29,500,000.00 |
| Amount of expense reimbursement sought: | $1,112,589.55 |

This is a Final application.

**FIRST AND FINAL APPLICATION OF UBS SECURITIES LLC, FINANCING AND CAPITAL MARKETS ARRANGER TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE CALIFORNIA PUBLIC UTILITIES COMMISSION, FOR ALLOWANCE OF COMPENSATION FOR PROFESSIONAL SERVICES RENDERED AND FOR REIMBURSEMENT OF EXPENSES**

UBS Securities LLC (f/k/a UBS Warburg LLC) ("**UBS**"), financing and capital markets arranger to the Official Committee of Unsecured Creditors (the "**OCC**") in the Pacific Gas & Electric Company ("**PG&E**" or the "**Debtor**") bankruptcy case (the "**Case**") and the California Public Utilities Commission (the "**Commission**"), submits this final application (the "**Application**") pursuant to sections 328(a), 330 and 331 of the Bankruptcy Code and Rule 2016 of the Federal Rules of Bankruptcy Procedure for allowance of compensation for services rendered and reimbursement of expenses incurred by UBS in connection with the Case and pursuant to the terms of the Letter Agreement (the "**Engagement Letter**") between UBS, the OCC and the Commission dated October 2, 2002 and approved by this Court on October 30, 2002 (as modified pursuant to the terms of the Settlement Agreement entered into by PG&E, PG&E Corporation and the Commission). A copy of the Engagement Letter is attached hereto as Exhibit A. A copy of the Settlement Agreement is attached hereto as Exhibit B.

This Application is supported by the Declaration of Walter S. Hulse, a Managing Director of UBS (the "**Hulse Dec.**"). A copy of this declaration is attached hereto as Exhibit C.[1]

In further support of this Application, UBS respectfully represents as follows:

## Introduction

1. Under the terms of the Engagement Letter, UBS requests final allowance of fees in the amount of $29,500,000.00 and expenses in the amount of $1,112,589.55. See Hulse Dec., ¶ 11. The fee portion of this request consists of several components paid to UBS pursuant to orders of the Court: (i) a retainer fee pursuant to paragraph 2(a)(i) of the Engagement Letter in the amount of $2,000,000 paid in November, 2002, (ii) monthly fees for the period from March 1,

[1] UBS reserves the right to supplement or amend this Application, if necessary, in order to obtain approval of the compensation and reimbursement of expenses it has received in connection with this matter.

Case: 01-30923 Doc# 15522 Filed: 07/12/04 Entered: 07/13/04 16:01:25 Page 3 of 16

2003 through December 31, 2003 pursuant to paragraph 2(a)(ii) of the Engagement Letter in the aggregate amount of $1,500,000, (iii) a fee for the delivery of a highly confident letter pursuant to paragraph 2(b) of the Engagement Letter in the amount of $6,000,000 and (iv) a Consummation Fee (as defined in the Engagement Letter) of $20,000,000 (after the reduction agreed to by UBS pursuant to the Settlement Agreement). See Hulse Dec., ¶ 11. Of the foregoing amounts, UBS has already been paid $29.5 million (consisting of the retainer fee, the monthly advisory fees, the fee for the highly confident letter and the Consummation Fee) and $989,333.41 in expenses. See Hulse Dec., ¶ 11. All of the fees were paid pursuant to orders of this Court entered after due notice and hearing. See October 30, 2002 Order; December 22, 2003 Confirmation Order.[2]

2. The terms of UBS's engagement and the fees to be paid for UBS's services were actively negotiated between UBS, the OCC and the Commission. See Hulse Dec., ¶ 14. In addition, after extensive negotiations with the Debtor, UBS agreed to reduce its Consummation Fee to $20 million pursuant to the Settlement Agreement, which was approved through the entry of the Confirmation Order. See Hulse Dec., ¶ 14.

3. UBS's aggregate fees, while substantial, have been earned under the specific terms of an Engagement Letter that was approved by this Court. On October 30, 2002, this Court approved the Engagement Letter pursuant to Section 328(a) of the Bankruptcy Code after full disclosure of the terms of the Engagement Letter to all interested parties, subject to final review under Section 330(a) of the Bankruptcy Code.

4. UBS submits that its contractual fees are reasonable and appropriate. The size of the fees reflects the enormity and importance of the tasks performed by, as well as the extraordinary commitment of resources required of, UBS pursuant to the Engagement Letter. As

---

[2] We also note that in connection with the exit financing required for the emergence of the Debtor from Chapter 11 and pursuant to the terms of the Settlement Agreement so ordered by this Court, UBS, along with Lehman Brothers, was authorized to and acted as exclusive book runner and lead manager with respect to the issuance of $6.7 billion in securities. Pursuant to the terms of the Settlement Agreement and customary arrangements between UBS, as an exclusive book runner, and PG&E, UBS earned $17,014,998.50 in underwriting fees and $1,150,278.85 in bank facility fees with respect to the exit financing.

Case: 01-30923 Doc# 15522 Filed: 07/12/04 Entered: 07/13/04 16:01:25 Page 4 of 16

demonstrated below, the requested fee is well within the range of reasonableness for the transactional services provided by UBS in this matter. Furthermore, pursuant to the Settlement Agreement, the amount of fees requested already reflects UBS's agreement to voluntarily reduce fees payable under the Engagement Letter by tens of millions of dollars.

**Negotiation of the Engagement Letter**

5. On March 11, 2002, this Court terminated PG&E's exclusive right to file a plan of reorganization (the "**PG&E Plan**") in favor of the Commission and ordered the Commission to file its plan (the "**Commission Plan**") and accompanying disclosure statement (the "**Commission Disclosure Statement**") by April 15, 2002. The Commission filed the Commission Plan and the Commission Disclosure Statement on April 15, 2002. After hearings on May 9 and 15, 2002, the Court approved the Commission Disclosure Statement and authorized the Commission and PG&E to distribute their competing plans to creditors by June 17, 2002 in a single solicitation package.

6. In June 2002, the Commission engaged UBS, a subsidiary of UBS AG, and a leading provider of investment banking and capital markets services in the global utilities and power sectors, to arrange for the financings required by the Commission Plan. See Hulse Dec., ¶ 3. Although the Court denied the Commission's request for an order requiring PG&E to pay UBS for its services in advance of UBS actually providing such services, UBS continued to provide financial and market-related advice and assistance with respect to the financing of the Commission Plan under an agreement with the Commission. See Hulse Dec., ¶ 3.

7. At the time that the plan solicitation materials were distributed to creditors, the OCC could not express a preference for either of the plans. However, the OCC continued to work actively to address its concerns with respect to each plan and to reach a consensual resolution of the ongoing disputes between the Commission and PG&E. As a result of these efforts, the OCC and the Commission reached an agreement to modify and amend the Commission Plan in a manner that addressed the OCC's concerns. The OCC became a co-proponent of the Commission/OCC Plan, which was filed with the Court on August 30, 2002.

Case: 01-30923 Doc# 15522 Filed: 07/12/04 Entered: 07/13/04 16:01:25 Page 5 of 16

8. To effectuate the Commission/OCC Plan, the OCC and the Commission, as co-proponents, selected UBS to provide services as financing and capital markets arranger in connection with the financing of the Commission/OCC Plan. See Hulse Dec., ¶ 5.

9. The financing services to be performed by UBS were vital to the implementation of the Commission/OCC Plan. See Hulse Dec., ¶ 8. The only way to determine whether the Commission/OCC Plan was feasible was for a financing arranger such as UBS to structure the debt and equity instruments to be issued under the Commission/OCC Plan, solicit indications of interest, and eventually solicit commitments to provide such financing, if necessary. See Hulse Dec., ¶ 8. UBS was also instrumental in helping the OCC and the Commission negotiate the OCC/Commission Plan and the amended plans filed by the OCC and the Commission on November 6, 2002 and December 5, 2002. See Hulse Dec., ¶ 8.

10. On October 30, 2002, the Court entered an order authorizing the OCC to retain UBS and approved the terms of the Engagement Letter; provided that UBS's fees would be subject to review pursuant to section 330(a) of the Bankruptcy Code. A copy of the Court's order is attached hereto as Exhibit D.

**UBS's Efforts on behalf of the OCC/Commission Plan**

11. In connection with UBS's engagement by the OCC and the Commission, UBS provided financial and market-related advice and assistance. See Hulse Dec., ¶ 6. UBS assisted the OCC and the Commission in analyzing and structuring the financing for PG&E necessary to the Commission/OCC Plan. See Hulse Dec., ¶ 6. This was an enormous task requiring the commitment of an extraordinary level of resources, undertaken in a hotly contested competing plan context against the backdrop of a highly complex regulatory environment.

12. On November 15, 2002, UBS delivered to the OCC and the Commission the highly confident letter described in section 2(b) of the Engagement Letter. See Hulse Dec., ¶ 7. In the highly confident letter, UBS stated that it was highly confident in its ability to arrange an aggregate of $10.7 billion of financing in the form of the securities and credit facilities proposed under the OCC/Commission Plan. See Hulse Dec., ¶ 7. This letter included the term sheets that

formed the outline for the securities to be issued under the OCC/Commission Plan. See Hulse Dec., ¶ 7. UBS was required to perform extensive financial analysis in order to develop the terms of the proposed securities, which was particularly challenging given the litigation context in which it occurred. See Hulse Dec., ¶ 7. In addition to UBS's development of the terms and structure for the securities that were necessary for the implementation of a feasible plan, Mr. Hulse of UBS provided testimony supporting the feasibility of the OCC/Commission Plan. See Hulse Dec., ¶ 7. In connection with providing such advice, testimony and support, UBS was extensively involved in the hotly contested litigation over the competing plans and its personnel devoted significant time and resources over the course of the litigation. See Hulse Dec., ¶ 7. Relatedly, UBS played a lead role in connection with the critical discussions with, and presentations to, the credit ratings agencies regarding the OCC/Commission Plan. See Hulse Dec., ¶ 7.

13. The OCC also requested that UBS AG backstop the sale of the Senior Notes and Preferred Stock by issuing a commitment in the amount of $1.5 billion. See Hulse Dec., ¶ 7. This was an extremely important step in moving forward with the OCC/Commission Plan, which required UBS to stand ready to use its own balance sheet to support the riskiest tranches of securities to be issued pursuant to the OCC/Commission Plan. See Hulse Dec., ¶ 7. UBS's support for the feasibility of the OCC/Commission Plan in this way played an integral role in the willingness of the litigating parties to work toward a consensual resolution. In this regard, UBS AG undertook the independent credit quality analysis necessary to provide this commitment and obtained the approval of its Global Syndicated Finance Commitment Committee, and it was at this critical juncture that the parties embarked upon the settlement process. See Hulse Dec., ¶ 7. The need for this commitment was ultimately superceded by the Settlement Agreement. See Hulse Dec., ¶ 7. UBS was not paid, and does not seek payment through this Application, of Commitment Fees related to the OCC's request in this regard.

**Settlement Agreement**

14. This Court commenced confirmation hearings on the competing plans of reorganization on November 18, 2002. Both prior to and during the confirmation hearings, UBS was an active and central participant in all issues relating to the financial aspects of the OCC/Commission Plan. See Hulse Dec., ¶ 9. Numerous UBS employees were deposed and Mr. Hulse of UBS testified before the Court on two occasions. UBS produced large volumes of documents and analyzed massive amounts of financial and market data in order to assist the OCC and the Commission. During the confirmation hearings on the PG&E Plan, the Court entered an order mandating a judicial settlement conference and, on March 11, 2003, entered an order staying further confirmation and related proceedings for sixty days to facilitate the settlement process (which was extended on several occasions). UBS's ability and willingness to provide financing for a joint plan was instrumental to helping the parties achieve a consensual resolution. See Hulse Dec., ¶ 9.

15. Ultimately the parties agreed to the Settlement Agreement. Pursuant to the Settlement Agreement, UBS and Lehman Brothers were named as exclusive book runners and lead managers for all of the financings pursuant to the Settlement Plan. See Hulse Dec., ¶ 10. UBS also agreed to reduce its Consummation Fee to $20 million. Hulse Dec., ¶ 10. Under the terms of the Engagement Letter, UBS was entitled not only to be the sole bookrunner, but also to a Consummation Fee of up to $60 million, less fees earned in connection with the underwriting. Hulse Dec., ¶ 10. Through the Settlement Agreement, in order to facilitate the achievement of a consensual resolution and end a hotly contested and expensive litigation, UBS accordingly has foregone approximately $20 million in additional fees provided for in the Court-approved Engagement Letter. Hulse Dec., ¶ 10.

**Compensation and Expenses Sought by UBS**

16. As set forth in Section 2 of the Engagement Letter, UBS was paid in stages, as certain work was performed and completed. Specifically, UBS was compensated as follows:

(a) Retainer fees: UBS received retainer fees, payable in two parts as follows: (i) $2,000,000 promptly upon the effectiveness of the Engagement Letter and (ii) for the

period from March 1, 2003 through the earlier to occur of December 31, 2003 or the end of the Term (as defined in the Engagement Letter), a monthly fee of $150,000.

(b) Upon the delivery to the OCC and the Commission of a "highly confident" letter by UBS, the requirements of and deadline for which are set forth in the Engagement Letter, UBS received an additional $6,000,000.

(c) Consummation Fee: At the time of the occurrence of a Consummation Transaction (as defined in the Engagement Letter) with respect to PG&E, UBS would have received a fee (the "**Consummation Fee**") equal to $60 million, minus up to $60 million of the following:

(i) the cumulative Commitment Fees previously paid to UBS; and

(ii) the portion of any underwriting commissions retained by UBS in its capacity as lead manager or co-manager of any underwritten financing in connection with such Consummation Transaction for acting in such capacity.

As described more fully in the Engagement Letter, a Consummation Transaction included the consummation of any reorganization or restructuring of the liabilities of PG&E other than: (a) any plan of reorganization that results in the disaggregation of PG&E into separate business entities with the effect of substantially removing from the Commission its authority under current law to regulate the rates of those entities; or (b) any plan of reorganization with respect to which the Commission does not agree or that does not involve the sale of debt or equity securities to make distributions to holders of allowed claims. The plan that was approved by this Court pursuant to the Settlement Agreement qualifies as a Consummation Transaction pursuant to the terms of the Engagement Letter. See Hulse Dec., ¶ 14. As previously discussed, UBS agreed to reduce its Consummation Fee to $20 million.

17. In addition to any fees payable to UBS, the Engagement Letter states that UBS is entitled to be reimbursed for reasonable expenses incurred by UBS in entering into and

performing services pursuant to the Engagement Letter, including the reasonable fees, disbursements and other charges of its legal counsel.

18. The services being provided by UBS were primarily transactional in nature, and UBS's compensation was structured accordingly. See Hulse Dec., ¶ 12. Such compensation is consistent with normal and customary compensation for transactional work of this type, requiring the level and scope of services and possible issuance of the types of financial commitments contemplated by the Engagement Letter. See Hulse Dec., ¶ 12.

19. Under the terms of the Engagement Letter (as modified by the Settlement Agreement), UBS requests final allowance of fees in the amount of $29.5 million and expenses in the amount of $1,112,589.55.

**UBS is Entitled to the Agreed-Upon Fees Pursuant to Sections 328(a) and 330 of the Bankruptcy Code**

20. UBS is entitled to receive the fees it has requested in accordance with the express terms of the Engagement Letter and the provisions of sections 328(a) and 330 of the Bankruptcy Code. While the Court retained its authority under Section 330 of the Bankruptcy Code to undertake a final review of compensation paid to UBS pursuant to the Engagement Letter, the Court made clear in approving UBS's retention that it was fully aware of the terms of the Engagement Letter and the structure of the fees payable thereunder. All of the fees requested herein are expressly provided for in the Engagement Letter approved by the Court. In addition, as part of the Settlement Agreement approval and confirmation of the Plan, the Court has already approved the award of the Consummation Fee of $20 million. It is against this background that the Section 330 analysis is and should be undertaken.

21. In reviewing a fee request under Section 330, the court should consider the applicant's commitment of resources; whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; whether the services were performed reasonably and efficiently given the complexity, importance, and nature of the problem, issue, or task addressed; and whether the

Case: 01-30923 Doc# 15522 Filed: 07/12/04 Entered: 07/13/04 16:01:25 Page 10 of 16

compensation is reasonable, based on the customary compensation charged by comparably skilled practitioners in matters outside of the bankruptcy context.

22. Market-based transaction fees have routinely been awarded pursuant to section 330 of the Bankruptcy Code. In awarding compensation to professionals pursuant to section 330 of the Bankruptcy Code, courts should adopt a "market-driven" approach in which the cost of comparable services is the most important factor in determining the reasonableness of fees. *See Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 258 (3d Cir. 1995); *In re Busy Beaver Bldg. Ctrs, Inc.*, 19 F.3d 833, 855 (3d Cir. 1994). Where a professional seeks a flat transaction-based fee or percentage fee, courts focus on evidence as to the reasonableness of the proposed fee in light of practices that prevail outside of bankruptcy. *See In re UDC Homes, Inc.*, 203 B.R 218, 222 (Bankr. D. Del. 1996) (approving restructuring fee in light of evidence that fee was consistent with those charged in other cases and that advisors commonly charged such fees in cases outside of bankruptcy).

23. The services performed must be actual and necessary in order to be compensable. *See, e.g. Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 958 (9th Cir. 1991). It is clear in this case that UBS's services were both actual and necessary, as these services were an integral part of the Commission/OCC Plan and, ultimately, the Settlement Plan. See Hulse Dec., ¶ 13. Without UBS's involvement, the OCC and the Commission would not have been able to show that their proposed plan was feasible, which is a requirement to confirm a plan. See Hulse Dec., ¶ 13. In addition, the Debtor acknowledged, and the Court endorsed, the importance of UBS's services when it agreed to the payment of UBS's fees and expenses pursuant to the Settlement Agreement. In fact, UBS was integral to providing and structuring the financing necessary for the Debtor to emerge from bankruptcy under the confirmed plan of reorganization. See Hulse Dec., ¶ 13.

24. The amounts of monthly advisory fees, the Consummation Fee and other fees that would be payable to UBS were set forth in the Engagement Letter and in the application seeking this Court's approval thereof. The Engagement Letter was filed with the Court and approved.

The Settlement Agreement was incorporated into the plan that was voted upon by the creditors and approved by this Court.

25. The fee provisions flowed directly from the Debtor's need for a large amount of financing, and the arrangements properly reflected the enormous challenges and risks that UBS faced in attempting to arrange such financing. See Hulse Dec., ¶ 13. The OCC and the Commission were well aware of those risks and challenges and of the amount of the potential fees when negotiating the Engagement Letter, and the Debtor ultimately executed the Settlement Agreement in the belief that such fees provided appropriate incentives to UBS for its work.

26. In the case of a transaction fee, the most important factors considered are whether the services were beneficial to the estate and whether the compensation approximates the practice outside of bankruptcy cases. *In re Intelogic Trace, Inc.*, 188 B.R 557, 559 (W.D. Tex. 1995). The courts therefore determine:

> Given the marketplace in which professionals such as this operate, and their legitimate expectation of repayment in this manner in exchange for rendering the services in question, has the "success fee" been "earned" such that it is appropriate for the estate to make the payment? In the process, we ought to remember that, in this particular context, a "success fee" is less a bonus than it is an incentive, designed to induce maximum return, on the theory that, but for the fee, the professional would not even have bothered to take on the engagement.

*Id.* at 560 (footnote omitted). In making this determination, the agreement made between the parties is particularly relevant, "especially if the evidence also suggests arms'-length bargaining, relatively equal bargaining positions, and other indicia that the agreement falls within the range that the market might generate in the absence of bankruptcy." *Id.* As to the Engagement Letter, which was fully negotiated between the parties and further amended at the request of the Debtor pursuant to the Settlement Agreement, each of these factors is present. The Engagement Letter was the product of arms-length negotiations between sophisticated and well-advised parties.

27. The Consummation Fee set forth in the Engagement Letter (as amended by the Settlement Agreement) is well within the range of the compensation earned by professionals for

providing transactional services of the kind provided by UBS. See Hulse Dec., ¶ 15. In a transaction of this magnitude and complexity, such a fee is entirely consistent with the market for services of a similar kind requiring the extraordinary level of commitment made by UBS and the level of risk associated with such a commitment. See Hulse Dec., ¶ 15.

28. There are few precedents for an attempt at facilitating a plan of reorganization in the context of competing plan solicitations. See Hulse Dec. ¶ 16. The services provided by UBS were similar to those provided in a merger or acquisition transaction that requires high levels of banking involvement and the provision of advice for an extended period of time. See Hulse Dec. ¶ 16. PG&E is a large, complex company with a total enterprise value of approximately $25 billion; therefore, in order to assess comparable deal fees, it is appropriate to look at transaction fees for other large companies with similar enterprise values.[3] See Hulse Dec. ¶ 16.

29. The services provided by UBS included, among other things, the following tasks:

- Performing extensive due diligence to familiarize UBS with the business, operations, financial condition and prospects of the Debtor.
- Assisting the OCC, the Commission and the Debtor in creating and implementing a financing plan.
- Identifying and contacting more than 300 potential investors.
- Conducting extensive negotiations with potential investors in order to obtain the best available financing terms.
- Assisting the OCC, the Commission and the Debtor in structuring the various plans and preparing the plans and disclosure statements.
- Performing extensive financial modeling for both the OCC/Commission Plan and the plan that was ultimately confirmed.
- Advising and updating the OCC and the Commission on the status of the financial markets and the financing steps necessary for PG&E to emerge from bankruptcy.
- Providing general litigation support and testimony regarding plan feasibility.

---

[3] Total enterprise value is based on the approximately $12 billion in liabilities of PG&E that needed to be restructured in order to move forward with a plan of reorganization, combined with the market value of the common equity PG&E's parent company of approximately $13 billion at the time of PG&E's emergence from Chapter 11.

Case: 01-30923 Doc# 15522 Filed: 07/12/04 Entered: 07/13/04 16:01:25 Page 13 of 16

- Interacting with the ratings agencies to achieve investment grade status for certain securities.
- Analyzing the form of the regulatory asset that was ultimately an integral part of the confirmed plan.
- Providing support in connection with PG&E's emergence from bankruptcy pursuant to the confirmed plan. See Hulse Dec., ¶ 18.

30. UBS's services have conferred substantial benefits on the Debtor, its estate and its creditors, and UBS's participation has been an essential factor in the Debtor's successful reorganization. It would be contrary to fundamental notions of fairness if the court-approved contract of the very professionals who played an integral role in the successful outcome of the Case was not honored. In light of the foregoing, UBS submits that the requested fee is reasonable and appropriate.

**Supporting Documentation**

31. The development of a financing plan for the Debtors was a firm wide effort and involved numerous senior-level professionals from UBS's offices in New York, Stamford, Dallas and San Francisco. Members of UBS's Global Power Group worked extensively with professionals in all departments of the firm, including the firm's Debt Capital Markets, Global Syndicated Finance, Restructuring, Fixed Income Derivatives, Credit Ratings Advisory, Credit Risk Control, Franchise Lending Origination, Fixed Income Research, Strategic Advisory and Debt Syndicate Groups. A list of the principal professionals who performed services in connection with this engagement is attached hereto as Exhibit E. The professional with primary overall responsibility for the matter was Walter S. Hulse, the Co-Head of the Global Power Group of UBS.

**Disbursements and Other Expenses**

32. In accordance with the Engagement Letter, UBS seeks final allowance of the reimbursement of its disbursements and other expenses in the aggregate amount of $1,112,589.55. A description of these expenses is attached hereto as Exhibit F. Exhibit F sets forth the categories of expenses incurred and the amounts that remain unpaid The expenses

incurred in the rendition of professional services by UBS were necessary, reasonable and justified under the circumstances.

**Conclusion**

For the reasons set forth above, UBS respectfully requests that this Court enter an Order pursuant to sections 328(a) and 330 of the Bankruptcy Code, (i) authorizing and directing the payment of the fees and expenses requested by UBS pursuant to this Application and (ii) granting such other and further relief as the Court may deem just and proper.

LA1:#6285673v1

-15-

FIRST AND FINAL FEE APPLICATION OF UBS SECURITIES LLC

(MP) 20543/016/CT PAPERS04/ubs.fee.app.doc 07/06/04 2:23 PM

07/06/04 18:15 FAX 650 752 2156 DPW 1-24 001

DATED: July 6, 2004

Respectfully submitted.

DAVIS POLK & WARDWELL

By: ______________________
Arthur J. Burke

Attorneys for UBS Securities LLC

LA1:#6285673v1

-16-

FIRST AND FINAL FEE APPLICATION OF UBS SECURITIES LLC

(MF) 20543/016/CT.PAPERS04/ubs.fee.app.doc 07/06/04 2:23 PM